**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, CA 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Attorney for Plaintiff*

- additional counsel on signature page -

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRIS HASHEM, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>NMC HEALTH PLC, PRASANTH MANGHAT, KHALIFA BIN BUTTI, PRASHANTH SHENOY, H. J. MARK TOMPKINS, and B. R. SHETTY,<br><br>Defendants | Case No. 2:20-cv-02303-CBM-MAA<br><br>(Consolidated with Case No. 2:20-cv-02895-CBM-MAA)<br><br>Hon. Consuelo B. Marshall<br><br><u>CLASS ACTION</u><br><br>AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><u>DEMAND FOR JURY TRIAL</u> |

Lead Plaintiffs Shengming Huang, Chris Hashem, and Abdul Raziq Abdul ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, public filings, wire and press releases published by and regarding NMC Health Plc ("NMC" or the "Company"), and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a class action on behalf of persons or entities who purchased or otherwise acquired NMC American Depositary Shares ("ADSs") between March 13, 2016 and March 10, 2020, both dates inclusive (the "Class Period").  Plaintiffs seek to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4.      This Court has jurisdiction over each defendant named herein because each defendant has sufficient minimum contacts so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

5.     During the Class Period, NMC's ADSs traded in the United States on the OTC Pink, an American trading venue operated by OTC Markets, Inc., an American company, under the ticker symbol "NMHLY." NMC's ADSs were registered exclusively in the United States by two American financial institutions, Deutsche Bank Trust Company Americas, located at 60 Wall Street, New York, New York 10005, and Citibank N.A., located at 399 Park Avenue New York, New York 10043, and could be exchanged for the underlying NMC ordinary shares at those designated U.S. branches of Deutsche Bank Trust Company Americas and Citibank N.A.   On information and belief, NMC ADSs are not traded on any trading venue outside the United States.

6.     Although the NMC ADS were not sponsored directly by NMC, one of the depositary institutions, Deutsche Bank, has explained to the "Securities and Exchange Commission during ADR rulemaking in 2008 stating that 'in practice, depositary banks typically obtain the issuer's consent before establishing an unsponsored ADR facility,'" *see Stoyas v. Toshiba Corp.*, 896 F.3d 933, 951-52 (9th Cir. 2018) (citing 2008 SEC ADR Rulemaking at 52,762 n.113).   And, a law firm that frequently represents depositary institutions opined regarding the 2008 rulemaking that depositary issuers of unsponsored ADRs "typically request[] a letter of non-objection" from the foreign company." *Id.* Accordingly, Plaintiffs are informed and believed that NMC has indicated its consent or non-objection to the American registration and trading of its ADSs, even though they are not expressly sponsored.   Finally, NMC "made it possible for depositary institutions to issue unsponsored [NMC] ADRs by meeting the requirements in 17 C.F.R. § 240.12g3-2(b), including posting its annual report in English on its website and by not establishing a sponsored ADR (which would preclude unsponsored ADRs)." *Id.*

7.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

8.    In connection with the acts, conduct, and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

9.    Plaintiffs, as set forth in their previously-filed certifications, incorporated by reference herein, purchased NMC ADS securities during the Class Period and were damaged thereby. Plaintiffs purchased their NMC ADS shares in the United States on the OTC Pink trading venue, and therefore incurred irrevocable liability for those transactions in the United States.

10.    During the Class Period, Defendant NMC, together with its subsidiaries, purported to provide healthcare services in the United Arab Emirates, the United Kingdom, Spain, and internationally.  The Company purported to own and manage approximately 200 healthcare facilities, including hospitals, medical centers, long term care facilities, day surgery centers, fertility clinics, and home health services providers. The Company purported to offer medical services as well as research and medical services in the field of gynecology, obstetrics, and human reproduction; and management services to hospitals, as well as retail pharmaceutical goods.

11.    NMC is incorporated in England and Wales with its head office located at Devonshire House, Level 1 One Mayfair Place, London W1J 8AJ, United Kingdom. During the Class Period, NMC owned a 70% interest in 25 United States fertility clinics, which it holds via a Delaware corporation called NMC Eugin US, and its subsidiary, Boston IVF Ventures, LLC.

12.    Defendant Prasanth Manghat ("Manghat") served as the Company's Chief Executive Officer ("CEO") and Executive Director from March 2017 until February

2020. Previously, Manghat had served as the Company's Deputy CEO and Chief Financial Officer ("CFO").

13. Defendant Khalifa Bin Butti, also known as Khalifa Butti Omeir Bin Yousef and Khalifa Butti al-Muhairi, ("K. Bin Butti") served as the Company's Executive Vice Chairman from July 2017 until February 2020 and as a Director from June 2017 until February 2020. K. Bin Butti purportedly owned 14.7% of NMC as of March 6, 2019. Together with Defendant Shetty (defined below) and H.E. Saeed Bin Butti ("H.E. Bin Butti"), K. Bin Butti was noted as one of "the Company's immediate and ultimate controlling part[ies]" in the Annual Reports 2015, 2016, 2017, and 2018.

14. Defendant Prashanth Shenoy ("Shenoy") has served as the Company's Chief Financial Officer ("CFO") since August 2017. Previously, Shenoy had served as the Company's Deputy CFO.

15. Defendant H. J. Mark Tompkins ("Tompkins") has served as the Company's Non-Executive (Joint) Chairman of the Board during the Class Period.

16. Defendant B. R. Shetty ("Shetty") founded the Company and served as the Company's CEO and Executive Vice Chairman until March 2017 and served as the Company's Non-Executive Joint Chairman of the Board from March 2017 until February 2020. Shetty purportedly owned 19.2% of NMC as of March 6, 2019. Along with Defendant K. Bin Butti and H.E. Bin Butti, the Company admitted that Shetty was one of the "the Company's immediate and ultimate controlling part[ies]" in the Annual Reports 2015, 2016, 2017, and 2018.

