Mark B. Chassman, SBN 119619
Email: mchassman@chassmanseelig.com
Ana Vasquez, SBN 231903
Email: avasquez@chassmanseelig.com
CHASSMAN & SEELIG, LLP
1250 Sixth Street, Suite 403
Santa Monica, CA 90401
Telephone: (310) 929-7192
Fax: (310) 929-7627

Alexander D. Pencu (*pro hac vice*)
Email: adp@msf-law.com
Benjamin D. Bianco (*pro hac vice*)
Email: bdb@msf-law.com
MEISTER SEELIG & FEIN LLP
125 Park Avenue, 7th Floor
New York, NY 10017
Telephone: (212) 655-3500
Fax: (646) 539-3649

*Attorneys for Defendant B.R. Shetty*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRIS HASHEM, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> NMC HEALTH PLC, PRASANTH MANGHAT, KHALIFA BIN BUTTI, PRASHANTH SHENOY, H.J. MARK TOMPKINS, and B.R. SHETTY, <br><br> Defendants. | Case No.: 2:20-cv-02303-CBM-MAA <br><br> (Consolidated with Case No. 2:20-cv-02895-CBM-MAA) |

## EXHIBIT 4

## TO REQUEST FOR JUDICIAL NOTICE AND INCORPORATION BY REFERENCE IN SUPPORT OF MOTION TO DISMISS OF DEFENDANT B.R. SHETTY



# Delivering a
# continuum of care

NMC Health plc
ANNUAL REPORT & ACCOUNTS 2015

Exhibit 4 to B.R. Shetty's Request for Judicial Notice    1 of 166    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

# Our journey to a continuum of care

NMC Health is the largest private healthcare services provider and one of the largest wholesale and distribution businesses in the UAE. Within its two operational divisions, NMC currently has five strategic verticals.



## Our verticals and brands

The company has completed strategic and value accretive acquisitions to date that have all met NMC's stringent investment criteria. These acquisitions, coupled with NMC's organic initiatives, have allowed the Group to establish new strategic verticals[1] within the broader healthcare delivery platform with specialization-specific capabilities and brands:.

1. The first four strategic verticals form the Healthcare Division, with the Products & Consumables currently being the only vertical in the Distribution Division.

## Healthcare

Owns and operates hospitals, day surgery centres, medical centres and pharmacies



### Multi-speciality

The addition of NMC Royal Hospital further expands our portfolio, bringing the total number of hospitals to seven across the UAE. This platform is complemented by a network of medical centres and day surgeries to increase operational reach and the addressable market through cross-referrals. We almost trebled our network of day surgeries and medical centres to eleven during 2015, up from four at the start of 2015, largely driven by our acquisition of Dr Sunny Healthcare Group, which operates six medical centres in Sharjah. We also added four pharmacies to our portfolio during the year for a total of 15.



Licensed beds
(NMC Healthcare & Dr. Sunny)

665



### Maternity & Fertility

The opening of Brightpoint Royal Women's Hospital combined with the subsequent acquisitions of Clinica Eugin and Fakih IVF confirms the Maternity & Fertility vertical's global market position, as one of the leading and premium international providers of fertility treatment services.



Licensed beds (Brightpoint Royal Women's Hospital & Clinica Eugin)

100

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          2 of 166          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA



## Distribution

Wholesale of pharmaceutical, scientific equipment, FMCG, food, veterinary and education products







### Long-term & Home Care

As a leading provider of in-home healthcare services in the UAE, Americare, acquired by NMC in April 2015, complements existing in-hospital healthcare services. In August 2015, NMC acquired ProVita, the UAE's leading provider of long-term medical care. Meeting the under-serviced demand for long-term care facilities, ProVita fills a gap between the short-term care offered by NMC's existing facilities and the in-home services offered by Americare.

### Operation & Management

Our experience in the Operation & Management is leading us to increasingly explore the prospects of expanding this business regionally. While this evaluation of the wider market remains at initial stages, our long experience of operating and managing healthcare assets in the region means we can contribute to the evolution of healthcare delivery outside our own assets.

### Products & Consumables

NMC Health's Product & Consumables or product distribution and wholesale business is one of the largest in the UAE in terms of product portfolio and sales. This portfolio of international and regional brands, sold mainly on exclusive basis by NMC to local retailers, has been built over the past 40 years across diverse product areas, including key segments such as FMCG, Pharmaceuticals and Scientific Equipment.



Licensed beds
(ProVita & Americare)

## 120



Beds (Sheikh Khalifa Hospital in UAQ)

## 205



SKUs (exclusive wholesaler of mainly globally established and branded healthcare products and equipment)

## c. 90,000

# NMC Health is the largest private healthcare operator in the UAE and one of the largest product distribution and wholesale companies in the country.



## I. Overview

1   Our locations
2   Chairman's 2015 report to shareholders

## II. Strategic Report

6   Executive Vice Chairman & CEO review
10  Our business model
12  Our strategy
18  Financial summary and highlights
20  Business overview
24  Financial review
28  Corporate social responsibility
37  Risk management

## III. Governance

41  Corporate governance report
65  Directors' remuneration report
84  Directors' report

## IV. Financial statements

87   Directors' statements
90   Independent auditor's report
95   Consolidated income statement
99   Consolidated statement of other comprehensive income
100  Consolidated statement of financial position
101  Consolidated statement of changes in equity
102  Consolidated statement of cash flows
103  Notes to the consolidated financial statements
148  Statement of financial position
149  Statement of changes in equity
150  Statement of cash flows
151  Notes to the financial statements

## V. Other information

IBC  Shareholder information



Read the annual report and much more on our website:
www.nmchealth.com

# Our locations

## NMC has a nationwide network in the UAE with ongoing segment and geographic diversification.

**MULTI-SPECIALITY NETWORK**

01. NMC Specialty Hospital
Abu Dhabi

02. NMC Day Surgery
Mohammed Bin Zayed City

03. Dr. Sunny Referral Network
Sharjah (Acquired 2015)

04. NMC Royal Hospital
Khalifa City (Opened September 2015)

05. NMC General Hospital
Dubai Investments Park
(Opened July 2014)

06. B.R. Medical Suites
DHCC

07. NMC General Hospital
Deira, Dubai

08. NMC Specialty Hospital
Dubai

09. NMC Medical Centre
Sharjah

10. NMC Specialty Hospital
Al Ain

11. NMC Medical Centre
Al Ain (Opened December 2014)

12. American Surgecenter
Abu Dhabi

**MATERNITY & FERTILITY**

13. Brightpoint Royal Women's Hospital
Abu Dhabi (Opened July 2014)

14. Clinica Eugin
Spain (Acquired 2015)

15. Fakih IVF
UAE (Acquired 2015)

**LONG-TERM & HOME CARE**

16. Provita
Abu Dhabi (Acquired 2015)

17. Provita
Al Ain (Acquired 2015)

18. Americare
Abu Dhabi (Acquired 2015)

**OPERATION & MANAGEMENT**

19. Sheikh Khalifa
General Hospital (Operator)
Umm al Quwain

**DISTRIBUTION**

20. NMC Sales and Marketing Office
Abu Dhabi

21. NMC Sales and Marketing Office
Al Ain

22. NMC Sales and Marketing Office
Dubai and Northern Emirates

23. NMC Warehouse
Mina, Abu Dhabi

24. NMC Warehouse
Al Ain

25. NMC Warehouse
DIP, Dubai

26. NMC Warehouse
Al Quoz, Dubai

27. NMC Warehouse
DIC, Dubai



UNITED ARAB EMIRATES

OMAN

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          5 of 166          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

Overview

## Chairman's 2015 report to shareholders

Dear Shareholder,

I am delighted to report to shareholders on the excellent progress made in the past year.

2015 has been a period of transformation and growth for NMC Health Plc as the Company launched the initial phase of its execution of its updated growth strategy which was announced in February 2015. Group Revenue increased from US$643.9m in 2014 to US$880.9m in 2015. Consolidated EBITDA also improved by 46.7% from US$102.5m to US$150.3m in the latest financial year.

### STRATEGY AND ACQUISITIONS

The most significant events for your Company during 2015 were the announcement of our updated Growth Strategy in February 2015, and the execution of the initial phase of that strategy during the year. The new Growth Strategy, to summarise, is to put in place, and to grow, an integrated multi-vertical and multi-brand healthcare network across several geographies. The acquisitions which we have made in 2015, together with the organic expansion referred to below, have enabled your Company to make a good start in the implementation of this strategic growth plan.

The acquisition of Clinica Eugin in Barcelona, Spain and the more recent completion of the acquisition of Fakih IVF in the UAE announced in February 2016, together with our existing Brightpoint Royal Women's Hospital in Abu Dhabi, has created a substantial vertical in IVF and women's health care. This vertical is being expanded by further selected acquisitions and organic development.

The acquisitions of ProVita and Americare, which focus on different aspects of long term care outside the hospital environment, both acute and non-acute, have provided your Company with a strong base for a second major vertical in an area of care which continues to experience a significant under-supply in the region. This vertical is also being expanded in line with your Company's revised Growth Strategy, through selected acquisitions and strong organic growth both within the UAE and in neighbouring GCC countries including notably Saudi Arabia and Qatar.

The management team and your Board have insisted, this year as last, on extreme rigour in assessing the numerous acquisition proposals which are identified each year as having possible merit for your Company and only progresses those which can be shown to be able to make a significant contribution to the achievement of your Company's strategic growth plan. I believe that shareholders can take comfort from the fact that your management team only brings opportunities to the Board for review and decision where they have very strong and robust reasons for believing that an investment will create long term value for shareholders.

Being positioned alongside our existing multi-specialty and general healthcare facilities, the new businesses acquired have already created the basis to grow two significant verticals as a first step towards the creation of the integrated multi-vertical healthcare Group, which is our aim.



# Making good strategic progress

**The anticipated growth in private healthcare, in the UAE and the wider GCC continues to be generally favourable.**

Exhibit 4 to B.R. Shetty's Request for Judicial Notice     6 of 166     Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

## ORGANIC EXPANSION

The Group's initial expansion strategy, focused on organic expansion through the development and opening of new hospitals and clinics in the UAE outlined at the time of the Company's IPO in 2012, This initial expansion plan is now complete and contributing usefully to your Company's results.

During the year, in addition to the excellent initial performance achieved during the ramp-up phase for both Brightpoint Royal Women's Hospital in Abu Dhabi and DIP General Hospital in Dubai which had opened in 2014, we partially opened our new 250 licensed bed flagship super specialty Hospital, NMC Royal Hospital, in the Khalifa City suburb of Abu Dhabi within budget. NMC Royal Hospital has been a vision of our founder and Executive Vice Chairman and CEO, Dr B.R. Shetty, for many years and its opening is a significant milestone for the Group.

As part of our Group Strategy, and alongside our acquisition program, management, supported by the Board, continue to seek new locations for organic growth through the development of traditional healthcare facilities in both the UAE, and regionally in the GCC.

> "The Group's initial expansion strategy, focused on organic expansion through the development and opening of new hospitals and clinics in the UAE."



**BUILDING CAPABILITY**

# Multi-speciality

Licensed beds
## 665

With the partial opening of our 250 licensed beds super specialty and quartenery care NMC Royal Hospital in 2015 and the subsequent opening of inpatient services with 75 beds operational in March 2016, we have completed the major component of the NMC hub-and-spoke network.

This enhanced multi-specialty healthcare delivery network of assets across the UAE has elevated NMC's capacity, geographical presence, service quality and offering complexity to further increase NMC's future growth prospects.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice        7 of 166        Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

Overview

# Chairman's 2015 report to shareholders continued

## GROUP FINANCING AND VIABILITY

Any period of substantial growth and capital development needs to be progressed against a background of a strong financial base. As I reported last year, in February 2015 the Company announced a new US$825m financing facility which was made up of two elements, namely a US$350m facility to repay existing debt and for general corporate purposes, and a US$475m facility to facilitate strategic acquisitions.

This strong financial base enabled the Company to restructure existing loans, reduce its cost of funds and create additional headroom to ensure that the Group is conservatively financed.

## RISK

Our Group businesses deal with risk every day in operating and in planning within their particular business or facility. The Board has always considered strategic risks in operating our businesses, executing our growth strategy and reviewing potential acquisitions. In Q4, 2014 the management team, supported by PwC, implemented a full risk identification process with the risks facing the business developed through a bottom-up/top-down review process which has been, and will be, reviewed during each financial year. There have been a few changes to the Group's risk profile in the last 12 months including specific focus on those risks which are inherent as part of an acquisitive strategy for growth. A list of the risks facing the Group, how these are mitigated and what effect the principal risks could have on the Group are set out on pages 37 to 39.

The Board has taken a proactive stance in considering risk, and the board sees this as an essential element in the successful development of the Group and in creating long term value for our shareholders.

## GOVERNANCE/VIABILITY

Your Board has been evolving in size, skill sets and cultural diversity since the Company's IPO in 2012. You will have noted in previous Annual Reports that the Board considered that an appraisal of its own performance was not appropriate in previous years given its changing nature and the continuing development of Board processes which were considered appropriate as the Group grew in size and complexity.

However, in December 2015 the Board did undertake an appraisal process by way of a questionnaire completed by Board members. This appraisal concluded that, in the Board's view, its structure, composition, processes and discussions are appropriate for NMC at the current time. Of course we will now appraise ourselves each year and continue to develop as a Board team.

The other governance related focus for the Board and the Company this year has been the inclusion of a Viability Statement as recommended under the 2014 UK Corporate Governance Code. The new requirement to make a statement in relation to our longer term viability is different in nature to the traditional consideration of whether we can continue to prepare our accounts on a Going Concern basis on a forward 12 month time frame. The Board has reviewed the Company's viability over a three year timeframe and our Viability Statement is included on page 89.

## DIVIDEND

As a result of the continued good performance and financial stability of the Company, your Board plans to submit a resolution to shareholders at the 2016 Annual General Meeting authorising payment of a cash dividend of 6.2 pence per share, an increase of 14.8% compared to the 2014 dividend payment as shareholders continue to benefit from the improved performance of the Group. For the fourth year running this is approximately 20% of profit after tax, within the range which the Board indicated at the time of the Company's IPO would be their dividend target.

## BOARD

2014 saw significant changes in the size and structure of the Board. During the 2015 financial year, however, there were no board changes, with the board structured with:

- A wider cultural and ethnic mix benefitting Board discussions given the Company's listing in the UK and operations in the UAE;
- Significant female representation (33%) on the Board;
- More than half of its number resident in the UAE, the Company's home market; and
- A wide range of skills and experience, including more than half of the Board having significant operational or regulatory experience of healthcare services from different parts of the world.

Heather Lawrence has since year end decided to step down from the Board with her resignation effective on 12 January 2016. Heather joined the Board in March 2012 prior to the Company's IPO and as well as serving on the Audit Committee, was instrumental in the Board setting up the Clinical Governance Committee to provide Board oversight of quality and safety in the Group's healthcare division. The Board are very grateful for her contribution over the last three years and wish her well for the future.

## MANAGEMENT AND STAFF

The management team was restructured with effect from 1 January 2015 when Prasanth Manghat was appointed Deputy Chief Executive Officer and Suresh Krishnamoorthy was appointed Chief Financial Officer. Prasanth Manghat has been assisting Dr Shetty in both managing the Group businesses and in executing the next phase of our strategic growth plan. Mr Krishnamoorthy has ensured that the Group is in a good financial position to be able to progress this strategy. The Board is delighted with the excellent progress that the Executive Directors and Senior Management Team have made in growing the Group in 2015.

Across the Group, we continue to consider the Company's human capital as vital to the success of your Company, particularly during this period of significant change and growth. We have welcomed new businesses and employees to the NMC family and both the Board and I would like to thank them all, whether new or long time employees, for their continued commitment, contribution, energy and goodwill during this period of change.

## OUTLOOK

Despite some challenging economic conditions within some of the markets where we operate due largely to the fall in the price of oil, the anticipated growth in private healthcare, in the UAE and the wider GCC continues to be generally favourable and your Board continues to view the outlook for your Group with confidence.

**H.J. MARK TOMPKINS**
Non-Executive Chairman

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          8 of 166          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA



# Group Strategic Report

In this section:

6   Executive Vice Chairman & CEO review
10   Our business model
12   Our strategy
18   Financial summary and highlights
20   Business overview
24   Financial review
28   Corporate social responsibility
37   Risk management

Exhibit 4 to B.R. Shetty's Request for Judicial Notice       9 of 166       Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

Strategic Report

# Executive Vice Chairman & CEO's review



**TRANSFORMATIONAL YEAR**

2015 was a transformative year for NMC Health, signalling the approaching completion of our capital development programme initiated by our listing on the London Stock Exchange in 2012, and marking the beginning of the next phase of our growth. During our forty year history of operating in the United Arab Emirates, we have achieved countless milestones in the development of NMC's healthcare delivery platform. However, our rapid expansion both organically and through acquisitions, during 2015 accelerated our growth and widened our offering of high quality healthcare services in an unprecedented manner to the benefit of UAE residents and citizens.

We have put the key components in place to create a strong, inter-connected, integrated multi-vertical and multi-brand private healthcare network with the scalability and flexibility to grow our operations in the future.

**COMPLETED INITIAL ORGANIC EXPANSION PROGRAMME**

Our initial organic expansion programme culminated in the partial opening of NMC Royal Hospital's out-patient services in 2015. This initial opening was followed-up with the commencement of in-patient services on 7 March 2016 with 75 beds operational out of a total licensed capacity of 250 beds at this super speciality hospital in Khalifa City, Abu Dhabi. The balance of the licensed bed capacity at this facility is expected to become operational in a phased manner over future periods based on demand growth. This is our seventh and largest integrated speciality hospital facility and will act as the central facility in our network and be

a regional referral point for best-in-class medical treatment for the UAE's growing population. This hospital completes our hub-and-spoke healthcare network in the UAE, however, we will continue to assess opportunities to complement our platform and extend our referral network.

In total, since its LSE listing, NMC has opened three hospitals with a total additional capacity of 410 licensed beds and two other healthcare centres - NMC Royal Hospital, Brightpoint Royal Women's Hospital, DIP General Hospital, Al Ain Medical Centre and MBZC Day Surgery - marking the largest ever private sector capacity expansion program in the UAE healthcare market.

**NEW STAGE OF STRATEGIC GROWTH**

Supported by an $825 million financing facility secured in February 2015, NMC has embarked on a new stage of strategic growth as it executed five major acquisitions during the year to accelerate its shift from the capacity focused first stage of its strategy (2012-2014) towards the new capabilities focused second stage (2015-2018).

The acquisitions of Clinica Eugin (86.4%) and Fakih IVF (51%) will allow us to establish NMC as the premier regional and global destination for top-quality fertility services. With the acquisitions of ProVita (100%) and Americare (90%), we extended our operational presence into the long-term and home-care segments and established NMC as a completely integrated provider for long-term patient needs. The expansion of our network in Sharjah with six additional medical centres and three pharmacies, through the acquisition of Dr Sunny Healthcare Group (100%), improved our

# Strong performance in 2015

We have put the key components in place to create a strong, inter-connected, integrated multi-vertical and multi-brand private healthcare network with the scalability and flexibility to grow our operations in the future.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice        10 of 166        Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

ability to participate in the future growth of healthcare in the Emirate which could see the adoption of mandatory healthcare insurance in the future, following Abu Dhabi (2007) and Dubai (2014).

These acquisitions, coupled with NMC's organic initiatives, have allowed the Group to establish new strategic verticals within the broader healthcare delivery platform with specialization-specific capabilities and brands:

- Multi-specialty - 665 licensed beds (NMC Healthcare & Dr. Sunny)
- Maternity & fertility - 100 licensed beds (Brightpoint Royal Women's Hospital, Clinica Eugin and Fakih IVF)
- Long-term & home care - 120 licensed beds (ProVita & Americare)
- Operation & management - 205 beds (Sheikh Khalifa Hospital in UAQ)[1]
- Products & consumables - Around 90,000 Stock Keeping Units (exclusive wholesaler of mainly globally established and branded healthcare products and equipment)

The updated strategy and its subsequent execution to date has meant that NMC's healthcare operations evolved from a single multi-specialty platform to include additional higher complexity and single specialty strategic verticals. In particular, this new positioning allows the Company to:

- Offer higher quality services to patients and payors
- Participate in under-supplied market segments with higher growth outlook and per service value
- Increase scalability potential in the UAE and wider region due to lower capex intensity



**BUILDING CAPABILITY**

# Maternity & Fertility

Capacity of over 20,000 fertility cycles globally
**20,000**



We are very proud to have helped thousands of women to fulfill their dream of becoming a mother. And many of them, more than once. Our team of specialists have vast experience in the field and are passionate about what they do. Yet the journey towards motherhood requires more than medical expertise. The decision to become a mother is a very important one and the emotions involved are intense, so our patients need the support of an experienced team whom they can trust.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice        11 of 166        Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

# Executive Vice Chairman & CEO's review
## continued

Today NMC is the leading private sector healthcare group in the UAE and one of the most advanced and diversified in terms of its service offering in the entire MENA region (Middle East and North Africa). Our Maternity & Fertility vertical with its market segment leading assets, is now considered to be one of the top three fertility services providers globally, based on cycles performed annually. In the long-term and home care vertical we occupy a top regional position and are the only provider present along the full continuum of care. In Operations & Management, NMC was the first local operator in the UAE to be awarded a contract to manage a government hospital. Our distribution division, the Products & Consumables vertical, as of year-end 2015 possessed more than around 90,000 Stock Keeping Units (SKUs) and is estimated to be amongst the top three wholesalers in the UAE.

NMC now operates a total of 26 healthcare services assets and 15 pharmacies, including the 205 bed Sheikh Khalifa General Hospital in Umm Al Quwain.

### REGIONAL EXPANSION
As outlined in our strategy updates during 2015, NMC continues to evaluate further expansion in the UAE and the Gulf Cooperation Council (GCC) countries. These markets offer attractive opportunities with growing populations, favourable demographic trends and an undersupply of healthcare services.

We expect to open five new fertility centres during 2016, including one centre in each of Qatar and Oman.

Meanwhile, we will continue to advance our initiatives to establish a regional presence in the long-term care segment.

### CONTINUOUS IMPROVEMENTS
In addition to the recent hospital openings and acquisitions, we have continued to focus on our more mature facilities, making upgrades to the existing hospital network to achieve an even more optimised service delivery and capacity utilisation. This has yielded several enhancements including a 15% increase in bed capacity at each of our pre-IPO specialty hospitals in Abu Dhabi, Dubai and Al Ain.

As a result, at the end of 2015, the Group's healthcare assets had a total licensed bed capacity of 885 beds (excluding the 205 bed government hospital), an 88% increase on the previous year and more than 185% compared with the start of 2014.

Our new hospitals were equipped with our Hospital Information System (HIS) which will increase the operational efficiency of our growing network of hospitals. We continue to introduce this system in a phased approach to ensure the introduction is smooth and our people receive the training required to successfully implement the new system. Some of our legacy assets will receive the HIS over the next 1-2 years to ensure a seamless transition. The implementation of the company's new financial Enterprise Resource Planning (ERP) system is behind the original schedule on account of challenges faced by the group during initial testing phase and also due to integration of newly acquired assets, however implementation of the system is now well underway across the Group and we expect it to be completed by end of Q2 FY2017.

Last year we strengthened the NMC management team with the promotion of Mr Prasanth Manghat from CFO to Deputy CEO and Mr Suresh Krishnamoorthy from Deputy CFO to the position of CFO.

Mr Manghat and Mr Krishnamoorthy have a collective tenure of 27 years of experience with NMC and related entities and we are confident that together with the other members of the management team at NMC, we have a leadership team capable of executing the growth strategy and take our Group into its next phase of expansion.

### OPERATIONAL AND FINANCIAL PERFORMANCE
In total we received 3.2 million patients into our facilities, representing 34.3% year on year growth. Hospital occupancy increased by 216bps to 73.5% demonstrating the continually high demand for quality services and we enlarged our medical specialist teams with the addition of 214 doctors throughout the year.

Our healthcare assets continue to perform very well and we see positive operational and financial results. Of particular interest amongst our more mature assets is Dubai Speciality Hospital, which recorded a 23.5% increase in the number of patients and 21% growth in revenues year on year - the highest growth for the hospital over the last five years - as the roll-out of mandatory healthcare insurance in Dubai continues to gain traction and progress towards completion of the phased adoption plan by year end 2016.



2-STAGE STRATEGY

Building capacity

Vision

Delivering a continuum of care

Building capability

Exhibit 4 to B.R. Shetty's Request for Judicial Notice   12 of 166   Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

Financial performance in 2015 for the Group was robust with reported revenues increasing by 36.8% and EBITDA increasing by 46.7% compared with 2014. This was supported by strong performance across our major assets, positive contribution from our newly acquired healthcare facilities and a better than expected impact from the continued roll-out of mandatory medical insurance in the UAE. We have a strong capital structure and estimate that we could have around US$270m available during the year for potential growth opportunities derived from existing unutilised financing, existing cash and cash generated during the year.

We also continued to methodically expand our Distribution division this year with new product introductions and brands and an increased focus on our sales effort. We strengthened the division, recruiting an additional 51 sales people, bringing the total number of employees in this successful team to 1,948. We also invested in our Distribution business transport adding 14 new vehicles bringing the total number to 221. Sales of pharmaceuticals and laboratory equipment increased due to an expanded product range and growing demand supported by Dubai's rollout of mandatory health insurance. Notably, we signed an agreement with Nestle to be the exclusive distributor of its infant product range to pharmacies in the UAE, increasing our competitive edge in the market. The number of SKUs increased to around 90,000, an increase of 6.8% compared to 2014 and we forecast another year of growth in this division as demand for products continues to grow.

### OUTLOOK

Rapid expansion, as we have experienced this year, always presents its challenges and I would like to thank my fellow members of the Board of Directors, the senior management team and our shareholders for their continued support and dedication throughout the year. Most importantly, I would like to thank the employees of NMC and its newly acquired local and international healthcare assets for their tireless efforts to provide the United Arab Emirates' and the region's growing population with increased access domestically to quality healthcare services and products, as we have done so for the last four decades.

Our transformation from a small pharmacy and clinic over 40 years ago into an internationally recognised provider of healthcare services could not have been possible without the unparalleled support of the UAE government and its residents and I extend my sincerest thanks to you for your encouragement.

We expect a good year for the UAE economy in 2016 supported by a reasonable GDP growth of around 3% despite the lower oil prices, based on forecasts by leading rating agencies. However, for the local healthcare sector the key accelerating driver of growth will be the on-going adoption of mandatory healthcare insurance in Dubai and the expected increase in covered patient rising from 1m to 3m according to Dubai Healthcare Authority (DHA). Most specifically for NMC, we expect strong growth coming from our enlarged network, its growing specialisms and the introduction of higher value added services especially through our single specialty verticals.

**DR B.R. SHETTY**
Executive Vice Chairman and CEO

Exhibit 4 to B.R. Shetty's Request for Judicial Notice        13 of 166        Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

Strategic Report

## Our business model

In 2015, the Group did various acquisitions and now owns and operates Clinica Eugin in Spain, one of the leading fertility treatment centres globally; Americare Group, the leading home care provider in the UAE; ProVita, the leading provider of long-term medical care, also in the UAE; Fakih IVF, the market leader for in-vitro fertilisation services in the Middle East and Dr Sunny, a reputable network of medical centres in Sharjah. All acquisitions were completed during 2015, except Fakih IVF which was completed on 31 January 2016.

The group also operates a UAE wide product distribution and wholesale business.

### HEALTHCARE DIVISION

Through our healthcare services division we provide people in the UAE with a range of high quality outpatient and inpatient services across our facilities. These facilities range from the larger specialty hospitals to medical centres, providing care along the care pathway from emergency and short-term health to in-home and long-term care.

In addition to our facilities in the UAE, we own and operate Clinica Eugin which is based in Spain. Through this acquisition we aim to complement our existing UAE capabilities with those of Clinica Eugin's world-class expertise in IVF technology and service delivery of the highest international standards. NMC continues to look for opportunities to transfer medical know-how from internationally leading organisations to benefit its patients in the gulf region.

Our network of retail pharmacies is mainly selling pharmaceuticals prescribed by our doctors to our patients either within, or in the immediate vicinity of, our healthcare services facilities. Our comprehensive care approach maximises patient convenience and increases revenue contribution to our business.

While we serve both insured and self-paying patients, the overwhelming majority of our healthcare division's revenue is generated through insured patients. Usually insured patients have to make a co-payment, which is the proportion of the full price of services rendered that the patient pays directly to NMC when they receive services at our facilities. NMC then submits claims to insurance companies to collect the remainder of our fees.

Pricing of our healthcare services is typically negotiated on an annual basis with the insurance companies we work with and may differ between the various insurance plans offered in the market. In contrast, prices of the majority of pharmaceutical products sold in our pharmacies are regulated and set by the UAE Ministry of Health.

NMC medical facilities are currently covered by the majority of the approximately 49 insurance companies operating in the UAE, including the largest market participants. These companies have either a direct relationship with us or through Third Party Administrators (TPAs) who currently provide private medical insurance.

Our Healthcare division also provides operational and management services to third party owned healthcare services assets. In return for our services, we receive a contracted management fee by the asset owner. Typically the fee

# Integrated private healthcare

NMC Health plc is a leading integrated private healthcare provider operating across the United Arab Emirates, with a nationwide network of hospitals and operations founded in 1975.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          14 of 166          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

received is partially tied to a set of pre-agreed performance metrics incorporating either qualitative and/or quantitative operational targets. We currently have one management contract with the UAE Ministry of Presidential Affairs pertaining to a general hospital in Umm al Quwain in the Northern Emirates.

### DISTRIBUTION DIVISION

NMC's Distribution Division is now one of the largest in the UAE and it offers products across several segments including FMCG, Pharmaceuticals, Scientific Equipment and Food.

NMC counts among its clients UAE Government entities, the largest UAE retailers, pharmacies and hospital operators. We supply our customers with a portfolio of globally and locally established brands and products with end-user demand in the UAE. We ensure our customers receive quality products in a timely manner with the required support services.

Our distribution capabilities are supported by a network of strategically located warehouses and a fleet of vehicles ensuring timely delivery to our customers across the country. Products are overwhelmingly sold on credit, with payments collected based on agreed terms. Our pricing of these products includes a mark-up over the product cost to generate a profit and to cover import costs and duties, registration administration and fees, distribution expenses, credit costs and, in certain cases, marketing costs. Pharmaceutical is the only segment where pricing is widely regulated by the UAE Ministry of Health.

Only registered domestic distributors, a locally established company like NMC, are entitled by customs authorities to import products into the country. Principals (suppliers) contract NMC as their distributor to gain access to the UAE market through a reputable partner with a long track-record, established distribution channels and infrastructure

and strong financial standing. Every individual brand and product has to go through an approval and registration process with local authorities before being allowed to be sold in the country. NMC facilitates this process and ensures local requirements are met. The majority of agreements with our Principals are on exclusive basis. All agreements are registered with the government.

NMC procurement is on a principal basis. In the majority of cases, NMC takes the inventory and collection risk of the product that it buys and sells. Acting as a principal rather than an agent enhances NMC's margins at the expense of increasing the Group's risk profile. Our agreements are almost exclusively operated on a credit basis, with the number of credit days agreed with our Principals.



NMC Health plc Annual Report and Accounts 2015          11

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          15 of 166          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

Strategic Report

# Our strategy

Over the past 40 years NMC has delivered significant growth by providing accessible top quality healthcare services in the fast growing major cities of the UAE, supported by:

· Visionary UAE leadership, continuously developing, diversifying and increasing the competitiveness of the economy
· Positive macro-economic environment
· Attractive healthcare supply/ demand dynamics
· Structural growth underpinned by the phased adoption of mandatory insurance

NMC's IPO in 2012 reinforced the Company's strategic commitment to expanding its capacity in the under-supplied and fragmented private UAE healthcare market. This was a major milestone in establishing the first integrated nationwide hub-and-spoke healthcare network in the UAE private sector with a primary, secondary and tertiary care offering.

NMC successfully executed the organic expansion plan outlined during its IPO, with four strategic and well-positioned healthcare asset openings in the UAE market during 2013 and 2014, culminating in 2015 with the partial opening of its largest hospital and the centrepiece in the NMC's multi-specialty platform - the 250 licensed bed super specialty NMC Royal Hospital in Abu Dhabi.

With the organic, capacity focused, expansion program approaching completion, NMC initiated a capabilities focused update to its strategy to accelerate the expansion of the Company's clinical offering into higher complexity and value specialties. This new phase of growth was supported by a new financing facility of up to US$825m, including US$475m earmarked for inorganic expansion to complement NMC's existing capabilities.

The updated strategy and its subsequent execution has meant that NMC's healthcare operations have evolved from a single multi-specialty platform operating under one brand, NMC, to include additional higher complexity and single specialty verticals operating under a multi-brand and multi-segment strategy. In particular, this new positioning allows the Company to:

· Offer higher quality services to patients and payors
· Participate in under-supplied market segments with higher growth outlook and per service value
· Increase expansion and scalability potential in the UAE and wider region due to lower capex intensity of single specialty route

NMC has reviewed and assessed multiple proposed in-organic, organic and partnership opportunities over the past year and continues to be highly selective and disciplined in its investment process.

The company has completed strategic and value accretive acquisitions to date that have all met NMC's stringent investment criteria. These acquisitions include:

· Clinica Eugin - A leading global fertility treatment company
· Fakih IVF - Middle Eastern fertility services leader
· ProVita - Pioneering UAE based long-term ventilated care provider
· Americare - Top UAE provider of home care services
· Dr Sunny Network - Highly reputable UAE based primary care provider in Sharjah

Exhibit 4 to B.R. Shetty's Request for Judicial Notice        16 of 166        Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

| Overview | Strategic Report | Governance | Financial Statements |

These acquisitions, coupled with NMC's organic initiatives, have allowed the Group to establish new strategic verticals[2] within the broader healthcare delivery platform with specialization-specific capabilities and brands:

1. Multi-specialty - 665 licensed beds (NMC Healthcare & Dr. Sunny)
2. Maternity & fertility - 100 licensed beds (Brightpoint Royal Women's Hospital & Clinica Eugin)
3. Long-term & home care - 120 licensed beds (ProVita & Americare)
4. Operation & management - 205 beds (Sheikh Khalifa Hospital in UAQ)
5. Products & consumables - Around 90,000 SKUs (exclusive wholesaler of mainly globally established and branded healthcare products and equipment)

The Group now has a capacity of 885 licensed beds and a network of medical centres and day-surgeries. In addition, NMC operates the 205 bed Sheikh Khalifa Hospital on behalf of the UAE government in the Emirate of Umm al-Quwain.

2   The first four strategic verticals form the Healthcare Division, with the Products & Consumables currently being the only vertical in the Distribution Division.

### MULTI-SPECIALTY

With the partial opening of our 250 licensed beds super specialty and quartenery care NMC Royal Hospital in 2015 and the subsequent opening of inpatient services with 75 beds operational in March 2016, we have completed the major component of the NMC hub-and-spoke network.

The addition of NMC Royal Hospital further expands our portfolio, bringing the total number of hospitals to seven across the UAE. This platform is complemented by a network of medical centres and day surgeries to increase operational reach and the addressable market through cross-referrals. We almost trebled our network of day surgeries and medical centres to eleven during 2015, up from four at the start of 2015, largely driven by our acquisition of Dr Sunny Healthcare

Group, which operates six medical centres in Sharjah. We also added four pharmacies to our portfolio during the year for a total of 15.

This enhanced multi-specialty healthcare delivery network of assets across the UAE has elevated NMC's capacity, geographical presence, service quality and offering complexity to further increase NMC's future growth prospects.

Under the NMC brand we will continue to operate with a multi-segment approach, thus targeting all UAE insurance categories from Basic (low-income expatriate workers), via Enhanced (middle-to-high income expatriates) all the way up to Thiqa or its equivalent (UAE nationals). Our core focus is to provide the highest quality and affordable healthcare services to the maximum



INORGANIC CAPABILITIES FOCUS

ORGANIC CAPACITY GROWTH

1

2

**Stage 1: 2012-2014**

| DEVELOPMENT | CATEGORY |
| --- | --- |
| MBZC | Day Surgery |
| Brightpoint | Maternity Hospital |
| DIP | General Hospital |
| Al Ain | Medical Centre |
| NMC Royal | Special Hospital |

Licenced beds
**+410**
132% growth

**Stage 2: 2015-2018**

| ACQUISITION | CATEGORY |
| --- | --- |
| Eugin | Fertility |
| Provita | Long Term Care |
| Americare | Homecare |
| Dr. Sunny | Medical Centre |
| Fakih IVF | Fertility |

Licenced beds
**+120**
16% growth

Exhibit 4 to B.R. Shetty's Request for Judicial Notice    17 of 166    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

Strategic Report

# Our strategy
## continued

number of insurance plans and optimum number of patients relative to our capacity and capabilities. The increased scale and patient volumes will enhance our ability to widen the service offering and complexity to the long-term benefit of all patients and the wider UAE healthcare market.

**MATERNITY & FERTILITY**
The opening of Brightpoint Royal Women's Hospital combined with the subsequent acquisitions of Clinica Eugin and Fakih IVF confirms the Maternity & Fertility vertical's global market position, as one of the leading and premium international providers of fertility treatment services based on:

- Scale of its global business and cycle capacity
- Focused strategic initiative towards raising capabilities and access to care in high growth and under-supplied markets
- Segment leading treatment capabilities and success rates
- Diversity and complexity of service offering across the fertility treatment spectrum
- Established presence and referral centres across regulatory geographies to facilitate one-stop approach for patients

## Our healthcare network

## NMC's capacity focused initial strategy completed the only nationwide multi-specialty hub-and-spoke healthcare network with tertiary care capabilities.



14    NMC Health plc Annual Report and Accounts 2015

Exhibit 4 to B.R. Shetty's Request for Judicial Notice        18 of 166        Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

The most recent acquisition of Fakih IVF which completed in January 2016 is expected to be highly synergistic with significant potential for cross-referral of patients and transfer of best practices and technologies within NMC's Maternity & Fertility vertical. Patients will have access to an integrated continuum of care with complementing capabilities and coordinated seamless service offerings including local IVF treatments of the highest international standards at Fakih IVF, international referral to Clinica Eugin and its wider fertility service offering as permitted by its operational and regulatory environment and hospitals, led by Brightpoint, for antenatal, delivery and postnatal services.

The premium market positioning internationally and in the UAE of our brands in this vertical, is increasing the company's overall penetration into the Thiqa insurance segment, which is exclusively comprised of UAE nationals in Abu Dhabi, where fertility treatment is covered.

In addition, fertility treatments are the leading drivers of medical tourism in the UAE and the acquisition of Fakih IVF and Clinica Eugin will position NMC as the destination of choice and a 'one-stop shop' with a complete service offering.

A roll-out plan for additional fertility centres in the Gulf region is currently being executed with a total of five new assets expected to open during 2016. Three assets will be located in the UAE and one in each of Qatar and Oman.

### LONG-TERM & HOME CARE
NMC also accelerated its establishment of Centres of Excellence through acquisitions that extend its services along the care pathway. As a leading provider of in-home healthcare services in the UAE, Americare, acquired by NMC in April 2015, complements existing in-hospital healthcare services. Americare operates a community-based physician practice providing medical care in the comfort of the patient's home for a variety of conditions and across all ages.

In August 2015, NMC acquired ProVita, the UAE's leading provider of long-term medical care. Meeting the under-serviced demand for long-term care facilities, ProVita fills a gap between the short-term care offered by NMC's existing facilities and the in-home services offered by Americare, furthering our strategy of being an integrated healthcare provider with Centres of Excellence across specialities.

By providing specialised long-term care, NMC can contribute towards accelerating the freeing up of the more expensive and comparatively lower quality of life ICU beds currently occupied by long-term acute and sub-acute care patients within NMC and other local/international private sector and government hospitals. This integrated solution across the continuum of care will allow for a seamless patient experience with higher quality of life for the patients and their families combined with synergies and enhanced efficiencies for NMC and payors. Given the limited availability of long term care facilities in the UAE, we expect our integrated care solution to provide an effective alternative to sending patients abroad for treatment and we therefore anticipate a continued repatriation of UAE patients back to their home country.

In addition, the acquisitions of Americare and ProVita extend NMC's access to Thiqa patients to further diversify NMC's patient population.

ProVita has long-term care assets in both Abu Dhabi and Al Ain with a combined total of 120 beds.

NMC has identified Qatar and Saudi Arabia as priority markets for the long-term care expansion due to the increasing healthcare expenditure in both countries, high prevalence of chronic and lifestyle diseases, aging population, lack of dedicated long-term care facilities and a substantial number of patients seeking treatment abroad.

### OPERATIONS & MANAGEMENT
NMC continued to successfully operate and manage the 205 bed Sheikh Khalifa General Hospital in Umm Al Quwain on behalf of the UAE government.

Our experience in the Operation & Management is leading us to increasingly explore the prospects of expanding this business regionally. While this evaluation of the wider market remains at initial stages, our long experience of operating and managing healthcare assets in the region means we can contribute to the evolution of healthcare delivery outside our own assets.

### PRODUCTS & CONSUMABLES
NMC Health's Product & Consumables or product distribution and wholesale business is one of the largest in the UAE in terms of product portfolio and sales. This portfolio of international and regional brands, sold mainly on exclusive basis by NMC to local retailers, has been built over the past 40 years across diverse product areas, including key segments such as FMCG, Pharmaceuticals and Scientific Equipment.

Today NMC has Around 90,000 SKUs sold across the UAE through its over 1,948 divisional staff, five warehouses with a total of over 500,000 sq feet of storage and 221 delivery vehicles. Around 98% of our SKUs are imported and sold exclusively in the UAE by NMC to retailers.

This division has continued to perform well during the year on brand and product line expansions, positive macro environment and growth in the retail space across the UAE.

Our strategy in the distribution division remains focused on investing in our people, logistics and strategic regional and global relationships with key principals. We aim to leverage off these key assets against a market back drop of good socio economic drivers and the on-going positive sector trends following the introduction of mandatory insurance most recently in Dubai with a wider roll out across the UAE expected in the future. With the pharmaceutical segment accounting for around 33.1% of sales in distribution, mandatory insurance roll-out is expected to support future growth.

We continue to explore attractive organic and inorganic growth opportunities in the UAE and across the wider gulf region to underpin and accelerate the growth of the Distribution division.

### KEY STRATEGIC OBJECTIVES
Following these strategic initiatives and the creation of its strategic verticals, NMC reiterates its commitment to the long-term strategic growth plan and the following key objectives:

- Accelerate development of Centres of Excellence in key specialties within the multi-specialty vertical (e.g. partnership with Oxford University affiliate to deliver in-hospital oncology therapy) as well as in newly-established single specialty verticals such as fertility and long-term care through organic, inorganic or partnership initiatives;
- Contribute towards increased healthcare spend retention within the UAE, through a broader and higher complexity offering;
- Expand medical specialty offering to the growing patient population within the UAE whilst maximising cross-referrals and operational synergies between existing network assets and verticals;
- Selectively pursue in-vertical consolidation opportunities to grow market presence and cross-referral capabilities and accelerate the patient volume reliant drive towards higher complexity/value added healthcare services;

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          19 of 166          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

Strategic Report

# Our strategy
## continued

- Offer fully integrated healthcare solutions within NMC's system to the benefit of patients and payors. This includes a leading presence across the continuum of care with the ability to 'step-up' and 'step-down' patients based on their healthcare needs (e.g. from super specialty hospital to/from long-term care to/from home-care);
- Further complement its market position through selective adoption of a multi-brand approach under the broader NMC Health umbrella brand;
- Increase participation in the rapidly growing medical tourism market within the UAE by establishing its facilities as a destination of choice for medical tourists from the wider region;
- Selectively establish a strategic presence outside the UAE, with an initial focus on Saudi Arabia and Qatar, through the more scalable and less capital expenditure intensive single specialty verticals, thereby allowing NMC to leverage its expertise and the reputation behind its key brands (such as Fakih IVF, Eugin and ProVita) in attractive markets.

### ACCELERATE THE ESTABLISHMENT OF CENTRES OF EXCELLENCE

Outpatient services are the largest contributor to the UAE healthcare market by volume and value, particularly in the private sector, whose focus is evolving from primary care to secondary and tertiary care. By definition, inpatient services are more complex and require high investments in human capital, technology and facilities, raising the entry barriers for providers.

Historically, both specialist outpatient and inpatient services in the UAE originated in government owned healthcare facilities and the public sector remains the largest provider of services, particularly for inpatients.

The UAE's medical insurance reform aims to advance the quality and capacity of care by encouraging more participation and investment by the private sector, resulting in the joint contribution of the public and private sectors for the ultimate benefit of the patient.

In line with this vision, NMC's large investment program and its growing network of state-of-the-art healthcare facilities, we are also increasingly raising the level, quality and focus of our healthcare services. By doing so, we aim to advance our competitive advantage through offering better and more specialised services for patients.

NMC's vision is to ensure all service delivery is performed around our specialities so we can accumulate higher levels of clinical expertise and experience. In addition, more secondary and tertiary care surgeries will contribute to higher inpatient revenues.

We believe successfully operated centres of excellence in-hospital or as single specialty verticals will attract and retain highly qualified physicians and surgeons, by offering: patient concentration, higher number of surgeries and a highly qualified and experienced peer group as colleagues.

The recent opening of NMC Royal Hospital, our super specialty tertiary hospital and the centre piece of our hub-and-spoke healthcare network, will raise the medical capabilities of NMC to a new level and accelerate the development of our key in-hospital centres of excellence.

Currently we have six in-hospital centres of excellence:

- Cardiology
- Urology & Andrology
- Orthopaedics
- Ophthalmology
- Oncology
- Surgery

By developing our core competitive advantages in quality healthcare around branded, highly identifiable and focused specialty centres we are incubating within our hospitals, centres of excellence, with a potential to evolve into even more specialised stand-alone single specialty assets and networks operating outside our hospitals in the future. Any expansion of prospective single specialty centres would be less capex intensive than trying to reach all potential target markets exclusively through the multi-specialty hospital route. We also believe that focused human capital, institutionalised experience and a strong brand identity will allow prospective single specialty centres to become expandable in the UAE and across the wider region in a more impactful and competitive manner than the multi-specialty hospital route.

Our emerging Maternity & Fertility vertical's background serves as a good example of this evolution, although it was enhanced with inorganic initiatives alongside the organic history. The acquisitions of Clinica Eugin and Fakih IVF and gradual evolution towards an increasingly independent vertical not only in the current strategic sense but also potentially in the full operational sense – were underpinned and preceded by our in-hospital maternity centres of excellence which evolved and led to the opening of Brightpoint Royal Women's Hospital in 2014, the most advanced women's and maternity care hospital in the Middle East. Today the Maternity & Fertility vertical is a global leader.

### OPTIMISING RETURNS

Throughout 2015 management worked on enhancing NMC's overall service mix, market presence and insurance segment diversification by extending group presence into new and mostly higher value per visit/patient healthcare specialisation. This shift in focus towards raising NMC's capabilities was underpinned by the completion of the organic expansion program and the successful raising of US$825m debt facility in February 2015 to support this new stage of our strategic growth.

The acquisitions discussed above served this objective as they expanded the group's offering and relative competitive advantage, stepped-up group revenue per patient through complexity and higher value-added services rather than only price increases. This accelerated the healthcare division's top-line growth while diluting the distribution business in relative terms to allow NMC to increasingly evolve into a 'pure-play' healthcare company which increased group EBITDA margins and optimised NMC's capital structure and return profile as the balance sheet went from being under-leveraged up to more reasonable gearing levels.

While any increase in debt carries certain risks, management continues to see the 2015 net debt/EBITDA levels of 3.7 as highly reasonable and the current capital structure as more optimised, especially when considered within the context of the historic growth profile of the company, the expected growth in 2016 and declining capital expenditure requirements of the group as the organic expansion program announced at the time of the IPO approaches full completion – in aggregate these factors are expected to increase the free cash flow generating ability of NMC in future periods.

**16**  NMC Health plc Annual Report and Accounts 2015

## INTEGRATING SUCCESS

Integration is a key aspect of all our acquisitions and will remain so in the period ahead as NMC is determined to integrate the success of these highly capable leaders in their respective specialist services and leverage their know-how.

While integration can be challenging, we have mitigated this by focusing in all acquisitions to retain key management personnel, support entrepreneurial drive, retain brands and institutional identity and employee facing policies and procedures.

The focus in NMC's management efforts is on facilitating the continued growth of these institutions by empowering them with the strategic drive of NMC combined with the support and synergistic opportunities presented by being part of a diversified healthcare network with the largest private sector patient base in the UAE. In addition we are extending their operational capacity and abilities by:

· financial expertise and funding capabilities
· project and expansion management capabilities and track-record
· payor relations, revenue cycle and claim management
· human capital sourcing
· centralised procurement and consumables cost optimisation



### BUILDING CAPABILITIES

# Long term & home care

Licensed beds
### 120

By providing specialised long-term care, NMC can contribute towards accelerating the freeing up of the more expensive and comparatively lower quality of life ICU beds currently occupied by long-term acute and sub-acute care patients within NMC and other local/international private sector and government hospitals. This integrated solution across the continuum of care will allow for a seamless patient experience with higher quality of life for the patients and their families combined with synergies and enhanced efficiencies for NMC and payors.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice        21 of 166        Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

# Financial summary and highlights

## Financial Highlights

– Group reported revenues increased by 36.8% to US$880.9m. Proforma revenues increased by 45.8% to US$938.7m
– Healthcare division revenue increased by 55.7%[1] to US$517.1m. Proforma healthcare revenues increased by 73.1% to US$575.0m
– Distribution division revenue grew by 16.1% to US$393.4m[1]
– Reported EBITDA increased by 46.7% to US$150.3m. Proforma EBITDA increased by 61.2% to US$165.2m
– Reported EBITDA margin expanded by 116bps to 17.1%. Proforma EBITDA margins improved by 169bps to 17.6%
– Net profit increased by 10.6% to US$85.8m. Proforma net profit increased by 27.4% to US$98.8m
– Net profit margin declined by 230bps to 9.7% as a result of the accelerated ramp up of new openings leading to higher depreciation as well as the acquisition related amortisations. Proforma net profit margin decreased by 152bps to 10.5%
– Adjusted net profit increased by 21.2% to US$93.9m. Proforma adjusted net profit increased by 42.5% to US$110.5m
– Earnings per share (EPS) amounted to US$0.443 (FY 2014: US$0.412)
– Adjusted earnings per share amounted to US$0.506 (FY 2014: US$0.412)
– Proposed dividend pay-out ratio is maintained at 20% of profit after tax, amounting to GBP2 6.2 pence per share

## Business Highlights - A year on year (YOY) comparison

– Healthcare division's patients increased by 34.3% to 3.2m. Proforma patient numbers increased by 47.3% to 3.5m
– Adjusted healthcare EBITDA[3] was US$140.1m. Adjusted Proforma healthcare EBITDA increased by 73.7% to US$154.9m
– Adjusted healthcare EBITDA margins 27.1%, adjusted pro-forma healthcare EBITDA margins 26.9%. (FY2014 healthcare margins 26.8%)
– Revenue per patient from healthcare services increased by 20.0% to reach US$137.4. Proforma per patient revenues increased by 22.3% to US$140.1
– Hospital bed occupancy rates reached 73.5%, an improvement of 216bps; Proforma bed occupancy rate was 74.6%
– Operational beds increased from 287 beds to 537 beds, 87.1% increase
– Doctors' employed reached 817, an increase of 35.5%
– Distribution division increased its product portfolio by 6.8% to 89,294 stock keeping units (SKUs)
– Sales and marketing personnel at the Distribution division grew 7.9% to 693

1  Before intra-group elimination
2  British Pound
3  Adjusted healthcare EBITDA is unaudited and refers to the healthcare EBITDA adjusted for one off expenses to the tune of US$3.1m incurred during the year

---

Revenue (US$m) and annual growth
## US$880.9m
+36.8%



- FY 2015 revenue reached US$880.9m, up 36.8% on FY 2014; Pro forma Group revenues US$938.7m, 45.8% increase.

EBITDA (US$m) and margin
## US$150.3m
+46.7%



- EBITDA increased by 46.7% to US$150.3m; Pro forma Group EBITDA US$165.2m, up 61.2% on FY 2014.
- EBITDA margin reached 17.1%, increase of 116bps YoY; Pro forma EBITDA margin 17.6%.

Healthcare revenue (US$m) and YoY growth
## US$517.1m
+55.7%



- Healthcare Division revenues increased by 55.7% on FY 2014 to reach a total of US$517.1m in FY 2015. Pro forma revenues increased 73.1% to US$575m.

18    NMC Health plc Annual Report and Accounts 2015

| Overview | Strategic Report | Governance | Financial Statements |

| US$m (unless stated) | FY 2015 Audited | FY 2014 Audited | Growth | Proforma 2015 Unaudited | Growth over FY 2014 |
|---|---|---|---|---|---|
| **Group** | | | | | |
| Revenue | 880.9 | 643.9 | 36.8% | 938.7 | 45.8% |
| EBITDA | 150.3 | 102.5 | 46.7% | 165.2 | 61.2% |
| EBITDA margin | 17.1% | 15.9% | 116bps | 17.6% | 169bps |
| Net Profit | 85.8 | 77.5 | 10.6% | 98.8 | 27.4% |
| Net Profit margin | 9.7% | 12.0% | -230bps | 10.5% | -152bps |
| Earnings per share (US$)-Basic | 0.443 | 0.412 | 7.5% | 0.513 | 24.5% |
| Adj Net Profit | 93.9 | 77.5 | 21.2% | 110.5 | 42.5% |
| Adj Earnings per share (US$) | 0.506 | 0.412 | 22.8% | 0.595 | 44.5% |
| **Divisional performances** | | | | | |
| Healthcare revenue | 517.1 | 332.2 | 55.7% | 575.0 | 73.1% |
| Healthcare EBITDA | 137.0 | 89.1 | 53.7% | 151.8 | 70.3% |
| Healthcare EBITDA margin | 26.5% | 26.8% | -34bps | 26.4% | -43bps |
| Healthcare net profit | 108.0 | 77.9 | 38.6% | 121.0 | 55.3% |
| Healthcare occupancy | 73.5% | 71.3% | 216bps | 74.6% | 333bps |
| Distribution revenue | 393.4 | 338.9 | 16.1% | 393.4 | 16.1% |
| Distribution EBITDA | 43.5 | 34.4 | 26.4% | 43.5 | 26.4% |
| Distribution EBITDA margin | 11.1% | 10.2% | 90bps | 11.1% | 90bps |
| Distribution net profit | 40.7 | 32.1 | 26.9% | 40.7 | 26.9% |

Notes:
- Net Profit equals profit after tax as shown in the Consolidated Income statement.
- Proforma numbers include consolidation of the acquired assets from the 'Locked-box' arrangement date and one off management fees treated as part of purchase consideration as per IFRS.
- 'Locked-box' arrangement date is the date from which the acquirer obtains the economic ownership of the targeted business, before it legally controls that business. Locked-box date details are given in page 20.
- EBITDA equals Profit from operations before depreciation, amortization and one off items as shown in the Consolidated Income statement.
- Healthcare and distribution numbers are before considering intra - group eliminations.

Healthcare EBITDA (US$m) and margin

## US$137.0m
+53.7%



- EBITDA  — EBITDA margin
- Division reported EBITDA US$137.0m, up 53.7% on FY 2014. Pro forma EBITDA increased 70.3% to US$151.8m.

Distribution revenue (US$m) and YoY growth

## US$393.4m
+16.1%



- Revenue  — Growth
- Distribution revenue increased by 16.1% YoY, to reach US$393.4m.

Distribution EBITDA (US$m) and margin

## US$43.5m
+26.4%



- EBITDA  — EBITDA margin
- Distribution EBITDA reported at US$ 43.5m (+26.4% YoY).

Exhibit 4 to B.R. Shetty's Request for Judicial Notice        23 of 166        Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

Strategic Report

# Business overview

**OPERATIONAL REVIEW**

NMC Health's business extends across the UAE through its healthcare and distribution divisions. NMC also owns and operates Spain based Clinica Eugin. The Group reported consolidated revenues of US$880.9m in FY2015 (+36.8% YoY) with approximately 56.8% (FY2014: 49.5%) coming from its healthcare division and 43.2% (FY2014: 50.5%) from the distribution division, marking the first year in the Group's recent history that healthcare revenues have accounted for a greater proportion of revenues than the distribution division.

The healthcare division accounted for 75.9% (FY2014: 72%) of Group EBITDA with the balance of 24.1% (FY2014: 28%) coming from the distribution division.

Consolidated group EBITDA reached US$150.3m with a year on year growth of 46.7%. On a unaudited proforma basis, adjusting for one offs, group EBITDA was US$165.2m, up 61.2% year on year, with a proforma EBITDA margin of 17.6% (FY2014: 15.9%). The unaudited proforma numbers include the economic benefit to NMC had the consolidation of the acquired assets during 2015 started from the date of the 'locked box' arrangement rather than the date of effective control. The locked box date is the date from which the acquirer obtains the economic ownership of the targeted business, before it legally controls that business.

**HEALTHCARE DIVISION**

Our healthcare division operates in the major emirates and cities of the UAE including Abu Dhabi, Al Ain, Dubai, Sharjah and Umm Al Quwain. Together these Emirates and cities account for nearly 85% of UAE residents. With a total licensed capacity of 885 beds, we operate seven hospitals, eleven day surgeries and medical centres and fifteen in-hospital pharmacies. In addition, the Group operates an eighth hospital on behalf of the UAE Ministry of Presidential Affairs, the 205 bed Sheikh Khalifa General Hospital in Umm Al Quwain, under an operations and management contract initiated in Q4 2012 with five year duration. Furthermore, NMC owns Clinica Eugin - a leading fertility services provider based in Spain.

The healthcare division reported revenues of US$517.1m in FY2015 (+55.7% YoY), including US$441.3m from healthcare services, US$69.8m from hospital pharmacies and US$6m from the operation and management of third-party healthcare assets. A total of 3.2m patients visited NMC's healthcare network in FY 2015, an increase of 34.3% compared to FY 2014. Average revenue per patient from healthcare services in FY 2015 was US$137.4, 20% growth over FY 2014; this has seen major increase due to higher revenue per patient in our newly acquired entity ProVita.

Although we continue to operate healthcare services as a division of our business, we are increasingly grouping our asset portfolio into specialist verticals based on strategic ambition and outlook as oppose to current operational reality. However, NMC might consider converting these strategic verticals in the future, specific operational structures and thus revenue segments.

**IMPORTANT ACQUISITION DATES**

| Acquisition | Date of Acquisition agreement | 'locked-box' date | Control date |
|---|---|---|---|
| Luarmia (Clinica Eugin) | 23 February 2015 | N/A | 23 February 2015 |
| ProVita | 15 June 2015 | 1 April 2015 | 20 August 2015 |
| Americare | 29 April 2015 | 1 January 2015 | 29 April 2015 |
| Dr Sunny Healthcare Network | 29 April 2015 | 1 January 2015 | 25 August 2015 |
| Fakih IVF | 24 November 2015 | N/A | 31 January 2016 |

20   NMC Health plc Annual Report and Accounts 2015

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          24 of 166          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

## MULTI-SPECIALTY

NMC and Dr Sunny branded healthcare hospitals, day-surgeries, medical centres and pharmacies together form our major strategic vertical - multi-specialty.

The total combined revenue of the healthcare division assets bundled in this strategic vertical was US$428.5m, with year on year growth of 31.6% and 31.7% growth in total patients compared to 2014 and with the total number of patients at 3.1m.

Revenue per patient was US$136.5. The occupancy rate was 73% during the year compared to 71.3% in 2014.

The FY 2014 comparative figure excludes Dr Sunny numbers for each parameter mentioned above.



### BUILDING CAPABILITIES

# Operation & management

Licensed beds
205

NMC continued to successfully operate and manage the 205 bed Sheikh Khalifa General Hospital in Umm Al Quwain on behalf of the UAE government. NMC has a five year contract to operate this hospital in return for an annual management fee based on qualitative metrics. This is the first such contract to manage a large Government healthcare facility awarded by a Government Department to a local UAE business, demonstrating confidence in NMC's significant healthcare experience and capabilities.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice        25 of 166        Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

Strategic Report

# Business overview
## continued

While revenue growth was strong across the portfolio, Dubai Specialty Hospital and NMC General Hospital in Dubai Investment Park (DIP) exceeded expectations on the back of an accelerated adoption of mandatory medical insurance in Dubai.

On 1 September 2015, NMC partially opened the outpatient services at the new super speciality hospital, NMC Royal Hospital, in the Khalifa area of Abu Dhabi City. On 7 March 2016 NMC commenced inpatient services at the hospital with 75 beds operational out of a total licensed capacity of 250 beds. The balance of inoperative beds is available for phased market introduction in future periods. NMC Royal Hospital is NMC's largest integrated speciality hospital facility in the UAE, alongside its speciality hospitals in Abu Dhabi, Dubai and Al Ain. It will act as the central hospital within NMC's hub-and-spoke healthcare platform and will be a regional referral point for best-in-class medical treatment to the growing population of the UAE. It will also serve patients in the growing residential and commercial areas in its immediate proximity.

While the revenue contribution of this facility was not material in 2015 given its opening in September 2015 of initial basic outpatient services, expenses associated with the opening were in-line with guidance. Inpatient operations started on 7 March 2016 with 75 beds out of the total licensed capacity of 250 beds. This hospital is expected to deliver considerable growth in future periods as patients grow and operations ramp up.

## MATERNITY & FERTILITY

NMC's maternity and fertility focused healthcare assets within the healthcare division, reported revenues at US$51.4m in 2015, with the total number of patients at 0.065m and Revenue per patient at US$784.5.

The comparative number under this vertical are not shown, as in Brightpoint Royal Women's Hospital only outpatient services started in FY 2014 and Luarmia was acquired in FY 2015.

Brightpoint Royal Women's Hospital which started its initial outpatient operations in July 2014, commenced inpatient services in May 2015 with 60 beds out of the total licensed bed capacity of 100. The bed occupancy achieved during this start-up period was 58%. The hospital ramp-up accelerated post the initiation of inpatient services and has by the year-end led us to open all 100 beds.

Clinica Eugin, which NMC acquired on 24 February 2015 with no 'locked-box' date arrangement, was consolidated from 1 March 2015. However, the revenue contribution to NMC from the acquisition relates only to approximately 10 months or 83.5% of the year.

As for Fakih IVF, which is also part of this strategic vertical, here too NMC had no 'locked-box' arrangement and its consolidation will be effective from 31 January 2016.

The locked box date is the date from which the acquirer obtains the economic ownership of the targeted business, before it legally controls that business.

## LONG-TERM & HOME CARE

NMC's long-term and home care focused healthcare assets within the healthcare division, reported combined revenues of US$31.1m in 2015, with total number of patients at 7,045 and Revenue per patient at US$4420.

The bed occupancy rate was 91.4% during the year. ProVita progressed with its 30 bed expansion during 2015 and the facility subsequently commenced operations on 1 March 2016.

A year-on-year comparison is not presented above for this vertical, as the entities were acquired in FY 2015.

ProVita, which was acquired with a 'locked-box date' set to be 1 April 2015, was consolidated from 1 September 2015. For Americare the 'locked-box' date set to be 1 January 2015 and it was consolidated from 1 May 2015.

## OPERATION & MANAGEMENT

NMC Health continued to operate and manage the 205-bed Sheikh Khalifa General Hospital in Umm al-Quwain on behalf of the UAE Ministry of Presidential Affairs since Q4 2012.

NMC has a five year contract to operate this hospital in return for an annual management fee based on qualitative metrics. This is the first such contract to manage a large Government healthcare facility awarded by a Government Department to a local UAE business, demonstrating confidence in NMC's significant healthcare experience and capabilities.

The total revenue contribution from this contract reached US$6m in 2015, with year on year growth of 5%.

## DISTRIBUTION DIVISION

Over the past 40 years, NMC has developed one of the largest product portfolios in the UAE with around 90,000 SKUs, and is the exclusive wholesaler of mainly globally established and branded healthcare products and equipment. Our distribution division operates across the entire UAE through a network of five warehouses and three sales and marketing offices strategically located in the major cities and a fleet of 221 vehicles ensuring timely distribution.

Division revenues were US$393.4m in 2015, up 16.1% year on year. Meanwhile, EBITDA increased by 26.4% to US$43.5m, resulting in an EBITDA margin of 11.1% (2014: 10.2%).

22   NMC Health plc Annual Report and Accounts 2015

The FMCG segment (+13.6% year on year) remained the largest contributor to the distribution division, however, the fastest growth came from the Education material (+29.2% year on year) and Scientific (+18.0% year on year) segments. Pharmaceutical revenue increased by 24.1%, in contrast, Veterinary segment declined by 5.9%.

Recent distribution agreements added to our portfolio are agreements with HBG General Trading LLC, Lotus Herbals Middle East (FZE), Nestle UAE LLC (only infant products), Otometrics A/S, SCA Hygiene Products AB, SCHILLER AG.

**IT**
As previously announced, NMC Health is implementing a capital investment programme in two new primary IT systems which will enhance the Group's ability to plan, manage, monitor and report on its operations and financials:

**A. HOSPITAL INFORMATION SYSTEM (HIS).**
Continuing developments in the regulatory framework in the UAE healthcare system, as well as additional monitoring and reporting requirements which the Group requires as the business grows, led to NMC's decision to implement a new HIS.

NMC is implementing a third party system which is already operating successfully within the UAE regulatory structure. Following a successful pilot phase, the new system is being rolled out in the major UAE based facilities and roll out across the Group is expected to be completed by end of Q2 FY 2017.

**B. ENTERPRISE RESOURCES PLANNING (ERP) FINANCIAL SYSTEM**
Management have taken time to ensure that all previous business processes are captured within the new IT systems. The roll out of the new ERP system into the Healthcare division, whilst delayed during the initial execution of the Group's strategic growth plan due to the challenges faced by the group during initial testing phase, however now the same is well underway across the Group and the final testing phase is in progress. In addition to the growing nature and structure of the Group, there have also been challenges in relation to the roll out of the ERP system into the Distribution division as a result of the volume and types of transactions to be captured. The Group has now finalised a time schedule for final roll out of the ERP system for both healthcare and Distribution division. This schedule indicates the commencement of final roll out across the Group beginning in Q3 2016, and given the number of business units involved, is due for completion in Q2 2017.

The investment in new information technology will help to reduce an element of manual intervention and improve reporting, and therefore will further enhance the company's internal control environment.

The company has spent a total amount of US$4.5m as of 31 December 2015 on the Hospital Information System (HIS) and the Enterprise Resources Planning (ERP) financial system.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice    27 of 166    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

# Financial review

FY 2015 was a transformational year for NMC Health Plc. with the new facilities opened during FY 2014 continuing to ramp up well and the Group embarking on acquisitions in the key verticals within the healthcare space, both within UAE as well as overseas.

The Group delivered a robust performance in 2015 both at the overall and at the divisional level primarily due to strong inpatient and outpatient performance at our existing hospitals and medical centres including the new ones commissioned during the previous years.

The acquired assets over the fertility and mother care space, homecare and long term care segments as well as the chains of clinics and pharmacies in the emirate of Sharjah delivered performance in line with expectation.

Consolidated Group Revenues increased from US$643.9m in FY2014 to US$880.9m in FY2015, a growth of 36.8% of which 24% was achieved organically with the remaining 12.8% growth resulting from the transformation strategy of the group through acquisitions.

After elimination of US$29.7m of intra-group revenues, Consolidated Group EBITDA improved from US$102.5m in FY2014 to US$150.3m in FY2015, a growth of 46.7%.

Group Net profit reached US$85.8m in FY2015, yielding Earnings per share (EPS) of US$0.443 compared to US$0.412 for the same period in 2014. Adjusted earnings per share were US$0.506 compared to US$0.412 for the same period in FY 2014.

## HEALTHCARE DIVISION

Revenue in the Healthcare division continued to witness improved performance from US$332.2m in FY2014 to US$517.1m in FY2015, a growth of 55.7% of which 30.9% was achieved organically with the remaining 24.8% of growth coming from acquired assets.

EBITDA improved from US$89.1m in FY2014 to US$137.0m in FY2015 recording a growth of 53.7%. EBITDA margins were at 26.5% (26.8% in FY 2014). The proforma EBITDA of the acquired assets would have been US$14.8m higher had we consolidated these assets from the date of the 'locked box' arrangement rather than the date of effective control. The locked box date is the date from which the acquirer obtains the economic ownership of the targeted business, before it legally controls that business.

Newly commissioned facilities, Brightpoint Royal Women's Hospital, NMC General Hospital LLC, Dubai Investment Park and NMC Day Surgery Centre LLC, Mohammed Bin Zayed City performed above expectation in terms of revenues, EBITDA and cash flows.

During the year, the Group acquired Luarmia, Americare, Dr Sunny Healthcare Group and ProVita as part of its new Growth Strategy to grow an integrated multi-vertical and multi-brand healthcare network across several geographies.

All the above acquisitions have a positive impact on the group revenue, EBITDA and cash flow.

## DISTRIBUTION DIVISION

Within the Distribution division, revenues increased from US$338.9m in FY2014 to US$393.4m in FY2015, a growth of 16.1%. EBITDA increased from US$34.4m in FY2014 to US$43.5m in FY2015, a growth of 26.4%. EBITDA margins grew by 90bps, 11.1% in FY2015 (10.2% in FY2014).

The positive macro-economic environment in the country coupled with new agencies, customer tie-ups and cost efficient operations contributed to better performance in terms of revenue and margins.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          28 of 166          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

**CAPITAL EXPENDITURE**

Capital expenditure incurred for the year was US$81.7m (FY2014: US$112.3m). This encompassed US$63.7m on the Group's capital projects. The Group also incurred US$18m on equipment required across the existing operations.

The Company was able to capitalise certain expenses, in accordance with IFRS and the Company's accounting policies. We expect this to continue in relation to costs (for example lease costs) arising during the construction of future projects. Although pre-operating expenses were nil in the year to 31 December 2015, we expect a small level of pre-operating costs which will be expensed in the 2016 financial year as a result of the opening of our new facility, NMC Royal Hospital, Khalifa City.



**BUILDING CAPABILITIES**

# Products & consumables

SKUs

## 90,000

Today NMC has Around 90,000 SKUs sold across the UAE through its over 1,948 divisional staff, five warehouses with a total of over 500,000 sq feet of storage and 221 delivery vehicles. Around 98% of our SKUs are imported and sold exclusively in the UAE by NMC to retailers.

Our strategy in the distribution division remains focused on investing in our people, logistics and strategic regional and global relationships with key principals.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice        29 of 166            Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

Strategic Report

# Financial review
## continued

As a result of the delays in the opening of certain facilities, additional costs in respect of loan interest and leases have been capitalised. Had these facilities opened in line with original plan these costs would have been expensed. Other than these items the delays have not resulted in an increase in budgeted capital costs.

A table outlining original estimated capital expenditure and other budgeted costs for each of our capital expenditure projects is set out below.

### ACQUISITIONS

During the year we completed and announced a number of transactions, some of which had a material impact on our results during the period. These transactions reflect our focused expansion strategy and total consideration paid for all the acquisitions was US$429m.

For detailed discussion on the acquired assets, please refer to the Business Combinations note (note 5) of the financial statements.

### CASH

Net cash inflow from operating activities for the 2015 financial year was US$84.1m, compared with US$85.7m for the comparative period in 2014. This was mainly due to the increase of working capital requirements on account of newly started facilities despite an increase in the revenues.

Including funds held on deposit, cash as at 31 December 2015 amounted to US$177.4m compared to US$263.2m at the end of FY2014. The company had allocated the funds raised through the IPO as well as through the syndicated loan against the capital cost of the five expansion projects announced during the IPO. The Company has completed four of these capital expenditure programmes as at 31 December 2015. The last of the capital expenditure program, NMC Royal Hospital in Khalifa City, Abu Dhabi commenced partial out-patient operations in September 2015 and initiated full services in March 2016.

As expected, the Group had a net debt position of US$553m at 31 December 2015 compared with US$113.0m at 31 December 2014. As the Group completed its capital project development program and embarked on acquisitions, the group utilized the new syndicated loan facility during the year and hence the level of net debt has increased during FY2015.

The company has assessed all significant capital expenditure projects including NMC Royal Hospital, Khalifa City for indicators of impairment and have concluded that the projects have sufficient headroom and that none of the assets are impaired.

### MOVEMENT IN NET DEBT

The movement in cash and the level of capital expenditure have had a significant effect on the movement in net debt during the 2015 financial year. A summary of the principal drivers is shown in the table below.

### WORKING CAPITAL

Working capital for our two operating business divisions is funded differently due to the nature of their business models. The Group is able to fund its working capital requirements for its Healthcare division from operational cash flow, and we do not expect this position to change in the 2016 financial year.

| (All US$m) | Budget | Actuals | | | |
|---|---|---|---|---|---|
| Project | Budgeted Capital Costs | Capital Costs | Capitalised Expenses (note 1) | Accounting adjustment for lease rentals | Total Capital Costs |
| Brightpoint Royal Women's Hospital | 70 | 79.6 | 6.5 | 28.3 | 114.4 |
| NMC Royal Hospital, Khalifa City | 200 | 142.8 | 8.8 | – | 151.6 |
| NMC General Hospital, Dubai Investment Park | 30 | 28.4 | 2.6 | 5.8 | 36.8 |
| Bateen Royal Clinic | 2.1 | 1.3 | – | 0.8 | 2.1 |
| Total | 302.1 | 252.1 | 17.9 | 34.9 | 304.9 |

Notes
1:  Prior to commencement of development of the existing four capital projects, management had an expectation that there would be an element of expense incurred before the new facilities were opened which would be written off through the Income Statement. Following a review certain of these costs have been capitalised in line with the Company's accounting policies (for example lease rent paid and finance costs).
2:  The lease in respect of Brightpoint contains a rent free period as well as specified rent increases. In line with IFRS and the Company's accounting policies, the rental cost of the lease has been adjusted to appropriately account for these items over the length of the lease. Accounting policies stipulate that the total lease value for the full lease period is divided evenly over the years.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          30 of 166          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

In relation to our Distribution division, the working capital requirement is dependent on a number of factors including the timing of receipt of debtors and the timing of payment of creditors as well as inventory flow during the year and the timing of reimbursement of promotional expenses agreed with our Principals in relation to the sale and marketing of their products. The Distribution division requires external working capital facilities throughout the year, the level of which is dependent on business seasonality. These working capital facilities are arranged through a number of banking providers and in general terms the level of working capital required is between 20%-30% of the Group's total debt facilities.

### LONG TERM DEBT FACILITIES

In 2015, the Group concluded an agreement for a new 5 year syndicated loan facility. The US$825m facility was structured in two tranches: 1) US$350m of term debt, this was utilised to refinance the existing higher cost debt; and 2) US$475m delayed drawdown acquisition facility to support NMC's capabilities focused strategy in making accretive acquisitions. NMC expects to achieve an aggregated saving of US$10m in respect of finance costs during this loan tenure. A total of US$513.7m has been drawn down from this facility as at 31 December 2015.

The total debt of the Group, excluding accounts payable and accruals, was US$730m as at 31 December 2015 compared to US$376m as at 31 December 2014.

### FINANCE COSTS AND INCOME

Total finance costs for 2015 were US$23.8m compared to US$14.5m in 2014. This was mainly on account of the higher facility amount availed to refinance the existing debts as well as to finance the acquisitions. Though the new facilities carried a relatively lower finance charge as the same was secured on better terms compared to the earlier facility, the increase in the quantum of the funds drawn resulted in higher finance costs.

As part of the Group's capital expenditure programme, borrowing costs of US$1.7m (2014: US$4.1m) have been capitalised during the year. The rate used to determine the amount of borrowing costs eligible for capitalisation was 2.1% (2014: 3.15%) which is the effective rate of the borrowings used to finance the capital expenditure.

### DIVIDEND

The Board is proposing to continue with its policy of annual dividend payments of between 20% and 30% of profit after tax, outlined in the Company's IPO prospectus in 2012. The Board is therefore recommending that a final dividend of 6.2 pence per share be paid in cash in respect of the year ended 31 December 2015 (FY2014: 5.4 pence per share).

Subject to approval of the shareholders at the company's annual general meeting on 03 June 2016, the dividend timetable is as follows:

Ex-dividend date - 19 May 2016
Record date - 20 May 2016
Payment date - 20 June 2016

### MOVEMENT OF NET DEBT (AMOUNTS IN US$M)

| | | | | | |
|---|---|---|---|---|---|
| Total Debt as at 1 January 2015 | 376.1 | Total Cash as at 1 January 2015 | 263.1 | Net Debt as at 1 January 2015 | 113.0 |
| Add: | | Add: | | | |
| New syndicated Loan drawdown | 513.7 | | | | |
| Other Bank facilities & refinancing (Net Movement) | 7.0 | Operational cash inflow | 84.1 | | |
| | | New syndicated Loan drawdown | 513.7 | | |
| | | Other Bank facilities & refinancing (Net Movement) | 7.0 | | |
| | | Finance Income | 0 | | |
| | | | 605.7 | | |
| Less: | | Less: | | | |
| Old syndicated Loan Repayments | 166.6 | Payment for Acquisitions | 379.9 | | |
| | | Old syndicated Loan Repayments | 166.6 | | |
| | | Additions & Disposals to Property | 79.3 | | |
| | | Finance Costs | 23.8 | | |
| | | Dividends Paid | 15.9 | | |
| | | Others | 25.9 | | |
| | | | 691.4 | | |
| Total Debt as at 31 December 2015 | 730.3 | Total Cash as at 31 December 2015 | 177.4 | Net Debt as at 31 December 2015 | 552.9 |

Exhibit 4 to B.R. Shetty's Request for Judicial Notice    31 of 166    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

Strategic Report

# Corporate social responsibility

We believe that a crucial and important criterion of how an organisation operates and how its success and development is measured is the way in which it fulfils its responsibilities both within and outside its businesses, its Corporate Social Responsibility (CSR). The level of an organisation's CSR can be gauged by studying a company's impact in five areas, namely environment, community, profession, marketplace and workplace.

## THE CSR PRINCIPLES

Since our Group was founded, NMC has been committed to practising a strong professional and social responsibility to its community. The NMC Healthcare vision statement reflects our fundamental desire "to be the trusted healthcare provider in UAE and abroad". Our original strong sense of community has developed a strong social responsibility and has helped us to become the largest and leading private healthcare provider in the UAE.

This tenet is also reflected in the UAE by His Highness Sheikh Khalifa Bin Zayed, President of the United Arab Emirates, in the desire to "mobilise and direct efforts to promote the social responsibility concept, so it can become an officially sanctioned approach, culture and practice".

## NMC'S GENERAL APPROACH TO CSR

NMC takes very seriously its social responsibility and supports the report of the International Bioethics Committee of UNESCO on Social Responsibility and Health. This report interprets social responsibility and healthcare delivery as both "passive" and "active" in how to manage internal operations and the impact of activities on the community and environment.

At NMC we engage in "passive" social responsibilities by complying with all regulatory requirements and general ethical standards, such as:

- respecting human rights;
- non-discriminatory work practices;
- protecting privacy rights that improve society;

- strict adherence to Anti-Bribery, Anti-Corruption, Gifts and Entertainment Policy by having a zero tolerance to such behaviour regardless of the identity or position of the originator or recipient of a bribe;
- welcoming patients from all segments of society, nationalities and income levels; and
- having environmental policies and practices that protect our society and environment.

We are also committed to "active" social responsibilities that go beyond legal obligations and general ethical standards. We actively pursue the interests and values of individuals and the local and global community and environment. These 'moral obligations' include:

- actively promoting preventive health programmes designed to improve the health and quality of life of residents;
- funding and making publicly available the annual Health Index for the UAE; and
- introducing best practice environmental management.

These all contribute to the common good of people, the community and the environment.

## OUR DIVISIONAL FOCUS ON CSR

At NMC we deliver quality healthcare based on evidence-based international best practices and we provide a targeted preventive healthcare programme designed to prevent medical conditions and chronic diseases. The health of our patients and residents of the UAE is our core business, and underpins our CSR programme.

NMC Trading, our distribution arm, also resonates this focus on CSR as it continues on its journey "to establish businesses that enhance stakeholders' prosperity" while continuing "to fulfil social obligations of the nation". NMC Trading's efforts towards being a responsible corporate citizen were recognised by the Dubai Chamber at their CSR Ceremony in 2015.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          32 of 166          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

## RESPONSIBILITY TO THE GLOBAL AND LOCAL ENVIRONMENT
### "THINK GLOBAL, ACT LOCAL"

We have made good progress in the consideration of our local and the global environment, and our particular emissions challenges, in 2015.

### OUR ENVIRONMENT AND ITS CHALLENGES

The extremely hot and humid weather leads to the UAE being one of the highest per capita greenhouse gas emitters globally. The use of gases and refrigerants is extensive, not only in the UAE as a whole, but also to ensure the most appropriate environment within which to treat and care for our patients, maintain our food and pharmaceutical stocks safely and to care for the welfare of our employees.

Our strategic expansion program is also providing challenges for us in relation to our reported emissions. Due to our new healthcare businesses becoming operational for the first time, the low occupancy rates in these new facilities during their ramp-up phases, results in abnormally high average power/fuels consumption per patient. This produces some emissions spikes as highlighted in our reported numbers and discussed below.

We address these challenges positively with a number of new and continuing initiatives to reduce our emissions and care for our environment.

### INITIATIVES IN 2015

We have started and continued a number of emission and waste reducing initiatives in 2015:

- Pilot Environmental Management Committee;
- Installation of GPS trackers in our distribution fleet; and
- More regular reporting and review of our emissions.

### GREENHOUSE GAS EMISSIONS
### OUR GREENHOUSE GAS EMISSIONS

Our greenhouse gas reporting covers the 12 month period of 1 October 2014 to 30 September 2015. This reporting period enables us to collate and review the data in timely manner ahead of the annual report and accounts.

We have applied an operational control approach in presenting our GHG emissions, and have reported on all material emission sources within scope 1 (combustion of fuel from operation of facilities and usage of vehicles) and scope 2 (purchased electricity and cooling). Gas and electricity usage information has been obtained from purchase invoices.

Vehicle fuel usage is based upon purchase invoices. Where NMC is not directly billed for the consumption of power and therefore does not have full visibility of the data, an estimation using average consumption from other similar sites has been applied.

### NEW FACILITIES

Given the abnormally high power/fuels consumption per patient in our new facilities as described below, and the number of newly acquired entities that have joined the Group in 2015, we have made the following decisions in our policy for emissions reporting to ensure that we monitor like for like emissions performance:

- Since Q3, 2014, three developed facilities became operational:
  - NMC General Hospital, DIP;
  - Al Wadi Medical Centre; and
  - Brightpoint Royal Women's Hospital.

We have included in our reported data above our emissions both including and excluding these entities. The primary reason for this is due to the average patient occupancy rates being much lower during the ramp-up phase of these entities which results in significantly higher average emissions per patient intensity ratio than would be expected when sites are more fully operational.

### GREENHOUSE GAS EMISSIONS (TONNES $CO_2E$)

| For the 12 months to 30 September | Healthcare Comparable Data (note 1) | | Healthcare Reported Data (note 2) | | Distribution | | Total | |
|---|---|---|---|---|---|---|---|---|
| | 2014 | 2015 | 2014 | 2015 | 2014 | 2015 | 2014 | 2015 |
| Scope 1 emissions (note 3) | 3,678 | 3,879 | 3,685 | 4,168 | 4,433 | 4,274 | 8,118 | 8,442 |
| Scope 2 emissions (note 4) | 20,423 | 20,323 | 21,313 | 27,972 | 5,786 | 5,452 | 27,099 | 33,424 |
| Total GHG emissions | 24,101 | 24,202 | 24,998 | 32,140 | 10,219 | 9,725 | 35,217 | 41,866 |
| GHG emissions intensity a - tonnes CO2e/1,000 patient b - tonnes CO2e/1,000 orders | 9.80[a] | 9.14[a] | 10.2[a] | 11.5[a] | 27.8[b] | 25.6[b] | | |
| GHG emissions intensity by revenue - tonnes CO2e/1,000 dollar | 0.076 | 0.063 | 0.078 | 0.079 | 0.031 | 0.026 | 0.054 | 0.054 |

Notes:
1. Comparable data for 2015 excludes the newly opened facilities detailed in note 10 below as well as any entities acquired during 2015.
2. Reported data includes the new opened facilities as detailed in note 10 below but excludes any entities acquired during 2015.
3. Scope 1 = direct emissions from fuel combustion and industrial processes. At our facilities this takes the form of gas for heating, diesel and petrol for the fleet and diesel for generators.
4. Scope 2 = indirect emissions from the generation of purchased electricity and cooling.
5. The GHG emissions reporting is in line with the GHG Protocol developed by the World Business Council for Sustainable Development, and additional guidance issued by the UK Government Department for Energy, Food and Rural Affairs ("DEFRA"). The emissions have been calculated using carbon conversion factors published by DECC/DEFRA in May 2015.
6. The total Scope 2 emissions have been reported in accordance with the 'location based' method which uses grid average emissions factors of the UAE where all entities under the reporting scope are located. There are no energy certificates or supplier-specific information available, therefore, the 'market based' method is not applicable here.
7. Conversion factors applicable to the UAE for Scope 2 have been obtained from the publication IEA $CO_2$ Emissions from Fuel Combustion (2012 edition).
8. A conversion factor for Sevoflurane was not available from DEFRA so an epa.gov greenhouse gas reporting figure was used.
9. We have restated the 2014 emissions data to take account of the change in reporting period from 31 December to 30 September and also changing from estimated consumption to actual data. In summary Healthcare scope 1 emissions for 2014 increased by 228 tonnes $CO_2e$, Distribution scope 1 emissions decreased by 166 tonnes $CO_2e$ and Distribution scope 2 emissions increased by 897 tonnes $CO_2e$.
10. During Q3-2014 and the 2015 period, a number of entities became operational. These entities include: NMC General Hospital, DIP, Al Wadi Medical Centre and Brightpoint Royal Women's Hospital. The exclusion of these entities from our total emissions provides a comparable position to the prior year data as the average patient occupancy rates during the start-up phase is low.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice        33 of 166        Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

# Corporate social responsibility
continued

We believe that this is an appropriate and transparent way to report our data so as to show a more accurate like for like comparison to the prior year.

- Any new facilities and businesses acquired during the year under review are not included in reporting for that year. Therefore we have not included any of the acquisitions which the Group has made in 2015. All of these facilities have commenced data collection and monitoring with effect from 1 October 2015.

## EMISSIONS REPORTING WORKSHOPS
We have held the following workshops for our businesses during the year:

- For those businesses operational at the start of the reporting year, we held workshops to discuss:
  - the data reporting process and to share good practice between the businesses;
  - requested changes to the detailed data reporting procedure manual put in place in early 2015; and
  - Initiatives that the different businesses have in place to reduce emissions.

- For new businesses opened or acquired during the year, the focus of the workshop was:
  - Orientation to the greenhouse gas emissions reporting program;
  - A review and launch of the new procedure manual in the respective businesses; and
  - To share the experiences of our other businesses at the commencement of our emissions reporting program.

## CONTINUINGLY IMPROVING OUR ENVIRONMENTAL PERFORMANCE
As most of our operations are in the UAE, we are actively progressing initiatives to reduce our emissions to align with the UAE Vision 2021 - a green economy for sustainable development. The primary sources of our GHG emissions relate to the use of fuels in vehicles in our distribution business and electricity consumption in our hospitals and some of our initiatives focus on these areas and are set out below:

- Environmental Management Committee: In 2015 we established a pilot Environment Management Committee within our more established Abu Dhabi Specialty Hospital with specific responsibilities for developing emission reduction initiatives and having oversight of their implementation. We will be considering the development of similar committees in other facilities during 2016.
- Tracking and monitoring: Fuel use in our vehicles, especially in NMC Distribution, is a major source of carbon emissions ("scope 1"). We have installed GPS trackers in our extensive vehicle fleet during 2014 and 2015 so that we can route them efficiently as possible without having an adverse impact on customer delivery schedules.
- Awareness and training: All our drivers are being provided with training sessions on managing fuel consumption and identifying inefficiencies. Furthermore we are replacing our older vehicles with newer models that are more environmentally efficient.
- Greenhouse gas emissions reporting: We continue to collate and evaluate our energy consumptions and greenhouse gas emissions across all our businesses. The information is collated and reviewed on a regular basis as are the various emission reduction initiatives that are being developed and implemented.
- New Facilities: As noted above, when our new healthcare businesses become operational for the first time, the average power/fuels consumption per patient can be high due to the low occupancy rates in these new sites. We are now looking at ways to make improvements to these operations so that consumption at low occupancy facilities can be reduced.

As a result our overall greenhouse gas emissions intensity has decreased well during the year in both our Distribution business and, on a like for like basis, in our Healthcare businesses. We take our role as a corporate citizen seriously and therefore we continually review our operations and the impacts they have in the communities we operate.

## WASTE MANAGEMENT, REUSE AND RECYCLING
Environmental Management and Environmental Procurement Policies and Action Plans have been prepared to manage hospital wastes and consumption of resources according to Best Practices. Patients are also being educated in safe ways of disposing of medications. The Environmental Procurement Policy gives preference to products that:
- reduce Greenhouse Gas Emissions;
- are more energy efficient;
- reduce the use of chemicals that are hazardous to the environment;
- reduce air and water pollution;
- reduce waste;
- are re-usable;
- have multiple functions; and
- are recyclable or biodegradable.

NMC is also keen to stimulate new local green waste management and recycling industries that are emerging in the UAE.

NMC has also provided an online platform on our intranet portal known as "classifieds" for staff to sell personal belongings. This initiative facilitates the re-use of personal possessions, such as household goods, furniture and equipment.

NMC Trading has also been contributing towards waste management by ensuring that the waste disposal activities are carried out in coordination with Registered Waste Transporters. Besides this, employees are constantly educated as to their impending responsibility to the environment by recycling of waste, on-going awareness campaigns, participation in Clean-up drives and quarterly environmental newsletters.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice    34 of 166    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

### ENVIRONMENTAL AND SOCIAL MANAGEMENT (PROVITA)

ProVita has a dedicated Environmental and Social Management (E&S) resource (provided by E&S Consults, a third party consultant) who supervises the integration of E&S aspects and ensures that E&S issues are identified, monitored and addressed. ProVita's approach to E&S is based on promoting sound environmental and social practices while contributing to positive development impacts through adopting and complying with globally recognized standards and guidelines such as those of International Finance Corporation (IFC).

### CLEAN-UP UAE CAMPAIGN (NMC TRADING AND AL AIN SPECIALTY HOSPITAL)

NMC Trading and Al Ain Specialty Hospital, in association with the Emirates Environmental Group, conducted the Clean-Up UAE Campaign. In Al Ain over 500 people from schools and corporations participated in the event, which was conducted in the Al Ain desert

### RESPONSIBILITY TO THE GLOBAL AND LOCAL COMMUNITY

NMC Health has always been at the forefront of building a healthier society and a safer future for generations to come. This section focusses on some key examples of how the Group is continuing this focus.

### NMC HUMANITARIAN AID TO NEPAL

In April 2015, Nepal suffered one of the most severe earthquakes in recent times that had a devastating effect on the capital Kathmandu. NMC Healthcare donated US$ 500,000 worth of medical supplies that were airlifted into Kathmandu in May 2015. The aid included antibiotics, painkillers, general antiseptics, first aid kits, surgical equipment and rehabilitation material such as crutches and braces. NMC employees additionally donated foodstuff and clothing to a relief program organised by the Emirates Red Crescent for Nepal. Clinica Eugin also participated in a fund raising campaign for the victims of the earthquake in Nepal.

### NMC HUMANITARIAN PARTNERSHIP WITH THE UAE GOVERNMENT

NMC has a close partnership with the UAE government. In 2015, NMC worked closely with humanitarian organisations within the UAE Government to provide medical aid to countries like Libya, Yemen and Malawi. NMC also provided surgeries for under privileged individuals in the UAE.

### PROMOTING SOCIAL INCLUSION (PROVITA)

ProVita cooperated with local charity organizations like Zayed Humanitarian Organization and Red Crescent to encourage the integration and acceptance of people with special needs at the community and national level.

### SOCIAL ACTION CAMPAIGNS (CLINICA EUGIN)

Clinica Eugin partners with the Fundación Esclerosis Múltiple (FEM), a Spanish foundation that aims to improve the quality of life of patients with multiple Sclerosis. Eugin has participated in fund raising activities for the foundation by organising and participating in campaigns like "Apple for Life" and "Swim & Run for Sclerosis".

### FOR THE JUNIORS (CLINICA EUGIN)

Eugin received three high school students for the program "Partners for one day". The goal was to show these students our "working day" in order to help them in their professional orientation.

Eugin's employees participated in a toy collection campaign for Sant Joan de Deu's Hospital Foundation. Maria is one of the children that received the toys donation.

### NMC ANNUAL HEALTH INDEX FOR THE UAE

The NMC annual Health Index for the UAE is one of the most important and unique initiatives of our CSR programme that strengthens our efforts to create a healthier society. The Health Index profiles the health of UAE residents and provides trending data for the development of hospital and public policy. The Health Index assesses the physical, social and emotional wellbeing of UAE residents and provides an overall index of the health of a nation. The findings of the Health Index allow NMC to provide the most appropriate public health education and screening programmes that best benefit the health and lifestyles of UAE residents. The Health Index also provides information that facilitates the formulation of a strategy that addresses the perceived and actual health issues in the UAE.

### Health Index Key Findings

- The physical health index has remained broadly consistent, and many of the aspects we use to measure physical health such as Body Mass Index, levels of physical activity, diet (consumption of fruit, vegetables and soft drinks) and levels of sick leave have also remained consistent with 2014.
- Three in ten (31%) residents in the UAE have been diagnosed with one or more non-communicable diseases which is broadly consistent with 2014 (26%).
- As in 2014, the most common diseases are high blood pressure (10%), obesity (8%), raised cholesterol (7%) and Type 1 Diabetes (6%).
- As in 2014, one third (33%) of UAE residents have visited their doctor in the last three months. Three quarters (74%) have seen their doctor at some point in the past year (up from 69% in 2014).
- Half of women in the UAE (51%) have undergone a blood pressure test in the last six months; smaller proportions of women have had general physical exams, pelvic exams and breast exams in the same period. Four in ten women (41%) have never had a breast examination and over one third (36%) have never had a pelvic examination.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          35 of 166          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

Strategic Report

# Corporate social responsibility
continued

Diagnosis with non-communicable diseases



% of respondents who say they have been diagnosed with

2014    2015

## Lifestyle Choices identified through the Index

- 24% smoke tobacco.
- 35% of residents get the recommended 7-8 hours' sleep each night.
- 33% of residents exercise less than once a week.
- 3% eat the recommended five or more portions of fruit and vegetables per day.
- 82% of residents consume carbonated or sugary drinks on a weekly basis. Two in five (43%) say they drink 1-2 such drinks a week, while 8% consume seven or more drinks per week.

### HALABABY AND MAMACARE PRENATAL EDUCATION PROGRAMMES
"HalaBaby" is Brightpoint Royal Women's Hospital's (BRWH) award winning prenatal education programme. "Hala" in Arabic means "welcome". The Halababy programme is offered free of charge to mothers-to-be from their first prenatal visit through to the delivery of their baby.

BRWH became an innovative reality for the women of Abu Dhabi as the first private women's hospital when it opened in July, 2014 and had its first delivery in May 2015. Since its inception BRWH has put women and children at the centre of the planning process in a consultation programme designed to identify the expectations of women.

These expectations have been incorporated into the design and development of BRWH and into the way the hospital delivers its healthcare services to women. "HalaBaby" is the result of a comprehensive consultation and research programme and is designed to exceed the expectations of mothers-to-be and healthcare Best Practices and to improve the chances of a healthier pregnancy, birth and baby.

Other NMC Hospitals throughout the UAE also offer the MamaCare Prenatal programme free of charge to mothers-to-be. This programme started at NMC Specialty Hospital, Abu Dhabi and proved so popular that it has now been expanded to Al Ain and Dubai Specialty Hospitals. The programme actively seeks participant input and has been improved to reflect patient suggestions, such as being more interactive and hands-on.

The Brightpoint 'HalaBaby' - Maternal Education Programme was awarded the Best Customer Education programme in the UAE.

### GOING ABOVE AND BEYOND MEDICAL CARE (PROVITA AND AMERICARE)
NMC does not restrict itself to providing medical care to its patients but always tries to ensure that the patients can lead fulfilling lives ahead. Over the years we have enabled our patients to lead extraordinary lives after recovering from life threatening situations.

ProVita fits very well with our legacy of enabling cardiac patients to run marathons, and stroke survivors to climb mountains. Long-term residents need more than medicine - they need physical, psychological and social care. This is why ProVita provides a 'holistic' approach - a multifaceted care programme that incorporates social services, physicians, nurses, therapists, family and social interaction. Every resident is approached as a unique individual to understand the deeply personal and social needs of each resident because the social and psychological aspects of care are an important part of everyday well-being. Some patients greatly benefit from being outdoors or in the community, whilst others often prefer the comfort of a close family environment or the stimulation of music or peaceful prayer. ProVita's approach has helped patients who were bound to ICUs to pursue their education and interests and develop into artists and contributing citizens.

Americare follows a similar approach to healthcare by providing holistic services that encompass health promotion and teaching, curative intervention, rehabilitation support and maintenance, social adaptation and integration and support for the patient and family and appointed caregivers.

### PREVENTIVE HEALTHCARE AND AWARENESS PROGRAMMES AND THE USE OF SOCIAL MEDIA
Community outreach and preventive health programmes are one of the ways NMC contributes towards enhancing the health of our society and nation. Quality healthcare is always a priority, and we undertook over 200 community initiatives during 2015 including, blood donation camps, health awareness programmes, free health screenings and hygiene workshops among others.

In the UAE, 37% of deaths are caused by cardiovascular diseases which are due to poor diet, exercise and smoking. These medical conditions are preventable by modifying lifestyle choices. The 2015 NMC Health Index shows that 68% of residents believe they have only 'some', 'little' or 'no' control over their lifestyle.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice     36 of 166     Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

Overview    Strategic Report    Governance    Financial Statements

NMC uses social media platforms to promote accurate healthcare information and patient empowerment.

- Our Facebook page provides interactive information relating to health and wellbeing such as the Diabetes Risk Assessment, Stress Assessment and NMC Health Index Survey.
- Our YouTube videos promote awareness about health and wellbeing and the information is presented in a format that is easily consumed and beneficial to the users.
- Our Twitter account provides an interactive real time social media channel to connect users directly with healthcare professionals and the customer experience team.
- Our LinkedIn account provides a social networking platform to distribute information about NMC as an employer. Users can connect with the NMC brand and browse the available job opportunities.

**COMMUNITY SCREENING AND OUTREACH PROGRAMMES**

Each year NMC actively undertakes screening programmes. In 2015 we reached over 25,000 UAE residents. The basic cardiovascular (CV) screening programme includes screening of Blood Glucose Levels, Blood Pressure and Body Mass Index for overweight/obesity and cholesterol levels. These simple tests can diagnose or predict the risk of developing the three major chronic diseases of hypertension, diabetes and obesity which are the precursors to cardiovascular disorders. Preventing or slowing down the progress of these diseases saves lives and improves Quality of Life.

NMC's preventive healthcare programme in the UAE extends to providing free health checks and screenings with regulatory bodies, insurance companies and corporates, such as polio, diabetes, cancer, immunizations and blood donations.

In line with the parent company, our acquisitions have also taken an active part in conducting community outreach programs. Dr Sunny Healthcare conducted seven free medical camps during the year, reaching out to more than 15,000 residents.

**GLOBAL HEALTH AWARENESS EVENTS**

'Prevention is always better than cure'. NMC actively supports global public health awareness campaigns such as: cervical, breast and prostate cancers, vaccinations, breast feeding, dental care, obesity, kidney stones etc. NMC conducts these health awareness campaigns throughout the UAE. With a pan-UAE presence, NMC covers a wide demographic profile in raising awareness in health campaigns. Throughout the year, NMC and Dr Sunny Healthcare have conducted radio talks and TV shows by our Doctors on various local channels on medical subjects to create and spread awareness.

**Cervical Cancer (January 2015)**
Cervical cancer awareness month was observed in the month of January. During this time NMC undertook various activities to raise awareness regarding the second most common cancer in females. Furthermore, NMC conducted educational lectures and seminars in various corporate organisations.

**World Brain Injury Awareness Month (March 2015)**
ProVita provided educational sessions to help improve knowledge of residents, families and staff to raise awareness about the causes, symptoms, prevention strategies, and available treatment options related to brain injury.

**World Immunization Week (April 2015)**
ProVita educated residents, their families and the wider community on the benefits of vaccination through a campaign during the World Immunization Week.

**World Hepatitis Day (July 2015)**
Dr. Sunny Healthcare conducted several outreach programs during the month and provided special packages for investigations to raise awareness about hepatitis.

**World Breastfeeding Week (1 - 7 August 2015)**
Every year breast feeding week is celebrated to raise awareness on benefits of breastfeeding and promote healthy habits. This year Brightpoint Royal Women's Hospital took up various activities to raise awareness and promote breastfeeding, such as, awareness postings on Facebook, patient education brochure "About Breastfeeding" and radio interviews with health professionals answering breastfeeding questions on air.

**World Heart Day (September 2015)**
NMC observed various community outreach screening programmes for preventive cardiac diseases throughout the month of September. A cardiology Continuing Medical Education program for doctors was also organised. A special programme on Thalassemia in association with the Dubai Health Authority was conducted in Latifa Hospital to create awareness on cardiovascular ailments on Thalassemia patients. Dr Sunny Healthcare played their part during the World Heart Day campaign by providing special packages to the residents.

**Breast Cancer Month (October 2015)**
During October NMC conducted more than 40 camps to create awareness on breast cancer. These camps were planned at various corporates, female groups, associations and colleges. Doctors delivered talks in corporates to raise awareness and provided them with the techniques to do self-breast examination.

**World Diabetes Month (November 2015)**
UAE has one of the highest number of diabetics per capita in the world. As part of the World Diabetes Campaign 2015, NMC Hospitals conducted a diabetes screening programme and identified 1076 patients for diabetic retinopathy screening where 313 were found positive. The retinal images were examined by the NMC optometrists and vitreo-retinal surgeons following which appointments were provided for further evaluation and treatment. The campaign was promoted to the public through radio, SMS, internal TV signage, social media and rolls ups in the hospitals.

To further celebrate World Diabetes Month, NMC gave away 600 Abbott Glucometer Starter Kits on Facebook.

**UAE National Breast Feeding Week Celebration (NMC Trading collaboration with Government Hospital)**
On the occasion of National Breastfeeding Week NMC Trading collaborated with Corniche Hospital, Abu Dhabi (Government hospital) and hosted a Breastfeeding Support Walk on the Corniche on 11 November. The theme of this year's celebration was "Breastfeeding, winning goal for life" focused on raising awareness about the benefits of breastfeeding.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice    37 of 166    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

Strategic Report

# Corporate social responsibility
## continued

### Cardiopulmonary Resuscitation (CPR) Sessions

During 2015, Brightpoint Royal Women's Hospital conducted seven CPR sessions for the general public providing information and hands-on-experience on "how to save baby's life during critical conditions such as choking". The response to the sessions was overwhelming with more than 150 families attending the informative sessions.

### RESPONSIBILITY TO THE HEALTHCARE PROFESSION

NMC Healthcare has a responsibility to contributing to the future of the medical profession. We are committed to investing in the professional development of both NMC and non NMC healthcare professionals throughout the UAE. We promote a learning culture, we procure state-of-the-art medical equipment and we help foster research, innovation as well as providing for NMC's planned expansion and succession.

### CONTINUING MEDICAL EDUCATION (CME) PROGRAMME FOR NON NMC DOCTORS

Our CME programme ensures we meet our Vision and Mission statement. In 2015, NMC conducted over 60 CMEs free of charge across the UAE to facilitate attendance for health professionals from different parts of the country.

Our 2015 CMEs were attended by over 5,300 NMC and non NMC health professionals. Approximately 90% of the doctors attending were non-NMC doctors providing a different perspective on the CME programme which therefore also assists us to innovate and improve our customer service experience. CME programmes provide us with a distinct advantage over other healthcare facilities since our employees and patients understand the tangible benefits of professional collaboration.

Another major achievement from our CME programme is how they help create NMC as a desirable workplace for healthcare professionals. NMC enjoys an excellent reputation among the primary care physicians in the UAE as their preferred healthcare provider. This is evidenced by the high number of doctor referrals to NMC.

Dr Sunny Healthcare has also played an active role in contributing towards the medical profession and conducted seminars on Glaucoma awareness and Rheumatoid Arthritis. The CME's conducted by the group saw the participation of nearly 2,500 professionals. They have also conducted several internal training sessions to keep their doctors updated with the latest happenings in the fields of Orthopaedics, Neurology and Cardiology to name a few.

### NMC ANNUALLY HOSTS INTERNATIONAL CONFERENCES FOR UAE HEALTHCARE PROFESSIONALS

Each year NMC organises and hosts an International Conference for NMC staff and UAE Healthcare professionals to attend. In April 2015 the subject was on Emergency Care.

### INTERNATIONAL NURSES DAY (12 MAY 2015)

International Nurses Day is celebrated around the world on 12 May of each year, the anniversary of Florence Nightingale's birth, to mark the contributions nurses make to society. NMC is proud to celebrate the role nurses play in delivering the highest level of quality care to their patients. The theme during Nurses Week 2015 was the importance of ethics in nursing care and acknowledging the strong commitment, compassion and care nurses display in their practice and care. It is also an opportunity to recognise and reward individual nurses for outstanding performance in the delivery of care and for articles that have been published in professional literature.

### HEALTHCARE RESEARCH, ACADEMIC ARTICLES AND GUEST SPEAKERS AT INTERNATIONAL CONFERENCES

The quality of healthcare that NMC deploys today is built upon decades of efforts by healthcare professionals. NMC encourages staff to continually review and research their respective fields. The UAE Health Index is an example of a major research project which is published and made publicly available free of charge by NMC on a yearly basis. Health research has a lot of value to society. It provides crucial information about disease trends and risk factors, outcomes of treatment or health interventions, functional abilities and patterns of care. NMC believes research and development is an integral part of pushing the entire healthcare industry forward. As such, NMC has a legally constituted and registered Research Ethics, authorised to undertake human subject's research in accordance with International Conference on Humanitarian Good Practice (ICHGP) guidelines. The NMC Ethics Committee comprises of a multi-disciplinary team including a mandatory physician and is HAAD licenced. Members of the Ethics Committee have undergone research ethics training and received certification from the University of Miami.

In 2015, NMC medical staff undertook a broad range of research and are prolific writers of scholarly articles in international journals such as the International Journal of Otolaryngology and Head and Neck Surgery, Indian journal of Otology. NMC health professionals also present papers at International Conferences, such as the Scandinavian Society for Head and Neck Oncology in Iceland, the European Society of Cataract and Refractory Surgeons Conference in Barcelona, the World Congress and Expo on oncology and Radiology and the Middle East Otolaryngology.

Our EyeCare Centre of Excellence nurtures researchers who in 2015 published numerous articles in journals such as, British Medical Journal, International Journal of Refractive Surgery, Journal of Optometry, Acta Ophthalmologica, Cataract and Refractory Surgery Today Europe (CRST Europe), International Ophthalmology, Clinical and Experimental Optometry, Current Eye Research, Journal of Ophthalmic and Vision Research, Middle East African Journal of Ophthalmology and Cornea Journal.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          38 of 166          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

### EUGIN FOUNDATION

The Eugin Foundation was established in September 2007. Its aim is to create a framework for teaching and research carried out by the centre. In order to do so, the foundation's main objective is the study of fertility and human reproduction, with regard to its personal and social aspects as well as the procedures that take place in the clinic and the promotion of health. All of the aforementioned is achieved through analysis, research and popularization of knowledge obtained.

The potential beneficiaries of the foundation's activities are all those individuals who might be interested in the study of fertilization and human reproduction.

One of the most important actions the foundation has carried out has been to organize a basic course on assisted reproduction aimed at people working within the health care sector who want to enhance their medical knowledge on human reproduction, as well as with regards to the various assisted reproduction techniques available.

Eugin conducts research with the universities of Barcelona, Milan, Cardiff, Leeds and Ghent in order to gain better knowledge of fertility and help more women achieve their dream of motherhood. However, the work is not restricted to pregnancy itself and studies that concern our patients' emotional state are also carried out to understand the best possible ways to support them throughout treatment.

Furthermore, our research also focuses on the health of children born through assisted reproduction techniques. Not only is their birth very important but so is growing up.

The collaborations with these universities and other professional schools also create a channel to hire future laboratory technicians or systems administrators. In 2015, Eugin welcomed nine trainees spread across several departments as a result of these collaborations.

### RESPONSIBILITY TO NMC EMPLOYEES AND THEIR FAMILIES

One of our key strengths has been a very loyal employee base, which has been associated with NMC for decades. Our annual employee turnover percentage is minimal. A well-defined performance management system, transparent compensation model and effective career paths helps NMC retain this loyal employee base. It is with great pride that many of our original staff and vendors are still with us today and that our healthcare professionals are now treating the grandchildren of original patients.

### VIPASSANA MEDITATION AT NMC SPECIALTY HOSPITAL

Vipassana meditation event was held on 9 December 2015 at NMC Specialty Hospital. Organisers of Vipassana Meditation from the UAE were invited to introduce the unique techniques for stress management and to help productivity of staff.

### SPONSORSHIP TO PURSUE SPORTS INTERESTS

Eugin sponsors Daniel Llambritch, who has been working at Eugin since 2007, to pursue his sports career in Paralympic swimming. Daniel has participated in four Olympic Games as a Paralympic swimmer (Barcelona'92 - bronze medal, Atlanta'96 - finalist, Athens'2004 - silver medal and Beijing'2008 - finalist). Now, Daniel continues his sports career in a very hard discipline: Paralympic triathlon.

NMC Trading sponsors Manjula Guruge, a member of the UAE National Cricket Team who in 2015 played in the World Cup. NMC also sponsors a NMC cricket team that plays in the UAE League.

### DIVERSITY, DISCRIMINATION AND GENDER

Our commitment to diversity and anti-discrimination policies are reflected in the profile of our employees.

NMC has an anti-discrimination policy in place to ensure that there is no discrimination or harassment of any person employed or seeking employment on the basis of their race, colour, religion, gender, age or nationality. These policies are also implemented in the businesses acquired in 2015.

In accordance with Spanish Law, Eugin also works to stimulate the social and labour integration of disabled people. Eugin currently employs five people with more than 33% disability. Eugin also supports Centros especiales de empleo, special work centres that employ disabled people by purchasing their products and services. Eugin's purchases from these centres exceeded US$ 57,000 during the year.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          39 of 166          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

Strategic Report

# Corporate social responsibility
## continued

As at 31 December 2015, our Group has grown its employee base across all its business operations to over 9,000 employees. We employed individuals from 79 different nationalities. In addition 47% of our workforce is female and 53% is male. We believe that this widespread cultural and balanced gender mix is testament to the effects of our discrimination policies and the multi-cultural nature of the UAE, our primary market.

A comparison of the split of employees by gender within the different business groups and different levels within the NMC Group is set out in the table below:

### RESPONSIBILITY TO THE GROWTH AND LONG TERM FUTURE OF NMC HEALTHCARE
#### QUALITY MANAGEMENT – EFQM EXCELLENCE MODEL
The NMC Healthcare Vision Statement reinforces our commitment to achieving excellence in the delivery of healthcare to society.

"To be the trusted healthcare provider in the UAE and abroad driven by excellence through innovation, quality, team work, advanced technologies, patient safety and customised care".

In line with our vision statement NMC Healthcare is strengthening its quality management framework beyond ISO and JCI accreditation requirements. As part of this process NMC Specialty Hospital, Abu Dhabi participated in the Sheikh Khalifa Excellence Award (SKEA) for the first time in 2015 in the Appreciation Certificate category. NMC Specialty Hospital exceeded all expectations by being awarded the Silver Award in its first year of participation. The award is based on the European Foundation for Quality Management (EFQM) model and recognises processes and systems that promote business excellence and adopt innovative world class Best Practices in Excellence.

The award is conferred by His Highness Sheikh Hamed bin Zayed Al Nahyan, Chairman of Abu Dhabi Crown Prince's Court and a member of Executive Council of Abu Dhabi.

#### THE WAY FORWARD
Going forward, our adoption of the EFQM Excellence model is helping us exceed normal performance and achieve outstanding results that can be sustained. We are always seeking opportunities to improve and to be innovative. EFQM allows us to identify our strengths and opportunities for improvement, compare and benchmark internally and externally so we continually are challenged to improve our performance and remain the most trusted private healthcare provider on the UAE.

### GENDER COMPARISON STUDY

| Facilities | Categories | 31 December 2015 | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | Gender | | Percentage | |
| | | Total | Male | Female | Male | Female |
| Board of Directors & Senior Management Team | NMC Board of Directors | 12 | 8 | 4 | 67% | 33% |
| | Senior Management Team | 6 | 5 | 1 | 83% | 17% |
| | Grand Total | 9,197 | 4,908 | 4,289 | 53% | 47% |
| Corporate Office | Total - Corporate Office | 363 | 239 | 124 | 66% | 34% |
| | Corporate Management* | 80 | 67 | 13 | 84% | 16% |
| | Corporate Staff | 283 | 172 | 111 | 61% | 39% |
| Reliance Infotech | Total - Reliance Infotech | 75 | 66 | 9 | 88% | 12% |
| | Reliance Management | 8 | 7 | 1 | 88% | 12% |
| | Reliance Staff | 67 | 59 | 8 | 88% | 12% |
| Healthcare | Total - Healthcare | 6,805 | 2,926 | 3,879 | 43% | 57% |
| | Healthcare Management | 121 | 72 | 49 | 60% | 40% |
| | Doctors | 828 | 520 | 308 | 63% | 37% |
| | Staff Nurses | 2,289 | 446 | 1,843 | 19% | 81% |
| | Technicians & Pharmacists | 794 | 351 | 443 | 44% | 56% |
| | Healthcare - Others | 2,773 | 1,537 | 1,236 | 55% | 45% |
| Distribution | Total - Distribution | 1,948 | 1,676 | 272 | 86% | 14% |
| | Distribution Management | 154 | 139 | 15 | 90% | 10% |
| | Distribution Staff | 1,794 | 1,537 | 257 | 86% | 14% |
| R&D | Eugin | 6 | 1 | 5 | 17% | 83% |

\* Corporate Management includes six Senior Management Personnel, three of whom were Executive Directors also, but excludes Non-Executive Directors.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          40 of 166          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

# Risk management

### IDENTIFICATION OF RISK

The Board consider the identification and mitigation of material risks and uncertainties faced by the Group as a key issue to be monitored at all levels of the organisation. The Board has overall responsibility for the Group's risk management and internal control systems. The Senior Management team ensure that operational management consider risk as part of their day to day activities. This is considered to be particularly key for NMC as a Group due to both our current strategic expansion program and the fact that our businesses are operating in regulated environments.

As there are multiple risks associated with our businesses, particularly the healthcare sector, the process of Risk Management is an essential mechanism to enable a risk based decision making process. NMC follows a conservative approach in risk taking and has implemented controls and mitigation strategies in order to reduce those risks.

The Strategic Risk Register, which is the basis for the list of principal risks and uncertainties, was developed using both a bottom up and top down assessment of business and strategic risks. This new strategic risk management process was implemented in Q4, 2014 and PwC have assisted management during the year in relation to the updating of the Group's strategic risks in 2015.

The bottom up exercise is conducted through discussions and interviews in each of the Group's businesses. The top down exercise includes meetings with senior executives. The output from the aggregated results of the top down and bottom up exercises produces a list of principal risks that are reviewed and agreed by the Senior Management Team before being presented to, and discussed by, the Board.

The Strategic Risk Register is reviewed and maintained on an on-going basis by management, with the Board retaining oversight and responsibility over the Register and the risk management process. Depending on the nature of the risk involved, a variety of risk mitigation measures have been implemented including, for example, insurance, standardised processes, delegation of authorities and succession plans, diversification in business and revenue streams.

### STRATEGIC RISKS AND UNCERTAINTIES

In the table of strategic risks below, the Board have set out the Group's strategic risks and the mitigating actions and controls taken against those risks. It should be noted that the order that these risks are expressed in the table does not reflect an order of magnitude as regards their potential impact on the Group. The Board Oversight of the System of Internal Control and Risk section on pages 60 to 63, also sets out additional details of the governance framework and controls in place within the Group's businesses to monitor and control risk.

There have been no material changes made to the Group's strategic risk register in 2015 or changes to the relative importance or materiality of any particular risk. However, the Board has made a number of minor changes to the list of principal risks, and the mitigation of those risks during the 2015 financial year principally relating to the challenges faced by the Group in the execution of its strategic growth plan, in particular the acquisitive nature of the Group and its entry into new markets.



**KEY THEMATIC RISKS**
**THE BIG PICTURE - 2015**

1. Delays in completion of new strategic expansion projects due to contractor or potential cash flow interruption and bad investment decisions may result in poor Return on Investment (ROI), decreased margins and market share.

2. Increased competition due to high private and public investments in the healthcare sector and to associated investments coming from new entrants or existing player.

3. Failing to innovate and to effectively deliver new services. Inexperience of operation in new markets/offerings leads to missed opportunity or poor delivery.

4. Potential inability to improve NMC's margin due to medical inflation and pressure and bargaining from key insurance providers.

5. Potential instability in revenue impairing cash flow and working capital health as a result of global and regional demographic, macro economic and geopolitical factors.

6. Failure to maximise the opportunity or acquisitions through successful integration strategies or through successful integration strategies or through ineffective management structure or operating model.

7. A Data Security (e.g. VVIP patient records) breach due to either intentional malicious cyber-attack or unintentional data or system loss resulting in reputational damage, operational disruption or regulatory breach.

8. Failure to comply with multi regulatory and standards bodies' requirements could result in financial fines, inability to remove licenses, as well as NMC reputation damage.

9. Failure to comply with internationally recognised clinical care and quality standards, clinical negligence, the mis-diagnosis of medical conditions or pharmaceuticals and the supply of unfit products across both divisions.

10. Failure to retain/acquire key professionals or inability to acquire sufficient Medical staff could potentially lead to inability to deliver required healthcare services and execute growth strategy.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice   41 of 166   Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

Strategic Report

## Risk management continued

| Risk Class | Description and Potential Impact | Current Mitigations |
| --- | --- | --- |
| Investment | Delays in completion of new strategic expansion projects due to contractor or potential cash flow interruption and bad investment decisions may result in:<br><br>• Lower Return on Investment (ROI);<br>• Lower revenue than expected;<br>• Decreased margins and market share;<br>• Potential for impairment of assets;<br>• Reputational issue leading to difficulty in raising future finance. | • Board oversight in approving and monitoring strategic projects<br>• Project management controls<br>• Detailed market and business appraisal processes |
| Competition | Increased competition due to high private and public investments in the UAE healthcare sector and associated investments coming from new entrants or existing player partnerships would lead to market share loss and potential reduction in access to future growth in UAE healthcare spend. | • Integrated Hub-Spoke model<br>• Growing healthcare network<br>• Partnership with Government hospitals<br>• Diversification of patient base<br>• Variety in service offerings |
| Financial | Failing to innovate and effectively deliver new services. Inexperience of operating in new markets/offerings leads to missed opportunity or poor service delivery. | • Frequent monitoring of both fixed and variable cost<br>• Synergy tracking and reporting<br>• Acquiring the skills associated with the M&A transactions |
| Financial | Potential inability to improve NMC's margin due to medical inflation and pricing pressure and bargaining from key insurance providers would result in less profitability | • Diversification of the revenue streams<br>• Frequent monitoring of both fixed and variable cost<br>• Good relationships with insurance providers<br>• Strategy to increase patient volumes and focus on clinical specialisms<br>• M&A Strategy in new markets |
| Macro-economic | Potential instability in revenue impairing cash flow and working capital health as a result of global and regional demographic, macro-economic and geopolitical factors. | • UAE is a stable and booming market to operate in<br>• Diverse business and revenue streams<br>• Long Term debt facilities and unutilized working capital limits<br>• Strong banking and supplier relationships |
| Financial | Failure to maximize the opportunity of acquisitions though successful integration strategies or through ineffective management structure or operating model may results in:<br><br>• Increased market and regulatory/ legal obligations;<br>• Increased culture resistance and complexity in shifting the governance model from enterprise to corporate structure;<br>• Increased operational exposure due to the complexity of integrating higher number of spokes to centralized hub of excellence;<br>• Increased investment risk due to weak due diligence and other mitigates. | • Proper due diligence<br>• Post-acquisition integration plan<br>• Rigorous analysis of value of the acquisition<br>• Focus on the corporate cultures involved<br>• Executive committee reporting and targets<br>• Synergy tracking and reporting<br>• Acquiring the skills associated with the M&A transactions |

38     NMC Health plc Annual Report and Accounts 2015

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          42 of 166          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

| | | |
|---|---|---|
| **Technology** | A Data Security (e.g. VIP patient records) breach due to either intentional malicious cyber-attack or unintentional data or system loss resulting in reputational damage, operational disruption or regulatory breach. | • ISO 27001 certified framework for IT policies and controls.<br>• Strict measures towards clients' data and records<br>• Investment in new Hospital Information System and ERP financial system approved by the Board and implementation in progress |
| **Compliance & Regulation** | Failure to comply with multi regulatory and standards bodies' requirements could result in financial fines, inability to renew licenses, as well as NMC reputation damage. | • Quality & Standards Department monitors regulatory changes<br>• Partnership with government<br>• Good relationships with regulators and accrediting organizations<br>• Continuous focus on delivering high levels of service |
| **Product & Service** | Failure to comply with internationally recognized clinical care and quality standards, clinical negligence, the misdiagnosis of medical conditions or pharmaceuticals and the supply of unfit products across both divisions could result in regulatory sanction, licence removal, significant reputational damage, loss of patient and customer confidence and potential criminal proceedings. | • Doctors subject to rigorous licensing procedures which operate in the UAE<br>• Healthcare division is a regulated business and the Group's three principal hospitals have international quality standards accreditation<br>• Many aspects of the operation of the Distribution division, including the sale of pharmaceuticals, is regulated in the UAE<br>• Board oversight and integrated governance structure<br>• Medical malpractice insurance to cover any awards of financial damages<br>• Continuous training and development programs |
| **Human Capital** | Failure to retain/acquire key professionals or inability to acquire sufficient Medical staff could potentially lead to inability to deliver required healthcare services and execute growth strategy. | • Partnership with education institutes<br>• Effective sourcing strategies & recruitment campaigns<br>• Ongoing review of senior management resources and succession plans in place for key positions<br>• Competitive salary packages, growth and good working conditions act as a good retention tool<br>• Clear career path for staff and continuous training and development programs |

As recommended by provision C.2.2 of the UK Corporate Governance Code, the Directors have considered a formal long-term assessment of the prospects and viability of the Group. As part of this assessment, the Board considered the potential impact of three principal risk themes facing the Group. The Board's viability statement is set out on page 89.

The Group Strategic Report set out on pages 6 to 39 has been approved by the Board and is signed on its behalf by:

**DR B.R. SHETTY**
Executive Vice Chairman & CEO

Exhibit 4 to B.R. Shetty's Request for Judicial Notice    43 of 166    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA



# Governance

In this section:

41   Corporate governance report
65   Directors' remuneration report
84   Directors' report

40     NMC Health plc Annual Report and Accounts 2015

# Corporate governance report
## Introduction

The Board is responsible for, and committed to, ensuring that procedures are in place so that good standards of corporate governance are operated at all levels in the Group in accordance with the guidance and principles set out in the UK Corporate Governance Code published by the Financial Reporting Council (FRC) in September 2014 (the "Code"). The Code can be found on the Financial Reporting Council website, frc.org.uk.

The Board, supported by its Committees and the Senior Management team, have in place a governance and control environment which they believe is appropriate for the NMC Group and which they believe are consistent with the standards which would be expected of a FTSE 250 Company listed on the Premium Segment of the London Stock Exchange. The Board ensures that governance processes are documented and implemented and, where appropriate, continue to be improved.

The Board has reviewed the Company's compliance against the provisions of the Code and believes that the Company was compliant with the provisions of the Code for the 2015 Financial Year. This Governance section describes how the Board has applied Corporate Governance principles during the 2015 financial year.

**GOVERNANCE FRAMEWORK**
The Company operates within a traditional governance framework:



The roles and responsibilities of each of the individuals and groups above, and their role in the overall governance framework, are set out below.

**THE BOARD**
**THE ROLE OF THE BOARD**
The Board is responsible for the overall conduct of the Group's business and:

- for the long term success of the Company ensuring that it meets its responsibilities towards all stakeholders;
- demonstrating leadership and focussing on matters that affect shareholder value;
- determining the strategic direction of the Group; and
- for ensuring the effectiveness of, and reporting on, the risks facing the Group and the systems of governance and internal control in place in the Group.

The Board seeks at all times to ensure that there is an appropriate balance between short term and long term considerations and objectives of the Group.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice    45 of 166    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

Governance

# Corporate governance report continued
## Introduction

The Board has the powers and duties as set out in the Company's Articles of Association and the relevant regulations applicable to the Company as a public listed company registered in England and Wales. As part of the terms of their appointment, each director agreed that they will act collectively with the rest of the Board to ensure the success of the Group.

The Company has agreed a formal schedule of matters reserved for the Board including:

- approval of strategic plans;
- approval of major capital projects, acquisitions and divestments;
- approval of long term financing plans;
- setting the annual budget;
- risk management and internal control systems and processes to ensure that the Group is managed appropriately; and
- approving the half-year and annual results and financial statements.

Specific responsibilities are delegated to Board Committees, details of which are set out on pages 52 to 59 or to the Executive Vice Chairman & CEO who is responsible for delivering the Company's strategic objectives.

### BOARD COMPOSITION AND INDEPENDENCE

The Board of the Company currently comprises eleven directors, all of whom have served throughout the year:

- the Non-Executive Chairman who is considered to be Independent
- two Executive Directors
- five Independent Non-Executive Directors
- three Non-Independent Non-Executive Directors

In addition, Heather Lawrence was also an Independent Non-Executive Director for the whole of FY2015, but resigned from the Board on 12 January 2016.

The biographies of each of the Directors is set out on pages 44 to 47.

Provision B.1.1 of the Code suggests that length of tenure is a factor in determining the independence of non-executive directors. The table below therefore shows how long each Director considered by the Board to be Independent Non-Executive Directors have been members of the Board.

| | Date of appointment | Term in office to 2016 AGM (years) |
|---|---|---|
| H.J. Mark Tompkins | 7 March 2012 | 4 |
| Dr Ayesha Abdullah | 26 June 2014 | 2 |
| Jonathan Bomford | 27 June 2013 | 3 |
| Lord Clanwilliam | 7 March 2012 | 4 |
| Salma Hareb | 26 June 2014 | 2 |
| Dr Nandini Tandon | 26 June 2014 | 2 |

The other five Directors are either Executive Directors or connected to, or representing, the Company's principal shareholders, and are therefore not independent.

The Board considers that it is independent.

The Senior Independent Director is Jonathan Bomford, who is available to shareholders should they have any concerns that they do not wish to raise with the Company or the Chairman directly. The Senior Independent Director can be contacted through the registered office of the Company.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          46 of 166          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

| Overview | Strategic Report | Governance | Financial Statements |
|---|---|---|---|

## BOARD DIVERSITY

The Board considers that the extensive and diverse business, cultural and operational experience of all the Directors, both Independent and non-Independent, ensures a good balance in all aspects of Group decision making and control. The above attributes also enable the Board to take account of diverse and independent judgement to bear on key issues of:

- strategy, including constructively challenging the strategic direction of the Group;
- scrutinising and challenging the performance of the Group;
- assessing risk and controls operating within the Group and in its decision making; and
- standards of conduct and governance and other matters presented to the Board.

Similar practices to ensure a diverse employee base are also operated within the Group's businesses. These are summarised in the Corporate Social Responsibility report on pages 28 to 36.

Therefore the Board is structured to ensure that:

- an appropriate cultural and racial mix is in place considering the Company's listing in the UK and its diversified operations, the vast majority of which are in the UAE, as well as global drivers and practice in healthcare related services;
- the conclusions of the Davis Report on Women on Boards, and in particular the benefits of significant male and female representation on the Board, are taken into account; and
- the individual skills and experience that Directors bring to the Board are well balanced.

The Board will continue to consider appropriate skills, gender and cultural balance when reviewing future Board appointments.

Board diversity and composition as at the date of this report is as follows:



Gender of Board

- Male — 73%
- Female — 27%

Executive/Non-Executive

- Executives — 18%
- Non-Exectuives — 82%

Tenure of Non-Executive Directors

- 2 years — 67%
- 3 years — 11%
- 4 years — 22%

Nationality

- UAE — 18%
- UK — 27%
- Indian — 37%
- Kenyan — 9%
- USA — 9%

NMC Health plc Annual Report and Accounts 2015        43

Governance

# Board of Directors







## MR H.J. MARK TOMPKINS
**NON-EXECUTIVE CHAIRMAN**

**Age:** 75

**Tenure:** 4 years

**Nationality:** British

**Skills and Experience**
- Significant public company experience on UK, US and French listed company Boards
- Experience in investment banking, international real estate and the financing of small and medium sized enterprises
- 2005-2009 Director of Allied Healthcare International and Chairman from 2007 to 2009
- 2002-2010 Non-Executive Director of Sodexo S.A.
- 2010-2012 Conseiller Special aupres du Conseil D'Administration of Sodexo S.A.
- Previously, Chief Executive Officer of Compagnie Financiere Haussmann
- Previously a Director of Apria Healthcare Inc

**Other Current Appointments**
- None

**Board Committees**
- Nominations Committee (Chairman)

## DR B.R. SHETTY
**EXECUTIVE VICE-CHAIRMAN & CEO**

**Age:** 73

**Tenure:** 5 years

**Nationality:** Indian

**Skills and Experience**
- Business Entrepreneur
- Founder, Director and principal shareholder of NMC Health
- Pioneer in the development of the private healthcare sector in the UAE
- Other Board positions and material investments in financial, hospitality, food and beverage, pharmaceuticals and real estate sectors

**Other Current Appointments**
- Director and principal shareholder of UAE Exchange and Travelex
- Member of the Advisory Board of the Dubai Economic Department's Financial Sector
- Chairman of the Abu Dhabi Indian School
- Member of the Executive Panel of Dubai's Pharmaceutical and Health Equipment Trading Business Group under the Dubai Chamber of Commerce and Industry
- Founder and patron of the Indian Pharmaceutical Association in the UAE
- Founder and member of various Business Councils in the UAE

**Board Committees**
- None

## MR PRASANTH MANGHAT
**DEPUTY CHIEF EXECUTIVE OFFICER**

**Age:** 41

**Tenure:** 2 years

**Nationality:** Indian

**Skills and Experience**
- 20 years' experience in accounting, corporate finance, treasury and banking, including 12 years' in NMC related businesses
- 2015 Deputy Chief Executive Officer of NMC Health assisting the Executive Vice Chairman and CEO on planning, strategy and M&A across Group businesses
- 2011-2014 Chief Financial Officer of NMC Health
- Spearheaded NMC's successful IPO on the London Stock Exchange in April 2012
- Chartered Accountant qualified in India
- CFO of the Year award - 2012 by ICAEW, Middle-East

**Other Current Appointments**
- None

**Board Committees**
- None

44    NMC Health plc Annual Report and Accounts 2015



## DR AYESHA ABDULLAH
### INDEPENDENT NON-EXECUTIVE DIRECTOR

**Age:** 49

**Tenure:** 2 years

**Nationality:** Emirati

Skills and Experience
- Significant experience in development and regulation of the healthcare industry in the UAE
- Oversaw development of, and then regulatory aspects of, Dubai Healthcare City (DHCC)
- Previously, CEO of Dubai Healthcare City (DHCC)
- Previously, Managing Director of the Science Cluster
- Previously, Chief Executive Officer at the Center for Healthcare Planning and Quality (CPQ)

Other Current Appointments
- Executive Dean of Health Sciences and Business at Higher College of Technology (Dubai)
- CEO of CERT Group of Companies

Board Committees
- Clinical Governance (Chair) and Audit Committees



## MR ABDULRAHMAN BASADDIQ
### NON-EXECUTIVE DIRECTOR

**Age:** 67

**Tenure:** 2 years

**Nationality:** Kenyan

Skills and Experience
- Significant business experience across a number of business sectors in the Middle East
- Previously 25 years with EY in the UK and GCC, including 15 years as an equity partner
- Previously Managing Partner of Riyadh and Abu Dhabi EY offices
- Since leaving EY, worked with a number of GCC based Groups operating in multiple jurisdictions and business sectors, including two major listed Groups
- UK qualified Chartered Accountant and licensed auditor in the UAE

Other Current Appointments
- Non-Executive Director Travelex, Chair of the Audit Committee and a member of the Remunerations Committee
- Non-Executive Director Abu Dhabi National Hotel Compass LLC, Chair of Audit & Remunerations Committees
- Non-Executive Director One Financial Markets, Chair of the Audit Committee
- Non-Executive Director UAE Exchange, Chair of the Audit Committee

Board Committees
- Remuneration and Nominations Committees



## MR JONATHAN BOMFORD
### SENIOR INDEPENDENT NON-EXECUTIVE DIRECTOR

**Age:** 67

**Tenure:** 3 years

**Nationality:** British

Skills and Experience
- Accounting, financial and audit experience gained principally in the Middle East and East Africa
- UK qualified Chartered Accountant
- Previously with EY (Middle East, East Africa, Abu Dhabi & Riyadh) for 24 years (15 years as a partner)
- EY clients included international clients across healthcare, oil, banking and construction sectors

Other Current Appointments
- Board Member of an Agricultural Trust funding UK agricultural projects
- Independent Non-Executive Director of Travelex
- Official Mentor providing business advice and services to clients of the Prince's Trust

Board Committees
- Audit Committee (Chairman) and Remuneration Committee

Exhibit 4 to B.R. Shetty's Request for Judicial Notice        49 of 166        Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

Governance

# Board of Directors continued







## LORD CLANWILLIAM
**INDEPENDENT NON-EXECUTIVE DIRECTOR**

**Age:** 55

**Tenure:** 4 years

**Nationality:** British

Skills and Experience
- Government and financial communications specialist
- Extensive network of governmental and institutional contacts across Middle East, UK and Eastern Europe
- Founding Partner and Chairman of Meade Hall Communications Limited
- Non-Executive Director of Polyus Gold OJSC 2007 to 2013
- Chairman of Eurasia Drilling Company 2007 to 2016

Other Current Appointments
- Non-Executive Director of Soma Oil and Gas

Board Committees
- Remuneration (Chairman) and Nominations Committees

## MRS SALMA ALI SAID BIN HAREB ALMHEIRI
**INDEPENDENT NON-EXECUTIVE DIRECTOR**

**Age:** 50

**Tenure:** 2 years

**Nationality:** Emirati

Skills and Experience
- Significant business experience and a recognised leading businesswoman in the Middle East
- CEO of Economic Zones World (EZW) and Jebel Ali Free Zone (Jafza) from 2005 to 2015
- Instrumental in creation of Dubai Logistics Corridor
- Oversaw EZW's expansion with development of international logistics parks in UAE, Europe, India, USA and Africa
- Chief Haematologist in the Department of Health and Medical Services from 1987 to 1997

Other Current Appointments
- None

Board Committees
- Remuneration Committee

## MR KEYUR NAGORI
**NON-EXECUTIVE DIRECTOR**

**Age:** 37

**Tenure:** 2 years

**Nationality:** Indian

Skills and Experience
- 9 years' of experience in international audit firms including Deloitte and KPMG
- Audit of multinational companies based in both India and Abu Dhabi
- 10 years' experience at KBBO Group

Other Current Appointments
- Chief Financial Officer, KBBO Group

Board Committees
- None

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          50 of 166          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA



## MR BINAY SHETTY

**NON-EXECUTIVE DIRECTOR**

**Age:** 32

**Tenure:** 2 years

**Nationality:** Indian

Skills and Experience
- Operations and strategic experience within a number of organisations
- 2010 to 2014 Chief Operating Officer, NMC Group
- 2004 to 2010 Executive Director of NMC responsible for strategic planning
- 2004 to 2006 Business Coordinator, NeoPharma

Other Current Appointments
- Director of UAE Exchange and Travelex
- Head of Shetty Family Investment office

Board Committees
- Clinical Governance Committee



## DR NANDINI TANDON

**INDEPENDENT NON-EXECUTIVE DIRECTOR**

**Age:** 53

**Tenure:** 2 years

**Nationality:** USA

Skills and Experience
- Investment and Board experience in healthcare and healthcare IT sectors
- Director and investment in numerous high tech companies in the USA
- Delegate and speaker on a number of high level global investment and governmental and investor summits and programs
- Investing in next generation education and healthcare and in renewable energy
- In January 2015 received the Pravasi Bharatiya Samman award for her work in life sciences and Healthcare and IT in USA and India along with other emerging markets
- In January 2016 received the Uttar Pradesh Ratna (Gem) award, the highest state award for non-resident Indians, for outstanding contribution to humanity and the society at large

Other Current Appointments
- Board of Trustees, Bay Area Council Economic Institute
- Board Member, SF- Bangalore Sister City Initiative
- Board Member TeleVital Real Time Telemedicine

Board Committees
- Audit and Clinical Governance Committees

Exhibit 4 to B.R. Shetty's Request for Judicial Notice    51 of 166    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

Governance

# Senior Management Team







## DR B.R. SHETTY
**EXECUTIVE VICE-CHAIRMAN & CEO**

Skills and Experience
- Business Entrepreneur
- Founder, Director and principal shareholder of NMC Health
- Pioneer in the development of the private healthcare sector in the UAE
- Other Board positions and material investments in financial, hospitality, food and beverage, pharmaceuticals and real estate sectors

## MR PRASANTH MANGHAT
**DEPUTY CHIEF EXECUTIVE OFFICER**

Skills and Experience
- 20 years' experience in accounting, corporate finance, treasury and banking, including 12 years' in NMC related businesses
- 2015 Deputy Chief Executive Officer of NMC Health assisting the Executive Vice Chairman and CEO on planning, strategy and M&A across Group businesses
- 2011-2014 Chief Financial Officer of NMC Health
- Spearheaded NMC's successful IPO on the London Stock Exchange in April 2012
- Chartered Accountant qualified in India
- CFO of the Year award - 2012 by ICAEW, Middle-East.Over 40 years' experience with NMC Health and a pioneer in developing the private healthcare sector in the UAE

## DR CHANDRAKUMARI R. SHETTY
**GROUP MEDICAL DIRECTOR**

Skills and Experience
- Over 40 years' experience with NMC Health and a pioneer in developing the private healthcare sector in the UAE
- Instrumental in establishing Centres of Excellence in various NMC facilities
- Chairs a number of NMC business committees covering Governance, Infection Control, Patient Rights, Quality and Facility Management
- Supervises NMC Healthcare's diversified multi-cultural workforce.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          52 of 166          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA



## MR ROY CHERRY
**HEAD OF STRATEGY & INVESTOR RELATIONS**

Skills and Experience
- 13 years' experience in financial services and healthcare
- Assists Executive Vice Chairman and CEO and Deputy CEO in relation to NMC strategic matters
- Leads Group's IR and played an instrumental role in the re-rating of NMC's shares
- Formerly a Senior Consultant at PwC Transaction Services providing advice on transactions across several sectors including healthcare
- Contributed to several regional IPO's including Saudi Catering, NMC Health, Deyaar, DP World and Royal Jordanian Airlines
- Previously headed the Equity Research Departments at SHUAA Capital in Dubai and Saudi Fransi Capital in Riyadh
- Holds a BSc in Management from University of London and speaks English, Arabic and Swedish fluently



## MR SURESH KRISHNAMOORTHY
**CHIEF FINANCIAL OFFICER**

Skills and Experience
- Appointed as CFO in January 2015 and heads up NMC's finance teams
- Joined NMC in December 2000 and held a number of senior finance roles in the Group
- Has had significant involvement in the Company's IPO in April 2012 and subsequent fund raising initiatives
- Prior to joining NMC, worked as Assistant Finance Manager in Kerala Industrial Infrastructure Corporation in India
- Qualified as a Chartered Accountant in India in 1998



## MR SIMON WATKINS
**GROUP COMPANY SECRETARY**

Skills and Experience
- Joined NMC in May 2012 shortly after the Group's IPO
- Responsible for Group's listing obligations and all governance matters, assisting the Chairman with ensuring effective and appropriate Board processes
- Over 25 years' of experience as a Company Secretary in large and medium sized UK public companies across a number of sectors
- Significant experience within Group's focussed on strategic and acquisitive growth
- Previous experience includes Deputy Company Secretary of Rank Group plc and Group Company Secretary of lastminute.com
- Qualified as a Chartered Secretary in the UK in 1987

Exhibit 4 to B.R. Shetty's Request for Judicial Notice        53 of 166        Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

Governance

# Corporate governance report

**KEY ROLES AND RESPONSIBILITIES IN THE GOVERNANCE STRUCTURE**
The roles of the Chairman and Chief Executive Officer are separate.

**CHAIRMAN**
The Chairman was appointed to the Board in March 2012 in anticipation of the Company's IPO. He was independent at the time of his appointment and is considered to be independent by the Board. The Chairman is responsible for the proper functioning of the Company's Board of directors including:

- the effective operation and governance of the Board
- setting the agenda and coordinating the style and tone of Board discussions

**EXECUTIVE VICE CHAIRMAN AND CHIEF EXECUTIVE OFFICER**
The Executive Vice Chairman and Chief Executive Officer is responsible for identifying, with the Senior Management Team, opportunities that are deemed appropriate and in line with the Board's strategic objectives. He is also responsible for delivering the key strategic objectives set by the Board. The Executive Vice Chairman and Chief Executive Officer is assisted in this task by the Deputy Chief Executive Officer and the remainder of the Senior Management Team who meet regularly to discuss the performance of the business, the progress of key capital projects, new development opportunities as well as other material matters arising within the business.

**SENIOR INDEPENDENT DIRECTOR**
The Senior Independent Director acts as a sounding board for the Chairman and serves as an intermediary for the other Directors as required. The Senior Independent Director is available to shareholders if they have concerns which they have not managed to resolve through the normal channels of the Chairman or the Executive Directors, or who feel that such contact is inappropriate for the concerns that they may have.

**GROUP COMPANY SECRETARY**
The Group Company Secretary acts as Secretary to the Board and to the Board Committees. He assists the Chairman in ensuring that all Directors have full and timely access to all relevant information and in organising induction programmes for new Directors. The Group Company Secretary is responsible for ensuring that the correct Board procedures are followed and advises the Board on corporate governance matters. The appointment and removal of the Group Company Secretary is a matter for the Board as a whole.

The biography of each individual holding the above positions is set out on pages 44 to 49.

**BOARD MEETINGS**
The Group Company Secretary supports the Chairman in finalising an agenda for each Board meeting and ensuring that appropriate papers are provided from the management team in a timely manner for circulation in advance of Board and Board Committee meetings. This is to ensure that fully informed decisions can be reached.

**BOARD FOCUS IN 2015**
Matters considered at all Board Meetings include:

- Operational performance through the Executive Vice Chairman & Chief Executive Officer's report
- Financial performance, including monitoring current and forecast trading, cash and debt levels against its expectations presented through the CFO report
- Progress being made on the Group's key capital development projects and other potential acquisition or organic growth opportunities
- Board Committee updates

During the course of the 2015 financial year the Board has also considered, as appropriate:

- The Group's future strategy with significant focus on potential organic and inorganic growth opportunities and the associated risks of such strategy and opportunities
- Long term acquisition and working capital financing
- The Group's half-year and full-year results
- The proposed operating budget for the following financial year
- The Group's business and strategic risks, the risk management process in place in the Group and the Group's approach to risk

**BOARD AND BOARD COMMITTEE ATTENDANCE IN THE 2015 FINANCIAL YEAR**
During the period under review, the Board met on six occasions as scheduled as well as three other brief ad-hoc meetings normally called at very short notice on matters requiring board approval or other discussions on matters which arose. During 2015, these ad-hoc meetings were principally in relation to acquisitions or long term finance related discussions and approvals. Scheduled periodic Board Meetings are planned in each financial year to be split, where possible, evenly between London and Abu Dhabi.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice        54 of 166        Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

The attendance of the Directors at each of the scheduled Board meetings during the period is set out in the table below. Whilst the ad-hoc meetings held are classified as formal meetings, given their brief nature and the fact that they were called at very short notice, the attendance table excludes such meetings.

| Board meeting attendance 2015 | | |
|---|---|---|
| H.J. Mark Tompkins | | 6/6 |
| Dr B.R. Shetty | | 6/6 |
| Dr Ayesha Abdullah | | 6/6 |
| Abdulrahman Basaddiq | | 6/6 |
| Jonathan Bomford | | 6/6 |
| Lord Clanwilliam | | 6/6 |
| Salma Hareb | | 6/6 |
| Heather Lawrence | | 6/6 |
| Prasanth Manghat | | 6/6 |
| Keyur Nagori | 5/6 | |
| Binay Shetty | | 6/6 |
| Dr Nandini Tandon | | 6/6 |

## BOARD EFFECTIVENESS
### DIRECTOR INDUCTION
On appointment, directors have the benefit of a personalised induction programme which is undertaken during the first few months of their tenure as a director. Each induction programme covers a number of different areas including:

- briefings and presentations from management to understand the business operations and financial drivers
- their legal and regulatory responsibilities as directors and the governance environment in which the Company operates
- opportunities to visit the Group's key facilities and new capital development project locations
- meetings with the Company's key advisors

### BOARD INFORMATION AND PROFESSIONAL DEVELOPMENT
The Directors maintain an appropriate dialogue amongst themselves and with senior management, which ensures that Non-Executive Directors are kept up to date with major developments in the Group's business.

Following an initial induction process, Non-Executive Directors meet with management and undertake visits to operational facilities each year in order to further understand the way the business operates and any change within the business. Emphasis in 2015 in relation to organised facility visits has been on monitoring progress in relation to the Company's key capital projects, particularly our new Khalifa City facility, and a visit to ProVita, the long term acute care business acquired during the year. The Board also had presentations from management during the year in relation to the Group's acquisition strategy and a presentation from PwC and management in relation to the strategic risks considered to be prevalent from their risk reviews within the businesses.

As part of their overall training and development needs, some non-executive directors have attended externally provided seminars and discussion forums relating to their general responsibilities as Directors or areas of specific responsibility, in particular in relation to the Board Committees on which they serve.

### PERFORMANCE EVALUATION
During the year the Board undertook its first evaluation of its own performance. This was undertaken by way of a questionnaire developed internally by the Chairman and the Group Company Secretary which asked Directors to assess the effectiveness of the Board and its committees and the Board and Board committee processes. The questionnaire included questions in relation to the suitability of the Board's discussions and whether the Directors felt able to be candid or raise matters of concern.

The evaluation questionnaire was completed confidentially by Directors and the results consolidated into a report by the Group Company Secretary which was then reviewed by the Chairman and reported to the Board. No material action items arose from the review.

The Board's intention is to undertake a Board evaluation each year and to conduct an externally facilitated performance appraisal every three years in compliance with the Code, with the first external appraisal therefore being conducted during the 2017 financial year.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice        55 of 166        Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

# Corporate governance report continued

**BOARD EFFECTIVENESS** continued
## RE-ELECTION OF DIRECTORS

All of the directors of the Company submit themselves for re-election at the annual general meeting of the Company to be held on 3 June 2016. Each resolution for re-election or election of a retiring director will be proposed as a separate resolution. The Board performance appraisal undertaken during the year has satisfied the Board that the contribution made by each director, and the Board as a whole, to board deliberations continues to be effective and that the shareholders of the Company should support their re-election.

**OTHER BOARD DISCLOSURES**
## CONFLICTS OF INTEREST

The Board are aware of the interest that some Directors have in other businesses in which they have invested. Any conflicts of interest and related party transactions that may arise are monitored by:

- A list of other relevant interests of each Director being circulated to the Board at each of its Board Meetings;
- Each of the Directors are asked to confirm that they have no other interests which would conflict them for the purposes of any item to be discussed at the meeting; where such conflict is reported, the respective Director is not permitted to take part in the consideration of that matter by the Board;
- Each Director discloses to the Board any related party transactions in which they are connected, and such transactions are reported in the Group's financial statements.

Whilst Directors on the Board have other business interests, the Board do not consider that these, nor the time commitment that they require, affect the ability of such Directors to undertake their role or comply with their statutory obligations.

## INDEPENDENT ADVICE

Each of the directors is permitted to obtain independent legal advice at the Company's expense in the performance of their duties as directors. This would normally be managed through the Group Company Secretary.

All directors, and the Board as a whole, also have access to the advice and services of the Group Company Secretary who, under the Chairman's direction, is responsible for ensuring that good Board procedures are followed.

## INDEMNIFICATION OF DIRECTORS

The Company has put in place a Directors and Officers Liability Insurance policy which provides all Board members with insurance cover in respect of liabilities that may arise against the Directors collectively or individually. The Directors do not benefit from any form of qualifying third party indemnities made by the Company.

**BOARD COMMITTEES**

The Board has established an Audit Committee, a Clinical Governance Committee, a Nominations Committee and a Remuneration Committee. The terms of reference for each committee clearly set out its authority and duties and have been approved by the Board. The terms of reference for each committee are available on our website at www.nmchealth.com or available from the Group Company Secretary.

## AUDIT COMMITTEE

**Overview provided by the Chair of the Audit Committee**

This is my third Audit Committee report since my appointment as Audit Committee Chairman in June 2013.

The 2015 financial year has been another busy year for the Audit Committee. As UK listed company reporting and governance requirements continue to evolve, I am pleased to report that both management and the audit committee have been committed to ensuring that they have a good understanding of new requirements as they arise.

This report sets out the work of the Committee, significant matters addressed by the Committee during the year and the responsibilities of, and work undertaken by, the external and internal auditors. In addition, the Board asks the Audit Committee to review various matters in relation to risk and internal control which, during a year of significant strategic activity and acquisitions, is a significant aspect of the Board and Audit Committee focus.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          56 of 166          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

**Membership and attendance**

The Audit Committee has consisted entirely of independent non-executive directors during the year under review. Following Heather Lawrence's decision to step down from the Board, Dr Nandini Tandon was appointed to serve on the Committee. I would like to thank Heather Lawrence for her contribution to Audit Committee deliberations over the last three years.

The Audit Committee members who have served during the year are:

| Audit Committee Member | Position | Period of membership during 2015 |
|---|---|---|
| Jonathan Bomford | Audit Committee Chairman and financial expert | Member and Chairman of Audit Committee throughout the year |
| Dr Ayesha Abdullah | Independent Non-Executive Director | Member of Audit Committee throughout the year |
| Dr Nandini Tandon | Independent Non-Executive Director | Member of Audit Committee since 18 October 2015 |
| Heather Lawrence | Independent Non-Executive Director | Member of Audit Committee until 18 October 2015 |

During the 2015 financial year, the Chairman of the Committee and the Committee's financial expert is Mr Jonathan Bomford. Mr Bomford is a Chartered Accountant and his brief biographical details and experience are set out on page 45 of the annual report.

The Audit Committee met formally five times during the year. The Meetings are scheduled to align with the Group's reporting timetable with planning meetings in advance of both the half-year review and full-year audit, and approving meetings shortly in advance of the announcement of the Group's half-year and full-year results.

Audit committee attendance



| | Scheduled Meetings | Attended Meetings |

Meetings are normally attended by the Deputy Chief Executive Officer and the Chief Financial Officer. The Chairman and some other Non-Executive Directors also attend meetings. The Group Company Secretary acts as Secretary to the Committee. The Committee also meets separately with the external auditors, the internal auditors and management with the other parties not present.

**Key role and responsibilities**

The key role of the Committee is to ensure that the integrity of published financial information by the Company, and the effectiveness of both external and internal audit processes, are appropriate to ensure that the interests of all shareholders are protected.

The Audit Committee assists the Board in:

· discharging its responsibilities with regard to financial reporting, external and internal audits and controls;
· reviewing the Company's financial results announcements, Annual Report and audited financial statements;
· monitoring the independence and extent of the non-audit work undertaken by the external auditors;
· making recommendations to the Board on the appointment of external auditors and the level of their remuneration;
· reviewing the effectiveness of the Company's internal audit activities and internal policies;
· overseeing the Group's compliance processes; and
· oversight of the Group's internal controls and risk management systems although the Board retains control over these matters.

The Audit Committee is required to report regularly to the Board of Directors in relation to its findings on the above and the discussions at each meeting. The ultimate responsibility for reviewing and approving the Company's Annual Report and audited financial statements and the half yearly reports remains with the Directors of the Company.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          57 of 166          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

# Corporate governance report continued

**BOARD COMMITTEES** continued

Main activities of the Committee during the year

During the year, the Committee has focussed significantly on areas of acquisition accounting, corporate governance and management of risk. In addition to the main activities on which the Committee focuses each year, being the Committee's consideration, and approval, of the Interim Results and the Annual Report, specific items which the Audit Committee discussed during the year included:

### Accounting for major acquisitions.

There are a number of aspects in relation to the Group's acquisition strategy which had an impact on accounting and audit matters during 2015. These included accounting in relation to the new long term financing facility, various aspects of each acquisition, including accounting for goodwill, judgements in respect of contingent consideration, work on the purchase price allocation including the identification of intangible fixed assets, assessing the accounting policies within each business for consistency with NMC accounting policies and also evaluating the internal control environment in the acquired businesses. These and related matters took up significant audit committee time during the year.

The Committee also re-visited and discussed the accounting treatment of consultancy services provided by the Group to both Americare and Dr Sunny Healthcare before the acquisition of those entities. This resulted in consultancy services recorded as revenue in the 2015 Half Year Results being adjusted from purchase consideration in relation to each acquisition. Further details in relation to this issue are set out in Note 5 to the Consolidated Financial Statements on page 117 to 122.

### Review of risk assessment for 2015 audit

The areas of significant risk which the auditors consider to be key for their audit focus, is an important and increasing area of Audit Committee deliberations. Whilst the auditors determine the areas of significant risk when assessing their audit program, the relevance to the audit committee is to ensure that the auditors have, what the committee believe, is the correct focus during their audit for the benefit of both the Company and its shareholders. A number of useful discussions were held in relation to audit focus, particularly given the acquisitive nature of the Group in 2015.

### Governance requirements

The various levels of Governance requirements facing UK Premium listed companies is ever growing. Focus for the Committee during the year has been the new requirements for a long term viability statement. Whilst the Board has always considered the longer term financial position of the Group, particularly in consideration of its growth strategy, the formality of additional review required, and the parameters of that review, has been a focus for the committee. The Committee has also reviewed feedback included in the FRC's Audit Quality Inspection reports 2014/15.

### The internal audit program.

Principal Internal Audit Reports are presented at Committee meetings twice a year with other updates from the Internal Auditors as required. During 2015, the internal audit plan has again been focused on areas considered to be key and strategic risks to ensure that these are closely and independently monitored. In addition to their core internal audit program, the Internal Audit remit was also expanded to carry out a review across aspects of the controls within the UAE acquired businesses and to review work carried out in relation to the implementation of the greenhouse gas data reporting within the businesses.

### Revenue recognition

The Group has a number of revenue streams across both its Healthcare and Distribution divisions. In addition, given the significant number of acquisitions undertaken by the Group in 2015, there are a number of areas within both divisions where the recognition of revenue has been reviewed to ensure that the correct treatment of principal versus agency revenue has been adopted in all business areas. There is a risk that incorrect accounting treatment could be adopted within a particular business unit, for example agency revenue being treated as principal revenue. Any error of this nature would affect the Revenue and not the EBITDA of the Group. The Committee has reviewed the different treatment adopted by management in each relevant business unit and is comfortable with the accounting for revenue across the Group.

Other considerations and activities of the Committee

### Internal control

The Committee has reviewed the process by which the Group evaluates its control environment across all of its businesses. The Chief Financial Officer provides a report to the Audit Committee on the effectiveness of internal controls and confirms to the Committee whether or not he is aware of any significant fraud that may have occurred within the business. The internal auditors also undertake a review across a wide range of control areas to give the Audit Committee and the Board assurance on the internal control environment.

### Risk management

The Committee oversaw a management project in Q4, 2014 and Q1, 2015 to implement an enhanced risk management program. This risk register and the risk management process will normally be kept under specific review by the Audit Committee, although in 2015 the Board received primary strategic risk presentations as part of their discussions. Further information in relation to the risk management process is set out on pages 37 to 39.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          58 of 166          Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

### Internal audit

A review of the work undertaken by the Group's internal auditors is an agenda item for the majority of Audit Committee meetings. The internal auditors report to the Committee their findings together with action plans to resolve any matters which they believe require to be addressed. Action plans are graded with key high risk matters taking priority to be resolved.

### External audit and auditor independence

The Committee believes that the effectiveness of the external audit is dependent on the identification of key risks during the financial year under review. EY produces and discusses with the Committee a detailed audit plan identifying these key risks, the focus of audit procedures and the work to be done to test management's assumptions and accounting treatment in these areas.

The Committee meets separately with the External Auditors to ensure that an independent dialogue is maintained in relation to monitoring key business and financial risks and to ensure that management have not restricted the scope of their audit. The Audit Committee Chairman also meets with the lead audit partner on a number of occasions during the year outside the formality of Audit Committee meetings.

The Committee discusses separately with management matters arising from the audit process and also to assess their view of the effectiveness of the audit work being undertaken.

The Committee did not undertake a formal review of the effectiveness of the external audit during the year although the Audit Committee and the external auditors discussed the FY2014 audit process in detail, including matters which had worked well and areas of improvement in the audit process for FY2015.

### Auditor fees and appointment

EY were appointed as auditor to the Company at the time of the Company's IPO in April 2012. The level of audit fees paid in relation to the 2015 financial year is set out in Note 13 to the Consolidated Financial Statements.

### Non-Audit fees

During FY2015, the level of non-audit fees, excluding the fees for the half-year review, amounted to a total of US$0.13m.

The Audit Committee has adopted a non-audit fees policy whereby it will only permit such fees in circumstances where they feel that use of the auditor firm is necessary, appropriate or efficient, and has delegated authority to the CFO to agree such projects subject to a strict cap on fees in relation to each financial year.

### Auditor Independence

The Audit Committee formally reviewed the independence of the Company's auditor, EY, during the period under review. The review took account of the relationship between management and the audit team, the processes that EY have in place internally to ensure objectivity and independence and also the level of non-audit fees incurred during the year.

As part of this review the Committee reviewed the potential threats to auditor independence as a result of:

- auditor self-interests, being those areas where the auditor may have a financial or other interest in the Company;
- auditor self-review, being areas where the results of non-audit services are reflected in the amounts included or disclosed in the financial statements;
- management threats, which may occur if partners or employees of the auditor take decision on behalf of management; and
- other threats, such as familiarity and intimidation.

The Audit Committee is satisfied that in all areas sufficient safeguards were adopted by the auditor and that the independence of EY and of the audit engagement partner had not been compromised. There is no limitation of liability in the terms of appointment of the Auditor for the audit of the Company's financial statements.

The Company has not yet completed five financial years since incorporation, and therefore to date has not been required to comply with any provisions of the September 2014 Competition and Markets Authority Order.

### JONATHAN BOMFORD, FCA
On behalf of the Audit Committee

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          59 of 166          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

Governance

# Corporate governance report continued

**BOARD COMMITTEES** continued
## CLINICAL GOVERNANCE COMMITTEE

**Overview provided by the Chair of the Clinical Governance Committee**

This my first report to you as the new Chair of the Clinical Governance Committee. I would like to thank the previous Chair of the Committee, Heather Lawrence, for her work in chairing the committee since its inception in 2013. The Committee has made good progress under her guidance and it intends to further this development as the Group grows as a result of its strategic acquisition program.

The Clinical Governance Committee meets regularly to provide Board oversight in the key area of Clinical Governance. The Committee works with management to ensure that the governance structure within the healthcare business is appropriate to ensure that clinical care is enhanced and that clinical quality indicators are monitored and maintained at a high standard. This oversight is designed to mitigate as far as possible the risks associated with operating a healthcare organisation.

Good progress has again been made during a very busy year with the majority of key clinical care indicators remaining at a strong level or improving. A wide range of clinical care indicators are being monitored and a governance structure is now in place in each of the Group's new healthcare facilities.

**Membership and attendance**

As well as my appointment as Chair of the Committee, the Committee has also been slightly restructured.

The Committee consists of a majority of Non-Executive Directors and also now includes Dr C R Shetty, the Group Medical Director. Her experience of governance structures operating in the Group, and the standards by which the Healthcare businesses are monitored, is very important to the Committee's ongoing monitoring of clinical care.

The Clinical Governance Committee members who have served during the year are:

| Clinical Governance Committee Member | Position | Period of membership during 2015 |
|---|---|---|
| Dr Ayesha Abdullah | Independent Non-Executive Director and Clinical Governance Committee Chair | Member of Clinical Governance Committee for the full financial year and Chair of the Committee since 18 October 2015 |
| Heather Lawrence | Clinical Governance Committee Chair | Member and Chair of Clinical Governance Committee until 18 October 2015 |
| Binay Shetty | Non-Executive Director | Member of Clinical Governance Committee for the full financial year |
| Dr C R Shetty | Group Medical Director | Member of Clinical Governance Committee since 18 October 2015 |
| Dr Nandini Tandon | Independent Non-Executive Director | Member of Clinical Governance Committee for the full financial year |

The Chair of the Clinical Governance Committee is also a member of the Audit Committee which assists in ensuring that the two committees interact providing an overall control and governance framework to manage the Group's key clinical risks.

Meetings of the Committee are scheduled three times per financial year. In addition to the Clinical Governance Committee members, the Vice President - Quality and Standards attends each meeting. The Group Company Secretary is Secretary to the Committee.

Clinical Governance Committee attendance



| | |
|---|---|
| ▦ Scheduled Meetings | ▦ Attended Meetings |

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          60 of 166          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

**Key role and responsibilities**
The establishment of the Clinical Governance Committee was undertaken as a result of an appreciation of the clinical risks faced by the Group.

The key role of the Committee is to oversee governance structures, processes and controls in relation to Clinical matters in place within the Group healthcare operations. This is to ensure that the risks associated with clinical care are mitigated in the interests of the Company and its stakeholders, including shareholders. As a result the Committee is a key aspect of the Group's internal control environment.

**Main activities of the Committee during the year**
Specific responsibilities of the Committee, and work undertaken by it during the year, include:

- Ensuring processes and controls are in place across the NMC Healthcare hospitals to promote safety and excellence in patient care and manage risks arising from clinical care on a continuing basis;
- Review the systems of clinical governance, monitoring that they operate effectively and that action is being taken to address any areas of concern;
- Review clinical performance indicators quarterly;
- Reviewing the KPI monitoring put in place in the Group's new healthcare facilities, Brightpoint Royal Women's Hospital and NMC General Hospital in DIP, to ensure that standards are maintained during their ramp-up phase;
- Reviewing the implications of new regulations and standards compliance implemented by our local health authority regulators;
- Initial reporting from Clinica Eugin, which was acquired by the Group during the year;
- Reviewing patient satisfaction data across all facilities;
- Specific review of the process undertaken when patients are transferred between our facilities and other medical facilities and institutions; and
- Discussion in relation to the use and benefits IT systems for all aspects of patient care and information monitoring.

**Principal Management activities on clinical governance matters during the year**
2015 has been a very busy year for management in relation to quality and clinical governance matters. In addition to new regulations and standards implemented by our regulators during the year to ensure that quality provided by UAE healthcare providers continues to be enhanced, two of the Group's primary facilities, Dubai and Al Ain Specialty Hospitals, completed their triennial JCI re-accreditation during the year with excellent results.

Sheikh Khalifa Hospital in Umm Al Quwain, which is managed by NMC, achieved JCI accreditation in June 2015. In addition, work has commenced to prepare for JCI accreditation surveys in both NMC General Hospital, DIP and Brightpoint Royal Women's Hospital during 2016. The triennial re-accreditation of Abu Dhabi Specialty Hospital is also due to take place in Q2, 2016.

In addition to the increasing size of the Group, and the continued monitoring program across the Group's facilities, the regulatory and standards workload has been significant. The Committee is delighted with the dedication and determination of management and all of our employees to keep up to date with regulatory changes and new standards ensuring that the Group is well positioned in its compliance with its requirements as well as offering an excellent and safe service to our patients.

The Quality and Clinical teams also continue their excellent work ensuring that clinical care monitoring within the business has been further enhanced which gives assurance to management and the Board that clinical risk is mitigated. Finally, I would like to thank my fellow Committee members for their contribution during the year.

**DR AYESHA ABDULLAH**
For and on behalf of the Clinical Governance Committee

Exhibit 4 to B.R. Shetty's Request for Judicial Notice        61 of 166        Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

Governance

# Corporate governance report continued

**BOARD COMMITTEES** continued
**REMUNERATION COMMITTEE**
Membership and attendance
The Remuneration Committee consists of four Non-Executive Directors, three of whom are Independent Non-Executive Directors, with an Independent Non-Executive Director holding the chairmanship of the Committee. During the 2015 financial year, the following served as members of the Committee for the full financial year:

| Chairman: | Lord Clanwilliam |
|---|---|
| Committee members: | Abdulrahman Basaddiq |
| | Jonathan Bomford |
| | Salma Hareb |

The Chairman of the Company is invited to attend Remuneration Committee meetings. The Executive Vice Chairman and Chief Executive Officer and the Deputy Chief Executive Officer do attend some Remuneration Committee meetings and the Chairman of the Committee discusses proposed remuneration policies with them during their formulation. No Director is present when their own remuneration is discussed.

The Group Company Secretary acts as Secretary to the Remuneration Committee and provides advice to the Committee on Corporate Governance aspects relating to remuneration matters. He also provides assistance to the Chairman of the Committee as required in discussions with the Remuneration Committee advisers and on implementation of Committee decisions. The Group Company Secretary is not present when his own remuneration is discussed.

The Committee met three times during the financial year.

Remuneration Committee attendance

| | |
|---|---|
| Lord Clanwilliam | 3 |
| | 3 |
| Abdulrahman Basaddiq | 3 |
| | 3 |
| Jonathan Bomford | 3 |
| | 3 |
| Salma Hareb | 3 |
| | 3 |

■ Scheduled Meetings    ■ Attended Meetings

Key role and responsibilities
The Remuneration Committee assists the Board in:

- making recommendations to the Board on the Company's framework of executive remuneration, including the use of incentive arrangements within that framework; and
- determining, on the Board's behalf, the entire individual remuneration packages for each Executive Director and advising the Chief Executive Officer in relation to the level of remuneration the Committee feel is appropriate for the Senior Management Team.

All other recommendations must be referred to the Board for approval.

No Committee member is permitted to participate in any discussion or decision regarding his/her own remuneration. The remuneration of non-executive directors is a matter for consideration by the Chairman of the Company, assisted by the Remuneration Committee Chairman, and the Executive Directors.

Main activities of the Committee during the year
The principal activities of the Committee during 2015 are set out in the Directors' Remuneration report on page 65 to 83.

The Directors' Policy and Remuneration Reports are set out on pages 65 to 83.

58    NMC Health plc Annual Report and Accounts 2015

## NOMINATIONS COMMITTEE

The Nominations Committee consists of three Non-Executive Directors, two of whom are Independent Non-Executive Directors, one of whom holds the chairmanship of the Committee. During the 2015 financial year, the following served as members of the Committee for the full financial year:

| | |
|---|---|
| Chairman: | H.J. Mark Tompkins |
| Committee members: | Abdulrahman Basaddiq |
| | Lord Clanwilliam |

The Nominations Committee has a role to assist the Board in:

- reviewing and making recommendations to the Board in relation to its structure, size and composition;
- reviewing succession planning in place for senior management;
- determining the appropriate skills and characteristics required of directors; identifying individuals qualified to become Board members and recommending such individuals to the Board;
- recommending individuals to be considered for election as Directors at the next Annual General Meeting of the Company or to fill vacancies; and
- preparing a description of the experience and capabilities required for a particular Board appointment.

Following the significant changes to the Board and work undertaken on the Senior Management Team structure in 2014, the Committee only met once during the year to discuss the new job title given to Dr B.R. Shetty which more reflects the wider strategic and visionary role which he undertakes. All Committee members were present at this meeting.

Other than in relation to specific matters which the Nominations Committee will be required to discuss, it is expected that the Nominations Committee would normally meet at least once in each financial year, or otherwise as requested by any member of the Committee. The Committee would expect to meet to consider appropriate candidates to fill any vacancy created on the Board should such a vacancy arise or be considered appropriate given other skills and experience on the Board.

The duties and activities of the Committee during the year are disclosed in the Company's Annual Report and audited financial statements each year.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          63 of 166          Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

# Corporate governance report continued

**BOARD OVERSIGHT OF SYSTEM OF INTERNAL CONTROL AND RISK**
**OVERVIEW**
Management is responsible for establishing and maintaining adequate internal controls over financial reporting and operational matters across the Group. The Board is responsible for reviewing such internal controls and for ensuring that they are effective to properly manage the Group's businesses.

**STRENGTHENING OF INTERNAL CONTROLS**
In recent years, as the Group has progressed an organic and inorganic growth strategy, in order to strengthen the governance and control structure further across the Group, management have progressively been:

- incorporating additional key internal controls into its financial and operational processes;
- implementing new policies and procedures covering all aspects of the Group's accounting policies and controls;
- extending its Quality Team and the Group's Quality and Clinical Governance processes;
- enhancing the Group's Internal Audit function which independently reviews and monitors key business processes; and
- developing new financial and hospital management IT systems.

All of these changes are part of an overall process to improve the Governance structure within the Group and to improve further the Group's formal internal control processes.

**CHALLENGES**
Acquired businesses
The businesses which we have acquired in 2015 all operated under differing levels of control. Similar to the NMC Group prior to preparation for its IPO in 2012, some of these businesses have a very centralised approach to control, with the majority of the controls over all financial and operational aspects of each business resting with a small number of individuals and, in some of the businesses, being manual in nature. We consider this to be a normal environment in which private family owned businesses have been used to operating.

IT environment
Management recognise that the Group's IT systems are not fully integrated and that an element of manual control procedures are still prevalent across the Group. Whilst this is still the case, the manual processes, supported by legacy IT systems in many of the Group's businesses, have provided a robust level of controls for a number of years.

**PRINCIPAL RISKS**
In Q4, 2014 management reviewed its approach to the monitoring and control of risks within the Group and implemented an enhanced risk management program.

The various layers of corporate, healthcare and distribution division management were involved in a program under which the Group's key risks were developed through a bottom up process and then reviewed alongside the macro-economic environment within which the Group operates through a top down review process to establish a Strategic Risk Register. This Strategic Risk Register is reviewed and updated regularly.

The Board has undertaken a robust assessment of the principal risks facing the Company, including those that would threaten its business model, future performance, solvency or liquidity. Further details on the approach taken to assess risks, and of the Group's strategic risks, are set out on pages 37 to 39. The board's appetite for risk, the internal controls and processes in place to mitigate business risks and the Board's review of the effectiveness of the control environment are set out below.

**CONTROLS AND RISK MITIGATION**
Financial and operational controls
The Group has, for over 40 years, grown into a substantial business and a leader in the provision of private healthcare, as well as operating a substantial distribution business, in the United Arab Emirates. The Group is a regulated business operating many regulatory, financial, clinical and quality control procedures.

The key elements of the Groups' internal controls are as follows:

- An annual budget and updated long-term forecasts for the Group that identifies risks and opportunities which are reviewed and approved by the Board. As part of these processes, management and the Board have processes in place to review appropriate risks faced by the Group and also a formal viability review which considers the Group long term viability.
- As part of the annual budget process, budgetary goals are set by the corporate office and these goals are monitored on an ongoing basis within each subsidiary by their accounting and finance teams. MIS teams monitor business performance. Within each subsidiary, these teams provide relevant analyses to operational management which assists in prudent decision making. Such information is also periodically reported to, and consolidated by, the corporate office teams, which analyses consolidated performance against budget.
- Monthly meetings at which the Senior Management Team review Group financial and operational performance, progress on capital projects and other principal functional areas of the business.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          64 of 166          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

- A system of internal monthly operational and financial reporting which includes monthly comparison of results and against budget and forecast, a review of KPIs, each discussed with additional management commentary and the reporting of key matters arising within the business during the month under review. The Group has a very flat organisational hierarchy resulting in an easy flow of information throughout the organisational structure. Communication of exceptional items happens naturally.
- A defined process for controlling capital expenditure, including appropriate authorisation levels, which is monitored and approved by the Board as appropriate.
- The financial statements of each subsidiary are drawn up by relevant accounting departments, which ensure compliance with local tax and regulatory requirements. These subsidiary company financial statements are subjected to a limited review for the Group's interim financial statements and a complete audit carried out by the auditors for all the subsidiaries for the Group's year-end financial statements.
- Reporting of accounting information, in standardised monthly reports, is carried out on the basis of a schedule established by the Corporate Accounts department. Each subsidiary applies Group procedures for the recording of accounting data for inclusion in the interim and annual financial statements.
- The reporting of subsidiaries is established according to the accounting policies of the Group, which are formalized in a Group policies manual given to all the subsidiaries.
- A formal process through which approval for organic and inorganic expansion projects is given. A formal transaction request paper is produced including details of the proposed transaction, how the transaction will be financed, market studies, strategic benefits and longer term effects on the Group, due diligence and key transaction risks are considered.
- Medical Directors' meetings to monitor clinical governance procedures.
- The production of quarterly and annual Quality reports.
- An appropriate approach to decentralisation and internal oversight within the Group.
  - Each NMC healthcare facility has a Medical Director and Head of Administration who are accountable for the operation of the facility. In relation to facilities acquired through the Company's acquisition program, these are generally smaller facilities and therefore managed by the lead clinician. This structure ensures that both our larger and smaller facilities have an appropriate organisation to provide effective and efficient management of both clinical and non-clinical areas.
  - Within the Healthcare division structure, a number of multidisciplinary committees are in place to monitor guidelines in respect of patient safety and quality, medication management, infection prevention and control, medical record documentation and facility management.
  - Both Healthcare and Distribution divisions have Financial Controllers and a finance team and are managed through fundamental activities of planning, executing and checking. The strategic direction of all operations is governed by the corporate office. With the exception of certain operations in some of the acquired businesses, which are in the process of being integrated into group procedures, all banking, treasury, procurement and payment processing is centralised within Group functions, but accounting for payments is decentralised.
  - The Senior Management Team believes that these divisions of responsibility at both facility and corporate levels provide a natural check and balance across all internal control areas.

- A delegation of authority which provides that very few individuals within the organisation have payment approval authority. Access to cash is also restricted to very few individuals. All material payments, including within the acquired businesses, are restricted to the senior management team.
- Group businesses hold very sensitive as well as personal information and data as part of their operations. To guard against the material risk of a cyber threat, the Group has numerous controls and procedures in place to control such threats. In addition, Group businesses are ISO27001 certified and as part of this certification an independent third party undertakes an annual information and systems security audit.
- Specifically in relation to acquired businesses, initial primary controls are implemented following completion of each transaction. The Group's policies and procedures, covering both operational and financial aspects of each business, are incorporated into each acquired business over an appropriate timeframe.

### Independent and regulatory controls

As a regulated business, the Group operates within a framework of managing all elements of risk which arise within the Group. As a result there are a number of ways in which the Company both internally and independently monitors its keys risks.

### Internal Audit

An effective externally provided Internal Audit program independently assists management in identifying key risks to business operations and monitors those risks through an Internal Audit program agreed with both management and the Audit Committee.

The Internal Auditors report directly to the Chairman of the Audit Committee but work in conjunction with the CFO. Their reports to the Audit Committee are received and discussed at Audit Committee meetings twice a year, usually in June and December.

Following the completion of each review, the internal auditors identify areas for remedial action and the required action plans are discussed and agreed with management. All areas requiring remedial action are highlighted as high, medium or low risk areas. The internal auditors present the reviews and the agreed management action plans for any remedies to the Audit Committee and then monitor the implementation of any required changes on behalf of the Audit Committee.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice    65 of 166    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

# Corporate governance report continued

**BOARD OVERSIGHT OF SYSTEM OF INTERNAL CONTROL AND RISK** continued
**CONTROLS AND RISK MITIGATION** continued

The consideration by management of the key risks faced by the Group is crucial to the work to be undertaken by the Internal Auditors. Management consider such risks before discussing with the internal auditors their planned areas of focus for reviews in each financial year. The Internal Audit plan for each year is agreed with the Audit Committee.

Crowe Horwath have provided internal audit services to the Group for a number of years. Whilst some internal audit reviews have been carried out in the acquired businesses in 2015, management are currently in the process of rolling out the formal internal audit program for implementation into the acquired businesses in 2016.

## Quality and Regulatory oversight

Aside of financial risks, the Board is aware that as a significant healthcare and distribution business it is subject to a range of risks related to clinical care, quality and product safety.

The Healthcare division, and elements of the Distribution division, are regulated by governmental and non-governmental organisations. In summary:

- Each UAE Healthcare facility is licensed by one of four regulatory bodies which exist in the UAE. The regulatory bodies monitor performance and clinical procedures against its regulations, key metrics and guidelines;
- Clinica Eugin is subject to local regulatory standards and laws applicable in each jurisdiction in which they operate;
- Each of the Group's three Specialty Hospitals, the Sheikh Khalifa Hospital in Umm al Quwain which is managed by the Group, and the clinical laboratory of Dr Sunny Medical Centres are accredited by Joint Commission International, an internationally renowned organisation monitoring clinical metrics and quality of patient care;
- The distribution of pharmaceuticals is controlled through the UAE Ministry of Health;
- The majority of the Group's healthcare revenue results from medical insurance arrangements. The Group's contractual arrangements with insurance providers include the monitoring of claims processing and clinical outcomes.

The Group has a Quality Team which operates in both the Healthcare and Distribution divisions. Quarterly and annual Quality reports monitor performance against a range of key KPIs based on clinical quality and safety metrics.

## Board Committees

The Board and its committees provide independent oversight of management's control systems, in particular the Audit Committee in relation to finance related matters and the Clinical Governance Committee in relation to clinical matters. The work and oversight of the board committees is set out on pages 62 to 63.

### Risk appetite

As there are multiple risks associated with the healthcare and distribution sectors, the process of risk management is an essential mechanism to enable risk based decision making process. The Board recognizes that complete risk control/avoidance is impossible, but that risks can be reduced by putting the right controls and mitigations in place as well as agreeing on a threshold for risk taking (risk appetite).

Risk appetite provides a structure within which opportunities can be pursued by setting out which, why and how much risk the Group is willing to take. The Senior Management Team has approved a set of risk appetite statements covering different views on the risk landscape surrounding NMC's business environment whilst addressing various risk classes. For each risk class, Key Risk Indicators (KRIs) were articulated to alert against unacceptable loss events.

The purpose of setting limits and triggers is to avoid concentrations of risk which would be out of line with internal or external expectations and to:

- keep business activities aligned to the strategic goals of the Group;
- ensure activities remain of an appropriate scale relative to the underlying risk and reward;
- ensure risk-taking is supported by appropriate expertise and capabilities.

## General Risk Appetite Statement

The Company will not accept any risks that would cause losses due to:

- malpractice,
- significant decline in patient satisfaction rate,
- brand damages,
- hospital acquired infections,
- decrease in the utilization rate for outpatient clinics,
- uncontrolled discharge for inpatients,
- downtime of life saving/ sustaining systems,
- inaccuracy of patients' records,
- non-compliance with internal and/or external controls and standards/ regulatory bodies,

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          66 of 166          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

- sensitive information/ patient record confidentiality breach/ loss,
- loss of sole distribution partnership agreement,
- loss of key staff/ key specialities,
- acquisitions, which are expected to be accretive and not dilutive.

NMC Board of Directors has approved a set of thresholds presented by management which relate to multiple business dimensions in the Healthcare and Distribution divisions to protect shareholders' value. Any areas falling short of the agreed indicators will be highlighted by management for action.

### Effectiveness of Internal Controls

The Board has overall responsibility for the Group's systems of internal control and on behalf of the Board, the Audit Committee has been engaged in the process of ensuring that management have established continuous processes for identifying, evaluating and managing the risks the Group faces. These processes include the reporting from the finance department on Group performance, the work of the internal auditors and issues identified by the external auditors to the extent covered by their audit work. The Board is responsible for monitoring the ongoing effectiveness of these systems and for conducting a formal annual review of the effectiveness of the Group's internal controls.

A system of internal controls is designed to manage, rather than eliminate, the risk of failure to meet business objectives and is designed to provide reasonable, but not absolute, assurance against material misstatement or loss.

In reviewing the effectiveness of the internal controls in place during the year, the Audit Committee considered, amongst other matters, manual controls in place, the independence of the separate operating units, the delegation of authority, the balance of centralised and decentralised systems and the reporting process in relation to exceptional items.

The Audit Committee has noted that the Group does not operate under a fully integrated high end IT environment and therefore an element of manual intervention is prevalent within the Group, including the businesses acquired during 2015. The Board has approved the implementation of a new Hospital Information System which, together with the implementation of the new ERP financial system, will result in a new integrated IT system becoming fully functional across the Group.

The Board notes that the implementation of new IT systems will not change the level of controls inherent in the business, but they will remove elements of manual intervention from financial and operational processes. Management have taken time to ensure that all previous business processes are captured within the new IT systems. The roll out of the new ERP system into the Healthcare division, whilst delayed during the initial execution of the Group's strategic growth plan due to the challenges faced by the group in the initial testing phase, is now well underway across the Group and the final testing phase is in progress. In addition to the growing nature and structure of the Group, there have also been challenges in relation to the roll out of the ERP system into the Distribution division as a result of the volume and types of transactions to be captured. The Group has now finalised the time schedule for final roll out of the ERP system for both Healthcare and Distribution divisions. This schedule indicates the commencement of final roll out across the Group beginning in Q3 2016 and, given the number of business units now involved, is due for completion in Q2 2017.

The Audit Committee have also noted the challenges faced as the acquired businesses are integrated into the Group. Such acquired businesses have differing levels of controls within their businesses. The Audit Committee have noted the initial primary and delegated authority controls which are put in place in the acquired businesses following completion as well as the roll out of financial and operational reporting requirements. The Committee has noted that some elements of the Group's policies and procedures have been implemented in these businesses, and this will continue into 2016.

The Board has reviewed the effectiveness of the Group's systems of internal controls for the 2015 financial year, in light of the key elements of the Group's internal controls outlined above. Given the additional internal controls that have been incorporated into the Group's financial and operational reporting process, such that sufficient internal controls were in place to monitor the Group's key risks, the Board believes, having evaluated the effectiveness of the internal controls and procedures, that these were effective during the period covered by this report. The Board also believes that the process undertaken by the Board and its Committees to monitor the internal control environment, accords with the guidance provided in the FRC's Guidance on Risk Management, Internal Control and Related Financial and Business Reporting.

### SHAREHOLDER ENGAGEMENT

The Company is committed to communicating with shareholders and stakeholders and to be available to meet with shareholders who require additional explanation of any matter which is of concern to them.

The Chairman and Senior Independent Non-Executive Director are also available, either through contacting the Company Secretary or at the Company's Annual General Meeting, to discuss any matters within their areas of responsibility or where individuals do not feel it is possible to discuss these matters with management.

During 2015, the Company has continued to focus on its formal program of investor interaction including one-to-one meetings with institutional investors and attendance at investor conferences. Mr Roy Cherry, who is the Head of Strategy & Investor Relations and a member of the Senior Management Team, leads these efforts.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice    67 of 166    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

Governance

# Corporate governance report continued

**SHAREHOLDER ENGAGEMENT** continued

During the financial year ended 31 December 2015, the Company issued its 2014 audited results and its 2015 half year unaudited results. In addition, given the significant strategic activities during the year, the Company kept shareholders updated regularly with regards to its long term financing and its material acquisitions, and the effect that these have on the Group.

Aside from direct shareholder meetings, the principal ongoing communication with shareholders will be through the publication of the Company's Annual report and audited financial statements and Interim Results as well as the opportunity to question the Board and Committees at the AGM. Shareholders are encouraged to attend the AGM and if unable to do so are encouraged to vote by proxy.

The Company has an investor relations section on its corporate website, www.nmchealth.com. This has been updated regularly with information that the Company considers relevant to its investors. Additionally, the number of analysts monitoring the Company and issuing notes in relation to their forecasts and expectations for the group continues to increase.

**ETHICS**
**WHISTLEBLOWING POLICY**
A confidential whistleblowing procedure is in operation allow employees to raise concerns of possible improprieties in relation to either operational or financial conduct.

**BRIBERY ACT 2010**
The Group has an Anti-Bribery and Anti-Corruption Policy which applies to all directors and employees of all Group Companies. The Policy, which has been communicated to all employees, includes clear statements setting out the Group's Anti-Bribery measures and Anti-Corruption culture. Practical guidance has been issued in relation to specific circumstances considered to be most relevant to Group employees. These include guidance notes for clinical staff attending pharmaceutical and training and development conferences in relation to entertainment and other possible inducements, as well as guidance notes in relation to the receipt of free products and equipment and how such products and incentives may affect clinical judgement. Specific guidance has also been provided in relation to the provision of sales incentives to senior sales and marketing staff within our Distribution division.

Employees have been provided with a copy of these policies and are aware of the significance of them. New employees receive training on all company policies and procedures as part of their induction program. A copy of the policies is included on the Company's employee intranet.

The Governance Report set out on pages 41 to 85 has been approved by the Board and is signed on its behalf by:

H.J. MARK TOMPKINS
Chairman

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          68 of 166          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

# Directors' remuneration report 2015
## Letter from the Remuneration Committee Chairman

Dear shareholder

This year I am writing to you on the back of an outstanding performance by management and to outline the initial actions which the Remuneration Committee have taken, and feel are appropriate, to start to align executive remuneration with the size of the organisation, the increased scope of the roles and market positioning.

**TRANSFORMATION AND GROWTH**

As shareholders will be aware, 2015 was a very busy and successful year for us, and a year during which management, with the Board's support:

- Developed an updated Group strategy to grow significantly through acquisition;
- Put in place a long-term financing structure to ensure that the Group is well financed for this next period of growth;
- Focussed on developing a number of healthcare verticals to make available to our patients a fully integrated care pathway;
- Executed a significant number of accretive acquisitions towards the achievement of our strategy;
- Continued to focus on our existing businesses producing an improved performance in the year which can be seen in our Group Strategy Report on pages 6 to 39; and
- Completed development of our flagship NMC Royal Hospital, Khalifa City, which when fully opened will operate 250 licensed beds and provide all multi-specialty care.

These actions have built on the solid base developed by the Group in the period since IPO in:

- Implementing the considerable step-change in culture from the requirements of a privately owned family business to a thriving public company;
- The successful execution of the initial organic and then subsequent acquisitive growth strategy; and
- Continued effective management of a vastly different and more complex Group, which has grown more than 50% since 2014.

As a result of the progress made by the management team, the Remuneration Committee has discussed its approach to rewarding and incentivising management in the future. A number of factors were considered to ensure an informed debate, including Company performance and external market data.

Over the 2015 financial year, our market value has increased by 82.7% bringing the total increase since IPO to 300%. An independent report requested by the Remuneration Committee in considering its plans for 2016 remuneration has shown that the Company is within the top three of all FTSE250 companies across a number of short and long term metrics, including total shareholder return both over one year and the last three years. For example, our three year TSR has been c. 300% compared to an average of 52% in the FTSE 250.

The Committee also considered external market data prepared by Deloitte LLP when determining the approach to pay for our Executive Directors. Companies positioned within the top quartile of the FTSE 250 based on their financial size were chosen by the Committee as a relevant reference point, therefore we have sought to ensure that our Executive Directors are competitively positioned against this group.

The market data shows that the Executive Directors have in prior years received remuneration at levels well below comparative market levels. The Committee has therefore decided to take a phased approach to aligning Executive Director remuneration to appropriate market levels.

Given this background, the Remuneration Committee has increased in 2016 the base salary of the Executive Vice Chairman & CEO to £650,000 and the Deputy CEO to £550,000. The Committee felt it was important to recognise:

- the fundamental role our Executive Directors have played in the Group's progress which, supported by the Board and shareholders, have translated into a significant and sustained increase in value for our shareholders; and
- the importance of our management team in achieving our future strategic objectives and the need to retain them. We have therefore sought to position them competitively against the relevant market reference point.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice    69 of 166    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

Governance

# Directors' remuneration report 2015 continued
## Letter from the Remuneration Committee Chairman continued

**INCREASE IN STIP OPPORTUNITY IN 2016**

In relation to the operation of the STIP for the 2016 financial year, the Company's intention is to increase the maximum STIP opportunity for the Executive Directors to 150% of base salary. The way in which any award from the 2016 STIP will be delivered will also change from previous years, with one-third of any STIP award being made in cash and two-thirds deferred into shares, half of which will vest one year after the award is made and the other half two years after the award. The measures and targets against which the 2016 STIP will be assessed is set out on pages 76 to 77.

This change to the operation of the STIP is outside the scope of the Company's remuneration policy approved at the 2014 AGM and is therefore subject to approval of shareholders at the 2016 AGM.

**FUTURE REMUNERATION POLICY**

The Committee is satisfied that, with the exception of the level of maximum STIP opportunity which shareholders will be asked to increase for 2016, the current remuneration policy continues to be appropriate, no further changes should be proposed this year with all remaining elements of remuneration will be in line with the remuneration policy that was previously approved by our shareholders at our 2014 AGM.

The remuneration policy must be approved every three years and the Committee will conduct a full review of the current remuneration policy in advance of submitting a new policy for shareholder approval at the 2017 AGM.

LORD CLANWILLIAM
Chairman of the Remuneration Committee

Exhibit 4 to B.R. Shetty's Request for Judicial Notice                70 of 166                Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

# Directors' remuneration report 2015

**INTRODUCTION**

This Directors' Remuneration Report is divided into two sections.

Firstly the Remuneration Policy summarises our policy on remuneration which was approved by shareholders at the Company's AGM in June 2014. The Committee believes that, with the exception of a change in the way in which the Remuneration Committee wishes to operate the STIP in 2016 as set out in the Letter from the Remuneration Committee Chairman above, the remainder of the remuneration policy continues to support the Group's strategy and therefore no other changes in the policy are being proposed this year. Therefore, the remuneration policy set out below is in summary form only for shareholder information and a copy of the full Directors' Remuneration Policy document can be found on our corporate website at www.nmchealth.com/shareholder-information.

Secondly, the Annual Remuneration Report details of how our remuneration policy was implemented in the year ended 31 December 2015, and what remuneration was paid to the Directors for that period, and then how we intend for the policy to apply for the year ending 31 December 2016.

The Annual Remuneration Report will be subject to an advisory shareholder vote at the 2016 AGM.

Where the information is subject to audit in this Directors' Remuneration Report this is identified in the relevant heading.

**SUMMARY OF EXISTING REMUNERATION POLICY**

In this remuneration policy section, we summarise the remuneration policy for the Board which shareholders approved at the Company's 2014 AGM. The full remuneration policy can be found on the Company's website.

**CONSIDERATIONS FOR REMUNERATION POLICY**

The Committee is aware of the need to be mindful of potential risks associated with elements of executive remuneration. The Committee is keen to ensure that variable remuneration is not structured in such a way as to encourage the taking of undue business risks for the purposes of achieving higher remuneration.

However, given the Board's acquisitive growth strategy, the Committee feels that executives should be incentivised significantly to ensure that this strategy is executed well thus creating increased shareholder value over the longer term. The policy is also designed to ensure that there is mitigation against key business risks through the setting of performance targets.

In particular, the policy includes:

- The Long Term Incentive Plan (LTIP) which encourages management to focus on long term share value enhancement;
- The Short Term Incentive Plan (STIP) under which Executive Directors and the Senior Management Team are targeted with both financial and operational measures each year, with the targets set depending on the Group's key focus in any particular financial year;
- The deferral of 50% of STIP awards into shares for a three year period;
- Market practice malus provisions allow the Company to forfeit the delivery of share related benefits to plan participants.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          71 of 166          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

Governance

# Directors' remuneration report 2015 continued

**SUMMARY OF EXISTING REMUNERATION POLICY** continued
**EXECUTIVE DIRECTOR REMUNERATION POLICY SUMMARY**
The table below summarises the key components of the remuneration package for the Executive Directors.

| Remuneration element | Purpose and link to remuneration strategy | Operation | Maximum opportunity | Performance measures |
|---|---|---|---|---|
| Base salary | To attract and retain management of the calibre required to deliver the Group's strategy without paying more than is necessary. To reward executives for the performance of their role. | Salaries are reviewed annually. When setting base salaries, consideration is given to a number of factors including individual and performance and local market conditions. | There is no maximum salary level. | None, although an individual's performance in the role will be considered when reviewing base salary levels. |
| Benefits | To provide benefits that are competitive relative to the employee's local market. | The Group provides a range of benefits which reflect typical benefits offered in the UAE including family accommodation, Private Medical Insurance and Life and Permanent Health Insurance cover. | The cost of benefit provision will depend on the cost to the Company of providing individual items and the individual's circumstances and therefore there is no maximum value. | None. |
| Retirement benefits | To provide a market competitive retirement benefit. | The Company currently does not operate any pension arrangements, but an end of service benefit, payable to the employee when he leaves the Group, is accrued annually in accordance with local UAE laws. | The Committee will determine the level of benefit based on local market practice, individual's circumstances and their role. | None. |
| STIP | To provide an annual bonus to attract, retain and motivate senior executives of the calibre required to manage the business and to align the interests of senior executives with those of shareholders by linking a significant proportion of the potential remuneration to performance and delivery of strategic objectives. | Bonus measures and performance targets are set annually dependent on the deemed strategic priorities for that year. The annual bonus is normally paid 50% in cash and 50% is deferred into Company shares which vest three years from award subject to continued employment. Malus provisions apply. | The maximum bonus opportunity is 100% of base salary. | Performance is based on a mix of key financial, operational/strategic metrics and individual KPIs measured over one financial year. |
| LTIP | To incentivise long-term value creation and exceptional business performance through the achievement of stretching Group financial targets. | Awards vest based on performance measured over a three year period against set targets. Awards are subject to malus provisions. | Maximum award is normally 150% of base salary. In exceptional circumstances the Committee may grant awards of up to 200% of base salary. | It is intended that awards will be based 50% on earnings per share growth and 50% on relative total shareholder return growth against our key healthcare peers. |
| Share option plan ("SOP") | To incentivise executive directors to increase the share price and deliver value for shareholders. | Awards under the plan are in the form of market value share options. It is intended that awards would only be made under this plan in exceptional circumstances. | Maximum award would normally be 150% of base salary. In exceptional circumstances the Committee may grant awards of up to 200% of base salary. | In the event that an award was to be granted under this plan in exceptional circumstances the Committee would determine appropriate performance conditions at that time. |

68    NMC Health plc Annual Report and Accounts 2015

In addition the following policies also apply:

**Shareholding guidelines**
Executive directors are expected to build a shareholding of 200% of base salary over a period of 5 years. The current shareholding of, and share awards held by, each of the Executive Directors is set out on page 80.

**Committee discretion**
The Committee has retained some discretion in a number of areas of the remuneration policy approved by shareholders including:

· where the terms of any payment were agreed before the policy came into effect;
· where arrangements were agreed at a time when the relevant individual was not a Director of the Company;
· the amendment of performance conditions applicable to the LTIP or Share Option Plan awards in certain circumstances;
· any payment which is not explicitly provided in this policy which is it obliged to make under UAE other relevant local laws; or
· minor amendments required for regulatory, exchange control, tax or administrative purposes or to take account of a change in legislation.

**Remuneration policy on recruitment**
The Policy includes a number of principles which the Committee would seek to apply for newly appointed Executive Directors. These are not summarised here but can be reviewed within the Directors' Remuneration Policy document.

**Service Agreements**
The Committee policy is that notice periods will not exceed 12 months.

**Termination of employment policy**
The policy includes a number of elements which the Committee will consider when individuals leave their Executive positions with the Company. These are not fully summarised here but can be reviewed within the Directors' Remuneration Policy document.

In general terms, if an individual leaves as a result of ill health, injury, disability, death, sale of employing company or business from the Group or for any other reason at the Committee's discretion, the Committee will normally pay contractual salary and retirement benefits and allow the retention of any incentive awards pro-rated to the date of cessation. For all other leavers, the contractual salary and benefits will be paid over any notice period to the date of cessation of employment, but unvested awards made under the Company's incentive arrangements would normally lapse. In the event of termination, the Company would also make any payments which it is contractually obliged to do under UAE law.

## NON-EXECUTIVE DIRECTOR REMUNERATION POLICY SUMMARY
The table below summarises the key components of the remuneration package for the Non-Executive Directors.

| | Purpose and link to remuneration strategy | Operation | Maximum opportunity |
|---|---|---|---|
| Chairman and Non-Executive Director fees | To provide an appropriate reward to attract and retain high-calibre individuals. | The remuneration of Non-Executive Directors is approved by the Executive Directors following recommendations and discussions with the Chairman of the Company and the Chairman of the Remuneration Committee.<br><br>Non-Executive Directors do not currently receive any benefits. However, benefits may be provided in the future if this was considered appropriate. | The maximum level of Non-Executive Director remuneration is set out in the Company's articles of association. This may be amended from time to time subject to shareholder approval. |

## ANNUAL REMUNERATION REPORT
### THE REMUNERATION COMMITTEE IN 2015
Details of the members of the Committee during the 2015 financial year, and its role and responsibility within the Group's Board and governance structure, is set out on pages 58 to 59 of the Governance report.

**Principal matters considered in 2015**
The significant discussions in relation to the structure of Executive Director and Senior Management remuneration had taken place during 2013, before being approved by shareholders at the 2014 AGM. No changes to the Remuneration Policy were considered in 2015 and therefore the Committee's primary discussions during the year related to the operation of each element of the Executive remuneration package as well as consideration in relation to the level of remuneration for management given the Group's growth and strategic acquisition growth plan.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          73 of 166          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

# Directors' remuneration report 2015 continued

**ANNUAL REMUNERATION REPORT** continued
**THE REMUNERATION COMMITTEE IN 2015** continued
Principal items discussed by the Committee included:

- A review and discussion of management proposals for the operation of the 2015 STIP;
- A review of the levels and targets set in relation to the 2015 LTIP. No changes were made to the targets set, and the initial level of LTIP awards made during the year, although a decision was taken to grant an LTIP award to the Executive Directors in September 2015 such that their 2015 LTIP grant equated to 150% of their average base salary for the year which is in line with our Policy (as opposed to an LTIP grant of 100% of base salary which had been the case before this change);
- Further consideration was given to the remuneration levels of the Executive Directors and the Senior Management Team given the excellent execution of the initial phase of the Group's strategic acquisition plans, management performance in delivering this as well as relevant market data. This resulted in an increase in base salaries for the Executive Directors and recommendations made in relation to the base salaries for the remainder of the Senior Management Team. Details of the remuneration paid to the Executive Directors in 2015 are set out in the single figure pay table on page 71.

### Support and External Advice

The Remuneration Committee seeks and considers advice from Deloitte LLP, independent remuneration advisers. Deloitte were appointed by the Remuneration Committee and have acted as advisors to the Company since 2012, specifically providing the Committee with objective and independent advice on executive remuneration matters. Deloitte is a founding member of the Remuneration Consultants' Group and, as such, voluntarily operates under the code of conduct in relation to executive remuneration consulting in the UK.

Deloitte have provided some tax advisory services to the Group in Spain and transaction services advice to the Group in the UAE, but none of this advice has related to remuneration matters in the Group and none of these teams have any connection with the engagement partner and team advising the Remuneration Committee. The Committee is satisfied that the advice they have received from Deloitte during the year has been objective and independent and that the Deloitte LLP engagement partner and team, which provide remuneration advice to the Committee, do not have connections with NMC that might impair their independence. The Committee reviewed the potential for conflicts of interest and judged that there were appropriate safeguards against such conflicts.

The Remuneration Committee has direct access to Deloitte as and when required. The Group Company Secretary liaises with Deloitte where necessary to ensure that all Committee requests and decisions are dealt with and implemented, but does so under the guidance of the Remuneration Committee Chairman. Deloitte attend meetings of the Committee as required.

During the year, Deloitte provided the following services and advice to the Committee:

- Assistance in preparation of the 2014 Directors' Remuneration Report;
- The tracking of performance against targets set in relation to awards granted under both the STIP and LTIP incentive arrangements; and
- Assistance in relation to the review of certain parts of the remuneration package available to Executive Directors and Senior Management and scenario modelling of the same.

Deloitte received fees of £32.2k (charged on a time plus expenses basis) for advice received during the year.

**RESULTS OF VOTING ON REMUNERATION MATTERS AT THE COMPANY'S 2015 ANNUAL GENERAL MEETING**
The following summarises voting at the 2015 AGM in respect of the advisory vote resolution proposed in relation to the 2014 Directors' Remuneration Report.

| Resolution | For | Against | Number of votes withheld |
|---|---|---|---|
| To approve the Directors' Remuneration Report | 97.59% | 2.41% | 4,081,168 |

The Committee is appreciative of the support which shareholders have given in relation to Directors remuneration matters.

**REMUNERATION ARRANGEMENTS THROUGHOUT THE GROUP**
The remuneration philosophy is the same throughout NMC - that individuals should be remunerated based on their role, responsibilities, experiences and market practice. NMC has a variety of different roles from senior executives, to doctors to administrators and therefore remuneration levels and structures vary to reflect the different requirements and expectations of these roles.

The Committee does consider that it is important, however, that Executive Directors and senior executives as a group are remunerated in a similar way to ensure that they are incentivised to collectively deliver the Group's strategy and create long term value for shareholders. Executive Directors and senior management therefore all participated in the STIP and LTIP arrangements in 2015.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          74 of 166          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

| Overview | Strategic Report | Governance | Financial Statements |

The Committee also retained the existing benefits structure which applied to UAE based Executive Directors and Senior Management in previous years. The benefits included reflect the expatriate nature of senior management in the UAE and are similar in nature to the types of benefits which are available to other expatriate employees in the Group. The benefits include private medical insurance, which is mandatory for employees in Abu Dhabi, where the Group is based.

## SHAREHOLDER VIEWS AND CONSIDERATION OF EMPLOYMENT CONDITIONS ELSEWHERE IN THE GROUP

**Communication with our Shareholders -** The Committee maintains an open dialogue with our shareholders and is available to discuss remuneration matters concerning shareholders at any time.

**Consideration of pay and conditions of employees -** The Committee considers pay information in relation to senior management when determining Executive Directors' pay, to ensure that pay structures are appropriately aligned. However, given the Group's wide geographic reach in relation to both its business interests and shareholders, and the significant corporate and public company responsibilities which are not reflected in roles in the rest of the Group, the Committee do not feel that Executive Director and Senior Management remuneration needs to be specifically aligned with other remuneration within the business. The Committee did not consult with employees when setting Executive Director pay.

## 2015 REMUNERATION - THIS SECTION IS SUBJECT TO AUDIT

This section outlines how the remuneration policy was applied in 2015, together with the outcomes for actual remuneration paid in relation to the financial year under review. This is shown in two parts - Remuneration paid to Executive Directors and a separate section in relation to Non-Executive Directors.

Executive Director Remuneration 2015
### Remuneration paid in 2015 (single pay figure)
The table below sets out the remuneration paid to or received by each Executive Directors of the Company who served during the financial year ended 31 December 2015.

| | Salary $'000 | | Benefits $'000 | | STIP $'000 | | LTIP awards $'000 | | Pension $'000 | | Total $'000 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Executive Director | 2015 | 2014 | 2015 | 2014 | 2015 | 2014 | 2015 | 2014 | 2015 | 2014 | 2015 | 2014 |
| Dr B.R. Shetty | 544.5 | 408.4 | 163.1 | 157.9 | 544.5 | 283.4 | 0.0 | 0.0 | 0.0 | 0.0 | 1,252.1 | 849.7 |
| Prasanth Manghat | 473.7 | 330.8 | 20.2 | 15.2 | 473.7 | 222.3 | 0.0 | 0.0 | 0.0 | 0.0 | 967.6 | 568.3 |

### Base salaries
The Committee has discussed base salaries of the Executive Directors on several occasions since Q4, 2014.

Our management team have been fundamental in the successful execution of the Group's strategy, which has led to a significant increase in the size and complexity of the Group since listing. During the salary review, the Committee took into account the increase in the scope and responsibilities given the enlarged, more complex Group the future acquisitive growth strategy as well as the market positioning of the remuneration packages. The Committee has been mindful that base salaries set can become uncompetitive over a relatively short timeframe.

Therefore, having recognised the exceptional performance of the executive directors the Committee reviewed Executive Directors base salaries during the year and approved an increase in base salaries resulting in average base salaries for the year being £333k for the Executive Vice Chairman and CEO and £290k for the Deputy CEO.

### Benefits
There was no change to the benefits available to the Executive Directors during the year. The Benefits paid included the following items:

| | Provision of family accommodation $'000 | | Private medical insurance $'000 | | Life insurance cover $'000 | | Annual family return flights to home country $'000 | |
|---|---|---|---|---|---|---|---|---|
| Executive Director | 2015 | 2014 | 2015 | 2014 | 2015 | 2014 | 2015 | 2014 |
| Dr B.R. Shetty | 160.6 | 153.2 | 2.2 | 2.2 | 0.0 | 0.0 | 2.5 | 2.5 |
| Prasanth Manghat | 0.0 | 0.0 | 4.4 | 4.4 | 0.6 | 0.6 | 15.2 | 15.2 |

### Outcome of 2015 STIP
The Group made significant progress during the year. In addition to the continued execution of the Group's strategic plan through the opening of new facilities, whilst the Group was acquisitive during 2015, the significant proportion of time and commitment of the Executive Directors and Senior Management in relation to the acquisition program was not included as a target for the 2015 STIP.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          75 of 166          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

# Directors' remuneration report 2015 continued

**ANNUAL REMUNERATION REPORT** continued
**2015 REMUNERATION – THIS SECTION IS SUBJECT TO AUDIT** continued
However, the business performed very well both operationally and financially and, as a result, both the Executive Directors achieved 100% of the 2015 STIP targets for the year. Therefore a bonus entitlement of 100% of average base salary was paid to each of the Executive Directors in respect of the 2015 financial year.

50% of the bonus awarded to the Executive Directors is paid in cash and the other 50% is deferred into shares for a period of three years under the terms of the Deferred Share Bonus Plan, for which additional performance conditions or other conditions, with exception of continued employment, do not apply.

The bonuses awarded were based on the achievement of stretching financial and non-financial targets set by the Remuneration Committee:

## Financial performance measures

| Measure | Purpose and link to remuneration strategy | Description of measure | Target and performance | Weighting | | Outcome (percentage of maximum) |
|---|---|---|---|---|---|---|
| | | | | Executive Vice Chairman and CEO | Deputy CEO | |
| Healthcare Revenues | Grow organisational revenues | Achieve a minimum level of healthcare revenues set by the Committee (including revenues from existing facilities, Clinica Eugin, new facilities to open in FY 2015, pharmacies and management fees). | Continuing growth from existing healthcare operations is a key focus for the Board and the management team. Existing operations and Clinica Eugin collectively performed above expectations.<br><br>Given that reported healthcare numbers were not used as a target in relation to this measure (i.e. because the measure was not adjusted to take account of other consolidated acquisitions completed later in 2015, specific targets are not being published in this report as these are considered to be commercially sensitive. However the Committee can confirm that achievement of management against the set targets was at stretch level. | 33.3% | 20% | 100% |
| EBITDA | Optimize cost of services | Achieve minimum levels of EBITDA set by the Committee (including EBITDA from existing facilities, Clinica Eugin, new facilities to open in FY 2015, pharmacies and management fees).<br><br>Additionally, this targeted level of EBITDA had to be achieved before any STIP entitlement could be earned in relation to FY2015. | The maintenance of good levels of EBITDA are also a key focus for the Board and the management team during a period of significant acquisitive growth. Existing operations and Clinica Eugin collectively performed above expectation.<br><br>Again, given that reported healthcare numbers were not used as a target in relation to this measure (i.e. because the measure was not adjusted to take account of other consolidated acquisitions completed later in 2015, specific targets are not being published in this report as these are considered to be commercially sensitive. However the Committee can confirm that achievement of management against the set targets was at stretch level. | 33% | 35% | 100% |
| Revenue per patient | Grow organisational revenues | Revenue/patient to achieve minimum average levels set by the Committee. | As a principal financial driver for the Group, the Committee set a stretch target of $121 revenue per patient against $114.5 achieved in FY2014. Target performance was set at $117 or greater. The revenue per patient achieved for FY2015 was $121.1. | – | 10% | 100% |

72    NMC Health plc Annual Report and Accounts 2015

| Overview | Strategic Report | Governance | Financial Statements |

| Measure | Purpose and link to remuneration strategy | Description of measure | Target and performance | Weighting | | Outcome (percentage of maximum) |
| --- | --- | --- | --- | --- | --- | --- |
| | | | | Executive Vice Chairman and CEO | Deputy CEO | |
| Patient Occupancy Levels | Optimize cost of services | Patient occupancy to achieve minimum average levels set by the Committee. This target excludes any new facilities opened in 2014 and 2015 as they were considered to be in ramp-up phase with expected abnormally low occupancy levels. | Utilisation of assets is key to performance and therefore growth in patient occupancy levels are a continuing target for the business. Significant progress had already been made in the growth of this KPI in previous years as assets matured and a stretch target of 75% or more occupancy against 71.3% achieved in 2014 was set. Target performance was set at 74% or greater. Occupancy achieved under this measure for FY2015 was 76%. | – | 10% | 100% |

### Non-financial performance measures

| Measure | Purpose and link to remuneration strategy | Description of measure | Target and performance | Weighting | | Outcome (percentage of maximum) |
| --- | --- | --- | --- | --- | --- | --- |
| | | | | Executive Vice Chairman and CEO | Deputy CEO | |
| JCI Accreditation | Strengthen and maintain NMC's corporate image | Achievement of set targets in relation to the monitoring of those clinical and quality indicators which are required to reach a certain standard under the Group's JCI accreditations. | Quality standards are key for the Group's healthcare business. The Committee set a target of an overall compliance rate against JCI quality standards of 97% or greater to achieve the stretch target in relation to this KPI. Target performance was set at 95% or greater. An average of 98.1% compliance was achieved during the financial year | 33% | – | 100% |
| Organisational capability | Build new patient serving facilities and implement state-of-the-art infrastructure | Specific targeted milestones set by the Committee for capital and technology enablement programs to be met. | The Group's flagship Khalifa City Royal Hospital opened in 2015, and given the excellent ramp-up performance of other new facilities opened, the Committee determined that this target had been met at its stretch level. | – | 15% | 100% |
| Human capital | Attract and develop capable and motivated manpower | Targets set by the Committee in relation to the enhancement of succession planning capabilities within the Group given the Company's growth and acquisition plans for 2015. | The Committee wanted to ensure that up to five key management positions had succession plans in place during FY 2015. This was achieved. | – | 10% | 100% |

Exhibit 4 to B.R. Shetty's Request for Judicial Notice        77 of 166        Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

Governance

# Directors' remuneration report 2015 continued

**ANNUAL REMUNERATION REPORT** continued

### 2015 LTIP

Awards for Executive Directors under the LTIP were granted for the first time in 2014 and therefore no LTIP grants have yet reached their vesting point.

### Awards made in 2015

During 2015, LTIP grants were made to the Executive Directors at 150% of base salary, in line with our approved Policy.

Initially, an award of 100% of salary was made in February 2015. In September 2015 a grant of 50% of salary was made to incentivise the Executive Directors towards sustained improvements in the long-term financial performance of the enlarged Group and further align them with the long-term interests of our shareholders. The details of the awards granted under the LTIP during 2015 are set out within the Directors' shareholdings and interests section on page 80.

### Performance targets

The following performance targets were used in relation to all LTIP awards granted in 2015.

### Company's Earnings per Share (EPS) growth

This measures the Company's annual compound growth in EPS and represents 50% of the total award. The table below sets out the EPS targets for the 2015 award and the corresponding level of vesting:

| Annual compound growth in EPS over the three-year Performance Period | Vesting percentage of target |
|---|---|
| 15% or more | 100% |
| Between 6% and 15% | On a straight-line basis between 25% and 100% |
| 6% | 25% |
| Less than 6% | 0% |

### Total Shareholder Return (TSR) growth

This measures the Company's TSR compared against a comparator group of companies and represents 50% of the total award. The table below sets out the TSR targets for the 2015 award and the corresponding level of vesting:

| Company's TSR over the three-year performance period compared to the comparator group | Vesting percentage of target |
|---|---|
| Upper quartile or above | 100% |
| Between median and upper quartile | Pro rata between 25% and 100% on a ranking basis |
| Median | 25% |
| Below median | 0% |

The Remuneration Committee has chosen a comparator group of international companies that are of a 'similar' size and business scope to the Company. The table below sets out our comparator group:

| Company | Country of listing |
|---|---|
| KORIAN MEDICA | FRANCE |
| AL NOOR HOSPITALS GP | UK |
| SPIRE HEALTHCARE GP | UK |
| RAFFLES MEDICAL GP | SINGAPORE |
| BANMEDICA | CHILE |
| SYNERGY HEALTH | UK |
| KPJ HEALTHCARE | MALAYSIA |
| NIB HOLDINGS | AUSTRALIA |
| AL-MAIDAN DNL CLINIC | KUWAIT |

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          78 of 166          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

Pension contributions
There were no pension contributions in 2014 or 2015.

## NON-EXECUTIVE DIRECTOR REMUNERATION 2015
Remuneration paid in 2015 (single pay figure)
The fee paid in cash to each Non-Executive Director during the year ended 31 December 2015 is set out in the following table:

| Director | Position | FY2015 (£'000) | FY2014 (£'000) |
|---|---|---|---|
| H.J. Mark Tompkins | Independent Non-Executive Chairman | 215.0 | 170.0 |
| Dr Ayesha Abdullah (see Note 1 below) | Independent Non-Executive Director | 85.0 | 25.2 |
| Abdulrahman Basaddiq (see Note 1 below) | Non-Executive Director | 85.0 | 42.3 |
| Jonathan Bomford | Senior Independent Non-Executive Director | 100.0 | 59.5 |
| Lord Clanwilliam | Independent Non-Executive Director | 85.0 | 50.0 |
| Salma Hareb (see Note 1 below) | Independent Non-Executive Director | 85.0 | 25.2 |
| Heather Lawrence | Independent Non-Executive Director | 85.0 | 50.0 |
| Keyur Nagori (see Note 1 below) | Non-Executive Director | 85.0 | 25.2 |
| Binay Shetty (see Note 2 below) | Non-Executive Director | 85.0 | See Note 2 below |
| Dr Nandini Tandon (see Note 1 below) | Independent Non-Executive Director | 85.0 | 25.2 |

Notes:
1.  The fees in FY2014 for each of Dr Ayesha Abdullah, Abdulrahman Basaddiq, Salma Hareb, Keyur Nagori and Dr Nandini Tandon were not in relation to a full financial year as they were all appointed during FY2014.
2.  Mr Binay Shetty was appointed as a Non-Executive Director of the Company on 1 January 2015 having previously been an Executive Director. Mr Shetty's total remuneration in relation to his previous executive role with the Company for FY2014 was US$460.8k.

None of the Non-Executive directors received any benefits, pension, STIP or LTIP entitlements or payments during FY2014 and FY2015.

Given the extension of the Company's growth strategy in 2015 and the complexity of business challenges faced during the year, there was a significant increase in the time commitment required from our Non-Executive Directors. To reflect this increase in the provision of services to the Group, the Executive Directors agreed to make a payment to each of the Non-Executive Directors during the year. The fees paid to reflect the additional time commitment were £25k for each Non-Executive Director, £30k for the Senior Independent Director and £35k for the Chairman and are in line with our shareholder approved Policy. These amounts are included in the FY2015 Remuneration in the table above.

## 2016 REMUNERATION
Executive remuneration in 2016
This section summarises the expected implementation of the remuneration policy in 2016.

As noted in the Chairman's letter, the Committee reviewed the remuneration for our Executive Directors during the year and made changes to recognise the exceptional performance of the Company. In addition, we took into account the need to retain our management team as they will be critical in successfully executing our future strategic ambitions.

The Committee also considered the positioning of current remuneration against the top quartile of companies in the FTSE 250 based on their financial size, and sought to ensure that our Executive Directors are positioned appropriately against this reference point.

### Base salaries for 2016
Given the background outlined above, the Remuneration Committee has increased in 2016 the base salary of the Executive Vice Chairman & CEO to £650,000 and the Deputy CEO to £550,000. The Committee felt it was important to recognise:
· the fundamental role our Executive Directors have played in the Group's progress which, supported by the Board and shareholders, have translated into a significant and sustained increase in value for our shareholders; and
· the clear and significant gap between executive remuneration levels paid in previous years and relevant market comparative remuneration levels confirmed by Deloitte, the Committee's independent advisers.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice    79 of 166    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

Governance

# Directors' remuneration report 2015 continued

**ANNUAL REMUNERATION REPORT** continued
**2016 REMUNERATION** continued
Operation of the STIP for 2016

As set out in the Remuneration Committee Chairman's letter above, following a review of the operation of the Company's STIP incentive arrangement against market data prepared by Deloitte LLP, the Remuneration Committee has determined that it intends to increase the maximum STIP opportunity for the Executive Directors to 150% of base salary. It is further proposed that the way in which any award from the 2016 STIP will be delivered will also change from previous years, with one-third of any STIP award being made in cash and two-thirds deferred into shares, half of which will vest one year after the award is made and the other half two years after the award.

The increase in the maximum STIP opportunity is outside the scope of the Company's remuneration policy approved at the 2014 AGM and is therefore subject to approval of shareholders and will be subject to a vote at the 2016 AGM.

The performance targets that will apply for the 2016 financial year have been set after considering the Group's priorities for the year. The Remuneration Committee considers that the specific targets are commercially sensitive at this stage as they could disclose details of budgeting and strategy for 2016 to the Company's competitors. The Remuneration Committee will disclose details in respect of the targets when it is satisfied that these are no longer commercially sensitive, likely in the 2016 Directors' Remuneration Report.

**Executive Vice Chairman and Chief Executive Officer**

| Measure | Purpose and link to remuneration strategy | Performance measure | Target | Percentage weighting for relevant individuals |
|---|---|---|---|---|
| Financial | Optimize cost of services | EBITDA target and gateway hurdle | Achieve minimum levels of EBITDA set by the Committee (including EBITDA from all Group businesses as at the date of this report). This target recognises that minimum levels of EBITDA must be achieved for the financial year, ensuring that new acquisitions in FY2015 and Q1, 2016 perform well and that the new facilities opened by the Company, including NMC Royal Hospital, Khalifa City, ramp-up well after opening. Additionally, a targeted level of EBITDA must be achieved before any STIP entitlement is earned in relation to FY2015. | 25 |
| Non-financial | Strengthen and maintain NMC's corporate image | JCI Accreditation | Achievement of set targets in relation to the monitoring of those clinical and quality indicators which are required to reach a certain standard under the Group's JCI accreditations. | 25 |
| | Strategic growth | Expansion into new geographies | Part of the Strategic growth plan agreed by the Board includes the expansion of the Healthcare division into new geographic locations, principally other GCC countries outside of the UAE. The Remuneration Committee has set targets related to this geographic expansion. | 25 |
| | New facility performance | Ramp-up of NMC Royal Hospital, Khalifa City | NMC Royal Hospital, Khalifa City, is the Group's newest and largest facility, and will be a regional flagship hub for the Group's Healthcare division. The Committee has set targets relating to the number of operational beds in this facility, and average occupancy of those beds, for 2016 as this will have a direct impact on both revenue and EBITDA levels for the Group | 25 |

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          80 of 166          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

| Overview | Strategic Report | Governance | Financial Statements |

### Deputy Chief Executive Officer

| Measure | Purpose and link to remuneration strategy | Performance measure | Target | Percentage weighting for relevant individuals |
|---------|------------------------------------------|---------------------|--------|----------------------------------------------|
| Financial | Optimize cost of services | EBITDA target and gateway hurdle | Achieve minimum levels of EBITDA set by the Committee (including EBITDA from all Group businesses as at the date of this report).<br><br>This target recognises that minimum levels of EBITDA must be achieved for the financial year, ensuring that new acquisitions in FY2015 and Q1, 2016 perform well and that the new facilities opened by the Company, including NMC Royal Hospital, Khalifa City, ramp-up well after opening.<br><br>Additionally, a targeted level of EBITDA must be achieved before any STIP entitlement is earned in relation to FY2015. | 25 |
| Non-financial | Strategic growth | Expansion into new geographies | Part of the Strategic growth plan agreed by the Board includes the expansion of the Healthcare division into new geographic locations, principally other GCC countries outside of the UAE.<br><br>The Remuneration Committee has set targets related to this geographic expansion. | 25 |
| | New facility performance | Ramp-up of NMC Royal Hospital, Khalifa City | NMC Royal Hospital, Khalifa City, is the Group's newest and largest facility, and will be a regional flagship hub for the Group's Healthcare division. The Committee has set targets relating to the number of operational beds in this facility, and average occupancy of those beds, for 2016 as this will have a direct impact on both revenue and EBITDA levels for the Group. | 25 |
| | Group efficiencies | Establishment of Central Laboratory | This measure relates to plans to open a centralised laboratory structure within the Group's Healthcare division. This target has been set to ensure as many facilities as possible are using the central laboratory for their laboratory testing requirements in the short term.<br><br>This target specifically promotes efficiencies within the Healthcare division and will assist in maintaining high laboratory standards. | 25 |

Exhibit 4 to B.R. Shetty's Request for Judicial Notice    81 of 166    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

Governance

# Directors' remuneration report 2015 continued

**ANNUAL REMUNERATION REPORT** continued
**2016 REMUNERATION** continued
Operation of the LTIP for 2016
The operation of the LTIP for 2016 will be consistent with the Company's Remuneration policy approved by Shareholders at the Company's 2014 Annual General Meeting and similar in operation to the LTIP commenced in 2014. The award level for achieving maximum performance will be 150% of base salary.

The performance targets that will apply for awards made under the plan in the 2016 financial year will be as follows:

| Measure | Purpose and link to remuneration strategy | Performance measure | Target | Percentage weighting for relevant individuals | Individual subject to target |
|---|---|---|---|---|---|
| Total shareholder return (TSR) | To incentivise management to deliver long term returns to shareholders | TSR growth compared to a comparator group of companies.<br><br>The Committee has decided to change the comparator group of companies as the previous comparator group does not include directly comparable business. It has been agreed therefore to use the constituents of the FTSE 250 (excluding investment trusts) as the relevant comparator group for 2016. | 25% of this element of the award will vest for performance equal to the median of the comparator group with 100% vesting for upper quartile performance or better.<br><br>Vesting is on a straight line basis between these points. | 50% | Executive Vice Chairman and CEO (Dr B.R. Shetty)<br><br>Deputy CEO (Prasanth Manghat) |
| Earnings per share (EPS) | To incentivise management to deliver bottom line earnings growth | Annual compound growth in EPS between the base year (i.e. 2015) and the end of the performance period. | 25% of this element of the award vests for compound EPS growth of 6% per annum with 100% vesting for EPS growth of 15% per annum.<br><br>Vesting is on a straight line basis between these points. | 50% | Executive Vice Chairman and CEO (Dr B.R. Shetty)<br><br>Deputy CEO (Prasanth Manghat) |

Non-Executive Directors Remuneration in 2016
For 2016, the fees payable to the non-executive directors effective as at 1 January 2016 are as follows:

| | (£'000) |
|---|---|
| Chairman | 180 |
| Senior Independent Director | 70 |
| Non-executive director | 60 |

Additional fees may be also payable to non-executive directors from time to time for additional board responsibilities (this may include fees for additional time commitments).

No additional fees are payable in relation to the Chairmanship or membership of any Board Committees.

Details of the remuneration paid to each of the non-executive directors who served during the year are included in the table on page 75.

Non-executive directors do not participate in any bonus or incentive plan or other form or performance-related remuneration. The Company does not provide any contribution to their pension arrangements.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          82 of 166          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

## OTHER INFORMATION

### DIRECTORS' SERVICE AGREEMENTS AND LETTERS OF APPOINTMENT

Executive Directors' service agreement and employment contracts

Each of the following served as Executive Directors for all of the 2015 financial year and were subject to service agreements entered into with NMC Healthcare LLC, one of the Company's subsidiaries.

| | Date of agreement |
|---|---|
| Dr B.R. Shetty | 19 March 2012 |
| Prasanth Manghat | 1 May 2011 |

Dr B.R. Shetty is employed by NMC Healthcare LLC pursuant to a service agreement dated 19 March 2012. The service agreement provides for an indefinite term of employment unless terminated earlier in accordance with the terms of the service agreement. The service agreement provided that, unless otherwise agreed between the parties, the service agreement can only be terminated on twelve months' prior written notice given by either Dr B.R. Shetty or NMC Healthcare LLC.

Mr Prasanth Manghat is employed by NMC Healthcare LLC pursuant to an employment contract dated 1 May 2011. The contract provides for a renewable two year term of employment unless terminated earlier in accordance with the terms of the contract. The Contract provides that, unless otherwise agreed between the parties, the contract can be terminated on one months' prior written notice given by either Prasanth Manghat or NMC Healthcare LLC.

Copies of the Service Agreement for Dr B.R. Shetty and employment contract for Mr Prasanth Manghat are available for inspection during normal business hours at the Company's Registered Office, and are available for inspection at the Company's annual general meeting.

For future executives the Committee policy is that notice periods will not exceed 12 months. There are no matters for which the Company requires approval of shareholders for the purposes of Chapter 4A of Part 10 of the Companies Act 2006.

### Letters of appointment for Non-Executive Directors

The Non-Executive Directors do not have service agreements with the Company, but instead have letters of appointment. The appointment of each of the Non-Executive Directors is stated for an initial term until the next annual general meeting of the Company at which, and at subsequent annual general meetings, they need to submit themselves for re-election if they so wish. Each of the Non-Executive Directors have a minimum time commitment that they need to give to the Company in any year.

The letters of appointment for each Non-Executive Director are summarised below:

| Director | Position | Date of appointment | Company and Director notice period |
|---|---|---|---|
| H.J. Mark Tompkins | Non-Executive Chairman | 7 March 2012 | 3 months |
| Dr Ayesha Abdullah | Independent Non-Executive Director | 26 June 2014 | 3 months |
| Abdulrahman Basaddiq | Non-Executive Director | 24 February 2014 | 3 months |
| Jonathan Bomford | Senior Independent Director | 27 June 2013 | 3 months |
| Lord Clanwilliam | Independent Non-Executive Director | 7 March 2012 | 3 months |
| Salma Hareb | Independent Non-Executive Director | 26 June 2014 | 3 months |
| Keyur Nagori | Non-Executive Director | 26 June 2014 | 3 months |
| Binay Shetty | Non-Executive Director | 1 January 2015 | 3 months |
| Dr Nandini Tandon | Independent Non-Executive Director | 26 June 2014 | 3 months |

There is no compensation payable upon the early termination of a Non-Executive Directors' appointment.

Copies of the above Non-Executive Directors' Letters of Appointment are available for inspection during normal business hours at the Company's Registered Office, and available for inspection at the Company's annual general meeting.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice    83 of 166    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

Governance

# Directors' remuneration report 2015 continued

**OTHER INFORMATION** continued
**DIRECTORS' SHAREHOLDINGS AND SHARE INTERESTS - SUBJECT TO AUDIT**
Directors' shareholdings
The table below shows details of the Directors' holdings of Ordinary Shares in the Company as at 1 January 2015 and at 31 December 2015.

| Director | Ordinary shares of 10p each | | Share options over Ordinary shares of 10p each | |
|---|---|---|---|---|
| | 1 January 2015 | 31 December 2015 | 1 January 2015 | 31 December 2015 |
| H.J. Mark Tompkins (Note 1) | 17,083 | 25,083 | 0 | 0 |
| Dr B.R. Shetty (Note 2) | 47,749,250 | 47,749,250 | 108,949 | 259,833 |
| Prasanth Manghat | 8,308 | 8,308 | 53,146 | 139,859 |
| Dr Ayesha Abdullah | 0 | 0 | 0 | 0 |
| Abdulrahman Basaddiq | 0 | 0 | 0 | 0 |
| Jonathan Bomford | 10,000 | 12,000 | 0 | 0 |
| Lord Clanwilliam | 0 | 0 | 0 | 0 |
| Salma Hareb | 0 | 0 | 0 | 0 |
| Heather Lawrence (Note 3) | 4,557 | 6,347 | 0 | 0 |
| Keyur Nagori | 0 | 0 | 0 | 0 |
| Binay Shetty | 6,842 | 6,842 | 9,926 | 21,464 |
| Dr Nandini Tandon | 0 | 0 | 0 | 0 |

Notes:
1. The interests of Mr H.J. Mark Tompkins in relation to the ordinary shares of the Company include the shares held in the name of his wife and by a family trust of which he is considered a beneficiary.
2. The interests in relation to both ordinary shares and options over ordinary shares of the Company for Dr B.R. Shetty include the shares and options in the name of his wife, Dr C R Shetty.
3. Heather Lawrence resigned as a Director of the Company on 12 January 2016.

None of the Directors received any loans, advances or other form of credit granted by the Company, nor were any guarantees of any kind provided by the Company on behalf of any Directors during the year ended 31 December 2015.

Except as stated above, none of the Directors who held office during the year held any Ordinary Shares or options over Ordinary Shares of the Company during the year. There have been no changes in the above shareholdings between 31 December 2015 and the date of this Directors' Remuneration Report.

Executive directors are expected to build a shareholding of 200% of base salary over the 5 year period to the end of 2019. The first share incentive awards granted to the Executive Directors do not vest until October 2017. The Executive Vice Chairman & CEO is a significant shareholder in the Company and therefore already meets this shareholding requirement. The Deputy CEO holds shares valued at £69.8k (based on the share price at 31 December 2015). These have a value of c. 20% of salary (based on salary at 31 December 2015).

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          84 of 166          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

### Directors' interests in shares

The following tables show details of the share awards made to Executive Directors that have not yet vested.

#### Long Term Incentive Plan

|  | Type of interest | Performance period ending | Award Date | Market price at date of award | Exercise price | Shares awarded | Face value of award | % vesting for minimum performance | Vesting date |
|---|---|---|---|---|---|---|---|---|---|
| Dr B.R. Shetty | LTIP award subject to performance | 31 December 2016 | 29 October 2014 | 494.9p | 0p | 50,923 | £252,018 | 25% of award | 29 October 2017 |
| Dr B.R. Shetty | LTIP award subject to performance | 31 December 2017 | 25 February 2015 | 520p | 0p | 57,692 | £300,000 | 25% of award | 25 February 2018 |
| Dr B.R. Shetty | LTIP award subject to performance | 31 December 2017 | 8 September 2015 | 760.5p | 0p | 26,298 | £200,000 | 25% of award | 8 September 2018 |
| Mr Prasanth Manghat | LTIP award subject to performance | 31 December 2016 | 29 October 2014 | 494.9p | 0p | 40,738 | £202,834 | 25% of award | 29 October 2017 |
| Mr Prasanth Manghat | LTIP award subject to performance | 31 December 2017 | 25 February 2015 | 520p | 0p | 50,000 | £260,000 | 25% of award | 25 February 2018 |
| Mr Prasanth Manghat | LTIP award subject to performance | 31 December 2017 | 8 September 2015 | 760.5p | 0p | 23,011 | £175,000 | 25% of award | 8 September 2018 |

Details of the performance measures attached to the LTIP awards are set out on page 74.

#### Deferred Share Bonus Plan

|  | Type of interest | Financial year share award made in respect of | Award date | Market price at date of award | Exercise price | Shares awarded | Face value of award | Vesting date |
|---|---|---|---|---|---|---|---|---|
| Dr B.R. Shetty | Deferred shares subject to continued employment | 2013 | 29 October 2014 | 494.9p | 0p | 15,510 | £76,759 | 29 October 2017 |
| Dr B.R. Shetty | Deferred shares subject to continued employment | 2014 | 25 February 2015 | 520.0p | 0p | 17,470 | £90,844 | 25 February 2018 |
| Mr Prasanth Manghat | Deferred shares subject to continued employment | 2013 | 29 October 2014 | 494.9p | 0p | 12,408 | £61,407 | 29 October 2017 |
| Mr Prasanth Manghat | Deferred shares subject to continued employment | 2014 | 25 February 2015 | 520p | 0p | 13,702 | £71,250 | 25 February 2018 |
| Mr Binay Shetty | Deferred shares subject to continued employment | 2013 | 29 October 2014 | 494.9p | 0p | 9,926 | £49,123 | 29 October 2017 |

No options vested or were exercised during the year.

Governance

# Directors' remuneration report 2015 continued

**PERFORMANCE GRAPH AND HISTORIC EXECUTIVE VICE CHAIRMAN & CEO REMUNERATION OUTCOMES**
The following graph shows the Total Shareholder Return performance of NMC Health plc shares against the FTSE 250.



NMC Health    FTSE 250

Source: DataStream as at 9 March 2016.

The Committee believes that the FTSE 250 Index is an appropriate comparator index used to compare performance given that the Company is a constituent of this Index and the lack of direct competitor comparators available in the London market.

The table below summarises the Executive Vice Chairman & CEO's single figure for total remuneration since listing. This table is also required to show the long-term incentive vesting as a percentage of the maximum for each year, however LTIP grants were made for the first time in 2014 and none have yet vested.

| Executive Vice Chairman & CEO - Dr B.R. Shetty | 2012 (US$'000) | 2013 (US$'000) | 2014 (US$'000) | 2015 (US$'000) |
|---|---|---|---|---|
| Single remuneration figure | 550.6 | 787.4 | 849.7 | 1,252.1 |
| STIP payout (% of maximum) | n/a | 75% | 95% | 100% |
| LTI vesting (% of maximum) | n/a | n/a | n/a | n/a |

The Company did not operate the STIP in respect of 2012.

**PAY ACROSS THE GROUP**
The table below sets out the increase in total remuneration of the Executive Vice Chairman & CEO and that of all employees during the 2015 financial year:

| % | Salary | Annual bonus | Benefits |
|---|---|---|---|
| Executive Vice Chairman & CEO | 33.3% | 92.1% | 4.8% |
| All-employees | 8% | n/a* | 5% |

* Note: the Company does not operate bonus plans for all employees.

82    NMC Health plc Annual Report and Accounts 2015

## RELATIVE IMPORTANCE OF SPEND ON PAY

The graph below shows the total group-wide remuneration expenditure and dividends for the last two years.



2014    2015

It is my pleasure to submit this report to shareholders. The Directors' Remuneration Report has been approved by the Board and is signed on its behalf by:

### LORD CLANWILLIAM
Chairman of the Remuneration Committee

Exhibit 4 to B.R. Shetty's Request for Judicial Notice    87 of 166    Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

# Directors' report 2015

The Directors of NMC Health plc are pleased to present their Annual Report including the audited consolidated financial statements for the financial year ended 31 December 2015.

This report has been prepared in accordance with the requirements in The Large and Medium-sized Companies and Groups (Accounts and Reports) Regulations 2008 and forms part of the management report as required under Disclosure & Transparency Rule 4. Certain information required to be set out in this Directors' Report can be found elsewhere in the 2015 Annual Report and is referenced below. This information is incorporated into this Directors' Report by reference.

## DIRECTORS' STATEMENTS
The Directors are required to make a statement regarding the preparation of the financial statements and also to provide details regarding the disclosure of information to the Company's auditor. The Code also requires the Board to review and make statements in relation to management's report on internal controls, the adoption of the Going Concern method of accounting and the long term viability of the Group. All of these statements are set out on pages 87 to 89.

## CORPORATE GOVERNANCE REPORT
The Corporate Governance Report set out on pages 41 to 85 is incorporated into this Directors' Report by reference.

## BUSINESS MODEL AND STRATEGY
The Strategic Report set out on pages 6 to 39 includes the Company's business model and strategy.

## DIRECTORS
The following served as directors of the Company during the 2015 financial year:

| Director |
| --- |
| H.J. Mark Tompkins |
| Dr B.R. Shetty |
| Prasanth Manghat |
| Dr Ayesha Abdullah |
| Abdulrahman Basaddiq |
| Jonathan Bomford |
| Lord Clanwilliam |
| Salma Hareb |
| Heather Lawrence |
| Keyur Nagori |
| Binay Shetty |
| Dr Nandini Tandon |

## CAPITAL STRUCTURE
All information relating to the Company's capital structure, including rights attaching to shares, details of the Company's principal shareholders and other shareholder information in contained on the inside back cover.

## DIVIDENDS
Details of the Company's dividend policy and proposed final dividend payment for the year ended 31 December 2015 is set out in the Financial Review on page 27.

## DISCLOSURE OF INFORMATION UNDER LISTING RULE 9.8.4 C
In accordance with the UK Financial Conduct Authority's Listing Rules (LR 9.8.4C), the information to be included in the Annual Report, where applicable, under LR 9.8.4, is set out in this Directors' Report, with the exception of transactions with controlling shareholders which is set out on pages 139 to 140 (Note 31 to the Consolidated Financial Statements) and interest capitalised which is set out on page 132 to 133 (Note 17 to the Consolidated Financial Statements).

## GREENHOUSE GAS EMISSIONS
The Company's disclosure in relation to its greenhouse gas emissions is included within the sustainability section of the Corporate Social Responsibility report on pages 29 to 31.

## POLITICAL DONATIONS

Neither the Company nor any subsidiary company in the Group made any political donations during the year ended 31 December 2015.

Whilst the Company has no intention of making formal political donations in the future, the Board acknowledge that given the wide interpretation of such donations, certain business events in which the Company or any of its subsidiaries, or the Board, may wish to participate may be caught under the formal definition of political donations. The Company will therefore again be seeking approval from shareholders at this year's annual general meeting, for a small approved limit for "political donations", for use in such circumstances. If this is approved by shareholders, the Board will provide full details of any such payments made in the next annual report.

## FINANCIAL INSTRUMENTS

The financial risk management objectives and policies of the Group, and the exposure of the Group to financial instruments, are included in Note 33 to the financial statements on pages 141 to 144.

## SUBSEQUENT EVENTS

Details of any important and material events affecting the Group which have occurred since the end of the 2015 financial year, are set out in Note 39 to the consolidated financial statements.

## FUTURE DEVELOPMENTS

The Group's strategy and potential future development are outlined in the Group Strategic Report on pages 6 to 39.

## RESEARCH AND DEVELOPMENT

The Eugin Foundation, part of the Clinica Eugin business, carries out research and development focused on fertility and human reproduction with particular regards to personal and social aspects as well as promotion of health.

## BRANCHES

The Group normally operates across all jurisdictions where it has a business presence through the incorporation of registered entities, but also operates through a number of branches where this is considered appropriate from an operational or regulatory perspective. A detailed list of entities and branches in the Group is provided in section 2.2 of financial statements.

## CONTRACTS OF SIGNIFICANCE AND CONTROLLING SHAREHOLDERS' AGREEMENT

Under UAE law and regulations, with the exception of certain specific areas designated by the Government as such, all land must be held legally by a UAE National. In addition, all healthcare facility and pharmacy operating licences may only be held legally by a UAE National, and not a body corporate. As a result, some of the property owned beneficially by the Group and all the Group's medical facility and pharmacy licences, are held legally in the name of either H.E. Saeed Bin Butti or Mr Khalifa Bin Butti, both previous Directors and continuing significant shareholders of the Company.

The Company has an agreement with Dr B.R. Shetty, H.E. Saeed Bin Butti and Khalifa Bin Butti ("Controlling Shareholders") under which the Controlling Shareholders agree to comply with the independence provisions of the UKLA Listing Rules. The Company has complied with the independence provisions contained in that agreement and, as far as the Company are aware, the Controlling Shareholders and any of their associates have also complied with such provisions and the procurement obligations included in the agreement.

The Directors' Report was approved by the Board on 13 March 2016 and are signed on behalf of the Board by:

**SIMON WATKINS**
Group Company Secretary

NMC Health plc (registered in England and Wales, number 7712220)
Level 1, Devonshire House, One Mayfair Place, London W1J 8AJ

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          89 of 166          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

Financial Statements

# Financial Statements

## In this section:

87   Directors' statements

90   Independent auditor's report

95   Consolidated income statement

99   Consolidated statement of other comprehensive income

100  Consolidated statement of financial position

101  Consolidated statement of changes in equity

102  Consolidated statement of cash flows

103  Notes to the consolidated financial statements

148  Statement of financial position

149  Statement of changes in equity

150  Statement of cash flows

151  Notes to the financial statements

86    NMC Health plc Annual Report and Accounts 2015

# Directors' statements

## STATEMENT OF DIRECTORS' RESPONSIBILITIES

The Directors are responsible for preparing the Annual Report, the Directors' Remuneration Report and the financial statements in accordance with applicable law and regulations.

The Directors are required by Company Law to prepare financial statements for the Group and the Company in accordance with the International Financial Reporting Standards as adopted by the European Union ("IFRS").

The financial statements are required to present fairly for each financial period the Company's financial position, financial performance and cash flows. In preparing the Group and parent company financial statements the Directors are also required to:

- Properly select and consistently apply accounting policies;
- Present information, including accounting policies, in a manner that provides relevant, reliable, comparable and understandable information;
- Provide additional disclosures when compliance with the specific requirements in IFRS is insufficient to enable users to understand the impact of particular transactions, other events and conditions on the entity's financial position and financial performance; and
- Make an assessment of the company's ability to continue as a going concern.

The Directors confirm that they have complied with the above requirements in preparing the financial statements. The Directors also confirm that they consider the annual report and accounts, taken as a whole, is fair, balanced and understandable and provides the information necessary for shareholders to assess the Company's performance, business model and strategy.

The Directors are responsible for keeping proper accounting records that are sufficient to show and explain the Company's transactions and disclose with reasonable accuracy at any time the financial position of the Company and to enable them to ensure that the financial statements comply with the Companies Act 2006. The Directors are also responsible for safeguarding the assets and hence for taking reasonable steps for the prevention and detection of fraud and other irregularities and for the preparation of a Directors' report and Directors' remuneration report which comply with the requirements of the Companies Act 2006.

The Directors are responsible for the maintenance and integrity of the Company's website. Legislation in the United Kingdom governing the preparation and dissemination of financial statements differs from legislation in other jurisdictions.

We confirm to the best of our knowledge:

- The financial statements, prepared in accordance with the International Financial Reporting Standards as adopted by the EU, give a true and fair view of the assets, liabilities, financial position and profit or loss of the Company and the undertakings included in the consolidation taken as a whole; and
- The Strategic Report includes a fair review of the development and performance of the business and the position of the Company and the undertakings included in the consolidation taken as a whole, together with a description of the principal risks and uncertainties they face.

## DISCLOSURE OF INFORMATION TO THE AUDITORS

Directors' statement as to disclosure of information to auditors:

The Directors who were members of the Board at the time of approving the Directors' Report are set out on pages 44 to 47. Having made enquiries of fellow directors and of the Company's Auditor, each of these Directors confirms that:

- to the best of each Director's knowledge and belief, there is no information (that is, information needed by the group's Auditor in connection with preparing their report) of which the Company's Auditor is unaware; and
- each Director has taken all the steps a Director might reasonably be expected to have taken to be aware of relevant audit information and to establish that the Company's Auditor is aware of that information.

EY have confirmed that they are willing to be reappointed as auditor for the financial year ending 31 December 2016.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice    91 of 166    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

# Directors' statements continued

### GOING CONCERN AND VIABILITY

#### Going Concern

The Group has two diverse operating divisions, both of which operate in a growing market. Management have undertaken an assessment of the future prospects of the Group and the wider risks that the Group is exposed to. In this assessment of whether the Group should adopt the going concern basis in preparing its financial statements, management have considered:

**Operating risk:** The management team prepare a Group budget for each financial year and a cashflow forecast for the following 18 months which allows the Board to monitor the financial position of the Group and to consider appropriate risks which the business may face from a financial perspective. Included in this review are future cashflow, both acquisition costs and subsequent cashflow generation, associated with acquisitions agreed but not completed at the end of the 2015 financial year. The Board receives monthly management reports covering key operational matters, monthly comparison to budget and updated forecasts on a half yearly basis for the full financial year to ensure that the business is trading in line with its expectations.

**Financing risk:** The Company has worked to structure its financing facilities for the medium and long term as well as utilising short term facilities to meet the Group's working capital requirements. In 2015 the Group entered into a structured consortium arrangement of US$825m as new syndicated loan facility, comprising US$350m of term debt and US$475m of delayed drawdown acquisition facilities. As at 31 December 2015, the Company has utilised all of the US$350m term debt facility available as well as US$164m of the delayed drawdown facility. Since 1 January 2016, a further US$219m has been utilised from the delayed drawdown facility, leaving US$93m unutilised.

The Group has banking arrangements through a spread of local and international banking groups. Debt covenants are reviewed by the board each month. The Board believes that the level of cash in the Group, the spread of bankers and the improved debt facility terms agreed during 2015 mitigates the financing risks that the Group faces from both its acquisitive growth strategy and in relation to working capital requirements.

**Customer and Supplier risk:** Both the Healthcare and the Distribution divisions have delivered a robust performance in 2015. All major financial and non-financial KPIs showed good improvement during 2015. In the Healthcare division, trade receivables are monitored regularly, provisions made where necessary and the Group has no history of significant bad debts. In the Distribution division, the increase in revenue and product flow has again had the anticipated adverse effect on the Group's working capital position. However trade receivables are monitored regularly and management maintain a close working relationship with all major suppliers to monitor performance as well as signs of financial risk.

The Board has reviewed a high level budget for 2016 as well as considered growth forecasts for the healthcare sector in UAE, in particular the continued positive impact from the introduction of mandatory healthcare insurance in Dubai, and from the Group's newly opened and newly acquired businesses, and considers the Group's future forecasts to be reasonable.

**Impairment risk:** The Board has considered the carrying value and useful economic lives of inventories, accounts receivable, property and equipment and intangible assets and concluded that there are no indicators of material impairment of these items and therefore no material cash flow impact associated with any loss in those areas.

In its review, management also considered other areas of potential risk, including regulatory risk, insurance and legal risks and potential areas of material contingent liability and found no matters which are likely to affect the viability of the Group in the medium term.

The Board has reviewed and considered management's formal assessment of the going concern concept of accounting and the cash flow forecast that has been prepared for the period to 30 June 2017 and has concluded that this assessment and forecast indicates that the Group has positive cash flows with sufficient headroom and will comply with all debt covenants.

The Directors therefore continue to adopt the going concern basis in the preparation of the financial statements.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          92 of 166          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

Viability

In order to protect longer term shareholder value, the Board have always considered how Group performance and its strategic decisions will affect the financial and operational prospects of the Group in the longer term. This year, as recommended by provision C.2.2 of the UK Corporate Governance Code, the Directors have considered a formal assessment of the prospects of the Group over a longer period than the 12 months review period required under the 'Going Concern basis of accounting.

Management conducted a formal viability review looking forward for a period of three years. This period was selected as the most appropriate timeframe over which the future prospects of the Group should be considered given the Group's changing nature and significant growth, the time taken to fully integrate acquired businesses and ramp-up newly opened facilities and the maturity date of current debt obligations.

In its review, management considered the current position of the Group and the following principal financial risks associated with the business:

· Risks associated with investments
· The impact of UAE market competition
· Potential instability associated with the UAE macroeconomic environment

The three year review considered the Group's profitability, cash flows, banking covenants and other key financial ratios over the period. These metrics were subjected to sensitivity analysis which involved flexing a number of the main assumptions underlying the forecasts both individually and in unison, including increases in financing costs and inflationary pressures, reduction in revenues resulting from lower expat residencies in the UAE and insurance reimbursement and an increase in human capital costs. Where appropriate, an analysis was carried out to evaluate the potential impact of any of these principal risks actually occurring.

Based on the results of this formal assessment, the Directors have a reasonable expectation that the Group will be able to continue in operation and meet its liabilities as they fall due over the three year period of the assessment.

By Order of the Board

SIMON WATKINS
Group Company Secretary

Exhibit 4 to B.R. Shetty's Request for Judicial Notice        93 of 166        Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

# Independent auditor's report
## To the members of NMC Health Plc

**OUR OPINION ON THE FINANCIAL STATEMENTS**
In our opinion:
• NMC Health plc's Group financial statements and Parent company financial statements (the "financial statements") give a true and fair view of the state of the group's and of the parent company's affairs as at 31 December 2015 and of the group's profit for the year then ended;
• The Group financial statements have been properly prepared in accordance with IFRSs as adopted by the European Union;
• The parent company financial statements have been properly prepared in accordance with IFRSs as adopted by the European Union as applied in accordance with the provisions of the Companies Act 2006; and
• The financial statements have been prepared in accordance with the requirements of the Companies Act 2006, and, as regards the Group financial statements, Article 4 of the IAS Regulation.

**WHAT WE HAVE AUDITED**
NMC Health plc's financial statements comprise:

| Group | Parent company |
|---|---|
| Consolidated statement of financial position as at 31 December 2015 | Statement of financial position as at 31 December 2015 |
| Consolidated income statement for the year then ended | Statement of changes in equity for the year then ended |
| Consolidated statement of comprehensive income for the year then ended | Statement of cash flows for the year then ended |
| Consolidated statement of changes in equity for the year then ended | Related Notes 1 to 15 to the financial statements |
| Consolidated statement of cash flows for the year then ended | |
| Related Notes 1 to 39 to the financial statements | |

The financial reporting framework that has been applied in their preparation is applicable law and International Financial Reporting Standards (IFRSs) as adopted by the European Union and as regards the parent company financial statements as applied in accordance with the provisions of the Companies Act 2006.

**OVERVIEW OF OUR AUDIT APPROACH**

| Risks of material misstatement | • Revenue recognition, including the timing of revenue recognition and the determination of whether the Group is acting in the capacity of an agent rather than principal.<br>• Accounting for major complex transactions. |
|---|---|
| Audit scope | • We performed an audit of the complete financial information of ten components and audit procedures on specific balances for a further five components.<br>• The components (including consolidation adjustments) where we performed full or specific audit procedures accounted for 100% of adjusted Profit before tax, 94% of Revenue and 97% of Total assets. |
| Materiality | • Overall Group materiality of $4.62m which represents 5% of adjusted Profit before tax. |

**OUR ASSESSMENT OF RISK OF MATERIAL MISSTATEMENT**
We identified the risks of material misstatement described below as those that had the greatest effect on our overall audit strategy, the allocation of resources in the audit and the direction of the efforts of the audit team. In addressing these risks, we have performed the procedures below which were designed in the context of the financial statements as a whole and, consequently, we do not express any opinion on these individual areas.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice        94 of 166        Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

| Risk | Our response to the risk | What we concluded to the Audit Committee |
|---|---|---|
| **Revenue recognition, including the timing of revenue recognition and the determination of whether the Group is acting in the capacity of an agent rather than principal** | We relied upon the controls tested over revenue recognition, including the timing of revenue recognition. | Based on the audit procedures performed, we are satisfied that revenue recognition is appropriate and that the Group has appropriately adhered to their revenue recognition policies, including the determination of whether the Group is acting as agent rather than as principal. |
| (The Group has revenue of $880.9m, 2014: $643.9m). | We performed analytical review procedures and performed cut-off testing procedures (by selecting a sample of transactions either side of year-end) to check that revenue had been recognised in the appropriate accounting period. | |
| *Refer to the Audit Committee Report (page 54); Accounting policies (pages 109 to 110); and Note 5 and 7 of the Consolidated Financial Statements (starting on pages 117 and 123 respectively).* | We performed procedures on contractual arrangements in respect of new and one-off fee income and considered the appropriateness of the accounting through verification to legal agreements and vouching the amounts recognised to invoices and cash receipts. | |
| The Group has a number of revenue streams relating to its Healthcare and Distribution segments including clinic revenues, insurance claims, over-the-counter sales, pharmacy sales and sales of goods. There is a risk of improper revenue recognition, particularly with regard to cut-off at period end dates, in the healthcare business, given the diversity of the Group's healthcare operations, and in the distribution business. Furthermore, there is a risk that management may incorrectly determine whether the Group is acting as principal or agent in certain arrangements such as distribution agreements with key suppliers and revenue sharing agreements with doctors. | We tested a sample of new distribution agreements entered into during the year and revenue sharing contracts with doctors in newly acquired businesses to verify that the Group's determination that they are acting as a principal rather than an agent is appropriate. | |
| | We checked the Group's adherence to their revenue recognition policies and we agreed that these policies are in accordance with IFRSs as adopted by the European Union. | |
| The risk has increased in the current year due to the acquisitions which have resulted in new revenue streams for the Group. | We performed full and specific scope audit procedures over this risk area in 13 locations, which covered 94% of the risk amount (including consolidation adjustments). | |

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          95 of 166          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

# Independent auditor's report continued
## To the members of NMC Health Plc

| Risk | Our response to the risk | What we concluded to the Audit Committee |
|---|---|---|
| **Accounting for major complex transactions**<br><br>(The Group recognised goodwill of $345.1m and intangible assets of $74.8m in respect of the acquisitions made in the current year. There were no acquisitions in the prior year.)<br><br>*Refer to the Audit Committee Report (page 54); Accounting policies (pages 111 to 113); Significant Accounting Judgements and Estimates (Note 2.3) and Notes 5, 18, 36 and 37 of the Consolidated Financial Statements (starting on pages 117, 133, 145 and 146 respectively).*<br><br>The Group made a number of significant acquisitions during the year including the Luarmia S.L group of companies, Americare Group, Dr Sunny Healthcare Group and ProVita International Medical Center LLC. The contractual arrangements for such transactions can be complex and require management to apply judgement in determining whether a transaction represents an acquisition of an asset or a business combination.<br><br>There is a risk that the estimates and judgements made in the recognition of an acquisition as a business combination may be inappropriate and the valuation of the assets and liabilities acquired may be misstated.<br><br>The complexity of the multiple contractual arrangements in respect of certain acquisitions and related services, and the different legal environments in which acquisitions have been undertaken, may lead to inappropriate judgements as to the basis of accounting.<br><br>Furthermore, there is a risk that these acquisitions may be recognised before the Group is exposed, or has rights, to variable returns from its involvement with the investee and has the ability to affect those returns through its power over the investee.<br><br>This is a new risk in the current year given that there were a number of such transactions in the current year and none in the prior year. | We obtained and reviewed the sale and purchase agreements entered into for the acquisitions which took place in the year and other relevant documentation to understand the terms and conditions of the agreements.<br><br>We assessed the judgements applied in determining whether acquisitions in the year represented an acquisition of an asset or a business combination. This involved assessing whether or not the entities and the assets acquired constitute the carrying on of a business, i.e., whether there are inputs and processes applied to those inputs that have the ability to create outputs.<br><br>Where transactions met the definition of a business combination we audited the Group's assessment of the assets and liabilities acquired and the allocation of the purchase consideration to these and the resultant goodwill or gain on bargain purchase recognised by performing the following procedures:<br><br>• We assessed the appropriateness of the recognition of intangible assets and consideration of their valuation inputs.<br>• We verified that the consideration transferred, and where relevant contingent consideration, in respect of each transaction was appropriately calculated in accordance with contractual arrangements.<br>• We assessed management's judgements in respect of what arrangements should be accounted for as part of the business combination and those that should be accounted for separately from the business combination.<br><br>We assessed whether the Group is exposed, or has rights, to variable returns from its involvement with the investee and has the ability to affect those returns through its power over the investee as at the date upon which the acquisitions were recognised.<br><br>We verified the appropriateness of the consolidation adjustments in respect of accounting for these transactions.<br><br>We assessed the accounting for the acquisitions to verify that they were accounted for and, where appropriate, disclosed in the financial statements in accordance with IFRS as adopted by the European Union.<br><br>We performed full scope audit procedures over Luarmia S.L group of companies, Americare Group, Dr Sunny Healthcare Group and ProVita International Medical Center LLC which represented all of the significant complex transactions in the current year.<br><br>We also performed audit procedures on the purchase price allocation exercise in respect of these acquisitions which covered 100% of the goodwill and intangible assets recognised in respect of these transactions. | Based upon the procedures we have performed, we concur with the Group's final accounting for the acquisitions of Luarmia S.L group of companies and Americare Group, and the provisional accounting for the acquisitions of Dr Sunny Healthcare Group and ProVita International Medical Center as at 31 December 2015.<br><br>We have reviewed the business combinations disclosures in respect of the acquisitions which completed in 2015 and we believe that these are appropriate and in compliance with the requirements of IFRS 3 Business combinations. |

Exhibit 4 to B.R. Shetty's Request for Judicial Notice    96 of 166    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

Overview          Strategic Report          Governance          Financial Statements

In the prior year, our auditor's report included risks of material misstatement in relation to the risk of valuation of trade receivables. In the current year, based upon the demonstrated history of debt collection and expected future trends, this was not a risk that had the greatest effect on our overall audit strategy, the allocation of resources in the audit and the direction of efforts of the audit team.

In the prior year, our auditor's report also included capitalisation of costs into capital work in progress as a risk of material misstatement. This year this was not a risk that had the greatest effect on our overall audit strategy, the allocation of resources in the audit and the direction of efforts of the audit team given that the quantum of capital work in progress has reduced and the likelihood of material misstatement was not considered to be high given that the majority of capitalised work in progress at year-end relates to a fixed price construction contract.

### THE SCOPE OF OUR AUDIT
#### TAILORING THE SCOPE
Our assessment of audit risk, our evaluation of materiality and our allocation of performance materiality determine our audit scope for each entity within the Group. Taken together, this enables us to form an opinion on the consolidated financial statements. We take into account size, risk profile, the organisation of the group and effectiveness of group-wide controls, changes in the business environment and other factors such as recent Internal audit results and whether the components have been newly acquired when assessing the level of work to be performed at each entity.

In assessing the risk of material misstatement to the Group financial statements, and to ensure we had adequate quantitative coverage of significant accounts in the financial statements, of the 21 reporting components of the Group, we selected 14 components covering entities within the United Arab Emirates (UAE) and Spain, which represent the principal business units within the Group.

Of the 14 components selected, we performed an audit of the complete financial information of ten components (full scope components) which were selected based on their size or risk characteristics; one of these components is located in Spain and the remainder in the UAE. For the remaining four components (specific scope components), all of which are located in the UAE, we performed audit procedures on specific accounts within that component that we considered had the potential for the greatest impact on the significant accounts in the financial statements either because of the size of these accounts or their risk profile.

The reporting components where we performed audit procedures accounted for 139% of the Group's adjusted Profit before tax (2014: 150% of the Group's Profit before tax), 97% (2014: 96%) of the Group's Revenue and 154% (2014: 156%) of the Group's Total assets.

For the current year, the full scope components contributed 139% of the Group's adjusted Profit before tax (2014: 152% of the Group's Profit before tax), 85% (2014: 89%) of the Group's Revenue and 140% (2014: 149%) of the Group's Total assets.

The specific scope components contributed 0% of the Group's adjusted profit before tax (2014: -2% of the Group's Profit before tax), 12% (2014: 7%) of the Group's Revenue and 14% (2014: 7%) of the Group's Total assets. The audit scope of these components may not have included testing of all significant accounts of the component but will have contributed to the coverage of significant accounts tested for the Group. Specific scope component testing is primarily focused on the significant risk in relation to revenue recognition however it also included procedures on property and equipment balances.

We also performed specified procedures over certain aspects of property and equipment at a 15th component located in the UAE.

Of the remaining six components, all of which are located in the UAE, that together represent -1% of the Group's adjusted Profit before tax, none are individually greater than 2% of the Group's adjusted profit before tax. For these components, we performed other procedures, including analytical review testing of consolidation journals and intercompany eliminations to respond to any potential risks of material misstatement to the Group financial statements.

The Group audit team also performed audit procedures over consolidation and foreign exchange adjustments, which were net negative to Revenue and adjusted Profit before tax of 3% and 39%, respectively (2014: net negative to Revenue and Profit before tax of 4% and 49% respectively), and reduced the calculated total overall percentage coverage to 97% (2014: 96%) and 100%, (2014: 100%) respectively.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          97 of 166          Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

# Independent auditor's report continued
## To the members of NMC Health Plc

The table below illustrates the coverage obtained from the work performed by our audit teams.

| Group audit scope | Number of locations | % of adjusted PBT | % of Revenue | % of Total assets |
|---|---|---|---|---|
| Full | 10 | 139% | 85% | 140% |
| Specific | 4 | 0% | 12% | 14% |
| Specified procedures | 1 | 1% | 1% | 0% |
| Not significant by size or risk (other procedures) | 6 | (1%) | 5% | 3% |
| Consolidation adjustments audited by Group audit team | | (39%) | (3%) | (57%) |
| Total coverage | | 100% | 100% | 100% |

### CHANGES FROM THE PRIOR YEAR
During the year the Group acquired Luarmia S.L, Americare Group, Dr Sunny Healthcare Group and ProVita International Medical Center LLC; these components were all assigned as full scope components. Furthermore, one component which was not in scope in the prior year was a specific scope component this year in order to increase the coverage of the Group's revenue and adjusted Profit before tax subject to audit procedures.

### INTEGRATED TEAM STRUCTURE AND INVOLVEMENT WITH COMPONENT TEAMS
The overall audit strategy is determined by the Senior Statutory Auditor. The senior statutory auditor is based in the UK but, since Group management and the majority of the operations reside in the UAE, the Group audit team includes members from both the UK and the UAE. The Group audit team members from the UAE are also members of the component teams.

In establishing our overall approach to the Group audit, we determined the type of work that needed to be undertaken at each of the components by us, as the primary audit engagement team, or by component auditors from other EY global network firms operating under our instruction. Of the ten full scope components, audit procedures were performed on one of these directly by the primary audit team and audit procedures were performed on the remaining nine by the component audit teams, one of which is located in Spain and the others in the UAE. For the components where the work was performed by component auditors, we determined the appropriate level of involvement to enable us to determine that sufficient audit evidence had been obtained as a basis for our opinion on the Group as a whole.

Given that the Group operates predominantly in the UAE the Senior Statutory Auditor visited the UAE five times during the current year audit process and members of the Group audit team in both jurisdictions work together as an integrated team throughout the audit process. During the year the Group acquired Luarmia S.L group of companies based in Spain which are audited by a component team in Spain. The Senior Statutory Auditor or members of the Group audit team visited Spain three times during the current year audit process. These visits involved discussing the audit approach with the component team and any issues arising from their work, meeting with local management (including of newly acquired entities), attending planning and closing meetings, performing site visits to medical facilities, reviewing key audit working papers on risk areas as well as involvement by the Group audit team in the audit procedures on significant risk areas, primarily revenue recognition and accounting for major complex transactions. The primary team interacted regularly with the component teams in the UAE and Spain where appropriate during various stages of the audit, reviewed key working papers and were responsible for the scope and direction of the audit process. This, together with the additional procedures performed at Group level by the Group audit team, gave us appropriate evidence for our opinion on the Group financial statements.

### OUR APPLICATION OF MATERIALITY
We apply the concept of materiality in planning and performing the audit, in evaluating the effect of identified misstatements on the audit and in forming our audit opinion.

### MATERIALITY
*The magnitude of an omission or misstatement that, individually or in the aggregate, could reasonably be expected to influence the economic decisions of the users of the financial statements. Materiality provides a basis for determining the nature and extent of our audit procedures.*

We initially determined materiality for the Group to be $5.67m (2014: $3.88m), which is 5% of forecast adjusted Profit before tax (2014: 5% of Profit before tax). We believe that it is appropriate to use adjusted Profit before tax in order to exclude the effects of certain non-recurring items from profit before tax. These related to the write-off of unamortised finance fees resulting from the refinance of loan facilities in the year of $2.61m and the costs of $4.13m in respect of the acquisitions which took place during the year. We Note that management have excluded these one-off items when assessing the performance of the Group. In the prior year there were no such non-recurring items and hence Profit before tax was used as the basis for setting materiality last year. We used a profit based measure for determining materiality as profit is one of the KPIs of the business and a focus of users of the financial statements.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          98 of 166          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

The increase in materiality from the prior year predominantly reflects the impact of the newly acquired entities on the Group's profit.

During the course of our audit, we reassessed initial materiality and, as the actual adjusted profit before tax figure was lower than that which we had used as the basis for determining materiality, we revised our materiality threshold to $4.62mn, which is approximately 5% of adjusted profit before tax.



| Starting basis | Profit before tax - $85.36mn |
| Adjustments | Write off of unamortised finance fees - $2.61mn<br>One-off costs in respect of acquisitions - $4.13mn |
| Materiality | Adjusted Profit before tax $92.10mn<br>Materiality of $4.62m (5% of adjusted Profit before tax) |

### PERFORMANCE MATERIALITY

*The application of materiality at the individual account or balance level. It is set at an amount to reduce to an appropriately low level the probability that the aggregate of uncorrected and undetected misstatements exceeds materiality.*

On the basis of our risk assessments, together with our assessment of the Group's overall control environment, our judgement was that performance materiality was 50% (2014: 50%) of our planning materiality, namely $2.83m (2014: $1.94m). We have set performance materiality at this percentage due to our expectation of misstatements, our risk assessment and changes in the organisation, particularly given the acquisitions which took place during the year. During the course of the audit, we revised our performance materiality threshold to $2.31mn, which is 50% of our revised materiality threshold.

Audit work at component locations for the purpose of obtaining audit coverage over significant financial statement accounts is undertaken based on a percentage of total performance materiality. The performance materiality set for each component is based on the relative scale and risk of the component to the Group as a whole and our assessment of the risk of misstatement at that component. In the current year, the range of performance materiality allocated to components was $0.46m to $1.50m (2014: $0.34m to $1.18m).

### REPORTING THRESHOLD

*An amount below which identified misstatements are considered as being clearly trivial.*

We agreed with the Audit Committee that we would report to them all uncorrected audit differences in excess of $0.28m (2014: $0.17m), which is set at 5% of planning materiality, as well as differences below that threshold that, in our view, warranted reporting on qualitative grounds. Given the revision of materiality we reported all uncorrected audit differences in excess of $0.23mn.

We evaluate any uncorrected misstatements against both the quantitative measures of materiality discussed above and in light of other relevant qualitative considerations in forming our opinion.

### SCOPE OF THE AUDIT OF THE FINANCIAL STATEMENTS

An audit involves obtaining evidence about the amounts and disclosures in the financial statements sufficient to give reasonable assurance that the financial statements are free from material misstatement, whether caused by fraud or error. This includes an assessment of: whether the accounting policies are appropriate to the group's and the parent company's circumstances and have been consistently applied and adequately disclosed; the reasonableness of significant accounting estimates made by the directors; and the overall presentation of the financial statements. In addition, we read all the financial and non-financial information in the annual report to identify material inconsistencies with the audited financial statements and to identify any information that is apparently materially incorrect based on, or materially inconsistent with, the knowledge acquired by us in the course of performing the audit. If we become aware of any apparent material misstatements or inconsistencies we consider the implications for our report.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice    99 of 166    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

Financial Statements

# Independent auditor's report continued
## To the members of NMC Health Plc

**RESPECTIVE RESPONSIBILITIES OF DIRECTORS AND AUDITOR**

As explained more fully in the Directors' Responsibilities Statement set out on page 87, the directors are responsible for the preparation of the financial statements and for being satisfied that they give a true and fair view. Our responsibility is to audit and express an opinion on the financial statements in accordance with applicable law and International Standards on Auditing (UK and Ireland). Those standards require us to comply with the Auditing Practices Board's Ethical Standards for Auditors.

This report is made solely to the company's members, as a body, in accordance with Chapter 3 of Part 16 of the Companies Act 2006. Our audit work has been undertaken so that we might state to the company's members those matters we are required to state to them in an auditor's report and for no other purpose. To the fullest extent permitted by law, we do not accept or assume responsibility to anyone other than the company and the company's members as a body, for our audit work, for this report, or for the opinions we have formed.

**OPINION ON OTHER MATTERS PRESCRIBED BY THE COMPANIES ACT 2006**

In our opinion:

- The part of the Directors' Remuneration Report to be audited has been properly prepared in accordance with the Companies Act 2006; and
- The information given in the Strategic Report and the Directors' Report for the financial year for which the financial statements are prepared is consistent with the financial statements.

**MATTERS ON WHICH WE ARE REQUIRED TO REPORT BY EXCEPTION**

| | | |
|---|---|---|
| ISAs (UK and Ireland) reporting | We are required to report to you if, in our opinion, financial and non-financial information in the annual report is:<br>• Materially inconsistent with the information in the audited financial statements; or<br>• Apparently materially incorrect based on, or materially inconsistent with, our knowledge of the Group acquired in the course of performing our audit; or<br>• Otherwise misleading.<br><br>In particular, we are required to report whether we have identified any inconsistencies between our knowledge acquired in the course of performing the audit and the directors' statement that they consider the annual report and accounts taken as a whole is fair, balanced and understandable and provides the information necessary for shareholders to assess the entity's performance, business model and strategy; and whether the annual report appropriately addresses those matters that we communicated to the audit committee that we consider should have been disclosed. | We have no exceptions to report. |
| Companies Act 2006 reporting | We are required to report to you if, in our opinion:<br>• Adequate accounting records have not been kept by the parent company, or returns adequate for our audit have not been received from branches not visited by us; or<br>• The parent company financial statements and the part of the Directors' Remuneration Report to be audited are not in agreement with the accounting records and returns; or<br>• Certain disclosures of directors' remuneration specified by law are not made; or<br>• We have not received all the information and explanations we require for our audit. | We have no exceptions to report. |
| Listing Rules review requirements | We are required to review:<br>• The directors' statement in relation to going concern, set out on page 88, and longer-term viability, set out on page 89; and<br>• The part of the Corporate Governance Statement relating to the company's compliance with the provisions of the UK Corporate Governance Code specified for our review. | We have no exceptions to report. |

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          100 of 166          Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

**STATEMENT ON THE DIRECTORS' ASSESSMENT OF THE PRINCIPAL RISKS THAT WOULD THREATEN THE SOLVENCY OR LIQUIDITY OF THE ENTITY**

| ISAs (UK and Ireland) reporting | We are required to give a statement as to whether we have anything material to add or to draw attention to in relation to:<br>• The directors' confirmation in the annual report that they have carried out a robust assessment of the principal risks facing the entity, including those that would threaten its business model, future performance, solvency or liquidity;<br>• The disclosures in the annual report that describe those risks and explain how they are being managed or mitigated;<br>• The directors' statement in the financial statements about whether they considered it appropriate to adopt the going concern basis of accounting in preparing them, and their identification of any material uncertainties to the entity's ability to continue to do so over a period of at least twelve months from the date of approval of the financial statements; and<br>• The directors' explanation in the annual report as to how they have assessed the prospects of the entity, over what period they have done so and why they consider that period to be appropriate, and their statement as to whether they have a reasonable expectation that the entity will be able to continue in operation and meet its liabilities as they fall due over the period of their assessment, including any related disclosures drawing attention to any necessary qualifications or assumptions. | We have nothing material to add or to draw attention to. |

**CAMERON CARTMELL (SENIOR STATUTORY AUDITOR)**
for and on behalf of Ernst & Young LLP, Statutory Auditor
London
13 March 2016

Notes:
1. The maintenance and integrity of the NMC Health plc web site is the responsibility of the directors; the work carried out by the auditors does not involve consideration of these matters and, accordingly, the auditors accept no responsibility for any changes that may have occurred to the financial statements since they were initially presented on the web site.
2. Legislation in the United Kingdom governing the preparation and dissemination of financial statements may differ from legislation in other jurisdictions.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          101 of 166          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

Financial Statements

# Consolidated income statement
For the year ended 31 December 2015

| | Notes | 2015 US$'000 | 2014 US$'000 |
|---|---|---|---|
| Revenue | 7 | 880,870 | 643,931 |
| Direct costs | 8 | (575,926) | (434,725) |
| GROSS PROFIT | | 304,944 | 209,206 |
| General and administrative expenses | 8 | (191,247) | (137,188) |
| Other income | 9 | 36,649 | 30,440 |
| PROFIT FROM OPERATION BEFORE DEPRECIATION, AMORTIZATION AND TRANSACTION COSTS | | 150,346 | 102,458 |
| Transaction costs in respect of business combinations | 5 | (4,131) | – |
| Depreciation | 17 | (29,851) | (14,050) |
| Amortisation | 18 | (5,475) | – |
| PROFIT FROM OPERATIONS | | 110,889 | 88,408 |
| Finance costs | 10 | (23,845) | (14,497) |
| Finance income | 11 | 925 | 3,623 |
| Unamortised finance fees written off | 27 | (2,612) | – |
| PROFIT FOR THE YEAR BEFORE TAX | 12 | 85,357 | 77,534 |
| Tax | 15 | 403 | – |
| PROFIT FOR THE YEAR | | 85,760 | 77,534 |
| Profit for the year attributable to: | | | |
| Equity holders of the Parent | | 82,215 | 76,566 |
| Non-controlling interests | | 3,545 | 968 |
| Profit for the year | | 85,760 | 77,534 |
| Earnings per share for profit attributable to the equity holders of the Parent: | | | |
| Basic EPS (US$) | 16 | 0.443 | 0.412 |
| Diluted EPS (US$) | 16 | 0.442 | 0.412 |
| Diluted Adjusted EPS (US$) | 16 | 0.505 | 0.412 |
| ADJUSTED PROFIT FOR THE PERIOD BEFORE ONE OFF ITEMS | 16 | 97,498 | 77,534 |

One off items includes transaction costs in respect of business combinations (US$4.1m), unamortised fees written off (US$2.6m), amortisation of acquired intangibles (US$5.0m).

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          102 of 166          Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

# Consolidated statement of other comprehensive income
For the year ended 31 December 2015

| | Notes | 2015 US$'000 | 2014 US$'000 |
|---|---|---|---|
| PROFIT FOR THE YEAR | | 85,760 | 77,534 |
| | | | |
| Other comprehensive income | | | |
| Other comprehensive income to be reclassified to income statement in subsequent periods (net of tax) | | | |
| Exchange difference on translation of foreign operations | | (5,342) | – |
| | | | |
| Other comprehensive income not to be reclassified to income statement in subsequent periods (net of tax) | | | |
| Re-measurement gains on defined benefit plans | 28 | 260 | – |
| Other comprehensive income for the year (net of tax) | | (5,082) | – |
| TOTAL COMPREHENSIVE INCOME FOR THE YEAR | | 80,678 | 77,534 |
| | | | |
| Total comprehensive income attributable to : | | | |
| Equity holders of the Parent | | 77,859 | 76,566 |
| Non-controlling interests | | 2,819 | 968 |
| Total comprehensive income | | 80,678 | 77,534 |

These results relate to continuing operations of the Group. There are no discontinued operations in the current and prior year.

The attached Notes 1 to 39 form part of the consolidated financial statements.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice     103 of 166     Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

Financial Statements

## Consolidated statement of financial position
As at 31 December 2015

| | Notes | 2015 US$'000 | 2014 US$'000 |
|---|---|---|---|
| **ASSETS** | | | |
| **Non-current assets** | | | |
| Property and equipment | 17 | 433,524 | 368,357 |
| Intangible assets | 18 | 413,059 | 4,236 |
| Deferred tax assets | 15 | 1,316 | – |
| Loan receivable | 19 | 1,725 | – |
| | | 849,624 | 372,593 |
| **Current assets** | | | |
| Inventories | 20 | 134,788 | 110,209 |
| Accounts receivable and prepayments | 21 | 282,475 | 196,569 |
| Loan receivable | 19 | 2,670 | – |
| Amounts due from related parties | 31 | 4,116 | 7,985 |
| Income tax receivable | | 2,810 | – |
| Bank deposits | 22 | 58,886 | 183,577 |
| Bank balances and cash | 22 | 118,511 | 79,592 |
| | | 604,256 | 577,932 |
| **TOTAL ASSETS** | | 1,453,880 | 950,525 |
| **EQUITY AND LIABILITIES** | | | |
| **Equity** | | | |
| Share capital | 23 | 29,566 | 29,566 |
| Share premium | 23 | 179,152 | 179,152 |
| Group restructuring reserve | 24 | (10,001) | (10,001) |
| Foreign currency translation reserve | | (4,616) | – |
| Option redemption reserves | 5 | (24,496) | – |
| Retained earnings | 25 | 318,092 | 250,306 |
| Equity attributable to equity holders of the Parent | | 487,697 | 449,023 |
| Non-controlling interests | | 11,968 | 4,004 |
| **Total equity** | | 499,665 | 453,027 |
| **Non-current liabilities** | | | |
| Term loans | 27 | 483,725 | 114,457 |
| Employees' end of service benefits | 28 | 19,284 | 12,450 |
| Other payables | 30 | 14,024 | 21 |
| Option redemption payable | 5 & 37 | 25,084 | – |
| Deferred tax liabilities | 15 | 9,761 | – |
| | | 551,878 | 126,928 |
| **Current liabilities** | | | |
| Accounts payable and accruals | 29 | 123,511 | 98,044 |
| Other payables | 30 | 11,150 | – |
| Amounts due to related parties | 31 | 17,419 | 8,380 |
| Bank overdrafts and other short term borrowings | 22 | 154,962 | 169,607 |
| Term loans | 27 | 91,621 | 92,055 |
| Employees' end of service benefits | 28 | 3,206 | 2,484 |
| Income tax payable | | 468 | – |
| | | 402,337 | 370,570 |
| **Total liabilities** | | 954,215 | 497,498 |
| **TOTAL EQUITY AND LIABILITIES** | | 1,453,880 | 950,525 |

The consolidated financial statements were authorised for issue by the board of directors on 13 March 2016 and were signed on its behalf by

**DR B.R. SHETTY**
Executive Vice Chairman & Chief Executive Officer

**MR SURESH KRISHNAMOORTHY**
Chief Financial Officer

The attached Notes 1 to 39 form part of the consolidated financial statements.

100    NMC Health plc Annual Report and Accounts 2015

# Consolidated statement of changes in equity
## For the year ended 31 December 2015

|  | | | Attributable to the equity holders of the Parent | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
|  | Share capital US$'000 | Share premium US$'000 | Group restructuring reserve US$'000 | Retained earnings US$'000 | Foreign currency translation reserve US$'000 | Option redemption reserve US$'000 | Total US$'000 | Non-controlling interest US$'000 | Total US$'000 |
| Balance as at 1 January 2014 | 29,566 | 179,152 | (10,001) | 187,519 | – | – | 386,236 | 2,915 | 389,151 |
| Total comprehensive income for the year | – | – | – | 76,566 | – | – | 76,566 | 968 | 77,534 |
| Dividend (Note 26) | – | – | – | (13,846) | – | – | (13,846) | – | (13,846) |
| Contribution by non-controlling interest | – | – | – | – | – | – | – | 121 | 121 |
| Share based payments (Note 32) | – | – | – | 67 | – | – | 67 | – | 67 |
| Balance as at 31 December 2014 | 29,566 | 179,152 | (10,001) | 250,306 | – | – | 449,023 | 4,004 | 453,027 |
| Profit for the year | – | – | – | 82,215 | – | – | 82,215 | 3,545 | 85,760 |
| Other comprehensive income | – | – | – | 260 | (4,616) | – | (4,356) | (726) | (5,082) |
| Total comprehensive income for the year | – | – | – | 82,475 | (4,616) | – | 77,859 | 2,819 | 80,678 |
| Dividend (Note 26) | – | – | – | (15,866) | – | – | (15,866) | – | (15,866) |
| Option redemption reserve (Note 5) | – | – | – | – | – | (24,496) | (24,496) | – | (24,496) |
| Acquisition of subsidiaries | – | – | – | – | – | – | – | 5,145 | 5,145 |
| Share based payments (Note 32) | – | – | – | 1,177 | – | – | 1,177 | – | 1,177 |
| Balance as at 31 December 2015 | 29,566 | 179,152 | (10,001) | 318,092 | (4,616) | (24,496) | 487,697 | 11,968 | 499,665 |

The attached Notes 1 to 39 form part of the consolidated financial statements.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice        105 of 166        Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

# Consolidated statement of cash flows
For the year ended 31 December 2015

| | Notes | 2015 US$'000 | 2014 US$'000 |
|---|---|---|---|
| **OPERATING ACTIVITIES** | | | |
| Profit for the year before tax | | 85,357 | 77,534 |
| Adjustments for: | | | |
| Depreciation | 17 | 29,851 | 14,050 |
| Employees' end of service benefits | 28 | 4,869 | 3,492 |
| Amortisation of intangible assets | 18 | 5,475 | – |
| Finance income | 11 | (925) | (3,623) |
| Finance costs | 10 | 23,845 | 14,497 |
| Loss on disposal of property and equipment | | 185 | 224 |
| Foreign exchange gain | | (536) | – |
| Non-cash other income | | (418) | – |
| Unamortised finance fees written off | 27 | 2,612 | – |
| Share based payments expense | 32 | 1,177 | 88 |
| | | 151,492 | 106,262 |
| Working capital changes: | | | |
| Inventories | | (19,139) | (16,086) |
| Accounts receivable and prepayments | | (59,969) | (28,080) |
| Amounts due from related parties | | 3,869 | 1,269 |
| Accounts payable and accruals | | 1,292 | 19,673 |
| Amounts due to related parties | | 9,039 | 3,301 |
| Net cash from operations | | 86,584 | 86,339 |
| Employees' end of service benefits paid | 28 | (1,133) | (657) |
| Income tax paid | | (1,367) | – |
| Net cash from operating activities | | 84,084 | 85,682 |
| **INVESTING ACTIVITIES** | | | |
| Purchase of property and equipment | | (79,281) | (111,245) |
| Purchase of intangible assets | 18 | (561) | (22) |
| Proceeds from disposal of property and equipment | | 85 | 256 |
| Acquisition of subsidiaries, net of cash acquired | 5 | (375,505) | – |
| Bank deposits maturing in over 3 months | | 27,115 | 66,171 |
| Restricted cash | | 6,498 | 14,150 |
| Finance income received | | 1,533 | 3,637 |
| Loan receivable | 19 | (4,395) | – |
| Net cash used in investing activities | | (424,511) | (27,053) |
| **FINANCING ACTIVITIES** | | | |
| New term loans and draw-downs | 27 | 822,698 | 263,594 |
| Repayment of term loans | 27 | (472,796) | (307,282) |
| Transaction cost of term loan | | (10,789) | – |
| Receipts of short term borrowings | | 407,849 | 383,705 |
| Repayment of short term borrowings | | (422,629) | (314,013) |
| Dividend paid to shareholders | 26 | (15,866) | (13,846) |
| Finance costs paid | | (20,335) | (13,669) |
| Net cash from/(used in) financing activities | | 288,132 | (1,511) |
| **(DECREASE)/INCREASE IN CASH AND CASH EQUIVALENTS** | | (52,295) | 57,118 |
| Cash and cash equivalents at 1 January | | 136,319 | 79,201 |
| **CASH AND CASH EQUIVALENTS AT 31 DECEMBER** | 22 | 84,024 | 136,319 |

The attached Notes 1 to 39 form part of the consolidated financial statements.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          106 of 166          Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

# Notes to the consolidated financial statements
At 31 December 2015

### 1 CORPORATE INFORMATION

NMC Health plc (the "Company" or "Parent") is a Company which was incorporated in England and Wales on 20 July 2011. The Company is a public limited company operating in the United Arab Emirates ("UAE"), Spain, Colombia and Italy. The address of the registered office of the Company is Level 1, Devonshire House, One Mayfair Place, London, W1J 8AJ. The registered number of the Company is 7712220. The Company's immediate and ultimate controlling party is a group of three individuals (H.E. Saeed Mohamed Butti Mohamed Al Qebaisi (H.E. Saeed Bin Butti), Dr B.R. Shetty and Mr Khalifa Butti Omair Yousif Ahmad Al Muhairi (Mr Khalifa Bin Butti) who are all shareholders and of whom one is a director of the Company and who together have the ability to control the Company.

The Parent and its subsidiaries (collectively the "Group") are engaged in providing professional medical services, home care services, long term care services and the provision of all types of research and medical services in the field of gynaecology, obstetrics and human reproduction, and the rendering of business management services to companies in the health care and hospital sector. The Group is also engaged in wholesale of pharmaceutical goods, medical equipment, cosmetics, food, IT products and services.

The consolidated financial statements of the Group for the year ended 31 December 2015 were authorised for issue by the board of directors on 13 March 2016 and the consolidated statement of financial position was signed on the Board's behalf by Dr B.R. Shetty and Mr Suresh Krishnamoorthy.

### 2.1 BASIS OF PREPARATION

The consolidated financial statements have been prepared in accordance with International Financial Reporting Standards as adopted by the European Union as they apply to the financial statements of the Group for the year ended 31 December 2015 and applied in accordance with the Companies Act 2006.

The consolidated financial statements are prepared under the historical cost convention, except for derivative financial instruments and contingent consideration payable which have been measured at fair value. The principal accounting policies adopted in the preparation of these consolidated financial statements are set out below. These policies have been consistently applied to all periods presented. From period ended 30 June 2015 onwards, the Group elected to present the consolidated income statement and consolidated statement of other comprehensive income separately, whereas in the financial statements for year ended 31 December 2014 and prior to that, a single consolidated statement of comprehensive income was presented.

#### FUNCTIONAL AND REPORTING CURRENCY

The functional currency of the Company and its subsidiaries in the UAE is the UAE Dirham and the functional currency of the subsidiaries in Spain and Italy is the Euro. The reporting currency of the Group is United States of America Dollar (US$) as this is a more globally recognized currency. The UAE Dirham is pegged against the US Dollar at a rate of 3.673 per US Dollar.

All values are rounded to the nearest thousand dollars ($000) except when otherwise indicated.

#### GOING CONCERN

The Group's business activities, together with the factors likely to affect its future development, performance and position are set out in the Strategic Review on pages 6 to 39. The financial position of the Group, its cash flows, liquidity position and borrowing facilities are described in the Financial Review on pages 24 to 27.

The Group has two diverse operating divisions, Healthcare and Distribution, both of which operate in a growing market.

The directors have undertaken an assessment of the future prospects of the Group and the wider risks that the Group is exposed to. In its assessment of whether the Group should adopt the going concern basis in preparing its financial statements, the directors have considered the adequacy of financial resources in order to manage its business risks successfully, together with other areas of potential risk such as regulatory, insurance and legal risks.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice        107 of 166        Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

Financial Statements

# Notes to the consolidated financial statements continued
At 31 December 2015

#### 2.1  BASIS OF PREPARATION continued

The Group has considerable financial resources including banking arrangements through a spread of local and international banking groups and utilizes short and medium term working capital facilities to optimise business funding. Debt covenants are reviewed by the Board each month. The Board believes that the level of cash in the Group, the spread of bankers and debt facilities mitigates the financing risks that the Group faces from both its expansion through acquisitions and in relation to working capital requirements.

The Group delivered a strong performance in 2015. Both the Healthcare and Distribution divisions have continued their positive growth in revenue during 2015. Net profit and EBITDA of both healthcare and distribution divisions have increased in 2015. EBITDA margin of Distribution is almost same as last year whereas for Healthcare it decreased slightly which is due to opening of new facilities during the year. The directors have reviewed the business plan for 2016 and the five year cash flow, together with growth forecasts for the healthcare sector in the UAE. The directors consider the Group's future forecasts to be reasonable.

The directors have not identified any other matters that may impact the viability of the Group in the medium term and therefore they continue to adopt the going concern basis in preparing the consolidated financial statements.

#### 2.2  BASIS OF CONSOLIDATION

The consolidated financial statements comprise the financial statements of the Group and its subsidiaries as at 31 December 2015. Control is achieved when the Group is exposed, or has rights, to variable returns from its involvement with the investee and has the ability to affect those returns through its power over the investee. Specifically, the Group controls an investee if, and only if, the Group has:

- Power over the investee (i.e., existing rights that give it the current ability to direct the relevant activities of the investee).
- Exposure, or rights, to variable returns from its involvement with the investee.
- The ability to use its power over the investee to affect its returns.

Generally, there is a presumption that a majority of voting rights result in control. To support this presumption and when the Group has less than a majority of the voting or similar rights of an investee, the Group considers all relevant facts and circumstances in assessing whether it has power over an investee, including:

- The contractual arrangement with the other vote holders of the investee.
- Rights arising from other contractual arrangements.
- The Group's voting rights and potential voting rights.

The Group re-assesses whether or not it controls an investee if facts and circumstances indicate that there are changes to one or more of the three elements of control. Consolidation of a subsidiary begins when the Group obtains control over the subsidiary and ceases when the Group loses control of the subsidiary. Assets, liabilities, income and expenses of a subsidiary acquired or disposed of during the year are included in the consolidated financial statements from the date the Group gains control until the date the Group ceases to control the subsidiary.

Profit or loss and each component of other comprehensive income (OCI) are attributed to the equity holders of the parent of the Group and to the non-controlling interests, even if this results in the non-controlling interests having a deficit balance. When necessary, adjustments are made to the financial statements of subsidiaries to bring their accounting policies into line with the Group's accounting policies. All intra-group assets and liabilities, equity, income, expenses and cash flows relating to transactions between members of the Group are eliminated in full on consolidation.

A change in the ownership interest of a subsidiary, without a loss of control, is accounted for as an equity transaction.

If the Group loses control over a subsidiary, it derecognises the related assets (including goodwill), liabilities, non-controlling interest and other components of equity while any resultant gain or loss is recognised in profit or loss. Any investment retained is recognised at fair value.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          108 of 166          Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

**2.2  BASIS OF CONSOLIDATION** continued

The consolidated financial statements include the financial statements of the Company and its subsidiaries listed below:

| | | Percentage of holdings | |
| --- | --- | --- | --- |
| | Country of incorporation | 31 December 2015 | 31 December 2014 |
| *Direct subsidiaries:* | | | |
| NMC Holding Co LLC | UAE | 100% | 100% |
| NMC Health Holdco Limited | UK | 100% | 100% |
| *Indirect subsidiaries:* | | | |
| NMC Healthcare LLC | UAE | 100% | 100% |
| New Pharmacy Company Limited | UAE | 99% | 99% |
| New Medical Centre Hospital LLC-Dubai | UAE | 99% | 99% |
| NMC Specialty Hospital LLC-Abu Dhabi | UAE | 99% | 99% |
| NMC Specialty Hospital LLC-Dubai | UAE | 99% | 99% |
| New Medical Centre Trading LLC-Abu Dhabi | UAE | 99% | 99% |
| NMC Trading LLC-Dubai | UAE | 99% | 99% |
| Bait Al Shifaa Pharmacy LLC-Dubai | UAE | 99% | 99% |
| New Medical Centre LLC-Sharjah | UAE | 99% | 99% |
| New Medical Centre Specialty Hospital LLC-Al Ain | UAE | 99% | 99% |
| Reliance Information Technology LLC | UAE | 99% | 99% |
| BR Medical Suites FZ LLC | UAE | 100% | 100% |
| Brightpoint Hospital LLC | UAE | 99% | 99% |
| NMC Day Surgery Centre LLC | UAE | 99% | 99% |
| NMC Hospital LLC (DIP Hospital) | UAE | 99% | 99% |
| Beiersdorf Cosmetics Trading LLC-Abu Dhabi branch. | UAE | 99% | 99% |
| New Marketing & Trading Co LLC | UAE | 99% | 99% |
| Beiersdorf Cosmetics Trading LLC-Al Ain branch | UAE | 99% | 99% |
| New Marketing & Trading Co LLC-Al Ain branch. | UAE | 99% | 99% |
| New Medical Centre Trading LLC-branch 2 | UAE | 99% | 99% |
| New Medical Centre Trading LLC-branch 3 | UAE | 99% | 99% |
| Beiersdorf Cosmetics Trading LLC-branch | UAE | 99% | 99% |
| National Marketing & Trading Co LLC | UAE | 99% | 99% |
| New Marketing & Trading Company LLC-branch | UAE | 99% | 99% |
| NMC Trading LLC-branch | UAE | 99% | 99% |
| Beiersdorf Cosmetics Trading Co LLC | UAE | 99% | 99% |
| National Marketing & Trading Co LLC-Dubai branch | UAE | 99% | 99% |
| New Marketing & Trading Co LLC-Dubai branch | UAE | 99% | 99% |
| New Medical Centre Trading (Store) LLC | UAE | 99% | 99% |
| New Medical Centre Veterinary Medicine & Equipment Trading Co LLC | UAE | 99% | 99% |
| NMC Trading LLC branch | UAE | 99% | 99% |
| NMC Trading LLC-Fujairah branch | UAE | 99% | 99% |
| NMC Trading RAK-branch LLC | UAE | 99% | 99% |
| New Medical Centre | UAE | 100% | 100% |
| New Medical Centre-branch (Al-Ain, Al wadi) | UAE | 100% | 100% |
| Medifertil, S.A | Columbia | 60.5% | – |
| Centro de infertilidad y Reproduccion Humana SLU (CIRH) | Spain | 86.4% | – |
| Centro de Medicina della Riproduzione (Biogenesi) | Italy | 51.8% | – |
| EUVITRO, S.L.U | Spain | 86.4% | – |
| ProVita International Medical Center LLC | UAE | 100% | – |
| NMC Royal Hospital LLC | UAE | 99% | – |
| The American Surgecenter Pharmacy LLC | UAE | 90% | – |
| The American Surgecenter LLC | UAE | 90% | – |
| Americare LLC | UAE | 90% | – |
| Trans Arabia Drug Store LLC | UAE | 75% | – |
| Sunny Specialty Medical Centre LLC | UAE | 100% | – |
| Sunny Medical Centre LLC | UAE | 100% | – |
| New Sunny Medical Centre LLC | UAE | 100% | – |
| Sunny Al Buhairah Medical Centre LLC | UAE | 100% | – |
| Sunny Al Nadha Medical Centre LLC | UAE | 100% | – |
| Sunny Dental Care LLC | UAE | 100% | – |
| Grand Hamad Pharmacy LLC | UAE | 100% | – |
| Hamad Pharmacy LLC | UAE | 100% | – |
| Sharjah Pharmacy LLC | UAE | 100% | – |

Exhibit 4 to B.R. Shetty's Request for Judicial Notice    109 of 166    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

# Notes to the consolidated financial statements continued
At 31 December 2015

### 2.3 SIGNIFICANT ACCOUNTING JUDGEMENTS AND ESTIMATES

The key assumptions concerning the future, key sources of estimation uncertainty and critical judgements at the reporting date that have a significant risk of causing a material adjustment to the carrying amounts of assets and liabilities within the next financial year are discussed below:

#### SIGNIFICANT ESTIMATES

**Impairment of inventories**

Inventories are held at the lower of cost and net realisable value. When inventories become old or obsolete, an estimate is made of their net realisable value. For individually significant amounts this estimation is performed on an individual basis. Amounts which are not individually significant, but which are old or obsolete, are assessed collectively and a provision applied according to the inventory type and the Group's policy for inventory provisioning. The gross carrying amount of inventories at 31 December 2015 was US$136,176,000 (2014: US$111,597,000) and the provision for old and obsolete items at 31 December 2015 was US$1,388,000 (2014: US$1,388,000) (Note 20).

**Impairment of accounts receivable**

An estimate of the collectible amount of trade accounts receivable is made when collection of the full amount is no longer probable. For individually significant amounts, this estimation is performed on an individual basis. Amounts which are not individually significant, but which are past due, are assessed collectively and a provision applied according to the length of time past due, based on historical recovery rates.

A majority of the receivables that are past due but not impaired pertains to Group's operations in UAE, these receivables are from insurance companies and government-linked entities in the United Arab Emirates which are inherently slow payers due to their long invoice verification and approval of payment procedures. Payments continue to be received from these customers and accordingly the risk of non-recoverability is considered to be low.

Gross trade accounts receivable at 31 December 2015 were US$255,038,000 (2014: US$177,203,000) and the provision for doubtful debts at 31 December 2015 was US$13,022,000 (2014: US$8,996,000) (Note 21). Any difference between the amounts actually collected in future periods and the amounts expected will be recognised in the consolidated income statement.

**Impairment of non-financial assets**

Impairment exists when the carrying value of an asset or cash generating unit exceeds its recoverable amount, which is the higher of its fair value less costs of disposal and its value in use. The fair value less costs of disposal calculation is based on available data from binding sales transactions, conducted at arm's length, for similar assets or observable market prices less incremental costs for disposing of the asset. The value in use calculation is based on a DCF model. The cash flows are derived from the budget for the next five years and do not include restructuring activities that the Group is not yet committed to or significant future investments that will enhance the asset's performance of the CGU being tested. The recoverable amount is sensitive to the discount rate used for the DCF model as well as the expected future cash-inflows and the growth rate used for extrapolation purposes. These estimates are most relevant to goodwill recognised by the Group. The key assumptions used to determine the recoverable amount for the different CGUs are disclosed and further explained in Note 18.

In addition, the Group has work in progress in respect of Hospital Information System (HIS) and ERP amounting to US$3,991,000 (2014: US$4,216,000). This amount is included in capital work in progress in property, plant and equipment and in software in intangible assets (Note 17 and Note 18). Management believes this amount is fully recoverable.

**Valuation of intangibles assets**

The Group measures its intangible assets acquired in a business combination as follows:

| | |
|---|---|
| Brand | Relief from royalty |
| Database and software | Replacement cost |
| Patient relationships | Multi period excess earning method |
| Non-compete agreements | Income approach-with or without method |
| Rental and private contracts | Multi period excess earning method |

Estimating the fair value of the brand requires determination of the most appropriate valuation method. This estimate also requires determination of the most appropriate inputs to the valuation method including the base revenue, expected life of the intangible assets, selecting an arm's length royalty rate, discount rate and making assumptions about them. Similarly, estimating the replacement cost of the database requires an estimate of the number of cycles that are recorded in the database along with the best estimate of the hours dedicated by the staff (such as doctors, nurses, biologists, and other specialist technicians) to collect the data, the useful life of the database, discount rate and an estimate of tax saving.

Estimating the fair value of patient relationships and the non-compete agreements requires an estimate of the expected revenue over an appropriate period of time, a churn rate to account for the reduction in the number of patients over the years, discount rate, rate of inflation and the useful life and the risk inherent in ownership of the asset or security interest being valued.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          110 of 166          Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

**2.3   SIGNIFICANT ACCOUNTING JUDGEMENTS AND ESTIMATES** continued
**SIGNIFICANT ESTIMATES** continued
Useful economic lives of property and equipment and depreciation method
Depreciation is calculated on all property and equipment other than land and capital work in progress, at the following rates calculated to write off the cost of each asset on a straight line basis over its expected useful life. Management has re-assessed the useful economic lives of all asset categories with effect from 1 January 2015, following a review of the useful economic lives of the Group's assets and market research conducted on depreciation rates and methods in the industry:

|  | Rate applied from 1 January 2015 | Rate applied from 31 December 2014 |
|---|---|---|
| Hospital building | 6% | 6% |
| Buildings | 6% | 6% |
| Leasehold improvements | 10% – 20% | 20% |
| Motor vehicles | 20% | 20% |
| Furniture, fixtures and fittings | 12.5% – 20% | 12.5% – 20% |
| Medical equipment | 10% – 25% | 10% – 25% |

The impact of the re-assessment of useful economic lives and depreciation method is an increase in reported profit of US$1,944,000 in the current year.

Useful economic lives of intangible assets and amortisation method
The useful lives of intangible assets are assessed as either finite or indefinite. Intangibles assets are amortised on straight line basis over their useful life. The following useful lives have been determined for acquired intangible assets:

Brand names – 5-20 years
Software – 5 years
Database – 15 years
Patient relationships – 7 years
Non-compete agreement – 3-4 years
Rental contracts – 7 years
Private contracts – 3 years

Contingent consideration on acquisitions
Contingent consideration, resulting from business combinations, is valued at fair value at the acquisition date as part of the business combination. When the contingent consideration meets the definition of a financial liability, it is subsequently re-measured to fair value at each reporting date. The change in the fair value at each reporting date is recorded in the consolidated income statement. The determination of the fair value is based on discounted cash flows. The key assumptions taken into consideration in determining the fair value are the probability of meeting relevant performance targets, securing certain agreements, completing certain acquisitions and the discount factor (Note 5).

**SIGNIFICANT JUDGEMENTS**
Business combinations and goodwill
When a business combination occurs, the fair values of the identifiable assets and liabilities assumed, including intangible assets, are recognised. The determination of the fair values of acquired assets and liabilities is based, to a considerable extent, on management's judgement. If the purchase consideration exceeds the fair value of the net assets acquired then the difference is recognised as goodwill. If the purchase price consideration is lower than the fair value of the assets acquired then a gain is recognised in the consolidated income statement. Allocation of the purchase price between finite lived assets and indefinite lived assets such as goodwill affects the results of the Group as finite lived intangible assets are amortised, whereas indefinite lived intangible assets, including goodwill, are not amortised The key judgements in respect of the contingent consideration recognised as part of a business combination relate to the performance of the business, the discount rates used and the contractual arrangements of ownership.

Valuation of put option
The accounting for put options requires significant management judgment and is driven by the specific contract terms. Put and call options were issued as part of the Luarmia SL acquisition. On the basis of the contract terms and interpretation of relevant accounting standards and guidance, the judgment is that the Group does not have present ownership of the 13.6% non-controlling interest (NCI) as at the date of acquisition. This judgment leads to the next stage of the accounting decisions required. The Group has concluded that IFRS 10 takes precedence over IAS 32, and the permitted policy choice is that there should be full recognition of NCI using the proportionate method. This means that the full 13.6% NCI is recognised as part of the Luarmia acquisition, a financial liability for the redemption value of the options was recognised at US$24,496,000 as at the date of acquisition, and an equal amount was set against other equity. As at 31 December 2015, the present value of the redemption liability is US$25,084,000 (Note 5 and 37).

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          111 of 166          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

# Notes to the consolidated financial statements continued
## At 31 December 2015

**2.3  SIGNIFICANT ACCOUNTING JUDGEMENTS AND ESTIMATES** continued
**SIGNIFICANT JUDGEMENTS** continued
Functional currency
The UAE Dirham is determined to be the functional currency of the Company.

Judgement has been used to determine the functional currency of the Company that most appropriately represents the economic effects of the Company's transactions, events and conditions.

The primary economic environment influencing the Company's income (dividends) is the UAE and the effect of the Companies local environment is limited to expenses incurred within the UK. The ability of the Company to meet its obligations and pay dividends to its shareholders is dependent on the economy of, and the operation of its subsidiaries in, the UAE.

Assets held in the name of the previous shareholder
In accordance with local laws, except in some specific locations in the UAE the registered title of land and buildings must be held in the name of a UAE national. As a result, land and buildings of the Group are legally registered in the name of shareholders or previous shareholders of the Group. As at 31 December 2015 certain land and buildings with a carrying amount of US$4,144,000 (2014: US$9,321,000) are held in the name of a previous shareholder for the beneficial interest of the Group. As the beneficial interest of such land and buildings resides with the Group, these assets are recorded within land and buildings in the Group consolidated financial statements. The directors take into account this local legal registration requirement, the Group's entitlement to the beneficial interest arising from these assets, as well as other general business factors, when considering whether such assets are impaired (Note 17).

Leases for buildings and land
Generally our hospitals, day patient medical centres and hospital projects under development are located on land and in buildings which are leased. As at 31 December 2015, the majority of the lease periods range from five to twenty seven years apart from the leases for New Medical Centre Hospital LLC-Dubai ("Dubai General Hospital") and the warehouse facilities, which had leases which are renewable on an annual basis with a total value of US$778,000 (2014: US$1,105,000) included within property, and equipment as at 31 December 2015 (Note 17). If any such leases are terminated or expire and are not renewed, the Group could lose the investment, including the hospital buildings and the warehouses on the leased sites which could have a material adverse effect on our business, financial condition and results of operations. The directors have considered the following facts in determining the likelihood that these leases will be renewed:

- Whilst some leases can be for long term durations, it is not unusual and can often be common practice throughout all of the emirates in the United Arab Emirates for landlords to lease land and buildings to companies on annually renewable leases of one year terms and for these leases to be renewed automatically. Throughout the Group's over 40 year history it has never had a lease cancelled or not renewed, and the Group enjoys a high degree of respect in the region and believes that it maintains strong relationships with the landlords.
- Both the Dubai General Hospital and the warehouse facilities have been occupied by the Group on annually renewable leases, for a period of more than 15 years and each year these leases have been automatically renewed.
- The warehouse facilities have been built by the Group on land leased from government bodies in the Emirates of Dubai and Abu Dhabi on the back of the policies of these governments to attract investment in warehousing in the United Arab Emirates.

**2.4  CHANGES IN ACCOUNTING POLICIES**
**NEW AND AMENDED STANDARDS AND INTERPRETATIONS**
The Group applied for the first time certain standards and amendments which are effective for annual periods beginning on or after 1 January 2015.

The amendments to IFRS, which are effective as of 1 January 2015 and are listed below, have no impact on the Group.
- Amendments to IAS 19 Defined Benefit Plans: Employee Contributions
- Annual Improvements 2010-2012 Cycle
  - IFRS 2 Share-based Payment
  - IFRS 3 Business Combinations
  - IFRS 8 Operating Segments
  - IAS 16 Property, Plant and Equipment and IAS 38 Intangible Assets
  - IAS 24 Related Party Disclosures

- Annual Improvements 2011-2013 Cycle
  - IFRS 3 Business Combinations
  - IFRS 13 Fair Value Measurement
  - IAS 40 Investment Property

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          112 of 166          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

## 3  SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES
### REVENUE RECOGNITION

Revenue is recognised to the extent that it is probable that the economic benefits will flow to the Group and the revenue can be reliably measured, regardless of when the payment is being made. Revenue is measured at the fair value of the consideration received or receivable, less discounts and rebates and taking into account contractually defined terms of payment and excluding taxes or duties.

Revenue streams include clinic service revenues, sale of goods – Pharmacy, sale of goods –Distribution, Healthcare management fees and revenue sharing arrangement with doctor.

The Group assesses its revenue arrangements against specific criteria in order to determine if it is acting as principal or agent. The Group determines it is acting as principal when it has exposure to the significant risks and rewards associated with the transaction and measures revenue as the gross amount received or receivable. When the Group does not retain the significant risks and rewards, it deems that it is acting as an agent and measures revenue as the amount received or receivable in return for its performance under the contract and excludes any amounts collected on behalf of a third party.

Clinic, homecare and long term care service revenues:
Clinic, homecare and long term care service revenues represent the revenue which NMC generates from the provision of either inpatient or outpatient medical services, homecare services or long term care services. The group primarily receives clinic service, homecare and long term care revenues from patients' private/medical insurance schemes. Clinic, home care and long term revenues are recognised when, and to the extent that, performance of a medical service occurs, and is measured at the fair value of the consideration received or receivable. NMC has determined that it is acting as Principal in these arrangements as it has the responsibility for providing the medical services to the patient, it sets the prices for services which are provided, it bears the credit risk and it bears the risk of providing the medical service.

Gynaecology, obstetrics and human reproduction
Revenue in respect of the different types of gynaecology, obstetrics and human reproduction services is recognized as follows:

### Donor IVF and Own IVF sales (In Vitro Fecundation)
Revenue in respect of gynaecology, obstetrics and human reproduction is mainly from In Vitro Fertilization (IVF) treatment. Revenue from IVF treatment is recognized based on the stage of the treatment. The treatment is divided into three stages. Each stage takes about 20 days. 25% of revenue is booked in the first stage (at the beginning of the treatment), 50% of revenue is booked in the middle stage (at patient's egg extraction in the case of the use of the patient's own egg or in the case of the use of a donor egg at the fertilization date) and 25% of revenue is booked at the final stage (embryo implantation). These percentages are based on an internal study of the costs incurred in the different streams performed in 2014.

### Cryo transfer sales
Total cost of the treatment is split in two phases in terms of revenue recognition. 25% is recorded when the doctor agrees with the patient to initialize the treatment and 75% at the embryo implantation. The time between both phases is about 2-3 weeks.

### Intrauterine insemination
Revenue is recognized in full at the insemination date.

### Sale of Goods – Pharmacy
The sales of goods from pharmacy relates to the sale of pharmaceutical and other products from hospitals and pharmacies. Whilst the Group does not establish the prices for the pharmaceutical products sold as both the purchase and selling prices for all pharmaceutical products are fixed by the Ministry of Health, UAE. NMC has determined that it is acting as Principal in respect of these sales as it provides the goods for sale, it bears the inventory risk, and it bears the credit risk from customers. Revenue from the sale of goods – Pharmacy is therefore recognised when the significant risks and rewards of ownership of the goods have passed to the buyer. Significant risk for retail goods is passed to the buyer at the point of sale.

### Sale of Goods – Distribution
Where the Group bears the inventory risk and the customer credit risk and has the ability to set the prices for the products sold then the Group has determined that it is acting as Principal. Revenue from the sale of goods is therefore recognised when the significant risks and rewards of ownership of the goods have passed to the buyer. Significant risk for retail goods is passed to the buyer for wholesale goods at the time of delivery.

For agency relationships, the revenue earned is measured as the Group's share of the revenue, as specified in the contract. Any amounts collected on behalf of the third party are excluded from revenue and are recorded as a payable. There are currently no material agency relationships.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          113 of 166          Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

Financial Statements

# Notes to the consolidated financial statements continued
At 31 December 2015

**3   SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES** continued
**REVENUE RECOGNITION** continued
Healthcare Management fees
Management fees represent fees earned for managing a hospital. Management fees are recognised when the services under the contract are performed, and the service level criteria have been met, and are measured at the fair value of the consideration received or receivable, in line with the terms of the management contract.

Revenue sharing arrangements with doctors
The Group enters into contracts with doctors whereby these doctors are employed to perform certain procedures or run outpatient services using the facilities. In return the doctors obtain a share of the revenues that are generated from these facilities. Each contractual arrangement with individual doctors is assessed against specific criteria to determine whether the Group is acting as principal or agent in the arrangement with these doctors.

**OTHER INCOME**

Other income comprises revenue from suppliers for the reimbursement of advertising and promotion costs incurred by the Group. Revenue is recognised following formal acceptance of the Group's reimbursement claims by suppliers and is measured at the confirmed amount receivable.

**INTEREST INCOME**
For all financial instruments measured at amortised cost, interest income or expense is recorded using the effective interest rate (EIR), which is the rate that exactly discounts the estimated future cash payments or receipts through the expected life of the financial instrument or a shorter period, where appropriate, to the net carrying amount of the financial asset or liability. Interest income is included in finance income in the consolidated income statement.

**REBATES FROM SUPPLIERS**
The Distribution business receives rebates in the ordinary course of business from a number of its suppliers of pharmaceutical products, in accordance with contractual arrangements in place with specific suppliers. Rebates are accounted for once approval has been received from the supplier following the negotiations which have taken place with them. Rebates receivable are accounted for as a deduction from the cost of purchasing pharmaceutical goods, once the rebate has been approved by the supplier on the basis under IAS 18 that the probability of inflow is not sufficiently certain and the amounts cannot be reliably measured until that point. When rebates have been agreed in advance, for example when it has been agreed that a certain rebate will be applied to the purchase of specific goods for a set period of time rather than just to a specific one off purchase, then the rebate is recognised as a reduction in the purchase price as soon as the goods are purchased. When rebates are offered based upon the volume purchased and it is probable that the rebate will be earned and the amount can be estimated reliably, then the discount is recognised as a reduction in the purchase price when the goods are purchased and the assessment is reviewed on an ongoing basis. Rebates receivable are accounted for on a net basis, being set off against the trade payables to which they relate, as they are a reduction in the amount we owe to our suppliers in respect of pharmaceutical products purchased.

**CURRENT INCOME TAX**
Current income tax assets and liabilities arising from overseas operations for the current period are measured at the amount expected to be recovered from or paid to the taxation authorities in the respective overseas jurisdictions. The tax rates and tax laws used to compute the amount are those that are enacted or substantively enacted, at the reporting date in the countries where the Group operates and generates taxable income.

Current income tax relating to items recognised directly in equity is recognised in equity and not in the consolidated income statement. Management periodically evaluates positions taken in the tax returns with respect to situations in which applicable tax regulations are subject to interpretation and establishes provisions where appropriate.

**DEFERRED TAX**
Deferred tax is provided using the liability method on temporary differences between the tax bases of assets and liabilities and their carrying amounts for financial reporting purposes at the reporting date.

Deferred tax liabilities are recognised for all taxable temporary differences, except:

· When the deferred tax liability arises from the initial recognition of goodwill or an asset or liability in a transaction that is not a business combination and, at the time of the transaction, affects neither the accounting profit nor taxable profit or loss;
· In respect of taxable temporary differences associated with investments in subsidiaries, when the timing of the reversal of the temporary differences can be controlled and it is probable that the temporary differences will not reverse in the foreseeable future.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice            114 of 166            Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

**3   SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES** continued
**DEFERRED TAX** continued
Deferred tax assets are recognised for all deductible temporary differences, the carry forward of unused tax credits and any unused tax losses. Deferred tax assets are recognised to the extent that it is probable that taxable profit will be available against which the deductible temporary differences, and the carry forward of unused tax credits and unused tax losses can be utilised, except:

- When the deferred tax asset relating to the deductible temporary difference arises from the initial recognition of an asset or liability in a transaction that is not a business combination and, at the time of the transaction, affects neither the accounting profit nor taxable profit or loss;
- In respect of deductible temporary differences associated with investments in subsidiaries, deferred tax assets are recognised only to the extent that it is probable that the temporary differences will reverse in the foreseeable future and taxable profit will be available against which the temporary differences can be utilised.

The carrying amount of deferred tax assets is reviewed at each reporting date and reduced to the extent that it is no longer probable that sufficient taxable profit will be available to allow all or part of the deferred tax asset to be utilised. Unrecognised deferred tax assets are re-assessed at each reporting date and are recognised to the extent that it has become probable that future taxable profits will allow the deferred tax asset to be recovered.

Deferred tax assets and liabilities are measured at the tax rates that are expected to apply in the year when the asset is realised or the liability is settled, based on tax rates (and tax laws) that have been enacted or substantively enacted at the reporting date.

Deferred tax relating to items recognised outside profit or loss is recognised outside profit or loss. Deferred tax items are recognised in correlation to the underlying transaction either in other comprehensive income or directly in equity. Deferred tax assets and deferred tax liabilities are offset if a legally enforceable right exists to set off current tax assets against current income tax liabilities and the deferred taxes relate to the same taxable entity and the same taxation authority.

Tax benefits acquired as part of a business combination, but not satisfying the criteria for separate recognition at that date, are recognised subsequently if new information about facts and circumstances change. The adjustment is either treated as a reduction in goodwill (as long as it does not exceed goodwill) if it was incurred during the measurement period or recognised in profit or loss.

**BUSINESS COMBINATIONS AND GOODWILL**
Business combinations are accounted for using the acquisition method. The cost of an acquisition is measured as the aggregate of the consideration transferred measured at acquisition date fair value and the amount of any non-controlling interests in the acquiree. For each business combination, the Group elects whether to measure the non-controlling interests in the acquiree at fair value or at the proportionate share of the acquiree's identifiable net assets. Acquisition-related costs are expensed as incurred and disclosed separately in the consolidated income statement.

When the Group acquires a business, it assesses the financial assets and liabilities assumed for appropriate classification and designation in accordance with the contractual terms, economic circumstances and pertinent conditions as at the acquisition date. This includes the separation of embedded derivatives in host contracts by the acquiree.

Any contingent consideration to be transferred by the Group is recognised at fair value at the acquisition date. Contingent consideration classified as an asset or liability that is a financial instrument and within the scope of IAS 39 *Financial Instruments: Recognition and Measurement*, is measured at fair value with the changes in fair value recognised in the consolidated income statement.

Goodwill is initially measured at cost, being the excess of the aggregate of the consideration transferred and the amount recognised for non-controlling interests, and any previous interest held, over the net identifiable assets acquired and liabilities assumed. If the fair value of the net assets acquired is in excess of the aggregate consideration transferred, the Group re-assesses whether it has correctly identified all of the assets acquired and all of the liabilities assumed and reviews the procedures used to measure the amounts to be recognised at the acquisition date. If the reassessment still results in an excess of the fair value of net assets acquired over the aggregate consideration transferred, then the gain is recognised in profit or loss.

After initial recognition, goodwill is measured at cost less any accumulated impairment losses. For the purpose of impairment testing, goodwill acquired in a business combination is, from the acquisition date, allocated to each of the Group's cash-generating units that are expected to benefit from the combination, irrespective of whether other assets or liabilities of the acquiree are assigned to those units.

Where goodwill has been allocated to a cash-generating unit and part of the operation within that unit is disposed of, the goodwill associated with the disposed operation is included in the carrying amount of the operation when determining the gain or loss on disposal. Goodwill disposed in these circumstances is measured based on the relative values of the disposed operation and the portion of the cash-generating unit retained.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          115 of 166          Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

Financial Statements

# Notes to the consolidated financial statements continued
## At 31 December 2015

**3   SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES** continued
### RESTRUCTURING RESERVE
The group restructuring reserve arises on consolidation under the pooling of interests method used for the group restructuring which took place on 1 April 2012. This represents the difference between the share capital of NMC Healthcare LLC, the previous parent company of the Group, and the carrying amount of the investment in that company at the date of the restructure. This reserve is non-distributable.

### PROPERTY AND EQUIPMENT
Property and equipment are stated at cost less accumulated depreciation and any impairment in value.

Depreciation is calculated on all property and equipment other than land and capital work in progress, at the following rates calculated to write off the cost of each asset on a straight line basis over its expected useful life:

| | |
|---|---|
| Hospital building | 6% |
| Buildings | 6% |
| Leasehold improvements | 10% – 20% |
| Motor vehicles | 20% |
| Furniture, fixtures and fittings | 12.5% – 20% |
| Medical equipment | 10% – 25% |

The carrying amounts of property and equipment are reviewed for impairment when events or changes in circumstances indicate the carrying value may not be recoverable. If any such indication exists and where the carrying values exceed the estimated recoverable amount, the assets are written down to their recoverable amount, being the higher of their fair value less cost to sell and their value in use.

Capital work in progress is stated at cost and is not depreciated. Lease costs in respect of capital work in progress are capitalised within capital work in progress during the period up until it is commissioned. When commissioned, capital work in progress is transferred to the appropriate property and equipment asset category and depreciated in accordance with the Group's policies. The carrying amounts of capital work in progress are reviewed for impairment when events or changes in circumstances indicate the carrying value may not be recoverable. If any such indication exists and where the carrying values exceed the estimated recoverable amount, the assets are written down to their recoverable amount.

Expenditure incurred to replace a component of an item of property and equipment that is accounted for separately is capitalised and the carrying amount of the component that is replaced is written off. Other subsequent expenditure is capitalised only when it increases future economic benefits of the related item of property and equipment. All other expenditure is recognised in the consolidated statement of comprehensive income as the expense is incurred.

### INTANGIBLE ASSETS
Intangible assets acquired separately are measured on initial recognition at cost. The cost of intangible assets acquired in a business combination is their fair value at the date of acquisition. Following initial recognition, intangible assets are carried at cost less any accumulated amortisation and accumulated impairment losses. Internally generated intangibles, excluding capitalised development costs, are not capitalised and the related expenditure is reflected in consolidated statement of comprehensive income in the period in which the expenditure is incurred.

The useful lives of intangible assets are assessed as either finite or indefinite. The following useful lives have been determined for acquired intangible assets:

Brands – 5-20 years
Software – 5 years
Database – 15 years
Patient relationships – 7 years
Non-compete agreement – 3-4 years
Rental contracts – 7 years
Private contracts – 3 years

Intangible assets with finite lives are amortised over the useful economic life and assessed for impairment whenever there is an indication that the intangible asset may be impaired. The amortisation period and the amortisation method for an intangible asset with a finite useful life are reviewed at least at the end of each reporting period. Changes in the expected useful life or the expected pattern of consumption of future economic benefits embodied in the asset are considered to modify the amortisation period or method, as appropriate, and are treated as changes in accounting estimates. The amortisation expense on intangible assets with finite lives is recognised in the consolidated income statement in the expense category that is consistent with the function of the intangible assets.

**112**   NMC Health plc Annual Report and Accounts 2015

### 3  SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES continued
#### INTANGIBLE ASSETS continued

Intangible assets with indefinite useful lives are not amortised, but are tested for impairment annually, either individually or at the cash-generating unit level. The assessment of indefinite life is reviewed annually to determine whether the indefinite life continues to be supportable. If not, the change in useful life from indefinite to finite is made on a prospective basis.

Gains or losses arising from derecognition of an intangible asset are measured as the difference between the net disposal proceeds and the carrying amount of the asset and are recognised in the consolidated income statement when the asset is derecognised.

#### BORROWING COSTS

Borrowing costs that are directly attributable to the acquisition or construction of an asset are capitalised as part of the cost of the asset until the asset is commissioned for use. Borrowing costs in respect of completed assets or not attributable to assets are expensed in the period in which they are incurred.

#### PRE-OPERATING EXPENSES

Pre-operating expenses are the expenses incurred prior to start of operations of a new business unit. These are recognised in the consolidated income statement in the year in which they occur.

#### INVENTORIES

Inventories are valued at the lower of cost and net realisable value after making due allowance for any obsolete or slow moving items. Costs are those expenses incurred in bringing each product to its present location and condition and are determined on a weighted average basis. Net realisable value is based on estimated selling price less any further costs expected to be incurred to disposal.

#### ACCOUNTS RECEIVABLE

Accounts receivable are stated at original invoice amount less a provision for any uncollectible amounts. Accounts receivable with no stated interest rates are measured at invoiced amounts when the effect of discounting is immaterial. An estimate of doubtful debts is made when collection of the full amount is no longer probable. Bad debts are written off when there is no possibility of recovery.

#### CASH AND CASH EQUIVALENTS

For the purpose of the consolidated statement of cash flows, cash and cash equivalents consist of cash in hand, bank balances and short term deposits with an original maturity of three months or less, net of outstanding bank overdrafts.

#### EQUITY

The Group has issued ordinary shares that are classified as equity. The difference between the issue price and the par value of ordinary share capital is allocated to share premium. The transaction costs incurred for the share issue are accounted for as a deduction from share premium, net of any related income tax benefit, to the extent they are incremental costs directly attributable to the share issue that would otherwise have been avoided.

#### ACCOUNTS PAYABLE AND ACCRUALS

Liabilities are recognised for amounts to be paid in the future for goods and services received whether billed by the supplier or not. Accounts payable are classified as current liabilities if payment is due within one year or less (or in the normal operating cycle of the business if longer). If not, they are presented as non-current liabilities. Accounts payable are recognised initially at fair value and subsequently measured at amortised cost using the effective interest method.

#### PROVISIONS

Provisions are recognised when the Group has an obligation (legal or constructive) arising from a past event, and the costs to settle the obligation are both probable and able to be reliably measured.

Provisions are measured at the present value of the expenditures expected to be required to settle the obligation using a pre-tax rate that reflects current market assessments of the time value of money and risks specific to the obligation. Increases in provisions due to the passage of time are recognised in the consolidated income statement within 'Finance costs'.

#### PUT OPTION-NON-CONTROLLING INTEREST

In circumstances where the Group has determined that they do not have the present ownership interest in the shares subject to a put option, the Group has concluded that IFRS 10 takes precedence over IAS 32 and accordingly a non-controlling interest (NCI) is fully recognised at the date of acquisition, The Group recognises the full NCI using the proportionate share of net assets method. The financial liability that may become payable under a put option in respect of the NCI is recognised at fair value within liabilities, with the liability being treated as an immediate reduction to equity attributable to the parent (other reserves). The financial liability is subsequently re-measured to fair value at each reporting date and the change in the fair value at each reporting date is recorded in the consolidated income statement.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          117 of 166          Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

Financial Statements

# Notes to the consolidated financial statements continued
At 31 December 2015

**3   SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES** continued
### TERM LOANS
Term loans are initially recognised at the fair value of the consideration received less directly attributable transaction costs. After initial recognition, term loans are subsequently measured at amortised cost using the effective interest method. Interest on term loans is charged as an expense as it accrues, with unpaid amounts included in "accounts payable and accruals".

When an existing financial liability is replaced by another from the same lender on substantially different terms, or the terms of an existing liability are substantially modified, such an exchange or modification is treated as the derecognition of the original liability and the recognition of a new liability. The difference in the respective carrying amounts is recognised in the consolidated income statement.

### EMPLOYEES' END OF SERVICE BENEFITS
The Group operates an un-funded post-employment benefit plan (employees' end of service benefits) for its expatriate employees in the UAE, in accordance with the labour laws of the UAE. The entitlement to these benefits is based upon the employees' final salary and length of service, subject to the completion of a minimum service period. Payment for employees' end of service benefits is made when an employee leaves, resigns or completes his service.

The cost of providing benefits under the post-employment benefit plan is determined using the projected unit credit method. Re-measurements, comprising of actuarial gains and losses, are recognized immediately in the statement of financial position with a corresponding debit or credit to retained earnings through other comprehensive income in the period in which they occur. Re-measurements are not reclassified to profit or loss in subsequent periods.

Interest is calculated by applying the discount rate to the defined benefit liability. The rate used to discount the end of service benefit obligation is determined by reference to market yields at the balance sheet date on high quality corporate bonds. The current and non-current portions of the provision relating to employees' end of service benefits are separately disclosed in the consolidated statement of financial position.

The Group recognises the following changes in the employees' end of service benefits under 'direct costs' and 'general and administrative expenses' in the consolidated statement of comprehensive income:

- Service costs comprising current service costs
- Interest expense

With respect to its UAE national employees, the Group makes contributions to the relevant UAE Government pension scheme calculated as a percentage of the employees' salaries. The obligations under these schemes are limited to these contributions, which are expensed when due.

### SHARE BASED PAYMENTS
Equity-settled share-based payments to employees (including executive directors) are measured at the fair value of the equity instruments at the grant date. The fair value excludes the effect of non-market-based vesting conditions. Details regarding the determination of the fair value of equity-settled share-based transactions are set out in Note 32.

The fair value determined at the grant date of the equity-settled share-based payments is expensed on a straight-line basis over the vesting period, based on the Group's estimate of equity instruments that will eventually vest. At each reporting date, the Group revises its estimate of the number of equity instruments expected to vest as a result of the effect of non-market-based vesting conditions. The impact of the revision of the original estimates, if any, is recognised in the consolidated statement of other comprehensive income such that the cumulative expense reflects the revised estimate, with a corresponding adjustment to equity reserves/other payables.

No expense is recognised for awards that do not ultimately vest, except for equity-settled transactions for which vesting are conditional upon a market or non-vesting condition. These are treated as vesting irrespective of whether or not the market or non-vesting condition is satisfied, provided that all other performance and/or service conditions are satisfied.

The dilutive effect of outstanding options is reflected as additional share dilution in the computation of diluted earnings per share (see Note 16).

### FOREIGN CURRENCIES
Transactions in foreign currencies are recorded in UAE Dirhams at the exchange rate ruling at the date of the transaction. Monetary assets and liabilities denominated in foreign currencies are retranslated at the rate of exchange ruling at the balance sheet date. All differences are taken to the consolidated income statement.

114     NMC Health plc Annual Report and Accounts 2015

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          118 of 166          Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

### 3   SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES continued

#### TRANSLATION OF FOREIGN OPERATIONS

On consolidation, the assets and liabilities of foreign operations are translated into US Dollars at the rate of exchange prevailing at the reporting date and their income statements are translated at average exchange rates (unless this average is not a reasonable approximation of the cumulative effect of the rates prevailing on the transaction dates, in which case income and expenses are translated at the rate on the dates of the transactions). All resulting currency translation differences are recognised as a separate component of equity.

The Group's principal geographical segment is the United Arab Emirates. The UAE Dirham is pegged against the US Dollar so a single rate of 3.673 per US Dollar is used to translate those assets and liabilities and balances in the consolidated income statement.

When a foreign operation is partially disposed of or sold, exchange differences that were recorded in equity are recognised in the consolidated income statement as part of the gain or loss on sale. Goodwill and fair value adjustments arising on the acquisition of a foreign operation are treated as assets and liabilities of the foreign operation and translated at the closing rate.

#### DERIVATIVE FINANCIAL INSTRUMENTS

The Group uses derivative financial instruments such as forward exchange contracts, put options and contingent consideration. Such derivative financial instruments are initially recognised at fair value on the date on which a contract is entered into and are subsequently remeasured at fair value. Derivatives with positive market values (unrealised gains) are recognised as assets and derivatives with negative market values (unrealised losses) are recognised as liabilities in the consolidated statement of financial position. Any gains or losses arising from changes in fair value on derivatives during the year are taken directly to profit or loss.

#### FAIR VALUE MEASUREMENT

Fair value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. The fair value measurement is based on the presumption that the transaction to sell the asset or transfer the liability takes place either:

- In the principal market for the asset or liability, or
- In the absence of a principal market, in the most advantageous market for the asset or liability.

The principal or the most advantageous market must be accessible to by the Group.

The fair value of an asset or a liability is measured using the assumptions that market participants would use when pricing the asset or liability, assuming that market participants act in their economic best interest.

A fair value measurement of a non-financial asset takes into account a market participant's ability to generate economic benefits by using the asset in its highest and best use or by selling it to another market participant that would use the asset in its highest and best use.

The Group uses valuation techniques that are appropriate in the circumstances and for which sufficient data are available to measure fair value, maximising the use of relevant observable inputs and minimising the use of unobservable inputs.

All assets and liabilities for which fair value is measured or disclosed in the financial statements are categorised within the fair value hierarchy, described as follows, based on the lowest level input that is significant to the fair value measurement as a whole:

- Level 1 – Quoted (unadjusted) market prices in active markets for identical assets or liabilities.
- Level 2 – Valuation techniques for which the lowest level input that is significant to the fair value measurement is directly or indirectly observable.
- Level 3 – Valuation techniques for which the lowest level input that is significant to the fair value measurement is unobservable.

For assets and liabilities that are recognised in the financial statements on a recurring basis, the Group determines whether transfers have occurred between levels in the hierarchy by re-assessing categorisation (based on the lowest level input that is significant to the fair value measurement as a whole) at the end of each reporting period.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          119 of 166          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

# Notes to the consolidated financial statements continued
At 31 December 2015

**3   SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES** continued

### IMPAIRMENT OF FINANCIAL ASSETS
An assessment is made at each consolidated statement of financial position date to determine whether there is objective evidence that a specific financial asset may be impaired. If such evidence exists, any impairment loss is recognised in the consolidated income statement. Impairment is determined as the difference between carrying value and the present value of future cash flows discounted at the current market rate of return for a similar financial asset.

### LEASES
The determination of whether an arrangement is, or contains, a lease is based on the substance of the arrangement at inception date, whether fulfilment of the arrangement is dependent on the use of a specific asset or assets or the arrangement conveys a right to use the asset, even if that right is not explicitly specified in an arrangement. Operating leases are recognised as an operating expense in the consolidated income statement on a straight line basis.

**4   ACCOUNTING STANDARDS AND INTERPRETATIONS ISSUED BUT NOT EFFECTIVE**

The standards and interpretations that are issued, but not yet effective, up to the date of issuance of the Group's financial statements are listed below. The Group intends to adopt these standards, if applicable, when they become effective.

### IFRS 15 REVENUE FROM CONTRACTS WITH CUSTOMERS
IFRS 15 was issued in May 2014 and establishes a new five-step model that will apply to revenue arising from contracts with customers. Under IFRS 15 revenue is recognised at an amount that reflects the consideration to which an entity expects to be entitled in exchange for transferring goods or services to a customer. The principles in IFRS 15 provide a more structured approach to measuring and recognising revenue. The new revenue standard is applicable to all entities and will supersede all current revenue recognition requirements under IFRS. Either a full or modified retrospective application is required for annual periods beginning on or after 1 January 2018 with early adoption permitted. The Group is currently assessing the impact of IFRS 15 and plans to adopt the new standard on the required effective date.

### IFRS 16 LEASES
IFRS 16 was issued in January 2016, and specifies how an IFRS reporter will recognise, measure, present and disclose leases. The standard provides a single lessee accounting model, requiring lessees to recognise assets and liabilities for all leases unless the lease term is 12 months or less or the underlying asset has a low value. Lessors continue to classify leases as operating or finance, with IFRS 16's approach to lessor accounting substantially unchanged from its predecessor, IAS 17.

IFRS 16 applies to annual reporting periods beginning on or after 1 January 2019. The Group is currently assessing the impact of IFRS 16 and plans to adopt the new standard on the required effective date.

In addition, the standards and interpretations that are issued, but not yet effective, up to the date of issuance of the Group's financial statements that are not expected to have any material impact on the Group are as follows:

- IFRS 9 Financial Instruments
- IFRS 14 Regulatory Deferral Accounts
- Amendments to IFRS 11 Joint Arrangements: Accounting for Acquisitions of Interests
- Amendments to IAS 16 and IAS 38: Clarification of Acceptable Methods of Depreciation and Amortisation
- Amendments to IAS 16 and IAS 41 Agriculture: Bearer Plants
- Amendments to IAS 27: Equity Method in Separate Financial Statements
- Amendments to IFRS 10 and IAS 28: Sale or Contribution of Assets between an Investor and its Associate or Joint Venture

Annual improvements 2012-2014 Cycle:
- IFRS 5 Non-current Assets Held for Sale and Discontinued Operations
- IFRS 7 Financial Instruments: Disclosures
- IAS 19 Employee Benefits
- IAS 34 Interim Financial Reporting
- Amendments to IAS 1 Disclosure Initiative
- Amendments to IFRS 10, IFRS 12 and IAS 28 Investment Entities: Applying the Consolidation Exception

## 5  BUSINESS COMBINATIONS

The fair value of the identifiable assets and liabilities of entities acquired as at the date of acquisition are as follows:

| Particulars | Luarmia SL US$'000 | CIRH US$'000 | Biogenesi US$'000 | TADS US$'000 | Americare US$'000 | Dr Sunny US$'000 | ProVita US$'000 | Total US$'000 |
|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | |
| Intangible assets | 35,657 | 378 | 7,373 | – | 2,623 | 6,847 | 21,935 | 74,813 |
| Property and equipment | 1,932 | 73 | 645 | 30 | 1,158 | 1,219 | 8,635 | 13,692 |
| Deferred tax asset | 842 | – | 1 | – | – | – | – | 843 |
| Inventories | 3,521 | – | – | 362 | 85 | 810 | 662 | 5,440 |
| Accounts receivable | 678 | 174 | – | 851 | 2,724 | 5,372 | 9,881 | 19,680 |
| Other receivables | 3,821 | 41 | – | 172 | 350 | 2,880 | 2,386 | 9,650 |
| Cash and bank balances | 9,610 | 1,976 | 9 | 2,001 | 1,199 | 3,828 | 9,825 | 28,448 |
| | 56,061 | 2,642 | 8,028 | 3,416 | 8,139 | 20,956 | 53,324 | 152,566 |
| **Liabilities** | | | | | | | | |
| Current tax | – | 35 | – | – | – | – | – | 35 |
| Borrowings | 25,006 | – | – | – | 39 | 1,566 | 54 | 26,665 |
| Deferred tax | 8,804 | 92 | 2,058 | – | – | – | – | 10,954 |
| Accounts payable | 2,887 | 382 | 2 | 922 | 1,016 | 3,865 | 3,066 | 12,140 |
| Other payable | 5,100 | 1,691 | 111 | 1,126 | 1,884 | 1,942 | 1,869 | 13,723 |
| | 41,797 | 2,200 | 2,171 | 2,048 | 2,939 | 7,373 | 4,989 | 63,517 |
| Total identified net assets at fair value | 14,264 | 442 | 5,857 | 1,368 | 5,200 | 13,583 | 48,335 | 89,049 |
| Non-controlling interest | (1,940) | – | (2,343) | (342) | (520) | – | – | (5,145) |
| Goodwill arising on acquisition | 117,059 | 13,622 | 8,329 | 4,879 | 26,763 | 53,838 | 120,582 | 345,072 |
| Purchase consideration | 129,383 | 14,064 | 11,843 | 5,905 | 31,443 | 67,421 | 168,917 | 428,976 |
| **Purchase consideration:** | | | | | | | | |
| Payable in cash | 127,107 | 11,393 | 5,522 | 5,905 | 31,443 | 57,973 | 160,592 | 399,935 |
| Contingent consideration | 2,276 | 2,671 | 6,321 | – | – | 9,448 | 8,325 | 29,041 |
| Total consideration | 129,383 | 14,064 | 11,843 | 5,905 | 31,443 | 67,421 | 168,917 | 428,976 |

With the exception of Luarmia SL and Americare all fair values stated in table above are provisional.

Analysis of cash flows on acquisitions is as follows:

| Particulars | Luarmia SL US$'000 | CIRH US$'000 | Biogenesi US$'000 | TADS US$'000 | Americare US$'000 | Dr Sunny US$'000 | ProVita US$'000 | Total US$'000 |
|---|---|---|---|---|---|---|---|---|
| Cash paid | (127,107) | (11,393) | (5,522) | (5,905) | (31,443) | (57,973) | (160,592) | (399,935) |
| Contingent consideration paid | (2,276) | – | – | – | – | (1,742) | – | (4,018) |
| Net cash acquired with the subsidiaries | 9,610 | 1,976 | 9 | 2,001 | 1,199 | 3,828 | 9,825 | 28,448 |
| Transaction costs | (1,745) | (87) | (96) | (81) | (313) | (374) | (608) | (3,304) |
| Net cash flow on acquisition | (121,518) | (9,504) | (5,609) | (3,985) | (30,557) | (56,261) | (151,375) | (378,809) |

The transaction costs reported in the consolidated income statement comprise of the following:

| | 2015 US$'000 | 2014 US$'000 |
|---|---|---|
| Transaction costs for the acquired entities | 3,304 | – |
| Transaction costs for Fakih IVF | 750 | – |
| Transaction costs for acquisitions in progress | 77 | – |
| | 4,131 | – |

The non-controlling interest in all acquired entities is measured at the proportionate share of net assets of subsidiaries.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice    121 of 166    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

Financial Statements

# Notes to the consolidated financial statements continued
At 31 December 2015

**5  BUSINESS COMBINATIONS** continued

Other financial information with respect to acquired entities is as follows:

| Particulars | Luarmia SL US$'000 | CIRH US$'000 | Biogenesi US$'000 | TADS US$'000 | Americare US$'000 | Dr Sunny US$'000 | ProVita US$'000 | Total US$'000 |
|---|---|---|---|---|---|---|---|---|
| Revenue from the date of acquisition | 29,668 | 6,645 | 2,858 | 5,243 | 11,435 | 12,158 | 19,701 | 87,708 |
| Profit after tax from the date of acquisition | 6,708 | 1,660 | 819 | 2,485 | 2,126 | 1,192 | 5,033 | 20,023 |
| Revenue from 1 January to 31 December 2015 (unaudited) | 36,063 | 8,804 | 5,990 | 5,841 | 16,601 | 36,357 | 54,007 | 163,663 |
| Profit after tax from 1 January to 31 December 2015 (unaudited) | 6,010 | 2,631 | 2,312 | 2,656 | 3,143 | 2,588 | 9,298 | 28,638 |
| Trade receivables gross value as of acquisition date | 858 | 174 | – | 851 | 2,724 | 6,510 | 12,451 | 23,568 |
| Trade receivables fair value as of acquisition date | 678 | 174 | – | 851 | 2,724 | 5,372 | 9,881 | 19,680 |

### ACQUISITION OF LUARMIA SL

On 23 February 2015, the Group acquired 86.4% of the voting shares of Luarmia SL ("Luarmia") and its subsidiaries, an unlisted company based in Spain and specialising in research and medical services in the fields of gynaecology, obstetrics and human reproduction. Luarmia owns Clinica Eugin through a wholly owned subsidiary. The Group acquired Luarmia SL because Eugin is a leading In Vitro Fertilisation (IVF) centre of excellence with world-leading technology and expertise as well as strong brand recognition and to bring the technologies in fertility services to NMC's network in the UAE to complement the existing NMC women's health services.

The consolidated financial statements include the results of Luarmia SL and its subsidiaries for the 10 month period from the acquisition date.

The goodwill recognised is attributed to the expected synergies and other benefits from combining the assets and activities of Luarmia and rolling out of fertility services to other entities of the Group. Goodwill is allocated to the healthcare segment. None of the recognised goodwill is expected to be deductible for income tax purposes.

At the date of acquisition, the fair value of identifiable intangible assets included brands amounting to US$19,855,000, software of US$3,168,000, intellectual properties of US$3,000, patients procedures database of US$11,683,000 and rental contract of US$948,000 (with a related deferred tax liability in respect of these intangible assets of US$8,713,000). The related deferred tax liability has been assessed using the rate of corporation tax (25%) applicable in Spain.

A contingent tax liability of US$1,445,000 has been recorded within the liabilities of Luarmia recognised at the acquisition date, the timing of the outflow of which is uncertain. The carrying amount of this liability was US$1,420,000 as at 31 December 2015. Under the terms of the share purchase agreement the Group is indemnified for any subsequent tax liabilities in respect of the pre-acquisition period and accordingly a corresponding asset of an equal amount has also been recognised.

As part of the purchase agreement with the previous owner, contingent consideration has been agreed. The purchase consideration of US$129,383,000 includes contingent consideration amounting to US$2,276,000. This relates to potential amounts payable in the event the advanced stage acquisitions of the acquired company are completed within 12 months from the purchase agreement date. Both of the acquisitions completed in 2015 and the contingent consideration has been paid during 2015.

The Group entered into separate co-investment/shareholder agreements dated 23 February 2015 with the sellers relating to put & call options on the minority 13.6% shareholdings that remains with the previous owners post-acquisition. The Group does not have 'present ownership' of this 13.6% minority shareholding due to the terms of the option agreements and will continue to account for the acquisition of Luarmia on the basis of an 86.4% equity stake, with full recognition of the 13.6% non-controlling interest. The put options are exercisable between 1 & 30 June 2018, 1 & 30 June 2019 and 1 & 30 June 2020 (three exercisable windows). On exercise of the put options, cash will be paid. The value of the put option is calculated based on the multiple of purchase price and further multiples are measured on the number of reproductive cycles specified in the agreement. A redemption liability for the value of the options at the acquisition date has been created amounting to US$24,496,000 (being the present value of the redemption liability at the acquisition date), with an equal amount being treated as a reduction in equity. As at 31 December 2015, the present value of the redemption liability is US$25,084,000 (Note 37).

The call options are exercisable between 1 & 30 June 2019 and 1 & 30 June 2020 (two exercisable windows). On exercise of the call options, cash will be paid. The value of the call option is calculated on the basis of Black Scholes model. The call options value is immaterial and hence not recognised in the consolidated financial statements.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice              122 of 166              Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

## 5   BUSINESS COMBINATIONS continued
### ACQUISITION OF CENTRO DE INFERTILIDAD Y REPRODUCCION HUMANA SLU (CIRH)

On 18 March 2015, the Group acquired 100% of the voting shares of CIRH, an unlisted company based in Spain and specialising in research and medical services in the fields of gynaecology, obstetrics and human reproduction. The Group acquired CIRH to enable Clinica Eugin to reinforce its presence in Spain and strengthen its brand and positioning at the forefront of its market.

The consolidated financial statements include the results of CIRH for the 9 month period from the acquisition date.

Goodwill represents future business potential and profit growth of CIRH and it comprises all of intangibles that cannot be individually recognised such as the assembled workforce, customer service, future client relationships and presence in the geographical market. Goodwill is allocated to the healthcare segment. None of the recognised goodwill is expected to be deductible for income tax purposes.

At the date of acquisition, the fair value of identifiable intangible assets included rental and private contracts amounting to US$371,000,software of US$7,000 (with a related deferred tax liability of US$92,000). The related deferred tax liability has been assessed using the rate of corporation tax applicable in Spain.

As part of the purchase agreement with the previous owner, a contingent consideration has been agreed. The total purchase consideration of US$14,064,000 includes consideration paid of US$11,393,000 and contingent consideration of US$2,671,000 payable subject to the attainment of revenue or reproductive cycle targets. Management believes these targets will be met. The full value of the contingent consideration payable is US$3,255,000 and the present value of US$2,768,000, as at 31 December 2015. This is due in 2017 and is included in other payables in the consolidated statement of financial position (Note 30).

### ACQUISITION OF CENTRO DE MEDICINA DELLA RIPRODUZIONE (BIOGENESI)

On 6 July 2015, the Group acquired a 60% equity interest in Biogenesi, an unlisted company based in Italy and specialising in research and medical services in the fields of gynaecology, obstetrics and human reproduction. The Group acquired Biogenesi to enable Clinica Eugin to reinforce its presence in Italy and strengthen its brand and positioning at the forefront of its market.

The acquisition has been accounted for using the acquisition method. The consolidated financial statements include the results of Biogenesi for the 6 month period from the acquisition date.

The goodwill recognised above is attributed to the expected synergies and other benefits from combining the assets and activities of Biogenesi with those of the Group. Goodwill is allocated to the healthcare segment. None of the recognised goodwill is expected to be deductible for income tax purposes.

At the date of acquisition, the fair value of identifiable intangible assets included commercial contracts amounting to US$7,373,000 (with a related deferred tax liability of US$ 2,058,000).The related deferred tax liability has been assessed using the corporation tax rate applicable in Italy.

As part of the purchase agreement with the previous owner, a contingent consideration has been agreed. The total purchase consideration of US$11,843,000 includes consideration paid of US$5,522,000 and contingent consideration of US$6,321,000 payable subject to the attainment of revenue or reproductive cycle targets. Management believes these targets will be met. The full value of the contingent consideration payable is US$7,700,000 and the present value at reporting date is US$6,578,000. Out of total contingent consideration, amount of US$2,130,000 is due in 2016 and amount of US$4,448,000 is due in 2019. This is included in other payables in the consolidated statement of financial position (Note 30).

### ACQUISITION OF TRANS ARABIA DRUG STORE LLC (TADS)

On 23 March 2015, the Group acquired 75% of the voting shares of TADS, an unlisted company based in Dubai, UAE and specialising in the distribution of specialist pharmaceutical products. The Group acquired TADS because of the synergies which will flow to the distribution segment (NMC Trading) because of entry into a niche area. The segment faces less competition due to the specialized products which they deal with.

The acquisition has been accounted for using the acquisition method. The consolidated financial statements include the results of TADS for the 9 month period from the acquisition date.

The goodwill recognised above is attributed to the expected synergies and other benefits from combining the assets and activities of TADS with those of the Group. Goodwill is allocated to the distribution and services segment. None of the recognised goodwill is expected to be deductible for income tax purposes as there is no corporation tax in the UAE. TADS is exclusive UAE distributor for various specialist pharmaceutical products, a business which will enhance distribution and services segment revenues and profitability.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice        123 of 166        Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

Financial Statements

# Notes to the consolidated financial statements continued
At 31 December 2015

**5  BUSINESS COMBINATIONS** continued
### ACQUISITION OF AMERICARE
On 29 April 2015, the Group acquired 90% (39% of the registered shareholdings and 51% beneficial interest in the shareholdings) of Americare LLC, the American Surgecenter LLC and the American Surgecenter Pharmacy LLC (collectively referred to as "Americare") which are unlisted companies based in Abu Dhabi, UAE specialising in home health services and other diversified medical and pharmacy services. The 51% beneficial shares are registered in the name of a UAE national. NMC has beneficial interest in these shares through an agreement entered into with the UAE national. All controlling rights (i.e. voting, appointment and removal of directors, dividend rights) vest with NMC. These rights are not relinquishable.

The Group acquired Americare because this acquisition extends NMC's service offering along the care pathway by complementing existing in-hospital healthcare services and expanding into the home based long term care market segment. In addition, Americare includes a medical centre with on-site pharmacy located in the upmarket Khalidiya residential area of Abu Dhabi City. This medical centre is expected to contribute to the patient cross-referral capabilities of NMC's nation-wide and multi-specialty hub-and-spoke healthcare services network.

The consolidated financial statements include the results of Americare for the 8 month period from the acquisition date.

The goodwill recognised above is attributed to the expected synergies and other benefits from combining the assets and activities of Americare with those of the Group. Goodwill is allocated to the healthcare segment. None of the recognised goodwill is expected to be deductible for income tax purposes as there is no corporation tax in the UAE. Synergistic benefits will arise in the following ways:

- Americare home services will complement the existing in-hospital services offered by Group. The addition of a home based service offering will increase healthcare segment value chain.
- Group's in-hospital patients will be referred to Americare for home based services as appropriate, thereby expanding healthcare segment revenues.
- Americare home based patients will be referred to NMC hospitals for in-hospital treatment as required, with a direct impact on hospital revenues.

At the date of the acquisition, the fair value of identifiable intangible assets included brands amounting to US$1,545,000 and non-compete agreements US$1,078,000. No deferred tax liability has been recognised as there is no corporation tax in the UAE.

Management fees of US$1,500,000 in respect of services provided by the Group to Americare prior to its acquisition were recognised as revenue in the first half of the year. In finalising the acquisition accounting, management have now concluded that the two arrangements were non-separable and hence the management fees should be treated as a reduction to the purchase consideration paid.

### ACQUISITION OF DR SUNNY HEALTHCARE
On 29 April 2015, the Group agreed to acquire 100% of the business of the Dr Sunny health centres and pharmacies (unincorporated businesses) and 100% of the voting shares of Sunny Speciality Medical Centre LLC (a company based in Sharjah, UAE). These businesses together are referred to as Dr Sunny Healthcare and specialise in the provision of medical services.

The Group acquired Dr Sunny Healthcare because it expands NMC's existing Sharjah operation into a network of healthcare facilities through the addition of six medical centres and three pharmacies. Consequently, this acquisition expands the geographical footprint, addressable market and patient cross-referral capabilities of NMC's nation-wide and multi-specialty hub-and-spoke healthcare services network.

NMC acquired control of Dr Sunny Healthcare on 25 August 2015, date on which conditions precedent were completed. The consolidated financial statements include the results of Dr Sunny Healthcare for the 4 month period from the acquisition date.

Other receivables include an amount of US$2,200,000 in respect of a receivable from previous shareholders in respect of some of the liabilities of the acquired entities assumed by the previous shareholders as at the acquisition date.

The goodwill recognised is attributable to the expected synergies and other benefits from combining the assets and activities of Dr Sunny Healthcare with those of the Group. Goodwill is allocated to the healthcare segment. None of the recognised goodwill is expected to be deductible for income tax purposes as there is no corporation tax in the UAE. Synergistic benefits will arise in the following ways:

- The acquisition of Dr Sunny Healthcare will give the Group enhanced direct access into Sharjah healthcare market and extends the healthcare segment's market position in Sharjah and UAE as a whole.
- The ability to cross refer patients from Dr Sunny medical centres to the nearby NMC Speciality Hospital in Dubai.

At the date of the acquisition, the fair value assessment of identifiable net assets included brands amounting to US$6,043,000 and non-compete agreements US$804,000. No deferred tax liability has been recognised as there is no corporation tax in the UAE.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          124 of 166          Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

Overview          Strategic Report          Governance          Financial Statements

**5   BUSINESS COMBINATIONS** continued
**ACQUISITION OF DR SUNNY HEALTHCARE** continued

As part of the acquisition the Group entered into contractual earn-out arrangements with the Chief Medical Director and CEO of Dr Sunny Healthcare who were the owners of the business. This entitles them to shares of the future profits of Dr Sunny Healthcare in respect of financial years 2015 and 2016. At the acquisition date, the estimated fair value of this contingent consideration was $9,448,000. In addition, the Group also entered into consultancy arrangements with these two individuals.

The full value of the contingent consideration has been measured as US$10,176,000. During the year the Group has paid an amount of US$1,742,000 in respect of contingent consideration. Present value of remaining outstanding contingent consideration is US$7,345,000 and is included in other payables (Note 30). Outstanding contingent consideration is payable partly in 2016 and partly in 2017.

Management fees of US$4,500,000 in respect of services provided by the Group to Dr Sunny Healthcare prior to its acquisition were recognised as revenue in the first half of the year. In finalising the acquisition accounting, management have now concluded that the two arrangements were non-separable and hence the management fees should be treated as a reduction to the purchase consideration paid.

**PROVITA INTERNATIONAL MEDICAL CENTRE LLC (PROVITA)**

On 15 June 2015, the Group agreed to acquire 100% (49% of the registered shareholdings and 51% beneficial interest in the shareholdings) of the voting shares of ProVita, an unlisted company based in Abu Dhabi, UAE and specialising in the provision of long-term care in the healthcare market. The Group acquired ProVita, a provider of long term patient care because it contemplates expansion in the GCC region supported by its growing healthcare services capabilities. The 51% beneficial shares are registered in the name of a UAE national. NMC has beneficial interest in these shares through an agreement entered into with the UAE national. All controlling rights (i.e. voting, appointment and removal of directors, dividend rights) vest with NMC. These rights are not relinquishable.

NMC acquired control of ProVita on 20 August 2015, the date on which conditions precedent were completed. The consolidated financial statements include the results of ProVita for the 4 month period from the acquisition date.

The goodwill recognised is attributable to the expected synergies and other benefits from combining the assets and activities of ProVita with those of the Group. Goodwill is allocated to the healthcare segment. None of the recognised goodwill is expected to be deductible for income tax purposes as there is no corporation tax in UAE. Synergistic benefits will arise from in the following ways:

- ProVita's long-term care services will complement the existing in-patient services offered by the Group hospital, as well as the shorter term in-home services offered by Americare.
- The addition of a long-term care provider offering will increase healthcare segment value chain. Synergies include expanded service offering, plugging an existing service gap, enhancing positioning as integrated healthcare provider, access to thiqa patients (thiqa is the premium insurance coverage for the UAE nationals), operational, revenue and cost synergies with NMC's existing facilities.

At the date of the acquisition, the fair value of identifiable assets included brands amounting to US$8,415,000, patient relationship US$13,471,000 and software of US$49,000.

Purchase consideration includes contingent consideration of US$8,325,000. The full value of the contingent consideration is US$8,500,000 and the present value as at 31 December 2015 is US$8,325,000. The contingent consideration relates to amounts payable in the event that licenses to operate in certain other GCC countries are obtained. As of 31 December 2015, contingent consideration remains payable and is included in other payables (Note 30). Contingent consideration is expected to be payable in 2016.

**POST BALANCE SHEET ACQUISITION: FAKIH IVF LLC AND FAKIH IVF FERTILITY CENTER LLC (FAKIH IVF)**

On 24 November 2015, NMC agreed to acquire a 51% controlling stake in the voting shares of Fakih IVF, an unlisted group registered in Cayman Islands and operationally headquartered in Abu Dhabi, UAE, which is the Middle East's leader in the provision of IVF and fertility services. Regulatory approvals and legal formalities were completed on 8 February 2016, meaning that control has passed to the Group, and full consolidation of results will commence from that date.

The agreed purchase consideration for the business is US$197,800,000, with additional potential earn out payments of US$9,000,000. The Group has agreed a mechanism by which it could increase its stake in Fakih over time (the buyout period) based on certain conditions being met.

The fair value assessment of identifiable net assets at the acquisition date remains in progress and therefore the fair value of the identifiable net assets is preliminary. The Group has a 1 year timeframe from the date of acquisition to finalise the measurement of the net assets acquired. The net assets identified to date are those existing at the acquisition date, those forming part of the acquisition, and those that meet the recognition criteria for assets and liabilities. No acquisition date contingent liabilities requiring full recognition have been noted as yet.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          125 of 166          Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

# Notes to the consolidated financial statements continued
## At 31 December 2015

### 5 BUSINESS COMBINATIONS continued

Provisional goodwill has been calculated being the difference between the fair value of the consideration paid, and the fair value of the net assets acquired. For convenience, the closest available balance sheet date has been used for the purposes of measuring net assets acquired. This date is 31 January 2016, with full consolidation commencing on 8 February 2016. We are not aware of any material transactions in the period between 31 January 2016 and 8 February 2016.

Details of the provisional goodwill calculated as of 31 January 2016 are as follows:

|  | Fair value recognised on acquisition US$'000 |
| --- | --- |
| **Assets** | |
| Intangible assets | 126 |
| Property, plant and equipment | 4,590 |
| Inventories | 613 |
| Accounts receivable | 12,717 |
| Cash and bank balances | 3,392 |
|  | 21,438 |
| **Liabilities** | |
| Accounts payable | 5,942 |
| Other Payable | 2,653 |
|  | 8,595 |
| Total identifiable net assets at fair value | 12,843 |
| Non-controlling interests | (6,293) |
| Goodwill arising on acquisition | 200,338 |
| **Purchase consideration transferred** | 206,888 |

The acquisition of Fakih IVF has resulted in a provisional goodwill of US$200,338,000. The Group has elected to measure the non-controlling interests in the acquiree using the proportionate method, resulting in an NCI on acquisition of US$6,293,000 (being 49% of the identifiable net assets at fair value).

The transaction costs of US$750,000 have been expensed and are included under transaction costs in respect of business combinations in the consolidated income statement.

### 6 MATERIAL PARTLY-OWNED SUBSIDIARIES

The financial information in respect of subsidiaries that have material non-controlling interests is provided below:

#### PROPORTION OF EQUITY INTEREST HELD BY NON-CONTROLLING INTEREST:

|  | Country of Incorporation | Percentage of holdings | |
| --- | --- | --- | --- |
|  |  | 31 December 2015 | 31 December 2014 |
| Indirect subsidiaries: | | | |
| Luarmia SL | Spain | 86.4%* | – |
| Americare LLC | UAE | 90% | – |

* Shareholding disclosed is for Luarmia SL only. Within Luarmia SL there are certain other subsidiaries. The financial information provided below is for Luarmia SL and its subsidiaries.

#### ACCUMULATED BALANCES OF MATERIAL NON-CONTROLLING INTEREST:

|  | 2015 US$'000 | 2014 US$'000 |
| --- | --- | --- |
| Luarmia SL | 4,298 | – |
| Americare | 704 | – |

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          126 of 166          Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

**6 MATERIAL PARTLY-OWNED SUBSIDIARIES** continued

**PROFIT ALLOCATED TO MATERIAL NON-CONTROLLING INTEREST:**

|  | 2015 US$'000 | 2014 US$'000 |
|---|---|---|
| Luarmia SL | 15 | – |
| Americare | 184 | – |

The summarised financial information of these subsidiaries is provided below. This information is stated before inter-company eliminations.

| Summarised statement of profit or loss for 2015: | Luarmia US$'000 | Americare US$'000 |
|---|---|---|
| Revenue | 39,020 | 11,435 |
| Direct costs | (16,205) | (6,485) |
| Administrative and other expenses | (14,116) | (2,538) |
| Depreciation & amortisation | (3,823) | (570) |
| Profit before tax | 4,876 | 1,842 |
| Income tax | 403 | – |
| **Profit for the year** | 5,279 | 1,842 |
| Other comprehensive loss | (5,342) | – |
| **Total comprehensive (loss) income** | (63) | 1,842 |
| Attributable to non-controlling interests | 15 | 184 |

| Summarised statement of financial position as at 31 December 2015 | Luarmia US$'000 | Americare US$'000 |
|---|---|---|
| Inventories & cash and bank balance (current) | 17,831 | 1,180 |
| Accounts receivable and prepayments (current) | 5,163 | 4,194 |
| Property and equipment and other non-current assets (non-current) | 108,265 | 3,333 |
| Accounts payable and accruals (current) | (9,026) | (1,350) |
| Interest-bearing loans (current) | (9,708) | – |
| Interest-bearing loans and deferred tax liabilities (non-current) | (35,524) | – |
| Other payable (non-current) | (12,801) | (313) |
| **Total Equity** | 64,200 | 7,044 |
| Attributable to: | | |
| Equity holders of parent | 59,902 | 6,339 |
| Non-controlling interest | 4,298 | 705 |

| Summarised cash flow information for period ended 31 December 2015 | Luarmia US$'000 | Americare US$'000 |
|---|---|---|
| Operating | 5,324 | 1,611 |
| Investing | (18,440) | (121) |
| Financing | 16,312 | (1,595) |
| **Net Increase/(decrease) in cash and cash equivalents** | 3,196 | (105) |

Comparatives are not provided for the above financial information in respect of material non-controlling interests as both of the subsidiaries were acquired in 2015.

**7 SEGMENT INFORMATION**

For management purposes, the Group is organised into business units based on their products and services and has two reportable segments as follows:

- ·The healthcare segment is engaged in providing professional medical services, comprising diagnostic services, in and outpatient clinics, provision of all types of research and medical services in the field of gynaecology, obstetrics and human reproduction and retailing of pharmaceutical goods. It also includes the provision of management services in respect of a hospital.
- The distribution & services segment is engaged in wholesale trading of pharmaceutical goods, medical equipment, cosmetics and food.

No operating segments have been aggregated to form the above reportable operating segments.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice    127 of 166    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

Financial Statements

# Notes to the consolidated financial statements continued
At 31 December 2015

### 7   SEGMENT INFORMATION continued

The new acquired companies, Luarmia SL, CIRH, Biogenesi, Americare, Dr Sunny Healthcare and ProVita come under the healthcare segment and TADS under the distribution and services segment.

Management monitors the operating results of its business units separately for the purpose of making decisions about resource allocation and performance assessment. Segment performance is evaluated based on EBITDA and profit or loss. These are measured consistently with EBITDA and profit or loss excluding finance income and group administrative expenses, unallocated depreciation and unallocated other income, in the consolidated financial statements.

Finance costs and finance income relating to UAE subsidiaries are not allocated to individual segments as they are managed on a group basis. In addition Group overheads are also not allocated to individual segments as these are managed on a Group basis.

Transfer prices between operating segments are on an arm's length basis in a manner similar to transactions with third parties.

The following tables present revenue and profit and certain asset and liability information regarding the Group's business segments for the years ended 31 December 2015 and 2014.

| | Healthcare US$'000 | Distribution and services US$'000 | Total segments US$'000 | Adjustments and eliminations US$'000 | Consolidated US$'000 |
|---|---|---|---|---|---|
| **Year ended 31 December 2015** | | | | | |
| **Revenue** | | | | | |
| External customers | 511,029 | 369,841 | 880,870 | – | 880,870 |
| Inter segment | 6,087 | 23,575 | 29,662 | (29,662) | – |
| Total | 517,116 | 393,416 | 910,532 | (29,662) | 880,870 |
| **(Expenses)/Income** | | | | | |
| Depreciation and amortization | (27,887) | (2,705) | (30,592) | (4,234) | (34,826) |
| Finance costs | (1,154) | (4) | (1,158) | (22,687) | (23,845) |
| Segment EBITDA | 136,976 | 43,498 | 180,474 | (30,128) | 150,346 |
| Segment profit | 108,037 | 40,708 | 148,745 | (62,985) | 85,760 |
| Segment assets | 1,029,305 | 257,484 | 1,286,789 | 167,091 | 1,453,880 |
| Segment liabilities | 160,677 | 65,748 | 226,425 | 727,790 | 954,215 |
| **Other disclosures** | | | | | |
| Capital expenditure | 78,271 | 2,085 | 80,356 | 1,907 | 82,263 |
| **Year ended 31 December 2014 (restated)** | | | | | |
| **Revenue** | | | | | |
| External customers | 327,714 | 316,217 | 643,931 | – | 643,931 |
| Inter segment | 4,484 | 22,675 | 27,159 | (27,159) | – |
| Total | 332,198 | 338,892 | 671,090 | (27,159) | 643,931 |
| **(Expenses)/Income** | | | | | |
| Depreciation | (11,215) | (2,349) | (13,564) | (486) | (14,050) |
| Finance costs-restated | – | – | – | (14,497) | (14,497) |
| Segment EBITDA-restated | 89,138 | 34,417 | 123,555 | (21,097) | 102,458 |
| Segment profit-restated | 77,924 | 32,067 | 109,991 | (32,457) | 77,534 |
| Segment assets | 459,745 | 208,935 | 668,680 | 281,845 | 950,525 |
| Segment liabilities | 50,497 | 58,300 | 108,797 | 388,701 | 497,498 |
| **Other disclosures** | | | | | |
| Capital expenditure | 108,809 | 3,005 | 111,814 | 501 | 112,315 |

Inter-segment revenues are eliminated upon consolidation and reflected in the 'adjustments and eliminations' column. All other adjustments and eliminations are part of detailed reconciliations presented further below.

From the current year the Group stopped allocating finance cost and IT cost to its UAE subsidiaries. Accordingly the prior year comparatives with respect to finance costs, segment EBITDA and segment profit have been restated.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice        128 of 166        Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

**7  SEGMENT INFORMATION** continued
**ADJUSTMENTS AND ELIMINATIONS**

Finance income and group overheads are not allocated to individual segments as they are managed on a group basis.

Term loans, bank overdraft and other short term borrowings and certain other assets and liabilities are substantially not allocated to segments as they are also managed on a group basis.

Capital expenditure consists of additions to property and equipment and intangible assets.

**RECONCILIATION OF SEGMENT EBITDA TO GROUP PROFIT**

| | 2015 US$'000 | (restated) 2014 US$'000 |
|---|---|---|
| Segment EBITDA | 180,474 | 123,555 |
| Unallocated group administrative expenses | (31,153) | (21,233) |
| Unallocated other income | 1,025 | 136 |
| Unallocated finance income | 925 | 3,623 |
| Unallocated unamortised finance fees written off | (2,612) | – |
| Finance costs | (23,845) | (14,497) |
| Depreciation | (29,851) | (14,050) |
| Amortisation | (5,475) | – |
| Transaction costs related to business combination | (4,131) | – |
| Tax | 403 | – |
| Group Profit | 85,760 | 77,534 |

**RECONCILIATION OF SEGMENT PROFIT TO GROUP PROFIT**

| | 2015 US$'000 | (restated) 2014 US$'000 |
|---|---|---|
| Segment profit | 148,745 | 109,991 |
| Unallocated finance income | 1,043 | 3,623 |
| Unallocated finance costs | (22,687) | (14,497) |
| Unallocated group administrative expenses | (31,153) | (21,233) |
| Unallocated unamortised finance fees written off | (2,612) | – |
| Unallocated depreciation | (624) | (486) |
| Unallocated other income | 1,025 | 136 |
| Unallocated amortisation cost | (4,110) | – |
| Unallocated transaction cost | (3,867) | – |
| Group Profit | 85,760 | 77,534 |

**RECONCILIATION OF GROUP ASSETS**

| | 2015 US$'000 | 2014 US$'000 |
|---|---|---|
| Segment assets | 1,286,789 | 668,680 |
| Unallocated property and equipment | 10,290 | 9,341 |
| Unallocated inventory | 22 | 26 |
| Unallocated accounts receivable and prepayments | 8,913 | 7,253 |
| Unallocated bank balances and cash | 86,321 | 78,633 |
| Unallocated bank deposits | 58,858 | 183,577 |
| Unallocated intangible assets | 2,687 | 3,015 |
| Group assets | 1,453,880 | 950,525 |

Exhibit 4 to B.R. Shetty's Request for Judicial Notice      129 of 166      Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

## Notes to the consolidated financial statements continued
At 31 December 2015

**7   SEGMENT INFORMATION** continued
**RECONCILIATION OF GROUP LIABILITIES**

|  | 2015 US$'000 | 2014 US$'000 |
|---|---|---|
| Segment liabilities | 226,425 | 108,797 |
| Unallocated term loans | 539,875 | 206,512 |
| Unallocated employees' end of service benefits | 1,854 | 1,101 |
| Unallocated accounts payable and accruals | 5,837 | 11,335 |
| Unallocated bank overdraft and other short term borrowings | 154,962 | 169,607 |
| Unallocated amounts due to related parties | 178 | 146 |
| Unallocated option redemption liability | 25,084 | – |
| Group liabilities | 954,215 | 497,498 |

**OTHER INFORMATION**

The following table provides information relating to Group's major customers who contribute more than 10% towards the Group's revenues:

|  | Healthcare US$'000 | Distribution and services US$'000 | Total US$'000 |
|---|---|---|---|
| Year ended 31 December 2015 |  |  |  |
| Customer 1 | 154,772 | – | 154,772 |
| Customer 2 | 47,083 | – | 47,083 |
|  | 201,855 | – | 201,855 |
| Year ended 31 December 2014 |  |  |  |
| Customer 1 | 92,246 | – | 92,246 |
| Customer 2 | 35,005 | – | 35,005 |
|  | 127,251 | – | 127,251 |

**GEOGRAPHICAL INFORMATION**

|  | 2015 US$'000 | 2014 US$'000 |
|---|---|---|
| Revenue from external customers |  |  |
| United Arab Emirates | 841,851 | 643,931 |
| Spain | 34,994 | – |
| Others | 4,025 | – |
| Total revenue as per consolidated income statement | 880,870 | 643,931 |
| Non-current assets |  |  |
| United Arab Emirates | 671,956 | 372,593 |
| Spain | 176,824 | – |
| Others | 844 | – |
| Total non-current assets | 849,624 | 372,593 |
| Deferred tax assets |  |  |
| United Arab Emirates | – | – |
| Spain | 1,302 | – |
| Others | 14 | – |
| Total deferred tax assets | 1,316 | – |

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          130 of 166          Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

## 7  SEGMENT INFORMATION continued
### ANALYSIS OF REVENUE BY CATEGORY:

| | 2015 US$'000 | 2014 US$'000 |
|---|---|---|
| Revenue from services: | | |
| Healthcare – clinic | 410,408 | 260,938 |
| Healthcare – management fees | 7,280 | 5,717 |
| | 417,688 | 266,655 |
| Sale of goods: | | |
| Distribution | 369,841 | 316,217 |
| Healthcare | 93,341 | 61,059 |
| | 463,182 | 377,276 |
| Total | 880,870 | 643,931 |

## 8  EXPENSES BY NATURE

| | 2015 US$'000 | 2014 US$'000 |
|---|---|---|
| Cost of inventories recognised as an expense | 389,702 | 314,408 |
| Salary expenses | 239,139 | 157,990 |
| Rent expenses | 44,859 | 27,728 |
| Sales promotion expenses | 43,882 | 35,174 |
| Repair and maintenance expenses | 9,891 | 7,630 |
| Electricity expenses | 4,927 | 3,932 |
| Legal and licence fees | 3,561 | 2,073 |
| Motor vehicle expenses | 3,292 | 2,572 |
| Insurance expenses | 2,688 | 1,233 |
| Printing and stationery | 2,560 | 2,214 |
| Communication expenses | 2,393 | 1,725 |
| IT expenses | 1,193 | 665 |
| Others | 19,086 | 14,569 |
| | 767,173 | 571,913 |
| Allocated to : | | |
| Direct costs | 575,926 | 434,725 |
| General and administrative expenses | 191,247 | 137,188 |
| | 767,173 | 571,913 |

The classifications of the remaining expenses by nature recognised in the consolidated income statement are:

| | 2015 US$'000 | 2014 US$'000 |
|---|---|---|
| Depreciation | 29,851 | 14,050 |
| Amortisation | 5,475 | – |
| Finance costs | 23,845 | 14,497 |
| Unamortised finance fees written off | 2,612 | – |
| | 61,783 | 28,547 |

## 9  OTHER INCOME
Other income includes US$35,256,000 (2014: US$30,180,000) relating to reimbursement of advertisement and promotional expenses incurred by the Group. Revenue is recognised following the formal acceptance of the Group's reimbursement claims by suppliers and is measured at the confirmed amount receivable.

Furthermore, other income includes US$536,000 (2014: US$Nil) in respect of a re-measurement gain on contingent consideration payable.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice    131 of 166    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

# Notes to the consolidated financial statements continued
At 31 December 2015

## 10  FINANCE COSTS

| | 2015 US$'000 | 2014 US$'000 |
|---|---|---|
| Bank interest | 18,106 | 12,324 |
| Bank charges | 2,489 | 2,173 |
| Financial instruments fair value adjustments | 1,793 | – |
| Amortisation of option redemption liability | 1,457 | – |
| | 23,845 | 14,497 |

## 11  FINANCE INCOME

| | 2015 US$'000 | 2014 US$'000 |
|---|---|---|
| Bank and other interest income | 925 | 3,623 |
| | 925 | 3,623 |

## 12  PROFIT FOR THE YEAR BEFORE TAX
The profit for the year before tax is stated after charging:

| | 2015 US$'000 | 2014 US$'000 |
|---|---|---|
| Cost of inventories recognised as an expense | 389,702 | 314,408 |
| Cost of inventories written off and provided (Note 20) | 1,678 | 2,318 |
| Minimum lease payments recognised as operating lease expense | 44,859 | 27,728 |
| Depreciation (Note 17) | 29,851 | 14,050 |
| Amortisation (Note 18) | 5,475 | – |
| Net Impairment of accounts receivable (Note 21) | 1,740 | 2,498 |
| Employees' end of service benefits (Note 28) | 4,869 | 3,492 |
| Net foreign exchange (gain)/loss | (593) | 1,490 |
| Loss on disposal of property and equipment | 185 | 224 |
| Share based payments expense (Note 32) | 1,177 | 88 |

## 13  AUDITOR'S REMUNERATION
The Group paid the following amounts to its auditor and its associates in respect of the audit of the financial statements and for other services provided to the Group.

| | 2015 US$'000 | 2014 US$'000 |
|---|---|---|
| Fees payable to the Company's auditor for the audit of the Company's annual accounts | 1,300 | 593 |
| Fees payable to the Company's auditor and its associates for other services: | | |
| – the audit of the company's subsidiaries pursuant to legislation | 453 | 149 |
| – audit related assurance services | 233 | 130 |
| – other assurance services | – | – |
| – Tax compliances services | 12 | 12 |
| – Tax advisory services | – | 8 |
| – non-audit services | 115 | 41 |
| | 2,113 | 933 |

Included in the fees payable to the Company's auditor for the audit of the Company's annual accounts is US$12,000 (2014: US$NIL) which was under-accrued in respect of the prior year audit of the Company's annual accounts.

The fees paid to the auditor includes US$115,000 (2014: US$92,000) in respect of out of pocket expenses. There were no benefits in kind provided to the auditor or its associates in either 2015 or 2014.

## 14 STAFF COSTS AND DIRECTORS' EMOLUMENTS
### (A) STAFF COSTS

| | 2015 US$'000 | 2014 US$'000 |
|---|---|---|
| Wages and salaries | 217,439 | 144,942 |
| Employees' end of service benefits (Note 28) | 4,869 | 3,492 |
| Share based payments expense (Note 32) | 1,177 | 88 |
| Others | 15,654 | 9,468 |
| | 239,139 | 157,990 |

Staff costs include amounts paid to directors, disclosed in part (b) below. The average number of monthly employees during the year was made up as follows:

| | 2015 | 2014 |
|---|---|---|
| Healthcare | 5,495 | 3,874 |
| Distribution & services | 2,456 | 1,846 |
| Administration | 230 | 174 |
| | 8,181 | 5,894 |

### (B) DIRECTORS' REMUNERATION

| | 2015 US$'000 | 2014 US$'000 |
|---|---|---|
| Directors' remuneration | 4,623 | 2,141 |

Some of the executive directors are entitled to end of service benefits and to participate in share option plans as disclosed in Note 32. Further information in respect of this compensation paid to directors is disclosed in the Directors' Remuneration Report.

## 15 TAX

The Group operates in the United Arab Emirates and Spain. As there is no corporation tax in the United Arab Emirates, no taxes are recognised or payable on the operations in the UAE. There is no taxable income in the UK and accordingly there is no tax liability arising in the UK. The unused tax losses amount to US$13,049,000 as at 31 December 2015 (2014: US$5,155,000).

With respect to operations in Spain, the tax disclosures are as follows:

| Consolidated income statement | 2015 US$ '000 | 2014 US$ '000 |
|---|---|---|
| **Current income tax:** | | |
| Charge for the year | 753 | – |
| Adjustment in respect of prior period income tax | (163) | – |
| | 590 | |
| **Deferred tax:** | | |
| Credit relating to origination and reversal of temporary differences in the current year | (993) | – |
| **Income tax credit reported in the income statement** | (403) | – |

No tax is included in other comprehensive income (2014: NIL).

The rate of corporation tax in Spain is 28%. Given that there is no tax payable in respect of operations in the UAE and no UK corporation tax payable, the Group has used the Spanish tax rate for the purpose of the preparation of the tax reconciliation presented below as all the taxable profits have been generated by Luarmia S.L. group of companies.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice    133 of 166    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

# Notes to the consolidated financial statements continued
## At 31 December 2015

### 15 TAX continued

Reconciliation of tax expense and the accounting profit multiplied by the Spanish domestic tax rate of 28% for 2015 is represented below:

| | 2015 US$'000 | 2014 US$'000 |
|---|---|---|
| Group accounting profit before tax from continuing operations for the year | 85,357 | |
| Less: Accounting profit before tax from continuing operations (not subject to tax) | 78,558 | – |
| Accounting profit before tax from continuing operations (subject to tax) | 6,799 | – |
| Tax at Spanish income tax rate of 28% | 1,904 | – |
| Non-taxable dividend income | (1,032) | – |
| Tax saved on amortisation of intangibles | (480) | – |
| Adjustment in respect of prior period income tax | (163) | – |
| Deductible expenses for tax purpose: | | |
| R&D and IT | (609) | – |
| Accelerated depreciation | (39) | – |
| Other non-deductible expenses | 16 | – |
| Income tax credit reported in the income statement | (403) | – |

The effective tax rate of the Group is -0.47% (2014:0.00%).

Deferred tax assets and liabilities comprise of:
Deferred tax assets:

| | 2015 US$ '000 | 2014 US$ '000 |
|---|---|---|
| Tax credit for R&D expenses | 1,235 | – |
| Limit on tax deductibility of depreciation and amortisation | 81 | – |
| Total deferred tax assets | 1,316 | – |

Deferred tax liabilities:

| | 2015 US$ '000 | 2014 US$ '000 |
|---|---|---|
| Depreciation and amortisation | 9,761 | – |
| Total deferred tax liabilities | 9,761 | – |

Reconciliation of deferred tax liabilities, net

| | 2015 US$ '000 | 2014 US$ '000 |
|---|---|---|
| As of 1 January | – | – |
| Tax charge/(credit) for the year | (993) | – |
| Foreign exchange adjustments | (673) | |
| Deferred taxes acquired on business combinations | 10,111 | – |
| As at 31 December | 8,445 | – |

Deferred tax assets are recognised to the extent that it is probable as supported by forecasts that future taxable profits will be available against which the temporary differences can be utilised.

There are no income tax consequences attached to the payment of dividends in either 2015 or 2014 by the Group to its shareholders.

**16  EARNINGS PER SHARE (EPS)**

Basic EPS amounts are calculated by dividing net profit for the year attributable to ordinary equity holders of the Parent Company by the weighted average number of ordinary shares outstanding during the year.

Diluted EPS amounts are calculated by dividing the profit attributable to ordinary equity holders of the parent by the weighted average number of ordinary shares outstanding during the year plus the weighted average number of ordinary shares that would be issued on conversion of all the dilutive potential ordinary shares into ordinary shares.

The following reflects the income and share data used in the basic and diluted earnings per share computations:

|  | 2015 | 2014 |
|---|---|---|
| Profit attributable to equity holders of the Parent (US$'000) | 82,215 | 76,566 |
| Weighted average number of ordinary shares in issue ('000) for basic EPS | 185,714 | 185,714 |
| Effect of dilution from share based payments ('000) | 484 | 56 |
| Weighted average number of ordinary shares ('000) for diluted EPS | 186,198 | 185,770 |
| Basic earnings per share (US$) | 0.443 | 0.412 |
| Diluted earnings per share (US$) | 0.442 | 0.412 |

The table below reflects the income and share data used in the adjusted earnings per share computations. All one off expense and expenses incurred first time i.e. amortisation, have been adjusted from the profit attributable to the equity holders of the parent to arrive at the adjusted earnings per share:

|  | 2015 US$'000 | 2014 US$'000 |
|---|---|---|
| Profit attributable to equity holders of the Parent | 82,215 | 76,566 |
| Unamortised finance fees written off | 2,612 | – |
| Transaction costs in respect of business combination | 4,131 | – |
| Amortisation of acquired intangible assets (net of tax) | 4,995 | – |
| Adjusted profit attributable to equity holders of the Parent | 93,953 | 76,566 |
| Weighted average number of ordinary shares ('000) | 186,198 | 185,770 |
| Diluted adjusted earnings per share (US$) | 0.505 | 0.412 |

Adjusted profit disclosed in the consolidated income statement is calculated as follows:

|  | 2015 US$'000 | 2014 US$'000 |
|---|---|---|
| Profit for the year | 85,760 | 77,534 |
| Unamortised finance fees written off | 2,612 | – |
| Transaction costs in respect of business combination | 4,131 | – |
| Amortisation of acquired intangible assets (net of tax) | 4,995 | – |
| Adjusted profit | 97,498 | 77,534 |

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          135 of 166          Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

Financial Statements

# Notes to the consolidated financial statements continued
## At 31 December 2015

### 17  PROPERTY AND EQUIPMENT
Property and equipment consists of the following:

|  | 2015 US$'000 | 2014 US$'000 |
|---|---|---|
| Property and equipment | 433,524 | 368,357 |
|  | 433,524 | 368,357 |

|  | Freehold land US$'000 | Hospital building US$'000 | Buildings US$'000 | Leasehold improve-ments US$'000 | Motor vehicles US$'000 | Furniture, fixtures fittings and medical equipment US$'000 | Capital work in progress US$'000 | Total US$'000 |
|---|---|---|---|---|---|---|---|---|
| **31 December 2015** | | | | | | | | |
| Cost: | 19,206 | 12,343 | 26,300 | 51,859 | 7,421 | 143,488 | 213,758 | 474,375 |
| Additions | – | – | – | 2,317 | 1,564 | 14,088 | 63,733 | 81,702 |
| Relating to acquisition of subsidiaries | – | – | – | 2,268 | 571 | 7,222 | 3,631 | 13,692 |
| Disposals | – | – | – | – | (234) | (2,231) | (33) | (2,498) |
| Transfer from CWIP | – | – | – | 101,444 | – | 17,893 | (119,337) | – |
| Exchange difference | – | – | – | – | – | (118) | (8) | (126) |
| At 31 December 2015 | 19,206 | 12,343 | 26,300 | 157,888 | 9,322 | 180,342 | 161,744 | 567,145 |
| Depreciation: | | | | | | | | |
| At 1 January 2015 | – | 8,114 | 5,920 | 13,730 | 5,185 | 73,069 | – | 106,018 |
| Charge for the year | – | 310 | 1,419 | 13,054 | 800 | 14,268 | – | 29,851 |
| Exchange difference | – | – | – | – | – | (20) | – | (20) |
| Relating to disposals | – | – | – | – | (206) | (2,022) | – | (2,228) |
| At 31 December 2015 | – | 8,424 | 7,339 | 26,784 | 5,779 | 85,295 | – | 133,621 |
| Net carrying amount: At 31 December 2015 | 19,206 | 3,919 | 18,961 | 131,104 | 3,543 | 95,047 | 161,744 | 433,524 |
| **31 December 2014** | | | | | | | | |
| Cost: | | | | | | | | |
| At 1 January 2014 | 19,206 | 12,343 | 26,300 | 17,388 | 5,887 | 114,074 | 171,389 | 366,587 |
| Additions | – | – | – | 1,064 | 1,576 | 14,967 | 94,686 | 112,293 |
| Disposals | – | – | – | – | (42) | (1,265) | – | (1,307) |
| Transfer from CWIP progress | – | – | – | 33,407 | – | 15,712 | (49,119) | – |
| Transfer to Intangible assets | – | – | – | – | – | – | (3,198) | (3,198) |
| At 31 December 2014 | 19,206 | 12,343 | 26,300 | 51,859 | 7,421 | 143,488 | 213,758 | 474,375 |
| Depreciation: | | | | | | | | |
| At 1 January 2014 | – | 7,804 | 4,501 | 10,279 | 4,868 | 65,343 | – | 92,795 |
| Charge for the year | – | 310 | 1,419 | 3,451 | 359 | 8,511 | – | 14,050 |
| Relating to disposals | – | – | – | – | (42) | (785) | – | (827) |
| At 31 December 2014 | – | 8,114 | 5,920 | 13,730 | 5,185 | 73,069 | – | 106,018 |
| Net carrying amount: At 31 December 2014 | 19,206 | 4,229 | 20,380 | 38,129 | 2,236 | 70,419 | 213,758 | 368,357 |

As part of the Group's capital expenditure programme, borrowing costs of US$1,691,000 (2014: US$4,068,000) have been capitalised during the year. The rate used to determine the amount of borrowing costs eligible for capitalisation was 2.1% (2014: 3.15%) which is the effective rate of the borrowings used to finance the capital expenditure. Companies in the UAE are not subject to taxation and as such there is no tax relief in respect of capitalised interest.

Total capital expenditure during the year ended 31 December 2015 was US$81,702,000 (2014: US$112,293,000). Of the total capital expenditure spend during the year, US$63,733,000 (2014: US$94,686,000) related to new capital projects and US$ 17,969,000 (2014: US$17,607,000) related to further capital investment in our existing facilities.

Generally hospital and distribution operations are carried out on land and buildings which are leased from Government authorities or certain private parties. The majority of the lease periods range from five to twenty seven years apart from New Medical Centre Hospital LLC-Dubai ("Dubai General Hospital"), and the warehouse facilities which have leases renewable on an annual basis (Note 2.3). As at 31 December 2015 US$778,000 (2014: US$1,015,000) of the amounts included in property and equipment related to assets with annually renewable leases.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice        136 of 166        Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

**17  PROPERTY AND EQUIPMENT** continued

In accordance with the local laws, except in some specific locations in the UAE the registered title of land and buildings must be held in the name of a UAE national. As a result, land and buildings of the Group are legally registered in the name of shareholders or previous shareholders of the Group. Certain land and buildings with a carrying amount of US$4,144,000 (31 December 2014: US$9,321,000) are held in the name of a previous shareholder for the beneficial interest of the Group. As the beneficial interest of such land and buildings resides with the Group, these assets are recorded within land and buildings in the Group's consolidated financial statements. The directors take into account this local legal registration requirement, the Group's entitlement to the beneficial interest arising from these assets, as well as other general business factors, when considering whether such assets are impaired.

**18  INTANGIBLE ASSETS**

| | Software US$'000 | Brands US$'000 | Patient relationship and Database US$'000 | Goodwill US$'000 | Others US$'000 | Total US$'000 |
|---|---|---|---|---|---|---|
| **31 December 2015** | | | | | | |
| Cost: | | | | | | |
| At 1 January 2015 | 3,220 | – | – | 1,016 | – | 4,236 |
| Additions | 548 | – | – | – | 13 | 561 |
| Relating to acquisition of subsidiaries | 3,217 | 40,914 | 20,098 | 345,072 | 10,584 | 419,885 |
| Exchange difference | (144) | (785) | (460) | (4,668) | (122) | (6,179) |
| At 31 December 2015 | 6,841 | 40,129 | 19,638 | 341,420 | 10,475 | 418,503 |
| Amortisation: | | | | | | |
| At 1 January 2015 | – | – | – | – | – | – |
| Charge for the year | 1,099 | 1,588 | 1,270 | – | 1,518 | 5,475 |
| Exchange difference | (21) | – | – | – | (10) | (31) |
| At 31 December 2015 | 1,078 | 1,588 | 1,270 | – | 1,508 | 5,444 |
| Net carrying amount: At 31 December 2015 | 5,763 | 38,541 | 18,368 | 341,420 | 8,967 | 413,059 |
| **31 December 2014** | | | | | | |
| Cost: | | | | | | |
| At 1 January 2014 | – | – | – | 1,016 | – | 1,016 |
| Additions | 22 | – | – | – | – | 22 |
| Transfer from Intangible | 3,198 | – | – | – | – | 3,198 |
| At 31 December 2014 | 3,220 | – | – | 1,016 | – | 4,236 |
| Amortisation: | | | | | | |
| At 1 January 2014 | – | – | – | – | – | – |
| Charge for the year | – | – | – | – | – | – |
| At 31 December 2014 | – | – | – | – | – | – |
| Net carrying amount: At 31 December 2014 | 3,220 | – | – | 1,016 | – | 4,236 |

Others include intellectual property, rental contracts, private contracts and non-compete arrangements.

**GOODWILL**

Additions to goodwill in the year relate to goodwill measured in respect of the acquisitions of Luarmia SL, CIRH, Biogenesi, ProVita, Dr Sunny Healthcare, Americare and Trans Arabia Drug Store LLC.

Goodwill is not amortised, but is reviewed annually for assessment of impairment in accordance with IAS 36. The Group performed its annual goodwill impairment test in December 2015 and 2014. Goodwill acquired through business combinations is allocated to the following operating segments representing a group of cash generating units (CGUs), which are also operating and reportable segments, for impairment testing:

- Healthcare
- Distribution and services

The healthcare CGU has goodwill allocated to it of US$336,541,000 at the year-end (2014: US$1,016,000). The distribution and services CGU has goodwill allocated to it of US$4,879,000 at the year-end (2014: US$ nil).

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          137 of 166          Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

Financial Statements

# Notes to the consolidated financial statements continued
## At 31 December 2015

**18 INTANGIBLE ASSETS** continued

The recoverable amounts for both CGUs are based on value in use, which has been calculated using cash flow projections from financial budgets approved by senior management covering a five year period. Cash flows beyond the five year period are extrapolated using a 3.0% growth rate (2014: 3.0%) which is significantly lower than the current annual growth rate of both CGUs. The pre-tax discount rate applied to the cash flows of both CGUs is 7.7% (2014:8%), which is based on the Group's weighted average cost of capital (WACC) and takes into account such measures as risk free rates of return, the Group's debt/equity ratio, cost of debt and local risk premiums specific to the CGUs. As a result of the analysis, there is headroom in both CGUs and no impairment has been identified. Reasonable sensitivities have been applied to each CGU's cash flows and the discount rates used, and in all cases the value in use continues to exceed the carrying amount of CGU goodwill.

The key assumptions on which management has based its cash flow projections for the five period covered by the most recent forecasts are those related to growth in available beds, patient numbers for the healthcare segment and revenue from the distribution of products for the distribution and services segment. The assumptions made reflect past experience and are based on management's best estimate and judgment.

**OTHER ACQUIRED INTANGIBLE ASSETS**

Assets in this class are amortised over their estimated useful lives on a straight line basis. All amortisation charges for the year have been charged against operating profits.

Other than goodwill, the Group does not hold any intangible assets with an indefinite life.

Included in software are HIS and ERP projects amounting to US$ 2,995,000 (2014: US$3,220,000) which are work-in-progress as of year-end. Management is currently in the process of estimating the useful economic life of the HIS and ERP projects. Amortization of the software will commence once it is implemented and goes live.

**19  LOAN RECEIVABLE**

|  | 2015 US$'000 | 2014 US$'000 |
|---|---|---|
| Loan receivable | 4,395 | – |
|  | 4,395 | – |
| Classification of loan receivable into current and non-current is as follows: | | |
| Current | 2,670 | – |
| Non-current | 1,725 | – |
|  | 4,395 | – |

During the year ended 31 December 2015, the Group entered into a loan arrangement, with a third party (Borrower), to finance certain payables in connection with a hospital facility, for an aggregate amount not to exceeding US$8,595,000. The loan will be repaid over a term of three years, US$2,670,000 each for the first two years and the balance outstanding amount in the third year. The Group believes that the amount is fully recoverable.

The loan is interest-free, however, any unpaid loan receivable as of due date shall bear commission at the rate of 15% per annum.

**20 INVENTORIES**

|  | 2015 US$'000 | 2014 US$'000 |
|---|---|---|
| Pharmaceuticals and cosmetics | 65,166 | 58,444 |
| Scientific equipment | 14,093 | 11,295 |
| Consumer products | 40,766 | 32,719 |
| Food | 9,118 | 6,041 |
| Egg bank | 2,622 | – |
| Consumables | 783 | 211 |
| Opticals | 315 | 333 |
| Goods in transit | 2,087 | 1,750 |
| Other | 1,226 | 804 |
|  | 136,176 | 111,597 |
| Less: provision for slow moving and obsolete inventories | (1,388) | (1,388) |
|  | 134,788 | 110,209 |

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          138 of 166          Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

**18 INTANGIBLE ASSETS** continued

The amount of write down of inventories recognised as an expense for the year ended 31 December 2015 is US$1,678,000 (2014: US$1,646,000). This is recognised in direct costs.

Charge for the year in respect of provision provided for slow moving and obsolete inventories is US$NIL (2014: US$672,000).

Trust receipts issued by banks amounting to US$21,370,000 (2014: US$25,059,000) are secured against the inventories.

**21 ACCOUNTS RECEIVABLE AND PREPAYMENTS**

|  | 2015 US$'000 | 2014 US$'000 |
|---|---|---|
| Accounts receivable | 242,016 | 168,207 |
| Receivable from suppliers for promotional expenses | 10,690 | 9,349 |
| Other receivables | 12,225 | 6,262 |
| Prepayments | 17,544 | 12,751 |
|  | 282,475 | 196,569 |

Receivables from suppliers relate to advertising and promotional expenses incurred by the Group. Accounts receivable are stated net of provision for doubtful debts of US$13,022,000 (2014: US$8,996,000). Movements in the provision for doubtful debts are as follows:

|  | 2015 US$'000 | 2014 US$'000 |
|---|---|---|
| At 1 January | 8,996 | 8,241 |
| Written off | (1,595) | (1,743) |
| Written back (Note 12) | (1,295) | (471) |
| Charge for the year (Note 12) | 3,035 | 2,969 |
| Addition from business combinations | 3,888 | – |
| Exchange difference | (7) | – |
| At 31 December | 13,022 | 8,996 |

The ageing of unimpaired accounts receivable is as follows:

|  | Total US$'000 | Neither past due nor impaired US$'000 | ‹ 90 days US$'000 | 91-180 days US$'000 | 181-365 days US$'000 | ›365 days US$'000 |
|---|---|---|---|---|---|---|
| **31 December 2015** |  |  |  |  |  |  |
| Accounts receivable | 242,016 | 168,747 | 49,460 | 12,466 | 7,016 | 4,327 |
| 31 December 2014 |  |  |  |  |  |  |
| Accounts receivable | 168,207 | 115,379 | 37,884 | 9,985 | 3,777 | 1,182 |

Unimpaired receivables are expected, on the basis of past experience, to be fully recoverable. It is not the practice of Group to obtain collateral over receivables and they are therefore unsecured. As at 31 December 2015 accounts receivables of US$13,022,000 (2014: US$8,996,000) were impaired and fully provided for.

Credit risk is managed through the Group's established policy, procedures and controls relating to credit risk management (Note 33). A majority of the receivables that are past due but not impaired are from insurance companies and government-linked entities in the United Arab Emirates which are inherently slow payers due to their long invoice verification and approval of payment procedures. Payments continue to be received from these customers and accordingly the risk of non-recoverability is considered to be low.

Of the net trade receivables balance of US$242,016,000 (2014: US$168,207,000) amount of US$108,936,000 is against five customers (2014: US$73,069,000 is against five customers).

The Group's terms require receivables to be repaid within 90-120 days depending on the type of customer, which is in line with local practice in the UAE. Due to the long credit period offered to customers, a significant amount of trade accounts receivable are neither past due nor impaired.

Amounts due from related parties amounting to US$4,116,000 (31 December 2014: US$7,985,000) as disclosed on the face of the consolidated statement of financial position are trading in nature and arise in the normal course of business.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice        139 of 166        Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

Financial Statements

# Notes to the consolidated financial statements continued
## At 31 December 2015

### 22 CASH AND CASH EQUIVALENTS

Cash and cash equivalents included in the consolidated statement of cash flows comprise of the following:

|  | 2015 US$'000 | 2014 US$'000 |
|---|---|---|
| Bank deposits | 58,886 | 183,577 |
| Bank balances and cash | 118,511 | 79,592 |
| Bank overdrafts and other short term borrowings | (154,962) | (169,607) |
|  | 22,435 | 93,562 |
| Adjustments for: |  |  |
| Short term borrowings | 129,095 | 143,875 |
| Bank deposits maturing in over 3 months | (55,094) | (82,209) |
| Restricted cash | (12,412) | (18,909) |
| Cash and cash equivalents | 84,024 | 136,319 |

Bank deposits of US$58,886,000 (2014: US$183,577,000) are with commercial banks in the United Arab Emirates and Spain. These are mainly denominated in the UAE Dirhams and Euro and earn interest at the respective deposit rates. These deposits have original maturity between 3 to 12 months (2014: 3 to 12 months).

Short term borrowings include trust receipts and invoice discounting facilities which mature between 90 and 180 days. Trust receipts are short term borrowings to finance imports. The bank overdrafts and short term borrowings are secured by assets of the Group up to the amount of the respective borrowings and personal guarantees of the shareholders (H.E. Saeed Bin Butti, Dr B.R. Shetty and Mr Khalifa Bin Butti) and carry interest at EIBOR plus margin rates ranging from 1% to 4% (2014: 1% to 4%) per annum.

At 31 December 2015, the Group had US$42,356,000 (2014: US$19,474,000) of undrawn bank overdraft facilities, which are renewable annually.

Restricted cash mainly represents funds held by a bank in respect of upcoming loan repayment instalments.

### 23 SHARE CAPITAL

As at 31 December 2015 and 31 December 2014:

|  | Number of shares (thousands) | Ordinary shares US$'000 | Share premium US$'000 | Total US$'000 |
|---|---|---|---|---|
| **Issued and fully paid** |  |  |  |  |
| *(nominal value 10 pence sterling each)* | 185,714 | 29,566 | 179,152 | 208,718 |

### 24 GROUP RESTRUCTURING RESERVE

The group restructuring reserve arises on consolidation under the pooling of interests method used for group restructuring, which took place on 28 March 2012 when the Company became the holding company of NMC Healthcare LLC through its wholly owned subsidiaries, NMC Holding LLC and NMC Health Holdco Limited. Under this method, the group is treated as a continuation of the NMC Healthcare LLC group. The difference between the share capital of NMC Healthcare LLC (US$27,226,000) and the carrying amount of the investment in that company (US$37,227,000), which equates to the net assets of NMC Healthcare LLC at the date of reorganisation (28 March 2012), amounting to US$10,001,000(debit), is recorded on consolidation as a group restructuring reserve. This reserve is non-distributable.

### 25 RETAINED EARNINGS

As at 31 December 2015, retained earnings of US$17,590,000 (2014: US$16,101,000) are not distributable. This relates to a UAE Companies Law requirement to set aside 10% of annual profit of all UAE subsidiaries until their respective reserves equal 50% of their paid up share capital. The subsidiaries discontinue such annual transfers once this requirement has been met.

**26   DIVIDEND**

In the AGM on 16 June 2015 the shareholders approved a dividend of 5.4 pence per share, amounting to GBP10,028,600 (US$15,866,000) to be paid to shareholders on the Company's share register on 29 May 2015. The dividend amount was paid to the shareholders on 25 June 2015 (2014: a dividend of GBP8,212,700 equivalent to US$13,846,000 was approved on 26 June 2014 and paid on 4 July 2014). No interim dividend was declared during the year. Subject to shareholders' approval at the Annual General Meeting on 3 June 2016, a final dividend of 6.2 pence per share, GBP11,580,000 (US$16,443,000) will be paid to shareholders on the Company's share register on 20 May 2016.

**27 TERM LOANS**

|  | 2015 US$'000 | 2014 US$'000 |
|---|---|---|
| Current portion | 91,621 | 92,055 |
| Non-current portion | 483,725 | 114,457 |
|  | 575,346 | 206,512 |
| Amounts are repayable as follows: |  |  |
| Within 1 year | 91,621 | 92,055 |
| Between 1 – 2 years | 98,355 | 49,129 |
| Between 2 – 5 years | 385,370 | 65,328 |
|  | 575,346 | 206,512 |

During the year ended 31 December 2015, the Group agreed a new syndicated loan facility, of US$825,000,000 (US$350,000,000 of term debt and US$475,000,000 of delayed drawdown acquisition facility). The loan facility is repayable over 60 monthly instalments with a grace period of twelve months. The applicable interest rate is dependent upon the respective leverages. Based upon the leverage at the time of initial drawdown, the initial margin was 100bps/70bps over 1 month LIBOR/EIBOR per annum.

The new syndicated loan facility has been utilised to repay some of the existing debts including the previous syndication loan obtained in FY2013 and will also be utilised for capital expenditures and acquisitions. The Group has utilised an amount of US$350,000,000 against the new syndicated loan facility as well as US$163,679,000 of the delayed drawdown acquisition finance as of 31 December 2015.

This new syndicated loan is guaranteed by corporate guarantees provided by NMC Health plc and operating subsidiaries of the Group. The new syndicated loan is secured against a collateral package which includes an assignment of some insurance company receivables and their proceeds by the Group and a pledge over certain bank accounts within the Group.

In addition to the new syndicate loan facility, term loans also include other short term revolving loans which get drawn–down and repaid over the year.

During the year ended 31 December 2015, the Group drew down term loan of US$822,698,000 (Year ended 31 December 2014: US$263,594,000) and repaid term loans of US$472,796,000 (Year ended 31 December 2014: US$307,282,000).

Total transaction fees in respect of the new loan amounts to US$10,789,000.

The Group has charged an amount of US$2,612,000 to the consolidated income statement with respect to unamortised transaction costs of existing debts which have been settled using the proceeds of new syndicated loan.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice    141 of 166    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

# Notes to the consolidated financial statements continued
## At 31 December 2015

**28 EMPLOYEES' END OF SERVICE BENEFITS**

Movements in the provision recognised in the consolidated statement of financial position are as follows:

| | 2015 US$'000 | 2014 US$'000 |
|---|---|---|
| Balance at 1 January | 14,934 | 12,099 |
| Charge for the year | 4,869 | 3,492 |
| Actuarial gain | (260) | – |
| Employees' end of service benefits paid | (1,133) | (657) |
| Addition from business combinations | 4,080 | – |
| Balance at 31 December | 22,490 | 14,934 |
| Current | 3,206 | 2,484 |
| Non–current | 19,284 | 12,450 |
| Balance at 31 December | 22,490 | 14,934 |
| Charge for the year comprise of the following: | | |
| Current service cost | 4,234 | 2,991 |
| Interest cost | 635 | 501 |
| Balance at 31 December | 4,869 | 3,492 |

In accordance with the provisions of IAS 19 – 'Employee Benefits', management has carried out an exercise to assess the present value of its obligation at 31 December 2015 and 2014, using the projected unit credit method, in respect of employees' end of service benefits payable under the UAE Labour Law.

During the current year, the Group has recognised an actuarial gain of US$260,000 in other comprehensive income. Management has assumed an average length of service of 5 years (2014: 5 years) and increment/promotion costs of 2.25% (2014: 3.0%). The expected liability at the date of employees' leaving service has been discounted to its net present value using a discount rate of 3.25% (2014: 4.0%). Management also performed a sensitivity analysis for changes in discount rate and increment costs; the results of this analysis showed that none of the factors had any material impact on the actuarial valuation.

**29 ACCOUNTS PAYABLE AND ACCRUALS**

| | 2015 US$'000 | 2014 US$'000 |
|---|---|---|
| Trade accounts payable | 87,029 | 77,906 |
| Accrued interest | 1,014 | 1,532 |
| Accrued expenses | 7,536 | 2,428 |
| Others | 27,932 | 16,178 |
| | 123,511 | 98,044 |

Trade and other payables are non-interest bearing and are normally settled on 50-60 day terms.

**30 OTHER PAYABLES**

| | 2015 US$'000 | 2014 US$'000 |
|---|---|---|
| Contingent consideration payable for acquisitions (Note 36) | 25,016 | – |
| Other payable | 158 | 21 |
| | 25,174 | 21 |
| Classification of other payables into current and non-current is as follows: | | |
| Current | 11,150 | – |
| Non-current | 14,024 | 21 |
| | 25,174 | 21 |

Exhibit 4 to B.R. Shetty's Request for Judicial Notice    142 of 166    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

## 31  RELATED PARTY TRANSACTIONS

These represent transactions with related parties, including major shareholders and senior management of the Group, and entities controlled, jointly controlled or significantly influenced by such parties, or where such parties are members of the key management personnel of the entities. Pricing policies and terms of all transactions are approved by the management of the Group.

The Company's immediate and ultimate controlling party is a group of three individuals (H.E. Saeed Bin Butti, Dr B.R. Shetty and Mr Khalifa Bin Butti) who are all shareholders and of whom one is a director of the Company and who together have the ability to control the company. As the immediate and ultimate controlling party is a group of individuals, it does not produce consolidated financial statements.

### RELATIONSHIP AGREEMENT

The Controlling Shareholders and the Company have entered into a relationship agreement, the principal purpose of which is to ensure that the Company is capable of carrying out its business independently of the Controlling Shareholders and that transactions and relationships with the Controlling Shareholders are at arm's length and on a normal commercial basis.

In accordance with the terms of the relationship agreement, the Controlling Shareholders have a collective right to appoint a number of Directors to the Board depending upon the level of their respective shareholdings. This entitlement reduces or is removed as the collective shareholdings reduce. The relationship agreement includes provisions to ensure that the Board remains independent.

Transactions with related parties included in the consolidated income statement are as follows:

|  | 2015 US$'000 | 2014 US$'000 |
|---|---|---|
| Entities significantly influenced by a shareholder who is a key management personnel in NMC |  |  |
| Sales | 699 | 9,775 |
| Purchases | 54,252 | 32,336 |
| Rent charged | 440 | 422 |
| Other income | 1,195 | 970 |
| Entities where a shareholder of NMC is a key member of management personnel of such entity |  |  |
| Management fees received from such entity by NMC | 6,003 | 5,717 |
| Sales | 438 | 2,015 |

Amounts due from and due to related parties disclosed in the consolidated statement of financial position are as follows:

|  | 2015 US$'000 | 2014 US$'000 |
|---|---|---|
| Entities significantly influenced by a shareholder who is a key management personnel in NMC |  |  |
| Amounts due from related parties | 328 | 3,603 |
| Amounts due to related parties | 17,419 | 8,380 |
| Entities where a shareholder of NMC is a key member of management personnel of the entity management personnel of such entity |  |  |
| Amounts due from related parties | 3,788 | 4,382 |

Outstanding balances with related parties at 31 December 2015 and 31 December 2014 were unsecured, payable on 50-60 days term and carried interest at 0% (31 December 2014: 0%) per annum. Settlement occurs in cash. As at 31 December 2015 US$1,778,000 of the amounts due from related parties were past due but not impaired (31 December 2014: US$1,998,000).

The Group has incurred expenses and recharged back an amount of US$1,854,000 (31 December 2014: US$3,018,000) made on behalf of a related party where a shareholder who has significant influence over the Group is a key management personnel of that entity.

Out of total term loans outstanding as of 31 December 2015, term loans of US$28,372,000 (2014: US$35,325,000) are secured by joint and several personal guarantees of the Shareholders (HE Saeed Bin Butti, Dr B.R. Shetty and Mr Khalifa Bin Butti).

Pharmacy licenses in UAE under which the Group sells its products, are granted to the shareholders or directors of the Company, who are UAE nationals. No payments are made in respect of these licenses to shareholders or directors.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          143 of 166          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

# Notes to the consolidated financial statements continued
At 31 December 2015

**31 RELATED PARTY TRANSACTIONS** continued
**COMPENSATION OF KEY MANAGEMENT PERSONNEL**

| | 2015 US$'000 | 2014 US$'000 |
|---|---|---|
| Short term benefits | 6,469 | 3,074 |
| Employees' end of service benefits | 16 | 20 |
| | 6,485 | 3,094 |

The key management personnel include all the Non-Executive Directors, the two (31 December 2014: three) Executive Directors and four (31 December 2014: three) senior management personnel.

During the year additional shares of 345,649 were granted to Executive Directors and other senior management in the form of share options.

One individual (31 December 2014: two) who is a related party of one of the shareholders is employed by the Group. The total compensation for employment received by that related party in the year ended 31 December 2015 amounts to US$786,000 (2014: US$572,000 for two individuals).

**32 SHARE BASED PAYMENTS**
The Group currently operates two share option schemes:

**LONG TERM INCENTIVE PLAN (LTIP)**
Options awarded under the LTIP are made annually to Executive Directors and other senior management. The exercise prices are nil. Options have a life of ten years and a vesting period of three years. The LTIP is subject to performance conditions which can be found in the Directors' Remuneration Report on pages 65 to 83.

**SHORT TERM INCENTIVE PLAN (STIP)**
Options awarded under the STIP are made annually to Executive Directors and other senior management. The exercise prices are nil. Options have a life of ten years and a vesting period of three years.

Fair values are determined using the Black-Scholes model. Expected volatility has been based on historical volatility over the period since the Company's shares have been publicly traded.

Administrative expenses include a charge of US$1,177,000 (2014: US$88,000) in respect of the cost of providing share options. The cost is calculated by estimating the fair value of the option at grant date and spreading that amount over the vesting period after adjusting for an expectation of non-vesting.

For options granted in the years ended 31 December 2014 and 2015, the fair value per option granted and the assumptions used in the calculation are as follows:

| | 2015 STIP | 2014 STIP |
|---|---|---|
| Share price at grant date | £5.200 | £4.570 |
| Fair value at measurement date | £5.060 | £4.403 |
| Exercise price | £nil | £nil |
| Expected volatility | 40% | 35% |
| Expected option life | 3 years | 3 years |
| Expected dividend yield | 0.91% | 1.23% |
| Risk free interest rate | 0.98% | 0.98% |

| | 2015 LTIP 1 | 2015 LTIP 2 | 2014 LTIP |
|---|---|---|---|
| Share price at grant date | £5.200 | £7.650 | £4.949 |
| Fair value at measurement date | £5.060 | £7.377 | £4.769 |
| Exercise price | £nil | £nil | £nil |
| Expected volatility | 40% | 40% | 35% |
| Expected option life | 3 years | 3 years | 3 years |
| Expected dividend yield | 0.91% | 1.21% | 1.23% |
| Risk free interest rate | 0.98% | 1.05% | 0.98% |

LTIP 1 and LTIP 2 represent long term incentive plans issued in February and September 2015 respectively.

**32 SHARE BASED PAYMENTS** continued
**SHORT TERM INCENTIVE PLAN (STIP)** continued
The options existing at the year-end were as follows:

| | Number of shares | 2015 Exercise price | Period when exercisable | 2014 Number of shares |
|---|---|---|---|---|
| Long term incentive plan (LTIP) | | | | |
| October 2014 | 160,778 | £nil | 29/10/17 to 28/10/24 | 160,778 |
| Short term incentive plan (STIP) | | | | |
| October 2014 | 55,527 | £nil | 29/10/17 to 28/10/24 | 55,527 |
| Long term incentive plan (LTIP) | | | | |
| February 2015 | 221,539 | £nil | 25/02/18 to 24/02/25 | – |
| Short term incentive plan (STIP) | | | | |
| February 2015 | 74,801 | £nil | 25/02/18 to 24/02/25 | – |
| Long term incentive plan (LTIP) | | | | |
| September 2015 | 49,309 | £nil | 09/09/18 to 08/09/25 | – |
| Total options subsisting on existing ordinary shares | 561,954 | | | 216,305 |
| Percentage of issued share capital | 0.3% | | | 0.1% |

Movement of share options during the year is as follows:

| | 2015 | 2014 |
|---|---|---|
| At 1 January | 216,305 | – |
| Granted during the year | 345,649 | 216,305 |
| Outstanding at 31 December | 561,954 | 216,305 |

No options expired, were exercised or forfeited during the year (2014: nil).

**33 FINANCIAL RISK MANAGEMENT OBJECTIVES AND POLICIES**
The Group's principal financial liabilities comprise loans and borrowings, contingent consideration on acquisition of subsidiaries, put option redemption liability and trade and other payables. In addition to these financial liabilities the Group has forward exchange contract as of 31 December 2015. The main purpose of these financial liabilities is to finance the Group's operations. The Group has accounts and other receivables, and cash and short-term deposits that arise directly from its operations.

The Group is exposed to interest rate risk, credit risk, liquidity risk and foreign currency risk. These risks and the Group's financial risk management objectives and policies are consistent with last year except for foreign currency risk which has increased due to the acquisition of subsidiaries in Spain, Italy and Columbia. The Group's exposure to foreign currency risk now includes risk on the Group's net investment in foreign subsidiaries in Spain, Italy and Columbia.

The Group's senior management oversees the management of these risks. The Board of Directors reviews and agrees policies for managing each of these risks which are summarised below.

**INTEREST RATE RISK**
Interest rate risk is the risk that the fair value or future cash flows of a financial instrument will fluctuate because of changes in market interest rates. The Group is exposed to interest rate risk on its interest bearing assets and liabilities (bank deposits, bank overdrafts and other short term borrowings and term loans). Management is of the opinion that the Group's exposure to interest rate risk is limited.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice     145 of 166     Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

Financial Statements

# Notes to the consolidated financial statements continued
## At 31 December 2015

**33 FINANCIAL RISK MANAGEMENT OBJECTIVES AND POLICIES** continued
**INTEREST RATE RISK** continued

The following table demonstrates the sensitivity of the consolidated income statement to reasonably possible changes in interest rates, with all other variables held constant. The sensitivity of the consolidated income statement is the effect of the assumed changes in interest rates on the Group's profit for the year based on the floating rate financial assets and financial liabilities as of the respective year end.

| Increase/(decrease) in basis points | Effect on profit at 31 December 2015 US$'000 | Effect on profit at 31 December 2014 US$'000 |
|---|---|---|
| 100 | (6,714) | (1,925) |
| (100) | 6,714 | 1,925 |

**CREDIT RISK**

Credit risk is the risk that counterparty will not meet its obligations under a financial instrument or customer contract, leading to a financial loss. The Group limits its credit risk with respect to customers due to the nature of the customers that it has dealings with. Within the Healthcare business in the UAE, the majority of the Group's customers are insurance companies. The largest insurance company in UAE is fully backed by Sovereign wealth funding from Abu Dhabi. All other insurance companies in the UAE are required to be listed on a stock exchange and therefore are governed by the regulations of their respective markets. The Group limits its credit risk with respect to healthcare customers in markets other than UAE by requesting certain percentage of advance payments from customers and obtaining final payments before completion of treatment. Within the distribution business the Group deals primarily with large reputable multinational retail companies. The Group further seeks to limit its credit risk by setting credit limits for individual customers and monitoring outstanding receivables.

The Group limits its credit risk with regard to bank deposits by only dealing with reputable banks. The external credit ratings for the banks at which the bank deposits and cash at bank are held are as follows:

| | 2015 US$'000 | 2014 US$'000 |
|---|---|---|
| B2 | – | 229 |
| AA-/A-1/Aa3 | 18,038 | 812 |
| A+/A1 | 722 | 4,345 |
| A/A2 | 19,426 | 267 |
| A+/A-1 | 419 | – |
| A3/A- | 4,352 | 599 |
| AA+ | 4 | – |
| B1 | 1,145 | – |
| BB | 2,496 | – |
| BB+ | 812 | – |
| Baa2 | – | 16,224 |
| Baa3 | 109,728 | 208,694 |
| BBB | 2,609 | – |
| BBB- | 7,941 | 30,229 |
| BBB+/Baa1/Baa1/P-2 | 5,769 | 280 |
| Without external credit rating | 2,895 | 1,149 |
| Total bank deposit and cash at bank | 176,356 | 262,828 |

With respect to credit risk arising from cash and cash equivalents, the Group's exposure to credit risk arises from default of the counterparty, with a maximum exposure equal to the carrying amount of these instruments.

**LIQUIDITY RISK**

The Group's objective is to maintain a balance between continuity of funding and flexibility through the use of banking facilities. The Group limits its liquidity risk by raising funds from its operations and ensuring bank facilities are available. Trade payables are normally settled within 50-60 days of the date of purchase.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          146 of 166          Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

**33 FINANCIAL RISK MANAGEMENT OBJECTIVES AND POLICIES** continued
**LIQUIDITY RISK** continued

The table below summarises the maturities of the Group's undiscounted financial liabilities, based on contractual payment dates and current market interest rates.

| | On demand US$'000 | Less than 3 months US$'000 | 3 to 12 months US$'000 | 1 to 5 years US$'000 | Total US$'000 |
|---|---|---|---|---|---|
| **At 31 December 2015** | | | | | |
| Trade accounts payable | – | 87,029 | – | – | 87,029 |
| Amounts due to related parties | – | 17,419 | – | – | 17,419 |
| Other payables | – | 32,932 | 4,194 | 18,321 | 55,447 |
| Option redemption payable | – | – | – | 30,163 | 30,163 |
| Terms loans | – | 46,612 | 54,889 | 506,722 | 608,223 |
| Bank overdrafts and other short term borrowings | 26,325 | 58,350 | 74,189 | – | 158,864 |
| Financial guarantees | 9,069 | – | – | – | 9,069 |
| **Total** | 35,394 | 242,342 | 133,272 | 555,206 | 966,214 |

| | On demand US$'000 | Less than 3 months US$'000 | 3 to 12 months US$'000 | 1 to 5 years US$'000 | Total US$'000 |
|---|---|---|---|---|---|
| **At 31 December 2014** | | | | | |
| Trade accounts payable | – | 77,906 | – | – | 77,906 |
| Amounts due to related parties | – | 8,380 | – | – | 8,380 |
| Other payables | – | 16,178 | – | 21 | 16,199 |
| Terms loans | – | 21,847 | 78,342 | 121,135 | 221,324 |
| Bank overdrafts and other short term borrowings | 26,180 | 60,136 | 87,982 | – | 174,298 |
| Financial guarantees | 8,311 | – | – | – | 8,311 |
| **Total** | 34,491 | 184,447 | 166,324 | 121,156 | 506,418 |

The Group also has future capital commitments for the completion of ongoing capital projects of US$30,230,000 (2014: US$25,012,000) (Note 31). These are to be financed from the fixed deposits held by the Group.

**FOREIGN CURRENCY RISK**
Foreign currency risk is the risk that the fair value or future cash flows of a financial instrument will fluctuate because of changes in foreign exchange rates. Foreign currency risk comprises of transaction risk, statement of financial position risk and the Group's net investment in foreign subsidiaries. Transaction risk relates to the Group's cash flow being adversely affected by a change in the exchange rates of foreign currencies against the UAE Dirham. Statement of financial position risk relates to the risk of the Group's monetary assets and liabilities in foreign currencies acquiring a lower or higher value, when translated into UAE Dirhams, as a result of currency movements.

The Group is exposed to currency risk on its trade accounts payable, put option redemption payable and certain receivables denominated in foreign currencies, mainly in Euros and Saudi Riyal. As the US Dollar is pegged to the UAE Dirham, balances in US Dollars are not considered to represent significant currency risk.

The table below indicates the impact of Group's foreign currency monetary liabilities and assets at 31 December, on its profit before tax.

| | 2015 US$'000 | 2014 US$'000 |
|---|---|---|
| +5% | (1,690) | (96) |
| -5% | 1,690 | 96 |

As a result of acquisition of new subsidiaries in Spain, Italy and Columbia the Group is exposed to foreign currency risk on net investment in foreign subsidiaries. During the year ended 31 December 2015 the Group has recorded a foreign currency exchange loss of US$5,342,000 on the translation of foreign subsidiaries in other comprehensive income.

During the year, the Group also entered into a forward currency contract. This derivative is not designated in a hedge relationship. It acts as an economic hedge and will offset the underlying transaction when that occurs.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice    147 of 166    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

# Notes to the consolidated financial statements continued
At 31 December 2015

**33 FINANCIAL RISK MANAGEMENT OBJECTIVES AND POLICIES** continued
**CAPITAL MANAGEMENT**
The primary objective of the Group's capital management is to ensure that it maintains healthy capital ratios in order to support its business and maximise shareholders' value.

The Group manages its capital structure and makes adjustments to it in light of changes in business conditions. Capital comprises share capital, share premium, group restructuring reserve and retained earnings and is measured at US$487,697,000 as at 31 December 2015 (2014: US$449,023,000). In order to maintain or adjust the capital structure, the group may adjust the amount of dividends paid to shareholders, return capital to shareholders, issue new shares or sell assets to reduce debt. Certain banking facilities may also impose covenant requirements on the Group with respect to capital management.

The Group monitors capital using a gearing ratio, which is net debt divided by capital plus net debt. The Group includes within net debt, interest bearing loans and borrowings, accounts payable and accruals and other payables less bank deposits and bank balances and cash.

|  | 2015 US$'000 | 2014 US$'000 |
|---|---|---|
| Interest bearing loans and borrowings | 730,308 | 376,119 |
| Accounts payable and accruals | 123,511 | 98,065 |
| Other payable | 25,174 | – |
| Option redemption payable | 25,084 | – |
| Less: bank deposits, bank balances and cash | (177,397) | (263,169) |
| Net debt | 726,680 | 211,015 |
| Capital | 487,697 | 449,023 |
| Capital and net debt | 1,214,377 | 660,038 |
| Gearing ratio | 60% | 32% |

**34 CONTINGENT LIABILITIES**
The Group had contingent liabilities in respect of bank and other guarantees and other matters arising in the ordinary course of business from which it is anticipated that no material liabilities will arise at 31 December 2015 of US$9,069,000 (2014: US$8,311,000).

**35 COMMITMENTS**
**CAPITAL COMMITMENTS**
The Group had future capital commitments of US$30,230,000 at 31 December 2015 (2014: US$25,012,000) principally relating to the completion of ongoing capital projects.

**OTHER COMMITMENTS**

|  | 2015 US$'000 | 2014 US$'000 |
|---|---|---|
| Future minimum rentals payable under non-cancellable operating leases |  |  |
| Within one year | 12,846 | 10,816 |
| After one year but not more than five years | 53,943 | 44,947 |
| More than five years | 84,407 | 91,003 |
| Total | 151,196 | 146,766 |

Exhibit 4 to B.R. Shetty's Request for Judicial Notice      148 of 166      Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

## 36 FINANCIAL INSTRUMENTS CARRIED AT FAIR VALUE

### FORWARD EXCHANGE CONTRACT

The Group holds a forward exchange contract to manage foreign exchange exposure. The forward contract has a principal value of US$15,000,000 and is denominated in Qatari Riyal. This contract has not been designated as a cash flow hedge and the decrease in the fair value during 2015 of US$ 1,200,000 (2014: US$ Nil) has been included in finance costs and the corresponding liability is included in the 'others' category within accounts payable and accruals (Note 29). This is a level 2 derivative financial instrument.

### CONTINGENT CONSIDERATION

The consideration to acquire Luarmia SL, Dr Sunny Healthcare, ProVita, CIRH and Biogenesi includes contingent consideration of US$29,041,000 (Note 5). In accordance with the fair value hierarchy under IFRS 13, contingent consideration is classified as a level 3 derivative financial instrument. The fair value of outstanding contingent consideration as at the reporting date is US$25,016,000. The valuation technique used for measurement of contingent consideration is the weighted average probability method and then applying discounting. Movement in contingent consideration payable is as follows:

|  | 2015 US$'000 | 2014 US$'000 |
|---|---|---|
| Contingent consideration recognised at acquisition | 29,041 | – |
| Unrealised gain recognised in other income (Note 9) | (536) | – |
| Unwinding adjustment | 585 | – |
| Exchange gain | (56) | – |
| Payments made | (4,018) | – |
|  | 25,016 | – |

Unwinding adjustment is included in financial instruments fair value adjustments in finance cost (Note 10). Exchange gain is recognised in exchange difference on translation of foreign operations in other comprehensive income.

Contingent consideration payable as of 31 December 2015 comprises of following:

|  | 2015 US$'000 | 2014 US$'000 |
|---|---|---|
| CIRH | 2,768 | – |
| Biogenesi | 6,578 | – |
| Dr Sunny Healthcare | 7,345 | – |
| ProVita | 8,325 | – |
|  | 25,016 | – |

### CIRH

Contingent consideration is payable subject to attainment of revenue or reproductive cycle targets. Management believes that these targets will be met. Significant unobservable inputs used is discount rate (9.2%). A 1% increase in discount rate would result in decrease in fair value of the contingent consideration by US$48,000 and a 1% decrease in discount rate would result in increase in fair value by US$49,000.

### BIOGENESI

Contingent consideration is payable subject to attainment of revenue or reproductive cycle targets. Management believes that these targets will be met. Significant unobservable inputs used is discount rate (10.7%). A 1% increase in discount rate would result in decrease in fair value of the contingent Consideration by US$84,000 and a 1% decrease in discount rate would result in increase in fair value by US$86,000.

### DR SUNNY HEALTHCARE

Significant unobservable inputs used are growth rate (13%) and WACC 7.7%. A 5% increase/decrease in growth rate would result in an increase/decrease in fair value of the contingent consideration by US$332,000. A 1% increase in WACC would result in a decrease in fair value by US$225,000 and a 1% decrease in WACC would result in increase in fair value by US$62,000.

### PROVITA

The contingent consideration relates to amounts payable in the event that licenses to operate in certain other GCC countries are obtained. Management believes that it is highly probable that these licenses will be obtained. Subsequent to year end, one of the licenses has been obtained and an amount of US$5,000,000 has been paid.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          149 of 166          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

# Notes to the consolidated financial statements continued
## At 31 December 2015

### 37 OPTION REDEMPTION PAYABLE

The financial liability that may become payable under a put option in respect of the non-controlling interest in Luarmia SL is recognised at expected amount payable of US$25,084,000 within non-current liabilities (Note 5). The key assumption in estimating the expected amount is the multiple of purchase price and reproductive cycles projections. The financial liability is sensitive to changes in these assumptions. For example a 10% increase in reproductive cycles will result in an increase in the financial liability to US$28,129,000, while a 10% decrease would result in a decrease in the financial liability to US$22,039,000.

### 38 FAIR VALUES OF FINANCIAL INSTRUMENTS

The fair values of the Group's financial instruments are not materially different from their carrying values at the statement of financial position date.

The Group uses the following hierarchy for determining and disclosing the fair value of financial instruments by valuation technique:

*Level 1:* quoted (unadjusted) prices in active markets for identical assets or liabilities.

*Level 2:* other techniques for which all inputs which have a significant effect on the recorded fair value are observable, either directly or indirectly.

*Level 3:* techniques which use inputs which have a significant effect on the recorded fair value that are not based on observable market data.

Financial assets and liabilities carried at fair value are disclosed in Note 36.

During the years ended 31 December 2015 and 31 December 2014, there were no transfers between Level 1 and Level 2 fair value measurements, and no transfers into or out of Level 3 fair value measurements.

### 39 SUBSEQUENT EVENTS

The Group entered into an agreement to buy 51% shareholding in Fakih IVF. The Group completed the acquisition of Fakih IVF on 8 February 2016. Refer to Note 5 for further details.

The Group entered into agreements to acquire two healthcare related businesses for purchase consideration amounting to US$14.5 million and US$11 million respectively. One of these transactions completed by 31 January 2016 and other is expected to complete before end of Q1 2016.

Financial Statements

# Statement of financial position
As at 31 December 2015

| | Notes | 2015 US$'000 | 2014 US$'000 |
|---|---|---|---|
| **ASSETS** | | | |
| **Non-current assets** | | | |
| Investment in subsidiary | 4 | 204,127 | 204,127 |
| **Current assets** | | | |
| Other receivables and prepayments | 5 | 114 | 290 |
| Amounts due from a related party | 6 | 610 | – |
| Bank balances and cash | | 600 | 131 |
| | | 1,324 | 421 |
| **TOTAL ASSETS** | | 205,451 | 204,548 |
| **EQUITY AND LIABILITIES** | | | |
| **Equity** | | | |
| Share capital | 7 | 29,566 | 29,566 |
| Share premium | 7 | 179,152 | 179,152 |
| Accumulated losses | 9 | (3,495) | (12,029) |
| **Total equity** | | 205,223 | 196,689 |
| **Non-current liabilities** | | | |
| Other payables | | 21 | 21 |
| **Current liabilities** | | | |
| Other payables and accruals | 8 | 207 | 261 |
| Amount due to a related party | 6 | – | 7,577 |
| | | 207 | 7,838 |
| **Total liabilities** | | 228 | 7,859 |
| **TOTAL EQUITY AND LIABILITIES** | | 205,451 | 204,548 |

The financial statements were authorised for issue by the board of directors on 13 March 2016 and were signed on its behalf by

**DR B.R. SHETTY**
Executive Vice Chairman and Chief Executive Officer

**MR SURESH KRISHNAMOORTHY**
Chief Financial Officer

The attached Notes 1 to 15 form part of the financial statements.

# Statement of changes in equity
## For the year ended 31 December 2015

| | Share Capital US$'000 | Share premium US$'000 | Accumulated losses US$'000 | Total US$'000 |
|---|---|---|---|---|
| Balance as at 1 January 2014 | 29,566 | 179,152 | (2,904) | 205,814 |
| Total (other) comprehensive income for the year (Note 9) | – | – | 4,654 | 4,654 |
| Share based payments (Note 12) | | – | 67 | 67 |
| Dividends paid (Note 14) | – | – | (13,846) | (13,846) |
| Balance as at 31 December 2014 | 29,566 | 179,152 | (12,029) | 196,689 |
| Total (other) comprehensive income for the year (Note 9) | – | – | 23,223 | 23,223 |
| Share based payments | – | – | 1,177 | 1,177 |
| Dividends paid (Note 14) | – | – | (15,866) | (15,866) |
| Balance as at 31 December 2015 | 29,566 | 179,152 | (3,495) | 205,223 |

The attached Notes 1 to 15 form part of the financial statements.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice    153 of 166    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

# Statement of cash flows
## For the year ended 31 December 2015

| | Note | 2015 US$'000 | 2014 US$'000 |
|---|---|---|---|
| **OPERATING ACTIVITIES** | | | |
| Profit for the year before tax | | 23,223 | 4,654 |
| Adjustments for: | | | |
| Finance costs | | – | 2 |
| Share based payments | | 1,177 | 88 |
| Dividends payment | 14 | (15,866) | (13,846) |
| | | 8,534 | (9,102) |
| Working capital changes: | | | |
| Amounts due from a related party | | (610) | 2,875 |
| Other receivables and prepayments | | 176 | (240) |
| Amounts due to a related party | | (7,577) | 7,577 |
| Other payables and accruals | | (54) | (1,211) |
| **Net cash from/(used in) operations** | | 469 | (101) |
| **FINANCING ACTIVITY** | | | |
| Finance costs paid | | – | (2) |
| **Cash used in financing activity** | | – | (2) |
| **INCREASE/(DECREASE) IN CASH AND CASH EQUIVALENTS** | | 469 | (103) |
| Cash and cash equivalents at 1 January | | 131 | 234 |
| **CASH AND CASH EQUIVALENTS AT 31 DECEMBER** | | 600 | 131 |

The attached Notes 1 to 15 form part of the financial statements.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          154 of 166          Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

# Notes to the financial statements
At 31 December 2015

## 1   CORPORATE INFORMATION

NMC Health plc (the "Company" or "Parent") is a Company which was incorporated in England and Wales on 20 July 2011. The Company is a public limited company. The address of the registered office of the Company is Level 1, Devonshire House, One Mayfair Place, London, W1J 8AJ. The registered number of the Company is 7712220. The Company's immediate and ultimate controlling party is a group of three individuals (H.E. Saeed Mohamed Butti Mohamed Al Qebaisi (H.E Saeed Bin Butti), Dr B.R. Shetty and Mr Khalifa Butti Omair Yousif Ahmad Al Muhairi (Mr Khalifa Bin Butti) who are all shareholders and of whom one is a director of the company and who together have the ability to control the company.

The Parent and its subsidiaries (collectively the "Group") are engaged in providing professional medical services and the provision of all types of research and medical services in the field of gynaecology, obstetrics and human reproduction, and the rendering of business management services to companies in the health care and hospital sector. The Group is also engaged in wholesale of pharmaceutical goods, medical equipment, cosmetics, food, IT products and services.

The financial statements of the Company for the year ended 31 December 2015 were authorised for issue by the board of directors on 13 March 2016 and the statement of financial position was signed on the Board's behalf by Dr B.R. Shetty and Mr Suresh Krishnamoorthy.

## 2.1 BASIS OF PREPARATION

The financial statements have been prepared in accordance with International Financial Reporting Standards as adopted by the European Union as they apply to the financial statements of the Company for the year ended 31 December 2015 and applied in accordance with the Companies Act 2006.

The financial statements are prepared under the historical cost convention. The principal accounting policies adopted in the preparation of these financial statements are set out below.

No profit and loss account is presented by the Company as permitted by Section 408 of the Companies Act 2006.

### FUNCTIONAL CURRENCY

The UAE Dirham is determined to be the functional currency of the Company. The reporting currency of the Company is United States of America Dollar (US$) as this is a more globally recognised currency. The UAE Dirham is pegged against the US Dollar at a rate of 3.673 per US Dollar.

All values are rounded to the nearest thousand dollars ($000) except when otherwise indicated.

### GOING CONCERN

These financial statements have been prepared on a going concern basis. The Company has made a profit of US$23,223,000 (2014: US$4,654,000) and has equity of US$205,223,000 (2014: US$196,689,000).

The Company is the parent of NMC Health plc group and is solely a holding company with no business activities of its own. The Company earned a dividend and reported a net profit during the year. The Group's business activities, together with the factors likely to affect its future development, performance and position are set out in the Strategic Review on pages 6 to 39. The financial position of the Group, its cash flows, liquidity position and borrowing facilities are described in the Strategic Review on pages 24 to 27.

The Group has considerable financial resources including bank facilities. As a consequence, the directors believe that the Group is well placed to manage its business risks successfully.

The directors expect that the Group has adequate resources to continue in operational existence for the foreseeable future. Thus they continue to adopt the going concern basis in preparing the financial statements.

## 2.2  SIGNIFICANT ACCOUNTING JUDGEMENTS AND ESTIMATES

The key assumptions concerning the future, key sources of estimation uncertainty and critical judgements at the statement of financial position date, that have a significant risk of causing a material adjustment to the carrying amounts of assets and liabilities within the next financial year are discussed below:

### SIGNIFICANT JUDGEMENTS

Functional currency

The UAE Dirham is determined to be the functional currency of the Company.

Judgement has been used to determine the functional currency of the Company that most appropriately represents the economic effects of the Company's transactions, events and conditions. As part of this assessment, the following information has been taken into account:

The primary economic environment influencing the Company's income (dividends) is the UAE and the effect of the local environment is limited to expenses incurred within the UK. The ability of the Company to meet its obligations and pay dividends to its shareholders is dependent on the economy of, and the operation of its subsidiaries in, the UAE.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          155 of 166          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

# Notes to the financial statements continued

## 2.3 CHANGES IN ACCOUNTING POLICIES

The accounting policies adopted are consistent with those of the previous financial period.

### NEW AND AMENDED STANDARDS AND INTERPRETATIONS:

The Company applied for the first time certain standards and amendments which are effective for annual periods beginning on or after 1 January 2015.

The amendments to IFRS, which are effective as of 1 January 2015 and are listed below, have no impact on the Group.

- Amendments to IAS 19 Defined Benefit Plans: Employee Contributions

- Annual Improvements 2010-2012 Cycle
  - IFRS 2 Share-based Payment
  - IFRS 3 Business Combinations
  - IFRS 8 Operating Segments
  - IAS 16 Property, Plant and Equipment and IAS 38 Intangible Assets
  - IAS 24 Related Party Disclosures

- Annual Improvements 2011-2013 Cycle
  - IFRS 3 Business Combinations
  - IFRS 13 Fair Value Measurement
  - IAS 40 Investment Property

## 2.4 SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES
### INVESTMENT IN SUBSIDIARY

Subsidiaries are entities over which the Company controls the operating and financial policies, generally by owning more than 50% of voting rights. Investments in subsidiaries are recognised at acquisition cost less any provision for impairment.

When the Company incurs increases in or return of share capital, to/from its subsidiaries, such movements are recognised within the cost of investment in subsidiaries.

At each reporting date, an assessment is made to determine whether there are any indicators of impairment. Where an indicator of impairment exists, a formal estimate of the recoverable amount of the investment in subsidiary is made, which is considered to be the higher of the fair value less costs to sell and the value in use. Fair value is determined as the amount that would be obtained from the sale of the investment in an arm's length transaction between knowledgeable and willing parties. When this information is not available the fair value is determined based on the net present value of the future cash flows related to its subsidiaries, using a discount rate that reflects current market assessments of the time value of money and the risks specific to the asset. If the carrying amount of an investment exceeds the recoverable amount, a provision is recorded in the income statement to reflect the investment at the recoverable amount.

Where an impairment charge has previously been recognised, an assessment is made at the end of each reporting period as to whether there is any indication that the impairment loss may no longer exist or may have decreased. If any such indication exists, an estimate of the recoverable amount is made. An impairment loss is reversed to the income statement to the extent that the increased carrying value of the investment in subsidiary does not exceed the carrying value that would have been determined had no impairment loss been recognised for the asset in prior years.

Acquisition of subsidiary under common control
When the Company acquires a subsidiary under common control, the cost of the investment is deemed to be the Company's share of the net assets of the subsidiary at the date of acquisition.

### Cash and cash equivalents

For the purpose of the statement of cash flows, cash and cash equivalents consists of cash in hand and bank balances,

### Equity

The Company has issued ordinary shares that are classified as equity. The difference between the issue price and the par value of ordinary share capital is allocated to share premium. The transaction costs incurred for the share issue are accounted for as a deduction from share premium, net of any related income tax benefit, to the extent they are incremental costs directly attributable to the share issue that would otherwise have been avoided.

### Accounts payable and accruals

Liabilities are recognised for amounts to be paid in the future for goods and services received whether billed by the supplier or not. Accounts payable are classified as current liabilities if payment is due within one year or less (or in the normal operating cycle of the business if longer). If not, they are presented as non-current liabilities. Accounts payable are recognised initially at fair value and subsequently measured at amortised cost using the effective interest method.

**2.4 SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES** continued
### Provisions
Provisions are recognised when the Company has an obligation (legal or constructive) arising from a past event, and the costs to settle the obligation are both probable and able to be reliably measured.

Provisions are measured at the present value of the expenditures expected to be required to settle the obligation using a pre-tax rate that reflects current market assessments of the time value of money and risks specific to the obligation. Increases in provisions due to the passage of time are recognised in the income statement.

### Share based payments
Equity-settled share-based payments to employees are measured at the fair value of the equity instruments at the grant date. The fair value excludes the effect of non-market-based vesting conditions. Details regarding the determination of the fair value of equity-settled share-based transactions are set out in Note 12.

The fair value determined at the grant date of the equity-settled share-based payments is expensed on a straight-line basis over the vesting period, based on the Group's estimate of equity instruments that will eventually vest. At each reporting date, the Group revises its estimate of the number of equity instruments expected to vest as a result of the effect of non-market-based vesting conditions. The impact of the revision of the original estimates, if any, is recognised in the statement of comprehensive income such that the cumulative expense reflects the revised estimate, with a corresponding adjustment to equity reserves/other payables.

No expense is recognised for awards that do not ultimately vest, except for equity-settled transactions for which vesting are conditional upon a market or non-vesting condition. These are treated as vesting irrespective of whether or not the market or non-vesting condition is satisfied, provided that all other performance and/or service conditions are satisfied.

### Foreign currencies
Transactions in foreign currencies are recorded in UAE Dirhams at the exchange rate ruling at the date of the transaction. Monetary assets and liabilities denominated in foreign currencies are retranslated at the rate of exchange ruling at the balance sheet date. All differences are taken to the statement of comprehensive income.

### Impairment of financial assets
An assessment is made at each statement of financial position date to determine whether there is objective evidence that a specific financial asset may be impaired. If such evidence exists, any impairment loss is recognised in the statement of comprehensive income. Impairment is determined as the difference between carrying value and the present value of future cash flows discounted at the current market rate of return for a similar financial asset.

### Financial guarantee contracts
Financial guarantee contracts issued by the Company are those contracts that require a payment to be made to reimburse the holder for a loss it incurs because the specified debtor fails to make a payment when due in accordance with the terms of a debt instrument. Financial guarantee contracts are recognised initially as a liability at fair value, adjusted for transaction costs that are directly attributable to the issuance of the guarantee. Subsequently, the liability is measured at the higher of the best estimate of the expenditure required to settle the present obligation at the reporting date and the amount recognised less cumulative amortisation.

## 3   ACCOUNTING STANDARDS AND INTERPRETATIONS ISSUED BUT NOT EFFECTIVE
The standards and interpretations that are issued, but not yet effective, up to the date of issuance of the Company's financial statements are disclosed below. The Company intends to adopt these standards, if applicable, when they become effective.

### AMENDMENTS TO IAS 27: EQUITY METHOD IN SEPARATE FINANCIAL STATEMENTS
The amendments will allow entities to use the equity method to account for investments in subsidiaries, joint ventures and associates in their separate financial statements. Entities already applying IFRS and electing to change to the equity method in its separate financial statements will have to apply that change retrospectively. The amendments are effective for annual periods beginning on or after 1 January 2016, with early adoption permitted. The Company is currently assessing the impact of this amendment on its financial statements.

### IFRS 15 REVENUE FROM CONTRACTS WITH CUSTOMERS
IFRS 15 was issued in May 2014 and establishes a new five-step model that will apply to revenue arising from contracts with customers. Under IFRS 15 revenue is recognised at an amount that reflects the consideration to which an entity expects to be entitled in exchange for transferring goods or services to a customer. The principles in IFRS 15 provide a more structured approach to measuring and recognising revenue. The new revenue standard is applicable to all entities and will supersede all current revenue recognition requirements under IFRS. Either a full or modified retrospective application is required for annual periods beginning on or after 1 January 2018 with early adoption permitted. The Company is currently assessing the impact of IFRS 15 and plans to adopt the new standard on the required effective date.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          157 of 166          Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

Financial Statements

# Notes to the financial statements continued

**3   ACCOUNTING STANDARDS AND INTERPRETATIONS ISSUED BUT NOT EFFECTIVE** continued
**IFRS 16 LEASES**
IFRS 16 was issued in January 2016, and specifies how an IFRS reporter will recognise, measure, present and disclose leases. The standard provides a single lessee accounting model, requiring lessees to recognise assets and liabilities for all leases unless the lease term is 12 months or less or the underlying asset has a low value. Lessors continue to classify leases as operating or finance, with IFRS 16's approach to lessor accounting substantially unchanged from its predecessor, IAS 17.

IFRS 16 applies to annual reporting periods beginning on or after 1 January 2019. The Company is currently assessing the impact of IFRS 16 and plans to adopt the new standard on the required effective date.

In addition, the standards and interpretations that are issued, but not yet effective, up to the date of issuance of the Company's financial statements that are not expected to have any material impact on the Company are as follows:

- IFRS 9 Financial Instruments
- IFRS 14 Regulatory Deferral Accounts
- Amendments to IFRS 11 Joint Arrangements: Accounting for Acquisitions of Interests
- Amendments to IAS 16 and IAS 38: Clarification of Acceptable Methods of Depreciation and Amortisation
- Amendments to IAS 16 and IAS 41 Agriculture: Bearer Plants
- Amendments to IAS 27: Equity Method in Separate Financial Statements
- Amendments to IFRS 10 and IAS 28: Sale or Contribution of Assets between an Investor and its Associate or Joint Venture
- Annual improvements 2012-2014 Cycle:
  - IFRS 5 Non-current Assets Held for Sale and Discontinued Operations
  - IFRS 7 Financial Instruments: Disclosures
  - IAS 19 Employee Benefits
  - IAS 34 Interim Financial Reporting
  - Amendments to IAS 1 Disclosure Initiative
  - Amendments to IFRS 10, IFRS 12 and IAS 28 Investment Entities: Applying the Consolidation Exception

**4   INVESTMENT IN SUBSIDIARY**

|  | 2015 US$'000 | 2014 US$'000 |
|---|---|---|
| As at 1 January and 31 December | 204,127 | 204,127 |

This represents the cost of the investment in NMC Healthcare LLC (previous parent company), a wholly owned subsidiary held through the holding company subsidiaries NMC Health Holdco Limited and NMC Holding Co LLC.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          158 of 166          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

**4  INVESTMENT IN SUBSIDIARY** continued

The subsidiaries held by NMC Heath plc are as follows:

| | | Percentage of holdings | |
|---|---|---|---|
| | Country of incorporation | 31 December 2015 | 31 December 2014 |
| *Direct subsidiaries:* | | | |
| NMC Holding Co LLC | UAE | 100% | 100% |
| NMC Health Holdco Limited | UK | 100% | 100% |
| | | | |
| *Indirect subsidiaries:* | | | |
| NMC Healthcare LLC | UAE | 100% | 100% |
| New Pharmacy Company Limited | UAE | 99% | 99% |
| New Medical Centre Hospital LLC-Dubai | UAE | 99% | 99% |
| NMC Specialty Hospital LLC-Abu Dhabi | UAE | 99% | 99% |
| NMC Specialty Hospital LLC-Dubai | UAE | 99% | 99% |
| New Medical Centre Trading LLC-Abu Dhabi | UAE | 99% | 99% |
| NMC Trading LLC-Dubai | UAE | 99% | 99% |
| Bait Al Shifaa Pharmacy LLC-Dubai | UAE | 99% | 99% |
| New Medical Centre LLC-Sharjah | UAE | 99% | 99% |
| New Medical Centre Specialty Hospital LLC-Al Ain | UAE | 99% | 99% |
| Reliance Information Technology LLC | UAE | 99% | 99% |
| BR Medical Suites FZ LLC | UAE | 100% | 100% |
| Brightpoint Hospital LLC | UAE | 99% | 99% |
| NMC Day Surgery Centre LLC | UAE | 99% | 99% |
| NMC Hospital LLC (DIP Hospital) | UAE | 99% | 99% |
| Beiersdorf Cosmetics Trading LLC-Abu Dhabi branch. | UAE | 99% | 99% |
| New Marketing & Trading Co. LLC | UAE | 99% | 99% |
| Beiersdorf Cosmetics Trading LLC-Al Ain branch | UAE | 99% | 99% |
| New Marketing & Trading Co -LLC-Al Ain branch. | UAE | 99% | 99% |
| New Medical Centre Trading LLC.-branch 2 | UAE | 99% | 99% |
| New Medical Centre Trading LLC-branch 3 | UAE | 99% | 99% |
| Beiersdorf Cosmetics Trading LLC-branch | UAE | 99% | 99% |
| National Marketing & Trading Co. LLC | UAE | 99% | 99% |
| New Marketing & Trading Company LLC-branch | UAE | 99% | 99% |
| NMC Trading LLC-branch | UAE | 99% | 99% |
| Beiersdorf Cosmetics Trading Co. LLC | UAE | 99% | 99% |
| National Marketing & Trading Co. LLC - Dubai branch | UAE | 99% | 99% |
| New Marketing & Trading Co. LLC-Dubai branch | UAE | 99% | 99% |
| New Medical Centre Trading (Store) LLC | UAE | 99% | 99% |
| New Medical Centre Veterinary Medicine & Equipment Trading Co LLC | UAE | 99% | 99% |
| NMC Trading LLC branch | UAE | 99% | 99% |
| NMC Trading LLC -Fujairah branch | UAE | 99% | 99% |
| NMC Trading RAK-branch LLC | UAE | 99% | 99% |
| New Medical Centre | UAE | 100% | 100% |
| New Medical Centre -branch (Al-Ain,Al wadi) | UAE | 100% | 100% |
| Medifertil, S.A | Columbia | 60.5% | – |
| Centro de infertilidad y Reproduccion Humana SLU (CIRH) | Spain | 86.4% | – |
| Centro de Medicina della Riproduzione (Biogenesi) | Italy | 51.8% | – |
| EUVITRO, S.L.U | Spain | 86.4% | – |
| ProVita International Medical Center LLC | UAE | 100% | – |
| NMC Royal Hospital LLC | UAE | 99% | – |
| The American Surgecenter Pharmacy LLC | UAE | 90% | – |
| The American Surgecenter LLC | UAE | 90% | – |
| Americare LLC | UAE | 90% | – |
| Trans Arabia Drug Store LLC | UAE | 75% | – |
| Sunny Specialty Medical Centre LLC | UAE | 100% | – |
| Sunny Medical Centre LLC | UAE | 100% | – |
| New Sunny Medical Centre LLC | UAE | 100% | – |
| Sunny Al Buhairah Medical Centre LLC | UAE | 100% | – |
| Sunny Al Nadha Medical Centre LLC | UAE | 100% | – |
| Sunny Dental Care LLC | UAE | 100% | – |
| Grand Hamad Pharmacy LLC | UAE | 100% | – |
| Hamad Pharmacy LLC | UAE | 100% | – |
| Sharjah Pharmacy LLC | UAE | 100% | – |

Exhibit 4 to B.R. Shetty's Request for Judicial Notice    159 of 166    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

## Notes to the financial statements continued

### 5  OTHER RECEIVABLE AND PREPAYMENTS

| | 2015 US$'000 | 2014 US$'000 |
|---|---|---|
| Other receivables | 83 | 263 |
| Prepayments | 31 | 27 |
| | 114 | 290 |

### 6  RELATED PARTY TRANSACTIONS

These represent transactions with related parties, i.e. major shareholders and senior management of the Company, and entities controlled, jointly controlled or significantly influenced by such parties. Pricing policies and terms of all transactions are approved by the management of the Company.

The Company's immediate and ultimate controlling party is a group of three individuals (H.E. Saeed Bin Butti, Dr B.R. Shetty and Mr Khalifa Bin Butti) who are all shareholders and of whom one is a director of the Company and who together have the ability to control the Company. As the immediate and ultimate controlling party is a group of individuals, it does not produce consolidated financial statements.

During the year the Company was charged a management fees of US$1,914,000 (2014: US$5,506,000) by NMC Healthcare LLC.

Dividend amount of US$15,866,000 (2014: US$13,846,000) was paid, on behalf of the Company, by a subsidiary to the shareholders of the Company.

| | 2015 US$'000 | 2014 US$'000 |
|---|---|---|
| **Amounts due from Subsidiary** | | |
| Amounts due from a related party | 610 | – |
| **Amounts due to Subsidiary** | | |
| Amounts due to a related party | – | 7,577 |

The Company is a guarantor along with other fellow subsidiary undertakings for the US$825,000,000 (2014: US$166,561,000) new syndicated loan facility (2014: Previous syndicated loan) raised by its subsidiary NMC Healthcare LLC.

#### COMPENSATION OF KEY MANAGEMENT PERSONNEL

| | 2015 US$'000 | 2014 US$'000 |
|---|---|---|
| Short term benefits | 3,037 | 1,504 |

Key management personnel include all the Non-Executives Directors (2014: all) and two senior management personnel (2014: two).

### 7  SHARE CAPITAL AND SHARE PREMIUM
As at 31 December 2015 and 31 December 2014:

#### SHARE CAPITAL

| | Number of shares (thousands) | Ordinary shares US$'000 | Share premium US$'000 | Total US$'000 |
|---|---|---|---|---|
| **Issued and fully paid** (nominal value 10 pence sterling) each) | 185,714 | 29,566 | 179,152 | 208,718 |

### 8  OTHER PAYABLES AND ACCRUALS

| | 2015 US$'000 | 2014 US$'000 |
|---|---|---|
| Other payables | 104 | 67 |
| Accrued expenses | 103 | 194 |
| | 207 | 261 |

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          160 of 166          Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

**9  PROFIT ATTRIBUTABLE TO MEMBERS OF THE PARENT COMPANY**

The Profit for the year in the financial statements of the Company is US$23,223,000 (2014: US$4,654,000).

**10  AUDITOR'S REMUNERATION**

The Company paid US$1,300,000 to its auditor in respect of the audit of the Company's annual accounts for the year ended 31 December 2015 (2014: US$593,000), which includes a portion in respect of the audit of the financial statements of the Company.

Fees paid to Ernst & Young LLP and its associates for non-audit services to the Company itself are not disclosed in the individual accounts of NMC Health plc because group financial statements are prepared which are required to disclose such fees on a consolidated basis.

**11  DIRECTORS' REMUNERATION**

|  | 2015 US$'000 | 2014 US$'000 |
|---|---|---|
| Directors' remuneration | 1,754 | 863 |

Further information in respect of this compensation paid to directors is disclosed in the Directors' Remuneration Report

**12  SHARE BASED PAYMENTS**

The Company currently operates two share option schemes:

**LONG TERM INCENTIVE PLAN (LTIP)**

Options awarded under the LTIP are made annually to Executive Directors and other senior management. The exercise prices are nil. Options have a life of ten years and a vesting period of three years. The LTIP is subject to performance conditions which can be found in the Directors' Remuneration Report on pages 65 to 83.

**SHORT TERM INCENTIVE PLAN (STIP)**

Options awarded under the STIP are made annually to Executive Directors and other senior management. The exercise prices are nil. Options have a life of ten years and a vesting period of three years.

Fair values are determined using the Black-Scholes model. Expected volatility has been based on historical volatility over the period since the Company's shares have been publicly traded.

The cost is calculated by estimating the fair value of the option at grant date and spreading that amount over the vesting period after adjusting for an expectation of non-vesting.

For options granted in the years ended 31 December 2014 and 2015, the fair value per option granted and the assumptions used in the calculation are as follows:

|  | 2015 STIP | 2014 STIP |
|---|---|---|
| Share price at grant date | £5.200 | £4.570 |
| Fair value at measurement date | £5.060 | £4.403 |
| Exercise price | £nil | £nil |
| Expected volatility | 40% | 35% |
| Expected option life | 3 years | 3 years |
| Expected dividend yield | 0.91% | 1.23% |
| Risk free interest rate | 0.98% | 0.98% |

|  | 2015 LTIP 1 | 2015 LTIP 2 | 2014 LTIP |
|---|---|---|---|
| Share price at grant date | £5.200 | £7.650 | £4.949 |
| Fair value at measurement date | £5.060 | £7.377 | £4.769 |
| Exercise price | £nil | £nil | £nil |
| Expected volatility | 40% | 40% | 35% |
| Expected option life | 3 years | 3 years | 3 years |
| Expected dividend yield | 0.91% | 1.21% | 1.23% |
| Risk free interest rate | 0.98% | 1.05% | 0.98% |

LTIP 1 and LTIP 2 represent long term incentive plans issued in February and September 2015 respectively.

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          161 of 166          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

# Notes to the financial statements continued

## 12 SHARE BASED PAYMENTS continued
### SHORT TERM INCENTIVE PLAN (STIP) continued

The options existing at the year-end were as follows:

| | Number of shares | 2015 Exercise price | Period when exercisable | 2014 Number of shares |
|---|---|---|---|---|
| Long term incentive plan (LTIP) | | | | |
| October 2014 | 160,778 | £nil | 29/10/17 to 28/10/24 | 160,778 |
| Short term incentive plan (STIP) | | | | |
| October 2014 | 55,527 | £nil | 29/10/17 to 28/10/24 | 55,527 |
| Long term incentive plan (LTIP) | | | | |
| February 2015 | 221,539 | £nil | 25/02/18 to 24/02/25 | – |
| Short term incentive plan (STIP) | | | | |
| February 2015 | 74,801 | £nil | 25/02/18 to 24/02/25 | – |
| Long term incentive plan (LTIP) | | | | |
| September 2015 | 49,309 | £nil | 09/09/18 to 08/09/25 | – |
| Total options subsisting on existing ordinary shares | 561,954 | | | 216,305 |
| Percentage of issued share capital | 0.3% | | | 0.1% |

Movement of share options during the year is as follows:

| | 2015 | 2014 |
|---|---|---|
| At 1 January | 216,305 | – |
| Granted during the year | 345,649 | 216,305 |
| Outstanding at 31 December | 561,954 | 216,305 |

No options expired, were exercised or forfeited during the year (2014: nil).

## 13 FINANCIAL RISK MANAGEMENT

The Company's principal financial liabilities are other payables, arising in the normal course of business. The Company's financial assets include an amount due from a related party and bank balances. The company's activities expose it to a variety of financial risks: interest rate risk, credit risk, liquidity risk and foreign currency risk.

### INTEREST RATE RISK

Interest rate risk is the risk that the fair value or future cash flows of a financial instrument will fluctuate because of changes in market interest rates. The Company is exposed to interest rate risk on its bank balances only, as the balance due from a related party is interest free, and therefore the Company's exposure to interest rate risk is limited.

### CREDIT RISK

Credit risk is the risk that counterparty will not meet its obligations under a financial instrument, leading to a financial loss. The Company's credit risk arises from amounts due from a related party and bank balances.

The directors assess the credit quality of the related party by taking into account their financial position, past experience and other factors. Management does not expect any losses from non-performance by this counterparty, which is a subsidiary of the Company.

The Company limits its credit risk with regard to bank balances by only dealing with reputable banks. The credit rating of the bank at which the cash at bank is held is AA+.

The Company's credit risk exposure against a corporate guarantee provided to NMC Healthcare LLC in respect of the new syndicate (2014: earlier previous) loan is US$825,000,000 (2014: US$166,561,000).

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          162 of 166          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

**13  FINANCIAL RISK MANAGEMENT** continued

**LIQUIDITY RISK**

The Company's objective is to maintain sufficient funding to meet its obligations as they fall due.

The table below analyses the Company's undiscounted financial liabilities into relevant maturity groupings based on the contractual payment dates.

Balances due within 12 months equal their carrying balances as the impact of discounting is not significant.

| | On demand US$'000 | Less than 3 months US$'000 | 3 to 12 months US$'000 | 1 to 5 years US$'000 | Total US$'000 |
|---|---|---|---|---|---|
| **At 31 December 2015** | | | | | |
| Other payables | – | 104 | – | 21 | 125 |
| Total | – | 104 | – | 21 | 125 |
| At 31 December 2014 | | | | | |
| Other payables | – | 67 | – | 21 | 88 |
| Total | – | 67 | – | 21 | 88 |

In addition to the above financial liabilities the Company has provided a corporate guarantee of US$825,000,000 (2014: US$166,561,000) to NMC Healthcare LLC in respect of the new syndicate (2014: Previous syndicate) loan. The fair value of the corporate guarantee is US$nil as at 31 December 2015 (2014: US$nil).

**FOREIGN CURRENCY RISK**

Foreign currency risk arises when future commercial transactions or recognised assets or liabilities are denominated in a currency that is not the entity's functional currency.

The Company is exposed to currency risk on its other payables denominated in Pound Sterling. Foreign currency payable balances included in the statement of financial position denominated in Pound Sterling are US$170,000 (2014: US$144,000). The impact of possible of foreign currency movement is not significant.

**FAIR VALUE ESTIMATION**

The fair values of the Company's financial instruments are not materially different from their carrying values at the statement of financial position date.

**FINANCIAL GUARANTEES**

The Company is a guarantor along with other fellow subsidiary undertakings for US$825,000,000 (2014: US$166,561,000) of a new syndicated loan Bank (2014: previous syndicate loan) raised by its subsidiary NMC Healthcare LLC.

**14  DIVIDENDS**

In the AGM on 16 June 2015 the shareholders approved a dividend of 5.4 pence per share, amounting to GBP10,028,600 (US$15,866,000) to be paid to shareholders on the Company's share register on 29 May 2015. The dividend amount was paid to the shareholders on 25 June 2015 (2014: a dividend of GBP8,212,700 equivalent to US$13,846,000 was approved on 26 June 2014 and paid on 4 July 2014). No interim dividend was declared during the year. Subject to shareholders' approval at the Annual General Meeting on 3 June 2016, a final dividend of 6.2 pence per share, GBP11,580,000 (US$16,443,000) will be paid to shareholders on the Company's share register on 20 May 2016.

The Company was advised that the dividend paid on 25 June 2015 should have been preceded by the filing of interim accounts with Companies House for the financial year end to a date preceding the distribution. As a result of the company not doing so, the dividends paid on 25 June 2015 did not comply fully with the technical requirements of the Companies Act 2006. The Company intends to propose appropriate resolutions to rectify this position at the Company's 2016 Annual General Meeting.

**15  TAX**

The Group operates in the United Arab Emirates and Spain. As there is no corporation tax in the United Arab Emirates, no taxes are recognised or payable on the operations in the UAE. There is no taxable income in the UK and accordingly there is no tax liability arising in the UK. The unused tax losses amount to US$13,049,000 as at 31 December 2015 (2014: US$5,155,000).

Exhibit 4 to B.R. Shetty's Request for Judicial Notice        163 of 166        Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

# Notes

Exhibit 4 to B.R. Shetty's Request for Judicial Notice          164 of 166          Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

# Shareholder information

**AGM AND DIVIDEND DATES**

| | |
|---|---|
| Ex-dividend date for final dividend | 19 May 2016 |
| Record date for final dividend | 20 May 2016 |
| Annual General Meeting | 3 June 2016 |
| Final dividend payment | 20 June 2016 |

**DIVIDENDS**

Information in relation to the Company's dividend policy and the proposed dividend payment per share is set out in the Financial Review on page 27 and in Note 26 to the Consolidated Financial Statements on page 137.

**SHARE CAPITAL**

There have been no changes to the issued share capital of the Company during the year. The issued share capital as at 1 January 2015 and at 31 December 2015 was £18,571,428 divided into 185,714,286 shares of 10p each. Options and share awards granted by the Company over its share capital are set out in the Directors' Remuneration Report on pages 65 to 83.

Under the articles of association of the Company, all Ordinary shares have equal rights to dividends and capital and to vote at general meetings of the Company. There are no restrictions on the size of holding nor on the transfer of shares, which are both governed under the terms of the articles of association and relevant legislation. The directors are not aware of any agreements between holders of the Company's shares that may result in restrictions on the transfer of securities or in voting rights.

**ANNUAL GENERAL MEETING**

The annual general meeting of NMC Health plc will be held at Allen & Overy LLP, One Bishops Square, London E1 6AD on 3 June 2016 at 2.00 pm.

Further details of the resolutions to be proposed at the annual general meeting is set out in the Notice of Annual General Meeting circular which is included in a separate circular enclosed with this annual report.

**SHARE REGISTRAR**

Our Registrars are Capita Asset Services who can be contacted as follows:

| | |
|---|---|
| Address: | The Registry, 34 Beckenham Road, Beckenham, Kent, BR3 4TU |
| Email: | shareholderenquiries@capita.co.uk |
| Telephone: | 0871 664 0300 |
| | International: +44 (0) 208 639 3399 |

Calls cost 12p per minute plus your phone company's access charge. Calls outside the United Kingdom will be charged at the applicable international rate. Lines are open between 09:00 - 17:30, Monday to Friday excluding public holidays in England and Wales.

**PRINCIPAL SHAREHOLDERS**

As at 13 March 2016, the Company is aware of the following significant shareholdings in the Ordinary shares of the Company:

| Shareholder | Number of shares | % of issued share capital held | Nature of holding |
|---|---|---|---|
| Dr B.R. Shetty | 47,742,409 | 25.7 | Direct |
| H.E. Saeed Bin Butti | 43,466,559 | 23.41 | Direct |
| Khalifa Bin Butti | 19,059,842 | 10.3 | Direct |
| Infinite Investment LLC | 14,072,024 | 7.6 | Direct |



MIX
Paper from responsible sources
FSC® C023105
www.fsc.org

Designed and produced by Emperor
www.emperordesign.co.uk +971 (0)56 150 8292





NMC Health plc
Level 1 Devonshire House
One Mayfair Place,
Mayfair
London W1J 8AJ