Mark B. Chassman, SBN 119619
Email: mchassman@chassmanseelig.com
Ana Vasquez, SBN 231903
Email: avasquez@chassmanseelig.com
CHASSMAN & SEELIG, LLP
1250 Sixth Street, Suite 403
Santa Monica, CA 90401
Telephone: (310) 929-7192
Fax: (310) 929-7627

Alexander D. Pencu (*pro hac vice*)
Email: adp@msf-law.com
Benjamin D. Bianco (*pro hac vice*)
Email: bdb@msf-law.com
MEISTER SEELIG & FEIN LLP
125 Park Avenue, 7th Floor
New York, NY 10017
Telephone: (212) 655-3500
Fax: (646) 539-3649

*Attorneys for Defendant B.R. Shetty*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRIS HASHEM, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> NMC HEALTH PLC, PRASANTH MANGHAT, KHALIFA BIN BUTTI, PRASHANTH SHENOY, H.J. MARK TOMPKINS, and B.R. SHETTY, <br><br> Defendants. | Case No.: 2:20-cv-02303-CBM-MAA <br><br> (Consolidated with Case No. 2:20-cv-02895-CBM-MAA) |

## EXHIBIT 5

## TO REQUEST FOR JUDICIAL NOTICE AND INCORPORATION BY REFERENCE IN SUPPORT OF MOTION TO DISMISS OF DEFENDANT B.R. SHETTY



# INTEGRATED APPROACH

NMC Health plc
Annual Report and Accounts 2017

# NMC Health is one of the world's top 10 healthcare operators by market value. A member of the coveted FTSE-100 index, NMC's geographic reach spans across 13 countries through 129 own or managed facilities.

The Group operates two business lines, Healthcare and Product Distribution, which are divided into five business verticals:



Read more about our vertically integrated brands



Exhibit 5 to B.R. Shetty's Request for Judicial Notice       2 of 164                 Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

## Company Highlights

NMC focuses on underserved medical services and geographies within the countries it operates in and will continue to utilise organic and inorganic growth strategies to address these opportunities.

### £7.1bn
FTSE 100 company - market capitalisation of £7.1bn at end February 2018

### $1.6bn
2017 Group revenues (US$)

### 1,539
Licensed beds

### $353.4m
2017 Group EBITDA (US$)

### 129
Own and managed facilities (51 own facilities and 78 managed facilities)

### 13
Operations across 13 countries

### c.1,400
Doctors

### +5.7m
Over 5.7m patients in 2017

### c.14,000
Staff

### +108,000
Over 108,000 distribution stock keeping units

**I.    Overview**
2     At a Glance
8     Value from Acquisition Strategy
10    Joint Chairmen's 2017 Report to Shareholders

**II.   Strategic Report**
14    Chief Executive Officer's Review
17    Financial Summary and Highlights
18    Business Model
20    Our Strategy
21    Business Overview
24    Financial Review
26    Management Evolution
28    Risk Management
32    Corporate Social Responsibility

**III.  Governance**
38    Board of Directors
40    Senior Management Team
41    Corporate Governance Report
58    Directors' Remuneration Report 2017
78    Directors' Report

**IV.   Financial Statements**
82    Directors' Statements
86    Independent Auditor's Report
94    Consolidated Income Statement
95    Consolidated Statement of Other Comprehensive Income
96    Consolidated Statement of Financial Position
97    Consolidated Statement of Changes in Equity
98    Consolidated Statement of Cash Flows
99    Notes to the Consolidated Financial Statements
146   Statement of Financial Position
147   Statement of Changes in Equity
148   Statement of Cash Flows
149   Notes to the Financial Statements

**V.    Other Information**
160   Shareholder information



Read the annual report and much more on our website: **www.nmchealth.com**

Exhibit 5 to B.R. Shetty's Request for Judicial Notice    3 of 164

Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

## At a Glance
## Our Business

# REGIONAL CLUSTERS DELIVERING ENHANCED PERFORMANCE

The NMC Group continues to operate and manage its businesses through its two primary divisions, Healthcare and Distribution.

## Business verticals

NMC has developed specialised verticals within the broader healthcare delivery platform with specialisation-specific capabilities and brands.



Multi-specialty Network



Maternity & Fertility



Long-term & Home Care



Operations & Management



Products & Consumables

## Clusters

Prior to 2017, operational decisions for NMC's multi-specialty hospitals and clinics were made by the senior leadership team and key decisions regarding day to day operations were elevated to the corporate office. NMC's success in its geographical expansion, as part of the capability building and capacity growth strategy, resulted in a previously very effective organisational structure, which was difficult to maintain operationally. This was particularly evident through the increasing cross relationships and patient referral processes which were developed to cross utilise brands and businesses for the benefit of our patients which in turn has improved the efficiency and use of each of our assets.

Therefore, within the UAE and the broader GCC, operational clusters were created on a geographic basis with more responsibility, accountability and business control placed in the hands of a new General Manager appointed for each cluster. This change has resulted in better facilitation of real-time decision making,

improved control of the day to day operations, allowed a better use of delegated authorities and ultimately, enhanced performance.

During the development of the cluster concept in H2 2017, the cluster leadership was rigorously evaluated to ensure that the right team was in place. In addition to the Healthcare Division and individual facility performance monitoring, Cluster specific key performance indicators have been developed and assigned to each Cluster General Manager with the additional brief of ensuring an appropriate structure in place to facilitate cross business cooperation in developing each business.

The Management team believe that this has enhanced both cost synergies and revenue enhancement projects which have been in place across the Group.

## Other Middle East & North Africa

12+ facilities

900 beds

4 countries

## Europe

15 facilities

50+ doctors

4 countries

2    NMC Health plc Annual Report and Accounts 2017

Exhibit 5 to B.R. Shetty's Request for Judicial Notice    4 of 164

Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

NMC has created regional clusters to aid the process of centralisation of key services to benefit from our strong growth over the past few years.

RAK

Umm Al Quwain

Sharjah

Dubai

Abu Dhabi

Al Ain

### Sharjah & Northern Emirates

20 facilities

379 beds

345 doctors

### Abu Dhabi

13 facilities

722 beds

643 doctors

### Dubai

9 facilities

206 beds

442 doctors

### Oman

12 facilities

127 beds

90 doctors

### Saudi Arabia

8 facilities

800+ beds

5 cities

Exhibit 5 to B.R. Shetty's Request for Judicial Notice          5 of 164          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

Overview

At a Glance
Strategy

# FUTURE GROWTH DRIVEN BY WELL-DEFINED STRATEGY

NMC focuses on underserved medical services and geographies within the countries it operates in and will continue to utilise organic and inorganic growth strategies to address these opportunities.

## Our strategy is built on three key tenets



Capacity Build



Capabilities Focus



Geographic Expansion

### 2015 Strategy Update

- Accelerate the establishment of Centres of Excellence in key specialities within existing hospitals.
- Increase participation in the growing UAE medical tourism industry and establish NMC as a destination of choice.
- Grow NMC's medical specialty offering and clinic network within the UAE and maximising operational synergies.
- Establish a strategic presence outside the UAE with leading global medical institutions to enhance and expand technological know-how and medical expertise.
- Increase NMC's footprint in Saudi Arabia and the broader GCC via organic initiatives and acquisitions.

### 2017 Strategy Update

**ADDITION OF NEW VERTICALS**
Addition of new verticals focused on highly underserved segments in the UAE and wider GCC and further development of Centres of Excellence.

**TARGETING WIDER EMERGING MARKETS**
Expanding the healthcare business' target market from the GCC to wider emerging markets.

**FERTILITY TO BE DEVELOPED AS A GLOBAL BUSINESS**
Fertility to be developed as a global business taking advantage of substantial growth opportunities.

**RAPID ADOPTION AND DEPLOYMENT OF TECHNOLOGICAL INNOVATION**
Rapid adoption and deployment of technological innovation via both organic initiatives and acquisitions.

4    NMC Health plc Annual Report and Accounts 2017

## Our Growth Story

| 2014 | 2017 | Growth |
|---|---|---|
| 1 | 13 | 1,200% |

Number of countries

| 2014 | 2017 | Growth |
|---|---|---|
| 310 | 1,539 | 396% |

Number of licenced beds

| 2014 | 2017 | Growth |
|---|---|---|
| 12 | 129 | 975% |

Number of own & managed facilities

| 2014 | 2017 | Growth |
|---|---|---|
| 4.60 | 28.85 | 527% |

Share price £

Exhibit 5 to B.R. Shetty's Request for Judicial Notice    7 of 164    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

Overview

**At a Glance**
Where We Operate

# ENHANCING OUR GEOGRAPHICAL FOOTPRINT



Spain
Barcelona
Ma

Colombia
Bogota

Brazil
São Paulo

Oman
Muscat

Yemen
Socotra

| Colombia | Denmark | Slovakia |
|---|---|---|
| 1 | 1 | 1 |

| Brazil | Spain | Italy |
|---|---|---|
| 4 | 3 | 3 |

**Key to number of facilities**

● Own and Operation & Management
● Own
● Operation & Management

Exhibit 5 to B.R. Shetty's Request for Judicial Notice        8 of 164        Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA



# 129

Facilities

# 13

Operating in 13 countries

# c.1,400

Doctors

# +5.7m

Patients

# c.14,000

Employees

Exhibit 5 to B.R. Shetty's Request for Judicial Notice    9 of 164    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

Overview

## Value from Acquisition Strategy
### Post-acquisition Integration and Synergy Benefits

# IDENTIFYING AND DEVELOPING SYNERGIES THAT FOSTER VALUE CREATION

Our approach to integration has been simple yet effective.

We recognise that each entity has its own focus areas and has developed and updated its unique business model over the years to suit its specific business requirements. Becoming a part of a larger group like NMC opens the resources and know-how of the wider Group to the entity while it continues to focus on what it does best.

Our approach to integration has been to:
- communicate our values;
- give a new direction to the acquired entities; and
- focus on identifying synergies in specific areas that are not disruptive to the business.

This has allowed our entities to mutually share their knowledge and best practices to bring in greater operational efficiencies and improving patient experience.

NMC continues to encourage and support the entrepreneurial drive that has made each of our businesses and brands a success in their own marketplaces by allowing them the managerial freedom to identify and pursue win-win synergies with the wider Group.

## COST SYNERGIES

By developing specialised verticals within the broader healthcare delivery platform, NMC has been able to integrate gradually with all its acquisitions thus providing sufficient time for growth and synergy.

NMC's collaborative approach to integration provides operational autonomy to the acquired entities. We then look for specific activities that, if coordinated, will yield cost savings or enhance revenues without disrupting either company's core business.

**CENTRALISED PROCUREMENT AND COST OPTIMISATION**
We have consolidated the procurement function across the Group in UAE and outside UAE in Spain, enabling the Group to take advantage of its scale to get preferential terms from suppliers.

**RESOURCE INTEGRATION AND OPTIMISATION**
NMC has established a rigorous program to achieve optimum resource sharing including back office integration in HR, Finance, IT, fleet and facilities, and medical operations to ensure full value potential is achieved.

**FINANCIAL EXPERTISE, FUNDING CAPABILITIES AND MANAGEMENT INTEGRATION**
A professional and effective managerial initiative through a more defined team structure, with optimal deployment of resources, and appropriate supervision and controls has enabled alignment of the Group-wide objectives and achievement of cost synergies.

**OPERATIONAL SYNERGIES THROUGH SHARING TECHNICAL KNOWLEDGE AND STANDARDISED PROTOCOLS**
Capitalising on Eugin's R&D activities and excellence in medical management, NMC has integrated the technical know-how by sharing protocols and analysing results across all clinics. This has given enhanced patient care outcomes and resulted in negotiations for competitive pricing for the new services offered.





8     NMC Health plc Annual Report and Accounts 2017

We have deployed effective financial controls from the Group into each of our acquired businesses and put in place robust financial reporting standards and unified consolidation processes.

We believe our integration strategy has created within each of the acquired businesses a strong sense of shared purpose and belonging to the NMC family, paving the way to pursue value adding synergies and efficiencies.

"The role of NMC leadership and management has been to encourage open dialogue between the different units and to facilitate the implementation of synergy-yielding opportunities identified by the businesses."

**PRASANTH MANGHAT**
Chief Executive Officer

## REVENUE SYNERGIES

The effort and initiative shown by each business to identify synergy yielding opportunities has even brought in revenue synergies while also resulting in improved patient care.

**THE STARTING POINT FOR A CONTINUUM OF CARE - CROSS REFERRALS**
Leveraging the wide spectrum of services delivered by the different entities in the Group, NMC has been able to create a Continuum of Care for its large patient base. Thanks to a well-established cross referral system, over 2,000 patients have benefited from this and were able to achieve a seamless patient experience and better medical outcomes.

**CROSS PRACTICING DOCTORS AND SHARING EXPERTISE IN COMPLEX CASES.**
Integrating the medical resources and clinical capabilities across the Group, NMC has been able to introduce new services at its facilities. Cross-practising of doctors has enabled the introduction of specialised treatments such as IVF, cardiothoracic surgery, long term care, bariatrics and aesthetics at various facilities across the Group.

**PROJECT EXPANSION MANAGEMENT CAPABILITIES AND TRACK-RECORD**
The alignment of our internal processes has enabled us to achieve organisation-wide expansion projects such as:
- the early commissioning of a 26 bed long term care wing at NMC Royal Hospital last year; and
- a 16 bed long term acute care unit at Al Zahra Hospital, Sharjah taking ProVita's success story and expertise to Sharjah, bringing easier access to long term care services for patients in the Northern Emirates of UAE.

**PAYOR RELATIONS, REVENUE CYCLE AND CLAIMS MANAGEMENT**
NMC's expertise in revenue cycle management and its wider network of insurance companies has helped us to add more mid-tier insurance networks to Al Zahra Hospital Sharjah enabling reach to a wider patient base. The training imparted by the NMC team has also improved the efficiency of claims management processes across the Group.

**A DIFFERENTIATED FERTILITY PLATFORM ADAPTED TO EACH OF ITS MARKETS**
NMC fertility has developed a pan-continental presence across Middle East, Europe and Latin America that gives the scale and flexibility to drive quality, access to treatment and innovation. An intricate network of clinics helps patient referrals and transfers within the Group and our patients can choose to receive treatment at any facility in any country. Our agile platform provides us with an unrivalled advantage of shifting or transporting sperms and embryos from one country to another, thus saving on time and dramatically reducing waiting periods.




Exhibit 5 to B.R. Shetty's Request for Judicial Notice    11 of 164    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

Overview

## Joint Chairmen's 2017 Report to Shareholders

# CONTINUED GROWTH, EFFICIENCY AND EXTENSION OF REACH

2017 was largely a year in which the Group focused on integration and the realisation of Group synergies and efficiencies.

**FOREWORD FROM INDEPENDENT NON-EXECUTIVE JOINT CHAIRMAN**

A key change in the structure of our management team occurred in March 2017 when our founder and one of our principal shareholders, Dr B R Shetty, decided to step down from his day to day Executive role in the Group. Dr Shetty has been instrumental in the development and continued success of the NMC Health Group over the last 45 years. Under his guidance and commitment, NMC has grown from a small clinic in Abu Dhabi, to a multi-national Group providing an extensive network of healthcare services across 13 countries. In addition, NMC operates one of the top 3 IVF businesses in the World together with a significant distribution business. The NMC Group and the Board are extremely grateful to Dr Shetty for his vision and very deep commitment to NMC over those 45 years and we were delighted that he accepted the role of Non-Executive Joint Chairman, a role in which his continued guidance and regional knowledge and standing particularly benefits the Board and Group.

**H. J. MARK TOMPKINS**
Independent Non-Executive
Joint Chairman

Dear Shareholder,

We are writing to you at the end of a year in which much progress has again been made by your Company in the continued execution of its growth strategy and its integration of the businesses now making up the wider NMC Group.

2017 has seen Group Revenue increase from US$1.2bn in 2016 to US$1.6bn in 2017 with Consolidated EBITDA also increasing by 43.6% to US$353.4m over the same period. This continued excellent growth and strong support from our investor base has resulted in a market capitalisation as of the end of February 2018 of £7.1bn.

**INTEGRATION AND EFFICIENCIES**

2017 commenced with completion of our largest acquisition to date, Al Zahra Hospital in Sharjah, UAE. The acquisition of Al Zahra Hospital provided the Company with a unique opportunity to increase its presence in the attractive Sharjah market in the UAE. A number of other acquisitions were completed during the year, particularly focused on geographic expansion outside of our home market and further into the GCC. Our year one performance achieved in our new Saudi Arabian and Oman businesses was encouraging.

2017 has also been an important year of consolidation. Alongside our strategic growth plan, we have been keen to ensure that the enlarging group is integrated appropriately to enhance asset utilisation and Group performance. The Board has been extremely pleased with management's partnership approach to integration which has allowed the Group to incorporate business and organisational structure changes, with commitment and drive from both existing and acquired businesses, to ensure that the Group operates as efficiently as possible.

These changes have resulted in an efficient operational structure focused on clear business verticals within our divisional segments and overseen through a more extensive management structure. In addition, integration projects have enabled the Group to consolidate a number of back-office processes and structures. This focus in 2017 leaves the Group well placed and efficiently structured to progress with further growth initiatives.

**OPERATIONAL EXPANSION**

Our existing facilities also performed well during the year. Our 250 licensed bed flagship super specialty Hospital, NMC Royal Hospital, in the Khalifa City suburb of Abu Dhabi, which opened for inpatient services in 2016 continues to ramp up well, as have Brightpoint Royal Women's Hospital in Abu Dhabi and NMC General Hospital Dubai Investment Park. Our IVF businesses and our Long-Term acute care business, ProVita, have continued to grow significantly taking advantage of the opportunities now available for expansion of their specific business areas across our enlarged healthcare network.

**STRATEGY**

Having successfully progressed our initial organic growth strategy followed by a period of acquisition-led growth, 2017 was largely a year in which the Group focused on integration and the realisation of Group synergies and efficiencies. This set in place an organisational structure which provides the Group with a good platform for future strategic growth.

In December 2017, we re-iterated and updated our growth strategy. In addition to adding additional healthcare verticals and developing Fertility as a global business, focus will be to expand the provision of healthcare services geographically both within the GCC and in other selected emerging markets. In addition, the Group intends to embrace

**10**    NMC Health plc Annual Report and Accounts 2017




technological innovation to ensure that its long term success within the healthcare sector is secured.

### DIVIDEND

As a result of our growth, good performance and continuing financial stability, your Board intends to retain its dividend payment policy of distributing a dividend of approximately 20% of profit after tax. Therefore, the Board plans to submit a resolution to shareholders at the 2018 Annual General Meeting authorising payment of a cash dividend of 13 pence per share, an increase of 22.6% compared to the 2016 dividend payment.

### BOARD AND MANAGEMENT CHANGES

Following Dr Shetty's decision to step down from his day to day Executive role, the Board appointed Prasanth Manghat as the Group's new CEO, as part of a planned succession plan. Prasanth had held the position of Deputy CEO for two years prior to his promotion, and was CFO of the Group for the 4 years prior that. Prasanth has been instrumental in the successful execution of the Group's strategic growth plan to date and is therefore well placed to manage that strategy on behalf of the Board and shareholders going forward.

In June 2017, we appointed two new Executive Directors to the Board. Khalifa Bin Butti re-joined the Board as Executive Vice Chairman and Hani Buttikhi joined the Board as Chief Investment Officer. Both Khalifa and Hani are welcome additions to the Board and are focused particularly on supporting Prasanth with driving business growth. Also in June 2017 two of our Non-Executive Directors, Binay Shetty and Keyur Nagori, stepped down from the Board. Their contribution to the Board over recent years was invaluable and they will be missed in board deliberations.

The Board continues to have a wide cultural and ethnic mix, significant female representation and a wide range of skills and operational experience from different parts of the world. Shareholders can therefore take continued re-assurance that different viewpoints are well represented during board discussions.

The increasing size of the Group and the Board's focus on continued strategic growth, has led Prasanth Manghat to restructure and provide additional depth to his management team. This should ensure that the demands of the Group's additional business streams, and in particular the pressure of geographical expansion into new markets, can be managed efficiently. The Group now has a wider and more experienced management team which is well placed to progress our further planned strategic growth.

Finally, but certainly not least, the growth achieved by your Company in recent years, with the share value accretion that this has created, resulted in your Company being promoted into the FTSE-100 index of the London Stock Exchange. This was a remarkable achievement, and a very proud moment, for our founder and Non-Executive Joint Chairman, Dr B. R. Shetty, as well as our CEO, Prasanth Manghat, his management team and for the Board. Such an achievement against a back-drop of significant growth and transformation, particularly in recent years, is a testament to the hard work of all our management team and staff since the Group's inception, in growing and delivering quality services for our patients and returns for our shareholders. The continued commitment of our management and staff during this period of transformational change and growth, is much appreciated by the Board.

### OUTLOOK

Economic conditions remain positive in most of the markets in which we operate. Moreover, the ongoing drive to increase private healthcare participation in a number of our primary markets, rising affluence and increasing awareness of the importance of proactive healthcare result in generally favourable conditions within our areas of operation and your Board continues to view the outlook for your Group with confidence.

**H. J. MARK TOMPKINS**
Independent Non-Executive Joint Chairman

**DR B. R. SHETTY**
Non-Executive Joint Chairman

Exhibit 5 to B.R. Shetty's Request for Judicial Notice          13 of 164          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

Strategic Report

# Strategic Report

Our long-term growth strategy continues to accelerate our expansion into more complex medical, and thus higher value added, specialty healthcare segments.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice          14 of 164          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA



**PRASANTH MANGHAT**
Chief Executive Officer                    Page 14

Exhibit 5 to B.R. Shetty's Request for Judicial Notice          15 of 164

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

## Chief Executive Officer's Review

# AN ACTIVE YEAR FOR NMC

2017 proved to be a year of tremendous achievements for NMC, enhancing further the successful track record already achieved by the Group in previous years.

Qualification for the FTSE 100 index, consolidation of previous organic and inorganic expansions, extension of our geographic footprint and strengthening and deepening of the management structure all marked a very active year for NMC. In short, we see 2017 as setting the stage for many more years of growth for the Company and we begin 2018 with confidence.

### TREND OF STRONG GROWTH MAINTAINED IN 2017

FY 2017 marked another year of record revenues and profits for NMC, with the top and bottom lines reaching US$1.6bn and US$209.2m, respectively. Our well-defined strategy continues to drive sustained growth. Moreover, with the recently announced strategy update stressing three key tenets, namely capacity growth, capability focus and geographic expansion, we remain confident in our ability to continue to build on the success of past years. The year also witnessed NMC receiving several awards, ranging from those recognising the level of care provided to patients to the extra emphasis the Group places on the value of its employees. However, entry into the prestigious FTSE-100 index is the one accolade that stands out in terms of recognising the 40+ years of hard work that has brought NMC to where it stands today!

### EXPANSION AND COLLABORATION: KEY OPERATIONAL THEMES OF THE YEAR

Our acquisition of Al Zahra in Sharjah, the launching of additional facilities in Saudi Arabia, entry into the Oman market and expansion of the Operations & Management ("O&M") business vertical, particularly for Emirates Healthcare Group's assets, marked key strategic growth milestones for the Healthcare division in 2017. Another exciting development during the year was the signing of a collaboration agreement with Cincinnati Children's Hospital Medical Centre, bringing highly specialised services to the underserved paediatrics segment in the UAE.

The verticals-based structure approach adopted by NMC, supported by underlying Centres of Excellence, has served the group well in implementing its growth strategy. As per the recent Group strategy update, we remain open to the idea of adding new verticals through acquisitions and also continue to see potential for some of our Centres of Excellence to be upgraded to new business verticals in the medium term. As I recently highlighted, the cosmetics business is one potential candidate for a new vertical, particularly after the recent acquisition of CosmeSurge.

The O&M vertical has also become a centre of renewed focus for NMC, with revenues in 2018 set to be significantly ahead of those achieved in 2017. We continue to actively seek new O&M contracts in the public and private sectors across a number of different geographies

and view this route as an attractive means of participating in the highly anticipated privatisation program in the GCC healthcare sector.

The Distribution division also continues to maintain its pace of healthy growth, outpacing overall economic growth due to the value added services NMC provides its customers. We continue to see this vertical as a key part of our business, with its benefits to the Group extending well beyond financial contribution. For example, instant procurement savings/synergies that we are able to offer to clients gives us a head start over competitors while bidding for O&M contracts.

### REVISED MANAGEMENT AND ORGANISATION STRUCTURE TO SUPPORT CONTINUED GROWTH

During 2017, our founder Dr. B.R. Shetty decided to step down from day to day operational activities and relinquished his positions as Executive Vice Chairman and CEO to take on the role of Joint non-executive Chairman of the Group. While we continue to benefit from his guidance as a member of the Board, there was a concerted focus on strengthening and deepening of NMC's management structure during this year of consolidation and integration to support the Group's sustained growth. As detailed on page 2 of this annual report, a new clusters-based approach has been adopted in this regard, which improves decision-making by decentralising the process from the corporate head-quarters.



For more information see Our Strategy on page 20

## Our Strategy











1 Develop centres of excellence within the multi-specialty vertical

2 Increasing healthcare spend retention within the UAE

3 Expand medical specialty offering and maximise cross-referrals

4 Pursue in-vertical consolidation opportunities

5 Offer fully integrated healthcare solutions

14    NMC Health plc Annual Report and Accounts 2017



*"NMC entered the prestigious FTSE-100 index in 2017, the first GCC-based company to achieve this major milestone."*

As highlighted in the HY 2017 results announcement, as part of the management restructuring process, Michael Davis and Hani Buttikhi have been appointed as Chief Operating Officer, Healthcare and Chief Investment Officer, respectively. Additionally, three new positions have been created that report directly to me, namely, Director of Employee Engagement, Head of IVF and Head of Saudi Arabian operations.

### YEAR OF ACCOLADES, CAPPED BY ENTRY INTO COVETED FTSE-100 INDEX

NMC entered the prestigious FTSE-100 index in 2017, the first GCC-based company to achieve this major milestone. We see this inclusion as a recognition of more than 40 years of hard work that has transformed the single clinic opened by Dr. B.R. Shetty in 1975 to one of the top 15 global healthcare operators in the world by market capitalisation.

The Company received several awards in 2017 recognising its operational excellence, the most notable of which include 1) NMC Royal receiving Gulf Customer Experience Awards 2016 in the Wellbeing and Healthcare category, 2) Service Olympian Awards for Best Use of Innovation and Technology for ProVita and 3) NMC Healthcare and NMC Trading both received two separate business excellence awards at the 9th Cycle of the Mohammed bin Rashid Al Maktoum Business Award ceremony. Furthermore, the Group also received recognition as one of the 'Top Companies to Work For' in UAE by the Great Place to Work Institute.

NMC also maintains sharp focus on clinical quality, with international accreditations seen as an important benchmark. NMC Royal Hospital, Brightpoint and Al Zahra Hospital all received the coveted JCI accreditation in 2017, making all seven of NMC's UAE hospitals JCI accredited. Our aim is to ensure that all our hospitals, acquired or otherwise, become accredited by JCI and this is an important KPI I have set for our operations teams.

### EMPLOYEES REMAIN FIRMLY AT THE CENTRE OF NMC'S SUCCESS

Our ethos has been built on, and remains, every patient matters, every employee counts. Our previous and current management teams have always understood that our employees of all levels are key to the success of NMC as an organisation. In August 2017, we celebrated NMC Foundation Day for the first time. Events were held across all of our facilities, both new and longstanding within the NMC family, and I remain encouraged and humbled at the continuing energy, commitment, professionalism and loyalty shown across our employee base, not just on these special days, but every day. We try to focus significant efforts on the wellbeing and future success of our employees and their commitment to the Group and the services we provide continues unabated. I thank all of our staff for their tremendous commitment to the Company and the strategy that we continue to pursue.

### TECHNOLOGICAL INNOVATION: HEALTHCARE INDUSTRY RIPE FOR DISRUPTION

With technological innovation touching every area of the industry, I firmly believe that next big disruption will be in healthcare. Remote monitoring of disease via wearable diagnostic gadgets, early diagnosis of disease, prenatal diagnosis and treatment of disease and a completely new way of looking at and treating degenerative diseases are just some of the examples of how the future of healthcare is changing dramatically. We are ensuring that NMC remains at the forefront of this change and rapid adoption and deployment of technological innovation is now embedded in the Group strategy, as announced in the December 2017 update.





6 Develop the NMC health umbrella brand

7 Increase participation in the medical tourism market

8 Establish a strategic presence outside the UAE

Exhibit 5 to B.R. Shetty's Request for Judicial Notice    17 of 164    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

## Chief Executive Officer's Review continued

*"NMC has moved from success to success over the past many years and I see no reason why this should change in the foreseeable future, despite an otherwise challenging environment."*

Artificial Intelligence (AI), while in its infancy of being understood, let alone being utilised, holds the most promise for revolutionising the healthcare sector. It has the potential to change how we look at the industry, taking it from the current model of "sickness care" towards preventive care by identifying and addressing ailments any individual may be prone to, well before they manifest themselves. Moreover, AI-powered virtual assistants can answer patients' routine questions while assisting in-house medical professionals. At the same time, robotics can potentially automate ancillary and back-office hospital services, improving efficiency and allowing medical staff to focus on direct patient care. In light of these rapid developments, NMC is establishing a robust innovation structure, and will rely on both organic and inorganic means to become a leader on this front. I am confident that by deeply integrating technology, NMC has the potential to expand the very boundaries of the healthcare sector.

**VIEWING THE FUTURE WITH OPTIMISM, DESPITE ALL CHALLENGES**

NMC has moved from success to success over the past many years and I see no reason why this should change in the foreseeable future, despite an otherwise challenging environment. Sustained ramp up of utilisation at facilities we opened in recent years, integration of acquired assets and continued discipline in organic and inorganic expansions should all translate into a very promising 2018 and beyond. The most important assets to keep a track of in this regard are: NMC Royal, Brightpoint and Chronic Care for ramp-up of operations, Al Zahra Hospital and CosmeSurge from an integration standpoint and the GCC in general and KSA in particular for additional acquisitions as we continue to see the benefit from acquiring assets and optimising their capabilities within the NMC network/model.

The Company continues to benefit from ready access to debt financing and a supportive shareholder base that we will not take for granted. While we continue to apply strict criteria to our expansion opportunities, this backdrop gives us confidence in addressing any future funding requirements to support our ambitious growth plans.

Yours sincerely,

**PRASANTH MANGHAT**
Chief Executive Officer

Exhibit 5 to B.R. Shetty's Request for Judicial Notice    18 of 164    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

# Financial Summary and Highlights

The Group's reported revenue grew by 31.3% to US$1.6bn (FY2016: US$1.2bn) of which 15.6% was achieved organically with the remaining 15.8% growth resulting from the transformation strategy of the group through acquisitions.

| US$m (unless stated) | FY 2017 | FY 2016 | Growth % |
|---|---|---|---|
| **Group** | | | |
| Revenue | 1,603.4 | 1,220.8 | 31.3% |
| EBITDA | 353.4 | 246.1 | 43.6% |
| EBITDA margin | 22.0% | 20.2% | *180bps* |
| Net Profit | 209.2 | 151.4 | 38.2% |
| Net Profit margin | 13.0% | 12.4% | *60bps* |
| Earnings per share (US$)-Basic | 0.910 | 0.711 | 28.0% |
| Adjusted Net Profit | 236.6 | 165.2 | 43.2% |
| Adjusted Earnings Per Share (US$) | 1.036 | 0.781 | 32.7% |
| **Divisional performances** | | | |
| Healthcare Revenue | 1,161.6 | 823.3 | 41.1% |
| Healthcare EBITDA | 355.4 | 241.1 | 47.4% |
| Healthcare EBITDA margin | 30.6% | 29.3% | *130bps* |
| Healthcare Net profit | 287.8 | 192.9 | 49.2% |
| Healthcare Occupancy | 71.6% | 74.3% | *-270bps* |
| Distribution Revenue | 486.8 | 431.9 | 12.7% |
| Distribution EBITDA | 51.5 | 47.1 | 9.4% |
| Distribution EBITDA margin | 10.6% | 10.9% | *-30bps* |
| Distribution Net Profit | 48.0 | 43.6 | 10.1% |

Notes:

Net Profit equals profit after tax as shown in the Consolidated Income statement.

Adjusted Net profit equals adjusted profit as shown in Note 16.

Adjusted Earnings per share equals diluted adjusted earnings per share as shown in Note 16.

EBITDA equals Profit from operations before depreciation, amortisation, transaction cost and impairment as shown in the Consolidated Income statement.

Healthcare and distribution numbers are before considering intra - group eliminations.



For more information see Our Financial Review on pages 24 and 25

Exhibit 5 to B.R. Shetty's Request for Judicial Notice    19 of 164    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

# Business Model
## How We Operate



Community
Local/City
Regional (UAE)

Est. 1975
c. 108,900 SKU's

Est. 2012
Over 400 beds

VERTICALS

Distribution

Operation & Management

Infrastructure network

Operational know-how & experience

Nephrology

Neurology

Oncology

Cardiology

Home care

Long-term & Home Care

Long-term care

CENTRE OF EXCELLENCE

Multi-speciality network

Urology

IVF

Cosmetics

Est. 2015
265 beds

Mothercare

Pediatrics

Orthopedics

Maternity & Fertility

Est. 2015
106 beds &
c.20k Cycles

Est. 1975
1,168 beds

### HEALTHCARE DIVISION CONTINUES TO INCREASE SHARE OF TOP AND BOTTOM LINES

NMC's business is built upon 5 distinct business verticals, 4 within Healthcare as well as Product Distribution. The Company's primary focus in terms of expansion remains in the Healthcare businesses, as a result of which its contribution to the top and bottom lines continues to increase. Management expects this trend to continue.

### HEALTHCARE INCREASING CONTRIBUTION TO TOP LINE...

**Revenue Share**

| Year | Healthcare | Distribution |
|------|-----------|--------------|
| 2017 | 70.5% | 29.5% |
| 2016 | 65.6% | 34.4% |
| 2015 | 56.8% | 43.2% |

■ Healthcare
■ Distribution

Source: NMC

### ...AS WELL AS TO PROFITABILITY

EBITDA Share

| Year | Healthcare | Distribution |
|------|-----------|--------------|
| 2017 | 87.3% | 12.7% |
| 2016 | 83.7% | 16.3% |
| 2015 | 75.9% | 24.1% |

■ Healthcare
■ Distribution

Source: NMC

Exhibit 5 to B.R. Shetty's Request for Judicial Notice    20 of 164

Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

## Healthcare

The primary source of NMC's revenue and net income generation is provision of medical services to the Company's patient base. These range from outpatient and inpatient services provided at NMC's network of clinics and hospitals to medical diagnostics and sales at pharmacies. The multi-specialty vertical, which encompasses all of NMC's hospitals, remains the single largest contributor to the Company's income, accounting for 72% of Healthcare revenues in 2017. Insured individuals account for the majority of NMC's patient base and as such insurance accounts for 80% of Healthcare revenues, while cash payments account for the remainder. Insurance claims are typically processed over a 90-day time period. With regards to the Distribution business, NMC offers its clients an end-to-end solution. Customers are offered payment terms ranging from 1 month for small enterprises to 120 days for large corporations. NMC also acquires inventory as part of the distribution chain and as such, the business requires funding for working capital.

### HEALTHCARE DIVISION
The Healthcare division is built upon 4 verticals: multi-specialty, maternity & fertility, long-term & home care and Operations & Management. NMC operates 51 facilities across its healthcare network, with a total of 1539 licensed beds, along with another 78 managed facilities. In terms of geographic reach, NMC's facilities (both owned and managed) are spread across 13 countries.

NMC continues to cater to underserved segments of the healthcare industry, with a dual focus on 1) unaddressed medical service requirements and 2) filling in geographic gaps within its target markets. The former is achieved by continuous development of Centres of Excellence, which are then upgraded to business vertical status, where warranted. With regards to the Group's geographic spread, NMC continues to expand its network within existing markets, as well as entering new countries, to capitalise on opportunities.

From a geographic standpoint, NMC has adopted a three-tiered approach for its Healthcare division:

1. The GCC remains the primary focus for expansion of the group's own healthcare network. Outside NMC's home market of UAE, Saudi Arabia represents the largest opportunity and as such remains a key focus area for future growth.
2. Given the nascent stage of IVF technology around the world, fertility is being developed as a global business by NMC. As the world's second largest player in the fragmented IVF market, the Group is well positioned to become a consolidator in the fertility space.
3. The O&M vertical is being utilised to extend NMC's reach beyond the GCC into wider emerging markets. In addition to generating high-margin revenues, O&M contracts provide NMC with vital market intelligence on new markets, which could subsequently translate into further growth opportunities for the Group's own healthcare network.

## Distribution

### PRODUCT DISTRIBUTION & WHOLESALE
NMC's distribution business ranks as one of the largest in the UAE, offering over 108,900 products across five verticals: Pharma, Medical equipment & consumables, Consumer, Education and Veterinary.

Despite being characterised by a slower growth profile than that for the Healthcare division, Distribution remains a vital part of NMC's business. In addition to healthy top and bottom line contribution, the Distribution division offers three distinct benefits:

1) Strategic market intelligence due to its role as one of the leading suppliers to healthcare and FMCG companies in the UAE;
2) Consistent cash flow generation throughout the year and;
3) Synergistic opportunities for improving efficiencies at businesses being managed by NMC under Operation & Management contracts.

NMC's Distribution offers a complete supply chain solution, with a wide range of services offered to clients: sales, marketing, merchandising, promotions, warehousing, delivery, analytics and technical service. The Group's distribution capabilities are supported by a network of over 725,000 sqft of warehousing space across the UAE, more than 230 vehicles and 820 professionals across the entire value chain ensuring that over 13,000 customers of the Distribution division are catered to properly.

**1,539 LICENSED BEDS SPREAD ACROSS 13 COUNTRIES**



Licensed beds by country



- UAE 75%
- KSA 18%
- Oman 7%

Source: NMC

**INSURED PATIENTS MAIN SOURCE OF HEALTHCARE REVENUES**

Revenue mix for Healthcare business



- Insurance 80%
- Cash 20%

Source: NMC

Exhibit 5 to B.R. Shetty's Request for Judicial Notice    21 of 164    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

# Our Strategy

Since its IPO in 2012, NMC has been successfully implementing a three-part growth strategy, with the first stage entailing capacity build-up from 2012 onwards, a shift in focus towards capabilities from 2015 onwards and geographic expansion beyond UAE from 2016 onwards.

An update to the Group's strategy was announced in 2015, which highlighted the following:

- Accelerate the establishment of Centres of Excellence in key specialties within its existing hospitals;
- Increase its participation in the rapidly growing medical tourism industry within the UAE by establishing its facilities as a destination of choice for medical tourists;
- Grow its medical specialty offering and clinic network within the UAE and maximising operational synergies in the region;
- Selectively establish a strategic presence outside the UAE via acquisitions of, or collaborations with, leading global medical institutions in order to further enhance and expand the technological know-how and medical expertise available across all of NMC's facilities; and
- Increase its footprint in Saudi Arabia and the broader Gulf Cooperation Council (GCC) region via organic initiatives and acquisitions.

NMC has made considerable progress on its strategic goals, the most notable of these include:

- Successful execution of the organic expansion plan outlined during NMC's IPO. The major asset additions in this regard include Brightpoint Royal Women's Hospital, NMC General Hospital Dubai Investment Park and NMC Royal Super Specialty Hospital.
- Expansion of NMC's portfolio of medical services and geographic footprint in the UAE through carefully executed acquisitions and investments. Major acquisitions include ProVita and Americare, which led to NMC's entry into the long-term and homecare markets, as well as Dr. Sunny Network and Al Zahra Hospital, which have helped NMC become the dominant healthcare provider in the Sharjah emirate.
- NMC's ranking as the second largest fertility treatment provider in the world through a combination of acquisitions, particularly of Clinica Eugin in Spain and Fakih IVF in UAE, as well as organic growth.
- Expansion in to the GCC healthcare market through establishment of a firm foothold in Oman and Saudi Arabia. NMC continues to rapidly increase its presence in the GCC through a combination of acquisitions and organic growth.

NMC's enlarged size, both in terms of medical service offerings and geographical footprint, now offers the Group substantial new growth opportunities. As a result, the Group recently announced a further update to its strategy, which is aimed at enhancing the depth and breadth of the existing infrastructure. The augmented Growth Strategy entails:

1) **Addition of new verticals:** NMC intends to add new healthcare verticals, focusing on highly underserved segments in the UAE, as well as the wider GCC. Furthermore, the Group continues to develop its underlying Centers of Excellence, with the potential for some to be upgraded to new verticals in the medium term.
2) **Targeting wider emerging markets:** After successfully growing its geographic footprint outside the UAE, NMC is now expanding its target market focus from the GCC to wider emerging markets for the healthcare business. The Distribution business will continue to be focused on the UAE.
3) **Fertility to be developed as a global business:** NMC's fertility business remains the only exception within the healthcare segment, as it will continue to be developed globally. Given the nascent stage of the fertility sector around the world, both developed and emerging markets offer substantial growth opportunities. As the world's second largest player in the fragmented IVF market, NMC's strategy of developing an institutionalised business makes it a prime candidate to become a global consolidator.
4) **Rapid adoption and deployment of technological innovation:** NMC aims to embrace technological disruption instead of becoming disrupted by it. A number of innovative projects are already under way that will 1) add new services (which were not achievable previously without new technology), 2) improve patient experience and 3) improve operational efficiencies. NMC is developing a robust innovation structure and will not rely on acquisitions alone.

20    NMC Health plc Annual Report and Accounts 2017

## Business Overview

FY 2017 continued to build on the achievements of FY 2016, with NMC further consolidating its position as the leading healthcare provider in the UAE and expanding its footprint in KSA. The Group also extended its geographic reach into Oman, where it currently accounts for 20% of the private sector bed capacity in the country.

**OPERATIONAL OVERVIEW**

Consolidated revenues of the Group recorded 31% YoY growth in 2017 to reach US$1.6bn. The Healthcare division continues to be the primary driver of top line growth, posting 41% YoY growth in 2017 vs. 13% for the Distribution division. The faster growth continues to translate into increasing revenue contribution from the healthcare business, with its share rising from 52% in 2014 to 72% in 2017.

Consolidated EBITDA reached US$353m (+44% YoY), with the Healthcare Division accounting for 87% of the Group EBITDA and Distribution division accounting for the remaining 13%. Higher margins associated with the healthcare business also continue to elevate overall Group margins, with consolidated EBITDA margin reaching 22% in 2017, up 180 bps YoY.

With the Healthcare division remaining the primary focus of NMC's organic and inorganic expansion plans going forward, the trend of increasing contribution from this segment to the Group's revenues and profitability is expected to continue for the foreseeable future. Consequently, the Group EBITDA margin is anticipated to rise further in the coming years. Moreover, in terms of the individual businesses, the sustainable EBITDA margin for the Healthcare division stands around 30% versus 9-10% for Distribution.



Revenue Share

| Year | Healthcare | Distribution |
|---|---|---|
| 2017 | 70.5% | 29.5% |
| 2016 | 65.6% | 34.4% |
| 2015 | 56.8% | 43.2% |

■ Healthcare
■ Distribution

EBITDA Share

| Year | Healthcare | Distribution |
|---|---|---|
| 2017 | 87.3% | 12.7% |
| 2016 | 83.7% | 16.3% |
| 2015 | 75.9% | 24.1% |

■ Healthcare
■ Distribution

EBITDA margins

| Year | Healthcare | Distribution | Consolidated |
|---|---|---|---|
| 2017 | 30.6% | 10.6% | 22.0% |
| 2016 | 29.3% | 10.9% | 20.2% |
| 2015 | 26.5% | 11.1% | 17.1% |

■ Healthcare
■ Distribution
■ Consolidated

Exhibit 5 to B.R. Shetty's Request for Judicial Notice    23 of 164    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

# Business Overview continued

## Healthcare Division

Building on the good momentum of previous years, the Healthcare division continued its trend of strong growth in 2017, with revenues posting 41% YoY growth to reach US$1.2bn. Healthcare services accounted for US$1.1bn out of the total, with pharmacies and Operations & Management contributing US$59m and US $8m, respectively. Sustained margin improvement again translated into more rapid expansion at the EBITDA level, which stood at US$355m (+ 47% YoY). EBITDA margin for the year stood at 31%, up 130 bps YoY.

A total of 5.8m patients visited NMC's facilities in 2017, up 33% YoY. The sharp rise was driven through a combination of continued ramp-up at facilities opened by the Group in recent years, particularly NMC Royal Hospital, and inorganic additions, particularly that of Al Zahra Hospital, during the year.

Average revenue per patient increased 8% YoY to US$189.8. Improving this metric remains an important focus area for NMC and average revenue per patient has risen 88% from US$100.7 at the time of our IPO in 2012. Introduction of higher value healthcare services, such as long-term care and IVF, combined with a concerted move towards undersupplied, more sophisticated medical procedures, is expected to sustain this trend of improving revenue per patient. For 2017 in particular, increasing contribution from NMC Royal Hospital and addition of Al Zahra Hospital to the portfolio supported improvement in average revenue per patient.



Healthcare Revenue & Growth (US$m)



Patient Numbers & Growth



Revenue per patient & Growth (US$)

### MULTI-SPECIALTY

Benefiting from rapid ramp-up of utilisation at facilities opened in recent years (particularly at NMC Royal Hospital and DIP Hospital) and addition of Al Zahra Hospital (NMC's largest acquisition to date), the multi-specialty vertical recorded 50% YoY growth in revenues to US$834m for 2017.

The number of patients within the multi-specialty vertical increased 35% to 5.5m in 2017. Meanwhile, average revenue per patient for the year stood at US$139.4 (+15% YoY). As indicated earlier, healthy ramp-up at NMC Royal Hospital and addition of Al Zahra Hospital to the portfolio have been key catalysts for the increase in number of patients, as well as improvement in average revenue per patient.

The number of licenced beds within the vertical increased from 655 in 2016 to 1,168 in 2017, with acquisition of Al Zahra Hospital, assets in Oman and two new hospitals in KSA, accounting for an addition of 398 beds to the portfolio. Additionally, 115 new beds were added in existing facilities, reflecting continued optimisation of even the more mature hospitals within NMC's network.

NMC Royal Hospital remains the cornerstone of the multi-specialty vertical, with the number of operational beds reaching 200 by end 2017. The remaining 116 licensed beds in the facility are expected to become operational by 2019.

In terms of inorganic expansion, 2017 witnessed the inclusion of Al Zahra Hospital to NMC's network. Acquisition of the hospital also completed the Group's hub-and-spoke model in Sharjah, making it the most dominant operator in the Emirate. The year also witnessed expansion of NMC's geographic footprint into Oman through the acquisition of Atlas Healthcare's facilities. The 102 beds in Oman translate into a 20% private sector market share for NMC in the country, positioning it well to benefit from the roll-out of mandatory healthcare insurance planned by the government from 2018. Last, but not least, the Group further strengthened its foothold in KSA by acquiring one multi-specialty facility each across the cities of Ha'il and Najran.

**KEY HEALTHCARE VERTICALS**
**PERFORMANCE OVERVIEW BY VERTICAL**

| Detail | Multispecialty | Maternity & Fertility | Longterm & Home care | Total |
|---|---|---|---|---|
| Revenue (US$'000) | 833,627 | 205,761 | 113,836 | 1,153,224 |
| Growth | 50% | 17% | 36% | |
| Revenue/patient (US$) | 139 | 1,003 | 20,063 | 189.8 |
| Growth | 15% | 12% | -50% | |
| Capacity | | | | |
| Licensed beds | 1,168 | 106 | 265 | 1,539 |
| Operational beds | 1,000 | 100 | 265 | 1,365 |
| Growth | 118% | 0% | 121% | 101% |
| Spare capacity (beds %) | 14% | 6% | 0% | 11% |
| Patients | 5,555,738 | 205,235 | 5,674 | 5,766,647 |
| Growth, YoY | 35% | 4% | 170% | |
| Bed Occupancy | 65.9% | 76.9% | 86.2% | 71.6% |

Source: NMC

\*    Revenue per patient excludes pharmacy revenues.

**22**    NMC Health plc Annual Report and Accounts 2017

## Healthcare Division



### MATERNITY & FERTILITY

The maternity & fertility vertical posted US$205m revenues in 2017, translating into 17% YoY growth. The business benefitted from continued ramp-up of operations at Brightpoint Hospital, with utilisation reaching 77% in 2017 (65% in 2016).

The fertility business also maintained its pace of strong YoY growth, marked by a combination of growing performance of the IVF network and an organic expansion with new Fakih IVF clinics added in Al Ain and Oman. NMC is steadily moving to build on its position as the second largest IVF player in the world and is focusing on expanding its footprint in the GCC, as well as other geographies in the coming months. One of the most important developments in this regard is the recent acquisition of Al Salam Medical Group, which will allow NMC to establish its first IVF clinic in Riyadh.



### LONG-TERM & HOME CARE

The long-term & home care vertical recorded revenues of US$114m in 2017, up 36%. The increase was driven by improved occupancy at existing facilities and addition of new capacity, particularly through the conversion of As Salama hospital in KSA from Multi-Specialty to a long-term care facility.

Additionally, 16 long-term care beds were added in Al Zahra Hospital, continuing the trend of cross-pollination across assets that commenced with the introduction of 26 long-term care beds in NMC Royal during 2016.

Occupancy rate for the long-term & home care vertical stood at 86% in 2017 vs. 90% in 2016. Meanwhile, revenue per patient for the vertical stood at US$20,063 in 2017, compared to US$39,854 in the previous year.



### OPERATION & MANAGEMENT

NMC renewed its focus on the Operations & Management vertical in 2017, with a key aim of growing the business strongly going forward. The existing contract for Khalifa Hospital in Umm Al Quwain was renewed for another 5-year period and several new contracts were signed. Two in particular were announced during the year, namely Emirates Healthcare Group's assets and a UAE government hospital in Yemen.

Revenues from the O&M vertical stood at US$8m in 2017 (+33% YoY), with substantial further growth anticipated in 2018.

## Distribution Division

### DISTRIBUTION

The Distribution business recorded 13% revenue growth in 2017 to reach US$487m. The growth was supported by the recent changes implemented by Dubai Government making insurance mandatory. EBITDA margin for the division declined slightly to 10.6%, translating into 2017 EBITDA of US$52m.

NMC further solidified its position as one of UAE's largest distribution companies, increasing the number of its SKUs to 108,900 (+17.5% YoY), with 46% of the products sold under exclusive agency contracts. The supporting infrastructure for the Distribution business also continued to increase, with total warehouse storage area increasing to 725,000 sq. ft. (+11%) and vehicle fleet rising to 232 (+1%).

The UAE government has implemented 5% Value Added Tax (VAT), effective from 1 January 2018. While most of NMC's business will not be affected by this tax (the majority of healthcare services are zero-rated and most pharmaceutical products are either exempt or zero-rated), parts of the Distribution business will be subject to VAT. However, the tax burden is expected to be transferred to the end consumer. Additionally, input tax incurred by NMC is refundable and can be adjusted against VAT on the Distribution division.



Distribution 2017

- FMCG 35.3%
- Pharma 34.2%
- Food 14.2%
- Scientific 11.1%
- Education 4.6%
- Vetinery 0.4%
- Homecare 0.2%

Exhibit 5 to B.R. Shetty's Request for Judicial Notice    25 of 164    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

# Financial Review

## The Group reported solid results in FY 2017 and is in a sound financial position overall.

The Group's reported revenue grew by 31.3% to US$1.6bn (FY2016: US$1.2bn) of which 15.6% was achieved organically with the remaining 15.8% growth resulting from the transformation strategy of the group through acquisitions. Group EBITDA increased by 43.6% to US$353.4m (FY2016: US$246.1m). Group EBITDA margin increased by 180 basis points to 22% mainly as a result of realising some of the acquisition related synergies within the Group and the improvement of margin in existing entities (including the new facilities). Group net profit increased by 38.2% to US$209.2m (FY2016: US$151.4m) and Group basic earnings per share grew by 28.0% to US$0.910 (FY2016: US$0.711).

Overall, our growth in revenue and improved profitability are attributed to both an improvement in performance of our existing hospitals and medical facilities and the acquisitions made within the Middle East, Europe and South America over the last 2 years.

### HEALTHCARE DIVISION

Revenue in the Healthcare division continued to achieve improved performance from US$823.3m in FY2016 to US$1,162m in FY2017, a level of growth of 41.1% of which 16.4% was achieved organically with the remaining 24.7% coming from acquired assets.

EBITDA improved to US$355.4m in FY2017 (2016: US$241.1m), a level of growth of 47.4%. EBITDA margins were 30.6% (FY2016: 29.3%).

The entities which were acquired earlier in the year, in particular Al Zahra Hospital though yet to be fully integrated within the Group performed above expectation in terms of revenues, EBITDA and cash flows.

The other entities acquired as part of the Group's Growth Strategy to build an integrated multi-vertical and multi-brand healthcare network across several geographies such as As Salama Hospital, Bin Said Clinics, and Atlas Healthcare Clinics performed in line with our

expectations. Overall, our acquisitions have contributed a positive impact on the group revenue, EBITDA and cash flow.

### DISTRIBUTION DIVISION

Within the Distribution division, revenues increased to US$486.8m in FY2017 (FY2016: US$431.9m), a growth rate of 12.7%. EBITDA increased to US$51.5m in FY2017 (FY2016: US$47.1m), a growth rate of 9.4%.

The growth in revenue is attributed to the expansion of and consolidation within our distribution network. Further, the introduction of mandatory insurance in Dubai in 2016 continues to have a favourable impact on the Pharma portfolio.

Our focus on identifying efficiencies within our operations contributed to an improvement in our margins.

### CAPITAL EXPENDITURE

Total capital additions of US$63.5m (FY2016: US$66.9m) were made during the year, in line with our expectations. Of the total capital expenditure spend during the period, US$31.4m (FY2016: US$38.9m) related to new capital projects and US$32.1m (FY2016: US$28.0m) related to further capital investment in our existing facilities.

The Group has assessed all significant capital expenditure projects for indicators of impairment and have concluded that the projects have sufficient headroom and that none of the assets are impaired.

### ACQUISITIONS

During the year, we completed and announced a number of transactions, some of which had a material impact on our results and reflect our focused expansion strategy. Total consideration paid for all the acquisitions was US$641.0m.

Intangible assets increased to US$1,156.9m from US$652.9m mainly because of the goodwill recognised in respect of the Al Zahra acquisition.

For detailed analysis of the acquired assets, please refer to the Business Combinations note (note 5) of the financial statements.

### CASH

Cash and cash equivalents decreased from US$433.4m to US$206.5m.

The Group converted 78.5% (2016: 71.7%) of underlying EBITDA into cash generated from operations. Net cash inflow from operating activities for the 2017 financial year was US$277.5m, compared with US$176.4m for the comparative period in 2016.

### NET DEBT AND FUNDING

Net Debt is calculated by reducing Cash and Bank balance from Gross Debt. Net debt increased during the year from US$431.3m to US$1,011.4m, in line with management's expectations. Net debt-to-EBITDA ratio at the end of 2017 stood at 2.9x, remaining at a very comfortable level relative to the Group's cash flow generation capacity.

The increase in net debt is largely attributed to the acquisitions made during the year. The overall movement is explained as follows:

24    NMC Health plc Annual Report and Accounts 2017

Exhibit 5 to B.R. Shetty's Request for Judicial Notice          26 of 164          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

|  | US$m |
|---|---|
| **Net Debt at 31 December 2016** | **431.3** |
| Free cash flow | (277.5) |
| Investment capital expenditure | 64.8 |
| Acquisitions (Note 5) | 628.1 |
| Contingent consideration paid for acquisition (Note 36) | 15.1 |
| Deferred consideration paid for acquisition (Note 5) | 4.4 |
| Loan receivable | 17.9 |
| Dividend paid (Note 26) | 42.3 |
| Finance cost paid | 54.1 |
| Other Items | 30.9 |
| **Net debt as at 31 December 2017** | **1,011.4** |

## WORKING CAPITAL

The Group's two divisions, Healthcare and Distribution, have different funding requirements. As in the previous years, the Group continues to fund its working capital requirements for its Healthcare division from operational cash flow, and we do not expect this position to change in the 2018 financial year.

In relation to the Distribution division, the working capital requirement is dependent on a number of factors including the timing of receipt of debtors and the timing of payment of creditors as well as inventory flow during the year and the timing of re-imbursement of promotional expenses agreed with our Principals in relation to the sale and marketing of their products. The Distribution division requires external working capital facilities throughout the year, the level of which is dependent on business seasonality. These working capital facilities are arranged through a number of banking providers and in general terms the level of working capital required is between 20%-30% of the Group's total debt facilities.

## FUNDING

The Group's largest acquisition during FY2017, the acquisition of Al Zahra Hospital was largely financed via borrowings, but also utilising the proceeds of a share placing raising US$322m in December 2016.

During the year, the Group entered two new syndicated facilities amounting to US$825m (Facility A) and US$250m (Facility B) respectively. Facility A is repayable over 60 months with an initial grace period of 12 months. Facility B is repayable over 84 months with a grace period of 12 months.

In addition to the above facilities, term loans also include other short term revolving loans which get drawn down and repaid over the period.

The total debt of the Group, excluding accounts payable and accruals, was US$1,399.0m as at 31 December 2017 compared to US$1,049.1m as at 31 December 2016.

## FINANCE COSTS AND INCOME

Total finance costs for FY2017 were US$63.8m compared to US$41.7m in FY2016. This was mainly on account of the higher facility amount availed to refinance the existing debts as well as to finance the acquisitions.

As part of the Group's capital expenditure programme, borrowing costs of Nil (FY2016: US$0.3m) have been capitalised during the year. The rate used to determine the amount of borrowing costs eligible for capitalisation was 1.9% for (FY2016, which is the effective rate of the borrowings used to finance the capital expenditure).

## DIVIDEND

The Board is proposing to continue with its policy of annual dividend payments of between 20% and 30% of profit after tax, outlined in the Company's IPO prospectus in 2012. The Board is therefore recommending that a final dividend of 13 pence per share be paid in cash in respect of the year ended 31 December 2017 (FY2016: 10.6 pence per share).

Subject to approval of the shareholders at the company's annual general meeting on 28 June 2018, the dividend timetable is as follows:

Ex-dividend date - 14 June 2018
Record date - 15 June 2018
Payment date - 10 July 2018

Exhibit 5 to B.R. Shetty's Request for Judicial Notice     27 of 164     Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

Strategic Report

Management Evolution

# SUCCESSION IN ACTION

## Well equipped for the future

NMC has always prided itself on its ability to evolve as an organisation as required during its growth over more than 40 years of developing the Group. During the period following the Group's IPO, during the period of organic capacity growth, the Organisation developed its structure at an appropriate pace to deal with the challenges which accompany growth.

Since 2015, the Group's organic growth was enhanced with a strategic plan to grow capability and capacity through acquisitions. In H2, 2017, following several years of transformational growth, and a period of consolidation and integration, a wider management team was put in place to deal with the additional challenges arising from geographic expansion.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice        28 of 164            Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

From a management structure perspective, the Group believe that it is now well placed to manage further planned strategic growth.



Management of the significantly larger Healthcare Division has also been enhanced during 2017.



Exhibit 5 to B.R. Shetty's Request for Judicial Notice    29 of 164    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

# Risk Management

NMC follows a conservative approach in risk taking and has implemented controls and mitigation strategies in order to reduce those risks.

**IDENTIFICATION OF RISK**

The Board consider the identification and mitigation of material risks and uncertainties faced by the Group as a key issue to be monitored at all levels of the organisation. The Board has overall responsibility for the Group's risk management and internal control systems. The Senior Management team ensure that operational management consider risk as part of their day to day activities.

Whilst identification of risks and related controls and mitigations are important elements for the stability of all businesses, the Board consider these areas to be particularly key for NMC as a Group due to both our growth strategy and the fact that our businesses operate in regulated environments.

As there are multiple risks evident across our various business verticals, the risk management processes operating within the NMC Group are an essential mechanism to enable a risk based decision making process. NMC follows a conservative approach in risk taking and has implemented controls and mitigation strategies in order to reduce those risks.

The Strategic Risk Register, which is the basis for the list of principal risks and uncertainties below, and our approach to controlling and mitigating risks was developed and is maintained using both a bottom up and top down assessment of business and strategic risks. The risk register is reviewed and considered regularly.

The Strategic Risk Register was produced by way of a bottom up exercise of risk reviews conducted through discussions in each of the Group's businesses. The top down exercise included meetings of senior executives. The output from the aggregated results of these exercises produces a list of principal risks that are reviewed and agreed by the Senior Management Team before being presented to, and discussed by, the Board.

The Board approved the Strategic Risk Register in both August 2017 and March 2018.

Depending on the nature of the risk involved, a variety of risk mitigation measures have been implemented including, for example, insurance, standardised processes, delegation of authorities and succession plans, diversification in business and revenue streams.

**RISK APPETITE**

As there are multiple risks associated with the healthcare and distribution sectors, the process of risk management is an essential mechanism to enable risk based decision making process. The Board recognises that complete risk control/avoidance is impossible, but that risks can be reduced by putting the right controls and mitigations in place as well as agreeing on a threshold for risk taking (risk appetite).

Risk appetite provides a structure within which opportunities can be pursued by setting out which, why and how much risk the Group is willing to take. The Senior Management Team has approved a set of risk appetite statements covering different views on the risk landscape surrounding NMC's business environment whilst addressing various risk classes. For each risk class, Key Risk Indicators (KRIs) were articulated to alert against unacceptable loss events.

The purpose of setting limits and triggers is to avoid concentrations of risk which would be out of line with internal or external expectations and to:

- keep business activities aligned to the strategic goals of the Group;
- ensure activities remain of an appropriate scale relative to the underlying risk and reward;
- ensure risk-taking is supported by appropriate expertise and capabilities.

**GENERAL RISK APPETITE STATEMENT**

The Company will not accept any risks that would cause losses due to:

- malpractice,
- significant decline in patient satisfaction rate,
- brand damages,
- hospital acquired infections,
- decrease in the utilisation rate for outpatient clinics,
- uncontrolled discharge for inpatients,
- downtime of life saving/sustaining systems,
- inaccuracy of patients' records,
- non-compliance with internal and/or external controls and standards/regulatory bodies,
- sensitive information/patient record confidentiality breach/loss,
- loss of sole distribution partnership agreement,
- loss of key staff/key specialities,
- acquisitions, which are expected to be accretive and not dilutive.

NMC Board of Directors has approved a set of thresholds presented by management which relate to multiple business dimensions in the Healthcare and Distribution divisions to protect shareholders' value. Any areas falling short of the agreed indicators will be highlighted by management for action.

**STRATEGIC RISKS AND UNCERTAINTIES**

In the table of strategic risks below, the Board have set out the Group's strategic risks and the mitigating actions and controls taken against those risks. It should be noted that the order that these risks are expressed in the table does not reflect an order of magnitude as regards their potential impact on the Group. The System of Internal Control and Risk section on pages 53 to 56 also sets out additional details of the governance framework and controls in place within the Group's businesses to monitor and control risk.

There have been no changes made to the Group's strategic risk register in the last 12 months.

28    NMC Health plc Annual Report and Accounts 2017

**KEY THEMATIC RISKS**
**THE BIG PICTURE - 2017**

## CUSTOMER CENTRICITY

1. Delays in completion of new strategic expansion projects due to contractor or potential cash flow interruption and bad investment decisions may result in poor return on Investment (ROI), decreased margins and market share.

## FINANCIAL HEALTH

2. Increased competition due to high private and public investments in the healthcare sector and to associated investments coming from new entrants or existing player.

3. Failing to innovate and effectively deliver new services. Inexperience of operating in new markets/offerings leads to missed opportunity or poor delivery.

4. Potential inability to improve NMC's margin due to medical inflation and pressure and bargaining from key insurance providers.

5. Potential instability in revenue impairing cash flow and working capital health as a result of global and regional demographic, macro economic and geopolitical factors.

6. Failure to maximise the opportunity or acquisitions through successful integration strategies or through ineffective management structure or operating model.

## SERVICES EXCELLENCE

7. A Data Security (e.g. VVIP patient records) breach due to either intentional malicious cyber-attack or unintentional data or system loss resulting in reputational damage, operational disruption or regulatory breach.

8. Failure to comply with multi regulatory and standards bodies' requirements could result in financial fines, inability to renew licenses, as well as NMC reputation damage.

9. Failure to comply with internationally recognised clinical care and quality standards, clinical negligence, the mis-diagnosis of medical conditions or pharmaceuticals and the supply of unfit products across both divisions.



## PEOPLE ENABLEMENT

10. Failure to retain/acquire key professionals or inability to acquire sufficient Medical staff could potentially lead to inability to deliver required healthcare services and execute growth strategy.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice    31 of 164    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

Strategic Report

## Risk Management continued

| Risk Class | Description and Potential Impact | Control & Mitigations |
|---|---|---|
| Investment | Bad decisions in relation to either acquisition or organic growth investments or an inability to appropriately execute integration or new facility ramp-up plans may result in:<br><br>• Lower Return on Investment (ROI);<br>• Lower revenue than expected;<br>• Decreased margins and market share;<br>• Potential for impairment of assets;<br>• Potential difficulty in raising future finance. | • Board oversight in approving and monitoring strategic projects<br>• Project management controls<br>• Detailed market and business appraisal processes<br>• Focus on integration pathway to improve Group revenue generation from intra-group business referrals and multi-brand facility sharing<br>• Strategy to acquire international know-how through acquisition plan<br>• Re-alignment of existing assets within the Group's hub and spoke model (e.g. existing specialty hospitals feeding the regional NMC Royal Hospital, Khalifa City). |
| Competition | Increased competition due to high private and public investments in the UAE healthcare sector and associated investments coming from new entrants or existing player partnerships would lead to market share loss and potential reduction in access to future growth in UAE healthcare spend. | • Integrated Hub-Spoke model<br>• Growing healthcare network<br>• Partnership with Government hospitals<br>• The development of international partnerships and use of increased know-how gained through strategic growth plan<br>• Diversification of patient base<br>• Variety in service offerings. |
| Financial | Failure to focus on innovation and technological advances and effectively deliver new services. Inexperience of operating in new markets/offerings leads to missed opportunity or poor service delivery. | • Frequent monitoring of both fixed and variable cost<br>• Synergy tracking and reporting<br>• Acquiring the skills associated with the M&A transactions<br>• Strategy to target investment in innovation and future healthcare services development. |
| Financial | Potential adverse effect NMC's margin as a result of unexpected regulatory or cultural changes affecting the provision of healthcare, the basis of the healthcare insurance structure or increases in medical inflation and pricing pressure and bargaining from key insurance providers in the Group's key markets, would result in less profitability. | • Diversification of the revenue streams<br>• Increased collaboration between different group assets and businesses<br>• Frequent monitoring of both fixed and variable cost<br>• Good relationships with insurance providers<br>• Strategy to increase patient volumes and focus on clinical specialisms<br>• M&A Strategy in new markets. |
| Macro-economic | Potential instability in revenue impairing cash flow and working capital health as a result of global and regional demographic, macro-economic and geopolitical factors. | • UAE is a stable and booming market to operate in<br>• Diverse business and revenue streams<br>• Long Term debt facilities and unutilised working capital limits<br>• Strong banking and supplier relationships. |
| Financial | Failure to maximise the opportunity of acquisitions though successful integration strategies or through ineffective management structure or operating model may results in:<br><br>• Increased market and regulatory/legal obligations;<br>• Increased culture resistance and complexity in shifting the governance model from enterprise to corporate structure;<br>• Increased operational exposure due to the complexity of integrating higher number of spokes to centralised hub of excellence;<br>• Increased investment risk due to weak due diligence and other mitigates. | • Proper due diligence<br>• Post-acquisition integration plan<br>• Rigorous analysis of value of the acquisition<br>• Focus on the corporate cultures involved<br>• Executive committee reporting and targets<br>• Synergy tracking and reporting<br>• Acquiring the skills associated with the M&A transactions. |

30    NMC Health plc Annual Report and Accounts 2017

| Risk Class | Description and Potential Impact | Control & Mitigations |
|---|---|---|
| Technology | A Data Security (e.g. VIP patient records) breach due to either intentional malicious cyber-attack or unintentional data or system loss resulting in reputational damage, operational disruption or regulatory breach. | • ISO 27001 certified framework for IT policies and controls.<br>• Strict measures towards clients' data and records<br>• Investment in new Hospital Information System and ERP financial system approved by the Board and implementation in progress. |
| Compliance & Regulation | Failure to comply with multi regulatory and standards bodies' requirements could result in financial fines, inability to renew licenses, as well as NMC reputation damage. | • Quality & Standards Department monitors regulatory changes<br>• Partnership with government<br>• Good relationships with regulators and accrediting organisations<br>• Continuous focus on delivering high levels of service. |
| Product & Service | Failure to comply with internationally recognised clinical care and quality standards, clinical negligence, the misdiagnosis of medical conditions or pharmaceuticals and the supply of unfit products across both divisions could result in regulatory sanction, licence removal, significant reputational damage, loss of patient and customer confidence and potential criminal proceedings. | • Doctors subject to rigorous licensing procedures which operate in the UAE<br>• Healthcare division is a regulated business and five of the Group's principal hospitals have achieved, or are in the process of achieving, international quality standards accreditation<br>• Many aspects of the operation of the Distribution division, including the sale of pharmaceuticals, is regulated in the UAE<br>• Board oversight and integrated governance structure<br>• Medical malpractice insurance to cover any awards of financial damages<br>• Continuous training and development programs. |
| Human Capital | Failure to retain/acquire key professionals or inability to acquire sufficient Medical staff could potentially lead to inability to deliver required healthcare services and execute growth strategy. | • Partnership with education institutes<br>• Effective sourcing strategies & recruitment campaigns<br>• Ongoing review of senior management resources and succession plans in place for key positions<br>• Competitive salary packages, growth and good working conditions act as a good retention tool<br>• Clear career path for staff and continuous training and development programs. |

As recommended by provision C.2.2 of the UK Corporate Governance Code, the Directors have considered a formal long-term assessment of the prospects and viability of the Group. As part of this assessment, the Board considered the potential impact of three principal risk themes facing the Group. The Board's viability statement is set out on pages 83 to 85.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice    33 of 164    Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

# Corporate Social Responsibility

We believe that a crucial criterion of how an organisation operates and how its success and development is measured is the way in which it fulfils its responsibilities both within and outside its businesses, is its Corporate Social Responsibility (CSR). Our CSR strategy focuses mainly on community, environment and workplace.

### THE CSR PRINCIPLES

For over 40 years the Group has been using its medical and non-medical infrastructure along with our expertise in the region to positively impact community, environment and workplace. NMC has been committed to practising a strong professional and social responsibility to its community, sustainable management of UAE's environment and ethical conduct and good governance in the workplace.

### NMC'S GENERAL APPROACH TO CSR

NMC takes very seriously its social responsibility and supports the report of the International Bioethics Committee of **UNESCO** on Social Responsibility and Health. This report interprets social responsibility and healthcare delivery as both "passive" and "active" in how to manage internal operations and the impact of activities on the community and environment.

At NMC we engage in "passive" social responsibilities by complying with all regulatory requirements and general ethical standards, such as:

- respecting human rights;
- non-discriminatory work practices;
- protecting privacy rights that improve society;
- strict adherence to Anti-Bribery, Anti-Corruption, Gifts and Entertainment Policy by having a zero tolerance to such behaviour regardless of the identity or position of the originator or recipient of a Bribe;
- welcoming patients from all segments of society, nationalities and income levels; and
- having environmental policies and practices that protect our society and environment.

We are also committed to "active" social responsibilities that go beyond legal obligations and general ethical standards. We actively pursue the interests and values of individuals and the local and global community and environment.

These 'moral obligations' include:

- actively promoting preventive health programmes designed to improve the health and quality of life of residents;
- funding and making publicly available the annual Health Index for the UAE; and
- introducing best practice environmental management.

These all contribute to the common good of people in the workplace, the community and the environment.

NMC considers three specific areas in relation to its social responsibility

- Our Employees
- The Environment
- The Community

## Employees

### EMPLOYEE ENGAGEMENT
#### NMC FOUNDATION DAY
NMC organises many employee engagement programs and events each year. In 2017, the principal such event was the first NMC foundation day, hosted on 1st August 2017, which saw events taking place across all of our facilities across the Group. Staff across the Group celebrated the success achieved by NMC since inception, and also attended receptions where the CEO, or other members of the Senior Management Team, congratulated staff and honoured high performing teams and employees. Presentations were made to employees reinforcing the spirit of the Foundation day which will be celebrated each year.

NMC Foundation Day ended with a gathering of corporate staff members who, in line with events earlier in the day, came together to celebrate this occasion with much gusto. The evening was also presided over by the senior management and guests from other facilities. Staff also enthusiastically shared their experiences of the day and extended warm wishes to NMC.

As the event unfolded, the most awaited guest for the evening, Dr. BR. Shetty, Founder and Chairman, Prasanth Manghat, CEO and Dr. C.R. Shetty, Group Medical Director arrived and took to the stage to take the evening further. After the welcome address, our beloved founder Dr. BR. Shetty, was presented with an exquisite plaque as a gift on his 75th birthday on behalf of all staff. Dr. BR. Shetty addressed the staff with his inspirational words of wisdom.

Mr Manghat also addressed the gathering and presented awards. Such events give employees the opportunity to come together, celebrate past successes and leave with optimism, vigor and renewed energy.

### EMPLOYEE EDUCATION PROGRAMME
NMC conducts multiple training programs throughout the year for its employees. In 2017 alone, both medical and non-medical staff have been trained in various engaging training programs which include fire and safety, quality control, occupational safety, utility management training, infection prevention control, health talks, etc. These training programs ensure continuous education and training to our staff across all healthcare and trading facilities. These programs are not only conducted internally but also by external qualified and reputed organisations such as Abu Dhabi Civil Defense for fire and safety training programs.

NMC Healthcare further conducts 'Continuing Development Programs' in-house at facilities across UAE. The aim of these programs is to impart and reinforce the doctors, nurses, and other staff on various health topics that range from prevention and management of diabetes, lifestyle diseases, cardiovascular diseases to name but a few.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice    34 of 164    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

Strategic report

GENDER DIVERSITY



### Board of Directors

**Total: 11**

| 8 | 3 |
| Male | Female |
| 73% | 27% |

### Senior management team

**Total: 7**

| 6 | 1 |
| Male | Female |
| 86% | 14% |

### Corporate office

**Total: 477**

| 295 | 182 |
| Male | Female |
| 62% | 38% |

| Management | Total: 122 | 83% | 17% |
| Staff | Total: 355 | 55% | 45% |

### Corporate infomation technology

**Total: 82**

| 73 | 9 |
| Male | Female |
| 89% | 11% |

| Management | Total: 11 | 91% | 9% |
| Staff | Total: 71 | 89% | 11% |

### Healthcare

**Total: 11,070**

| 4,362 | 6,708 |
| Male | Female |
| 39% | 61% |

| Management | Total: 586 | 64% | 36% |
| Doctors | Total: 1,437 | 59% | 41% |
| Staff Nurse | Total: 3,813 | 17% | 83% |
| Technicians & Pharmacists | Total: 1,069 | 43% | 57% |
| Others | Total: 4,165 | 49% | 51% |

### Distribution

**Total: 2,092**

| 1,833 | 259 |
| Male | Female |
| 88% | 12% |

| Management | Total: 179 | 90% | 10% |
| Staff | Total: 1,913 | 87% | 13% |

**DIVERSITY, DISCRIMINATION AND GENDER**
Our commitment to diversity and anti-discrimination policies is reflected in the profile of our employees.

NMC has an anti-discrimination policy in place to ensure that there is no discrimination or harassment of any person employed or seeking employment on the basis of their race, colour, religion, gender, age or nationality.

In accordance with Spanish Law, Eugin also works to stimulate the social and labour integration of disabled people and supports Centros especiales de empleo, special work centres that employ disabled people by purchasing their products and services.

As at 31 December 2017, our Group has grown its employee base across all its business operations to over 13,000 employees. We employ individuals from different nationalities around the World. In addition, our workforce is nearly equally split between female and male employees. We believe that this widespread cultural and balanced gender mix is testament to the effects of our discrimination policies and the multi-cultural nature of the UAE, our primary market.

Our employees, and how we treat them as an employer, are important to us and we were very pleased to have been recognised as one of the "Top Companies to Work For" in the UAE by the Great Place to Work Institute in 2017.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice          35 of 164

Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

# Corporate Social Responsibility continued

## Environment

### RESPONSIBILITY TO THE ENVIRONMENT

NMC recognises the importance and our responsibility of environmental stewardship. Reflecting our role in the sustainable management of UAE's environment, we are committed to conducting our work in an environmentally responsible way. We operate in compliance with all relevant environmental legislation and we continue to strive to use pollution prevention and environmental best practices in the workplace to minimise our potential impact on the environment.

All employees in NMC have enthusiastically undertaken a responsibility to work in a sustainable manner and reduce the negative impact of their own activities on the environment. All managers are responsible for implementing this policy and are accountable for environmental performance in their areas of responsibility.

### OUR ENVIRONMENT AND ITS CHALLENGES

The extremely hot and humid weather leads to the UAE being one of the highest per capita greenhouse gas emitters globally. The use of gases and refrigerants is extensive, not only in the UAE as a whole, but also to ensure the most appropriate environment within which to treat and care for our patients, maintain our food and pharmaceutical stocks safely and to care for the welfare of our employees.

In line with our CSR principles, we seek to reduce our greenhouse gas emissions where possible and hence limit our effect on the environment.

### OUR GREENHOUSE GAS EMISSIONS

Our greenhouse gas reporting covers the 12-month period of 1 October 2016 to 30 September 2017. This reporting period enables us to collate and review the data in a timely manner ahead of the annual report and accounts.

We have applied an operational control approach in presenting our GHG emissions, and have reported on all material emission sources within scope 1 (combustion of fuel from operation of facilities and usage of vehicles) and scope 2 (purchased electricity and cooling). Gas and electricity usage information has been obtained from purchase invoices. Vehicle fuel usage is based upon purchase invoices. Where NMC is not directly billed for the consumption of power and therefore does not have full visibility of the data, an estimation using average consumption from other similar sites has been applied.

The data shows that there has been a 22% increase in GHG intensity per 1,000 orders and 8% increase on a per 1,000 dollar revenue basis for the distribution business. This increase is mainly due to increase in warehouse storage area along with increase in overall fleet for the distribution business.

### GHG EMISSIONS (TONNES CO$_2$E)

| For the 12 months to 30 September | Healthcare (excluding the acquired entities) | | Healthcare (all entities) | | Distribution | | Total | |
|---|---|---|---|---|---|---|---|---|
| | 2016 | 2017 | 2016 | 2017 | 2016 | 2017 | 2016 | 2017 |
| Scope 1 emissions | 7,699 | 7,090 | 9,666 | 8,966 | 3,917 | 4,351 | 13,579 | 13,318 |
| Scope 2 emissions | 29,829 | 44,144 | 43,361 | 50,091 | 5,230 | 7,367 | 48,591 | 57,457 |
| Total GHG emissions | 37,528 | 51,235 | 53,027 | 59,057 | 9,147 | 11,718 | 62,174 | 70,775 |
| GHG emissions intensity - tonnes CO$_2$e/1,000 patient | 11.3 | 11.8 | 12.5 | 11.6 | | | | |
| GHG emissions intensity - tonnes CO$_2$e/1,000 orders | | | | | 20.97 | 25.62 | | |
| GHG emissions intensity by revenue - tonnes CO$_2$e/1,000 dollar | 0.073 | 0.073 | 0.065 | 0.051 | 0.022 | 0.024 | 0.051 | 0.044 |

Scope 1 = direct emissions from fuel combustion and industrial processes. At these sites this takes the form of gas for heating, diesel and petrol for the fleet and diesel for generators.
Scope 2 = indirect emissions from the generation of purchased electricity and cooling.

Notes:
1. The GHG emissions reporting is in line with the GHG Protocol developed by the World Business Council for Sustainable Development, and additional guidance issued by the UK Government. The emissions have been calculated using carbon conversion factors published by the UK Government in October 2016.
2. The total Scope 2 emissions have been reported in accordance with the 'location based' method which uses grid average emissions factors. There are no energy certificates or supplier-specific information available in the UAE, therefore, the 'market based' method is not applicable here.
3. Conversion factors applicable to the UAE for Scope 2 have been obtained from the publication "IEA CO$_2$ Emissions from Fuel Combustion" (2012 edition).
4. A conversion factor for Sevoflurane was not available from the UK Government so an epa.gov ghg reporting figure was used.
5. During FY 2017 period, Group one of the acquired entity, Fakih IVF, started GHG reporting. For comparison, we have excluded acquired entities which started reporting from FY 16 and FY 17. These entities include: Fakih IVF, Clinica Eugin, ProVita, Dr Sunny Healthcare Group and Americare.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice        36 of 164        Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

There has also been a 5% increase in tonnes $CO_2$e per 1,000 patients, and a 0.4% increase in tonnes $CO_2$e per 1,000 dollars of revenue for Healthcare (when excluding the new facilities), this is due to NMC Royal hospital which was excluded in last year's reporting but has been considered fully in FY 17. However, there has been a 7% decrease in GHG intensity on a per 1,000 patient basis overall, when looking at all Healthcare entities. This is due to the initial ramp up phase whereby hospitals are operational but patient numbers are initially lower in last year as compared to this year where the patient numbers in the ramp up hospital have increased substantially. This has contributed to a 21% overall decrease in GHG emissions intensity per 1,000 dollars of revenue for NMC as a whole.

NMC remains committed to continuous improvement and ongoing reduction of GHG emissions when measured on an intensity basis.

### OTHER SUSTAINABILITY PROJECTS

Businesses across the NMC Group undertake various sustainability initiatives each year.

- NMC Trading, Dubai participated in the 'We Plant' initiative on 17th December 2017 at Dibba Al Hasn, Sharjah.
- NMC Trading Quality Department Team has initiated a sustainability drive and has collected paper waste from NMC Trading offices and warehouses across the UAE.
- NMC Trading has donated over 3 tons of paper waste to Emirates Environment Group, Dubai for recycling. In return NMC Trading has been gifted 2 trees which have been planted at Dibba Al Hasn, Sharjah.
- Recycling increased by 1,167.66% between 2015 and 2017.

## Community

### OUTREACH CAMPS

As part of NMC Healthcare's community outreach initiatives, facilities in Abu Dhabi, Dubai, Sharjah and Al Ain conduct health and wellness programs for various private and public companies, insurance partners, academic institutions, educational organisations, embassies and other professional entities in the UAE. Over 250 such health and wellness camps have been conducted across the country where NMC has touched over 500,000 people through educational health talks, screening programs and on-site doctor consultations. We also distributed educational literature and vouchers for both employees of these companies and their families to avail of at their nearby NMC facility.

Organisations such as Abu Dhabi Investment Authority (ADIA), Abu Dhabi National Exhibition Center, Etisalat, Du, Siemens, SERCO, First Abu Dhabi Bank, Emirates NBD, Mashreq Bank, Dubai Police, Dubai, Abu Dhabi Investment Bank, UAE University, Higher Colleges of Technology, DAMAC, Sharjah Ports Authority are some of the companies where NMC has provided health and wellness campaigns for their employees.

On the online front, we posted over 200 posts on good health and prevention which attracted engagement with approximately 300,000 people, while having an organic reach of over 2.5m views.

NMC Trading conducted a 'Blood Donation' camp as part of its CSR initiative, in which over 200 staff have donated blood.

Group businesses also undertake other specific outreach programmes.

The Group Strategic Report set out on pages 12 to 35 has been approved by the Board and is signed on its behalf by:

**PRASANTH MANGHAT**
Chief Executive Officer

Exhibit 5 to B.R. Shetty's Request for Judicial Notice     37 of 164

Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

# Governance

**The Board and management team have strengthened internal controls and kept approach to risk under review during the period of sustained growth and integration.**

Exhibit 5 to B.R. Shetty's Request for Judicial Notice          38 of 164          Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA



Exhibit 5 to B.R. Shetty's Request for Judicial Notice    39 of 164    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

Governance

# Board of Directors

## Leadership



### DR B. R. SHETTY
Non-Executive Joint Chairman
**Nationality:** Indian
**Appointed as Director:** 20 July 2011
**Relevant Experience:**
- Business Entrepreneur
- Founder, Director and principal shareholder of NMC Health
- Pioneer in the development of the private healthcare sector in the UAE
- Other Board positions and material investments in financial, hospitality, food and beverage, pharmaceuticals and real estate sectors



### MR H. J. MARK TOMPKINS ③
Non-Executive Joint Chairman
**Nationality:** British
**Appointed as Director:** 7 March 2012
**Relevant Experience:**
- Significant public company experience on UK, US and French listed company Boards
- Experience in investment banking, international real estate and the financing of small and medium sized enterprises
- Director and Chairman of Allied Healthcare International
- Non-Executive Director and Conseiller Special aupres du Conseil D'Administration of Sodexo S.A.



### MR KHALIFA BIN BUTTI
Executive Vice Chairman
**Nationality:** Emirati
**Appointed as Director:** 1 July 2017
**Relevant Experience:**
- Has significant Abu Dhabi financial industry insight
- At the age of 27 he was appointed Chairman & CEO of Brokerage House Securities LLC
- Established KBBO (Khalifa Butti Bin Omeir) Group, which includes One Financial (operations in UK, China, UAE, Saudi Arabia, Kuwait, Jordan & other areas of the Middle East)
- Has extensive experience in Chairman/Vice Chairman related roles in many well established firms



### MR ABDULRAHMAN BASADDIQ ③ ④
Non-Executive Director
**Nationality:** Kenyan
**Appointed as Director:** 24 February 2014
**Relevant Experience:**
- Significant business experience across a number of GCC based Groups operating in multiple jurisdictions and business sectors, including two major listed Groups
- Previously 25 years with EY in the UK and GCC, including 15 years as an equity partner
- Currently Non-Executive Director of Abu Dhabi National Hotel Group, Travelex and UAE Exchange
- UK qualified Chartered Accountant and licensed auditor in the UAE



### MR JONATHAN BOMFORD ① ④
Senior Independent Non-Executive Director
**Nationality:** British
**Appointed as Director:** 27 June 2013
**Relevant Experience:**
- Accounting, financial & audit experience gained principally in the Middle East & East Africa
- Previously with EY (Middle East, East Africa, Abu Dhabi & Riyadh) for 24 years (15 years as a partner)
- EY clients included international clients across healthcare, oil, banking & construction sectors
- Currently Non-Executive Director of Travelex
- UK qualified Chartered Accountant
- Official Mentor providing Business Advice and Services to clients of the Prince's Trust



### LORD CLANWILLIAM ③ ④
Independent Non-Executive Director
**Nationality:** British
**Appointed as Director:** 7 March 2012
**Relevant Experience:**
- Government and financial communications specialist
- Extensive network of governmental and institutional contacts across Middle East, UK and Eastern Europe
- Founding Partner and Chairman of Meade Hall Communications Limited
- Chairman of Eurasia Drilling Company 2007 to 2016



**Executive/ Non-Executive**
- Executive - 27%
- Non-Executive - 73%



**Nationality**
- Emirati - 3
- British - 4
- Indian - 2
- Kenyan - 1
- USA - 1



**Tenure of Non-Executive Directors**
- 1-2 years - 2
- 3-4 years - 5
- 5+ years - 4

Exhibit 5 to B.R. Shetty's Request for Judicial Notice      40 of 164      Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA



### MR PRASANTH MANGHAT
**Chief Executive Officer & Executive Director**
**Nationality:** Indian
**Appointed as Director:** 26 June 2014
**Relevant Experience:**
- 20 years' experience in accounting, corporate finance, treasury and banking, including 14 years' in NMC related businesses
- Chief Financial Officer of NMC Health 2011-2014
- Spearheaded NMC's successful IPO on the London Stock Exchange in April 2012
- Has been acknowledged and recognised at many business and social forums
- Chartered Accountant



### MR HANI BUTTIKHI
**Chief Investment Officer and Executive Director**
**Nationality:** British
**Appointed as Director:** July 2017
**Relevant Experience:**
- Served as Head of Syndicate at SHUAA, a leading financial services firm between 2006 & 2014
- Oversaw the largest IPO in the UAE worth an estimated four billion US$, as well as the NMC Health IPO
- Served as a Chief Investment Officer at Centurion Partners between 2014 and 2017
- Is on the Board of Directors at 3 other companies



### DR AYESHA ABDULLAH
**Independent Non-Executive Director** ① ②
**Nationality:** Emirati
**Appointed as Director:** 26 June 2014
**Relevant Experience:**
- Over 20 years' experience within the healthcare industry
- Significant experience in development and regulation of the healthcare industry in the UAE
- Oversaw development of, and then regulatory aspects of, Dubai Healthcare City (DHCC)
- Previously, CEO of Dubai Healthcare City (DHCC)
- Currently Executive Dean of Health Sciences and Business at Higher College of Technology (Dubai)
- Awarded both the prestigious 2009 "Leading woman CEO" award and the 2010 L'Officiel Arab Woman of the Year



### MRS SALMA ALI SAID BIN HAREB ALMHEIRI
**Independent Non-Executive Director** ④
**Nationality:** Emirati
**Appointed as Director:** 26 June 2014
**Relevant Experience:**
- Significant business experience and a recognised leading businesswoman in the Middle East, with many achievements and awards being granted to her, most recently the Frost & Sullivan Growth, Innovation & Leadership award of 2014 as well as being named Overall Winner - Professional Category in Emirates Women Awards 2013
- CEO of Economic Zones World (EZW) and Jebel Ali Free Zone (Jafza) from 2005 to 2015
- Instrumental in creation of Dubai Logistics Corridor and oversaw EZW's expansion with development of international logistics parks in UAE, Europe, India, USA and Africa



### DR NANDINI TANDON
**Independent Non-Executive Director** ① ②
**Nationality:** USA
**Appointed as Director:** 26 June 2014
**Relevant Experience:**
- Investment and Board experience in healthcare and healthcare IT sectors
- Director and investment in numerous high tech companies in the USA
- Delegate and speaker on many high level global investment and governmental and investor summits and programs
- Board of Trustees, Bay Area Council Economic Institute, Board Member, SF-Bangalore Sister City Initiative and TeleVital Real Time Telemedicine

### Key to committees
① Audit Committee
② Clinical Governance
③ Nominations
④ Remuneration
\* Denotes chair of committee

Notes:
1. The Board Committees have now been restructured, details of which are provided in the description of the Board Committees in the Corporate Governance Report.
2. Full biographies can be viewed on the Company's Investor Relations website at www.nmchealth.com

Exhibit 5 to B.R. Shetty's Request for Judicial Notice    41 of 164    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

Governance

# Senior Management Team

## Leadership



**MR PRASANTH MANGHAT**
CEO and Executive Director

Please see page 39 for
full biography



**MR HANI BUTTIKHI**
Chief Investment Officer and
Executive Director

Please see page 39 for
full biography



**PRASHANTH SHENOY**
Chief Financial Officer
Relevant Experience:
- Appointed CFO in August 2017, having been appointed Deputy CFO in 2016
- He has played an instrumental role in NMC's acquisition of Al Zahra Hospital Sharjah (class 1 transaction on the LSE)
- 16 years' worth of experience across various industries, although predominantly in pharmaceuticals & healthcare
- Rounded experience in corporate finance, managing business collaborations/overseas subsidiaries, treasury, foreign exchange risk management, business strategy, preparing business plans and evaluation of investment opportunities
- Chartered Accountant



**DR CHANDRAKUMARI R. SHETTY**
Group Medical Director
Relevant Experience:
- Over 40 years' experience with NMC Health and a pioneer in developing the private healthcare sector in the UAE
- Instrumental in establishing Centres of Excellence in various NMC facilities
- Chairs a number of NMC business committees covering Governance, Infection Control, Patient Rights, Quality and Facility Management
- Supervises NMC Healthcare's diversified multi-cultural workforce



**MICHAEL BRENDEN DAVIS**
Chief Operating Officer - Healthcare
Relevant Experience:
- Has 30 years of acute and post-acute care experience within large, publicly listed hospital systems in the US
- Held a number of corporate positions including Chief Clinical Officer, with operational oversight of 36 long-term acute care and inpatient rehabilitation hospitals across the United States, as well as Market CEO for Kindred Healthcare, one of the largest healthcare providers in North America
- Post moving to the UAE in 2013 he was the CEO of Provita International Medical Center, the first provider of long-term acute care in the UAE
- He has played an integral role in NMC's entry into the KSA market



**NIRMAN SHETTY**
Chief Operating Officer - Distribution
Relevant Experience:
- Nirman spearheads NMC's distribution business "NMC Trading", exclusively distributing for Nivea (Beiersdorf), Pfizer, Nestle & Wyeth Infant Nutrition, Unilever, Sanofi to name just a few
- Responsible for 1700 employees within the NMC Trading bracket
- Previously within NMC, Nirman was President of Corporate Affairs, responsible for transforming the information technology, customer service and sales and marketing functions for NMC Healthcare. As UAE's largest private healthcare provider, Nirman's responsibility was to ensure that key components of the infrastructure that supports NMC's clinicians were in place and constantly improving
- Previous senior managerial jobs were at Lodha Developers and Microsoft



**SIMON WATKINS**
Group Company Secretary
Relevant Experience:
- Joined NMC in May 2012 shortly after the Group's IPO
- Responsible for Group's listing obligations and all governance matters, assisting the Chairman with ensuring effective and appropriate Board processes
- Over 25 years of experience as a Company Secretary in large and medium sized UK public companies across a number of sectors
- Significant experience within groups focused on strategic and acquisitive growth
- Previous experience includes Deputy Company Secretary of Rank Group plc and Group Company Secretary of lastminute.com
- Qualified as a Chartered Secretary in the UK in 1987

Exhibit 5 to B.R. Shetty's Request for Judicial Notice   42 of 164   Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

# Corporate Governance Report

**INTRODUCTION**

The Board is responsible for, and committed to, ensuring that procedures are in place so that good standards of corporate governance are operated at all levels in the Group in accordance with the guidance and principles set out in the UK Corporate Governance Code published by the Financial Reporting Council (FRC) in April 2016 (the "Code"). The Code can be found on the Financial Reporting Council website, frc.org.uk.

The Board, supported by its Committees and the Senior Management team, have in place a governance and control environment which they believe is appropriate for the NMC Group and which they believe are consistent with the standards which would be expected of a FTSE 100 Company listed on the Premium Segment of the London Stock Exchange. The Board ensures that governance processes are documented and implemented and, where appropriate, continue to be improved.

The Board has reviewed the Company's compliance against the provisions of the Code and believes that, with the exception of Code principle B.6, the Company was compliant with the provisions of the Code for the 2016 Financial Year. An evaluation of the Board and the individual Directors was not undertaken during the year. The Board does consider that the balance of skills and experience as well as its diversity, continues to provide the Board with an excellent base from which to manage the Group on shareholders behalf. Although the Group has continued to perform very well and the Board believes that it operates successfully and with consensus, the Board acknowledges the benefits of using an external facilitator to assess its own performance and therefore it has been agreed that Prism Boardroom will facilitate an independent review of the performance of the Board during 2018.

This Governance section describes how the Board has applied Corporate Governance principles during the 2017 financial year.

The Company operates within a traditional governance framework:



The roles and responsibilities of each of the individuals and groups above, and their role in the overall governance framework, are set out below.

**THE BOARD**

**THE ROLE OF THE BOARD**

The Board is responsible for the overall conduct of the Group's business and:

• for the long term success of the Company ensuring that it meets its responsibilities towards all stakeholders;
• demonstrating leadership and focusing on matters that affect shareholder value;
• determining the strategic direction of the Group; and
• for ensuring the effectiveness of, and reporting on, the risks facing the Group and the systems of governance and internal control in place in the Group.

The Board seeks at all times to ensure that there is an appropriate balance between short term and long term considerations and objectives of the Group.

The Board has the powers and duties as set out in the Company's Articles of Association.

The Company has agreed a formal schedule of matters reserved for the Board including:

• approval of strategic plans;
• approval of major capital projects, acquisitions and divestments;
• approval of long term financing plans;
• setting the annual budget;
• risk management and internal control systems and processes to ensure that the Group is managed appropriately; and
• approving the half-year and annual results and financial statements.

Specific responsibilities are delegated to Board Committees, details of which are set out on pages 45 to 52 or to the Chief Executive Officer who is responsible for delivering the Company's strategic objectives.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice    43 of 164    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

# Corporate Governance Report continued

**THE BOARD** CONTINUED

## BOARD COMPOSITION AND INDEPENDENCE

The Company has controlling shareholders and therefore keeps under review the independence of individual Directors and the Board as a whole. The Executive Directors and any Non-Executive Directors representing the interests of the Company's controlling shareholders are not considered to be independent by the Board.

The Board of the Company currently comprises eleven directors, all of whom have served on the Board for six years or less:
- the Independent Non-Executive Joint Chairman
- the Non-Executive Joint Chairman
- three Executive Directors
- five Independent Non-Executive Directors
- one Non-Independent Non-Executive Director

The Board considers that it is independent.

The Senior Independent Director is Jonathan Bomford, who is available to shareholders should they have any concerns that they do not wish to raise with the Company or either of the Joint Chairmen directly. The Senior Independent Director can be contacted through the UK corporate office, and registered office, of the Company.

## BOARD DIVERSITY

The Board considers that the extensive and diverse business, cultural and operational experience of all the Directors, both Independent and non-Independent, ensures a good balance in all aspects of Group decision making and control. The above attributes also enable the Board to take account of diverse and independent judgement to bear on key issues of:
- strategy, including constructively challenging the strategic direction of the Group;
- the consideration of acquisition proposals and long term financing of the Group's growth strategy;
- scrutinising and challenging the performance of the Group;
- assessing risk and controls operating within the Group and in its decision making; and
- standards of conduct and governance and other matters presented to the Board.

Therefore the Board is structured to ensure that:
- an appropriate cultural and ethnic mix is in place considering the Company's listing in the UK and its diversified operations, the vast majority of which are in the GCC, as well as global drivers and practice in healthcare related services;
- the conclusions of the Davis Report on Women on Boards, and in particular the benefits of significant male and female representation on the Board, are taken into account; and
- the individual skills and experience that Directors bring to the Board are well balanced.

The Board will continue to consider appropriate skills, gender and cultural balance when reviewing future Board appointments.

Board diversity as at the date of this report is as follows:



**Board Gender**
- Male - 73%
- Female - 27%

**Nationality**
- Emirati - 3
- British - 4
- Indian - 2
- Kenyan - 1
- USA - 1

Similar practices to ensure a diverse employee base are also operated within the Group's businesses and the diversity of employees in the Group is summarised in the Corporate Social Responsibility report on pages 32 to 35.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice    44 of 164    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

**KEY ROLES AND RESPONSIBILITIES IN THE GOVERNANCE STRUCTURE**

The roles of the Chairmen and Chief Executive Officer are separate.

**INDEPENDENT NON-EXECUTIVE JOINT CHAIRMAN**

The Independent Non-Executive Joint Chairman was appointed to the Board in March 2012 in anticipation of the Company's IPO. He was independent at the time of his appointment and is considered to be independent by the Board. Alongside his Co-chair, the Independent Non-Executive Joint Chairman is responsible for the proper functioning of the Company's Board of directors including:

- the effective operation and governance of the Board
- setting the agenda and coordinating the style and tone of Board discussions

The Independent Non-Executive Joint Chairman takes the lead in chairing board meetings.

**NON-EXECUTIVE JOINT CHAIRMAN**

The Non-Executive Joint Chairman previously held the positions of CEO and Executive Vice Chairman of the Company. His wealth of experience, his deep knowledge of the business and the management team, as well as his unrivalled contacts in the sector and region built over forty years continue to be invaluable to the Group. His new role enables him to continue to be available to guide the Board and guide and mentor management as required as we continue to grow the business and deliver shareholder value.

**CHIEF EXECUTIVE OFFICER**

The CEO is responsible for identifying, with the Senior Management Team, opportunities that are deemed appropriate and in line with the Board's strategic objectives. He is also responsible for delivering the key strategic objectives set by the Board. The Chief Executive Officer is assisted in this task by his Senior Management Team who meet regularly to discuss the performance of the business, new development opportunities as well as other material matters arising within the business.

**SENIOR INDEPENDENT DIRECTOR**

The Senior Independent Director acts as a sounding board for the Joint Chairmen and serves as an intermediary for the other Directors as required. The Senior Independent Director is available to shareholders if they have concerns which they have not managed to resolve through the normal channels of the Joint Chairmen or the Executive Directors, or who feel that such contact is inappropriate for the concerns that they may have.

The biography of each individual holding the above positions is set out on pages 38 to 39.

**BOARD MEETINGS**

The Group Company Secretary supports the Joint Chairmen in finalising an agenda for each Board meeting and ensuring that appropriate papers are provided from the management team in a timely manner for circulation in advance of Board and Board Committee meetings. This is to ensure that fully informed decisions can be reached.

**BOARD FOCUS IN 2017**

Matters considered at all Board Meetings include:

- Operational and financial performance through management reports
- Potential acquisition or organic growth opportunities being considered in pursuance of the Group's growth strategy
- Other development opportunities
- Board Committee updates
- Risk and risk management

During the course of the 2017 financial year the Board has also considered, as appropriate:

- Review of the Group's strategy and future development and growth opportunities, including the risks associated with such strategy and opportunities
- the specific development of certain of the Group's business verticals and also geographic expansion of the Group into new key markets
- The progress of integration and centralisation projects designed to improve asset utilisation and operating efficiencies across the wider NMC group
- Long term acquisition and working capital financing
- The key competitive and regulatory environment drivers in the Group's key markets, particularly in the UAE
- The Group's half-year and full-year results
- The proposed operating budget for the following financial year
- The Group's strategic risks register and consideration of any changes to key risks, controls and mitigations

**BOARD ATTENDANCE IN THE 2017 FINANCIAL YEAR**

During the period under review, the Board met, as scheduled, on five occasions as well as other ad-hoc meetings, normally called at very short notice, on specific matters requiring board approval or consideration. Scheduled periodic Board Meetings are normally split, where possible, between London and Abu Dhabi.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice    45 of 164    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

# Corporate Governance Report continued

**BOARD MEETINGS** CONTINUED

**BOARD ATTENDANCE IN THE 2017 FINANCIAL YEAR** CONTINUED

The attendance of the Directors at each of the scheduled Board meetings during the period is set out in the table below.

| Board meeting attendance 2017 | Scheduled/Attended |
|---|---|
| H.J. Mark Tompkins | 5/5 |
| Dr B.R. Shetty | 5/5 |
| Mr Khalifa Bin Butti | 3/3 |
| Mr Prasanth Manghat | 5/5 |
| Mr Hani Buttikhi | 3/3 |
| Dr Ayesha Abdullah | 5/5 |
| Mr Abdulrahman Basaddiq | 5/5 |
| Mr Jonathan Bomford | 5/5 |
| Lord Clanwilliam | 5/5 |
| Salma Hareb | 5/5 |
| Keyur Nagori | 2/1 |
| Binay Shetty | 2/2 |
| Dr Nandini Tandon | 5/5 |

**BOARD EFFECTIVENESS**

**DIRECTOR INDUCTION**

On appointment, directors have the benefit of a personalised induction programme available to be undertaken during the first few months of their tenure as a director. Each induction programme covers a number of different areas including:
- briefings and presentations from management to understand the business operations and financial drivers
- their legal and regulatory responsibilities as directors and the governance environment in which the Company operates
- opportunities to visit the Group's key facilities and new capital development project locations
- meetings with the Company's key advisors

**BOARD INFORMATION AND PROFESSIONAL DEVELOPMENT**

The Directors maintain an appropriate dialogue amongst themselves and with senior management, which ensures that Non-Executive Directors are kept up to date with major developments in the Group's business.

Non-Executive Directors meet with management and undertake visits to operational facilities as required in order to further understand the way the business operates and any change within the business. The Board had presentations from management during the year in relation to the Group's material acquisitions and financing arrangements, as well as market conditions and drivers within the Group's key markets. Directors also receive through Board and Board Committee meetings, as well as ongoing communications during the year, updates in relation to other key areas such as changes to the governance requirements and financial reporting as they apply to UK listed companies.

As part of their overall training and development needs, some non-executive directors have attended externally provided seminars and discussion forums relating to their general responsibilities as Directors or areas of specific responsibility, in particular in relation to the Board Committees on which they serve. Such development opportunities are made available to all Directors on an ongoing basis.

**PERFORMANCE EVALUATION**

During the year the Board did not undertake an evaluation of its own performance. The Company has however agreed a project with Prism Boardroom to undertake an independently facilitated appraisal during 2018, the results of which will be reported on in the Company's 2018 Annual Report.

**RE-ELECTION OF DIRECTORS**

All of the directors of the Company submit themselves for re-election at the annual general meeting of the Company to be held on 28 June 2018. Each resolution for re-election or election of a retiring director will be proposed as a separate resolution. The Board is satisfied that the contribution made by each director, and the Board as a whole, to board deliberations continues to be appropriate and effective to ensure good stewardship of the Group on behalf of the shareholders of the Company and believe that shareholders should support the re-election of each Director of the Company at the 2018 annual general meeting.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice    46 of 164    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

## OTHER BOARD DISCLOSURES

### CONFLICTS OF INTEREST

The Board are aware of the interest that some Directors have in other businesses in which they have invested. Any conflicts of interest and related party transactions that may arise are monitored with:

- Each of the Directors are asked to confirm that they have no other interests which would conflict them for the purposes of any item to be discussed at the meeting; where such conflict is reported, the respective Director is not permitted to take part in the consideration of that matter by the Board;
- Each Director discloses to the Board any related party transactions in which they are connected, and such transactions are reported in the Group's financial statements.

Whilst Directors on the Board have other business interests, the Board do not consider that these, nor the time commitment that they require, affect the ability of such Directors to undertake their role or comply with their statutory obligations.

### INDEPENDENT ADVICE

Each of the directors is permitted to obtain independent legal advice at the Company's expense in the performance of their duties as directors. This would normally be managed through the Group Company Secretary.

All directors, and the Board as a whole, also have access to the advice and services of the Group Company Secretary who, under the Joint Chairmen's direction, is responsible for ensuring that good Board procedures are followed.

### INDEMNIFICATION OF DIRECTORS

The Company has put in place a Directors and Officers Liability Insurance policy which provides all Board members with insurance cover in respect of liabilities that may arise against the Directors collectively or individually. The Directors do not benefit from any form of qualifying third party indemnities made by the Company.

### BOARD COMMITTEES

The Board has established an Audit Committee, a Clinical Governance Committee, a Nominations Committee and a Remuneration Committee. The terms of reference for each committee clearly set out its authority and duties and have been approved by the Board. The terms of reference for each committee are available on our website at www.nmchealth.com or available from the Group Company Secretary.

The composition of the Board Committees going forward has been changed. This is in order to ensure that the Committees continue to have a fresh focus in their specific areas of work, which will be for the longer term benefit of the Board and Shareholders. The new composition of each Committee is set out within each Committee report below.



Exhibit 5 to B.R. Shetty's Request for Judicial Notice    47 of 164    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

# Corporate Governance Report continued

**BOARD COMMITTEES** CONTINUED

## AUDIT COMMITTEE

**Overview provided by the Chair of the Audit Committee**

The 2017 financial year has been a year of continued growth and expansion which has been an important focus for the Audit Committee resulting in another busy year. As UK listed company reporting and governance requirements continue to evolve, and as the Group grows, both management and the audit committee have been committed to appropriate focus on finance, governance and controls across the Group.

This report sets out the work of the Committee, significant matters addressed by the Committee during the year and the responsibilities of, and work undertaken by, the external and internal auditors. In addition, the Board asks the Audit Committee to review various matters in relation to risk and internal control which, during a year of significant strategic activity and integration, is a significant aspect of the Board and Audit Committee focus.

**Membership and attendance**

The Audit Committee has consisted entirely of independent non-executive directors during the year under review.

During the 2017 financial year, the following served as members of the Committee for the full financial year:

| Chairman: | Committee members: |
|---|---|
| Jonathan Bomford | Dr Ayesha Abdullah |
| | Dr Nandini Tandon |

During the 2017 financial year, the Chairman of the Committee and the Committee's financial expert was Mr Jonathan Bomford. Mr Bomford is a Chartered Accountant and his brief biographical details and experience are set out on page 38 of the annual report.

The Audit Committee met 4 times during the year. The Meetings are scheduled to align with the Group's reporting timetable with planning meetings in advance of both the half-year review and full-year audit, and approving meetings shortly in advance of the announcement of the Group's half-year and full-year results.

| Board meeting attendance 2017 | Scheduled/Attended |
|---|---|
| Jonathan Bomford | 4/4 |
| Dr Ayesha Abdullah | 4/4 |
| Dr Nandini Tandon | 4/4 |

Meetings are normally attended by the Chief Executive Officer, the Chief Financial Officer and Deputy Financial Officer. Other Non-Executive Directors also attend meetings. The Group Company Secretary acts as Secretary to the Committee. The Committee also meets separately with the external auditors and management with the other parties not present.

The composition of the Audit Committee has been changed and will now be as follows:

| Chairman: | Committee members: |
|---|---|
| Lord Clanwilliam | Mr Jonathan Bomford |
| | Dr Nandini Tandon |

Exhibit 5 to B.R. Shetty's Request for Judicial Notice          48 of 164          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

Key role and responsibilities

The key role of the Committee is to ensure the integrity of published financial reports; compliance with applicable legal and regulatory regulations in the group areas of activity; effectiveness of internal controls and assessing the independence and expertise of the external and internal auditors and assessing their effectiveness and performance in the year. Risk management is dealt with by the board and the Audit Committee reports to the board their assessment of such matters.

During the year the Audit Committee assisted the Board in:

- discharging its responsibilities with regard to financial reporting, external and internal audits and controls;
- reviewing the Company's financial results announcements, Annual Report and audited financial statements, including review of the long-term viability and going concern assessments;
- monitoring the independence of, and extent of the non-audit work undertaken by, the external auditors;
- making recommendations to the Board on the appointment of external auditors and the level of their remuneration;
- reviewing the effectiveness of the Company's internal audit activities and internal policies;
- overseeing the Group's compliance processes; and
- oversight of the Group's internal controls and risk management systems although the Board retains control over these matters.

Consideration of principal risks and the risk management process in place across the Group is a matter retained for discussion and review by the Board. The Audit Committee is required to report regularly to the Board of Directors in relation to its findings on the above and the discussions at each meeting. The ultimate responsibility for reviewing and approving the Company's Annual Report and audited financial statements and the half yearly reports remains with the Directors of the Company.

Main activities of the Committee during the year

During the year, the Committee has focused significantly on areas relating to the growth strategy of the Group, including both acquisition accounting and the resulting effect of the changing IT and internal control environment across the Group.

The main activities on which the Committee focuses each year, being the Committee's consideration, and approval, of the Interim Results and the Annual Report, remains unchanged. The wider focus and additional issues discussed by the Audit Committee during the year included:

Revenue Recognition

In addition to reviewing the consistency of revenue recognition policies across the Group, particularly to ensure that the revenue recognition policies across the Group's acquired entities is appropriate, the implementation of IFRS 15 has been considered by the Committee and management with a full assessment of revenue recognition practices and policies by independent external experts or consultants, including site visits to all key locations and reviewing contracts, to assess the likely impact of IFRS 15 on the Group.

Acquisition Accounting

There are a number of aspects in relation to the Group's acquisition strategy which had an impact on accounting and audit matters during 2017. These included approving the appointment of financial experts independent of the Group auditors to assess the value of goodwill for acquisitions, accounting for goodwill, judgements in respect of contingent consideration, and specifically work on the purchase price allocation for transactions, including the identification of intangible assets, assessing the accounting policies within each business for consistency with NMC accounting policies.

Accounting for new loans and financing arrangements

The audit committee has been concerned to ensure that the replacement or extension of group financing arrangements are dealt with appropriately in the Group's financial statements.

IT systems and the effect on control environment

The Committee monitored progress on implementation of new IT systems during the year, including proposals to implement a new consolidation system which is expected to be completed by the end of H1, 2018.

Internal audit focus

Internal Audit Reports are presented at Committee meetings twice a year with other updates from the Internal Auditors as required. During 2017, in addition to ongoing work, the Internal Audit program has focused on acquired entities as well as developing and enhancing the work of the Internal Auditors within the IVF businesses. The internal audit plan during this period of strategic growth has been focused on the internal control measures operating in the acquired businesses and to enhance such controls and processes as necessary.

IFRS 15 and 16

The committee reviewed and considered the potential impact that the implementation of IFRS 15 and IFRS 16 will have on the Group's financial statements, and discussed the accounting policies related thereto.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice    49 of 164    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

# Corporate Governance Report continued

**BOARD COMMITTEES** CONTINUED
**AUDIT COMMITTEE** CONTINUED
External audit and auditor independence
External Audit effectiveness

The Committee believes that the effectiveness of the external audit is dependent on the identification and consideration of key risks by the Committee, management and, as part of their audit process, by the auditors during the financial year under review. EY produces and discusses with the Committee a detailed audit plan identifying these key risks, the focus of audit procedures and the work to be done to test management's assumptions and accounting treatment in these areas.

The Committee meets separately with the External Auditors to ensure that an independent dialogue is maintained in relation to monitoring key business and financial risks and to ensure that management have not restricted the scope of their audit. The Audit Committee Chairman also meets with the lead audit partner on a number of occasions during the year outside the formality of Audit Committee meetings.

The Committee did not commission an independent review of the effectiveness of the external audit during the year. However the effectiveness of the Group Audit was discussed and considered, by the Committee, management and, as part of their audit process, by the auditors.

Auditor fees and appointment

EY were appointed as auditor to the Company at the time of the Company's IPO in April 2012. The level of audit fees paid in relation to the 2017 financial year is set out in note 13 to the Consolidated Financial Statements.

Non-Audit fees

During FY2017, the level of non-audit fees amounted to a total of US$891k.

The Audit Committee currently complies with regulations adopted by the FRC in their implementation of an EU directive in relation to non-audit fees. The Audit Committee adopted a new policy in relation to the Company's non-audit services in March 2018.

Auditor Independence

The Audit Committee formally reviewed the independence of the Company's auditor, EY, during the period under review. The review took account of the relationship between management and the audit team, the processes that EY have in place internally to ensure objectivity and independence and also the level of non-audit fees incurred during the year.

As part of this review the Committee reviewed the potential threats to auditor independence as a result of:

• auditor self-interests, being those areas where the auditor may have a financial or other interest in the Company;
• auditor self-review, being areas where the results of non-audit services are reflected in the amounts included or disclosed in the financial statements;
• management threats, which may occur if partners or employees of the auditor take decision on behalf of management; and
• Other threats, such as familiarity and intimidation.

The Audit Committee is satisfied that in all areas sufficient safeguards were adopted by the auditor and that the independence of EY and of the audit engagement partner had not been compromised. There is no limitation of liability in the terms of appointment of the Auditor for the audit of the Company's financial statements.

Audit re-tender policy

In accordance with the requirements set out in the September 2014 Competition and Markets Authority Order, the Audit Committee's approach to audit tendering is that it currently intends to undertake a competitive tender process in relation to statutory audit services provided to the Group in 2020 with the chosen statutory auditor being appointed for the FY2021 audit.

However, between now and the planned competitive tender date during which the Group is expected to grow substantially through execution of its organic and acquisitive growth strategy leading to transformational changes in the size and complexity of the NMC Group, the Audit Committee is conscious of the need to keep the provision of audit services under continual review for the benefit of both the Group and its Shareholders. The Audit Committee has therefore not ruled out that an earlier tender process may be appropriate.

JONATHAN BOMFORD, FCA
On behalf of the Audit Committee

48   NMC Health plc Annual Report and Accounts 2017

## CLINICAL GOVERNANCE COMMITTEE

I report to you this year as Chair of the Clinical Governance Committee with good progress having been made across the enlarged Group in relation to Clinical Quality matters.

The Clinical Governance Committee meets regularly to provide Board oversight in the key area of Clinical Governance. The Committee works with management to ensure that the governance structure within the healthcare business is appropriate, that clinical care is enhanced in line with latest good practice and that clinical quality indicators are monitored and maintained at a high standard. This oversight is designed to mitigate as far as possible the risks associated with operating a healthcare organisation.

In line with the experience of management, the Board and its other committees, a time of significant growth in the healthcare business is both exciting and challenging from a quality and clinical governance perspective. Good progress has again been made during a very busy year with the majority of key clinical care indicators remaining at a strong level or improving.

With a number of integration and consolidation projects taking place across the Group, 2017 proved to be an ideal time for management to develop a clinical strategy document which was approved by the Committee in December 2017. This provides a framework upon which the Clinical Governance Committee can monitor the progress of management and quality procedures across the NMC network, and it is a very welcome tool in that respect.

### Membership and attendance

The Committee consists of a majority of Non-Executive Directors plus Dr C R Shetty, the Group Medical Director. Her experience of governance structures operating in the Group, and the standards by which the Healthcare businesses are monitored, is very important to the Committee's ongoing monitoring of clinical care.

During the 2017 financial year, the following served as members of the Committee for the full financial year (unless stated):

| Chairman: | Committee members: |
|---|---|
| Dr Ayesha Abdullah | Binay Shetty (until 28 June 2017) |
| | Dr C. R. Shetty |
| | Dr Nandini Tandon |

The Chair of the Clinical Governance Committee is also a member of the Audit Committee which assists in ensuring that the two committees provide an overall control and governance framework to manage the Group's key clinical risks.

The Clinical Governance Committee met twice during 2017. In addition to the Clinical Governance Committee members, the Vice President - Quality and Standards attends each meeting and the Group Company Secretary is Secretary to the Committee.

| Board meeting attendance 2017 | | Scheduled/Attended |
|---|---|---|
| Dr Ayesha Abdullah | | 2/2 |
| Binay Shetty | 0/0 | |
| Dr C R Shetty | 2/1 | |
| Dr Nandini Tandon | | 2/2 |

The composition of the Clinical Governance Committee has been changed and will now be as follows:

| Chairman: | Committee members: |
|---|---|
| Dr Ayesha Abdullah | Mr Prasanth Manghat |
| | Dr C. R. Shetty |

### Key role and responsibilities

The key role of the Committee is to oversee governance structures, processes and controls in relation to Clinical matters in place within the Group healthcare operations. This is to ensure that the risks associated with clinical care are mitigated in the interests of the Company and its stakeholders.

### Main activities of the Committee during the year

Specific responsibilities of the Committee, and work undertaken by it during the year, include:

- Review and approval of a new clinical strategy document which sets out the future development of Clinical Quality monitoring and control;
- Review of clinical performance indicators quarterly. These were reviewed either at meetings held or, in between meetings, with reports circulated to the Committee for review;
- Overseeing the continuing inclusion of additional group facilities in achieving JCI accreditation;
- Reviewing the implications of new regulations and standards compliance implemented by our local health authority regulators;
- Ongoing discussion in relation to the use and benefits of IT systems and solutions for all aspects of patient care and information monitoring.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice    51 of 164    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

Governance

# Corporate Governance Report continued

**BOARD COMMITTEES** CONTINUED
**CLINICAL GOVERNANCE COMMITTEE** CONTINUED
**Principal Management activities on clinical governance matters during the year**
2017 has again been a very busy year for management in relation to quality and clinical governance matters. Three hospitals, Brightpoint Royal Women's Hospital. NMC Royal Hospital and Al Zahra Hospital all achieved JCI accreditation in the year, bringing to seven the number of hospitals accredited. Management consider independent accreditation, and the ongoing monitoring of accreditation KPIs and standards, and as an important aspect of the Group's approach to patient care and an important element to mitigate the risks associated with operating healthcare facilities.

In addition to the Group's other businesses, a clinical quality monitoring and governance structure has been implemented at Al Zahra Hospital in Sharjah.

The corporate quality team have produced a clinical quality strategy which sets out how the enlarged Group will further develop its approach to clinical quality in the coming years. It was felt that with the significant expansion of the Group in recent years, such a strategy would be key to ensuring a standardised and high-level performance approach to quality across all NMC Group Healthcare facilities. The Clinical Governance Committee will monitor progress that the Group is making towards the overall goals of this strategy.

The Committee is delighted with the dedication and determination of management, and all of our employees, to keep up to date with regulatory changes and new standards, ensuring that the Group is well positioned in compliance with its requirements as well as offering an excellent and safe service to our patients.

The Quality and Clinical teams also continue their excellent work ensuring that clinical care monitoring within the business, including the acquired businesses, has been further enhanced during the year, which gives assurance to management and the Board that clinical risk is effectively managed. Finally, I would like to thank my fellow Committee members for their contribution during the year.

**DR AYESHA ABDULLAH**
For and on behalf of the Clinical Governance Committee

Exhibit 5 to B.R. Shetty's Request for Judicial Notice                52 of 164                Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

## REMUNERATION COMMITTEE

### Membership and attendance

The Remuneration Committee consists of four Non-Executive Directors, three of whom are Independent Non-Executive Directors, with an Independent Non-Executive Director holding the chairmanship of the Committee. The Board consider that this is an appropriate structure to ensure that the interests of all shareholders can be reflected in the formulation of Executive Remuneration policies most appropriate for the long term success of the Group.

During the 2017 financial year, the following served as members of the Committee for the full financial year:

| Chairman: | Committee members: |
|---|---|
| Lord Clanwilliam | Abdulrahman Basaddiq |
|  | Jonathan Bomford |
|  | Salma Hareb |

The Chief Executive Officer attends Remuneration Committee meetings and the Chairman of the Committee discusses proposed remuneration policies with him during their formulation. No Director is present when their own remuneration is discussed.

The Group Company Secretary acts as Secretary to the Remuneration Committee and, along with the Committee's independent advisors, Deloitte, provides advice to the Committee on Corporate Governance aspects relating to remuneration matters. He also provides assistance to the Chairman of the Committee as required in discussions with the Remuneration Committee advisers and on implementation of Committee decisions. The Group Company Secretary is not present when his own remuneration is discussed.

The Committee met four times during the financial year.

| Board meeting attendance 2017 | Scheduled/Attended |
|---|---|
| Lord Clanwilliam | 4/4 |
| Abdulrahman Basaddiq | 4/4 |
| Jonathan Bomford | 4/4 |
| Salma Hareb | 4/4 |

The composition of the Remuneration Committee has been changed and will now be as follows:

| Chairman: | Committee members: |
|---|---|
| Mr Jonathan Bomford | Dr Ayesha Abdullah |
|  | Dr Nandini Tandon |
|  | Mr H. J. Mark Tompkins |

### Key role and responsibilities

The Remuneration Committee assists the Board in:

- making recommendations to the Board on the Company's Directors' Remuneration Policy, the framework of executive remuneration, including the use of incentive arrangements within that framework; and
- determining, on the Board's behalf, the entire individual remuneration packages for each Executive Director and advising the Chief Executive Officer in relation to the level of remuneration the Committee feel is appropriate for the Senior Management Team.

All other recommendations must be referred to the Board for approval.

No Committee member is permitted to participate in any discussion or decision regarding his/her own remuneration. The remuneration of non-executive directors is a matter for consideration by the Executive Directors, in discussion with the Chairman of the Company.

The principal activities of the Committee during 2017 and the Annual Remuneration Report, are set out in the Directors' Remuneration report on pages 58 to 77.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice    53 of 164    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

# Corporate Governance Report continued

**BOARD COMMITTEES** CONTINUED

**NOMINATIONS COMMITTEE**

Main activities of the Committee during the year

The Nominations Committee consists of three Non-Executive Directors, two of whom are Independent Non-Executive Directors, one of whom holds the chairmanship of the Committee. During the 2017 financial year, the following served as members of the Committee for the full financial year:

| Chairman: | Committee members: |
| --- | --- |
| H.J. Mark Tompkins | Abdulrahman Basaddiq |
| | Lord Clanwilliam |

The composition of the Nominations Committee has been changed and will now be as follows:

| Chairman: | Committee members: |
| --- | --- |
| H.J. Mark Tompkins | Abdulrahman Basaddiq |
| | Mrs Salma Hareb |

The Nominations Committee has a role to assist the Board in:

• reviewing and making recommendations to the Board in relation to its structure, size and composition;
• reviewing succession planning in place for senior management;
• determining the appropriate skills and characteristics required of directors; identifying individuals qualified to become Board members and recommending such individuals to the Board;
• recommending individuals to be considered for election as Directors at the next Annual General Meeting of the Company or to fill vacancies; and
• preparing a description of the experience and capabilities required for a particular Board appointment.

The Committee met once in March 2017 to discuss and approve both the appointment of Dr B. R. Shetty as Non-Executive Joint Chairman of the Company and the appointment of Mr Prasanth Manghat as Chief Executive Officer to replace Dr Shetty following his decision to step down from his day to day Executive role with the Group. The Committee members also held discussions to approve the appointment of Mr Khalifa Bin Butti and Mr Hani Buttikhi as Executive Directors of the Company in June 2017.

Committee members also held a number of informal discussions during the year on matters of interest to the role of the Committee. The Committee would expect to meet to consider appropriate candidates to fill any vacancy created on the Board should such a vacancy arise or be considered appropriate given other skills and experience on the Board.

The approach of the Committee, and of the Board, to the issue of diversity is set out in this Governance section on pages 33 and 42.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice          54 of 164          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

**BOARD OVERSIGHT OF SYSTEM OF INTERNAL CONTROL AND RISK**

## OVERVIEW

Management is responsible for establishing and maintaining adequate internal controls over financial reporting and operational matters across the Group. The Board is responsible for reviewing such internal controls and for ensuring that they are effective to properly manage the Group's businesses.

## STRENGTHENING OF INTERNAL CONTROLS

In recent years, as the Group has progressed an organic and inorganic growth strategy, in order to strengthen the governance and control structure further across the Group, management have progressively been:

• incorporating additional key internal controls into its financial and operational processes;
• implementing new policies and procedures covering all aspects of the Group's accounting policies and controls;
• extending its Quality Team and the Group's Quality and Clinical Governance processes;
• enhancing the Group's Internal Audit function which independently reviews and monitors key business processes; and
• revising and extending the reach of delegated authorities across group businesses.

All of these changes are part of an overall process to improve the Governance structure within the Group and to improve further the Group's formal internal control processes.

## CHALLENGES

New businesses

Businesses which have been acquired as part of the Group's strategic growth plan over the last three years, all operated under differing levels of control. Some of these businesses had a very centralised approach to control, with the majority of the controls over all financial and operational aspects of each business resting with a small number of individuals and, in some of the businesses, being manual in nature. We consider this to be a normal environment in which smaller privately owned businesses are used to operating. In addition, the program to open new facilities since the Company's IPO has resulted in a significant level of growth in the Group. This increases further the challenge on the Company in relation to controls and risk.

Integration

Such transformational changes in the Group over the last 5 years inevitably results in different control environments operating across group businesses. Measured integration, at a pace which is appropriate to each individual new business, and integration of those businesses, is undertaken to align control processes.

IT environment

Management recognise that the Group's IT systems are not fully integrated and that an element of manual control procedures are still prevalent across the Group. The growth of the Group, organically and through acquisition, together with significant regulatory changes in UAE healthcare businesses in recent years and the introduction of VAT with effect from 1 January 2018, have hampered focused efforts to develop integrated group IT systems. Whilst this is still the case, the manual processes, supported by legacy IT systems in many of the Group's businesses, continues to provide a robust level of control.

## APPROACH TO RISK

A new approach to the monitoring and control of risks within the Group has now been operating for two years.

The Group operates a multi-layered approach to risk identification control and mitigation. Group's business risks are identified through a bottom up process undertaken within each of the Group's businesses. Senior Management then review these risks alongside the macro-economic environment within which the Group operates through a top down review process to establish a Strategic Risk Register.

This Strategic Risk Register is reviewed and, where necessary, updated regularly. Having been through significant change in 2015 and 2016, no changes to the Strategic Risk Register were considered necessary in 2017.

Further details on the approach taken to assess risks, and of the Group's strategic risks, are set out on pages 28 to 31. The internal controls and processes in place to mitigate business risks and the Board's review of the effectiveness of the control environment are set out below.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice    55 of 164    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

# Corporate Governance Report continued

**BOARD OVERSIGHT OF SYSTEM OF INTERNAL CONTROL AND RISK** CONTINUED

**CONTROLS AND RISK MITIGATION**

Financial and operational controls

The Group has, for over 40 years, grown into a substantial business and a leader in the provision of private healthcare in the GCC, as well as operating a substantial distribution business. The Group is a regulated business operating many regulatory, financial, clinical and quality control procedures.

In the past three years, the Group has expanded operations into Europe, South America and the GCC, now having operations in 12 countries. During this period of growth, management have continued to integrate and structure financial and operational controls appropriately across all of its businesses.

The key elements of the Groups' financial and operational controls are as follows:

- An annual budget and updated long-term forecasts for the Group which are reviewed and approved by the Board. As part of these reviews, management and the Board have processes in place to consider appropriate risks faced by the Group.
- Regular meetings of the Senior Management Team take place to review Group financial and operational performance and other principal functional areas of the business.
- A system of internal monthly operational and financial reporting which includes monthly comparison of results and against budget and forecast, and a review of key KPIs.
- MIS teams monitor business performance within each subsidiary.
- A defined process for controlling capital expenditure, including appropriate authorisation levels, which is monitored and approved by the Board as appropriate.
- The financial statements of each subsidiary are drawn up by relevant accounting departments, which ensure compliance with local tax and regulatory requirements. A complete audit carried out by the auditors of significant subsidiaries for the Group's year-end financial statements.
- Reporting of accounting information, in standardised monthly reports, is carried out on the basis of a schedule established by the Corporate Accounts department. Each subsidiary applies Group procedures for the recording of accounting data for inclusion in the interim and annual financial statements.
- The reporting of subsidiaries is established according to the accounting policies of the Group, which are formalised in a Group policies manual given to all the subsidiaries.
- Formal reviews which considers the Group long term viability and going concern basis of accounting are conducted.
- A formal process through which approval for organic and inorganic expansion projects is given. A formal transaction request paper is produced including details of the proposed transaction, how the transaction will be financed, market studies, strategic benefits and longer term effects on the Group, due diligence and key transaction risks are considered.
- An appropriate approach to decentralisation and internal oversight within the Group.
  - Our larger NMC healthcare hospitals facilities have a Medical Director and Head of Administration who are accountable for the operation of the facility. Smaller facilities are generally managed by the lead clinician. Our other businesses normally have their own management structure. Therefore all of our facilities and businesses have an appropriate and relevant organisation to provide effective and efficient management of both clinical and non-clinical areas.
  - In addition to facility management, we have created a number of geographic clusters, each cluster having an operational head responsible for business from across all the Group's business verticals located in that region.
  - Within the Healthcare division structure, a number of multidisciplinary committees are in place to monitor guidelines in respect of patient safety and quality, medication management, infection prevention and control, medical record documentation and facility management.
  - Medical Directors' meetings to monitor clinical governance procedures.
  - Both Healthcare and Distribution divisions have Financial Controllers and a finance team and are managed through fundamental activities of planning, executing and checking. The strategic direction of all operations is governed by the corporate office.
  - The Senior Management Team believes that these divisions of responsibility at both facility and corporate levels provide a natural check and balance across all internal control areas.
- As the Group has grown, extending its reach and capacity across multiple jurisdictions, the Group's system of delegated authorities have been amended in order that management at Group, Divisional, cluster and facility levels have layered authorities within which they are permitted to operate.
- Group businesses hold very sensitive as well as personal information and data as part of their operations. To guard against the material risk of a cyber threat, Group businesses have processes and procedures in place to control such threats.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice          56 of 164          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

Independent controls - *Internal Audit*

An effective externally provided Internal Audit program independently assists management in identifying key risks to business operations and monitors those risks through an Internal Audit program agreed with both management and the Audit Committee.

The Internal Auditors report directly to the Chairman of the Audit Committee but work in conjunction with the CFO. Their reports to the Audit Committee are received and discussed at Audit Committee meetings twice a year, usually in June and December.

Following the completion of each review, the internal auditors identify areas for remedial action and the required action plans are discussed and agreed with management. All areas requiring remedial action are highlighted as high, medium or low risk areas. The internal auditors present the reviews and the agreed management action plans for any remedies to the Audit Committee and then monitor the implementation of any required changes on behalf of the Audit Committee.

Crowe Horwath provide internal audit services to the Group, except in relation to the IVF businesses where Deloitte provide internal audit services. The internal audit services provided by external firms focus on key strategic areas of risk and this program works alongside operational internal audit functions in place within Group businesses.

Independent controls - *Quality and Regulatory oversight*

The Board is aware that as a significant healthcare and distribution business it is subject to a range of risks related to clinical care, quality and product safety.

The Healthcare division, and elements of the Distribution division, are regulated by governmental and non-governmental organisations. In summary:

- Each UAE Healthcare facility is licensed by one of four regulatory bodies which exist in the UAE. The regulatory bodies monitor performance and clinical procedures against its regulations, key metrics and guidelines;
- Clinica Eugin clinics are subject to local regulatory standards and laws applicable in each jurisdiction in which they operate;
- Healthcare facilities outside of the UAE are regulated by the relevant local responsible body in their relevant jurisdictions;
- Seven of the Group's owned Hospitals, as well as Sheikh Khalifa Hospital in Umm al Quwain which is managed by the Group, and the clinical laboratory of Dr Sunny Medical Centres are accredited by Joint Commission International, an internationally renowned organisation monitoring clinical metrics and quality of patient care;
- The distribution and disposal of pharmaceuticals is strictly controlled through the UAE Ministry of Health;
- The majority of the Group's healthcare revenue, particularly in our principal market of the UAE, results from medical insurance arrangements. The Group's contractual arrangements with insurance providers include the monitoring of claims processing and clinical outcomes.

The Group has a Quality Team which operates in both the Healthcare and Distribution divisions. Quarterly and annual Quality reports monitor performance against a range of key KPIs based on clinical quality and safety metrics.

The Board and its committees provide independent oversight of management's control systems, in particular the Audit Committee in relation to finance related matters and the Clinical Governance Committee in relation to clinical and quality matters. The work and oversight of the board committees is set out on pages 45 to 52.

## EFFECTIVENESS OF INTERNAL CONTROLS

The Board has overall responsibility for the Group's systems of internal control and on behalf of the Board, the Audit Committee has been engaged in the process of ensuring that management have established continuous processes for identifying, evaluating and managing the risks the Group faces. These processes include the reporting from the finance department on Group performance, the work of the internal auditors and issues identified by the external auditors to the extent covered by their audit work. The Board is responsible for monitoring the ongoing effectiveness of these systems and for conducting a formal annual review of the effectiveness of the Group's internal controls.

A system of internal controls is designed to manage, rather than eliminate, the risk of failure to meet business objectives and is designed to provide reasonable, but not absolute, assurance against material misstatement or loss.

In reviewing the effectiveness of the internal controls in place during the year, the Audit Committee considered, amongst other matters, manual controls in place, the independence of the separate operating units, the delegation of authority, the balance of centralised and decentralised systems and the reporting process in relation to exceptional items.

The Audit Committee has noted that the Group does not operate under a fully integrated high end IT environment and therefore an element of manual intervention is prevalent within the Group, including the businesses acquired in the last two financial years. The Board has approved the implementation of a new Hospital Information System which, together with the implementation of a new financial system and new consolidation software, will result in a new integrated IT system becoming fully functional across the Group.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice    57 of 164

Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

# Corporate Governance Report continued

**BOARD OVERSIGHT OF SYSTEM OF INTERNAL CONTROL AND RISK** CONTINUED
**EFFECTIVENESS OF INTERNAL CONTROLS** CONTINUED

The Board notes that the implementation of new IT systems will not change the level of controls inherent in the business, but they will remove elements of manual intervention from financial and operational processes. Management have taken time to ensure that all previous business processes are captured within the new IT systems. The roll out of the new ERP system into the Healthcare division, whilst delayed during the initial execution of the Group's strategic growth plan due to the challenges faced by the group in the initial testing phase, and as a result of significant regulatory changes over the last two years, remains underway and a focus across the Group. In addition to the growing nature and structure of the Group, there have also been challenges in relation to the roll out of the ERP system into the Distribution division, and this has also been delayed. The Company has made a root cause analysis and course corrections are under way for a phased roll out over 2019.

The Audit Committee have also noted the challenges faced as the acquired businesses are integrated into the Group. Such acquired businesses have differing levels of controls within their businesses. The Audit Committee have noted the initial primary and delegated authority controls which are put in place in the acquired businesses following completion as well as the roll out of financial and operational reporting requirements.

The Board has reviewed the effectiveness of the Group's systems of internal controls for the 2017 financial year, in light of the key elements of the Group's internal controls outlined above. Given the additional internal controls that have been incorporated into the Group's financial and operational reporting process, such that sufficient internal controls were in place to monitor the Group's key risks, the Board believes, having evaluated the effectiveness of the internal controls and procedures, that these were effective during the period covered by this report. The Board also believes that the process undertaken by the Board and its Committees to monitor the internal control environment, accords with the guidance provided in the FRC's Guidance on Risk Management, Internal Control and Related Financial and Business Reporting.

**SHAREHOLDER ENGAGEMENT**

The Company is committed to communicating with shareholders and stakeholders and to be available to meet with shareholders who require additional explanation of any matter which is of concern to them.

During 2017, the Company has continued to focus on its formal program of investor interaction including one-to-one meetings with institutional investors and attendance at investor conferences. Such meetings are attended by conducted by various members of the management team depending on the focus for specific meetings. The Company also held a Capital Markets Day in November 2017 which included visits to the Al Zahra Hospital and NMC Royal Hospital as well as presentations on our businesses from the Group's wider management team.

Meetings were also held in 2017 and in January 2018 between Independent Non-Executive Directors and our larger institutional shareholders, the former meeting to discuss a range of governance matters and the latter organised to discuss matters connected with the remuneration of the Company's Executive Directors.

During the financial year ended 31 December 2017, the Company issued its 2016 audited results and its 2017 half year unaudited results. In addition, given the significant strategic activities during the year, the Company kept shareholders updated regularly with regards to its long-term financing and its material acquisitions, and the effect that these have on the Group.

The Joint Chairmen and Senior Independent Non-Executive Director are also available, either through contacting the Company Secretary or at the Company's General Meetings, to discuss any matters within their areas of responsibility or where individuals do not feel it is possible to discuss these matters with management.

Aside from direct shareholder meetings, the principal ongoing communication with shareholders will be through the publication of the Company's Annual report and audited financial statements and Interim Results as well as the opportunity to question the Board and Committees at General Meetings. Shareholders are encouraged to attend General Meetings and if unable to do so are encouraged to vote by proxy.

The Company has an investor relations section on its corporate website, www.nmchealth.com. This has been updated regularly with information that the Company considers relevant to its investors. Additionally, the number of analysts monitoring the Company and issuing notes in relation to their forecasts and expectations for the group continues to increase.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice          58 of 164          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

ETHICS

## WHISTLEBLOWING POLICY

A confidential whistleblowing procedure is in operation to allow employees to raise concerns of possible improprieties in relation to either operational or financial conduct.

## BRIBERY ACT 2010

The Group has an Anti-Bribery and Anti-Corruption Policy which applies to all directors and employees of all Group Companies. The Policy, which has been communicated to employees, includes clear statements setting out the Group's Anti-Bribery measures and Anti-Corruption culture. Practical guidance has been issued in relation to specific circumstances considered to be most relevant to Group employees. These include guidance notes for clinical staff attending pharmaceutical and training and development conferences in relation to entertainment and other possible inducements, as well as guidance notes in relation to the receipt of free products and equipment and how such products and incentives may affect clinical judgement. Specific guidance has also been provided in relation to the provision of sales incentives to senior sales and marketing staff within our Distribution division.

Employees have been provided with a copy of these policies and are aware of the significance of them. New employees receive training on all company policies and procedures as part of their induction program.

The Corporate Governance Report set out on pages 41 to 57 has been approved by the Board and is signed on its behalf by:

## H. J. MARK TOMPKINS
Non-Executive Joint Chairman

## DR B. R. SHETTY
Non-Executive Joint Chairman

Exhibit 5 to B.R. Shetty's Request for Judicial Notice     59 of 164

Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

Governance

# Directors' Remuneration Report 2017
## Letter from the Remuneration Committee Chairman

Dear Shareholder,

I am pleased to present the Directors' Remuneration Report for 2017. As you are no doubt aware, once again the management team have excelled in delivering a further period of continuing substantial growth for the Company. I would like to take this opportunity to provide you with an overview of the major decisions that the Committee has taken during 2017 and to provide the context in which these decisions were taken.

Our strategy centred on increasing capacity, growing our capabilities and expanding our geographic reach continues to deliver significant and sustainable long-term growth. In 2017, we have delivered against all these strategic objectives. We have materially expanded our market position beyond the UAE, now having operations in 13 countries.

In addition, we have continued to improve the operational efficiency of our facilities and maintained a disciplined approach to EBITDA growth. This strategy has delivered long-term double digit sales and earnings growth driving the increased market value which is demonstrated in the chart shown here that provides a succinct view of our performance since 2012.

The chart below shows NMC's TSR growth since mid-2012, compared to the median and upper quartile TSR growth of the current FTSE 150 over the same period.

### TSR PERFORMANCE AGAINST THE FTSE 150



NMC is recognised for, and committed to, delivering high quality standards in our facilities and we are similarly proud of our quality performance in 2017, which in turn ensures our value creation for shareholders is sustainable over the long-term.

To sustain these levels of performance, remuneration must be competitive to attract and retain the appropriate talent to grow our business. We place a strong emphasis on linking pay to performance, particularly performance that benefits the Group over the longer-term and reflects our core remuneration principles.

### OUR REMUNERATION PRINCIPLES
- Alignment between executives and long-term shareholders
- Focus on long-term value creation
- Transparency in our approach to remuneration

In 2016, we introduced a new Remuneration Policy. This year's Remuneration Report shows how we applied the Policy, closely aligning executive pay with performance.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice    60 of 164    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

## CONTINUED STRONG PERFORMANCE THROUGHOUT 2017

2017 was another year of strong performance. We successfully delivered EBITDA of US$353.4m, on a revenue base that grew 31.3% to US$1.6bn over 2016-2017. Our market capitalisation is now £7.1b, as of the end of February 2018. Quality measures are also key to a healthcare business, and we are proud that we now have 7 JCI accredited hospitals across the Group and these facilities achieved excellent ratings against JCI performance measures.

Given this excellent performance, further details of which are provided in the business overview and financial review sections on pages 21 and 24 of this annual report, the Remuneration Committee has approved 100% of the bonus opportunity for the Chief Executive Officer (200% of salary), Executive Vice Chairman (175% of salary), and the Chief Investment Officer (150% of salary). Awards for the latter two Directors are pro-rated for their length of service in the year.

In line with our principle of transparency, we have provided a detailed summary of the measures and targets associated with these STIP outcomes on page 66.

In respect of vesting under the 2015 LTIP, performance is assessed against three-year relative TSR and three-year compound annual growth in EPS. Our TSR for this period was 509.26% (significantly ahead of the peer group median and upper quartile of 4.83% and 50.71%, respectively) with compound annual growth in EPS of 30.23%. This strong level of performance has, unsurprisingly, resulted in 100% of the 2015 LTIP awards vesting.

## EXECUTIVE REMUNERATION IN 2017

Notwithstanding the Company's performance, the Committee is acutely conscious of how executive remuneration remains under close scrutiny in the public arena and we therefore carefully consider how our executives are paid. While our performance justifies the incentive outcomes detailed above, we believe the Committee has exercised both restraint in remuneration decisions, as well as enhanced disclosure over the course of 2017. This is evidenced in the following ways:

### CEO SALARY REMAINS UNCHANGED

No change to the Chief Executive Officer's base salary. Prasanth Manghat assumed the role of Chief Executive Officer in March of 2017 and along with the management team, has made an outstanding contribution to the Company's success. Despite this promotion and associated increase in his role scope, the Committee did not make any adjustment to his fixed or variable remuneration. As a result, his base salary is less than that paid to the previous CEO, Dr Shetty, before he stepped down from his Executive role.

### BOARD APPOINTMENTS

As announced on 29 June 2017, the Board appointed two new Executive Directors, with the appointment of an Executive Vice Chairman and a Chief Investment Officer. These Directors' STIP incentive opportunity was set below the potential cap of 200%, at 175% and 150% for the Executive Vice Chairman and Chief Investment Officer, respectively.

### ENHANCED STIP DISCLOSURE

The Company has committed to enhanced bonus disclosure and we have provided increased detail in our disclosure of 2016 and 2017 STIP outcomes as shown on pages 66 to 67. This includes a detailed breakdown of non-financial measures, which is more detailed than that provided by most FTSE 100 companies. In line with the majority of other FTSE 100 companies, ex ante bonus disclosure is regarded as inappropriate given commercial sensitivity. In NMC's case, this is particularly so for the individual metrics and underpins relating to quality and capacity, which would provide competitors with market competitive information about our business.

### SHAREHOLDERS' FEEDBACK AND REMUNERATION FOR 2018

Prior to the 2017 AGM, the Remuneration Committee wrote to our larger institutional shareholders to explain our remuneration rationale in both 2016 and 2017. In early 2018, the Committee consulted with our larger shareholders on remuneration practices. Two recurring themes became apparent from these exercises: i) without exception all shareholders congratulated the Company on our extra-ordinary progression from the FTSE 250 to becoming a constituent of the FTSE 100, and ii) the method in which we played "catch-up" with our new peer group as we progressed to the FTSE 100 could have been handled differently with large one-off adjustments being preferred. The Committee also received feedback in relation to STIP metrics not being sufficiently oriented towards financial measures, as well as our EPS targets.

In light of this feedback, the Committee has made some changes to the operation of remuneration for 2018, while remaining within the parameters of our existing Remuneration Policy and keeping our fixed and variable remuneration relevant for the Group at its current point of evolution. These are summarised below.

### RESTRAINT ON MANAGEMENT REMUNERATION AND BOARD FEES

It is not the Committee's current intention to make any adjustment to the remuneration of the CEO or other Executive Directors for 2018.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice          61 of 164          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

# Directors' Remuneration Report 2017 continued
## Letter from the Remuneration Committee Chairman continued

**SHAREHOLDERS' FEEDBACK AND REMUNERATION FOR 2018** CONTINUED

### REBALANCING OF STIP MEASURES

A rebalancing of STIP measures to be financial in focus but with the addition of demanding underpins reflecting quality and capacity metrics. As shown on pages 70 and 71, for 2018 the Committee has determined that EBITDA and EBITDA margin will be retained along with specific operational measures for the Executive Vice Chairman and Chief Investment Officer. In line with our commitment to quality, for 2018 we have introduced underpins relating to stretch standards of facility quality performance, growth in patient numbers within existing facilities, and as well as occupancy levels. All three underpins must be met before any bonus is payable.

### INTRODUCTION OF AN EBITDA GROWTH MEASURE IN THE LTIP

The Group is focused on sustainable EBITDA growth. Indeed, a key driver of our success is the ability to acquire and ramp up assets efficiently. In this respect EBITDA growth is an appropriate metric. In addition, the underlying drivers of EBITDA are cascaded to management to enhance value from both existing and acquired businesses as efficiently as possible. Given the focus on EBITDA as a metric within the organisation, the Committee is confident that it is both prudent and in shareholders' interests to enhance the focus on this measure by including it in the LTIP.

The Committee has therefore determined that the EPS element of the LTIP, currently weighted at 50% will be replaced with an EBITDA CAGR measure, with the current TSR element remaining unchanged. This is outlined on page 71. The Committee regards this measure as a stretching requirement, particularly on the back of continuing EBITDA growth which has been achieved over many years.

Through our approach to remuneration, NMC has evidenced our commitment to applying best practices in remuneration policies and to listen to shareholder feedback. As we look to 2018, and beyond, we remain committed to delivering continued long-term sustainable growth and, we look forward to shareholders' support by voting in favour of the Directors' Remuneration Report at the 2018 AGM.

**LORD CLANWILLIAM**
Chairman of the Remuneration Committee

Exhibit 5 to B.R. Shetty's Request for Judicial Notice          62 of 164          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

CONTENTS
- Summary of Remuneration Policy
- The Remuneration Committee in 2017
- 2017 remuneration
- 2018 remuneration
- Other information

## INTRODUCTION

This Directors' Remuneration Report summarises the Company's Directors Remuneration Policy, outlines the activities of the Committee in the year under review, details how our remuneration policy was implemented in the year ended 31 December 2017, what remuneration was paid to the Directors for that period, and how the Committee intends to apply the policy for the year ending 31 December 2018.

The Directors' Remuneration Report will be subject to an advisory shareholder vote at the 2018 AGM.

Where the information is subject to audit in this Directors' Remuneration Report this is identified in the relevant heading.

## SUMMARY OF REMUNERATION POLICY

The Remuneration Policy summarised below was approved by shareholders in December of 2016. The Policy is effective until the third anniversary of its approval or a revised policy is approved, whichever is the sooner.

| | Element of remuneration | Link to strategy | Framework and opportunity |
|---|---|---|---|
| Fixed Remuneration | Base salary | To attract and retain management of the calibre required to deliver the Group's strategy without paying more than is necessary. To reward executives for their performance in the role. | No maximum level. Set in relation to: (i) Remuneration levels at companies of a comparable size and complexity in the FTSE, other similar UAE companies and other international healthcare companies; (ii) Salary increases elsewhere in the Group; (iii) Business and individual performance; (iv) The experience of the individual; (v) The external economic climate and market conditions; and (vi) Local market practice. |
| | Benefits | | The Group provides a range of benefits which reflect typical benefits offered in the UAE including, but not limited to: (i) Employee/family accommodation; (ii) Private Medical Insurance (including family cover); (iii) Company provided transport facility (iv) Annual family return flight to home country; (v) 30 days' holiday; (vi) Reimbursement of reasonable personal accommodation and travel costs including any related tax liability. |
| | Pension | | No pension provision. Executives are eligible to receive an end of service benefit, accrued in line with local UAE laws. |

Exhibit 5 to B.R. Shetty's Request for Judicial Notice    63 of 164    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

# Directors' Remuneration Report 2017 continued

**SUMMARY OF REMUNERATION POLICY** CONTINUED

| | Element of remuneration | Link to strategy | Framework and opportunity |
|---|---|---|---|
| Variable Remuneration | STIP* | Bonus measures and targets are set annually dependent on the deemed strategic priorities for that year. | The maximum bonus opportunity in respect of a financial year is 200% of base salary. In exceptional circumstances, the Committee may increase the maximum limit to 250% of salary. Normally, up to 50% of the bonus pays-out for target performance.<br><br>Any annual bonus achieved for a financial year is normally delivered one-third in cash and two-thirds in deferred shares. Normally, 50% of the deferred element vests one year from award and the rest vests two years from award subject to continued employment. |
| | LTIP* | Awards vest based on performance measured over a three year period.<br><br>Performance measures are determined by the Committee and are chosen to be aligned with the long-term success of the business. The Committee believes a measure linked to profitability and a share price related measure remain appropriate. | The maximum award opportunity in respect of a financial year is 250% of base salary. In exceptional circumstances, the Committee may grant awards of up to 300% of salary.<br><br>Up to 25% of the award pays out for threshold performance. Awards vest on a straight-line between threshold and maximum performance. |
| | Share options* | In exceptional circumstances the Committee has the ability to make awards of market value options. | In the event market value options were awarded, the maximum value is 200% of salary. Awards vest based on performance measured over a three year period based on measures adopted prior to grant. Options may be exercised until the 10th anniversary of the date of grant. |
| Shareholding guidelines | | To align the interests of the management team with shareholders, the company operates a shareholding guideline for Executive directors of 300% of salary. | |

\* Malus provisions are included in the Policy. In addition, as noted in the 2016 annual report, clawback is also in effect for all elements of variable remuneration.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice          64 of 164          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

## THE REMUNERATION COMMITTEE IN 2017

Details of the members of the Committee during the 2017 financial year, and its role and responsibility within the Group's Board and governance structure, is set out on page 51 of the Governance report.

### PRINCIPAL MATTERS CONSIDERED IN 2017

The Committee met formally four times during the year. Principal items discussed by the Committee included:
- A new tiered remuneration structure for Executive Directors and Senior Management under which different roles attract differing incentive opportunity levels;
- Voting and voting recommendations in relation to the Directors Remuneration Report resolution put to the 2017 AGM; and
- Current remuneration trends and corporate governance developments in relation to remuneration related matter.

### SUPPORT AND EXTERNAL ADVICE

The Remuneration Committee seeks and considers advice from independent remuneration advisers when discussing and setting Executive Director and Senior Management salary levels. Deloitte was appointed by the Remuneration Committee and acted as advisors to the Company since 2012 and were re-appointed by the Committee following a competitive tender process in 2016.

The Committee have reviewed and considered Deloitte's independence, and consider them to be independent advisers to the committee notwithstanding that Deloitte, as an international firm, provide the following services to the group:
- Some tax advisory services to the Group in Spain;
- Internal Auditors to our IVF businesses, Clinica Eugin and Fakih IVF; and
- transaction services and accounting advice to the Group in the UAE, both before and after some of the Group's acquisitions.

It was noted that none of this advice has related to remuneration matters in the Group, all teams providing these services are based in countries other than the UK where the remuneration advisory team are based and none of these teams have any connection with the engagement partner and team advising the Remuneration Committee.

The Committee is satisfied that the advice they have received from Deloitte during the year has been objective and independent and that the Deloitte LLP engagement partner and team, which provide remuneration advice to the Committee, do not have connections with NMC that might impair their independence. The Committee reviewed the potential for conflicts of interest and judged that there were appropriate safeguards against such conflicts. Deloitte are signatories to the remuneration consultants' group code of conduct in relation to executive remuneration consulting in the UK.

The Remuneration Committee has direct access to Deloitte as and when required. The Group Company Secretary liaises with Deloitte where necessary to ensure that all Committee requests and decisions are dealt with and implemented, but does so under the guidance of the Remuneration Committee Chairman. Deloitte attend meetings of the Committee as required.

Deloitte received fees of £86k (charged on a time plus expenses basis) for advice received during the year.

### RESULTS OF VOTING ON REMUNERATION MATTERS AT GENERAL MEETINGS OF THE COMPANY

The following summarises voting in relation to the approval of the 2016 Directors' Remuneration Report at the Annual General Meeting in 2017:

| Meeting Date | Resolution | Resolution type | For | Against | Number of votes withheld |
|---|---|---|---|---|---|
| 23 May 2017 | To approve the Directors' Remuneration Report | Advisory | 71.36% | 28.64% | 255,623 |

The Committee noted and discussed the level of voting received against the Company's Directors' Remuneration Report at its 2017 Annual General and the resulting inclusion of the Company in the Public Register implemented later in 2017 by the Investment Association.

The Committee believes that its approach to Executive Remuneration during the 2012 to 2016 financial years was in the best interests of the Company and all its shareholders. Following a pay freeze during the initial three years following IPO, which resulted in Executive Remuneration being significantly below lower quartile levels, Executive Remuneration was re-aligned in 2015 and 2016 to competitive market levels. The Committee believe that this was both a conservative and appropriate approach in ensuring that management were not rewarded until successful execution of the first phase of the Group's strategic growth plan and until improved performance had been reflected in increased shareholder confidence in the Company. Pay then increased as performance improved at a time of transformational growth for the Company and in shareholder value, ensuring that management were appropriately incentivised during this crucial period.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice          65 of 164          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

Governance

# Directors' Remuneration Report 2017 continued

**THE REMUNERATION COMMITTEE IN 2017** CONTINUED
The following 5-year charts reflect the appropriate and necessary actions taken by the Committee during recent financial years:

FTSE 100 SALARY AND PERFORMANCE COMPARISON



FTSE 250 SALARY AND PERFORMANCE COMPARISON



The Committee noted that a number of shareholders were not supportive of this approach, preferring pay levelling to take place over an even longer period of time, hence the level of votes against the Company's 2016 Directors' Remuneration Report. The Committee is of the view that this would not have been a sustainable position to properly incentivise and reward management in achieving excellent performance and growth on shareholders' behalf.

In early 2018, the Committee have been discussing the Company's remuneration structure with shareholders and shareholder representatives, both the above past practices and future intentions, and we look forward to the support of shareholders in relation to our remuneration practices going forward.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice          66 of 164          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

**REMUNERATION ARRANGEMENTS THROUGHOUT THE GROUP**

The remuneration philosophy is the same throughout NMC - that individuals should be remunerated based on their role, responsibilities, experiences and market practice. NMC has a variety of different roles from senior executives, to doctors and nurses and to administrators and support staff, and therefore remuneration levels and structures vary to reflect the different requirements, expectations and geographic locations of these roles.

The Committee does consider that it is important, however, that Executive Directors and senior executives as a group are remunerated in a similar way to ensure that they are incentivised to collectively deliver the Group's strategy and create long term value for shareholders. Executive Directors and senior management therefore all participated in the STIP and LTIP arrangements in 2017.

**SHAREHOLDER VIEWS AND CONSIDERATION OF EMPLOYMENT CONDITIONS ELSEWHERE IN THE GROUP**
**COMMUNICATION WITH OUR SHAREHOLDERS**

Some members of the Committee met with our larger institutional shareholders and the Investment Association in early 2018 to discuss the operation of Executive Remuneration in 2018. The Committee remains available to discuss remuneration matters concerning shareholders at any time.

**CONSIDERATION OF PAY AND CONDITIONS OF EMPLOYEES**

The Committee considers the correlation between Executive Director remuneration and that of Senior Management, as well as pay levels externally for similar roles, when determining individual remuneration levels. However, given the Group's wide geographic reach in relation to both its business interests and shareholders, and the significant corporate and public company responsibilities which are not reflected in roles in the rest of the Group, the Committee do not feel that Executive Director and Senior Management remuneration needs to be aligned with other remuneration within the business. The Committee did not consult with employees when setting Executive Director pay.

**2017 REMUNERATION - THIS SECTION IS SUBJECT TO AUDIT**

This section outlines how the remuneration policy was applied in 2017, together with the outcomes for actual remuneration paid in relation to the financial year under review. This is shown in two parts - Remuneration paid to Executive Directors and a separate section in relation to Non-Executive Directors.

**EXECUTIVE DIRECTOR REMUNERATION 2017**
Remuneration paid in 2017 (single pay figure)
The table below sets out the remuneration paid to or received by each Executive Director of the Company who served during the financial year ended 31 December 2017.

| Executive Director | Salary $'000 2017 | Salary $'000 2016 | Benefits $'000 2017 | Benefits $'000 2016 | STIP $'000 2017 | STIP $'000 2016 | LTIP awards $'000 2017 | LTIP awards $'000 2016 | Pension $'000 2017 | Pension $'000 2016 | Total $'000 2017 | Total $'000 2016 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Dr B R Shetty | 425.0 | 1,061.8 | 35.1 | 173.4 | 0.0 | 1,592.7 | 3,254.4 | 2,013.4 | 0.0 | 0.0 | 3,714.5 | 4,841.3 |
| Prasanth Manghat | 1,033.2 | 898.4 | 19.6 | 19.6 | 2,066.4 | 1,347.6 | 2,829.0 | 1,610.7 | 0.0 | 0.0 | 5,948.2 | 3,876.3 |
| Khalifa Bin Butti | 348.5 | N/A | 0.0 | N/A | 400.0 | N/A | 0.0 | N/A | 0.0 | N/A | 748.5 | N/A |
| Hani Buttikhi | 330.8 | N/A | 0.0 | N/A | 325.4 | N/A | 0.0 | N/A | 0.0 | N/A | 656.2 | N/A |

Notes:
(1)  The salary for Dr B R Shetty includes salary for 2 months of the year during which he served as Executive Vice Chairman and CEO plus fees as Non-Executive Joint Chairman for the period of 10 months that he served in this role.
The value shown in the 2016 LTIP awards column is the award which vested on 29 October 2017 and is valued using the execution share price on 30 October 2017 of 2877.0p per share.
(2)  The value shown in the 2017 column is the award which will vest on 6 March 2018, the date of this report. As it is not practical to provide an actual value attributable to these shares, the value shown above is calculated by reference to the average closing share price of the Company in the Quarter ended 31 December 2017, which was 2867p per share.
(3)  Participants also receive additional shares equivalent in value to the dividends that would have been paid during the vesting period on any shares that vest. Therefore included in 2016 and 2017 LTIP values above are the value of such shares received or to be received.

Base salaries

The base salaries of the Dr B R Shetty as Executive Vice Chairman & CEO, of $1.2m (AED 4.485m) per annum, and Mr Prasanth Manghat, as Deputy CEO, of $1.0m (AED 3.798m) per annum, were set effective from 1 January 2017. In the case of Dr Shetty, there was no change to his base salary in 2017 until he stepped down from his Executive Director role and was appointed Non-Executive Joint Chairman. In relation to Mr Manghat, there has been no change in his base salary during the 2017 financial year despite his change of role and promotion to Chief Executive Officer in March 2017.

The base salaries for Mr Khalifa Bin Butti, of $680k (AED 2.518m) per annum, and Mr Hani Buttikhi, $650k (AED 2.390m) per annum, were set from their date of appointment as Directors, and are unchanged since that date.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice          67 of 164          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

Governance

# Directors' Remuneration Report 2017 continued

**2017 REMUNERATION - THIS SECTION IS SUBJECT TO AUDIT** CONTINUED
**EXECUTIVE DIRECTOR REMUNERATION 2017** CONTINUED

Benefits

There was no change to the structure of benefits available to the Executive Directors during the year. The Benefits paid included the following items:

| Executive Director | Provision of family accommodation $'000 2017 | 2016 | Private medical insurance $'000 2017 | 2016 | Annual family return flights to home country $'000 2017 | 2016 |
|---|---|---|---|---|---|---|
| Dr B R Shetty | 30.4 | 168.7 | 2.2 | 2.2 | 2.5 | 2.5 |
| Prasanth Manghat | 0.0 | 0.0 | 4.4 | 4.4 | 15.2 | 15.2 |
| Khalifa Bin Butti | 0.0 | N/A | 0.0 | N/A | 0.0 | N/A |
| Hani Buttikhi | 0.0 | N/A | 0.0 | N/A | 0.0 | N/A |

Outcome of the 2017 STIP

The level of STIP award is determined by the Committee based on NMC's performance and where relevant individual Directors' performance. For the purpose of the 2017 annual bonus, the executive directors were eligible for bonus awards as follows:

- Chief Executive Officer: 200% of salary;
- Executive Vice Chairman: 175% of salary (pro rated for partial service in the year);
- Chief Investment Officer: 150% of salary (pro rated for partial service in the year).

For the year ended 31 December 2017, the Committees assessment of outcomes are set out below.

| Measure | CEO | Executive Vice Chairman (pro-rated for period of service) | CIO (pro-rated for period of service) | Threshold | Target | Maximum | Actual performance | Payout (% of maximum) |
|---|---|---|---|---|---|---|---|---|
| EBITDA | 25% | 50% | 50% | US$335m | US$340m | US$350m | US$353m | 100% |
| EBITDA Margin | 25% | 50% | 50% | 20.5% | 21.0% | 21.5% | 22% | 100% |
| JCI Accreditation | 25% | - | - | NMC seeks to achieve a high quality standards in each of its facilities. Quality standards are seen as a key component in relation to customer service and monitoring of such standards a key clinical risk mitigation factor and component of the Group's internal control mechanism. The JCI accreditations measure required the Group to achieve a JCI accreditation score of greater than 95% in two of its Speciality Hospitals for a threshold pay-out and in four of its Speciality Hospitals for maximum pay-out. The Group received a JCI accreditation score of greater than 95% in all four of its Hospitals who had JCI accreditation for the whole of 2017, resulting in a maximum pay-out under this measure. | | | | 100% |
| Facility efficiency | 25% | - | - | The facility efficiency metric (which measures the number of operational beds and bed occupancy) was measured across two of the Group's key hospitals. The targets used to measure performance, together with actual performance achieved is set out in the following table. | | | | 100% |

*NMC Royal hospital*

| | Minimum | Target | Maximum | Actual |
|---|---|---|---|---|
| Operational beds | 110 | 125 | 150 | 200 |

Al Zahra hospital

| | Minimum | Target | Maximum | Actual |
|---|---|---|---|---|
| Operational beds | 137 | 142 | 154 | 154 |

The Committee set a required occupancy level of 60%, with actual occupancy of 61% achieved across these facilities.

Based on the above performance, the Committee approved 100% of maximum pay-outs for the Executive Directors. For the CEO, one-third of the award achieved is being paid in cash with two-thirds delivered in the form of a deferred share award, which vests equally after periods of one year and two years. For the Executive Vice Chairman and CIO whose awards were pro-rated for time served in the year, for this initial year of participation the amounts payable are being paid wholly in cash.

66    NMC Health plc Annual Report and Accounts 2017

Dr B. R. Shetty, who stepped down from his role as Executive Vice Chairman and CEO in March 2017 did not participate in the 2017 STIP.

Outcome of 2016 STIP

Consistent with our principle of transparency, we are also now able to provide below a detailed summary of our 2016 STIP outcomes.

| Measure | Weighting | | Underlying targets | | | | |
| | Executive Vice Chairman and CEO | Deputy CEO | Threshold | Target | Maximum | Actual performance | Payout (% of maximum) |
|---|---|---|---|---|---|---|---|
| EBITDA | 25% | 25% | US$214m | US$225m | US$236m | US$246.1m | 100% |
| JCI Accreditation | 25% | - | NMC seeks to achieve a high quality standard in each of its facilities.<br><br>For 2016 the Committee required all three speciality hospitals having JCI accreditation at that time, to attain JCI scores of 95% or greater against JCI KPIs. Actual results for 2016 were:<br><br>Dubai Specialty Hospital 98.48%<br>Al Ain Specialty Hospital 99.85%<br>Abu Dhabi Specialty Hospital 98.96% | | | | 100% |
| Expansion into new geographies | 25% | 25% | Geographic expansion was a component of the 2016 growth plan. This required management to expand healthcare revenues across the GCC but outside of the UAE.<br><br>The specific target was based on the number of new jurisdictions into which the group expanded in the year. Over the course of 2016, the Company realised this objective through expansion into 3 new countries in the year. | | | | 100% |
| Ramp up of NMC Royal Hospital Khalifa City | 25% | 25% | Facility performance in terms of the number of operational beds and the average occupancy of those beds is shown below. | | | | 100% |
| Establishment of Central Laboratory | - | 25% | This measure reflected the strategic intention of realising efficiencies across the Group through maximising the number of facilities use the central laboratory for testing.<br><br>The target set required management to set up the new Central Laboratory and for the number of facilities using the new laboratory from 1 facility (threshold) to 4 facilities (maximum). Realised performance was 4 facilities using the new laboratory. | | | | 100% |

*NMC Royal hospital*

| | Target | Maximum | Actual |
|---|---|---|---|
| Operational beds | 75 beds | 100 beds | 101 beds |
| Average Occupancy | 35% | 50% or higher | 61.9% |

Exhibit 5 to B.R. Shetty's Request for Judicial Notice    69 of 164    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

# Directors' Remuneration Report 2017 continued

**2017 REMUNERATION - THIS SECTION IS SUBJECT TO AUDIT** CONTINUED
**EXECUTIVE DIRECTOR REMUNERATION 2017** CONTINUED
Long Term Incentive Plan
Performance in relation to LTIP Awards made in 2015
The Remuneration Committee has reviewed performance against the targets set for LTIP grants made in 2015. 50% of the award was subject to an Earnings Per Share (EPS) growth performance condition, whilst the remaining 50% of the award was based on the Company's Total Shareholder Return relative to a bespoke peer group.

| Measure | Threshold (25% vesting) | Maximum (100% vesting) | Actual performance | Level of vesting |
|---|---|---|---|---|
| Earnings Per Share[1] | 6% p.a. growth | 15% p.a. growth | 30.23% p.a. growth | 100% |
| Total Shareholder Return[2,3] | Median | Upper quartile | 509.26% (100th percentile) | 100% |

1   straight line vesting between threshold and maximum.
2   Pro-rata vesting between median and lower quartile on a ranking basis.
3   Peer group - Korian (France); Mediclinic International (UK); Spire Healthcare GP (UK); Raffles Medical GP (Singapore); Banmedica (Chile); KPJ Healthcare (Malaysia); NIB Holdings (Australia); Al-Maidan DNL. Clinic (Kuwait); Steris Corporation (USA).

Given the strong level of relative TSR and EPS performance delivered over the three-year performance period, the Committee determined that 100% of the 2015 LTIP awards will vest.

As the share price at the date of vesting was not known at the date of publication of this report, the value included within the single figure table is based on the number of shares that vested multiplied by the average share price over the quarter ending 31 December 2017, which is 2,867p per share.

Awards made in 2017
During 2017, LTIP grants were made to the Executive Directors as follows, within the levels permitted by our approved Policy applying during the 2017 financial year.

| | |
|---|---|
| Mr Prasanth Manghat, Chief Executive Officer | 250% of salary |
| Mr Khalifa Bin Butti, Executive Vice Chairman | 225% of salary |
| Mr Hani Buttikhi, Chief Investment Officer | 175% of salary |

Performance targets
The following performance targets were used in relation to all LTIP awards granted in 2017.

*Company's Earnings per Share (EPS) growth*
This measures the Company's annual compound growth in EPS and represents 50% of the total award. The table below sets out the EPS targets for the 2017 award and the corresponding level of vesting:

| Annual compound growth in EPS over the three-year Performance Period | Vesting percentage of target |
|---|---|
| 15% or more | 100% |
| Between 8% and 15% | On a straight-line basis between 25% and 100% |
| 8% | 25% |
| Less than 8% | 0% |

Total Shareholder Return (TSR) growth
This measures the Company's TSR compared against a comparator group of companies and represents 50% of the total award. The table below sets out the TSR targets for the 2017 award and the corresponding level of vesting:

| Company's TSR over three-year performance period compared to the LTIP comparator group (as defined below) | Vesting percentage of target |
|---|---|
| Upper quartile | 100% |
| Between median and upper quartile | Pro-rata between 25% and 100% on a ranking basis |
| Median | 25% |
| Below Median | 0% |

For LTIP grants made in 2017, the TSR comparator group used is the 150 largest companies in the FTSE 350 (excluding investment trusts and the Company).

Exhibit 5 to B.R. Shetty's Request for Judicial Notice          70 of 164          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

## Pension contributions

There were no pension contributions in 2017. During 2016, the Committee considered its policy not to provide executive directors with a pension arrangement. The Committee considered that a one-off payment of 20% of salary for 2016 in lieu of pension contributions was appropriate to compensate for a lack of an ongoing pension arrangement. The Committee considered this appropriate in light of the normal practice of other UK listed companies of comparable size and scope.

## NON-EXECUTIVE DIRECTOR REMUNERATION 2017

### Remuneration paid in 2017 (single pay figure)

The fee paid in cash to each Non-Executive Director during the year ended 31 December 2017 is set out in the following table:

| Director | Position | FY2017 (£'000) | FY2016 (£'000) |
|---|---|---|---|
| H. J. Mark Tompkins | Independent Non-Executive Joint Chairman | 228 | 215 |
| Dr Ayesha Abdullah | Independent Non-Executive Director | 103 | 95 |
| Abdulrahman Basaddiq | Non-Executive Director | 98 | 95 |
| Jonathan Bomford | Senior Independent Non-Executive Director | 103 | 100 |
| Lord Clanwilliam | Independent Non-Executive Director | 108 | 90 |
| Salma Hareb | Independent Non-Executive Director | 93 | 95 |
| Keyur Nagori | Non-Executive Director | 42.5 | 90 |
| Binay Shetty | Non-Executive Director | 47.5 | 90 |
| Dr Nandini Tandon | Independent Non-Executive Director | 98 | 100 |

Note: The Remuneration for Dr B. R. Shetty, Non-Executive Joint Chairman, as a Non-Executive Director is included in the Single Pay Table for Executive Directors as he was an Executive Director for part of the year.

None of the Non-Executive directors received any benefits, pension, STIP or LTIP entitlements or payments during FY2016 and FY2017.

In 2017, there was no increase in the fees paid to Non-Executive Directors with the exception of:

- An increase of £10k per annum to £210k for the position of Joint Chairman with effect from 1 January 2017; and
- An increase from £5k to £10k per annum paid to each Board Committee Chair.

Therefore, with effective from 1 January 2017, the annual fees of the Non-Executive Directors have been structured as follows:

- Base fees:     Joint Chairman - £210k
                 Senior Independent Director - £85k
                 Non-Executive Director - £75k
- An additional fee of £10k per annum is paid to the Chair of each board committee
- A fee of £5k paid to each Non-Executive Director who attends meetings of the Board, in person, in a country which is not their primary residence. The Executive Directors decided to adjust the way in which this attendance allowance is paid with effect from 1 October 2017, and from this date Non-Executive Directors are paid £4k for each meeting attended irrespective of location. This reflects the significant time commitment required for NEDs to attend meetings, often away from their own country of residence.

The above fee structure is reflected in the fees paid to each NED during 2017.

## Payments to past directors

There were no payments made to past directors during the 2017 financial year

## Payments for loss of office

There were no payments made for loss of office to past directors during the 2017 financial year

Exhibit 5 to B.R. Shetty's Request for Judicial Notice        71 of 164        Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

Governance

# Directors' Remuneration Report 2017 continued

## 2018 REMUNERATION

### EXECUTIVE REMUNERATION IN 2018

This section summarises how the Committee intends to implement the Company's existing remuneration policy in 2018.

**Executive Director base salaries**

Annual base salaries payable with effect from 1 January 2018 remain as follows:

| | |
|---|---|
| Chief Executive Officer | US$1,033.4k (AED 3.795m) |
| Executive Vice Chairman | US$685.6k (AED 2.518m) |
| Chief Investment Officer | US$650.8k (AED 2.390m) |

The base salary of the Chief Executive Officer was set with effect from 1 January 2017 whilst in the role of Deputy CEO and was not increased upon the promotion of Mr Manghat to CEO in March 2017 or since. The base salary of the CEO therefore currently remains at a level lower than that paid for the same position in 2016.

The base salary of the Executive Vice Chairman and the Chief Investment Officer were set on appointment of each individual during the 2017 financial year and remain at the same level.

It is not the Committee's current intention to make any adjustment to the remuneration of the CEO or other Executive Directors for 2018.

**Benefits**

There is no change to the structure of benefits in 2018 which will be paid in line with the arrangements in place for the 2017 financial year.

**Operation of the STIP for 2018**

The maximum STIP opportunity for each of the Executive Directors in 2018 will be as follows:

| | |
|---|---|
| Chief Executive Officer | 200% of base salary |
| Executive Vice Chairman | 175% of base salary |
| Chief Investment Officer | 150% of base salary |

The way in which any award from the 2018 STIP will be delivered will be one-third of any STIP award being made in cash and two-thirds deferred into shares, half of which will vest one year after any award is made and the other half two years after any award.

The performance targets that will apply for the 2018 financial year have been set, as in previous years, after considering the Group's priorities for the year. EBITDA and EBITDA margin will remain as key measures for the year for each Executive Director, with the Executive Vice Chairman and Chief Investment Officer both also having specific individual targets in relation to their areas of strategic focus in 2018.

The Remuneration Committee considers that ex-ante disclosure of the specific targets are commercially sensitive at this stage as they could disclose details of strategy and operations for 2017 to the Company's competitors. The Remuneration Committee will disclose details in respect of the targets when it is satisfied that these are no longer commercially sensitive.

### 2018 STIP Targets

As noted in the Remuneration Committee Chairman's letter, the Board consulted with shareholders ahead of determining STIP measures for 2018. These are shown below. Further, the Board will continue to disclose actual performance against targets when they are considered to be no longer commercially sensitive.

For 2018 targets will be set against the following measures.

| Measure | Weighting | | | Rationale |
|---|---|---|---|---|
| | CEO | EVC* | CIO** | |
| EBITDA | 50% | 33% | 33% | • Directly linked to the Group's strategy.<br>• Represents key metric or UAE and non-UAE operations. |
| EBITDA margin | 50% | 33% | 33% | • Key performance indicator for the business.<br>• Rewards efficient profit generation. |
| Corporate Development Revenue and Cost Synergies | | | 33% | • Acquisition and collaborations remain key to the strategy.<br>• Measures the efficiency of corporate activity. |
| Operations and Management Revenue | | 33% | | • Focus area for the Company.<br>• Reflects revenue contracts where NMC does not own the asset but can leverage the NMC network/referrals. |

\*    Executive Vice Chairman
\*\*   Chief Investment Officer

70    NMC Health plc Annual Report and Accounts 2017

In addition before any bonus is payable, the following underpin conditions apply (all three underpins must be met).

| Underpin | Rationale |
| --- | --- |
| Facility quality performance | The quality scores obtained across our facilities in different countries remains fundamental to sustainable growth. As such, a zero tolerance approach will be applied such that all facilities undergoing an accreditation process must pass that process. NMC has not failed an accreditation to date, nonetheless the Committee is minded to adopt this tough stance to reinforce the importance of quality. |
| Growth in patient numbers | Growth in patient numbers in existing facilities is in line with our focus on efficiency and effective use of our assets. |
| Occupancy levels | A minimum standard will be applied across facilities, again in line with our focus one efficient growth and use of assets. |

The Committee has selected these measures and underpins in light of feedback from shareholders and is confident that performance against stretch targets on these metrics aligns management performance with shareholders' interests.

### Operation of the LTIP for 2018

Within the limit of the provisions set out in the Company's Directors' Remuneration policy approved by shareholders on 29 December 2016, the LTIP award levels for the Executive Directors in respect of 2018 will be granted at a maximum level of 250% of base salary.

For 2018, the Committee is providing a tiered approach to LTIP grants for Executive Directors and Senior Management. The grants applicable to each Executive Director will be as follows:

| | Maximum opportunity (% of base salary) |
| --- | --- |
| Chief Executive Officer | 250% |
| Executive Vice Chairman | 225% |
| Chief Investment Officer | 175% |

The performance targets that apply for awards to be made under the plan in the 2018 financial year will be as follows:

| Measure | Purpose and link to remuneration strategy | Performance measure | Target | Percentage Weighting for relevant individuals |
| --- | --- | --- | --- | --- |
| Total shareholder return (TSR) | To incentivise management to deliver long term returns to shareholders | TSR growth compared to a comparator group of companies. The comparator group are the companies making up the 150 largest companies within the London Stock Exchange FTSE350 Index (excluding investment trusts and the Company). | 25% of this element of the award will vest for performance equal to the median of the comparator group with 100% vesting for upper quartile performance or better. Vesting is on a straight line basis between these points. | 50% |
| EBITDA Compound Annual Growth Rate | To incentivise management to deliver bottom line earnings growth | Annual compound growth in EBITDA between the base year (i.e. 2017) and the end of the performance period. | 25% of this element of the award vests for compound EPS growth of 5% per annum with 100% vesting for EPS growth of 15% per annum. Vesting is on a straight line basis between these points. | 50% |

Awards under the LTIP for 2017 and beyond are subject to a clawback provision, on top of the existing malus provision. In addition, in the event of an acquisition or disposal during the performance period, the Committee will assess whether the financial performance of the acquired/disposed business should be included or excluded, with targets adjusted accordingly.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice    73 of 164    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

# Directors' Remuneration Report 2017 continued

**2018 REMUNERATION** CONTINUED
## NON-EXECUTIVE DIRECTORS REMUNERATION IN 2018

The fees payable to the non-executive directors effective as at 1 January 2018 are as follows:

|  | (£'000) |
|---|---|
| Joint Chairmen | 210 |
| Senior Independent Director | 85 |
| Non-executive director | 75 |
| Chairman of a Board Committee | 10 |

These fees are unchanged from those operating in the 2017 financial year. In addition, it is not the Executive Directors' current intention to make any adjustment to the fees payable to the non-executive directors for 2018.

Given that the location of the Company's Board Meetings varies during the year, and also due to the geographic diversity of the country of residence for Board members, an additional fee is also payable for attendance at Board meetings.

Details of the remuneration paid to each of the non-executive directors who served during the year are included in the table on page 69.

Non-executive directors do not participate in any bonus or incentive plan or other form or performance-related remuneration. The Company does not provide any contribution to their pension arrangements.

### OTHER INFORMATION
## DIRECTORS' SERVICE AGREEMENTS AND LETTERS OF APPOINTMENT
Executive Directors' service agreement and employment contracts
Each of the following served as Executive Directors during the 2017 financial year and were subject to service agreements entered into with NMC Healthcare LLC, one of the Company's subsidiaries.

|  | Date of agreement |
|---|---|
| Dr B R Shetty | 19 March 2012 |
| Prasanth Manghat | 1 May 2011 |
| Khalifa Bin Butti | 28 June 2017 |
| Hani Buttikhi | 28 June 2017 |

Dr B R Shetty was employed by NMC Healthcare LLC pursuant to a service agreement dated 19 March 2012 until 8 March 2017 when he stepped down from his role as Executive Vice Chairman and Chief Executive Officer.

Mr Prasanth Manghat is employed by NMC Healthcare LLC pursuant to an employment contract dated 1 May 2011. The contract provides for a renewable two-year term of employment unless terminated earlier in accordance with the terms of the contract. The Contract provides that, unless otherwise agreed between the parties, the contract can be terminated on one months' prior written notice given by either Prasanth Manghat or NMC Healthcare LLC.

Mr Khalifa Bin Butti is employed by NMC Healthcare LLC pursuant to an employment contract dated 28 June 2017. The contract provides for a renewable two-year term of employment unless terminated earlier in accordance with the terms of the contract. The Contract provides that, unless otherwise agreed between the parties, the contract can be terminated on 12 months' prior written notice given by either Mr Bin Butti or NMC Healthcare LLC.

Mr Hani Buttikhi is employed by NMC Healthcare LLC pursuant to an employment contract dated 28 June 2017. The contract provides for a renewable two-year term of employment unless terminated earlier in accordance with the terms of the contract. The Contract provides that, unless otherwise agreed between the parties, the contract can be terminated on one months' prior written notice given by either Mr Hani Buttikhi or NMC Healthcare LLC.

Copies of the Agreements for each of the Executive Directors are available for inspection during normal business hours at the Company's Registered Office, and are available for inspection at the Company's annual general meeting.

For future executives the Committee policy is that notice periods will not exceed 12 months. There are no matters for which the Company requires approval of shareholders for the purposes of Chapter 4A of Part 10 of the Companies Act 2006.

### Letters of appointment for Non-Executive Directors
The Non-Executive Directors do not have service agreements with the Company, but instead have letters of appointment. The appointment of each of the Non-Executive Directors is stated for an initial term until the next annual general meeting of the Company at which, and at subsequent annual general meetings, they need to submit themselves for re-election if they so wish. Each letter of appointment is terminable by 3 months' notice by both the Company and the Director and include a minimum time commitment that they need to give to the Company in any year.

There is no compensation payable upon the early termination of a Non-Executive Directors' appointment.

72    NMC Health plc Annual Report and Accounts 2017

Copies of the Non-Executive Directors' Letters of Appointment are available for inspection during normal business hours at the Company's Registered Office, and available for inspection at the Company's annual general meeting.

## DIRECTORS' SHAREHOLDINGS AND SHARE INTERESTS - SUBJECT TO AUDIT

### Directors' shareholdings and interests

The table below shows details of the Directors' holdings of Ordinary Shares and interests in the Company as at 1 January 2017 and at 31 December 2017.

| Director | Ordinary shares of 10p each | | Share options over Ordinary shares of 10p each | |
|---|---|---|---|---|
| | 1 January 2017 (or date of appointment if later) | 31 December 2017 | 1 January 2017 (or date of appointment if later) | 31 December 2017 |
| H. J. Mark Tompkins (note 1) | 25,083 | 53,083 | 0 | 0 |
| Dr B. R. Shetty (note 2) | 51,756,893 | 39,713,893 | 444,671 | 479,336 |
| Khalifa Bin Butti (note 3) | 30,096,561 | 30,096,561 | 0 | 43,416 |
| Prasanth Manghat | 8,308 | 8,308 | 217,130 | 399,052 |
| Hani Buttikhi | | 0 | 0 | 32,051 |
| Dr Ayesha Abdullah | 0 | 0 | 0 | 0 |
| Abdulrahman Basaddiq | 0 | 0 | 0 | 0 |
| Jonathan Bomford | 17,000 | 18,000 | 0 | 0 |
| Lord Clanwilliam (note 4) | 0 | 3,660 | 0 | 0 |
| Salma Hareb | 0 | 6,600 | 0 | 0 |
| Dr Nandini Tandon | 0 | 0 | 0 | 0 |

Notes:

1. The interests of Mr H J Mark Tompkins in relation to the ordinary shares of the Company include the shares held in the name of his wife and by a family trust of which he is considered a beneficiary. Mr Tompkins purchased an additional 3,000 Ordinary shares of the Company on 6 February 2018.

2. The interests in relation to both ordinary shares and options over ordinary shares of the Company for Dr B. R. Shetty include the shares and options in the name of his wife, Dr C R Shetty.

3. Mr Bin Butti also holds an interest in 15,280,426 shares of the Company through Infinite Investment LLC, which he jointly owns with H.E. Saeed Bin Butti.

4. Lord Clanwilliam purchased an additional 3,000 Ordinary shares of the Company on 5 February 2018.

None of the Directors received any loans, advances or other form of credit granted by the Company, nor were any guarantees of any kind provided by the Company on behalf of any Directors during the year ended 31 December 2017.

Except as stated above, none of the Directors who held office during the year held any Ordinary Shares or options over Ordinary Shares of the Company during the year. Except as stated in the notes to the table above, there have been no changes in the above interests between 31 December 2017 and the date of this Directors' Remuneration Report.

Executive directors are expected to build a shareholding of 300% of base salary over a 5-year period. The first share incentive awards granted to the Executive Directors vested in October 2017. The Chief Executive Officer holds shares valued at £239.6k (US$287.0k based on the share price and £:US$ exchange rate at 31 December 2017) and has fully vested but unexercised share awards valued at £1,533.3k (US$1,836.9k based on the share price and £:US$ exchange rate at 31 December 2017). These shares and vested share awards have a value of c. 28% and 178% of salary respectively (based on salary at 31 December 2017).

The Executive Vice Chairman, appointed in June 2017, is a significant shareholder in the Company and therefore already meets the shareholding requirement. Mr Hani Buttikhi, also appointed in June 2017, currently holds no shares but was granted LTIP share awards shortly after he joined the Board.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice    75 of 164    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

Governance

# Directors' Remuneration Report 2017 continued

**OTHER INFORMATION** CONTINUED
**DIRECTORS' SHAREHOLDINGS AND SHARE INTERESTS - SUBJECT TO AUDIT** CONTINUED
Directors' interests in shares
The following tables show details of the share awards made to Executive Directors that have not yet vested or have vested but as at 31 December 2017 were unexercised.

Long Term Incentive Plan

| | Type of interest | Performance period ending | Award Date | Market Price at Date of Award | Exercise price | Shares Awarded | Face value of award | % vesting for minimum performance | Vesting Date |
|---|---|---|---|---|---|---|---|---|---|
| Dr B R Shetty | LTIP award subject to performance | 31 December 2017 | 25 February 2015 | 520p | 0p | 57,692 | £300,000 | 25% of award | 25 February 2018 |
| Dr B R Shetty | LTIP award subject to performance | 31 December 2017 | 8 September 2015 | 760.5p | 0p | 26,298 | £200,000 | 25% of award | 8 September 2018 |
| Dr B R Shetty | LTIP award subject to performance | 31 December 2018 | 15 March 2016 | 967.5p | 0p | 100,775 | £975,000 | 25% of award | 15 March 2019 |
| Mr Prasanth Manghat | LTIP award subject to performance | 31 December 2016 | 29 October 2014 | 494.9p | 0p | 40,738 | £202,834 | 25% of award | 29 October 2017 |
| Mr Prasanth Manghat | LTIP award subject to performance | 31 December 2017 | 25 February 2015 | 520p | 0p | 50,000 | £260,000 | 25% of award | 25 February 2018 |
| Mr Prasanth Manghat | LTIP award subject to performance | 31 December 2017 | 8 September 2015 | 760.5p | 0p | 23,011 | £175,000 | 25% of award | 8 September 2018 |
| Mr Prasanth Manghat | LTIP award subject to performance | 31 December 2018 | 15 March 2016 | 967.5p | 0p | 85,271 | £825,000 | 25% of award | 15 March 2019 |
| Mr Prasanth Manghat | LTIP award subject to performance | 31 December 2019 | 26 January 2017 | 1633.0p | 0p | 125,442 | £2,048,000 | 25% of award | 26 January 2020 |
| Mr Khalifa Bin Butti | LTIP award subject to performance | 31 December 2019 | 7 September 2017 | 2739.0p | 0p | 43,416 | £1,189,000 | 25% of award | 7 September 2020 |
| Mr Hani Buttikhi | LTIP award subject to performance | 31 December 2019 | 7 September 2017 | 2739.0p | 0p | 32,051 | £878,000 | 25% of award | 7 September 2020 |

Note: the outstanding share awards with a grant date of 29 October 2014 in the above table are fully vested but to date unexercised share awards.

Following the decision by Dr B. R. Shetty to step down from his Executive role as Executive Vice Chairman and CEO in March 2017, given his ongoing role as Joint Chairman of the Company it was agreed that he should retain in full both the LTIP and DSBP awards granted to him, with the exception of the LTIP Award granted in January 2017 which has lapsed.

Details of the performance measures attached to the LTIP awards, and performance to date against these measures, are set out on page 68.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice     76 of 164     Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

## Deferred Share Bonus Plan

| | Type of interest | Financial Year Share Award made in respect of | Award Date | Market Price at Date of Award | Exercise price | Shares Awarded | Face value of award | Vesting Date |
|---|---|---|---|---|---|---|---|---|
| Dr B R Shetty | Deferred shares subject to continued employment | 2014 | 25 February 2015 | 520.0p | 0p | 17,470 | £90,844 | 25 February 2018 |
| Dr B R Shetty | Deferred shares subject to continued employment | 2015 | 15 March 2016 | 967.5p | 0p | 17,226 | £166,662 | 15 March 2019 |
| Dr B R Shetty | Deferred shares subject to continued employment | 2016 | 9 May 2017 | 2074.0p | 0p | 39,583 | £821,000 | Equally on 9 May 2018 and 9 May 2019 |
| Mr Prasanth Manghat | Deferred shares subject to continued employment | 2013 | 29 October 2014 | 494.9p | 0p | 12,408 | £61,407 | 29 October 2017 |
| Mr Prasanth Manghat | Deferred shares subject to continued employment | 2014 | 25 February 2015 | 520p | 0p | 13,702 | £71,250 | 25 February 2018 |
| Mr Prasanth Manghat | Deferred shares subject to continued employment | 2015 | 15 March 2016 | 967.5p | 0p | 14,987 | £145,000 | 15 March 2019 |
| Mr Prasanth Manghat | Deferred shares subject to continued employment | 2016 | 9 May 2017 | 2074.0p | 0p | 33,493 | £695,000 | Equally on 9 May 2018 and 9 May 2019 |

Note: the outstanding share awards with a grant date of 29 October 2014 in the above table are fully vested but to date unexercised share awards.

The following share awards vested and were exercised, or where stated lapsed, during the year:

| | Incentive Plan | Award Date | Award Shares Exercised (note 1) | Exercise price | Market Price on Vesting | Comment |
|---|---|---|---|---|---|---|
| Dr B R Shetty | DSBP | 29 October 2014 | 15,771 | 0.0p | 2,887p per share | Award vested and exercised |
| Dr B R Shetty | LTIP | 29 October 2014 | 51,782 | 0.0p | 2,887p per share | Award vested and exercised |
| Dr B R Shetty | LTIP | 26 January 2017 | 148,250 | 0.0p | N/A | Award lapsed |

Note 1: Award shares exercised includes an enhancement equivalent to the value of dividends that would have been payable on the award shares during the performance period of the relevant share award.

Except as stated above, no other options vested or were exercised during the year.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice    77 of 164    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

## Directors' Remuneration Report 2017 continued

**OTHER INFORMATION** CONTINUED

**PERFORMANCE GRAPH AND HISTORIC EXECUTIVE VICE CHAIRMAN & CEO REMUNERATION OUTCOMES**

The following graph shows the Total Shareholder Return performance of NMC Health plc shares against the FTSE 100.



■ NMC Health     ■ FTSE 100     ■ TSR bespoke peer group

The Committee believes that the FTSE 100 Index is an appropriate comparator index used to compare performance given that the Company is a constituent of this Index and the lack of direct competitor comparators available in the London market.

The table below summarises the Chief Executive Officer's single figure for total remuneration for the last 5 financial years.

| Chief Executive Officer | 2013 (US$'000) | 2014 (US$'000) | 2015 (US$'000) | 2016 (US$'000) | 2017 (US$'000) |
|---|---|---|---|---|---|
| Single remuneration figure | 787.4 | 849.7 | 1,254.3 | 4,841.3 | 5,948.2 |
| STIP payout (% of maximum) | 75% | 95% | 100% | 100% | 100% |
| LTIP vesting (% of maximum) | n/a | n/a | n/a | n/a | 100% |

**PAY ACROSS THE GROUP**

As required, the table below sets out the increase in remuneration of the Chief Executive Officer and that of all employees during the 2017 financial year. However, for the reasons stated on page 65 above, the Committee do not reference the salary or other elements of remuneration of Executive Directors to all other employees of the Group.

| % | Salary | Annual bonus | Benefits |
|---|---|---|---|
| Chief Executive Officer | -2.7% | 52.7% | -88.7% |
| All-employees | 7.80% | n/a | 4.90% |

\*   note: the Company does not operate bonus plans for all employees.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice     78 of 164     Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

## RELATIVE IMPORTANCE OF SPEND ON PAY

The graph below shows the total group-wide remuneration expenditure and dividends for the last two years.



It is my pleasure to submit this report to shareholders. The Directors' Remuneration Report has been approved by the Board and is signed on its behalf by:

### LORD CLANWILLIAM

Chairman of the Remuneration Committee

Exhibit 5 to B.R. Shetty's Request for Judicial Notice    79 of 164    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

Governance

# Directors' Report

The Directors of NMC Health plc are pleased to present their Annual Report including the audited consolidated financial statements for the financial year ended 31 December 2017.

This report has been prepared in accordance with the requirements in The Large and Medium-sized Companies and Groups (Accounts and Reports) Regulations 2008 and forms part of the management report as required under Disclosure & Transparency Rule 4. Certain information required to be set out in this Directors' Report can be found elsewhere in the 2017 Annual Report and is referenced below. This information is incorporated into this Directors' Report by reference.

### DIRECTORS' STATEMENTS
The Directors are required to make a statement regarding the preparation of the financial statements and also to provide details regarding the disclosure of information to the Company's auditor. The Code also requires the Board to review and make statements in relation to management's report on internal controls, the adoption of the Going Concern method of accounting and the long term viability of the Group. All of these statements are set out on pages 82 to 85.

### CORPORATE GOVERNANCE REPORT
The Corporate Governance Report set out on pages 41 to 57 is incorporated into this Directors' Report by reference.

### BUSINESS MODEL AND STRATEGY
The Strategic Report set out on pages 12 to 35 includes the Company's business model and strategy.

### DIRECTORS
The following served as directors of the Company during the 2017 financial year:

| Director |
| --- |
| H. J. Mark Tompkins |
| Dr B. R. Shetty |
| Prasanth Manghat |
| Khalifa Bin Butti (see note below) |
| Hani Buttikhi (see note below) |
| Dr Ayesha Abdullah |
| Abdulrahman Basaddiq |
| Jonathan Bomford |
| Lord Clanwilliam |
| Salma Hareb |
| Keyur Nagori (see note below) |
| Binay Shetty (see note below) |
| Dr Nandini Tandon |

Mr Keyur Nagori and Mr Binay Shetty both resigned as Directors of the Company with effect from 28 June 2017. Mr Khalifa Bin Butti and Mr Hani Buttikhi were both appointed as Directors of the Company on 28 June 2017.

### CAPITAL STRUCTURE
All information relating to the Company's capital structure, including changes to the Company's share capital in the year, the rights attaching to shares, details of the Company's principal shareholders and other shareholder information in contained on page 160.

### DIVIDENDS
Details of the Company's dividend policy and proposed final dividend payment for the year ended 31 December 2017 are set out in the Financial Review on page 25.

### DISCLOSURE OF INFORMATION UNDER LISTING RULE 9.8.4 C
In accordance with the UK Financial Conduct Authority's Listing Rules (LR 9.8.4C), the information to be included in the Annual Report, where applicable, under LR 9.8.4, is set out in this Directors' Report, with the exception of transactions with controlling shareholders which is set out on pages 135 to 136 (note 31 to the Consolidated Financial Statements) and interest capitalised which is set out on pages 128 to 129 (note 17 to the Consolidated Financial Statements).

### EMPLOYEE ENGAGEMENT
The way in which the Group engages with its employees, and the Group's approach to diversity, is set out in the Corporate Social Responsibility report on pages 32 to 35.

### GREENHOUSE GAS EMISSIONS
The Company's disclosure in relation to its greenhouse gas emissions is included within the sustainability section of the Corporate Social Responsibility report on pages 34 to 35.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice          80 of 164          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

## POLITICAL DONATIONS

Neither the Company nor any subsidiary company in the Group made any political donations during the year ended 31 December 2017.

Whilst the Company has no intention of making formal political donations in the future, the Board acknowledge that given the wide interpretation of such donations, certain business events in which the Company or any of its subsidiaries, or the Board, may wish to participate may be caught under the formal definition of political donations. The Company will therefore again be seeking approval from shareholders at this year's annual general meeting, for a small approved limit for "political donations", for use in such circumstances. If this is approved by shareholders, the Board will provide full details of any such payments made in the next annual report.

## FINANCIAL INSTRUMENTS

The financial risk management objectives and policies of the Group, and the exposure of the Group to financial instruments, are included in note 36 to the financial statements on pages 141 to 142.

## SUBSEQUENT EVENTS

Details of any important and material events affecting the Group which have occurred since the end of the 2017 financial year, are set out in note 41 to the consolidated financial statements on page 145.

## FUTURE DEVELOPMENTS

The Group's strategy and potential future development are outlined in the Group Strategic Report on pages 12 to 35.

## RESEARCH AND DEVELOPMENT

The Eugin Foundation, part of the Clinica Eugin business, carries out research and development focused on fertility and human reproduction with particular regards to personal and social aspects as well as promotion of health.

## BRANCHES

The Group normally operates across all jurisdictions where it has a business presence through the incorporation of registered entities, but also operates through a number of branches where this is considered appropriate from an operational or regulatory perspective. A detailed list of entities and branches in the Group is provided in section 2.2 of financial statements.

## CONTRACTS OF SIGNIFICANCE AND CONTROLLING SHAREHOLDERS' AGREEMENT

Under UAE law and regulations, with the exception of certain specific areas designated by the Government as such, all land must be held legally by a UAE National. In addition, all healthcare facility and pharmacy operating licences may only be held legally by a UAE National, and not a body corporate. As a result, some of the property owned beneficially by the Group and all the Group's medical facility and pharmacy licences, are held legally in the name of either H.E. Saeed Bin Butti or Mr Khalifa Bin Butti, both continuing significant shareholders of the Company.

The Company has an agreement with Dr B R Shetty, H.E. Saeed Bin Butti and Khalifa Bin Butti ("Controlling Shareholders") under which the Controlling Shareholders agree to comply with the independence provisions of the UKLA Listing Rules. The Company has complied with the independence provisions contained in that agreement and, as far as the Company are aware, the Controlling Shareholders and any of their associates have also complied with such provisions and the procurement obligations included in the agreement.

The Directors' Report was approved by the Board on 6 March 2018 and is signed on behalf of the Board by:

SIMON WATKINS
Group Company Secretary

NMC Health plc (registered in England and Wales, number 7712220)
Level 1, Devonshire House, One Mayfair Place, London W1J 8AJ

Exhibit 5 to B.R. Shetty's Request for Judicial Notice          81 of 164          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

# Financial Statements

The Company has concentrated on structuring its financing facilities to ensure a strong balance sheet for the medium to long term.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice          82 of 164                    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA



Exhibit 5 to B.R. Shetty's Request for Judicial Notice   83 of 164

Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

# Directors' Statements

## STATEMENT OF DIRECTORS' RESPONSIBILITIES

The Directors are responsible for preparing the Annual Report, the Directors' Remuneration Report and the financial statements in accordance with applicable law and regulations.

The Directors are required by Company Law to prepare financial statements for the Group and the Company in accordance with the International Financial Reporting Standards as adopted by the European Union ("IFRS").

The financial statements are required to present fairly for each financial period the Company's financial position, financial performance and cash flows. In preparing the Group and parent company financial statements the Directors are also required to:
- Properly select and consistently apply accounting policies;
- Present information, including accounting policies, in a manner that provides relevant, reliable, comparable and understandable information;
- Provide additional disclosures when compliance with the specific requirements in IFRS is insufficient to enable users to understand the impact of particular transactions, other events and conditions on the entity's financial position and financial performance; and
- Make an assessment of the company's ability to continue as a going concern.

The Directors confirm that they have complied with the above requirements in preparing the financial statements. The Directors also confirm that they consider the annual report and accounts, taken as a whole, is fair, balanced and understandable and provides the information necessary for shareholders to assess the Company's performance, business model and strategy.

The Directors are responsible for keeping proper accounting records that are sufficient to show and explain the Company's transactions and disclose with reasonable accuracy at any time the financial position of the Company and to enable them to ensure that the financial statements comply with the Companies Act 2006. The Directors are also responsible for safeguarding the assets and hence for taking reasonable steps for the prevention and detection of fraud and other irregularities and for the preparation of a Directors' report and Directors' remuneration report which comply with the requirements of the Companies Act 2006.

The Directors are responsible for the maintenance and integrity of the Company's website. Legislation in the United Kingdom governing the preparation and dissemination of financial statements differs from legislation in other jurisdictions.

We confirm to the best of our knowledge:
- The financial statements, prepared in accordance with the International Financial Reporting Standards as adopted by the EU, give a true and fair view of the assets, liabilities, financial position and profit or loss of the Company and the undertakings included in the consolidation taken as a whole; and
- The Strategic Report includes a fair review of the development and performance of the business and the position of the Company and the undertakings included in the consolidation taken as a whole, together with a description of the principal risks and uncertainties they face.

## DISCLOSURE OF INFORMATION TO THE AUDITORS

Directors' statement as to disclosure of information to auditors:

The Directors who were members of the Board at the time of approving the Directors' Report are set out on pages 38 and 39. Having made enquiries of fellow directors and of the Company's Auditor, each of these Directors confirms that:
- to the best of each Director's knowledge and belief, there is no information (that is, information needed by the group's Auditor in connection with preparing their report) of which the Company's Auditor is unaware; and
- each Director has taken all the steps a Director might reasonably be expected to have taken to be aware of relevant audit information and to establish that the Company's Auditor is aware of that information.

EY have confirmed that they are willing to be reappointed as auditor for the financial year ending 31 December 2018.

## GOING CONCERN AND VIABILITY
### GOING CONCERN
The Group has two diverse operating divisions, both of which operate in a growing market. Management have undertaken an assessment of the future prospects of the Group and the wider risks that the Group is exposed to. In this assessment of whether the Group should adopt the going concern basis in preparing its financial statements, management have considered:

Operating risk:
The management team prepare a Group budget for each financial year and a cashflow forecast for the following 18 months which allows the Board to monitor the financial position of the Group and to consider appropriate risks which the business may face from a financial perspective. Included in this review are future cashflow, both acquisition costs and subsequent cashflow generation, associated with acquisitions agreed but not completed at the end of the 2017 financial year. The Board receives monthly management reports covering key operational matters, monthly comparison to budget and updated forecasts on a half yearly basis for the full financial year to ensure that the business is trading in line with its expectations.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice              84 of 164              Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

**GOING CONCERN AND VIABILITY** CONTINUED
**GOING CONCERN** CONTINUED

Financing risk:

The Company has worked to structure its financing facilities for the medium and long term as well as utilising short term facilities to meet the Group's working capital requirements. The Group entered into two syndicated loan facilities amounting to US$825m and US$350m in 2017. New facilities are repayable over 60 and 84 monthly instalments respectively with a grace period of twelve months.

The Group has banking arrangements through a spread of local and international banking groups. Debt covenants are reviewed by the board each month. The Board believes that the level of cash in the Group and the spread of bankers providing these facilities mitigates the financing risks that the Group faces from both its acquisitive growth strategy and in relation to working capital requirements.

Customer and Supplier risk:

The Group delivered a robust performance in 2017 both at the overall and at the divisional level primarily due to strong in-patient and out-patient performance at our existing hospitals and medical centres including the new sites commissioned during the previous years. The acquired assets over the fertility segment, homecare and long term segments as well as the chains for clinics and pharmacies in the emirate of Sharjah delivered good performance.

The Board has reviewed a high level budget for 2018 as well as considered growth forecasts for the healthcare sector in UAE, in particular the continued positive impact from the introduction of mandatory healthcare insurance in Dubai, and from the Group's newly opened and newly acquired businesses, and considers the Group's future forecasts to be reasonable.

Impairment risk:

The Board has considered the carrying value and useful economic lives of inventories, accounts receivable, property and equipment and intangible assets and concluded that there are no indicators of material impairment of these items and therefore no material cash flow impact associated with any loss in those areas.

In its review, management also considered other areas of potential risk, including regulatory risk, insurance and legal risks and potential areas of material contingent liability and found no matters which are likely to affect the viability of the Group in the medium term.

The Board has reviewed and considered management's formal assessment of the going concern concept of accounting and the cash flow forecast that has been prepared for the period to 30 June 2019 and has concluded that this assessment and forecast indicates that the Group has positive cash flows with sufficient headroom and will comply with all debt covenants.

The Directors therefore continue to adopt the going concern basis in the preparation of the financial statements.

**VIABILITY**

To protect longer term shareholder value, the Board have always considered how Group performance and its strategic decisions will affect the financial and operational prospects of the Group in the longer term. As recommended by provision C.2.2 of the UK Corporate Governance Code, the Directors have conducted a formal assessment of the prospects of the Group over a longer period than the 12 months review period required under the 'Going Concern basis of accounting.

As part of this assessment for consideration by the Board, Management conducted a formal viability review looking forward for a period of three years. This period was selected as the most appropriate timeframe over which the prospects of the Group should be considered given the Group's recent acquisitions, changing nature, significant growth, the time taken to fully integrate acquired businesses and ramp-up newly opened facilities and the maturity date of current debt obligations.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice    85 of 164    Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

Financial Statements

# Directors' Statements continued

**GOING CONCERN AND VIABILITY** CONTINUED

**VIABILITY** CONTINUED

In its review, management considered the current position of the Group and the following principal risks associated with the business:

| Description | | Potential impact and mitigation |
|---|---|---|
| a) | Risks associated with investments | Discussed in the risk management section of the annual report |
| b) | The impact of market competition investments | Discussed in the risk management section of the annual report |
| c) | The impact of regulatory changes (with respect to the implementation of VAT in the GCC and diagnostic based billing in the UAE); | *Implementation of VAT*<br>Earlier in the year, the Gulf Cooperative Council ("GCC") member states agreed on a common framework for the introduction of Value Added Tax ("VAT"). The framework agreement was published in April 2017 and since then both the UAE and Kingdom of Saudi Arabia ("KSA") introduced a VAT system with effect from 1 January 2018.<br><br>NMC completed its VAT registrations in both the UAE and KSA ahead of this planned implementation of VAT.<br><br>As the health care services provided by NMC in both the UAE and KSA are classified as being zero-rated (and the Group make minimal supplies that are categorised as being exempt), the implementation of VAT is not likely to result in any material erosion of Group profitability.<br><br>The implementation of VAT may however have some impact on the group's working capital requirements due to the time lag between the recovery of any VAT refunds from the Tax Authority and the payment of any input VAT to our suppliers.<br><br>*Implementation of diagnostic based billings*<br>The Dubai Health Authority announced the implementation of a new health insurance payment system across the Emirate of Dubai (Diagnosis Related Groups). This is now expected to be implemented later in 2018. Preparations are ongoing for the implementation of Diagnosis Related Groups in Dubai with NMC planning to implement shadow billing prior to the full implementation. |
| d) | Potential instability associated with the regulatory and macroeconomic environment in which the Company operates. | The regulatory, political and macroeconomic environment in which the Group operates can provide volatility and have an effect on Group operations and financial performance. In the GCC, the price of oil can have an effect of both government and business spending and confidence, including government's approach to healthcare provision.<br><br>In addition, the evolving regulatory position relating to the structure of healthcare provision in the GCC can result in changes that may be detrimental to NMC and other healthcare providers, An example of such changes is the introduction of a new Diagnostic Related Group payment system in Dubai and the new JAWDAH performance based insurance re-imbursement system introduced by the Health Authority of Abu Dhabi.<br><br>Finally, uncertainty in global financial markets may affect the Group in relation to its exposure to currency fluctuations and ability to raise financing for Group operations and future strategic growth. Any downturn in major global economies may reduce the flexibility that the Group has in relation to its future strategy. This includes, but not to any material effect, any uncertainty in European markets as a result of the Brexit negotiations between the UK and European Union.<br><br>Overall, we are confident that NMC is well positioned through its long-term financing arrangements, appropriate treasury policies and procedures and increasing breadth of service provision and geographic spread to cope with the changing macroeconomic and regulatory environment. |

Exhibit 5 to B.R. Shetty's Request for Judicial Notice          86 of 164          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

**GOING CONCERN AND VIABILITY** CONTINUED

**VIABILITY** CONTINUED

The three-year review considered the Group's profitability, cash flows, banking covenants and other key financial ratios over the period. The plan makes certain assumptions about the ability to refinance debt as it falls due and the acceptable performance of the core revenue streams and market segments. The plan is stress tested using sensitivity analysis which reflects severe but plausible combinations of the principal financial risks of the business and then the potential impact of each scenario, using certain assumption on the following levers which were stress tested:

- reductions in revenue per patient;
- reduction in market share impacting the number of patients and occupancies;
- increase manpower cost due to shortage of talent;
- cost escalation due to inflation and new tax regime;
- impact on revenue due to currency fluctuations;
- increase in accounts receivable (debtor days) due to increase in insurance business;
- a larger increase in accounts receivable (debtor days) than expected; and
- increase in interest rate.

Where appropriate, an analysis was carried out to evaluate the potential impact of any of these principal risks actually occurring.

Based on the results of this formal assessment, the Directors have a reasonable expectation that the Group will be able to continue in operation and meet its liabilities as they fall due over the three-year period of the assessment.

By Order of the Board

**SIMON WATKINS**
Group Company Secretary

Exhibit 5 to B.R. Shetty's Request for Judicial Notice    87 of 164    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

Financial Statements

# Independent Auditor's Report
## To the Members of NMC Health Plc

OPINION

In our opinion:

- NMC Health plc's group financial statements and parent company financial statements (the "financial statements") give a true and fair view of the state of the group's and of the parent company's affairs as at 31 December 2017 and of the group's profit for the year then ended;
- the group financial statements have been properly prepared in accordance with IFRS as adopted by the European Union;
- the parent company financial statements have been properly prepared in accordance with IFRSs as adopted by the European Union as applied in accordance with the provisions of the Companies Act 2006; and
- the financial statements have been prepared in accordance with the requirements of the Companies Act 2006, and, as regards the group financial statements, Article 4 of the IAS Regulation.

We have audited the financial statements of NMC Health plc which comprise:

| Group | Parent company |
| --- | --- |
| Consolidated balance sheet as at 31 December 2017 | Balance sheet as at 31 December 2017 |
| Consolidated income statement for the year then ended | Statement of changes in equity for the year then ended |
| Consolidated statement of comprehensive income for the year then ended | Statement of cash flows for the year then ended |
| Consolidated statement of changes in equity for the year then ended | Related notes 1 to 15 to the financial statements including a summary of significant accounting policies |
| Consolidated statement of cash flows for the year then ended | |
| Related notes 1 to 41 to the financial statements, including a summary of significant accounting policies | |

The financial reporting framework that has been applied in their preparation is applicable law and International Financial Reporting Standards (IFRSs) as adopted by the European Union and, as regards the parent company financial statements, as applied in accordance with the provisions of the Companies Act 2006.

BASIS FOR OPINION

We conducted our audit in accordance with International Standards on Auditing (UK) (ISAs (UK)) and applicable law. Our responsibilities under those standards are further described in the Auditor's responsibilities for the audit of the financial statements section of our report below. We are independent of the group and parent company in accordance with the ethical requirements that are relevant to our audit of the financial statements in the UK, including the FRC's Ethical Standard as applied to listed public interest entities, and we have fulfilled our other ethical responsibilities in accordance with these requirements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our opinion.

USE OF OUR REPORT

This report is made solely to the company's members, as a body, in accordance with Chapter 3 of Part 16 of the Companies Act 2006. Our audit work has been undertaken so that we might state to the company's members those matters we are required to state to them in an auditor's report and for no other purpose. To the fullest extent permitted by law, we do not accept or assume responsibility to anyone other than the company and the company's members as a body, for our audit work, for this report, or for the opinions we have formed.

CONCLUSIONS RELATING TO PRINCIPAL RISKS, GOING CONCERN AND VIABILITY STATEMENT

We have nothing to report in respect of the following information in the annual report, in relation to which the ISAs(UK) require us to report to you whether we have anything material to add or draw attention to:

- the disclosures in the annual report set out on page 28 to 31 that describe the principal risks and explain how they are being managed or mitigated;
- the directors' confirmation set out on page 83 in the annual report that they have carried out a robust assessment of the principal risks facing the entity, including those that would threaten its business model, future performance, solvency or liquidity;
- the directors' statement set out on page 82 in the financial statements about whether they considered it appropriate to adopt the going concern basis of accounting in preparing them, and their identification of any material uncertainties to the entity's ability to continue to do so over a period of at least twelve months from the date of approval of the financial statements;
- whether the directors' statement in relation to going concern required under the Listing Rules in accordance with Listing Rule 9.8.6R(3) is materially inconsistent with our knowledge obtained in the audit; or
- the directors' explanation set out on page 83 in the annual report as to how they have assessed the prospects of the entity, over what period they have done so and why they consider that period to be appropriate, and their statement as to whether they have a reasonable expectation that the entity will be able to continue in operation and meet its liabilities as they fall due over the period of their assessment, including any related disclosures drawing attention to any necessary qualifications or assumptions.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice      88 of 164      Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

## OVERVIEW OF OUR AUDIT APPROACH

| | |
|---|---|
| Key audit matters | • Revenue recognition<br>• Accounting for acquisitions |
| Audit scope | • We performed an audit of the complete financial information of 21 components and audit procedures on specific balances for a further 2 components<br>• The components where we performed full or specific audit procedures accounted for 99% of Profit before tax, 95% of Revenue and 98% of Total assets |
| Materiality | • Overall group materiality of US$10.69mn which represents 5% of 2017 Profit before tax |

## KEY AUDIT MATTERS

Key audit matters are those matters that, in our professional judgment, were of most significance in our audit of the financial statements of the current period and include the most significant assessed risks of material misstatement (whether or not due to fraud) that we identified. These matters included those which had the greatest effect on: the overall audit strategy, the allocation of resources in the audit; and directing the efforts of the engagement team. These matters were addressed in the context of our audit of the financial statements as a whole, and in our opinion thereon, and we do not provide a separate opinion on these matters.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice     89 of 164

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

Financial Statements

# Independent Auditor's Report continued
## To the Members of NMC Health Plc

| Risk | Our response to the risk | Key observations communicated to the Audit Committee |
|---|---|---|
| **Revenue recognition**<br><br>Group Revenue 2017: US$1,603.4mn, 2016: US$1,220.8mn.<br><br>Refer to the Financial summary and highlights Report (page 17); Accounting policies (page 105); and Note 7 of the Consolidated Financial Statements (page 120)<br><br>The Group has a number of revenue streams relating to its Healthcare and Distribution segments including pharmacy sales and sales of goods, hospital and clinic revenues, over the counter sales and In Vitro Fertilisation (IVF).<br><br>The following are the risks:<br>• There is a risk of improper revenue recognition, particularly with regard to cut-off at period end dates.<br>• Supplier agreements are often complex which could lead to inaccurate accounting or conditions for recognition of the supplier income, including fees and discounts, not being met.<br>• Management may incorrectly determine whether the Group is acting as principal or agent in certain arrangements such as distribution agreements with key suppliers and revenue sharing agreements with doctors.<br>• Revenue recognition is impacted as insurance providers may reject the claims made which requires management to assess the percentage of rejections and defer revenue.<br>• Different accounting practices of new acquisitions could result in a misalignment with group accounting policies. | We tested key controls over revenue recognition, including the timing of revenue recognition. Where we relied on the controls tested by internal audit we satisfied ourselves about their objectivity, independence and professional skills. We discussed the audit plan and audit program with the internal auditors, reviewed their testing of controls and re-performed a sample of their work. We also independently tested an additional sample.<br><br>We performed substantive audit procedures including testing a sample of transactions, analytical review procedures including developments in patient numbers per facility and cut-off tests to check that revenue had been recognised in the appropriate accounting period. For IVF revenues we tested management's estimate as to cut off of completed IVF phases.<br><br>Confirmation letters from key customers were obtained, including health insurance providers as well as an additional representative sample. Reconciling items were traced back to original documentation or corroborated to resubmissions made by the company.<br><br>For customer volume discounts we ensured the completeness and accuracy of the provision amount and accounting through post year end credit testing, by reviewing the customer agreements and verifying the conditions for the discounts.<br><br>We reviewed a sample of material supplier agreements and accounting for the supplier income including fees and discounts by reviewing the agreements, verifying the data of conditions for the discounts being met and vouched the amounts recognised to invoices and cash receipt.<br><br>We reviewed a sample of new distribution agreements entered into during the year and revenue sharing contracts with doctors in newly acquired businesses to verify that the Group's determination that they are acting in a capacity of a principal rather than an agent is appropriate considering the balance of risk and rewards.<br><br>We obtained assurance over the recognition of revenue through audit work on accounts receivable specifically by reviewing the rejection rates based on historical experience and have verified that receivable balances as at year end are presented at their recoverable amount.<br><br>We checked the Group's consistency and adherence to their revenue recognition policies including the impact of new reporting standard IFRS 15 and we agreed that these policies are in accordance with IFRSs as adopted by the European Union.<br><br>The overall risk of revenue recognition has remained stable in the current year. | Based on the audit procedures performed, we are satisfied that revenue recognition is appropriate and that the Group has appropriately adhered to their revenue recognition policies, including the determination of whether the Group is acting as agent rather than as principal.<br><br>We audited the impact assessment prepared by the company of the new reporting standard IFRS 15 on the Group's accounting policies. As a result of this work we identified that the new reporting standard will have an immaterial impact on the Group's financial results. |

Exhibit 5 to B.R. Shetty's Request for Judicial Notice          90 of 164          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

| Risk | Our response to the risk | Key observations communicated to the Audit Committee |
|---|---|---|
| **Accounting for acquisitions**<br><br>The Group recognised goodwill of US$471.6mn (2016: US$233.9mn) and intangible assets of US$17.3mn (2016: US$25.5mn) in respect of the acquisitions made in the current year.<br><br>Three acquisitions made during the year (seven in total), included as full audit scope based on the materiality and related risks, represent 96% of the recognised goodwill and intangible assets.<br><br>The following are the key audit matters:<br>• The contractual arrangements can be complex and subject to different legal environments. This requires management to apply judgement in determining whether a transaction represents an acquisition of an asset or a business combination in accordance with IFRS 3.<br>• Estimates and judgements made in the recognition of an acquisition as a business combination may be inappropriate and the valuation of the assets and liabilities acquired may be misstated.<br>• Acquisitions may be recognised before the Group is exposed, or has rights, to variable returns from its involvement with the investee and has the ability to affect those returns through its power over the investee. | We obtained and reviewed the sale and purchase agreements and other relevant documentation to understand the terms and conditions of the acquisitions which took place in the year.<br><br>We assessed the judgements applied in determining whether acquisitions represented an acquisition of an asset or a business combination. This involved assessing whether or not the entities and the assets acquired constitute the carrying on of a business.<br><br>Where transactions met the definition of a business combination we audited the management assessment of the assets and liabilities acquired and the allocation of the purchase consideration to these and the resultant goodwill by performing the following procedures:<br>• We read the due diligence reports and audited the opening balance sheets for acquired entities.<br>• We performed procedures on the purchase price allocation, assessed the appropriateness of the recognition of intangible assets, challenged the consideration of the valuation inputs and the valuation methodology.<br>• We verified that the consideration transferred, and where relevant contingent consideration, was appropriately calculated in accordance with contractual arrangements.<br>• We assessed management's judgements in respect of what arrangements should be accounted for as part of the business combination and those that should be accounted for separately from the business combination.<br>• We assessed whether the Group is exposed, or has rights, to variable returns and has the ability to affect those returns through its power over the investee as at the date upon which the acquisitions were recognised. This includes also an assessment of acquisitions completed early in the following reporting period.<br>• We verified the appropriateness of the consolidation adjustments in respect of accounting for these transactions including accounting for acquisitions related costs.<br>• We verified that disclosure in the financial statements are in accordance with IFRS as adopted by the European Union.<br><br>The overall risk has remained stable in the current year. | Based on the audit procedures we have performed, we concur with the Group's accounting for all acquisitions above our performance materiality.<br><br>We have reviewed the business combinations disclosures in respect of the acquisitions which completed in 2017 and we believe that these are appropriate and materially in compliance with the requirements of IFRS 3 Business combinations.<br><br>We have also verified appropriateness of disclosures for the material business combinations (including purchase of minority interest) completed in 2018 and appropriateness of the period in which the Group obtained control of the acquired entities and applicable regulatory approvals. |

In the prior year, our auditor's report included the same Key Audit Matters as noted above.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice    91 of 164    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

# Independent Auditor's Report continued
## To the Members of NMC Health Plc

### AN OVERVIEW OF THE SCOPE OF OUR AUDIT
#### TAILORING THE SCOPE

Our assessment of audit risk, our evaluation of materiality and our allocation of performance materiality determine our audit scope for each entity within the Group. Taken together, this enables us to form an opinion on the consolidated financial statements. We take into account size, risk profile, the organisation of the group and effectiveness of group-wide controls, changes in the business environment and other factors such as recent Internal audit results when assessing the level of work to be performed at each entity.

In assessing the risk of material misstatement to the Group financial statements, and to ensure we had adequate quantitative coverage of significant accounts in the financial statements, of the 41 reporting components of the Group, we selected 23 components covering entities within United Arab Emirates (UAE), Spain, Denmark, Brazil, Italy, Saudi Arabia and Oman, which represent the principal business units within the Group.

Of the 23 components selected, we performed an audit of the complete financial information of 21 components ("full scope components") which were selected based on their size or risk characteristics. For the remaining 2 components ("specific scope components"), we performed audit procedures on specific accounts within that component that we considered had the potential for the greatest impact on the significant accounts in the financial statements either because of the size of these accounts or their risk profile.

The reporting components where we performed audit procedures accounted for the following percentages of the Group financial statements before consolidation adjustments;
• Aggregated Profit before tax - 99% (2016: 96%)
• Aggregated Revenue - 95% (2016: 98%)
• Aggregated Total assets - 98% (2016: 99%)

The components in scope contributed the following percentages of the Group financial statements before consolidation adjustments:
• Full scope components: 96% (2016: 90%) of the aggregated Profit before tax, 92% (2016: 96%) of the aggregated Revenue and 97% (2016: 97%) of the aggregated Total assets.
• Specific scope component: 3% (2016: 6%) of the aggregated Profit before tax, 3% (2016: 2%) of the aggregated Revenue and 1% (2016: 2%) of the aggregated Total assets. The audit scope of these components may not have included testing of all significant accounts of the component but will have contributed to the coverage of significant accounts. Specific scope component testing is primarily focused on the significant risk in relation to revenue recognition however it also included procedures on property and equipment balances and accounts receivables among others.

The remaining 18 components, which are primarily located in the UAE, together represent 1% of the Group's aggregated Profit before Tax. For these components, we performed other procedures, including analytical review and testing of consolidation journals and intercompany eliminations and foreign currency translation recalculations to respond to any potential risks of material misstatement to the Group financial statements.

### CHANGES FROM THE PRIOR YEAR
During the year the Group acquired seven entities out of which Al Zahra, Atlas Healthcare and As Salama Hospitals LLC were identified as full scope components. The other four acquired entities were not in scope this year based on their respective size and risk characteristics including due to being acquired later in the reporting period and as such limiting the impact on 2017 consolidation. Furthermore, two components which were specific scope components in the prior year were not in scope this year based on their respective size after considering new acquisitions and risk characteristics.

#### INTEGRATED TEAM STRUCTURE AND INVOLVEMENT WITH COMPONENT TEAMS
The overall audit strategy is determined by the Senior Statutory Auditor. The Senior Statutory Auditor is based in the UK. However, since Group management and the majority of the operations reside in the UAE, the Group audit team includes members from both the UK and the UAE. The Group audit team members from the UAE are also members of selected components teams.

In establishing our overall approach to the Group audit, we determined the type of work that needed to be undertaken at each of the components by us, as the primary audit engagement team, or by component auditors from other EY global network firms operating under our instruction. Of the 21 full scope components, audit procedures were performed on two of these directly by the primary audit team and audit procedures on the remaining 19 entities by the component audit teams. For these components, we determined the appropriate level of involvement to enable us to determine that sufficient audit evidence had been obtained as a basis for our opinion on the Group as a whole.

Given that the Group operates predominantly in the UAE, the Senior Statutory Auditor with his UK based audit team members travelled to the UAE during three periods to work in an integrated manner with the EY UAE audit team members as part of the half year review, interim and yearend audit.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice          92 of 164          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

During the current year the Senior partner also visited Spain, where the Luarmia S.L. group of companies are based and visited the recently acquired clinic in Brazil. In addition, the UAE integrated audit team visited the subsidiary in Oman. These visits involved discussing the audit approach with the component team and any issues arising from their work, meeting with local management, attending the closing meetings, performing site visits to medical facilities, reviewing key audit working papers on risk areas. The primary team interacted regularly with the component teams in the UAE and Spain as appropriate during various stages of the audit, reviewed key working papers and were responsible for the scope and direction of the audit process. This, together with the additional procedures performed at Group level by the Group audit team, gave us appropriate evidence for our opinion on the Group financial statements.

### OUR APPLICATION OF MATERIALITY

We apply the concept of materiality in planning and performing the audit, in evaluating the effect of identified misstatements on the audit and in forming our audit opinion.

### MATERIALITY

*The magnitude of an omission or misstatement that, individually or in the aggregate, could reasonably be expected to influence the economic decisions of the users of the financial statements. Materiality provides a basis for determining the nature and extent of our audit procedures.*

We determined materiality for the Group to be US$10.69mn (2016: US$7.81mn), which is 5% (2016: 5%) of the Group consolidated Profit before Tax. We believe that Profit before tax is one of the key performance indicators of the business and a focus of users of the financial statements. The increase in materiality from the prior year reflects the impact of the newly acquired entities on the Group's profit and organic growth of the legacy entities. Compared to prior year, Profit before tax was not adjusted for the effect of non-recurring items. These related to the cost in respect of the acquisitions which, given the continued activities in recent years are no longer deemed as non-recurring. Had we excluded the one off costs in respect of acquisitions in amount of US$5.97mn, our materiality would have been US$10.83mn.

We determined materiality for the Parent Company to be US$5.52mn (2016: US$5.47mn), which is 1% (2016: 1%) of Equity.

### PERFORMANCE MATERIALITY

The application of materiality at the individual account or balance level. It is set at an amount to reduce to an appropriately low level the probability that the aggregate of uncorrected and undetected misstatements exceeds materiality.

On the basis of our risk assessments, together with our assessment of the Group's overall control environment, our judgement was that performance materiality was 50% (2016: 50%) of our planning materiality, namely US$5.34mn (2016: US$3.9mn). We have set performance materiality at this percentage due to our expectation of potential misstatements, our risk assessment and changes in the organisation, particularly given the acquisitions which took place during the year.

Audit work at component locations for the purpose of obtaining audit coverage over significant financial statement accounts is undertaken based on a percentage of total performance materiality. The performance materiality set for each component is based on the relative scale and risk of the component to the Group as a whole and our assessment of the risk of misstatement at that component. In the current year, the range of performance materiality allocated to components was US$1.07mn to US$2.67mn (2016: US$ 0.78mn to US$ 2.34mn).

### REPORTING THRESHOLD

*An amount below which identified misstatements are considered as being clearly trivial.*

We agreed with the Audit Committee that we would report to them all uncorrected audit differences in excess of US$0.53mn (2016: US$0.39mn), which is set at 5% of planning materiality, as well as differences below that threshold that, in our view, warranted reporting on qualitative grounds.

We evaluate any uncorrected misstatements against both the quantitative measures of materiality discussed above and in light of other relevant qualitative considerations in forming our opinion.

### OTHER INFORMATION

The other information comprises the information included in the annual report and includes the information other than the financial statements and our auditor's report thereon. These information are included in the Shareholder Summary information report, Group's Strategic report and Group's Governance report including Director's report, Remuneration report and Corporate Governance Report set out on pages 41 to 79. The directors are responsible for the other information.

Our opinion on the financial statements does not cover the other information and, except to the extent otherwise explicitly stated in this report, we do not express any form of assurance conclusion thereon.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice    93 of 164    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

# Independent Auditor's Report continued
## To the Members of NMC Health Plc

In connection with our audit of the financial statements, our responsibility is to read the other information and, in doing so, consider whether the other information is materially inconsistent with the financial statements or our knowledge obtained in the audit or otherwise appears to be materially misstated. If we identify such material inconsistencies or apparent material misstatements, we are required to determine whether there is a material misstatement in the financial statements or a material misstatement of the other information. If, based on the work we have performed, we conclude that there is a material misstatement of the other information, we are required to report that fact.

We also report in regard to our responsibility to specifically address the following items in the other information and to report as uncorrected material misstatements of the other information where we conclude that those items meet the following conditions:
- Fair, balanced and understandable set out on page 82 - the statement given by the directors that they consider the annual report and financial statements taken as a whole is fair, balanced and understandable and provides the information necessary for shareholders to assess the group's performance, business model and strategy, is materially inconsistent with our knowledge obtained in the audit; or
- Audit committee reporting set out on page 46 to 48 - the section describing the work of the audit committee does not appropriately address matters communicated by us to the audit committee; or
- Directors' statement of compliance with the UK Corporate Governance Code set out on page 41 - the parts of the directors' statement required under the Listing Rules relating to the company's compliance with the UK Corporate Governance Code containing provisions specified for review by the auditor in accordance with Listing Rule 9.8.10R(2) do not properly disclose a departure from a relevant provision of the UK Corporate Governance Code.

We have nothing to report in this regard.

### OPINIONS ON OTHER MATTERS PRESCRIBED BY THE COMPANIES ACT 2006
In our opinion, the part of the directors' remuneration report to be audited has been properly prepared in accordance with the Companies Act 2006.

In our opinion, based on the work undertaken in the course of the audit:
- the information given in the strategic report and the directors' report for the financial year for which the financial statements are prepared is consistent with the financial statements; and
- the strategic report and the directors' report have been prepared in accordance with applicable legal requirements.

### MATTERS ON WHICH WE ARE REQUIRED TO REPORT BY EXCEPTION
In the light of the knowledge and understanding of the group and the parent company and its environment obtained in the course of the audit, we have not identified material misstatements in the strategic report or the directors' report.

We have nothing to report in respect of the following matters in relation to which the Companies Act 2006 requires us to report to you if, in our opinion:
- adequate accounting records have not been kept by the parent company, or returns adequate for our audit have not been received from branches not visited by us; or
- the parent company financial statements and the part of the Directors' Remuneration Report to be audited are not in agreement with the accounting records and returns; or
- certain disclosures of directors' remuneration specified by law are not made; or
- we have not received all the information and explanations we require for our audit

### RESPONSIBILITIES OF DIRECTORS
As explained more fully in the directors' responsibilities statement set out on page 82, the directors are responsible for the preparation of the financial statements and for being satisfied that they give a true and fair view, and for such internal control as the directors determine is necessary to enable the preparation of financial statements that are free from material misstatement, whether due to fraud or error.

In preparing the financial statements, the directors are responsible for assessing the group and parent company's ability to continue as a going concern, disclosing, as applicable, matters related to going concern and using the going concern basis of accounting unless the directors either intend to liquidate the group or the parent company or to cease operations, or have no realistic alternative but to do so.

### AUDITOR'S RESPONSIBILITIES FOR THE AUDIT OF THE FINANCIAL STATEMENTS
Our objectives are to obtain reasonable assurance about whether the financial statements as a whole are free from material misstatement, whether due to fraud or error, and to issue an auditor's report that includes our opinion. Reasonable assurance is a high level of assurance, but is not a guarantee that an audit conducted in accordance with ISAs (UK) will always detect a material misstatement when it exists. Misstatements can arise from fraud or error and are considered material if, individually or in the aggregate, they could reasonably be expected to influence the economic decisions of users taken on the basis of these financial statements.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice                94 of 164                Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

**EXPLANATION AS TO WHAT EXTENT THE AUDIT WAS CONSIDERED CAPABLE OF DETECTING IRREGULARITIES, INCLUDING FRAUD**

The objectives of our audit, in respect to fraud, are; to identify and assess the risks of material misstatement of the financial statements due to fraud; to obtain sufficient appropriate audit evidence regarding the assessed risks of material misstatement due to fraud including management override, through designing and implementing appropriate responses; and to respond appropriately to fraud or suspected fraud identified during the audit. However, the primary responsibility for the prevention and detection of fraud rests with both those charged with governance of the entity and management.

Our approach was as follows:
- We obtained an understanding of the legal and regulatory frameworks that are applicable to the group. The group is subject to regulations applicable and specific to their individual markets. The group operates two different segments - i.e. Healthcare and Distribution. The Healthcare division is regulated by governmental and non-governmental organisations which are responsible for monitoring the performance and clinical procedures against its regulations including renewal of operating licences. The distribution division is present only in the UAE and is, for much of their product range, controlled through the UAE Ministry of Health dealing with pricing and compliance with the regulation of disposal of pharmaceuticals.
- The Board is responsible for setting out the Group's strategic risks and the mitigating actions and controls taken against those risks. We have obtained and reviewed the Risk register which includes the risk of failure to comply with multi regulatory and standards bodies' requirements and risk of inadequate data security measures.
- Based on this understanding we designed our audit procedures to identify non-compliance with such laws and regulations. Our procedures involved making inquiries with the Group Board members including Chief Executive officer and Chief Financial officer. In addition we held inquiry with the group's legal team and obtained independent legal confirmation letters from external legal advisors for each entity/country in scope. We have reviewed minutes of Board meetings and Audit Committee meetings and have tested legal expenses to confirm completeness of known litigations and claims. In areas where management relies on controls procedures performed by Internal audit, we met with the Internal audit and discussed the Audit plan and/or reviewed the results report.
- We assessed the susceptibility of the group's financial statements to material misstatement, by considering the controls that the Group has established to address risks identified by the entity, including how fraud might occur either through individual transaction, transactions with related parties or transactions with a high degree of management judgment or estimate. We note that revenues from both segments consist of a large numbers of transactions with individual immaterial amounts and a low degree of judgment or estimate. Our procedures included performing journal entry testing, performing analytical review of disaggregated financial information (i.e. revenue movements over the period and location), obtaining a list of related parties and reviewing minutes of various meetings to confirm the completeness of this list. We have in addition maintained our professional scepticism during the substantive test of transactions including those with new customers and suppliers or those where management in their accounting and valuation applied significant estimates and judgments.

A further description of our responsibilities for the audit of the financial statements is located on the Financial Reporting Council's website at https://www.frc.org.uk/auditorsresponsibilities. This description forms part of our auditor's report.

**OTHER MATTERS WE ARE REQUIRED TO ADDRESS**
- We were re-appointed by the company at the Annual General Meeting on 23 May 2017 to audit the financial statements for the year ending 31 December 2017 and subsequent financial periods.
  The period of total uninterrupted engagement including previous renewals and reappointments is 6 years, covering the years ending 31 December 2012 to 31 December 2017.
- The non-audit services prohibited by the FRC's Ethical Standard were not provided to the group or the parent company and we remain independent of the group and the parent company in conducting the audit.
- The audit opinion is consistent with the additional report to the audit committee.

**VICTOR VEGER (SENIOR STATUTORY AUDITOR)**
for and on behalf of Ernst & Young LLP, Statutory Auditor
London
6 March 2018

Exhibit 5 to B.R. Shetty's Request for Judicial Notice    95 of 164    Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

Financial Statements

## Consolidated Income Statement
For the year ended 31 December 2017

| | Notes | 2017 US$'000 | 2016 US$'000 |
|---|---|---|---|
| Revenue | 7 | 1,603,396 | 1,220,835 |
| Direct costs | 8 | (968,044) | (753,325) |
| GROSS PROFIT | | 635,352 | 467,510 |
| General and administrative expenses | 8 | (335,168) | (267,895) |
| Other income | 9 | 53,203 | 46,466 |
| PROFIT FROM OPERATIONS BEFORE DEPRECIATION, AMORTISATION, TRANSACTION COSTS AND IMPAIRMENT | | 353,387 | 246,081 |
| Transaction costs in respect of business combinations | 5 | (5,969) | (4,603) |
| Depreciation | 17 | (58,107) | (45,010) |
| Amortisation | 18 | (12,776) | (10,989) |
| Impairment of assets | 17&18 | (3,010) | (1,376) |
| PROFIT FROM OPERATIONS | | 273,525 | 184,103 |
| Finance costs | 10 | (63,792) | (41,684) |
| Finance income | 11 | 7,487 | 9,157 |
| Unamortised finance fees written off | 27 | (6,794) | – |
| PROFIT FOR THE YEAR BEFORE TAX | 12 | 210,426 | 151,576 |
| Tax | 15 | (1,245) | (174) |
| PROFIT FOR THE YEAR | | 209,181 | 151,402 |
| Profit for the year attributable to: | | | |
| Equity holders of the Parent | | 185,970 | 132,689 |
| Non-controlling interests | | 23,211 | 18,713 |
| Profit for the year | | 209,181 | 151,402 |
| Earnings per share for profit attributable to the equity holders of the Parent: | | | |
| Basic EPS (US$) | 16 | 0.910 | 0.711 |
| Diluted EPS (US$) | 16 | 0.903 | 0.707 |

94    NMC Health plc Annual Report and Accounts 2017

Exhibit 5 to B.R. Shetty's Request for Judicial Notice          96 of 164          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

II. Consolidated Statements / V

## Consolidated Statement of Other Comprehensive Income
For the year ended 31 December 2017

| | Notes | 2017 US$'000 | 2016 US$'000 |
|---|---|---|---|
| PROFIT FOR THE YEAR | | 209,181 | 151,402 |
| | | | |
| Other comprehensive income | | | |
| *Other comprehensive income to be reclassified to income statement in subsequent periods (net of tax)* | | | |
| Exchange difference on translation of foreign operations | | 15,304 | (4,050) |
| | | | |
| *Other comprehensive income not to be reclassified to income statement in subsequent periods (net of tax)* | | | |
| Re-measurement gains/(loss) on defined benefit plans | 28 | 1 | (147) |
| Other comprehensive income for the year (net of tax) | | 15,305 | (4,197) |
| TOTAL COMPREHENSIVE INCOME FOR THE YEAR | | 224,486 | 147,205 |
| Total comprehensive income attributable to : | | | |
| Equity holders of the Parent | | 199,497 | 129,030 |
| Non-controlling interests | | 24,989 | 18,175 |
| Total comprehensive income | | 224,486 | 147,205 |

These results relate to continuing operations of the Group. There are no discontinued operations in the current and prior year.

The attached notes 1 to 41 form part of the consolidated financial statements.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice    97 of 164    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

Financial Statements

## Consolidated Statement of Financial Position
As at 31 December 2017

| | Notes | 2017 US$'000 | 2016 US$'000 |
|---|---|---|---|
| **ASSETS** | | | |
| **Non-current assets** | | | |
| Property and equipment | 17 | 607,092 | 459,338 |
| Intangible assets | 18 | 1,156,904 | 652,983 |
| Investment in Joint Venture | | – | 834 |
| Deferred tax assets | 15 | 3,418 | 2,135 |
| Loan receivable | 19 | – | 9,129 |
| Advances paid for acquisitions | 5 | – | 1,614 |
| Other non-current assets | 30 | 43,090 | 43,053 |
| | | 1,810,504 | 1,169,086 |
| **Current assets** | | | |
| Inventories | 20 | 181,330 | 144,387 |
| Accounts receivable and prepayments | 21 | 518,842 | 374,457 |
| Loan receivable | 19 | 32,187 | 5,387 |
| Amounts due from related parties | 31 | 1,776 | 3,628 |
| Income tax receivable | | 3,063 | 2,208 |
| Bank deposits | 22 | 185,611 | 137,900 |
| Bank balances and cash | 22 | 202,002 | 479,940 |
| | | 1,124,811 | 1,147,907 |
| Asset held for sale | 39 | 3,693 | – |
| **TOTAL ASSETS** | | 2,939,008 | 2,316,993 |
| **EQUITY AND LIABILITIES** | | | |
| **Equity** | | | |
| Share capital | 23 | 31,928 | 31,910 |
| Share premium | 23 | 492,634 | 491,778 |
| Group restructuring reserve | 24 | (10,001) | (10,001) |
| Foreign currency translation reserve | | 5,398 | (8,128) |
| Option redemption reserves | 37 | (33,483) | (35,027) |
| Retained earnings | 25 | 603,240 | 436,337 |
| **Equity attributable to equity holders of the Parent** | | 1,089,716 | 906,869 |
| Non-controlling interests | | 54,910 | 42,002 |
| **Total equity** | | 1,144,626 | 948,871 |
| **Non-current liabilities** | | | |
| Term loans | 27 | 987,840 | 594,780 |
| Employees' end of service benefits | 28 | 41,374 | 26,648 |
| Other payables | 30 | 38,984 | 40,792 |
| Option redemption payable | 37 | 12,728 | 37,500 |
| Deferred tax liabilities | 15 | 9,693 | 8,245 |
| | | 1,090,619 | 707,965 |
| **Current liabilities** | | | |
| Accounts payable and accruals | 29 | 209,470 | 158,812 |
| Other payables | 30 | 18,110 | 26,827 |
| Option redemption payable | 37 | 26,019 | – |
| Amounts due to related parties | 31 | 28,472 | 14,876 |
| Bank overdrafts and other short term borrowings | 22 | 207,034 | 219,851 |
| Term loans | 27 | 204,154 | 234,519 |
| Employees' end of service benefits | 28 | 6,905 | 3,560 |
| Income tax payable | | 2,265 | 1,712 |
| Dividend payable | 26 | 1,334 | – |
| | | 703,763 | 660,157 |
| **Total liabilities** | | 1,794,382 | 1,368,122 |
| **TOTAL EQUITY AND LIABILITIES** | | 2,939,008 | 2,316,993 |

The consolidated financial statements were authorised for issue by the board of directors on 6 March 2018 and were signed on its behalf by:

**PRASANTH MANGHAT**
Chief Executive Officer

**PRASHANTH SHENOY**
Chief Financial Officer

The attached notes 1 to 41 form part of the consolidated financial statements.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice          98 of 164          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

## Consolidated Statement of Changes in Equity
For the year ended 31 December 2017

| | Share capital US$ '000 | Share premium US$ '000 | Group restructuring reserve US$ '000 | Retained earnings US$ '000 | Foreign currency translation reserve US$ '000 | Option redemption reserves US$ '000 | Total US$ '000 | Non-controlling interest US$ '000 | Total US$ '000 |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Attributable to the equity holders of the Parent | | | |
| Balance as at 1 January 2017 | 31,910 | 491,778 | (10,001) | 436,337 | (8,128) | (35,027) | 906,869 | 42,002 | 948,871 |
| Profit for the year | - | - | - | 185,970 | - | - | 185,970 | 23,211 | 209,181 |
| Other comprehensive income | - | - | - | 1 | 13,526 | - | 13,527 | 1,778 | 15,305 |
| Total comprehensive income for the year | | | | 185,971 | 13,526 | - | 199,497 | 24,989 | 224,486 |
| Dividend (note 26) | - | - | - | (27,779) | - | - | (27,779) | (21,160) | (48,939) |
| Option redemption reserve (note 37) | - | - | - | - | - | 1,544 | 1,544 | - | 1,544 |
| Exercise of stock option shares (note 23) | 18 | 856 | - | (874) | - | - | - | - | - |
| Adjustment to prior year business combination (note 5) | - | - | - | 1,683 | - | - | 1,683 | 1,631 | 3,314 |
| Acquisition of non-controlling interest (note 2.2) | - | - | - | (1,279) | - | - | (1,279) | (1,336) | (2,615) |
| Acquisition of subsidiaries (note 5) | - | - | - | - | - | - | - | 8,784 | 8,784 |
| Share based payments (note 32) | - | - | - | 9,181 | - | - | 9,181 | - | 9,181 |
| Balance as at 31 December 2017 | 31,928 | 492,634 | (10,001) | 603,240 | 5,398 | (33,483) | 1,089,716 | 54,910 | 1,144,626 |
| Balance as at 1 January 2016 | 29,566 | 179,152 | (10,001) | 318,092 | (4,616) | (24,496) | 487,697 | 11,968 | 499,665 |
| Profit for the year | - | - | - | 132,689 | - | - | 132,689 | 18,713 | 151,402 |
| Other comprehensive income | - | - | - | (147) | (3,512) | - | (3,659) | (538) | (4,197) |
| Total comprehensive income for the year | | | | 132,542 | (3,512) | - | 129,030 | 18,175 | 147,205 |
| Dividend (note 26) | - | - | - | (16,350) | - | - | (16,350) | (5,300) | (21,650) |
| Option redemption reserve (note 37) | - | - | - | - | - | (12,801) | (12,801) | - | (12,801) |
| Issue of shares - new (note 23) | 2,344 | 319,970 | - | - | - | - | 322,314 | - | 322,314 |
| Shares issue costs (note 23) | - | (7,344) | - | - | - | - | (7,344) | - | (7,344) |
| Acquisition of non-controlling interest | - | - | - | (587) | - | - | (587) | (1,365) | (1,952) |
| Settlement of put option (note 37) | - | - | - | - | - | 2,270 | 2,270 | - | 2,270 |
| Acquisition of subsidiaries (note 5 ) | - | - | - | - | - | - | - | 18,524 | 18,524 |
| Share based payments (note 32) | - | - | - | 2,640 | - | - | 2,640 | - | 2,640 |
| Balance as at 31 December 2016 | 31,910 | 491,778 | (10,001) | 436,337 | (8,128) | (35,027) | 906,869 | 42,002 | 948,871 |

The attached notes 1 to 41 form part of the consolidated financial statements.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice    99 of 164    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

Financial Statements

# Consolidated Statement of Cash Flows
For the year ended 31 December 2017

| | Notes | 2017 US$'000 | 2016 US$'000 |
|---|---|---|---|
| **OPERATING ACTIVITIES** | | | |
| Profit for the year before tax | | 210,426 | 151,576 |
| Adjustments for: | | | |
| Depreciation | 17 | 58,107 | 45,010 |
| Employees' end of service benefits | 28 | 11,106 | 7,246 |
| Amortisation of intangible assets | 18 | 12,776 | 10,989 |
| Finance income | 11 | (7,487) | (9,157) |
| Finance costs | 10 | 63,792 | 41,684 |
| Loss on disposal of property and equipment | | 190 | 31 |
| Foreign exchange loss | | 21 | 358 |
| Non cash other income | | – | 626 |
| Unamortised finance fees written off | 8 | 6,794 | – |
| Impairment of assets | 17,18 | 3,010 | 1,376 |
| Share based payments expense | 32 | 9,181 | 2,640 |
| | | 367,916 | 252,379 |
| Working capital changes: | | | |
| Inventories | | (28,212) | (8,630) |
| Accounts receivable and prepayments | | (82,078) | (78,638) |
| Amounts due from related parties | | 2,670 | 487 |
| Accounts payable and accruals | | 11,554 | 15,524 |
| Amounts due to related parties | | 13,487 | (2,539) |
| Net cash from operations | | 285,337 | 178,583 |
| Employees' end of service benefits paid | 28 | (3,447) | (1,546) |
| Income tax paid | | (4,379) | (666) |
| Net cash from operating activities | | 277,511 | 176,371 |
| **INVESTING ACTIVITIES** | | | |
| Purchase of property and equipment | | (63,448) | (59,571) |
| Purchase of intangible assets | 18 | (1,413) | (473) |
| Proceeds from disposal of property and equipment | | 88 | 1,574 |
| Acquisition of subsidiaries, net of cash acquired | 5 | (628,057) | (236,328) |
| Investment in Joint venture | | (2,880) | (928) |
| Bank deposits maturing in over 3 months | | (40,759) | 26,764 |
| Restricted cash | | 52,770 | (84,473) |
| Finance income received | | 1,144 | 6,529 |
| Advances paid for acquisitions | 5 | – | (1,614) |
| Loan receivable | 19 | (17,934) | (10,505) |
| Other non-current assets | | (1,335) | (1,768) |
| Contingent consideration paid for acquisition | 36 | (15,053) | (9,567) |
| Deferred consideration paid for acquisition | 5 | (4,356) | – |
| Net cash used in investing activities | | (721,233) | (370,360) |
| **FINANCING ACTIVITIES** | | | |
| New term loans and draw-downs | 27 | 671,353 | 631,548 |
| Repayment of term loans | 27 | (319,111) | (378,660) |
| Transaction cost of term loan | | (16,075) | – |
| Receipts of short term borrowings | | 351,775 | 351,089 |
| Repayment of short term borrowings | | (373,318) | (319,556) |
| Dividend paid to shareholders | 26 | (27,779) | (16,350) |
| Dividend paid to non-controlling interest | 26 | (14,523) | (5,300) |
| Other payable | | 1,200 | – |
| Finance costs paid | | (54,126) | (32,421) |
| Acquisition of non-controlling interest | | (2,615) | (1,952) |
| Proceed from new share issue - net | | – | 314,970 |
| Net cash from financing activities | | 216,781 | 543,368 |
| **(DECREASE)/INCREASE IN CASH AND CASH EQUIVALENTS** | | (226,941) | 349,379 |
| Cash and cash equivalents at 1 January | | 433,403 | 84,024 |
| **CASH AND CASH EQUIVALENTS AT 31 DECEMBER** | 22 | 206,462 | 433,403 |

The attached notes 1 to 41 form part of the consolidated financial statements.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice          100 of 164          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

# Notes to the Consolidated Financial Statements
At 31 December 2017

### 1   CORPORATE INFORMATION

NMC Health plc (the "Company" or "Parent") is a Company which was incorporated in England and Wales on 20 July 2011. The Company is a public limited company operating in the United Arab Emirates ("UAE"), Oman, Saudi Arabia, Spain, Colombia, Italy, Denmark and Brazil. The address of the registered office of the Company is Level 1, Devonshire House, One Mayfair Place, London, W1J 8AJ. The registered number of the Company is 7712220. The Company's immediate and ultimate controlling party is a group of three individuals (H.E. Saeed Mohamed Butti Mohamed Al Qebaisi (H.E. Saeed Bin Butti), Dr BR Shetty and Mr Khalifa Butti Omair Yousif Ahmad Al Muhairi (Mr. Khalifa Bin Butti) who are all shareholders and of whom two are directors of the Company and who together have the ability to control the Company.

The Parent and its subsidiaries (collectively the "Group") are engaged in providing professional medical services, home care services, long term care services and the provision of all types of research and medical services in the field of gynaecology, obstetrics and human reproduction, and the rendering of business management services to companies in the health care and hospital sector. The Group is also engaged in wholesale of pharmaceutical goods, medical equipment, cosmetics, food, IT products and services.

The consolidated financial statements of the Group for the year ended 31 December 2017 were authorised for issue by the board of directors on 6 March 2018 and the consolidated statement of financial position was signed on the Board's behalf by Mr Prasanth Manghat and Mr Prashanth Shenoy.

### 2.1   BASIS OF PREPARATION

The consolidated financial statements have been prepared in accordance with International Financial Reporting Standards as adopted by the European Union as they apply to the financial statements of the Group for the year ended 31 December 2017 and applied in accordance with the Companies Act 2006.

The consolidated financial statements are prepared under the historical cost convention, except for derivative financial instruments and contingent consideration payable which have been measured at fair value. The principal accounting policies adopted in the preparation of these consolidated financial statements are set out below. These policies have been consistently applied to all periods, presented.

### FUNCTIONAL AND REPORTING CURRENCY

The functional currency of the Company and its subsidiaries in the UAE is the UAE Dirham and the functional currency of the subsidiaries operating outside UAE is the currency of those respective countries. The reporting currency of the Group is United States of America Dollar (US$) as this is a more globally recognised currency. The UAE Dirham is pegged against the US Dollar at a rate of 3.673 per US Dollar.

All values are rounded to the nearest thousand dollars ($000) except when otherwise indicated.

### GOING CONCERN

The Group's business activities, together with the factors likely to affect its future development, performance and position are set out in the Strategic Review on pages 12 to 35. The financial position of the Group, its cash flows, liquidity position and borrowing facilities are described in the Financial Review on pages 24 to 25.

The Group has two diverse operating divisions, Healthcare and Distribution, both of which operate in a growing market.

The directors have undertaken an assessment of the future prospects of the Group and the wider risks that the Group is exposed to. In its assessment of whether the Group should adopt the going concern basis in preparing its financial statements, the directors have considered the adequacy of financial resources in order to manage its business risks successfully, together with other areas of potential risk such as regulatory, insurance and legal risks.

The Group has considerable financial resources including banking arrangements through a spread of local and international banking groups and utilises short and medium term working capital facilities to optimise business funding. Debt covenants are reviewed by the Board each month. The Board believes that the level of cash in the Group, the spread of bankers and debt facilities mitigates the financing risks that the Group faces from both its expansion through acquisitions and in relation to working capital requirements.

The Group delivered a strong performance in 2017. Both the Healthcare and Distribution divisions have continued their positive growth in revenue during 2017. Net profit and earnings before interest tax depreciation and amortisation (EBITDA) of both healthcare and distribution divisions have increased in 2017. EBITDA margin of Distribution is almost the same as last year whereas for Healthcare it increased slightly which is due to opening of new facilities during the year. The directors have reviewed the business plan for 2018 and the five-year cash flow, together with growth forecasts for the healthcare sector in the UAE. The directors consider the Group's future forecasts to be reasonable.

The directors have not identified any other matters that may impact the viability of the Group in the medium term and therefore they continue to adopt the going concern basis in preparing the consolidated financial statements.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice     101 of 164     Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

# Notes to the Consolidated Financial Statements continued
At 31 December 2017

### 2.2 BASIS OF CONSOLIDATION

The consolidated financial statements comprise the financial statements of the Group and its subsidiaries as at 31 December 2017. Control is achieved when the Group is exposed, or has rights, to variable returns from its involvement with the investee and has the ability to affect those returns through its power over the investee. Specifically, the Group controls an investee if, and only if, the Group has:

- Power over the investee (i.e., existing rights that give it the current ability to direct the relevant activities of the investee)
- Exposure, or rights, to variable returns from its involvement with the investee
- The ability to use its power over the investee to affect its returns

Generally, there is a presumption that a majority of voting rights result in control. To support this presumption and when the Group has less than a majority of the voting or similar rights of an investee, the Group considers all relevant facts and circumstances in assessing whether it has power over an investee, including:

- The contractual arrangement with the other vote holders of the investee
- Rights arising from other contractual arrangements
- The Group's voting rights and potential voting rights

The Group re-assesses whether or not it controls an investee if facts and circumstances indicate that there are changes to one or more of the three elements of control. Consolidation of a subsidiary begins when the Group obtains control over the subsidiary and ceases when the Group loses control of the subsidiary. Assets, liabilities, income and expenses of a subsidiary acquired or disposed of during the year are included in the consolidated financial statements from the date the Group gains control until the date the Group ceases to control the subsidiary.

Profit or loss and each component of other comprehensive income (OCI) are attributed to the equity holders of the parent of the Group and to the non-controlling interests, even if this results in the non-controlling interests having a deficit balance. When necessary, adjustments are made to the financial statements of subsidiaries to bring their accounting policies into line with the Group's accounting policies. All intra-group assets and liabilities, equity, income, expenses and cash flows relating to transactions between members of the Group are eliminated in full on consolidation.

A change in the ownership interest of a subsidiary, without a loss of control, is accounted for as an equity transaction.

If the Group loses control over a subsidiary, it derecognises the related assets (including goodwill), liabilities, non-controlling interest and other components of equity while any resultant gain or loss is recognised in profit or loss. Any investment retained is recognised at fair value.

The consolidated financial statements include the financial statements of the Company and its subsidiaries listed below:

| | | Percentage of holdings | |
|---|---|---|---|
| | Country of incorporation | 31 December 2017 | 31 December 2016 |
| Direct subsidiaries: | | | |
| NMC Holding Co LLC | UAE | 100% | 100% |
| NMC Health Holdco Limited | UK | 100% | 100% |
| Indirect subsidiaries: | | | |
| NMC Healthcare LLC | UAE | 100% | 100% |
| New Pharmacy Company WLL | UAE | 100% | 100% |
| New Medical Centre LLC-Dubai | UAE | 100% | 100% |
| NMC Specialty Hospital LLC-Abu Dhabi | UAE | 100% | 100% |
| NMC Specialty Hospital LLC- Dubai | UAE | 100% | 100% |
| New Medical Centre Trading LLC-Abu Dhabi | UAE | 100% | 100% |
| NMC Trading LLC-Dubai | UAE | 100% | 100% |
| Bait Al Shifaa Pharmacy LLC-Dubai | UAE | 100% | 100% |
| New Medical Centre LLC-Sharjah | UAE | 100% | 100% |
| New Medical Centre Specialty Hospital LLC-Al Ain | UAE | 100% | 100% |
| Reliance Information Technology LLC | UAE | 100% | 100% |
| BR Medical Suites FZ LLC | UAE | 100% | 100% |
| Bright Point Royal Womens Hospital LLC | UAE | 100% | 100% |
| NMC Day Surgery Centre LLC | UAE | 100% | 100% |
| NMC Hospital LLC (DIP Hospital) | UAE | 100% | 100% |
| Medifertil, S.A | Columbia | 61.90% | 61.90% |
| Centro de infertilidad y Reproduccion Humana SLU (CIRH) | Spain | 88.40% | 88.40% |
| Centro de Medicina della Riproduzione (Biogenesi) | Italy | 53.00% | 53.00% |
| EUVITRO, S.L.U | Spain | 88.40% | 88.40% |
| Copenhagen Fertility Center Holding Aps (DK) | Denmark | 79.60% | 79.60% |
| Huntington Centro de Medicina Reproductive, S/A (BR) | Brazil | 53% | 53% |
| ProVita International Medical Center LLC | UAE | 100% | 100% |

Exhibit 5 to B.R. Shetty's Request for Judicial Notice     102 of 164     Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

## 2.2 BASIS OF CONSOLIDATION CONTINUED

| | Country of incorporation | Percentage of holdings | |
|---|---|---|---|
| | | 31 December 2017 | 31 December 2016 |
| Lifewise Home Healthcare LLC | UAE | 100% | 100% |
| NMC Royal Hospital LLC | UAE | 100% | 100% |
| The American Surgecenter Pharmacy LLC | UAE | 100% | 90% |
| The American Surgecenter LLC | UAE | 100% | 90% |
| Americare LLC | UAE | 100% | 90% |
| Trans Arabia Drug Store LLC | UAE | 75% | 75% |
| Sunny Specialty Medical Centre LLC. | UAE | 100% | 100% |
| Sunny Medical Centre LLC. | UAE | 100% | 100% |
| New Sunny Medical Centre LLC | UAE | 100% | 100% |
| Sunny Al Buhairah Medical Centre LLC | UAE | 100% | 100% |
| Sunny Al Nadha Medical Centre LLC | UAE | 100% | 100% |
| Sunny Dental Care LLC. | UAE | 100% | 100% |
| Grand Hamad Pharmacy LLC | UAE | 100% | 100% |
| Hamad Pharmacy LLC | UAE | 100% | 100% |
| Sharjah Pharmacy L.L.C | UAE | 100% | 100% |
| Sunny Sharqan Medical Centre L.L.C. | UAE | 100% | 100% |
| NMC Royal Medical Centre L.L.C. | UAE | 100% | 100% |
| NMC Healthcare L.L.C. | Oman | 100% | 100% |
| Fulfil Trading L.L.C. | UAE | 100% | 100% |
| Nadia Medical Centre L.L.C. | UAE | 100% | 100% |
| Cooper Dermatology and Dentistry Clinic | UAE | 100% | 100% |
| Cooper Health Clinic | UAE | 100% | 100% |
| Fakih IVF Fertility Centre LLC | UAE | 51% | 51% |
| Fakih IVF LLC | UAE | 51% | 51% |
| Beiersdorf Cosmetics Trading LLC- Abu Dhabi branch. | UAE | 100% | 100% |
| New Marketing & Trading Co.LLC-Abu Dhabi | UAE | 100% | 100% |
| Beiersdorf Cosmetics Trading LLC- Al Ain branch | UAE | 100% | 100% |
| New Marketing & Trading Co -LLC-Al Ain branch. | UAE | 100% | 100% |
| New Medical Centre Trading LLC.-branch 2 | UAE | 100% | 100% |
| New Medical Centre Trading LLC-branch 3 | UAE | 100% | 100% |
| Beiersdorf Cosmetics Trading LLC- Ajman branch | UAE | 100% | 100% |
| National Marketing & Trading Co. LLC-Ajman | UAE | 100% | 100% |
| New Marketing & Trading Company LLC-Ajman branch | UAE | 100% | 100% |
| NMC Trading LLC-Ajman branch | UAE | 100% | 100% |
| Beiersdorf Cosmetics Trading Co. LLC-Dubai | UAE | 100% | 100% |
| National Marketing & Trading Co. LLC - Dubai branch | UAE | 100% | 100% |
| New Marketing & Trading Co. LLC- Dubai branch | UAE | 100% | 100% |
| New Medical Centre Trading (Store) LLC-Dubai | UAE | 100% | 100% |
| New Medical Centre Veterinary Medicine & Equipment Trading Co LLC-Dubai | UAE | 100% | 100% |
| NMC Trading LLC- Dubai branch | UAE | 100% | 100% |
| NMC Trading LLC -Fujairah branch | UAE | 100% | 100% |
| NMC Trading RAK- branch LLC | UAE | 100% | 100% |
| New Medical Centre | UAE | 100% | 100% |
| New Medical Centre L.L.C. -branch (Al-Ain,Al wadi) | UAE | 100% | 100% |
| NMC Pharmacy | UAE | 100% | 100% |
| NMC Pharmacy-Branch | UAE | 100% | 100% |
| PVHC KSA | KSA | 100% | 100% |
| TVM KSA Acquisition 2 Ltd. | Cyprus | 100% | 100% |
| NMC Royal Medical Centre LLC-Branch | UAE | 100% | 100% |
| Muscat Central Healthcare L.L.C. | Oman | 100% | 100% |
| NMC Healthcare India Pvt. Ltd. | India | 100% | 100% |
| NMC International Trading L.L.C. | UAE | 100% | 100% |
| Cooper Health Clinic-Branch | UAE | 100% | 100% |
| New Reproductive Care Ltd. | Cayman | 51% | 51% |
| New Medical Centre Abu Dhabi branch | UAE | 100% | 100% |
| New Medical Centre Trading LLC branch 1 | UAE | 100% | 100% |
| NMC Trading LLC branch | UAE | 100% | 100% |
| New Medical Centre Pharmacy Al Ain branch1 | UAE | 100% | 100% |
| Focus Optics | UAE | 100% | 100% |
| Bright Point Pharmacy LLC | UAE | 100% | 100% |
| Lotus Pharmacy LLC | UAE | 100% | 100% |
| New Medial Centre Pharmacy LLC Sharjah | UAE | 100% | 100% |

Exhibit 5 to B.R. Shetty's Request for Judicial Notice          103 of 164          Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

# Notes to the Consolidated Financial Statements continued
At 31 December 2017

### 2.2  BASIS OF CONSOLIDATION CONTINUED

| | | Percentage of holdings | |
| | Country of incorporation | 31 December 2017 | 31 December 2016 |
|---|---|---|---|
| New Medical Centre Trading (Store) LLC-Abu Dhabi Br | UAE | 100% | 100% |
| Provita International Medical Centre LLC Alain branch | UAE | 100% | 100% |
| NMC Medical Professional Trading Centre LLC | UAE | 100% | 100% |
| New Pharmacy Company WLL branch 1 | UAE | 100% | 100% |
| New Pharmacy Company WLL branch 2 | UAE | 100% | 100% |
| New Pharmacy Company WLL branch 6 | UAE | 100% | 100% |
| Royal Arsom Wellness Centre LLC | UAE | 100% | 100% |
| NMC Medical Centre branch 2 (scientific store) | UAE | 100% | 100% |
| New Medical Centre Pharmacy LLC Alain | UAE | 100% | 100% |
| Fertilitetsklinikken Lygten A/S | Denmark | 79.60% | 79.60% |
| Luarmia, S.L. | Spain | 88.40% | 88.40% |
| Al Aseel Laundry | UAE | 100% | 100% |
| Zari Spa & Beauty Centre | UAE | 100% | 100% |
| Zari Spa for Men | UAE | 100% | 100% |
| PEL Assistencia A Infertillidade LTDA | Brazil | 53% | 53% |
| Mustashfa Jadeed Fund. | KSA | 100% | – |
| Al Qadi Speciality Hospital LLC | KSA | 60% | – |
| As Salama Hospital LLC | KSA | 70% | – |
| Al Zahra Private Hospital Company | UAE | 100% | – |
| Sunny Halwan Speciality Medical Centre | UAE | 100% | – |
| Hamad Drug Store LLC | UAE | 100% | – |
| Sunny Maysloon Speciality Medical Centre LLC | UAE | 100% | – |
| Centre de Reproduccio Asistida del ("Fecunmed") | Spain | 70.7% | – |
| NMC Royal Medical Centre LLC | Oman | 100% | – |
| NMC Trading LLC | Oman | 100% | – |

The Group acquired an additional 10% interest in the voting shares of Americare LLC, The American Surgecenter Pharmacy LLC and the American Surgecenter LLC increasing its ownership interest to 100% for cash consideration of US$2,615,000. The Group recorded a loss of US$1,279,000 on this in retained earnings.

### 2.3  SIGNIFICANT ACCOUNTING JUDGEMENTS AND ESTIMATES
The key assumptions concerning the future, key sources of estimation uncertainty and critical judgements at the reporting date that have a significant risk of causing a material adjustment to the carrying amounts of assets and liabilities within the next financial year are discussed below:

#### SIGNIFICANT ESTIMATES
Impairment of inventories
Inventories are held at the lower of cost and net realisable value. When inventories become old or obsolete, an estimate is made of their net realisable value. For individually significant amounts this estimation is performed on an individual basis. Amounts which are not individually significant, but which are old or obsolete, are assessed collectively and a provision applied according to the inventory type and the Group's policy for inventory provisioning. The gross carrying amount of inventories at 31 December 2017 was US$182,549,000 (2016: US$145,565,000) and the provision for old and obsolete items at 31 December 2017 was US$1,219,000 (2016: US$1,178,000) (note 20).

Impairment of accounts receivable
An estimate of the collectible amount of trade accounts receivable is made when collection of the full amount is no longer probable. For individually significant amounts, this estimation is performed on an individual basis. Amounts which are not individually significant, but which are past due or claims which can potentially be rejected, are assessed collectively and a provision applied according to the length of time past due, based on historical recovery rates.

A majority of the receivables that are past due but not impaired pertains to Group's operations in UAE, these receivables are from insurance companies and government-linked entities in the United Arab Emirates which are inherently slow payers due to their long invoice verification and approval of payment procedures. Payments continue to be received from these customers and accordingly the risk of non-recoverability is considered to be low.

Gross trade accounts receivable at 31 December 2017 were US$455,893,000 (2016: US$326,480,000) and the provision for doubtful debts at 31 December 2017 was US$15,747,000 (2016: US$12,129,000) (note 21). Any difference between the amounts actually collected in future periods and the amounts expected will be recognised in the consolidated income statement.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice          104 of 164          Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

**2.3  SIGNIFICANT ACCOUNTING JUDGEMENTS AND ESTIMATES** CONTINUED
**SIGNIFICANT ESTIMATES** CONTINUED
Impairment of non-financial assets
Impairment exists when the carrying value of an asset or cash generating unit (CGU) exceeds its recoverable amount, which is the higher of its fair value less costs of disposal and its value in use. The fair value less costs of disposal calculation is based on available data from binding sales transactions, conducted at arm's length, for similar assets or observable market prices less incremental costs for disposing of the asset. The value in use calculation is based on a DCF model. The cash flows are derived from the budget for the next five years and do not include restructuring activities that the Group is not yet committed to or significant future investments that will enhance the asset's performance of the CGU being tested. The recoverable amount is sensitive to the discount rate used for the DCF model as well as the expected future cash-inflows and the growth rate used for extrapolation purposes. These estimates are most relevant to goodwill recognised by the Group. The key assumptions used to determine the recoverable amount for the different CGUs are disclosed and further explained in note 18.

In addition, the Group has work in progress in respect of Hospital Information System (HIS) and ERP amounting to US$1,783,000 (2016:US$4,345,000). This amount is included in capital work in progress in property and equipment and in software in intangible assets (note 17 and note 18). As of 31 December 2017, the Group has recorded impairment of US$3,010,000 (2016:US$nil) against this.

Valuation of intangibles assets
The Group measures its intangible assets acquired in a business combination as follows:

| | |
|---|---|
| Brand | Relief from royalty |
| Database and software | Replacement cost |
| Patient relationships | Multi period excess earning method |
| Non-compete agreements | Income approach-with or without method |
| Rental and private contracts | Multi period excess earning method |

Estimating the fair value of the brand requires determination of the most appropriate valuation method. This estimate also requires determination of the most appropriate inputs to the valuation method including the base revenue, expected life of the intangible assets, selecting an arm's length royalty rate, discount rate and making assumptions about them. Similarly, estimating the replacement cost of the database requires an estimate of the number of cycles that are recorded in the database along with the best estimate of the hours dedicated by the staff (such as doctors, nurses, biologists, and other specialist technicians) to collect the data, the useful life of the database, discount rate and an estimate of tax saving.

Estimating the fair value of patient relationships and the non-compete agreements requires an estimate of the expected revenue over an appropriate period of time, a churn rate to account for the reduction in the number of patients over the years, discount rate, rate of inflation and the useful life and the risk inherent in ownership of the asset or security interest being valued.

Useful economic lives of property and equipment and depreciation method
Depreciation is calculated on all property and equipment other than land and capital work in progress, at the rates calculated to write off the cost of each asset on a straight-line basis over its expected useful life. Management has re-assessed the useful economic lives of all asset categories with effect from 1 January 2017, following a review of the useful economic lives of the Group's assets and market research conducted on depreciation rates and methods in the industry:

| | Rate applied from 1 January 2017 | Rate applied up to 31 December 2016 |
|---|---|---|
| Hospital building | 2% - 6% | 2% - 6% |
| Buildings | 4.8 % - 6% | 6% |
| Leasehold improvements | 5.88% - 20% | 5.88% - 20% |
| Motor vehicles | 20% | 20% |
| Furniture, fixtures and fittings | 12.5% - 20% | 12.5% - 20% |
| Medical equipment | 10% - 25% | 10% - 25% |

The impact of the re-assessment of useful economic lives and depreciation method is an increase in reported profit of US$784,000 in the current year.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice    105 of 164    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

Financial Statements

# Notes to the Consolidated Financial Statements continued
## At 31 December 2017

**2.3  SIGNIFICANT ACCOUNTING JUDGEMENTS AND ESTIMATES** CONTINUED
**SIGNIFICANT ESTIMATES** CONTINUED
Useful economic lives of intangible assets and amortisation method
The useful lives of intangible assets are assessed as either finite or indefinite. Intangibles assets are amortised on straight line basis over their useful life. The following useful lives have been determined for acquired intangible assets:

Brands - 2-20 years
Software - 5 years
Database - 15 years
Patient relationships - 7 years
Non-compete agreement - 3-4 years
Rental contracts - 7 years
Private contracts - 3 years

Management has re-assessed the useful economic lives of all intangible asset categories with effect from 1 January 2017, following a review of the useful economic lives of the Group's intangible assets and market research conducted on amortisation rates and methods in the industry. Based on the review, useful life of brand relating to Provita and Americare has been revised to 15 years from 10 years and for Fakih brand useful life has been revised to 20 years from 16 years.

The impact of the re-assessment of useful economic lives and amortisation method is an increase in reported profit of US$696,000 in the current year.

Contingent consideration on acquisitions
Contingent consideration, resulting from business combinations, is valued at fair value at the acquisition date as part of the business combination. When the contingent consideration meets the definition of a financial liability, it is subsequently re-measured to fair value at each reporting date. The change in the fair value at each reporting date is recorded in the consolidated income statement. The determination of the fair value is based on discounted cash flows. The key assumptions taken into consideration in determining the fair value are the probability of meeting relevant performance targets, securing certain agreements, completing certain acquisitions and the discount factor (note 5).

**SIGNIFICANT JUDGEMENTS**
Business combinations and goodwill
Management judgement is applied in determining whether the acquisition represents an acquisition of an asset or a business combination. This involves assessing whether or not the entities and the assets acquired constitute the carrying on of a business, i.e., whether there are inputs and processes applied to those inputs that have the ability to create outputs. When a business combination occurs, the fair values of the identifiable assets and liabilities assumed, including intangible assets, are recognised. The determination of the fair values of acquired assets and liabilities is based, to a considerable extent, on management's judgement. If the purchase consideration exceeds the fair value of the net assets acquired, then the difference is recognised as goodwill. If the purchase price consideration is lower than the fair value of the assets acquired then a gain is recognised in the consolidated income statement. Allocation of the purchase price between finite lived assets and indefinite lived assets such as goodwill affects the results of the Group as finite lived intangible assets are amortised, whereas indefinite lived intangible assets, including goodwill, are not amortised. The key judgements in respect of the contingent consideration recognised as part of a business combination relate to the performance of the business, the discount rates used and the contractual arrangements of ownership.

Valuation of put option
The accounting for put options requires significant management judgment and is driven by the specific contract terms. Put options were issued as part of the Luarmia SL, CFC HCMR and Fecunmed acquisitions. On the basis of the contract terms and interpretation of relevant accounting standards and guidance, the judgment is that the Group does not have present ownership of the non-controlling interest (NCI) on account of Luarmia SL, CFC HCMR and Fecunmed as at the date of acquisition. This judgment leads to the next stage of the accounting decisions required. The Group has concluded that IFRS 10 takes precedence over IAS 32, and the permitted policy choice is that there should be full recognition of NCI using the proportionate method.

The financial liability that is payable under the put option is measured at fair value at each reporting date. The key assumptions taken into consideration in determining the fair value are the probability of meeting relevant reproductive cycles, EBITDA and net debt targets (note 37).

**104**   NMC Health plc Annual Report and Accounts 2017

**2.3   SIGNIFICANT ACCOUNTING JUDGEMENTS AND ESTIMATES** CONTINUED
**SIGNIFICANT JUDGEMENTS** CONTINUED
Leases for buildings and land
Generally our hospitals, day patient medical centres and hospital projects under development are located on land and in buildings which are leased. As at 31 December 2017, the majority of the lease periods range from five to twenty seven years apart from the leases for New Medical Centre Hospital LLC-Dubai ('Dubai General Hospital) and the warehouse facilities, which had leases which are renewable on an annual basis with a total value of US$569,000 (2016: US$801,000) included within property, and equipment as at 31 December 2017 (note 17). If any such leases are terminated or expire and are not renewed, the Group could lose the investment, including the hospital buildings and the warehouses on the leased sites which could have a material adverse effect on our business, financial condition and results of operations. The directors have considered the following facts in determining the likelihood that these leases will be renewed:

- Whilst some leases can be for long term durations, it is not unusual and can often be common practice throughout all of the emirates in the United Arab Emirates for landlords to lease land and buildings to companies on annually renewable leases of one year terms and for these Leases to be renewed automatically. Throughout the Group's over 44 year history it has never had a lease cancelled or not renewed, and the Group enjoys a high degree of respect in the region and believes that it maintains strong relationships with the landlords.
- Both the Dubai General Hospital and the warehouse facilities have been occupied by the Group on annually renewable leases, for a period of more than 17 years and each year these leases have been automatically renewed.
- The warehouse facilities have been built by the Group on land leased from government bodies in the Emirates of Dubai and Abu Dhabi on the back of the policies of these governments to attract investment in warehousing in the United Arab Emirates.

Lease for NMC Royal Hospital LLC
NMC Royal Hospital LLC is constructed from land leased from Municipality of Abu Dhabi. Remaining period of lease as of 31 December 2017 is 23 years expiring in 2040. Management has determined the useful life of NMC Royal Hospital LLC building 50 years. Carrying amount of NMC Royal Hospital LLC building included in property and equipment as of 31 December 2017 is US$130,042,000 (2016: US$122,463,000). Management believe that lease will be renewed for the full useful life of the building. The directors have considered the facts that throughout the Group's 44 year history it has never had a lease cancelled or not renewed, and the Group enjoys a high degree of respect in the region and believes that it maintains strong relationships with the lessor in determining the likelihood that lease will be renewed.

**2.4   CHANGES IN ACCOUNTING POLICIES**
**NEW AND AMENDED STANDARDS AND INTERPRETATIONS:**
The Group applied for the first-time certain amendments to the standards, which are effective for annual periods beginning on or after 1 January 2017. The Group has not early adopted any standards, interpretations or amendments that have been issued but are not yet effective.
- Amendments to IAS 7 Statement of Cash Flows: Disclosure Initiative

The amendments to IAS 7 Statement of Cash Flows require entities to provide disclosure of changes in their liabilities arising from financing activities, including both changes arising from cash flows and non-cash changes (such as foreign exchange gains or losses). The Group has provided the information for both the current and the comparative period in Note 40.

The new standards, amendments to IFRS, which are effective as of 1 January 2017 are listed below, have no impact on the Group.
- Amendments to IAS 12 Income Taxes: Recognition of Deferred Tax Assets for Unrecognised Losses
- Annual Improvements 2014-2016 Cycle
  - Amendments to IFRS 12 Disclosure of Interests in Other Entities: Clarification of the scope of disclosure requirements in IFRS 12

**3     SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**
**REVENUE RECOGNITION**
Revenue is recognised to the extent that it is probable that the economic benefits will flow to the Group and the revenue can be reliably measured, regardless of when the payment is being made. Revenue is measured at the fair value of the consideration received or receivable, less discounts and rebates and taking into account contractually defined terms of payment and excluding taxes or duties.

Revenue streams include clinic service revenues, sale of goods - Pharmacy, sale of goods -Distribution, Healthcare management fees and revenue sharing arrangement with doctors.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice          107 of 164          Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

# Notes to the Consolidated Financial Statements continued
## At 31 December 2017

**3  SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES** CONTINUED
**REVENUE RECOGNITION** CONTINUED

The Group assesses its revenue arrangements against specific criteria in order to determine if it is acting as principal or agent. The Group determines it is acting as principal when it has exposure to the significant risks and rewards associated with the transaction and measures revenue as the gross amount received or receivable. When the Group does not retain the significant risks and rewards, it deems that it is acting as n agent and measures revenue as the amount received or receivable in return for its performance under the contract and excludes any amounts collected on behalf of a third party.

**Clinic, homecare and long term care service revenues:**
Clinic, homecare and long term care service revenues represent the revenue which NMC generates from the provision of either inpatient or outpatient medical services, homecare services or long term care services. The group primarily receives these revenues from patients' private/medical insurance schemes. Revenues are recognised when, and to the extent that, performance of a medical service occurs, and is measured at the fair value of the consideration received or receivable. NMC has determined that it is acting as Principal in these arrangements as it has the responsibility for providing the medical services to the patient, it sets the prices for services which are provided, it bears the credit risk and it bears the risk of providing the medical service.

**Gynaecology, obstetrics and human reproduction:**
Revenue in respect of the different types of gynaecology, obstetrics and human reproduction services is recognised as follows:
*   Donor IVF and Own IVF sales (In Vitro Fecundation):
    Revenue in respect of gynaecology, obstetrics and human reproduction is mainly from In Vitro Fertilisation (IVF) treatment.

    Revenue from IVF treatment is recognised based on the stage of the treatment. The treatment is divided into three stages. Each stage takes about 20 days. 24%-25% of revenue is booked in the first stage (at the beginning of the treatment), 50%-65% of revenue is booked in the middle stage (at patient's egg extraction in the case of the use of the patient's own egg or in the case of the use of a donor egg at the fertilisation date) and 11%-25% of revenue is booked at the final stage (embryo implantation). These percentages are based on an internal study of the costs incurred in the different streams performed in prior years.

*   Cryo transfer sales:
    Total cost of the treatment is split in two phases in terms of revenue recognition. 25% is recorded when the doctor agrees with the patient to initialise the treatment and 75% at the embryo implantation. The time between both phases is about 2-3 weeks.

*   Intrauterine insemination:
    Revenue is recognised in full at the insemination date.

**Sale of Goods - Pharmacy:**
The sales of goods from pharmacy relates to the sale of pharmaceutical and other products from hospitals and pharmacies. Whilst the Group does not establish the prices for the pharmaceutical products sold as both the purchase and selling prices for all pharmaceutical products are fixed by the Ministry of Health, UAE. NMC has determined that it is acting as Principal in respect of these sales as it provides the goods for sale, it bears the inventory risk, and it bears the credit risk from customers. Revenue from the sale of goods - Pharmacy is therefore recognised when the significant risks and rewards of ownership of the goods have passed to the buyer. Significant risk for retail goods is passed to the buyer at the point of sale.

**Sale of Goods - Distribution:**
Where the Group bears the inventory risk and the customer credit risk and has the ability to set the prices for the products sold then the Group has determined that it is acting as Principal. Revenue from the sale of goods is therefore recognised when the significant risks and rewards of ownership of the goods have passed to the buyer. Significant risk for retail goods is passed to the buyer for wholesale goods at the time of delivery.

For agency relationships, the revenue earned is measured as the Group's share of the revenue, as specified in the contract. Any amounts collected on behalf of the third party are excluded from revenue and are recorded as a payable. There are currently no material agency relationships.

**Healthcare Management fees:**
Management fees represent fees earned for managing a hospital. Management fees are recognised when the services under the contract are performed, and the service level criteria have been met, and are measured at the fair value of the consideration received or receivable, in line with the terms of the management contract.

**Revenue sharing arrangements with doctors:**
The Group enters into contracts with doctors whereby these doctors are employed to perform certain procedures or run outpatient services using the facilities. In return the doctors obtain a share of the revenues that are generated from these facilities. Each contractual arrangement with individual doctors is assessed against specific criteria to determine whether the Group is acting as principal or agent in the arrangement with these doctors.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice    108 of 164    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

### 3  SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES CONTINUED

#### OTHER INCOME

Other income comprises revenue from suppliers for the reimbursement of advertising and promotion costs incurred by the Group. Revenue is recognised following formal acceptance of the Group's reimbursement claims by suppliers and is measured at the confirmed amount receivable.

#### INTEREST INCOME

For all financial instruments measured at amortised cost, interest income or expense is recorded using the effective interest rate (EIR), which is the rate that exactly discounts the estimated future cash payments or receipts through the expected life of the financial instrument or a shorter period, where appropriate, to the net carrying amount of the financial asset or liability. Interest income is included in finance income in the consolidated income statement.

#### REBATES FROM SUPPLIERS

The Distribution business receives rebates in the ordinary course of business from a number of its suppliers of pharmaceutical products, in accordance with contractual arrangements in place with specific suppliers. Rebates are accounted for once approval has been received from the supplier following the negotiations which have taken place with them. Rebates receivable are accounted for as a deduction from the cost of purchasing pharmaceutical goods, once the rebate has been approved by the supplier on the basis under IAS 18 that the probability of inflow is not sufficiently certain and the amounts cannot be reliably measured until that point. When rebates have been agreed in advance, for example when it has been agreed that a certain rebate will be applied to the purchase of specific goods for a set period of time rather than just to a specific one off purchase, then the rebate is recognised as a reduction in the purchase price as soon as the goods are purchased. When rebates are offered based upon the volume purchased and it is probable that the rebate will be earned and the amount can be estimated reliably, then the discount is recognised as a reduction in the purchase price when the goods are purchased and the assessment is reviewed on an ongoing basis. Rebates receivable are accounted for on a net basis, being set off against the trade payables to which they relate, as they are a reduction in the amount we owe to our suppliers in respect of pharmaceutical products purchased.

#### CURRENT INCOME TAX

Current income tax assets and liabilities arising from overseas operations for the current period are measured at the amount expected to be recovered from or paid to the taxation authorities in the respective overseas jurisdictions. The tax rates and tax laws used to compute the amount are those that are enacted or substantively enacted, at the reporting date in the countries where the Group operates and generates taxable income.

Current income tax relating to items recognised directly in equity is recognised in equity and not in the consolidated income statement. Management periodically evaluates positions taken in the tax returns with respect to situations in which applicable tax regulations are subject to interpretation and establishes provisions where appropriate.

#### DEFERRED TAX

Deferred tax is provided using the liability method on temporary differences between the tax bases of assets and liabilities and their carrying amounts for financial reporting purposes at the reporting date.

Deferred tax liabilities are recognised for all taxable temporary differences, except:
- When the deferred tax liability arises from the initial recognition of goodwill or an asset or liability in a transaction that is not a business combination and, at the time of the transaction, affects neither the accounting profit nor taxable profit or loss;
- In respect of taxable temporary differences associated with investments in subsidiaries, when the timing of the reversal of the temporary differences can be controlled and it is probable that the temporary differences will not reverse in the foreseeable future.

Deferred tax assets are recognised for all deductible temporary differences, the carry forward of unused tax credits and any unused tax losses. Deferred tax assets are recognised to the extent that it is probable that taxable profit will be available against which the deductible temporary differences, and the carry forward of unused tax credits and unused tax losses can be utilised, except:
- When the deferred tax asset relating to the deductible temporary difference arises from the initial recognition of an asset or liability in a transaction that is not a business combination and, at the time of the transaction, affects neither the accounting profit nor taxable profit or loss;
- In respect of deductible temporary differences associated with investments in subsidiaries, deferred tax assets are recognised only to the extent that it is probable that the temporary differences will reverse in the foreseeable future and taxable profit will be available against which the temporary differences can be utilised.

The carrying amount of deferred tax assets is reviewed at each reporting date and reduced to the extent that it is no longer probable that sufficient taxable profit will be available to allow all or part of the deferred tax asset to be utilised. Unrecognised deferred tax assets are re-assessed at each reporting date and are recognised to the extent that it has become probable that future taxable profits will allow the deferred tax asset to be recovered.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice          109 of 164          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

Financial Statements

# Notes to the Consolidated Financial Statements continued
## At 31 December 2017

### 3  SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES CONTINUED
#### DEFERRED TAX CONTINUED
Deferred tax assets and liabilities are measured at the tax rates that are expected to apply in the year when the asset is realised or the liability is settled, based on tax rates (and tax laws) that have been enacted or substantively enacted at the reporting date.

Deferred tax relating to items recognised outside profit or loss is recognised outside profit or loss. Deferred tax items are recognised in correlation to the underlying transaction either in other comprehensive income or directly in equity. Deferred tax assets and deferred tax liabilities are offset if a legally enforceable right exists to set off current tax assets against current income tax liabilities and the deferred taxes relate to the same taxable entity and the same taxation authority.

Tax benefits acquired as part of a business combination, but not satisfying the criteria for separate recognition at that date, are recognised subsequently if new information about facts and circumstances change. The adjustment is either treated as a reduction in goodwill (as long as it does not exceed goodwill) if it was incurred during the measurement period or recognised in profit or loss.

#### BUSINESS COMBINATIONS AND GOODWILL
Business combinations are accounted for using the acquisition method. The cost of an acquisition is measured as the aggregate of the consideration transferred measured at acquisition date fair value and the amount of any non-controlling interests in the acquiree. For each business combination, the Group elects whether to measure the non-controlling interests in the acquiree at fair value or at the proportionate share of the acquiree's identifiable net assets. Acquisition-related costs are expensed as incurred and disclosed separately in the consolidated income statement.

When the Group acquires a business, it assesses the financial assets and liabilities assumed for appropriate classification and designation in accordance with the contractual terms, economic circumstances and pertinent conditions as at the acquisition date. This includes the separation of embedded derivatives in host contracts by the acquiree.

Any contingent consideration to be transferred by the Group is recognised at fair value at the acquisition date. Contingent consideration classified as an asset or liability that is a financial instrument and within the scope of IAS 39 Financial Instruments: Recognition and Measurement, is measured at fair value with the changes in fair value recognised in the consolidated income statement.

Goodwill is initially measured at cost, being the excess of the aggregate of the consideration transferred and the amount recognised for non-controlling interests, and any previous interest held, over the net identifiable assets acquired and liabilities assumed. If the fair value of the net assets acquired is in excess of the aggregate consideration transferred, the Group re-assesses whether it has correctly identified all of the assets acquired and all of the liabilities assumed and reviews the procedures used to measure the amounts to be recognised at the acquisition date. If the reassessment still results in an excess of the fair value of net assets acquired over the aggregate consideration transferred, then the gain is recognised in profit or loss.

After initial recognition, goodwill is measured at cost less any accumulated impairment losses. For the purpose of impairment testing, goodwill acquired in a business combination is, from the acquisition date, allocated to each of the Group's cash-generating units that are expected to benefit from the combination, irrespective of whether other assets or liabilities of the acquiree are assigned to those units.

Where goodwill has been allocated to a cash-generating unit and part of the operation within that unit is disposed of, the goodwill associated with the disposed operation is included in the carrying amount of the operation when determining the gain or loss on disposal. Goodwill disposed in these circumstances is measured based on the relative values of the disposed operation and the portion of the cash-generating unit retained.

#### RESTRUCTURING RESERVE
The group restructuring reserve arises on consolidation under the pooling of interest method used for the group restructuring which took place on 1 April 2012. This represents the difference between the share capital of NMC Healthcare LLC, the previous parent company of the Group, and the carrying amount of the investment in that company at the date of the restructure. This reserve is non-distributable.

#### DEFERRED CONSIDERATION
Deferred consideration arises when settlement of all or any part of the cost of a business combination is deferred. It is stated at fair value at the date of acquisition, which is determined by discounting the amount due to present value at that date. Interest is imputed on the fair value of non-interest bearing deferred consideration at the discount rate and expensed within finance costs. At each balance sheet date deferred consideration comprises the remaining deferred consideration valued at acquisition plus unwinding of interest imputed on such amounts from acquisition to the balance sheet date.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice          110 of 164          Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

## 3   SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES CONTINUED

### PROPERTY AND EQUIPMENT

Property and equipment are stated at cost less accumulated depreciation and any impairment in value. Depreciation is calculated on all property and equipment other than land and capital work in progress, at the following rates calculated to write off the cost of each asset on a straight line basis over its expected useful life:

| | |
|---|---|
| Hospital building | 2%-6% |
| Buildings | 4.8%-6% |
| Leasehold improvements | 5.88%-20% |
| Motor vehicles | 20% |
| Furniture, fixtures and fittings | 12.5%-20% |
| Medical equipment | 10%-25% |

The carrying amounts of property and equipment are reviewed for impairment when events or changes in circumstances indicate the carrying value may not be recoverable. If any such indication exists and where the carrying values exceed the estimated recoverable amount, the assets are written down to their recoverable amount, being the higher of their fair value less cost to sell and their value in use.

Capital work in progress is stated at cost and is not depreciated. Lease costs in respect of capital work in progress are capitalised within capital work in progress during the period up until it is commissioned. When commissioned, capital work in progress is transferred to the appropriate property and equipment asset category and depreciated in accordance with the Group's policies. The carrying amounts of capital work in progress are reviewed for impairment when events or changes in circumstances indicate the carrying value may not be recoverable. If any such indication exists and where the carrying values exceed the estimated recoverable amount, the assets are written down to their recoverable amount.

Expenditure incurred to replace a component of an item of property and equipment that is accounted for separately is capitalised and the carrying amount of the component that is replaced is written off. Other subsequent expenditure is capitalised only when it increases future economic benefits of the related item of property and equipment. All other expenditure is recognised in the consolidated statement of comprehensive income as the expense is incurred.

### INTANGIBLE ASSETS

Intangible assets acquired separately are measured on initial recognition at cost. The cost of intangible assets acquired in a business combination is their fair value at the date of acquisition. Following initial recognition, intangible assets are carried at cost less any accumulated amortisation and accumulated impairment losses. Internally generated intangibles, excluding capitalised development costs, are not capitalised and the related expenditure is reflected in consolidated statement of comprehensive income in the period in which the expenditure is incurred.

The useful lives of intangible assets are assessed as either finite or indefinite. The following useful lives have been determined for acquired intangible assets:

Brands - 2-20 years
Software - 5 years
Database - 15 years
Patient relationships - 7 years
Non-compete agreement - 3-4 years
Rental contracts - 7 years
Private contracts - 3 years

Intangible assets with finite lives are amortised over the useful economic life and assessed for impairment whenever there is an indication that the intangible asset may be impaired. The amortisation period and the amortisation method for an intangible asset with a finite useful life are reviewed at least at the end of each reporting period. Changes in the expected useful life or the expected pattern of consumption of future economic benefits embodied in the asset are considered to modify the amortisation period or method, as appropriate, and are treated as changes in accounting estimates. The amortisation expense on intangible assets with finite lives is recognised in the consolidated income statement in the expense category that is consistent with the function of the intangible assets.

Intangible assets with indefinite useful lives are not amortised, but are tested for impairment annually, either individually or at the cash-generating unit level. The assessment of indefinite life is reviewed annually to determine whether the indefinite life continues to be supportable. If not, the change in useful life from indefinite to finite is made on a prospective basis.

Gains or losses arising from derecognition of an intangible asset are measured as the difference between the net disposal proceeds and the carrying amount of the asset and are recognised in the consolidated income statement when the asset is derecognised.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice     111 of 164     Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

## Notes to the Consolidated Financial Statements continued
At 31 December 2017

### 3  SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES CONTINUED

#### BORROWING COSTS

Borrowing costs that are directly attributable to the acquisition or construction of an asset are capitalised as part of the cost of the asset until the asset is commissioned for use. Borrowing costs in respect of completed assets or not attributable to assets are expensed in the period in which they are incurred.

#### PRE-OPERATING EXPENSES

Pre-operating expenses are the expenses incurred prior to start of operations of a new business unit. These are recognised in the consolidated income statement in the year in which they occur.

#### INVENTORIES

Inventories are valued at the lower of cost and net realisable value after making due allowance for any obsolete or slow moving items. Costs are those expenses incurred in bringing each product to its present location and condition and are determined on a weighted average basis. Net realisable value is based on estimated selling price less any further costs expected to be incurred to disposal.

#### ACCOUNTS RECEIVABLE

Accounts receivable are stated at original invoice amount less a provision for any uncollectible amounts. Accounts receivable with no stated interest rates are measured at invoiced amounts when the effect of discounting is immaterial. An estimate of doubtful debts is made when collection of the full amount is no longer probable. Bad debts are written off when there is no possibility of recovery.

#### LOANS RECEIVABLES

Loans receivables are initially recognised at fair value. After initial measurement, such financial assets are subsequently measured at amortised cost using effective interest rate (EIR) method, less impairment. Amortised cost is calculated by taking into account any discount or premium on acquisition and fees or costs that are an integral part of the EIR. The EIR amortisation is included in finance income in the statement of profit or loss. The losses arising from impairment are recognised in the statement of profit or loss.

#### CASH AND CASH EQUIVALENTS

For the purpose of the consolidated statement of cash flows, cash and cash equivalents consist of cash in hand, bank balances and short term deposits with an original maturity of three months or less, net of outstanding bank overdrafts.

#### EQUITY

The Group has issued ordinary shares that are classified as equity. The difference between the issue price and the par value of ordinary share capital is allocated to share premium. The transaction costs incurred for the share issue are accounted for as a deduction from share premium, net of any related income tax benefit, to the extent they are incremental costs directly attributable to the share issue that would otherwise have been avoided.

#### ACCOUNTS PAYABLE AND ACCRUALS

Liabilities are recognised for amounts to be paid in the future for goods and services received whether billed by the supplier or not. Accounts payable are classified as current liabilities if payment is due within one year or less (or in the normal operating cycle of the business if longer). If not, they are presented as non-current liabilities. Accounts payable are recognised initially at fair value and subsequently measured at amortised cost using the effective interest method.

#### PROVISIONS

Provisions are recognised when the Group has an obligation (legal or constructive) arising from a past event, and the costs to settle the obligation are both probable and able to be reliably measured.

Provisions are measured at the present value of the expenditures expected to be required to settle the obligation using a pre-tax rate that reflects current market assessments of the time value of money and risks specific to the obligation. Increases in provisions due to the passage of time are recognised in the consolidated income statement within 'Finance costs'.

#### PUT OPTION-NON CONTROLLING INTEREST

In circumstances where the Group has determined that they do not have the present ownership interest in the shares subject to a put option, the Group has concluded that IFRS 10 takes precedence over IAS 32 and accordingly a non-controlling interest (NCI) is fully recognised at the date of acquisition, The Group recognises the full NCI using the proportionate share of net assets method. The financial liability that may become payable under a put option in respect of the NCI is recognised at fair value within liabilities, with the liability being treated as an immediate reduction to equity attributable to the parent (option redemption reserve). The financial liability is subsequently re-measured to fair value at each reporting date and the change in the fair value at each reporting date is recorded in the consolidated income statement.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice          112 of 164          Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

### 3  SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES CONTINUED

#### TERM LOANS

Term loans are initially recognised at the fair value of the consideration received less directly attributable transaction costs. After initial recognition, term loans are subsequently measured at amortised cost using the effective interest method. Interest on term loans is charged as an expense as it accrues, with unpaid amounts included in "accounts payable and accruals".

When an existing financial liability is replaced by another from the same lender on substantially different terms, or the terms of an existing liability are substantially modified, such an exchange or modification is treated as the derecognition of the original liability and the recognition of a new liability. The difference in the respective carrying amounts is recognised in the consolidated income statement.

#### NON-CURRENT ASSETS HELD FOR SALE

The Group classifies non-current assets and disposal groups as held for sale if their carrying amounts will be recovered principally through a sale transaction rather than through continuing use. Non-current assets and disposal groups classified as held for sale are measured at the lower of their carrying amount and fair value less costs to sell. Costs to sell are the incremental costs directly attributable to the disposal of an asset (disposal group), excluding finance costs and income tax expense.

The criteria for held for sale classification is regarded as met only when the sale is highly probable and the asset or disposal group is available for immediate sale in its present condition. Actions required to complete the sale should indicate that it is unlikely that significant changes to the sale will be made or that the decision to sale will be withdrawn. Management must be committed to the plan to sell the asset and the sale expected to be completed within one year from the date of the classification.

Property and equipment and intangible assets are not depreciated or amortised once classified as held for sale.

Assets and liabilities classified as held for sale are presented separately as current items in the statement of financial position.

#### EMPLOYEES' END OF SERVICE BENEFITS

The Group operates an un-funded post-employment benefit plan (employees' end of service benefits) for its expatriate employees in the UAE, in accordance with the labour laws of the UAE. The entitlement to these benefits is based upon the employees' final salary and length of service, subject to the completion of a minimum service period. Payment for employees' end of service benefits is made when an employee leaves, resigns or completes his service.

The cost of providing benefits under the post-employment benefit plan is determined using the projected unit credit method. Re-measurements, comprising of actuarial gains and losses, are recognised immediately in the statement of financial position with a corresponding debit or credit to retained earnings through other comprehensive income in the period in which they occur. Re-measurements are not reclassified to profit or loss in subsequent periods.

Interest is calculated by applying the discount rate to the defined benefit liability. The rate used to discount the end of service benefit obligation is determined by reference to market yields at the balance sheet date on high quality corporate bonds. The current and non-current portions of the provision relating to employees' end of service benefits are separately disclosed in the consolidated statement of financial position.

The Group recognises the following changes in the employees' end of service benefits under 'direct costs' and 'general and administrative expenses' in the consolidated statement of comprehensive income:
- Service costs comprising current service costs
- Interest expense

With respect to its UAE national employees, the Group makes contributions to the relevant UAE Government pension scheme calculated as a percentage of the employees' salaries. The obligations under these schemes are limited to these contributions, which are expensed when due.

#### SHARE BASED PAYMENTS

Equity-settled share-based payments to employees (including executive directors) are measured at the fair value of the equity instruments at the grant date. The fair value excludes the effect of non-market-based vesting conditions. Details regarding the determination of the fair value of equity-settled share-based transactions are set out in note 32.

The fair value determined at the grant date of the equity-settled share-based payments is expensed on a straight-line basis over the vesting period, based on the Group's estimate of equity instruments that will eventually vest. At each reporting date, the Group revises its estimate of the number of equity instruments expected to vest as a result of the effect of non-market-based vesting conditions. The impact of the revision of the original estimates, if any, is recognised in the consolidated statement of other comprehensive income such that the cumulative expense reflects the revised estimate, with a corresponding adjustment to equity reserves/other payables.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice    113 of 164    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

# Notes to the Consolidated Financial Statements continued
## At 31 December 2017

### 3  SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES CONTINUED
#### SHARE BASED PAYMENTS CONTINUED

No expense is recognised for awards that do not ultimately vest, except for equity-settled transactions for which vesting are conditional upon a market or non-vesting condition. These are treated as vesting irrespective of whether or not the market or non-vesting condition is satisfied, provided that all other performance and/or service conditions are satisfied.

The dilutive effect of outstanding options is reflected as additional share dilution in the computation of diluted earnings per share (see note 16).

#### FOREIGN CURRENCIES

Transactions in foreign currencies are recorded in UAE Dirhams at the exchange rate ruling at the date of the transaction. Monetary assets and liabilities denominated in foreign currencies are retranslated at the rate of exchange ruling at the balance sheet date. All differences are taken to the consolidated income statement.

#### TRANSLATION OF FOREIGN OPERATIONS

On consolidation, the assets and liabilities of foreign operations are translated into US Dollars at the rate of exchange prevailing at the reporting date and their income statements are translated at average exchange rates (unless this average is not a reasonable approximation of the cumulative effect of the rates prevailing on the transaction dates, in which case income and expenses are translated at the rate on the dates of the transactions). All resulting currency translation differences are recognised as a separate component of equity.

The Group's principal geographical segment is the United Arab Emirates. The UAE Dirham is pegged against the US Dollar so a single rate of 3.673 per US Dollar is used to translate those assets and liabilities and balances in the consolidated income statement.

When a foreign operation is partially disposed of or sold, exchange differences that were recorded in equity are recognised in the consolidated income statement as part of the gain or loss on sale. Goodwill and fair value adjustments arising on the acquisition of a foreign operation are treated as assets and liabilities of the foreign operation and translated at the closing rate.

#### DERIVATIVE FINANCIAL INSTRUMENTS

The Group uses derivative financial instruments such as forward exchange contracts, put options and contingent consideration. Such derivative financial instruments are initially recognised at fair value on the date on which a contract is entered into and are subsequently remeasured at fair value. Derivatives with positive market values (unrealised gains) are recognised as assets and derivatives with negative market values (unrealised losses) are recognised as liabilities in the consolidated statement of financial position.

Any gains or losses arising from changes in fair value on derivatives during the year are taken directly to profit or loss.

#### FAIR VALUE MEASUREMENT

Fair value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. The fair value measurement is based on the presumption that the transaction to sell the asset or transfer the liability takes place either:
• In the principal market for the asset or liability, or
• In the absence of a principal market, in the most advantageous market for the asset or liability

The principal or the most advantageous market must be accessible to by the Group.

The fair value of an asset or a liability is measured using the assumptions that market participants would use when pricing the asset or liability, assuming that market participants act in their economic best interest.

A fair value measurement of a non-financial asset takes into account a market participant's ability to generate economic benefits by using the asset in its highest and best use or by selling it to another market participant that would use the asset in its highest and best use.

The Group uses valuation techniques that are appropriate in the circumstances and for which sufficient data are available to measure fair value, maximising the use of relevant observable inputs and minimising the use of unobservable inputs.

All assets and liabilities for which fair value is measured or disclosed in the financial statements are categorised within the fair value hierarchy, described as follows, based on the lowest level input that is significant to the fair value measurement as a whole:
• Level 1 – Quoted (unadjusted) market prices in active markets for identical assets or liabilities
• Level 2 – Valuation techniques for which the lowest level input that is significant to the fair value measurement is directly or indirectly observable
• Level 3 – Valuation techniques for which the lowest level input that is significant to the fair value measurement is unobservable

Exhibit 5 to B.R. Shetty's Request for Judicial Notice          114 of 164          Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

### 3  SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES CONTINUED
#### FAIR VALUE MEASUREMENT CONTINUED

For assets and liabilities that are recognised in the financial statements on a recurring basis, the Group determines whether transfers have occurred between levels in the hierarchy by re-assessing categorisation (based on the lowest level input that is significant to the fair value measurement as a whole) at the end of each reporting period.

#### IMPAIRMENT OF FINANCIAL ASSETS

An assessment is made at each consolidated statement of financial position date to determine whether there is objective evidence that a specific financial asset may be impaired. If such evidence exists, any impairment loss is recognised in the consolidated income statement. Impairment is determined as the difference between carrying value and the present value of future cash flows discounted at the current market rate of return for a similar financial asset.

#### LEASES

The determination of whether an arrangement is, or contains, a lease is based on the substance of the arrangement at inception date, whether fulfilment of the arrangement is dependent on the use of a specific asset or assets or the arrangement conveys a right to use the asset, even if that right is not explicitly specified in an arrangement. Operating leases are recognised as an operating expense in the consolidated income statement on a straight line basis. Lease incentives are recorded as a reduction of rental expense over the lease term, on a straight-line basis.

#### JOINT VENTURE

A joint venture is a type of joint arrangement whereby the parties that have joint control of the arrangement have rights to the net assets of the joint venture.

Joint ventures are accounted for using the equity method (equity accounted investees) and are initially recognised at cost. The Group's investment includes goodwill identified on acquisition, net of any accumulated impairment losses. The consolidated financial statements include the Group's share of the total comprehensive income and equity movements of equity accounted investees, from the date that joint control commences until the date that joint control ceases. When the Group's share of losses exceeds its interest in an equity accounted investee, the Group's carrying amount is reduced to nil and recognition of further losses is discontinued except to the extent that the Group has incurred legal or constructive obligations or made payments on behalf of an investee.

### 4  ACCOUNTING STANDARDS AND INTERPRETATIONS ISSUED BUT NOT EFFECTIVE

The standards and interpretations that are issued, but not yet effective, up to the date of issuance of the Group's financial statements are listed below. The Group intends to adopt these standards, if applicable, when they become effective.

#### IFRS 15 REVENUE FROM CONTRACTS WITH CUSTOMERS

Nature of change

The IASB has issued a new standard for the recognition of revenue. This will replace IAS 18 which covers contracts for goods and services and IAS 11 which covers construction contracts. The new standard is based on the principle that revenue is recognised when control of a good or service transfers to a customer.

The standard permits either a full retrospective or a modified retrospective approach for the adoption.

Impact

Management has completed a detailed assessment to estimate the potential impact of adopting the requirements of IFRS 15 by reviewing all its material revenue streams. The adoption of the new revenue accounting standard is not likely to have a material impact on the Group's revenue or profitability. However, there will be some changes which will be required to comply with the new disclosure requirements of the new standard.

As the adoption of the new standard is not likely have a material impact on the Group, management will adopt the requirements of the new standard using the modified retrospective approach.

Mandatory application date/Date of adoption by Group

IFRS 15 must be applied for financial years commencing on or after 1 January 2018.The Group does not intend to adopt the standard before its effective date.

#### IFRS 9 FINANCIAL INSTRUMENTS

Nature of change

IFRS 9 addresses the classification, measurement and derecognition of financial assets and financial liabilities, introduces new rules for hedge accounting and a new impairment model for financial assets.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice        115 of 164        Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

# Notes to the Consolidated Financial Statements continued
## At 31 December 2017

### 4  ACCOUNTING STANDARDS AND INTERPRETATIONS ISSUED BUT NOT EFFECTIVE CONTINUED
#### IFRS 9 FINANCIAL INSTRUMENTS CONTINUED
Impact

The Group has undertaken a detailed assessment of the classification and measurement of financial assets.

Majority of the financial assets held by the Group are currently measured at amortised cost and these financial assets appear to meet the conditions for classification at amortised cost under IFRS 9. Accordingly, the Group does not expect the new guidance to have a significant impact on the classification and measurement of its financial assets.

There will be no significant impact on the Group's accounting for financial liabilities, as the new requirements only affect the accounting for financial liabilities that are designated at fair value through profit or loss and, other than forward foreign exchange rate contracts designated at fair value through profit or loss which are insignificant, the Group does not have any such liabilities. The derecognition rules have been transferred from IAS 39 Financial Instruments: Recognition and Measurement and have not been changed.

The new hedge accounting rules will align the accounting for hedging instruments more closely with the Group's risk management practices. As a general rule, more hedge relationships might be eligible for hedge accounting, as the standard introduces a more principles-based approach. The Group does not currently have any material hedging relationships. Accordingly, the Group does not expect a significant impact on the accounting for its hedging relationships.

The new impairment model requires the recognition of impairment provisions based on expected credit losses (ECL) rather than only incurred credit losses as is the case under IAS 39. It applies to financial assets classified at amortised cost, debt instruments measured at fair value through other comprehensive income (FVOCI), contract assets under IFRS 15 Revenue from Contracts with Customers, lease receivables, loan commitments and certain financial guarantee contracts. Though the adoption of the requirements of the new standard may result in an earlier recognition of credit losses the impact of this is not likely to be material. The Group intend adopt the simplified approach to estimating its expected credit losses with respect to trade receivables as these are non-interest bearing.

The new standard also introduces expanded disclosure requirements and changes in presentation. These are expected to change the nature and extent of the disclosures about its financial instruments particularly in the year of the adoption of the new standard.

Mandatory application date/Date of adoption by Group
IFRS 9 must be applied for financial years commencing on or after 1 January 2018. Based on the transitional provisions in the completed IFRS 9, early adoption in phases was only permitted for annual reporting periods beginning before 1 February 2015. After that date, the new rules must be adopted in their entirety.

The Group does not intend to adopt IFRS 9 before its mandatory date.

#### IFRS 16 LEASES
IFRS 16 was issued in January 2016, and specifies how the Group will recognise, measure, present and disclose leases. The standard provides a single lessee accounting model, requiring lessees to recognise assets and liabilities for all leases unless the lease term is 12 months or less or the underlying asset has a low value. Lessors continue to classify leases as operating or finance, with IFRS 16's approach to lessor accounting substantially unchanged from its predecessor, IAS 17.

IFRS 16 applies to annual reporting periods beginning on or after 1 January 2019. The Group is currently assessing the impact of IFRS 16 and plans to adopt the new standard on the required effective date.

In addition, the standards and interpretations that are issued, but not yet effective, up to the date of issuance of the Group's financial statements that are not expected to have any material impact on the Group are as follows:
- Amendments to IFRS 10 and IAS 28: Sale or Contribution of Assets between an Investor and its Associate or Joint Venture
- IFRS 17 Insurance Contracts
- Transfer to Investment Property - Amendments to IAS 40
- IFRS 2 Classification and Measurement of Share-based Payment Transactions – Amendments to IFRS 2
- Annual Improvements 2014-2016 Cycle (issued in December 2016)
    - IFRS 1First time Adoption of International Financial Reporting Standards - Deletion of short-term exemptions for first-time adopters
    - IAS 28 Investments in Associates and Joint Ventures- Clarification that measuring the investees at fair value through profit or loss is an investment-by-investment choice
- Applying IFRS 9 Financial Instruments with IFRS 4 Insurance Contracts - Amendments to IFRS4
- IFRIC Interpretation 22 Foreign Currency Transactions and Advance Consideration
- IFRIC Interpretation 23 Uncertainty over Income Tax Treatment

**114**   NMC Health plc Annual Report and Accounts 2017

## 5 BUSINESS COMBINATIONS

During the financial year ended 31 December 2017, the Group completed a number of acquisitions in line with its growth strategy. These acquisitions have increased group's market share in the healthcare industry and complement the group's existing healthcare portfolio.

| Particulars | Al Zahra US$'000 | Others US$'000 | Total US$'000 |
|---|---|---|---|
| **Assets** | | | |
| Intangible assets | 1,004 | 16,314 | 17,318 |
| Property and equipment | 124,196 | 18,786 | 142,982 |
| Inventories | 6,668 | 2,064 | 8,732 |
| Accounts receivable | 44,143 | 15,163 | 59,306 |
| Other receivables | 1,924 | 1,149 | 3,073 |
| Cash and bank balances | 6,095 | 2,438 | 8,533 |
| | 184,030 | 55,914 | 239,944 |
| **Liabilities** | | | |
| Borrowings | – | 10,329 | 10,329 |
| Accounts payable | 26,077 | 5,972 | 32,049 |
| Other payable | 11,990 | 7,084 | 19,074 |
| Tax payable | – | 321 | 321 |
| | 38,067 | 23,706 | 61,773 |
| Total identified net assets at fair value | 145,963 | 32,208 | 178,171 |
| Non-controlling interest | – | (8,784) | (8,784) |
| Goodwill arising on acquisition | 416,888 | 54,685 | 471,573 |
| Purchase consideration | 562,851 | 78,109 | 640,960 |
| **Purchase consideration:** | | | |
| Payable in cash | 562,851 | 73,739 | 636,590 |
| Contingent consideration | – | 704 | 704 |
| Deferred consideration | – | 2,869 | 2,869 |
| Advance paid in 2016 | – | 797 | 797 |
| Total consideration | 562,851 | 78,109 | 640,960 |

Until last year, each acquisitions was shown separately. From current year, smaller acquisitions have been clubbed together as "Others". Comparatives have been adjusted accordingly.

The fair value assessment of identifiable net assets is completed as final for Al Zahra, Atlas healthcare and As Salama hospital. For other acquisitions it is provisional.

The non-controlling interest in all acquired entities is measured at the proportionate share of net assets of subsidiaries.

Analysis of cash flows on acquisitions is as follows:

| Particulars | Al Zahra US$'000 | Others US$'000 | Total US$'000 |
|---|---|---|---|
| Cash paid | (562,851) | (73,739) | (636,590) |
| Net cash acquired with the subsidiaries | 6,095 | 2,438 | 8,533 |
| Transaction costs | (4,458) | (205) | (4,663) |
| Net cash flow on acquisition | (561,214) | (71,506) | (632,720) |

The transaction costs reported in the consolidated income statement comprise of the following:

| | 2017 US$ '000 | 2016 US$ '000 |
|---|---|---|
| Transaction costs for the acquired entities | 4,663 | 1,259 |
| Transaction costs for acquisitions in progress | 1,306 | 3,344 |
| | 5,969 | 4,603 |

Exhibit 5 to B.R. Shetty's Request for Judicial Notice    117 of 164

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

# Notes to the Consolidated Financial Statements continued
At 31 December 2017

## 5  BUSINESS COMBINATIONS CONTINUED
Other financial information with respect to acquired entities is as follows:

| Particulars | Al Zahra US$'000 | Others US$'000 | Total US$'000 |
|---|---|---|---|
| Revenue from the date of acquisition | 116,343 | 44,631 | 160,974 |
| Profit after tax from the date of acquisition | 30,226 | 1,538 | 31,764 |
| Revenue from 1 January to 31 December 2017 (unaudited) | 126,359 | 48,605 | 174,964 |
| Profit (loss) after tax from 1 January to 31 December 2017 (unaudited) | 32,014 | (6,501) | 25,513 |
| Trade receivables gross value as of acquisition date | 44,143 | 15,163 | 59,306 |
| Trade receivables fair value as of acquisition date | 44,143 | 15,163 | 59,306 |

### ACQUISITION OF AL ZAHRA HOSPITAL ("AL ZAHRA")
On 14 December 2016, the Group agreed to acquire a 100% controlling stake in the voting shares of Al Zahra, UAE providing both in-patient and outpatient service to the highest standards, supported by state of art facilities. Al Zahra is one of the largest full service multi-specialty hospitals in the UAE in Sharjah and Northern Emirates. The hospital has 137 active in patients beds and a capacity of 154 beds (expandable to at least 200 beds), treating approximately 400,000 outpatients and 23,000 in patients bed days per year. It has strong relationships with a number of major insurance providers in Sharjah with approximately 85% of outpatients referred through the insurance channel.

The total purchase consideration was US$562,851,000. There were no deferred and contingent consideration payable.

NMC acquired control of Al Zahra on 13 February 2017, date on which all conditions precedent were completed, meaning that control has passed to the Group. For convenience, the closest available balance sheet date has been used for the purposes of measuring net assets acquired. This date is 31 January 2017, with full consolidation commencing on 1 February 2017. We are not aware of any material transactions in the period between 01 February 2017 and 13 February 2017.

The consolidated financial statements include the results of Al Zahra for 11 months period.

The goodwill recognised is attributable to the expected synergies and other benefits from combining the assets and activities of Al Zahra with those of the Group. It comprises all of the intangibles that cannot be individually recognised such as the assembled workforce, the customer service, future client relationships, the presence in geographic markets, the synergies that Al Zahra & NMC will obtain. Goodwill is allocated to the healthcare segment. None of the recognised goodwill is expected to be deductible for income tax purposes as there is no corporation tax in the UAE.

At the date of acquisition, the fair value of identifiable tangible assets included Building of US$86,500,000, land of US$13,500,000 and intangible assets included brands amounting to US$545,000 and software amounting to US$459,000.

No acquisition date contingent liabilities requiring full recognition have been noted as yet.

### OTHER ACQUISITIONS
In the Sultanate of Oman, the Group acquired a general hospital and a private clinic
* The Group agreed to acquire the Healthcare Business and assets of Atlas Healthcare on 05 December 2016. Atlas Healthcare is one of the leading providers of comprehensive healthcare services in Al Ruwi and Al Ghoubra a suburb of Muscat, the capital city of the Sultanate of Oman. Regulatory approvals and legal formalities Completed on 02 January 2017, meaning that control has passed to the Group. For convenience, the closest available balance sheet date i.e. 01 January 2017 has been used for the purposes of measuring net assets acquired. The total purchase consideration was US$28,259,000. There were no deferred and contingent consideration payable.

The Group also agreed to acquire the Healthcare Business and assets of Bin Said, a private clinic on 04 October 2016 in Muscat. Regulatory approvals and legal formalities Completed on 01 January 2017, meaning that control has passed to the Group. The total purchase consideration of US$885,000 includes consideration paid of US$19,000 and consideration paid advance of US$797,000 in 2016.

In the kingdom of Saudi Arabia, the Group acquired a general hospital
* In the Kingdom of Saudi Arabia, the Group agreed to acquire a 70% controlling stake in the voting shares of As Salama Hospital LLC ("ASH") on 28 August 2016, an unlisted private general hospital which exists to serve the healthcare needs of all people in Al-Khobar by providing acute and long-term care. ASH is the fifth largest hospital in the Eastern province of Saudi Arabia and account for 10% of market share. Regulatory approvals and legal formalities were completed on 02 January 2017, meaning that control has passed to the Group. For convenience, the closest available balance sheet date i.e. 01 January 2017 has been used for the purposes of measuring net assets acquired. At the date of acquisition, the fair value of identifiable intangible assets included brands amounting to US$5,000,000 and Private contracts of US$7,400,000. The total purchase consideration of US$29,195,000 includes consideration paid of US$26,395,000 and deferred consideration payable of US$2,800,000 in 2018. This is due in 2018 and is included in other payables in the consolidated statement of financial position (Note 30).

Exhibit 5 to B.R. Shetty's Request for Judicial Notice          118 of 164          Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

**5  BUSINESS COMBINATIONS** CONTINUED
**OTHER ACQUISITIONS** CONTINUED

• The Group agreed to acquire 60% controlling stake in the Al Qadi hospital located in the southern Saudi Arabia city of Najran houses 100 beds with adjacent land for future growth on 25 September 2017. Regulatory approvals and legal formalities Completed on 15 December 2017, meaning that control has passed to the Group. For convenience, the closest available balance sheet date i.e. 31 December 2017 has been used for the purposes of measuring net assets acquired. The hospital-initiated outpatient operations in late 2016 and commenced inpatient services in Q1 2017. The facility boasts state of the art clinical equipment and is well positioned to provide tertiary care services to this area of Saudi Arabia. At the date of acquisition, the fair value of identifiable intangible assets included Private contracts amounting to US$3,774,000. The total purchase consideration was US$16,432,000. There were no deferred and contingent consideration payable.

In Spain, the Group acquired an IVF clinic
• The Group agreed to acquire 80% controlling stake in Fecunmed IVF clinic located in Spain on 15 December 2017, meaning that control has passed to the Group. For convenience, the closest available balance sheet date i.e. 31 December 2017 has been used for the purposes of measuring net assets acquired. Fecunmed is a private clinic specialised in the diagnosis and treatment of sterility and infertility based in Spain. The total purchase consideration of US$2,521,000 includes consideration paid of US$1,817,000 and contingent consideration payable of US$704,000 on attainment of revenue targets in 2018. This is due in 2018 and is included in other payables in the consolidated statement of financial position (Note 36).

The Group acquired 100% controlling stake in Hamad Drug Store LLC ("HDS") located in Sharjah Emirate of United Arab Emirates on 31 August 2017, meaning that control has passed to the Group. The total purchase consideration was US$817,000. There were no deferred and contingent consideration payable.

The fair value of the identifiable assets and liabilities of entities acquired in previous year at the dates of acquisition were as follows:

| Particulars | Fakih IVF US$'000 | Others US$'000 | Total US$'000 |
|---|---|---|---|
| **Assets** | | | |
| Intangible assets | 25,324 | 150 | 25,474 |
| Property and equipment | 4,309 | 3,176 | 7,485 |
| Inventories | 613 | 356 | 969 |
| Accounts receivable | 8,579 | 4,685 | 13,264 |
| Other receivables | 41,436 | 910 | 42,346 |
| Deferred tax asset | – | 48 | 48 |
| Cash and bank balances | 3,395 | 1,478 | 4,873 |
| | 83,656 | 10,803 | 94,459 |
| **Liabilities** | | | |
| Borrowings | – | 855 | 855 |
| Accounts payable | 4,788 | 3,844 | 8,632 |
| Other payable | 43,001 | 903 | 43,904 |
| Tax payable | – | 249 | 249 |
| | 47,789 | 5,851 | 53,640 |
| Total identified net assets at fair value | 35,867 | 4,952 | 40,819 |
| Non -controlling interest | (17,575) | (949) | (18,524) |
| Goodwill arising on acquisition | 186,616 | 47,290 | 233,906 |
| Purchase consideration | 204,908 | 51,293 | 256,201 |
| **Purchase consideration:** | | | |
| Payable in cash | 190,446 | 45,443 | 235,889 |
| Contingent consideration | 8,128 | 1,514 | 9,642 |
| Deferred consideration | 7,051 | 4,336 | 11,387 |
| Fair value measurement | (717) | – | (717) |
| Total consideration | 204,908 | 51,293 | 256,201 |

Exhibit 5 to B.R. Shetty's Request for Judicial Notice    119 of 164    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

## Notes to the Consolidated Financial Statements continued
At 31 December 2017

### 5  BUSINESS COMBINATIONS CONTINUED
### UNDER OTHERS ACQUISITIONS:

Purchase price allocation for Copenhagen Fertility Centre ("CFC") and Huntington Centro De Medina Reproductiva S/A ("HCMR") were provisional as of 31 December 2016 and have been completed during the year. Purchase price allocation of CFC remain same, however updated for HCMR.

- HCMR Brand amounting to US$3,824,000 and private contracts amounting to US$1,818,000 have been recognised. Corresponding credit has been recognised in goodwill of US$2,376,000 deferred tax liability of US$1,359,000, NCI of US$1,631,000 and exchange gain of US$276,000.
- CFC goodwill amounting to US$1,683,000 has been recognised and correspondingly credit to equity.

Analysis of cash flows for acquisitions done in previous year disclosed in 2016 consolidated financial statements was as follows:

| Particulars | Fakih IVF US$'000 | Others US$'000 | Total US$'000 |
|---|---|---|---|
| Cash paid | (190,446) | (45,443) | (235,889) |
| Deferred consideration paid | (3,410) | (1,902) | (5,312) |
| Net cash acquired with the subsidiaries | 3,395 | 1,478 | 4,873 |
| Transaction costs | – | (1,259) | (1,259) |
| Net cash flow on acquisition | (190,461) | (47,126) | (237,587) |

During the year deferred consideration amounting to US$4,356,000 in respect of Fakih IVF and Nadia has been paid.

Other financial information with respect to entities acquired in previous year disclosed in 2016 consolidated financial statements was as follows:

| Particulars | Fakih IVF US$'000 | Others US$'000 | Total US$'000 |
|---|---|---|---|
| Revenue from the date of acquisition | 65,171 | 19,881 | 85,052 |
| Profit after tax from the date of acquisition | 35,293 | 5,039 | 40,332 |
| Revenue from 1 January to 31 December 2016 (unaudited) | 70,600 | 32,817 | 103,417 |
| Profit after tax from 1 January to 31 December 2016 (unaudited) | 38,101 | 5,837 | 43,938 |
| Trade receivables gross value as of acquisition date | 8,579 | 4,929 | 13,508 |
| Trade receivables fair value as of acquisition date | 8,579 | 4,685 | 13,264 |

### ADVANCES PAID FOR ACQUISITIONS
As of the reporting date, certain acquisitions are in progress for which the Group has paid an advance of US$nil (2016: US$1,614,000).

### 6  MATERIAL PARTLY-OWNED SUBSIDARIES
The financial information in respect of subsidiaries that have material non-controlling interests is provided below:

### PROPORTION OF EQUITY INTEREST HELD BY NMC:

| | | Percentage of holdings | |
|---|---|---|---|
| | Country of Incorporation | 31 December 2017 | 31 December 2016 |
| Indirect subsidiaries: | | | |
| Luarmia SL | Spain | 88.4%* | 88.4%* |
| Fakih | UAE | 51% | 51% |

*Shareholding disclosed is for Luarmia SL only. Within Luarmia SL there are certain other subsidiaries. The financial information provided below is for Luarmia SL and its subsidiaries.

### ACCUMULATED BALANCES OF MATERIAL NON-CONTROLLING INTEREST:

| | 2017 US$'000 | 2016 US$'000 |
|---|---|---|
| Luarmia SL | 11,113 | 5,836 |
| Fakih IVF LLC | 33,902 | 34,160 |

Exhibit 5 to B.R. Shetty's Request for Judicial Notice          120 of 164          Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

**6   MATERIAL PARTLY-OWNED SUBSIDARIES** CONTINUED
**PROFIT ALLOCATED TO MATERIAL NON-CONTROLLING INTEREST:**

| | 2017 US$'000 | 2016 US$'000 |
|---|---|---|
| Luarmia SL | 4,180 | 1,251 |
| Fakih IVF LLC | 19,580 | 16,586 |

The summarised financial information of these subsidiaries is provided below. This information is stated before inter-company eliminations.

| Summarised statement of profit or loss for 2017: | Luarmia US$'000 | Fakih US$'000 |
|---|---|---|
| Revenue | 84,414 | 74,146 |
| Direct cost | (37,870) | (21,154) |
| Administrative and other expenses | (25,278) | (10,366) |
| Depreciation and amortisation | (7,272) | (2,666) |
| Profit before tax | 13,994 | 39,960 |
| Income tax | (918) | – |
| Profit for the year | 13,076 | 39,960 |
| Other comprehensive Income | 15,325 | – |
| Total comprehensive income | 28,401 | 39,960 |
| Attributable to non-controlling interests | 4,180 | 19,580 |

| Summarised statement of profit or loss for 2016: | Luarmia US$'000 | Fakih US$'000 |
|---|---|---|
| Revenue | 66,078 | 65,171 |
| Direct cost | (23,597) | (19,469) |
| Administrative and other expenses | (26,812) | (8,831) |
| Depreciation and amortisation | (6,000) | (3,022) |
| Profit before tax | 9,669 | 33,849 |
| Income tax | (174) | – |
| Profit for the year | 9,495 | 33,849 |
| Other comprehensive loss | (3,955) | – |
| Total comprehensive income | 5,540 | 33,849 |
| Attributable to non-controlling interests | 1,251 | 16,586 |

| Summarised statement of financial position as at 31 December 2017 | Luarmia US$'000 | Fakih US$'000 |
|---|---|---|
| Inventories and cash and bank balance (current) | 20,370 | 10,459 |
| Account receivable and prepayment (current) | 14,564 | 37,848 |
| Property and equipment and other non-current assets (non-current) | 145,189 | 70,868 |
| Accounts payable and accruals (current) | (14,583) | (11,075) |
| Interest-bearing loans (current) | (17,263) | – |
| Interest-bearing loans and deferred tax liabilities (non- current) | (36,538) | – |
| Other payable (non-current) | (20,913) | (38,911) |
| Total Equity | 90,826 | 69,189 |
| Attributable to: | – | – |
| Equity holders of parent | 79,713 | 35,287 |
| Non-controlling interest | 11,113 | 33,902 |

Exhibit 5 to B.R. Shetty's Request for Judicial Notice    121 of 164    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

## Notes to the Consolidated Financial Statements continued
At 31 December 2017

### 6  MATERIAL PARTLY-OWNED SUBSIDARIES CONTINUED
#### PROFIT ALLOCATED TO MATERIAL NON-CONTROLLING INTEREST CONTINUED

| Summarised statement of financial position as at 31 December 2016 | Luarmia US$'000 | Fakih US$'000 |
|---|---|---|
| Inventories and cash and bank balance (current) | 17,449 | 13,861 |
| Account receivable and prepayment (current) | 8,934 | 31,615 |
| Property, plant and equipment and other non-current assets (non-current) | 135,570 | 68,454 |
| Accounts payable and accruals (current) | (17,682) | (5,113) |
| Interest-bearing loans (current) | (10,704) | - |
| Interest-bearing loans and deferred tax liabilities (non-current) | (36,592) | - |
| Other payable (non- current) | (20,450) | (39,102) |
| Total Equity | 76,525 | 69,715 |
| Attributable to: | | |
| Equity holders of parent | 70,689 | 35,555 |
| Non-controlling interest | 5,836 | 34,160 |

| Summarised cash flow information for year ended 31 December 2017 | Luarmia US$'000 | Fakih US$'000 |
|---|---|---|
| Operating | 13,631 | 35,084 |
| Investing | (4,739) | (5,079) |
| Financing | (10,408) | (33,365) |
| Net decrease in cash and cash equivalents | (1,516) | (3,360) |

| Summarised cash flow information for year ended 31 December 2016 | Luarmia US$'000 | Fakih US$'000 |
|---|---|---|
| Operating | 15,593 | 15,003 |
| Investing | (26,607) | (4,914) |
| Financing | 10,398 | - |
| Net (decrease)/Increase in cash and cash equivalents | (616) | 10,089 |

### 7  SEGMENT INFORMATION

For management purposes, the Group is organised into business units based on their products and services and has two reportable segments as follows:

- The healthcare segment is engaged in providing professional medical services, comprising diagnostic services, in and outpatient clinics, provision of all types of research and medical services in the field of gynaecology, obstetrics and human reproduction and retailing of pharmaceutical goods. It also includes the provision of management services in respect of a hospital.
- The distribution & services segment is engaged in wholesale trading of pharmaceutical goods, medical equipment, cosmetics and food.

No operating segments have been aggregated to form the above reportable operating segments.

The new acquired companies, Al Zahra, As Salama, Al Qadi, Atlas, Bin Said and Fecunmed come under the healthcare segment.

Management monitors the operating results of its business units separately for the purpose of making decisions about resource allocation and performance assessment. Segment performance is evaluated based on EBITDA and profit or loss. These are measured consistently with EBITDA and profit or loss excluding finance income and group administrative expenses, unallocated depreciation and unallocated other income, in the consolidated financial statements.

Finance costs and finance income relating to UAE subsidiaries are not allocated to individual segments as they are managed on a group basis. In addition Group overheads are also not allocated to individual segments as these are managed on a Group basis.

Transfer prices between operating segments are on an arm's length basis in a manner similar to transactions with third parties.

The following tables present revenue and profit and certain asset and liability information regarding the Group's business segments for the years ended 31 December 2017 and 2016.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice      122 of 164      Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

## 7 SEGMENT INFORMATION CONTINUED

| | Healthcare US$'000 | Distribution and services US$'000 | Total segments US$'000 | Adjustments and eliminations US$'000 | Consolidated US$'000 |
|---|---|---|---|---|---|
| **Year ended 31 December 2017** | | | | | |
| **Revenue** | | | | | |
| External customers | 1,146,243 | 457,153 | 1,603,396 | – | 1,603,396 |
| Inter segment | 15,374 | 29,601 | 44,975 | (44,975) | – |
| Total | 1,161,617 | 486,754 | 1,648,371 | (44,975) | 1,603,396 |
| **(Expenses)/Income** | | | | | |
| Depreciation and amortisation | (58,143) | (3,526) | (61,669) | (9,214) | (70,883) |
| Finance costs | (8,692) | (7) | (8,699) | (55,093) | (63,792) |
| Segment EBITDA | 355,401 | 51,549 | 406,950 | (53,563) | 353,387 |
| Segment profit | 287,827 | 48,016 | 335,843 | (126,662) | 209,181 |
| Segment assets | 2,270,559 | 296,445 | 2,567,004 | 372,004 | 2,939,008 |
| Segment liabilities | 343,258 | 97,703 | 440,961 | 1,353,421 | 1,794,382 |
| **Other disclosures** | | | | | |
| Capital expenditure | 58,214 | 5,105 | 63,319 | 1,542 | 64,861 |
| **Year ended 31 December 2016** | | | | | |
| **Revenue** | | | | | |
| External customers | 816,314 | 404,521 | 1,220,835 | – | 1,220,835 |
| Inter segment | 7,001 | 27,406 | 34,407 | (34,407) | – |
| Total | 823,315 | 431,927 | 1,255,242 | (34,407) | 1,220,835 |
| **(Expenses)/Income** | | | | | |
| Depreciation and amortisation | (43,320) | (3,248) | (46,568) | (9,431) | (55,999) |
| Finance costs | (5,834) | (9) | (5,843) | (35,841) | (41,684) |
| Segment EBITDA | 241,115 | 47,113 | 288,228 | (42,147) | 246,081 |
| Segment profit | 192,932 | 43,565 | 236,497 | (85,095) | 151,402 |
| Segment assets | 1,454,767 | 265,194 | 1,719,961 | 597,032 | 2,316,993 |
| Segment liabilities | 256,613 | 72,405 | 329,018 | 1,039,104 | 1,368,122 |
| **Other disclosures** | | | | | |
| Capital expenditure | 61,483 | 4,171 | 65,654 | 1,751 | 67,405 |

Inter-segment revenues are eliminated upon consolidation and reflected in the 'adjustments and eliminations' column. All other adjustments and eliminations are part of detailed reconciliations presented further below.

### ADJUSTMENTS AND ELIMINATIONS

Finance income and group overheads are not allocated to individual segments as they are managed on a group basis.

Term loans, bank overdraft and other short term borrowings and certain other assets and liabilities are not allocated to segments as they are also managed on a group basis.

Capital expenditure consists of additions to property and equipment and intangible assets.

### RECONCILIATION OF SEGMENT EBITDA TO GROUP PROFIT

| | 2017 US$'000 | 2016 US$'000 |
|---|---|---|
| Segment EBITDA | 406,950 | 288,228 |
| Unallocated group administrative expenses | (54,400) | (42,202) |
| Unallocated other income | 837 | 55 |
| Unallocated finance income | 7,487 | 9,157 |
| Unallocated unamortised finance fees written off | (6,794) | - |
| Finance costs | (63,792) | (41,684) |
| Depreciation | (58,107) | (45,010) |
| Amortisation | (12,776) | (10,989) |
| Impairment of assets | (3,010) | (1,376) |
| Transaction costs related to business combination | (5,969) | (4,603) |
| Tax | (1,245) | (174) |
| Group Profit | 209,181 | 151,402 |

Exhibit 5 to B.R. Shetty's Request for Judicial Notice    123 of 164    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

## Notes to the Consolidated Financial Statements continued
At 31 December 2017

**7  SEGMENT INFORMATION** CONTINUED

**RECONCILIATION OF SEGMENT PROFIT TO GROUP PROFIT**

|  | 2017 US$'000 | 2016 US$'000 |
|---|---|---|
| Segment profit | 335,843 | 236,497 |
| Unallocated finance income | 2,036 | 6,699 |
| Unallocated finance costs | (55,093) | (35,841) |
| Unallocated group administrative expenses | (54,400) | (42,202) |
| Unallocated unamortised finance fees written off | (6,794) | – |
| Unallocated depreciation | (1,090) | (1,034) |
| Unallocated other income | 837 | 55 |
| Unallocated amortisation cost | (8,123) | (8,398) |
| Unallocated impairment of assets | (3,010) | (1,030) |
| Unallocated transaction cost | (1,025) | (3,344) |
| Group Profit | 209,181 | 151,402 |

**RECONCILIATION OF GROUP ASSETS**

|  | 2017 US$'000 | 2016 US$'000 |
|---|---|---|
| Segment assets | 2,567,004 | 1,719,961 |
| Unallocated property and equipment | 7,995 | 10,710 |
| Unallocated inventory | 215 | 22 |
| Unallocated accounts receivable and prepayments | 16,553 | 8,656 |
| Unallocated bank balances and cash | 161,028 | 436,949 |
| Unallocated bank deposits | 184,430 | 137,869 |
| Unallocated intangible assets | 1,783 | 2,826 |
| Group assets | 2,939,008 | 2,316,993 |

**RECONCILIATION OF GROUP LIABILITIES**

|  | 2017 US$'000 | 2016 US$'000 |
|---|---|---|
| Segment liabilities | 440,961 | 329,018 |
| Unallocated term loans | 1,105,524 | 782,624 |
| Unallocated employees' end of service benefits | 4,706 | 2,608 |
| Unallocated accounts payable and accruals | 9,109 | 8,281 |
| Unallocated bank overdraft and other short term borrowings | 207,034 | 219,851 |
| Unallocated amounts due to related parties | 1,029 | 488 |
| Unallocated option redemption liability | 26,019 | 25,252 |
| Group liabilities | 1,794,382 | 1,368,122 |

**OTHER INFORMATION**

The following table provides information relating to Group's major customers who contribute more than 10% towards the Group's revenues:

|  | Healthcare US$'000 | Distribution and services US$'000 | Total US$'000 |
|---|---|---|---|
| **Year ended 31 December 2017** |  |  |  |
| Customer 1 | 442,070 | – | 442,070 |
|  | 442,070 | – | 442,070 |
| **Year ended 31 December 2016** |  |  |  |
| Customer 1 | 324,285 | – | 324,285 |
|  | 324,285 | – | 324,285 |

Exhibit 5 to B.R. Shetty's Request for Judicial Notice          124 of 164          Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

## 7  SEGMENT INFORMATION CONTINUED
### GEOGRAPHICAL INFORMATION

| | 2017 US$'000 | 2016 US$'000 |
|---|---:|---:|
| **Revenue from external customers** | | |
| United Arab Emirates | 1,474,344 | 1,154,757 |
| Spain | 46,684 | 55,361 |
| Others | 82,368 | 10,717 |
| Total revenue as per consolidated income statement | 1,603,396 | 1,220,835 |
| | | |
| **Non-current assets** | | |
| United Arab Emirates | 1,528,083 | 974,522 |
| Spain | 201,456 | 193,706 |
| Others | 80,965 | 858 |
| Total non-current assets | 1,810,504 | 1,169,086 |
| | | |
| **Deferred tax assets** | | |
| United Arab Emirates | – | – |
| Spain | 2,877 | 2,122 |
| Others - 2016 | 541 | 13 |
| Total Deferred tax assets | 3,418 | 2,135 |

### ANALYSIS OF REVENUE BY CATEGORY

| | 2017 US$'000 | 2016 US$'000 |
|---|---:|---:|
| **Revenue from services:** | | |
| Healthcare - clinic | 999,678 | 720,051 |
| Healthcare - management fees | 13,016 | 10,135 |
| | 1,012,694 | 730,186 |
| | | |
| **Sale of goods:** | | |
| Distribution | 457,153 | 404,521 |
| Healthcare | 133,549 | 86,128 |
| | 590,702 | 490,649 |
| Total | 1,603,396 | 1,220,835 |

## 8  EXPENSES BY NATURE

| | 2017 US$'000 | 2016 US$'000 |
|---|---:|---:|
| Cost of inventories recognised as an expense | 571,953 | 457,276 |
| Salary expenses | 499,768 | 371,075 |
| Rent expenses | 76,168 | 65,549 |
| Sales promotion expenses | 61,349 | 50,695 |
| Repair and maintenance expenses | 19,840 | 13,408 |
| Electricity expenses | 10,246 | 6,652 |
| Legal & licence fees | 9,355 | 8,134 |
| Insurance expenses | 9,087 | 8,338 |
| Motor vehicle expenses | 5,093 | 3,773 |
| Professional fees expenses | 4,931 | 1,585 |
| Communication expenses | 4,147 | 3,724 |
| Printing and stationery | 3,514 | 3,169 |
| IT expenses | 2,472 | 1,656 |
| Others | 25,289 | 26,186 |
| | 1,303,212 | 1,021,220 |
| Allocated to : | | |
| Direct costs | 968,044 | 753,325 |
| General and administrative expenses | 335,168 | 267,895 |
| | 1,303,212 | 1,021,220 |

Exhibit 5 to B.R. Shetty's Request for Judicial Notice      125 of 164

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

## Notes to the Consolidated Financial Statements continued
At 31 December 2017

**8  EXPENSES BY NATURE** CONTINUED

The classifications of the remaining expenses by nature recognised in the consolidated income statement are:

|  | 2017 US$'000 | 2016 US$'000 |
|---|---|---|
| Transaction costs in respect of business combinations | 5,969 | 4,603 |
| Depreciation | 58,107 | 45,010 |
| Amortisation | 12,776 | 10,989 |
| Finance costs | 63,792 | 41,684 |
| Impairment of assets | 3,010 | 1,376 |
| Unamortised finance fees written off | 6,794 | – |
| | 150,448 | 103,662 |

**9  OTHER INCOME**

Other income includes US$47,106,000 (2016:US$43,644,000) relating to reimbursement of advertisement and promotional expenses incurred by the Group. Revenue is recognised following the formal acceptance of the Group's reimbursement claims by suppliers and is measured at the confirmed amount receivable.

**10  FINANCE COSTS**

|  | 2017 US$'000 | 2016 US$'000 |
|---|---|---|
| Bank interest | 53,142 | 31,648 |
| Bank charges | 3,866 | 3,594 |
| Financial instruments fair value adjustments | 4,772 | 4,282 |
| Amortisation and Re-measurement of option redemption liability (note 37) | 2,012 | 2,160 |
| | 63,792 | 41,684 |

**11  FINANCE INCOME**

|  | 2017 US$'000 | 2016 US$'000 |
|---|---|---|
| Bank and other interest income | 2,067 | 1,418 |
| Financial instruments fair value adjustments | 5,420 | 7,739 |
| | 7,487 | 9,157 |

**12  PROFIT FOR THE YEAR BEFORE TAX**

The profit for the year before tax is stated after charging:

|  | 2017 US$'000 | 2016 US$'000 |
|---|---|---|
| Cost of inventories recognised as an expense | 571,953 | 457,276 |
| Cost of inventories written off and provided (note 20) | 2,346 | 1,869 |
| Minimum lease payments recognised as operating lease expense | 76,168 | 65,549 |
| Depreciation (note 17) | 58,107 | 45,010 |
| Amortisation (note 18) | 12,776 | 10,989 |
| Net Impairment of accounts receivable (note 21) | 7,956 | 2,957 |
| Employees' end of service benefits (note 28) | 11,106 | 7,246 |
| Net foreign exchange (gain)/loss | (550) | 490 |
| Loss on disposal of property and equipment | 190 | 31 |
| Share based payments expense (note 32) | 9,181 | 2,640 |

Exhibit 5 to B.R. Shetty's Request for Judicial Notice        126 of 164        Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

**13  AUDITOR'S REMUNERATION**

The Group paid the following amounts to its auditor and its associates in respect of the audit of the financial statements and for other services provided to the Group.

| | 2017 US$'000 | 2016 US$'000 |
|---|---|---|
| Fees payable to the Company's auditor for the audit of the Company's annual accounts | 1,008 | 984 |
| Fees payable to the Company's auditor and its associates for other services: | | |
| - the audit of the company's subsidiaries pursuant to legislation | 902 | 727 |
| - audit related assurance services | 258 | 198 |
| - other assurance services | - | 11 |
| - Tax compliances services | - | - |
| - Tax advisory services | - | - |
| - non audit services | 891 | 1,960 |
| | 3,059 | 3,880 |

The fees paid to the auditor includes US$100,000 (2016: US$61,000) in respect of out of pocket expenses. There were no benefits in kind provided to the auditor or its associates in either 2017 or 2016.

Non-audit services in 2016 relate to a Class 1 transaction (significant acquisition) combined with an equity placement and are non-recurring in nature. This includes Reporting Accountants Report on the Historical financial information of the acquired company as well as working capital and Pro-forma financial information report, issuing of Comfort and Consent Letters and the Bring down Public Report.

**14  STAFF COSTS AND DIRECTORS' EMOLUMENTS**
**(A) STAFF COSTS**

| | 2017 US$'000 | 2016 US$'000 |
|---|---|---|
| Wages and salaries | 445,181 | 340,910 |
| Employees' end of service benefits (note 28) | 11,106 | 7,246 |
| Share based payments expense (note 32) | 9,181 | 2,640 |
| Staff medical expense | 8,865 | 2,120 |
| Staff recruitment expense | 6,975 | 4,367 |
| Others | 18,460 | 13,792 |
| | 499,768 | 371,075 |

Staff costs include amounts paid to directors, disclosed in part (b) below. The average number of monthly employees during the year was made up as follows:

| | 2017 | 2016 |
|---|---|---|
| Healthcare | 11,215 | 8,443 |
| Distribution & services | 2,170 | 2,089 |
| Administration | 287 | 289 |
| | 13,672 | 10,821 |

**(B) DIRECTORS' REMUNERATION**

| | 2017 US$'000 | 2016 US$'000 |
|---|---|---|
| Directors' remuneration | 11,546 | 7,166 |

Some of the executive directors are entitled to end of service benefits and to participate in share option plans as disclosed in note 32. Further information in respect of this compensation paid to directors is disclosed in the Directors' Remuneration Report.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice        127 of 164

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

## Notes to the Consolidated Financial Statements continued
At 31 December 2017

### 15 TAX

The Group operates in the United Arab Emirates and Spain and certain other countries. As there is no corporation tax in the United Arab Emirates, no taxes are recognised or payable on the operations in the UAE. There is no taxable income in the UK accordingly there is no tax liability arising in the UK. The unused tax losses amount to US$46,549,000 as at 31 December 2017 (2016: US$25,549,000).

With respect to Group operations in Europe and South America the tax disclosures are as follows:

| Consolidated income statement | 2017 US$'000 | 2016 US$'000 |
|---|---|---|
| **Current income tax:** | | |
| Charge for the year | 3,606 | 2,305 |
| Adjustment in respect of charge for the year | – | (5) |
| | 3,606 | 2,300 |
| **Deferred tax:** | | |
| Charge on profit origination and reversal of temporary differences in the current year | (2,361) | (2,126) |
| Income tax charge reported in the income statement | 1,245 | 174 |

Reconciliation of tax expense and the accounting profit multiplied by the Spanish domestic tax rate of 25% (2016: 25%) is represented below:

| | 2017 US$'000 | 2016 US$'000 |
|---|---|---|
| Group accounting profit before tax from continuing operations for the year | 210,426 | 151,575 |
| Less: Accounting profit before tax from continuing operations (not subject to tax) | 192,659 | 139,594 |
| Accounting profit before tax from continuing operations (subject to tax) | 17,767 | 11,981 |
| Tax at the rate of 24.9% (2016: 25%) | 4,416 | 2,995 |
| Non-taxable dividend income | (1,880) | (1,774) |
| Tax saved on amortisation of intangibles | (591) | (1,198) |
| Adjustment in respect of prior period income tax | – | (5) |
| Different tax rates on overseas earnings | (87) | 233 |
| Expenses not deductible for tax purposes and other permanent differences | – | 72 |
| **Deductible expenses for tax purpose:** | | |
| R&D and IT | (543) | (382) |
| Other deductible expenses | (70) | 233 |
| Income tax charged reported in the income statement | 1,245 | 174 |

The effective tax rate of the Group is 0.59% (2016: 0.11%).

### DEFERRED TAX ASSETS AND LIABILITIES COMPRISE OF:
Deferred tax assets:

| | 2017 US$'000 | 2016 US$'000 |
|---|---|---|
| Tax credit for R&D expenses | 1,226 | 1,126 |
| Limit on tax deductibility of depreciation and amortisation | 2,192 | 1,009 |
| Total deferred tax assets | 3,418 | 2,135 |

Deferred tax liabilities:

| | 2017 US$'000 | 2016 US$'000 |
|---|---|---|
| Depreciation and amortisation | 9,693 | 8,245 |
| Total deferred tax liabilities | 9,693 | 8,245 |

Exhibit 5 to B.R. Shetty's Request for Judicial Notice        128 of 164        Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

**15 TAX** CONTINUED

**DEFERRED TAX ASSETS AND LIABILITIES COMPRISE OF:** CONTINUED

| Reconciliation of deferred tax liabilities, net | 2017 US$'000 | 2016 US$'000 |
|---|---|---|
| As of 1 January | 6,110 | 8,445 |
| Tax (credit) for the year | (2,361) | (2,127) |
| Adjustment to prior year business combination (note 5) | 1,359 | – |
| Foreign exchange adjustments | 1,167 | (208) |
| As at 31 December | 6,275 | 6,110 |

Deferred tax assets are recognised to the extent that it is probable as supported by forecasts that future taxable profits will be available against which the temporary differences can be utilised.

**16 EARNINGS PER SHARE (EPS)**

Basic EPS amounts are calculated by dividing net profit for the year attributable to ordinary equity holders of the Parent Company by the weighted average number of ordinary shares outstanding during the year.

Diluted EPS amounts are calculated by dividing the profit attributable to ordinary equity holders of the parent by the weighted average number of ordinary shares outstanding during the year plus the weighted average number of ordinary shares that would be issued on conversion of all the dilutive potential ordinary shares into ordinary shares.

The following reflects the income and share data used in the basic and diluted earnings per share computations:

| | 2017 | 2016 |
|---|---|---|
| Profit attributable to equity holders of the Parent (US$'000) | 185,970 | 132,689 |
| Weighted average number of ordinary shares in issue ('000) for basic EPS | 204,302 | 186,627 |
| Effect of dilution from share based payments ('000) | 1,538 | 922 |
| Weighted average number of ordinary shares ('000) for diluted EPS | 205,840 | 187,549 |
| Basic earnings per share (US$) | 0.910 | 0.711 |
| Diluted earnings per share (US$) | 0.903 | 0.707 |

The table below reflects the income and share data used in the adjusted earnings per share computations. All one off expenses, transaction costs in respect of business combination, and amortisation of acquired intangible assets (net of tax) and impairment of assets, have been adjusted from the profit attributable to the equity holders of the parent to arrive at the adjusted earnings per share:

| | 2017 US$'000 | 2016 US$'000 |
|---|---|---|
| Profit attributable to equity holders of the Parent | 185,970 | 132,689 |
| Unamortised finance fees written off | 6,794 | – |
| Transaction costs in respect of business combination | 5,969 | 4,603 |
| Amortisation of acquired intangible assets (net of tax) | 11,606 | 7,819 |
| Impairment of assets | 3,010 | 1,376 |
| Adjusted profit attributable to equity holders of the Parent | 213,349 | 146,487 |
| Weighted average number of ordinary shares ('000) | 205,840 | 187,549 |
| Diluted adjusted earnings per share (US$) | 1.036 | 0.781 |

Adjusted profit for the year of the Group is calculated as follows:

| | 2017 US$'000 | 2016 US$'000 |
|---|---|---|
| Profit for the year | 209,181 | 151,402 |
| Unamortised finance fees written off | 6,794 | – |
| Transaction costs in respect of business combination | 5,969 | 4,603 |
| Amortisation of acquired intangible assets (net of tax) | 11,606 | 7,819 |
| Impairment of assets | 3,010 | 1,376 |
| Adjusted profit | 236,560 | 165,200 |

Exhibit 5 to B.R. Shetty's Request for Judicial Notice     129 of 164

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

## Notes to the Consolidated Financial Statements continued
At 31 December 2017

### 17  PROPERTY AND EQUIPMENT

Property and equipment consists of the following:

| | 2017 US$'000 | 2016 US$'000 |
|---|---|---|
| Property and equipment | 607,092 | 459,338 |
| | 607,092 | 459,338 |

| | Freehold land US$'000 | Hospital building US$'000 | Buildings US$'000 | Leasehold improve-ments US$'000 | Motor vehicles US$'000 | Furniture, fixtures fittings and medical equipment US$'000 | Capital work in progress US$'000 | Total US$'000 |
|---|---|---|---|---|---|---|---|---|
| **31 December 2017** | | | | | | | | |
| Cost: | | | | | | | | |
| At 1 January 2017 | 19,206 | 137,321 | 26,991 | 172,612 | 11,108 | 246,113 | 22,981 | 636,332 |
| Additions | – | 224 | 180 | 4,122 | 3,110 | 24,420 | 31,392 | 63,448 |
| Relating to acquisition of subsidiaries | 13,746 | 88,337 | – | 3,157 | 85 | 36,491 | 1,166 | 142,982 |
| Transfer from CWIP | – | 9,946 | – | 4,893 | – | 4,303 | (19,142) | – |
| Impairments | – | – | – | – | – | – | (1,010) | (1,010) |
| Exchange difference | – | (60) | – | – | – | 1,401 | 57 | 1,398 |
| Disposals | – | – | – | (108) | (545) | (710) | (57) | (1,420) |
| At 31 December 2017 | 32,952 | 235,768 | 27,171 | 184,676 | 13,758 | 312,018 | 35,387 | 841,730 |
| Depreciation: | | | | | | | | |
| At 1 January 2017 | – | 10,511 | 8,793 | 44,093 | 6,755 | 106,842 | – | 176,994 |
| Charge for the year | – | 5,110 | 1,076 | 18,811 | 1,581 | 31,529 | – | 58,107 |
| Exchange difference | – | (8) | – | – | – | 687 | – | 679 |
| Disposals | – | – | – | (45) | (511) | (586) | – | (1,142) |
| At 31 December 2017 | – | 15,613 | 9,869 | 62,859 | 7,825 | 138,472 | – | 234,638 |
| Net carrying amount: At 31 December 2017 | 32,952 | 220,155 | 17,302 | 121,817 | 5,933 | 173,546 | 35,387 | 607,092 |

| | Freehold land US$'000 | Hospital building US$'000 | Buildings US$'000 | Leasehold improve-ments US$'000 | Motor vehicles US$'000 | Furniture, fixtures fittings and medical equipment US$'000 | Capital work in progress US$'000 | Total US$'000 |
|---|---|---|---|---|---|---|---|---|
| **31 December 2016** | | | | | | | | |
| Cost: | | | | | | | | |
| At 1 January 2016 | 19,206 | 12,343 | 26,300 | 157,888 | 9,322 | 180,342 | 161,744 | 567,145 |
| Additions | – | 970 | – | 4,072 | 1,751 | 21,190 | 38,949 | 66,932 |
| Relating to acquisition of subsidiaries | – | – | – | 2,228 | 35 | 5,222 | – | 7,485 |
| Disposals | – | – | – | (498) | (370) | (2,239) | – | (3,107) |
| Transfer from CWIP | – | 124,046 | 691 | 9,000 | 370 | 41,915 | (176,022) | – |
| Reclassification | – | – | – | (78) | – | 78 | | – |
| Transfer to Intangible | – | – | – | – | – | – | (318) | (318) |
| Impairments | – | – | – | – | – | – | (1,376) | (1,376) |
| Exchange difference | – | (38) | – | – | – | (395) | 4 | (429) |
| At 31 December 2016 | 19,206 | 137,321 | 26,991 | 172,612 | 11,108 | 246,113 | 22,981 | 636,332 |
| Depreciation: | | | | | | | | |
| At 1 January 2016 | – | 8,424 | 7,339 | 26,784 | 5,779 | 85,295 | – | 133,621 |
| Charge for the year | – | 2,032 | 1,454 | 17,429 | 1,345 | 22,750 | – | 45,010 |
| Reclassification | – | – | – | (40) | – | 40 | – | – |
| Exchange difference | – | 55 | – | – | – | (190) | – | (135) |
| Relating to disposals | – | – | – | (80) | (369) | (1,053) | – | (1,502) |
| At 31 December 2016 | – | 10,511 | 8,793 | 44,093 | 6,755 | 106,842 | – | 176,994 |
| Net carrying amount: At 31 December 2016 | 19,206 | 126,810 | 18,198 | 128,519 | 4,353 | 139,271 | 22,981 | 459,338 |

As part of the Group's capital expenditure programme, borrowing costs of US$nil (2016: US$357,000) have been capitalised during the year. The rate used to determine the amount of borrowing costs eligible for capitalisation was NIL% (2016: 1.9%) which is the effective rate of the borrowings used to finance the capital expenditure. Companies in the UAE are not subject to taxation and as such there is no tax relief in respect of capitalised interest.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice          130 of 164          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

**17  PROPERTY AND EQUIPMENT** CONTINUED

Total capital expenditure during the year ended 31 December 2017 was US$63,448,000 (2016: US$66,932,000). Of the total capital expenditure spend during the year, US$31,392,000 (2016: US$38,949,000) related to new capital projects and US$32,056,000 (2016: US$27,983,000) related to further capital investment in our existing facilities.

Generally hospital and distribution operations are carried out on land and buildings which are leased from Government authorities or certain private parties. The majority of the lease periods range from five to twenty seven years apart from New Medical Centre Hospital LLC-Dubai ("Dubai General Hospital"), and the warehouse facilities which have leases renewable on an annual basis (note 2.3). As at 31 December 2017 US$569,000 (2016: US$801,000) of the amounts included in property and equipment related to assets with annually renewable leases.

In accordance with the local laws, except in some specific locations in the UAE the registered title of land and buildings must be held in the name of a UAE national. As a result, land and buildings of the Group are legally registered in the name of shareholders or previous shareholders of the Group. Land with a carrying amount of US$4,144,000 (31 December 2016: US$4,144,000) is held in the name of a previous shareholder for the beneficial interest of the Group. As the beneficial interest of such land resides with the Group, these assets are recorded within land in the Group's consolidated financial statements. The directors take into account this local legal registration requirement, the Group's entitlement to the beneficial interest arising from these assets, as well as other general business factors, when considering whether such assets are impaired.

**18  INTANGIBLE ASSETS**

| | Software US$'000 | Brands US$'000 | Patient relationship and Database US$'000 | Goodwill US$'000 | Others US$'000 | Total US$'000 |
|---|---|---|---|---|---|---|
| **31 December 2017** | | | | | | |
| Cost: | | | | | | |
| At 1 January 2017 | 7,723 | 64,713 | 19,282 | 567,338 | 10,169 | 669,225 |
| Additions | 1,413 | – | – | – | – | 1,413 |
| Relating to acquisition of subsidiaries | 547 | 5,588 | – | 471,573 | 11,183 | 488,891 |
| Reclassification | – | (5,056) | 5,056 | – | – | – |
| Adjustment to prior year business Combinations (Note 5) | – | 3,824 | | (693) | 1,818 | 4,949 |
| Exchange difference | 276 | 3,965 | 1,269 | 19,547 | 1,231 | 26,288 |
| At 31 December 2017 | 9,959 | 73,034 | 25,607 | 1,057,765 | 24,401 | 1,190,766 |
| Amortisation: | | | | | | |
| At 1 January 2017 | 1,858 | 6,202 | 3,951 | – | 4,231 | 16,242 |
| Charge for the year | 1,044 | 5,353 | 2,698 | – | 3,681 | 12,776 |
| Impairment | 2,000 | – | – | – | – | 2,000 |
| Exchange difference | 48 | 2,183 | – | – | 613 | 2,844 |
| At 31 December 2017 | 4,950 | 13,738 | 6,649 | – | 8,525 | 33,862 |
| Net carrying amount: At 31 December 2017 | 5,009 | 59,296 | 18,958 | 1,057,765 | 15,876 | 1,156,904 |

| | Software US$'000 | Brands US$'000 | Patient relationship and Database US$'000 | Goodwill US$'000 | Others US$'000 | Total US$'000 |
|---|---|---|---|---|---|---|
| **31 December 2016** | | | | | | |
| Cost: | | | | | | |
| At 1 January 2016 | 6,841 | 40,129 | 19,638 | 341,420 | 10,475 | 418,503 |
| Additions | 473 | – | – | – | – | 473 |
| Relating to acquisition of subsidiaries | 258 | 25,214 | – | 233,906 | 2 | 259,380 |
| Transfer from tangible | 318 | – | – | – | – | 318 |
| PPA Adjustment Dr. Sunny (note 5) | – | – | – | (2,126) | – | (2,126) |
| Exchange difference | (167) | (630) | (356) | (5,862) | (308) | (7,323) |
| At 31 December 2016 | 7,723 | 64,713 | 19,282 | 567,338 | 10,169 | 669,225 |
| Amortisation: | | | | | | |
| At 1 January 2016 | 1,078 | 1,588 | 1,270 | – | 1,508 | 5,444 |
| Charge for the year | 819 | 4,614 | 2,681 | – | 2,875 | 10,989 |
| Exchange difference | (39) | – | – | – | (152) | (191) |
| At 31 December 2016 | 1,858 | 6,202 | 3,951 | – | 4,231 | 16,242 |
| Net carrying amount: At 31 December 2016 | 5,865 | 58,511 | 15,331 | 567,338 | 5,938 | 652,983 |

Exhibit 5 to B.R. Shetty's Request for Judicial Notice          131 of 164

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

Financial Statements

# Notes to the Consolidated Financial Statements continued
## At 31 December 2017

**18 INTANGIBLE ASSETS** CONTINUED

Others include intellectual property, rental contracts, private contracts and non-compete arrangements.

Reclassification of US$5,056,000 in 2017 represents transfer of patient relationship incorrectly classified under brands in 2016.

### GOODWILL

Additions to goodwill in the year relate to goodwill measured in respect of the acquisitions of Al Zahra Private Hospital Company, As Salama Hospital LLC, Hamad Drug Store LLC, Atlas Healthcare, Al Qadi Speciality Hospital LLC and Fecunmed.

Goodwill is not amortised, but is reviewed annually for assessment of impairment in accordance with IAS 36. The Group performed its annual goodwill impairment test in December 2017 and 2016. Goodwill acquired through business combinations is allocated to the following operating segments representing a group of cash generating units (CGUs), which are also operating and reportable segments, for impairment testing:
- Healthcare
- Distribution and services

The healthcare CGU has goodwill allocated to it of US$1,052,886,000 at the year-end (2016: US$562,459,000). The distribution and services CGU has goodwill allocated to it of US$4,879,000 at the year-end (2016:US$4,879,000).

The recoverable amounts for both CGUs are based on value in use, which has been calculated using cash flow projections from financial budgets approved by senior management covering a five year period. Cash flows beyond the five-year period are extrapolated using a 3% growth rate (2016: 3%) which is significantly lower than the current annual growth rate of both CGUs. The pre-tax discount rate applied to the cash flows of both CGUs is 8.23% (2016: 8.45%), which is based on the Group's weighted average cost of capital (WACC) and takes into account such measures as risk free rates of return, the Group's debt/equity ratio, cost of debt and local risk premiums specific to the CGUs. As a result of the analysis, there is headroom in both CGUs and no impairment has been identified. Reasonable sensitivities have been applied to each CGU's cash flows and the discount rates used, and in all cases the value in use continues to exceed the carrying amount of CGU goodwill.

The key assumptions on which management has based its cash flow projections for the five year period covered by the most recent forecasts are those related to growth in available beds, patient numbers for the healthcare segment and revenue from the distribution of products for the distribution and services segment. The assumptions made reflect past experience and are based on management's best estimate and judgment.

### OTHER ACQUIRED INTANGIBLE ASSETS

Assets in this class are amortised over their estimated useful lives on a straight line basis. All amortisation charges for the year have been charged against operating profits.

Other than goodwill, the Group does not hold any intangible assets with an indefinite life.

Included in software are HIS and ERP projects amounting to US$1,783,000 (2016: US$3,349,000) which are work-in-progress as of year-end. As of 31 December 2017, the Group has recorded impairment of US$2,000,000 (2016:US$nil) against this.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice          132 of 164          Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

## 19  LOAN RECEIVABLE

| | 2017 US$'000 | 2016 US$'000 |
|---|---|---|
| Loan receivable | 32,187 | 14,516 |
| | 32,187 | 14,516 |
| Classification of loan receivable into current and non-current is as follows: | | |
| Current | 32,187 | 5,387 |
| Non-current | – | 9,129 |
| | 32,187 | 14,516 |

In 2015, the Group entered into a loan arrangement, with a third party (Borrower), to finance certain payables in connection with a hospital facility, for an aggregate amount not to exceeding US $8,848,000 with the repayment of the first trance US$2,720,000 on 10 November 2016, second trance US $2,720,000 on 10 November 2017 and the remaining final trance payment by 10 November 2018.

During the year ended 31 December 2017, the loan agreement was amended in respect of first trance and second trance repayment date and total loan facility amount. First and second trance loan repayment date was revised as 31 March 2018 and the loan facility ceiling was increased to US$32,528,000.

The Group believes that the amount is fully recoverable. Loan is secured by obtaining personal guarantees of shareholders of borrower. The fair value of the loan receivable as on 31 December 2017 was US$32,187,000 (2016: US$14,516,000).

The loan is interest -free, however, any unpaid loan receivable as of due date shall bear commission at the rate of 15% per annum starting from due date till date of payment.

## 20  INVENTORIES

| | 2017 US$'000 | 2016 US$'000 |
|---|---|---|
| Pharmaceuticals and cosmetics | 101,096 | 75,657 |
| Scientific equipment | 12,675 | 13,404 |
| Consumer products | 49,181 | 42,568 |
| Food | 9,632 | 7,087 |
| Egg bank | 5,083 | 2,656 |
| Consumables | 1,926 | 855 |
| Opticals | 294 | 309 |
| Goods in transit | 1,440 | 1,636 |
| Other | 1,222 | 1,393 |
| | 182,549 | 145,565 |
| Less: provision for slow moving and obsolete inventories | (1,219) | (1,178) |
| | 181,330 | 144,387 |

The amount of write down of inventories recognised as an expense for the year ended 31 December 2017 is US$2,346,000 (2016: US$1,869,000). This is recognised in direct costs.

## 21  ACCOUNTS RECEIVABLE AND PREPAYMENTS

| | 2017 US$'000 | 2016 US$'000 |
|---|---|---|
| Accounts receivable | 440,146 | 314,351 |
| Receivable from suppliers for promotional expenses | 14,235 | 13,164 |
| Other receivables | 43,568 | 27,179 |
| Prepayments | 20,893 | 19,763 |
| | 518,842 | 374,457 |

Exhibit 5 to B.R. Shetty's Request for Judicial Notice          133 of 164          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

# Notes to the Consolidated Financial Statements continued
## At 31 December 2017

**21 ACCOUNTS RECEIVABLE AND PREPAYMENTS** CONTINUED

Receivables from suppliers relate to advertising and promotional expenses incurred by the Group. Accounts receivable are stated net of provision for doubtful debts of US$15,747,000 (2016: US$12,129,000). Movements in the provision for doubtful debts are as follows:

|  | 2017 US$'000 | 2016 US$'000 |
|---|---|---|
| At 1 January | 12,129 | 13,022 |
| Written off | (4,382) | (4,377) |
| Written back (note 12) | (2,056) | (1,843) |
| Charge for the year (note 12) | 10,012 | 4,800 |
| Addition from business combinations | – | 549 |
| Exchange difference | 44 | (22) |
| At 31 December | 15,747 | 12,129 |

The ageing of unimpaired accounts receivable is as follows:

|  | Total US$'000 | Neither past due nor impaired US$'000 | Past due but not impaired | | | |
|---|---|---|---|---|---|---|
|  |  |  | ‹ 90 days US$'000 | 91-180 days US$'000 | 181-365 days US$'000 | ›365 days US$'000 |
| **31 December 2017** |  |  |  |  |  |  |
| Accounts receivable | 440,146 | 279,343 | 86,363 | 34,302 | 24,435 | 15,703 |
| **31 December 2016** |  |  |  |  |  |  |
| Accounts receivable | 314,351 | 210,592 | 70,940 | 19,070 | 8,944 | 4,805 |

Unimpaired receivables are expected, on the basis of past experience, to be fully recoverable. It is not the practice of Group to obtain collateral over receivables and they are therefore unsecured. As at 31 December 2017 accounts receivables of US$15,747,000 (2016: US$12,129,000) were impaired and fully provided for.

Credit risk is managed through the Group's established policy, procedures and controls relating to credit risk management (note 33). A majority of the receivables that are past due but not impaired are from insurance companies and government-linked entities in the United Arab Emirates which are inherently slow payers due to their long invoice verification and approval of payment procedures. Payments continue to be received from these customers and accordingly the risk of non-recoverability is considered to be low.

Of the net trade receivables balance of US$440,146,000 (2016:US$314,351,000) amount of US$226,298,000 is receivables from five customers (2016: US$159,922,000 is receivables from five customers).

The Group's terms require receivables to be repaid within 90-120 days depending on the type of customer, which is in line with local practice in the UAE. Due to the long credit period offered to customers, a significant amount of trade accounts receivable are neither past due nor impaired.

Amounts due from related parties amounting to US$1,776,000 (31 December 2016: US$3,628,000) as disclosed on the face of the consolidated statement of financial position are trading in nature and arise in the normal course of business.

Included in other receivables is an amount of US$5,245,000 (2016:US$7,679,000) receivable from entities owned by a non-controlling interest.

**22 CASH AND CASH EQUIVALENTS**

Cash and cash equivalents included in the consolidated statement of cash flows comprise of the following:

|  | 2017 US$'000 | 2016 US$'000 |
|---|---|---|
| Bank deposits | 185,611 | 137,900 |
| Bank balances and cash | 202,002 | 479,940 |
| Bank overdrafts and other short term borrowings | (207,034) | (219,851) |
|  | 180,579 | 397,989 |
| Adjustments for: |  |  |
| Short term borrowings | 139,086 | 160,628 |
| Bank deposits maturing in over 3 months | (69,088) | (28,329) |
| Restricted cash | (44,115) | (96,885) |
| Cash and cash equivalents | 206,462 | 433,403 |

Bank deposits of US$185,611,000 (2016: US$137,900,000) are with commercial banks in the United Arab Emirates and Spain. These are mainly denominated in the UAE Dirhams and Euro and earn interest at the respective deposit rates. These deposits have original maturity between 1 to 12 months (2016: 1 to 12 months).

Exhibit 5 to B.R. Shetty's Request for Judicial Notice          134 of 164          Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

**22 CASH AND CASH EQUIVALENTS** CONTINUED

Short term borrowings include trust receipts and invoice discounting facilities which mature between 90 and 180 days. Trust receipts are short term borrowings to finance imports. The bank overdrafts and short-term borrowings are secured by the corporate guarantee of subsidiary companies and personal guarantees of the shareholders (H.E. Saeed Bin Butti, Dr BR Shetty and Mr Khalifa Bin Butti) and carry interest at EIBOR plus margin rates ranging from 1% to 4% (2016: 1% to 4%) per annum.

At 31 December 2017, the Group had US$34,928,000 (2016: US$59,715,000) of undrawn bank overdraft facilities, which are renewable annually.

Restricted cash mainly represents funds held by a bank in respect of upcoming loan repayment and payment for acquisitions.

**23 SHARE CAPITAL**
**31 DECEMBER 2017**

|  | Number of shares (thousands) | Ordinary shares US$'000 | Share premium US$'000 | Total US$'000 |
|---|---|---|---|---|
| **Issued and fully paid** *(nominal value 10 pence sterling each)* | 204,423 | 31,928 | 492,634 | 524,562 |

**31 DECEMBER 2016:**

|  | Number of shares (thousands) | Ordinary shares US$'000 | Share premium US$'000 | Total US$'000 |
|---|---|---|---|---|
| **Issued and fully paid** *(nominal value 10 pence sterling each)* | 204,285 | 31,910 | 491,778 | 523,688 |

Issued share capital and share premium movement

|  | Number of shares (thousands) | Ordinary shares US$ '000 | Share premium US$ '000 | Total US$ '000 |
|---|---|---|---|---|
| **31 December 2017** |  |  |  |  |
| At 1 January 2017 | 204,285 | 31,910 | 491,778 | 523,688 |
| Exercise of stock option shares | 138 | 18 | 856 | 874 |
| At 31 December 2017 | 204,423 | 31,928 | 492,634 | 524,562 |
| **31 December 2016** |  |  |  |  |
| At 1 January 2016 | 185,714 | 29,566 | 179,152 | 208,718 |
| Issue of new shares - IPO | 18,571 | 2,344 | 319,970 | 322,314 |
| Share issue costs | – | – | (7,344) | (7,344) |
| At 31 December 2016 | 204,285 | 31,910 | 491,778 | 523,688 |

**24 GROUP RESTRUCTURING RESERVE**

The group restructuring reserve arises on consolidation under the pooling of interests method used for group restructuring, which took place on 28 March 2012 when the Company became the holding company of NMC Healthcare LLC through its wholly owned subsidiaries, NMC Holding LLC and NMC Health Holdco Limited. Under this method, the group is treated as a continuation of the NMC Healthcare LLC group. The difference between the share capital of NMC Healthcare LLC (US$27,226,000) and the carrying amount of the investment in that company (US$37,227,000), which equates to the net assets of NMC Healthcare LLC at the date of reorganisation (28 March 2012), amounting to US$10,001,000(debit), is recorded on consolidation as a group restructuring reserve. This reserve is non-distributable.

**25 RETAINED EARNINGS**

As at 31 December 2017, retained earnings of US$18,423,000 (2016: US$18,009,000) are not distributable. This relates to a UAE Companies Law requirement to set aside 10% of annual profit of all UAE subsidiaries until their respective reserves equal 50% of their paid up share capital. The subsidiaries discontinue such annual transfers once this requirement has been met.

**26 DIVIDEND**

In the AGM on 23 May 2017 the shareholders approved a dividend of 10.6 pence per share, amounting to GBP 21,753,000 (US$27,779,000) to be paid to shareholders on the Company's share register on 12 May 2017. The dividend `amount was paid to the shareholders on 1 June 2017 (30 June 2016: a dividend of GBP 11,514,000 equivalent to US$16,350,000 was approved on 3 June 2016 and paid on 14 June 2016). No interim dividend was declared during the year. Subject to shareholder' approval at the Annual General Meeting on 28 June 2018, a final dividend of 13.0 pence per share, GBP 26,952,000 (US$37,194,000) will be paid on 10 July 2018 to shareholders on the Company's share register on 15 June 2018.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice    135 of 164    Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

# Notes to the Consolidated Financial Statements continued
At 31 December 2017

**26 DIVIDEND** CONTINUED

An amount US$21,160,000 (2016: US$5,300,000) was declared as dividend to non-controlling interest during the year, out of that US$5,303,000 (2016: US$nil) was adjusted against related party receivable balance, US$14,523,000 (2016: US$5,300,000) was paid as dividend during the year and US$1,334,000 (2016: US$nil) remain unpaid for the year ended 31 December 2017.

**27 TERM LOANS**

|  | 2017 US$'000 | 2016 US$'000 |
|---|---|---|
| Current portion | 204,154 | 234,519 |
| Non-current portion | 987,840 | 594,780 |
|  | 1,191,994 | 829,299 |
| Amounts are repayable as follows: |  |  |
| Within 1 year | 204,154 | 234,519 |
| Between 1 - 2 years | 206,942 | 243,115 |
| Between 2 - 6 years | 780,898 | 351,665 |
|  | 1,191,994 | 829,299 |

During the year, the Group entered two syndicated facilities amounting to US$825m and US$250m. These syndicated facilities were used to settle an existing syndicated loan and for acquisition purposes. New facilities are repayable over 60 and 84 monthly instalments respectively with a grace period of twelve months. New facilities are guaranteed by corporate guarantees from NMC Health plc and operating subsidiaries of the Group. These loans are secured against a collateral package which includes assignment of some insurance company receivables and a pledge over certain bank accounts within the Group and shares of the entities acquired using the proceeds of the loan.

In addition to the above facilities, term loans also include other short term revolving loans which get drawn down and repaid over the year. The Group has charged an amount of US$6,794,000 to the consolidated income statement with respect to unamortised transaction costs of existing debts which have been settled using proceeds of new syndicate loan.

During the year ended 31 December 2017, the Group drew down term loans of US$671,353,000 (2016: US$631,548,000) and repaid term loans of US$319,111,000 (2016: US$378,660,000).

**28 EMPLOYEES' END OF SERVICE BENEFITS**

Movements in the provision recognised in the consolidated statement of financial position are as follows:

|  | 2017 US$'000 | 2016 US$'000 |
|---|---|---|
| Balance at 1 January | 30,208 | 22,490 |
| Charge for the year | 11,106 | 7,246 |
| Actuarial (gain)/loss | (1) | 147 |
| Transfer from related party | 180 | 4 |
| Employees' end of service benefits paid | (3,447) | (1,546) |
| Addition from business combinations | 10,233 | 1,867 |
| Balance at 31 December | 48,279 | 30,208 |
| Current | 6,905 | 3,560 |
| Non-current | 41,374 | 26,648 |
| Balance at 31 December | 48,279 | 30,208 |
| Charge for the year comprise of the following: |  |  |
| Current service cost | 10,173 | 6,525 |
| Interest cost | 933 | 721 |
| Balance at 31 December | 11,106 | 7,246 |

In accordance with the provisions of IAS 19 'Employee Benefits', management has carried out an exercise to assess the present value of its obligation at 31 December 2017 and 2016, using the projected unit credit method, in respect of employees' end of service benefits payable under the UAE Labour Law.

During the current year, the Group has recognised an actuarial gain of US$1,000 (31 December 2016: loss of US$147,000) in other comprehensive income. Management has assumed an average length of service of 5 years (2016: 5 years) and increment/promotion costs of 1.5% (2016: 1.5%). The expected liability at the date of employees' leaving service has been discounted to its net present value using a discount rate of 2.5% (2016: 2.5%). Management also performed a sensitivity analysis for changes in discount rate and increment costs; the results of this analysis showed that none of the factors had any material impact on the actuarial valuation.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice    136 of 164    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

## 29 ACCOUNTS PAYABLE AND ACCRUALS

| | 2017 US$'000 | 2016 US$'000 |
|---|---|---|
| Trade accounts payable | 152,811 | 108,202 |
| Accrued interest | 2,681 | 2,691 |
| Accrued expenses | 9,921 | 7,362 |
| Others | 44,057 | 40,557 |
| | 209,470 | 158,812 |

Trade and other payables are non-interest bearing and are normally settled on 50-60 day terms.

Included in others is an amount of US$17,596,000 (2016: US$22,822,000) in respect of lease payable.

## 30 OTHER PAYABLES

| | 2017 US$'000 | 2016 US$'000 |
|---|---|---|
| Contingent consideration payable for acquisitions (note 36) | 10,519 | 24,139 |
| Deferred consideration payable for acquisitions | 5,307 | 6,551 |
| Other payable | 41,268 | 36,929 |
| | 57,094 | 67,619 |
| Classification of other payables into current and non-current is as follows: | | |
| Current | 18,110 | 26,827 |
| Non-current | 38,984 | 40,792 |
| | 57,094 | 67,619 |

During 2016, the Group assumed a liability upon acquisition of Fakih IVF to deliver cash or another financial asset by issuing the Post-dated cheques (those were issued by a subsidiary prior to acquisition by NMC and not connected to the subsidiary acquired) and met the definition of financial liability, present value of such Post-dated cheques of US $38,029,000 was recorded as liability as of acquisition date. Further, the Group has a contractual right to be compensated from the Seller by way of cash or other financial asset in case it suffers any loss on account of those Post-dated cheques as the Group is indemnified by the Seller for any loss that may arise on account of encashment of such issued Post-dated cheques before their replacement. Accordingly, a contra indemnity asset was recorded of the above same amount as of acquisition date.

As of 31 December 2017, present value of Post-dated cheques issued and corresponding receivable is US$40,068,000 (2016: US$36,929,000) and have been recorded under other payables and other assets. Current portion of other assets is recorded under other receivables included in accounts receivable and prepayment (note 21) and non-current portion is recorded under other non-current assets. Classification of financial asset is as follows:

| | 2017 US$'000 | 2016 US$'000 |
|---|---|---|
| Current | 4,043 | – |
| Non-current | 36,025 | 36,929 |
| | 40,068 | 36,929 |

## 31 RELATED PARTY TRANSACTIONS

These represent transactions with related parties, including major shareholders and senior management of the Group, and entities controlled, jointly controlled or significantly influenced by such parties, or where such parties are members of the key management personnel of the entities. Pricing policies and terms of all transactions are approved by the management of the Group.

The Company's immediate and ultimate controlling party is a group of three individuals (H.E. Saeed Bin Butti, Dr BR Shetty and Mr Khalifa Bin Butti) who are all shareholders and of whom two are directors of the Company and who together have the ability to control the company. As the immediate and ultimate controlling party is a group of individuals, it does not produce consolidated financial statements.

### RELATIONSHIP AGREEMENT

The Controlling Shareholders and the Company have entered into a relationship agreement, the principal purpose of which is to ensure that the Company is capable of carrying out its business independently of the Controlling Shareholders and that transactions and relationships with the Controlling Shareholders are at arm's length and on a normal commercial basis.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice          137 of 164
Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

## Notes to the Consolidated Financial Statements continued

At 31 December 2017

**31 RELATED PARTY TRANSACTIONS** CONTINUED

**RELATIONSHIP AGREEMENT** CONTINUED

In accordance with the terms of the relationship agreement, the Controlling Shareholders have a collective right to appoint a number of Directors to the Board depending upon the level of their respective shareholdings. This entitlement reduces or is removed as the collective shareholdings reduce. The relationship agreement includes provisions to ensure that the Board remains independent.

Transactions with related parties included in the consolidated income statement are as follows:

|  | 2017 US$'000 | 2016 US$'000 |
|---|---|---|
| Entities significantly influenced by a shareholder who is a key management personnel in NMC management personnel in NMC. | | |
| Sales | 40 | 14 |
| Purchases | 78,778 | 59,370 |
| Rent charged | 353 | 451 |
| Other income | 1,883 | 1,435 |
| Entities where a shareholder of NMC is a key member of management personnel of such entity Personnel of the entity. | | |
| Management fees received from such entity by NMC | 1,776 | 6,303 |
| Sales | - | 296 |

Amounts due from and due to related parties disclosed in the consolidated statement of financial position are as follows:

|  | 2017 US$'000 | 2016 US$'000 |
|---|---|---|
| Entities significantly influenced by a shareholder who is a key management personnel in NMC | | |
| Amounts due to related parties | 28,472 | 14,876 |
| Amounts due from related parties | 1,776 | - |
| Entities where a shareholder of NMC is a key member of management personnel of the entity management personnel of such entity | | |
| Amounts due from related parties | - | 3,628 |

Outstanding balances with related parties at 31 December 2017 and 31 December 2016 were unsecured, payable on 50-60 days term and carried interest at 0% (31 December 2016: 0%) per annum. Settlement occurs in cash. As at 31 December 2017 US$nil of the amounts due from related parties were past due but not impaired (31 December 2016: US$1,576,000).

The bank overdrafts and short-term borrowings are secured by the corporate guarantee of subsidiary companies and personal guarantees of the shareholders (H.E. Saeed Bin Butti, Dr BR Shetty and Mr Khalifa Bin Butti).

Pharmacy licenses in UAE under which the Group sells its products, are granted to the shareholders or directors of the Company, who are UAE nationals. No payments are made in respect of these licenses to shareholders or directors.

**COMPENSATION OF KEY MANAGEMENT PERSONNEL**

|  | 2017 US$'000 | 2016 US$'000 |
|---|---|---|
| Short term benefits | 15,142 | 10,236 |
| Employees' end of service benefits | 24 | 16 |
|  | 15,166 | 10,252 |

The key management personnel include all the Non-Executive Directors, the three (31 December 2016: two) Executive Directors and four (31 December 2016: four) senior management personnel.

During the year additional shares of 833,284 (2016: 451,868) were granted to Executive Directors and other senior management in the form of share options.

One individual (31 December 2016: One) who is a related party of one of the shareholders is employed by the Group. The total compensation for employment received by that related party in the year ended 31 December 2017 amounts to US$2,286,000 (2016: US$1,303,000).

Exhibit 5 to B.R. Shetty's Request for Judicial Notice         138 of 164         Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

## 32 SHARE BASED PAYMENTS

The Group currently operates two share option schemes:

### LONG TERM INCENTIVE PLAN (LTIP)

Options awarded under the LTIP are made annually to Executive Directors and other senior management. The exercise prices are nil. Options have a life of ten years and a vesting period of three years. The LTIP is subject to performance conditions which can be found in the Directors' Remuneration Report on pages 58 to 77.

### SHORT TERM INCENTIVE PLAN (STIP)

Options awarded under the STIP are made annually to Executive Directors and other senior management. The exercise prices are nil. Options have a life of ten years and a vesting period of 3 years.

Fair values are determined using the Black-Scholes model. Expected volatility has been based on historical volatility over the period since the Company's shares have been publically traded.

Administrative expenses include a charge of US$9,181,000 (2016: US$2,640,000) in respect of the cost of providing share options. The cost is calculated by estimating the fair value of the option at grant date and spreading that amount over the vesting period after adjusting for an expectation of non-vesting.

For options granted in the years ended 31 December 2016 and 2017, the fair value per option granted and the assumptions used in the calculation are as follows:

|  | 2017 STIP | 2016 STIP |
|---|---|---|
| Share price at grant date | £20.740 | £9.675 |
| Fair value at measurement date | £20.425 | £9.520 |
| Exercise price | £nil | £nil |
| Expected volatility | 40% | 40% |
| Expected option life | 2 years | 3 years |
| Expected dividend yield | 0.51% | 0.54% |
| Risk free interest rate | 1.57% | 1.05% |

|  | 2017 LTIP1 | 2017 LTIP2 | 2016 LTIP |
|---|---|---|---|
| Share price at grant date | £16.330 | £27.390 | £9.675 |
| Fair value at measurement date | £16.082 | £27.088 | £9.520 |
| Exercise price | £nil | £nil | £nil |
| Expected volatility | 40% | 40% | 40% |
| Expected option life | 3 years | 3 years | 3 years |
| Expected dividend yield | 0.51% | 0.37% | 0.54% |
| Risk free interest rate | 1.49% | 1.38% | 1.05% |

LTIP represent long term incentive plans issued in January and September 2017.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice    139 of 164    Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

# Notes to the Consolidated Financial Statements continued
At 31 December 2017

**32 SHARE BASED PAYMENTS** CONTINUED
**SHORT TERM INCENTIVE PLAN (STIP)** CONTINUED
The options existing at the year-end were as follows:

| | 2017 | | 2016 | | |
| --- | --- | --- | --- | --- | --- |
| | Number of shares | Exercise price | Number of shares | Exercise price | Period when exercisable |
| Long term incentive plan (LTIP) | | | | | |
| October 2014 | 60,292 | £nil | 160,778 | £nil | 29/10/17 to 28/10/24 |
| Short term incentive plan (STIP) | | | | | |
| October 2014 | 20,165 | £nil | 55,527 | £nil | 29/10/17 to 28/10/24 |
| Long term incentive plan (LTIP) | | | | | |
| February 2015 | 221,539 | £nil | 221,539 | £nil | 25/02/18 to 24/02/25 |
| Short term incentive plan (STIP) | | | | | |
| February 2015 | 74,801 | £nil | 74,801 | £nil | 25/02/18 to 24/02/25 |
| Long term incentive plan (LTIP) | | | | | |
| September 2015 | 49,309 | £nil | 49,309 | £nil | 09/09/18 to 08/09/25 |
| Long term incentive plan (LTIP) | | | | | |
| March 2016 | 383,717 | £nil | 383,717 | £nil | 15/03/19 to 14/03/26 |
| Short term incentive plan (STIP) | | | | | |
| March 2016 | 68,151 | £nil | 68,151 | £nil | 15/03/19 to 14/03/26 |
| Long term incentive plan (LTIP) | | | | | |
| January 2017 | 562,323 | £nil | – | – | 27/01/18 to 26/01/27 |
| Short term incentive plan (STIP) | | | | | |
| May 2017 | 150,435 | £nil | – | – | 09/05/18 to 08/05/27 |
| Long term incentive plan (LTIP) | | | | | |
| September 2017 | 120,526 | £nil | – | – | 07/09/18 to 06/09/27 |
| Long term incentive plan (LTIP) | | | | | |
| Total options subsisting on existing ordinary shares | 1,711,258 | | 1,013,822 | | |
| Percentage of issued share capital | 0.8% | | 0.5% | | |

Movement of share options during the year is as follows:

| | 2017 | 2016 |
| --- | --- | --- |
| At 1 January | 1,013,822 | 561,954 |
| Vested in lieu of dividend | 2,290 | – |
| Granted during the year | 833,284 | 451,868 |
| Exercised during the year | (138,138) | – |
| Outstanding at 31 December | 1,711,258 | 1,013,822 |

No options expired or forfeited during the year (2016: nil).

**33 FINANCIAL RISK MANAGEMENT OBJECTIVES AND POLICIES**
The Group's principal financial liabilities comprise loans and borrowings, contingent consideration on acquisition of subsidiaries, put option redemption liability and trade and other payables. The main purpose of these financial liabilities is to finance the Group's operations. The Group has accounts and other receivables, and cash and short-term deposits that arise directly from its operations.

The Group is exposed to interest rate risk, credit risk, liquidity risk and foreign currency risk. These risks and the Group's financial risk management objectives and policies are consistent with last year. The Group's exposure to foreign currency risk includes risk on the Group's net investment in foreign subsidiaries in Spain and certain other countries.

The Group's senior management oversees the management of these risks. The Board of Directors reviews and agrees policies for managing each of these risks which are summarised below.

**INTEREST RATE RISK**
Interest rate risk is the risk that the fair value or future cash flows of a financial instrument will fluctuate because of changes in market interest rates. The Group is exposed to interest rate risk on its interest bearing assets and liabilities (bank deposits, bank overdrafts and other short term borrowings and term loans). Management is of the opinion that the Group's exposure to interest rate risk is limited.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice         140 of 164         Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

**33 FINANCIAL RISK MANAGEMENT OBJECTIVES AND POLICIES** CONTINUED

**INTEREST RATE RISK** CONTINUED

The following table demonstrates the sensitivity of the consolidated income statement to reasonably possible changes in interest rates, with all other variables held constant. The sensitivity of the consolidated income statement is the effect of the assumed changes in interest rates on the Group's profit for the year based on the floating rate financial assets and financial liabilities as of the respective year end.

| Increase/(decrease) in basis points | Effect on profit at 31 December 2017 US$'000 | Effect on profit at 31 December 2016 US$'000 |
|---|---|---|
| 100 | (12,134) | (9,112) |
| (100) | 12,134 | 9,112 |

**CREDIT RISK**

Credit risk is the risk that counterparty will not meet its obligations under a financial instrument or customer contract, leading to a financial loss. The Group limits its credit risk with respect to customers due to the nature of the customers that it has dealings with. Within the Healthcare business in the GCC, the majority of the Group's customers are insurance companies. The largest insurance company in GCC is fully backed by Sovereign wealth funding from Abu Dhabi. All other insurance companies in the GCC are required to be listed on a stock exchange and therefore are governed by the regulations of their respective markets. The Group limits its credit risk with respect to healthcare customers in markets other than GCC by requesting certain percentage of advance payments from customers and obtaining final payments before completion of treatment. Within the distribution business the Group deals primarily with large reputable multinational retail companies. The Group further seeks to limit its credit risk by setting credit limits for individual customers and monitoring outstanding receivables.

The Group limits its credit risk with regard to bank deposits by only dealing with reputable banks. The external credit ratings for the banks at which the bank deposits and cash at bank are held are as follows:

| | 2017 US$'000 | 2016 US$'000 |
|---|---|---|
| AA-/A-1/Aa3 | - | 11,903 |
| A+/A1 | - | 5,494 |
| A/A2 | 162 | 219,787 |
| A+/A-1 | 33,188 | 4,273 |
| A3/A- | 2,258 | 5,865 |
| A2 | 22,857 | - |
| AAA/A-1+ | 95,859 | 6,164 |
| A2/P-1 | 15,264 | 140 |
| A3/P-2 | 11,465 | 19 |
| B1 | - | 1,629 |
| BB | 1,505 | 4,196 |
| BB+ | 1,404 | 562 |
| Baa2 | 55 | - |
| P-3 | 142,748 | - |
| Baa3 | - | 163,491 |
| BBB | 6,878 | 1,938 |
| BBB- | 567 | 42,172 |
| BBB+/Baa1/Baa1/P-2 | 499 | 120,627 |
| Caa1/B3 | 2,198 | - |
| Without external credit rating | 49,199 | 28,633 |
| **Total bank deposit and cash at bank** | **386,106** | **616,893** |

With respect to credit risk arising from cash and cash equivalents, the Group's exposure to credit risk arises from default of the counterparty, with a maximum exposure equal to the carrying amount of these instruments.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice          141 of 164

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

# Notes to the Consolidated Financial Statements continued
## At 31 December 2017

**33 FINANCIAL RISK MANAGEMENT OBJECTIVES AND POLICIES** CONTINUED
### LIQUIDITY RISK

The Group's objective is to maintain a balance between continuity of funding and flexibility through the use of banking facilities. The Group limits its liquidity risk by raising funds from its operations and ensuring bank facilities are available. Trade payables are normally settled within 50-60 days of the date of purchase.

The table below summarises the maturities of the Group's undiscounted financial liabilities, based on contractual payment dates and current market interest rates.

| | On demand US$'000 | Less than 3 months US$'000 | 3 to 12 months US$'000 | 1 to 6 years US$'000 | Total US$'000 |
|---|---|---|---|---|---|
| **At 31 December 2017** | | | | | |
| Trade accounts payable | - | 152,811 | - | - | 152,811 |
| Amounts due to related parties | - | 28,472 | - | - | 28,472 |
| Other payables | - | - | 18,773 | 76,186 | 94,959 |
| Option redemption payable | - | - | 19,041 | 15,776 | 34,817 |
| Terms loans | - | 53,255 | 193,774 | 1,077,215 | 1,324,244 |
| Bank overdrafts and other short term borrowings | 68,948 | 73,079 | 69,726 | - | 211,753 |
| Financial guarantees | 18,209 | - | - | - | 18,209 |
| **Total** | 87,157 | 307,617 | 301,314 | 1,169,177 | 1,865,265 |

| | On demand US$'000 | Less than 3 months US$'000 | 3 to 12 months US$'000 | 1 to 6 years US$'000 | Total US$'000 |
|---|---|---|---|---|---|
| **At 31 December 2016** | | | | | |
| Trade accounts payable | - | 108,202 | - | - | 108,202 |
| Amounts due to related parties | - | 14,876 | - | - | 14,876 |
| Other payables | - | - | 28,391 | 81,592 | 109,983 |
| Option redemption payable | - | - | - | 42,605 | 42,605 |
| Terms loans | - | 79,560 | 174,085 | 615,769 | 869,414 |
| Bank overdrafts and other short term borrowings | 60,154 | 107,170 | 56,957 | - | 224,281 |
| Financial guarantees | 11,764 | - | - | - | 11,764 |
| **Total** | 71,918 | 309,808 | 259,433 | 739,966 | 1,381,125 |

The Group also has future capital commitments for the completion of ongoing capital projects of US$5,723,000 (2016: US$9,048,000) (note 35). These are to be financed from the fixed deposits held by the Group.

### FOREIGN CURRENCY RISK

Foreign currency risk is the risk that the fair value or future cash flows of a financial instrument will fluctuate because of changes in foreign exchange rates. Foreign currency risk comprises of transaction risk, statement of financial position risk and the Group's net investment in foreign subsidiaries. Transaction risk relates to the Group's cash flow being adversely affected by a change in the exchange rates of foreign currencies against the UAE Dirham. Statement of financial position risk relates to the risk of the Group's monetary assets and liabilities in foreign currencies acquiring a lower or higher value, when translated into UAE Dirhams, as a result of currency movements.

The Group is exposed to currency risk on its trade accounts payable, put option redemption payable and certain other payables denominated in foreign currencies, mainly in Euros and Saudi Riyal. As the US Dollar is pegged to the UAE Dirham, balances in US Dollars are not considered to represent significant currency risk.

The table below indicates the impact of Group's foreign currency monetary liabilities and assets at 31 December, on its profit before tax.

| | 2017 US$'000 | 2016 US$'000 |
|---|---|---|
| +5% | (2,460) | (2,113) |
| -5% | 2,460 | 2,113 |

The Group is exposed to foreign currency risk on net investment in foreign subsidiaries. During the year ended 31 December 2017 the Group has recorded a foreign currency exchange gain of US$15,304,000 (2016: loss of US$4,050,000) on the translation of foreign subsidiaries in other comprehensive income.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice          142 of 164          Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

## 33 FINANCIAL RISK MANAGEMENT OBJECTIVES AND POLICIES CONTINUED
### CAPITAL MANAGEMENT

The primary objective of the Group's capital management is to ensure that it maintains healthy capital ratios in order to support its business and maximise shareholders' value.

The Group manages its capital structure and makes adjustments to it in light of changes in business conditions. Capital comprises share capital, share premium, reserves and retained earnings is measured at US$1,089,716,000 as at 31 December 2017 (2016: US$906,869,000). In order to maintain or adjust the capital structure, the group may adjust the amount of dividends paid to shareholders, return capital to shareholders, issue new shares or sell assets to reduce debt. Certain banking facilities may also impose covenant requirements on the Group with respect to capital management.

The Group monitors capital using a gearing ratio, which is net debt divided by capital plus net debt. The Group includes within net debt, interest bearing loans and borrowings, accounts payable and accruals and other payables less bank deposits and bank balances and cash.

|  | 2017 US$'000 | 2016 US$'000 |
|---|---|---|
| Interest bearing loans and borrowings | 1,399,028 | 1,049,150 |
| Accounts payable and accruals | 209,470 | 158,812 |
| Other payable | 57,094 | 67,619 |
| Option redemption payable | 38,747 | 37,500 |
| Less: bank deposits, bank balances and cash | (387,613) | (617,840) |
| Net debt and payables | 1,316,726 | 695,241 |
| Capital | 1,089,716 | 906,869 |
| Capital and net debt | 2,406,442 | 1,602,110 |
| Gearing ratio | 55% | 43% |

## 34 CONTINGENT LIABILITIES

The Group had contingent liabilities in respect of bank and other guarantees and other matters arising in the ordinary course of business from which it is anticipated that no material liabilities will arise at 31 December 2017 of US$18,209,000 (2016: US$11,764,000).

## 35 COMMITMENTS

### CAPITAL COMMITMENTS

The Group had future capital commitments of US$5,723,000 at 31 December 2017 (2016: US$9,048,000) principally relating to the completion of ongoing capital projects.

### OTHER COMMITMENTS

|  | 2017 US$'000 | 2016 US$'000 |
|---|---|---|
| Future minimum rentals payable under non-cancellable operating leases |  |  |
| Within one year | 12,888 | 11,354 |
| After one year but not more than five years | 57,916 | 53,896 |
| More than five years | 54,023 | 74,080 |
| Total | 124,827 | 139,330 |

## 36 FINANCIAL INSTRUMENTS CARRIED AT FAIR VALUE

### CONTINGENT CONSIDERATION

Contingent consideration relates to acquisitions done in current and prior year. Movements in contingent consideration payable are as follows:

|  | 2017 US$'000 | 2016 US$'000 |
|---|---|---|
| Balance at 1 January | 24,139 | 25,016 |
| Contingent consideration recognised at acquisition (note 5) | 704 | 9,642 |
| Fair value measurement | (133) | 1,549 |
| Purchase price allocation adjustment | – | (2,126) |
| Exchange loss/(gain) | 862 | (375) |
| Payments made | (15,053) | (9,567) |
| Balance at 31 December | 10,519 | 24,139 |

Exhibit 5 to B.R. Shetty's Request for Judicial Notice          143 of 164

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

# Notes to the Consolidated Financial Statements continued
## At 31 December 2017

**36 FINANCIAL INSTRUMENTS CARRIED AT FAIR VALUE** CONTINUED
**CONTINGENT CONSIDERATION** CONTINUED

In accordance with the fair value hierarchy under IFRS 13, contingent consideration is classified as a level 3 derivative financial instrument. The fair value of outstanding contingent consideration as at the reporting date is US$10,519,000 (2016:US$24,139,000). The valuation technique used for measurement of contingent consideration is the weighted average probability method and then applying discounting.

Contingent consideration payable as of 31 December 2017 comprises of following:

|  | 2017 US$'000 | 2016 US$'000 |
|---|---|---|
| CIRH | – | 2,912 |
| Biogenesi | 3,391 | 4,741 |
| Dr Sunny Healthcare | – | 3,644 |
| ProVita | 3,298 | 3,298 |
| Fakih | 3,126 | 8,128 |
| CFC | – | 1,416 |
| Fecunmed | 704 | – |
|  | 10,519 | 24,139 |

CIRH

Contingent consideration is payable subject to attainment of revenue targets. Significant unobservable inputs used are revenue targets and discount rate (9.2%). Contingent consideration on achieving 2016 EBITDA target has been paid fully in 2017.

Biogenesi

Contingent consideration is payable subject to attainment of profit before tax target. Significant unobservable inputs used are profit before tax and discount rate (10.7%). Full value of contingent consideration payable is US$3,594,000 (2016: US$5,260,000) and its present value is US$3,391,000 (2016: US$4,741,000). Contingent consideration amounting to US$2,259,000 on achieving 2017 EBITDA target has been paid during the year. Outstanding contingent consideration is payable in the period from 2018 to 2019. A 1% increase in discount rate would result in decrease in fair value of the contingent consideration by US$17,000 and a 1% decrease in discount rate would result in increase in fair value by US$17,000. Management believe profit before tax targets for FY 2018 - FY 2019 will be met and accordingly not considered sensitive to fair value measurement.

Dr. Sunny Healthcare

The contingent consideration relates to amounts payable on achieving 2016 EBITDA target amount. Target EBITDA has been achieved and accordingly this contingent consideration has been paid during the year.

ProVita

The contingent consideration relates to amounts payable in the event that licenses to operate in Qatar will be obtained. Management believes that it is highly probable that these licenses will be obtained. Full value of contingent consideration payable is US$3,500,000 and its present value is US$3,298,000.

Fakih

The contingent consideration relates to amounts payable in the event that licenses to operate in certain other GCC countries are obtained. Management believes that it is highly probable that these licenses will be obtained. Contingent consideration amounting to US$5,000,000 on obtaining Oman facility licence has been paid during the year. Full value of contingent consideration payable is US$3,474,000 (2016: US$9,031,000) and its present value is US$3,126,000 (2016: US$8,128,000).

CFC

The contingent consideration relates to amounts payable on achieving 2016 EBITDA target amount. Target EBITDA has been achieved and accordingly this has been fully paid in 2017.

**FECUNMED**

Contingent consideration is payable subject to attainment of revenue targets. Significant unobservable inputs used are revenue targets and discount rate (9.2%). Full value of contingent consideration payable is US$958,000 and its present value is US$704,000.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice          144 of 164          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

## 37 OPTION REDEMPTION PAYABLE

Option redemption payable comprise of the following:

|  | 2017 US$'000 | 2016 US$'000 |
|---|---|---|
| Luarmia | 26,019 | 25,252 |
| CFC and HCMR | 11,874 | 12,248 |
| Fecunmed | 854 | – |
|  | 38,747 | 37,500 |

Movement in option redemption payable is as follows:

|  | 2017 US$'000 | 2016 US$'000 |
|---|---|---|
| Balance at 1 January | 37,500 | 25,084 |
| Addition | 854 | 12,801 |
| Re-measurement of liability | (2,398) | – |
| Re-measurement adjustment (note 10) | 2,012 | 2,160 |
| Exchange loss/(gain) | 779 | (275) |
| Settlement of put option | – | (2,270) |
| Balance at 31 December | 38,747 | 37,500 |

Classification of option redemption payables into current and non-current is as follows:

|  | 2017 US$'000 | 2016 US$'000 |
|---|---|---|
| Current | 26,019 | – |
| Non-current | 12,728 | 37,500 |
|  | 38,747 | 37,500 |

### LUARMIA

As part of acquisition of Luarmia SL ("Luarmia") in 2015, the Group entered into separate co-investment/shareholder agreements dated 23 February 2015 with the sellers relating to put & call options on the minority 11.6% shareholdings that remains with the previous owners post-acquisition. The Group does not have 'present ownership' of this 11.6% minority shareholding due to the terms of the option agreements and continue to account for the acquisition of Luarmia on the basis of an 88.4% equity stake, with full recognition of the 11.6% non-controlling interest. The put options are exercisable between 1 & 30 June 2018, 1 & 30 June 2019 and 1 & 30 June 2020 (three exercisable windows). On exercise of the put options, cash will be paid. The value of the put option is calculated based on the multiple of purchase price and further multiples are measured on the number of reproductive cycles specified in the agreement. A redemption liability for the value of the options at the acquisition date was created amounting to US$24,496,000 (being the present value of the redemption liability at the acquisition date), with an equal amount being treated as a reduction in equity. As at 31 December 2017, the present value of the redemption liability is US$26,019,000 (2016: US$25,252,000).

The key assumption in estimating the expected amount is the multiple of purchase price and reproductive cycle's projections. The financial liability is sensitive to changes in these assumptions for example a 10% increase in reproductive cycles will result in an increase in the financial liability by US$1,545,400 (2016: US$3,268,830), while a 10% decrease would result in a decrease in the financial liability by US$1,544,000 (2016: US$3,101,800).

### CFC and HCMR

In 2016, Luarmia SL entered into put option agreements with the minority shareholders of Brazil and Denmark entities. A redemption liability for the value of the options at the acquisition date was created amounting to US$11,216,000 and US$1,585,000 (being the present value of the redemption liability at the acquisition date), with an equal amount being treated as a reduction in equity. As at 31 December 2017, the present value of the redemption liability is US$9,979,000 and US$1,895,000 respectively.

During the year Luarmia SL entered into put option agreements with the minority shareholders of Fecunmed. A redemption liability for the value of the options at the acquisition date was created amounting to US$854,000. The present value of the redemption liability remains same as on 31 December 2017.

The put option of HCMR is exercisable any time starting from the third anniversary and 36 months thereafter. The earliest date of exercise is September 2019. The key assumption in estimating the liability amount is the forecasted EBITDA of the year 2018 and 2019 and projected net debt of 2019. The financial liability is sensitive to changes in the forecasted EBITDA and Net Debt. For example a 10% simultaneous increase in EBITDA and Net debt will result in an increase in the financial liability with US$866,000 while a 10% decrease would result in a decrease in the financial liability with US$866,000 .

Exhibit 5 to B.R. Shetty's Request for Judicial Notice     145 of 164     Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

## Notes to the Consolidated Financial Statements continued
At 31 December 2017

**37 OPTION REDEMPTION PAYABLE** CONTINUED
**LUARMIA** CONTINUED

The put option for CFC is exercisable from the fifth anniversary of the date of the agreement. With respect to this, the earliest month of exercise is June 2021. The key assumption in estimating the liability amount is the forecasted EBITDA of the entity for 2020. The financial liability is sensitive to changes in the forecasted EBITDA. For example a 10% increase in EBITDA will result in an increase in the financial liability with US$189,000, while a 10% decrease would result in a decrease in the financial liability with US$189,000 .

Fecunmed

The put option for Fecunmed is exercisable from the third anniversary of the date of the agreement. With respect to this, the earliest month of exercise is 31 December 2020. The key assumption in estimating the liability amount is the forecasted EBITDA of the entity for 2020. The financial liability is sensitive to changes in the forecasted EBITDA. For example a 10% increase in EBITDA will result in an increase in the financial liability with US$71,000, while a 10% decrease would result in a decrease in the financial liability with US$71,000 .

**38 FAIR VALUES OF FINANCIAL INSTRUMENTS**

The fair values of the Group's financial instruments are not materially different from their carrying values at the statement of financial position date.

The Group uses the following hierarchy for determining and disclosing the fair value of financial instruments by valuation technique:

*Level 1:* quoted (unadjusted) prices in active markets for identical assets or liabilities.

*Level 2:* other techniques for which all inputs which have a significant effect on the recorded fair value are observable, either directly or indirectly.

*Level 3:* techniques which use inputs which have a significant effect on the recorded fair value that are not based on observable market data.

Financial assets and liabilities carried at fair value are disclosed in note 36.

During the years ended 31 December 2017 and 31 December 2016, there were no transfers between Level 1 and Level 2 fair value measurements, and no transfers into or out of Level 3 fair value measurements.

**39 ASSET CLASSIFIED AS HELD FOR SALE**

| | 2017 US$'000 | 2016 US$'000 |
|---|---|---|
| Asset classified as held for sale | 3,693 | – |
| | 3,693 | – |

In September 2017, the Group decided to sell the investment in joint venture and the negotiated sale is at an advanced stage and is expected to be completed before the end of June 2018.

**40 CHANGES IN LIABILITIES ARISING FROM FINANCING ACTIVITIES**

| | 01 January 2017 US$ 000 | Cash Inflow US$ 000 | Cash Outflow US$ 000 | Forex exchange movement US$ 000 | Others US$ 000 | 31 December 2017 US$ 000 |
|---|---|---|---|---|---|---|
| Term Loans (Current and Non-current portion) | 829,299 | 671,353 | (319,111) | 6,417 | 4,036 | 1,191,994 |
| Bank overdrafts and Other short-term borrowings | 219,851 | 351,775 | (373,318) | – | 8,726 | 207,034 |
| Dividend payable | – | – | – | – | 1,334 | 1,334 |
| Total liabilities from financing activities | 1,049,150 | 1,023,128 | (692,429) | 6,417 | 14,096 | 1,400,362 |

| | 01 January 2016 US$ 000 | Cash Inflow US$ 000 | Cash Outflow US$ 000 | Forex exchange movement US$ 000 | Others US$ 000 | 31 December 2016 US$ 000 |
|---|---|---|---|---|---|---|
| Term Loans (Current and Non-current portion) | 575,346 | 631,548 | (378,660) | (1,970) | 3,035 | 829,299 |
| Bank overdrafts and Other short-term borrowings | 154,962 | 351,089 | (319,556) | – | 33,356 | 219,851 |
| Dividend payable | – | – | – | – | – | – |
| Total liabilities from financing activities | 730,308 | 982,637 | (698,216) | (1,970) | 36,391 | 1,049,150 |

**40 CHANGES IN LIABILITIES ARISING FROM FINANCING ACTIVITIES** CONTINUED

The 'Others' column includes the effect of amortisation of transaction costs, additions in interest-bearing loans from business combination and accrual of dividend that were not yet paid at the year-end. The Group classifies interest paid as cash flow from operating activities.

**41 SUBSEQUENT EVENTS**

**ACQUISITION IN UNITED ARAB EMIRATES**

- On 03 January 2018, the Group acquired an additional 49% interest in the voting shares of Fakih IVF, increasing its ownership interest to 100% for consideration of US$205m. Of the total consideration, US$66m is to be settled in cash and the remainder to be settled by issuing equity shares of NMC Health plc. As the ownership interest increased by 49%, the Group will derecognise the minority interest. Excess of consideration paid over the carrying amount of the non-controlling interests will be recognised in equity. The Group has elected to recognise this effect in retained earnings.
- On 03 January 2018, the Group acquired 100% interest in the voting shares of Fakih Medical Center, for cash consideration of US$68m. Regulatory approvals and legal formalities completed on 18 February 2018, meaning that control has passed to the Group and full consolidation of results will commence from that date.
- On 05 November 2017, the Group agreed to acquire the business and assets of RAK, located in Ras al-Khaimah emirate of United Arab Emirates. RAK offers an extensive range of medical care programs, easy access to doctors and a wide variety of specialties. RAK Royal Medical Center employs over a 100 staff and during 2017 served an average of 100 patients a day. RAK consists of Medical Center, Dental centre, Royal Diagnostic Center and Royal Pharmacy. Regulatory approvals and legal formalities completed on 03 January 2018, meaning that control has passed to the Group and full consolidation of results will commence from that date. The agreed purchase consideration for the business was US$6.8m.
- On 21 January 2018, the Group agreed to acquire 70% controlling stake of Cosmesurge Clinics ("CS"). CS is an industry leader in the UAE in providing quality cosmetic surgery and aesthetic medicine. The assets being acquired include 17 operational clinics, and a 10-bed hospital and two new clinics which are being constructed and scheduled to open in 2018. NMC currently provides invasive cosmetic procedures and complex surgeries and the addition of CS will expand the Group's offering. Having managed CS under an O&M contract since September 2017, NMC has already identified a number of revenue and cost synergy opportunities. The agreed purchase consideration for the business is US$170m. There is no deferred and contingent consideration payable. Regulatory approvals and legal formalities with respect to the acquisition are expected to be completed by Q1 2018.

**ACQUISITION IN KINGDOM OF SAUDI ARABIA**

- On 03 January 2018, the Group acquired an additional 29% interest in the voting shares of As Salama, increasing its ownership interest to 100% for cash consideration of US$13m. As the ownership interest increased by 29%, the Group will derecognise 29% the minority interest. Excess of consideration paid over the carrying amount of the non-controlling interests will be recognised in equity. The Group has elected to recognise this effect in retained earnings.
- On 27 December 2017, the Group agreed to acquire 100% controlling stake in the voting shares of Al Rashid Hospital, subject to the completion of all the conditions precedent referred in SPA. Al Rashid Specialty Hospital LLC is the first private hospitals in the Hail province of KSA, operating 64 active inpatient beds, serving approximately 110,000 outpatients and 9,500 inpatient bed days per year. This asset would be difficult to replicate, and considerably marks NMC's presence in the Northern region of KSA. NMC acquired control of Al Rashid Hospital on 03 January 2018, the date on which all the conditions precedent were met, meaning that control has passed to the Group and full consolidation of results will commence from that date. The total purchase consideration was US$28.7m.

**ACQUISITION IN BRAZIL**

- On 21 December 2017, the Group agreed to acquire 60% controlling stake in the voting shares of Pro-Criar, an unlisted company based in Brazil and specialising in research and medical services in the fields of gynaecology, obstetrics and human reproduction. NMC acquired control of Pro-Criar on 07 January 2018, the date on which all the conditions precedent were met, meaning that control has passed to the Group and full consolidation of results will commence from that date. For convenience, the closest available balance sheet date has been used for the purposes of measuring net assets acquired. The total purchase consideration was US$2.6m.

**NEW SYNDICATION TERM LOAN**

On 26 February 2018, the Group agreed a new syndicated loan facility of US$2,000,000,000.

The new syndicated loan facility will been utilised to refinance some of the existing debts as well as to support the Group's growth strategy in making accretive acquisitions.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice    147 of 164    Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

# Statement of Financial Position
As at 31 December 2017

| | Notes | 2017 US$'000 | 2016 US$'000 |
|---|---|---|---|
| **ASSETS** | | | |
| **Non-current assets** | | | |
| Investment in subsidiary | 4 | 532,965 | 204,127 |
| **Current assets** | | | |
| Other receivables and prepayments | 5 | 113 | 131 |
| Amounts due from a related party | 6 | 19,505 | 343,441 |
| Bank balances and cash | | 162 | 220 |
| | | 19,780 | 343,792 |
| **TOTAL ASSETS** | | 552,745 | 547,919 |
| **EQUITY AND LIABILITIES** | | | |
| **Equity** | | | |
| Share capital | 7 | 31,928 | 31,910 |
| Share premium | 7 | 492,634 | 491,778 |
| Retained earnings | 9 | 27,441 | 23,488 |
| **Total equity** | | 552,003 | 547,176 |
| **Current liabilities** | | | |
| Other payables and accruals | 8 | 742 | 743 |
| **Total liabilities** | | 742 | 743 |
| **TOTAL EQUITY AND LIABILITIES** | | 552,745 | 547,919 |

No profit and loss account is presented by the Company as permitted by Section 408 of the Companies Act 2006.

The financial statements were authorised for issue by the board of directors on 6 March 2018 and were signed on its behalf by:

**PRASANTH MANGHAT**
Chief Executive Officer

**PRASHANTH SHENOY**
Chief Financial Officer

The attached notes 1 to 15 form part of the financial statements.

## Statement of Changes in Equity
For the year ended 31 December 2017

| | Share Capital US$'000 | Share premium US$'000 | Retained earnings US$'000 | Total US$'000 |
|---|---|---|---|---|
| Balance as at 1 January 2017 | 31,910 | 491,778 | 23,488 | 547,176 |
| Total (other) comprehensive income for for the year (note 9) | – | – | 23,425 | 23,425 |
| Share based payments | – | – | 9,181 | 9,181 |
| Dividends paid (note 14) | – | – | (27,779) | (27,779) |
| Exercise of stock option shares | 18 | 856 | (874) | – |
| **Balance as at 31 December 2017** | 31,928 | 492,634 | 27,441 | 552,003 |
| Balance as at 1 January 2016 | 29,566 | 179,152 | (3,495) | 205,223 |
| Total (other) comprehensive income for for the year (note 9) | – | – | 40,693 | 40,693 |
| Share based payments | – | – | 2,640 | 2,640 |
| Dividends paid (note 14) | – | – | (16,350) | (16,350) |
| Issuance of share capital - new | 2,344 | 319,970 | – | 322,314 |
| Share issue costs | – | (7,344) | – | (7,344) |
| Balance as at 31 December 2016 | 31,910 | 491,778 | 23,488 | 547,176 |

The attached notes 1 to 15 form part of the financial statements.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice          149 of 164          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

## Statement of Cash Flows
For the year ended 31 December 2017

| | Notes | 2017 US$'000 | 2016 US$'000 |
|---|---|---|---|
| **OPERATING ACTIVITIES** | | | |
| Profit for the year before tax | 9 | 23,425 | 40,693 |
| Adjustments for: | | | |
| Share based payments | 12 | 9,181 | 2,640 |
| Dividends payment | 14 | (27,779) | (16,350) |
| | | 4,827 | 26,983 |
| Working capital changes: | | | |
| Amounts due from a related party | | (4,901) | (27,861) |
| Other receivables and prepayments | | 18 | (17) |
| Amounts due to a related party | | - | - |
| Other payables and accruals | | (2) | 515 |
| **Net cash (used in) operations** | | (58) | (380) |
| **DECREASE IN CASH AND CASH EQUIVALENTS** | | (58) | (380) |
| Cash and cash equivalents at 1 January | | 220 | 600 |
| **CASH AND CASH EQUIVALENTS AT 31 DECEMBER** | | 162 | 220 |

Note: Proceeds of US$314,970,000 raised from issuance of equity were directly received in NMC Healthcare LLC bank account. For the purpose of statement of cash flows these proceeds are adjusted from amounts due from a related party.

The attached notes 1 to 15 form part of the financial statements.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice          150 of 164          Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

# Notes to the Financial Statements
## At 31 December 2017

**1   CORPORATE INFORMATION**

NMC Health plc (the "Company" or "Parent") is a Company which was incorporated in England and Wales on 20 July 2011. The Company is a public limited company. The address of the registered office of the Company is Level 1, Devonshire House, One Mayfair Place, London, W1J 8AJ. The registered number of the Company is 7712220. The Company's immediate and ultimate controlling party is a group of three individuals (H.E. Saeed Mohamed Butti Mohamed Al Qebaisi (H.E Saeed Bin Butti), Dr BR Shetty and Mr Khalifa Butti Omair Yousif Ahmad Al Muhairi (Mr Khalifa Bin Butti) who are all shareholders and of whom two are directors of the company and who together have the ability to control the company.

The Parent and its subsidiaries (collectively the "Group") are engaged in providing professional medical services and the provision of all types of research and medical services in the field of gynaecology, obstetrics and human reproduction, and the rendering of business management services to companies in the health care and hospital sector. The Group is also engaged in wholesale of pharmaceutical goods, medical equipment, cosmetics, food, IT products and services.

The financial statements of the Company for the year ended 31 December 2017 were authorised for issue by the board of directors on 6 March 2018 and the statement of financial position was signed on the Board's behalf by Mr Prasanth Manghat and Mr Prashanth Shenoy.

**2.1 BASIS OF PREPARATION**

The financial statements have been prepared in accordance with International Financial Reporting Standards as adopted by the European Union as they apply to the financial statements of the Company for the year ended 31 December 2017 and applied in accordance with the Companies Act 2006.

The financial statements are prepared under the historical cost convention. The principal accounting policies adopted in the preparation of these financial statements are set out below.

No profit and loss account is presented by the Company as permitted by Section 408 of the Companies Act 2006.

The Profit for the year in the financial statements of the Company is US$23,425,000 (2016: US$40,693,000).

**FUNCTIONAL CURRENCY**

The UAE Dirham is determined to be the functional currency of the Company. The reporting currency of the Company is United States of America Dollar (US$) as this is a more globally recognised currency. The UAE Dirham is pegged against the US Dollar at a rate of 3.673 per US Dollar.

All values are rounded to the nearest thousand dollars ($000) except when otherwise indicated.

**2.2 SIGNIFICANT ACCOUNTING JUDGEMENTS AND ESTIMATES**
**GOING CONCERN**

These financial statements have been prepared on a going concern basis. The Company has made a profit of US$23,425,000 (2016: US$40,693,000) and has equity of US$552,003,000 (2016: US$547,176,000).

The Company is the parent of NMC Health plc group and is solely a holding company with no business activities of its own. The Company earned a dividend and reported a net profit during the year. The Group's business activities, together with the factors likely to affect its future development, performance and position are set out in the Strategic Review on pages 12 to 35. The financial position of the Group, its cash flows, liquidity position and borrowing facilities are described in the Financial Review on pages 24 to 25.

The Group has considerable financial resources including bank facilities. As a consequence, the directors believe that the Group is well placed to manage its business risks successfully. The directors expect that the Group has adequate resources to continue in operational existence for the foreseeable future. Thus they continue to adopt the going concern basis in preparing the financial statements.

The key assumptions concerning the future, key sources of estimation uncertainty and critical judgements at the statement of financial position date, that have a significant risk of causing a material adjustment to the carrying amounts of assets and liabilities within the next financial year are discussed below:

Exhibit 5 to B.R. Shetty's Request for Judicial Notice          151 of 164          Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

Financial Statements

# Notes to the Financial Statements continued
## At 31 December 2017

### 2.3  CHANGES IN ACCOUNTING POLICIES

The accounting policies adopted are consistent with those of the previous financial period.

#### NEW AND AMENDED STANDARDS AND INTERPRETATIONS:

The Company applied for the first-time certain amendments to the standards, which are effective for annual periods beginning on or after 1 January 2017. The Company has not early adopted any standards, interpretations or amendments that have been issued but are not yet effective.

The new standards, amendments to IFRS, which are effective as of 1 January 2017 are listed below, have no impact on the Company.
• Amendments to IAS 7 Statement of Cash Flows: Disclosure Initiative
• Amendments to IAS 12 Income Taxes: Recognition of Deferred Tax Assets for Unrecognised Losses
• Annual Improvements 2014-2016 Cycle
  – Amendments to IFRS 12 Disclosure of Interests in Other Entities: Clarification of the scope of disclosure requirements in IFRS 12

### 2.4  SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES
#### INVESTMENT IN SUBSIDIARIES

Subsidiaries are entities which are controlled by the Company. Control is achieved when the Company is exposed, or has rights, to variable returns from its involvement with the investee and has the ability to affect those returns through its power over the investee. Specifically, the Company controls an investee if, and only if, the Company has:
• Power over the investee (i.e., existing rights that give it the current ability to direct the relevant activities of the investee)
• Exposure, or rights, to variable returns from its involvement with the investee
• The ability to use its power over the investee to affect its returns

Investments in subsidiaries are recognised at acquisition cost less any provision for impairment.

When the Company incurs increases in or return of share capital, to/from its subsidiaries, such movements are recognised within the cost of investment in subsidiaries.

At each reporting date, an assessment is made to determine whether there are any indicators of impairment. Where an indicator of impairment exists, a formal estimate of the recoverable amount of the investment in subsidiary is made, which is considered to be the higher of the fair value less costs to sell and the value in use. Fair value is determined as the amount that would be obtained from the sale of the investment in an arm's length transaction between knowledgeable and willing parties. When this information is not available the fair value is determined based on the net present value of the future cash flows related to its subsidiaries, using a discount rate that reflects current market assessments of the time value of money and the risks specific to the asset. If the carrying amount of an investment exceeds the recoverable amount, a provision is recorded in the income statement to reflect the investment at the recoverable amount.

Where an impairment charge has previously been recognised, an assessment is made at the end of each reporting period as to whether there is any indication that the impairment loss may no longer exist or may have decreased. If any such indication exists, an estimate of the recoverable amount is made. An impairment loss is reversed to the income statement to the extent that the increased carrying value of the investment in subsidiary does not exceed the carrying value that would have been determined had no impairment loss been recognised for the asset in prior years.

Acquisition of subsidiary under common control
When the Company acquires a subsidiary under common control, the cost of the investment is deemed to be the Company's share of the net assets of the subsidiary at the date of acquisition.

#### CASH AND CASH EQUIVALENTS

For the purpose of the statement of cash flows, cash and cash equivalents consists of cash in hand and bank balances.

#### EQUITY

The Company has issued ordinary shares that are classified as equity. The difference between the issue price and the par value of ordinary share capital is allocated to share premium. The transaction costs incurred for the share issue are accounted for as a deduction from share premium, net of any related income tax benefit, to the extent they are incremental costs directly attributable to the share issue that would otherwise have been avoided.

#### ACCOUNTS PAYABLE AND ACCRUALS

Liabilities are recognised for amounts to be paid in the future for goods and services received whether billed by the supplier or not. Accounts payable are classified as current liabilities if payment is due within one year or less (or in the normal operating cycle of the business if longer). If not, they are presented as non-current liabilities. Accounts payable are recognised initially at fair value and subsequently measured at amortised cost using the effective interest method.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice          152 of 164          Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

## 2.4 SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES CONTINUED

### PROVISIONS

Provisions are recognised when the Company has an obligation (legal or constructive) arising from a past event, and the costs to settle the obligation are both probable and able to be reliably measured.

Provisions are measured at the present value of the expenditures expected to be required to settle the obligation using a pre-tax rate that reflects current market assessments of the time value of money and risks specific to the obligation. Increases in provisions due to the passage of time are recognised in the income statement.

### SHARE BASED PAYMENTS

Equity-settled share-based payments to employees are measured at the fair value of the equity instruments at the grant date. The fair value excludes the effect of non-market-based vesting conditions. Details regarding the determination of the fair value of equity-settled share-based transactions are set out in note 12.

The fair value determined at the grant date of the equity-settled share-based payments is expensed on a straight-line basis over the vesting period, based on the Group's estimate of equity instruments that will eventually vest. At each reporting date, the Group revises its estimate of the number of equity instruments expected to vest as a result of the effect of non-market-based vesting conditions. The impact of the revision of the original estimates, if any, is recognised in the statement of comprehensive income such that the cumulative expense reflects the revised estimate, with a corresponding adjustment to equity reserves/other payables.

No expense is recognised for awards that do not ultimately vest, except for equity-settled transactions for which vesting are conditional upon a market or non-vesting condition. These are treated as vesting irrespective of whether or not the market or non-vesting condition is satisfied, provided that all other performance and/or service conditions are satisfied.

### FOREIGN CURRENCIES

Transactions in foreign currencies are recorded in UAE Dirhams at the exchange rate ruling at the date of the transaction. Monetary assets and liabilities denominated in foreign currencies are retranslated at the rate of exchange ruling at the balance sheet date. All differences are taken to the statement of comprehensive income.

### IMPAIRMENT OF FINANCIAL ASSETS

An assessment is made at each statement of financial position date to determine whether there is objective evidence that a specific financial asset may be impaired. If such evidence exists, any impairment loss is recognised in the statement of comprehensive income. Impairment is determined as the difference between carrying value and the present value of future cash flows discounted at the current market rate of return for a similar financial asset.

### FINANCIAL GUARANTEE CONTRACTS

Financial guarantee contracts issued by the Company are those contracts that require a payment to be made to reimburse the holder for a loss it incurs because the specified debtor fails to make a payment when due in accordance with the terms of a debt instrument. Financial guarantee contracts are recognised initially as a liability at fair value, adjusted for transaction costs that are directly attributable to the issuance of the guarantee. Subsequently, the liability is measured at the higher of the best estimate of the expenditure required to settle the present obligation at the reporting date and the amount recognised less cumulative amortisation.

### DIVIDEND INCOME

Revenue is recognised when the Company's right to receive the payment is established, which is generally when shareholders approve the dividend.

## 3 ACCOUNTING STANDARDS AND INTERPRETATIONS ISSUED BUT NOT EFFECTIVE

The standards and interpretations that are issued, but not yet effective, up to the date of issuance of the Company's financial statements are disclosed below. The Company intends to adopt these standards, if applicable, when they become effective.

### IFRS 15 REVENUE FROM CONTRACTS WITH CUSTOMERS

Nature of change

The IASB has issued a new standard for the recognition of revenue. This will replace IAS 18 which covers contracts for goods and services and IAS 11 which covers construction contracts.
The new standard is based on the principle that revenue is recognised when control of a good or service transfers to a customer.

The standard permits either a full retrospective or a modified retrospective approach for the adoption.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice     153 of 164

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

# Notes to the Financial Statements continued
At 31 December 2017

**3   ACCOUNTING STANDARDS AND INTERPRETATIONS ISSUED BUT NOT EFFECTIVE** CONTINUED
**IFRS 15 REVENUE FROM CONTRACTS WITH CUSTOMERS** CONTINUED
Impact
Management has completed a detailed assessment to estimate the potential impact of adopting the requirements of IFRS 15 by reviewing all its material revenue streams. The adoption of the new revenue accounting standard is not likely to have a material impact on the Company's revenue or profitability. However, there will be some changes which will be required to comply with the new disclosure requirements of the new standard.

As the adoption of the new standard is not likely have a material impact on the Company, management will adopt the requirements of the new standard using the modified retrospective approach.

Mandatory application date/Date of adoption by Group
IFRS 15 must be applied for financial years commencing on or after 1 January 2018.The Company does not intend to adopt the standard before its effective date.

**IFRS 9 FINANCIAL INSTRUMENTS**
Nature of change
IFRS 9 addresses the classification, measurement and derecognition of financial assets and financial liabilities, introduces new rules for hedge accounting and a new impairment model for financial assets.

Impact
The Company has undertaken a detailed assessment of the classification and measurement of financial assets.

Majority of the financial assets held by the Company are currently measured at amortised cost and these financial assets appear to meet the conditions for classification at amortised cost under IFRS 9. Accordingly, the Company does not expect the new guidance to have a significant impact on the classification and measurement of its financial assets.

There will be no significant impact on the Company's accounting for financial liabilities, as the new requirements only affect the accounting for financial liabilities that are designated at fair value through profit or loss and, other than forward foreign exchange rate contracts designated at fair value through profit or loss which are insignificant, the Company does not have any such liabilities. The derecognition rules have been transferred from IAS 39 Financial Instruments: Recognition and Measurement and have not been changed.

The new hedge accounting rules will align the accounting for hedging instruments more closely with the Company's risk management practices. As a general rule, more hedge relationships might be eligible for hedge accounting, as the standard introduces a more principles-based approach. The Company does not currently have any material hedging relationships. Accordingly, the Company does not expect a significant impact on the accounting for its hedging relationships.

The new impairment model requires the recognition of impairment provisions based on expected credit losses (ECL) rather than only incurred credit losses as is the case under IAS 39. It applies to financial assets classified at amortised cost, debt instruments measured at fair value through other comprehensive income (FVOCI), contract assets under IFRS 15 Revenue from Contracts with Customers, lease receivables, loan commitments and certain financial guarantee contracts. Though the adoption of the requirements of the new standard may result in an earlier recognition of credit losses the impact of this is not likely to be material. The Company intend adopt the simplified approach to estimating its expected credit losses with respect to trade receivables as these are non-interest bearing.

The new standard also introduces expanded disclosure requirements and changes in presentation. These are expected to change the nature and extent of the disclosures about its financial instruments particularly in the year of the adoption of the new standard.

Mandatory application date/Date of adoption by Group
IFRS 9 must be applied for financial years commencing on or after 1 January 2018. Based on the transitional provisions in the completed IFRS 9, early adoption in phases was only permitted for annual reporting periods beginning before 1 February 2015. After that date, the new rules must be adopted in their entirety.

The Company does not intend to adopt IFRS 9 before its mandatory date.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice          154 of 164          Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

**3   ACCOUNTING STANDARDS AND INTERPRETATIONS ISSUED BUT NOT EFFECTIVE** CONTINUED

**IFRS 16 LEASES**

IFRS 16 was issued in January 2016, and specifies how the Company will recognise, measure, present and disclose leases. The standard provides a single lessee accounting model, requiring lessees to recognise assets and liabilities for all leases unless the lease term is 12 months or less or the underlying asset has a low value. Lessors continue to classify leases as operating or finance, with IFRS 16's approach to lessor accounting substantially unchanged from its predecessor, IAS 17.

IFRS 16 applies to annual reporting periods beginning on or after 1 January 2019. The Company is currently assessing the impact of IFRS 16 and plans to adopt the new standard on the required effective date.

In addition, the standards and interpretations that are issued, but not yet effective, up to the date of issuance of the Company's financial statements that are not expected to have any material impact on the Company are as follows:
- Amendments to IFRS 10 and IAS 28: Sale or Contribution of Assets between an Investor and its Associate or Joint Venture
- IAS 7 Disclosure Initiative - Amendments to IAS 7
- IAS 12 Recognition of Deferred Tax Assets for Unrealised Losses- Amendments to IAS 12
- IFRS 2 Classification and Measurement of Share-based Payment Transactions – Amendments to IFRS 2

**4   INVESTMENT IN SUBSIDIARY**

|  | 2017 US$'000 | 2016 US$'000 |
|---|---|---|
| As at 1 January and 31 December | 532,965 | 204,127 |

This represents the cost of the investment in NMC Healthcare LLC (previous parent company), a wholly owned subsidiary held through the holding company subsidiaries NMC Health Holdco Limited and NMC Holding Co LLC. NMC Healthcare LLC, is registered and operates in United Arab Emirates.

The subsidiaries held by NMC Heath plc are as follows:

|  | Country of incorporation | Percentage of holdings | |
|---|---|---|---|
|  |  | 31 December 2017 | 31 December 2016 |
| **Direct subsidiaries:** |  |  |  |
| NMC Holding Co LLC | UAE | 100% | 100% |
| NMC Health Holdco Limited | UK | 100% | 100% |
| **Indirect subsidiaries:** |  |  |  |
| NMC Healthcare LLC | UAE | 100% | 100% |
| New Pharmacy Company WLL | UAE | 100% | 100% |
| New Medical Centre LLC-Dubai | UAE | 100% | 100% |
| NMC Specialty Hospital LLC-Abu Dhabi | UAE | 100% | 100% |
| NMC Specialty Hospital LLC- Dubai | UAE | 100% | 100% |
| New Medical Centre Trading LLC-Abu Dhabi | UAE | 100% | 100% |
| NMC Trading LLC-Dubai | UAE | 100% | 100% |
| Bait Al Shifaa Pharmacy LLC-Dubai | UAE | 100% | 100% |
| New Medical Centre LLC-Sharjah | UAE | 100% | 100% |
| New Medical Centre Specialty Hospital LLC-Al Ain | UAE | 100% | 100% |
| Reliance Information Technology LLC | UAE | 100% | 100% |
| BR Medical Suites FZ LLC | UAE | 100% | 100% |
| Bright Point Royal Womens Hospital LLC | UAE | 100% | 100% |
| NMC Day Surgery Centre LLC | UAE | 100% | 100% |
| NMC Hospital LLC (DIP Hospital) | UAE | 100% | 100% |
| Medifertil, S.A | Columbia | 61.90% | 61.90% |
| Centro de infertilidad y Reproduccion Humana SLU (CIRH) | Spain | 88.40% | 88.40% |
| Centro de Medicina della Riproduzione (Biogenesi) | Italy | 53.00% | 53.00% |
| EUVITRO, S.L.U | Spain | 88.40% | 88.40% |
| Copenhagen Fertility Center Holding Aps (DK) | Denmark | 79.60% | 79.60% |
| Huntington Centro de Medicina Reproductive, S/A (BR) | Brazil | 53% | 53% |
| ProVita International Medical Center LLC | UAE | 100% | 100% |
| Lifewise Home Healthcare LLC | UAE | 100% | 100% |
| NMC Royal Hospital LLC | UAE | 100% | 100% |
| The American Surgecenter Pharmacy LLC | UAE | 100% | 90% |
| The American Surgecenter LLC | UAE | 100% | 90% |
| Americare LLC | UAE | 100% | 90% |
| Trans Arabia Drug Store LLC | UAE | 75% | 75% |
| Sunny Specialty Medical Centre LLC. | UAE | 100% | 100% |
| Sunny Medical Centre LLC. | UAE | 100% | 100% |
| New Sunny Medical Centre LLC | UAE | 100% | 100% |

Exhibit 5 to B.R. Shetty's Request for Judicial Notice          155 of 164          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

Financial Statements

## Notes to the Financial Statements continued
At 31 December 2017

**4  INVESTMENT IN SUBSIDIARY** CONTINUED

| | | Percentage of holdings | |
| --- | --- | --- | --- |
| | Country of incorporation | 31 December 2017 | 31 December 2016 |
| Sunny Al Buhairah Medical Centre LLC | UAE | 100% | 100% |
| Sunny Al Nadha Medical Centre LLC | UAE | 100% | 100% |
| Sunny Dental Care LLC. | UAE | 100% | 100% |
| Grand Hamad Pharmacy LLC | UAE | 100% | 100% |
| Hamad Pharmacy LLC | UAE | 100% | 100% |
| Sharjah Pharmacy L.L.C | UAE | 100% | 100% |
| Sunny Sharqan Medical Centre L.L.C. | UAE | 100% | 100% |
| NMC Royal Medical Centre L.L.C. | UAE | 100% | 100% |
| NMC Healthcare L.L.C. | Oman | 100% | 100% |
| Fulfil Trading L.L.C. | UAE | 100% | 100% |
| Nadia Medical Centre L.L.C. | UAE | 100% | 100% |
| Cooper Dermatology and Dentistry Clinic | UAE | 100% | 100% |
| Cooper Health Clinic | UAE | 100% | 100% |
| Fakih IVF Fertility Centre LLC | UAE | 51% | 51% |
| Fakih IVF LLC | UAE | 51% | 51% |
| Beiersdorf Cosmetics Trading LLC- Abu Dhabi branch. | UAE | 100% | 100% |
| New Marketing & Trading Co.LLC-Abu Dhabi | UAE | 100% | 100% |
| Beiersdorf Cosmetics Trading LLC- Al Ain branch | UAE | 100% | 100% |
| New Marketing & Trading Co –LLC-Al Ain branch. | UAE | 100% | 100% |
| New Medical Centre Trading LLC.-branch 2 | UAE | 100% | 100% |
| New Medical Centre Trading LLC-branch 3 | UAE | 100% | 100% |
| Beiersdorf Cosmetics Trading LLC- Ajman branch | UAE | 100% | 100% |
| National Marketing & Trading Co. LLC-Ajman | UAE | 100% | 100% |
| New Marketing & Trading Company LLC-Ajman branch | UAE | 100% | 100% |
| NMC Trading LLC-Ajman branch | UAE | 100% | 100% |
| Beiersdorf Cosmetics Trading Co. LLC-Dubai | UAE | 100% | 100% |
| National Marketing & Trading Co. LLC - Dubai branch | UAE | 100% | 100% |
| New Marketing & Trading Co. LLC- Dubai branch | UAE | 100% | 100% |
| New Medical Centre Trading (Store) LLC-Dubai | UAE | 100% | 100% |
| New Medical Centre Veterinary Medicine & Equipment Trading Co LLC-Dubai | UAE | 100% | 100% |
| NMC Trading LLC- Dubai branch | UAE | 100% | 100% |
| NMC Trading LLC -Fujairah branch | UAE | 100% | 100% |
| NMC Trading RAK- branch LLC | UAE | 100% | 100% |
| New Medical Centre | UAE | 100% | 100% |
| New Medical Centre L.L.C. –branch (Al-Ain,Al wadi) | UAE | 100% | 100% |
| NMC Pharmacy | UAE | 100% | 100% |
| NMC Pharmacy-Branch | UAE | 100% | 100% |
| PVHC KSA | KSA | 100% | 100% |
| TVM KSA Acquisition 2 Ltd. | Cyprus | 100% | 100% |
| NMC Royal Medical Centre LLC-Branch | UAE | 100% | 100% |
| Muscat Central Healthcare L.L.C. | Oman | 100% | 100% |
| NMC Healthcare India Pvt. Ltd. | India | 100% | 100% |
| NMC International Trading L.L.C. | UAE | 100% | 100% |
| Cooper Health Clinic-Branch | UAE | 100% | 100% |
| New Reproductive Care Ltd. | Cayman | 51% | 51% |
| New Medical Centre Abu Dhabi branch | UAE | 100% | 100% |
| New Medical Centre Trading LLC branch 1 | UAE | 100% | 100% |
| NMC Trading LLC branch | UAE | 100% | 100% |
| New Medical Centre Pharmacy Al Ain branch1 | UAE | 100% | 100% |
| Focus Optics | UAE | 100% | 100% |
| Bright Point Pharmacy LLC | UAE | 100% | 100% |
| Lotus Pharmacy LLC | UAE | 100% | 100% |
| New Medial Centre Pharmacy LLC Sharjah | UAE | 100% | 100% |
| New Medical Centre Trading (Store) LLC-Abu Dhabi Br | UAE | 100% | 100% |
| Provita International Medical Centre LLC Alain branch | UAE | 100% | 100% |
| NMC Medical Professional Trading Centre LLC | UAE | 100% | 100% |
| New Pharmacy Company WLL branch 1 | UAE | 100% | 100% |
| New Pharmacy Company WLL branch 2 | UAE | 100% | 100% |
| New Pharmacy Company WLL branch 6 | UAE | 100% | 100% |
| Royal Arsom Wellness Centre LLC | UAE | 100% | 100% |
| NMC Medical Centre branch 2 (scientific store) | UAE | 100% | 100% |

Exhibit 5 to B.R. Shetty's Request for Judicial Notice        156 of 164        Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

#### 4  INVESTMENT IN SUBSIDIARY CONTINUED

| | | Percentage of holdings | |
| | Country of incorporation | 31 December 2017 | 31 December 2016 |
|---|---|---|---|
| New Medical Centre Pharmacy LLC Alain | UAE | 100% | 100% |
| Fertilitetsklinikken Lygten A/S | Denmark | 79.60% | 79.60% |
| Luarmia, S.L. | Spain | 88.40% | 88.40% |
| Al Aseel Laundry | UAE | 100% | 100% |
| Zari Spa & Beauty Centre | UAE | 100% | 100% |
| Zari Spa for Men | UAE | 100% | 100% |
| PEL Assistencia A Infertillidade LTDA | Brazil | 53% | 53% |
| Mustashfa Jadeed Fund. | KSA | 100% | – |
| Al Qadi Speciality Hospital LLC | KSA | 60% | – |
| As Salama Hospital LLC | KSA | 70% | – |
| Al Zahra Private Hospital Company | UAE | 100% | – |
| Sunny Halwan Speciality Medical Centre | UAE | 100% | – |
| Hamad Drug Store LLC | UAE | 100% | – |
| Sunny Maysloon Speciality Medical Centre LLC | UAE | 100% | – |
| Centre de Reproduccio Asistida del ("Fecunmed") | Spain | 70.7% | – |
| NMC Royal Medical Centre LLC | Oman | 100% | – |
| NMC Trading LLC | Oman | 100% | – |

#### 5  OTHER RECEIVABLE AND PREPAYMENTS

| | 2017 US$'000 | 2016 US$'000 |
|---|---|---|
| Other receivables | 98 | 83 |
| Prepayments | 15 | 48 |
| | 113 | 131 |

#### 6  RELATED PARTY TRANSACTIONS

These represent transactions with related parties, i.e. major shareholders and senior management of the Company, and entities controlled, jointly controlled or significantly influenced by such parties. Pricing policies and terms of all transactions are approved by the management of the Company.

The Company's immediate and ultimate controlling party is a group of three individuals (H.E. Saeed Bin Butti, Dr BR Shetty and Mr Khalifa Bin Butti) who are all shareholders and of whom two are directors of the Company and who together have the ability to control the Company. As the immediate and ultimate controlling party is a group of individuals, it does not produce consolidated financial statements.

During the year, the Company was charged a management fees of US$2,907,000 (2016: US$2,869,000) by NMC Healthcare LLC.

Dividend amount of US$27,779,000 (2016: US$16,350,000) was paid, on behalf of the Company, by a subsidiary to the shareholders of the Company.

| | 2017 US$'000 | 2016 US$'000 |
|---|---|---|
| Amounts due from Subsidiary | | |
| Amounts due from a related party | 19,505 | 343,441 |

The Company is a guarantor along with other fellow subsidiary undertakings for the US$1,075,000,000 (2016: US$825,000,000) syndicated loan facility raised by its subsidiary NMC Healthcare LLC.

##### TERMS AND CONDITIONS OF TRANSACTIONS WITH RELATED PARTIES

The sales to and purchases from related parties are made on terms equivalent to those that prevail in arm's length transactions. Outstanding balances at the year-end are unsecured and interest free and settlement occurs in cash. There have been no guarantees provided or received for any related party receivables or payables. For the year ended 31 December 2017, the Group has not recorded any impairment of receivables relating to amounts owed by related parties (2016: US$nil). This assessment is undertaken each financial year through examining the financial position of the related party and the market in which the related party operates.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice      157 of 164      Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

Financial Statements

## Notes to the Financial Statements continued
At 31 December 2017

### 6   RELATED PARTY TRANSACTIONS CONTINUED
#### COMPENSATION OF KEY MANAGEMENT PERSONNEL

|  | 2017 US$'000 | 2016 US$'000 |
|---|---|---|
| Short term benefits | 4,152 | 3,359 |

Key management personnel include all the Non-Executives Directors (2016: all) and one senior management personnel (2016: two).

### 7   SHARE CAPITAL AND SHARE PREMIUM
#### 31 DECEMBER 2017

|  | Number of shares (thousands) | Ordinary shares US$'000 | Share premium US$'000 | Total US$'000 |
|---|---|---|---|---|
| Issued and fully paid (nominal value 10 pence sterling each) | 204,423 | 31,928 | 492,634 | 524,562 |

#### 31 DECEMBER 2016

|  | Number of shares (thousands) | Ordinary shares US$'000 | Share premium US$'000 | Total US$'000 |
|---|---|---|---|---|
| Issued and fully paid (nominal value 10 pence sterling each) | 204,285 | 31,910 | 491,778 | 523,688 |

Issued share capital and share premium movement

|  | Number of shares (thousands) | Ordinary shares US$ '000 | Share premium US$ '000 | Total US$ '000 |
|---|---|---|---|---|
| **31 December 2017** |  |  |  |  |
| At 1 January 2017 | 204,285 | 31,910 | 491,778 | 523,688 |
| Exercise of stock option shares | 138 | 18 | 856 | 874 |
| At 31 December 2017 | 204,423 | 31,928 | 492,634 | 524,562 |
| **31 December 2016** |  |  |  |  |
| At 1 January 2016 | 185,714 | 29,566 | 179,152 | 208,718 |
| Issue of new shares - IPO | 18,571 | 2,344 | 319,970 | 322,314 |
| Share issue costs | – | – | (7,344) | (7,344) |
| At 31 December 2016 | 204,285 | 31,910 | 491,778 | 523,688 |

On 14 December 2016, NMC Health plc had public offering on the London Stock Exchange and raised US$322,314,000, of which US$170,000,000 (9,732,847 shares) was subscribed collectively by Dr. B R Shetty, H.E Saeed Bin Butti and Khalifa Bin Butti and Infinite Investment LLC. Infinite Investment LLC is an associate of H.E Saeed Bin Butti and Khalifa Bin Butti.

### 8   OTHER PAYABLES AND ACCRUALS

|  | 2017 US$'000 | 2016 US$'000 |
|---|---|---|
| Other payables | 604 | 688 |
| Accrued expenses | 138 | 55 |
|  | 742 | 743 |

### 9   PROFIT ATTRIBUTABLE TO MEMBERS OF THE PARENT COMPANY
The Profit for the year in the financial statements of the Company is US$23,425,000 (2016: US$40,693,000).

Exhibit 5 to B.R. Shetty's Request for Judicial Notice          158 of 164          Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

## 10  AUDITOR'S REMUNERATION

The Company paid US$1,008,000 to its auditor in respect of the audit of the Company's annual accounts for the year ended 31 December 2017 (2016:US$984,000), which includes a portion in respect of the audit of the financial statements of the Company.

Fees paid to Ernst & Young LLP and its associates for non-audit services to the Company itself are not disclosed in the individual accounts of NMC Health plc because group financial statements are prepared which are required to disclose such fees on a consolidated basis.

## 11  DIRECTORS' REMUNERATION

|  | 2017 US$'000 | 2016 US$'000 |
|---|---|---|
| Directors' remuneration | 2,624 | 1,435 |

Further information in respect of this compensation paid to directors is disclosed in the Directors' Remuneration Report.

## 12  SHARE BASED PAYMENTS

The Group currently operates two share option schemes:

### LONG TERM INCENTIVE PLAN (LTIP)

Options awarded under the LTIP are made annually to Executive Directors and other senior management. The exercise prices are nil. Options have a life of ten years and a vesting period of three years. The LTIP is subject to performance conditions which can be found in the Directors' Remuneration Report on pages 58 to 77.

### SHORT TERM INCENTIVE PLAN (STIP)

Options awarded under the STIP are made annually to Executive Directors and other senior management. The exercise prices are nil. Options have a life of ten years and a vesting period of 3 years.

Fair values are determined using the Black-Scholes model. Expected volatility has been based on historical volatility over the period since the Company's shares have been publically traded.

Administrative expenses include a charge of US$9,181,000 (2016: US$2,640,000) in respect of the cost of providing share options. The cost is calculated by estimating the fair value of the option at grant date and spreading that amount over the vesting period after adjusting for an expectation of non-vesting.

For options granted in the years ended 31 December 2016 and 2017, the fair value per option granted and the assumptions used in the calculation are as follows:

|  | 2017 STIP | 2016 STIP |
|---|---|---|
| Share price at grant date | £20.740 | £9.675 |
| Fair value at measurement date | £20.425 | £9.520 |
| Exercise price | £nil | £nil |
| Expected volatility | 40% | 40% |
| Expected option life | 2 years | 3 years |
| Expected dividend yield | 0.51% | 0.54% |
| Risk free interest rate | 1.57% | 1.05% |

|  | 2017 LTIP1 | 2017 LTIP2 | 2016 LTIP |
|---|---|---|---|
| Share price at grant date | £16.330 | 27.390 | £9.675 |
| Fair value at measurement date | £16.082 | 27.088 | £9.520 |
| Exercise price | £nil | nil | £nil |
| Expected volatility | 40% | 40% | 40% |
| Expected option life | 3 years | 3 years | 3 years |
| Expected dividend yield | 0.51% | 0.37% | 0.54% |
| Risk free interest rate | 1.49% | 1.38% | 1.05% |

LTIP represent long term incentive plans issued in January and September 2017.

Exhibit 5 to B.R. Shetty's Request for Judicial Notice     159 of 164     Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

# Notes to the Financial Statements continued
At 31 December 2017

**12  SHARE BASED PAYMENTS** CONTINUED
**SHORT TERM INCENTIVE PLAN (STIP)** CONTINUED
The options existing at the year-end were as follows:

| | Number of shares | 2017 Exercise price | Number of shares | 2016 Exercise price | Period when exercisable |
|---|---|---|---|---|---|
| Long term incentive plan (LTIP) October 2014 | 60,292 | £nil | 160,778 | £nil | 29/10/17 to 28/10/24 |
| Short term incentive plan (STIP) October 2014 | 20,165 | £nil | 55,527 | £nil | 29/10/17 to 28/10/24 |
| Long term incentive plan (LTIP) February 2015 | 221,539 | £nil | 221,539 | £nil | 25/02/18 to 24/02/25 |
| Short term incentive plan (STIP) February 2015 | 74,801 | £nil | 74,801 | £nil | 25/02/18 to 24/02/25 |
| Long term incentive plan (LTIP) September 2015 | 49,309 | £nil | 49,309 | £nil | 09/09/18 to 08/09/25 |
| Long term incentive plan (LTIP) March 2016 | 383,717 | £nil | 383,717 | £nil | 15/03/19 to 14/03/26 |
| Short term incentive plan (STIP) March 2016 | 68,151 | £nil | 68,151 | £nil | 15/03/19 to 14/03/26 |
| Long term incentive plan (LTIP) January 2017 | 562,323 | £nil | - | - | 27/01/18 to 26/01/27 |
| Short term incentive plan (STIP) May 2017 | 150,435 | £nil | - | - | 09/05/18 to 08/05/27 |
| Long term incentive plan (LTIP) September 2017 | 120,526 | £nil | - | - | 07/09/18 to 06/09/27 |
| Long term incentive plan (LTIP) | | | | | |
| Total options subsisting on existing ordinary shares | 1,711,258 | | 1,013,822 | | |
| Percentage of issued share capital | 0.8% | | 0.5% | | |

Movement of share options during the year is as follows:

| | 2017 | 2016 |
|---|---|---|
| At 1 January | 1,013,822 | 561,954 |
| Vested in lieu of dividend | 2,290 | - |
| Granted during the year | 833,284 | 451,868 |
| Exercised during the year | (138,138) | - |
| Outstanding at 31 December | 1,711,258 | 1,013,822 |

No options expired or forfeited during the year (2016: nil).

**13  FINANCIAL RISK MANAGEMENT**
The Company's principal financial liabilities are other payables, arising in the normal course of business. The Company's financial assets include an amount due from a related party and bank balances. The company's activities expose it to a variety of financial risks: interest rate risk, credit risk, liquidity risk and foreign currency risk.

**INTEREST RATE RISK**
Interest rate risk is the risk that the fair value or future cash flows of a financial instrument will fluctuate because of changes in market interest rates. The Company is exposed to interest rate risk on its bank balances only, as the balance due from a related party is interest free, and therefore the Company's exposure to interest rate risk is limited.

**CREDIT RISK**
Credit risk is the risk that counterparty will not meet its obligations under a financial instrument, leading to a financial loss. The Company's credit risk arises from amounts due from a related party and bank balances.

The directors assess the credit quality of the related party by taking into account their financial position, past experience and other factors. Management does not expect any losses from non-performance by this counterparty, which is a subsidiary of the Company.

The Company limits its credit risk with regard to bank balances by only dealing with reputable banks. The credit rating of the bank at which the cash at bank is held is AA+.

The Company's credit risk exposure against a corporate guarantee provided to NMC Healthcare LLC in respect of the syndicate loan is US$1,075,000,000 (2016:US$825,000,000).

Exhibit 5 to B.R. Shetty's Request for Judicial Notice          160 of 164          Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA

**13  FINANCIAL RISK MANAGEMENT** CONTINUED

**LIQUIDITY RISK**

The Company's objective is to maintain sufficient funding to meet its obligations as they fall due.

The table below analyses the Company's undiscounted financial liabilities into relevant maturity groupings based on the contractual payment dates.

Balances due within 12 months equal their carrying balances as the impact of discounting is not significant.

| | On demand US$'000 | Less than 3 months US$'000 | 3 to 12 months US$'000 | 1 to 5 years US$'000 | Total US$'000 |
|---|---|---|---|---|---|
| **At 31 December 2017** | | | | | |
| Other payables | - | 604 | - | - | 604 |
| **Total** | - | 604 | - | - | 604 |
| At 31 December 2016 | | | | | |
| Other payables | - | 688 | - | - | 688 |
| Total | - | 688 | - | - | 688 |

In addition to the above financial liabilities, the Company has provided a corporate guarantee of US$1,075,000,000 (2016: US$825,000,000) to NMC Healthcare LLC in respect of the syndicate loan. The fair value of the corporate guarantee is US$nil as at 31 December 2017 (2016: US$nil).

**FOREIGN CURRENCY RISK**

Foreign currency risk arises when future commercial transactions or recognised assets or liabilities are denominated in a currency that is not the entity's functional currency.

The Company is exposed to currency risk on its other payables denominated in Pound Sterling. Foreign currency payable balances included in the statement of financial position denominated in Pound Sterling are US$583,000 (2016: US$680,000). The impact of possible of foreign currency movement is not significant.

**FAIR VALUE ESTIMATION**

The fair values of the Company's financial instruments are not materially different from their carrying values at the statement of financial position date.

**FINANCIAL GUARANTEES**

The Company is a guarantor along with other fellow subsidiary undertakings for US$1,075,000,000 (2016: US$825,000,000) of a syndicated bank loan raised by its subsidiary NMC Healthcare LLC.

**14  DIVIDENDS**

In the AGM on 23 May 2017 the shareholders approved a dividend of 10.6 pence per share, amounting to GBP 21,753,000 (US$27,779,000) to be paid to shareholders on the Company's share register on 12 May 2017. The dividend `amount was paid to the shareholders on 1 June 2017 (30 June 2016: a dividend of GBP 11,514,000 equivalent to US$16,350,000 was approved on 3 June 2016 and paid on 14 June 2016). No interim dividend was declared during the year. Subject to shareholder' approval at the Annual General Meeting on 28 June 2018, a final dividend of 13.0 pence per share, GBP 26,952,000 (US$37,194,000) will be paid on 10 July 2018 to shareholders on the Company's share register on 15 June 2018.

**15  TAX**

The Group operates in the United Arab Emirates and Spain and certain other countries. There is no taxable income in the UK and accordingly there is no tax liability arising in the UK. The unused tax losses amount to US$46,549,000 as at 31 December 2017 (2016: US$25,549,000).

Exhibit 5 to B.R. Shetty's Request for Judicial Notice     161 of 164     Hashem, et al., v. NMC Health PLC, et al., 2:20-cv02303-CBM-MAA

# Shareholder information

### AGM AND DIVIDEND DATES

| | |
|---|---|
| Ex-dividend date for final dividend | 14 June 2018 |
| Record date for final dividend | 15 June 2018 |
| Annual General Meeting | 28 June 2018 |
| Final dividend payment | 10 July 2018 |

### DIVIDENDS
Information in relation to the Company's dividend policy and the proposed dividend payment per share is set out in the Financial Review on page 24 and in Note 26 to the Consolidated Financial Statements on page 133.

### SHARE CAPITAL
The issued share capital as at 1 January 2017 was  20,428,571 divided into 204,285,714 Ordinary shares of 10p each. On 16 November 2017, the Company issued 138,138 new Ordinary shares. No other changes to the share capital of the Company were made during the year.

The issued share capital of the Company as at 31 December 2017 was  20,442,385.20 divided into 204,423,852 Ordinary shares of 10p each. Options and share awards granted by the Company over its share capital are set out in the Directors' Remuneration Report on pages 58 to 77.

Under the articles of association of the Company, all Ordinary shares have equal rights to dividends and capital and to vote at general meetings of the Company. The directors are not aware of any agreements between holders of the Company's shares that may result in restrictions on the transfer of securities or in voting rights.

### ANNUAL GENERAL MEETING
The annual general meeting of NMC Health plc will be held at Allen & Overy LLP, One Bishops Square, London E1 6AD on 28 June 2018 at 2.00 pm.

Further details of the resolutions to be proposed at the annual general meeting is set out in the Notice of Annual General Meeting circular which is included in a separate document enclosed with this annual report.

### SHARE REGISTRAR
Our Registrars are Link Asset Services who can be contacted as follows:

Address: Link Asset Services, The Registry, 34 Beckenham Road, Beckenham, Kent, BR3 4TU

| | |
|---|---|
| Email: | enquiries@linkgroup.co.uk |
| Telephone: | 0871 664 0300 |
| | International: +44 (0) 371 664 0300 |

Calls cost 12p per minute plus your phone company's access charge. Calls outside the United Kingdom will be charged at the applicable international rate. Lines are open between 09:00 - 17:30, Monday to Friday excluding public holidays in England and Wales.

### PRINCIPAL SHAREHOLDERS
As at 6 March 2018, the Company is aware of the following significant shareholdings in the Ordinary shares of the Company:

| Shareholder | Number of shares | % of issued share capital held | Nature of holding |
|---|---|---|---|
| Dr B. R. Shetty | 39,707,052 | 19.09 | Direct |
| H.E. Saeed Bin Butti | 36,419,091 | 17.51 | Direct |
| Khalifa Bin Butti | 30,696,561 | 14.76 | Direct |
| Infinite Investment LLC | 15,280,426 | 7.35 | Direct |

Exhibit 5 to B.R. Shetty's Request for Judicial Notice          162 of 164          Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv02303-CBM-MAA







**nmc health**

NMC Health plc
Level 1 Devonshire House
One Mayfair Place
Mayfair
London W1J 8AJ