Mark B. Chassman, SBN 119619
Email: mchassman@chassmanseelig.com
Ana Vasquez, SBN 231903
Email: avasquez@chassmanseelig.com
CHASSMAN & SEELIG, LLP
1250 Sixth Street, Suite 403
Santa Monica, CA 90401
Telephone: (310) 929-7192
Fax: (310) 929-7627

Alexander D. Pencu (*pro hac vice*)
Email: adp@msf-law.com
Benjamin D. Bianco (*pro hac vice*)
Email: bdb@msf-law.com
Austin D. Kim (*pro hac vice*)
Email: adk@msf-law.com
MEISTER SEELIG & FEIN LLP
125 Park Avenue, 7th Floor
New York, NY 10017
Telephone: (212) 655-3500
Fax: (646) 539-3649

*Attorneys for Defendant B.R. Shetty*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRIS HASHEM, individually and on behalf of all others similarly situated, | Case No.: 2:20-cv-02303-CBM-MAA |
| Plaintiff, | (Consolidated with Case No. 2:20-cv-02895-CBM-MAA) |
| v. | |
| NMC HEALTH PLC, PRASANTH MANGHAT, KHALIFA BIN BUTTI, PRASHANTH SHENOY, H.J. MARK TOMPKINS, and B.R. SHETTY, | |
| Defendants. | |

## EXHIBIT 6
## TO SECOND REQUEST FOR JUDICIAL NOTICE AND INCORPORATION BY REFERENCE IN SUPPORT OF MOTION TO DISMISS OF DEFENDANT B.R. SHETTY

nmc health

# Continuing our strategic growth journey

NMC Health plc
Annual Report
and Accounts 2018



# NMC Health is the leading private healthcare operator in the GCC with international services across 19 countries.

NMC believes in providing healthcare to all segments of society while upholding the highest ethical medical practices. Our patients are assured of receiving the highest standards of quality at affordable prices. Healthcare is not simply about detecting, diagnosing, informing or treating an individual, but it is about helping people to lead a wholesome and healthy life.



Read the annual report and much more on our website:
**www.nmchealth.com**

At a Glance

# Our Business

NMC has created regional clusters to aid the process of centralisation of key services to benefit from our strong growth over the past few years. We operate two business lines, Healthcare and Product Distribution, which are divided into five business verticals as indicated below:



## Healthcare

Multi-specialty

Maternity & Fertility

Long-term & Home Care

Operations & Management

## Product Distribution

Products & Consumables

## Where we operate

NMC has created regional clusters to aid the process of centralisation of key services to benefit from our strong growth over the past few years.

USA

Spain

Colombia

Brazil

● Own and Operation & Management
● Own
● Operation & Management



NMC focuses on underserved medical services and geographies within the countries it operates in and will continue to utilise organic and inorganic growth strategies to address these opportunities.

## Company Highlights



Patients

# 7.5m

2017: +5.7m



Licensed beds

# 2,186

2017: 1,539



Doctors

# c.1,735

2017: c.1,400



Employees

# c.18,000

2017: c.14,000



Countries

# 19

2017: 13



Facilities

# 189+

2017: 129 own and managed facilities
(51 owned facilities and 78 managed)

### Overview
At a Glance
2   Joint Chairmen's 2018 letter to Shareholders

### Group Strategic Report
6   Chief Executive Officer's Review
8   Our Business Model
10   Our Strategy
12   Financial Summary and Operational Highlights
13   Business and Financial Review
20   Key Performance Indicators
22   Strategic Risk Management
26   Corporate Social Responsibility

### Governance
38   Board of Directors
40   Senior Management Team
42   Corporate Governance Report
62   Directors' Remuneration Report 2018
79   Directors' Report

### Financial Statements
84   Directors' Statements
87   Independent Auditor's Report
96   Consolidated Income Statement
97   Consolidated Statement of Other Comprehensive Income
98   Consolidated Statement of Financial Position
99   Consolidated Statement of Changes in Equity
101   Consolidated Statement of Cash Flows
103   Notes to the Consolidated Financial Statements
158   Statement of Financial Position
159   Statement of Changes in Equity
160   Statement of Cash Flows
161   Notes to the Financial Statements

### Other Information
174   Shareholder information

Exhibit 6 to B.R. Shetty's Request for Judicial Notice          5 of 182          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

Overview

Joint Chairmen's 2018 letter to Shareholders

# Continuing our strategic growth journey

The past year has been one of solid progress as we continue to execute our strategy of growth and integration of the businesses now making up the wider NMC Group.

Dear Shareholder,

2018 saw Group Revenue increase to US$2.1bn in 2018, up 28.3% from 2017. Consolidated EBITDA increased by 37.9% to US$487.4m over the same period. These financial results are an impressive testament to the achievements of our management and staff in 2018.

### Integration and Efficiencies
As we reported last year, 2017 was an important year of consolidation, and management have in 2018 built on the success of its integration program in 2017. In pursuing these projects, management have sought to ensure that the Group operates through its geographic clusters and business verticals as efficiently as possible. The management structure has been enhanced, providing additional experience and bandwidth.

From a financial perspective, good organic growth was achieved not only in EBITDA but also in EBITDA margin in 2018. Our published guidance indicates that this trend continues into 2019.

### Strategy
In December 2017, the Company reiterated and updated its growth strategy. During 2018, the Company:

- Acquired the remaining minority interest in Fakih IVF that it didn't previously own;
- Acquired 70% of CosmeSurge, a growing cosmetic surgery business;
- Opened a number of new IVF clinics, and acquired Boston IVF, to widen the reach of the growing IVF business;
- Opened and acquired hospital facilities in the Kingdom of Saudi Arabia; and
- Acquired Aspen Healthcare in the UK.

These acquisitions and new openings have been accretive for shareholders in the shorter term.

In addition, we also announced recently that the creation of a Joint Venture with Hassana Investment Company in the Kingdom of Saudi Arabia had been finalised.

2    NMC Health plc Annual Report and Accounts 2018

*"We also announced recently that the creation of a Joint Venture with Hassana Investment Company in the Kingdom of Saudi Arabia had been finalised."*

### Long-Term Financial Stability

During 2018 and early 2019, the management team have also been focussed on ensuring that the Company's debt is structured efficiently.

In April 2018 the Company issued a $450m Convertible Bond converting existing debt into a more structured seven-year bond. In November 2018, the Company issued a $400m Sukuk financing arrangement. The Sukuk is the first US$ denominated Sukuk by a healthcare provider globally as well as the first international capital markets issuance from the healthcare sector in the MENA region.

These financing transactions lengthened the average term of our net debt and provide the Group with the long-term stability required for a phased expansion strategy.

### Dividend

As a result of our growth, good performance and continuing financial stability, your Board intends to retain its dividend payment policy of distributing a dividend of approximately 20% of profit after tax. Therefore, the Board plans to submit a resolution to shareholders at the 2019 Annual General Meeting authorising payment of a cash dividend of 18.1 pence per share, an increase of 39% compared to the 2017 dividend payment.

### Management

The increasing size of the Group has led Prasanth Manghat to continue the expansion of his management team in both the Corporate Centre and within Group businesses. This has included the development of an NMC Group HR function and an expanded Quality Department. The management team now has additional experience and bandwidth to satisfy the demands of the Group's additional business streams and the pressure of geographical expansion into new markets.

### Environmental, Social and Governance

The focus on governance and the wider social conscience has increased in recent years. The Board and management have likewise focused more attention on these matters.

The Board believes that the Company has a good governance structure providing assurance to all shareholders of the Company.

During 2018 the Board restructured its Committees, which had been in place for three years, to ensure that they provide a fresh focus on Committee business. The Board has a wide cultural and ethnic mix as well as a wide range of skills and operational experience from different parts of the world. Shareholders can therefore take continued re-assurance that different viewpoints are well represented during Board discussions.

The Board for the first time, undertook an externally facilitated board evaluation in 2018. The evaluation concluded that "the Board is operating effectively and healthily". A summary of the findings of the board evaluation is set out on page 46.

The Company has always considered both the interests of its primary stakeholders and those of the external communities within which it operates. With the integration and transformation of the Group well on track, management and the Board have been able to focus more fully on the transparency of our Environmental, Social and Governance (ESG) activities and the reporting of these activities to shareholders.

In 2018 the Company published its first ESG report and enhanced further its employee engagement activities. These included the commencement of employee forums in facilities across the Group. Our ethical related policies and procedures were also updated and awareness and training increased on these policies across the Group's employee base. Our employee and patient engagement activities, including our work to promote healthy living in the communities in which we operate, are continuing examples of our approach to social activities.

The Board adopted a Modern Slavery Policy in 2018 and has published its first Modern Slavery Statement. This Statement reviews our internal policies and procedures and Modern Slavery risks within both our own businesses and those of our supplier base.

In line with many other companies we see all aspects of ESG and stakeholder engagement as a journey and we will continue to update shareholders on progress in this area each year.

### Board and Employees

Dr Nandini Tandon decided recently to step down from the Board to focus on her other business interests. The Board has thanked Nandini for her contribution as a Director over the last 4½ years and wish her well for the future. The search for a new independent non-executive Director is in progress.

The Board is very appreciative of the hard work of all our management team and staff in delivering quality services for our patients and returns for our shareholders. The continued commitment and support they have shown during this continuing period of transformational change and growth is testament to their strong work ethic.

### Outlook

Despite challenging economic conditions being experienced in some global financial markets, we remain positive in the markets in which we operate. The ongoing drive to increase private healthcare participation in a number of our primary markets, rising affluence and increasing awareness of the importance of proactive healthcare result in generally favourable conditions within our areas of operation. Your Board continues to view the outlook for your Group with confidence.

### H. J. MARK TOMPKINS
Independent Non-Executive Joint Chairman

### Dr B. R. SHETTY
Non-Executive Joint Chairman

Group Strategic Report

# Future growth driven by well-defined strategy

Our long-term growth strategy continues to accelerate our expansion into more complex medical, and thus higher value added, specialty healthcare segments.

4    NMC Health plc Annual Report and Accounts 2018

Group Strategic Report

Chief Executive Officer's Review

# 2018 builds on the foundations laid in previous years

FY 2018 set another year of record top and bottom lines, with revenues reaching US$2,057.3m and EBITDA at US$487.4m. 2018 has benefited from the solid growth foundations laid in previous years, while simultaneously building upon them.

As I highlighted in my previous annual review, 2017 was a year of integration and consolidation, key themes that continued in 2018. The cluster-based approach adopted in the previous year proved instrumental in unlocking efficiencies within the Group during FY 2018 and also allowing continued rapid expansion. I often get asked how NMC manages to grow so quickly without unduly pressurizing management. Our verticals-based structure, combined with the clusters-based management approach, has proven instrumental in allowing the Company to maintain sharp growth without constraining management bandwidth.

**Integration process picks up pace**
Building on 2017's core theme of integration, FY 2018 witnessed a more concerted effort towards unlocking additional synergies across NMC's growing healthcare network. Few examples reflect this as adequately as the opening of a CosmeSurge clinic in Al Zahra hospital. The combination of two assets, each acquired in 2017 (Al Zahra hospital) and 2018 (CosmeSurge), respectively, speaks volumes of the Group's ability to streamline acquisition and integration capabilities. The successful introduction of long-term care beds in both NMC Royal Abu Dhabi and Al Zahra hospital is another example in this regard. In fact, the Company has added another 15 long-term care beds in Al Zahra hospital after rapid occupancy of the initial batch of beds.

The Group's Integration and Efficiency projects are important to extract further value from legacy and acquired assets. A significant proportion of the Group's EBITDA growth in FY 2018 is organic derived from both increasing revenues and the success of management's integration and efficiency projects over the last two years.

6     NMC Health plc Annual Report and Accounts 2018

*"A significant proportion of the Group's EBITDA growth in FY 2018 is organic derived from both increasing revenues and the success of management's integration and efficiency projects over the last two years."*

### UAE remains the engine of short to medium term growth...

Despite being the most dominant private healthcare operator in the UAE, NMC continues to see attractive growth opportunities in its home market. The Group's hospital network stands out from its competition due to two key factors: 1) an unrivalled geographic reach, with NMC's network spread across six of the seven Emirates in the country and 2) catering to the entire range of patient base in economic terms. It is the latter that has given NMC the scale and critical mass to offer some of the most complex medical services in the country. The collaborations signed with Boston Children's Hospital and the Cincinnati Children's Hospital is an embodiment of these factors. The combination of state-of-the-art facilities and an unrivalled paediatric patient base in the country led two of the world's top children hospitals to sign an exclusive agreement with NMC across not just the UAE, but the entire GCC region.

The continued roll-out of mandatory insurance in the UAE, with Dubai the latest to complete its implementation last year, remains a key growth driver in the country. Capitalizing on this opportunity, the Group has outlined a 300+ beds expansion program, involving brownfield expansions of the two existing facilities in Dubai and a 100-bed greenfield facility in the underserved Mirdif area.

As outlined at our 2018 Capital Markets Day, the UAE continues to offer growth opportunities that were unavailable even up until recent years. The OSM agreement signed with ADNOC in 2018 is one such example. The prestigious contract has extended NMC's reach to the town of Ruwais, a location that may not otherwise have become part of the Group's network.

### ... while KSA offers exciting longer-term growth opportunities

Hosting nearly triple the population size of the UAE, the underserved KSA healthcare market offers many attractive growth opportunities. While accounting for a relatively small share of NMC's top and bottom lines in 2018, KSA is expected to become a significant contributor to the Company's financial performance in the longer term.

NMC signed a joint venture agreement with GOSI/Hassana Investment Company, which was recently finalized. Positioned as the second largest multispecialty operator in the Kingdom in terms of number of beds, the JV is ideally positioned to significantly increase NMC's penetration of the Saudi market.

### ESG: Increasing focus on sustainability and ethical impact

Be it patient care, employee satisfaction, corporate governance or maintaining rights of minority shareholders, sustainability and ethics have long been ingrained in NMC's core strategy. In 2018 the Company started to coordinate its Group efforts in this area, much of which had previously been undertaken and driven at individual business level. We published our first annual ESG report, which documents a wide range of KPIs relevant to the Company, as well as the wider sector. With both equity and debt markets laying greater emphasis on ESG, the Company has enhanced the quality of reporting, as well as investor engagement, on this front.

Apart from improving its reporting standard, the Company maintains its efforts on improving the underlying metrics that form the foundation of a sustainable and ethical business. Our employees truly serve as the core asset of the company. Management continues to take steps to further improve the working environment. As part of this process, a new Head of HR (GCC) was hired during 2018, who brings substantial international experience and reinforces the department's senior management team. Additionally, the Company continues host a number of events to recognize the performance of high-achieving employees, along with giving them a chance to interact with top management. The most prominent event in this regard is the Group's Foundation Day, celebrated on 1 August of every year to commemorate the history of the Company, as well as its future. A number of informal events are held regularly, ranging from friendly sports matches to talent competitions, which act as team strengthening exercises, as well as an opportunity for staff members to interact with senior management in an informal environment.

In 2018, the Company reviewed further its engagement activities with employees. New Employee Forums have been set up across the Group as a new, more formal, way of Senior Management and the Board engaging with employees.

The success of management's continuous efforts to improve the Group's work environment is reflected by the fact that NMC has consistently been recognized as one of the "Top Companies to Work For" by the Great Place to Work Institute in recent years.

**PRASANTH MANGHAT**
Chief Executive Officer

Group Strategic Report

## Our Business Model

# How we create value



### Healthcare division continues to increase share of top and bottom lines

NMC's business is built upon 5 distinct business verticals, 4 within Healthcare as well as Product Distribution. The Company's primary focus in terms of expansion remains in the Healthcare businesses, as a result of which its contribution to the top and bottom lines continues to increase. Management expects this trend to continue.

### Healthcare's share of revenues continues to rise...

Revenue Share



| | Healthcare | Distribution |
|---|---|---|
| 2018 | 25.9% | 74.1% |
| 2017 | 29.5% | 70.5% |
| 2016 | 34.4% | 65.6% |

● Healthcare
● Distribution

Source: NMC

### ...as well as its contribution to profitability

EBITDA Share



| | Healthcare | Distribution |
|---|---|---|
| 2018 | 12.3% | 87.7% |
| 2017 | 12.7% | 87.3% |
| 2016 | 16.3% | 83.7% |

● Healthcare
● Distribution

Source: NMC

8    NMC Health plc Annual Report and Accounts 2018

## Healthcare Division

The Healthcare division is built upon 4 verticals: Multi-Specialty, Maternity & Fertility, Long-term & Home Care and Operations & Management. The Company has an expansive footprint, operating and managing 189 facilities across 19 countries. With a total of 2,186 licensed beds, the Group continues to cater to underserved segments of the healthcare industry, with a dual focus on 1) unaddressed medical service requirements and 2) filling in geographic gaps within its target markets.

The Healthcare business remains the biggest contributor to NMC's top and bottom lines. The Company's business model entails pan-geographic presence within its target markets as well as covering the entire spectrum of patients in economic terms. Medical services provided by NMC range from outpatient and inpatient services across its network of clinics and hospitals to medical diagnostics and sales at pharmacies. The Group also ranks as one of the most sophisticated private healthcare providers in UAE in terms of complexity of care, with plans to replicate this successful model in other target markets in the GCC as well.

The Multi-specialty vertical, which encompasses all of NMC's hospitals, remains the single largest contributor to the Company's income, accounting for 74.5% of Healthcare revenues in 2018. Insured individuals account for the majority of NMC's patient base and as such insurance accounts for 79% of Healthcare revenues, while cash payments account for the remainder.

### Operational clusters facilitate institutionalization of the business

As detailed in last year's annual report, NMC created operational clusters in 2017 to delegate greater responsibility, authority and business control in the hands of new General Managers (GM) appointed for each cluster. This has significantly facilitated real-time decision making, improved control of day to day operations, better use of delegated authority and hence, enhanced performance.

From an operational point of view, NMC's healthcare business is split into 6 clusters. This division has been done either on the basis of geography (such as Sharjah) or service line (such as long-term & home care). Moreover, the head of the largest asset in each cluster also acts the General Manager of the respective cluster. The cluster GMs report to three Regional Heads, who in turn report to the COO of the Healthcare division. The reporting line of the latter culminates with the Group CEO.

NMC's management feels that this cluster-based approach is the best means of managing the Group's rapid expansion by essentially empowering operations at the asset level, while simultaneously increasing accountability. Moreover, the Company has realized higher cost synergies as well as launched revenue enhancement projects on the back of the new operational structure in place since 2017.

## Product Distribution & Wholesale

NMC's Distribution business ranks as one of the largest in the UAE, offering over 115,000 products across two segments: Pharma and non-pharma. Offering a complete supply chain solution, the Distribution business provides its clients a wide range of services: sales, marketing, merchandising, promotions, warehousing, delivery, analytics and technical service. Customers are offered payment terms ranging from 1 month for small enterprises to 120 days for large corporations. Moreover, NMC also acquires inventory as part of the distribution chain and as such, the business requires funding for working capital.

In addition to a wide customer reach, the Distribution business benefits from over 44% of its total SKUs being distributed under exclusive agreements. This has proven instrumental in allowing NMC to sustainably maintain significantly higher margins than typical distribution businesses.

The Group's distribution capabilities are supported by a network of over 780,000 sqft of warehousing space across the UAE, more than 240 vehicles and 769 professionals across the entire value chain ensuring that over 15,000 customers of the Distribution division are catered to properly.

Find out more: This business model reflects our evolved strategy which is described on pages 10 and 11.

Exhibit 6 to B.R. Shetty's Request for Judicial Notice          13 of 182          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

Group Strategic Report

## Our Strategy

# Significant progress made in 2018 on continuing implementation of strategy

The updated strategy outlined in 2017 continues to channel the Company's growth trajectory along a well-defined path. Significant progress was made in the implementation of the three key tenets of the Group's strategy: capacity building, capabilities focus and geographic expansion.

## Our strategy is built on three key tenets



**Capacity Build**



**Capabilities Focus**



**Geographic Expansion**

### 2015 Strategy Update

Accelerate the establishment of Centres of Excellence in key specialities within existing hospitals.

Increase participation in the growing UAE medical tourism industry and establish NMC as a destination of choice.

Grow NMC's medical specialty offering and clinic network within the UAE and maximising operational synergies.

Establish a strategic presence outside the UAE with leading global medical institutions to enhance and expand technological know-how and medical expertise.

Increase NMC's footprint in Saudi Arabia and the broader GCC via organic initiatives and acquisitions.

### 2017 Strategy Update

Addition of new verticals focused on highly underserved segments in the UAE and wider GCC and further development of Centres of Excellence.

Expanding the healthcare business' target market from the GCC to wider emerging markets.

Fertility to be developed as a global business taking advantage of substantial growth opportunities.

Rapid adoption and deployment of technological innovation via both organic initiatives and acquisitions.

The updated strategy outlined in 2017 continues to channel the Company's growth trajectory along a well-defined path. Significant progress was made in the implementation of the three key tenets of the Group's strategy: capacity building, capabilities focus and geographic expansion.

The Group continued **Capacity** building through organic and inorganic means during 2018. As part of this process, NMC is adding over 300 new beds in the Dubai market through brownfield expansions of its two existing facilities (NMC Royal DIP and Dubai Specialty Hospital) and a greenfield hospital in the underserved Mirdif Hills development. The Group also further enhanced its presence in the UAE through expansions into the Northern Emirates through both organic (multispecialty clinic in Ajman and CosmeSurge clinic in Ras Al Khaimah) as well as inorganic means (Royal RAK Medical Centre). Similarly, the Company continues to add capacities in its key markets of Oman and Saudi Arabia. The latter witnessed NMC's expansion into Riyadh, the largest healthcare market in KSA, through the acquisition of Al-Salam Medical Group.

The acquisitions of CosmeSurge and Aspen Healthcare during 2018 represent two of the most significant steps taken by the Group to enhance its suite of **Capabilities**. The only institutionalized cosmetics business in the GCC, CosmeSurge substantially enhances NMC's capabilities in the high-margin cosmetics business. In fact, cosmetics has been identified as the next potential vertical for the Group, as highlighted in the 2018 Capital Markets Day. Moreover, the acquisition of UK-based Aspen Healthcare has considerably raised NMC's expertise in Oncology and Orthopaedics, in addition to providing ideal locations in the UK for expansion of the Group's IVF business. The Company also signed exclusive collaboration agreements with Cincinnati Children's Hospital and Boston Children's Hospital covering the entire GCC region. Under the agreements, doctors from the two top-ranked US-based paediatric hospitals visit NMC Royal Abu Dhabi each month and are now offering medical services that did not exist previously in the country. The paediatrics segment remains underserved across the entire GCC and continues to offer strong growth opportunities. In fact, paediatrics was also identified in the 2018 Capital Markets Day as a potential vertical over the longer term.

2018 also witnessed a significant expansion of NMC's **Geographic** reach. As highlighted in last year's annual report as well, the GCC remains the core focus for NMC's capital expenditure program, with expansions outside the region focused primarily on the IVF business or O&M contracts. Within the UAE, NMC expanded its reach into the Northern Emirates and now ranks as the only private healthcare operator in the country with a presence in 6 out of the 7 Emirates. Similarly, pursuing its strategy of a pan-Saudi approach, the addition of Riyadh extends NMC's reach to 5 cities in the Kingdom. Moreover, the recently concluded JV with GOSI/Hassana Investment Company provides NMC the ideal platform to boost its presence in the Kingdom.

The highly fragmented IVF business remains a truly global opportunity for NMC, with the company adding its presence in another 5 countries: Sweden, Latvia, US, Oman and Kenya. While entry into the other three markets were achieved through acquisitions, expansion into Oman and Kenya was achieved through organic means. NMC's IVF operations are now spread across a total of 11 countries.

The Group also started managing healthcare facilities in Egypt, Kenya and Seychelles during 2018, extending the NMC's reach into the wider Emerging Markets. As detailed in last year's annual report, while NMC's capital expenditure program remains sharply focused on the GCC, O&M contracts offer a lucrative means of gaining exposure to attractive Emerging Markets, without putting capital at risk.

Exhibit 6 to B.R. Shetty's Request for Judicial Notice          15 of 182          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

Group Strategic Report

# Financial Summary and Operational Highlights

FY 2018 proved to be another year of record revenues and profits for NMC on the back of continued efficiencies at existing facilities and successful integration of acquired assets.

| US$m (unless stated) | FY 2018 | FY 2017 | YoY Growth |
|---|---|---|---|
| Revenue | 2,057.3 | 1,603.4 | 28.3% |
| EBITDA | 487.4 | 353.4 | 37.9% |
| EBITDA margin | 23.7% | 22.0% | 170 bps |
| Earnings per share (US$)-Basic | 1.196 | 0.910 | 31.4% |
| Net Profit | 251.9 | 209.2 | 20.4% |
| Adjusted Profit | 283.5 | 236.6 | 19.9% |
| Adjusted Earnings Per Share (US$) | 1.332 | 1.036 | 28.5% |

Notes:
Adjusted Profit is same as shown in Note 17.
Adjusted Earnings per share equals Diluted adjusted earnings per share as shown in Note 17.
EBITDA equals Profit from operations before depreciation, amortization, transaction cost and impairment as shown in the Condensed Consolidated Income statement. This is the definition of EBITDA which is used throughout the document.
Weighted average shares outstanding in FY 2018 stood at 209.3m shares compared to 205.8m shares in FY 2017. The increase resulted from the issuance of 3.5m shares for partial payment of outstanding minorities in Fakih IVF and exercise of share options.

- Strong financial performance with continued growth (both organically and inorganically), with Group revenues growing by 28.3% to US$2,057.3m.
- Organic revenue growth for FY 2018 ahead of guidance at 15.4% YoY.
- EBITDA growth (+37.9% YoY to US$487.4m) continued to outpace revenue growth, translating into 170bps improvement in EBITDA margin to 23.7%.

- Healthcare division continues to drive NMC's growth with revenue and EBITDA up 34.4% and 37.3% respectively.
- Net Profit increased 20.4% YoY to US$251.9m, the highest in Group's history.
- Strategic initiatives in 2018 including; expansion into Saudi Arabia, integration of CosmeSurge and extension of the IVF platform, including in USA and Africa, further enhancing our platform for growth.

- Healthy cash flow including improvement in the Group's working capital position through strong collections to reduce days sales outstanding to 96.
- Stable balance sheet to support future growth with year-end net debt/EBITDA at 3.1x.
- Strong start to current year reinforces confidence in operational performance and outlook for 2019 of +22-24% YoY revenue growth and +18-20% YoY EBITDA growth. The board remains committed to maintaining a 20-30% payout ratio, which it believes to be a progressive policy given our underlying growth rate in the business.



For more information see our Business and Financial Review on pages 13 to 19.

12    NMC Health plc Annual Report and Accounts 2018

Business and Financial Review

# Solid growth performance in 2018

NMC has focused on both integration and strategically led organic growth as well as identifying new opportunities to continue our strategic growth journey.

- Group reported revenues reached US$2,057.3m in FY 2018, up 28.3% YoY.
  - The Healthcare division recorded 34.4% YoY increase in revenues to reach US$1,561.4m, while revenues for the Distribution division stood at US$545.1m (+12.0% YoY).
  - Healthcare division accounted for 74.1% of Group revenues (2017: 70.5%), while the Distribution division contributed 25.9%.
  - In terms of geographic mix, UAE accounted for 87.6% of total revenues in 2018, while Spain, UK and Others (including KSA) accounted for 2.6%, 2.6% and 7.2%, respectively.
- Organic revenue growth for FY 2018 in line with expectations at 15.4% YoY[1].
- Group EBITDA increased 37.9% YoY to US$487.4m for 2018.
  - EBITDA margin increased 170bps YoY to 23.7%.
  - Healthcare EBITDA margin rose 70bps YoY to 31.3%, while Distribution EBITDA margin increased 200bps YoY to 12.5%
  - The Healthcare division accounted for 87.7% of Group EBITDA, while Distribution contributed the remaining 12.3%
- Net Profit increased 20.4% YoY to US$251.9m, the highest in Group's history.

## Healthcare
### Multiple Growth Drivers In Play

- NMC's reinforced its position as the leading healthcare operator in the GCC, with a total of 7.5m patients visiting the Group's facilities in 2018, up 30.1% YoY.
- Licensed bed capacity stood at 2,186 (+42% YoY) in 2018, while operational beds capacity rose 34% YoY to 1,831.
- Occupancy rate for the Healthcare division stood at 66.9% in 2018, down 460bps YoY.
  - The decline in occupancy was due to the significant increase in capacity noted above, through both organic and inorganic means.
- The Group's three largest hospitals by revenue share posted strong top line growth in FY 2018: Abu Dhabi Speciality +8.1% YoY, Al Zahra Hospital +13.0% YoY and NMC Royal Abu Dhabi +30.3% YoY.
  - With 250 operational beds by the end of 2018, NMC Royal Abu Dhabi remains one of the most important drivers of organic growth for NMC.
  - NMC Royal ranked as the second largest hospital in terms of revenue contribution in 2018 and remains on track to become the largest by the end of 2019.

- Dubai continues to benefit from the roll-out of mandatory insurance: aggregate revenues from the facilities in the Emirate grew at over 20% YoY during FY 2018.
- Revenues for the IVF business as a whole increased 19.2% YoY in FY 2018, benefiting from organic and inorganic growth.
- The Long-term & Homecare vertical also sustained its strong growth profile, with revenues rising 20.6% YoY. The growth was supported by ramp-up of utilisation in KSA-based long-term care facilities, particularly Chronic Care Specialist Medical Centre and the acquisition of a bolt-on homecare business in the UAE.
- O&M revenues reached US$23m in 2018, up 173% YoY. This business line remains one of the highest margin opportunities for NMC and an important focus area for growth in the coming years.
- CosmeSurge, one of the most significant acquisitions in 2018, both in terms of size and growth opportunity, contributed c. US$25m to Group EBITDA for the year, in line with guidance provided at the time of its acquisition.
  - Realisation of revenue and cost synergies has also helped in improving EBITDA margin for the business above the 31% level at the time of acquisition.

### Key healthcare verticals
Performance overview by vertical

| Detail | Multispecialty | Maternity & Fertility | Longterm & Home care | O&M |
|---|---|---|---|---|
| Revenue (US$ '000) | 1,163,064 | 238,124 | 137,284 | 22,911 |
| Growth | 39.5% | 15.7% | 20.6% | 173% |
| Revenue/patient | 150 | 1,094 | 20,375 | |
| Growth | 7.4% | 9.1% | 1.6% | |
| Capacity | | | | |
| Licensed beds | 1,595 | 106 | 485 | |
| Operational beds | 1,341 | 100 | 390 | |
| Growth | 34% | 0% | 47% | |
| Spare capacity (beds %) | 16% | 6% | 20% | |
| Patients | 7,276,977 | 217,659 | 6,738 | |
| Growth, YoY | 31% | 6% | 19% | |
| Bed occupancy | 64.2% | 79.6% | 72.4% | |

1. Reported revenues of US$214.0m from acquired assets (see Note 5 for details) include US$7.8m from Chronic Care Specialist Medical Centre. The Jeddah-based facility is a greenfield development, with NMC's investment in the project previously recorded as a "loan receivable" (see Note 20 for details). Consequently, the revenue contribution from Chronic Care has been adjusted for in calculating organic growth in 2018.

# Business and Financial Review continued

## Healthcare continued

 Multi-specialty vertical

# 1,595
Licensed beds

 Maternity & Fertility vertical

# 106
Licensed beds

- The Multispecialty vertical recorded total revenues of US$1.16bn in 2018, up 39.5% YoY, accounting for 74% of total Healthcare division revenues.

  - Total revenues for the Multispecialty vertical include US$72.9m (+23.8% YoY) from pharmacies. This sharp increase was supported by increased sales to assets being managed under O&M contracts.

  - Revenues from CosmeSurge are included within the multispecialty vertical at this stage.

- Average revenue per patient in the vertical continues to improve, reaching US$150, up 7.4% YoY.

  - The increase continues to be driven by rising share of revenues from assets such as NMC Royal, that are associated with higher average revenue per patient.

- Licensed bed capacity increased to 1,595 (+37% YoY), while operational beds capacity stood at 1,341 (+34% YoY).

- The Multispecialty vertical continued to perform well in 2018, supported in particular by strong growth at NMC Royal Hospital as well as Al Zahra Hospital. Additional factors that sustained the positive momentum include:

  - Reinforcement of NMC's position as the dominant private sector player in UAE with continued capacity addition and consolidation. As at the end of 2018, NMC was the only private sector operator with a pan-UAE presence.
  - Further expansion into the attractive KSA market. Moreover, while the newly formed JV with GOSI/Hassana Investment Company did not impact 2018 financials, it is set to substantially increase the pace of expansion in the Kingdom in coming years.
  - Continued capacity expansion in Oman, cementing the Group's position as one of the leading private sector players in the country.

- The Maternity & Fertility vertical posted 15.7% YoY growth in revenues to reach US$238.1m.

  - The Fertility segment remains the main driver of the vertical's growth, with revenues for the IVF business as a whole rising 19.2% YoY in FY 2018, benefiting from organic and inorganic growth.

- Brightpoint Hospital was renamed NMC Royal Women's Hospital to reflect the high level of medical complexity offered at the facility.

- Licensed and operational bed capacity in the vertical remained consistent YoY at 106 and 100 respectively, as NMC Royal Women's Hospital continues to be the only facility with beds within the vertical.

  - Occupancy at the facility improved 270bps to 79.6%.

- Average revenue per patient increased 9.1% YoY to US$1,094, as the contribution of fertility business continues to rise.



### Long-term & Home Care vertical

# 485

Licensed beds



### Operation & Management vertical

# +1,000

Licensed beds



## Distribution Division

### Products & Consumables vertical

# 115,795

Stock Keeping Units

---

- The Long-term & Homecare vertical recorded healthy 20.6% YoY growth on the back of ramp-up in existing facilities (particularly in KSA) and the acquisition of a homecare business in the UAE.

- The vertical continues to be associated with the highest average revenue per patient amongst NMC's verticals at US$20,375, up 1.6% YoY.

- Jeddah-based Chronic Care Specialist Medical Centre remains one of the most significant drivers of the vertical's growth in the near to medium term. Given the unique proposition offered by the facility, it continues to witness rapid pace of ramp-up, with operational beds reaching 125 by year end (H1 2018:61).

- The Group continues to capitalize on opportunities arising within the long-term and homecare market, with 15 new long-term care beds added in Al Zahra hospital, after the success of the first batch of beds introduced in the facility earlier in 2018.

---

- The O&M vertical recorded the strongest revenue growth at 173% YoY, albeit starting from a low base (revenues of US$23m in 2018 versus US$8.4m in 2017).

- The sharp rise in revenues was driven a number of new contract wins in 2017 and 2018, including contracts with Emirates Healthcare Group (2017), ADNOC (2018) and private parties in Kenya (2018).

- The O&M vertical continues to be an important focus area for management in terms of future growth. In addition to being associated with some of the highest margins within NMC's healthcare business, O&M contracts allow the Company to learn about new medical segments and geographies without risking any of its own capital.

---

**Stable Underlying Platform**
- Revenues for the Distribution division stood at US$545.1m in 2018, up 12.0% over the US$486.8m in the previous year.

- Total SKUs reached 115,795, up 6.3% YoY, supporting revenue growth for the year.

  - Over 90% of revenues are generated through products distributed under exclusive agreements.

- Distribution EBITDA reached US$68.4m in 2018, up 32.7% YoY.

  - EBITDA margin for the Distribution division stood at 12.5% for the year.
  - YoY increase in EBITDA margin was 195bps.

- Following normalization of collections during H2 2018, receivables days for FY 2018 stood at 84, considerably lower than 107 for H1 2018 (2017: 85).

- NMC continued to invest in the supporting infrastructure for the Distribution business during 2018:

  - Total warehousing storage area increased 7.8% to c. 782,000 sq. ft.
  - Total vehicle fleet increased to 244, up 5.2% YoY.

# Business and Financial Review continued

## Strategic initiatives: setting the stage for coming years

NMC took a number of strategic initiatives in 2018, which are expected to provide a solid platform for sustaining the Group's strong growth trend.

### KSA JV with GOSI/Hassana Investment Company

NMC signed an agreement with GOSI/Hassana Investment Company in 2018 to form a new joint venture to drive future expansion plans in the Kingdom. Finalized earlier this year, the JV ranks as the second largest healthcare operator in KSA by number of beds. This provides NMC with the appropriate platform to significantly increase its presence in the attractive Saudi healthcare market. Management recently outlined plans for significant capacity and capability expansion in KSA through the JV in the coming years.

Given the relatively early stage of NMC's expansion into KSA, the country currently contributes a limited amount to the Group's financial performance (less than 4% revenue contribution in 2018). However, given the attractive long-term fundamentals of the Kingdom's healthcare market, combined with the ideal positioning of the JV, NMC remains confident that KSA will become a significant source of revenues and profits for the Group in the coming years.

### CosmeSurge

The only institutionalized cosmetics business in the GCC, CosmeSurge was acquired (70% stake for NMC) in January 2018 from a related party (financial consolidation from April 2018). The business was initially being managed by NMC under an O&M contract since September 2017 and was subsequently acquired after identification of a number of revenue and cost synergies. These synergies are already reflected in the strong margin improvement in the business since acquisition.

NMC has rapidly integrated CosmeSurge into its existing business, with the opening of a number of new clinics, including a successful large clinic in Al Zahra Hospital (which itself was integrated into the NMC group from early 2017).

### Reinforcing the IVF platform

The Group took a number of steps in 2018 to work towards its stated goal of becoming the top IVF provider in the world. Key measures taken in this regard include:

- Acquisition of the outstanding 49% minority stake in Fakih IVF.
- Entry into the attractive US market through the acquisition of a 70% stake in Boston IVF.
- The first free-standing outpatient IVF centre in the US, Boston IVF is the largest academically-affiliated IVF centre in the country. It has also established one of the most desirable Fellowship programs in the country in association with Harvard Medical School and Beth Israel Deaconess Medical Centre.
- Further penetration into the European and Latin American IVF markets through organic and inorganic growth.

- Entry into the underserved sub-Saharan Africa market through a greenfield IVF clinic in Kenya.

### Aspen Healthcare

During 2018, NMC acquired UK-based Aspen Healthcare. While the Group's core growth strategy remains sharply focused on the GCC, with the global IVF business being the only notable exception, the attractively priced acquisition (c. 2x EV/EBITDA multiple) has already starting adding substantial value to the Group.

Strategic location of Aspen's facilities, along with expertise in Oncology and Orthopaedics in particular, have proven to be the most significant value addition to the Group. Oncology-related diagnosis fall within the top 10 DRGs for NMC in Abu Dhabi, thus making knowledge transfer within this segment of particular use. Consequently, Abu Dhabi Specialty Hospital and Aspen's Cancer Centre of London (CCL) have already been paired as "sister facilities" to facilitate collaboration. Similarly, NMC's large orthopaedic patient base out of UAE, KSA and Oman is starting to already benefit from the transfer of best practices from Aspen's Parkside Hospital and Wimbledon Orthopaedic Group. Moreover, the UAE regulator has shown an interest in shifting towards the UK-based Care Quality Commission (CQC) model. Given that all of its facilities have received a Good or Outstanding rating from the CQC, the decades-long experience of quality, nursing and leadership teams at Aspen is proving invaluable in realigning NMC's corporate quality framework.

Meanwhile, Aspen Healthcare has similarly seen a number of benefits post its acquisition by NMC. The Group is implementing a number of expansion opportunities that require minimal capital investment, yet generate immediate in-patient and day surgery revenues. Additionally, IVF and high-end cosmetic surgery are in process of being introduced at Aspen's existing facilities, with the possibility of introducing homecare services, where feasible. All these factors combined have already translated into a significant improvement in Aspen Healthcare's financial performance.

The combination of organic and inorganic expansion in recent years has laid a solid foundation for the Group's continued growth in the foreseeable future. Management continues to extract significant value out of the business by improving efficiencies at existing facilities and realizing synergies from acquisitions. A key example of the former is continued increase in the level of medical complexities at the Group's facilities. Meanwhile, rapid integration of acquired assets into the Group is helping unlock revenue and cost synergies. Notable examples include opening of Provita beds into NMC Royal Abu Dhabi and Al Zahra Hospital, as well as the opening of a CosmeSurge clinic in Al Zahra Hospital in 2018. Keeping the aforementioned in view, management remains confident with near to medium term outlook, as reflected by the guidance of continued strong growth provided for 2019 (+22-24% YoY revenue growth and +18-20% YoY EBITDA growth).

## Improving cash flows and realigning the balance sheet to support future growth

EBITDA to Cash Flow from Operations conversion remained healthy at 79.6% for FY 2018 (FY 2017: 78.5%).

Adjusting for growth capital expenditure, 2018 recorded the highest annual Free Cash Flow generation since IPO.

With a view to implement a revised long-term capital structure, the Group refinanced a major portion of its debt through a new syndicated facility of US$2.0 billion in Q1 2018.

- Comprised of a 5-year US$600m term-loan, an 18-month US$1,000m bridge facility and a US$400m revolving facility (which remains untapped), the refinancing was used to settle an existing syndicated loan, acquisition/general purposes and to provide headroom for future needs.

NMC has historically relied only on bank debt and equity financing to fund its growth over the years. However, in order to better align its balance sheet with its scale as a large cap FTSE-100 index company, the Group opted to diversify its funding sources by tapping the debt capital market in 2018. As part of this process the Group issued:

- A 7-year, US$450m convertible bond was issued in April 2018 at a coupon rate of 1.875%, and

- A 5-year, US$400m sukuk in November 2018 at a coupon of 5.95%.
- Proceeds from the convertible bond and the sukuk were utilised to replace the outstanding bridge facility.

FY 2018 gross debt (including convertible bond and sukuk bond) stood at US$1,992.7m as compared to US$1,399.0m in 2017, in line with management's expectations.

2018 year-end net debt-to-EBITDA at 3.1x (2017: 2.9x).

- 2018 witnessed the completion of a number of acquisitions totalling US$552.6m (excluding contingent consideration and expenditure on minority buyouts), including the US$64.7m Boston IVF transaction in December 2018. While cash outflows and debt taken related to these transactions are fully reflected on NMC's 2018 balance sheet, revenue and EBITDA from these acquisitions were recorded only for part of the year.

- 2018 pro-forma net debt-to-EBITDA stood at 3.0.

Total finance cost for the year stood at US$121.3m for 2018, including a non-cash component of US$28.5m.

**Receivables and working capital**
The working capital-to-revenues ratio declined to 27.7% in 2018 (2017: 30.6%).

- The reduction in working capital-to-revenues ratio was mainly driven by an improvement in days receivable outstanding and a slight extension of days payable outstanding.

# Business and Financial Review *continued*

Strong collections have led to a decline in receivables days outstanding for FY 2018 to 96 (FY 2017: 100, H1 2018: 107).

- Receivables days outstanding for the Healthcare business declined to 97, compared to 103 for FY 2017.

- Receivables days outstanding for the Distribution business stood at 84, versus 85 for FY 2017, and 107 for H1 2018.

Adoption of IFRS 9 has translated in more conservative provisioning.

- Additional provision of US$17.2m provided for in 2018 due to implementation of new regulation.

- Excluding additional impact of IFRS 9, days receivables outstanding would stand at 99.

Inventory days increased slightly from 61 in 2017 to 64 in 2018.

- The increase was driven primarily due to full consolidation of balance sheets of assets acquired during the year, yet partial revenue contribution during the year.

Days payable outstanding stood extended slightly from 58 in 2017 to 60 in 2018.

## Capital expenditure

Total capital expenditure for 2018 stood at US$165m, slightly ahead of the guidance provided for the year.

Growth capital expenditure for the year stood at c. US$101m.

Guidance for 2019 capital expenditure remains at 3% of revenues for maintenance capex and additional US$100m for growth capex.

## Goodwill

Given the active acquisition strategy adopted by NMC in recent years, Goodwill represents a significant portion of NMC's asset base (US$1.4bn out of total assets of US$3.9b in 2018).

The five largest acquisitions to date account for 66.4% of total goodwill as at 31 December 2018: Al Zahra (28.9%), Fakih IVF (12.9%), CosmeSurge (9.0%), Provita (8.4%) and Clínica Eugin (8.0%).

- Each of the above mentioned assets continue to serve as key drivers of NMC's growth and have performed in line with, or better than, forecasted prior to their acquisitions.

The underlying assumptions for impairment testing remain conservative, as a result of which, management remains satisfied with the amount of Goodwill on the balance sheet:

- Explicit forecasts are made over a 5-year period, based on financial budgets.

- Cash flows from the 6th to 10th year are extrapolated at 3% growth rate (2017: 3%), significantly below the current annual growth rates being realized across the business.

- 0% growth rate is applied to cash flows beyond the 10th year.

- The pre-tax discount rate applied to cash flows is 9.71% (2017: 8.23%), based on the Group's WACC.

## Acquisitions

NMC completed a number of acquisitions during 2018, with a total expenditure of US$552.6m (excluding contingent consideration). Additionally, US$225.3m was spent on purchasing outstanding minority stakes in Fakih IVF and As Salama Hospital.

Assets acquired during 2018 contributed US$214.0m in revenues, and US$14.8m in profit after tax during the year.

The acquisitions remained in line with NMC's strategy and can be grouped as follows:

- US$225.3m on minority buyouts, including US$212.9m spent to acquire the outstanding 49% minority for Fakih IVF
- US$129.1m on CosmeSurge, adding to the suite of capabilities offered by NMC
- US$186.9m on assets in the UAE
- US$117.8m on assets in Saudi Arabia
- US$91.1m on expansion of the IVF business
- US$20m on assets in Oman
- US$7.8m on the acquisition of Aspen in the UK, which has significantly enhanced NMC's capabilities in Oncology and Orthopaedics, along with providing ideal locations for introducing IVF in the country

The Group had also paid US$8.8m in advances for acquisitions as at the end of 2018, the majority of which is meant for acquiring outstanding minority stakes in previously acquired entities.

**Dividend**

The Board is proposing to continue with its policy of annual dividend payments of between 20% and 30% of profit after tax, outlined in the Company's IPO prospectus in 2012. The Board is therefore recommending that a final dividend of 18.1 pence per share be paid in cash in respect of the year ended 31 December 2018 (FY2017: 13.0 pence per share).

Subject to approval of the shareholders at the company's annual general meeting on 20 June 2019, the dividend timetable is as follows:

| | |
|---|---|
| Ex-dividend date | - 13 June 2019 |
| Record date | - 14 June 2019 |
| Payment date | - 10 July 2019 |

## Outlook: year to date operational performance inspires confidence in 2019

Building on the success seen in the previous year, the Group's operations started 2019 on a strong note.

NMC's unmatched geographic reach within its key target markets, combined with significant lead over competitors in terms of diversity and complexity of medical services remain vital competitive advantages. These factors continue to prove instrumental in allowing NMC to maintain strong growth, translating into management's confidence in the outlook for the future.

The Group remains confident with the guidance previously provided for FY 2019. To reiterate:

- +22-24% YoY revenue growth
- +18-20% YoY EBITDA growth
- Excluding impact of acquisitions completed in 2018, FY 2019 revenue growth is anticipated to be 12-13% YoY and EBITDA growth approximately 15% YoY
- Year-end net-debt to EBITDA to further reduce to 2.2-2.4x
- 2019 guidance does not include impact of IFRS 16 implementation or the anticipated consolidation of National Medical Care Co.

Management also remains confident with the longer-term Group EBITDA margin guidance of 25%.

# Key Performance Indicators

## Financial KPIs

Growth of the business, quality of earnings and efficient use of resources are crucial target areas for NMC and we employ a number of performance measures to monitor them. The KPIs used to monitor the financial performance of the business are set out below.

### 2,057.3
Group Revenue (US$m)

| | |
|---|---|
| 2018 | 2,057.3 |
| 2017 | 1,603.4 |
| 2016 | 1,220.8 |
| 2015 | 880.9 |
| 2014 | 643.9 |

### 487.4
EBITDA (US$m)

| | |
|---|---|
| 2018 | 487.4 |
| 2017 | 353.4 |
| 2016 | 246.1 |
| 2015 | 150.3 |
| 2014 | 102.5 |

### 23.7
EBITDA Margin (%)

| | |
|---|---|
| 2018 | 23.7 |
| 2017 | 22.0 |
| 2016 | 20.2 |
| 2015 | 17.1 |
| 2014 | 15.9 |

### 251.9
Net Profit (US$m)

| | |
|---|---|
| 2018 | 251.9 |
| 2017 | 209.2 |
| 2016 | 151.4 |
| 2015 | 85.8 |
| 2014 | 77.5 |

## Definition

This represents statutory revenue which is predominantly generated through the provision of goods or services to patients or corporate customers and is generally recognised when services have been delivered or goods sold.

EBITDA is Profit from operations before depreciation, amortization, transaction cost and impairment.

EBITDA margin is the reported EBITDA of the Group as a percentage of Group revenue.

Net Profit is income minus cost of goods sold, all other expenses and taxes.

## 2018 performance comment

Group revenues increased 28.3% YoY in 2018, supported by organic and inorganic expansion. Organic growth for the year stood at 15.4%.

EBITDA growth continued to outpace revenue growth, rising 37.9% YoY. The Healthcare segment continues to be the biggest driver of top and bottom line growth.

EBITDA margin improved 170bps YoY as contribution share of the higher margin Healthcare segment rose to 87.7% of Group EBITDA.

Group net profit increased 20.4% YoY. Net income for the year was impacted by US$31.6m in non-recurring expenses.

Exhibit 6 to B.R. Shetty's Request for Judicial Notice          24 of 182          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

Overview    Group Strategic Report    Governance    Financial Statements    Other Information

## Non-financial KPIs

### We monitor non-financial areas in our businesses, with a particular focus on the patient and ensuring the best possible care available.





| **15.6** | **7.5** | **2,186** | **1,831** | **1,735** |
|---|---|---|---|---|
| ROCE (%) | Patient Numbers (m) | Licensed Beds | Operational Beds | No. of Doctors |

| | | | | |
|---|---|---|---|---|
| 2018   15.6 | 2018   7.5 | 2018   2,186 | 2018   1,831 | 2018   1,735 |
| 2017   14.4 | 2017   5.8 | 2017   1,539 | 2017   1,365 | 2017   1,437 |
| 2016   11.0 | 2016   4.3 | 2016   875 | 2016   679 | 2016   1,030 |
| 2015   13.1 | 2015   3.2 | 2015   885 | 2015   537 | 2015   828 |
| 2014   11.8 | 2014   2.4 | 2014   310 | 2014   287 | 2014   603 |

| | | | | |
|---|---|---|---|---|
| Return on Capital Employed is the ratio of net operating profit to average capital employed. | Total number of outpatients and inpatients treated at NMC's facilities each year. | Number of beds (as at year-end) approved by regulatory authorities across all of NMC's healthcare facilities. | Actual number of beds (as at year-end) being utilized across NMC's facilities to treat patients. | Number of doctors employed by NMC across all of its healthcare facilities. |

| | | | | |
|---|---|---|---|---|
| ROCE maintained its upward trend during 2018 as ramp-up of existing facilities and integration of acquired assets progresses. | Total number of patients treated at the Group rose 30.1% YoY, crossing the 7mn mark in 2018. This large patient base remains one of the key factors that differentiates NMC from its peers. | Total licensed beds increased 42.0% YoY as organic and inorganic expansion continued during the year. | Ramp-up at existing facilities and addition of further operational beds through acquisitions led to a 34.1% YoY increase in total operational beds across the Group. | |

Exhibit 6 to B.R. Shetty's Request for Judicial Notice    25 of 182    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

Group Strategic Report

## Strategic Risk Management

# Risk management is an integral part of the success of our strategic journey

The Board consider the identification and mitigation of material risks and uncertainties faced by the Group as a key issue to be monitored at all levels of the organisation.

### Identification of risk

The Board has overall responsibility for the Group's risk management and internal control systems. The Senior Management team ensure that operational management consider risk as part of their day to day activities.

Whilst identification of risks and related controls and mitigations are important elements for the stability of all businesses, the Board consider these areas to be particularly key for NMC as a Group due to our growth strategy, the significant amount of transformation within the Group in recent years and the fact that our businesses operate in regulated environments.

As there are multiple risks evident across our various business verticals, the risk management processes operating within the NMC Group are an essential mechanism to enable a risk-based decision making process. NMC follows a conservative approach in risk taking and has implemented controls and mitigation strategies in order to reduce those risks.

The Group identifies risks in two ways. Firstly, a bottom up business risk review and secondly a top-down strategic risk review also taking account of any material or systemic risk arising from the business risk review exercise. The process undertaken in relation to both of these processes is set out in the Board Oversight of system of Internal Control and risk section from pages 57 to 60 of this annual report.

The Strategic Risk Register, which is the Group's list of principal risks and uncertainties, is set our below. This Register is reviewed and considered regularly. The Board approved the Strategic Risk Register in both August 2018 and March 2019.

Depending on the nature of the risk involved, a variety of risk mitigation measures have been implemented including, for example, insurance, standardised processes, delegation of authorities and succession plans, diversification in business and revenue streams.

### Risk appetite

As there are multiple risks associated with the healthcare and distribution sectors, the process of risk management is an essential mechanism to enable risk based decision making process. The Board recognizes that complete risk control/avoidance is impossible, but that risks can be reduced by putting the right controls and mitigations in place as well as agreeing on a threshold for risk taking (risk appetite).

Risk appetite provides a structure within which opportunities can be pursued by setting out which, why and how much risk the Group is willing to take. The Senior Management Team has approved a set of risk appetite statements covering different views on the risk landscape surrounding NMC's business environment whilst addressing various risk classes. For each risk class, Key Risk Indicators (KRIs) were articulated to alert against unacceptable loss events.

The purpose of setting limits and triggers is to avoid concentrations of risk which would be out of line with internal or external expectations and to:

- keep business activities aligned to the strategic goals of the Group;
- ensure activities remain of an appropriate scale relative to the underlying risk and reward; and
- ensure risk-taking is supported by appropriate expertise and capabilities.

### General Risk Appetite Statement

The Company will not accept any risks that would cause losses due to:

- malpractice,
- significant decline in patient satisfaction rate,
- brand damages,
- hospital acquired infections,
- decrease in the utilization rate for outpatient clinics,
- uncontrolled discharge for inpatients,
- downtime of life saving/sustaining systems,
- inaccuracy of patients' records,
- non-compliance with internal and/or external controls and standards/ regulatory bodies,
- sensitive information/ patient record confidentiality breach/ loss,
- loss of sole distribution partnership agreement,
- loss of key staff/ key specialities,
- acquisitions, which the Board expects to be accretive and not dilutive.

NMC Board of Directors has approved a set of thresholds presented by management which relate to multiple business dimensions in the Healthcare and Distribution divisions to protect shareholders' value. Any areas falling short of the agreed indicators will be highlighted by management for action.

### Strategic risks and uncertainties

In the table of strategic risks below, the Board have set out the Group's strategic risks and the mitigating actions and controls taken against those risks. It should be noted that the order that these risks are expressed in the table does not reflect an order of magnitude as regards their potential impact on the Group. The System of Internal Control and Risk section on pages 57 to 60 also sets out additional details of the governance framework and controls in place within the Group's businesses to monitor and control risk.

There have been no significant changes made to the Group's strategic risk register in the last 12 months.

Exhibit 6 to B.R. Shetty's Request for Judicial Notice

## Key thematic risks

The big picture - 2018



7. Failure to develop integrated IT systems may result in an inability to manage group information, accounting errors and operational disruption. A Data Security (e.g. WIP patient records) breach due to either intentional malicious cyber-attack or unintentional data or system loss resulting in reputational damage, operational disruption or regulatory breach.

8. Failure to comply with multi regulatory and standards bodies requirements could result in financial fines, inability to renew licenses, as well as NMC reputation damage.

9. Failure to comply with internationally recognized clinical care and quality standards, clinical negligence, the misdiagnosis of medical conditions or pharmaceuticals and the supply of unfit products across both divisions could result in regulatory sanction, licence removal, significant reputational damage, loss of patient and customer confidence and potential criminal proceedings.

11. Disruption to the global disruption model may lead to significant changes to distribution arrangements with "marquee" suppliers which would then impact revenue and profitability of the trading division.

1. Bad decision and/or delays in relation to either acquisition or organic growth investments or an inability to appropriately execute integration or new facility ramp-up plans may result in:
   • Lower Return on Investment (ROI);
   • Lower revenue than expected;
   • Decreased margins and market share;
   • Potential for impairment of assets;
   • Potential difficulty in raising future finance.

10. Failure to retain/acquire key professionals or inability to acquire sufficient Medical staff could potentially lead to inability to deliver required healthcare services and executive growth strategy.

2. Increased competition due to high private and public investments in the UAE healthcare sector and associated investments coming from new entrants or existing player partnerships would lead to market share loss and potential reduction in access to future growth in UAE healthcare spend.

3. Failure to focus on, and invest in, innovation and technological advances and effectively deliver new services or enhance patient experience. Inexperience of operating in new markets/offerings leads to missed opportunity or poor service delivery.

4. Potential adverse effect NMC's revenue and profitability as a result of unexpected regulatory or cultural changes affecting the provision of healthcare, the basis of the healthcare insurance structure or increases in medical inflation and pricing pressure and bargaining from key insurance providers in the Group's key markets, would result in reduced profitability.

5. Potential instability in revenue impairing cash flow, working capital health and greater exposure to credit risk as a result of global and regional demographic, macro-economic and geopolitical factors. Uncertainty in the global financial markets may result in exposure to interest rate risk which would impact profitability of the Group.

6. Failure to maximize the opportunity of acquisitions though successful integration strategies or through ineffective management structure or operating model.

Exhibit 6 to B.R. Shetty's Request for Judicial Notice          27 of 182          Hashem, et al., v. NMC Health PLC, et al.,
                                                                                   2:20-cv-02303-CBM-MAA

**Strategic Risk Management** continued

# Principal risks and mitigations

| Risk Class | Description and Potential Impact | Controls and Mitigations |
|---|---|---|
| **Investment** | Bad decisions and/or delays in relation to either acquisition or organic growth investments or an inability to appropriately execute integration or new facility ramp-up plans may result in:<br><br>• Lower Return on Investment (ROI);<br>• Lower revenue than expected;<br>• Decreased margins and market share;<br>• Potential for impairment of assets;<br>• Potential difficulty in raising future finance. | • Board oversight in approving and monitoring strategic projects<br>• Project management controls<br>• Detailed market and business appraisal and comprehensive due diligence processes<br>• Focus on integration pathway to improve Group revenue generation from intra-group business referrals and multi-brand sharing of facilities and centralized services<br>• Strategy to acquire international know-how through acquisition plan<br>• Re-alignment of existing assets within the Group's hub and spoke model (e.g. existing specialty hospitals feeding the regional NMC Royal Hospital, Khalifa City) |
| **Competition** | Increased competition due to high private and public investments in the UAE healthcare sector and associated investments coming from new entrants or existing player partnerships would lead to market share loss and market reduction in access to future growth in UAE healthcare spend. | • Integrated Hub-Spoke model<br>• Growing healthcare network<br>• Partnership with Government hospitals<br>• The development of international partnerships and use of increased know-how gained through strategic growth plan<br>• Diversification of patient base<br>• Variety in service offerings |
| **Financial** | Failure to focus on, and invest in, innovation and technological advances and effectively deliver new services or enhance patient experience. Inexperience of operating in new markets/offerings leads to missed opportunity or poor service delivery. | • Frequent monitoring of both fixed and variable cost<br>• Synergy tracking and reporting<br>• Acquiring the skills associated with the M&A transactions<br>• Continuous development of both front and back end IT related processes to enhance patient experience<br>• Strategy to target investment in innovation and future healthcare services development |
| **Financial** | Potential adverse effect NMC's revenue and profitability as a result of unexpected regulatory or cultural changes affecting the provision of healthcare, the basis of the healthcare insurance structure or increases in medical inflation and pricing pressure and bargaining from key insurance providers in the Group's key markets, would result in reduced profitability. | • Diversification of the revenue streams<br>• Increased collaboration between different group assets and businesses<br>• Frequent monitoring of both fixed and variable cost<br>• Good relationships with insurance providers<br>• Strategy to increase patient volumes and focus on clinical specialisms<br>• Proactive approach relationships and dialogue with the Group's regulators<br>• M&A Strategy in new markets. |
| **Macro-economic** | Potential instability in revenue impairing cash flow, working capital health and greater exposure to credit risk as a result of global and regional demographic, macro-economic and geopolitical factors.<br><br>Uncertainty in the global financial markets may result in exposure to interest rate risk which would impact profitability of the Group. | • UAE is a stable and booming market to operate in<br>• Diverse business and revenue streams<br>• Long term debt facilities and unutilised working capital limits<br>• Strong banking and supplier relationships. |

| Risk Class | Description and Potential Impact | Controls and Mitigations |
|---|---|---|
| Financial | Failure to maximize the opportunity of acquisitions though successful integration strategies or through ineffective management structure or operating model may result in:<br><br>• Increased market and regulatory/legal obligations;<br>• Increased culture resistance and complexity in shifting the governance model from enterprise to corporate structure;<br>• Increased operational exposure due to the complexity of integrating higher number of spokes to centralized hub of excellence;<br>• Increased investment risk due to weak due diligence and other mitigates. | • Implementation of a cluster structure to ensure that synergies are attained while maintaining appropriate autonomy at the facility level<br>• Full due diligence<br>• Development of standardised policies across the Group and centralized support functions<br>• Post-acquisition integration plan<br>• Rigorous analysis of value of the acquisition<br>• Focus on the corporate cultures involved<br>• Executive committee reporting and targets<br>• Synergy tracking and reporting<br>• Acquiring the skills associated with the M&A transactions |
| Technology | Failure to develop integrated IT systems may result in an inability to manage group information, accounting errors and operational disruption.<br><br>A Data Security (e.g. VIP patient records) breach due to either intentional malicious cyber-attack or unintentional data or system loss resulting in reputational damage, operational disruption or regulatory breach. | • ISO 27001 certified framework for IT policies and controls.<br>• Strict measures towards clients' data and records<br>• Some of the Group's businesses are still progressing through an integration phase, however manual processes, supported by legacy IT systems, continues to provide a robust level of control |
| Compliance & Regulation | Failure to comply with multi regulatory and standards bodies' requirements could result in financial fines, inability to renew licenses, as well as NMC reputation damage. | • Quality & Standards Department monitors regulatory changes<br>• Partnership with government<br>• Good relationships with regulators and accrediting organizations<br>• Continuous focus on delivering high levels of service |
| Product and Service | Failure to comply with internationally recognized clinical care and quality standards, clinical negligence, the misdiagnosis of medical conditions or pharmaceuticals and the supply of unfit products across both divisions could result in regulatory sanction, licence removal, significant reputational damage, loss of patient and customer confidence and potential criminal proceedings. | • Regular clinical audits completed by Quality team<br>• Doctors subject to rigorous licensing procedures which operate in the UAE<br>• Healthcare division is a regulated business and five of the Group's principal hospitals have achieved, or are in the process of achieving, international quality standards accreditation<br>• Many aspects of the operation of the Distribution division, including the sale of pharmaceuticals, is regulated in the UAE<br>• Board oversight and integrated governance structure<br>• Medical malpractice insurance to cover any awards of financial damages<br>• Continuous training and development programs |
| Human Capital | Failure to retain/acquire key professionals or inability to acquire sufficient Medical staff could potentially lead to inability to deliver required healthcare services and execute growth strategy. | • Partnership with education institutes<br>• Effective sourcing strategies & recruitment campaigns<br>• Ongoing review of senior management resources and succession plans in place for key positions<br>• Competitive salary packages, growth and good working conditions act as a good retention tool<br>• Clear career path for staff and continuous training and development programs |
| Product and Service | Disruption to the global distribution model may lead to significant changes to the distribution arrangements with "marquee" suppliers which would then impact revenue and profitability of the trading division. | • Continuous development of our service offering and communication with key suppliers<br>• Investment in IT and logistics network to ensure a compelling proposition is provided by NMC to key suppliers. |

As recommended by provision C.2.2 of the UK Corporate Governance Code, the Directors have considered a formal long-term assessment of the prospects and viability of the Group. As part of this assessment, the Board considered the potential impact of three principal risk themes facing the Group. The Board's viability statement is set out on page 86.

Group Strategic Report

## Corporate Social Responsibility

# We are committed to being a responsible business in everything we do

Welcome to NMC Healthcare's Corporate Social Responsibility Overview for the year 2018.

In this report, we share with our stakeholders how we honour our responsibility towards our local communities. This is demonstrated through the programmes, activities and initiatives that we executed through partnerships with civil society players, local community members, non-profit organisations and other key partners across our value chain.

In addition, this report highlights our commitment to our employees, in relation to engagement, diversity, training and anti-discrimination policies, as well as operating in an environmentally responsible manner in alignment with our values.

This overview report summarises our CSR and some of our ESG activities. More detailed CSR and ESG reports are published on our corporate website at www.nmchealth.com.

### Our Local Community

As an influential, committed and proactive corporate community partner, NMC Healthcare believes in community involvement where we work and serve. Collectively, our healthcare facilities help improve the lives of our patients, their families and the overall community. Through our community engagement programmes, we are able to partner with organisations to deliver measurable long-term impact. We invest in public health awareness campaigns and continuous medical education programmes designed to promote healthy lifestyles and increase access to health services.

The integration of Corporate Social Responsibility (CSR) throughout the organisation and in the local communities which we serve, is a goal we strive for every day. By **aligning CSR activities to our values**, we are able to improve health of the population in the countries in which we operate. Our community engagement agenda is versatile and includes initiatives with community partners, volunteering activities and civic engagement. We are pleased to share a few of these initiatives in this section:

### Community Engagement Activities

We have developed a comprehensive approach to community health awareness that addresses not only the pressing health concerns in communities, but also the underlying causes. We believe that the best approach to healthcare is prevention. Using our wealth of knowledge and expertise, we give back to our local communities by raising awareness on important public health topics. We do this on a yearly basis by conducting free health screenings, awareness workshops, corporate programmes and digital outreach. We also aim to raise awareness around specific diseases and health issues by engaging patients and the local community through insightful campaigns and events. Some of these annual events are:

- World Health Day
- World Liver Day
- World Immunization Week
- World Asthma Day
- International Blood Donor Day
- World Hand Hygiene Day
- World Thalassaemia Day
- International Nurses Day
- World Hypertension Day
- International Albinism Awareness Day
- World No Tobacco Day



Care.
Community.
Compassion.







- World Diabetes Day
- Histopathology Day
- World Prematurity Day
- Emirati Children's Day

**Emirati Children's Day**
In celebration of this day, our CEO took a group of Emirati children who would like to become doctors when they grow up to visit our facilities, meet doctors and ask questions about the profession. A video was created to share the experience with other Emirati children to be inspired by their peers.

**Walk for a Healthy Life**
On the occasion of World Diabetes Day, NMC Healthcare organised a Walkathon in association with the Ras Al Khaimah Police and Public Services Department on Friday 9th November, 2018 to raise awareness among the community.

**Participation in the Arab Health Exhibition**
We participated in the 2018 The Arab Health Exhibition to share with interested community members and healthcare professionals our latest services and technologies.

**Digital Outreach**
We have utilised the power of Social Media to maximize our community outreach and ensure we are able to reach specific demographics who might be concerned in learning about specific diseases. Our focus in our digital outreach efforts was to transition channels like Facebook from a narrowcast to a broadcast platform and engage our target audience. This year, 12 of our most popular accounts have used their Facebook pages to create campaigns that spread awareness about global diseases and health issues. These campaigns comprising of forty-eight local and global themes, including the UN Health days and the days of importance to UAE nationals and expats, reached out to over 720,000 members of our communities garnering over 30,000 active conversations and engagements.

**Community Educational Activities**
Our healthcare facilities provide a wide range of educational programmes that address topics related to the needs of local communities. Each healthcare facility assesses its community's health assets and needs and then develops community benefit plans that address unmet health priorities. These priorities are then integrated into the hospitals' strategic plans and budgets to assure adequate resources are devoted to planning, developing, managing and reporting community benefit initiatives. Below are a few examples that were delivered during 2018:

- Dental screening
- Breast Cancer Awareness Campaign
- Cardiology Health Awareness Programme
- Gastroenterology, Endoscopic Conference
- Aesthetic Gynaecology
- Asthma and Lung Cancer
- Diabetes Type 2
- How to Keep your Skin Healthy During Summer
- Peripheral Artery Disease
- VenaSeal Closure System
- Obstetric & Medicine Symposium

**Continuous Medical Education (CME)**
The Continuous Medical Education (CME) Programme constitutes of a series of workshops offered to doctors outside of NMC Healthcare facilities free of charge. It was created from the conviction that doctors serving patients must keep up to date with the latest discoveries and practices. Thus, a knowledge-sharing platform was needed to bring together expertise to promote sharing and growth. In 2018, over 9,700 doctors attended events under the CME programme focused on paediatric infectious diseases, cardio-pulmonology, pulmonology health, respiratory health and several others.

**Community Health Checks**
Regular check-ups can help increase chances for treatment and help find a cure in the early stages of diseases. These health checks provide essential

health screenings and immunizations for underserved population, in addition to some services geared toward adults. During the year 2018, we have delivered 2,000 health screenings through 47 visits across corporates, schools and community facilities.

**Protection of the Community**
In 2018 the NMC Health plc Board approved the Group's new Modern Slavery policy and subsequently issued its first Modern Slavery Statement.

Modern Slavery is a growing global issue and takes various forms including slavery, servitude, forced and compulsory labour and human trafficking, all of which have in common the deprivation of a person's liberty by another or to exploit them for personal or commercial gain. NMC takes a zero-tolerance approach to Modern Slavery and human trafficking within our own businesses and our supply chain. As part of our increased focus in this area, we:

- are increasing our staff training and supplier reviews;
- have reviewed our own internal policies and procedures in relation to employees, engagement of contractors and our ethical and anti-bribery related policies;
- have assessed the risk of modern slavery across our own businesses and within our supplier chain; and
- have decided on additional steps to be taken to increase assurance that modern slavery forms no part of our business operations.

Full details of our actions in this area can be found in our Modern Slavery Statement published on our website.

More detail in relation to our community and patient care activities is included in our CSR and ESG reports published on our website.

NMC Health plc Annual Report and Accounts 2018    27

Group Strategic Report

# Corporate Social Responsibility *continued*



## Our Employees

The healthcare sector is a people-intensive industry. It requires adopting a compassionate approach in the provision of treatment and care for all patients. The emotional commitment of our healthcare professionals forms a critical aspect in providing our patients with the best care possible. Therefore, at NMC Healthcare we heavily invest in the wellbeing and prosperity of our employees.

The relationship we have with our employees is based on mutual respect. We are committed to full compliance with legislative workplace requirements in the countries in which we operate. The health and safety of our people is also a key priority and is tied to the Group's overall performance. Thus we maintain the highest level of health and safety as we understand that it lays the foundation towards providing high quality healthcare services.

We regard our employees as valuable assets and we strive to create a safe, stimulating and rewarding work environment for them. We are proud of our ability to attract a talented pool of highly competent individuals who contribute to our long-term success and viability. Due to our efforts, we were honoured with the Superbrands Award and the Great Place To Work Award in the UAE, both for three consecutive years. Both awards are a testament of providing a growth environment for our employees and stakeholders.

### Employee Engagement

We ensure employees have open channels to communicate their ideas and feedback through various methods across our different businesses. These include periodic meetings, online channels and internal systems. In addition, we have set up formal employee forums in the majority of our businesses made up from groups of employees below managerial or supervisory roles. In addition to periodic meetings which each forum holds, the CEO spends one full day per facility to interact with the employee forum and our frontline and grassroot employees to hear their opinion and feedback on a range of matters in person. Employees can also directly write to the CEO via their intranet portal ensuring that views or concerns raised are dealt with swiftly and fairly.

### Employee social activities

In addition to daily activities, meetings and interactions, we engage our employees through annual events that aim to create close working relationships and create an environment of collaboration. The table below showcases a few of the events held during 2018.

## Employee Social Activities

| Event Name | Description |
|---|---|
| NMC Champions Trophy | An Inter Facility Cricket Tournament in which 500 players from 24 teams competed across 48 matches. The season's duration was 7 weeks with games being held every Friday. Almost 500 players participated. |
| Ladies Dash | NMC Royal Women's Hospital was the Strategic Partner for this event, which was supported by the Department of Health - Abu Dhabi and under the patronage of the Abu Dhabi Sports Council. The running event for ladies included the participation of 30 ladies from 5 NMC units from Abu Dhabi. |
| Fit On Click's Corporate Football Tournament | A Corporate Football Tournament organised by Fit on Click, a fitness focused online platform. NMC was the Medical Partner and 20 participants from 2 NMC units in Dubai participated. |
| Foundation Day | Foundation Day is the annual celebration of the foundation of NMC Healthcare. Employees gathering in a festive day and our CEO along with senior leadership teams visit our facilities, address employees and grant awards across different functions. The day concludes with a gala celebration at the corporate office. |
| Abu Dhabi Dash | It is a corporate relay for companies across UAE presented by the Department of Health under the patronage of Abu Dhabi Sports Council. NMC was the Strategic Health Partner and around 60 participants took part in the run. |
| Mini Dash | A fun filled sporting event for children presented by the Department of Health under the patronage of Abu Dhabi Sports Council. NMC was the Strategic Health Partner, and children of NMC staff were invited to participate in this event. |
| NMC Show Stoppers | A talent show to celebrate the diversity of talents across our multicultural organisation. Around 17 units participated across the UAE and the final show gathered an audience of around 500. |

28      NMC Health plc Annual Report and Accounts 2018

Gender study
Group overall – 2018

## Board of Directors & Senior Management Team

### NMC Board of Directors

# 11



Male 73%

Directors
8

Female 27%

Directors
3

### Senior Management Team

# 7



Male 86%

Senior Management
6

Female 14%

Senior Management
1

### Corporate Office

# 507



Male 69%

Corporate Management
127 (87%)

Corporate Staff
225 (62%)

Total 352

Female 31%

Corporate Management
19 (13%)

Corporate Staff
136 (38%)

Total 155

### Corporate Information Technology

# 96

Male 90%

IT Management
10 (77%)

IT Staff
76 (92%)

Total 86

Female 10%

IT Management
3 (23%)

IT Staff
7 (8%)

Total 10

### Healthcare division

# 14,965

Male 42%

Healthcare Management
419 (64%)

Doctors
1,046 (60%)

Staff Nurse
883 (18%)

Technicians
635 (41%)

Pharmacists
248 (50%)

Healthcare - Others
2,997 (53%)

Total 6,228

Female 58%

Healthcare Management
234 (36%)

Doctors
689 (40%)

Staff Nurse
3,998 (82%)

Technicians
907 (59%)

Pharmacists
244 (50%)

Healthcare - Others
2,665 (47%)

Total 8,737

### Distribution division

# 2,162



Male 88%

Distribution Management
161 (94%)

Distribution Staff
1,741 (87%)

Total 1,902

Female 12%

Distribution Management
11 (6%)

Distribution Staff
249 (13%)

Total 260

Exhibit 6 to B.R. Shetty's Request for Judicial Notice          33 of 182          Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

Group Strategic Report

# Corporate Social Responsibility continued

## Health & Safety

The health and safety of our employees is of utmost importance. We ensure all measures are in place and we routinely conduct training and awareness programmes around the topics of fire and safety, occupational safety, infection prevention and health talks. Each NMC hospital has an assigned Health and Safety Committee coordinating with the Health and Safety Manager to ensure that goals and KPIs are being met.

Our Health and Safety Policy covers planned and preventive maintenance, safe and proper disposal of sharp and hazardous materials, as well monitoring the exposure levels of staff working within radiation and diagnostic imaging services. We also conduct regular training programmes for our employees on the latest organisational health and safety practices and procedures, sharing information pertaining to this area across our network of hospitals, to ensure greater adoption of preventive measures.

In certain countries in which we operate, the vast majority of our employees will be expatriate workers who are living and working in a country which is not their own and often away from family and friends. We have policies in place to help employees working and living in such circumstances, including for example Happiness Officers within many facilities whose role is to ensure the well-being of all employees working in that facility.

## Diversity & Inclusion

As one of the leading healthcare providers, we recognise the importance of maintaining a diverse work environment through the creation of a strong and healthy workplace that fosters innovation and shared learning experiences. We celebrate differences and do not tolerate any discrimination based on race, religion, gender, age, ability, marital status, nationality or other characteristic protected by the laws of the countries in which we operate. Our anti-discrimination policy educates employees on discrimination and harassment topics, as well as how to address them and report them shall they occur. Diversity metrics are monitored on an ongoing basis, and appropriate measures are in place. We provide equal employment opportunities that allow all individuals to maximise their capabilities and richness to our work environment.

Our diversity is further instilled by the fact that we employ people from 86 different nationalities.

As at 31 December 2018, our Group has grown its employee base across all its business operations to nearly 18,000 employees. Our employee base is made up of employees from 86 countries and remains nearly equally split, as in 2017, between female and male employees. Our widespread cultural and balanced gender mix is testament to the effects of our discrimination policies and the multi-cultural nature of the UAE, our primary market. Key diversity data is set out below.

## Employees' Nationalities

Our diverse workforce is comprised of 86 different nationalities, a significant 28% increase from 67 nationalities employed in 2017. The table below is a representation of the top 5 nationalities employed at NMC Healthcare Group globally.

## Learning and Development

We place a strong value on employee training and professional development. We believe that investing in our employees not only enhances the quality

## Top 5 Nationalities



**United Kingdom (3%)**
568
employees
(2017: 58 (0%))

**Egypt (4%)**
763
employees
(2017: 394 (3%))

**Pakistan (3%)**
568
employees
(2017: 667 (5%))

**Philippines (17%)**
3,077
employees
(2017: 2,223 (16%))

**India (60%)**
10,598
employees
(2017: 8,472 (62%))

**Other (12%)**
2,156
employees
(2017: 1,907 (14%))

30    NMC Health plc Annual Report and Accounts 2018

and efficiency of our organisation, but also contributes to employee satisfaction and engagement. Our ability to deliver high quality healthcare services is largely due to attracting and retaining qualified and engaged healthcare professionals.

All employees go through learning and development programmes that help them excel at their jobs. Employees go through periodic performance evaluation in which improvement areas are identified and match with appropriate learning plans. Below is a sample list of the skills-based learning programmes that were implemented in 2018 and attended by over 5,600 trainees across 23 healthcare facilities.

- Exceptional Servicing
- Essentials of Communication
- Team Dynamics
- Patient Experience
- Problem Solving & Decision Making
- Crisis Management
- Principles of Executive Leadership
- Arabic Language & Emirati Culture
- Interpersonal Skills
- Critical Thinking

**Customised Training**
From the time employees join any NMC Healthcare facility, they are given a thorough and intensive induction, after which they are handed employee manuals as a guiding reference. Furthermore, a central training resource was created to encourage sharing practices and proactive learning. Our Continuing Development Programme provides in-house facilities as well as education and training programmes conducted internally and by external qualified experts.

NMC also has a dedicated learning and development centre. The Dr. C.R. Shetty Centre for Simulation and Interactive Learning was launched in 2017 to provide a variety of medical and non-medical training programmes. In that same year, we conducted at a comprehensive assessment to identify gaps in training needs.

*More detail in relation to our employee activities is included in our CSR and ESG reports published on our website.*

## The Environment

We are committed to operating in an environmentally responsible manner in alignment with our values. Our commitment is translated into action through instilling rigorous monitoring and evaluation systems and tools that track our water, electricity and fuel consumption. In addition, we have waste management systems in place and we calculate our carbon emissions using the Greenhouse Gas (GHG) Protocol.

We engage our employees in ongoing communication to maintain our culture of resource preservation and conscious consumption of all resources, which in turn helps us manage our overall carbon footprint in specific, and environmental impact in general.

At NMC Healthcare, service is rooted in our culture - both to our stakeholders and local communities. We are particularly proud of our employee volunteering programmes that reflect our strong desire to drive an impact and foster the spirit of community engagement.

Together with our team members, we aim to be a part of a movement to inspire hope and create healthier future for our communities worldwide.

### "Together We Make the Difference" Campaign
Championed by the Abu Dhabi Environmental Agency, this campaign was created in alignment with the Year of Zayed and is comprised of a series of seabed clean-ups. As the healthcare partner of this campaign, we extended our support by providing an ambulance and setting a first-aid area for the participants. One of the clean-ups at Al Mirfa Port, collected 4,700kg of marine litter.

### Supporting "For Our Emirates We Plant"
"For Our Emirates We Plant" is a community programme run by the Emirates Environmental Group to mobilise the community and to find unique ways of giving back to the environment. NMC Healthcare participated this year by activating a group of employees who dedicated time to serve the community they live in by planting trees.

### "Clean Up The World" with Dubai Municipality
NMC employees volunteered as part of "Clean Up the World", which is an environmental programme that calls for individuals around the world to clean up their environment, repair and maintain it. The event was managed by Dubai Municipality and has boosted the sense of citizenship and environmental consciousness among our employees.







# Corporate Social Responsibility continued

### Internal Environmental Initiatives

#### No Meat Monday

Globally, animal agriculture is responsible for more greenhouse gasses than all the world's transportation systems combined. According to the United Nations, a global shift toward a vegan diet is necessary to combat the worst effects of climate change. At NMC, we have conducted an initiative to raise awareness about this environmental fact by announcing the last Monday of every month as "No Meat Monday". Participation is voluntary for all employees. This is a small step, yet, in a meaningful direction to raise awareness about our environmental impact.

#### Plastic Free Saturdays

Plastic pollution is a serious global problem. The amount of plastic in the ocean continues to grow - affecting wildlife and humans alike. At NMC, we took a moral ground to reduce our plastic usage. Saturdays, being the busiest days in our hospitals, have now gone plastic free. All pharmacy dispensing is done via cloth bags, eventually saving about 15,000 poly-bags going into the circulation.

### Water Consumption

Hospitals are one of the major stakeholders within the healthcare industry and one of the top users of water resources. Water quality and availability are both essential to protecting patient health and critical to daily hospital operations. Because water quality is a public health issue and poses a special concern for the healthcare community, we at NMC Healthcare take a clear stand on water consumption and preservation. We track the utilisation of all the three precious resources carefully.

### Electricity Consumption

Our electricity consumption is needed to power our Operating Rooms, the high end machinery, light up our facilities and operate medical devices. We are aware of our high dependence on electrical consumption and thus carefully monitor and measure it to identify the avenues of energy preservation. We purchase electricity from local authorities and receive monthly bills detailing our consumption. In some of our facilities, we use generators to generate our own electricity as backup methods to ensure continuous and uninterrupted care for our patients.

Some initiatives we have taken to reduce electricity consumption include using motion sensors in some of our facilities to reduce power wastage and using solar power for water heating and lighting wherever possible.

### Fuel Consumption

Fuel is mostly used to power our vehicles and transportation solutions we either own or lease. In addition, we use fuel to power our generators and specific machinery. We purchase petrol and diesel from local stations and monitor our consumption in order to accurately calculate our Greenhouse Gas (GHG) emissions and limit our carbon footprint.

### Waste Management

Hospitals produce medical waste that, if not handled correctly, could potentially pose serious health and environmental negative impacts. At NMC Healthcare, we take this topic very seriously by putting in place an effective management system of healthcare waste which addresses the basic elements of waste minimisation, segregation and proper identification into key categories including: medical, general, recycled and food waste.

### Greenhouse Gas (GHG) Emissions

The Healthcare industry operates hospitals that are highly energy intensive, consume large amounts of energy resources and produce large amounts of waste. That is in addition to the construction, operation and maintenance of buildings. This makes the healthcare sector a significant source of carbon emissions globally, and therefore a contributor to climate change trends that may cause health threats. By reducing carbon emissions and efficiently managing infrastructure and facilities

### GHG Emissions

| For the 12 months to 30 September | Healthcare (excluding the acquired entities) | | | Healthcare (all entities) | | | Distribution (NMC Trading) | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2016 | 2017 | 2018 | 2016 | 2017 | 2018 | 2016 | 2017 | 2018 | 2016 | 2017 | 2018 |
| Scope 1 Emissions - tonnes of $CO_2e$ | 7,699 | 7,090 | 5,413 | 9,666 | 8,966 | 12,597 | 3,917 | 4,351 | 4,349 | 13,579 | 13,318 | 16,946 |
| Scope 2 Emissions - tonnes of $CO_2e$ | 29,829 | 44,144 | 42,019 | 43,361 | 50,091 | 63,739 | 5,230 | 7,367 | 5,770 | 48,591 | 57,457 | 69,510 |
| Total GHG Emissions - tonnes of $CO_2e$ | 37,528 | 51,235 | 47,431 | 53,027 | 59,057 | 76,336 | 9,147 | 11,718 | 10,120 | 62,174 | 70,775 | 86,456 |
| GHG Emissions Intensity - tonnes $CO_2e/1,000$ patients | 11.3 | 11.8 | 10.2 | 12.5 | 11.6 | 11.9 | - | - | - | - | - | - |
| GHG Emissions Intensity - tonnes $CO_2e/1,000$ orders | - | - | - | - | - | - | 20.97 | 25.62 | 18.79 | - | - | - |
| GHG Emissions Intensity by Revenue - tonnes $CO_2e/1,000$ dollar | 0.073 | 0.073 | 0.035 | 0.065 | 0.051 | 0.049 | 0.022 | 0.024 | 0.019 | 0.051 | 0.044 | 0.041 |

Notes:

1.  The GHG emissions reporting is in line with the GHG Protocol developed by the World Business Council for Sustainable Development, and additional guidance issued by the UK Government. The emissions have been calculated using carbon conversion factors published by the UK Government in October 2018.
2.  The total Scope 2 emissions have been reported in accordance with the 'location based' method which uses grid average emissions factors. There are no energy certificates or supplier-specific information available in the UAE, therefore, the 'market based' method is not applicable here.
3.  Conversion factors applicable to the UAE for Scope 2 have been obtained from the publication "IEA $CO_2$ Emissions from Fuel Combustion" (2012 edition).
4.  A conversion factor for Sevoflurane was not available from the UK Government so an epa.gov GHG reporting figure was used.
5.  During the last years, several entities were acquired by NMC. These entities are: Eugin Group, Provita Group, Sunny Group, Americare Group, Oman Group, As Salama Hospital, Fakih Group and Al Zahra Hospital. In order to conduct an accurate comparison with the previous years before acquisitions and be consistent with the previous NMC reports, we are reporting GHG emissions separately for: (1) NMC entities excluding the acquired ones separately, and (2) GHG emissions for all entities including the acquired ones.
6.  GHG Emissions Intensity - tonnes $CO_2e/1,000$ orders is only applicable to NMC Distribution which deals with delivering orders to hospitals. Thus it is not applicable to NMC Healthcare.
7.  GHG Emissions Intensity - tonnes $CO_2e/1,000$ patients is only applicable to NMC Healthcare with has patients. Thus it is not applicable to NMC Distribution which does not deal directly with patients.

Exhibit 6 to B.R. Shetty's Request for Judicial Notice
36 of 182
Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

through environment-friendly practices, healthcare organisations can reduce their carbon footprint and improve overall public health.

At NMC Healthcare, we address this topic of importance by integrating measures and mitigation plans to align our Greenhouse Gas (GHG) emissions reporting with the GHG Protocols and extend our disclosure to Scope 1 (direct emissions from our owned or controlled sources) and Scope 2 (indirect emissions from the generation of purchased energy), and with the intention of expanding our reporting to Scope 3 (indirect emissions that occur in the value chain of the reporting company, including both upstream and downstream emissions) in the future.

**Hospitals Included in the GHG Emissions Calculations**

Healthcare (Excluding Acquired Entities)
- NMC Specialty Hospital, Abu Dhabi
- NMC Specialty Hospital Al Nahda Dubai
- NMC Specialty Hospital, Al Ain
- NMC Hospital DIP, Dubai
- NMC Hospital Deira, Dubai
- BR Medical Suites DHCC, Dubai
- NMC Day Surgery Center MBZ, Abu Dhabi
- New Medical Center, Sharjah
- NMC Clinic Al Wadi
- Corporate Office
- New Pharmacy LLC, Abu Dhabi
- Bait Al Shifa Pharmacy LLC
- BrightPoint Royal Hospital, Abu Dhabi
- NMC Royal Hospital Khalifa City, Abu Dhabi

Healthcare (Acquired Entities)
- Eugin Group
- Provita Group
- Sunny Group
- Americare Group
- Oman Group
- As Salama

During 2018, we have witnessed an overall increase in total GHG emissions for both Scopes 1 and 2 for NMC Healthcare and Distribution. However, there has been a decrease in GHG emissions intensity by revenue. This means that NMC is performing well in terms of expanding our business to bring additional economic value while achieving less GHG emissions despite the expansion.

Within our Healthcare businesses (excluding the acquired entities), we see a decrease overall in the emissions and the intensity. This is due to energy efficiency and conservation measures that we continuously introduce to manage our carbon footprint, including introduction of policies, regulations, energy saving technologies, training of our employees and monitoring results closely. Among the technologies introduced are the use of GPS systems in our vehicles to decrease time lost in reaching locations, the use of motion sensors to light areas only when needed and using solar power for heating and lighting wherever possible.

Looking at the GHG emissions for Healthcare (all entities), we see an increase in emissions across Scopes 1 and 2. This is an expected increase due to the newly acquired entities that are in the process of implementing NMC's regulations and procedures when it comes to monitoring their GHG emissions. We commit to working with all new entities to support them in their adaptation process to ensure efficient management of energy and resources.

More detail in relation to Water, Electricity and Fuel consumption, our waste management initiatives and Greenhouse Gas Emissions is included in our CSR and ESG reports published on our website.

The Group Strategic Report set out on pages 4 to 35 has been approved by the Board and is signed on its behalf by:

**PRASANTH MANGHAT**
Chief Executive Officer

Group Strategic Report



# Aligning with the Year of Zayed, UAE

The year 2018 marked 100 years since the birth of the late Sheikh Zayed bin Sultan Al Nahyan, the Founding Father of the UAE, who was renowned for his passion for ensuring the health and well-being of people worldwide.

In alignment with the Year of Zayed, we have made a global pledge to treat 100 child refugees with serious heart conditions. The children received the much-needed treatment for a variety of serious heart conditions through our medical facilities around the world. We have also participated at the Sheikh Zayed Heritage Festival by supporting assessing the health and fitness of over 20,000 guests across the sixty-day period of the festival. In addition, we provided healthcare treatment discounts valued at AED 3.5 million to more than 700 patients.

34  NMC Health plc Annual Report and Accounts 2018



# AED3.5m

healthcare treatment discounts provided to more than 700 patients

# 100

child refugees with serious heart conditions treated

# 20K

guests health and fitness was assessed at the Sheikh Zayed Heritage Festival

Exhibit 6 to B.R. Shetty's Request for Judicial Notice          39 of 182          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

# Governance

The Board and management team have strengthened internal controls and kept approach to risk under review during the period of sustained growth and integration.



Exhibit 6 to B.R. Shetty's Request for Judicial Notice     41 of 182

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

Governance

# Board of Directors



**DR B. R. SHETTY**
Non-Executive Joint Chairman

Nationality: Indian

Appointed as Director: 20 July 2011

Relevant Experience:
- Business Entrepreneur
- Founder, Director and principal shareholder of NMC Health
- Pioneer in the development of the private healthcare sector in the UAE
- Other Board positions and material investments in financial, hospitality, food and beverage, pharmaceuticals, education and environmental sectors



**MR H. J. MARK TOMPKINS** Ⓢ Ⓐ
Non-Executive Joint Chairman

Nationality: British

Appointed as Director: 7 March 2012

Relevant Experience:
- Significant public company experience on UK, US and French listed company Boards
- Experience in investment banking, international real estate and the financing of small and medium sized enterprises
- Director and Chairman of Allied Healthcare International
- Non-Executive Director and Conseiller Special aupres du Conseil D'Administration of Sodexo S.A.



**MR KHALIFA BIN BUTTI**
Executive Vice Chairman

Nationality: Emirati

Appointed as Director: 1 July 2017

Relevant Experience:
- Has significant Abu Dhabi financial industry insight
- At the age of 27 he was appointed Chairman & CEO of Brokerage House Securities LLC.
- Established KBBO (Khalifa Butti Bin Omeir) Group, which includes One Financial (operations in UK, China, UAE, Saudi Arabia, Kuwait, Jordan & other areas of the Middle East)
- Has extensive experience in Chairman/ Vice Chairman related roles in many well established firms



**MR ABDULRAHMAN BASADDIQ** Ⓝ
Non-Executive Director

Nationality: Kenyan

Appointed as Director: 24 February 2014

Relevant Experience:
- Significant business experience across a number of GCC based Groups operating in multiple jurisdictions and business sectors, including two major listed Groups
- Previously 25 years with EY in the UK and GCC, including 15 years as an equity partner
- Currently Non-Executive Director of Abu Dhabi National Hotel Group, Travelex and UAE Exchange
- UK qualified Chartered Accountant and licensed auditor in the UAE



**MR JONATHAN BOMFORD** Ⓐ Ⓝ
Senior Independent Non-Executive Director

Nationality: British

Appointed as Director: 27 June 2013

Relevant Experience:
- Accounting, financial and audit experience gained principally in the Middle East and East Africa
- Previously with EY (Middle East, East Africa, Abu Dhabi & Riyadh) for 24 years (15 years as a partner)
- EY clients included international clients across healthcare, oil, banking and construction sectors
- Currently manages his own business services and renewable energy company and a Non-Executive Director of Travelex
- UK qualified Chartered Accountant
- Official Mentor providing Business Advice and Services to clients of the Prince's Trust



**LORD CLANWILLIAM** Ⓣ
Independent Non-Executive Director

Nationality: British

Appointed as Director: 7 March 2012

Relevant Experience:
- Government and financial communications specialist
- Extensive network of governmental and institutional contacts across Middle East, UK and Eastern Europe
- Currently Chairman of 17 Arm and Chairman designate of Angus Energy, an AIM listed company
- Founding Partner and Chairman of Meade Hall Communications Limited
- Chairman of Eurasia Drilling Company 2007 to 2016

Exhibit 6 to B.R. Shetty's Request for Judicial Notice          42 of 182          Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA



#### MR PRASANTH MANGHAT
Chief Executive Officer & Executive Director ❷

**Nationality:** Indian

**Appointed as Director:** 26 June 2014

**Relevant Experience:**
- 20 years' experience in accounting, corporate finance, treasury and banking, including 15 years' in NMC related businesses
- Chief Financial Officer of NMC Health 2011–2014
- Spearheaded NMC's successful IPO on the London Stock Exchange in April 2012
- Acknowledged and recognised as a healthcare sector thought-leader, participating in many global events and forums
- Chartered Accountant



#### MR HANI BUTTIKHI
Chief Investment Officer and Executive Director

**Nationality:** British

**Appointed as Director:** July 2017

**Relevant Experience:**
- Served as Head of Syndicate at SHUAA, a leading financial services firm between 2006 & 2014
- Oversaw the largest IPO in the UAE worth an estimated four billion US$, as well as the NMC Health IPO
- Served as a Chief Investment Officer at Centurion Partners between 2014 and 2017
- Is on the Board of Directors at 3 other companies



#### DR AYESHA ABDULLAH
Independent Non-Executive Director ❷ 

**Nationality:** Emirati

**Appointed as Director:** 26 June 2014

**Relevant Experience:**
- Over 25 years' experience within the healthcare and education industries.
- Significant experience in development and regulation of the healthcare industry in the UAE
- Oversaw development of, and then regulatory aspects of, Dubai Healthcare City (DHCC)
- Previously, CEO of Dubai Healthcare City (DHCC)
- Currently Executive Dean of The Business School at Higher College of Technology (Dubai)
- Awarded both the prestigious 2009 "Leading woman CEO" award and the 2010 "L'Officiel Arab Woman of the Year"



#### MRS SALMA ALI SAID BIN HAREB ALMHEIRI
Independent Non-Executive Director ❸

**Nationality:** Emirati

**Appointed as Director:** 26 June 2014

**Relevant Experience:**
- Significant business experience and a recognised leading businesswoman in the Middle East, with many achievements and awards being granted to her, most recently the Frost & Sullivan Growth, Innovation & Leadership award of 2014 as well as being named Overall Winner - Professional Category in Emirates Women Awards 2013.
- CEO of Economic Zones World (EZW) and Jebel Ali Free Zone (Jafza) from 2005 to 2015
- Instrumental in creation of Dubai Logistics Corridor and oversaw EZW's expansion with development of international logistics parks in UAE, Europe, India, USA and Africa

**Key to committees**
1. Audit Committee
2. Clinical Governance
3. Nomination
4. Remuneration
• Committee Chair

Notes:
1. Full biographies can be viewed on the Company's Investor Relations website at www.nmchealth.com

Governance

# Senior Management Team

The Senior Management Team consists of:

   

**MR PRASANTH MANGHAT**
Chief Executive Officer
& Executive Director

**Nationality:** Indian

**Appointed as Director:** 26 June 2014

**Relevant Experience:**
- Over 20 years' experience in accounting, corporate finance, treasury and banking, including 15 years' in NMC related businesses
- Chief Financial Officer of NMC Health 2011-2014
- Spearheaded NMC's successful IPO on the London Stock Exchange in April 2012
- Acknowledged and recognised as a healthcare sector thought-leader, participating in many global events and forums.
- Chartered Accountant

**MR HANI BUTTIKHI**
Chief Investment Officer and Executive Director

**Nationality:** British

**Appointed as Director:** July 2017

**Relevant Experience:**
- Served as Head of Syndicate at SHUAA, a leading financial services firm between 2006 & 2014
- Oversaw the largest IPO in the UAE worth an estimated four billion US$, as well as the NMC Health IPO.
- Served as a Chief Investment Officer at Centurion Partners between 2014 and 2017.
- Is on the Board of Directors at 3 other companies

**PRASHANTH SHENOY**
Chief Financial Officer

**Relevant Experience:**
- Appointed CFO in August 2017, having been appointed Deputy CFO in 2016
- He has played an instrumental role in NMCs acquisition of Al Zahra Hospital Sharjah (class 1 transaction on the LSE) and has been spearheading fund raising and equity placing activities for the group
- 18 years' worth of experience across various industries, although predominantly in pharmaceuticals & healthcare
- Rounded experience in corporate finance, managing business collaborations/overseas subsidiaries, treasury, foreign exchange risk management, business strategy, preparing business plans and evaluation of investment opportunities
- Chartered Accountant

**DR CHANDRAKUMARI R. SHETTY**
Group Medical Director

**Relevant Experience:**
- Over 40 years' experience with NMC Health and a pioneer in developing the private healthcare sector in the UAE
- Instrumental in establishing Centres of Excellence in various NMC facilities
- Chairs a number of NMC business committees covering Governance, Infection Control, Patient Rights, Quality and Facility Management
- Supervises NMC Healthcare's diversified multi-cultural workforce

Exhibit 6 to B.R. Shetty's Request for Judicial Notice          44 of 182          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA



**MICHAEL BRENDEN DAVIS**
Chief Operating Officer - Healthcare

Relevant Experience:

- Has 30 years of acute and post-acute care experience within large, publicly listed hospital systems in the US
- Held a number of corporate positions including Chief Clinical Officer, with operational oversight of 36 long-term acute care and inpatient rehabilitation hospitals across the United States, as well as Market CEO for Kindred Healthcare, one of the largest healthcare providers in North America
- Post moving to the UAE in 2013 he was the CEO of Provita International Medical Center, the first provider of long-term acute care in the UAE
- He has played an integral role in NMC's entry into the KSA market



**NIRMAN SHETTY**
Chief Operating Officer - Distribution

Relevant Experience:

- Nirman spearheads NMC's distribution business "NMC Trading", exclusively distributing for Nivea (Beiersdorf), Pfizer, Nestle & Wyeth Infant Nutrition, Unilever, Sanofi to name just a few.
- Responsible for 1700 employees within the NMC Trading bracket
- Previously within NMC, Nirman was President of Corporate Affairs, responsible for transforming the information technology, customer service and sales and marketing functions for NMC Healthcare. As UAE's largest private healthcare provider, Nirman's responsibility was to ensure that key components of the infrastructure that supports NMC's clinicians were in place and constantly improving.
- Previous senior managerial jobs were at Lodha Developers and Microsoft



**SIMON WATKINS**
Group Company Secretary

Relevant Experience:

- Joined NMC in May 2012 shortly after the Group's IPO
- Responsible for Group's listing obligations and all governance matters, assisting the Chairman with ensuring effective and appropriate Board processes
- Nearly 30 years of experience as a Company Secretary in large and medium sized UK public companies across a number of sectors
- Significant experience within Group's focussed on strategic and acquisitive growth
- Previous experience includes Deputy Company Secretary of Rank Group plc and Group Company Secretary of lastminute.com
- Qualified as a Chartered Secretary in the UK in 1987

Exhibit 6 to B.R. Shetty's Request for Judicial Notice    45 of 182    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

Governance

# Corporate Governance Report

### Governance foreword

In this Corporate Governance Report, the Board sets out its governance structures and processes and discusses some of the Governance areas that the Board has focussed on in the last 12 months. These include:

- An externally facilitated Board Evaluation;
- A change to Board Committees to refresh their membership;
- A review of the provisions of the new version of the UK Corporate Governance Code effective for reporting periods on or after 1 January 2019 and the early implementation of some aspects of that Code;
- The review and updating of the Group's ethical policies and Whistleblowing procedures and adoption of a new Modern Slavery Policy.

The Board will continue to review and develop its governance processes as the Group evolves, not simply to "tick a governance box" but to ensure that they remain appropriate to the NMC Group and the management of the Group for shareholders on an ongoing basis.

**MR H. J. MARK TOMPKINS**
Independent Non-Executive Joint Chairman

**DR B. R. SHETTY**
Non-Executive Joint Chairman

### Introduction

The Board is responsible for, and committed to, ensuring that procedures are in place so that good standards of corporate governance are operated at all levels in the Group. In this Corporate Governance Report we review ourselves in accordance with the guidance and principles set out in the UK Corporate Governance Code published by the Financial Reporting Council (FRC) in April 2016 (the "Code"). The Code can be found on the Financial Reporting Council website, frc.org.uk.

The Board, supported by its Committees and the Senior Management team, have in place a governance and control environment which they believe are both appropriate for the NMC Group and consistent with the standards which would be expected of a FTSE 100 Company listed on the Premium Segment of the London Stock Exchange. The Board ensures that governance processes are documented and implemented and, where appropriate, continue to be improved.

The Board has reviewed the Company's compliance against the provisions of the Code and believes that the Company was compliant with the provisions of the Code for the 2018 Financial Year.

This Governance section describes how the Board has applied Corporate Governance principles during the 2018 financial year.

The Company operates within a traditional governance framework:



Exhibit 6 to B.R. Shetty's Request for Judicial Notice          46 of 182          Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

The roles and responsibilities of each of the individuals and groups above, and their role in the overall governance framework, are set out below.

## The Board

**The role of the Board**

The Board is responsible for the overall conduct of the Group's business and:

- for the long term success of the Company ensuring that it meets its responsibilities towards all stakeholders;
- demonstrating leadership and focussing on matters that affect shareholder value;
- determining the strategic direction of the Group; and
- for ensuring the effectiveness of, and reporting on, the risks facing the Group and the systems of governance and internal control in place in the Group.

The Board seeks at all times to ensure that there is an appropriate balance between short term and long term considerations and objectives of the Group.

The Board has the powers and duties as set out in the Company's Articles of Association.

The Company has agreed a formal schedule of matters reserved for the Board including:

- approval of strategic plans;
- approval of major capital projects, acquisitions and divestments;
- approval of long term financing plans;
- setting the annual budget;
- risk management and internal control systems and processes to ensure that the Group is managed appropriately; and
- approving the half-year and annual results and financial statements.

Specific responsibilities are delegated to Board Committees, details of which are set out on pages 47 to 56 or to the Chief Executive Officer who is responsible for delivering the Company's strategic objectives.

**Board composition and independence**

The Company has controlling shareholders and therefore ensures that it keeps under review the independence of individual Directors and the Board as a whole. The Executive Directors and any Non-Executive Directors representing the interests of the Company's controlling shareholders are not considered to be independent by the Board.

The Board of the Company currently comprises ten directors, the majority of whom have served on the Board for six years or less:

- the Independent Non-Executive Joint Chairman
- the Non-Executive Joint Chairman
- three Executive Directors
- five Independent Non-Executive Directors
- one Non-Independent Non-Executive Director

## Executive/Non-Executive

**3** Executive
**30%**

**7** Non-Executive
**70%**

## Tenure of Non-Executive Directors



- 5 Years
- 7 Years
- 6 Years
- › 7 Years

**43%**   29%   **14%**   14%

Jonathan Bomford is our Senior Independent Director having joined the NMC Board in June 2013. In 2015 he was invited to join the Board of Travelex, a private company owned by one of our principal shareholders, Dr B. R Shetty. He was invited to join the Travelex Board to bring his independent outlook, governance experience and professional approach and advice to that board. Mr Bomford has no other interest in Travelex. Mr Bomford has advised that his role on the Travelex Board is coming to a conclusion and he anticipates he will resign from the Travelex Board by 31 March 2019. This cross directorship has been reviewed regularly and, with the background summarised above, the Board consider that such a position does not affect Mr Bomford's independence.

Exhibit 6 to B.R. Shetty's Request for Judicial Notice          47 of 182          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

Governance

# Corporate Governance Report continued

### The Board continued
**Board composition and independence** continued
The Board currently has three Executive Directors and seven Non-Executive Directors. In relation to the Non-Executive Directors, both Dr B. R. Shetty and Mr Abdulrahman Basaddiq were appointed as representatives of the Principal Shareholders under the terms of the Relationship Agreement between the Shareholders and the Company, and are therefore not Independent. The Board has considered the independence of the remaining five Non-Executive Directors and consider them to be Independent.

The Board therefore considers that it is independent.

The Senior Independent Director is Jonathan Bomford, who is available to shareholders should they have any concerns that they do not wish to raise with the Company or either of the Joint Chairmen directly. The Senior Independent Director can be contacted through the UK corporate office, and registered office, of the Company.

### Board Diversity
The Board considers that the extensive and diverse business, cultural and operational experience of all the Directors, both Independent and non-Independent, ensures a good balance in all aspects of Group decision making and control. The above attributes also enable the Board to take account of diverse and independent judgement to bear on key issues of:
- strategy, including constructively challenging the strategic direction of the Group;
- the consideration of acquisition proposals and long term financing of the Group's growth strategy;
- scrutinising and challenging the performance of the Group;
- assessing risk and controls operating within the Group and in its decision making; and
- standards of conduct and governance and other matters presented to the Board.

Therefore the Board is structured to ensure that:
- an appropriate cultural and ethnic mix is in place considering the Company's listing in the UK and its diversified operations, the vast majority of which are in the GCC, as well as global drivers and practice in healthcare related services;
- the conclusions of the Davis Report on Women on Boards, and in particular the benefits of male and female representation on the Board, are taken into account; and
- the individual skills and experience that Directors bring to the Board are well balanced.

The Board will continue to consider and balance the wide range of different attributes required by the Board when considering future Board appointments. These attributes include appropriate skills, geographic and business sector experience, gender and cultural balance.

Board diversity as at the date of this report is as follows:

## Gender of Board



Male
**80%**

Female
20%

## Nationalities of the Board



UK – 4
UAE – 3
Indian – 2
Kenyan – 1

**40%**   30%   **20%**   10%

Similar practices to ensure a diverse employee base are also operated within the Group's businesses and the diversity of employees in the Group is summarised in the Corporate Social Responsibility report on pages 26 to 33.

44   NMC Health plc Annual Report and Accounts 2018

## Key roles and responsibilities in the governance structure

The roles of the Chairmen and Chief Executive Officer are separate.

### Independent Non-Executive Joint Chairman

The Independent Non-Executive Joint Chairman was appointed to the Board in March 2012 in anticipation of the Company's IPO. He was independent at the time of his appointment and is considered to be independent by the Board. Alongside his Co-chair, the Independent Non-Executive Joint Chairman is responsible for the proper functioning of the Company's Board of directors including:
- the effective operation and governance of the Board
- setting the agenda and coordinating the style and tone of Board discussions

The Independent Non-Executive Joint Chairman takes the lead in chairing board meetings.

### Non-Executive Joint Chairman

The Non-Executive Joint Chairman previously held the positions of CEO and Executive Vice Chairman of the Company. His wealth of experience, his deep knowledge of the business and the management team, as well as his unrivalled contacts in the sector and region built over forty years continue to be invaluable to the Group. His current role enables him to continue to be available to guide the Board and guide and mentor management as required as we continue to grow the business and deliver shareholder value.

### Chief Executive Officer

The CEO is responsible for identifying, with the Senior Management Team, opportunities that are deemed appropriate and in line with the Board's strategic objectives. He is also responsible for delivering the key strategic objectives set by the Board. The Chief Executive Officer is assisted in this task by his Senior Management Team who meet regularly to discuss the performance of the business, new development opportunities as well as other material matters arising within the business.

### Senior Independent Director

The Senior Independent Director acts as a sounding board for the Joint Chairmen and serves as an intermediary for the other Directors as required. The Senior Independent Director is also available to shareholders if they have concerns which they have not managed to resolve through the normal channels of the Joint Chairmen or the Executive Directors, or who feel that such contact is inappropriate for the concerns that they may have.

The biography of each individual holding the above positions is set out on pages 38 to 39.

## Board meetings

The Group Company Secretary supports the Joint Chairmen in finalising an agenda for each Board meeting and ensuring that appropriate papers are circulated in a timely manner in advance of each Board and Board Committee meeting to ensure that fully informed decisions can be reached.

### Board focus in 2018

Matters considered at all Board Meetings include:
- Operational and financial performance, competitive and regulatory updates through management reports
- Potential acquisition or organic growth opportunities being considered in pursuance of the Group's growth strategy
- Other development opportunities
- Board Committee updates
- Risk and risk management either directly or indirectly whilst discussing matters considered by the Board

During the course of the 2018 financial year the Board has also considered and/or received presentations on other matters including:
- An overview of the extended Group structure and steps taken to widen the breadth of management expertise across the Group;
- Specific market presentations in relation to either both markets in which the Group currently operates and also potential future markets into which the Group may expand;
- Long term acquisition and working capital financing;
- The key competitive and regulatory environment drivers in the Group's key markets;
- The Group's half-year and full-year results;
- The proposed operating budget for the following financial year;
- The Group's strategic risks register and consideration of any changes to key risks, controls and mitigations; and
- The new provisions of the UK Corporate Governance Code updated in 2018.

### Board attendance in the 2018 financial year

During the period under review, the Board met, as scheduled, on five occasions as well as other ad-hoc meetings, normally called at very short notice, on specific matters requiring board approval or consideration. Scheduled periodic Board Meetings are normally split, where possible, between London and Abu Dhabi.

Exhibit 6 to B.R. Shetty's Request for Judicial Notice          49 of 182          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

# Corporate Governance Report continued

## Board meetings continued

**Board attendance in the 2018 financial year** continued

The attendance of the Directors at each of the scheduled Board meetings during the period is set out in the table below.

| Board meeting attendance 2018 | Attended/ Scheduled |
|---|---|
| H.J. Mark Tompkins | 5/5 |
| Dr B.R. Shetty | 5/5 |
| Mr Khalifa Bin Butti | 5/5 |
| Mr Prasanth Manghat | 5/5 |
| Mr Hani Buttikhi | 5/5 |
| Dr Ayesha Abdullah | 5/5 |
| Mr Abdulrahman Basaddiq | 5/5 |
| Mr Jonathan Bomford | 5/5 |
| Lord Clanwilliam | 5/5 |
| Salma Hareb | 5/5 |
| Dr Nandini Tandon | 4/5 |

## Board effectiveness

### Director induction

On appointment, directors have the benefit of an induction programme undertaken during the first few months of their tenure as a director. Each induction programme covers a number of different areas including:

- briefings and presentations from management to understand the business operations and financial drivers
- their legal and regulatory responsibilities as directors and the governance environment in which the Company operates
- opportunities to visit the Group's key facilities and new capital development project locations
- meetings with the Company's key advisors

### Board information and professional development

The Directors maintain an appropriate dialogue amongst themselves and with senior management, which ensures that Non-Executive Directors are kept up to date with major developments in the Group's business.

Non-Executive Directors meet with management and undertake visits to operational facilities as required in order to further understand the way the business operates and any change within the business. The Board had presentations from management during the year in relation to the Group's more material acquisitions and financing arrangements, as well as market conditions and drivers within the Group's key and developing markets. Directors also receive through Board and Board Committee meetings, as well as ongoing communications during the year, updates in relation to other key areas such as changes to the governance requirements and financial reporting as they apply to UK listed companies.

As part of their overall training and development needs, some non-executive directors have attended externally provided seminars and discussion forums relating to their general responsibilities as Directors or areas of specific responsibility, in particular in relation to the Board Committees on which they serve. Such development opportunities are made available to all Directors on an ongoing basis.

### Board evaluation

An externally-facilitated Board evaluation was undertaken by Prism Boardroom during 2018. Prism Boardroom has no other connection with the Company. The purpose of the Board evaluation was to focus on the effectiveness of both the Board and its Committees and to provide assurance that Board members, individually and collectively, operate in the interests of all key stakeholders. As the Company has Controlling Shareholders, the effectiveness of the relationship between the Independent and the Non-Independent members of the Board was also a point of focus for the evaluation.

The scope of the 2018 evaluation was determined following a review by Prism Boardroom of Board and Board Committee papers and included both one-to-one interviews with Board members and observation of the December 2018 Board meeting.

The evaluation found that:

- The Board's processes and relationships are aligned to the success of the Company;
- The Board does an effective job at bringing potentially different perspectives to bear on its decision making in a collaborative way; and
- The Board Committees are well regarded.

A number of recommendations were made which the Board will be considering, although it is noted that none of these are material. The conclusion of the evaluation report is that "*the Board is operating effectively and healthily*".

Exhibit 6 to B.R. Shetty's Request for Judicial Notice

Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

**Re-election of directors**

All of the directors of the Company submit themselves for re-election at the annual general meeting of the Company to be held on 20 June 2018. Each resolution for re-election or election of a retiring director will be proposed as a separate resolution. The Board is satisfied that the contribution made by each director, and the Board as a whole, to board deliberations continues to be appropriate and effective to ensure good stewardship of the Group on behalf of the shareholders of the Company and believe that shareholders should support the re-election of each Director of the Company at the 2019 annual general meeting.

## Other Board disclosures
**Conflicts of interest**

The Board are aware that some Directors have interests in other businesses in which they have invested. Any conflicts of interest and related party transactions that may arise are monitored with:

- Each of the Directors are asked to confirm that they have no other interests which would conflict them for the purposes of any item to be discussed at the meeting; where such conflict is reported, the respective Director is not permitted to take part in the consideration of that matter by the Board;
- Each Director discloses to the Board any related party transactions in which they are connected, and such transactions are reported in the Group's financial statements.

Whilst Directors on the Board have other business interests, the Board do not consider that these, nor the time commitment that they require, affect the ability of such Directors to undertake their role or comply with their statutory obligations.

**Independent advice**

Each of the directors is permitted to obtain independent legal advice at the Company's expense in the performance of their duties as directors. This would normally be managed through the Group Company Secretary.

All directors, and the Board as a whole, also have access to the advice and services of the Group Company Secretary who, under the Joint Chairmen's direction, is responsible for ensuring that good Board procedures are followed.

**Indemnification of directors**

The Company has put in place a Directors and Officers Liability Insurance policy which provides all Board members with insurance cover in respect of liabilities that may arise against the Directors collectively or individually. The Directors do not benefit from any form of qualifying third party indemnities made by the Company.

## Board Committees

The Board has established an Audit Committee, a Clinical Governance Committee, a Nominations Committee and a Remuneration Committee. The terms of reference for each committee clearly set out its authority and duties and have been approved by the Board. The terms of reference for each committee are available on our website at www.nmchealth.com or available from the Group Company Secretary.

The composition of the Board Committees changed in Q1, 2018 and as noted in the 2017 Annual Report. The composition of each Committee is set out within each Committee report below.



Exhibit 6 to B.R. Shetty's Request for Judicial Notice          51 of 182          Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

Governance

# Corporate Governance Report continued

## Board Committees continued
### Audit Committee
Overview provided by the Chair of the Audit Committee

The 2018 financial year has been another busy year for the audit committee. As UK listed company reporting and governance requirements continually evolve, particularly this year with the implementation of new accounting standards, and as the Group grows, both management and the audit committee continue to focus on finance, governance, risk and control matters across the Group.

This report sets out the work of the Committee, significant matters addressed by the Committee during the year and the responsibilities of, and work undertaken by, the external and internal auditors. In addition, the Board asks the Audit Committee to review various matters in relation to risk and internal control which, during a year of significant strategic activity and integration, has been a significant aspect of the Board and Audit Committee focus also.

### LORD CLANWILLIAM

Membership and attendance

The Audit Committee consisted entirely of independent non-executive directors during the year under review.

During the 2018 financial year, the following served as members of the Committee:

| | |
|---|---|
| Chairman: | Lord Clanwilliam (since 6 March 2018) |
| Committee members: | Jonathan Bomford (Chairman until 6 March 2018 and continuing member for the whole of FY2018) |
| | Dr Nandini Tandon |
| | Dr Ayesha Abdullah (until 6 March 2018) |

Note: subsequent to 31 December 2018, Dr Nandini Tandon ceased to be a member of the Committee on 8 February 2019 upon her resignation from the Board.

Lord Clanwilliam was appointed as Chairman of the Committee on 6 March 2018. Lord Clanwilliam's relevant experience includes being the Chair of another FTSE100 Company Audit Committee and a member of NMC's Audit Committee between 2012 and 2014.

During the 2018 financial year, the Committee's financial expert was Mr Jonathan Bomford. Mr Bomford is a Chartered Accountant and his brief biographical details and experience are set out on page 38 of the annual report.

The Audit Committee met four times during the year. The meetings are scheduled to align with the Group's reporting timetable with planning meetings in advance of both the half-year review and full-year audit, and approving meetings shortly in advance of the announcement of the Group's half-year and full-year results.

| Audit Committee attendance | Attended /Scheduled |
|---|---|
| Dr Nandini Tandon | 3/4 |
| Dr Ayesha Abdullah | 1/1 |
| Mr Jonathan Bomford | 4/4 |
| Lord Clanwilliam | 3/3 |

Meetings are normally attended by the Chief Executive Officer, the Chief Financial Officer and Deputy Financial Officer. Other Non-Executive Directors also attend meetings. The Group Company Secretary acts as Secretary to the Committee. The Committee also meets separately with the external auditors and management with the other parties not present.

## Key role and responsibilities

The key role of the Committee is to ensure the integrity of published financial reports; compliance with applicable legal and regulatory regulations in the group areas of activity; effectiveness of internal controls and assessing the independence and expertise of the external and internal auditors and assessing their effectiveness and performance in the year. Risk management is dealt with by the board and the Audit Committee reports to the board their assessment of such matters.

During the year the Audit Committee assisted the Board in:
- discharging its responsibilities with regard to financial reporting, external and internal audits and controls;
- reviewing the Company's financial results announcements, Annual Report and audited financial statements, including review of the long-term viability and going concern assessments;
- monitoring the independence of, and extent of the non-audit work undertaken by, the external auditors;
- making recommendations to the Board on the appointment of external auditors and the level of their remuneration;
- reviewing the effectiveness of the Company's internal audit activities and internal policies;
- overseeing the Group's compliance processes; and
- oversight of the Group's internal controls and risk management systems although the Board retains control over these matters.

Consideration of principal risks and the risk management process in place across the Group is a matter retained for discussion and review by the Board. The Audit Committee is required to report regularly to the Board of Directors in relation to its findings on the above and the discussions at each meeting. The ultimate responsibility for reviewing and approving the Company's Annual Report and audited financial statements and the half yearly reports remains with the Directors of the Company.

## Main activities of the Committee during the year

During the year, the Committee has focussed significantly on areas relating to the growth strategy of the Group, including both acquisition accounting and the resulting effect of the changing IT and internal control environment across the Group, as well as the implementation of new accounting standards. Where the Committee feels that it requires additional knowledge and advice when considering complex accounting matters, the Committee uses independent external advisers. During the year it received such reports and advice in relation to the following matters:
- The accounting for, and reporting of, Company's finance and loan facilities;
- The implications of the implementation of IFRS 16 (Accounting for Leases); and
- Accounting for Goodwill and acquired asset valuations.

The main activities on which the Committee focuses each year, being the Committee's consideration, and approval, of the Interim Results and the Annual Report, remains unchanged. The wider focus and additional issues discussed by the Audit Committee during the year included:

### Revenue Recognition

In addition to reviewing the consistency of revenue recognition policies across the Group, particularly to ensure that the revenue recognition policies across the Group's acquired entities is appropriate, the implementation of IFRS 15 has been reviewed by the Committee and management to ensure appropriate revenue recognition practices and policies are in place.

### Acquisition Accounting

There are a number of aspects in relation to the Group's acquisition strategy which had an impact on accounting and audit matters during 2018. These included approving the appointment of financial experts independent of the Group auditors to assess the value of goodwill for acquisitions, accounting for goodwill and specifically work on the purchase price allocation for transactions, including the identification of intangible assets, assessing the accounting policies within each business for consistency with NMC accounting policies.

### Accounting for new loans and financing arrangements

Given the focus on a number of long term financing transactions during year, the audit committee has been concerned to ensure that all new group financing arrangements are dealt with appropriately in the Group's financial statements.

### Development of risk management and internal control environment

The Committee reviewed work being undertaken by management in relation to the further development of the Group's risk management and internal control environment as part of the Group's Integration and business transformation programs.

### Internal audit

Internal Audit Reports are presented at Committee meetings twice a year with other updates from the Internal Auditors as required. During the 2018 financial year, Internal Audit reviews were commenced in Oman and the Committee reviewed the results of those reports.

Governance

# Corporate Governance Report continued

**Board Committees** continued
**Audit Committee** continued
Main activities of the Committee during the year continued
IFRS implementation

During the year, and in the previous financial year, the committee reviewed and considered the required accounting changes and impact that the implementation of IFRS 9 and IFRS 15 has on the Group's financial statements, and discussed the accounting policies related thereto. The Committee has also received initial reviews in relation to the impact of IFRS 16 which is effective for accounting periods commencing on or after 1 January 2019.

Fair balanced and understandable assessment

The Committee advises the Board on whether the Annual Report and Financial Statements, taken as a whole, are fair, balanced and understandable and provide the necessary information to assess the Company's performance, business model and strategy. Having reviewed the processes undertaken, the Committee concluded that the disclosures, and the processes and controls underlying their production, were appropriate and recommended to the Board that the Annual Report and Financial Statements are fair, balanced and understandable.

Change of Audit partner

The Committee discussed and monitored the impending change of audit partner and approved the new lead audit partner appointed in relation to the 2019 financial year.

**External audit and auditor independence**
External Audit effectiveness

The Committee believes that the effectiveness of the external audit is dependent on the identification and consideration of key risks by the Committee, management and, as part of their audit process, by the auditors during the financial year under review. EY produces and discusses with the Committee a detailed audit plan identifying these key risks, the focus of audit procedures and the work to be done to test management's assumptions and accounting treatment in these areas.

The Committee meets separately with the External Auditors to ensure that an independent dialogue is maintained in relation to monitoring key business and financial risks and to ensure that management have not restricted the scope of their audit. Audit Committee members also meet with the lead audit partner on a number of occasions during the year outside the formality of Audit Committee meetings.

The Committee did not commission an independent review of the effectiveness of the external audit during the year. However the effectiveness of the Group Audit was discussed and considered, by the Committee, management and, as part of their audit process, by the auditors.

Auditor fees and appointment

EY were appointed as auditor to the Company at the time of the Company's IPO in April 2012. The level of audit fees paid in relation to the 2018 financial year is set out in note 14 to the Consolidated Financial Statements.

Non-Audit fees

During FY2018, the level of non-audit fees amounted to a total of US$984k.

The Audit Committee adopted a new policy in relation to the Company's non-audit services in March 2018, ensuring that the new policy reflected current practice within the Group as well as relevant legislation.

Auditor Independence

The Audit Committee formally reviewed the independence of the Company's auditor, EY, during the period under review. The review took account of the relationship between management and the audit team, the processes that EY have in place internally to ensure objectivity and independence and also the level of non-audit fees incurred during the year.

As part of this review the Committee reviewed the potential threats to auditor independence as a result of:
- auditor self-interests, being those areas where the auditor may have a financial or other interest in the Company;
- auditor self-review, being areas where the results of non-audit services are reflected in the amounts included or disclosed in the financial statements;
- management threats, which may occur if partners or employees of the auditor take decision on behalf of management; and
- other threats, such as familiarity and intimidation.

The Audit Committee is satisfied that in all areas sufficient safeguards were adopted by the auditor and that the independence of EY and of the audit engagement partner had not been compromised. There is no limitation of liability in the terms of appointment of the Auditor for the audit of the Company's financial statements.

**Change of audit partner**

In H2, 2018, EY advised the Company that the lead audit partner for EY on the audit of the Company, Victor Veger, was taking up a new role within EY and would therefore be stepping down as lead audit partner. It was agreed that this would take place following the completion of the audit of the Company for the full financial year 2018. A new audit partner, Kevin Harkin, was selected from a list of prospective audit partners provided by EY and will lead EY's audit of the Company in 2019.

**Audit re-tender policy**

In accordance with the requirements set out in the September 2014 Competition and Markets Authority Order, the Audit Committee's approach to audit tendering is that it currently intends to undertake a competitive tender process in relation to statutory audit services provided to the Group in 2020 with the chosen statutory auditor being appointed for the FY2021 audit.

However, between now and the planned competitive tender date during which the Group is expected to grow substantially through execution of its organic and acquisitive growth strategy leading to transformational changes in the size and complexity of the NMC Group, the Audit Committee is conscious of the need to keep the provision of audit services under continual review for the benefit of both the Group and its Shareholders. The Audit Committee has therefore not ruled out that an earlier tender process may be appropriate.

**LORD CLANWILLIAM**
On behalf of the Audit Committee

Governance

# Corporate Governance Report continued

## Board Committees continued
### Clinical Governance Committee
Overview provided by the Chair of the Clinical Governance Committee

I report to you this year as Chair of the Clinical Governance Committee with good progress again having been made in relation to Clinical Quality matters.

The Clinical Governance Committee provides Board oversight in the key area of Clinical Governance. The Committee seeks to ensure with management that the Group has an appropriate governance structures within the healthcare business and that clinical care continues to improve.

Good progress has again been made during a very busy year with the majority of key patient safety and clinical care indicators remaining at a strong level or improving. Many clinical performance and quality improvement initiatives were implemented this year which will contribute clinical excellence across the Group. Following the many integration projects undertaken across the Group over the last 2 years, management have been reviewing, widening and increasing the experience of the Quality functions. The new Corporate Quality Department is expanding further on the good platform developed across the Group in prior years and has a goal to improve both clinical quality performance and monitoring. The Group has performed very well in patient satisfaction surveys and as well as other operations metrics. The use of technology platforms now in place means that the Quality functions across the Group are now well placed to improve standards across all businesses in the Group.

**DR AYESHA ABDULLAH**

### Membership and attendance
During the 2018 financial year, the following served as members of the Committee:

| Chair: | Dr Ayesha Abdullah |
| --- | --- |
| Committee members: | Dr C.R. Shetty |
| | Mr Prasanth Manghat (since 6 March 2018) |
| | Dr Nandini Tandon (until 6 March 2018) |

The Clinical Governance Committee met twice during 2018. In addition to the Clinical Governance Committee members, the Chief Operating Officer and the Vice President - Quality and Standards attended each meeting. The Group Company Secretary is Secretary to the Committee.

| Clinical Governance Committee attendance | Attended /Scheduled |
| --- | --- |
| Dr Ayesha Abdullah | 2/2 |
| Dr C.R. Shetty | 2/2 |
| Mr Prasanth Manghat | 2/2 |

### Key role and responsibilities
The key role of the Committee is to oversee governance structures, processes and controls in relation to Clinical matters in place within the Group healthcare operations. This is to ensure that the risks associated with clinical care are mitigated in the interests of the Company and its stakeholders.

#### Main activities of the Committee during the year

Specific responsibilities of the Committee, and work undertaken by it during the year, include:

- Review of clinical performance indicators;
- Overseeing the continuing inclusion of additional group facilities in achieving JCI accreditation;
- Reviewing the implications of new regulations and standards compliance implemented by our local health authority regulators; and
- Ongoing discussion in relation to the use and benefits of IT systems and solutions for all aspects of patient care and information monitoring.

#### Principal Management activities on clinical governance matters during the year

2018 was a very busy year for management in relation to quality and clinical governance matters.

Two hospitals, our Specialty hospitals in Dubai and Al Ain, were re-accredited by Joint Commission International, with excellent results, during the year. The Quality function will oversee a number of further re-accreditations, which take place every three years, during 2019. Our laboratories at NMC Royal Hospital and NMC Royal Women's Hospital both achieved successful Lab ISO reaccreditation in 2018 also.

NMC has joined the International DAISY (Foundation) Nursing Awards and four NMC nurses achieved the internationally recognised award of becoming a DAISY honoree.

The Committee is delighted with the dedication and determination of management, and all of our employees, to keep up to date with regulatory changes and new standards, ensuring that the Group is well positioned in compliance with its requirements as well as offering an excellent and safe service to our patients.

During the year, the Governance structure was enhanced with the creation of a wider Corporate Quality Team. This new team has already been busy in 2018 reviewing processes and standards across the Group and this will continue into 2019 with a proposed new NMC Clinical Quality Framework incorporating "Good Governance from the Board to the Bedside". This new framework, working alongside both our Accreditation and Regulatory standards will enable enhanced monitoring and quick identification, assessment, mitigation and management of clinical risks as well as validate emerging trends within the businesses.

The Committee will report on the progress of the Quality function's aim to transform Clinical and Quality Governance across our businesses in the 2019 Annual Report.

#### DR AYESHA ABDULLAH

For and on behalf of the Clinical Governance Committee

Governance

# Corporate Governance Report continued

**Board Committees** continued
**Remuneration Committee**
Membership and attendance
The membership of the Remuneration Committee changed on 6 March 2018. The Committee now consists of four Independent Non-Executive Directors, one of whom is the Independent Non-Executive Joint Chairman. An Independent Non-Executive Director is the Chairman of the Committee.

During the 2018 financial year, the following served as members of the Committee:

| | |
|---|---|
| Chairman: | Jonathan Bomford (Chairman since 6 March 2018 and a member of the Committee for the whole of the 2018 financial year) |
| Committee members: | H. J. Mark Tompkins (since 6 March 2018) |
| | Dr Ayesha Abdullah (since 6 March 2018) |
| | Dr Nandini Tandon (since 6 March 2018) |
| | Lord Clanwilliam (Committee Chairman and member until 6 March 2018) |
| | Abdulrahman Basaddiq (Committee member until 6 March 2018) |
| | Salma Hareb (Committee member until 6 March 2018) |

Note: subsequent to 31 December 2018, Dr Nandini Tandon ceased to be a member of the Committee on 8 February 2019 upon her resignation from the Board.

The Chief Executive Officer attends Remuneration Committee meetings and the Chairman of the Committee discusses proposed remuneration policies with him during their formulation. No Director is present when their own remuneration is discussed.

The Group Company Secretary acts as Secretary to the Remuneration Committee and, along with the Committee's independent advisors, Deloitte, provides advice to the Committee on Corporate Governance aspects relating to remuneration matters. He also provides assistance to the Chairman of the Committee as required in discussions with the Remuneration Committee advisers and on implementation of Committee decisions. The Group Company Secretary is not present when his own remuneration is discussed.

The Committee met four times during the financial year.

| Board meeting attendance 2018 | | Attended/ Scheduled |
|---|---|---|
| Dr Ayesha Abdullah | 2/2 | |
| Dr Nandini Tandon | 2/2 | |
| Mr Mark Tompkins | 2/2 | |
| Salma Hareb | 2/2 | |
| Mr Jonathan Bomford | | 4/4 |
| Mr Abdulrahman Basaddiq | 2/2 | |
| Lord Clanwilliam | 2/2 | |

Exhibit 6 to B.R. Shetty's Request for Judicial Notice

Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

**Key role and responsibilities**

The Remuneration Committee assists the Board in:

- making recommendations to the Board on the Company's Directors' Remuneration Policy, the framework of executive remuneration, including the use of incentive arrangements within that framework; and
- determining, on the Board's behalf, the entire individual remuneration packages for each Executive Director, the Chairmen and the Senior Management Team.

All other recommendations must be referred to the Board for approval.

No Committee member is permitted to participate in any discussion or decision regarding his/her own remuneration. The remuneration of non-executive directors is a matter for consideration by the Executive Directors, in discussion with the Chairman of the Company.

**Main activities of the Committee during the year**

The principal activities of the Committee during 2018 and the Annual Remuneration Report, are set out in the Directors' Remuneration report on pages 62 to 78.

**JONATHAN BOMFORD**

For and on behalf of the Remuneration Committee

Exhibit 6 to B.R. Shetty's Request for Judicial Notice      59 of 182      Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

Governance

# Corporate Governance Report continued

### Board Committees continued
**Nominations Committee**

The Nominations Committee consists of three Non-Executive Directors, two of whom are Independent Non-Executive Directors, one of whom holds the chairmanship of the Committee. During the 2018 financial year, the following served as members of the Committee:

| | |
|---|---|
| Chairman: | H.J. Mark Tompkins |
| Committee members: | Abdulrahman Basaddiq |
| | Mrs Salma Hareb (since 6 March 2018) |
| | Lord Clanwilliam (until 6 March 2018) |

The Nominations Committee has a role to assist the Board in:
- reviewing and making recommendations to the Board in relation to its structure, size and composition;
- reviewing succession planning in place for senior management and to discuss succession planning for the Board;
- determining the appropriate skills and characteristics required of directors; identifying individuals qualified to become Board members and recommending such individuals to the Board;
- recommending individuals to be considered for election as Directors at the next Annual General Meeting of the Company or to fill vacancies; and
- preparing a description of the experience and capabilities required for a particular Board appointment.

The Committee did not meet in 2018 but committee members held informal discussions in relation to the Board and Board Committee structure on matters of interest to the role of the Committee. The Committee would expect to meet to consider appropriate candidates to fill any vacancy created on the Board should such a vacancy arise or be considered appropriate given other skills and experience on the Board.

The approach of the Committee, and of the Board, to the issue of diversity is set out in this Governance section on pages 30 and 44.

**MR H. J. MARK TOMPKINS**
For and on behalf of the Nominations Committee

## Board Oversight of system of Internal Control and risk

### Overview

Management is responsible for establishing and maintaining adequate internal controls over financial reporting, operational and clinical matters across the Group. The Board is responsible for reviewing such internal controls and for ensuring that they are effective to properly manage the Group's businesses and to assure the identification, assessment, mitigation and management of risk.

### Alignment of risk assurance with business growth

While progressing its organic and inorganic growth strategy, over the last two years the Group has dedicated significant resources to integrating its recently acquired facilities while consolidating the market position of its legacy facilities, mainly in the UAE. Further, as the risks that the Group is exposed to continue to evolve (mainly due to macro-economic uncertainly and the uncertainty resulting from regulatory and technological disruption in the healthcare sector) the Group is constantly re-evaluating the design effectiveness of key controls.

Given the changes to the Group's structure and the nature of the risks faced by the Group, in order to strengthen its governance and control structure, and to assure the Board that structures are sufficiently robust to support the growth in the Group, management have progressively been:

- re-designing some of its key controls in an attempt to automate these and thereby reducing the level of manual intervention;
- incorporating additional key internal controls into its financial, operational and clinical quality review processes;
- implementing revisions to policies and procedures covering all aspects of the Group's accounting policies and controls to ensure consistency across the Group and compliance with the requirements of the recently implemented IFRS 9 and IFRS 15;
- taking account of the increasing influence of global standards particularly from the UK on the regulatory framework in the UAE;
- Expanding its Quality Team, including a new Senior Vice President for Quality and other staff who are familiar with UK regulatory standards;
- Reviewing and revising clinical governance including key staff, policies and procedures, systems and processes at both corporate and facility levels;
- Developing frameworks to guide and support an extended scope of clinical services in the UAE and beyond and encouraging business integration of operations and clinical governance to align mitigation and management of risk;
- Increasing the opportunities through clinical meetings, events, workshops and seminars to share best clinical practice across the Group, and utilizing the vast clinical experience the group now commands;
- Enhancing Corporate support services, including widening the breadth of the Group HR function under a new GCC Head of Human Resources to manage infrastructure risks related to the Group's workforce;
- enhancing the Group's Internal Audit and IT functions; and
- updating and extending the reach of delegated authorities and decentralisation of accountability across group businesses through the cluster and business verticals structure the Group has implemented.

All of these changes are essential to align good governance with large scale business growth and to continue to improve further the Group's internal control framework.

### Challenges

#### Acquisitions, integration and strategic alignment

Businesses which have been acquired as part of the Group's strategic growth plan over the last few years, all operated with different legacies in terms of structure, processes, systems and governance. Some of these businesses historically had a centralised approach to control, with the majority of the controls over all financial and operational aspects of each business resting with a few key individuals and, in some of the businesses, being manual in nature. We consider this to be a normal environment in which smaller privately-owned businesses are used to operating. Implementing change management programs to integrate new businesses into the group has been successful but will remain a challenge, a long-term project and a key risk for the Group as it continues to grow.

#### Regulatory changes

Disruption resulting from changes in the regulatory environment and in the insurance industry

In the Middle East region, where operations of the Group are primarily based. There have been a number of significant changes being introduced by our various regulators e.g. the implementation of VAT in UAE and changes to healthcare regulation and processes amongst others. These changes have resulted in the redesign of the Group's financial and operating processes and its internal control framework.

#### Human Capital

The growth of the Group and the augmentation and evolution of the organisational structure to support, guide and control this process, means that there is a risk that the Group's structure and processes can sometimes expand ahead of or, out of line with, the culture. As the employee numbers increase and diversify, increased engagement, communication and training across the Group is required to control and manage risks around organisational transformation.

Governance

# Corporate Governance Report continued

### Board Oversight of system of Internal Control and risk continued
**Challenges** continued
#### IT environment
Management recognise that the Group's IT systems are not fully integrated and that an element of manual control procedures are still prevalent in few of the Groups entities. Group has grown, organically and through acquisition, together with some significant regulatory changes as outlined above, despite witnessing these rapid changes group continues its commitment to develop the integrated IT systems. Whilst this is still the case, the manual processes, supported by legacy IT systems in many of the Group's businesses, continues to provide a robust level of control.

#### Approach to risk
Our approach to risk is adopted having in mind the complex and changing environment in which the Group operates which requires continual renewal and extension of control processes to monitor and manage risks.

The Group operates a multi-layered approach to risk identification control and mitigation. Group's business risks are identified through a bottom up process undertaken within each of the Group's businesses. Senior Management then review these risks alongside the macro-economic environment within which the Group operates through a top down review process to establish a Strategic Risk Register.

During 2018, the Group once again conducted a "bottom-up" exercise, with the assistance of external consultants working in conjunction with facility and corporate management, to evaluate and update its business risks registers. This exercise, which took place in addition to reviews undertaken on a case by case basis to consider risk and controls in specific entities as part of our internal audit program and following due diligence and acquisition of businesses into the Group, produced updated business risk registers and further raised awareness of risk and risk mitigation across our primary business assets. Clinica Eugin operates its own ongoing risk assessment and control mitigation program which assesses key risks, mitigation controls and governance from acquisition of a facility and continuing on an ongoing basis.

Taking into account the results of the business risk assessments, and top-down reviews twice during the year, Senior Management produce the Strategic Risk register for review by the Board twice annually.

Further details on the approach taken to assess risks, and of the Group's strategic risks, are set out on pages 22 to 25. The internal controls and processes in place to mitigate business risks and the Board's review of the effectiveness of the control environment are set out below.

#### Controls and risk mitigation
#### Management and Group structure
During the last two financial years, the Group has taken a phased approach to increase oversight over Group businesses including increasing management bandwidth with increased headcount and new oversight departments in the Corporate Office, improving and aligning controls in acquired businesses and decentralising accountability and many processes through its cluster management approach.

The overall management structure of the Group is now as follows:



58   NMC Health plc Annual Report and Accounts 2018

## Financial, operational and clinical quality controls

Key elements of the Groups' financial and operational controls are as follows:

- Clearly defined matters reserved for the Board or its Committees covering;
- Approval and review of the annual budget and long-term forecasts;
- Group Strategy including the risks and risk mitigation in relation to the same; and
- Capital expenditure, financial structuring and acquisition and investment decisions.
- Formalised delegations of authority and lines of accountability as part of the Group's "cluster management structure" provides a mechanism to monitor performance and operations of a manageable number of facilities in sufficient detail covering monthly operational and financial reporting including monthly comparison of results and against budget and forecast, and a review of key KPIs.
- Oversight of business operations
    - Monthly meetings between the CEO and regional leadership to:
        - Discuss ongoing business strategy
        - Review market shifts in regulatory oversight
        - Develop action plans to mitigate any issues that could negatively impact the Group's success
    - Monthly Operations reviews are conducted at regional and facility level to:
        - Review performance against budget
        - Discuss roadblocks to achieving targets
        - Review recruitment and retention targets
        - Manage any regulatory or clinical quality issues
        - Develop future success action plans
- Policies, procedures and controls covering:
    - The preparation of financial statements of each subsidiary in accordance with IFRS, local tax and regulatory requirements (a complete audit is carried out by the auditors of significant subsidiaries for the purposes of the Group's year-end financial statement);
    - The preparation of standardised monthly/daily reports in accordance with accounting policies of the Group, which are formalized in a Group accounting manual given to all the subsidiaries. This accounting manual is regularly updated to incorporate any changes to IFRS and regulation;
    - The formal process for organic and inorganic expansion projects with full assessments of potential acquisitions or other material investments including due diligence, financing, market studies, risk analysis, strategic benefits to the Group;
    - The Group's mitigation plans with respect to its strategic risks, including cyber risks and protection of personal data; and
    - The Group's long term viability and going concern basis of accounting. These are conducted using both internal resources and external consultants.
- An appropriate business management and governance structures:
    - Our larger NMC healthcare hospitals facilities have a Medical Director and Head of Administration who are accountable for the operation of the facility. Smaller facilities are generally managed by the lead clinician.
    - Support functions such as Revenue Cycle Management, HR, IT, legal, finance and marketing, among others are provided by a central or cluster team.
    - Within the Healthcare division structure, a number of multidisciplinary committees are in place to monitor guidelines in respect of patient safety and quality, medication management, infection prevention and control, medical record documentation and facility management.
    - Medical Directors' meetings to monitor clinical governance procedures.
    - The Group has a Quality Team which operates in both the Healthcare and Distribution divisions. Quarterly and annual Quality reports monitor performance against a range of key KPIs based on clinical quality and safety metrics.

Therefore, all of our facilities and businesses we have an appropriate and relevant structure to provide effective and efficient management and clear lines of accountability of both clinical and non-clinical areas. The Senior Management Team believes that these divisions of responsibility at both facility and corporate levels provide a natural check and balance across all internal control areas.

## Independent controls - *Internal Audit*

The Group largely makes use of an outsourced internal audit function which is closely aligned to the Group risk management function.

At each significant operating facility, the effectiveness of the system of internal financial control is independently evaluated through the internal and external audit programmes. In addition to these audits, the effectiveness of operational procedures is examined internally through self-assessment processes. The results of these assurance processes are monitored by the Group's Audit Committee.

The Internal Auditors report directly to the Chairman of the Audit Committee and on a day to day basis works in conjunction with the CFO. Their reports to the Audit Committee are received and discussed at Audit Committee meetings.

# Corporate Governance Report continued

### Board Oversight of system of Internal Control and risk continued
**Controls and risk mitigation** continued
Independent controls - *Internal Audit* continued

Following the completion of each review, the internal auditors identify areas for remedial action and the required action plans are discussed and agreed with management. All areas requiring remedial action are highlighted as high, medium or low risk areas. The internal auditors present the reviews and the agreed management action plans for any remedies to the Audit Committee and then monitor the implementation of any required changes on behalf of the Audit Committee.

Independent controls - *Quality and Regulatory oversight*

The Board is aware that as a significant healthcare and distribution business it is subject to a range of risks related to clinical care, quality and product safety.

The Healthcare division, and elements of the Distribution division, are regulated by governmental and non-governmental organisations. In summary:
- Each UAE Healthcare facility is licensed by one of four regulatory bodies which exist in the UAE. The regulatory bodies monitor performance and clinical procedures against its regulations, key metrics and guidelines;
- Healthcare facilities outside of the UAE are regulated by the relevant local responsible body in their relevant jurisdictions, for example in the UK, where there is an Independent Regulatory, the Care Quality Commission;
- Clinica Eugin clinics are subject to local regulatory standards and laws applicable in each jurisdiction in which they operate;
- Seven of the Group's owned Hospitals, as well as Sheikh Khalifa Hospital in Umm al Quwain which is managed by the Group, and the clinical laboratory of Dr Sunny Medical Centres are accredited by Joint Commission International, an internationally renowned organisation monitoring clinical metrics and quality of patient care;
- The distribution and disposal of pharmaceuticals is strictly controlled through the UAE Ministry of Health;
- The majority of the Group's healthcare revenue, particularly in our principal market of the UAE, results from medical insurance arrangements. The Group's contractual arrangements with insurance providers include the monitoring of claims processing and clinical outcomes; and
- The Group's facilities through its legal entities in the UAE and Saudi Arabia are registered for VAT and required to comply with the VAT guidelines.

The Board and its committees provide independent oversight of management's control systems, in particular the Audit Committee in relation to finance related matters and the Clinical Governance Committee in relation to clinical and quality matters. The work and oversight of the board committees is set out on pages 47 to 56.

### Effectiveness of Internal Controls
The Board has overall responsibility for the Group's systems of internal control and on behalf of the Board, the Audit Committee, and in relation to clinical quality the Clinical Governance Committee, has been engaged in the process of ensuring that management have established continuous processes for identifying, evaluating and managing the risks the Group faces.

These processes include:
- the reporting from the Finance Department on Group performance;
- the work of the internal auditors;
- issues identified by the external auditors to the extent covered by their audit work; and
- the reporting from the Quality Department in relation to clinical quality performance and patient experience.

The Board is responsible for monitoring the ongoing effectiveness of these systems and for conducting a formal annual review of the effectiveness of the Group's internal controls.

A system of internal controls is designed to manage, rather than eliminate, the risk of failure to meet business objectives and is designed to provide reasonable, but not absolute, assurance against material misstatement or loss.

In reviewing the effectiveness of the internal controls in place during the year, the Audit Committee considered, amongst other matters, the enhancements to the control framework, manual controls in place, the independence of the separate operating units, the delegated authorities, the balance of centralised and decentralised systems and the reporting process in relation to exceptional items.

The Audit Committee have also noted the challenges faced as the acquired businesses are integrated into the Group. Such acquired businesses have differing levels of controls within their businesses. The Audit Committee have noted the initial primary and delegated authority controls which are put in place in the acquired businesses following completion as well as the roll out of financial and operational reporting requirements.

The Board has reviewed the effectiveness of the Group's systems of internal controls for the 2018 financial year, in light of the key elements of the Group's internal controls outlined above. Given the additional internal controls that have been incorporated into the Group's financial and operational reporting process, such that sufficient internal controls were in place to monitor the Group's key risks, the Board believes, having evaluated the both the design and operating effectiveness of the internal controls and procedures, that these were effective during the period covered by this report. The Board also believes that the process undertaken by the Board and its Committees to monitor the internal control environment, accords with the guidance provided in the FRC's Guidance on Risk Management, Internal Control and Related Financial and Business Reporting.

### Shareholder engagement

The Company is committed to communicating with shareholders and stakeholders and to be available to meet with shareholders who require additional explanation of any matter which is of concern to them.

During 2018, the Company has continued to focus on its formal program of investor interaction including one-to-one meetings with institutional investors and attendance at investor conferences. Such meetings are attended by conducted by various members of the management team depending on the focus for specific meetings. The Company also held a Capital Markets Day in October 2018 which included presentations on various aspects of the Group's businesses and financial performance.

Meetings were also held in January 2018 between Independent Non-Executive Directors and our larger institutional shareholders, to principally discuss matters connected with the remuneration of the Company's Executive Directors.

During the financial year ended 31 December 2018, the Company issued its 2017 audited results and its 2018 half year unaudited results. In addition, given the strategic acquisition and financing activities during the year, the Company kept shareholders updated regularly with regards to its long-term financing and its material acquisitions, and the effect that these have on the Group.

The Joint Chairmen and Senior Independent Non-Executive Director are also available, either through contacting the Company Secretary or at the Company's General Meetings, to discuss any matters within their areas of responsibility or where individuals do not feel it is possible to discuss these matters with management.

Aside from direct shareholder meetings, the principal ongoing communication with shareholders will be through the publication of the Company's Annual report and audited financial statements and Interim Results as well as the opportunity to question the Board and Committees at General Meetings. Shareholders are encouraged to attend General Meetings and if unable to do so are encouraged to vote by proxy.

The Company has an investor relations section on its corporate website, www.nmchealth.com. This has been updated regularly with information that the Company considers relevant to its investors. Additionally, the number of analysts monitoring the Company and issuing notes in relation to their forecasts and expectations for the group continues to increase.

### Ethics

**Whistleblowing Policy**

A confidential whistleblowing procedure is in operation to allow employees to raise concerns of possible improprieties in relation to either operational or financial conduct.

**Anti-Bribery**

The Group has an Anti-Bribery and Anti-Corruption Policy as well as a Gifts and Entertainment Policy which applies to all directors and employees of all Group Companies. The Policies, which have been communicated to employees, includes clear statements setting out the Group's Anti-Bribery measures and Anti-Corruption culture. Practical guidance has been issued in relation to specific circumstances considered to be most relevant to Group employees. These include guidance notes for clinical staff attending pharmaceutical and training and development conferences in relation to entertainment and other possible inducements, as well as guidance notes in relation to the receipt of free products and equipment and how such products and incentives may affect clinical judgement. Specific guidance has also been provided in relation to the provision of sales incentives to senior sales and marketing staff within our Distribution division.

**Modern Slavery Policy**

The Board approved the Group's new Modern Slavery policy in December 2018 and subsequently issued its first Modern Slavery Statement. Further information in relation to the implementation of this policy is included in the Corporate Social Responsibility report on page 27.

The Corporate Governance Report set out on pages 42 to 61 has been approved by the Board and is signed on its behalf by:

**H. J. MARK TOMPKINS**
Non-Executive Joint Chairman

**DR B. R. SHETTY**
Non-Executive Joint Chairman

Governance

# Directors' Remuneration Report 2018

### Letter from the Remuneration Committee Chairman

Dear Shareholder,

I am pleased to present the Directors' Remuneration Report for 2018. I would like to take this opportunity to provide you with an overview of the principal work of the Committee during 2018 and to provide the context in which decisions were taken by the Committee.

The Committee believe that the management team have again excelled in delivering a further period of continuing growth for the Company during a period of significant internal transformation and integration.

Our strategy continues to be centred on increasing capacity, growing our capabilities and expanding our geographic reach, and continues to deliver significant and sustainable long-term growth. In 2018, we delivered against these strategic objectives through the expansion of our market position beyond the UAE. The number of patients attending group facilities in FY2018 grew to 7.5m. The Group's expansion has also resulted in the number of countries in which we now operate increasing to 19.

In addition, management have, alongside seeking expansion opportunities, focused significantly on operational and financial structures in order that the Company continues to improve the operational efficiency of our facilities, extracting additional value out of both our acquired and legacy assets and therefore maintaining a very disciplined approach to EBITDA growth.

In this context the Remuneration Committee has worked over 2018 to ensure that remuneration policies and practices support the Company's strategy and promote long-term sustainable success.

Accordingly, several key decisions were taken during the year, as summarised below.

**Key remuneration decisions**

| |
|---|
| Maintenance of an approach of restraint over 2018, continuing that of 2017, in making no adjustment to Directors' remuneration. |
| Adjustment upwards of the LTIP targets governing vesting for 2019 awards. |
| Introduction of an additional underpin for 2019 LTIP awards, requiring a conversion of EBITDA to net income hurdle to be met. |
| Inclusion of more transparent disclosure in respect of adjustments made for material corporate events, with the aim being STIP and LTIP targets will be no easier or stretching by virtue of corporate activity. |
| Introduction of a holding period under the LTIP. |
| Introduction of more definitive malus and clawback provisions. |

These points are discussed further in this year's Remuneration Report and I anticipate they will be viewed positively by shareholders.

**Corporate Governance**

As noted in our Corporate Governance Report, the FRC published a revised UK Corporate Governance Code in 2018 (new Code) which applies to NMC with effect from our 2019 financial year.

The Committee has considered the new Code and determined during 2018 how the new provisions will be implemented. Apart from influencing the key remuneration decisions outlined, in response to the new Code we have made some changes as well as identified areas for further development. These include:

- While the Committee has always had oversight, it now formally approves remuneration for the executive committee, in addition to the Executive Directors.
- We have reviewed our incentive award documentation to ensure the Committee has full discretion to adjust pay outcomes where the formulaic outcome may not be in shareholders' interests.
- Implemented a holding period to apply for 2019 LTIP awards onwards.
- In reviewing Executive Director remuneration, the Committee initiated a process for ensuring it will have access to broader information around pay policies and practices across the Company.

Given the acquisition of Aspen Healthcare, NMC will comply with the requirement to publish information on the pay ratio of the Chief Executive to UK employees in our 2019 annual report.

Exhibit 6 to B.R. Shetty's Request for Judicial Notice

Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

**2018 Performance**

2018 was another year of strong performance. We successfully delivered EBITDA of US$487.4m, a growth of 37.9%, on a revenue base that grew 28.3% over 2017 to US$2.06bn. EBITDA margin also improved by 170bps to 23.7% and Adjusted Net Profit by 19.9% from US$236.6m to US$283.6m. Quality measures are also key to a healthcare business, and we are proud that we have 7 JCI accredited hospitals across the Group and these facilities continue to achieve excellent ratings against JCI performance measures.

**Executive Remuneration in 2018 and 2019**

Notwithstanding the Company's performance, the Committee is acutely conscious of how executive remuneration remains under close scrutiny in the public arena and we therefore carefully consider how our executives are paid. While our performance justifies the incentive outcomes detailed below, we believe the Committee continues to exercise restraint and apply good corporate governance in its remuneration decisions which is evidenced in the following ways:

**CEO Salary Remains Unchanged**

No change to the Chief Executive Officer's base salary (or other Executive Directors). Prasanth Manghat assumed the role of Chief Executive Officer in March of 2017 and, along with the rest of the management team, has made an outstanding contribution to the Company's success. Despite this promotion and associated increase in his role scope, the Committee has not made any adjustment to his fixed or variable remuneration since 1 January 2017. As a result his base salary continues to be less than that paid to the previous CEO in 2016.

**Benefit levels**

The majority of employees and Senior Management that the Group employs are ex-patriate employees living and working away from their home country. Remuneration packages for employees, in our primary markets are therefore structured accordingly. The Executive Directors have similar benefit arrangements available to them, but have chosen not to take the primary benefit being an accommodation allowance. The Committee is also aware that, unlike the situation in many other companies, the Company does not provide pension benefits to its employees or its Executive Directors. The level of benefits paid to the Executive Directors is therefore modest in comparison to typical UK practice.

**STIP and LTIP adjustments**

The Committee is aware from its consultation with shareholders of the concern for greater transparency in adjustments to STIP and LTIP targets to take account of material events. The Committee accepts that investors will expect targets to be adjusted in the event of a material acquisition which was not envisaged or implied in the original targets. They would expect either the targets to be increased to reflect the additional contribution or that additional contribution to be adjusted out of the metric used for performance assessment.

The application of this policy has led to two adjustments in the last year in relation to the 2018 STIP which are disclosed within this Directors' Remuneration Report. In addition, adjustments made to existing LTIP awards and the adjustment made in relation to the 2016 LTIP awards which vest in March 2019, are also set out within this Report.

**2018 STIP achievement**

Given the excellent performance of the Group, further details of which are provided in the business overview and financial review sections on pages 13 and 19 of this annual report, and taking account of the adjustments to targets made by the Committee during the year, the Remuneration Committee has approved the maximum entitlement of bonus opportunity for each of the Executive Directors.

We have provided a detailed summary of the measures and targets associated with these STIP outcomes on pages 68 to 69.

**2016 LTIP Award vesting**

In respect of vesting under the 2016 LTIP, performance was assessed against three-year relative TSR and three-year compound annual growth in EPS. Our TSR for this period was 296.4% (significantly ahead of the peer group median and upper quartile of 11.8% and 41.5% respectively) with compound annual growth in EPS of 15.81% following significant adjustment for acquisitions. This strong level of performance has, unsurprisingly, resulted in 100% of the 2016 LTIP awards vesting.

Exhibit 6 to B.R. Shetty's Request for Judicial Notice          67 of 182          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

Governance

# Directors' Remuneration Report 2018 continued

### Letter from the Remuneration Committee Chairman continued
**Executive Remuneration in 2018 and 2019** continued

#### 2019 LTIP awards
Having reviewed and amended LTIP measures in 2018 following shareholder consultation in early 2018, the Committee has decided not to amend for 2019 the measures it uses to incentivise management over the longer term through the Company's LTIP arrangements. However, the Committee is making the following changes to the LTIP awards it makes for 2019:

- Increase in the EBITDA growth performance requirement for 2019 LTIP awards from 5% – 15% to 10% to 18% (CAGR) at threshold and maximum respectively;
- Introduction of an additional underpin capturing the conversion of EBITDA to net income, to provide shareholders with an aggregate view on earnings, cash flow, and capital efficiency. Failure to meet the underpin will reduce the proportion of the award vesting by up to 50%; and
- Addition of a 2 year holding period which follows the performance period during which LTIP awards may not be exercised by participants. In addition, any leavers will normally be subject to the holding period, effectively applying a post-cessation guideline.

The Committee believes that these changes, alongside base salaries and incentive opportunities remaining unchanged, is evidence of sound governance principles and restraint in the application of the remuneration policy at a time when good performance and growth continues.

#### Shareholder Feedback
The Committee engaged with key shareholders over the course of 2018. This process, along with the new Code, influenced the Committee's decision making as outlined above.

The Company's existing Remuneration Policy was approved by shareholders on 29 December 2016 and therefore a new Remuneration Policy will be put before shareholders by 29 December 2019. The Company intends to consult with larger shareholders in relation to the new Policy in H2, 2019 prior to submitting a new Policy for approval by shareholders before the end of 2019.

For this reason, the Committee is not planning any shareholder consultation in advance of the 2019 AGM. I am, of course, available to discuss any Remuneration matters with shareholders at any time should they so wish.

As we look to 2019, and beyond, we remain committed to delivering continued long-term sustainable growth. We look forward to shareholders' support by voting in favour of the Directors' Remuneration Report at the 2019 AGM.

**JONATHAN BOMFORD**
Chairman of the Remuneration Committee

## Directors' Remuneration Report Contents

- Summary of Remuneration Policy
- The Remuneration Committee in 2018
- 2018 remuneration
- 2019 remuneration
- Other information

## Introduction

This Directors' Remuneration Report summarises the Company's Directors Remuneration Policy, outlines the activities of the Committee in the year under review, details how our remuneration policy was implemented in the year ended 31 December 2018, what remuneration was paid to the Directors for that period, and how the Committee intends to apply the policy for the year ending 31 December 2019.

The Directors' Remuneration Report will be subject to an advisory shareholder vote at the 2019 AGM.

Where the information is subject to audit in this Directors' Remuneration Report this is identified in the relevant heading.

## Summary of Remuneration Policy

The Remuneration Policy summarised below was approved by shareholders in December of 2016. The Policy is effective until the third anniversary of its approval or a revised policy is approved, whichever is the sooner. The policy is available on our website.

| | Element of remuneration | Link to strategy | Framework and opportunity |
|---|---|---|---|
| Fixed Remuneration | Base salary | To attract and retain management of the calibre required to deliver the Group's strategy without paying more than is necessary. To reward executives for their performance in the role. | No maximum level. Set in relation to: (i) Remuneration levels at companies of a comparable size and complexity in the FTSE, other similar UAE companies and other international healthcare companies; (ii) Salary increases elsewhere in the Group; (iii) Business and individual performance; (iv) The experience of the individual; (v) The external economic climate and market conditions; and (vi) Local market practice. |
| | Benefits | | The Group provides a range of benefits which reflect typical benefits offered in the UAE including, but not limited to: (i) Employee/family accommodation; (ii) Private Medical Insurance (including family cover); (iii) Company provided transport facility (iv) Annual family return flight to home country; (v) 30 days' holiday; (vi) Reimbursement of reasonable personal accommodation and travel costs including any related tax liability. |
| | Pension | | No pension provision.

Executives are eligible to receive an end of service benefit, accrued in line with local UAE laws. |

# Directors' Remuneration Report 2018 continued

## Summary of Remuneration Policy continued

| | Element of remuneration | Link to strategy | Framework and opportunity |
|---|---|---|---|
| Variable Remuneration | STIP | Bonus measures and targets are set annually dependent on the deemed strategic priorities for that year. | The maximum bonus opportunity in respect of a financial year is 200% of base salary. In exceptional circumstances, the Committee may increase the maximum limit to 250% of salary. Normally, up to 50% of the bonus pays-out for target performance. |
| | | | Any annual bonus achieved for a financial year is normally delivered one-third in cash and two-thirds in deferred shares. Normally, 50% of the deferred element vests one year from award and the rest vests two years from award subject to continued employment. |
| | LTIP | Awards vest based on performance measured over a three year period. | The maximum award opportunity in respect of a financial year is 250% of base salary. In exceptional circumstances, the Committee may grant awards of up to 300% of salary. |
| | | Performance measures are determined by the Committee and are chosen to be aligned with the long-term success of the business. The Committee believes a measure linked to profitability and a share price related measure remain appropriate. | Up to 25% of the award pays out for threshold performance. Awards vest on a straight-line between threshold and maximum performance. |
| | Share options | In exceptional circumstances the Committee has the ability to make awards of market value options. | In the event market value options were awarded, the maximum value is 200% of salary. Awards vest based on performance measured over a three year period based on measures adopted prior to grant. Options may be exercised until the 10th anniversary of the date of grant. |
| Shareholding guidelines | | To align the interests of the management team with shareholders, the company operates a shareholding guideline for Executive directors of 300% of salary. | |
| Malus and clawback | | Malus provisions are included in the Policy. In addition, as noted in the 2016 annual report, clawback is also in effect for all elements of variable remuneration. | |

## The Remuneration Committee in 2018

Details of the members of the Committee during the 2018 financial year, and its role and responsibility within the Group's Board and governance structure, is set out on pages 54 to 55 of the Governance report.

### Principal matters considered in 2018

The Committee met formally four times during the year. Principal items discussed by the Committee included:

- Review of varying elements of remuneration for Executive Directors and Senior Management following shareholder consultation and feedback in early 2018, including changes to the Company's LTIP target measures;
- Adjustment of 2018 STIP targets and review of LTIP award targets to reflect the change in the Group as a result of acquisitions to ensure performance targets are measured on a like for like basis;
- Approval of a new holding period under which all future LTIP awards, 2019 onwards, would not be able to be exercised for a period of two years following the initial three year performance period;
- Consideration of post-employment shareholding in light of the new holding period; and
- Review of the requirements of the updated UK Corporate Governance Code which is effective for accounting periods beginning or after 1 January 2019. This included a review of incentive plan documentation to ensure discretion could be applied to override formulaic outcomes, and for clearly defined malus and clawback provisions to apply.

Exhibit 6 to B.R. Shetty's Request for Judicial Notice                    70 of 182                    Hashem, et al., v. NMC Health PLC, et al.,
                                                                                                         2:20-cv-02303-CBM-MAA

**Support and External Advice**

The Remuneration Committee seeks and considers advice from independent remuneration advisers when discussing and setting Executive Director and Senior Management salary levels. Deloitte was appointed by the Remuneration Committee and acted as advisors to the Company since 2012.

The Committee have reviewed and considered Deloitte's independence, and consider them to be independent advisers to the committee notwithstanding that Deloitte, as an international firm, provide the following services to the group:
- Some tax advisory services to the Group in Spain;
- Internal Auditors to our IVF businesses, Clinica Eugin and Fakih IVF; and
- Transaction services and accounting advice to the Group in the UAE, both before and after some of the Group's acquisitions.

It was noted that none of this advice has related to remuneration matters in the Group, all teams providing these services are based in countries other than the UK where the remuneration advisory team are based and none of these teams have any connection with the engagement partner and team advising the Remuneration Committee.

The Committee is satisfied that the advice they have received from Deloitte during the year has been objective and independent and that the Deloitte LLP engagement partner and team, which provide remuneration advice to the Committee, do not have connections with NMC that might impair their independence. The Committee reviewed the potential for conflicts of interest and judged that there were appropriate safeguards against such conflicts. Deloitte are signatories to the remuneration consultants' group code of conduct in relation to executive remuneration consulting in the UK.

The Remuneration Committee has direct access to Deloitte as and when required. The Group Company Secretary liaises with Deloitte where necessary to ensure that all Committee requests and decisions are dealt with and implemented, but does so under the guidance of the Remuneration Committee Chairman. Deloitte attend meetings of the Committee as required.

Deloitte received fees of £75k (charged on a time plus expenses basis) for advice received during the year.

**Remuneration arrangements throughout the Group**

The remuneration philosophy is the same throughout NMC in that individuals should be remunerated based on their role, responsibilities, experiences and market practice. NMC has a variety of different roles from senior executives, to doctors and nurses and to administrators and support staff, and therefore remuneration levels and structures vary to reflect the different requirements, expectations and geographic locations of these roles, particularly having in mind the large proportion of ex-patriate employees working in the Group.

The Committee does consider that it is important, however, that Executive Directors and senior executives as a group are remunerated in a similar way to ensure that they are incentivised to collectively deliver the Group's strategy and create long term value for shareholders. Going forward, the Committee will be updated annually on how broader workforce remuneration and related policies align with the culture of NMC, and review this when deciding on executive remuneration matters.

**Results of voting on Remuneration matters at General Meetings of the Company**

The following summarises voting in relation to the approval of the respective Directors' Remuneration Reports at both the Annual General Meeting in 2017 and 2018:

| Meeting date | Resolution | Resolution type | For | Against | Number of votes withheld |
|---|---|---|---|---|---|
| 23 May 2017 | To approve the Directors' Remuneration Report | Advisory | 71.36% | 28.64% | 255,623 |
| 28 June 2018 | To approve the Directors' Remuneration Report | Advisory | 92.6% | 7.4% | 3,804 |

The Committee believes that its consultation with shareholders in early 2018 helped to explain the Committee's approach to Executive remuneration and allowed the Committee to take note of the views of the larger institutional investors in development of its 2018 Executive remuneration proposals. The vote for the Directors' Remuneration Policy increased significantly at the 2018 Annual General Meeting.

Governance

# Directors' Remuneration Report 2018 continued

## 2018 remuneration - this section is subject to audit

This section outlines how the remuneration policy was applied in 2018, together with the outcomes for actual remuneration paid in relation to the financial year under review. This is shown in two parts - Remuneration paid to Executive Directors and a separate section in relation to Non-Executive Directors.

### Executive Director Remuneration 2018
Remuneration paid in 2018 (single pay figure)

The table below sets out the remuneration paid to or received by each Executive Director of the Company who served during the financial year ended 31 December 2018.

| Executive Director | Salary $'000 2018 | 2017 | Benefits $'000 2018 | 2017 | STIP $'000 2018 | 2017 | LTIP awards $'000 2018 | 2017 | Pension $'000 2018 | 2017 | Total $'000 2018 | 2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Prasanth Manghat | 1,033.2 | 1,033.2 | 19.0 | 19.6 | 2,066.4 | 2,066.4 | 2,364.9 | 2,560 | 0.0 | 0.0 | 5,483.5 | 5,948.2 |
| Khalifa Bin Butti | 685.5 | 348.5 | 0.0 | 0.0 | 1,199.6 | 400.0 | 0.0 | 0.0 | 0.0 | 0.0 | 1,885.1 | 748.5 |
| Hani Buttikhi | 650.7 | 330.8 | 0.0 | 0.0 | 976.0 | 325.4 | 0.0 | 0.0 | 0.0 | 0.0 | 1,626.7 | 656.2 |

Notes:
(1)  The Executive Vice Chairman and Chief Investment Officer were appointed to the Board as Executive Directors on 28 June 2017 and therefore remuneration for 2017 is not in relation to a full year of service.
(2)  The value shown in the 2017 LTIP awards column is the awards which vested during 2018 and are valued using the execution share price on the respective dates of vesting.
(3)  The value shown in the 2018 LTIP column is the award which will vest on 15 March 2019. As it is not possible to provide an actual value attributable to these shares, the value shown above is calculated by reference to the average closing share price of the Company in the Quarter ended 31 December 2018, which was 3,256p per share.
(4)  Participants also receive additional shares equivalent in value to the dividends that would have been paid during the vesting period on any shares that vest. Therefore included in 2017 and 2018 LTIP values above are the value of such shares received or to be received.

### Base salaries
The base salaries of the Chief Executive Officer during the year was $1.0m (AED 3.798m) per annum, which was set effective from 1 January 2017. The base salaries for the Executive Vice Chairman and Chief Investment Officer of $685k (AED 2.518m) and $650k (AED 2.390m) per annum respectively, were set from their date of appointment as Directors.

The base salaries of the Executive Directors were unchanged during the 2017 and 2018 financial years.

### Benefits
There was no change to the structure of benefits available to the Executive Directors during the year. The Benefits paid included the following items:

| Executive Director | Provision of family accommodation $'000 2018 | 2017 | Private medical insurance $'000 2018 | 2017 | Annual family return flights to home country $'000 2018 | 2017 |
|---|---|---|---|---|---|---|
| Prasanth Manghat | 0.0 | 0.0 | 4.0 | 4.4 | 15.0 | 15.2 |
| Khalifa Bin Butti | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Hani Buttikhi | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |

### Outcome of the 2018 STIP
The level of STIP award is determined by the Committee based on NMC's performance and where relevant individual Directors' performance. For the purpose of the 2018 annual bonus, the Executive Directors were eligible for maximum bonus awards as follows:

•   Chief Executive Officer: 200% of salary;
•   Executive Vice Chairman: 175% of salary;
•   Chief Investment Officer: 150% of salary.

Exhibit 6 to B.R. Shetty's Request for Judicial Notice

Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

**Adjustment of STIP targets**

The Committee reviewed the 2018 STIP targets twice during the financial year to take account of material acquisitions and investments. The first adjustment was made following acquisitions and additional investments made in January 2018 with a further adjustment made later in the financial year to take account of improved performance of the Group in the second half of the financial year. In this respect the EBITDA target and stretch levels were increased to $445m and $475m respectively from the original targets of $425m and $435m at target and stretch respectively. There were no adjustments made to the remaining targets or underpins.

The Committee also considered the acquisition of Aspen Healthcare completed towards the end of August 2018. Given the timing of such acquisition and the fact that the contribution from that business in the 2018 financial year is not material, the Committee decided to exclude the results of Aspen from both the EBITDA and EBITDA margin targets and performance achievement for the year.

For the year ended 31 December 2018, the Committee's assessment of outcomes against the revised targets are set out below.

**Performance Measures and targets**

| Measure | Weighting | | | Underlying targets | | | | |
|---|---|---|---|---|---|---|---|---|
| | Chief Executive Officer | Executive Vice Chairman | Chief Investment Officer | Threshold | Target (revised) | Maximum (revised) | Actual performance | Payout (% of maximum) |
| EBITDA | 50% | 33.3% | 33.3% | US$415m | US$445m | US$475m | US$489.4m | 100% |
| EBITDA Margin | 50% | 33.3% | 33.3% | 22.6% | 23.6% | 24.2% | 24.43% | 100% |
| Operations & Management Revenue | – | 33.3% | – | US$15m | US$19m | US$23m | US$23m | 100% |
| Corporate Development Revenue and cost synergies | – | – | 33.3% | US$9m US$4m | US$11m US$6m | US$13m US$8m | US$17m US$8m | 100% |

As set out in our 2017 Directors' Remuneration Report, three underpins central to the Company's quality performance and patient growth must be met before any STIP amount is payable. For 2018, these underpins and their achievement are summarised below.

| | |
|---|---|
| Facility quality performance | The Company maintains a zero tolerance approach to quality. All facilities undergoing an accreditation process must pass that process. In 2018, 2 facilities passed re-accreditation surveys with results significantly ahead of those required by JCI. |
| Growth in patient numbers | Growth in patient numbers aligns with our focus on efficient growth. For 2018, the Company delivered a growth in patient numbers from existing facilities of 13% against a requirement of 8%. |
| Occupancy levels | Again aligning with the Company's focus on efficient growth, a minimum occupancy level of 60% was established for 2018. Actual occupancy was 67%. |

On this basis the Committee has determined that the STIP outcomes above are supported by strong performance in our core underpins. As such, the Committee approved the following pay-outs for the Executive Directors, with one-third of each award achieved being paid in cash with two-thirds delivered in the form of a deferred share award, which vests equally after periods of one year and two years:

- 200% of base salary for the Chief Executive Officer (100% of maximum opportunity);
- 175% of base salary for the Executive Vice Chairman (100% of maximum opportunity); and
- 150% of base salary for the Chief Investment Officer (100% of maximum opportunity)

Governance

# Directors' Remuneration Report 2018 continued

## 2018 remuneration - this section is subject to audit continued
### Long Term Incentive Plan
Performance in relation to LTIP Awards made in 2016

The Remuneration Committee has reviewed performance against the targets set for LTIP grants made in 2016. 50% of the award was subject to an earnings per share (EPS) growth performance condition, whilst the remaining 50% of the award was based on the Company's Total Shareholder Return relative to a bespoke comparator group.

A significant adjustment was made to the base year earnings figure when calculating compound annual growth in earnings per share. The Committee's intention in doing so was to ensure the earnings per share target remains comparably stretching as when the awards were made.

| Measure | Threshold (25% vesting) | Maximum (100% vesting) | Actual performance | Level of vesting |
|---|---|---|---|---|
| Earnings Per Share[1] | 6% p.a. growth | 15% p.a. growth | 15.81% | 100% |
| Total Shareholder Return[2,3] | Median | Upper quartile or above | 296.4% (100th percentile) | 100% |

1   Straight line vesting between threshold and maximum.
2   Pro-rata vesting between median and lower quartile on a ranking basis.
3   Comparator group - The companies making up the London Stock Exchange FTSE250 Index (excluding investment trusts and the Company).
4   The earnings per share target was adjusted to take account of acquisitions during the performance period ending 31 December 2018. Unadjusted earnings per share compound annual growth was 32.9%. However, to reflect the impact of acquisitions, the base year earnings figure was subject to a significant upwards adjustment. This resulted in a compound growth in earnings per share of 15.81%.

The Committee is pleased with a total shareholder return for the period of 296.4% relative to the peer group performance of 11.8% (median) and 41.5% (upper quartile). As such, awards will vest in full for this component. While upwards adjustments to the base year earnings figure made earnings per share performance tougher, compound annual growth performance of 15.81% allows for full vesting of the earnings per share component. The Committee has therefore determined that the 2016 LTIP awards will vest in full.

As the share price at the date of vesting is not known at the date of approval of this report, the value included within the single figure table is based on the number of shares that vested multiplied by the average share price over the quarter ending 31 December 2018, which is 3,256p per share.

Awards made in 2018
During 2018, LTIP grants were made to the Executive Directors as follows, within the levels permitted by our approved Policy applying during the 2018 financial year.

Mr Prasanth Manghat, Chief Executive Officer          250% of salary
Mr Khalifa Bin Butti, Executive Vice Chairman          225% of salary
Mr Hani Buttikhi, Chief Investment Officer          175% of salary

Performance targets
The following performance targets were used in relation to all LTIP awards granted in 2018.

### EBITDA growth

This measures the Company's annual compound growth in EBITDA over a three year period and represents 50% of the total award. The table below sets out the EBITDA growth targets for the 2018 award and the corresponding level of vesting:

| Annual compound growth in EBITDA over the three-year Performance Period | Vesting percentage of target |
|---|---|
| 15% or more | 100% |
| Between 5% and 15% | On a straight-line basis between 25% and 100% |
| 5% | 25% |
| Less than 5% | 0% |

## Total Shareholder Return (TSR) growth

This measures the Company's TSR compared against a comparator group of companies and represents 50% of the total award. The table below sets out the TSR targets for the 2018 award and the corresponding level of vesting:

| Company's TSR over three-year performance period compared to the LTIP comparator group (as defined below) | Vesting percentage of target |
|---|---|
| Upper quartile | 100% |
| Between median and upper quartile | Pro-rata between 25% and 100% on a ranking basis |
| Median | 25% |
| Below median | 0% |

For LTIP grants made in 2018, the TSR comparator group used is the 150 largest companies in the FTSE 350 (excluding investment trusts and the Company).

## Pension contributions

There were no pension contributions in 2017 or 2018.

## Non-Executive Director Remuneration 2018
Remuneration paid in 2018 (single pay figure)

The fee and other remuneration paid to each Non-Executive Director during the year ended 31 December 2018 is set out in the following table:

| Director | Position | FY2018 (£'000) | FY2017 (£'000) |
|---|---|---|---|
| H. J. Mark Tompkins | Independent Non-Executive Joint Chairman | 240 | 228 |
| Dr B. R. Shetty (note 1) | Non-Executive Joint Chairman | 3,548 | 3,405 |
| Dr Ayesha Abdullah | Independent Non-Executive Director | 97 | 103 |
| Abdulrahman Basaddiq | Non-Executive Director | 95 | 98 |
| Jonathan Bomford | Senior Independent Non-Executive Director | 115 | 103 |
| Lord Clanwilliam | Independent Non-Executive Director | 105 | 108 |
| Salma Hareb | Independent Non-Executive Director | 91 | 93 |
| Dr Nandini Tandon | Independent Non-Executive Director | 87 | 98 |

Note 1: The Remuneration for Dr B. R. Shetty for 2017 includes remuneration as an Executive Director of the Company from 1 January 2017 to 8 March 2017 when Dr Shetty was appointed Non-Executive Joint Chairman. The 2017 and 2018 Remuneration includes the value of Long-Term Incentive and Deferred Share Bonus Plan Awards granted during his term as an Executive Director, and for which the Remuneration Committee permitted retention and continued vesting. Dr Shetty did not participate in the 2017 STIP and did not receive any awards under the 2017 LTIP.

Other than the continued vesting of legacy LTIP and DSBP awards granted to the Non-Executive Joint Chairman during his service as an Executive Director, none of the Non-Executive directors received any benefits, pension, STIP or LTIP entitlements or payments during FY2017 and FY2018.

With effective from 1 January 2018, the annual fees of the Non-Executive Directors have been structured as follows:
• Base fees:    Joint Chairman - £210k
                Senior Independent Director - £85k
                Non-Executive Director - £75k
• An additional fee of £10k per annum is paid to the Chair of each board committee.
• A fee of £4k paid to each Non-Executive Director who attends meetings of the Board in person. This is to reflect the significant time commitment required for NEDs to attend meetings, often away from their own country of residence.

The above fee structure is reflected in the fees paid to each NED during 2018 as indicated in the table above.

Payments to past directors
There were no payments made to past directors during the 2018 financial year.

Payments for loss of office
There were no payments made for loss of office to past directors during the 2018 financial year.

Governance

# Directors' Remuneration Report 2018 continued

## 2019 Remuneration

### Executive remuneration in 2019

This section summarises how the Committee intends to implement the Company's existing remuneration policy in 2019.

### Executive Director base salaries

Annual base salaries payable with effect from 1 January 2018 remain as follows:

| | |
|---|---|
| Chief Executive Officer | US$1,033.4k (AED 3.795m) |
| Executive Vice Chairman | US$685.6k (AED 2.518m) |
| Chief Investment Officer | US$650.7k (AED 2.390m) |

The base salary of the Chief Executive Officer was set with effect from 1 January 2017 whilst in the role of Deputy CEO and was not increased upon the promotion of Mr Manghat to CEO in March 2017 or since. The base salary of the CEO therefore currently remains at a level lower than that paid for the same position in 2016.

The base salary of the Executive Vice Chairman and the Chief Investment Officer were set on appointment of each individual during the 2017 financial year and remain at the same level.

The Committee has not made any adjustments to the remuneration of the CEO or other Executive Directors for 2019.

### Benefits

There is no change to the structure of benefits in 2019 which will be paid in line with the arrangements in place for the 2018 financial year.

### Operation of the STIP for 2019

The maximum STIP opportunity for each of the Executive Directors in 2019 will be as follows:

| | |
|---|---|
| Chief Executive Officer | 200% of base salary |
| Executive Vice Chairman | 175% of base salary |
| Chief Investment Officer | 150% of base salary |

The way in which any award from the 2019 STIP will be delivered will be one-third of any STIP award being made in cash and two-thirds deferred into shares, half of which will vest one year after any award is made and the other half two years after any award.

The performance targets that will apply for the 2019 financial year have been set, as in previous years, after considering the Group's priorities for the year. EBITDA and EBITDA margin will remain as key target measures for the year for each Executive Director.

Therefore for 2019 targets will be set against the following measures.

| Measure | Weighting | | | Rationale |
|---|---|---|---|---|
| | CEO | EVC* | CIO** | |
| EBITDA | 50% | 50% | 50% | • Directly linked to the Group's strategy. |
| | | | | • Represents key metric or UAE and non-UAE operations. |
| EBITDA margin | 50% | 50% | 50% | • Key performance indicator for the business. |
| | | | | • Rewards efficient profit generation. |

\*    Executive Vice Chairman
\*\*   Chief Investment Officer

Full disclosure of the targets, and the performance against those targets, will be made in the 2019 Annual Report.

In addition, before any bonus is payable, the following underpin conditions will continue to apply for the STIP in 2019 (all three underpins must be met).

| Underpin | Rationale |
|---|---|
| Facility Quality | The quality scores obtained across our facilities in different countries remains fundamental to sustainable growth. As such, a zero tolerance approach will be applied such that all facilities undergoing an accreditation process must pass that process. NMC has not failed an accreditation to date, nonetheless the Committee is minded to adopt this tough stance to reinforce the importance of quality. |
| Growth in patient numbers | Growth in patient numbers in existing facilities is in line with our focus on efficiency and effective use of our assets. |
| Occupancy levels | A minimum standard will be applied across facilities, again in line with our focus one efficient growth and use of assets. |

The Committee selected these measures and underpins in light of feedback from shareholders and is confident that performance against stretch targets on these metrics aligns management performance with shareholders' interests.

72    NMC Health plc Annual Report and Accounts 2018

## Operation of the LTIP for 2019

Within the limit of the provisions set out in the Company's Directors' Remuneration policy approved by shareholders on 29 December 2016, the LTIP award levels for the Executive Directors in respect of 2019 will be granted at a maximum level of 250% of base salary.

For 2019, the Committee is again operating a tiered approach to LTIP grants for Executive Directors and Senior Management. The grants applicable to each Executive Director will be as follows:

|  | Maximum opportunity (% of base salary) |
| --- | --- |
| Chief Executive Officer | 250% |
| Executive Vice Chairman | 225% |
| Chief Investment Officer | 175% |

The performance targets that apply for awards to be made under the plan in the 2019 financial year will be as follows:

| Measure | Purpose and link to remuneration strategy | Performance measure | Target | Percentage weighting for relevant individuals |
| --- | --- | --- | --- | --- |
| Total shareholder return (TSR) | To incentivise management to deliver long term returns to shareholders. | TSR growth compared to a comparator group of companies.<br><br>The comparator group are the companies making up the 150 largest companies within the London Stock Exchange FTSE350 Index (excluding investment trusts and the Company). | 25% of this element of the award will vest for performance equal to the median of the comparator group with 100% vesting for upper quartile performance or better.<br><br>Vesting is on a straight line basis between these points. | 50% |
| EBITDA Compound Annual Growth Rate | To incentivise management to deliver bottom line earnings growth. | Annual compound growth in EBITDA between the base year (i.e. 2018) and the end of the performance period. | 25% of this element of the award vests for compound EBITDA growth of 10% per annum with 100% vesting for EBITDA growth of 18% per annum.<br><br>Vesting is on a straight line basis between these points. | 50% |

EBITDA has been included again this year given the Group's internal focus on sustainable EBITDA growth. This growth is adjusted for material acquisitions so that performance is measured on a like-for-like basis. As such, organic growth, asset utilisation and attainment of efficiencies across the Group are key to performance achievement and in this respect EBITDA growth is the appropriate metric. However, following feedback from investors, the Committee determined to apply an underpin for 2019 LTIP awards. As such, an underpin measuring the conversion of EBITDA to net income will be applied. This underpin will provide shareholders with an aggregate view on earnings, cash flow, and capital efficiency. Failure to meet the underpin will reduce the proportion of 2019 LTIP awards vesting by up to 50%.

In addition, in the event of an acquisition or disposal during the performance period, the Committee will assess whether the financial performance of the acquired/disposed business should be included or excluded, with targets adjusted accordingly.

## Holding period

Awards under the 2019 LTIP will be measured over a period of three years and subject to a holding period of two years.

## Malus and clawback

As in prior years, awards under the LTIP for 2017 and beyond are subject to a clawback provision, on top of the existing malus provision. In reviewing its approach to recovery of remuneration, the Committee has determined that awards under the LTIP and Deferred Share Bonus Plan will be subject to malus and clawback provisions that can be applied for up to five years from the date of grant in respect of the LTIP and within two years of the grant of an award under the Deferred Share Bonus Plan. The circumstances in which malus and clawback can be applied include, but are not limited to: a material misstatement of the Company's audited results; a material failure of risk management by the Company, any Group Member or a relevant business unit; or serious reputational damage to the Company, any Group member or a relevant business unit as a result of the Participant's misconduct or otherwise.

Exhibit 6 to B.R. Shetty's Request for Judicial Notice        77 of 182        Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

Governance

# Directors' Remuneration Report 2018 continued

## 2019 Remuneration continued

### Non-Executive Directors' Remuneration in 2019

The fees payable to the non-executive directors effective as at 1 January 2019 are as follows:

|  | (£'000) |
|---|---|
| Joint Chairmen | 210 |
| Senior Independent Director | 85 |
| Non-executive director | 75 |
| Chair of a Board Committee | 10 |

These fees are unchanged from those operating in the 2018 financial year.

Given that the location of the Company's Board Meetings varies during the year, and also due to the geographic diversity of the country of residence for Board members, an additional fee is also payable for attendance at Board meetings.

Details of the remuneration paid to each of the non-executive directors who served during the year are included in the table on page 71.

Non-executive directors do not participate in any bonus or incentive plan or other form or performance-related remuneration. The Company does not provide any contribution to their pension arrangements.

## Other Information

### Directors' Service Agreements and Letters of Appointment

Executive Directors' service agreement and employment contracts

Each of the following served as Executive Directors during the 2018 financial year and were subject to service agreements entered into with NMC Healthcare LLC, one of the Company's subsidiaries.

|  | Date of agreement |
|---|---|
| Prasanth Manghat | 1 May 2011 |
| Khalifa Bin Butti | 28 June 2017 |
| Hani Buttikhi | 28 June 2017 |

Mr Prasanth Manghat is employed by NMC Healthcare LLC pursuant to an employment contract dated 1 May 2011. The contract provides for a renewable two-year term of employment unless terminated earlier in accordance with the terms of the contract. The Contract provides that, unless otherwise agreed between the parties, the contract can be terminated on one months' prior written notice given by either Prasanth Manghat or NMC Healthcare LLC.

Mr Khalifa Bin Butti is employed by NMC Healthcare LLC pursuant to an employment contract dated 28 June 2017. The contract provides for a renewable two-year term of employment unless terminated earlier in accordance with the terms of the contract. The Contract provides that, unless otherwise agreed between the parties, the contract can be terminated on 12 months' prior written notice given by either Mr Bin Butti or NMC Healthcare LLC.

Mr Hani Buttikhi is employed by NMC Healthcare LLC pursuant to an employment contract dated 28 June 2017. The contract provides for a renewable two-year term of employment unless terminated earlier in accordance with the terms of the contract. The Contract provides that, unless otherwise agreed between the parties, the contract can be terminated on one months' prior written notice given by either Mr Hani Buttikhi or NMC Healthcare LLC.

Copies of the Agreements for each of the Executive Directors are available for inspection during normal business hours at the Company's Registered Office, and are available for inspection at the Company's annual general meeting.

For future executives the Committee policy is that notice periods will not exceed 12 months. There are no matters for which the Company requires approval of shareholders for the purposes of Chapter 4A of Part 10 of the Companies Act 2006.

Exhibit 6 to B.R. Shetty's Request for Judicial Notice

Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

#### Letters of appointment for Non-Executive Directors

The Non-Executive Directors do not have service agreements with the Company, but instead have letters of appointment. The appointment of each of the Non-Executive Directors is stated for an initial term until the next annual general meeting of the Company at which, and at subsequent annual general meetings, they need to submit themselves for re-election if they so wish. Each letter of appointment is terminable by 3 months' notice by both the Company and the Director and include a minimum time commitment that they need to give to the Company in any year.

There is no compensation payable upon the early termination of a Non-Executive Directors' appointment.

Copies of the Non-Executive Directors' Letters of Appointment are available for inspection during normal business hours at the Company's Registered Office, and available for inspection at the Company's annual general meeting.

**Directors' shareholdings and share interests - subject to audit**

#### Directors' shareholdings and interests

The table below shows details of the Directors' holdings of Ordinary Shares and interests in the Company as at 1 January 2018 and at 31 December 2018.

| | Ordinary shares of 10p each | | Share options over Ordinary shares of 10p each | |
| --- | --- | --- | --- | --- |
| Director | 1 January 2018 | 31 December 2018 | 1 January 2018 | 31 December 2018 |
| H. J. Mark Tompkins (note 1) | 53,083 | 51,233 | 0 | 0 |
| Dr B. R. Shetty (note 2) | 39,713,893 | 40,008,923 | 479,336 | 328,465 |
| Khalifa Bin Butti (note 3) | 30,696,561 | 30,696,561 | 43,416 | 77,369 |
| Prasanth Manghat (note 4) | 8,308 | 20,308 | 399,052 | 486,234 |
| Hani Buttikhi | 0 | 6,000 | 32,051 | 57,116 |
| Dr Ayesha Abdullah | 0 | 0 | 0 | 0 |
| Abdulrahman Basaddiq | 0 | 0 | 0 | 0 |
| Jonathan Bomford | 18,000 | 20,000 | 0 | 0 |
| Lord Clanwilliam | 3,660 | 6,660 | 0 | 0 |
| Salma Hareb | 6,600 | 12,100 | 0 | 0 |
| Dr Nandini Tandon | 0 | 0 | 0 | 0 |

Notes:
1.  The interests of Mr H J Mark Tompkins in relation to the ordinary shares of the Company include the shares held in the name of his wife and by a family trust of which he is considered a beneficiary.
2.  The interests in relation to both ordinary shares and options over ordinary shares of the Company for Dr B. R. Shetty include the shares and options in the name of his wife, Dr C R Shetty.
3.  Mr Bin Butti also holds an interest in 15,280,426 shares of the Company through Infinite Investment LLC, which he jointly owns with H.E. Saeed Bin Butti.
4.  On 1 February 2019, Mr Prasanth Manghat exercised vested share options resulting in his shareholding increasing by 158,964 shares resulting in his shareholding at the date of this report being 179,272 shares.

None of the Directors received any loans, advances or other form of credit granted by the Company, nor were any guarantees of any kind provided by the Company on behalf of any Directors during the year ended 31 December 2018.

Except as stated above, none of the Directors who held office during the year held any Ordinary Shares or options over Ordinary Shares of the Company during the year. Except as stated in the notes to the table above, there have been no changes in the above interests between 31 December 2018 and the date of this Directors' Remuneration Report.

Executive directors are expected to build a shareholding of 300% of base salary over a 5-year period. The first share incentive awards granted to the Executive Directors vested in October 2017. As at the latest practicable date prior to the approval of this Report, being 28 February 2019, the Chief Executive Officer holds 179,272 Ordinary shares valued at £4,848k (US$6,447k based on the share price and £:US$ exchange rate at close of business on 28 February 2019). This represents a value of 624% of current base salary.

The Executive Vice Chairman, appointed in June 2017, is a significant shareholder in the Company and therefore already meets the shareholding requirement. Mr Hani Buttikhi, also appointed in June 2017, currently holds 6,000 shares valued at £162k (US$216k based on the share price and £:US$ exchange rate at close of business on 28 February 2019). This represents a value of 33% of current base salary. Mr Buttikhi is included in the Incentive arrangements for Executive Directors, none of which have vested for him at the date of this report.

# Directors' Remuneration Report 2018 continued

### Other Information continued
**Directors' shareholdings and share interests - subject to audit** continued
Directors' interests in shares
The following tables show details of the share awards made to Executive Directors that have not yet vested or have vested but as at 31 December 2018 were unexercised.

Long Term Incentive Plan

| | Type of interest | Performance period ending | Award date | Market price at date of award | Exercise price | Shares awarded | Face value of award | % vesting for minimum performance | Vesting date |
|---|---|---|---|---|---|---|---|---|---|
| Mr Prasanth Manghat | LTIP award subject to performance | 31 December 2016 | 29 October 2014 | 494.9p | 0p | 40,738 | £202,834 | 25% of award | 29 October 2017 |
| Mr Prasanth Manghat | LTIP award subject to performance | 31 December 2017 | 25 February 2015 | 520p | 0p | 50,000 | £260,000 | 25% of award | 25 February 2018 |
| Mr Prasanth Manghat | LTIP award subject to performance | 31 December 2017 | 8 September 2015 | 760.5p | 0p | 23,011 | £175,000 | 25% of award | 8 September 2018 |
| Dr B R Shetty | LTIP award subject to performance | 31 December 2018 | 15 March 2016 | 967.5p | 0p | 100,775 | £975,000 | 25% of award | 15 March 2019 |
| Mr Prasanth Manghat | LTIP award subject to performance | 31 December 2018 | 15 March 2016 | 967.5p | 0p | 85,271 | £825,000 | 25% of award | 15 March 2019 |
| Mr Prasanth Manghat | LTIP award subject to performance | 31 December 2019 | 26 January 2017 | 1633.0p | 0p | 125,442 | £2,048,000 | 25% of award | 26 January 2020 |
| Mr Khalifa Bin Butti | LTIP award subject to performance | 31 December 2019 | 7 September 2017 | 2739.0p | 0p | 43,416 | £1,189,000 | 25% of award | 7 September 2020 |
| Mr Hani Buttikhi | LTIP award subject to performance | 31 December 2019 | 7 September 2017 | 2739.0p | 0p | 32,051 | £878,000 | 25% of award | 7 September 2020 |
| Mr Prasanth Manghat | LTIP award subject to performance | 31 December 2020 | 8 March 2018 | 3274.0p | 0p | 56,858 | £1,861,561 | 25% of award | 8 March 2021 |
| Mr Khalifa Bin Butti | LTIP award subject to performance | 31 December 2020 | 8 March 2018 | 3274.0p | 0p | 33,953 | £1,111,639 | 25% of award | 8 March 2021 |
| Mr Hani Buttikhi | LTIP award subject to performance | 31 December 2020 | 8 March 2018 | 3274.0p | 0p | 25,065 | £820,657 | 25% of award | 8 March 2021 |

Notes:
1. Following the decision by Dr B. R. Shetty to step down from his Executive role as Executive Vice Chairman and CEO in March 2017, given his ongoing role as Joint Chairman of the Company it was agreed that he should retain in full both the LTIP and DSBP awards granted to him, with the exception of an LTIP Award granted in January 2017 which lapsed in 2017.
2. Subsequent to the year end, the LTIP awards granted to Mr Prasanth Manghat on 29 October 2014, 25 February 2015 and 8 September 2015 were all exercised in full.

Details of the performance measures attached to the LTIP awards, and performance to date against these measures, are set out on page 70.

## Deferred Share Bonus Plan

| | Type of interest | Financial year share award made in respect of | Award date | Market price at date of award | Exercise price | Shares awarded and not yet exercised | Face value of award | Vesting date |
|---|---|---|---|---|---|---|---|---|
| Dr B R Shetty | Deferred shares subject to continued employment | 2015 | 15 March 2016 | 967.5p | 0p | 17,226 | £166,662 | 15 March 2019 |
| Dr B R Shetty | Deferred shares subject to continued employment | 2016 | 9 May 2017 | 2074.0p | 0p | 19,792 | £410,500 | 9 May 2019 |
| Mr Prasanth Manghat | Deferred shares subject to continued employment | 2013 | 29 October 2014 | 494.9p | 0p | 12,408 | £61,407 | 29 October 2017 |
| Mr Prasanth Manghat | Deferred shares subject to continued employment | 2014 | 25 February 2015 | 520p | 0p | 13,702 | £71,250 | 25 February 2018 |
| Mr Prasanth Manghat | Deferred shares subject to continued employment | 2015 | 15 March 2016 | 967.5p | 0p | 14,987 | £145,000 | 15 March 2019 |
| Mr Prasanth Manghat | Deferred shares subject to continued employment | 2016 | 9 May 2017 | 2074.0p | 0p | 33,493 | £695,000 | Equally on 9 May 2018 and 9 May 2019 |
| Mr Prasanth Manghat | Deferred shares subject to continued employment | 2017 | 8 March 2018 | 3274.0p | 0p | 30,324 | £992,833 | Equally on 8 March 2019 and 8 March 2020 |

Notes:

1. Following the decision by Dr B. R. Shetty to step down from his Executive role as Executive Vice Chairman and CEO in March 2017, given his ongoing role as Joint Chairman of the Company it was agreed that he should retain in full both the LTIP and DSBP awards granted to him, with the exception of an LTIP Award granted in January 2017 which lapsed in 2017.

2. Subsequent to the year end, the DSBP awards granted to Mr Prasanth Manghat on 29 October 2014 and 25 February 2015 were all exercised in full as well as the 50% vested portion of the DSBP award granted on 9 May 2017.

The following share awards vested and were exercised, or where stated lapsed, during the year:

| | Incentive plan | Award date | Award shares exercised (note 1) | Exercise price | Market price on vesting | Comment |
|---|---|---|---|---|---|---|
| Dr B R Shetty | DSBP | 25 February 2015 | 17,765 | 0.0p | 3,498p per share | Award vested and exercised |
| Dr B R Shetty | LTIP | 25 February 2015 | 58,667 | 0.0p | 3,498p per share | Award vested and exercised |
| Dr B R Shetty | DSBP | 9 May 2017 | 19,884 | 0.0p | 3,518p per share | 50% of Award vested and exercised |
| Dr B R Shetty | LTIP | 8 September 2015 | 26,657 | 0.0p | 3,690p per share | Award vested and exercised |

Note 1: Award shares exercised includes an enhancement equivalent to the value of dividends that would have been payable on the award shares during the performance period of the relevant share award.

Except as stated above, no other options vested or were exercised during the year.

Governance

# Directors' Remuneration Report 2018 continued

**Other Information** continued

**Directors' shareholdings and share interests – subject to audit** continued

Performance graph and historic Executive Vice Chairman & CEO remuneration outcomes

The following graph shows the Total Shareholder Return performance of NMC Health plc shares against the FTSE 100.



■ NMC Health   ■ FTSE 100

The Committee believes that the FTSE 100 Index is an appropriate comparator index used to compare performance given that the Company is a constituent of this Index and the lack of direct competitor comparators available in the London market.

The table below summarises the Chief Executive Officer's single figure for total remuneration for the last 5 financial years.

| Chief Executive Officer | 2012 (US$'000) | 2013 (US$'000) | 2014 (US$'000) | 2015 (US$'000) | 2016 (US$'000) | 2017 (US$'000) | 2018 (US$'000) |
|---|---|---|---|---|---|---|---|
| Single remuneration figure | 550.6 | 787.4 | 849.7 | 1,254.3 | 4,841.3 | 5,948.2 | 5,483.5 |
| STIP payout (% of maximum) | n/a | n/a | 95% | 100% | 100% | 100% | 100% |
| LTIP vesting (% of maximum) | n/a | n/a | n/a | n/a | n/a | 100% | 100% |

Pay across the Group

As required, the table below sets out the increase in remuneration of the Chief Executive Officer and that of all employees during the 2018 financial year. However, for the reasons stated on page 67 above, the Committee do not reference the salary or other elements of remuneration of Executive Directors to all other employees of the Group.

| % | Salary | Annual bonus | Benefits |
|---|---|---|---|
| Chief Executive Officer | 0 | 0 | 0 |
| All-employees | 8.1 | n/a | 5.2 |

\*   Note: the Company does not operate bonus plans for all employees.

Relative importance of spend on pay

The graph below shows the total group-wide remuneration expenditure and dividends for the last two years.



Profit for the financial year attributable to equity ($m)   186.0   248.7
Distributions to shareholders ($m)   27.8   49.7
Total employee pay ($m)   500.0   643.6

● 2018   ● 2017

It is my pleasure to submit this report to shareholders. The Directors' Remuneration Report has been approved by the Board and is signed on its behalf by:

**JONATHAN BOMFORD**
Chairman of the Remuneration Committee

# Directors' Report

The Directors of NMC Health plc are pleased to present their Annual Report including the audited consolidated financial statements for the financial year ended 31 December 2018.

This report has been prepared in accordance with the requirements in The Large and Medium-sized Companies and Groups (Accounts and Reports) Regulations 2008 and forms part of the management report as required under Disclosure & Transparency Rule 4. Certain information required to be set out in this Directors' Report can be found elsewhere in the 2018 Annual Report and is referenced below. This information is incorporated into this Directors' Report by reference.

## Directors' Statements
The Directors are required to make a statement regarding the preparation of the financial statements and also to provide details regarding the disclosure of information to the Company's auditor. The Code also requires the Board to review and make statements in relation to management's report on internal controls, the adoption of the Going Concern method of accounting and the long term viability of the Group. All of these statements are set out on pages 84 to 86.

## Corporate Governance Report
The Corporate Governance Report set out on pages 42 to 61 is incorporated into this Directors' Report by reference.

## Business model and strategy
The Strategic Report set out on pages 4 to 35 includes the Company's business model and strategy.

## Directors
The following served as directors of the Company during the 2018 financial year:

| Director |
| --- |
| H. J. Mark Tompkins |
| Dr B. R. Shetty |
| Khalifa Bin Butti |
| Prasanth Manghat |
| Hani Buttikhi |
| Dr Ayesha Abdullah |
| Abdulrahman Basaddiq |
| Jonathan Bomford |
| Lord Clanwilliam |
| Salma Hareb |
| Dr Nandini Tandon (see note below) |

Dr Nandini Tandon resigned as a Director of the Company on 8 February 2019.

## Capital structure
All information relating to the Company's capital structure, including changes to the Company's share capital in the year, the rights attaching to shares, details of the Company's principal shareholders and other shareholder information in contained on page 174.

## Dividends
Details of the Company's dividend policy and proposed final dividend payment for the year ended 31 December 2018 are set out in the Financial Review on page 19.

## Disclosure of information under Listing Rule 9.8.4 C
In accordance with the UK Financial Conduct Authority's Listing Rules (LR 9.8.4C), the information to be included in the Annual Report, where applicable, under LR 9.8.4, is set out in this Directors' Report, with the exception of transactions with controlling shareholders which is set out on pages 147 and 148 (note 34 to the Consolidated Financial Statements) and interest capitalised which is set out on pages 136 to 138 (note 18 to the Consolidated Financial Statements).

## Employee engagement
The way in which the Group engages with its employees, and the Group's approach to diversity, is set out in the Corporate Social Responsibility report on pages 28 to 30.

Exhibit 6 to B.R. Shetty's Request for Judicial Notice          83 of 182          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

Governance

# Directors' Report continued

## Greenhouse gas emissions
The Company's disclosure in relation to its greenhouse gas emissions is included within the sustainability section of the Corporate Social Responsibility report on pages 32 to 33.

## Impact Statement on the anticipated effects of Brexit
The decision made by the UK to leave the European Union, or 'Brexit' as it has become known, means that all companies with interests in the UK or the European Union must embrace the challenges that this decision will bring. NMC Health has reviewed its position in this respect.

We have a small business footprint in the UK, principally through the operation of Aspen Healthcare. There may be some effect on Aspen Healthcare as a result of potential negative economic effects affecting the UK and the ability of our UK business to attract sufficient calibre and quantity of doctors and other clinical staff from outside the UK, and our UK business has a number of contingency plans to deal with such issues to ensure that the provision of services is not interrupted.

The Group also has a number of IVF businesses across Europe which are not dependent on patients, staff, goods, services and expertise from the UK, so aside of any European-wide economic difficulties or uncertainties resulting from Brexit, we expect these businesses to be unaffected.

Overall the exposure for NMC Health as a group is low and manageable as a result of limited dependence financially and operationally on the movement of people, goods, services and capital between the UK and Europe. Therefore, whilst we will be keeping our position and planning under review, irrespective of the final negotiated or non-negotiated position regarding Brexit between the UK and European Union, NMC Health does not expect any material effect on the Group as a result of Brexit.

## Political donations
Neither the Company nor any subsidiary company in the Group made any political donations during the year ended 31 December 2018.

Whilst the Company has no intention of making formal political donations in the future, the Board acknowledge that given the wide interpretation of such donations, certain business events in which the Company or any of its subsidiaries, or the Board, may wish to participate may be caught under the formal definition of political donations. The Company will therefore again be seeking approval from shareholders at this year's annual general meeting, for a small approved limit for "political donations", for use in such circumstances. If this is approved by shareholders, the Board will provide full details of any such payments made in the next annual report.

## Financial Instruments
The financial risk management objectives and policies of the Group, and the exposure of the Group to financial instruments, are included in note 39 to the financial statements on pages 153 to 155.

## Subsequent Events
Details of any important and material events affecting the Group which have occurred since the end of the 2018 financial year, are set out in note 44 to the consolidated financial statements on page 157.

## Future Developments
The Group's strategy and potential future development are outlined in the Group Strategic Report on pages 4 to 35.

## Research and development
The Eugin Foundation, part of the Clinica Eugin business, carries out research and development focused on fertility and human reproduction with particular regards to personal and social aspects as well as promotion of health.

## Branches
The Group normally operates across all jurisdictions where it has a business presence through the incorporation of registered entities, but also operates through a number of branches where this is considered appropriate from an operational or regulatory perspective. A detailed list of entities and branches in the Group is provided in section 2.2 of financial statements.

Exhibit 6 to B.R. Shetty's Request for Judicial Notice            84 of 182            Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

### Contracts of significance and Controlling Shareholders' Agreement

Under UAE law and regulations, with the exception of certain specific areas designated by the Government as such, all land must be held legally by a UAE National. In addition, all healthcare facility and pharmacy operating licences may only be held legally by a UAE National, and not a body corporate. As a result, some of the property owned beneficially by the Group and all the Group's medical facility and pharmacy licences, are held legally in the name of either H.E. Saeed Bin Butti or Mr Khalifa Bin Butti, both continuing significant shareholders of the Company.

The Company has an agreement with Dr B R Shetty, H.E. Saeed Bin Butti and Khalifa Bin Butti ("Controlling Shareholders") under which the Controlling Shareholders agree to comply with the independence provisions of the UKLA Listing Rules. The Company has complied with the independence provisions contained in that agreement and, as far as the Company are aware, the Controlling Shareholders and any of their associates have also complied with such provisions and the procurement obligations included in the agreement.

The Directors' Report was approved by the Board on 06 March 2019 and is signed on behalf of the Board by:

### SIMON WATKINS
Group Company Secretary

NMC Health plc (registered in England and Wales, number 7712220)
Level 1, Devonshire House, One Mayfair Place, London W1J 8AJ

Exhibit 6 to B.R. Shetty's Request for Judicial Notice        85 of 182        Hashem, et al., v. NMC Health PLC, et al.,
                                                                              2:20-cv-02303-CBM-MAA

Financial Statements

# Financial Statements

The Company has concentrated on structuring its financing facilities to ensure a strong balance sheet for the medium to long term.

Exhibit 6 to B.R. Shetty's Request for Judicial Notice     86 of 182     Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA



Exhibit 6 to B.R. Shetty's Request for Judicial Notice          87 of 182          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

Financial Statements

# Directors' Statements

## Statement of Directors' responsibilities

The Directors are responsible for preparing the Annual Report, the Directors' Remuneration Report and the financial statements in accordance with applicable law and regulations.

The Directors are required by Company Law to prepare financial statements for the Group and the Company in accordance with the International Financial Reporting Standards as adopted by the European Union ('IFRS').

The financial statements are required to present fairly for each financial period the Company's financial position, financial performance and cash flows. In preparing the Group and parent company financial statements the Directors are also required to:
· Properly select and consistently apply accounting policies;
· Present information, including accounting policies, in a manner that provides relevant, reliable, comparable and understandable information;
· Provide additional disclosures when compliance with the specific requirements in IFRS is insufficient to enable users to understand the impact of particular transactions, other events and conditions on the entity's financial position and financial performance; and
· Make an assessment of the company's ability to continue as a going concern.

The Directors confirm that they have complied with the above requirements in preparing the financial statements. The Directors also confirm that they consider the annual report and accounts, taken as a whole, is fair, balanced and understandable and provides the information necessary for shareholders to assess the Company's performance, business model and strategy.

The Directors are responsible for keeping proper accounting records that are sufficient to show and explain the Company's transactions and disclose with reasonable accuracy at any time the financial position of the Company and to enable them to ensure that the financial statements comply with the Companies Act 2006. The Directors are also responsible for safeguarding the assets and hence for taking reasonable steps for the prevention and detection of fraud and other irregularities and for the preparation of a Directors' report and Directors' remuneration report which comply with the requirements of the Companies Act 2006.

The Directors are responsible for the maintenance and integrity of the Company's website. Legislation in the United Kingdom governing the preparation and dissemination of financial statements differs from legislation in other jurisdictions.

We confirm to the best of our knowledge:
· The financial statements, prepared in accordance with the International Financial Reporting Standards as adopted by the EU, give a true and fair view of the assets, liabilities, financial position and profit or loss of the Company and the undertakings included in the consolidation taken as a whole; and
· The Strategic Report includes a fair review of the development and performance of the business and the position of the Company and the undertakings included in the consolidation taken as a whole, together with a description of the principal risks and uncertainties they face.

## Disclosure of Information to the Auditors

Directors' statement as to disclosure of information to auditors:

The Directors who were members of the Board at the time of approving the Directors' Report are set out on pages 38 and 39. Having made enquiries of fellow directors and of the Company's Auditor, each of these Directors confirms that:
· to the best of each Director's knowledge and belief, there is no information (that is, information needed by the group's Auditor in connection with preparing their report) of which the Company's Auditor is unaware; and
· each Director has taken all the steps a Director might reasonably be expected to have taken to be aware of relevant audit information and to establish that the Company's Auditor is aware of that information.

EY have confirmed that they are willing to be reappointed as auditor for the financial year ending 31 December 2019.

## Going Concern and viability
### Going Concern
NMC is a global healthcare provider operating multi-speciality hospitals and day care facilities across the Middle East, Europe, North and South America and Africa. The Group operates a diverse business covering the provision of healthcare services, distribution of health care items and the provision of healthcare management services.

Management have undertaken an assessment of the future prospects of the Group and the wider risks that the Group is exposed to. In this assessment of whether the Group should adopt the going concern basis in preparing its financial statements, management have considered:

a) *Operating risk*: The management team prepare a Group budget for each financial year and a cashflow forecast for the following 18 months which allows the Board to monitor the financial position of the Group and to consider appropriate risks which the business may face from a financial perspective. Included in this review are future cashflow, both acquisition costs and subsequent cashflow generation, associated with acquisitions agreed and completed at the end of the 2018 financial year only. The Board receives monthly management reports covering key operational matters, monthly comparison to budget and updated forecasts on a half yearly basis for the full financial year to ensure that its businesses are trading in line with its expectations.

b) *Financing risk*: The Group's largest acquisitions during FY2018, the acquisition of CosmeSurge, Boston IVF and Fakih Medical Centre were largely financed via borrowings.

During the year, the Group entered into the following new long-term financing arrangements:
- Sukuk: On 21 November 2018, the Group issued US$400,000,000 Sukuk certificates ('Islamic finance') with maturity for payment on 2023. Sukuk carry a profit rate of 5.950%, payable half-yearly in arrears on 21 May and 21 November. The facility is secured against corporate guarantee provided by NMC Health Plc and its certain operating subsidiaries.
- Convertible bond: On 23 April 2018 we issued convertible bonds with an aggregate principal amount of US$450 million. These bonds are listed on the Open Market of the Frankfurt Stock Exchange and bear interest at a cash coupon at the rate of 1.875% per annum, payable semi-annually. They have a maturity of 7 years to 30 April 2025 and a conversion option for the bondholders.

The net proceeds of both the bonds were used to repay part of the US$1.0 billion bridge facility.
- Term loans; The Group entered a syndicated facility amounting to US$2.0 billion. The syndicated facility was used to settle an existing syndicated loan and for acquisition purposes. The facility is structured into three sub facilities, these sub facilities are completely repayable within 18-60 months. The facility is secured against a corporate guarantee provided by NMC Health Plc and its certain operating subsidiaries. The facility carries interest at LIBOR plus margin.

The Group has banking arrangements through a spread of local and international banking groups. Debt covenants are reviewed by the board each month. The Board believes that the level of cash in the Group and the spread of bankers providing these facilities mitigates the financing risks that the Group faces from both its acquisitive growth strategy and in relation to working capital requirements.

c) *Customer and Supplier risk*: Both the Healthcare and the Distribution divisions, and hence the Group as a whole, have delivered a robust performance in 2018. All major financial and non-financial KPIs continued to show good improvement during the year. Trade receivables across the Group are monitored regularly, provisions made where necessary and the Group has no history of significant bad debts.

Although the Group relies on the provision of the majority of its products from a small number of large suppliers, as well as a significant number of smaller suppliers, management do not believe that these suppliers are showing any signs of financial or operating difficulty. Management maintain close working relationships with all major suppliers in order to continually assess and monitor supplier performance as well as signs of financial risk. We do not currently assess there to be a heightened risk associated with supplier insolvency.

d) *Impairment risk*: The Board has considered the carrying value and useful economic lives of inventories, accounts receivable, property and equipment and intangible assets and concluded that there are no indicators of material impairment of these items and therefore no material cash flow impact associated with any loss in those areas.

In its going concern review, management also considered other areas of potential risk, including regulatory risk, insurance and legal risks and potential areas of material contingent liability and found no matters which are likely to affect the viability of the Group in the medium term.

The Board has reviewed and considered management's formal assessment of the going concern concept of accounting and the cash flow forecast that has been prepared for the period to 30 June 2020 and has concluded that this assessment and forecast indicates that the Group has positive cash flows with sufficient headroom and will comply with all debt covenants.

The Directors therefore continue to adopt the going concern basis in the preparation of the financial statements.

# Directors' Statements continued

### Viability

In order to protect longer term shareholder value, the Board have always considered how Group performance and its strategic decisions will affect the financial and operational prospects of the Group in the longer term. As recommended by provision C.2.2 of the UK Corporate Governance Code, the Directors have considered a formal assessment of the prospects of the Group over a longer period than the 12 months review period required under the 'Going Concern basis of accounting.

Management conducted a formal viability review looking forward for a period of three years. This period was selected as the most appropriate timeframe over which the future prospects of the Group should be considered given the Group's changing nature and significant growth, the time taken to fully integrate acquired businesses and ramp-up newly opened facilities and the maturity date of current debt obligations.

In its review, management considered the current position of the Group and the following principal financial risks associated with the business:
- Uncertainty relating to changes in the macro economic environment including regulatory changes impacting the healthcare and insurance sectors;
- Uncertainty attributed to competitor activity in key markets, changing patient demographics, demands attributes; and
- Uncertainty associated with integrating recently acquired entities.

The three year review considered the Group's profitability, cash flows, banking covenants and other key financial ratios over the period. The plan makes certain assumptions about the ability to refinance debt as it falls due and the acceptable performance of the core revenue streams and market segments. The plan is stress tested using sensitivity analysis which reflects severe but plausible combinations of the principal financial risks of the business and then the potential impact of each scenario, using certain assumptions on the following levers were stress tested:
- reductions in revenue per patient;
- reduction in market share impacting the number of patients and occupancies;
- increase manpower cost due to shortage of talent;
- cost escalation due to inflation and a new tax regime;
- impact on revenue due to currency fluctuation on overseas acquisition;
- increase in accounts receivable (debtor days) and rejections due to increase in insurance business;
- impact of digital patient engagement;
- one-off payments, investments and charges; and
- increase in interest rates.

Where appropriate, an analysis was carried out to evaluate the potential impact of any of these principal risks actually occurring.

Based on the results of this formal assessment, the Directors have a reasonable expectation that the Group will be able to continue in operation and meet its liabilities as they fall due over the three year period of the assessment.

By Order of the Board

**SIMON WATKINS**
Group Company Secretary

# Independent Auditor's Report
To the Members of NMC Health Plc

## Opinion

In our opinion:

- NMC Health plc's group financial statements and parent company financial statements (the "financial statements") give a true and fair view of the state of the group's and of the parent company's affairs as at 31 December 2018 and of the group's profit for the year then ended;
- the group financial statements have been properly prepared in accordance with IFRS as adopted by the European Union;
- the parent company financial statements have been properly prepared in accordance with IFRSs as adopted by the European Union as applied in accordance with the provisions of the Companies Act 2006; and
- the financial statements have been prepared in accordance with the requirements of the Companies Act 2006, and, as regards the group financial statements, Article 4 of the IAS Regulation.

We have audited the financial statements of NMC Health plc which comprise:

| Group | Parent company |
|---|---|
| Consolidated balance sheet as at 31 December 2018 | Balance sheet as at 31 December 2018 |
| Consolidated income statement for the year then ended | Statement of changes in equity for the year then ended |
| Consolidated statement of comprehensive income for the year then ended | Statement of cash flows for the year then ended |
| Consolidated statement of changes in equity for the year then ended | Related notes 1 to 15 to the financial statements including a summary of significant accounting policies |
| Consolidated statement of cash flows for the year then ended | |
| Related notes 1 to 44 to the financial statements, including a summary of significant accounting policies | |

The financial reporting framework that has been applied in their preparation is applicable law and International Financial Reporting Standards (IFRSs) as adopted by the European Union and, as regards the parent company financial statements, as applied in accordance with the provisions of the Companies Act 2006.

## Basis for opinion

We conducted our audit in accordance with International Standards on Auditing (UK) (ISAs (UK)) and applicable law. Our responsibilities under those standards are further described in the Auditor's responsibilities for the audit of the financial statements section of our report below. We are independent of the group and parent company in accordance with the ethical requirements that are relevant to our audit of the financial statements in the UK, including the FRC's Ethical Standard as applied to listed public interest entities, and we have fulfilled our other ethical responsibilities in accordance with these requirements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our opinion.

## Conclusions relating to principal risks, going concern and viability statement

We have nothing to report in respect of the following information in the annual report, in relation to which the ISAs(UK) require us to report to you whether we have anything material to add or draw attention to:

- the disclosures in the annual report set out on pages 22 to 25 that describe the principal risks and explain how they are being managed or mitigated;
- the directors' confirmation set out on page 86 in the annual report that they have carried out a robust assessment of the principal risks facing the entity, including those that would threaten its business model, future performance, solvency or liquidity;
- the directors' statement set out on page 84 in the financial statements about whether they considered it appropriate to adopt the going concern basis of accounting in preparing them, and their identification of any material uncertainties to the entity's ability to continue to do so over a period of at least twelve months from the date of approval of the financial statements;
- whether the directors' statement in relation to going concern required under the Listing Rules in accordance with Listing Rule 9.8.6R(3) is materially inconsistent with our knowledge obtained in the audit; or
- the directors' explanation set out on pages 84 to 86 in the annual report as to how they have assessed the prospects of the entity, over what period they have done so and why they consider that period to be appropriate, and their statement as to whether they have a reasonable expectation that the entity will be able to continue in operation and meet its liabilities as they fall due over the period of their assessment, including any related disclosures drawing attention to any necessary qualifications or assumptions.

# Independent Auditor's Report continued
## To the Members of NMC Health Plc

### Overview of our audit approach

| | |
|---|---|
| Key audit matters | • Revenue recognition<br>• Accounting for acquisitions |
| Audit scope | • We performed an audit of the complete financial information of 14 components and audit procedures on specific balances for a further 10 components.<br>• The components where we performed full or specific audit procedures accounted for 97% of Profit before tax, 90% of Revenue and 94% of Total assets, all before consolidation adjustments. |
| Materiality | • Overall group materiality of US$13.2mn which represents 5% of 2018 Profit before tax. |

### Key audit matters

Key audit matters are those matters that, in our professional judgment, were of most significance in our audit of the financial statements of the current period and include the most significant assessed risks of material misstatement (whether or not due to fraud) that we identified. These matters included those which had the greatest effect on: the overall audit strategy, the allocation of resources in the audit; and directing the efforts of the engagement team. These matters were addressed in the context of our audit of the financial statements as a whole, and in our opinion thereon, and we do not provide a separate opinion on these matters.

| Risk | Our response to the risk |
|------|--------------------------|
| **Revenue recognition**<br><br>Group Revenue<br>2018: US$2,057.3mn<br>2017: US$1,603.4mn<br><br>Refer to the Financial summary and highlights Report (page 12); Accounting policies (page 111); and Note 7 of the Consolidated Financial Statements (page 127).<br><br>The Group has a number of revenue streams relating to its Healthcare and Distribution segments including clinic and hospital revenues, over the counter sales, pharmacy sales and sales of goods.<br><br>The following areas of revenue recognition are recognised as significant risks:<br>• Management may incorrectly determine whether the Group is acting as principal or agent in certain arrangements such as distribution agreements with key suppliers and revenue sharing agreements with doctors.<br>• Revenue recognition is impacted as insurance providers may reject claims made which requires management to estimate the percentage of rejections and adjust revenues accordingly.<br><br>The following areas of revenue recognition are audit focus areas however not seen as significant risks:<br>• Supplier agreements are often complex which could lead to inaccurate accounting or conditions for recognition of the supplier income, including fees and discounts, not being met.<br>• Volume of transactions increases risk of improper revenue recognition, particularly with regards to cut-off at period end dates.<br><br>The overall risk of revenue recognition has remained stable in the current year. | We tested key controls over revenue recognition, including the timing of revenue recognition. Where we relied on the controls tested by internal audit we satisfied ourselves about their objectivity, independence and professional skills. We discussed the audit plan and audit program with the internal auditors, reviewed their testing of controls and re-performed a sample of their work. We also independently tested an additional sample.<br><br>We reviewed a sample of new distribution agreements entered into during the year and revenue sharing contracts with doctors in newly acquired businesses to verify that the Group's determination that they are acting in a capacity of a principal rather than an agent is appropriate considering the balance of risk and rewards.<br><br>We obtained assurance over the recognition of revenue through audit work on accounts receivable specifically by testing the rejection rates based on historical experience and have verified that receivable balances as at year end are presented at their recoverable amount and revenues adjusted accordingly.<br><br>We performed substantive audit procedures including testing a sample of transactions by tracing invoices back to original documentation or corroborated to resubmissions made by the company.<br><br>We reviewed a sample of material supplier agreements and accounting for the supplier income including fees and discounts by reviewing the agreements, verifying the data of conditions for the discounts being met and vouched the amounts recognised to invoices and cash receipts.<br><br>For customer volume discounts we ensured the completeness and accuracy of the provision amount and accounting through post year end credit testing, by reviewing the customer agreements and verifying the conditions for discounts.<br><br>We performed cut off testing for a sample of revenue transactions around the period end, to check that they were recognised in the appropriate period with particular focus on inpatient revenues and distribution sales and assessing any reversals of revenues after year end. For IVF revenues we tested management's estimate as to cut off of completed IVF phases and verified revenues are recognised proportionally.<br><br>We performed analytical review procedures including developments in patient numbers per facility and corroborated these with the revenue movement.<br><br>We performed other audit procedures specifically designed to address the risk of management override of controls including journal entry testing, applying particular focus to manual journals and to the timing of revenue transactions.<br><br>We checked the Group's consistency and adherence to their revenue recognition policies including the impact of new reporting standard IFRS 15 and we agreed that these policies are in accordance with IFRSs as adopted by the European Union. We assessed the disclosures against the requirements of IFRS 15.<br><br>We performed full and specific scope audit procedures over this risk areas in 24 locations, which covered 90% of the group's revenue. |

## Independent Auditor's Report continued
To the Members of NMC Health Plc

### Key audit matters continued

| Risk | Our response to the risk |
|---|---|
| **Key observations communicated to the Audit Committee** | |

Based on the audit procedures performed, we are satisfied that revenue recognition is appropriate and that the Group has appropriately adhered to their revenue recognition policies, including the determination of whether the Group is acting as agent rather than as principal.

We audited the impact of the new reporting standard IFRS 15 on the Group's accounting policies and report that the new reporting standard has an immaterial impact on the Group's financial results.

| Accounting for acquisitions | |
|---|---|
| The Group recognised goodwill of US$392.2mn (2017: US$471.6mn) and intangible assets of US$94.8mn (2017: US$17.3mn) in respect of the acquisitions made in the current year. | We obtained and reviewed the sale and purchase agreements and other relevant documentation to understand the terms and conditions of the acquisitions which took place in the year. |
| Of the 18 acquisitions in the year, 7 were included as full or specific audit scope based on the materiality and related risks. | We assessed the judgements applied in determining whether acquisitions represented an acquisition of an asset or a business combination. This involved assessing whether or not the entities and the assets acquired constitute the carrying on of a business. |
| The following are the key audit risks:<br>• The contractual arrangements can be complex and subject to different legal environments. This requires management to apply judgement in determining whether a transaction represents an acquisition of an asset or a business combination in accordance with IFRS 3.<br>• Estimates and judgements made in the recognition of an acquisition as a business combination may be inappropriate and the valuation of the assets and liabilities acquired may be misstated.<br>• Acquisitions may be recognised before the Group is exposed, or has rights, to variable returns from its involvement with the investee and has the ability to affect those returns through its power over the investee. | Where transactions met the definition of a business combination we audited the management assessment of the assets and liabilities acquired and the allocation of the purchase consideration to these and the resultant goodwill by performing the following procedures:<br>• We reviewed the due diligence reports.<br>• The audit team with the assistance of the valuation experts, validated the appropriateness of the purchase price allocation, assessed the appropriateness of the recognition of intangible assets, and challenged the consideration of the valuation inputs and the valuation methodology.<br>• We verified that the consideration transferred, and where relevant contingent consideration, was appropriately calculated in accordance with contractual arrangements.<br>• We assessed whether the Group is exposed, or has rights, to variable returns and has the ability to affect those returns through its power over the investee as at the date upon which the acquisitions were recognised including applicable regulatory approvals. This includes also an assessment of acquisitions completed early in the following reporting period.<br>• We verified the appropriateness of the consolidation adjustments in respect of accounting for these transactions including accounting for acquisitions related costs.<br>• We reviewed the predecessor auditor working papers for the entities acquired and in group scope. |
| **The overall risk has remained stable in the current year.** | |
| | We verified that disclosure in the financial statements are in accordance with IFRS as adopted by the European Union. |
| **Key observations communicated to the Audit Committee** | |

Based on the audit procedures we have performed, we concur with the Group's accounting for all acquisitions above our performance materiality.

We have reviewed the business combinations disclosures in respect of the acquisitions which completed in 2018 and we believe that these are appropriate and in compliance with the requirements of IFRS 3 Business combinations.

In the prior year, our auditor's report included the same Key Audit Matters as noted above.

## An overview of the scope of our audit

**Tailoring the scope**

Our assessment of audit risk, our evaluation of materiality and our allocation of performance materiality determine our audit scope for each entity within the Group. Taken together, this enables us to form an opinion on the consolidated financial statements. We take into account size, risk profile, the organisation of the group and effectiveness of group-wide controls, changes in the business environment and other factors such as recent Internal audit results when assessing the level of work to be performed at each entity.

In assessing the risk of material misstatement to the Group financial statements, and to ensure we had adequate quantitative coverage of significant accounts in the financial statements, of the 41 reporting components of the Group, we selected 21 components covering entities within United Arab Emirates (UAE), Spain, Denmark, Brazil, Italy, Saudi Arabia and Oman, which represent the principal business units within the Group.

Of the 24 components selected, we performed an audit of the complete financial information of 14 components ("full scope components") which were selected based on their size or risk characteristics. For the remaining 10 components ("specific scope components"), we performed audit procedures on specific accounts within that component that we considered had the potential for the greatest impact on the significant accounts in the financial statements either because of the size of these accounts or their risk profile.

The reporting components where we performed audit procedures accounted for the following percentages of the Group financial statements before consolidation adjustments;
· Aggregated Profit before tax - 97% (2017: 99%)
· Aggregated Revenue - 90% (2017: 95%)
· Aggregated Total assets - 95% (2017: 98%)

The components in scope contributed the following percentages of the Group financial statements before consolidation adjustments:
· Full scope components: 92% (2017: 96%) of the aggregated Profit before tax, 74% (2017: 92%) of the aggregated Revenue and 87% (2017: 97%) of the aggregated Total assets.
· Specific scope component: 5% (2017: 3%) of the aggregated Profit before tax, 16% (2017: 3%) of the aggregated Revenue and 8% (2017: 1%) of the aggregated Total assets. The audit scope of these components may not have included testing of all significant accounts of the component but will have contributed to the coverage of significant accounts. Specific scope component testing is primarily focused on the significant risk in relation to revenue recognition however it also included procedures on property and equipment balances and accounts receivables among others.

The remaining 31 components, which are primarily located in the UAE, together represent 3% of the Group's aggregated Profit before tax. For these components, we performed other procedures, including analytical review and testing of consolidation journals and intercompany eliminations and foreign currency translation recalculations to respond to any potential risks of material misstatement to the Group financial statements.

## Changes from the prior year

During the year the Group acquired 18 entities out of which CosmeSurge (UAE), Chronic Care (KSA), Al Salam (KSA), Emirates Medical Center (Oman), Aspen Healthcare (UK, 3 entities), Eugin Sweden AB and Pro-Criar (BRA) were included in the group audit scope. The other 11 acquired entities were not in scope this year based on their respective size and risk characteristics including due to being acquired later in the reporting period and as such limiting the impact on 2018 consolidation results for the year.

Due to expansion of the group both through organic growth and acquisition we have revisited group scoping of entities from prior year considering their size, respective risks and result of prior year audits and made the following changes this year:
· four full scope components in the prior year are reduced to specific scope,
· two specific scope components in the prior year were not in scope this year.

Financial Statements

# Independent Auditor's Report continued
To the Members of NMC Health Plc

## Changes from the prior year continued
**Integrated team structure and involvement with component teams**

The overall audit strategy is determined by the Senior Statutory Auditor. The Senior Statutory Auditor is based in the UK. However, since Group management and the majority of the operations reside in the UAE, the Group audit team includes members from both the UK and the UAE. The Group audit team members from the UAE are also members of selected components teams.

In establishing our overall approach to the Group audit, we determined the type of work that needed to be undertaken at each of the components by us, as the primary audit engagement team, or by component auditors from other EY global network firms operating under our instruction. Of the 14 full scope components, audit procedures were performed on four of these directly by the primary audit team and audit procedures on the remaining 10 entities by the component teams. For these components, we determined the appropriate level of involvement to enable us to determine that sufficient audit evidence had been obtained as a basis for our opinion on the Group as a whole.

Given that the Group operates predominantly in the UAE, the Senior Statutory Auditor with his UK based audit team members travelled to the UAE during three periods to work in an integrated manner with the EY UAE audit team members as part of the half year review, interim and yearend audit. This involved defining audit strategy for significant accounts, discussing the approach with management, monitoring the execution and reviewing the underlying work.

During the current year the Primary team also visited Spain, where the Luarmia S.L. group of companies are based (Luarmia Group is full scope component). These visits involved discussing the results of the audit of component team, meeting with local management, attending the closing meetings and reviewing key audit working papers on risk areas.

Primary team also met management of Aspen Healthcare (2018 acquisition, specific scope component) to discuss the business and overall audit approach in addition to reviewing key audit working papers on risk areas.

In addition, in the UAE, the Primary team met with the KSA audit team responsible for the audit of two newly acquired KSA components and discussed the results of the interim audit work. We also reviewed the underlying working papers on risk areas for Al Salam (specific scope component).

The primary team also interacted with all individual component teams in group scope during the interim audit and year-end audit discussing audit progress, audit findings and other key observations.

This, together with the additional procedures performed at Group level by the Group audit team, gave us appropriate evidence for our opinion on the Group financial statements.

## Our application of materiality
We apply the concept of materiality in planning and performing the audit, in evaluating the effect of identified misstatements on the audit and in forming our audit opinion.

**Materiality**

*The magnitude of an omission or misstatement that, individually or in the aggregate, could reasonably be expected to influence the economic decisions of the users of the financial statements. Materiality provides a basis for determining the nature and extent of our audit procedures.*

We determined materiality for the Group to be US$13.2mn (2017: US$10.69mn), which is 5% (2017: 5%) of the Group consolidated Profit before tax. We believe that Profit before tax is one of the key performance indicators of the business and a focus of users of the financial statements. The increase in materiality from the prior year reflects the impact of the newly acquired entities on the Group's profit and organic growth of the legacy entities. Compared to prior year, Profit before tax was not adjusted for the effect of non-recurring items. These related to the cost in respect of the acquisitions which, given the continued activities in recent years are no longer deemed as non-recurring. Had we excluded the one-off costs in respect of acquisitions in amount of US$5.0mn, our materiality would have been US$12.9mn considering actual year end Profit before tax.

We determined materiality for the Parent Company to be US$7.16mn (2017: US$5.52mn), which is 1% (2017: 1%) of Equity.

Exhibit 6 to B.R. Shetty's Request for Judicial Notice

**Performance materiality**

*The application of materiality at the individual account or balance level. It is set at an amount to reduce to an appropriately low level the probability that the aggregate of uncorrected and undetected misstatements exceeds materiality.*

On the basis of our risk assessments, together with our assessment of the Group's overall control environment, our judgement was that performance materiality was 50% (2017: 50%) of our planning materiality, namely US$6.6mn (2017: US$5.34mn). We have set performance materiality at this percentage due to our expectation of potential misstatements, our risk assessment and changes in the organisation, particularly given the acquisitions which took place during the year.

Audit work at component locations for the purpose of obtaining audit coverage over significant financial statement accounts is undertaken based on a percentage of total performance materiality. The performance materiality set for each component is based on the relative scale and risk of the component to the Group as a whole and our assessment of the risk of misstatement at that component. In the current year, the range of performance materiality allocated to components was US$1.32mn to US$3.24mn (2017: US$ 1.07mn to US$ 2.67mn).

**Reporting threshold**

*An amount below which identified misstatements are considered as being clearly trivial.*

We agreed with the Audit Committee that we would report to them all uncorrected audit differences in excess of US$0.66mn (2017: US$0.53mn), which is set at 5% of planning materiality, as well as differences below that threshold that, in our view, warranted reporting on qualitative grounds.

We evaluate any uncorrected misstatements against both the quantitative measures of materiality discussed above and in light of other relevant qualitative considerations in forming our opinion.

**Other Information**

The other information comprises the information included in the annual report set out on pages 36 to 81 including Shareholder Summary information report, Group's Strategic report and Group's Governance report including Director's report, Remuneration report and Corporate Governance Report, other than the financial statements and our auditor's report thereon. The directors are responsible for the other information.

Our opinion on the financial statements does not cover the other information and, except to the extent otherwise explicitly stated in this report, we do not express any form of assurance conclusion thereon.

In connection with our audit of the financial statements, our responsibility is to read the other information and, in doing so, consider whether the other information is materially inconsistent with the financial statements or our knowledge obtained in the audit or otherwise appears to be materially misstated. If we identify such material inconsistencies or apparent material misstatements, we are required to determine whether there is a material misstatement in the financial statements or a material misstatement of the other information. If, based on the work we have performed, we conclude that there is a material misstatement of the other information, we are required to report that fact.

We also report in regard to our responsibility to specifically address the following items in the other information and to report as uncorrected material misstatements of the other information where we conclude that those items meet the following conditions:
- **Fair, balanced and understandable set out on page 84** - the statement given by the directors that they consider the annual report and financial statements taken as a whole is fair, balanced and understandable and provides the information necessary for shareholders to assess the group's performance, business model and strategy, is materially inconsistent with our knowledge obtained in the audit; or
- **Audit committee reporting set out on pages 48 to 51** - the section describing the work of the audit committee does not appropriately address matters communicated by us to the audit committee; or
- **Directors' statement of compliance with the UK Corporate Governance Code set out on page 42** - the parts of the directors' statement required under the Listing Rules relating to the company's compliance with the UK Corporate Governance Code containing provisions specified for review by the auditor in accordance with Listing Rule 9.8.10R(2) do not properly disclose a departure from a relevant provision of the UK Corporate Governance Code.

We have nothing to report in this regard.

Exhibit 6 to B.R. Shetty's Request for Judicial Notice          97 of 182          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

# Independent Auditor's Report continued
## To the Members of NMC Health Plc

### Opinions on other matters prescribed by the Companies Act 2006

In our opinion, the part of the directors' remuneration report to be audited has been properly prepared in accordance with the Companies Act 2006.

In our opinion, based on the work undertaken in the course of the audit:
· the information given in the strategic report and the directors' report for the financial year for which the financial statements are prepared is consistent with the financial statements; and
· the strategic report and the directors' report have been prepared in accordance with applicable legal requirements.

### Matters on which we are required to report by exception

In the light of the knowledge and understanding of the group and the parent company and its environment obtained in the course of the audit, we have not identified material misstatements in the strategic report or the directors' report.

We have nothing to report in respect of the following matters in relation to which the Companies Act 2006 requires us to report to you if, in our opinion:
· adequate accounting records have not been kept by the parent company, or returns adequate for our audit have not been received from branches not visited by us; or
· the parent company financial statements and the part of the Directors' Remuneration Report to be audited are not in agreement with the accounting records and returns; or
· certain disclosures of directors' remuneration specified by law are not made; or
· we have not received all the information and explanations we require for our audit.

### Responsibilities of directors

As explained more fully in the directors' responsibilities statement set out on page 84, the directors are responsible for the preparation of the financial statements and for being satisfied that they give a true and fair view, and for such internal control as the directors determine is necessary to enable the preparation of financial statements that are free from material misstatement, whether due to fraud or error.

In preparing the financial statements, the directors are responsible for assessing the group and parent company's ability to continue as a going concern, disclosing, as applicable, matters related to going concern and using the going concern basis of accounting unless the directors either intend to liquidate the group or the parent company or to cease operations, or have no realistic alternative but to do so.

### Auditor's responsibilities for the audit of the financial statements

Our objectives are to obtain reasonable assurance about whether the financial statements as a whole are free from material misstatement, whether due to fraud or error, and to issue an auditor's report that includes our opinion. Reasonable assurance is a high level of assurance, but is not a guarantee that an audit conducted in accordance with ISAs (UK) will always detect a material misstatement when it exists. Misstatements can arise from fraud or error and are considered material if, individually or in the aggregate, they could reasonably be expected to influence the economic decisions of users taken on the basis of these financial statements.

### Explanation as to what extent the audit was considered capable of detecting irregularities, including fraud

The objectives of our audit, in respect to fraud, are; to identify and assess the risks of material misstatement of the financial statements due to fraud; to obtain sufficient appropriate audit evidence regarding the assessed risks of material misstatement due to fraud including management override, through designing and implementing appropriate responses; and to respond appropriately to fraud or suspected fraud identified during the audit. However, the primary responsibility for the prevention and detection of fraud rests with both those charged with governance of the entity and management.

Our approach was as follows:
· We obtained an understanding of the legal and regulatory frameworks that are applicable to the group. The group is subject to regulations applicable and specific to their individual markets. The group operates two different segments - i.e. Healthcare and Distribution. The Healthcare division is regulated by governmental and non-governmental organisations which are responsible for monitoring the performance and clinical procedures against its regulations including renewal of operating licences. The distribution division is present only in the UAE and is, for much of their product range, controlled through the UAE Ministry of Health dealing with pricing and compliance with the regulation of disposal of pharmaceuticals.
· The Board is responsible for setting out the Group's strategic risks and the mitigating actions and controls taken against those risks. We have obtained and reviewed the Risk register which includes the risk of failure to comply with multi regulatory and standards bodies' requirements and risk of inadequate data security measures.
· Based on this understanding we designed our audit procedures to identify non-compliance with such laws and regulations. Our procedures involved making inquiries with the Group Board members including Chief Executive officer and Chief Financial officer. In addition we held inquiry with the group's legal team and obtained independent legal confirmation letters from external legal advisors for each entity/country in scope. We have reviewed minutes of Board meetings and Audit Committee meetings and have tested legal expenses to confirm completeness of known litigations and claims. In areas where management relies on controls procedures performed by Internal audit, we met with the internal audit and discussed the Audit plan and/or reviewed the results report.

- We assessed the susceptibility of the group's financial statements to material misstatement, by considering the controls that the Group has established to address risks identified by the entity, including how fraud might occur either through individual transaction, transactions with related parties or transactions with a high degree of management judgment or estimate. We note that revenues from both segments consist of large volume/low value transactions and a low degree of judgment or estimate with the exception of rejection rates. Our procedures included performing journal entry testing, with a focus on manual consolidation journals and journals at individual company level indicating larger one off or unusual transactions especially those impacting revenues, performing analytical review of disaggregated financial information (i.e. revenue movements over the period and location), obtaining a list of related parties and reviewing minutes of various meetings to confirm the completeness of this list. We have in addition maintained our professional scepticism during the substantive test of transactions e.g. by including in our testing those with new customers and suppliers or those where management in their accounting and valuation applied significant estimates and judgments.

A further description of our responsibilities for the audit of the financial statements is located on the Financial Reporting Council's website at https://www.frc.org.uk/auditorsresponsibilities. This description forms part of our auditor's report.

## Other matters we are required to address
- We were re-appointed by the company at the Annual General Meeting on 28 June 2018 to audit the financial statements for the year ending 31 December 2018 and subsequent financial periods.
- The period of total uninterrupted engagement including previous renewals and reappointments is 7 years, covering the years ending 31 December 2012 to 31 December 2018.
- The non-audit services prohibited by the FRC's Ethical Standard were not provided to the group or the parent company and we remain independent of the group and the parent company in conducting the audit.
- The audit opinion is consistent with the additional report to the audit committee.

## Use of our report
This report is made solely to the company's members, as a body, in accordance with Chapter 3 of Part 16 of the Companies Act 2006. Our audit work has been undertaken so that we might state to the company's members those matters we are required to state to them in an auditor's report and for no other purpose. To the fullest extent permitted by law, we do not accept or assume responsibility to anyone other than the company and the company's members as a body, for our audit work, for this report, or for the opinions we have formed.

**VICTOR VEGER (SENIOR STATUTORY AUDITOR)**
for and on behalf of Ernst & Young LLP, Statutory Auditor
London
06 March 2019

Financial Statements

# Consolidated Income Statement
For the year ended 31 December 2018

| | Notes | 2018 US$'000 | 2017 US$'000 |
|---|---|---|---|
| Revenue | 7 | 2,057,253 | 1,603,396 |
| Direct costs | 8 | (1,216,126) | (968,044) |
| GROSS PROFIT | | 841,127 | 635,352 |
| | | | |
| General and administrative expenses | 8 | (442,966) | (335,168) |
| Other income | 9 | 89,211 | 53,203 |
| PROFIT FROM OPERATIONS BEFORE DEPRECIATION, AMORTIZATION, TRANSACTION COSTS AND IMPAIRMENT | | 487,372 | 353,387 |
| Transaction costs in respect of business combinations | 5 | (4,976) | (5,969) |
| Depreciation | 18 | (81,569) | (58,107) |
| Amortisation | 19 | (18,794) | (12,776) |
| Impairment of assets | 18&19 | (2,214) | (3,010) |
| PROFIT FROM OPERATIONS | | 379,819 | 273,525 |
| Finance costs on borrowings | 10 | (104,405) | (63,792) |
| Interest on convertible bond and sukuk | 11 | (16,896) | – |
| Finance income | 12 | 5,829 | 7,487 |
| Gain from bargain purchase on acquisition | 5 | 5,628 | – |
| Unamortised finance fees written off | 28 | (13,124) | (6,794) |
| PROFIT FOR THE YEAR BEFORE TAX | 13 | 256,851 | 210,426 |
| Tax | 16 | (4,942) | (1,245) |
| PROFIT FOR THE YEAR | | 251,909 | 209,181 |
| Profit for the year attributable to: | | | |
| Equity holders of the Parent | | 248,653 | 185,970 |
| Non-controlling interests | | 3,256 | 23,211 |
| Profit for the year | | 251,909 | 209,181 |
| Earnings per share for profit attributable to the equity holders of the Parent: | | | |
| Basic EPS (US$) | 17 | 1.196 | 0.910 |
| Diluted EPS (US$) | 17 | 1.188 | 0.903 |

## Consolidated Statement of Other Comprehensive Income
For the year ended 31 December 2018

| | Notes | 2018 US$'000 | 2017 US$'000 |
|---|---|---|---|
| PROFIT FOR THE YEAR | | 251,909 | 209,181 |
| Other comprehensive income | | | |
| *Other comprehensive income to be reclassified to income statement in subsequent periods (net of tax)* | | | |
| Exchange difference on translation of foreign operations | | (9,512) | 15,304 |
| *Other comprehensive income not to be reclassified to income statement in subsequent periods (net of tax)* | | | |
| Re-measurement gains on defined benefit plans | 29 | 3,429 | 1 |
| Other comprehensive (loss) income for the year (net of tax) | | (6,083) | 15,305 |
| TOTAL COMPREHENSIVE INCOME FOR THE YEAR | | 245,826 | 224,486 |
| Total comprehensive income attributable to: | | | |
| Equity holders of the Parent | | 243,910 | 199,497 |
| Non-controlling interests | | 1,916 | 24,989 |
| Total comprehensive income | | 245,826 | 224,486 |

These results relate to continuing operations of the Group. There are no discontinued operations in the current and prior year.

The attached notes 1 to 44 form part of the consolidated financial statements.

# Consolidated Statement of Financial Position
As at 31 December 2018

| | Notes | 2018 US$'000 | 2017 US$'000 |
|---|---|---|---|
| **ASSETS** | | | |
| **Non-current assets** | | | |
| Property and equipment | 18 | 829,900 | 607,092 |
| Intangible assets | 19 | 1,618,450 | 1,156,904 |
| Deferred tax assets | 16 | 5,794 | 3,418 |
| Advances paid for acquisitions | 5 | 18,301 | – |
| Other non-current assets | | 8,478 | 43,090 |
| | | 2,480,923 | 1,810,504 |
| **Current assets** | | | |
| Inventories | 21 | 247,306 | 181,330 |
| Accounts receivable and prepayments | 22 | 639,124 | 518,842 |
| Loan receivable | 20 | 2,001 | 32,187 |
| Amounts due from related parties | 34 | 7,346 | 1,776 |
| Income tax receivable | | 4,532 | 3,063 |
| Bank deposits | 23 | 167,156 | 185,611 |
| Bank balances and cash | 23 | 324,027 | 202,002 |
| | | 1,391,492 | 1,124,811 |
| Asset held for sale | 42 | – | 3,693 |
| **TOTAL ASSETS** | | 3,872,415 | 2,939,008 |
| **EQUITY AND LIABILITIES** | | | |
| **Equity** | | | |
| Share capital | 24 | 32,443 | 31,928 |
| Share premium | 24 | 633,744 | 492,634 |
| Group restructuring reserve | 25 | (10,001) | (10,001) |
| Foreign currency translation reserve | | (3,007) | 5,398 |
| Option redemption reserves | 40 | (40,372) | (33,483) |
| Convertible bond equity component | 33 | 64,960 | – |
| Retained earnings | 26 | 626,015 | 603,240 |
| **Equity attributable to equity holders of the Parent** | | 1,303,782 | 1,089,716 |
| Non-controlling interests | | 52,981 | 54,910 |
| **Total equity** | | 1,356,763 | 1,144,626 |
| **Non-current liabilities** | | | |
| Term loans | 28 | 660,835 | 987,840 |
| Convertible bond and Sukuk | 33 | 783,009 | – |
| Post Employment benefit plans | 29 | 55,137 | 41,374 |
| Other payables | 31 | 15,689 | 38,984 |
| Option redemption payable | 40 | 20,179 | 12,728 |
| Finance lease liabilities | 32 | 2,995 | – |
| Deferred tax liabilities | 16 | 17,745 | 9,693 |
| | | 1,555,589 | 1,090,619 |
| **Current liabilities** | | | |
| Accounts payable and accruals | 30 | 317,587 | 209,470 |
| Other payables | 31 | 6,806 | 18,110 |
| Option redemption payable | 40 | 26,019 | 26,019 |
| Amounts due to related parties | 34 | 47,737 | 28,472 |
| Bank overdrafts and other short term borrowings | 23 | 168,950 | 207,034 |
| Term loans | 28 | 379,919 | 204,154 |
| Post Employment benefit plans | 29 | 6,549 | 6,905 |
| Income tax payable | | 4,812 | 2,265 |
| Finance lease liabilities | 32 | 1,684 | – |
| Dividend payable | 27 | – | 1,334 |
| | | 960,063 | 703,763 |
| **Total liabilities** | | 2,515,652 | 1,794,382 |
| **TOTAL EQUITY AND LIABILITIES** | | 3,872,415 | 2,939,008 |

The consolidated financial statements were authorised for issue by the board of directors on 06 March 2019 and were signed on its behalf by

**PRASANTH MANGHAT**
Chief Executive Officer

**PRASHANTH SHENOY**
Chief Financial Officer

The attached notes 1 to 44 form part of the consolidated financial statements.

## Consolidated Statement of Changes in Equity
For the year ended 31 December 2018

| | Share Capital US$ '000 | Share premium US$ '000 | Group restructuring reserve US$ '000 | Retained earnings US$ '000 | Foreign currency translation reserve US$ '000 | Equity component of convertible bonds US$ '000 | Option redemption reserves US$ '000 | Total US$ '000 | Non-controlling interest US$ '000 | Total US$ '000 |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Attributable to the equity holders of the Parent | | | | | | | |
| Balance as at 1 January 2018 | 31,928 | 492,634 | (10,001) | 603,240 | 5,398 | – | (33,483) | 1,089,716 | 54,910 | 1,144,626 |
| IFRS 9 credit risk adjustment (Note 22) | – | – | – | (17,231) | – | – | – | (17,231) | – | (17,231) |
| Balance as at 1 January 2018 (adjusted) | 31,928 | 492,634 | (10,001) | 586,009 | 5,398 | – | (33,483) | 1,072,485 | 54,910 | 1,127,395 |
| Profit for the year | | | | 248,653 | – | – | | 248,653 | 3,256 | 251,909 |
| Other comprehensive income | | | | 3,662 | (8,405) | – | | (4,743) | (1,340) | (6,083) |
| Total comprehensive income for the year | – | – | – | 252,315 | (8,405) | – | – | 243,910 | 1,916 | 245,826 |
| Dividend (note 27) | – | – | – | (35,739) | – | – | – | (35,739) | (1,769) | (37,508) |
| Exercise of stock option shares (note 24) | 38 | 2,396 | – | (2,434) | – | – | – | – | – | – |
| Issuance of share capital-new (Note 17) | 477 | 138,714 | – | – | – | – | – | 139,191 | – | 139,191 |
| Equity component convertible bond (Note 33) | – | – | – | – | – | 66,034 | – | 66,034 | – | 66,034 |
| Option redemption reserve (note 40) | – | – | – | – | – | – | (6,889) | (6,889) | – | (6,889) |
| Acquisition of non-controlling interest (note 2.2) | – | – | – | (184,406) | – | – | – | (184,406) | (40,926) | (225,332) |
| Acquisition of subsidiaries (note 5) | – | – | – | – | – | – | – | – | 39,271 | 39,271 |
| Adjustment to prior year business combination (note 5) | – | – | – | – | – | – | – | – | (2,307) | (2,307) |
| Adjustment for current period (note 5) | – | – | – | 566 | – | – | – | 566 | 1,886 | 2,452 |
| Share based payments (note 35) | – | – | – | 9,704 | – | – | – | 9,704 | – | 9,704 |
| Transaction cost on issuance of convertible bond | – | – | – | – | – | (1,074) | – | (1,074) | – | (1,074) |
| Balance as at 31 December 2018 | 32,443 | 633,744 | (10,001) | 626,015 | (3,007) | 64,960 | (40,372) | 1,303,782 | 52,981 | 1,356,763 |

Exhibit 6 to B.R. Shetty's Request for Judicial Notice          103 of 182          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

Financial Statements

## Consolidated Statement of Changes in Equity continued
For the year ended 31 December 2017

| | Attributable to the equity holders of the Parent | | | | | | | | | |
| | Share Capital US$ '000 | Share premium US$ '000 | Group restructuring reserve US$ '000 | Retained earnings US$ '000 | Foreign currency translation reserve US$ '000 | Equity component of convertible bonds US$ '000 | Option redemption reserves US$ '000 | Total US$ '000 | Non-controlling interest US$ '000 | Total US$ '000 |
|---|---|---|---|---|---|---|---|---|---|---|
| Balance as at 1 January 2017 | 31,910 | 491,778 | (10,001) | 436,337 | (8,128) | – | (35,027) | 906,869 | 42,002 | 948,871 |
| Profit for the year | – | – | – | 185,970 | – | – | – | 185,970 | 23,211 | 209,181 |
| Other comprehensive income | – | – | – | 1 | 13,526 | – | – | 13,527 | 1,778 | 15,305 |
| Total comprehensive income for the year | | | | 185,971 | 13,526 | – | – | 199,497 | 24,989 | 224,486 |
| Dividend (note 27) | – | – | – | (27,779) | – | – | – | (27,779) | (21,160) | (48,939) |
| Option redemption reserve (note 40) | – | – | – | – | – | – | 1,544 | 1,544 | – | 1,544 |
| Exercise of stock option shares (note 24) | 18 | 856 | – | (874) | – | – | – | – | – | – |
| Adjustment to prior year business combination | – | – | – | 1,683 | – | – | – | 1,683 | 1,631 | 3,314 |
| Acquisition of non-controlling interest | – | – | – | (1,279) | – | – | – | (1,279) | (1,336) | (2,615) |
| Acquisition of subsidiaries (note 5) | – | – | – | – | – | – | – | – | 8,784 | 8,784 |
| Share based payments (note 35) | – | – | – | 9,181 | – | – | – | 9,181 | – | 9,181 |
| Balance as at 31 December 2017 | 31,928 | 492,634 | (10,001) | 603,240 | 5,398 | – | (33,483) | 1,089,716 | 54,910 | 1,144,626 |

The attached notes 1 to 44 form part of the consolidated financial statements.

# Consolidated Statement of Cash Flows
For the year ended 31 December 2018

| | Notes | 2018 US$'000 | 2017 US$'000 |
|---|---|---|---|
| **OPERATING ACTIVITIES** | | | |
| Profit for the year before tax | | 256,851 | 210,426 |
| Adjustments for: | | | |
| Depreciation | 18 | 81,569 | 58,107 |
| Employees' end of service benefits | 29 | 13,742 | 11,106 |
| Amortisation of intangible assets | 19 | 18,794 | 12,776 |
| Finance income | 12 | (5,829) | (7,487) |
| Finance costs on borrowings | 10 | 104,405 | 63,792 |
| Interest on convertible bond and sukuk | 11 | 16,896 | – |
| Loss on disposal of property and equipment | | 107 | 190 |
| Foreign exchange loss | | 795 | 21 |
| Unamortised finance fees written off | 8 | 13,124 | 6,794 |
| Impairment of assets | 18,19 | 2,214 | 3,010 |
| Gain on disposal of asset held for sale (net) | | (21) | – |
| Gain from bargain purchase on acquisition | | (5,628) | – |
| Reversal of contingent and deferred consideration | | (8,222) | – |
| Share based payments expense | 35 | 9,704 | 9,181 |
| | | 498,501 | 367,916 |
| Working capital changes: | | | |
| Inventories | | (50,134) | (28,212) |
| Accounts receivable and prepayments | | (43,950) | (82,078) |
| Amounts due from related parties | | (5,570) | 2,670 |
| Accounts payable and accruals | | (19,762) | 11,554 |
| Amounts due to related parties | | 19,190 | 13,487 |
| Net cash from operations | | 398,275 | 285,337 |
| Employees' end of service benefits paid | 29 | (7,954) | (3,447) |
| Income tax paid | | (2,501) | (4,379) |
| Net cash from operating activities | | 387,820 | 277,511 |
| **INVESTING ACTIVITIES** | | | |
| Purchase of property and equipment | 18 | (160,222) | (63,448) |
| Purchase of intangible assets | 19 | (4,765) | (1,413) |
| Proceeds from disposal of property and equipment | | 508 | 88 |
| Proceeds from disposal of asset held for sale | | 9,244 | – |
| Acquisition of subsidiaries, net of cash acquired and adjustment of loan | 5 | (480,609) | (628,057) |
| Asset held for sale | | (5,530) | (2,880) |
| Bank deposits maturing in over 3 months | | (43,828) | (40,759) |
| Restricted cash | | 30,818 | 52,770 |
| Finance income received | | 6,153 | 1,144 |
| Advances paid for acquisitions | | (18,301) | – |
| Loan receivable | 20 | (9,025) | (17,934) |
| Other non-current assets | | (654) | (1,335) |
| Contingent consideration paid for acquisition | 39 | (2,363) | (15,053) |
| Net cash used in investing activities | | (678,574) | (716,877) |

## Consolidated Statement of Cash Flows continued
For the year ended 31 December 2018

| | Notes | 2018 US$'000 | 2017 US$'000 |
|---|---|---|---|
| **FINANCING ACTIVITIES** | | | |
| New term loans and draw-downs | 28 | 1,532,570 | 671,353 |
| Repayment of term loans | 28 | (1,700,751) | (319,111) |
| Transaction cost of term loan | | (23,377) | (16,075) |
| Receipts of short term borrowings | | 311,011 | 351,775 |
| Repayment of short term borrowings | | (338,173) | (373,318) |
| Repayment of finance lease liability | | (633) | – |
| Convertible bond | 33 | 450,000 | – |
| Transaction cost of convertible bond | | (7,316) | – |
| Issuance of sukuk | 33 | 400,000 | – |
| Transaction cost of sukuk | | (7,392) | – |
| Dividend paid to shareholders | 27 | (35,739) | (27,779) |
| Dividend paid to non-controlling interest | 27 | (3,103) | (14,523) |
| Other payable | | (2,764) | 1,200 |
| Finance costs paid | | (92,820) | (54,126) |
| Acquisition of non-controlling interest | | (85,545) | (2,615) |
| Deferred consideration paid for acquisition | | (3,600) | (4,356) |
| **Net cash from financing activities** | | 392,368 | 212,425 |
| **INCREASE/(DECREASE) IN CASH AND CASH EQUIVALENTS** | | 101,614 | (226,941) |
| Cash and cash equivalents at 1 January | | 206,462 | 433,403 |
| **CASH AND CASH EQUIVALENTS AT 31 DECEMBER** | 23 | 308,076 | 206,462 |

The attached notes 1 to 44 form part of the consolidated financial statements.

# Notes to the Consolidated Financial Statements
## At 31 December 2018

### 1  Corporate information

NMC Health plc (the "Company" or "Parent") is a Company which was incorporated in England and Wales on 20 July 2011. The Company is a public limited company operating in the Middle East, Europe, United Kingdom, Africa, South America and North America. The Group is primarily based in United Arab Emirates ("UAE"). The address of the registered office of the Company is Level 1, Devonshire House, One Mayfair Place, London, W1J 8AJ. The registered number of the Company is 7712220. The Company's immediate and ultimate controlling party is a group of three individuals (H.E. Saeed Mohamed Butti Mohamed Al Qebaisi (H.E. Saeed Bin Butti), Dr BR Shetty and Mr Khalifa Butti Omair Yousif Ahmad Al Muhairi (Mr. Khalifa Bin Butti) who are all shareholders and of whom two are directors of the Company and who together have the ability to control the Company.

The Parent and its subsidiaries (collectively the "Group") are engaged in providing professional medical services, home care services, long term care services and the provision of all types of research and medical services in the field of gynaecology, obstetrics and human reproduction, and the rendering of business management services to companies in the health care and hospital sector. The Group is also engaged in wholesale of pharmaceutical goods, medical equipment, cosmetics, food.

The consolidated financial statements of the Group for the year ended 31 December 2018 were authorised for issue by the board of directors on 06 March 2019.

### 2.1  Basis of preparation

The consolidated financial statements have been prepared in accordance with International Financial Reporting Standards as adopted by the European Union as they apply to the financial statements of the Group for the year ended 31 December 2018 and applied in accordance with the Companies Act 2006.

The consolidated financial statements are prepared under the historical cost convention, except for derivative financial instruments and contingent consideration payable which have been measured at fair value. The principal accounting policies adopted in the preparation of these consolidated financial statements are set out below. These policies have been consistently applied to all periods, presented.

**Functional and reporting currency**

The functional currency of the Company and its subsidiaries in the UAE is the UAE Dirham and the functional currency of the subsidiaries operating outside UAE is the currency of those respective countries. The reporting currency of the Group is United States of America Dollar (US$) as this is a more globally recognized currency. The UAE Dirham is pegged against the US Dollar at a rate of 3.673 per US Dollar.

All values are rounded to the nearest thousand dollars ($000) except when otherwise indicated.

**Going concern**

The Group's business activities, together with the factors likely to affect its future development, performance and position are set out in the Strategic Review in the Annual Report. The financial position of the Group, its cash flows, liquidity position and borrowing facilities are described in the Financial Review in the Annual Report.

The Group has two diverse operating divisions, Healthcare and Distribution, both of which operate in a growing market.

The directors have undertaken an assessment of the future prospects of the Group and the wider risks that the Group is exposed to. In its assessment of whether the Group should adopt the going concern basis in preparing its financial statements, the directors have considered the adequacy of financial resources in order to manage its business risks successfully, together with other areas of potential risk such as regulatory, insurance and legal risks.

The Group has considerable financial resources including banking arrangements through a spread of local and international banking groups and utilizes short and medium term working capital facilities to optimise business funding. Debt covenants are reviewed by the Board each quarterly. The Board believes that the level of cash in the Group, the spread of bankers and debt facilities mitigates the financing risks that the Group faces from both its expansion through acquisitions and in relation to working capital requirements.

The Group delivered a strong performance in 2018. Both the Healthcare and Distribution divisions have continued their positive growth in revenue during 2018. Net profit and earnings before interest tax depreciation and amortization (EBITDA) of both healthcare and distribution divisions have increased in 2018. EBITDA margin of Distribution is almost the same as last year whereas for Healthcare it increased slightly which is due to opening of new facilities during the year. The directors have reviewed the business plan for 2019 and the five-year cash flow, together with growth forecasts for the healthcare sector in the UAE. The directors consider the Group's future forecasts to be reasonable.

The directors have not identified any other matters that may impact the viability of the Group in the medium term and therefore they continue to adopt the going concern basis in preparing the consolidated financial statements.

# Notes to the Consolidated Financial Statements continued
## At 31 December 2018

### 2.2 Basis of consolidation

The consolidated financial statements comprise the financial statements of the Company and its subsidiaries as at 31 December 2018. Control is achieved when the Group is exposed, or has rights, to variable returns from its involvement with the investee and has the ability to affect those returns through its power over the investee. Specifically, the Group controls an investee if, and only if, the Group has:

- Power over the investee (i.e., existing rights that give it the current ability to direct the relevant activities of the investee)
- Exposure, or rights, to variable returns from its involvement with the investee
- The ability to use its power over the investee to affect its returns

Generally, there is a presumption that a majority of voting rights result in control. To support this presumption and when the Group has less than a majority of the voting or similar rights of an investee, the Group considers all relevant facts and circumstances in assessing whether it has power over an investee, including:

- The contractual arrangement with the other vote holders of the investee
- Rights arising from other contractual arrangements
- The Group's voting rights and potential voting rights

The Group re-assesses whether or not it controls an investee if facts and circumstances indicate that there are changes to one or more of the three elements of control. Consolidation of a subsidiary begins when the Group obtains control over the subsidiary and ceases when the Group loses control of the subsidiary. Assets, liabilities, income and expenses of a subsidiary acquired or disposed of during the year are included in the consolidated financial statements from the date the Group gains control until the date the Group ceases to control the subsidiary.

Profit or loss and each component of other comprehensive income (OCI) are attributed to the equity holders of the parent of the Group and to the non-controlling interests, even if this results in the non-controlling interests having a deficit balance. When necessary, adjustments are made to the financial statements of subsidiaries to bring their accounting policies into line with the Group's accounting policies. All intra-group assets and liabilities, equity, income, expenses and cash flows relating to transactions between members of the Group are eliminated in full on consolidation.

A change in the ownership interest of a subsidiary, without a loss of control, is accounted for as an equity transaction.

If the Group loses control over a subsidiary, it derecognises the related assets (including goodwill), liabilities, non-controlling interest and other components of equity while any resultant gain or loss is recognised in profit or loss. Any investment retained is recognised at fair value.

The consolidated financial statements include the financial statements of the Company and its subsidiaries listed below:

| | | Percentage of holdings | |
| | Country of incorporation | 31 December 2018 | 31 December 2017 |
| --- | --- | --- | --- |
| *Direct subsidiaries:* | | | |
| NMC Holding Co LLC | UAE | 100% | 100% |
| NMC Health Holdco Limited | UK | 100% | 100% |
| NMC Eugin UK Limited | UK | 100% | – |
| *Indirect subsidiaries:* | | | |
| NMC Healthcare LLC | UAE | 100% | 100% |
| New Pharmacy Company WLL | UAE | 100% | 100% |
| New Medical Centre LLC-Dubai | UAE | 100% | 100% |
| NMC Specialty Hospital LLC-Abu Dhabi | UAE | 100% | 100% |
| NMC Specialty Hospital LLC-Dubai | UAE | 100% | 100% |
| New Medical Centre Trading LLC-Abu Dhabi | UAE | 100% | 100% |
| NMC Trading LLC-Dubai | UAE | 100% | 100% |
| Bait Al Shifaa Pharmacy LLC-Dubai | UAE | 100% | 100% |
| New Medical Centre LLC-Sharjah | UAE | 100% | 100% |
| New Medical Centre Specialty Hospital LLC-Al Ain | UAE | 100% | 100% |
| Reliance Information Technology LLC | UAE | 100% | 100% |
| BR Medical Suites FZ LLC | UAE | 100% | 100% |
| Bright Point Royal Womens Hospital LLC | UAE | 100% | 100% |
| NMC Day Surgery Centre LLC | UAE | 100% | 100% |
| NMC Hospital LLC (DIP Hospital) | UAE | 100% | 100% |
| Medifertil, S.A | Columbia | 61.90% | 61.90% |
| Centro de infertilidad y Reproduccion Humana SLU (CIRH) | Spain | 88.40% | 88.40% |
| Centro de Medicina della Riproduzione (Biogenesi) | Italy | 53.00% | 53.00% |
| EUVITRO, S.L.U | Spain | 88.40% | 88.40% |
| Copenhagen Fertility Center Holding Aps (DK) | Denmark | 79.60% | 79.60% |
| Huntington Centro de Medicina Reproductive, S/A (BR) | Brazil | 53% | 53% |
| ProVita International Medical Center LLC | UAE | 100% | 100% |
| Lifewise Home Healthcare LLC | UAE | 100% | 100% |

| | Country of incorporation | Percentage of holdings | |
|---|---|---|---|
| | | 31 December 2018 | 31 December 2017 |
| NMC Royal Hospital LLC | UAE | 100% | 100% |
| The American Surgecenter Pharmacy LLC | UAE | 100% | 100% |
| The American Surgecenter LLC | UAE | 100% | 100% |
| Americare LLC | UAE | 100% | 100% |
| Trans Arabia Drug Store LLC | UAE | 75% | 75% |
| Sunny Specialty Medical Centre LLC. | UAE | 100% | 100% |
| Sunny Medical Centre LLC. | UAE | 100% | 100% |
| New Sunny Medical Centre LLC | UAE | 100% | 100% |
| Sunny Al Buhairah Medical Centre LLC | UAE | 100% | 100% |
| Sunny Al Nadha Medical Centre LLC | UAE | 100% | 100% |
| Sunny Dental Care LLC. | UAE | 100% | 100% |
| Grand Hamad Pharmacy LLC | UAE | 100% | 100% |
| Hamad Pharmacy LLC | UAE | 100% | 100% |
| Sharjah Pharmacy L.L.C | UAE | 100% | 100% |
| Sunny Sharqan Medical Centre L.L.C. | UAE | 100% | 100% |
| NMC Royal Medical Centre L.L.C. | UAE | 100% | 100% |
| NMC Healthcare L.L.C. | Oman | 100% | 100% |
| Fulfil Trading L.L.C. | UAE | 100% | 100% |
| Nadia Medical Centre L.L.C. | UAE | 100% | 100% |
| Cooper Dermatology and Dentistry Clinic | UAE | 100% | 100% |
| Cooper Health Clinic | UAE | 100% | 100% |
| Fakih IVF Fertility Clinic LLC | UAE | 100% | 51% |
| Fakih IVF LLC | UAE | 100% | 51% |
| Beiersdorf Cosmetics Trading LLC-Abu Dhabi Branch. | UAE | 100% | 100% |
| New Marketing & Trading Co.LLC-Abu Dhabi | UAE | 100% | 100% |
| New Medical Centre Trading LLC.-Branch 2 | UAE | 100% | 100% |
| New Medical Centre Trading LLC-Branch 3 | UAE | 100% | 100% |
| Beiersdorf Cosmetics Trading LLC-Ajman Branch | UAE | 100% | 100% |
| National Marketing & Trading Co. LLC-Ajman | UAE | 100% | 100% |
| New Marketing & Trading Company LLC-Ajman Branch | UAE | 100% | 100% |
| NMC Trading LLC-Ajman Branch | UAE | 100% | 100% |
| Beiersdorf Cosmetics Trading Co. LLC-Dubai | UAE | 100% | 100% |
| National Marketing & Trading Co. LLC - Dubai Branch | UAE | 100% | 100% |
| New Marketing & Trading Co. LLC-Dubai Branch | UAE | 100% | 100% |
| New Medical Centre Trading (Store) LLC-Dubai | UAE | 100% | 100% |
| New Medical Centre Veterinary Medicine & Equipment Trading Co LLC-Dubai | UAE | 100% | 100% |
| NMC Trading LLC-Dubai Branch | UAE | 100% | 100% |
| NMC Trading LLC-Fujairah Branch | UAE | 100% | 100% |
| NMC Trading RAK-Branch LLC | UAE | 100% | 100% |
| New Medical Centre | UAE | 100% | 100% |
| New Medical Centre L.L.C.-Branch (Al-Ain,Al wadi) | UAE | 100% | 100% |
| NMC Pharmacy | UAE | 100% | 100% |
| NMC Pharmacy-Branch | UAE | 100% | 100% |
| PVHC KSA | KSA | 100% | 100% |
| TVM KSA Acquisition 2 Ltd. | Cyprus | 100% | 100% |
| NMC Royal Medical Centre LLC-Branch | UAE | 100% | 100% |
| Muscat Central Healthcare L.L.C. | Oman | 100% | 100% |
| NMC Healthcare India Pvt. Ltd. | India | 100% | 100% |
| NMC International Trading L.L.C. | UAE | 100% | 100% |
| Cooper Health Clinic-Branch | UAE | 100% | 100% |
| New Reproductive Care Ltd | Cayman Islands | 51% | 51% |
| New Medical Centre Abu Dhabi Branch | UAE | 100% | 100% |
| New Medical Centre Trading LLC Branch 1 | UAE | 100% | 100% |
| NMC Trading LLC Branch | UAE | 100% | 100% |
| New Medical Centre Pharmacy Al Ain Branch 1 | UAE | 100% | 100% |
| Focus Optics | UAE | 100% | 100% |
| Bright Point Pharmacy LLC | UAE | 100% | 100% |
| Lotus Pharmacy LLC | UAE | 100% | 100% |
| New Medial Centre Pharmacy LLC Sharjah | UAE | 100% | 100% |
| New Medical Centre Trading (Store) LLC-Abu Dhabi Br | UAE | 100% | 100% |
| Provita International Medical Centre LLC Alain branch | UAE | 100% | 100% |
| NMC Medical Professional Training Centre LLC | UAE | 100% | 100% |
| New Pharmacy Company WLL Branch 1 | UAE | 100% | 100% |
| New Pharmacy Company WLL Branch 2 | UAE | 100% | 100% |

Financial Statements

# Notes to the Consolidated Financial Statements continued
## At 31 December 2018

### 2.2 Basis of consolidation continued

| | Country of incorporation | Percentage of holdings | |
| --- | --- | --- | --- |
| | | 31 December 2018 | 31 December 2017 |
| New Pharmacy Company WLL Branch 6 | UAE | 100% | 100% |
| Royal Arsom Wellness Centre LLC | UAE | 100% | 100% |
| NMC Medical Centre Branch 2 (scientific store) | UAE | 100% | 100% |
| New Medical Centre Pharmacy LLC Alain | UAE | 100% | 100% |
| Fertilitetsklinikken Lygten A/S | Denmark | 79.60% | 79.60% |
| Luarmia, S.L. | Spain | 88.40% | 88.40% |
| Al Aseel Laundry | UAE | 100% | 100% |
| Zari Spa & Beauty Centre | UAE | 100% | 100% |
| Zari Spa for Men | UAE | 100% | 100% |
| PEL Assistencia A Infertilidade LTDA | Brazil | 53% | 53% |
| Mustashfa Jadeed Fund | KSA | 100% | 100% |
| Al Qadi Speciality Hospital LLC | KSA | 60% | 60% |
| As Salama Hospital LLC | KSA | 99% | 70% |
| Al Zahra Private Hospital Company | UAE | 100% | 100% |
| Sunny Halwan Speciality Medical Centre | UAE | 100% | 100% |
| Hamad Drug Store LLC | UAE | 100% | 100% |
| Sunny Maysloon Speciality Medical Centre LLC | UAE | 100% | 100% |
| Centre de Reproduccio Asistida del ("Fecunmed") | Spain | 70.7% | 70.7% |
| NMC Royal Medical Centre LLC | Oman | 100% | 100% |
| NMC Trading LLC | Oman | 100% | 100% |
| Fertilitetsklinikken Lygten A/S-Branch 2 | Denmark | 79.6% | 79.6% |
| Centro de Medicina della Riproduzione-C.M.R, S.R.L-Branch 2 | Italy | 53% | 53% |
| Centro de Medicina della Riproduzione-C.M.R, S.R.L-Branch 3 | Italy | 53% | 53% |
| Huntington Centro De Medicina Reproductiva, Vila Mariana S/A | Brazil | 53% | 53% |
| Huntington Centro De Medicina Reproductiva Campinas Ltda | Brazil | 88.4% | 88.4% |
| Euvitro, S.L.U-Branch 2 | Spain | 88.4% | 88.4% |
| NMC Royal Medical Clinic L.L.C. (Etisalat) | UAE | 100% | - |
| NMC Royal First Aid Clinic LLC (Adnec Clinic) | UAE | 100% | - |
| NMC Royal First Aid Clinic LLC (Adnec Clinic)-Branch 2 | UAE | 100% | - |
| Hamad Al Ihterafeya Pharmacy L.L.C | UAE | 100% | - |
| Hamad Al Mumayazah Pharmacy LLC | UAE | 100% | - |
| Hamad Al Oula Pharmacy LLC | UAE | 100% | - |
| NMC Medical Centre Ajman LLC Br. | UAE | 100% | - |
| NMC Royal Dental Centre | UAE | 100% | - |
| NMC Royal Medical Centre | UAE | 100% | - |
| NMC Royal Pharmacy Centre | UAE | 100% | - |
| Emirates Medical Center LLC | Oman | 100% | - |
| New Medical Centre Pharmacy/Branch | UAE | 100% | - |
| Fakih Medical Center L.L.C | UAE | 100% | - |
| Fakih Medical Center Pharmacy LLC | UAE | 100% | - |
| Bareen International Hospital | UAE | 100% | - |
| Bareen Pharmacy | UAE | 100% | - |
| Fakih IVF Center | Oman | 100% | - |
| Fakih IVF Fertility Center LLC-Branch 3 | UAE | 100% | - |
| Mesk Al Madina Medical Centre L.L.C | UAE | 100% | - |
| Zanbaq Al Madina Pharmacy L.L.C | UAE | 100% | - |
| NMC Healthcare UK Limited | UK | 100% | - |
| HCN European Surgery Center Holdings Limited | UK | 100% | - |
| European Surgical Partners Limited | UK | 100% | - |
| Global Healthcare Partners Limited | UK | 100% | - |
| Aspen Healthcare Limited | UK | 100% | - |
| Parkside IHL Scanning Services LLP | UK | 51.8% | - |
| Edinburgh Medical Services Limited T/A The Edinburgh Clinic | UK | 100% | - |
| Eye-Docs Limited T/A Midland Eye | UK | 70.0% | - |
| Aspen Leasing Limited | UK | 100% | - |
| Crossco (1385) Limited | UK | 100% | - |
| HTI St James'S Limited T/A Nova Healthcare | UK | 100% | - |
| Cancer Centre London LLP | UK | 63.0% | - |
| Highgate Hospital LLP | UK | 99.0% | - |
| Claremont Hospital Holdings Limited | UK | 100% | - |
| Claremont Hospital LLP | UK | 81.0% | - |
| NMC Fertility Kenya Limited | Kenya | 60% | - |
| NMC Healthcare Sukuk Limited | Cayman Islands | 100% | - |

| | Country of incorporation | Percentage of holdings | |
| --- | --- | --- | --- |
| | | 31 December 2018 | 31 December 2017 |
| *Cytomed Middle East - Branch of Abu Dhabi* | UAE | 100% | – |
| *Cytomed Middle East LLC (Sharjah)* | UAE | 100% | – |
| *New Medical Center Trading Store LLC - Branch2* | UAE | 100% | – |
| *NMC Health (Jersey) Limited* | UK | 100% | – |
| *New Pharmacy Company Wll-Branch4* | UAE | 100% | – |
| *Premier Care Home Medical And Health Care L.L.C* | UAE | 70% | – |
| *Taskeen Home Medical And Health Care L.L.C* | UAE | 70% | – |
| *Reaya Mumayaza Specialized For Medical Home Care LLC* | UAE | 70% | – |
| *NMC Health Investments LLC* | UAE | 100% | – |
| *Chronic Care Specialist Medical Center Co* | KSA | 100% | – |
| *New Medical Centre Hospital Hail* | KSA | 100% | – |
| *Al Salam Medical Group JSC Company* | KSA | 80% | – |
| *Al Salam Hospital* | KSA | 80% | – |
| *Al Salam Polyclinic* | KSA | 80% | – |
| *Ishbaliya Polyclinic Company LLS* | KSA | 80% | – |
| *Sandook Al Watani Al Tejari LLC* | KSA | 100% | – |
| *Emirates Hospital Wellness And Obesity Clinic* | UAE | 100% | – |
| *Poly Clinic Aesthetic Dermatology Plastic Surgery Dental LIC* | UAE | 100% | – |
| *Aesthetic Skin Care Clinic LIC* | UAE | 75% | – |
| *Centurion Medical Facilities Management Group LLC* | UAE | 100% | – |
| *CosmeSurge Investment LLC* | UAE | 70% | – |
| *CosmeSurge Hospital - Umm Suquiem* | UAE | 70% | – |
| *CosmeSurge Clinics LLC, Jumeirah* | UAE | 70% | – |
| *CosmeSurge & Emirates Clinics For One Day Surgery LLC* | UAE | 70% | – |
| *CosmeSurge Clinics LLC, Marina Branch* | UAE | 70% | – |
| *CosmeSurge Clinics LLC, Conrad Branch* | UAE | 70% | – |
| *CosmeSurge Clinics LLC - Branch Of Abu Dhabi* | UAE | 70% | – |
| *CosmeSurge Clinics LLC Fujarah Branch* | UAE | 70% | – |
| *CosmeSurge Clinics LLC Oman Branch* | Oman | 70% | – |
| *CosmeSurge Clinics LLC Rak Branch 1* | UAE | 70% | – |
| *CosmeSurge Clinics LLC Rak Branch* | UAE | 70% | – |
| *CosmeSurge & Emirates Clinics For One Day Surgery LLC Br 2* | UAE | 70% | – |
| *CosmeSurge & Emirates Clinics For One Day Surgery LLC Br 1* | UAE | 70% | – |
| *CosmeSurge & Emirates Clinics For One Day Surgery LLC.S Br* | UAE | 70% | – |
| *CREA, SRL* | Italy | 88.4% | – |
| *Pró-Criar Participaçoes E Empreendimentos S/A* | Brazil | 53.0% | – |
| *Clínica Jpjc Ltda* | Brazil | 53.0% | – |
| *Clínica De Reprodução Assistida Sul Mineira Ltda* | Brazil | 53.0% | – |
| *Eugin Sweden Ab* | Sweden | 66.3% | – |
| *Nordic Eggbank Ab* | Sweden | 66.3% | – |
| *Nordic IVF Center Göteborg Ab* | Sweden | 66.3% | – |
| *Nordic IVF Center Malmö Ab* | Sweden | 66.3% | – |
| *Nordic IVF Och Gynekologi Stockholm Ab* | Sweden | 66.3% | – |
| *Stockholm IVF Ab* | Sweden | 66.3% | – |
| *AVA Clinic SIA* | Latvia | 100% | – |
| *NMC Eugin USA Corporation* | USA | 70% | – |
| *Boston IVF Ventures, LLC ("Holdco")* | USA | 70% | – |
| *BIVF Management Services, LLC Company"* | USA | 70% | – |
| *Friendly doctor* | USA | 70% | – |
| *Albany Fertility & Gynecology, PLLC ("Albany IVF")* | USA | 70% | – |
| *Boston IVF, LLC ("Boston Subsidiary)* | USA | 70% | – |
| *Boston IVF Fertility Services at The Women's Hospital,LLC* | USA | 70% | – |
| *MPD Medical, LLC* | USA | 70% | – |
| *Boston IVF - CRMI'Holding, LLC* | USA | 70% | – |
| *Boston IVF - The Arizona Center, LLC* | USA | 70% | – |
| *Scottsdale - Boston Surgery Center, LLC* | USA | 70% | – |
| *NMC Genetics India Private Limited* | India | 85% | – |
| *NMC Lifesciences LLC* | UAE | 100% | – |

Exhibit 6 to B.R. Shetty's Request for Judicial Notice          111 of 182          Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-03303-CBM-MAA

# Notes to the Consolidated Financial Statements continued
## At 31 December 2018

### 2.2 Basis of consolidation continued

During the year ended 31 December 2018, the Group increased its shareholding in the listed below.

Subsidiaries and the excess of consideration paid over the carrying amount of the non-controlling interest amounting to US$ 184,406,000 been recognised in retained earnings:

| Acquiree | Country | Additional stake | Date of subsequent purchase |
|---|---|---|---|
| As Salama Hospital LLC | KSA | 29% | 03 January 2018 |
| Fakih IVF Fertility Center LLC and Fakih IVF LLC | UAE | 49% | 08 February 2018 |

### 2.3 Significant accounting judgements and estimates

The key assumptions concerning the future, key sources of estimation uncertainty and critical judgements at the reporting date that have a significant risk of causing a material adjustment to the carrying amounts of assets and liabilities within the next financial year are discussed below:

**Significant estimates**

**Impairment of non-financial assets**

Impairment exists when the carrying value of an asset or cash generating unit (CGU) exceeds its recoverable amount, which is the higher of its fair value less costs of disposal and its value in use. The fair value less costs of disposal calculation is based on available data from binding sales transactions, conducted at arm's length, for similar assets or observable market prices less incremental costs for disposing of the asset. The value in use calculation is based on a DCF model. The cash flows are derived from the budget for the next five years and do not include restructuring activities that the Group is not yet committed to or significant future investments that will enhance the asset's performance of the CGU being tested. The recoverable amount is sensitive to the discount rate used for the DCF model as well as the expected future cash-inflows and the growth rate used for extrapolation purposes. These estimates are most relevant to goodwill recognised by the Group. The key assumptions used to determine the recoverable amount for the different CGUs are disclosed and further explained in note 19.

**Valuation of intangibles assets**

The Group measures its intangible assets acquired in a business combination as follows:

| | |
|---|---|
| Brand | Relief from royalty |
| Database and software | Replacement cost |
| Patient relationships | Multi period excess earning method |
| Non-compete agreements | Income approach-with or without method |
| Rental and private contracts | Multi period excess earning method |

Estimating the fair value of the brand requires determination of the most appropriate valuation method. This estimate also requires determination of the most appropriate inputs to the valuation method including the base revenue, expected life of the intangible assets, selecting an arm's length royalty rate, discount rate and making assumptions about them. Most significant inputs which can materially impact values are base revenue and royalty rate. Similarly, estimating the replacement cost of the database requires an estimate of the number of cycles that are recorded in the database along with the best estimate of the hours dedicated by the staff (such as doctors, nurses, biologists, and other specialist technicians) to collect the data, the useful life of the database, discount rate and an estimate of tax saving.

Estimating the fair value of patient relationships and the non-compete agreements requires an estimate of the expected revenue over an appropriate period of time, a churn rate to account for the reduction in the number of patients over the years, discount rate, rate of inflation and the useful life and the risk inherent in ownership of the asset or security interest being valued. Most significant inputs which can materially impact values are expected revenue and churn rate.

**Contingent consideration on acquisitions**

Contingent consideration, resulting from business combinations, is valued at fair value at the acquisition date as part of the business combination. When the contingent consideration meets the definition of a financial liability, it is subsequently re-measured to fair value at each reporting date. The change in the fair value at each reporting date is recorded in the consolidated income statement. The determination of the fair value is based on discounted cash flows. The key assumptions taken into consideration in determining the fair value are the probability of meeting relevant performance targets, securing certain agreements, completing certain acquisitions and the discount factor (note 39).

**Rejections on medical services**

In the Middle East, the normal business practice associated with transactions with insurers includes an amount of claims disallowed (i.e. rejections) which is not paid by the insurer. These disallowed claims could be for various technical or medical reasons. The Group accepts and expects an amount of consideration that is less than what was originally claimed. The Group determines the rejections based on historical rate of 2-3 years multiplied to the credit sales. Rejection rate is key in determining the rejection amount. Any significant changes in experience as compared to historical rejections will impact the expected rejection rates estimated by the Group.

A 10% increase and decrease of rejection rate would result in increase and decrease in profit before tax by an amount of US$ 1,370,000.

### Provision for expected credit losses of trade receivables

The Group uses a provision matrix to calculate ECLs for trade receivables. The provision rates are based on days past due for groupings of various customer segments that have similar loss patterns (i.e., by geography, product type, customer type).

The provision matrix is initially based on the Group's historical observed default rates. At every reporting date, the historical observed default rates are updated and changes in the forward-looking estimates are analysed.

The amount of ECLs is sensitive to changes in circumstances and of forecast economic conditions. The Group's historical credit loss experience and forecast of economic conditions may also not be representative of customer's actual default in the future. The information about the ECLs on the Group's trade receivables is disclosed in Note 22.

### Significant judgements

### Business combinations and goodwill

When a business combination occurs, the fair values of the identifiable assets and liabilities assumed, including intangible assets, are recognised. If the purchase price consideration exceeds the fair value of the net assets acquired, then the difference is recognised as goodwill. If the purchase price consideration is lower than the fair value of the assets acquired then a gain is recognised in the consolidated income statement. Judgements are applied to measure the fair values of identifiable assets and liabilities. This mostly relate to measurement of intangible assets and contingent consideration. Judgements include if a separately recognisable intangible exits and selection of appropriate method for valuation of intangibles. The key judgement in respect of the contingent consideration recognised as part of business combination relate to the performance of the business. Measurement of intangibles and contingent consideration include various estimates also. Refer to estimate section for detail of these.

### Valuation of put option

The accounting for put options requires significant management judgment and is driven by the specific contract terms. Put options were issued as part of the Luarmia SL, CFC HCMR and Fecunmed acquisitions. On the basis of the contract terms and interpretation of relevant accounting standards and guidance, the judgment is that the Group does not have present ownership of the non-controlling interest (NCI) on account of Luarmia SL, CFC HCMR and Fecunmed as at the date of acquisition. This judgment leads to the next stage of the accounting decisions required. The Group has concluded that IFRS 10 takes precedence over IAS 32, and the permitted policy choice is that there should be full recognition of NCI using the proportionate method.

The financial liability that is payable under the put option is measured at fair value at each reporting date. The key assumptions taken into consideration in determining the fair value are the probability of meeting relevant reproductive cycles, EBITDA and net debt targets (note 38).

### Leases for buildings and land

Generally our hospitals, day patient medical centres and hospital projects under development are located on land and in buildings which are leased. As at 31 December 2018, the majority of the lease periods range from five to twenty seven years apart from the leases for New Medical Centre Hospital LLC-Dubai ('Dubai General Hospital) and the warehouse facilities, which had leases which are renewable on an annual basis with a total value of US$ 370,000 (2017: US$ 569,000) included within property and equipment as at 31 December 2018 (note 18). If any such leases are terminated or expire and are not renewed, the Group could lose the investment, including the hospital buildings and the warehouses on the leased sites which could have a material adverse effect on our business, financial condition and results of operations. The directors have considered the following facts in determining the likelihood that these leases will be renewed:

- Whilst some leases can be for long term durations, it is not unusual and can often be common practice throughout all of the emirates in the United Arab Emirates for landlords to lease land and buildings to companies on annually renewable leases of one year terms and for these Leases to be renewed automatically. Throughout the Group's over 45 year history it has never had a lease cancelled or not renewed, and the Group enjoys a high degree of respect in the region and believes that it maintains strong relationships with the landlords.
- Both the Dubai General Hospital and the warehouse facilities have been occupied by the Group on annually renewable leases, for a period of more than 18 years and each year these leases have been automatically renewed.
- The warehouse facilities have been built by the Group on land leased from government bodies in the Emirates of Dubai and Abu Dhabi on the back of the policies of these governments to attract investment in warehousing in the United Arab Emirates.

### Lease for NMC Royal Hospital LLC

NMC Royal Hospital LLC is constructed from land leased from Municipality of Abu Dhabi. Remaining period of lease as of 31 December 2018 is 22 years expiring in 2040. Management has determined the useful life of NMC Royal Hospital LLC building 50 years. Carrying amount of NMC Royal Hospital LLC building included in property and equipment as of 31 December 2018 is US$ 131,969,000 (2017: US$ 130,042,000). Management believe that lease will be renewed for the full useful life of the building. The directors have considered the facts that throughout the Group's 45 year history it has never had a lease cancelled or not renewed, and the Group enjoys a high degree of respect in the region and believes that it maintains strong relationships with the lessor in determining the likelihood that lease will be renewed.

Exhibit 6 to B.R. Shetty's Request for Judicial Notice    113 of 182    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

Financial Statements

# Notes to the Consolidated Financial Statements continued
At 31 December 2018

### 2.3  Significant accounting judgements and estimates continued
Significant judgements continued
Revenue from contracts with customers
The Group applied the following judgement that significantly affect the determination of the amount and timing of revenue:

Principal v/s agent considerations:
Each contractual arrangement with individual doctors is assessed against specific criteria to determine whether the Group is acting as principal or agent in the arrangement with these doctors. NMC has determined that it is acting as Principal in these arrangements if it has the responsibility for providing the medical services to the patient, it acts as the primary obligator and it bears the risk of controls the goods before delivery to customers, providing the medical service and sales of goods.

### 2.4  Changes in accounting policies
New and amended standards and interpretations:
The Group applied for the first-time certain amendments to the standards, which are effective for annual periods beginning on or after 1 January 2018. The Group has not early adopted any standards, interpretations or amendments that have been issued but are not yet effective.

**IFRS 15 Revenue from Contracts with Customers**
IFRS 15 supersedes IAS 11 Construction Contracts, IAS 18 Revenue and related Interpretations and it applies, with limited exceptions, to all revenue arising from contracts with its customers. IFRS 15 establishes a five-step model to account for revenue arising from contracts with customers and requires that revenue be recognised at an amount that reflects the consideration to which an entity expects to be entitled in exchange for transferring goods or services to a customer.

IFRS 15 requires entities to exercise judgement, taking into consideration all of the relevant facts and circumstances when applying each step of the model to contracts with their customers.

The Group adopted IFRS 15 using modified retrospective method of adoption.

The adoption of IFRS 15 from 1 January 2018 resulted in immaterial adjustments to the amounts recognised in the consolidated financial statements.

The group has not identified any significant changes in the way in which it was recognizing its revenue as per IFRS 15 compared to IAS 18, since the revenue is of short term nature and performance obligations are satisfied upon delivery of service/goods.

**IFRS 9 Financial Instruments**
IFRS 9 Financial Instruments replaces IAS 39 Financial Instruments: Recognition and Measurement for annual periods beginning on or after 1 January 2018, bringing together all three aspects of the accounting for financial instruments: classification and measurement; impairment; and hedge accounting.

The Group has applied the requirements of IFRS 9 prospectively, with the initial application date of 1 January 2018 and without restating comparative information. As the balance sheet as at 31 December 2017 has not been restated, any reclassifications and the adjustments arising from the new impairment rules are recognised in the opening balance sheet on 1 January 2018.

The following tables show the adjustments recognised for each individual line item. Line items that were not affected by the changes have not been included.

| Statement of financial position (extracts) | 31 December 2017 US$ '000 | IFRS 9 adjustments* US$ '000 | 1 January 2018 adjusted US$ '000 |
|---|---|---|---|
| Accounts receivable | 440,146 | (17,231) | 422,915 |
| Retained earnings | 603,240 | (17,231) | 586,009 |

The change did not have impact on the Group's profit, operating, investing and financing cash flows and the basic and diluted EPS reported in 2017.

The adoption of IFRS 9 did not have significant impact on classification of financial instruments.

The new standards, amendments to IFRS, which are effective as of 1 January 2018 are listed below, have no impact on the Group.
- IFRIC Interpretation 22 Foreign Currency Transactions and Advance Considerations
- Amendments to IAS 40 Transfers of Investment Property
- Amendments to IFRS 2 Classification and Measurement of Share-based Payment Transactions
- Amendments to IFRS 4 Applying IFRS 9 Financial Instruments with IFRS 4 Insurance Contracts
- Amendments to IAS 28 Investments in Associates and Joint Ventures
- Amendments to IFRS 1 First-time Adoption of International Financial Reporting Standards

Exhibit 6 to B.R. Shetty's Request for Judicial Notice

Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

## 3  Summary of significant accounting policies

**Revenue recognition**

The Group is in the business of providing medical and distribution services. Revenue from contracts with customers is recognised when control of the goods or services are transferred to the customer at an amount that reflects the consideration to which the Group expects to be entitled in exchange for those goods or services.

The disclosures of significant accounting judgements, estimates and assumptions relating to revenue from contracts with customers are provided in Note 2.3.

Revenue streams include clinic service revenues, sale of goods - Pharmacy, sale of goods -Distribution, Healthcare management fees and revenue sharing arrangement with doctors.

The Group assesses its revenue arrangements against specific criteria in order to determine if it is acting as principal or agent. The Group has concluded that it is the principal in its revenue arrangements, because it typically controls the goods or services before transferring them to the customer. When the Group does not control goods or services before transferring them to the customer, it deems that it is acting as an agent and measures revenue as the amount received or receivable in return for its performance under the contract and excludes any amounts collected on behalf of a third party.

**Clinic, homecare and long term care service revenues:**

Clinic, homecare and long-term care service revenues primarily comprise fees charged for inpatient and outpatient medical services. The fees for services include charges for doctors' consultancy fees, room rent, radiology, laboratory, and pharmaceutical items used.

Revenue is recorded when the performance obligation are satisfied. For outpatient customers services are simultaneously received and consumed by the patient. For inpatient customers, revenue is recognized as serviced are performed over the period. The Group primarily receives these revenues from patients' private/medical insurance schemes. Revenue is measured at fees calculated and billed based on various tariffs agreed with insurers reduced by provision for rejections. Rejections are calculated based on expected value method and are determined based on average rejection rate of 2-3 years multiplied by credit sales.

The Group enters into contracts with third party doctors who perform certain procedures or run outpatient services. The doctors are contracted to satisfy the performance obligations but the entity act as principal In return for their services, the doctors obtain a share of the revenues generated by them. Fees are recognised when the services under the contract are performed. NMC has determined that it is acting as principal in these arrangements if it has the responsibility for providing the medical services to the patient, it sets the prices for services which are provided, it acts as the primary obligator and it bears the risk of providing the medical service.

**Gynaecology, obstetrics and human reproduction:**

Revenue in respect of the different types of gynaecology, obstetrics and human reproduction services is recognized as follows:

•  Donor IVF and Own IVF sales (In Vitro Fecundation):
    Revenue in respect of gynaecology, obstetrics and human reproduction is mainly from In Vitro Fertilization (IVF) treatment.

    Revenue from IVF treatment is recognized over time on an input method based on stage of the treatment. The treatment is divided into three stages. Each stage takes about 20 days. 24%-25% of revenue is booked in the first stage (at the beginning of the treatment), 50%-65% of revenue is booked in the middle stage (at patient's egg extraction in the case of the use of the patient's own egg or in the case of the use of a donor egg at the fertilization date) and 11%-25% of revenue is booked at the final stage (embryo implantation). These percentages are based on an internal study of the costs incurred in the different streams performed in prior years. These percentages depict the transfer of control of promised services.

•  Cryo transfer sales:
    Revenue from cryo transfers are recognised over time on an input method based on the stage of treatment. 25% is recorded when treatment is initialized and 75% at the embryo implantation. These percentages depict the transfer of control of promise services. The time between both phases is about 2-3 weeks.

•  Intrauterine insemination:
    Revenue is recognized in full at the insemination date. Performance obligation is satisfied at a point in time which is insemination date.

**Sale of Goods - Pharmacy:**

The sales of goods from pharmacy relates to the sale of pharmaceutical and other products from hospitals and pharmacies. Revenue from the sale of goods - Pharmacy is recognised when control of the goods has passed to the buyer i.e. at the point of sale/delivery to the customer at an amount that reflects the consideration to which the Group expects to be entitled in exchange for those goods.

Whilst the Group does not establish the prices for the pharmaceutical products sold as both the purchase and selling prices for all pharmaceutical products are fixed by the Ministry of Health, UAE. NMC has determined that it is acting as Principal in respect of these sales as it typically controls the goods before delivering them to the customers.

# Notes to the Consolidated Financial Statements continued
At 31 December 2018

**3  Summary of significant accounting policies** continued
**Revenue recognition** continued
**Sale of Goods - Distribution:**
The sales of goods from distribution division relates to the sale of pharmaceutical and non-pharmaceutical products to retailers. Revenue from the sale of goods - Distribution is recognised when control of the goods has passed to the buyer i.e. at the point of sale/delivery to the customer at an amount that reflects the consideration to which the Group expects to be entitled in exchange for those goods.

Where the Group controls the goods before delivery to the customers, the Group has determined that it is acting as Principal.

Certain contracts provide a customer with a right to return the goods within a specified period. The Group uses the expected value method to estimate the goods that will be returned. For goods that are expected to be returned, the Group recognize a refund liability. A right of return asset (and corresponding adjustment to cost of sales) is also recognized for the right to recover products from a customer.

**Healthcare Management fees:**
Management fees represent fees earned for managing hospitals and medical centers. Management fees are recognised when the performance obligations under the contract are performed, and the service level criteria have been met. Management fees comprises of fixed and variable components and is measured at the consideration to which the Group expects to be entitled, in line with the terms of the management contracts. Variable fees are measured based on rates agreed in the agreements and if service level criteria are met.

**Contract liabilities:**
A contract liability is the obligation to transfer goods or services to a customer for which the Group has received consideration (or an amount of consideration is due) from the customer. If a customer pays consideration before the Group transfers goods or services to the customer, a contract liability is recognised when the payment is made or the payment is due (whichever is earlier). Contract liabilities are recognised as revenue when the Group performs under the contract.

**Other Income**
Other income comprises revenue from suppliers for the reimbursement of advertising and promotion costs incurred by the Group. Revenue is recognised following formal acceptance of the Group's reimbursement claims by suppliers and is measured at the confirmed amount receivable. Relevant advertising and promotional costs are presented as sales promotional expenses in general and administrative expenses. The Group has determined that it is acting as Principal in advertising and promotional arrangements since it is controlling the advertising and promotional activities.

**Interest Income**
For all financial instruments measured at amortised cost, interest income or expense is recorded using the effective interest rate (EIR), which is the rate that exactly discounts the estimated future cash payments or receipts through the expected life of the financial instrument or a shorter period, where appropriate, to the net carrying amount of the financial asset or liability. Interest income is included in finance income in the consolidated income statement.

**Rebates from Suppliers**
The Distribution business receives rebates in the ordinary course of business from a number of its suppliers of pharmaceutical products, in accordance with contractual arrangements in place with specific suppliers. Rebates are accounted for once approval has been received from the supplier following the negotiations which have taken place with them. Rebates receivable are accounted for as a deduction from the cost of purchasing pharmaceutical goods, once the rebate has been approved by the supplier on the basis that the probability of inflow is not sufficiently certain and the amounts cannot be reliably measured until that point. When rebates have been agreed in advance, for example when it has been agreed that a certain rebate will be applied to the purchase of specific goods for a set period of time rather than just to a specific one off purchase, then the rebate is recognised as a reduction in the purchase price as soon as the goods are purchased. When rebates are offered based upon the volume purchased and it is probable that the rebate will be earned and the amount can be estimated reliably, then the discount is recognised as a reduction in the purchase price when the goods are purchased and the assessment is reviewed on an ongoing basis. Rebates receivable are accounted for on a net basis, being set off against the trade payables to which they relate, as they are a reduction in the amount we owe to our suppliers in respect of pharmaceutical products purchased.

**Current Income tax**
The tax currently payable is based on taxable profit for the year. Taxable profit differs from profit as reported in the consolidated statement of profit or loss and other comprehensive income because it excludes items of income or expense that are taxable or deductible in other years and it further excludes items that are not taxable or tax deductible. The group's liability for current tax is calculated using rates (and tax laws) that have been enacted or substantively enacted in countries where the company and subsidiaries operate by the end of the reporting period. Current income tax also includes Zakat applicable in Saudi Arabia.

A provision is recognised for those matters for which the tax determination is uncertain but it is considered probable that there will be a future outflow of funds to a tax authority. The provisions are measured at the best estimate of the amount expected to become payable. The assessment is based on the judgement of tax professionals within the company supported by previous experience in respect of such activities and in certain cases based on specialist independent tax advice.

112    NMC Health plc Annual Report and Accounts 2018

**Deferred tax**

Deferred tax is recognised on the differences between the carrying amounts of assets and liabilities in the financial statements and the corresponding tax bases used in the computation of taxable profit. Deferred tax liabilities are generally recognised for all taxable temporary differences and deferred tax assets are recognised to the extent that it is probable that taxable profits will be available against which deductible temporary differences can be utilised. Such assets and liabilities are not recognised if the temporary difference arises from goodwill or from the initial recognition (other than in a business combination) of other assets and liabilities in a transaction that affects neither the taxable profit nor the accounting profit.

Deferred tax liabilities are recognised on taxable temporary differences arising on investments in subsidiaries and associates, and interests in joint ventures, except where the group is able to control the reversal of the temporary difference and it is probable that the temporary difference will not reverse in the foreseeable future. Deferred tax assets arising from deductible temporary differences associated with such investments and interests are only recognised to the extent that it is probable that there will be sufficient taxable profits against which to utilise the benefits of the temporary differences and they are expected to reverse in the foreseeable future.

The carrying amount of deferred tax assets is reviewed at the end of each reporting period and reduced to the extent that it is no longer probable that sufficient taxable profits will be available to allow all or part of the asset to be recovered.

Deferred tax is calculated at the tax rates that are expected to apply in the period when the liability is settled or the asset realised based on the tax rates (and tax laws) that have been enacted or substantively enacted by the end of the reporting period. Except for investment properties measured using the fair value model, the measurement of deferred tax liabilities and assets reflects the tax consequences that would follow from the manner in which the group expects, at the end of the reporting period, to recover or settle the carrying amount of its assets and liabilities.

For the purposes of measuring deferred tax liabilities and deferred tax assets for investment properties that are measured using the fair value model the carrying amounts of such properties are presumed to be recovered through sale, unless the presumption is rebutted. The presumption is rebutted when the investment property is depreciable and is held within a business model of the group whose business objective is to consume substantially all of the economic benefits embodied in the investment property over time, rather than through sale. The group has not rebutted the presumption that the carrying amount of the investment properties will be recovered entirely through sale.

Deferred tax assets and liabilities are offset when there is a legally enforceable right to set off current tax assets against current tax liabilities and when they relate to income taxes levied by the same taxation authority and the group intends to settle its current tax assets and liabilities on a net basis.

Current and deferred tax are recognised as an expense or income in profit or loss, except when they relate to items credited or debited outside profit or loss (either in other comprehensive income or directly in equity), in which case the tax is also recognised outside profit or loss (either in other comprehensive income or directly in equity, respectively), or where they arise from the initial accounting for a business combination. In the case of a business combination, the tax effect is taken into account in calculating goodwill or determining the excess of the acquirer's interest in the net fair value of the acquiree's identifiable assets, liabilities and contingent liabilities over cost.

**Value added tax ("VAT")**

Expenses and assets are recognised net of the amount of VAT, except:
- When the sales tax incurred on a purchase of assets or services is not recoverable from the taxation authority, in which case, the sales tax is recognised as part of the cost of acquisition of the asset or as part of the expense item, as applicable.
- When receivables and payables are stated with the amount of VAT included The net amount of VAT recoverable from, or payable to, the taxation authority is included as part of receivables or payables in the statement of financial position.

**Business combinations and goodwill**

Business combinations are accounted for using the acquisition method. The cost of an acquisition is measured as the aggregate of the consideration transferred measured at acquisition date fair value and the amount of any non-controlling interests in the acquiree. For each business combination, the Group elects whether to measure the non-controlling interests in the acquiree at fair value or at the proportionate share of the acquiree's identifiable net assets. Acquisition-related costs are expensed as incurred and disclosed separately in the consolidated income statement.

When the Group acquires a business, it assesses the financial assets and liabilities assumed for appropriate classification and designation in accordance with the contractual terms, economic circumstances and pertinent conditions as at the acquisition date. This includes the separation of embedded derivatives in host contracts by the acquiree.

Any contingent consideration to be transferred by the Group is recognised at fair value at the acquisition date. Contingent consideration classified as an asset or liability that is a financial instrument and within the scope of IFRS 9 *Financial Instruments*, is measured at fair value with the changes in fair value recognised in the consolidated income statement.

NMC Health plc Annual Report and Accounts 2018    113

Exhibit 6 to B.R. Shetty's Request for Judicial Notice    117 of 182    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

# Notes to the Consolidated Financial Statements continued
At 31 December 2018

### 3  Summary of significant accounting policies continued
**Business combinations and goodwill** continued

Goodwill is initially measured at cost, being the excess of the aggregate of the consideration transferred and the amount recognised for non-controlling interests, and any previous interest held, over the net identifiable assets acquired and liabilities assumed. If the fair value of the net assets acquired is in excess of the aggregate consideration transferred, the Group re-assesses whether it has correctly identified all of the assets acquired and all of the liabilities assumed and reviews the procedures used to measure the amounts to be recognised at the acquisition date. If the reassessment still results in an excess of the fair value f net assets acquired over the aggregate consideration transferred, then the gain is recognised in profit or loss.

After initial recognition, goodwill is measured at cost less any accumulated impairment losses. For the purpose of impairment testing, goodwill acquired in a business combination is, from the acquisition date, allocated to each of the Group's cash-generating units. For impairment testing, cash generating units are aggregated to operating segments. It is the view of management that goodwill resulting from the acquisitions will generate economic benefits only when combined with other assets (i.e. assets within the healthcare or distribution segments). Therefore, impairment test is applied at operating segments level.

Where goodwill has been allocated to a cash-generating unit and part of the operation within that unit is disposed of, the goodwill associated with the disposed operation is included in the carrying amount of the operation when determining the gain or loss on disposal. Goodwill disposed in these circumstances is measured based on the relative values of the disposed operation and the portion of the cash-generating unit retained.

**Restructuring reserve**

The group restructuring reserve arises on consolidation under the pooling of interest method used for the group restructuring which took place on 1 April 2012. This represents the difference between the share capital of NMC Healthcare LLC, the previous parent company of the Group, and the carrying amount of the investment in that company at the date of the restructure. This reserve is non-distributable.

**Deferred consideration**

Deferred consideration arises when settlement of all or any part of the cost of a business combination is deferred. It is stated at fair value at the date of acquisition, which is determined by discounting the amount due to present value at that date. Interest is imputed on the fair value of non-interest bearing deferred consideration at the discount rate and expensed within finance costs. At each balance sheet date deferred consideration comprises the remaining deferred consideration valued at acquisition plus unwinding of interest imputed on such amounts from acquisition to the balance sheet date.

**Property and equipment**

Property and equipment are stated at cost less accumulated depreciation and any impairment in value. Depreciation is calculated on all property and equipment other than land and capital work in progress, at the following rates calculated to write off the cost of each asset on a straight line basis over its expected useful life:

| | |
|---|---|
| Hospital building | 2% – 6% |
| Buildings | 4.8% – 6% |
| Leasehold improvements | 5.88% – 20% |
| Motor vehicles | 20% |
| Furniture, fixtures and fittings | 12.5% – 20% |
| Medical equipment | 10% – 25% |

The carrying amounts of property and equipment are reviewed for impairment when events or changes in circumstances indicate the carrying value may not be recoverable. If any such indication exists and where the carrying values exceed the estimated recoverable amount, the assets are written down to their recoverable amount, being the higher of their fair value less cost to sell and their value in use.

Capital work in progress is stated at cost and is not depreciated. Lease costs in respect of capital work in progress are capitalised within capital work in progress during the period up until it is commissioned. When commissioned, capital work in progress is transferred to the appropriate property and equipment asset category and depreciated in accordance with the Group's policies. The carrying amounts of capital work in progress are reviewed for impairment when events or changes in circumstances indicate the carrying value may not be recoverable. If any such indication exists and where the carrying values exceed the estimated recoverable amount, the assets are written down to their recoverable amount.

Expenditure incurred to replace a component of an item of property and equipment that is accounted for separately is capitalised and the carrying amount of the component that is replaced is written off. Other subsequent expenditure is capitalised only when it increases future economic benefits of the related item of property and equipment. All other expenditure is recognised in the consolidated statement of comprehensive income as the expense is incurred.

## Intangible assets

Intangible assets acquired separately are measured on initial recognition at cost. The cost of intangible assets acquired in a business combination is their fair value at the date of acquisition. Following initial recognition, intangible assets are carried at cost less any accumulated amortisation and accumulated impairment losses. Internally generated intangibles, excluding capitalised development costs, are not capitalised and the related expenditure is reflected in consolidated statement of comprehensive income in the period in which the expenditure is incurred.

The useful lives of intangible assets are assessed as either finite or indefinite. The following useful lives have been determined for acquired intangible assets:
Brands - 2-20 years
Software - 5 years
Database - 15 years
Patient relationship - 7 years
Non-compete agreement - 3-4 years
Rental contracts - 7 years
Private contracts - 3 years

Intangible assets with finite lives are amortised over the useful economic life and assessed for impairment whenever there is an indication that the intangible asset may be impaired. The amortisation period and the amortisation method for an intangible asset with a finite useful life are reviewed at least at the end of each reporting period. Changes in the expected useful life or the expected pattern of consumption of future economic benefits embodied in the asset are considered to modify the amortisation period or method, as appropriate, and are treated as changes in accounting estimates. The amortisation expense on intangible assets with finite lives is recognised in the consolidated income statement in the expense category that is consistent with the function of the intangible assets.

Intangible assets with indefinite useful lives are not amortised, but are tested for impairment annually, either individually or at the cash-generating unit level. The assessment of indefinite life is reviewed annually to determine whether the indefinite life continues to be supportable. If not, the change in useful life from indefinite to finite is made on a prospective basis.

Gains or losses arising from derecognition of an intangible asset are measured as the difference between the net disposal proceeds and the carrying amount of the asset and are recognised in the consolidated income statement when the asset is derecognised.

## Borrowing costs

Borrowing costs that are directly attributable to the acquisition or construction of an asset are capitalised as part of the cost of the asset until the asset is commissioned for use. Borrowing costs in respect of completed assets or not attributable to assets are expensed in the period in which they are incurred.

## Inventories

Inventories are valued at the lower of cost and net realisable value after making due allowance for any obsolete or slow moving items. Costs are those expenses incurred in bringing each product to its present location and condition and are determined on a weighted average basis. Net realisable value is based on estimated selling price less any further costs expected to be incurred to disposal.

## Financial assets

### Classification and measurement

The classification of financial assets at initial recognition depends on the financial asset's contractual cash flow characteristics and the Group's business model for managing them. With the exception of trade receivables that do not contain a significant financing component, the Group initially measures a financial asset at its fair value plus, in the case of a financial asset not at fair value through profit or loss, transaction costs. Trade receivables that do not contain a significant financing component are measured at the transaction price determined under IFRS 15.

Debt financial instruments are subsequently measured at fair value through profit or loss (FVPL), amortised cost, or fair value through other comprehensive income (FVOCI). The classification is based on two criteria: the Group's business model for managing the assets; and whether the instruments' contractual cash flows represent 'solely payments of principal and interest' on the principal amount outstanding (the 'SPPI criterion'). The most relevant classification for the Group is the financial instruments carried at amortised cost.

The Group measures financial assets at amortised cost if both of the following conditions are met:
· The financial asset is held within a business model with the objective to hold financial assets in order to collect contractual cash flows; and
· The contractual terms of the financial asset give rise on specified dates to cash flows that are solely payments of principal and interest on the principal amount outstanding.

Financial assets at amortised cost are subsequently measured using the effective interest (EIR) method and are subject to impairment. Gains and losses are recognised in profit or loss when the asset is derecognised, modified or impaired.

The Group's financial assets at amortised cost primarily includes trade receivables.

Exhibit 6 to B.R. Shetty's Request for Judicial Notice    119 of 182    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

# Notes to the Consolidated Financial Statements continued
At 31 December 2018

**3  Summary of significant accounting policies** continued
**Financial assets** continued
**Impairment**
The adoption of IFRS 9 has fundamentally changed the Group's accounting for impairment losses for financial assets by replacing IAS 39's incurred loss approach with a forward-looking expected credit loss (ECL) approach. IFRS 9 requires the Group to record an allowance for ECLs for all loans and other debt financial assets not held at FVPL. ECLs are estimated using a provision matrix permissible under the simplified approach outlined as per IFRS 9.

ECLs are recognised in two stages. For credit exposures for which there has not been a significant increase in credit risk since initial recognition, ECLs are provided for credit losses that result from default events that are possible within the next 12-months (a 12-month ECL). For those credit exposures for which there has been a significant increase in credit risk since initial recognition, a loss allowance is required for credit losses expected over the remaining life of the exposure, irrespective of the timing of the default (a lifetime ECL).

**Cash and cash equivalents**
For the purpose of the consolidated statement of cash flows, cash and cash equivalents consist of cash in hand, bank balances and short term deposits with an original maturity of three months or less, net of outstanding bank overdrafts.

**Equity**
The Group has issued ordinary shares that are classified as equity. The difference between the issue price and the par value of ordinary share capital is allocated to share premium. The transaction costs incurred for the share issue are accounted for as a deduction from share premium, net of any related income tax benefit, to the extent they are incremental costs directly attributable to the share issue that would otherwise have been avoided.

**Accounts payable and accruals**
Liabilities are recognised for amounts to be paid in the future for goods and services received whether billed by the supplier or not. Accounts payable are classified as current liabilities if payment is due within one year or less (or in the normal operating cycle if the business if longer). If not, they are presented as non-current liabilities. Accounts payable are recognised initially at fair value and subsequently measured at amortised cost using the effective interest method.

**Provisions**
Provisions are recognised when the Group has an obligation (legal or constructive) arising from a past event, and the costs to settle the obligation are both probable and able to be reliably measured.

Provisions are measured at the present value of the expenditures expected to be required to settle the obligation using a pre-tax rate that reflects current market assessments of the time value of money and risks specific to the obligation. Increases in provisions due to the passage of time are recognised in the consolidated income statement within 'Finance costs'.

**Put option - Non controlling interest**
In circumstances where the Group has determined that they do not have the present ownership interest in the shares subject to a put option, the Group has concluded that IFRS 10 takes precedence over IAS 32 and accordingly a non-controlling interest (NCI) is fully recognised at the date of acquisition, The Group recognises the full NCI using the proportionate share of net assets method. The financial liability that may become payable under a put option in respect of the NCI is recognised at fair value within liabilities, with the liability being treated as an immediate reduction to equity attributable to the parent (option redemption reserve). The financial liability is subsequently re-measured to fair value at each reporting date and the change in the fair value at each reporting date is recorded in the consolidated income statement.

**Term Loans**
Term loans are initially recognised at the fair value of the consideration received less directly attributable transaction costs. After initial recognition, term loans are subsequently measured at amortised cost using the effective interest method. Interest on term loans is charged as an expense as it accrues, with unpaid amounts included in "accounts payable and accruals".

When an existing financial liability is replaced by another from the same lender on substantially different terms, or the terms of an existing liability are substantially modified, such an exchange or modification is treated as the derecognition of the original liability and the recognition of a new liability. The difference in the respective carrying amounts is recognised in the consolidated income statement.

**Non-current assets held for sale**
The Group classifies non-current assets and disposal groups as held for sale if their carrying amounts will be recovered principally through a sale transaction rather than through continuing use. Non-current assets and disposal groups classified as held for sale are measured at the lower of their carrying amount and fair value less costs to sell. Costs to sell are the incremental costs directly attributable to the disposal of an asset (disposal group), excluding finance costs and income tax expense.

The criteria for held for sale classification is regarded as met only when the sale is highly probable and the asset or disposal group is available for immediate sale in its present condition. Actions required to complete the sale should indicate that it is unlikely that significant changes to the sale will be made or that the decision to sale will be withdrawn. Management must be committed to the plan to sell the asset and the sale expected to be completed within one year from the date of the classification.

Property and equipment and intangible assets are not depreciated or amortised once classified as held for sale.

Assets and liabilities classified as held for sale are presented separately as current items in the statement of financial position.

### Employees' end of service benefits

The Group operates an un-funded post-employment benefit plan (employees' end of service benefits) for its expatriate employees in the UAE, in accordance with the labour laws of the UAE. The entitlement to these benefits is based upon the employees' final salary and length of service, subject to the completion of a minimum service period. Payment for employees' end of service benefits is made when an employee leaves, resigns or completes his service.

The cost of providing benefits under the post-employment benefit plan is determined using the projected unit credit method. Re-measurements, comprising of actuarial gains and losses, are recognized immediately in the statement of financial position with a corresponding debit or credit to retained earnings through other comprehensive income in the period in which they occur. Re-measurements are not reclassified to profit or loss in subsequent periods.

Interest is calculated by applying the discount rate to the defined benefit liability. The rate used to discount the end of service benefit obligation is determined by reference to market yields at the balance sheet date on high quality corporate bonds. The current and non-current portions of the provision relating to employees' end of service benefits are separately disclosed in the consolidated statement of financial position.

The Group recognises the following changes in the employees' end of service benefits under 'direct costs' and 'general and administrative expenses' in the consolidated statement of comprehensive income:
· Service costs comprising current service costs
· Interest expense

With respect to its UAE national employees, the Group makes contributions to the relevant UAE Government pension scheme calculated as a percentage of the employees' salaries. The obligations under these schemes are limited to these contributions, which are expensed when due.

### Pension costs and other post-retirement benefits

For defined benefit schemes the amounts charged to operating profit are the costs arising from employee services rendered during the period and the cost of plan introductions, benefit changes, settlements and curtailments. They are included as part of staff costs. The net interest cost on the net defined benefit liability is charged to profit or loss and included within finance costs. Remeasurement comprising actuarial gains and losses and the return on scheme assets (excluding amounts included in net interest on the net defined benefit liability) are recognised immediately in other comprehensive income.

Defined benefit schemes are funded, with the assets of the scheme held separately from those of the Company, in separate trustee administered funds. Pension scheme assets are measured at fair value and liabilities are measured on an actuarial basis using the projected unit credit method. The difference between market value of assets and present value of liabilities is disclosed as an asset or liability in the balance sheet. The actuarial valuations are obtained at least triennially and are updated at each balance sheet date.

For defined contribution schemes the amount charged to the profit and loss account in respect of pension costs and other retirement benefits is the contributions payable in the year. Differences between contributions payable in the year and contributions actually paid are shown as either accruals or prepayments in the balance sheet.

### Share based payments

Equity-settled share-based payments to employees (including executive directors) are measured at the fair value of the equity instruments at the grant date. The fair value excludes the effect of non-market-based vesting conditions. Details regarding the determination of the fair value of equity-settled share-based transactions are set out in note 35.

The fair value determined at the grant date of the equity-settled share-based payments is expensed on a straight-line basis over the vesting period, based on the Group's estimate of equity instruments that will eventually vest. At each reporting date, the Group revises its estimate of the number of equity instruments expected to vest as a result of the effect of non-market-based vesting conditions. The impact of the revision of the original estimates, if any, is recognised in the consolidated statement of other comprehensive income such that the cumulative expense reflects the revised estimate, with a corresponding adjustment to equity reserves/other payables.

No expense is recognised for awards that do not ultimately vest, except for equity-settled transactions for which vesting are conditional upon a market or non-vesting condition. These are treated as vesting irrespective of whether or not the market or non-vesting condition is satisfied, provided that all other performance and/or service conditions are satisfied.

The dilutive effect of outstanding options is reflected as additional share dilution in the computation of diluted earnings per share (see note 17).

Exhibit 6 to B.R. Shetty's Request for Judicial Notice        121 of 182        Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

# Notes to the Consolidated Financial Statements continued
At 31 December 2018

### 3  Summary of significant accounting policies continued

**Foreign currencies**

Transactions in foreign currencies are recorded in UAE Dirhams at the exchange rate ruling at the date of the transaction. Monetary assets and liabilities denominated in foreign currencies are retranslated at the rate of exchange ruling at the balance sheet date. All differences are taken to the consolidated income statement.

**Translation of foreign operations**

On consolidation, the assets and liabilities of foreign operations are translated into US Dollars at the rate of exchange prevailing at the reporting date and their income statements are translated at average exchange rates (unless this average is not a reasonable approximation of the cumulative effect of the rates prevailing on the transaction dates, in which case income and expenses are translated at the rate on the dates of the transactions). All resulting currency translation differences are recognised as a separate component of equity.

The Group's principal geographical segment is the United Arab Emirates. The UAE Dirham is pegged against the US Dollar so a single rate of 3.673 per US Dollar is used to translate those assets and liabilities and balances in the consolidated income statement.

When a foreign operation is partially disposed of or sold, exchange differences that were recorded in equity are recognised in the consolidated income statement as part of the gain or loss on sale. Goodwill and fair value adjustments arising on the acquisition of a foreign operation are treated as assets and liabilities of the foreign operation and translated at the closing rate.

**Derivative financial instruments**

The Group uses derivative financial instruments such as forward exchange contracts, put options and contingent consideration. Such derivative financial instruments are initially recognised at fair value on the date on which a contract is entered into and are subsequently remeasured at fair value. Derivatives with positive market values (unrealised gains) are recognised as assets and derivatives with negative market values (unrealised losses) are recognised as liabilities in the consolidated statement of financial position.

Any gains or losses arising from changes in fair value on derivatives during the year are taken directly to profit or loss.

**Fair value measurement**

Fair value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. The fair value measurement is based on the presumption that the transaction to sell the asset or transfer the liability takes place either:
· In the principal market for the asset or liability, or
· In the absence of a principal market, in the most advantageous market for the asset or liability.

The principal or the most advantageous market must be accessible to by the Group.

The fair value of an asset or a liability is measured using the assumptions that market participants would use when pricing the asset or liability, assuming that market participants act in their economic best interest.

A fair value measurement of a non-financial asset takes into account a market participant's ability to generate economic benefits by using the asset in its highest and best use or by selling it to another market participant that would use the asset in its highest and best use.

The Group uses valuation techniques that are appropriate in the circumstances and for which sufficient data are available to measure fair value, maximising the use of relevant observable inputs and minimising the use of unobservable inputs.

All assets and liabilities for which fair value is measured or disclosed in the financial statements are categorised within the fair value hierarchy, described as follows, based on the lowest level input that is significant to the fair value measurement as a whole:
· Level 1 – Quoted (unadjusted) market prices in active markets for identical assets or liabilities
· Level 2 – Valuation techniques for which the lowest level input that is significant to the fair value measurement is directly or indirectly observable
· Level 3 – Valuation techniques for which the lowest level input that is significant to the fair value measurement is unobservable

For assets and liabilities that are recognised in the financial statements on a recurring basis, the Group determines whether transfers have occurred between levels in the hierarchy by re-assessing categorisation (based on the lowest level input that is significant to the fair value measurement as a whole) at the end of each reporting period.

**Leases**

The determination of whether an arrangement is (or contains) a lease is based on the substance of the arrangement at the inception of the lease. The arrangement is, or contains, a lease if fulfilment of the arrangement is dependent on the use of a specific asset (or assets) and the arrangement conveys a right to use the asset (or assets), even if that asset is (or those assets are) not explicitly specified in an arrangement.

### Group as a lessee

A lease is classified at the inception date as a finance lease or an operating lease. A lease that transfers substantially all the risks and rewards incidental to ownership to the Group is classified as a finance lease. Finance leases are capitalised at the commencement of the lease at the inception date fair value of the leased property or, if lower, at the present value of the minimum lease payments. Lease payments are apportioned between finance charges and reduction of the lease liability so as to achieve a constant rate of interest on the remaining balance of the liability. Finance charges are recognised in finance costs in the statement of profit or loss.

A leased asset is depreciated over the useful life of the asset. However, if there is no reasonable certainty that the Group will obtain ownership by the end of the lease term, the asset is depreciated over the shorter of the estimated useful life of the asset and the lease term.

An operating lease is a lease other than a finance lease. Operating lease payments are recognised as an operating expense in the statement of profit or loss on a straight-line basis over the lease term.

### Convertible bonds

Convertible bonds are separated into liability and equity components based on the terms of the contract. On issuance of the convertible bonds, the fair value of the liability component is determined using a market rate for an equivalent non-convertible instrument. This amount is classified as a financial liability measured at amortised cost (net of transaction costs) until it is extinguished on conversion or redemption.

The remainder of the proceeds is allocated to the conversion option that is recognised and included in equity. Transaction costs are deducted from equity. The carrying amount of the conversion option is not remeasured in subsequent years. Transaction costs are apportioned between the liability and equity components of the convertible bond, based on the allocation of proceeds to the liability and equity components when the instruments are initially recognised.

### Sukuk

Sukuk are initially recognised at the fair value of the consideration received less directly attributable transaction costs. After initial recognition, sukuk are subsequently measured at amortised cost using the effective interest method. Interest on sukuk is charged as an expense as it accrues, with unpaid amounts included in "accounts payable and accruals".

### 4  Accounting standards and interpretations issued but not effective

The new and amended standards and interpretations that are issued, but not yet effective, up to the date of issuance of the Group's financial statements are disclosed below. The Group intends to adopt these new and amended standards and interpretations, if applicable, when they become effective.

### IFRS 16 Leases

IFRS 16 replaces existing guidance on the accounting for leases, including IAS17 Leases, IFRIC 4 Determining whether an Arrangement contains a Lease, SIC-15 Operating Leases - Incentives and SIC-27 Evaluating the Substance of Transactions Involving the Legal Form of a Lease. The standard is applicable for annual periods beginning on or after 1 January 2019. Early adoption is permitted.

IFRS 16 introduces a single comprehensive, on-balance sheet lease accounting model for lessees. IFRS 16 distinguishes leases and service contracts on the basis of whether an identified asset is controlled by a customer. Distinctions of operating leases (off balance sheet) and finance leases (on balance sheet) are removed for lessee accounting and is replaced by a model where a right-of-use asset and a corresponding liability have to be recognised for leases by lessees (i.e. all on balance sheet) except for short-term leases and leases of low value assets.

Lessor accounting under IFRS 16 is substantially unchanged from today's accounting under IAS 17. Lessors will continue to classify all leases using the same classification principle as in IAS 17 and distinguish between two types of leases: operating and finance leases.

IFRS 16, which is effective for annual periods beginning on or after 1 January 2019, requires lessees and lessors to make more extensive disclosures than under IAS 17.

## Notes to the Consolidated Financial Statements continued
At 31 December 2018

**4 Accounting standards and interpretations issued but not effective** continued

**IFRS 16 Leases** continued

**Transition to IFRS 16**

The Group will adopt IFRS 16 using modified retrospectively approach, with the initial application date of 1 January 2019 and without restating comparative information. As the balance sheet as at 31 December 2018 will not be restated, any reclassifications and the adjustments arising will be recognised in the opening balance sheet on 1 January 2019.

The Group will use the following practical expedients when applying this Standard retrospectively to leases previously classified as operating leases applying IAS 17. Group will apply these practical expedients on a lease-by-lease basis:

1.  Group will apply a single discount rate to a portfolio of leases with reasonably similar characteristics (such as leases with a similar remaining lease term for a similar class of underlying asset in a similar economic environment).
2.  Group will elect not to apply the requirements of IFRS 16 to leases for which the lease term ends within 12 months of the date of initial application. In this case, Group will:
    (i)  account for those leases in the same way as short-term leases; and
    (ii) Include the cost associated with those leases within the disclosure of short-term lease expense in the annual reporting period that includes the date of initial application.
3.  Group will use hindsight, such as in determining the lease term if the contract contains options to extend or terminate the lease.

The right of use (ROU) assets will be taken as equal to lease liability as of transaction date.

On adoption of requirements of IFRS 16, the Group's operating profit will improve (being the operating lease rental amount that will be replaced by a depreciation charge and interest expense). This is due to the change in the accounting for expenses of leases that were classified as operating leases under IAS 17.

The Group has designed a new leasing strategy, and the actual impact of the IFRS 16 on lease expense, finance expenses, depreciation, lease liability and right of use of assets to be brought onto the consolidated financial statements as at 1 January 2019 can only be estimated once the new strategy will be implemented. New strategy includes renegotiation of lease terms, rentals and other services with the lessors, decisions to buy or lease out on case by case basis.

At the date of the consolidated financial statement, the following other standards, amendments and interpretations have not been effective and have not been early adopted by the Group:

a)  IFRIC 23 Uncertainty Over Income Tax Treatments - effective 1 January 2019;
b)  Prepayment Features with Negative Compensation (Amendments to IFRS 9) - effective 1 January 2019;
c)  Annual Improvements to IFRS 2015 - 2017 Cycle (Amendments to IFRS 3, IFRS 11, IAS 12 and IAS 23) - effective 1 January 2019;
d)  Long-term Interests in Associates and Joint Ventures (Amendments to IAS 28) - effective 1 January 2019;
e)  Sale or Contribution of Assets between an Investor and its Associates or Joint Venture (Amendments to IFRS 10 and IAS 28) - Available for optional adoption/effective date deferred indefinitely;
f)  IFRIC Interpretation 23 Uncertainty over Income Tax Treatment - effective 1 January 2019;
g)  Amendments to IAS 19: Plan Amendment, Curtailment or Settlement- effective 1 January 2019; and
h)  Transfer to Investment Property - Amendments to IAS 40.

With the exception of IFRS 16, management anticipates that the application of the above Standards and Interpretations in future periods will have no material impact on the consolidated financial statement of the Group in the period of initial application.

## 5  Business combinations

During the financial year ended 31 December 2018, the Group completed a number of acquisitions in line with its growth strategy. These acquisitions have increased group's market share in the healthcare industry and complement the group's existing healthcare portfolio.

| Particulars | CS US$'000 | BIVF US$'000 | CCSMC US$'000 | Al Salam US$'000 | Aspen US$'000 | Others US$'000 | Total US$'000 |
|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | |
| Intangible assets | 16,472 | 33,421 | 7,142 | 12,373 | 3,009 | 22,359 | 94,776 |
| Property and equipment | 36,831 | 9,806 | 16,221 | 15,378 | 44,330 | 28,714 | 151,280 |
| Deferred tax asset | – | 43 | – | – | 4,238 | – | 4,281 |
| Inventories | 1,504 | 496 | 703 | 1,886 | 5,184 | 6,070 | 15,843 |
| Accounts receivable | 3,839 | 5,980 | 2,710 | 2,100 | 23,977 | 24,529 | 63,135 |
| Other receivables | 3,851 | 954 | 2,775 | 20,828 | 1,012 | 8,681 | 38,101 |
| Cash and bank balances | 4,898 | 2,940 | 2,703 | 857 | 1,459 | 18,857 | 31,714 |
| | 67,395 | 53,640 | 32,254 | 53,422 | 83,209 | 109,210 | 399,130 |
| | | | | | | | |
| **Liabilities** | | | | | | | |
| Borrowings | – | – | – | 20,414 | – | 133 | 20,547 |
| Accounts payable | 3,318 | 6,050 | 465 | 7,906 | 50,938 | 14,153 | 82,830 |
| Deferred tax liability | – | 10,029 | – | – | 171 | 243 | 10,443 |
| Other payable | 10,154 | 5,348 | 2,770 | 9,323 | 8,767 | 20,891 | 57,253 |
| Finance lease payable | – | – | – | – | 5,409 | – | 5,409 |
| Tax payable | – | 78 | – | 150 | 184 | 459 | 871 |
| | 13,472 | 21,505 | 3,235 | 37,793 | 65,469 | 35,879 | 177,353 |
| | | | | | | | |
| Total identified net assets at fair value | 53,923 | 32,135 | 29,019 | 15,629 | 17,740 | 73,331 | 221,777 |
| Non-controlling interest | (16,177) | (9,640) | – | (3,126) | (4,402) | (5,926) | (39,271) |
| Goodwill arising on acquisition | 91,304 | 42,205 | 23,523 | 24,022 | – | 209,275 | 390,329 |
| Bargain gain on acquisition | – | – | – | – | (5,567) | (61) | (5,628) |
| **Purchase consideration** | 129,050 | 64,700 | 52,542 | 36,525 | 7,771 | 276,619 | 567,207 |
| | | | | | | | |
| **Purchase consideration:** | | | | | | | |
| Payable in cash | 129,050 | 64,700 | 52,542 | 36,525 | 7,771 | 260,946 | 551,534 |
| Contingent consideration | – | – | – | – | – | 14,604 | 14,604 |
| Deferred consideration | – | – | – | – | – | 1,069 | 1,069 |
| **Total consideration** | 129,050 | 64,700 | 52,542 | 36,525 | 7,771 | 276,619 | 567,207 |

The fair value assessment of identifiable net assets is complete for all entities except for Aspen, Boston IVF, Premier and Cytomed. Aspen, Boston IVF, Premier and Cytomed fair value assessment is provisional.

The non-controlling interest in all acquired entities is measured at the proportionate share of net assets of subsidiaries.

With respect to the bargain gain on acquisition Group re-assessed whether it has correctly identified all of the assets acquired and all of the liabilities assumed and reviewed the procedures used to measure the amounts to be recognised at the acquisition date. The reassessment still resulted in an excess of the fair value of net assets acquired over the aggregate consideration transferred.

The Group purchased Aspen at a discounted price as compared to its estimated fair market value from market participant's perspective. NMC competitive edge over other prospective bidders helps to conclude the transaction at a bargain purchase.

Financial Statements

# Notes to the Consolidated Financial Statements continued
## At 31 December 2018

### 5 Business combinations continued

Analysis of cash flows on acquisitions is as follows:

| Particulars | CS US$'000 | BIVF US$'000 | CCSMC US$'000 | Al Salam US$'000 | Aspen US$'000 | Others US$'000 | Total US$'000 |
|---|---|---|---|---|---|---|---|
| Cash paid | (129,050) | (64,700) | (52,542) | (36,525) | (7,771) | (260,946) | (551,534) |
| Loan paid adjusted | – | – | 39,211 | – | – | – | 39,211 |
| Net cash acquired with the subsidiaries | 4,898 | 2,940 | 2,703 | 857 | 1,459 | 18,857 | 31,714 |
| Transaction costs | – | (1,592) | (80) | (253) | (684) | (1,145) | (3,754) |
| Net cash flow on acquisition | (124,152) | (63,352) | (10,708) | (35,921) | (6,996) | (243,234) | (484,363) |

The transaction costs reported in the consolidated income statement comprise of the following:

| | 2018 US$'000 | 2017 US$'000 |
|---|---|---|
| Transaction costs for the acquired entities | 3,754 | 4,663 |
| Transaction costs for acquisitions in progress | 1,222 | 1,306 |
| | 4,976 | 5,969 |

Other financial information with respect to acquired entities is as follows:

| Particulars | Total US$'000 |
|---|---|
| Revenue from the date of acquisition | 214,020 |
| Profit after tax from the date of acquisition | 14,817 |
| Revenue from 1 January to 31 December 2018 (unaudited) | 468,139 |
| Profit after tax from 1 January to 31 December 2018 (unaudited) | 16,477 |
| Trade receivables gross value as of acquisition date | 63,135 |
| Trade receivables fair value as of acquisition date | 63,135 |

On the grounds of commercial sensitivity the profit information for individual acquired entities is not provided however overall profit impact for all acquired entities is disclosed.

The goodwill recognised with respect to all the acquisitions made during 2018 is attributable to the expected synergies and other benefits from combining the assets and activities of acquired entities with those of the Group. Goodwill represents the future business potential and profit growth of the acquired entities. It comprises all of the intangibles that cannot be individually recognised such as the assembled workforce, future client relationships, the presence in geographic markets, the synergies that the acquired entities & NMC will obtain. Goodwill is allocated to the healthcare segment US$ 371,163,000 and distribution segment US$ 19,166,000.

### Acquisition of CosmeSurge Investment LLC ("CosmeSurge" or "CS")

On 18 January 2018, the Group agreed to acquire 70% controlling stake of CS. CS is an industry leader in the UAE in providing quality cosmetic surgery and aesthetic medicine. The assets being acquired include 17 operational clinics, and a 10-bed hospital and two new clinics which are being constructed and scheduled to open in 2018. NMC currently provides invasive cosmetic procedures and complex surgeries and the addition of CS will expand the Group's offering. Having managed CS under an Operation and Management ("O&M") contract since September 2017, NMC has already identified a number of revenue and cost synergy opportunities.

NMC acquired control of CosmeSurge on 21 March 2018, date on which all conditions precedents were completed, meaning that control has passed to the Group. For convenience, the closest available balance sheet date has been used for the purposes of measuring net assets acquired. This date is 31 March 2018, with full consolidation commencing on 1 April 2018. We are not aware of any material transactions in the period between 21 March 2018 and 31 March 2018.

At the date of acquisition, the fair value of identifiable intangible assets included brands amounting to US$11,572,000 and customer relationship of US$4,900,000. The fair values of brands have been assessed using the relief from royalties' method and customer relationship have been assessed using the multi-period excess earning method. No deferred tax liability has been recognized as there is no Corporation tax applicable in UAE.

**Acquisition of CosmeSurge Investment LLC ("CosmeSurge" or "CS")** continued

The goodwill recognised is attributable to the expected synergies and other benefits from combining the assets and activities of CosmeSurge with those of the Group. Goodwill represents the future business potential and profit growth of the CosmeSurge. It comprises all of the intangibles that cannot be individually recognised such as the assembled workforce, future client relationships, the presence in geographic markets, the synergies that CosmeSurge & NMC will obtain. Goodwill is allocated to the healthcare segment. None of the recognised goodwill is expected to be deductible for income tax purposes as there is no corporation tax in the UAE.

Between 1 April 2018 to 31 December 2018 turnover of US$ 49,438,000 arising from CosmeSurge was included in Groups turnover. If the business had been acquired at the beginning of the year, the Groups turnover for the year ended 31 December 2018 would have been US$ 62,847,000.

**Acquisition of Boston IVF ("BIVF")**

On 17 December 2018, the Group agreed to acquire 70% controlling stake of Boston IVF Group ("BIVF"). Boston IVF is one of the main US leaders in Assisted Reproductive Technology ("ART") market which offers services of medicine related to fertility, gynaecology and obstetrics. BIVF was founded in 1986 and its based in Waltham, Massachusetts United States.

NMC acquired control of BIVF on 17 December 2018, date on which all conditions precedents were completed, meaning that control has passed to the Group. For convenience, the closest available balance sheet date has been used for the purposes of measuring net assets acquired. This date is 31 December 2018, with full consolidation commencing on 1 January 2019. We are not aware of any material transactions in the period between 17 December 2018 and 31 December 2018.

At the date of acquisition, the fair value of identifiable intangible assets included brands amounting to US$33,381,000 The fair values of brands have been assessed using the relief from royalties' method (with a related deferred tax liability in respect of these intangible assets of US$9,914,000). The related deferred tax liability has been assessed using the rate of corporation tax (30%) applicable in USA.

The goodwill recognised is attributable to the expected synergies and other benefits from combining the assets and activities of BIVF with those of the Group. Goodwill represents the future business potential and profit growth of the BIVF. It comprises all of the intangibles that cannot be individually recognised such as the assembled workforce, future client relationships, the presence in geographic markets, the synergies that BIVF & NMC will obtain. Goodwill is allocated to the healthcare segment.

If the business had been acquired at the beginning of the year, the Groups turnover for the year ended 31 December 2018 would have been US$ 70,222,000.

**Acquisition of Chronic Care Specialist Medical Center ("CCSMC")**

On 05 February 2018, the Group agreed to acquire a 100% controlling stake in the voting shares of CCSMC, an unlisted long-term care provider based in the Kingdom of Saudi Arabia having a licensed capacity of about 220 beds. NMC acquired control of CCSMC on 21 March 2018 when NMC obtained the required regulatory approvals from the authorities in the Kingdom of Saudi Arabia. An amount of US$13,300,000 was paid to shareholders of CCSMC to acquire its entire share capital. As at the date of acquisition, included in the net liabilities of CCSMC were long term loans payable to NMC amounting to US$ 39,211,000. The acquisition transaction in effect settles the pre-existing relationship between the NMC and the previous shareholders of CCSMC therefore the total purchase consideration is deemed to be US$ 52,542,000. There is no deferred and contingent consideration payable.

At the date of acquisition, the fair value of identifiable intangible assets included brand amounting to US$6,981,000. The fair values of brand have been assessed using the relief from royalties' method.

The goodwill recognised is attributable to the expected synergies and other benefits from combining the assets and activities of CCSMC with those of the Group. Goodwill represents the future business potential and profit growth of the CCSMC. It comprises all of the intangibles that cannot be individually recognised such as the assembled workforce, future client relationships, the presence in geographic markets, the synergies that CCSMC & NMC will obtain. Goodwill is allocated to the healthcare segment.

Between 1 April 2018 to 31 December 2018 turnover of US$ 7,773,000 arising from CCSMC was included in Groups turnover. If the business had been acquired at the beginning of the year, the Groups turnover for the year ended 31 December 2018 would have been US$ 10,392,000.

Financial Statements

# Notes to the Consolidated Financial Statements continued
## At 31 December 2018

### 5  Business combinations continued
**Acquisition of Al Salam Hospital ('Al Salam')**
On 21 January 2018, the Group agreed to acquire 80% controlling stake of Al Salam. Al Salam Medical Group's hospital and clinics focus on a number of key specialities, including cardiology and paediatrics and served over 900k patients in 2017. ASMG served over 900,000 patients in 2017 and has a healthy mix of cash and insurance patients. The assets and businesses of ASMG comprise:
* Al Salam Medical Centre (established in 1985) - This includes 31 clinics across 16 specialities. The company employs over 200 staff;
* Ishbilia Medical Center (established in 2003) - This includes 34 clinics across 15 specialities. The company employs 174 staff; and
* Al Salam Hospital (commenced operations in Q4 2016) - This is a 100-bed hospital.

Regulatory approvals and legal formalities were completed on 2 April 2018, meaning that control has passed to the Group and full consolidation of results will commence from that date. For convenience, the closest available balance sheet date has been used for the purposes of measuring net assets acquired. This date is 1 April 2018, with full consolidation commencing on 1 April 2018. We are not aware of any material transactions in the period between 1 April 2018 and 2 April 2018.

The agreed cash purchase consideration for the business was US$36,525,000.

At the date of acquisition, the fair value of identifiable intangible assets included brands amounting to US$8,345,000 and license right of US$3,733,000. The fair values of brands have been assessed using the relief from royalties' method and license have been assessed using replacement cost method.

The goodwill recognised is attributable to the expected synergies and other benefits from combining the assets and activities of Al Salam with those of the Group. Goodwill represents the future business potential and profit growth of the Al Salam. It comprises all of the intangibles that cannot be individually recognised such as the assembled workforce, future client relationships, the presence in geographic markets, the synergies that Al Salam & NMC will obtain. Goodwill is allocated to the healthcare segment.

Between 1 April 2018 to 31 December 2018 turnover of US$ 21,874,000 arising from Al Salam was included in Groups turnover. If the business had been acquired at the beginning of the year, the Groups turnover for the year ended 31 December 2018 would have been US$ 29,202,000.

**Acquisition of Aspen ('Aspen')**
On 17th August 2018 the Group acquired 100% of the issued share capital of HCN European Surgery Center Holdings limited, which owns 100% of Aspen Healthcare Limited ('Aspen') based in the United Kingdom. Aspen operates a network of 9 facilities across the country including 4 hospitals, 3 of which are based in the attractive Greater London market (Parkside Hospital, The Holly Private Hospital and Highgate Hospital). With this acquisition, the Group has expanded its footprint in United Kingdom as well. The total purchase consideration was US$7,771,000. The acquisition of Aspen has resulted into bargain purchase of US$ 5,567,000.

At the date of acquisition, the fair value of identifiable tangible assets included property plant and equipment ('PPE') amounting to US$3,010,000. The fair values of PPE have been assessed using three main approaches (cost, market and income approach). Based on the nature of the assets and information available, the most appropriate approach to value each asset was followed.

The goodwill recognised is attributable to the expected synergies and other benefits from combining the assets and activities of Aspen Group with those of the Group. Goodwill represents the future business potential and profit growth of the Aspen. It comprises all of the intangibles that cannot be individually recognised such as the assembled workforce, future client relationships, the presence in geographic markets, the synergies that Aspen & NMC will obtain. Goodwill is allocated to the healthcare segment.

Between 1 September 2018 to 31 December 2018 turnover of US$ 53,985,000 arising from Aspen was included in Groups turnover. If the business had been acquired at the beginning of the year, the Groups turnover for the year ended 31 December 2018 would have been US$ 170,434,000.

Exhibit 6 to B.R. Shetty's Request for Judicial Notice
Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

## Other acquisitions

The Group has made several other small acquisitions during the year for which key information is provided below.

| Acquiree | Effective shareholding | Purchase consideration US$'000 | Contingent consideration US$'000 | Deferred consideration US$'000 | Fair value of intangibles US$'000 | Bargain gain US$'000 | Goodwill US$'000 |
|---|---|---|---|---|---|---|---|
| **Acquisitions - UAE** | | | | | | | |
| Fakih Medical Centre LLC | 100% | 73,800 | 695 | – | – | – | 63,751 |
| Aesthetic Skin Care Clinic LLC | 75% | 40,839 | – | – | 1,851 | – | 38,385 |
| Premier Care Home Medical and Healthcare LLC | 70% | 36,393 | 2,633 | – | 2,805 | – | 33,251 |
| Royal Medical Centre LLC | 100% | 7,128 | 744 | – | – | – | 4,844 |
| Others | 100% | 36,262 | 3,456 | 109 | 8,440 | (61) | 19,879 |
| | | 194,422 | 7,528 | 109 | 13,096 | (61) | 160,110 |
| **Acquisitions - KSA** | | | | | | | |
| New Medical Centre Hospital Hail | 100% | 28,698 | – | – | 1,756 | – | 5,885 |
| | | 28,698 | – | – | 1,756 | – | 5,885 |
| **Acquisitions - Oman** | | | | | | | |
| Emirates Medical Center LLC | 100% | 19,982 | – | 960 | 6,096 | – | 12,118 |
| | | 19,982 | – | 960 | 6,096 | – | 12,118 |
| **Acquisitions - Europe** | | | | | | | |
| Eugin Sweden AB | 75% | 17,603 | 7,076 | – | – | – | 18,807 |
| AVA Clinic SIA | 100% | 10,810 | – | – | 1,217 | – | 8,195 |
| Others | 60% - 100% | 5,104 | – | – | 0 | – | 4,160 |
| | | 33,517 | 7,076 | – | 1,217 | – | 31,162 |
| **Total** | | 276,619 | 14,604 | 1,069 | 22,165 | (61) | 209,275 |

The fair value of the identifiable assets and liabilities of entities acquired in previous year at the dates of acquisition were as follows:

| Particulars | Al Zahra US$'000 | Others US$'000 | Total US$'000 |
|---|---|---|---|
| **Assets** | | | |
| Intangible assets | 1,004 | 16,314 | 17,318 |
| Property and equipment | 124,196 | 18,786 | 142,982 |
| Inventories | 6,668 | 2,064 | 8,732 |
| Accounts receivable | 44,143 | 15,163 | 59,306 |
| Other receivables | 1,924 | 1,149 | 3,073 |
| Cash and bank balances | 6,095 | 2,438 | 8,533 |
| | 184,030 | 55,914 | 239,944 |
| **Liabilities** | | | |
| Borrowings | – | 10,329 | 10,329 |
| Accounts payable | 26,077 | 5,972 | 32,049 |
| Other payable | 11,990 | 7,084 | 19,074 |
| Tax payable | – | 321 | 321 |
| | 38,067 | 23,706 | 61,773 |
| Total identified net assets at fair value | 145,963 | 32,208 | 178,171 |
| Non-controlling interest | – | (8,784) | (8,784) |
| Goodwill arising on acquisition | 416,888 | 54,685 | 471,573 |
| Purchase consideration | 562,851 | 78,109 | 640,960 |
| **Purchase consideration:** | | | |
| Payable in cash | 562,851 | 73,739 | 636,590 |
| Contingent consideration | – | 704 | 704 |
| Deferred consideration | – | 2,869 | 2,869 |
| Advance paid in 2016 | – | 797 | 797 |
| **Total consideration** | 562,851 | 78,109 | 640,960 |

Exhibit 6 to B.R. Shetty's Request for Judicial Notice    129 of 182    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

Financial Statements

# Notes to the Consolidated Financial Statements continued
At 31 December 2018

### 5  Business combinations continued

Analysis of cash flows for acquisitions done in previous year disclosed in 2017 consolidated financial statements was as follows:

| Particulars | Al Zahra US$'000 | Others US$'000 | Total US$'000 |
|---|---|---|---|
| Cash paid | (562,851) | (73,739) | (636,590) |
| Net cash acquired with the subsidiaries | 6,095 | 2,438 | 8,533 |
| Transaction costs | (4,458) | (205) | (4,663) |
| Net cash flow on acquisition | (561,214) | (71,506) | (632,720) |

Other financial information with respect to acquired entities in 2017 is as follows:

| Particulars | Al Zahra US$'000 | Others US$'000 | Total US$'000 |
|---|---|---|---|
| Revenue from the date of acquisition | 116,343 | 44,631 | 160,974 |
| Profit after tax from the date of acquisition | 30,226 | 1,538 | 31,764 |
| Revenue from 1 January to 31 December 2017 (unaudited) | 126,359 | 48,605 | 174,964 |
| Profit (loss) after tax from 1 January to 31 December 2017 (unaudited) | 32,014 | (6,501) | 25,513 |
| Trade receivables gross value as of acquisition date | 44,143 | 15,163 | 59,306 |
| Trade receivables fair value as of acquisition date | 44,143 | 15,163 | 59,306 |

**Acquisition of Al Zahra Hospital ('Al Zahra')**

On 14 December 2016, the Group agreed to acquire a 100% controlling stake in the voting shares of Al Zahra, UAE providing both in-patient and outpatient service to the highest standards, supported by state of art facilities. Al Zahra is one of the largest full service multi-speciality hospitals in the UAE in Sharjah and Northern Emirates. The hospital has 137 active in patients beds and a capacity of 154 beds (expandable to at least 200 beds), treating approximately 400,000 outpatients and 23,000 in patients bed days per year. It has strong relationships with a number of major insurance providers in Sharjah with approximately 85% of outpatients referred through the insurance channel.

The total purchase consideration was US$562,851,000. There were no deferred and contingent consideration payable.

NMC acquired control of Al Zahra on 13 February 2017, date on which all conditions precedent were completed, meaning that control has passed to the Group. For convenience, the closest available balance sheet date has been used for the purposes of measuring net assets acquired. This date is 31 January 2017, with full consolidation commencing on 1 February 2017. We are not aware of any material transactions in the period between 01 February 2017 and 13 February 2017.

The consolidated financial statements include the results of Al Zahra for 11 months period.

The goodwill recognised is attributable to the expected synergies and other benefits from combining the assets and activities of Al Zahra with those of the Group. It comprises all of the intangibles that cannot be individually recognised such as the assembled workforce, the customer service, future client relationships, the presence in geographic markets, the synergies that Al Zahra & NMC will obtain. Goodwill is allocated to the healthcare segment. None of the recognised goodwill is expected to be deductible for income tax purposes as there is no corporation tax in the UAE.

At the date of acquisition, the fair value of identifiable tangible assets included Building of US$86,500,000, land of US$13,500,000 and intangible assets included brands amounting to US$545,000 and software amounting to US$459,000.

No acquisition date contingent liabilities requiring full recognition have been noted as yet.

**Other acquisitions**

The Group has made several other small acquisitions during the year for which key information is provided below.

| Acquirer | Effective shareholding | Purchase consideration US$'000 | Contingent consideration US$'000 | Deferred consideration US$'000 | Fair value of intangibles US$'000 | Advance paid for acquisition US$'000 | Goodwill US$'000 |
|---|---|---|---|---|---|---|---|
| **Acquisitions - UAE** | | | | | | | |
| Others | 100% | 817 | – | – | – | – | 735 |
| | | 817 | – | – | – | – | 735 |
| **Acquisitions - KSA** | | | | | | | |
| As Salama Hospital LLC | 70% | 29,195 | | 2,800 | 12,400 | – | 14,382 |
| Al Qadi Hospital LLC | 60% | 16,432 | – | | 3,774 | – | 13,144 |
| | | 45,627 | – | 2,800 | 16,174 | – | 27,526 |
| **Acquisitions - Oman** | | | | | | | |
| Atlas Healthcare | 100% | 28,259 | – | – | – | – | 24,089 |
| Others | 100% | 885 | – | 69 | – | 797 | 788 |
| | | 29,144 | – | 69 | – | 797 | 24,877 |
| **Acquisitions - Europe** | | | | | | | |
| Fecunmed | 80% | 2,521 | 704 | – | – | – | 1,547 |
| | | 2,521 | 704 | – | – | – | 1,547 |
| **Total** | | 78,109 | 704 | 2,869 | 16,174 | 797 | 54,685 |

**Under others acquisitions:**

As of 31 December 2017, an amount of US$ 4,016,000 payable to non-controlling interest of Al Qadi Hospital was not included in purchase price allocation. This is now corrected in current period and recorded as financial liability. This resulted in increase in goodwill by an amount of US$ 2,410,000 and reduction of non-controlling interest by an amount of US$ 1,606,000.

Further, during the current year, out of total payable US$ 4,016,000 to non-controlling interest, an amount of US$ 1,886,000 was converted to equity, an amount of US$ 1,564,000 was paid to non-controlling interest and US$ 566,000 was waived by non-controlling interest and transferred to retained earnings.

During the year, purchase price allocation of Al Qadi Hospital was finalised. Fair values of property and equipment has been reduced by US$ 1,355,000, trade receivables by US$ 267,000 and increase in fair value of liabilities by US$ 130,000. All these, resulted in decrease in net assets as of acquisition date by US$ 1,752,000. This resulted in increase in goodwill by an amount of US$ 1,051,000 and reduction in non-controlling interest of US$ 701,000.

**Advances in respect of Acquisitions:**

Advances paid in respect of acquisitions as of 31 December 2018 amounting to US$ 18,301,000 (31 December 2017 US$ nil).

Included in this is an amount of US$ 9,529,000 in respect of contingent consideration paid in advance for an acquisition. This amount is adjustable from contingent consideration payable to the sellers of that entity.

**6  Material partly-owned subsidiaries**

For the year ended 31 December 2018, there are no material partly-owned subsidiaries.

**7  Segment information**

For management purposes, the Group is organised into business units based on their products and services and has two reportable segments as follows:

• The healthcare segment is engaged in providing professional medical services, comprising diagnostic services, in and outpatient clinics, provision of all types of research and medical services in the field of gynaecology, obstetrics and human reproduction and retailing of pharmaceutical goods. It also includes the provision of management services in respect of hospitals.
• The distribution & services segment is engaged in wholesale trading of pharmaceutical goods, medical equipment, cosmetics and food.

No operating segments have been aggregated to form the above reportable operating segments.

# Notes to the Consolidated Financial Statements continued
At 31 December 2018

### 7 Segment information continued
The new acquired companies/businesses (Aspen, CosmeSurge, Boston IVF, Aesthetics, Al Salam, Al Rashid, CCSMC, EMC, Pro-Criar, FMC, Royal RAK, CREA, Sweden IVF, Premier, AVA and Mesk) come under the healthcare segment and Cytomed come under distribution segment.

Management monitors the operating results of its business units separately for the purpose of making decisions about resource allocation and performance assessment. Segment performance is evaluated based on EBITDA and profit or loss. These are measured consistently with EBITDA and profit or loss excluding finance income and group administrative expenses, unallocated depreciation and unallocated other income, in the consolidated financial statements.

Finance costs and finance income relating to UAE subsidiaries are not allocated to individual segments as they are managed on a group basis. In addition Group overheads are also not allocated to individual segments as these are managed on a Group basis.

Transfer prices between operating segments are on an arm's length basis in a manner similar to transactions with third parties.

The following tables present revenue and profit and certain asset and liability information regarding the Group's business segments for the years ended 31 December 2018 and 2017.

| | Healthcare US$'000 | Distribution and services US$'000 | Total segments US$'000 | Adjustments and eliminations US$'000 | Consolidated US$'000 |
|---|---|---|---|---|---|
| **Year ended 31 December 2018** | | | | | |
| **Revenue** | | | | | |
| External customers | 1,549,870 | 507,383 | 2,057,253 | – | 2,057,253 |
| Inter segment | 11,513 | 37,742 | 49,255 | (49,255) | – |
| **Total** | 1,561,383 | 545,125 | 2,106,508 | (49,255) | 2,057,253 |
| **(Expenses)/Income** | | | | | |
| Depreciation and amortization | (82,945) | (4,737) | (87,682) | (12,681) | (100,363) |
| Finance costs | (9,904) | (424) | (10,328) | (110,973) | (121,301) |
| Segment EBITDA | 487,974 | 68,383 | 556,357 | (68,985) | 487,372 |
| Segment profit | 394,367 | 62,896 | 457,263 | (205,354) | 251,909 |
| Segment assets | 3,070,981 | 382,251 | 3,453,232 | 419,183 | 3,872,415 |
| Segment liabilities | 434,966 | 124,277 | 559,243 | 1,956,409 | 2,515,652 |
| **Other disclosures** | | | | | |
| Capital expenditure | 152,130 | 4,004 | 156,134 | 8,853 | 164,987 |
| **Year ended 31 December 2017** | | | | | |
| **Revenue** | | | | | |
| External customers | 1,146,243 | 457,153 | 1,603,396 | – | 1,603,396 |
| Inter segment | 15,374 | 29,601 | 44,975 | (44,975) | – |
| **Total** | 1,161,617 | 486,754 | 1,648,371 | (44,975) | 1,603,396 |
| **(Expenses)/Income** | | | | | |
| Depreciation and amortization | (58,143) | (3,526) | (61,669) | (9,214) | (70,883) |
| Finance costs | (8,692) | (7) | (8,699) | (55,093) | (63,792) |
| Segment EBITDA | 355,401 | 51,549 | 406,950 | (53,563) | 353,387 |
| Segment profit | 287,827 | 48,016 | 335,843 | (126,662) | 209,181 |
| Segment assets | 2,270,559 | 296,445 | 2,567,004 | 372,004 | 2,939,008 |
| Segment liabilities | 343,258 | 97,703 | 440,961 | 1,353,421 | 1,794,382 |
| **Other disclosures** | | | | | |
| Capital expenditure | 58,214 | 5,105 | 63,319 | 1,542 | 64,861 |

Inter-segment revenues are eliminated upon consolidation and reflected in the 'adjustments and eliminations' column. All other adjustments and eliminations are part of detailed reconciliations presented further below.

### Adjustments and eliminations

Finance income and group overheads are not allocated to individual segments as they are managed on a group basis.

Term loans, convertible bond, sukuk, bank overdraft and other short term borrowings and certain other assets and liabilities are not allocated to segments as they are also managed on a group basis.

Capital expenditure consists of additions to property and equipment and intangible assets.

### Reconciliation of Segment EBITDA to Group profit

|  | 2018 US$'000 | 2017 US$'000 |
|---|---|---|
| Segment EBITDA | 556,357 | 406,950 |
| Unallocated group administrative expenses | (70,295) | (54,400) |
| Unallocated other income | 1,310 | 837 |
| Unallocated finance income | 5,829 | 7,487 |
| Unallocated unamortised finance fees written off | (13,124) | (6,794) |
| Finance costs on borrowings | (104,405) | (63,792) |
| Interest on convertible bond and sukuk | (16,896) | – |
| Depreciation | (81,569) | (58,107) |
| Amortisation | (18,794) | (12,776) |
| Impairment of assets | (2,214) | (3,010) |
| Transaction costs related to business combinations | (4,976) | (5,969) |
| Gain from bargain purchase on acquisition | 5,628 | – |
| Tax | (4,942) | (1,245) |
| Group Profit | 251,909 | 209,181 |

### Reconciliation of Segment profit to Group profit

|  | 2018 US$'000 | 2017 US$'000 |
|---|---|---|
| Segment profit | 457,263 | 335,843 |
| Unallocated finance income | 3,064 | 2,036 |
| Unallocated finance costs on borrowings | (94,076) | (55,093) |
| Unallocated interest on convertible bond and sukuk | (16,896) | – |
| Unallocated group administrative expenses | (70,295) | (54,400) |
| Unallocated unamortised finance fees written off | (13,124) | (6,794) |
| Unallocated depreciation | (1,886) | (1,090) |
| Unallocated other income | 1,310 | 837 |
| Unallocated amortisation cost | (10,796) | (8,123) |
| Unallocated impairment of assets | (1,783) | (3,010) |
| Unallocated transaction cost | (872) | (1,025) |
| Group Profit | 251,909 | 209,181 |

## Notes to the Consolidated Financial Statements continued
At 31 December 2018

### 7 Segment information continued

**Reconciliation of Group assets**

| | 2018 US$'000 | 2017 US$'000 |
|---|---|---|
| Segment assets | 3,453,232 | 2,567,004 |
| Unallocated property and equipment | 6,330 | 7,995 |
| Unallocated inventory | 229 | 215 |
| Unallocated accounts receivable and prepayments | 19,145 | 16,553 |
| Unallocated bank balances and cash | 158,157 | 161,028 |
| Unallocated bank deposits | 235,322 | 184,430 |
| Unallocated intangible assets | – | 1,783 |
| Group assets | 3,872,415 | 2,939,008 |

**Reconciliation of Group liabilities**

| | 2018 US$'000 | 2017 US$'000 |
|---|---|---|
| Segment liabilities | 559,243 | 440,961 |
| Unallocated term loans | 953,807 | 1,105,524 |
| Unallocated employees' end of service benefits | 1,997 | 4,706 |
| Unallocated accounts payable and accruals | 22,291 | 9,109 |
| Unallocated convertible bond and sukuk | 783,009 | – |
| Unallocated bank overdraft and other short term borrowings | 168,950 | 207,034 |
| Unallocated amounts due to related parties | 336 | 1,029 |
| Unallocated option redemption payable | 26,019 | 26,019 |
| Group liabilities | 2,515,652 | 1,794,382 |

**Other information**

The following table provides information relating to Group's major customers who contribute more than 10% towards the Group's revenues:

| | Healthcare US$'000 | Distribution and services US$'000 | Total US$'000 |
|---|---|---|---|
| Year ended 31 December 2018 | | | |
| Customer 1 | 583,232 | – | 583,232 |
| | 583,232 | – | 583,232 |
| Year ended 31 December 2017 | | | |
| Customer 1 | 442,070 | – | 442,070 |
| | 442,070 | – | 442,070 |

## Geographical information

|  | 2018 US$'000 | 2017 US$'000 |
|---|---|---|
| **Revenue from external customers** | | |
| United Arab Emirates | 1,801,295 | 1,474,344 |
| United Kingdom | 53,985 | – |
| Spain | 53,082 | 46,684 |
| Others | 148,891 | 82,368 |
| **Total revenue as per consolidated income statement** | 2,057,253 | 1,603,396 |
| **Non-current assets** | | |
| United Arab Emirates | 1,834,226 | 1,528,083 |
| United Kingdom | 49,136 | – |
| Spain | 216,402 | 201,456 |
| Others | 381,159 | 80,965 |
| **Total non-current assets** | 2,480,923 | 1,810,504 |
| **Deferred tax assets** | | |
| United Arab Emirates | – | – |
| United Kingdom | 3,752 | – |
| Spain | 1,429 | 2,877 |
| Others | 613 | 541 |
| **Total Deferred tax assets** | 5,794 | 3,418 |

## Analysis of revenue by category:

|  | 2018 US$'000 | 2017 US$'000 |
|---|---|---|
| **Revenue from services:** | | |
| Healthcare - clinic | 1,342,950 | 999,678 |
| Healthcare - management fees | 22,911 | 13,016 |
|  | 1,365,861 | 1,012,694 |
| **Sale of goods:** | | |
| Distribution | 507,383 | 457,153 |
| Healthcare - pharmacy | 184,009 | 133,549 |
|  | 691,392 | 590,702 |
| **Total** | 2,057,253 | 1,603,396 |

## Analysis of revenue by verticals:

|  | 2018 US$'000 | 2017 US$'000 |
|---|---|---|
| **Revenue from services:** | | |
| Multi-speciality & pharmacies | 1,163,065 | 833,627 |
| Maternity & fertility | 238,124 | 201,139 |
| Long term & home care | 137,283 | 113,835 |
| Operation & management | 22,911 | 13,016 |
|  | 1,561,383 | 1,161,617 |
| **Sale of goods:** | | |
| Distribution | 545,125 | 486,754 |
| **Eliminations:** | | |
| Intra-group eliminations | (49,255) | (44,975) |
| **Total revenue as per consolidated income statement** | 2,057,253 | 1,603,396 |

As of 31 December 2018, transaction prices allocated to remaining performance obligation (unsatisfied or partially satisfied) are immaterial.

Exhibit 6 to B.R. Shetty's Request for Judicial Notice    135 of 182    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

## Notes to the Consolidated Financial Statements continued
At 31 December 2018

### 8  Expenses by nature

| | 2018 US$'000 | 2017 US$'000 |
|---|---|---|
| Cost of inventories recognised as an expense | 690,191 | 571,953 |
| Salary expenses | 651,800 | 492,793 |
| Rent expenses | 100,847 | 76,168 |
| Sales promotion expenses | 72,998 | 61,349 |
| Repair and maintenance expenses | 33,341 | 19,840 |
| Legal & licence fees | 19,041 | 9,355 |
| Electricity expenses | 14,627 | 10,246 |
| Insurance expenses | 11,115 | 9,087 |
| Recruitment expense | 10,818 | 6,975 |
| Motor vehicle expenses | 6,415 | 5,093 |
| Communication expenses | 5,531 | 4,147 |
| Expected credit loss of trade receivables | 4,576 | 7,956 |
| Professional fees expenses | 4,202 | 4,931 |
| Printing and stationery | 3,798 | 3,514 |
| IT expenses | 3,070 | 2,472 |
| Others | 26,722 | 17,333 |
| | 1,659,092 | 1,303,212 |
| Allocated to: | | |
| Direct costs | 1,216,126 | 968,044 |
| General and administrative expenses | 442,966 | 335,168 |
| | 1,659,092 | 1,303,212 |

The classifications of the remaining expenses by nature recognised in the consolidated income statement are:

| | 2018 US$'000 | 2017 US$'000 |
|---|---|---|
| Transaction costs in respect of business combinations | 4,976 | 5,969 |
| Depreciation | 81,569 | 58,107 |
| Amortisation | 18,794 | 12,776 |
| Finance costs on borrowings | 104,405 | 63,792 |
| Interest on convertible bond and sukuk | 16,896 | – |
| Impairment of assets | 2,214 | 3,010 |
| Unamortised finance fees written off | 13,124 | 6,794 |
| | 241,978 | 150,448 |

### 9  Other Income
Other income includes US$ 55,309,000 (2017: US$ 47,106,000) relating to reimbursement of advertisement and promotional expenses incurred by the Group. Revenue is recognised following the formal acceptance of the Group's reimbursement claims by suppliers and is measured at the confirmed amount receivable.

This also includes an amount of US$ 6,424,000 (2017: US$ nil) in respect of contingent consideration which is released to consolidated income statement as relevant KPIs were not met (note 39).

### 10  Finance costs on borrowings

| | 2018 US$'000 | 2017 US$'000 |
|---|---|---|
| Bank interest | 95,017 | 53,142 |
| Bank charges | 5,570 | 3,866 |
| Financial instruments fair value adjustments | 1,273 | 4,772 |
| Amortisation and Re-measurement of option redemption liability (note 40) | 2,545 | 2,012 |
| | 104,405 | 63,792 |

## 11 Interest on bond and sukuk

| | 2018 US$'000 | 2017 US$'000 |
|---|---|---|
| Interest on convertible bond | 14,159 | - |
| Interest on sukuk | 2,737 | - |
| | 16,896 | - |

## 12 Finance income

| | 2018 US$'000 | 2017 US$'000 |
|---|---|---|
| Bank and other interest income | 3,372 | 2,067 |
| Financial instruments fair value adjustments | 2,457 | 5,420 |
| | 5,829 | 7,487 |

## 13 Profit for the year before tax

The profit for the year before tax is stated after charging:

| | 2018 US$'000 | 2017 US$'000 |
|---|---|---|
| Cost of inventories recognised as an expense | 690,191 | 571,953 |
| Cost of inventories written off and provided (note 21) | 2,241 | 2,346 |
| Minimum lease payments recognised as operating lease expense | 100,847 | 76,168 |
| Depreciation (note 18) | 81,569 | 58,107 |
| Amortisation (note 19) | 18,794 | 12,776 |
| Net Impairment of accounts receivable (note 22) | 4,576 | 7,956 |
| Employees' end of service benefits (note 29) | 13,742 | 11,106 |
| Net foreign exchange loss/(gain) | 1,091 | (550) |
| Loss on disposal of property and equipment | 107 | 190 |
| Share based payments expense (note 35) | 9,704 | 9,181 |

## 14 Auditor's remuneration

The Group paid the following amounts to its auditor and its associates in respect of the audit of the financial statements and for other services provided to the Group.

| | 2018 US$'000 | 2017 US$'000 |
|---|---|---|
| Fees payable to the Company's auditor for the audit of the Company's annual accounts | 1,096 | 1,008 |
| Fees payable to the Company's auditor and its associates for other services: | | |
| - the audit of the company's subsidiaries pursuant to legislation | 2,609 | 902 |
| - audit related assurance services | 346 | 258 |
| - other assurance services | - | - |
| - Tax compliances services | - | - |
| - Tax advisory services | - | - |
| - non audit services | 984 | 891 |
| | 5,035 | 3,059 |

The fees paid to the auditor includes US$ 100,000 (2017: US$ 100,000) in respect of out of pocket expenses. There were no benefits in kind provided to the auditor or its associates in either 2018 or 2017.

Exhibit 6 to B.R. Shetty's Request for Judicial Notice      137 of 182      Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

## Notes to the Consolidated Financial Statements continued
At 31 December 2018

### 15 Staff costs and directors' emoluments
**(a) Staff costs**

| | 2018 US$'000 | 2017 US$'000 |
|---|---|---|
| Wages and salaries | 589,413 | 445,181 |
| Employees' end of service benefits (note 29) | 13,742 | 11,106 |
| Staff medical expense | 11,819 | 8,865 |
| Share based payments expense (note 35) | 9,704 | 9,181 |
| Others | 27,122 | 18,460 |
| | 651,800 | 492,793 |

Staff costs include amounts paid to directors, disclosed in part (b) below. The average number of monthly employees during the year was made up as follows:

| | 2018 | 2017 |
|---|---|---|
| Healthcare | 16,974 | 11,215 |
| Distribution & services | 2,206 | 2,170 |
| Administration | 377 | 287 |
| | 19,557 | 13,672 |

**(b) Directors' remuneration**

| | 2018 US$'000 | 2017 US$'000 |
|---|---|---|
| Directors' remuneration | 15,658 | 11,546 |

Some of the executive directors are entitled to end of service benefits and to participate in share option plans as disclosed in note 35. Included in directors' remuneration is an amount of US$ 8,139,000 (2017: US$ 6,115,000) in respect of cost of providing share options. Further information in respect of this compensation paid to directors is disclosed in the Directors' Remuneration Report.

### 16 Tax
The Group operates in the United Arab Emirates, Spain, the UK and other jurisdictions. No deferred tax asset has been recognised in respect of the estimated unused tax losses due to the unpredictability of future profit streams. Included in unrecognised tax losses are losses of approximately US$94,320,041 (2017: US$46,549,000) that may be carried forward indefinitely. Additionally the group has unrecognized Zakat losses in Saudi Arabia of US$48,712,269 which have not been recognized for deferred tax purposes.

With respect to Group operations in Europe, UK, KSA, and South America the tax disclosures are as follows:

| Consolidated income statement | 2018 US$'000 | 2017 US$'000 |
|---|---|---|
| **Current income tax:** | | |
| Charge for the year | 5,461 | 3,606 |
| Adjustment in respect of charge for the year | 13 | - |
| | 5,474 | 3,606 |
| **Deferred tax:** | | |
| Charge on profit origination and reversal of temporary differences in the current year | (532) | (2,361) |
| **Income tax charge reported in the income statement** | 4,942 | 1,245 |

Reconciliation of tax expense and the accounting profit multiplied by the Spanish domestic tax rate of 25% (2017: 24.9%) is represented below:

| | 2018 US$'000 | 2017 US$'000 |
|---|---|---|
| Group accounting profit before tax from continuing operations for the year | 256,851 | 210,426 |
| Less: Accounting profit before tax from continuing operations (not subject to tax) | 259,197 | 192,659 |
| Accounting profit before tax from continuing operations (subject to tax) | (2,346) | 17,767 |
| Tax at the rate of 25.0 % (2017: 24.9%) | (586) | 4,416 |
| Non-taxable dividend income | – | (1,880) |
| Tax saved on amortization of intangibles | – | (591) |
| Adjustment in respect of prior period income tax | 13 | – |
| Different tax rates on overseas earnings | 275 | (87) |
| Expenses not deductible for tax purposes and other permanent differences | 224 | – |
| Deductible expenses for tax purpose: | | |
| R&D and IT | (327) | (543) |
| Other deductible expenses | – | (70) |
| Gain not subject to tax | (1,407) | – |
| Losses not previously recognized for deferred tax | 6,750 | – |
| Income tax charged reported in the income statement | 4,942 | 1,245 |

The effective tax rate of the Group is 1.92% (2017: 0.59%).

**Deferred tax assets and liabilities comprise of:**

Deferred tax assets:

| | 2018 US$'000 | 2017 US$'000 |
|---|---|---|
| Tax credit for R&D expenses | 924 | 1,226 |
| Limit on tax deductibility of depreciation and amortisation | 4,327 | 2,192 |
| Provisions disallowed for tax | 523 | – |
| Others | 20 | – |
| Total deferred tax assets | 5,794 | 3,418 |

Deferred tax liabilities:

| | 2018 US$'000 | 2017 US$'000 |
|---|---|---|
| Depreciation and amortization | 17,745 | 9,693 |
| Total deferred tax liabilities | 17,745 | 9,693 |

| Reconciliation of deferred tax liabilities, net | 2018 US$'000 | 2017 US$'000 |
|---|---|---|
| As of 1 January | 6,275 | 6,110 |
| Tax (credit) for the year | 150 | (2,361) |
| Adjustment to prior year business combination | 5,526 | 1,359 |
| Foreign exchange adjustments | – | 1,167 |
| As at 31 December | 11,951 | 6,275 |

Deferred tax assets are recognised to the extent that it is probable as supported by forecasts that future taxable profits will be available against which the temporary differences can be utilised.

Financial Statements

# Notes to the Consolidated Financial Statements continued
At 31 December 2018

## 17 Earnings per share (EPS)

Basic EPS amounts are calculated by dividing net profit for the year attributable to ordinary equity holders of the Parent Company by the weighted average number of ordinary shares outstanding during the year.

Diluted EPS amounts are calculated by dividing the profit attributable to ordinary equity holders of the parent by the weighted average number of ordinary shares outstanding during the year plus the weighted average number of ordinary shares that would be issued on conversion of all the dilutive potential ordinary shares into ordinary shares.

The following reflects the income and share data used in the basic and diluted earnings per share computations:

|  | 2018 | 2017 |
|---|---|---|
| Profit attributable to equity holders of the Parent (US$'000) | 248,653 | 185,970 |
| Weighted average number of ordinary shares in issue ('000) for basic EPS | 207,888 | 204,302 |
| Effect of dilution from share based payments ('000) | 1,401 | 1,538 |
| Weighted average number of ordinary shares ('000) for diluted EPS | 209,289 | 205,840 |
| Basic earnings per share (US$) | 1.196 | 0.910 |
| Diluted earnings per share (US$) | 1.188 | 0.903 |

Convertible bond has anti-dilutive effect, accordingly it is not considered for the calculations of diluted EPS.

The table below reflects the income and share data used in the adjusted earnings per share computations. Unamortized finance fees written off, transaction costs in respect of business combination, amortisation of acquired intangible assets (net of tax), impairment of assets and gain from bargain purchase on acquisition have been adjusted from the profit attributable to the equity holders of the parent to arrive at the adjusted earnings per share:

|  | 2018 US$'000 | 2017 US$'000 |
|---|---|---|
| Profit attributable to equity holders of the Parent | 248,653 | 185,970 |
| Unamortised finance fees written off | 13,124 | 6,794 |
| Transaction costs in respect of business combinations | 4,976 | 5,969 |
| Amortisation of acquired intangible assets (net of tax) | 15,346 | 11,606 |
| Impairment of assets | 2,214 | 3,010 |
| Gain from bargain purchase on acquisition | (5,628) | - |
| Adjusted profit attributable to equity holders of the Parent | 278,685 | 213,349 |
| Weighted average number of ordinary shares ('000) | 209,289 | 205,840 |
| Diluted adjusted earnings per share (US$) | 1.332 | 1.036 |

Adjusted profit for the year of the Group is calculated as follows:

|  | 2018 US$'000 | 2017 US$'000 |
|---|---|---|
| Profit for the year | 251,909 | 209,181 |
| Unamortised finance fees written off | 13,124 | 6,794 |
| Transaction costs in respect of business combinations | 4,976 | 5,969 |
| Amortisation of acquired intangible assets (net of tax) | 16,946 | 11,606 |
| Impairment of assets | 2,214 | 3,010 |
| Gain from bargain purchase on acquisition | (5,628) | - |
| Adjusted profit | 283,541 | 236,560 |

## 18 Property and equipment

Property and equipment consists of the following:

|  | 2018 US$'000 | 2017 US$'000 |
|---|---|---|
| Property and equipment | 829,900 | 607,092 |
|  | 829,900 | 607,092 |

| | Freehold land US$'000 | Hospital building US$'000 | Buildings US$'000 | Leasehold improvements US$'000 | Motor vehicles US$'000 | Furniture, fixtures fittings and medical equipment US$'000 | Capital work in progress US$'000 | Total US$'000 |
|---|---|---|---|---|---|---|---|---|
| **31 December 2018** | | | | | | | | |
| Cost: | | | | | | | | |
| At 1 January 2018 | 32,952 | 235,768 | 27,171 | 184,676 | 13,758 | 312,018 | 35,387 | 841,730 |
| Additions | 5,124 | 231 | 362 | 11,865 | 3,725 | 51,050 | 87,865 | 160,222 |
| Relating to acquisition of subsidiaries | 1,076 | 10,787 | 10,526 | 37,198 | 718 | 79,464 | 11,511 | 151,280 |
| Transfer from CWIP | – | 4,659 | – | 13,856 | – | 1,588 | (20,103) | – |
| Impairments | – | – | – | – | – | – | (431) | (431) |
| Reclassification | – | (997) | – | – | – | 547 | – | (450) |
| Exchange difference | – | 75 | (311) | (239) | (30) | (5,556) | (59) | (6,120) |
| Disposals | – | – | – | (129) | (768) | (1,900) | (72) | (2,869) |
| At 31 December 2018 | 39,152 | 250,523 | 37,748 | 247,227 | 17,403 | 437,211 | 114,098 | 1,143,362 |
| Depreciation: | | | | | | | | |
| At 1 January 2018 | – | 15,613 | 9,869 | 62,859 | 7,825 | 138,472 | – | 234,638 |
| Charge for the year | – | 7,470 | 1,764 | 23,007 | 2,418 | 46,910 | – | 81,569 |
| Reclassification | – | (516) | – | – | – | 376 | – | (140) |
| Adjustment to prior year (note 5) | – | – | – | – | 11 | 1,344 | – | 1,355 |
| Exchange difference | – | (3) | (108) | (30) | (1) | (1,564) | – | (1,706) |
| Disposals | – | – | – | (117) | (690) | (1,447) | – | (2,254) |
| At 31 December 2018 | – | 22,564 | 11,525 | 85,719 | 9,563 | 184,091 | – | 313,462 |
| Net carrying amount: At 31 December 2018 | 39,152 | 227,959 | 26,223 | 161,508 | 7,840 | 253,120 | 114,098 | 829,900 |

Reclassification represents amounts wrongly included in hospital building for furniture and software which are now reclassified to respective categories.

| | Freehold land US$'000 | Hospital building US$'000 | Buildings US$'000 | Leasehold improvements US$'000 | Motor vehicles US$'000 | Furniture, fixtures fittings and medical equipment US$'000 | Capital work in progress US$'000 | Total US$'000 |
|---|---|---|---|---|---|---|---|---|
| **31 December 2017** | | | | | | | | |
| Cost: | | | | | | | | |
| At 1 January 2017 | 19,206 | 137,321 | 26,991 | 172,612 | 11,108 | 246,113 | 22,981 | 636,332 |
| Additions | – | 224 | 180 | 4,122 | 3,110 | 24,420 | 31,392 | 63,448 |
| Relating to acquisition of subsidiaries | 13,746 | 88,337 | – | 3,157 | 85 | 36,491 | 1,166 | 142,982 |
| Transfer from CWIP | – | 9,946 | – | 4,893 | – | 4,303 | (19,142) | – |
| Impairments | – | – | – | – | – | – | (1,010) | (1,010) |
| Exchange difference | – | (60) | – | – | (545) | 1,401 | 57 | 1,398 |
| Disposals | – | – | – | (108) | (710) | – | (57) | (1,420) |
| At 31 December 2017 | 32,952 | 235,768 | 27,171 | 184,676 | 13,758 | 312,018 | 35,387 | 841,730 |
| Depreciation: | | | | | | | | |
| At 1 January 2017 | – | 10,511 | 8,793 | 44,093 | 6,755 | 106,842 | – | 176,994 |
| Charge for the year | – | 5,110 | 1,076 | 18,811 | 1,581 | 31,529 | – | 58,107 |
| Exchange difference | – | (8) | – | – | – | 687 | – | 679 |
| Disposals | – | – | – | (45) | (511) | (586) | – | (1,142) |
| At 31 December 2017 | – | 15,613 | 9,869 | 62,859 | 7,825 | 138,472 | – | 234,638 |
| Net carrying amount: At 31 December 2017 | 32,952 | 220,155 | 17,302 | 121,817 | 5,933 | 173,546 | 35,387 | 607,092 |

The carrying value of plant and equipment held under finance lease contracts at 31 December 2018 was US$ 5,587,000 (2017: Nil). Leased assets are pledged as security for the related finance lease liabilities.

As part of the Group's capital expenditure programme, borrowing costs of US$ 238,000 (2017: US$ nil) have been capitalised during the year. The rate used to determine the amount of borrowing costs eligible for capitalisation was 5.09% (2017: Nil%) which is the effective rate of the borrowings used to finance the capital expenditure. Companies in the UAE are not subject to taxation and as such there is no tax relief in respect of capitalised interest.

Total capital expenditure during the year ended 31 December 2018 was US$160,222,000 (2017: US$63,448,000). Of the total capital expenditure spend during the year, US$ 87,865,000 (2017: US$31,392,000) related to new capital projects and US$72,357,000 (2017: US$32,056,000) related to further capital investment in our existing facilities.

NMC Health plc Annual Report and Accounts 2018    137

Exhibit 6 to B.R. Shetty's Request for Judicial Notice        141 of 182        Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

# Notes to the Consolidated Financial Statements continued
## At 31 December 2018

### 18  Property and equipment continued

Generally hospital and distribution operations are carried out on land and buildings which are leased from Government authorities or certain private parties. The majority of the lease periods range from five to twenty seven years apart from New Medical Centre Hospital LLC-Dubai ('Dubai General Hospital'), and the warehouse facilities which have leases renewable on an annual basis (note 2.3). As at 31 December 2018 US$370,000 (2017: US$569,000) of the amounts included in property and equipment related to assets with annually renewable leases.

In accordance with the local laws, except in some specific locations in the UAE the registered title of land and buildings must be held in the name of a UAE national. As a result, land and buildings of the Group are legally registered in the name of shareholders or previous shareholders of the Group. Land with a carrying amount of US$4,144,000 (31 December 2017: US$4,144,000) is held in the name of a previous shareholder for the beneficial interest of the Group. As the beneficial interest of such land resides with the Group, these assets are recorded within land in the Group's consolidated financial statements. The directors take into account this local legal registration requirement, the Group's entitlement to the beneficial interest arising from these assets, as well as other general business factors, when considering whether such assets are impaired.

### 19  Intangible assets

| | Software US$'000 | Brands US$'000 | Patient relationship US$'000 | Database US$'000 | Goodwill US$'000 | Others US$'000 | Total US$'000 |
|---|---|---|---|---|---|---|---|
| **31 December 2018** | | | | | | | |
| Cost: | | | | | | | |
| At 1 January 2018 | 9,959 | 73,034 | 13,471 | 12,136 | 1,057,765 | 24,401 | 1,190,766 |
| Additions | 3,629 | 381 | – | – | – | 755 | 4,765 |
| Relating to acquisition of subsidiaries | 3,734 | 57,207 | 6,752 | – | 390,329 | 27,083 | 485,105 |
| Reclassification (note 18) | 450 | – | – | – | – | – | 450 |
| Adjustment to prior year business Combinations (Note 5) | – | – | – | – | 3,461 | – | 3,461 |
| Exchange difference | (319) | (1,536) | – | (413) | (11,264) | (443) | (13,975) |
| At 31 December 2018 | 17,453 | 129,086 | 20,223 | 11,723 | 1,440,291 | 51,796 | 1,670,572 |
| Amortisation: | | | | | | | |
| At 1 January 2018 | 4,950 | 13,738 | 4,490 | 2,159 | – | 8,525 | 33,862 |
| Charge for the year | 1,670 | 7,209 | 3,190 | 809 | – | 5,916 | 18,794 |
| Impairment | 1,783 | – | – | – | – | – | 1,783 |
| Reclassification (note 18) | 140 | – | – | – | – | – | 140 |
| Exchange difference | (55) | (1,572) | – | – | – | (830) | (2,457) |
| At 31 December 2018 | 8,488 | 19,375 | 7,680 | 2,968 | – | 13,611 | 52,122 |
| Net carrying amount: At 31 December 2018 | 8,965 | 109,711 | 12,543 | 8,755 | 1,440,291 | 38,185 | 1,618,450 |

| | Software US$'000 | Brands US$'000 | Patient relationship US$'000 | Database US$'000 | Goodwill US$'000 | Others US$'000 | Total US$'000 |
|---|---|---|---|---|---|---|---|
| **31 December 2017** | | | | | | | |
| Cost: | | | | | | | |
| At 1 January 2017 | 7,723 | 64,713 | 8,415 | 10,867 | 567,338 | 10,169 | 669,225 |
| Additions | 1,413 | – | – | – | – | – | 1,413 |
| Relating to acquisition of subsidiaries | 547 | 5,588 | – | – | 471,573 | 11,183 | 488,891 |
| Reclassification | – | (5,056) | 5,056 | – | – | – | – |
| Adjustment to prior year business Combinations (Note 5) | – | 3,824 | – | – | (693) | 1,818 | 4,949 |
| Exchange difference | 276 | 3,965 | – | 1,269 | 19,547 | 1,231 | 26,288 |
| At 31 December 2017 | 9,959 | 73,034 | 13,471 | 12,136 | 1,057,765 | 24,401 | 1,190,766 |
| Amortisation: | | | | | | | |
| At 1 January 2017 | 1,858 | 6,202 | 2,566 | 1,385 | – | 4,231 | 16,242 |
| Charge for the year | 1,044 | 5,353 | 1,924 | 774 | – | 3,681 | 12,776 |
| Impairment | 2,000 | – | – | – | – | – | 2,000 |
| Exchange difference | 48 | 2,183 | – | – | – | 613 | 2,844 |
| At 31 December 2017 | 4,950 | 13,738 | 4,490 | 2,159 | – | 8,525 | 33,862 |
| Net carrying amount: At 31 December 2017 | 5,009 | 59,296 | 8,981 | 9,977 | 1,057,765 | 15,876 | 1,156,904 |

Others include rental contracts, private contracts and non-compete arrangements.

Reclassification of US$5,056,000 in 2017 represents transfer of patient relationship incorrectly classified under brands in 2016.

**Goodwill**

Additions to goodwill in the year relate to goodwill measured in respect of the acquisitions of CosmeSurge, Boston IVF, Aesthetics, Al Salam, Al Rashid, CCSMC, EMC, Pro-Criar, FMC, Royal RAK, CREA, Sweden IVF, Premier, AVA, Mesk and Cytomed.

Goodwill is not amortised, but is reviewed annually for assessment of impairment in accordance with IAS 36. The Group performed its annual goodwill impairment test in December 2018 and 2017. Goodwill acquired through business combinations is allocated to the following operating segments representing a group of cash generating units (CGUs), which are also operating and reportable segments, for impairment testing:

· Healthcare
· Distribution and services

The healthcare CGU has goodwill allocated to it of US$ 1,416,246,000 at the year-end (2017: US$1,052,886,000). The distribution and services CGU has goodwill allocated to it of US$ 24,045,000 at the year-end (2017: US$4,879,000).

The recoverable amounts for both CGUs are based on value in use, which has been calculated using cash flow projections from financial budgets approved by senior management covering a five-year period. Cash flows from the sixth to tenth year period are extrapolated using a 3% growth rate (2017: 3%) which is significantly lower than the current annual growth rate of both CGUs. 0% growth rate is applied for cash flows beyond tenth year. The pre-tax discount rate applied to the to the cash flows of both CGUs is 9.71% (2017: 8.23%), which is based on the Group's weighted average cost of capital (WACC) and takes into account such measures as risk free rates of return, the Group's debt/equity ratio, cost of debt and local risk premiums specific to the CGUs. As a result of the analysis, there is headroom in both CGUs and no impairment has been identified. Reasonable sensitivities have been applied to each CGU's cash flows and the discount rates used, and in all cases the value in use continues to exceed the carrying amount of CGU goodwill.

The key assumptions on which management has based its cash flow projections for the six year period covered by the most recent forecasts are those related to growth in available beds, patient numbers for the healthcare segment and revenue from the distribution of products for the distribution and services segment. The assumptions made reflect past experience and are based on management's best estimate and judgment.

**Other acquired intangible assets**

Assets in this class are amortised over their estimated useful lives on a straight line basis. All amortisation charges for the year have been charged against operating profits.

Other than goodwill, the Group does not hold any intangible assets with an indefinite life.

Included in software are HIS and ERP projects amounting to US$ nil (2017: US$1,783,000) which are work-in-progress as of year-end. As of 31 December 2018, the Group has recorded accumulated impairment of US$ 3,783,000 (2017: US$ 2,000,000) against this.

**20  Loan receivable**

|  | 2018 US$'000 | 2017 US$'000 |
|---|---|---|
| Loan receivable | 2,001 | 32,187 |
|  | 2,001 | 32,187 |

In 2018, the Group acquired 100% voting shares of CCSMC by utilising the loan funded in prior years amounting US$32,187,000 and additional funding US$7,024,000 during the period and accordingly loan receivable was reclassified as investment in subsidiary.

In addition, the Group, invested US$2,001,000 in a technology company through a convertible promissory note. The note will attract interest at the rate of 6% p.a and will be repayable on demand or before 3rd March 2019. This investment will support NMC Healthcare to have a better service offerings in the UAE. As the instrument doesn't meet all the features of a puttable instrument to be classified as equity in the event of liquidation, we classified the above instrument as loan receivable.

## Notes to the Consolidated Financial Statements continued
At 31 December 2018

### 21 Inventories

|  | 2018 US$'000 | 2017 US$'000 |
|---|---|---|
| Pharma | 144,511 | 101,096 |
| Non pharma | 94,572 | 73,414 |
| Egg bank | 6,023 | 5,083 |
| Goods in transit | 693 | 1,440 |
| Other | 3,635 | 1,516 |
|  | 249,434 | 182,549 |
| Less: provision for slow moving and obsolete inventories | (2,128) | (1,219) |
|  | 247,306 | 181,330 |

The amount of write down of inventories recognised as an expense for the year ended 31 December 2018 is US$ 2,241,000 (2017: US$ 2,346,000). This is recognised in direct costs.

### 22 Accounts receivable and prepayments

|  | 2018 US$'000 | 2017 US$'000 |
|---|---|---|
| Accounts receivable | 542,221 | 440,146 |
| Receivable from suppliers for promotional expenses | 16,012 | 14,235 |
| Other receivables | 50,050 | 43,568 |
| Prepayments | 30,841 | 20,893 |
|  | 639,124 | 518,842 |

Receivables from suppliers relate to advertising and promotional expenses incurred by the Group.

Other receivable includes US$13,721,000 (2017 US$ 4,245,000) in respect of healthcare management fees.

Prepayments mainly includes rentals paid in advance and insurance prepayments.

Accounts receivable are stated net of provision for doubtful debts of US$30,013,000 (31 December 2017: US$15,747,000). During the year ended 31 December 2018, the Group has provided an additional provision based on IFRS 9 impact analysis US$17,231,000.

Movements in the provision for doubtful debts are as follows:

|  | 2018 US$'000 | 2017 US$'000 |
|---|---|---|
| At 1 January | 15,747 | 12,129 |
| IFRS 9 credit risk adjustment | 17,231 | - |
| At 1 January (adjusted) | 32,978 | 12,129 |
| Written off | (6,383) | (4,382) |
| Written back (note 13) | (811) | (2,056) |
| Reclassification | (1,314) | - |
| Charge for the year (note 13) | 5,387 | 10,012 |
| Exchange difference | 156 | 44 |
| At 31 December | 30,013 | 15,747 |

Reclassification represents rejection adjustment wrongly booked under provision for doubtful debt instead of accounts receivables.

The ageing of unimpaired accounts receivable is as follows:

| | Total US$'000 | Neither past due nor impaired US$'000 | Past due but not impaired | | | |
| | | | < 90 days US$'000 | 91-180 days US$'000 | 181-365 days US$'000 | >365 days US$'000 |
|---|---|---|---|---|---|---|
| **31 December 2018** | | | | | | |
| Accounts receivable | 542,221 | 345,108 | 117,029 | 34,552 | 21,254 | 24,278 |
| **31 December 2017** | | | | | | |
| Accounts receivable | 440,146 | 279,343 | 86,363 | 34,302 | 24,435 | 15,703 |

Unimpaired receivables are expected, on the basis of past experience, to be fully recoverable. It is not the practice of Group to obtain collateral over receivables and they are therefore unsecure. As at 31 December 2018 accounts receivables of US$30,013,000 (2017: US$15,747,000) were impaired and fully provided for.

Credit risk is managed through the Group's established policy, procedures and controls relating to credit risk management (note 36). A majority of the receivables that are past due but not impaired are from insurance companies and government-linked entities in the United Arab Emirates which are inherently slow payers due to their long invoice verification and approval of payment procedures. Payments continue to be received from these customers and accordingly the risk of non-recoverability is considered to be low.

Of the net trade receivables balance of US$ 542,221,000 (31 December 2017: US$440,146,000) an amount of US$287,038,000 (2017: US$ 226,298,000) is against five customers.

The Group's terms require receivables to be repaid within 90-120 days depending on the type of customer, which is in line with local practice in the UAE. Due to the long credit period offered to customers, a significant amount of trade accounts receivable are neither past due nor impaired.

Amounts due from related parties amounting to US$ 7,346,000 (31 December 2017: US$1,776,000) as disclosed on the face of the consolidated statement of financial position are trading in nature and arise in the normal course of business.

Included in other receivables is an amount of US$nil (2017:US$5,245,000) receivable from entities owned by a non-controlling interest.

### 23  Cash and cash equivalents

Cash and cash equivalents included in the consolidated statement of cash flows comprise of the following:

| | 2018 US$'000 | 2017 US$'000 |
|---|---|---|
| Bank deposits | 167,156 | 185,611 |
| Bank balances and cash | 324,027 | 202,002 |
| Bank overdrafts and other short-term borrowings | (168,950) | (207,034) |
| | 322,233 | 180,579 |
| Adjustments for: | | |
| Short term borrowings | 112,056 | 139,086 |
| Bank deposits maturing in over 3 months | (112,916) | (69,088) |
| Restricted cash | (13,297) | (44,115) |
| Cash and cash equivalents | 308,076 | 206,462 |

Bank deposits of US$ 167,156,000 (31 December 2017: US$ 185,611,000) are with commercial banks. These are mainly denominated in UAE Dirhams and Euro and earn interest at the respective deposit rates. These deposits have original maturity between 1 to 12 months (31 December 2017: 1 to 12 months).

Short term borrowings include trust receipts and invoice discounting facilities which mature between 90 and 180 days. Trust receipts are short term borrowings to finance purchases. The bank overdrafts and short-term borrowings are secured by corporate Guarantees and personal guarantees of few of the major shareholders of the parent company and carry interest at EIBOR plus margin rates ranging from 1% to 4%. (31 December 2017: 1% to 4%).

# Notes to the Consolidated Financial Statements continued
## At 31 December 2018

### 24  Share capital
**31 December 2018**

| | Number of shares (thousands) | Ordinary shares US$'000 | Share premium US$'000 | Total US$'000 |
|---|---|---|---|---|
| **Issued and fully paid** *(nominal value 10 pence sterling each)* | 208,237 | 32,443 | 633,744 | 666,187 |

**31 December 2017**

| | Number of shares (thousands) | Ordinary shares US$'000 | Share premium US$'000 | Total US$'000 |
|---|---|---|---|---|
| **Issued and fully paid** *(nominal value 10 pence sterling each)* | 204,423 | 31,928 | 492,634 | 524,562 |

**Issued share capital and share premium movement**

| | Number of shares (thousands) | Ordinary shares US$'000 | Share premium US$'000 | Total US$'000 |
|---|---|---|---|---|
| **31 December 2018** | | | | |
| At 1 January 2018 | 204,423 | 31,928 | 492,634 | 524,562 |
| Issue of new shares | 3,534 | 477 | 138,714 | 139,191 |
| Exercise of stock option shares | 280 | 38 | 2,396 | 2,434 |
| At 31 December 2018 | 208,237 | 32,443 | 633,744 | 666,187 |
| | | | | |
| **31 December 2017** | | | | |
| At 1 January 2017 | 204,285 | 31,910 | 491,778 | 523,688 |
| Exercise of stock option shares | 138 | 18 | 856 | 874 |
| At 31 December 2017 | 204,423 | 31,928 | 492,634 | 524,562 |

### 25  Group restructuring reserve
The group restructuring reserve arises on consolidation under the pooling of interests method used for group restructuring, which took place on 28 March 2012 when the Company became the holding company of NMC Healthcare LLC through its wholly owned subsidiaries, NMC Holding LLC and NMC Health Holdco Limited. Under this method, the group is treated as a continuation of the NMC Healthcare LLC group. The difference between the share capital of NMC Healthcare LLC (US$27,226,000) and the carrying amount of the investment in that company (US$37,227,000), which equates to the net assets of NMC Healthcare LLC at the date of reorganisation (28 March 2012), amounting to US$10,001,000(debit), is recorded on consolidation as a group restructuring reserve. This reserve is non-distributable.

### 26  Retained earnings
As at 31 December 2018, retained earnings of US$ 18,806,000 (2017: US$ 18,423,000) are not distributable. This relates to a UAE Companies Law requirement to set aside 10% of annual profit of all UAE subsidiaries until their respective reserves equal 50% of their paid up share capital. The subsidiaries discontinue such annual transfers once this requirement has been met.

### 27  Dividend
In the AGM on 28 June 2018 the shareholders approved a dividend of 13.0 pence per share, amounting to GBP 27,066,000 (US$ 35,739,000) to be paid to shareholders on the Company's share register on 15 June 2018 (30 June 2017: a dividend of GBP 21,753,000 equivalent to US$ 27,779,000 was approved on 23 May 2017 and paid on 1 June 2017). No interim dividend was declared during the year. Subject to shareholder' approval at the Annual General Meeting on 20 June 2019, a final dividend of 18.1 pence per share, GBP37,652,000 (US$49,731,000) will be paid on 10 July 2019 to shareholders on the Company's share register on 14 June 2019.

An amount of US$ 3,103,000 was paid during the year to non-controlling interest, out of which US$ 1,334,000 pertains to previous year dividend payable and US$ 1,769,000 pertains to current year's dividend.

In 2017, an amount US$ 21,160,000 was declared as dividend to non-controlling interest during the year, out of that US$5,303,000 was adjusted against related party receivable balance, US$14,523,000 was paid as dividend during the year and US$1,334,000 remained unpaid for the year ended 31 December 2017.

## 28  Term loans

| | 2018 US$'000 | 2017 US$'000 |
|---|---|---|
| Current portion | 379,919 | 204,154 |
| Non-current portion | 660,835 | 987,840 |
| | 1,040,754 | 1,191,994 |
| Amounts are repayable as follows: | | |
| Within 1 year | 379,919 | 204,154 |
| Between 1 - 2 years | 183,372 | 206,942 |
| Between 2 - 6 years | 477,463 | 780,898 |
| | 1,040,754 | 1,191,994 |

During the year, the Group entered a syndicated facility amounting to US$ 2.0 billion. The syndicated facility was used to settle an existing syndicated loan and for acquisition purposes. The facility is structured into three sub facilities, these sub facilities are completely repayable within 18-60 months. The facility is secured against corporate guarantee provided by NMC Health Plc and its certain operating subsidiaries. The facility carries interest at LIBOR plus margin.

In addition to the above facilities, term loans also include other long term and short-term revolving loans which get drawn down and repaid over the year. The Group has charged an amount of US$ 13,124,000 to the consolidated income statement with respect to unamortised transaction costs of existing debts which have been settled using proceeds of new syndicate loan.

## 29  Post employment benefit plans
### Employees end of service benefits

Movements in the provision recognised in the consolidated statement of financial position are as follows:

| | 2018 US$'000 | 2017 US$'000 |
|---|---|---|
| Balance at 1 January | 48,279 | 30,208 |
| Charge for the year | 13,742 | 11,106 |
| Actuarial gain | (3,429) | (1) |
| Transfer from related party | (76) | 180 |
| Exchange difference | (4) | - |
| Employees' end of service benefits paid | (7,954) | (3,447) |
| Addition from business combinations | 11,128 | 10,233 |
| Balance at 31 December | 61,686 | 48,279 |
| Current | 6,549 | 6,905 |
| Non-current | 55,137 | 41,374 |
| Balance at 31 December | 61,686 | 48,279 |
| Charge for the year comprise of the following: | | |
| Current service cost | 11,916 | 10,173 |
| Interest cost | 1,826 | 933 |
| Balance at 31 December | 13,742 | 11,106 |

Management engaged an actuary to carry out an exercise to assess the present value of its obligation at 31 December 2018 and 2017, using the projected unit credit method, in respect of employees' end of service benefits payable under the UAE Labour Law.

During the current year, the Group has recognised an actuarial gain of US$ 3,429,000 (31 December 2017: gain of US$ 1,000) in other comprehensive income. Management has assumed an average length of service of 5 years (2017: 5 years) and increment/promotion costs of 2.25% (2017: 1.5%). The expected liability at the date of employees' leaving service has been discounted to its net present value using a discount rate of 3.75% (2017: 2.5%). Management also performed a sensitivity analysis for changes in discount rate and increment costs; the results of this analysis showed that none of the factors had any material impact on the actuarial valuation.

Financial Statements

# Notes to the Consolidated Financial Statements continued
At 31 December 2018

### 29  Post employment benefit plans continued
**Defined benefit plan**

The Group has a defined pension benefit plan in the UK which is funded. The level of benefits provided depends on the member's length of service and salary at retirement age. This plan is governed by the employment laws of the UK.

The following tables summarise the components of net benefit expense recognised in the statement of profit or loss and recognised in other comprehensive income.

### Net benefit expense (recognized in profit or loss)

|  | US$'000 |
|---|---|
| Service cost | – |
| Net interest on net defined benefit liability/(asset) | (26) |
| Administration expenses | – |
| Past service cost | 50 |
| Impact of surplus restriction | 26 |
| **Profit and loss charge** | 50 |

### Total amount recognised in other comprehensive income

|  | US$'000 |
|---|---|
| Return less interest income on scheme assets | (1,385) |
| Remeasurement gain/(loss) | 1038 |
| Impact of surplus restriction | 26 |
| Impact of liability future employer contributions | (390) |
| Change in unrecognised surplus | 313 |
| **(Loss) recorded in OCI** | (398) |

As at 31 December 2018, the fair value of the schemes assets amounted to US$ 17,777,000 and the present value of its defined benefit obligations amounted to US$17,097,000.

The changes in fair value of scheme assets and in the defined benefit obligation were:

| Changes in fair values of scheme assets | US$'000 |
|---|---|
| Fair value of scheme assets at start of period | 20,211 |
| Interest income on scheme assets | 451 |
| Return on schemes assets (excluding interest income) | (1,240) |
| Contributions by the employer | 52 |
| Benefits paid | (583) |
| Exchange rate differences | (1,114) |
| **Fair value of scheme assets at end of period** | 17,777 |

| Changes in the defined benefit obligation | US$'000 |
|---|---|
| Defined benefit obligation at start of period | 19,194 |
| Service cost | – |
| Interest cost on defined benefit obligation | 428 |
| Benefit paid | (583) |
| Past service costs | 45 |
| Remeasurement loss/(gain): |  |
|   Changes in financial assumptions | (891) |
|   Changes in demographic assumptions | (96) |
|   Experience adjustments | 55 |
| Exchange rate differences | (1,055) |
| **Defined benefit obligation at end of period** | 17,097 |

Exhibit 6 to B.R. Shetty's Request for Judicial Notice          148 of 182          Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

The principal assumptions used in determining pension and post-employment medical benefit obligations for the Group's plans are shown below:

| | 31 December 2018 % per annum |
|---|---|
| Discount rate | 2.8 |
| Price inflation: | |
| - RPI | 3.6 |
| - CPI | 2.6 |
| Deferred pension increases (non-GMP) | 2.6 |
| Pension increases in payment: | |
| - GMPs accrued from 6 April 1988 to 5 April 1997 | 2.2 |
| - Non-GMPs accrued to 5 April 1997 | 3.0 |
| - Pensions accrued 6 April 1997 to 5 February 2001 | 3.0 |
| - Pensions accrued 6 February 2001 to 5 April 2005 | 2.6 |
| - Pensions accrued from 6 April 2005 | 2.0 |

| | 31st December 2018 |
|---|---|
| Retirements | Each tranche of pension is assumed to be payable from the earliest age it can be taken without reduction or consent |
| Mortality • Base table • Future improvements • Long term rate | 100% S2PA CMI 2017 Core 1% |
| Commutation | 25% of pension |
| Marital Status | 90% married at date of retirement or earlier death |
| Age difference | +/- 3 years |

| | 31 December 2018 % per annum |
|---|---|
| Discount rate | 2.8 |
| Rate of price inflation: | |
| - RPI | 3.6 |
| - CPI | 2.6 |
| Rate of increase for non-GMP pensions in deferment | 2.6 |
| Rate of increase for pensions in payment: | |
| - GMP accrued 6 April 1988 to 5 April 1997 | 2.2 |
| - Non-GMP accrued to 5 April 1997 | 3.0 |
| - Pension accrued 6 April 1997 to 5 February 2001 | 3.0 |
| - Pension accrued 6 February 2001 to 5 April 2005 | 2.6 |
| - Pension accrued from 6 April 2005 | 2.0 |

| | 31 December 2018 % per annum |
|---|---|
| Mortality: | |
| - Base table | 100% S2PA |
| - Future improvements | CMI 2017 |
| - Long term rate | Core 1% |
| Expected future lifetime from age 65: | |
| - Male currently aged 65 | 21.8 |
| - Female currently aged 65 | 23.7 |
| - Male currently aged 45 | 22.9 |
| - Female currently aged 45 | 25.0 |

Exhibit 6 to B.R. Shetty's Request for Judicial Notice          149 of 182          Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

# Notes to the Consolidated Financial Statements continued
At 31 December 2018

## 30  Accounts payable and accruals

|  | 2018 US$'000 | 2017 US$'000 |
|---|---|---|
| Trade accounts payable | 200,123 | 152,811 |
| Accrued interest | 5,794 | 2,681 |
| Accrued expenses | 23,276 | 9,921 |
| Contract liabilities | 8,715 | 3,040 |
| Others | 79,679 | 41,017 |
|  | 317,587 | 209,470 |

Trade and other payables are non-interest bearing and are normally settled on 50-60 day terms.

Included in others is an amount of US$ 46,024,000 (2017: US$ 17,596,000) in respect of lease payable. Further it includes advances from customers, deposits payable and certain other payables.

## 31  Other payables

|  | 2018 US$'000 | 2017 US$'000 |
|---|---|---|
| Contingent consideration payable for acquisitions (note 39) | 17,240 | 10,519 |
| Deferred consideration payable for acquisitions | 1,671 | 5,307 |
| Other payable | 3,584 | 41,268 |
|  | 22,495 | 57,094 |
| Classification of other payables into current and non-current is as follows: |  |  |
| Current | 6,806 | 18,110 |
| Non-current | 15,689 | 38,984 |
|  | 22,495 | 57,094 |

Post-dated cheques liability and related indemnified asset recognized on acquisition of Fakih IVF in 2016 has been reversed during the year, as both liability and indemnified asset were relating to Fakih Medical Center which has become now part of the Group. Carrying value of the liability and asset as of 31 December 2017 was US$ 40,068,000. It was classified as other liabilities and other assets in previous year.

## 32  Finance lease liability
The Group has finance leases for various items of property and equipment. The Group's obligations under finance leases are secured by the lessor's title to the leased assets. Future minimum lease payments under finance leases, together with the present value of the net minimum lease payments are, as follows:

|  | 2018 | | 2017 | |
|---|---|---|---|---|
|  | Minimum payments US$'000 | Present value of payments US$'000 | Minimum payments US$'000 | Present value of payments US$'000 |
| Within one year | 2,176 | 1,684 | – | – |
| After one year but not more than five years | 3,788 | 2,926 | – | – |
| More than five years | 94 | 69 | – | – |
| Total minimum lease payments | 6,058 | 4,679 | – | – |
| Less amounts representing finance charges | (1,379) | – | – | – |
| Present value of minimum lease payments | 4,679 | 4,679 | – | – |

### 33  Convertible bond and sukuk

**Convertible bond**

At 31 December 2018, there were 2,250 convertible bond units in issue. Each bond has a par value of US$ 200,000. The bonds carry a coupon rate of 1.875% per annum, payable half-yearly in arrears on 30 April and 31 October. The bonds were issued on 30 April 2018.

Unless the bondholders exercise the option to convert to shares, bond will be redeemed by cash on 02 May 2023 or maturity. The bonds are convertible (at any time between 11 June 2018 and their maturity date, 02 May 2025) into a fixed number of ordinary shares of the parent of the Group on the basis of a fixed exchange price of US$ 72.7301.

The convertible bonds are separated into liability and equity components based on the terms of the contract. As of 31 December 2018, the fair value of the liability component is US$ 387,664,000 (net of transaction costs) is recorded as liability and residual amount of US$ 66,034,000 recorded as equity component.

**Sukuk**

On 21 November 2018, the Group issued US$400,000,000 Sukuk certificates ("Islamic finance") with maturity for payment on 2023. Sukuk carry a profit rate of 5.950%, payable half-yearly in arrears on 21 May and 21 November. The facility is secured against corporate guarantee provided by NMC Health Plc and its certain operating subsidiaries.

### 34  Related party transactions

These represent transactions with related parties, including major shareholders and senior management of the Group, and entities controlled, jointly controlled or significantly influenced by such parties, or where such parties are members of the key management personnel of the entities. Pricing policies and terms of all transactions are approved by the management of the Group.

The Company's immediate and ultimate controlling party is a group of three individuals (H.E. Saeed Bin Butti, Dr BR Shetty and Mr Khalifa Bin Butti) who are all shareholders and of whom two are directors of the Company and who together have the ability to control the Company. As the immediate and ultimate controlling party is a group of individuals, it does not produce consolidated financial statements.

**Relationship agreement**

The Controlling Shareholders and the Company have entered into a relationship agreement, the principal purpose of which is to ensure that the Company is capable of carrying out its business independently of the Controlling Shareholders and that transactions and relationships with the Controlling Shareholders are at arm's length and on a normal commercial basis.

In accordance with the terms of the relationship agreement, the Controlling Shareholders have a collective right to appoint a number of Directors to the Board depending upon the level of their respective shareholdings. This entitlement reduces or is removed as the collective shareholdings reduce. The relationship agreement includes provisions to ensure that the Board remains independent.

Transactions with related parties included in the consolidated income statement are as follows:

| | 2018 US$'000 | 2017 US$'000 |
|---|---|---|
| **Entities significantly influenced by a shareholder who is a key management personnel in NMC management personnel in NMC.** | | |
| Sales | 149 | 40 |
| Purchases of healthcare inventory* | 130,106 | 78,778 |
| Rent charged | 288 | 353 |
| Other income | 5,082 | 1,883 |
| Management fees | 10,700 | 1,776 |

Amounts due from and due to related parties disclosed in the consolidated statement of financial position are as follows:

| | 2018 US$'000 | 2017 US$'000 |
|---|---|---|
| **Entities significantly influenced by a shareholder who is a key management personnel in NMC** | | |
| Amounts due to related parties* | 47,737 | 28,472 |
| Amounts due from related parties | 7,346 | 1,776 |

\*    Purchase of healthcare inventory are made at a price fixed by the regulator.

# Notes to the Consolidated Financial Statements continued
## At 31 December 2018

### 34 Related party transactions continued
**Relationship agreement continued**

Outstanding balances with related parties at 31 December 2018 and 31 December 2017 were unsecured, payable on 50-60 days term and carried interest at 0% (31 December 2017: 0%) per annum. Settlement occurs in cash.

Pharmacy licenses in UAE under which the Group sells its products, are granted to the shareholders or directors of the Company, who are UAE nationals. No payments are made in respect of these licenses to shareholders or directors.

**Compensation of key management personnel**

|  | 2018 US$'000 | 2017 US$'000 |
|---|---|---|
| Short term benefits | 18,656 | 15,142 |
| Employees' end of service benefits | 47 | 24 |
| | 18,703 | 15,166 |

The key management personnel include all the Non-Executive Directors, the three (31 December 2017: three) Executive Directors and four (31 December 2017: four) senior management personnel.

During the year additional shares of 232,601 amounting to US$ 9,385,000 (31 December 2017: 833,284 shares amounting to US$ 18,725,000) were granted to Executive Directors and other senior management in the form of share options.

One individual (31 December 2017: one) who is a related party of one of the shareholders is employed by the Group. The total compensation for employment received by that related party in the year ended 31 December 2018 amounts to US$ 2,729,000 (31 December 2017: US$2,286,000).

As discussed in Note 5, on 18 January 2018, the Group agreed to acquire 70% controlling stake of CosmeSurge, Aesthetic and Wellness from a related party who is also an executive director in the Company. CosmeSurge, Aesthetic and Wellness are an industry leader in the UAE in providing quality cosmetic surgery and aesthetic medicine. The agreed arm's length purchase consideration for these entities was US$170m which has been fully paid during the year and was determined based on valuation done by the management.

In 2018 asset held for sale was sold for a consideration of US$ 9,244,000 to a related party (note 42).

Land with a carrying amount of US$4,144,000 (31 December 2017: US$4,144,000) is held in the name of a previous shareholder for the beneficial interest of the Group (Note 18).

### 35 Share based payments

The Group currently operates two share option schemes:

**Long term incentive plan (LTIP)**

Options awarded under the LTIP are made annually to Executive Directors and other senior management. The exercise prices are nil. Options have a life of ten years and a vesting period of three years. The LTIP is subject to performance conditions which can be found in the Directors' Remuneration Report in the Annual Report.

**Short term incentive plan (STIP)**

Options awarded under the STIP are made annually to Executive Directors and other senior management. The exercise prices are nil. Options have a life of ten years and a vesting period of 3 years.

Fair values are determined using the Black-Scholes model. Expected volatility has been based on historical volatility over the period since the Company's shares have been publicly traded.

Administrative expenses include a charge of US$ 9,704,000 (2017: US$ 9,181,000) in respect of the cost of providing share options. The cost is calculated by estimating the fair value of the option at grant date and spreading that amount over the vesting period after adjusting for an expectation of non-vesting.

For options granted in the years ended 31 December 2017 and 2018, the fair value per option granted and the assumptions used in the calculation are as follows:

| | 2018 STIP | 2017 STIP |
|---|---|---|
| Share price at grant date | £33.620 | £20.740 |
| Fair value at measurement date | £33.499 | £20.425 |
| Exercise price | £nil | £nil |
| Expected volatility | 40% | 40% |
| Expected option life | 1-2 years | 2 years |
| Expected dividend yield | 0.36% | 0.51% |
| Risk free interest rate | 2.42% | 1.57% |

| | 2018 LTIP | 2017 LTIP | 2017 LTIP2 |
|---|---|---|---|
| Share price at grant date | £33.620 | £16.330 | £27.390 |
| Fair value at measurement date | £33.259 | £16.082 | £27.088 |
| Exercise price | £nil | £nil | £nil |
| Expected volatility | 40% | 40% | 40% |
| Expected option life | 3 years | 3 years | 3 years |
| Expected dividend yield | 0.36% | 0.51% | 0.37% |
| Risk free interest rate | 2.42% | 1.49% | 1.38% |

Share prices at grant date are the closing prices as of those dates.

LTIP represent long term incentive plans and STIP represent short term incentive plans issued in March 2018.

The options existing at the year-end were as follows:

| | 2018 Number of shares | 2018 Exercise price | 2017 Number of shares | 2017 Exercise price | Period when exercisable |
|---|---|---|---|---|---|
| **Long term incentive plan (LTIP)** Oct-14 | 60,292 | £nil | 60,292 | £nil | 29/10/17 to 28/10/24 |
| **Short term incentive plan (STIP)** Oct-14 | 20,165 | £nil | 20,165 | £nil | 29/10/17 to 28/10/24 |
| **Long term incentive plan (LTIP)** Feb-15 | 69,615 | £nil | 221,539 | £nil | 25/02/18 to 24/02/25 |
| **Short term incentive plan (STIP)** Feb-15 | 25,240 | £nil | 74,801 | £nil | 25/02/18 to 24/02/25 |
| **Long term incentive plan (LTIP)** Sep-15 | 23,011 | £nil | 49,309 | £nil | 09/09/18 to 08/09/25 |
| **Long term incentive plan (LTIP)** Mar-16 | 383,717 | £nil | 383,717 | £nil | 15/03/19 to 14/03/26 |
| **Short term incentive plan (STIP)** Mar-16 | 68,151 | £nil | 68,151 | £nil | 15/03/19 to 14/03/26 |
| **Long term incentive plan (LTIP)** Jan-17 | 334,634 | £nil | 562,323 | £nil | 27/01/20 to 26/01/27 |
| **Short term incentive plan (STIP)** May-17 | 54,705 | £nil | 150,435 | £nil | 09/05/18 to 08/05/27 |
| **Long term incentive plan (LTIP)** Sep-17 | 120,526 | £nil | 120,526 | £nil | 07/09/20 to 06/09/27 |
| **Long term incentive plan (LTIP)** Mar-18 | 46,219 | £nil | nil | £nil | 08/03/21 to 08/03/28 |
| **Short term incentive plan (STIP)** Mar-18 | 186,382 | £nil | nil | £nil | 08/03/19 to 08/03/28 |
| Total options subsisting on existing ordinary shares | 1,392,657 | | 1,711,258 | | |
| Percentage of issued share capital | 0.70% | | 0.80% | | |

Financial Statements

# Notes to the Consolidated Financial Statements continued
At 31 December 2018

### 35  Share based payments continued
**Short term incentive plan (STIP) continued**
Movement of share options during the year is as follows:

|  | 2018 | 2017 |
|---|---|---|
| At 1 January | 1,711,258 | 1,013,822 |
| Vested in lieu of dividend | 2,047 | 2,290 |
| Granted during the year | 232,601 | 833,284 |
| Exercised during the year | (275,646) | (138,138) |
| Lapsed during the year | (227,689) | - |
| Outstanding at 31 December | 1,442,571 | 1,711,258 |

No options expired or forfeited during the year (2017: nil).

### 36  Financial risk management objectives and policies
The Group's principal financial liabilities comprise loans, convertible bond, sukuk and borrowings, contingent consideration on acquisition of subsidiaries, put option redemption liability and trade and other payables. The main purpose of these financial liabilities is to finance the Group's operations and acquisitions. The Group has accounts and other receivables, and cash and short-term deposits that arise directly from its operations.

The Group is exposed to interest rate risk, credit risk, liquidity risk and foreign currency risk. These risks and the Group's financial risk management objectives and policies are consistent with last year. The Group's exposure to foreign currency risk includes risk on the Group's net investment in foreign subsidiaries in Spain and certain other countries.

The Group's senior management oversees the management of these risks. The Board of Directors reviews and agrees policies for managing each of these risks which are summarised below.

**Interest rate risk**
Interest rate risk is the risk that the fair value or future cash flows of a financial instrument will fluctuate because of changes in market interest rates. The Group is exposed to interest rate risk on its interest bearing assets and liabilities (bank deposits, bank overdrafts and other short term borrowings and term loans). Management is of the opinion that the Group's exposure to interest rate risk is limited.

The following table demonstrates the sensitivity of the consolidated income statement to reasonably possible changes in interest rates, with all other variables held constant. The sensitivity of the consolidated income statement is the effect of the assumed changes in interest rates on the Group's profit for the year based on the floating rate financial assets and financial liabilities as of the respective year end.

| Increase/(decrease) in basis points | Effect on profit at 31 December 2018 US$'000 | Effect on profit at 31 December 2017 US$'000 |
|---|---|---|
| 100 | (18,302) | (12,134) |
| (100) | 18,302 | 12,134 |

**Credit risk**
Credit risk is the risk that counterparty will not meet its obligations under a financial instrument or customer contract, leading to a financial loss. The Group limits its credit risk with respect to customers due to the nature of the customers that it has dealings with. Within the Healthcare business in the GCC, the majority of the Group's customers are insurance companies. The largest insurance company in GCC is fully backed by Sovereign wealth funding from Abu Dhabi. All other insurance companies in the GCC are required to be listed on a stock exchange and therefore are governed by the regulations of their respective markets. The Group limits its credit risk with respect to healthcare customers in markets other than GCC by requesting certain percentage of advance payments from customers and obtaining final payments before completion of treatment. Within the distribution business the Group deals primarily with large reputable multinational retail companies. The Group further seeks to limit its credit risk by setting credit limits for individual customers and monitoring outstanding receivables.

The Group limits its credit risk with regard to bank deposits by only dealing with reputable banks. The external credit ratings for the banks at which the bank deposits and cash at bank are held are as follows:

| | 2018 US$'000 | 2017 US$'000 |
|---|---:|---:|
| AA-/A-1/Aa3 | 411 | – |
| A+/A1 | 2,709 | – |
| A/A2 | – | 162 |
| A+/A-1 | 55,074 | 33,188 |
| A3/A- | 2,123 | 2,258 |
| A-2 | 13,381 | 22,857 |
| AAA/A-1+ | 8,371 | 95,859 |
| A2/P-1 | 22,020 | 15,264 |
| A-3/P-2 | 15,417 | 11,465 |
| BB | 191 | 1,505 |
| BB+/B+ | 2 | 1,404 |
| Baa2 | 356 | 55 |
| P-3 | 315,653 | 142,748 |
| BBB | – | 6,878 |
| BBB- | – | 567 |
| BBB+/Ba1/Baa1/P-2 | 3,156 | 499 |
| Caa1/B3 | – | 2,198 |
| Without external credit rating | 49,996 | 49,199 |
| Total bank deposit and cash at bank | 488,860 | 386,106 |

With respect to credit risk arising from cash and cash equivalents, the Group's exposure to credit risk arises from default of the counterparty, with a maximum exposure equal to the carrying amount of these instruments.

**Liquidity risk**

The Group's objective is to maintain a balance between continuity of funding and flexibility through the use of banking facilities. The Group limits its liquidity risk by raising funds from its operations and ensuring bank facilities are available. Trade payables are normally settled within 50-60 days of the date of purchase.

The table below summarises the maturities of the Group's undiscounted financial liabilities, based on contractual payment dates and current market interest rates.

| | On demand US$'000 | Less than 3 months US$'000 | 3 to 12 months US$'000 | 1 to 6 years US$'000 | Total US$'000 |
|---|---:|---:|---:|---:|---:|
| **At 31 December 2018** | | | | | |
| Trade accounts payable | – | 200,123 | – | – | 200,123 |
| Amounts due to related parties | – | 47,737 | – | – | 47,737 |
| Other payables | – | – | 11,005 | 13,503 | 24,508 |
| Option redemption payable | – | – | 26,309 | 28,267 | 54,576 |
| Terms loans | – | 84,608 | 343,652 | 731,502 | 1,159,762 |
| Bank overdrafts and other short term borrowings | 57,807 | 68,028 | 47,101 | – | 172,936 |
| Finance lease liability | – | – | 2,176 | 3,882 | 6,058 |
| Convertible bond and sukuk | – | – | 32,238 | 974,731 | 1,006,969 |
| Financial guarantees | 26,411 | – | – | – | 26,411 |
| **Total** | 84,218 | 400,496 | 462,481 | 1,751,885 | 2,699,080 |

| | On demand US$'000 | Less than 3 months US$'000 | 3 to 12 months US$'000 | 1 to 6 years US$'000 | Total US$'000 |
|---|---:|---:|---:|---:|---:|
| **At 31 December 2017** | | | | | |
| Trade accounts payable | – | 152,811 | – | – | 152,811 |
| Amounts due to related parties | – | 28,472 | – | – | 28,472 |
| Other payables | – | – | 18,773 | 76,186 | 94,959 |
| Option redemption payable | – | – | 19,041 | 15,776 | 34,817 |
| Terms loans | – | 53,255 | 193,774 | 1,077,215 | 1,324,244 |
| Bank overdrafts and other short term borrowings | 68,948 | 73,079 | 69,726 | – | 211,753 |
| Financial guarantees | 18,209 | – | – | – | 18,209 |
| **Total** | 87,157 | 307,617 | 301,314 | 1,169,177 | 1,865,265 |

The Group also has future capital commitments for the completion of ongoing capital projects of US$ 31,774,000 (2017: US$ 5,723,000) (note 38). These are to be financed from the fixed deposits held by the Group.

Financial Statements

# Notes to the Consolidated Financial Statements continued
## At 31 December 2018

### 36  Financial risk management objectives and policies continued
**Foreign currency risk**

Foreign currency risk is the risk that the fair value or future cash flows of a financial instrument will fluctuate because of changes in foreign exchange rates. Foreign currency risk comprises of transaction risk, statement of financial position risk and the Group's net investment in foreign subsidiaries. Transaction risk relates to the Group's cash flow being adversely affected by a change in the exchange rates of foreign currencies against the UAE Dirham. Statement of financial position risk relates to the risk of the Group's monetary assets and liabilities in foreign currencies acquiring a lower or higher value, when translated into UAE Dirhams, as a result of currency movements.

The Group is exposed to currency risk on its trade accounts payable, put option redemption payable and certain other payables denominated in foreign currencies, mainly in Euros and Saudi Riyal. As the US Dollar is pegged to the UAE Dirham, balances in US Dollars are not considered to represent significant currency risk.

The table below indicates the impact of Group's foreign currency monetary liabilities and assets at 31 December, on its profit before tax.

|  | 2018 US$'000 | 2017 US$'000 |
|---|---|---|
| +5% | (4,199) | (2,460) |
| -5% | 4,199 | 2,460 |

The Group is exposed to foreign currency risk on net investment in foreign subsidiaries. During the year ended 31 December 2018 the Group has recorded a foreign currency exchange loss of US$9,512,000 (2017: Gain of US$15,304,000) on the translation of foreign subsidiaries in other comprehensive income.

**Capital management**

The primary objective of the Group's capital management is to ensure that it maintains healthy capital ratios in order to support its business and maximise shareholders' value.

The Group manages its capital structure and makes adjustments to it in light of changes in business conditions. Capital comprises share capital, share premium, convertible bond equity component, reserves and retained earnings is measured at US$ 1,303,782,000 as at 31 December 2018 (2017: US$ 1,089,716,000). In order to maintain or adjust the capital structure, the group may adjust the amount of dividends paid to shareholders, return capital to shareholders, issue new shares or sell assets to reduce debt. Certain banking facilities may also impose covenant requirements on the Group with respect to capital management.

The Group monitors capital using a gearing ratio, which is net debt divided by capital plus net debt. The Group includes within net debt, interest bearing loans and borrowings, accounts payable and accruals and other payables less bank deposits and bank balances and cash.

|  | 2018 US$'000 | 2017 US$'000 |
|---|---|---|
| Interest bearing loans and borrowings | 1,209,704 | 1,399,028 |
| Accounts payable and accruals | 317,587 | 209,470 |
| Convertible bond and Sukuk | 783,009 | - |
| Finance lease liability | 4,679 | - |
| Other payable | 22,495 | 57,094 |
| Option redemption payable | 46,198 | 38,747 |
| Less: bank deposits, bank balances and cash | (491,183) | (387,613) |
| Net debt and Payables | 1,892,489 | 1,316,726 |
| Capital | 1,303,782 | 1,089,716 |
| Capital and net debt | 3,196,271 | 2,406,442 |
| Gearing ratio | 59% | 55% |

### 37  Contingent liabilities

The Group had contingent liabilities in respect of bank and other guarantees and other matters arising in the ordinary course of business from which it is anticipated that no material liabilities will arise at 31 December 2018 of US$ 26,411,000 (2017: US$ 18,209,000).

## 38  Commitments

### Capital commitments

The Group had future capital commitments of US$ 31,774,000 at 31 December 2018 (2017: US$ 5,723,000) principally relating to the completion of ongoing capital projects.

### Other commitments

| | 2018 US$'000 | 2017 US$'000 |
|---|---|---|
| Future minimum rentals payable under non-cancellable operating leases | | |
| Within one year | 17,404 | 12,888 |
| After one year but not more than five years | 71,427 | 57,916 |
| More than five years | 80,233 | 54,023 |
| Total | 169,064 | 124,827 |

## 39  Financial instruments carried at fair value

### Contingent consideration

Contingent consideration relates to acquisitions done in current and prior year. Movements in contingent consideration payable are as follows:

| | 2018 US$'000 | 2017 US$'000 |
|---|---|---|
| Balance at 1 January | 10,519 | 24,139 |
| Contingent consideration recognised at acquisition (note 5) | 14,604 | 704 |
| Fair value measurement | 1,176 | (133) |
| Unused amount reversed (note 9) | (6,424) | - |
| Exchange (gain)/loss | (272) | 862 |
| Payments made | (2,363) | (15,053) |
| Balance at 31 December | 17,240 | 10,519 |

In accordance with the fair value hierarchy under IFRS 13, contingent consideration is classified as a level 3 derivative financial instrument. The fair value of outstanding contingent consideration as at the reporting date is US$ 17,240,000 (2017: US$ 10,519,000). The valuation technique used for measurement of contingent consideration is the weighted average probability method and then applying discounting.

Contingent consideration payable as of 31 December 2018 comprises of following:

| | 2018 US$'000 | 2017 US$'000 |
|---|---|---|
| Sweden | 7,266 | - |
| Premier | 2,908 | - |
| FMC | 696 | - |
| Cytomed | 3,774 | - |
| Biogenesi | 1,117 | 3,391 |
| ProVita | - | 3,298 |
| Fakih | - | 3,126 |
| Fecunmed | 735 | 704 |
| Royal RAK | 744 | - |
| | 17,240 | 10,519 |

### Sweden

Contingent consideration is payable subject to attainment of EBITDA targets. Significant unobservable inputs used are EBITDA and discount rate (10.0%). Full value of contingent consideration payable is US$8745,000 and its present value is US$7,266,000. A 1% increase in discount rate would result in decrease in fair value of the contingent consideration by US$124,000 and a 1% decrease in discount rate would result in increase in fair value by US$128,000. Management believe EBITDA targets for FY 2018 – FY 2021 will be met and accordingly not considered sensitive to fair value measurement.

### Premier

Contingent consideration is payable subject to attainment of 2019 net profit targets. Significant unobservable inputs used are profit before tax, multiple of 8 and discount rate (11%). Full value of contingent consideration payable is US$2,922,000 and its present value is US$2,908,000. A 1% increase in discount rate would result in decrease in fair value of the contingent consideration by US$23,000 and a 1% decrease in discount rate would result in increase in fair value by US$24,000. Management believe profit before tax targets for FY 2019 will be met and accordingly not considered sensitive to fair value measurement.

Financial Statements

# Notes to the Consolidated Financial Statements continued
## At 31 December 2018

### 39  Financial instruments carried at fair value continued
**Contingent consideration** continued

#### FMC
Contingent consideration is payable subject to collection of acquisition date receivables within 6 months. Full value of contingent consideration payable is US$5,736,000 of which US$5,041,000 is already collected till July and hence management believes that the above targets will be met and accordingly not considered sensitive to fair value measurement.

#### Cytomed
Contingent consideration is payable subject to attainment of EBITDA targets. Significant unobservable inputs used are EBITDA and discount rate (13.5%). Full value of contingent consideration payable is US$4,083,000 and its present value is US$3,774,000. A 1% increase in discount rate would result in decrease in fair value of the contingent consideration by US$21,000 and a 1% decrease in discount rate would result in increase in fair value by US$21,000. Management believe EBITDA targets for FY 2018 - FY 2019 will be met and accordingly not considered sensitive to fair value measurement.

#### Biogenesi
Contingent consideration is payable subject to attainment of profit before tax target. Significant unobservable inputs used are profit before tax and discount rate (10.7%). Full value of contingent consideration payable is US$ 1,145,000 (2017: US$ 3,594,000) and its present value is US$1,117,000 (2017: US$ 3,391,000). Contingent consideration amounting to US$ 2,362,000 on achieving 2017 EBITDA target has been paid during the year. A 1% increase in discount rate would result in decrease in fair value of the contingent consideration by US$3,000 and a 1% decrease in discount rate would result in increase in fair value by US$3,000 Management believe profit before tax targets for FY 2018 will be met and accordingly not considered sensitive to fair value measurement.

#### Fecunmed
Contingent consideration is payable subject to attainment of revenue targets. Significant unobservable inputs used are revenue targets and discount rate (9.2%). Full value of contingent consideration payable is US$916,000 and its present value is US$735,000. A 1% increase in discount rate would result in decrease in fair value of the contingent consideration by US$16,000 and a 1% decrease in discount rate would result in increase in fair value by US$17,000. Management believe profit before revenue targets for FY 2020 will be met and accordingly not considered sensitive to fair value measurement.

#### Royal RAK
Contingent consideration is payable subject to collection of 30 September 2017 receivables. Full value of contingent consideration payable is US$1,154,000 of which US$394,000 is already collected and paid during the reporting period. Management believes that the above targets will be met and accordingly not considered sensitive to fair value measurement.

#### Provita and Fakih
The contingent consideration in relation to Provita and Fakih were reversed as the conditions/KPIs were not met and the amounts were not payable.

### 40  Option redemption payable
Option redemption payable comprise of the following:

|  | 2018 US$'000 | 2017 US$'000 |
|---|---|---|
| Luarmia | 26,019 | 26,019 |
| CFC and HCMR | 13,624 | 11,874 |
| Fecunmed | 633 | 854 |
| Sweden | 4,227 | – |
| ProCriar | 1,695 | – |
|  | 46,198 | 38,747 |

Movement in option redemption payable is as follows:

|  | 2018 US$'000 | 2017 US$'000 |
|---|---|---|
| Balance at 1 January | 38,747 | 37,500 |
| Addition | 6,889 | 854 |
| Other adjustment | – | (2,398) |
| Re-measurement of liability (note 10) | 2,545 | 2,012 |
| Exchange (gain)/loss | (1,983) | 779 |
| Balance at 31 December | 46,198 | 38,747 |

Exhibit 6 to B.R. Shetty's Request for Judicial Notice

Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

Other adjustment relates to re-measurement done for put option liability for Huntington Centro de Medicina Reproductive, S/A (HCMR) acquired in 2016. This adjustment was done within twelve month period of acquisition date and was accordingly credited to equity.

Classification of option redemption payables into current and non-current is as follows:

| | 2018 US$'000 | 2017 US$'000 |
|---|---|---|
| Current | 26,019 | 26,019 |
| Non-current | 20,179 | 12,728 |
| | 46,198 | 38,747 |

### Luarmia

As part of acquisition of Luarmia SL ("Luarmia") in 2015, the Group entered into separate co-investment/shareholder agreements dated 23 February 2015 with the sellers relating to put & call options on the minority 11.6% shareholdings that remains with the previous owners post-acquisition. The Group does not have 'present ownership' of this 11.6% minority shareholding due to the terms of the option agreements and continue to account for the acquisition of Luarmia on the basis of an 88.4% equity stake, with full recognition of the 11.6% non-controlling interest. The put options are exercisable between 1 & 30 June 2018, 1 & 30 June 2019 and 1 & 30 June 2020 (three exercisable windows). On exercise of the put options, cash will be paid. The value of the put option is calculated based on the multiple of purchase price and further multiples are measured on the number of reproductive cycles specified in the agreement. A redemption liability for the value of the options at the acquisition date was created amounting to US$24,496,000 (being the present value of the redemption liability at the acquisition date), with an equal amount being treated as a reduction in equity. As at 31 December 2018, the present value of the redemption liability is US$ 26,019,000.

The key assumption in estimating the expected amount is the multiple of purchase price and reproductive cycle's projections. The financial liability is sensitive to changes in these assumptions for example a 10% increase in reproductive cycles will result in an increase in the financial liability by US$ 3,333,000 (2017: US$ 1,545,400), while a 10% decrease would result in a decrease in the financial liability by US$ 1,887,000 (2017: US$ 1,544,000).

### CFC and HCMR

In 2016, Luarmia SL entered into put option agreements with the minority shareholders of Brazil and Denmark entities. A redemption liability for the value of the options at the acquisition date was created amounting to US$11,216,000 and US$1,585,000 (being the present value of the redemption liability at the acquisition date), with an equal amount being treated as a reduction in equity. As at 31 December 2018, the present value of the redemption liability is US$12,221,000 and US$1,402,000 respectively.

During the year Luarmia SL entered into put option agreements with the minority shareholders of Sweden and ProCriar. A redemption liability for the value of the options at the acquisition date was created amounting to US$4,417,000 and US$2,472,000 respectively. The present value of the redemption liability as on 31 December 2018 was US$4,227,000 and US$1,695,000 respectively.

The put option of HCMR is exercisable any time starting from the third anniversary and 36 months thereafter. The earliest date of exercise is September 2019. The key assumption in estimating the liability amount is the forecasted EBITDA of the year 2018 and 2019 and projected net debt of 2019. The financial liability is sensitive to changes in the forecasted EBITDA and Net Debt. For example a 10% increase in EBITDA will result in an increase in the financial liability with US$415,000, while a 10% decrease would result in a decrease in the financial liability with US$415,000.

The put option for CFC is exercisable from the fifth anniversary of the date of the agreement. With respect to this, the earliest month of exercise is June 2021. The key assumption in estimating the liability amount is the forecasted EBITDA of the entity for 2020. The financial liability is sensitive to changes in the forecasted EBITDA. For example a 10% increase in EBITDA will result in an increase in the financial liability with US$200,000, while a 10% decrease would result in a decrease in the financial liability with US$200,000.

### Fecunmed

The put option for Fecunmed is exercisable from the third anniversary of the date of the agreement. With respect to this, the earliest month of exercise is 31 December 2020. A redemption liability for the value of the options at the acquisition date was created amounting to US$854,000 (being the present value of the redemption liability at the acquisition date), with an equal amount being treated as a reduction in equity. As at 31 December 2018, the present value of the redemption liability is US$633,000 The key assumption in estimating the liability amount is the forecasted EBITDA of the entity for 2020. The financial liability is sensitive to changes in the forecasted EBITDA. For example a 10% increase in EBITDA will result in an increase in the financial liability with US$64,000, while a 10% decrease would result in a decrease in the financial liability with US$64,000.

Financial Statements

# Notes to the Consolidated Financial Statements continued
At 31 December 2018

### 40 Option redemption payable continued

**Sweden**

During the year Luarmia SL entered into put option agreements with the minority shareholders of Sweden.

The put option for Sweden is exercisable from the fifth anniversary of the date of the agreement. With respect to this, the earliest month of exercise is 07 June 2023. A redemption liability for the value of the options at the acquisition date was created amounting to US$4,418,000 (being the present value of the redemption liability at the acquisition date), with an equal amount being treated as a reduction in equity. As at 31 December 2018, the present value of the redemption liability is US$4,227,000. The key assumption in estimating the liability amount is the forecasted EBITDA of the entity for 2022. The financial liability is sensitive to changes in the forecasted EBITDA. For example a 10% increase in EBITDA will result in an increase in the financial liability with US$415,000, while a 10% decrease would result in a decrease in the financial liability with US$415,000.

**ProCriar**

During the year Luarmia SL entered into put option agreements with the minority shareholders of ProCriar.

The put option for ProCriar is exercisable from the third anniversary of the date of the agreement. With respect to this, the earliest month of exercise is 05 February 2021. A redemption liability for the value of the options at the acquisition date was created amounting to US$2,471,000 (being the present value of the redemption liability at the acquisition date), with an equal amount being treated as a reduction in equity. As at 31 December 2018, the present value of the redemption liability is US$1,695,000. The key assumption in estimating the liability amount is the forecasted EBITDA of the entity for 2021. The financial liability is sensitive to changes in the forecasted EBITDA. For example a 10% increase in EBITDA will result in an increase in the financial liability with US$340,000, while a 10% decrease would result in a decrease in the financial liability with US$309,000.

### 41 Fair values of financial instruments

The fair values of the Group's financial instruments are not materially different from their carrying values at the statement of financial position date.

The Group uses the following hierarchy for determining and disclosing the fair value of financial instruments by valuation technique:

*Level 1:* quoted (unadjusted) prices in active markets for identical assets or liabilities.

*Level 2:* other techniques for which all inputs which have a significant effect on the recorded fair value are observable, either directly or indirectly.

*Level 3:* techniques which use inputs which have a significant effect on the recorded fair value that are not based on observable market data.

Financial assets and liabilities carried at fair value are disclosed in note 37.

During the years ended 31 December 2018 and 31 December 2017, there were no transfers between Level 1 and Level 2 fair value measurements, and no transfers into or out of Level 3 fair value measurements.

### 42 Asset classified as held for sale

|  | 2018 US$'000 | 2017 US$'000 |
|---|---|---|
| Asset classified as held for sale | - | 3,693 |
|  | - | 3,693 |

Asset held for sale represents investment made in a healthcare project. During the year, the Group paid an amount of US$ 5,530,000 for the project. Subsequently in 2018, the investment was sold for a consideration of US$ 9,244,000 to a related party (note 34).

### 43  Changes in liabilities arising from financing activities

| | 01 January 2018 US$'000 | Cash Inflow US$'000 | Cash outflow US$'000 | Forex exchange movement US$'000 | Equity component convertible bond US$'000 | Others US$'000 | 31 December 2018 US$'000 |
|---|---|---|---|---|---|---|---|
| Term Loans (Current and Non-current portion) | 1,191,994 | 1,532,570 | (1,700,751) | (2,412) | – | 19,353 | 1,040,754 |
| Bank overdrafts and Other short-term borrowings | 207,034 | 311,011 | (338,173) | – | – | (10,922) | 168,950 |
| Dividend payable | 1,334 | – | (1,334) | – | – | – | – |
| Convertible bond and sukuk | – | 850,000 | – | – | (64,960) | (2,031) | 783,009 |
| Finance lease liability | – | – | (633) | – | – | 5,312 | 4,679 |
| **Total liabilities from financing activities** | **1,400,362** | **2,693,581** | **(2,040,891)** | **(2,412)** | **(64,960)** | **11,712** | **1,997,392** |

| | 01 January 2017 US$'000 | Cash Inflow US$'000 | Cash Outflow US$'000 | Forex exchange movement US$'000 | Equity component convertible bond US$'000 | Others US$'000 | 31 December 2017 US$'000 |
|---|---|---|---|---|---|---|---|
| Term Loans (Current and Non-current portion) | 829,299 | 671,353 | (319,111) | 6,417 | – | 4,036 | 1,191,994 |
| Bank overdrafts and Other short-term borrowings | 219,851 | 351,775 | (373,318) | – | | 8,726 | 207,034 |
| Dividend payable | – | – | – | – | | 1,334 | 1,334 |
| **Total liabilities from financing activities** | **1,049,150** | **1,023,128** | **(692,429)** | **6,417** | | **14,096** | **1,400,362** |

The 'Others' column includes the effect of amortisation of transaction costs, additions in interest-bearing loans from business combination and accrual of dividend that were not yet paid at the year-end. The Group classifies interest paid as cash flow from operating activities.

### 44  Subsequent events

The Group signed the definitive documents on 04 March 2019 to form a strategic partnership in healthcare with Hassana Investment Company ("Hassana"), the investment arm of the General Organization for Social Insurance ("GOSI") in Saudi Arabia. The General Organization for Social Insurance is one of the largest pension funds in the world by assets under management. It is a government administered pension fund covering private sector employees in Saudi Arabia.

All commercial terms and agreements have been finalised between NMC Healthcare LLC ("NMC") and Hassana, with both parties working towards customary closing requirements. The strategic partnership is formed by NMC Healthcare Saudi Arabia Company ("NMC KSA") contribution of its five subsidiaries in Saudi Arabia ("KSA") and an additional cash injection at closing, and GOSI's contribution of 38.88% stake in Tadawul-listed National Medical Care Company ("Care") at an agreed price per share. At the closing of the transaction, NMC will own 52% stake (through the combination of asset contribution and cash injection) and GOSI - through a wholly-owned subsidiary vehicle - will own 48% stake. NMC will have the control of the above strategic partnership.

NMC Health plc Annual Report and Accounts 2018   157

Exhibit 6 to B.R. Shetty's Request for Judicial Notice        161 of 182        Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

Financial Statements

# Statement of Financial Position
As at 31 December 2018

| | Notes | 2018 US$'000 | 2017 US$'000 |
|---|---|---|---|
| **ASSETS** | | | |
| **Non-current assets** | | | |
| Other non-current assets | | 404 | - |
| Investment in subsidiaries | 4 | 810,694 | 532,965 |
| | | 811,098 | 532,965 |
| **Current assets** | | | |
| Loan to subsidiary | 6 | 4,465 | - |
| Other receivables and prepayments | 5 | 161 | 113 |
| Amounts due from a related party | 6 | - | 19,505 |
| Bank balances and cash | | 122 | 162 |
| | | 4,748 | 19,780 |
| **TOTAL ASSETS** | | 815,846 | 552,745 |
| **EQUITY AND LIABILITIES** | | | |
| **Equity** | | | |
| Share capital | 7 | 32,443 | 31,928 |
| Share premium | 7 | 633,744 | 492,634 |
| Retained earnings | 9 | 49,691 | 27,441 |
| **Total equity** | | 715,878 | 552,003 |
| **Current liabilities** | | | |
| Amounts due to a related party | 6 | 98,212 | - |
| Deferred consideration payable | 13 | 596 | - |
| Other payables and accruals | 8 | 1,160 | 742 |
| **Total liabilities** | | 99,968 | 742 |
| **TOTAL EQUITY AND LIABILITIES** | | 815,846 | 552,745 |

No profit and loss account is presented by the Company as permitted by Section 408 of the Companies Act 2006.

The financial statements were authorised for issue by the board of directors on 6 March 2019 and were signed on its behalf by

**PRASANTH MANGHAT**
Chief Executive Officer

**PRASHANTH SHENOY**
Chief Financial Officer

The attached notes 1 to 16 form part of the financial statements.

## Statement of Changes in Equity
For the year ended 31 December 2018

| | Share capital US$'000 | Share premium US$'000 | Retained earnings US$'000 | Total US$'000 |
|---|---|---|---|---|
| Balance as at 1 January 2018 | 31,928 | 492,634 | 27,441 | 552,003 |
| Total (other) comprehensive income for the year (note 9) | – | – | 50,719 | 50,719 |
| Share based payments | – | – | 9,704 | 9,704 |
| Dividends paid (note 15) | – | – | (35,739) | (35,739) |
| Exercise of stock option shares | 38 | 2,396 | (2,434) | – |
| Issuance of share capital-new | 477 | 138,714 | – | 139,191 |
| Balance as at 31 December 2018 | 32,443 | 633,744 | 49,691 | 715,878 |
| | | | | |
| Balance as at 1 January 2017 | 31,910 | 491,778 | 23,488 | 547,176 |
| Total (other) comprehensive income for the year (note 9) | – | – | 23,425 | 23,425 |
| Share based payments | – | – | 9,181 | 9,181 |
| Dividends paid (note 15) | – | – | (27,779) | (27,779) |
| Exercise of stock option shares | 18 | 856 | (874) | – |
| Balance as at 31 December 2017 | 31,928 | 492,634 | 27,441 | 552,003 |

The attached notes 1 to 16 form part of the financial statements.

Exhibit 6 to B.R. Shetty's Request for Judicial Notice    163 of 182    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

Financial Statements

# Statement of Cash Flows
For the year ended 31 December 2018

| | Notes | 2018 US$'000 | 2017 US$'000 |
|---|---|---|---|
| **OPERATING ACTIVITIES** | | | |
| Profit for the year before tax | 9 | 50,719 | 23,425 |
| Adjustments for: | | | |
| Share based payments | 12 | 9,704 | 9,181 |
| Dividend Income | | (71,221) | (44,385) |
| | | (10,798) | (11,779) |
| Working capital changes: | | | |
| Amounts due from a related party | | – | 11,705 |
| Other receivables and prepayments | | (48) | 18 |
| Amounts due to a related party | | 10,388 | – |
| Other payables and accruals | | 418 | (2) |
| **Net cash (used in) operations** | | (40) | (58) |
| **DECREASE IN CASH AND CASH EQUIVALENTS** | | (40) | (58) |
| Cash and cash equivalents at 1 January | | 162 | 220 |
| **CASH AND CASH EQUIVALENTS AT 31 DECEMBER** | | 122 | 162 |

Note:

1   Proceeds of US$139,191,000 raised from issuance of equity were directly received in NMC Healthcare LLC bank account. For the purpose of statement of cash flows these proceeds are adjusted from amounts due from a related party.

2   An amount of US$138,538,000 was paid by NMC Healthcare LLC, on behalf of the Company for acquisition of subsidiaries. For the purpose of statement of cash flows these proceeds are adjusted from amounts due from a related party.

3   During the year the Company recorded dividend income of US$ 71,221,000. This was non cash transactions and adjusted from amount due from related party.

4   Dividend amount of US$ 35,739,000 was paid by NMC Healthcare LLC on behalf of the Company to its shareholders. This is non cash transactions and adjusted from amount due from related party.

The attached notes 1 to 16 form part of the financial statements.

# Notes to the Financial Statements
## At 31 December 2018

### 1  Corporate information

NMC Health plc (the "Company" or "Parent") is a Company which was incorporated in England and Wales on 20 July 2011. The Company is a public limited company. The address of the registered office of the Company is Level 1, Devonshire House, One Mayfair Place, London, W1J 8AJ. The registered number of the Company is 7712220. The Company's immediate and ultimate controlling party is a group of three individuals (H.E. Saeed Mohamed Butti Mohamed Al Qebaisi (H.E Saeed Bin Butti), Dr BR Shetty and Mr Khalifa Butti Omair Yousif Ahmad Al Muhairi (Mr Khalifa Bin Butti) who are all shareholders and of whom two are directors of the company and who together have the ability to control the company.

The Parent and its subsidiaries (collectively the "Group") are engaged in providing professional medical services, home care services, long term care services and the provision of all types of research and medical services in the field of gynaecology, obstetrics and human reproduction, and the rendering of business management services to companies in the health care and hospital sector. The Group is also engaged in wholesale of pharmaceutical goods, medical equipment, cosmetics, food.

The financial statements of the Company for the year ended 31 December 2018 were authorised for issue by the board of directors on 06 March 2019.

### 2.1  Basis of preparation

The financial statements have been prepared in accordance with International Financial Reporting Standards as adopted by the European Union as they apply to the financial statements of the Company for the year ended 31 December 2018 and applied in accordance with the Companies Act 2006.

The financial statements are prepared under the historical cost convention. The principal accounting policies adopted in the preparation of these financial statements are set out below.

No profit and loss account is presented by the Company as permitted by Section 408 of the Companies Act 2006.

The Profit for the year in the financial statements of the Company is US$50,719,000 (2017: US$23,425,000).

Certain amounts in cash flow statement have been reclassified to conform to the current year presentation.

#### Functional currency

The UAE Dirham is determined to be the functional currency of the Company. The reporting currency of the Company is United States of America Dollar (US$) as this is a more globally recognised currency. The UAE Dirham is pegged against the US Dollar at a rate of 3.673 per US Dollar.

All values are rounded to the nearest thousand dollars ($000) except when otherwise indicated.

### 2.2  Going concern

These financial statements have been prepared on a going concern basis. The Company has made a profit of US$50,719,000 (2017: US$23,425,000) and has equity of US$715,878,000 (2017: US$552,003,000).

The Company is the parent of NMC Health plc group and is solely a holding company with no business activities of its own. The Company earned a dividend and reported a net profit during the year. The Group's business activities, together with the factors likely to affect its future development, performance and position are set out in the Strategic Review on pages 4 to 35. The financial position of the Group, its cash flows, liquidity position and borrowing facilities are described in the Financial Review on pages 13 to 19.

The Group has considerable financial resources including bank facilities. As a consequence, the directors believe that the Group is well placed to manage its business risks successfully. The directors expect that the Group has adequate resources to continue in operational existence for the foreseeable future. Thus they continue to adopt the going concern basis in preparing the financial statements.

Exhibit 6 to B.R. Shetty's Request for Judicial Notice    165 of 182    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

# Notes to the Financial Statements continued
## At 31 December 2018

### 2.3 Changes in accounting policies
The accounting policies adopted are consistent with those of the previous financial period.

**New and amended standards and interpretations:**
The Company applied for the first-time certain amendments to the standards, which are effective for annual periods beginning on or after 1 January 2018. The Company has not early adopted any standards, interpretations or amendments that have been issued but are not yet effective.

**IFRS 15 Revenue from Contracts with Customers**
IFRS 15 supersedes IAS 11 Construction Contracts, IAS 18 Revenue and related interpretations and it applies, with limited exceptions, to all revenue arising from contracts with its customers. IFRS 15 establishes a five-step model to account for revenue arising from contracts with customers and requires that revenue be recognised at an amount that reflects the consideration to which an entity expects to be entitled in exchange for transferring goods or services to a customer.

IFRS 15 requires entities to exercise judgement, taking into consideration all of the relevant facts and circumstances when applying each step of the model to contracts with their customers.

The Company adopted IFRS 15 using modified retrospective method of adoption.

The adoption of IFRS 15 from 1 January 2018 has no significant impact on the financial statements of the Company.

**IFRS 9 Financial Instruments**
IFRS 9 Financial Instruments replaces IAS 39 Financial Instruments: Recognition and Measurement for annual periods beginning on or after 1 January 2018, bringing together all three aspects of the accounting for financial instruments: classification and measurement; impairment; and hedge accounting.

The Company has applied the requirements of IFRS 9 prospectively, with the initial application date of 1 January 2018 and without restating comparative information.

The adoption of IFRS 9 from 1 January 2018 has no significant impact on the financial statements of the Company.

The other new standards, amendments to IFRS, which are effective as of 1 January 2018 are listed below, have no impact on the Company.
- IFRIC Interpretation 22 Foreign Currency Transactions and Advance Considerations
- Amendments to IAS 40 Transfers of Investment Property
- Amendments to IFRS 2 Classification and Measurement of Share-based Payment Transactions
- Amendments to IFRS 4 Applying IFRS 9 Financial Instruments with IFRS 4 Insurance Contracts
- Amendments to IAS 28 Investments in Associates and Joint Ventures
- Amendments to IFRS 1 First-time Adoption of International Financial Reporting Standards

### 2.4 Summary of significant accounting policies
**Investment in subsidiaries**
Subsidiaries are entities which are controlled by the Company. Control is achieved when the Company is exposed, or has rights, to variable returns from its involvement with the investee and has the ability to affect those returns through its power over the investee. Specifically, the Company controls an investee if, and only if, the Company has:
- Power over the investee (i.e., existing rights that give it the current ability to direct the relevant activities of the investee)
- Exposure, or rights, to variable returns from its involvement with the investee
- The ability to use its power over the investee to affect its returns

Investments in subsidiaries are recognised at acquisition cost less any provision for impairment.

When the Company incurs increases in or return of share capital, to/from its subsidiaries, such movements are recognised within the cost of investment in subsidiaries.

At each reporting date, an assessment is made to determine whether there are any indicators of impairment. Where an indicator of impairment exists, a formal estimate of the recoverable amount of the investment in subsidiary is made, which is considered to be the higher of the fair value less costs to sell and the value in use. Fair value is determined as the amount that would be obtained from the sale of the investment in an arm's length transaction between knowledgeable and willing parties. When this information is not available the fair value is determined based on the net present value of the future cash flows related to its subsidiaries, using a discount rate that reflects current market assessments of the time value of money and the risks specific to the asset. If the carrying amount of an investment exceeds the recoverable amount, a provision is recorded in the income statement to reflect the investment at the recoverable amount.

Where an impairment charge has previously been recognised, an assessment is made at the end of each reporting period as to whether there is any indication that the impairment loss may no longer exist or may have decreased. If any such indication exists, an estimate of the recoverable amount is made. An impairment loss is reversed to the income statement to the extent that the increased carrying value of the investment in subsidiary does not exceed the carrying value that would have been determined had no impairment loss been recognised for the asset in prior years.

## Cash and cash equivalents
For the purpose of the statement of cash flows, cash and cash equivalents consists of cash in hand and bank balances.

## Equity
The Company has issued ordinary shares that are classified as equity. The difference between the issue price and the par value of ordinary share capital is allocated to share premium. The transaction costs incurred for the share issue are accounted for as a deduction from share premium, net of any related income tax benefit, to the extent they are incremental costs directly attributable to the share issue that would otherwise have been avoided.

## Accounts payable and accruals
Liabilities are recognised for amounts to be paid in the future for goods and services received whether billed by the supplier or not. Accounts payable are classified as current liabilities if payment is due within one year or less (or in the normal operating cycle of the business if longer). If not, they are presented as non-current liabilities. Accounts payable are recognised initially at fair value and subsequently measured at amortised cost using the effective interest method.

## Provisions
Provisions are recognised when the Company has an obligation (legal or constructive) arising from a past event, and the costs to settle the obligation are both probable and able to be reliably measured.

Provisions are measured at the present value of the expenditures expected to be required to settle the obligation using a pre-tax rate that reflects current market assessments of the time value of money and risks specific to the obligation. Increases in provisions due to the passage of time are recognised in the income statement.

## Share based payments
Equity-settled share-based payments to employees are measured at the fair value of the equity instruments at the grant date. The fair value excludes the effect of non-market-based vesting conditions. Details regarding the determination of the fair value of equity-settled share-based transactions are set out in note 12.

The fair value determined at the grant date of the equity-settled share-based payments is expensed on a straight-line basis over the vesting period, based on the Group's estimate of equity instruments that will eventually vest. At each reporting date, the Group revises its estimate of the number of equity instruments expected to vest as a result of the effect of non-market-based vesting conditions. The impact of the revision of the original estimates, if any, is recognised in the statement of comprehensive income such that the cumulative expense reflects the revised estimate, with a corresponding adjustment to equity reserves/other payables.

No expense is recognised for awards that do not ultimately vest, except for equity-settled transactions for which vesting is conditional upon a market or non-vesting condition. These are treated as vesting irrespective of whether or not the market or non-vesting condition is satisfied, provided that all other performance and/or service conditions are satisfied.

## Foreign currencies
Transactions in foreign currencies are recorded in UAE Dirhams at the exchange rate ruling at the date of the transaction. Monetary assets and liabilities denominated in foreign currencies are retranslated at the rate of exchange ruling at the balance sheet date. All differences are taken to the statement of comprehensive income.

## Impairment of financial assets
An assessment is made at each statement of financial position date to determine whether there is objective evidence that a specific financial asset may be impaired. If such evidence exists, any impairment loss is recognised in the statement of comprehensive income. Impairment is determined as the difference between carrying value and the present value of future cash flows discounted at the current market rate of return for a similar financial asset.

## Financial guarantee contracts
Financial guarantee contracts issued by the Company are those contracts that require a payment to be made to reimburse the holder for a loss it incurs because the specified debtor fails to make a payment when due in accordance with the terms of a debt instrument. Financial guarantee contracts are recognised initially as a liability at fair value, adjusted for transaction costs that are directly attributable to the issuance of the guarantee. Subsequently, the liability is measured at the higher of the best estimate of the expenditure required to settle the present obligation at the reporting date and the amount recognised less cumulative amortisation.

## Dividend income
Revenue is recognised when the Company's right to receive the payment is established, which is generally when shareholders approve the dividend.

# Notes to the Financial Statements continued
## At 31 December 2018

### 3  Accounting standards and interpretations issued but not effective

The new and amended standards and interpretations that are issued, but not yet effective, up to the date of issuance of the Company's financial statements are disclosed below. The Company intends to adopt these new and amended standards and interpretations, if applicable, when they become effective.

**IFRS 16 Leases**

IFRS 16 replaces existing guidance on the accounting for leases, including IAS17 Leases, IFRIC 4 Determining whether an Arrangement contains a Lease, SIC-15 Operating Leases - Incentives and SIC-27 Evaluating the Substance of Transactions Involving the Legal Form of a Lease. The standard is applicable for annual periods beginning on or after 1 January 2019. Early adoption is permitted.

IFRS 16 introduces a single comprehensive, on-balance sheet lease accounting model for lessees. IFRS 16 distinguishes leases and service contracts on the basis of whether an identified asset is controlled by a customer. Distinctions of operating leases (off balance sheet) and finance leases (on balance sheet) are removed for lessee accounting and is replaced by a model where a right-of-use asset and a corresponding liability have to be recognised for leases by lessees (i.e. all on balance sheet) except for short-term leases and leases of low value assets.

Lessor accounting under IFRS 16 is substantially unchanged from today's accounting under IAS 17. Lessors will continue to classify all leases using the same classification principle as in IAS 17 and distinguish between two types of leases: operating and finance leases.

IFRS 16, which is effective for annual periods beginning on or after 1 January 2019, requires lessees and lessors to make more extensive disclosures than under IAS 17.

### Transition to IFRS 16

The Company will adopt IFRS 16 using modified retrospectively approach, with the initial application date of 1 January 2019 and without restating comparative information. As the balance sheet as at 31 December 2018 will not be restated, any reclassifications and the adjustments arising will be recognised in the opening balance sheet on 1 January 2019.

The Company will use the following practical expedients when applying this Standard retrospectively to leases previously classified as operating leases applying IAS 17. Company will apply these practical expedients on a lease-by-lease basis:
1.  Company will apply a single discount rate to a portfolio of leases with reasonably similar characteristics (such as leases with a similar remaining lease term for a similar class of underlying asset in a similar economic environment).
2.  Company will elect not to apply the requirements of IFRS 16 to leases for which the lease term ends within 12 months of the date of initial application. In this case, Company will:
    (i)  Account for those leases in the same way as short-term leases; and
    (ii)  Include the cost associated with those leases within the disclosure of short-term lease expense in the annual reporting period that includes the date of initial application.
3.  Company will use hindsight, such as in determining the lease term if the contract contains options to extend or terminate the lease.

The right of use (ROU) assets will be taken as equal to lease liability as of transaction date.

On adoption of requirements of IFRS 16, the Company's operating profit will improve (being the operating lease rental amount that will be replaced by a depreciation charge and interest expense). This is due to the change in the accounting for expenses of leases that were classified as operating leases under IAS 17.

The Company has designed a new leasing strategy, and the actual impact of the IFRS 16 on lease expense, finance expenses, depreciation, lease liability and right of use of assets to be brought onto the consolidated financial statements as at 1 January 2019 can only be estimated once the new strategy will be implemented. New strategy includes renegotiation of lease terms, rentals and other services with the lessors, decisions to buy or lease out on case by case basis.

164   NMC Health plc Annual Report and Accounts 2018

At the date of the financial statement, the following other standards, amendments and Interpretations have not been effective and have not been early adopted by the Company:

a) IFRIC 23 Uncertainty Over Income Tax Treatments - effective 1 January 2019;
b) Prepayment Features with Negative Compensation (Amendments to IFRS 9) - effective 1 January 2019;
c) Annual Improvements to IFRS 2015 - 2017 Cycle (Amendments to IFRS 3, IFRS 11, IAS 12 and IAS 23) - effective 1 January 2019;
d) Long-term Interests in Associates and Joint Ventures (Amendments to IAS 28) - effective 1 January 2019;
e) Sale or Contribution of Assets between an Investor and its Associates or Joint Venture (Amendments to IFRS 10 and IAS 28) - Available for optional adoption/effective date deferred indefinitely;
f) IFRIC Interpretation 23 Uncertainty over Income Tax Treatment - effective 1 January 2019;
g) Amendments to IAS 19: Plan Amendment, Curtailment or Settlement- effective 1 January 2019; and
h) Transfer to Investment Property - Amendments to IAS 40.

With the exception of IFRS 16, management anticipates that the application of the above Standards and Interpretations in future periods will have no material impact on the financial statement of the Company in the period of initial application.

#### 4  Investment in subsidiaries

| | 2018 US$'000 | 2017 US$'000 |
|---|---|---|
| As at 1 January and 31 December | 810,694 | 532,965 |
| This represents the cost of the investment in following subsidiaries | | |
| NMC Healthcare LLC | 532,965 | 532,965 |
| Fakih IVF LLC | 212,929 | - |
| NMC Eugin UK Ltd | 64,700 | - |
| NMC Health Jersey Ltd | 100 | - |
| | 810,694 | 532,965 |

| | Country of incorporation | Percentage of holdings 31 December 2018 | 31 December 2017 |
|---|---|---|---|
| Direct subsidiaries: | | | |
| NMC Holding Co LLC | UAE | 100% | 100% |
| NMC Health Holdco Limited | UK | 100% | 100% |
| NMC Eugin UK Limited | UK | 100% | - |
| Indirect subsidiaries: | | | |
| NMC Healthcare LLC | UAE | 100% | 100% |
| New Pharmacy Company WLL | UAE | 100% | 100% |
| New Medical Centre LLC - Dubai | UAE | 100% | 100% |
| NMC Specialty Hospital LLC - Abu Dhabi | UAE | 100% | 100% |
| NMC Specialty Hospital LLC - Dubai | UAE | 100% | 100% |
| New Medical Centre Trading LLC - Abu Dhabi | UAE | 100% | 100% |
| NMC Trading LLC - Dubai | UAE | 100% | 100% |
| Bait Al Shifaa Pharmacy LLC - Dubai | UAE | 100% | 100% |
| New Medical Centre LLC - Sharjah | UAE | 100% | 100% |
| New Medical Centre Specialty Hospital LLC - Al Ain | UAE | 100% | 100% |
| Reliance Information Technology LLC | UAE | 100% | 100% |
| BR Medical Suites FZ LLC | UAE | 100% | 100% |
| Bright Point Royal Womens Hospital LLC | UAE | 100% | 100% |
| NMC Day Surgery Centre LLC | UAE | 100% | 100% |
| NMC Hospital LLC (DIP Hospital) | UAE | 100% | 100% |
| Medifertil, S.A | Columbia | 61.90% | 61.90% |
| Centro de infertilidad y Reproduccion Humana SLU (CIRH) | Spain | 88.40% | 88.40% |
| Centro de Medicina della Riproduzione (Biogenesi) | Italy | 53.00% | 53.00% |
| EUVITRO, S.L.U | Spain | 88.40% | 88.40% |
| Copenhagen Fertility Center Holding Aps (DK) | Denmark | 79.60% | 79.60% |
| Huntington Centro de Medicina Reproductive, S/A (BR) | Brazil | 53% | 53% |
| ProVita International Medical Center LLC | UAE | 100% | 100% |
| Lifewise Home Healthcare LLC | UAE | 100% | 100% |
| NMC Royal Hospital LLC | UAE | 100% | 100% |
| The American Surgecenter Pharmacy LLC | UAE | 100% | 100% |
| The American Surgecenter LLC | UAE | 100% | 100% |
| Americare LLC | UAE | 100% | 100% |
| Trans Arabia Drug Store LLC | UAE | 75% | 75% |
| Sunny Specialty Medical Centre LLC | UAE | 100% | 100% |
| Sunny Medical Centre LLC | UAE | 100% | 100% |
| New Sunny Medical Centre LLC | UAE | 100% | 100% |
| Sunny Al Buhairah Medical Centre LLC | UAE | 100% | 100% |
| Sunny Al Nadha Medical Centre LLC | UAE | 100% | 100% |

Exhibit 6 to B.R. Shetty's Request for Judicial Notice          169 of 182          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

Financial Statements

# Notes to the Financial Statements continued
At 31 December 2018

## 4 Investment in subsidiaries continued

| | Country of incorporation | Percentage of holdings | |
| --- | --- | --- | --- |
| | | 31 December 2018 | 31 December 2017 |
| Sunny Dental Care LLC | UAE | 100% | 100% |
| Grand Hamad Pharmacy LLC | UAE | 100% | 100% |
| Hamad Pharmacy LLC | UAE | 100% | 100% |
| Sharjah Pharmacy LLC | UAE | 100% | 100% |
| Sunny Sharqan Medical Centre LLC | UAE | 100% | 100% |
| NMC Royal Medical Centre LLC | UAE | 100% | 100% |
| NMC Healthcare LLC | Oman | 100% | 100% |
| Fulfil Trading LLC | UAE | 100% | 100% |
| Nadia Medical Centre LLC | UAE | 100% | 100% |
| Cooper Dermatology and Dentistry Clinic | UAE | 100% | 100% |
| Cooper Health Clinic | UAE | 100% | 100% |
| Fakih IVF Fertility Centre LLC | UAE | 100% | 51% |
| Fakih IVF LLC | UAE | 100% | 51% |
| Beiersdorf Cosmetics Trading LLC - Abu Dhabi Branch. | UAE | 100% | 100% |
| New Marketing & Trading Co.LLC - Abu Dhabi | UAE | 100% | 100% |
| New Medical Centre Trading LLC - Branch 2 | UAE | 100% | 100% |
| New Medical Centre Trading LLC - Branch 3 | UAE | 100% | 100% |
| Beiersdorf Cosmetics Trading LLC - Ajman Branch | UAE | 100% | 100% |
| National Marketing & Trading Co. LLC - Ajman | UAE | 100% | 100% |
| New Marketing & Trading Company LLC - Ajman Branch | UAE | 100% | 100% |
| NMC Trading LLC - Ajman Branch | UAE | 100% | 100% |
| Beiersdorf Cosmetics Trading Co. LLC - Dubai | UAE | 100% | 100% |
| National Marketing & Trading Co. LLC - Dubai Branch | UAE | 100% | 100% |
| New Marketing & Trading Co. LLC - Dubai Branch | UAE | 100% | 100% |
| New Medical Centre Trading (Store) LLC - Dubai | UAE | 100% | 100% |
| New Medical Centre Veterinary Medicine & Equipment Trading Co LLC - Dubai | UAE | 100% | 100% |
| NMC Trading LLC - Dubai Branch | UAE | 100% | 100% |
| NMC Trading LLC - Fujairah Branch | UAE | 100% | 100% |
| NMC Trading RAK - Branch LLC | UAE | 100% | 100% |
| New Medical Centre | UAE | 100% | 100% |
| New Medical Centre LLC - Branch (Al-Ain, Al wadi) | UAE | 100% | 100% |
| NMC Pharmacy | UAE | 100% | 100% |
| NMC Pharmacy-Branch | UAE | 100% | 100% |
| PVHC KSA | KSA | 100% | 100% |
| TVM KSA Acquisition 2 Ltd. | Cyprus | 100% | 100% |
| NMC Royal Medical Centre LLC - Branch | UAE | 100% | 100% |
| Muscat Central Healthcare LLC | Oman | 100% | 100% |
| NMC Healthcare India Pvt. Ltd. | India | 100% | 100% |
| NMC International Trading LLC | UAE | 100% | 100% |
| Cooper Health Clinic - Branch | UAE | 100% | 100% |
| New Reproductive Care Ltd. | Cayman Islands | 51% | 51% |
| New Medical Centre Abu Dhabi Branch | UAE | 100% | 100% |
| New Medical Centre Trading LLC Branch 1 | UAE | 100% | 100% |
| NMC Trading LLC Branch | UAE | 100% | 100% |
| New Medical Centre Pharmacy Al Ain Branch 1 | UAE | 100% | 100% |
| Focus Optics | UAE | 100% | 100% |
| Bright Point Pharmacy LLC | UAE | 100% | 100% |
| Lotus Pharmacy LLC | UAE | 100% | 100% |
| New Medial Centre Pharmacy LLC Sharjah | UAE | 100% | 100% |
| New Medical Centre Trading (Store) LLC - Abu Dhabi Br | UAE | 100% | 100% |
| Provita International Medical Centre LLC - Alain Branch | UAE | 100% | 100% |
| NMC Medical Professional Training Centre LLC | UAE | 100% | 100% |
| New Pharmacy Company WLL Branch 1 | UAE | 100% | 100% |
| New Pharmacy Company WLL Branch 2 | UAE | 100% | 100% |
| New Pharmacy Company WLL Branch 6 | UAE | 100% | 100% |
| Royal Arsom Wellness Centre LLC | UAE | 100% | 100% |
| NMC Medical Centre Branch 2 (scientific store) | UAE | 100% | 100% |
| New Medical Centre Pharmacy LLC Alain | UAE | 100% | 100% |
| Fertilitetsklinikken Lygten A/S | Denmark | 79.60% | 79.60% |
| Luarmia, S.L. | Spain | 88.40% | 88.40% |
| Al Aseel Laundry | UAE | 100% | 100% |
| Zari Spa & Beauty Centre | UAE | 100% | 100% |
| Zari Spa for Men | UAE | 100% | 100% |

| | Country of incorporation | Percentage of holdings | |
| --- | --- | --- | --- |
| | | 31 December 2018 | 31 December 2017 |
| *PEL Assistencia A Infertilidade LTDA* | Brazil | 53% | 53% |
| *Mustashfa Jadeed Fund* | KSA | 100% | 100% |
| *Al Qadi Speciality Hospital LLC* | KSA | 60% | 60% |
| *As Salama Hospital LLC* | KSA | 99% | 70% |
| *Al Zahra Private Hospital Company* | UAE | 100% | 100% |
| *Sunny Halwan Speciality Medical Centre* | UAE | 100% | 100% |
| *Hamad Drug Store LLC* | UAE | 100% | 100% |
| *Sunny Maysloon Speciality Medical Centre LLC* | UAE | 100% | 100% |
| *Centre de Reproduccio Asistida del ("Fecunmed")* | Spain | 70.7% | 70.7% |
| *NMC Royal Medical Centre LLC* | Oman | 100% | 100% |
| *NMC Trading LLC* | Oman | 100% | 100% |
| *Fertilitetsklinikken Lygten A/S-Branch2* | Denmark | 79.6% | 79.6% |
| *Centro de Medicina della Riproduzione-C.M.R. S.R.L. - Branch 2* | Italy | 53% | 53% |
| *Centro de Medicina della Riproduzione-C.M.R. S.R.L. - Branch 3* | Italy | 53% | 53% |
| *Huntington Centro De Medicina Reproductiva, Vila Mariana S/A* | Brazil | 53% | 53% |
| *Huntington Centro De Medicina Reproductiva Campinas Ltda* | Brazil | 88.4% | 88.4% |
| *Euvitro, S.L.U - Branch 2* | Spain | 88.4% | 88.4% |
| *NMC Royal Medical Clinic LLC (Etisalat)* | UAE | 100% | – |
| *NMC Royal First Aid Clinic LLC (Adnec Clinic)* | UAE | 100% | – |
| *NMC Royal First Aid Clinic LLC (Adnec Clinic)-Branch2* | UAE | 100% | – |
| *Hamad Al Ihterafeya Pharmacy LLC* | UAE | 100% | – |
| *Hamad Al Mumayazah Pharmacy LLC* | UAE | 100% | – |
| *Hamad Al Oula Pharmacy LLC* | UAE | 100% | – |
| *NMC Medical Centre Ajman LLC Br.* | UAE | 100% | – |
| *NMC Royal Dental Centre* | UAE | 100% | – |
| *NMC Royal Medical Centre* | UAE | 100% | – |
| *NMC Royal Pharmacy Centre* | UAE | 100% | – |
| *Emirates Medical Center LLC* | Oman | 100% | – |
| *New Medical Centre Pharmacy/Branch* | UAE | 100% | – |
| *Fakih Medical Center L.L.C* | UAE | 100% | – |
| *Fakih Medical Center Pharmacy LLC* | UAE | 100% | – |
| *Bareen International Hospital* | UAE | 100% | – |
| *Bareen Pharmacy* | UAE | 100% | – |
| *Fakih IVF Center* | Oman | 100% | – |
| *Fakih IVF Fertility Center LLC-Branch 3* | UAE | 100% | – |
| *Mesk Al Madina Medical Centre LLC* | UAE | 100% | – |
| *Zanbaq Al Madina Pharmacy LLC* | UAE | 100% | – |
| *NMC Healthcare UK Limited* | UK | 100% | – |
| *HCN European Surgery Center Holdings Limited* | UK | 100% | – |
| *European Surgical Partners Limited* | UK | 100% | – |
| *Global Healthcare Partners Limited* | UK | 100% | – |
| *Aspen Healthcare Limited* | UK | 100% | – |
| *Parkside IHL Scanning Services LLP* | UK | 51.8% | – |
| *Edinburgh Medical Services Limited T/A The Edinburgh Clinic* | UK | 100% | – |
| *Eye-Docs Limited T/A Midland Eye* | UK | 70.0% | – |
| *Aspen Leasing Limited* | UK | 100% | – |
| *Crossco (1385) Limited* | UK | 100% | – |
| *HTI St James'S Limited T/A Nova Healthcare* | UK | 100% | – |
| *Cancer Centre London LLP* | UK | 63.0% | – |
| *Highgate Hospital LLP* | UK | 99.0% | – |
| *Claremont Hospital Holdings Limited* | UK | 100% | – |
| *Claremont Hospital LLP* | UK | 81.0% | – |
| *NMC Fertility Kenya Limited* | Kenya | 60% | – |
| *NMC Healthcare Sukuk Limited* | Cayman Islands | 100% | – |
| *Cytomed Middle East - Branch of Abu Dhabi* | UAE | 100% | – |
| *Cytomed Middle East LLC (Sharjah)* | UAE | 100% | – |
| *New Medical Center Trading Store LLC - Branch 2* | UAE | 100% | – |
| *NMC Health (Jersey) Limited* | UK | 100% | – |
| *New Pharmacy Company WII-Branch 4* | UAE | 100% | – |
| *Premier Care Home Medical And Health Care LLC* | UAE | 70% | – |
| *Taskeen Home Medical And Health Care LLC* | UAE | 70% | – |
| *Reaya Mumayaza Specialized For Medical Home Care LLC* | UAE | 70% | – |
| *NMC Health Investments LLC* | UAE | 100% | – |
| *Chronic Care Specialist Medical Center Co* | KSA | 100% | – |
| *New Medical Centre Hospital Hail* | KSA | 100% | – |

NMC Health plc Annual Report and Accounts 2018     167

Exhibit 6 to B.R. Shetty's Request for Judicial Notice     171 of 182     Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

# Notes to the Financial Statements continued
At 31 December 2018

## 4  Investment in subsidiaries continued

| | Country of incorporation | Percentage of holdings 31 December 2018 | 31 December 2017 |
|---|---|---|---|
| Al Salam Medical Group JSC Company | KSA | 80% | – |
| Al Salam Hospital | KSA | 80% | – |
| Al Salam Polyclinic | KSA | 80% | – |
| Ishbaliya Polyclinic Company LLS | KSA | 80% | – |
| Sandook Al Watani Al Tejari LLC | KSA | 100% | – |
| Emirates Hospital Wellness And Obesity Clinic | UAE | 100% | – |
| Poly Clinic Aesthetic Dermatology Plastic Surgery Dental LLC | UAE | 100% | – |
| Aesthetic Skin Care Clinic LLC | UAE | 75% | – |
| Centurion Medical Facilities Management Group LLC | UAE | 100% | – |
| CosmeSurge Investment LLC | UAE | 70% | – |
| CosmeSurge Hospital - Umm Suquiem | UAE | 70% | – |
| CosmeSurge Clinics LLC, Jumeirah | UAE | 70% | – |
| CosmeSurge & Emirates Clinics For One Day Surgery LLC | UAE | 70% | – |
| CosmeSurge Clinics LLC, Marina Branch | UAE | 70% | – |
| CosmeSurge Clinics LLC, Conrad Branch | UAE | 70% | – |
| CosmeSurge Clinics LLC, Branch Of Abu Dhabi | UAE | 70% | – |
| CosmeSurge Clinics LLC, Fujarah Branch | UAE | 70% | – |
| CosmeSurge Clinics LLC, Oman Branch | Oman | 70% | – |
| CosmeSurge Clinics LLC, Rak Branch 1 | UAE | 70% | – |
| CosmeSurge Clinics LLC, Rak Branch | UAE | 70% | – |
| CosmeSurge & Emirates Clinics For One Day Surgery LLC Br 2 | UAE | 70% | – |
| CosmeSurge & Emirates Clinics For One Day Surgery LLC Br 1 | UAE | 70% | – |
| CosmeSurge & Emirates Clinics For One Day Surgery LLC.SBr | UAE | 70% | – |
| CREA, SRL | Italy | 88.4% | – |
| Pró-Criar Participaçoes E Empreendimentos S/A | Brazil | 53.0% | – |
| Clinica Jpjc Ltda | Brazil | 53.0% | – |
| Clinica De Reprodução Assistida Sul Mineira Ltda | Brazil | 53.0% | – |
| Eugin Sweden Ab | Sweden | 66.3% | – |
| Nordic Eggbank Ab | Sweden | 66.3% | – |
| Nordic IVF Center Göteborg Ab | Sweden | 66.3% | – |
| Nordic IVF Center Malmö Ab | Sweden | 66.3% | – |
| Nordic IVF Och Gynekologi Stockholm Ab | Sweden | 66.3% | – |
| Stockholm IVF Ab | Sweden | 66.3% | – |
| AVA Clinic SIA | Latvia | 100% | – |
| NMC Eugin USA Corporation | USA | 70% | – |
| Boston IVF Ventures, LLC ("Holdco") | USA | 70% | – |
| BIVF Management Services, LLC Company | USA | 70% | – |
| Friendly doctor | USA | 70% | – |
| Albany Fertility & Gynecology, PLLC ("Albany IVF") | USA | 70% | – |
| Boston IVF, LLC ("Boston Subsidiary) | USA | 70% | – |
| Boston IVF Fertility Services at The Women's Hospital, LLC | USA | 70% | – |
| MPD Medical, LLC | USA | 70% | – |
| Boston IVF - CRMI Holding, LLC | USA | 70% | – |
| Boston IVF - The Arizona Center, LLC | USA | 70% | – |
| Scottsdale - Boston Surgery Center, LLC | USA | 70% | – |
| NMC Genetics India Private Limited | India | 85% | – |
| NMC Lifesciences LLC | UAE | 100% | – |

## 5  Other receivable and prepayments

| | 2018 US$'000 | 2017 US$'000 |
|---|---|---|
| Other receivables | 112 | 98 |
| Prepayments | 49 | 15 |
| | 161 | 113 |

Exhibit 6 to B.R. Shetty's Request for Judicial Notice            172 of 182            Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

## 6  Related party transactions

These represent transactions with related parties, i.e. major shareholders and senior management of the Company, and entities controlled, jointly controlled or significantly influenced by such parties. Pricing policies and terms of all transactions are approved by the management of the Company.

The Company's immediate and ultimate controlling party is a group of three individuals (H.E. Saeed Bin Butti, Dr BR Shetty and Mr Khalifa Bin Butti) who are all shareholders and of whom two are directors of the Company and who together have the ability to control the Company. As the immediate and ultimate controlling party is a group of individuals, it does not produce consolidated financial statements.

### Transactions with related parties

During the year, expenses amounting to US$760,000 (2017: US$2,907,000) was charged by NMC Healthcare LLC to the Company.

Dividend amount of US$35,739,000 (2017: US$27,779,000) was paid, on behalf of the Company, by NMC Healthcare LLC to the shareholders of the Company. Amount paid by subsidiary was recorded as payable to the subsidiary.

During the year the Company recorded dividend income of US$71,221,000 (2017: US$44,385,000). This was non cash transactions and debited to NMC Healthcare LLC.

An amount of US$138,538,000 was paid by NMC Healthcare LLC, on behalf of the Company for acquisition of subsidiaries.

| | 2018 US$'000 | 2017 US$'000 |
|---|---|---|
| **Amounts due from Subsidiary** | | |
| Amounts due from a related party | – | 19,505 |
| **Amounts due to Subsidiary** | | |
| Amounts due to a related party | 98,212 | – |

### Loan to a Subsidiary

This represents loan given to BIVF Management Services LLC and is repayable in 2019. It carries interest at 10% per annum.

The Company is a guarantor along with other fellow subsidiary undertakings for the US$1,200,000,000 (2017: US$1,075,000,000) syndicated loan facility raised by its subsidiary NMC Healthcare LLC.

### Terms and conditions of transactions with related parties

The sales to and purchases from related parties are made on terms equivalent to those that prevail in arm's length transactions. Outstanding balances at the year-end are unsecured and interest free and settlement occurs in cash. There have been no guarantees provided or received for any related party receivables or payables. For the year ended 31 December 2018, the Group has not recorded any impairment of receivables relating to amounts owed by related parties (2017: US$ nil). This assessment is undertaken each financial year through examining the financial position of the related party and the market in which the related party operates.

### Compensation of key management personnel

| | 2018 US$'000 | 2017 US$'000 |
|---|---|---|
| Short term benefits | 7,570 | 4,152 |

Key management personnel include all the Non-Executives Directors (2017: all) and one senior management personnel (2017: one).

Financial Statements

# Notes to the Financial Statements continued
At 31 December 2018

### 7  Share capital and share premium
**31 December 2018**

| | Number of shares (thousands) | Ordinary shares US$'000 | Share premium US$'000 | Total US$'000 |
|---|---|---|---|---|
| **Issued and fully paid** *(nominal value 10 pence sterling each)* | 208,237 | 32,443 | 633,744 | 666,187 |

**31 December 2017**

| | Number of shares (thousands) | Ordinary shares US$'000 | Share premium US$'000 | Total US$'000 |
|---|---|---|---|---|
| **Issued and fully paid** *(nominal value 10 pence sterling each)* | 204,423 | 31,928 | 492,634 | 524,562 |

**Issued share capital and share premium movement**

| | Number of shares (thousands) | Ordinary shares US$'000 | Share premium US$'000 | Total US$'000 |
|---|---|---|---|---|
| **31 December 2018** | | | | |
| At 1 January 2018 | 204,423 | 31,928 | 492,634 | 524,562 |
| Issue of new shares | 3,534 | 477 | 138,714 | 139,191 |
| Exercise of stock option shares | 280 | 38 | 2,396 | 2,434 |
| At 31 December 2018 | 208,237 | 32,443 | 633,744 | 666,187 |
| **31 December 2017** | | | | |
| At 1 January 2017 | 204,285 | 31,910 | 491,778 | 523,688 |
| Exercise of stock option shares | 138 | 18 | 856 | 874 |
| At 31 December 2017 | 204,423 | 31,928 | 492,634 | 524,562 |

### 8  Other payables and accruals

| | 2018 US$'000 | 2017 US$'000 |
|---|---|---|
| Other payables | 1,118 | 604 |
| Accrued expenses | 42 | 138 |
| | 1,160 | 742 |

### 9  Profit attributable to members of the parent company
The Profit for the year in the financial statements of the Company is US$50,719,000 (2017: US$23,425,000).

### 10  Auditor's remuneration
The Company paid US$1,148,000 to its auditor in respect of the audit of the Company's annual accounts for the year ended 31 December 2018 (2017: US$1,008,000), which includes a portion in respect of the audit of the financial statements of the Company.

Fees paid to Ernst & Young LLP and its associates for non-audit services to the Company itself are not disclosed in the individual accounts of NMC Health plc because group financial statements are prepared which are required to disclose such fees on a consolidated basis.

### 11  Directors' remuneration

| | 2018 US$'000 | 2017 US$'000 |
|---|---|---|
| Directors' remuneration | 5,659 | 2,624 |

Further information in respect of this compensation paid to directors is disclosed in the Directors' Remuneration Report.

## 12  Share based payments

The Group currently operates two share option schemes:

### Long term incentive plan (LTIP)

Options awarded under the LTIP are made annually to Executive Directors and other senior management. The exercise prices are nil. Options have a life of ten years and a vesting period of three years. The LTIP is subject to performance conditions which can be found in the Directors' Remuneration Report in the Annual Report.

### Short term incentive plan (STIP)

Options awarded under the STIP are made annually to Executive Directors and other senior management. The exercise prices are nil. Options have a life of ten years and a vesting period of 3 years.

Fair values are determined using the Black-Scholes model. Expected volatility has been based on historical volatility over the period since the Company's shares have been publicly traded.

Administrative expenses include a charge of US$ 9,704,000 (2017: US$ 9,181,000) in respect of the cost of providing share options. The cost is calculated by estimating the fair value of the option at grant date and spreading that amount over the vesting period after adjusting for an expectation of non-vesting.

For options granted in the years ended 31 December 2017 and 2018, the fair value per option granted and the assumptions used in the calculation are as follows:

|  | 2018 STIP | 2017 STIP |
|---|---|---|
| Share price at grant date | £33.620 | £20.740 |
| Fair value at measurement date | £33.499 | £20.425 |
| Exercise price | £nil | £nil |
| Expected volatility | 40% | 40% |
| Expected option life | 1-2 years | 2 years |
| Expected dividend yield | 0.36% | 0.51% |
| Risk free interest rate | 2.42% | 1.57% |

|  | 2018 LTIP | 2017 LTIP1 | 2017 LTIP2 |
|---|---|---|---|
| Share price at grant date | £33.620 | £16.330 | £27.390 |
| Fair value at measurement date | £33.259 | £16.082 | £27.088 |
| Exercise price | £nil | £nil | £nil |
| Expected volatility | 40% | 40% | 40% |
| Expected option life | 3 years | 3 years | 3 years |
| Expected dividend yield | 0.36% | 0.51% | 0.37% |
| Risk free interest rate | 2.42% | 1.49% | 1.38% |

Share prices at grant date are the closing prices as of those dates.

LTIP represent long term incentive plans and STIP represent short term incentive plans issued in March 2018.

Financial Statements

# Notes to the Financial Statements continued
At 31 December 2018

## 12 Share based payments continued
**Short term incentive plan (STIP) continued**
The options existing at the year-end were as follows:

| | 2018 | | 2017 | | |
| --- | --- | --- | --- | --- | --- |
| | Number of shares | Exercise price | Number of shares | Exercise price | Period when exercisable |
| Long term incentive plan (LTIP) Oct-14 | 60,292 | £nil | 60,292 | £nil | 29/10/17 to 28/10/24 |
| Short term incentive plan (STIP) Oct-14 | 20,165 | £nil | 20,165 | £nil | 29/10/17 to 28/10/24 |
| Long term incentive plan (LTIP) Feb-15 | 69,615 | £nil | 221,539 | £nil | 25/02/18 to 24/02/25 |
| Short term incentive plan (STIP) Feb-15 | 25,240 | £nil | 74,801 | £nil | 25/02/18 to 24/02/25 |
| Long term incentive plan (LTIP) Sep-15 | 23,011 | £nil | 49,309 | £nil | 09/09/18 to 08/09/25 |
| Long term incentive plan (LTIP) Mar-16 | 383,717 | £nil | 383,717 | £nil | 15/03/19 to 14/03/26 |
| Short term incentive plan (STIP) Mar-16 | 68,151 | £nil | 68,151 | £nil | 15/03/19 to 14/03/26 |
| Long term incentive plan (LTIP) Jan-17 | 334,634 | £nil | 562,323 | £nil | 27/01/20 to 26/01/27 |
| Short term incentive plan (STIP) May-17 | 54,705 | £nil | 150,435 | £nil | 09/05/18 to 08/05/27 |
| Long term incentive plan (LTIP) Sep-17 | 120,526 | £nil | 120,526 | £nil | 07/09/20 to 06/09/27 |
| Long term incentive plan (LTIP) Mar-18 | 46,219 | £nil | nil | £nil | 08/03/21 to 08/03/28 |
| Short term incentive plan (STIP) Mar-18 | 186,382 | £nil | nil | £nil | 08/03/19 to 08/03/28 |
| Total options subsisting on existing ordinary shares | 1,392,657 | | 1,711,258 | | |
| Percentage of issued share capital | 0.70% | | 0.80% | | |

Movement of share options during the year is as follows:

| | 2018 | 2017 |
| --- | --- | --- |
| At 1 January | 1,711,258 | 1,013,822 |
| Vested in lieu of dividend | 2,047 | 2,290 |
| Granted during the year | 232,601 | 833,284 |
| Exercised during the year | (275,646) | (138,138) |
| Lapsed during the year | (227,689) | - |
| Outstanding at 31 December | 1,442,571 | 1,711,258 |

No options expired or forfeited during the year (2017: nil).

## 13 Deferred consideration payable
This represents deferred consideration in respect of 49% shares acquired by the Company in Fakih IVF UAE. Remaining 51% shares are owned by NMC Healthcare LLC. Deferred consideration is payable in 2019.

## 14 Financial risk management
The Company's principal financial liabilities are other payables, arising in the normal course of business. The Company's financial assets include an amount due from a related party and bank balances. The company's activities expose it to a variety of financial risks: interest rate risk, credit risk, liquidity risk and foreign currency risk.

**Interest rate risk**
Interest rate risk is the risk that the fair value or future cash flows of a financial instrument will fluctuate because of changes in market interest rates. The Company is exposed to interest rate risk on its bank balances only, as the balance due from a related party is interest free, and therefore the Company's exposure to interest rate risk is limited.

## Credit risk

Credit risk is the risk that counterparty will not meet its obligations under a financial instrument, leading to a financial loss. The Company's credit risk arises from amounts due from a related party and bank balances.

The directors assess the credit quality of the related party by taking into account their financial position, past experience and other factors. Management does not expect any losses from non-performance by this counterparty, which is a subsidiary of the Company.

The Company limits its credit risk with regard to bank balances by only dealing with reputable banks. The credit rating of the bank at which the cash at bank is held is AA+.

The Company's credit risk exposure against a corporate guarantee provided to NMC Healthcare LLC in respect of the syndicate loan is US$1,200,000,000 (2017: US$1,075,000,000).

## Liquidity risk

The Company's objective is to maintain sufficient funding to meet its obligations as they fall due.

The table below analyses the Company's undiscounted financial liabilities into relevant maturity groupings based on the contractual payment dates.

Balances due within 12 months equal their carrying balances as the impact of discounting is not significant

| | On demand US$'000 | Less than 3 months US$'000 | 3 to 12 months US$'000 | 1 to 5 years US$'000 | Total US$'000 |
|---|---|---|---|---|---|
| **At 31 December 2018** | | | | | |
| Other payables | - | 1,118 | - | - | 1,118 |
| **Total** | - | 1,118 | - | - | 1,118 |
| At 31 December 2017 | | | | | |
| Other payables | - | 604 | - | - | 604 |
| **Total** | - | 604 | - | - | 604 |

In addition to the above financial liabilities, the Company has provided a corporate guarantee of US$1,200,000,000 (2017: US$1,075,000,000) to NMC Healthcare LLC in respect of the syndicate loan. The fair value of the corporate guarantee is US$nil as at 31 December 2018 (2017: US$nil).

## Foreign currency risk

Foreign currency risk arises when future commercial transactions or recognised assets or liabilities are denominated in a currency that is not the entity's functional currency.

The Company is exposed to currency risk on its other payables denominated in Pound Sterling. Foreign currency payable balances included in the statement of financial position denominated in Pound Sterling are US$1,056,000 (2017: US$583,000). The impact of possible of foreign currency movement is not significant.

## Fair value estimation

The fair values of the Company's financial instruments are not materially different from their carrying values at the statement of financial position date.

## Financial guarantees

The Company is a guarantor along with other fellow subsidiary undertakings for US$1,200,000,000 (2017: US$1,075,000,000) of a syndicated bank loan raised by its subsidiary NMC Healthcare LLC.

## 15 Dividends

In the AGM on 28 June 2018 the shareholders approved a dividend of 13.0 pence per share, amounting to GBP 27,066,000 (US$35,739,000) to be paid to shareholders on the Company's share register on 15 June 2018 (30 June 2017: a dividend of GBP 21,753,000 equivalent to US$27,779,000 was approved on 23 May 2017 and paid on 1 June 2017). No interim dividend was declared during the year. Subject to shareholder' approval at the Annual General Meeting on 20 June 2019, a final dividend of 18.1 pence per share, GBP37,652,000 (US$49,731,000) will be paid on 10 July 2019 to shareholders on the Company's share register on 14 June 2019.

## 16 Tax

The Group operates in the United Arab Emirates, Spain, the UK and other jurisdictions. No deferred tax asset has been recognised in respect of the estimated unused tax losses due to the unpredictability of future profit streams. Included in unrecognised tax losses are losses of approximately US$94,320,041 (2017: US$46,549,000) that may be carried forward indefinitely. Additionally the group has unrecognized Zakat losses in Saudi Arabia of US$48,712,269 which have not been recognized for deferred tax purposes.

Other Information

# Shareholder Information

## AGM and dividend dates

| | |
|---|---|
| Ex-dividend date for final dividend | 13 June 2019 |
| Record date for final dividend | 14 June 2019 |
| Annual General Meeting | 20 June 2019 |
| Final dividend payment | 10 July 2019 |

## Dividends

Information in relation to the Company's dividend policy and the proposed dividend payment per share is set out in the Financial Review on page 19 and in Note 27 to the Consolidated Financial Statements on page 142.

## Share Capital

The issued share capital as at 1 January 2018 was £20,442,385.20 divided into 204,423,852 Ordinary shares of 10p each. During the 2018 financial year, the Company issued a total of 3,813,490 new Ordinary shares, with 3,533,857 shares issued as part of the consideration payable for the purchase of the minority interest in Fakih IVF not previously owned by the Group, and the remaining 279,633 shares issued following the exercise of share awards granted under the Company's Long Term Incentive Plan and Deferred Share Bonus Plan. No other changes to the share capital of the Company were made during the year.

The issued share capital of the Company as at 31 December 2018 was £20,823,734.20 divided into 208,237,342 Ordinary shares of 10p each. Options and share awards granted by the Company over its share capital are set out in the Directors' Remuneration Report on pages 62 to 78.

Under the articles of association of the Company, all Ordinary shares have equal rights to dividends and capital and to vote at general meetings of the Company. The directors are not aware of any agreements between holders of the Company's shares that may result in restrictions on the transfer of securities or in voting rights.

## Annual General Meeting

The annual general meeting of NMC Health plc will be held at Allen & Overy LLP, One Bishops Square, London E1 6AD on 20 June 2019 at 2.30 pm.

Further details of the resolutions to be proposed at the annual general meeting is set out in the Notice of Annual General Meeting circular which is included in a separate document enclosed with this annual report.

## Share Registrar

Our Registrars are Link Asset Services who can be contacted as follows:

| | |
|---|---|
| Address: | Link Asset Services, The Registry, 34 Beckenham Road, Beckenham, Kent, BR3 4TU |
| Email: | enquiries@linkgroup.co.uk |
| Telephone: | 0871 664 0300 |
| International: | +44 (0) 371 664 0300 |
| | Calls cost 12p per minute plus your phone company's access charge. Calls outside the United Kingdom will be charged at the applicable international rate. Lines are open between 09:00 - 17:30, Monday to Friday excluding public holidays in England and Wales |

## Principal shareholders

As at 6 March 2019, the Company is aware of the following significant shareholdings in the Ordinary shares of the Company:

| Shareholder | Number of shares | % of issued share capital held | Nature of holding |
|---|---|---|---|
| Dr B. R. Shetty | 40,008,923 | 19.2% | Direct |
| H.E. Saeed Bin Butti | 36,419,091 | 17.5% | Direct |
| Khalifa Bin Butti | 30,696,561 | 14.7% | Direct |
| Infinite Investment LLC | 15,280,426 | 7.3% | Direct |

Case 2:20-cv-02303-CBM-MAA   Document 82-1   Filed 09/22/21   Page 180 of 183   Page ID #:1558

Overview
Group Strategic Report
Governance
Financial Statements
Other Information

Exhibit 6 to B.R. Shetty's Request for Judicial Notice          179 of 182          Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA





**nmc health**

NMC Health plc
Level 1 Devonshire House
One Mayfair Place
Mayfair
London W1J 8AJ