17. Defendants Manghat, K. Bin Butti, Shenoy, Tompkins, and Shetty are collectively referred to herein as the "Individual Defendants."

18. Each of the Individual Defendants:

    (a)    directly participated in the management of the Company;

AMENDED COMPLAINT
4

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g) approved or ratified these statements in violation of the federal securities laws.

19.     NMC is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

20.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to NMC under *respondeat superior* and agency principles.

21.     Defendants NMC and the Individual Defendants are collectively referred to herein as "Defendants."

AMENDED COMPLAINT

5

## SUBSTANTIVE ALLEGATIONS

### The Fraudulent Scheme

22.    Throughout the Class Period, Defendants NMC and the Individual Defendants (collectively, "Defendants") engaged in a device, scheme, or artifice to defraud in violation of Exchange Act §10(b) and SEC Rule 10b5(a); made untrue statements of material fact and omitted information necessary to make such statements not misleading in violation of Exchange Act §10(b) and SEC Rule 10b-5(b); and engaged in acts, practices and a course of business which operated as a fraud or deceit in violation of Exchange Act §10(b) and SEC Rule 10b-5(c). The concealed related party transactions, asset stripping, and hidden debt (including to related parties) as described below were the focus of the scheme, and to further the scheme Defendants also engaged in a distinct course of false and misleading statements described below.

23.    As part of the scheme, NMC incurred a crippling debt load of at least $6.6 billion, which it did not disclose to investors. This debt included both traditional debt, as well as debt disguised as undisclosed operating leases and undisclosed reverse factoring (i.e., factoring of accounts payable).

24.    As described below, at the end of the Class Period, a review that the Company initiated independent of the Individual Defendants "discovered evidence leading to suspected fraudulent behavior," and identified several billion dollars of undisclosed debt facilities.[1]

25.    In a separate judicial proceeding in the United Kingdom, the court stated "Something had gone very wrong with the management and oversight" of NMC.[2] In a statement put out in April 2020, Defendant Shetty admitted "that serious fraud and

---

[1] *See In re NMC Health PLC*, No. 20-11385-MFW, ECF No. 1-1 (Verified Petition Under Chapter 15 for Recognition of a Foreign Proceeding) (Del. Bkr. May 28, 2020).

[2] *See* "Assets of billionare B.R. Shetty frozen worldwide by UK court," *available at* https://www.thenewsminute.com/article/assets-billionaire-br-shetty-frozen-worldwide-uk-court-143481.

AMENDED COMPLAINT

6

wrongdoing appears to have taken place at NMC" and other companies he controlled, including Finablr, "by current and former executives."[3] Although he disclaimed actual knowledge or involvement, Defendant Shetty admitted "that bank accounts were operated in his name to engineer fraudulent money transfers."[4]

## Materially False and Misleading
## Statements Issued During the Class Period

26.     On or around March 13, 2016, NMC released its Annual Report & Accounts 2015 ("Annual Report 2015").  The Annual Report indicated that Defendants Manghat and Shetty were responsible for "managing the Group businesses and in executing the next phase of our strategic growth plan."  It was signed by Defendant Shetty as "Executive Vice Chairman and CEO."

27.     The Annual Report 2015 stressed the Company's strong financial base, strong risk management, organic expansion and acquisitions.

28.     In particular, it stated the following about the Company's strong financial base:

> Any period of substantial growth and capital development needs to be progressed against a background of a strong financial base.

*     *     *

> This strong financial base enabled the Company to restructure existing loans, reduce its cost of funds and create additional headroom ***to ensure that the Group is conservatively financed***.

(Emphasis added.)

29.     The Regarding the Company's risk management, the 2015 Annual Report stated in pertinent part:

---

[3] *See* "BR Shetty admits serious fraud in companies, blames group of executives for it," *available at* https://www.thenewsminute.com/article/br-shetty-admits-serious-fraud-companies-blames-group-executives-it-123608

[4] *Id.*

In Q4, 2014 the management team, supported by [PricewaterhouseCoopers], implemented a full risk identification process with the risks facing the business developed through a bottom-up/top-down review process which has been, and will be, reviewed during each financial year. There have been a few changes to the Group's risk profile in the last 12 months including specific focus on those risks which are inherent as part of an acquisitive strategy for growth. A list of the risks facing the Group, how these are mitigated and what effect the principal risks could have on the Group are set out on pages 37 to 39. ***The Board has taken a proactive stance in considering risk, and the board sees this as an essential element in the successful development of the Group and in creating long term value for our shareholders.***

(Emphasis added.)

30.     The Annual Report 2015 also stated:

***NMC follows a conservative approach in risk taking and has implemented controls and mitigation strategies in order to reduce those risks.***

\*       \*       \*

There have been no material changes made to the Group's strategic risk register in 2015 or changes to the relative importance or materiality of any particular risk.

(Emphasis added.)

31.     The Annual Report 2015, regarding potential conflicts of interest, stated the following:

The Board are aware of the interest that some Directors have in other businesses in which they have invested. Any conflicts of interest and related party transactions that may arise are monitored by:

- A list of other relevant interests of each Director being circulated to the Board at each of its Board Meetings;

- Each of the Directors are asked to confirm that they have no other interests which would conflict them for the purposes of any item to be discussed at the meeting; where such conflict is reported, the respective Director is not permitted to take part in the consideration of that matter by the Board;

- Each Director discloses to the Board any related party transactions in which they are connected, and such transactions are reported in the Group's financial statements.

Whilst Directors on the Board have other business interests, the Board do not consider that these, nor the time commitment that they require, affect the

ability of such Directors to undertake their role or comply with their statutory obligations.

32.   The Annual Report 2015 touted the Company's "strengthening of internal controls," stating in pertinent part:

In recent years, as the Group has progressed an organic and inorganic growth strategy, in order to strengthen the governance and control structure further across the Group, management have progressively been:

- incorporating additional key internal controls into its financial and operational processes;
- implementing new policies and procedures covering all aspects of the Group's accounting policies and controls;
- extending its Quality Team and the Group's Quality and Clinical Governance processes;
- enhancing the Group's Internal Audit function which independently reviews and monitors key business processes[.]

33.   The Annual Report 2015 also listed several "key elements" of its controls and risk mitigation.  These key elements included the following:

- A defined process for controlling capital expenditure, including appropriate authorization levels, which is monitored and approved by the Board as appropriate.

\*      \*      \*

- A formal process through which approval for organic and inorganic expansion projects is given. A formal transaction request paper is produced including details of the proposed transaction, how the transaction will be financed, market studies, strategic benefits and longer term effects on the Group, due diligence and key transaction risks are considered.

\*      \*      \*

- A delegation of authority which provides that very few individuals within the organization have payment approval authority. Access to cash is also restricted to very few individuals. All material payments, including within the acquired businesses, are restricted to the senior management team.

34.   The Annual Report 2015 was attested to by the Board of Directors in full, including Defendants Shetty, Manghat and Tompkins, with the Board "confirming to the best of [their] knowledge:"

AMENDED COMPLAINT

9

- The financial statements, prepared in accordance with the International Financial Reporting Standards as adopted by the EU, **give a true and fair view of the assets, liabilities, financial position** and profit or loss of the Company and the undertakings included in the consolidation taken as a whole; and

- The Strategic Report includes a fair review of the development and performance of the business and the position of the Company and the undertakings included in the consolidation taken as a whole, together with a description of the principal risks and uncertainties they face.

(Emphasis added.)

35.     The Annual Report 2015 stated the following regarding related party transactions:

RELATED PARTY TRANSACTIONS

These represent transactions with related parties, including major shareholders and senior management of the Group, and entities controlled, jointly controlled or significantly influenced by such parties, or where such parties are members of the key management personnel of the entities. Pricing policies and terms of all transactions are approved by the management of the Group.

The Company's immediate and ultimate controlling party is a group of three individuals (H.E. Saeed Bin Butti, Dr B.R. Shetty and Mr Khalifa Bin Butti) who are all shareholders and of whom one is a director of the Company and who together have the ability to control the company. As the immediate and ultimate controlling party is a group of individuals, it does not produce consolidated financial statements.

RELATIONSHIP AGREEMENT

The Controlling Shareholders and the Company have entered into a relationship agreement, the **principal purpose of which is to ensure that the Company is capable of carrying out its business independently of the Controlling Shareholders and that transactions and relationships with the Controlling Shareholders are at arm's length and on a normal commercial basis.**

**In accordance with the terms of the relationship agreement, the Controlling Shareholders have a collective right to appoint a number of Directors to the Board depending upon the level of their respective shareholdings. This entitlement reduces or is removed as the collective shareholdings reduce.** The relationship agreement includes provisions to ensure that the Board remains independent.

\*     \*     \*

AMENDED COMPLAINT

10

RELATED PARTY TRANSACTIONS

These represent transactions with related parties, i.e. major shareholders and senior management of the Company, and entities controlled, jointly controlled or significantly influenced by such parties. Pricing policies and terms of all transactions are approved by the management of the Company.

The Company's immediate and ultimate controlling party is a group of three individuals (H.E. Saeed Bin Butti, Dr B.R. Shetty and Mr Khalifa Bin Butti) who are all shareholders and of whom one is a director of the Company and who together have the ability to control the Company.

(Emphasis added.)

36.     The Annual Report 2015 stated that the Company's "Net Debt" as of December 31, 2015 was $553,000,000.   Moreover, it stated that the Board, including Defendants Shetty, Manghat and Tompkins, ensured that the "exposure of the Group to financial instruments" was fully set out in the Annual Report's financial statements and accompanying footnotes.

37.     On or around March 7, 2017, NMC released its Annual Report & Accounts 2016 ("Annual Report 2016").   The Annual Report 2016 attributed results to the contribution of "Dr. Shetty and his executive team."   It was signed by Defendant Shetty as Executive Chairman and CEO.

38.     The Annual Report 2016 stressed the Company's acquisitions, organic expansion, and financial stability.

39.     In particular, it stated in a portion attributed to Defendant Tompkins:

In 2016, the Board have been keen to retain flexibility with regards to financing, as well as ensuring that the Group is well funded for both general working capital purposes and to facilitate strategic acquisitions.

40.     The Annual Report 2016 stated the following regarding risk management, in pertinent part:

**NMC follows a conservative approach in risk taking and has implemented controls and mitigation strategies in order to reduce those risks.**

*     *     *

AMENDED COMPLAINT

11

There have been no material changes made to the Group's strategic risk register in 2016.

(Emphasis added.)

41.    The Annual Report 2016 reiterated the Annual Report 2015 regarding the Board and potential conflicts of interest, stating in pertinent part:

The Board are aware of the interest that some Directors have in other businesses in which they have invested. Any conflicts of interest and related party transactions that may arise are monitored by:

- A list of other relevant interests of each Director being circulated to the Board at each of its Board Meetings;

- Each of the Directors are asked to confirm that they have no other interests which would conflict them for the purposes of any item to be discussed at the meeting; where such conflict is reported, the respective Director is not permitted to take part in the consideration of that matter by the Board;

- Each Director discloses to the Board any related party transactions in which they are connected, and such transactions are reported in the Group's financial statements.

Whilst Directors on the Board have other business interests, the Board do not consider that these, nor the time commitment that they require, affect the ability of such Directors to undertake their role or comply with their statutory obligations.

42.    The Annual Report 2016, in a section approved by the Board, also listed and reiterated several "key elements" of its controls and risk mitigation from the Annual Report 2015.  These key elements included the follow

- A defined process for controlling capital expenditure, including appropriate authorization levels, which is monitored and approved by the Board as appropriate.

                    *       *       *

- A formal process through which approval for organic and inorganic expansion projects is given. A formal transaction request paper is produced including details of the proposed transaction, how the transaction will be financed, market studies, strategic benefits and

AMENDED COMPLAINT

12

longer term effects on the Group, due diligence and key transaction risks are considered.

\*      \*      \*

- A delegation of authority which provides that very few individuals within the organization have significant payment approval authority. Access to cash is also restricted to very few individuals. All material payments, including within the acquired businesses, are restricted to the senior management team.

43.     The Annual Report 2016 also touted the independent and regulatory controls on the Company in conjunction with its internal auditing.  Moreover, it stated that the Board, including Defendants Shetty, Manghat and Tompkins, ensured that the "exposure of the Group to financial instruments" was fully set out in the Annual Report's financial statements and accompanying footnotes.

44.     The Annual Report 2016 reiterated the Annual Report 2015 regarding related party transactions, stating the following:

RELATED PARTY TRANSACTIONS

These represent transactions with related parties, including major shareholders and senior management of the Group, and entities controlled, jointly controlled or significantly influenced by such parties, or where such parties are members of the key management personnel of the entities. Pricing policies and terms of all transactions are approved by the management of the Group.

The Company's immediate and ultimate controlling party is a group of three individuals (H.E. Saeed Bin Butti, Dr BR Shetty and Mr Khalifa Bin Butti) who are all shareholders and of whom one is a director of the Company and who together have the ability to control the company. As the immediate and ultimate controlling party is a group of individuals, it does not produce consolidated financial statements.

RELATIONSHIP AGREEMENT

The Controlling Shareholders and the Company have entered into a relationship agreement, ***the principal purpose of which is to ensure that the Company is capable of carrying out its business independently of the Controlling Shareholders and that transactions and relationships with the***

AMENDED COMPLAINT

13

***Controlling Shareholders are at arm's length and on a normal commercial basis.***

***In accordance with the terms of the relationship agreement, the Controlling Shareholders have a collective right to appoint a number of Directors to the Board depending upon the level of their respective shareholdings. This entitlement reduces or is removed as the collective shareholdings reduce.*** The relationship agreement includes provisions to ensure that the Board remains independent.

\*        \*        \*

RELATED PARTY TRANSACTIONS

These represent transactions with related parties, i.e. major shareholders and senior management of the Company, and entities controlled, jointly controlled or significantly influenced by such parties. Pricing policies and terms of all transactions are approved by the management of the Company.

The Company's immediate and ultimate controlling party is a group of three individuals (H.E. Saeed Bin Butti, Dr BR Shetty and Mr Khalifa Bin Butti) who are all shareholders and of whom one is a director of the Company and who together have the ability to control the Company. As the immediate and ultimate controlling party is a group of individuals, it does not produce consolidated financial statements.

(Emphasis added.)

45.    The Annual Report 2016 stated that the Company's "Net Debt" as of December 31, 2016 was $431,300,000.

46.    On or around March 6, 2018, NMC released its Annual Report & Accounts 2017 ("Annual Report 2017"). The Annual Report 2017 was signed by Defendants Shetty and Tompkins, the Company's Non-Executive Joint Chairmen, and stated that the Board, including Defendants Shetty, Manghat and Tompkins, ensured that the "exposure of the Group to financial instruments" was fully set out in the Annual Report's financial statements and accompanying footnotes.

47.    In the Annual Report 2017, the then-new CEO, Defendant Manghat, included his Chief Executive Officer's Review to shareholders. Therein, Manghat stressed the Company's growth. In particular, he stated the following:

AMENDED COMPLAINT
14

VIEWING THE FUTURE WITH OPTIMISM, DESPITE ALL CHALLENGES

NMC has moved from success to success over the past many years and I see no reason why this should change in the foreseeable future, despite an otherwise challenging environment.

* * *

The Company continues to benefit from ready access to debt financing and a supportive shareholder base that we will not take for granted. While **we continue to apply strict criteria to our expansion opportunities, this backdrop gives us confidence in addressing any future funding requirements to support our ambitious growth plans.**

(Emphasis added.)

48.    The Annual Report 2017 stated the following, in pertinent part, regarding risk management: NMC follows a conservative approach in risk taking and has implemented controls and mitigation strategies in order to reduce those risks.

49.    The Annual Report 2017 stated the following, in pertinent part, regarding internal controls:

The Board and management team have strengthened internal controls and kept approach to risk under review during the period of sustained growth and integration.

* * *

The Board has overall responsibility for the Group's systems of internal control and on behalf of the Board, the Audit Committee has been engaged in the process of ensuring that management have established continuous processes for identifying, evaluating and managing the risks the Group faces. These processes include the reporting from the finance department on Group performance, the work of the internal auditors and issues identified by the external auditors to the extent covered by their audit work. The Board is responsible for monitoring the ongoing effectiveness of these systems and for conducting a formal annual review of the effectiveness of the Group's internal controls.

* * *

In reviewing the effectiveness of the internal controls in place during the year, the Audit Committee considered, amongst other matters, manual controls in place, the independence of the separate operating units, the delegation of authority, the balance of centralized and decentralized systems and the reporting process in relation to exceptional items.

50.     The Annual Report 2017 stated the following regarding the Board and potential conflicts of interest, in pertinent part:

> The Board are aware of the interest that some Directors have in other businesses in which they have invested. Any conflicts of interest and related party transactions that may arise are monitored with:
>
> - Each of the Directors are asked to confirm that they have no other interests which would conflict them for the purposes of any item to be discussed at the meeting; where such conflict is reported, the respective Director is not permitted to take part in the consideration of that matter by the Board;
> - Each Director discloses to the Board any related party transactions in which they are connected, and such transactions are reported in the Group's financial statements.
>
> Whilst Directors on the Board have other business interests, the Board do not consider that these, nor the time commitment that they require, affect the ability of such Directors to undertake their role or comply with their statutory obligations.

51.     The Annual Report 2017 reiterated the Annual Reports of 2015 and 2016 and listed several "key elements" of its controls and risk mitigation, stating in pertinent part:

> - A defined process for controlling capital expenditure, including appropriate authorization levels, which is monitored and approved by the Board as appropriate.
>
> *          *          *
>
> - A formal process through which approval for organic and inorganic expansion projects is given. ***A formal transaction request paper is produced including details of the proposed transaction, how the transaction will be financed, market studies, strategic benefits and longer term effects on the Group, due diligence and key transaction risks are considered.***

(Emphasis added.)

52.     The Annual Report 2017 reiterated the Annual Reports 2015 and 2016 regarding related party transactions, stating the following:

AMENDED COMPLAINT

16

RELATED PARTY TRANSACTIONS

These represent transactions with related parties, including major shareholders and senior management of the Group, and entities controlled, jointly controlled or significantly influenced by such parties, or where such parties are members of the key management personnel of the entities. Pricing policies and terms of all transactions are approved by the management of the Group.

The Company's immediate and ultimate controlling party is a group of three individuals (H.E. Saeed Bin Butti, Dr BR Shetty and Mr Khalifa Bin Butti) who are all shareholders and of whom two are directors of the Company and who together have the ability to control the company. As the immediate and ultimate controlling party is a group of individuals, it does not produce consolidated financial statements.

RELATIONSHIP AGREEMENT

The Controlling Shareholders and the Company have entered into a relationship agreement, ***the principal purpose of which is to ensure that the Company is capable of carrying out its business independently of the Controlling Shareholders and that transactions and relationships with the Controlling Shareholders are at arm's length and on a normal commercial basis.***

***In accordance with the terms of the relationship agreement, the Controlling Shareholders have a collective right to appoint a number of Directors to the Board depending upon the level of their respective shareholdings. This entitlement reduces or is removed as the collective shareholdings reduce.*** The relationship agreement includes provisions to ensure that the Board remains independent.

\*     \*     \*

RELATED PARTY TRANSACTIONS

These represent transactions with related parties, i.e. major shareholders and senior management of the Company, and entities controlled, jointly controlled or significantly influenced by such parties. Pricing policies and terms of all transactions are approved by the management of the Company.

The Company's immediate and ultimate controlling party is a group of three individuals (H.E. Saeed Bin Butti, Dr BR Shetty and Mr Khalifa Bin Butti) who are all shareholders and of whom two are directors of the Company and who together have the ability to control the Company.

AMENDED COMPLAINT

17

(Emphasis added.)

53.     The Annual Report 2017 also added the following regarding related party transactions, in pertinent part:

TERMS AND CONDITIONS OF TRANSACTIONS WITH RELATED PARTIES

***The sales to and purchases from related parties are made on terms equivalent to those that prevail in arm's length transactions.***

(Emphasis added.)

54.     The Annual Report 2017 stated that the Company's "Net debt and payables" as of December 31, 2017 was $1,316,726,000.

55.     On or around March 6, 2019, NMC released its Annual Report & Accounts 2018 ("Annual Report 2018"). The Annual Report 2018 was signed by Defendants Shetty and Tompkins, the Company's Non-Executive Joint Chairmen, and stated that the Board, including Defendants Shetty, Manghat and Tompkins, ensured that the "exposure of the Group to financial instruments" was fully set out in the Annual Report's financial statements and accompanying footnotes.

56.     The Annual Report 2018 stated the following, in pertinent part, regarding risk management:

Risk management is an integral part of the success of our strategic journey

The Board consider the identification and mitigation of material risks and uncertainties faced by the Group as a key issue to be monitored at all levels of the organization.

57.     The Annual Report 2018 reiterated the false reassurances described above in the Annual Reports of 2015, 2016, and 2017 including, in pertinent part:

- Board oversight in approving and monitoring strategic projects
- Project management controls

- Detailed market and business appraisal and comprehensive due diligence processes

                    *        *        *

- Full due diligence

                    *        *        *

- Rigorous analysis of value of the acquisition
- Focus on the corporate cultures involved

58.    The Annual Report 2018 touted the internal controls of the Company, stating in pertinent part:

> The Board and management team have strengthened internal controls and kept approach to risk under review during the period of sustained growth and integration.

59.    The Annual Report 2018, reiterated the Annual Reports 2015, 2016, and 2017 regarding the Board and potential conflicts of interest, stating in pertinent part:

> The Board are aware that some Directors have interests in other businesses in which they have invested. Any conflicts of interest and related party transactions that may arise are monitored with:
>
> - Each of the Directors are asked to confirm that they have no other interests which would conflict them for the purposes of any item to be discussed at the meeting; where such conflict is reported, the respective Director is not permitted to take part in the consideration of that matter by the Board;
> - Each Director discloses to the Board any related party transactions in which they are connected, and such transactions are reported in the Group's financial statements.
>
> Whilst Directors on the Board have other business interests, the Board do not consider that these, nor the time commitment that they require, affect the ability of such Directors to undertake their role or comply with their statutory obligations.

60.    The Annual Report 2018 stated the following regarding the Board and potential conflicts of interest, in pertinent part:

AMENDED COMPLAINT

19

Alignment of risk assurance with business growth

While progressing its organic and inorganic growth strategy, over the last two years the Group has dedicated significant resources to integrating its recently acquired facilities while consolidating the market position of its legacy facilities, mainly in the UAE. Further, as the risks that the Group is exposed to continue to evolve (mainly due to macro-economic uncertainly and the uncertainty resulting from regulatory and technological disruption in the healthcare sector) the Group is constantly re-evaluating the design effectiveness of key controls.

61.     The Annual Report 2018 reiterated the Annual Reports 2015, 2016, and 2017 and listed several "key elements" of its controls and risk mitigation.  These key elements included the following:

- Approval and review of the annual budget and long-term forecasts;

- Group Strategy including the risks and risk mitigation in relation to the same; and

- Capital expenditure, financial structuring and acquisition and investment decisions.

- Formalized delegations of authority and lines of accountability as part of the Group's "cluster management structure" provides a mechanism to monitor performance and operations of a manageable number of facilities in sufficient detail covering monthly operational and financial reporting including monthly comparison of results and against budget and forecast, and a review of key KPIs.

*     *     *

- Policies, procedures and controls covering:

- The preparation of financial statements of each subsidiary in accordance with IFRS, local tax and regulatory requirements (a complete audit is carried out by the auditors of significant subsidiaries for the purposes of the Group's year-end financial statement);

- The preparation of 20 standardized monthly/daily reports in accordance with accounting policies of the Group, which are formalized in a Group accounting manual given to all the subsidiaries. This accounting manual is regularly updated to incorporate any changes to IFRS and regulation;

- The formal process for organic and inorganic expansion projects with full assessments of potential acquisitions or other material investments including due diligence, financing, market studies, risk analysis, strategic benefits to the Group;

- The Group's mitigation plans with respect to its strategic risks, including cyber risks and protection of personal data; and

- The Group's long term viability and going concern basis of accounting. These are conducted using both internal resources and external consultants.

\*       \*       \*

Therefore, all of our facilities and businesses we have an appropriate and relevant structure to provide effective and efficient management and clear lines of accountability of both clinical and non-clinical areas. The Senior Management Team believes that these divisions of responsibility at both facility and corporate levels provide a natural check and balance across all internal control areas.

62.    The Annual Report 2018 stated the following regarding the Company's internal controls, in pertinent part:

In reviewing the effectiveness of the internal controls in place during the year, the Audit Committee considered, amongst other matters, the enhancements to the control framework, manual controls in place, the independence of the separate operating units, the delegated authorities, the balance of centralized and decentralized systems and the reporting process in relation to exceptional items.

\*       \*       \*

The Board has reviewed the effectiveness of the Group's systems of internal controls for the 2018 financial year, in light of the key elements of the Group's internal controls outlined above. Given the additional internal controls that have been incorporated into the Group's financial and operational reporting process, such that sufficient internal controls were in place to monitor the Group's key risks, the Board believes, having evaluated the both the design and operating effectiveness of the internal controls and procedures, that these were effective during the period covered by this report. The Board also believes that the process undertaken by the Board and its Committees to monitor the internal control environment, accords with the guidance provided in the FRC's Guidance on Risk Management, Internal Control and Related Financial and Business Reporting.

63.    The Annual Report 2018 stated that the Company's "Net debt and payables" as of December 31, 2018 was 1,892,489,000.

AMENDED COMPLAINT

21

64.    The Annual Report 2018 included in its calculation of "Net debt and payables" only $4,679,000 of "Finance lease liability" on 31 December 2018.

65.    On or around August 22, 2019, NMC released its Financial Report for the Six Months Ended 30 June 2019 ("H1 2019").

66.    The H1 2019 Report updated the Company's lease liabilities by adding $352,203,000. This was noted as "[f]ollowing a review of lease data validation during the IFRS 16 transition process, additional lease payments were identified which were previously not part of operating lease commitments."

67.    On November 11, 2019, NMC issued a press release entitled "Progress on key governance initiatives; Enhanced disclosure on Supply Chain Financing being utilized by NMC's Distribution suppliers[.]" (the "November; 2019 Press Release"). The November 2019 Press Release was meant, in part, to "provide[] greater clarity on Supply Chain Financing utilized by the company's non-healthcare, Distribution suppliers."

68.    The November 2019 Press Release explained its suppliers' use of supply chain financing, stating in pertinent part:

> [I]n order to support its vendors and facilitate the stringent demands of such contracts, NMC permits receivable financing for its suppliers through supply chain programs. Key features of all such programs include:
>
> - Financing is arranged after NMC guarantees payment to the supplier for the full provision of contracted goods/services
> - All supply chain financing arrangements are initiated by suppliers -
>   All costs of supply chain financing are always borne by the suppliers
> - The financing is non-recourse to NMC
> - NMC supports suppliers' initiatives for supply chain financing through reputed platforms

69.    The statements contained in ¶¶ 26-68 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company lacked effective internal controls

and risk management; (ii) the Company engaged in undisclosed and extensive related party and de facto related party transactions; (iii) NMC's debts were significantly understated and obfuscated; (iv) NMC's cash-on-hand figures were overstated; (v) NMC's principal shareholders were not accurately reporting or accounting their interests or stakes in the Company; (vi) NMC did not review or know their principal shareholders interests or stakes in the Company; (vii) consequently, the Company was not enforcing its Relationship Agreement with the principal shareholders; and (viii) as a result, Defendants' statements about NMC's business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## THE TRUTH BEGINS TO EMERGE

70. On December 17, 2019, Muddy Waters Capital LLC ("Muddy Waters") published a report (the "Report") explaining that NMC had misled investors and failed to disclose: (i) its lack of internal controls; (ii) (de facto) related party transactions; (iii) its true debt burden; (iv) its true cash-on-hand and asset values; and (v) its use of reverse factoring.

71. The Report noted that NMC's build-out costs of NMC Royal Women's Hospital (then-named Brightpoint Hospital) were double the market price – a stark contrast to NMC's continued statements regarding its internal controls and lack of improper related party transactions. Muddy Waters stated the following regarding this transaction's costs, in pertinent part:

> Reasonably sophisticated hospitals in the UAE seem to cost $3,000 to $4,000 per square meter to build on an all-in cost basis, and the trend is broadly consistent across metropolitan areas in the Gulf states. We calculate that NMC Royal Women's, on the other hand, cost $7,700 per square meter. This is more than double the average cost of the group of hospitals we examined.

72. The primary contractor for that project was Modular Concepts, LLC ("Modular Concepts"), a Defendant Shetty controlled company. The Report noted that Modular Concepts has built many hospitals for NMC and its management. In fact, according to the Report, relying on the Indian credit rating agency ICRA, NMC provides

80% of Modular Concepts revenues.  Modular Concepts is also 30% owned by Pradeep Rai ("Rai"), NMC's Head of Procurement.  Rai is also Defendant Shetty's long-time confidant and a non-blood relative.

73.     The Report noted that the Royal Women's Hospital project also included the KBBO Group, a Defendant K. Bin Butti controlled company.

74.     The Report noted that in March 2018, NMC acquired 70% of Premier Care Home Medical and Health Care LLC ("Premier") for $36.4 million cash.  The sole advisor to the transaction was Guggenheim KBBO Partners Investment Banking – a joint venture of KBBO Group.  Premier was founded in 2014 and 91% of the sale was for intangibles. The Report found that Premier's facility was only 280 square meters and employed only nine people – and the facility did not have authorization to conduct medical procedures. In November 2018, NMC ceded a 1% share of Premier to H.E. Bin Butti.  In November 2019, NMC purchased another 30% stake in Premier.

75.     The Report noted that in 2018, NMC acquired 70% of CosmeSurge from KBBO Group for $170 million (12x EBIDA) without any third-party valuation.

76.     The Report noted that Muddy Waters added up NMC's financial statements and determined NMC to have $491 million cash-on-hand at year-end 2018.  However, NMC's interest expense of its debt is 5.7% and the Company's annual interest income average was 0.77%.  The Report noted that NMC's interest income is too low for its reported cash balances.

77.     According to the Report, following the Aspen acquisition, NMC has not included the approximately $320 million finance leases the Company inherited.  The Report claims that this is in addition to the $352.2 million of operating leases which NMC failed to include in its Annual Report 2018 but then disclosed in its H1 2019.  Moreover, the Report claims that the undiscounted liability NMC holds from the Aspen acquisition

is approximately $450 million, not $350 million (as of Fiscal Year 2018, Aspen's filings included minimum noncancelable undiscounted lease payments of £353 million).

78.    The Report noted that, as opposed to long-standing impressions, NMC has been utilizing supply chain financing facilities, i.e. "reverse factoring." The Report stated in pertinent part:

> We found reverse factoring facilities for NMC arranged by Credit Suisse and Channel Finance S.A. Both are recourse to NMC.
>
> *        *        *
>
> The Moody's analyst recently confirmed his understanding that NMC does not engage in reverse factoring. However, a July 2019 sell-side report on NMC mentioned two Credit Suisse supply chain finance funds that own payables of NMC; NMC then apparently denied this was reverse factoring because the payables were not tied to a single supplier, which the sell-side analyst dismissed as a "borderline technicality".
>
> The reality is that NMC does engage in reverse factoring, and it goes beyond the Credit Suisse amounts. In addition to the Credit Suisse funds, we found a facility issued by an entity called Channel Finance. Just as importantly, we suspect that NMC's reported debt does not include these reverse factoring facilities. Interestingly, in November 2019, the notes financing the facility were de-listed, which could be an attempt to conceal this facility.

79.    Reverse factoring, as summarized by a *Barron's* article covering the Report, is described as:

> [A] third party pays off the company's suppliers early, and the company pays the financier back at a later date. . . In short, reverse factoring transactions allow companies to put off paying suppliers for longer, while suppliers get paid on time.
>
> Meanwhile, accounting and credit-rating firms are starting to express some significant concerns about supply-chain finance and reverse factoring. In particular, they are worried that companies that use this technique are not disclosing an accurate picture of their total debt loads. There are also worries because of the role reverse factoring played in the high-profile collapses of the U.K.'s Carillion and Spain's Abengoa.
>
> *        *        *
>
> And ***while reverse factoring can boost company cash in the short term, it comes with risks if a company falls into distress***, the Moody's analysts wrote.

"Many non-financial corporates have created a 'tiger trap' financing arrangement," they said. "With inadequate disclosure, the [reverse factoring] facility can lie hidden in the capital structure until…[it leaves] a big liquidity hole which magnifies and intensifies the underlying problem."

(Emphasis added.)

80. On this news, NMC ADSs fell $11.68 per ADS, or over 33.6%, to close at $23.00 per ADS on December 17, 2019, from its December 16, 2019 close at $34.68, damaging investors.

81. Then, on January 8, 2020, NMC issued a press release entitled "KBBO pricing announcement" which acknowledged and downplayed Defendant K. Bin Butti and H.E. Bin Butti's 31.2 million shares sell-off, which equates to roughly 15% of the Company, from January 7, 2020.

82. On this news, NMC ADSs fell $6.48 per ADS, or over 28.4%, to close at $16.36 per ADS on January 8, 2020, from its January 6, 2020 close at $22.84, further damaging investors.

83. Then, on February 14, 2020, NMC issued a press release with preliminary share data, unverified, provided by Defendant K. Bin Butti, H.E. Bin Butti, and Defendant Shetty. The press release confirmed the need for greater clarity from its long-time principal shareholders, stating:

> The Company continues urgently to seek clarity from Dr. B.R. Shetty, Khalifa Bin Butti and H.E. Saeed Bin Butti in relation to the above arrangements and their respective shareholdings, and encourages Dr. B.R. Shetty, Khalifa Bin Butti and H.E. Saeed Bin Butti, and their advisers, to agree the legal position in relation to the ownership of the Ordinary Shares in question without further delay.

84. That same day, NMC announced that Defendant K. Bin Butti had resigned as a Director effective immediately.

85. On this news, NMC ADSs fell $0.54 per ADS, or almost 5%, to close at $10.40 per ADS on February 14, 2020, further damaging investors.

86.     Then on February 17, 2020, NMC announced that Abdulrahman Basaddiq and Hani Buttikhi had both resigned as Directors of the Company.  Both were appointed to the Board of Directors by the principal shareholder group of Defendant K. Bin Butti, H.E. Bin Butti, and Defendant Shetty.

87.     Also on February 17, 2020, NMC announced that Defendant Shetty had resigned as Joint-Non-Executive Chairman and as a Director of the Company.

88.     Then, on February 18, 2020, NMC announced an update to Defendant Shetty's shares of the Company.  The update announced that a bank account for BRS International Holding Ltd ("BRS International"), of which Defendant Shetty is the sole shareholder, had sold over 10 million shares of NMC ordinary shares between February 3 and 6, 2020.

89.     On this news, NMC ADSs fell $0.74 per ADS, or over 6.5%, to close at $10.48 per ADS on February 19, 2020, further damaging investors.

90.     Then on February 24, 2020, BRS International, announced that Defendant Shetty "had pledged 7 million of the company's shares as security for debt" to Goldman Sachs.  It was also announced that Defendant Shetty only "currently has a 9.81% interest" in NMC.

91.     On this new NMC ADSs fell $0.66 per ADS, or over 5.7%, to close at $10.81 per ADS on February 24, 2020, further damaging investors.

92.     Then, on March 10, 2020, the *Financial Times* published the article titled "NMC Health Discovers Almost $3bn of Debt Hidden from Its Board" which continued to disclose NMC's lack of internal controls and under reporting of debt.

93.     Further on March 10, 2020, *Bloomberg* published the article titled "Abu Dhabi Insurer Steps In to Help NMC Health Pay Salaries" reporting that an insurer was assisting to pay NMC's expenses, stating the following in pertinent part:

AMENDED COMPLAINT
27

An Abu Dhabi-owned insurer is helping NMC Health Plc pay overdue bills, according to people familiar with the matter, in what could be a sign the emirate is stepping in to help the embattled hospital operator.

The National Health Insurance Co., known as Daman, is speeding up payments to Abu Dhabi-based NMC so it can pay salaries and other invoices, the people said.

94.     On this news, NMC ADSs fell $3.28 per ADS, or almost 64%, to close at $1.85 per ADS on March 10, 2020, further damaging investors.

95.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

96.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired NMC ADS securities publicly traded on the OTC Pink during the Class Period, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of NMC, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Officer or Director Defendants have or had a controlling interest.

97.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, NMC ADSs were actively traded on the OTC Pink.  While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds, if not thousands of members in the proposed Class.

98.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

AMENDED COMPLAINT
28

99.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

100.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition and business of NMC;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused NMC to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of NMC ADSs during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

101.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

102.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

AMENDED COMPLAINT

- NMC ADSs met the requirements for listing, and were listed and actively traded on the OTC Pink, an efficient market;

- NMC regularly communicated with public investors (including American investors) via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- NMC's securities were liquid and traded with sufficient volume during the Class Period; and

- NMC was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

103. Based on the foregoing, the market for NMC ADSs promptly digested current information regarding NMC from all publicly available sources and reflected such information in the prices of the securities, and Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

104. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## <u>COUNT I</u>

### **For Violations of Section 10(b) and Rule 10b-5 Promulgated Thereunder <u>Against All Defendants</u>**

105. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

106. This Count asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

107. During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they

knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

108.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5(a), (b) and (c) in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of NMC ADSs during the Class Period.

109.    Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of NMC were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.  These defendants by virtue of their receipt of information reflecting the true facts of NMC, their control over, and/or receipt and/or modification of NMC's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning NMC, participated in the fraudulent scheme alleged herein.

110.    Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to

ascertain and disclose the true facts in the statements made by them or other NMC personnel to members of the investing public, including Plaintiffs and the Class.

111.   As a result of the foregoing, the market price of NMC's ADSs was artificially inflated during the Class Period.  In ignorance of the falsity of Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of NMC ADSs during the Class Period in purchasing NMC ADSs at prices that were artificially inflated as a result of Defendants' false and misleading statements and/or omissions.

112.   Had Plaintiffs and the other members of the Class been aware that the market price of NMC ADSs had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased NMC ADSs at the artificially inflated prices that they did, or at all.

113.   As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

114.   By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of NMC ADSs during the Class Period.

<u>COUNT II</u>

**Violations of Section 20(a) of The Exchange Act**

**<u>Against the Individual Defendants</u>**

115.   Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

116.   During the Class Period, the Individual Defendants participated in the operation and management of NMC, and conducted and participated, directly and

indirectly, in the conduct of NMC's business affairs.  Because of their senior positions, they knew the adverse non-public information about NMC's misstatement of revenue and profit and false financial statements.

117.   As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to NMC's financial condition and results of operations, and to correct promptly any public statements issued by NMC which had become materially false or misleading.

118.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which NMC disseminated in the marketplace during the Class Period concerning NMC's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause NMC to engage in the wrongful acts complained of herein.   The Individual Defendants, therefore, were "controlling persons" of NMC within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of NMC ADSs.

119.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by NMC.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, pray for judgment and relief as follows:

A.   Declaring this action to be a proper class action, designating Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiffs' counsel as Class Counsel;

B.   Awarding damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, together with interest thereon;

C.      Awarding Plaintiffs and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding Plaintiffs and other members of the Class such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

Dated:  July 7, 2021                               Respectfully submitted,

**POMERANTZ LLP**
*/s/ Joshua B. Silverman*

**POMERANTZ LLP**
Joshua B. Silverman  (*pro hac vice*)
Patrick V. Dahlstrom (*pro hac vice*)
Jared M. Schneider (*pro hac vice*)
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
jbsilverman@pomlaw.com
pdahlstrom@pomlaw.com
jschneider@pomlaw.com

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, CA 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
peretz@bgandg.com

**THE ROSEN LAW FIRM, P.A.**

Laurence M. Rosen (SBN 219683)

AMENDED COMPLAINT
34

355 South Grand Avenue, Suite 2450
Los Angeles, California 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

***Attorneys for Lead Plaintiffs***

AMENDED COMPLAINT
35