Mark B. Chassman, SBN 119619
Email: mchassman@chassmanseelig.com
Ana Vasquez, SBN 231903
Email: avasquez@chassmanseelig.com
CHASSMAN & SEELIG, LLP
1250 Sixth Street, Suite 403
Santa Monica, CA 90401
Telephone: (310) 929-7192
Fax: (310) 929-7627

Alexander D. Pencu (*pro hac vice*)
Email: adp@msf-law.com
Benjamin D. Bianco (*pro hac vice*)
Email: bdb@msf-law.com
Austin D. Kim (*pro hac vice*)
Email: adk@msf-law.com
MEISTER SEELIG & FEIN LLP
125 Park Avenue, 7th Floor
New York, NY 10017
Telephone: (212) 655-3500
Fax: (646) 539-3649

*Attorneys for Defendant B.R. Shetty*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRIS HASHEM, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>NMC HEALTH PLC, PRASANTH MANGHAT, KHALIFA BIN BUTTI, PRASHANTH SHENOY, H.J. MARK TOMPKINS, and B.R. SHETTY,<br><br>Defendants. | Case No.: 2:20-cv-02303-CBM-MAA<br><br>(Consolidated with Case No. 2:20-cv-02895-CBM-MAA) |

**EXHIBIT 7**
**TO SECOND REQUEST FOR JUDICIAL NOTICE AND INCORPORATION BY REFERENCE IN SUPPORT OF MOTION TO DISMISS OF DEFENDANT B.R. SHETTY**

Case 2:20-cv-02303-CBM-MAA   Document 82-2   Filed 09/22/21   Page 2 of 146   Page
Case 2:15-cv-04194-DDP-JC   Document 75 #Filed 08/08/19   Page 1 of 145   Page ID #:1526
ID #:1503

ROBBINS GELLER RUDMAN
  & DOWD LLP
DENNIS J. HERMAN (220163)
WILLOW E. RADCLIFFE (200087)
JOHN H. GEORGE (292332)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
dennish@rgrdlaw.com
willowr@rgrdlaw.com
jgeorge@rgrdlaw.com

Lead Counsel for Plaintiffs

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARK STOYAS and NEW ENGLAND TEAMSTERS & TRUCKING INDUSTRY PENSION FUND, <br><br> Plaintiffs, <br><br> and <br><br> AUTOMOTIVE INDUSTRIES PENSION TRUST FUND, Individually and on Behalf of All Others Similarly Situated, <br><br> Lead Plaintiff, <br><br> vs. <br><br> TOSHIBA CORPORATION, <br><br> Defendant. | Case No. 2:15-cv-04194-DDP(JCx) <br><br> <u>CLASS ACTION</u> <br><br> SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE SECURITIES LAWS OF THE UNITED STATES AND JAPAN <br><br> <u>DEMAND FOR JURY TRIAL</u> |

4847-0125-0718.v2

Exhibit 7 to B.R. Shetty's
Request for Judicial Notice          1 of 145          Hashem, et al., v. NMC Health PLC, et al.,
                                                       2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA    Document 82-2    Filed 09/22/21    Page 3 of 146   Page
Case 2:15-cv-04194-DDP-JC   Document 75 #Filed 08/08/19   Page 2 of 145   Page ID #:1527

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ............................................................. 1

II.   JURISDICTION & VENUE .............................................. 5

III.  PARTIES ......................................................................... 7

      A.   Plaintiffs ............................................................... 7

      B.   Defendant Toshiba and Its Business .................... 9

IV.   SECURITIES AT ISSUE ................................................ 12

      A.   Securities Granting Ownership Interests in Common
           Stock Issued and Authorized for Sale by Toshiba ......... 12

      B.   Establishment of and Trading in Toshiba ADSs ........ 14

           1.   Nature of an ADS .......................................... 14

           2.   Establishment of the TOSYY ADS Program ........ 16

           3.   Toshiba's Consent to Sale of TOSYY ........... 19

      C.   The OTC Market ................................................ 23

V.    OVERVIEW OF SCHEME TO DEFRAUD ................... 25

      A.   Government Inquiry Sparks Widening Probes into
           Toshiba's Fraudulent Accounting ..................... 25

      B.   Investigators Find that Toshiba Deliberately Inflated
           Profits by Forcing Subsidiaries to Misrepresent Their
           Financial Results ............................................... 30

      C.   Toshiba Admits Wrongdoing; Fires, Disciplines, and
           Sues Its Top Executives ..................................... 37

      D.   Toshiba Restates Five Years of Results ............ 40

      E.   Toshiba Belatedly Reveals Westinghouse Goodwill
           Impairment ......................................................... 43

VI.   FRAUDULENT STATEMENTS, OMISSIONS & COURSE OF
      BUSINESS DURING THE CLASS PERIOD ................. 51

      A.   False Financial Statements ................................ 53

           1.   False Annual Financial Reports .................. 56

           2.   False Quarterly Financial Reports .............. 58

- i -

4847-0125-0718.v2

Exhibit 7 to B.R. Shetty's
Request for Judicial Notice

2 of 145

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

B.    False Statements About Westinghouse Goodwill Impairment ...................................................................... 60

    1.    Failure to Disclose or Record Goodwill Impairment Charges in FY12 and FY13 ...................... 60

    2.    Continuing Concealment of Goodwill Impairment Charges During 2015 Investigations of Accounting Fraud ..................................................................... 64

C.    False Statements About Internal Controls ............................... 70

VII.    SUMMARY OF ACCOUNTING FRAUD .................................................... 76

A.    False Accounting of Percentage of Completion Contracts ...... 78

    1.    Westinghouse ("Project G") ............................................. 79

    2.    Landis + Gyr ("Project H") ............................................. 80

    3.    TIC America ("Project I") ................................................ 81

    4.    Other Instances of False POC Accounting ..................... 83

B.    Cookie Jar Accounting in Visual Products Business ............... 84

C.    Channel Stuffing in PC Business ............................................. 88

D.    Failure to Report Westinghouse Goodwill Impairment Charges, or to Record Charges on Consolidated Financial Statements ................................................................................... 93

E.    Other False Accounting Practices ............................................ 97

    1.    Failure to Record Asset Impairment Charges ................ 97

    2.    Failure to Devalue Obsolete Semiconductor Inventory ......................................................................... 98

    3.    Recognition of Phantom Profits in the Visual Products Business ........................................................... 100

    4.    Improper Deferral of Operating Expenses in the PC Business .................................................................. 101

    5.    Manipulation of Foreign Currency Exchange Rates .... 101

    6.    Delayed Charge and Expense Recognition .................. 102

VIII.    PRESUMPTION OF RELIANCE (FRAUD ON THE MARKET) ........... 103

IX.    LOSS CAUSATION & DAMAGES ................................................................ 106

A.    TOSYY and TOSBF Trade at the Same Price as 6502 in Japan .......................................................................................... 107

- ii -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice

3 of 145

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

B.    Investors Were Harmed When the Risks and Information
      Concealed by Defendant's Fraud Were Revealed.................. 109

      1.    Release of SIC Findings............................................... 112

      2.    Release of IIC Report and Restatement of
            Financial Results .......................................................... 115

      3.    Disclosure of Westinghouse Impairment...................... 118

X.    CLASS ACTION ALLEGATIONS ............................................. 118

XI.   CLAIMS FOR RELIEF ................................................................ 121

XII.  PRAYER FOR RELIEF ................................................................ 127

XIII. JURY DEMAND ........................................................................... 128

- iii -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's                   4 of 145          Hashem, et al., v. NMC Health PLC, et al.,
Request for Judicial Notice                                                   2:20-cv-02303-CBM-MAA

# GLOSSARY OF DEFINED TERMS

The following short forms and citations are used herein:

| TERM | DEFINITION |
| --- | --- |
| "6502" | Common stock issued by Toshiba |
| "ADS" | American Depositary Share[1] |
| "ADR" | American Depositary Receipt |
| "AICPA" | American Institute of Certified Public Accountants |
| "Appendix" or "Apx." | Appendix of Exhibits to the Second Amended and Consolidated Class Action Complaint for Violation of the Securities Laws of the United States and Japan, filed concurrently herewith |
| "ASC" | Accounting Standards Codification |
| "ATS" | Alternative Trading System |
| "Barclays" | Barclays Capital LE |
| "BNY" | The Bank of New York Mellon |
| "ClearBridge" | ClearBridge Advisors LLC |
| "C/O" | Carryover |
| "Citibank" | Citibank, N.A. |
| "Class Period" | May 8, 2012 through November 12, 2015, inclusive |
| "COGS" | Cost of goods sold |
| "Company" | Toshiba Corporation |
| "Convergex" | Convergex Depositary, Inc. |
| "Corrective Period" | April 3, 2015 through November 13, 2015, inclusive |
| "CPA" | Certified Public Accountant |
| "Depositary Banks" | Collectively, BNY, Deutsche Bank, Citibank, and Convergex |
| "Deutsche Bank" | Deutsche Bank Trust Company Americas |

---

[1] "ADSs" is also used collectively to refer to both ADSs and ADRs. *See* ¶¶40 n.3, 51.

- iv -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice
5 of 145
Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA   Document 82-2   Filed 09/22/21   Page 7 of 146   Page
Case 2:15-cv-04194-DDP-JC   Document 75   Filed 08/08/19   Page 6 of 145   Page ID #:1531
ID #:1568

| "E&Y ShinNihon" | Ernst & Young ShinNihon LLC |
|---|---|
| "E&Y" | Ernst & Young |
| "EBITDA" | Earnings before interest, taxes, depreciation, and amortization |
| "Ex. __" | Exhibits to the Second Amended and Consolidated Class Action Complaint for Violation of the Securities Laws of the United States and Japan, filed concurrently herewith |
| "Exchange Act" | Securities Exchange Act of 1934 |
| "FINRA" | Financial Industry Regulatory Authority, Inc. |
| "FIX" | Financial Information eXchange |
| "FSA" | Financial Services Agency of Japan |
| "GAAP" | Generally accepted accounting principles |
| "IIC" | Independent Investigation Committee |
| "JFIEA" | Financial Instruments and Exchange Act of Japan |
| "Nikkei" | Nikkei 225 Index |
| "OTC" | Over-the-Counter |
| "OTC Markets Group" | OTC Markets Group Inc. |
| "OTC Link" | OTC Link LLC |
| "Pink" | Pink OTC Markets Inc. |
| "POC" | Percentage of completion |
| "SEC" | United States Securities and Exchange Commission |
| "SESC" | Securities and Exchange Surveillance Commission of Japan |
| "SG&A" | Selling, general and administrative |
| "SIC" | Special Investigation Committee |
| "SIS Co." | Social Infrastructure Systems Company |
| "TAES" | Toshiba America Energy Systems Corporation |
| "TAIS" | Toshiba America Information Systems, Inc. |

- v -

4847-0125-0718.v2

Exhibit 7 to B.R. Shetty's
Request for Judicial Notice

6 of 145

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

| "TDnet" | Tokyo Stock Exchange Electronic Disclosure for Investors Network |
|---|---|
| "TIH" | Toshiba Information Equipment (Hanghzhou) Co., Ltd. |
| "TNEH" | Toshiba Nuclear Energy Holdings (US) Inc. |
| "Toshiba" | Toshiba Corporation |
| "TPSC" | Toshiba Power Systems Company |
| "TSE" | Tokyo Stock Exchange |
| "TTI" | Toshiba Trading Incorporated |
| "TTIP" | Taiwan Toshiba International Procurement Corp. |
| "Westinghouse" | Westinghouse Electric Company LLC |
| "WIP" | Work-in-progress |

- vi -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice

7 of 145

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

## I.   INTRODUCTION

1.      This is a class action complaint seeking damages from Toshiba Corporation ("Toshiba" or the "Company") for violation of the U.S. Securities Exchange Act of 1934 ("Exchange Act") and the Financial Instruments & Exchange Act of Japan ("JFIEA") in connection with transactions in: (i) Toshiba American Depositary Shares ("ADS") sold under the ticker symbol TOSYY on the Over-the-Counter ("OTC") Market in the United States; (ii) Toshiba common stock sold as F-shares under the ticker symbol TOSBF on the OTC Market in the United States; and (iii) Toshiba common stock sold under the ticker symbol 6502 on the Tokyo and Nagoya stock exchanges in Japan.

2.      The claims alleged herein are brought on behalf of the class of persons defined in ¶334 below (the "Class"), which consists of: (i) all persons who purchased shares of TOSYY or TOSBF on the OTC Market between May 8, 2012 and November 12, 2015, inclusive (the "Class Period"); and (ii) all citizens and residents of the United States who purchased shares of Toshiba common stock ("6502") during the Class Period.

3.      This case arises from Toshiba's deliberate use of improper accounting over a period of at least six years to inflate its pre-tax profits by more than $2.6 billion (¥225 billion) and conceal at least $1.3 billion (¥128.2 billion) in impairment losses at its U.S. nuclear business, Westinghouse Electric Co. ("Westinghouse").

4.      The Company's accounting fraud was orchestrated by three successive CEOs of Toshiba and dozens of top executives who directed the manipulation of financial results reported by scores of Company subsidiaries and business units. An internal investigation concluded that the fraudulent accounting had been "carried out . . . in an institutional manner" under an oppressive command and control environment in which subsidiaries and subordinates were required to falsify financial results in order to demonstrate purported compliance with profit

- 1 -

4847-0125-0718.v2

Exhibit 7 to B.R. Shetty's
Request for Judicial Notice

8 of 145

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

projections that Toshiba's senior management had established knowing the targets were unattainable under current business conditions. Investigators found that Toshiba's control over the accounting fraud was so strict that "correcting such situation became practically impossible."

5.      Toshiba's accounting fraud was uncovered by a series of investigations that took place beginning in February 2015. The ever-widening probe quickly revealed numerous instances of deliberate violations of generally accepted accounting principles ("GAAP") carried out at the direction or with the knowledge and approval of Toshiba's most senior executives, including CEOs Atsutoshi Nishida, Norio Sasaki, and Hisao Tanaka; Audit Committee Chairman Fumio Muraoka; and CFO Makoto Kubo, who was also the Company's chief conference call spokesman during the Class Period.

6.      The investigations resulted in the September 7, 2015 restatement of more than six years of reported financial results that eliminated approximately one-third ($2.6 billion) of the profits Toshiba had reported from 2008 to 2014. In issuing the restatement, Toshiba assured investors that there was no need to write down the $2.8 billion (¥344 billion) in goodwill still carried on Toshiba's books as a result of its 2006 acquisition of Westinghouse, falsely claiming that its nuclear business had strengthened since the acquisition, even after the March 2011 meltdown of the Fukushima Daiichi nuclear reactor. It was not until Toshiba issued its 2Q15 results on November 6, 2015 that it admitted that, in fact, Westinghouse had written down goodwill in both FY12 and FY13. (Those charges were neither disclosed nor reflected in Toshiba's financial statements at the time they were taken.) Six days later, on November 12, a shocking report in the Nikkei Business journal revealed that the secret write-downs had totaled $1.3 billion: $926 million in FY12 and $400 million in FY13. Toshiba has since admitted that it should have disclosed the FY12 impairment charges at the time Westinghouse recorded the write-down.

- 2 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice                    9 of 145              Hashem, et al., v. NMC Health PLC, et al.,
                                                                                    2:20-cv-02303-CBM-MAA

7. The fraudulent accounting practices described herein were ingrained in Toshiba's business and carried out for the purpose of meeting earnings forecasts that were unattainable by any other means. As detailed in the report of the Independent Investigation Committee ("IIC") formed to investigate the fraud, Toshiba deliberately violated GAAP by failing to timely record losses on unprofitable construction contracts; channel stuffing manufacturing parts sold at inflated prices; deferring operating expenses until they could be reported without causing an earnings loss; failing to record charges for obsolete inventory or impaired assets; manipulating foreign currency conversion rates; and engaging in the other fraudulent practices alleged herein. *See* Ex. 1 to the Appendix of Exhibits ("Appendix" or "Apx.") to this Complaint; *infra* §§VI-VII.

8. According to a January 25, 2018 Nikkei article based on competent sources of information, the fraud described in the IIC report accelerated in 2010, shortly after Toshiba's new CEO, Sasaki, "began facing tough questions from shareholders in the U.S." regarding Toshiba's projections for Westinghouse's nuclear reactor business. T. Sugimoto & E. Hayashi, *How internal power struggles put Toshiba on a dangerous path*, Nikkei (Jan. 25, 2018) https://tinyurl.com/y3dabe33. Sasaki had worked closely with his predecessor, Nishida, on the Westinghouse acquisition, had developed the initial post-acquisition projection that Westinghouse would build 33 reactors, and had raised that projection to 39 reactors as soon as he was elevated to CEO. According to the Nikkei article, following the questions raised by U.S. investors over his projections, "Sasaki, hungry for better numbers, exacerbated the accounting irregularities that had started under Nishida."

9. By deliberately overriding its own internal control procedures and taking advantage of known internal control weaknesses that it deliberately failed to correct, Toshiba was able to inappropriately consolidate its subsidiaries' results into

- 3 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice
10 of 145
Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

its own financial statements while avoiding detection by investors or, in many instances, outside auditors.

10.     When auditors recognized an overstatement of earnings on a Westinghouse project in FY13, Toshiba refused to apply the correct accounting in order to avoid a negative earnings impact, and then pressured the auditor to ignore the deliberate overstatement by improperly classifying it as an immaterial error. When U.S. auditors ordered Westinghouse to write down its goodwill based on worsening business conditions, Toshiba similarly threatened to replace its outside auditor in an effort to force the auditor to back off on the requirement. After that effort failed, Toshiba pressured the auditor to replace the U.S. audit manager with a manager from Japan, while making extensive efforts to ensure that the fact that Westinghouse had taken a writedown would not be publicly disclosed or recorded on Toshiba's consolidated financial statements.

11.     By falsifying its earnings and failing to take required write-downs and charges, Toshiba avoided stock price declines that would have accompanied revelation of the Company's actual financial condition and results. Between April 3, 2015, when the internal investigation into Toshiba's accounting practices was first announced, and November 13, 2015, following the issuance of Toshiba's restatement and the revelation of the impaired goodwill at Westinghouse, the price of Toshiba securities declined by more than 40%, resulting in a loss of $7.6 billion (¥908 billion) in market capitalization that caused hundreds of millions of dollars in damages to U.S. investors in Toshiba securities:[2]

---

[2]   The chart below reflects the movement of Toshiba's common stock sold on the Tokyo Stock Exchange.  The price of both TOSYY and TOSBF sold in the United States is linked to and moves in tandem with the price of Toshiba 6502 common stock on the Tokyo exchange, such that the movements of the latter during the Class Period, as reflected in the chart below, are also illustrative of the movements of the former. *See infra* ¶¶309-315.

- 4 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice            11 of 145            Hashem, et al., v. NMC Health PLC, et al.,
                                                             2:20-cv-02303-CBM-MAA



## II.   JURISDICTION & VENUE

12.   The Exchange Act claims are asserted on behalf of purchasers of TOSYY and TOSBF shares in the United States and arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5.  Jurisdiction over the Exchange Act claims is conferred by §27 of the Exchange Act, 15 U.S.C. §78aa.

13.   Lead Plaintiff Automotive Industries Pension Trust Fund and named plaintiff New England Teamsters & Trucking Industry Pension Fund are both citizens of the United States.  Defendant Toshiba is a citizen of Japan.  The amount in controversy under the JFIEA claims exceeds $5 million.  Jurisdiction over the JFIEA claims is therefore conferred by 28 U.S.C. §1332(a)(2), and by 28 U.S.C. §1332(d)(2).

- 5 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice
12 of 145
Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

14.     The JFIEA claims are so related to the Exchange Act claims that they form part of the same case or controversy.  Jurisdiction over the JFIEA claims is therefore also conferred by 28 U.S.C. §1367.

15.     Toshiba is subject to personal jurisdiction in the United States and in this District because, as alleged in further detail below: (i) it engaged in the fraudulent scheme and course of conduct described herein, including by engaging in fraud that arose from transactions and occurrences that took place in and caused foreseeable losses in the United States and this District; (ii) in committing the fraudulent acts complained of herein, Toshiba operated as a unitary business and an integrated enterprise with its wholly-owned subsidiaries, including those based in this District and elsewhere in the United States, and controlled the internal affairs and operations of the subsidiaries to the extent that they became mere instrumentalities of their parent; and (iii) Toshiba has had and continues to have continuous and systematic contacts with this forum that render it at home in the United States and in this District.

16.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) and (c)(3) because Toshiba's principal places of business in the United States are located in and around Irvine, California within this District, and because some of the fraudulent acts alleged herein occurred or were related to transactions and occurrences that occurred in the United States and caused economic harm in the United States, including in this District.

17.     In prior judicial proceedings, Toshiba has asserted that this District is a convenient forum for litigation and discovery of disputes in which it is involved.

18.     Toshiba provides products for sale in this District and in the United States to its Irvine-based subsidiary, Toshiba America Information Systems ("TAIS").  Toshiba is the parent corporation of Toshiba America, Inc., which in turn is the parent corporation of TAIS.  Toshiba is aware and intends that its products are or have been marketed and sold to customers in this District and the United States.

- 6 -

4847-0125-0718.v2

Exhibit 7 to B.R. Shetty's
Request for Judicial Notice

13 of 145

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

The business documents and records relating to the marketing, sales, and financials of products sold in the United States are located at TAIS in this District.

19. In connection with the acts alleged in this Complaint, Toshiba, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, the Internet, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES

### A. Plaintiffs

20. Lead Plaintiff Automotive Industries Pension Trust Fund ("AIPTF") is a pension fund formed for the benefit of auto industry workers. AIPTF is based in Alameda, California. As set forth in the certification attached hereto as Exhibit A, AIPTF purchased 36,000 shares of TOSYY through transactions on the OTC Market in the United States on March 23, 2015, thereby acquiring an ownership interest in 216,000 shares of 6502 common stock issued and authorized for sale by Toshiba.

21. The TOSYY ADR reflecting AIPTF's purchase and its beneficial ownership of the underlying 6502 shares was issued by Citibank, located in New York City, within the United States. Contemporaneous with AIPTF's purchase and issuance of the ADR, the 216,000 shares of 6502 common stock in which it acquired an ownership interest were deposited with Citibank, which held the shares for the benefit of AIPTF.

22. AIPTF incurred irrevocable liability in the United States to purchase the TOSYY shares it acquired during the Class Period. The placement of the buy order, the payment of the purchase price, transfer of the title to the securities, and other related transactions took place within the territorial jurisdiction of the United States:

(a) AIPTF's purchase of TOSYY was directed by its outside investment manager, ClearBridge Advisors LLC located in New York;

- 7 -

4847-0125-0718.v2

Exhibit 7 to B.R. Shetty's
Request for Judicial Notice

14 of 145

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

(b)    Clearbridge placed the buy order through AIPTF's broker, Barclays Capital LE, located in New York;

(c)    Barclay's purchased TOSYY for AIPTF on the OTC Market using the OTC Link trading platform, both of which are based in New York;

(d)    On information and belief based on the facts about the OTC Market alleged in §IV.C below, the purchase order and trade confirmation were routed through OTC Link's servers, which are located wholly within the United States;

(e)    The TOSYY ADR reflecting AIPTF's purchase and its ownership interest in the underlying 6502 shares was issued by Citibank from its depositary bank office in New York;

(f)    AIPTF's purchase of TOSYY was settled on March 26, 2015, through the payment of $922,057.20 (including commission) in U.S. dollars disbursed from its custodial account maintained by Amalgamated Bank in New York; and

(g)    As required by the ADR agreement filed with the SEC by Citibank (*see infra* §IV.B.2), a transfer of title establishing AIPTF's beneficial ownership of TOSYY and the Toshiba shares on deposit on its behalf was recorded on the transfer books of Citibank maintained in New York.

23.    Named plaintiff New England Teamsters & Trucking Industry Pension Fund ("NETPF") is a pension fund formed for the benefit of New England trucking industry workers.  NETPF is based in Burlington, Massachusetts.  As set forth in the certification attached hereto as Exhibit B, NETPF made the following purchases of Toshiba common stock on the Tokyo and Nagoya stock exchanges during the Class Period:

| Date Acquired | No. of Shares | Price |
| --- | --- | --- |
| 4/1/15 | 110,400 | ¥ 503.42 |
| 4/2/15 | 66,600 | ¥ 512.26 |
| 9/4/15 | 58,000 | ¥ 356.51 |

- 8 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice                    15 of 145                    Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA    Document 82-2    Filed 09/22/21    Page 17 of 146    Page
Case 2:15-cv-04194-DDP-JC   Document 75 Filed 08/08/19   Page 16 of 145   Page ID #:1541
ID #:1578

| Date Acquired | No. of Shares | Price |
|---|---|---|
| 10/22/15 | 57,600 | ¥ 340.53 |
| 10/23/15 | 9,000 | ¥ 343.35 |
| 10/26/15 | 23,400 | ¥ 356.66 |
| 10/27/15 | 18,000 | ¥ 349.00 |

24.    Named plaintiff Mark Stoyas filed the initial complaint in this action. *See* ECF No. 1.

**B.    Defendant Toshiba and Its Business**

25.    Toshiba is a worldwide enterprise that engages in the research, development, manufacture, construction, and sale of a wide variety of electronic and energy products and services, including semiconductors, disc drives, storage devices, computers, televisions, appliances, nuclear power plants, elevators, lighting systems, and medical equipment.  The Company was founded in 1875 and is headquartered in Tokyo, Japan.

26.    Toshiba operates its business through a worldwide network of subsidiaries and affiliated companies whose activities and financial reports were closely directed and tightly controlled by the Company's top executives during the Class Period, as described below.  During the Class Period, Toshiba treated its subsidiaries and business units as mere instrumentalities of itself, ordering them to inflate revenues and delay recognition of expenses in order to meet profit expectations that Toshiba had established even knowing the targets could not be attained without falsifying financial results.  Toshiba used the phrase "Toshiba Group" throughout its public filings to refer to Toshiba and its consolidated subsidiaries.

27.    Toshiba's Board of Directors was composed of 14-16 members during the Class Period, the majority of whom were then members of the Company's executive management team or had been in the recent past.  As reflected in the letters to shareholders and corporate governance disclosures on Toshiba's website and in its annual reports, Toshiba's Board of Directors took an active role in supervising

- 9 -

4847-0125-0718.v2

Exhibit 7 to B.R. Shetty's
Request for Judicial Notice

16 of 145

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA Document 82-2 Filed 09/22/21 Page 18 of 146 Page
Case 2:15-cv-04194-DDP-JC Document 75 Filed 08/08/19 Page 17 of 145 Page ID #:1542
ID #:1579

the Company's executive management, received detailed reports and had thorough discussions of the Company's results of operations and forecasts, and made important decisions on the Company's basic policies to exert direct supervision over executive officers' business operations.

28. The Company regularly communicates with investors through periodic filings with the Financial Services Agency ("FSA") and Securities Exchange and Surveillance Commission ("SESC") of Japan and in press releases, conference calls, and investor and analyst presentations. During the Class Period Toshiba maintained both English- and Japanese-language corporate websites at http://www.toshiba.co.jp, on which it established an Investor Relations section where regulatory filings, press releases, conference call transcripts, corporate profiles, descriptions of its business, and other information about the Company is made available to investors. Toshiba's annual reports included detailed financial information presenting results in both Japanese and U.S. currency.

29. On an ongoing basis and for each fiscal year, Toshiba published on its Internet website English-language versions of its annual and quarterly reports, earnings and other press releases, investor presentations, governance and business policies, and other information reflecting the Company's results of operations or financial condition, changes in business, acquisitions or dispositions of assets, changes in management or control, and other information required to maintain compliance with SEC Rule 12g3-2(b), 17 C.F.R. §240.12g3-2(b).

30. Toshiba operates on an April 1 – March 31 fiscal year, with the fiscal year identified by the year in which it starts. Toshiba's FY13, for example, started on April 1, 2013 and ended March 31, 2014.

31. From FY09 through FY13, Toshiba reported net sales in North America ranging from $11.3 billion to $13.9 billion, representing approximately 18% of its worldwide sales in each fiscal year. According to its most recent corporate profile, Toshiba employs 22,585 people – 11.8% of its workforce – in North America.

- 10 -

4847-0125-0718.v2

Exhibit 7 to B.R. Shetty's
Request for Judicial Notice

17 of 145

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

32.    During the Class Period, Toshiba organized its business into worldwide segments differentiated by the products or services offered.  In FY11 and FY12, Toshiba organized its business into four segments: Digital Products (personal computers, televisions, and related products), Electronic Devices (memory, hard drives, other storage devices, semiconductors, and similar products), Social Infrastructure (utility and power plant construction, medical devices, elevators and building systems, and similar activities), and Home Appliances (refrigerators, washing machines, lighting systems, air conditioning, etc.).

33.    Starting in FY13, Toshiba reorganized its business activities into five segments, primarily by splitting the Social Infrastructure segment into three new segments: Energy & Infrastructure (power plant and utility construction), Community Solutions (building facilities such as elevators, lighting, and air conditioning systems), and Healthcare Systems & Services (medical devices and related services and equipment).  The Digital Products and Home Appliances segments were combined in the reorganization to form the Lifestyle Products & Services segment, while the Electronic Devices segment stayed the same, and was renamed Electronic Devices & Components.

34.    Toshiba maintained a substantial presence in the United States through its business activities, operations, and corporate representatives in the United States. During the Class Period, many of Toshiba's largest and most significant subsidiaries and affiliates, including those directly involved in the fraud alleged herein, were based in or had significant business operations in the United States, including Westinghouse, based in Township, PA; TAIS, Toshiba America Medical Systems, Inc., Toshiba America Electronic Components, Inc., and Toshiba America Business Solutions, Inc., all based in or around Irvine, CA; Toshiba International Corp., based in Houston, TX; Toshiba America Nuclear Energy Corp., based in Charlotte, NC; and Toshiba America, Inc. San Francisco, which "functions as a U.S.-based purchasing and export agent for Toshiba companies around the world."

- 11 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice

18 of 145

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

35.    During the Class Period, Toshiba's Power Systems Company ("TPSC") (part of its Energy & Infrastructure segment) included the nuclear power plant operations of Westinghouse.  Westinghouse was a Limited Liability Company under U.S. law with its headquarters in Pennsylvania, and with a principal business of designing, manufacturing, and maintaining nuclear fuel and nuclear power generating facilities.  Westinghouse was a consolidated subsidiary of Toshiba, with all of its equity effectively held by Toshiba Nuclear Energy Holdings (US) Inc. ("TNEH").  Toshiba held 87% of the voting rights of TNEH.

36.    In addition to Westinghouse, TPSC included business operations in or around: San Francisco, CA (Toshiba International Corp. Power Systems Division headquarters); Charlotte, NC (Toshiba America Energy Systems ("TAES") Nuclear Business Unit, TAES headquarters, and TPSC US Corp.); West Allis, WI (Toshiba America Energy Systems Thermal Business Unit); Littleton, CO (Toshiba America Energy Systems Hydro Business Unit); Rogers, MN (TurbinePROSs, L.L.C.); Lafayette, IN and Pequot Lakes, MN (Landis+Gyr regional offices); and Alpharetta, GA (Landis+Gyr North America regional headquarters).

## IV.    SECURITIES AT ISSUE

37.    Each of the Class members acquired beneficial ownership interests in Toshiba through the purchase of one or more of the following securities: 6502, TOSBF and/or TOSYY (all as further described and defined below).

### A.    Securities Granting Ownership Interests in Common Stock Issued and Authorized for Sale by Toshiba

38.    Toshiba's common stock is publicly traded on the Tokyo and Nagoya stock exchanges in Japan under the ticker symbol "6502."

39.    Toshiba common stock is also sold in the United States as "F-shares" under the ticker "TOSBF."  An F-share is a foreign security denominated in U.S. currency, and traded on the U.S. OTC Market based in New York.  One share of TOSBF represents ownership of one share of Toshiba common stock sold under the

- 12 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice                    19 of 145                    Hashem, et al., v. NMC Health PLC, et al.,
                                                                                   2:20-cv-02303-CBM-MAA

ticker symbol 6502 in Japan.  An F-share is established in the U.S. when a broker-dealer files with the Financial Industry Regulatory Authority ("FINRA") to create a U.S. ticker symbol in order to facilitate reporting trades in the U.S. in the company's security.  OTC Markets Group, Inc., the operator of the OTC Market, identifies TOSBF as "Ordinary Shares" on its website.

40.   Toshiba common stock is also packaged and sold on the OTC Market in the United States under the ticker symbol "TOSYY."  TOSYY is an American Depositary Receipt ("ADR") reflecting ownership of shares of 6502 common stock that have been deposited with or are otherwise controlled by a depositary institution in the United States and held for the benefit of the TOSYY purchaser.[3]  One share of TOSYY conferred on Class Period purchasers a beneficial ownership interest in six shares of Toshiba 6502 common stock that had been authorized for sale by Toshiba.  OTC Markets Group identifies TOSYY as an ADR on its website.

41.   Purchasers of TOSYY and TOSBF shares on the OTC Market become irrevocably liable to purchase the shares at the stated price at the time their purchase order is placed.

42.   As of the first day of the Class Period, Toshiba had issued and authorized the sale of more than 4.2 billion shares of common stock.

43.   Only shares of common stock that had been issued and authorized by Toshiba were available to be sold as ADSs or F-shares in the United States under the ticker symbols TOSBF and TOSYY.

44.   During the Class Period, investors in the United States owned at least 485 million shares of Toshiba common stock through holdings in 6502, TOSYY and TOSBF, representing more than 11% of the Company's outstanding shares.

---

[3]   The shares so deposited are referred to as "American Depositary Shares" ("ADSs").  For convenience, and unless the context indicates otherwise, the term ADSs is used herein to refer collectively to both ADRs and the underlying ADSs on deposit as required to support their sale.

- 13 -

4847-0125-0718.v2

Exhibit 7 to B.R. Shetty's
Request for Judicial Notice                20 of 145          Hashem, et al., v. NMC Health PLC, et al.,
                                                                      2:20-cv-02303-CBM-MAA

45.     More than 500 holders of Toshiba common stock are resident in the United States within the meaning of SEC Rule 12g3-2(a), 17 C.F.R. §240.12g3-2(a).

46.     Both TOSBF and TOSYY shares are bought and sold at market prices that are set to equal the trading price of 6502 on the Tokyo and Nagoya stock exchanges at the time of the transaction, converted to U.S. dollars at the then-current foreign currency exchange rate (USD to Japanese yen).  Thus, events that impact the trading price of 6502 shares on the Tokyo and Nagoya stock exchanges have a contemporaneous impact on the trading price of TOSBF and TOSYY shares sold on the OTC Market in the United States.  *Infra* §IX.

47.     During the Class Period, the average trading volume of 6502 on the Tokyo exchange was 36,304,023 shares/day.  The average trading volume of TOSYY and TOSBF on the OTC Market during the Class Period was 18,118 shares/day and 12,896 shares/day respectively.

**B.     Establishment of and Trading in Toshiba ADSs**

**1.     Nature of an ADS**

48.     The sale of ADSs was authorized by Congress in 1927, as a way to permit American investors to diversify their portfolios by acquiring shares of foreign companies without the necessity of purchasing those shares on foreign exchanges using foreign currency.  The SEC has explained that "ADRs allow U.S. investors to invest in non-U.S. companies and give non-U.S. companies easier access to the U.S. capital markets."   SEC Office of Investor Education and Advocacy, *Investor Bulletin: American Depositary Receipts* (Aug. 2012) at 1 ("SEC ADR Bulletin").

49.     TOSYY and other ADSs are sold in the United States pursuant to regulations adopted by the SEC, including SEC Rule 12g3-2(b), 17 C.F.R. §240.12g3-2(b).

50.     The purchase of an ADS is equivalent to the purchase of the underlying foreign securities (here, 6502 shares issued by Toshiba) which are held by the depositary banks for the benefit of the purchasers of the ADR (here, TOSYY).

- 14 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice

21 of 145

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

51.    As explained by the SEC:

An ADR is a negotiable certificate that evidences an ownership interest in American Depositary Shares ("ADSs") which, in turn, represent an interest in the shares of a non-U.S. company that have been deposited with a U.S. bank.  It is similar to a stock certificate representing shares of stock.  The terms ADR and ADS are often used interchangeably by market participants.  ADRs trade in U.S. dollars and clear through U.S. settlement systems, allowing ADR holders to avoid having to transact in a foreign currency.

SEC ADR Bulletin at 1.

52.    Thus, ADSs, including TOSYY, are securities that represent specific shares of common stock of foreign issuers that have been deposited with a U.S. bank. This method of sale of foreign shares in the United States has historically been referred to in the industry as a "hat check" model, because an ADR is akin to the receipt provided to a customer who left his hat for safekeeping at the door of a nightclub or restaurant.  The hat, in turn, is akin to the foreign shares, which is the article that the customer (investor) has purchased and deposited for safekeeping.

53.    SEC regulations, including SEC Rule 12g3-2(b), require depositary institutions to acquire and hold shares of foreign securities in an amount equal to the number of those shares sold as ADSs in the United States, based on the ratio of foreign-to-domestic shares stated in the ADR.[4]  The underlying shares of common stock must be deposited with the depositary institution by the time the ADR transaction is cleared, thereby removing them from the market until the ADR is cancelled or sold.  Thus, the number of foreign shares that can be sold as ADSs in the United States is limited by the number of shares that have been issued and authorized for sale by the foreign issuer.  An ADS program has no ability to expand ownership interests in the foreign issuer beyond the limits established by that issuer.

---

[4]    For example, during the Class Period TOSYY ADRs were issued at a ratio of 6 foreign shares (6502) for each ADS.  Thus, for every 1 million shares of TOSYY sold, the depositary banks were required to hold 6 million shares of 6502 for the benefit of the purchasers.

- 15 -

4847-0125-0718.v2

Exhibit 7 to B.R. Shetty's
Request for Judicial Notice

22 of 145

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

54. ADSs may be either "sponsored" or "unsponsored." Sponsored ADSs are established pursuant to a contract signed by the foreign issuer. Unsponsored ADSs are established by one or more depositary banks by filing a Form F-6 with the SEC. Unsponsored ADSs may only be established where, *inter alia*: (i) no sponsored ADS program exists; (ii) the foreign issuer is listed on a regulated foreign exchange; (iii) the foreign issuer provides regular financial reports and other investor information in English, and on a website that is generally available to U.S. investors; and (iv) the holder of the ADS is entitled to receive the corresponding deposited shares issued by the foreign company on demand at any time.

55. Unsponsored ADSs are not sold without the express or implied consent of the foreign issuer. As described in more detail below, each of the depositary institutions involved in the sale of unsponsored ADSs has a regular practice of contacting foreign issuers before an unsponsored program is established, and will generally not establish or sell unsponsored ADSs where the foreign issuer refuses to consent.

**2. Establishment of the TOSYY ADS Program**

56. TOSYY is an unsponsored ADS.

57. TOSYY shares are denominated in U.S. dollars, cleared through U.S. settlement systems, and listed alongside U.S. stocks.

58. Four depositary institutions have filed Forms F-6 with the SEC to register and issue TOSYY ADRs in the United States: Deutsche Bank Trust Company Americas ("Deutsche Bank") (filed Oct. 14, 2008); Citibank, N.A. ("Citibank") (filed Oct. 27, 2008); The Bank of New York Mellon ("BNY") (filed Nov. 24, 2010); and Convergex Depository, Inc. ("Convergex") (filed Oct. 16, 2014).[5] Apx. Exs. 10-13.

---

[5] BNY, Deutsche Bank, Convergex and Citibank are collectively referred to herein as the "Depositary Banks." Convergex stopped doing ADR conversions in or around April 2015.

- 16 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice

23 of 145

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA   Document 82-2   Filed 09/22/21   Page 25 of 146   Page
Case 2:15-cv-04194-DDP-JC   Document 75 #Filed 08/08/19   Page 24 of 145   Page ID #:1549
ID #:1586

59.   The number of TOSYY shares that are available for sale in the United States is limited by the number of 6502 shares that have been issued and authorized for sale by Toshiba, as explained above.  Depository banks are prohibited from selling TOSYY shares that are not supported by underlying shares of 6502 stock deposited and held by the depositary.  Thus, as with ADSs generally, the Depositary Banks here have no ability to create or issue additional securities or shares of Toshiba beyond the number of 6502 shares that have been specifically issued and authorized for sale by the Company.

60.   The Forms F-6 filed by each of the Depositary Banks identify the location of its depository as a physical address in New York City, New York, within the territory of the United States.

61.   Each Form F-6 includes a form of agreement between the Depositary Bank and the holders of TOSYY shares (a "Form of Receipt").  Each such agreement filed by the Depositary Banks states that it is to be interpreted under the laws of New York, within the United States.

62.   Each Form of Receipt contains terms:

(a)   certifying that the ADR represents 6502 shares that have been deposited with the bank for the benefit of the purchaser;

(b)   obligating the bank to hold the deposited 6502 shares for the benefit of the purchaser;

(c)   requiring the bank to deliver the 6502 shares to the TOSYY purchaser immediately upon tender of their ADR to the bank;

(d)   affirming that Toshiba publishes financial and other information required by SEC Rule 12g3-2(b) in English on a website generally available to the public;

(e)   undertaking to maintain transfer books at the bank's New York City office that list the owners of the ADRs to record transfers of title in those books

- 17 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice
24 of 145
Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA    Document 82-2    Filed 09/22/21    Page 26 of 146    Page
Case 2:15-cv-04194-DDP-JC   Document 75   Filed 08/08/19   Page 25 of 145   Page ID #:1550
ID #:1587

upon the purchase or sale of an ADR, and to make those books available for inspection during regular business hours;

(f)    obligating the bank to distribute dividends and other distributions of cash or rights associated with the 6502 shares to the TOSYY purchaser on whose behalf those shares are being held; and

(g)    providing for the reimbursement of certain expenses and fees that may be charged by the bank for its custodial and other services provided under the agreement.

63.    Purchasers of TOSYY have the right under the Form of Receipt filed by the Depositary Banks to tender their ADSs to the Depositary Bank and receive the underlying 6502 shares in return.  The Forms of Receipt attached to the Forms F-6 filed by each of the Depositary Banks require that, to obtain their underlying 6502 shares, purchasers must tender their receipt evidencing the purchase of ADSs (*i.e.*, their ADR), at the Depositary Bank's office in New York.

64.    Each Form of Receipt attached to the Forms F-6 filed by the Depositary Banks contains the following clause, or a substantially identical clause:

> Until the surrender of this Receipt in accordance with the terms hereof, the Depositary will maintain at a designated office in the Borough of Manhattan, The City of New York, a register for the registration and transfers of Receipts and where the Holders of Receipts may, during regular business hours upon reasonable prior notice, inspect the transfer books or the list of Holders of Receipts as maintained by the Depositary.  The transfer of this Receipt is registrable on the transfer books of the Depositary at the Depositary's Office in the City of New York by the Holder hereof in person or by duly authorized attorney, upon surrender of this Receipt properly endorsed for transfer or accompanied by proper instruments of transfer and payment of funds sufficient to pay the fees and expenses of the Depositary and any applicable taxes and other governmental charges and upon compliance with such regulations, if any, as the Depositary may establish for such purpose.

65.    Consistent with the economic reality of the transaction, the Form of Receipt filed with the SEC by each of the Depositary Banks reflects that purchasers are being provided with a receipt reflecting their purchase and ownership of shares of common stock – *i.e.*, 6502 – that have been authorized and issued by Toshiba.

- 18 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice
25 of 145
Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

*See* Ex. 12 (BNY ADR "for Common Shares, of Toshiba Corporation"); Ex. 10 (Deutsche Bank ADR "Evidencing American Depositary Shares For Shares of Common Stock of Toshiba Corporation"); Ex. 11 (Citibank ADR "Evidencing American Depositary Shares Representing Shares of Common Stock of Toshiba Corporation"); Ex. 13 (Convergex ADR "Evidencing American Depositary Shares For Common Stock of Toshiba Corporation").

### 3.     Toshiba's Consent to Sale of TOSYY

66.    It is a regular practice and custom in the industry for a depositary institution to notify the foreign issuer of securities of its intent to register those securities for sale as unsponsored ADSs in the United States, and to obtain its affirmative or implied consent to the sale of those securities before an unsponsored ADS is sold.  If a foreign issuer refuses to consent or otherwise objects to the establishment of an unsponsored ADS program, a depositary institution ordinarily will not proceed to register or sell those shares as unsponsored ADSs.

67.    For example, in a regulatory comment letter sent to the SEC on April 21, 2008 addressing the question of whether proposed regulations should require formal consent from foreign issuers before an unsponsored ADS program is established, Deutsche Bank asserted that such a requirement was unnecessary because: "***in practice depositary banks obtain the issuer's consent before establishing an unsponsored ADR program***."  Deutsche Bank – which was the bank that first established the unsponsored ADR program for the sale of Toshiba common stock as TOSYY shares in the U.S. – further explained:

> In our experience, foreign issuers are often willing to allow a depositary bank to establish an unsponsored ADR program but are reluctant to memorialize this in writing.  We believe that, given the adequacy of the current environment of self-regulation, the protection provided issuers by the ability to affirmatively object to the establishment of an unsponsored ADR program and the benefit provided to U.S. investors by ***unsponsored ADR programs, consent should be implied by a lack of affirmative objection by the issuer***.

- 19 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice                    26 of 145                    Hashem, et al., v. NMC Health PLC, et al.,
                                                                              2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA   Document 82-2   Filed 09/22/21   Page 28 of 146   Page
Case 2:15-cv-04194-DDP-JC   Document 75   Filed 08/08/19   Page 27 of 145   Page ID #:1552
ID #:1589

68.     Other commentators who regularly advise entities involved in ADR transactions have made similar observations.  In an October 2008 article discussing the SEC's adoption of regulations permitting the sale of unsponsored ADSs, the law firm of Paul, Weiss noted, for example, that a "depositary typically requests a letter of non-objection from the issuer before establishing an unsponsored program."[6] Similar observations were made in articles by other law firms regularly involved in advising ADR issuers and investors following the Ninth Circuit's decision in this action.  *See* Linklaters, *Ninth Circuit Holds that Rule 10b-5 Could Apply to Unsponsored ADRs Traded Over the Counter* (July 2018) at 1 ("Although an unsponsored facility may be established without the consent of the issuer, the depositary will typically request a letter of non-objection from the issuer before establishing the program in order to maintain a good relationship with the issuer."); Sullivan & Cromwell, *Ninth Circuit Holds that Non-U.S. Issuers Can Be Liable in U.S. for Unsponsored American Depositary Receipt Facility* (July 30, 2018) at 2 ("depositary banks frequently seek letters of non-objection from the non-U.S. issuer before establishing an unsponsored ADR facility").

69.     Former executives of depositary institutions based in the United States have also confirmed to plaintiffs that such institutions, as part of formal internal procedures to be followed in establishing an unsponsored ADS program, are generally required to contact foreign issuers before an unsponsored program is established to determine whether the issuer objects to the program.  If the foreign issuer objects to the establishment of the program, the depositary institution typically will not pursue it.

(a)     According to a former BNY managing director with decades of experience in its ADR business, BNY had a practice of contacting issuers before an

---

[6]  Paul, Weiss, Rifind, Wharton & Garrison LLP, *SEC Amends Form F-6, which has Implications for Foreign Private Issuers that do not have ADR Programs* (October 2008).

- 20 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice                27 of 145            Hashem, et al., v. NMC Health PLC, et al.,
                                                                2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA   Document 82-2   Filed 09/22/21   Page 29 of 146   Page
Case 2:15-cv-04194-DDP-JC   Document 75   Filed 08/08/19   Page 28 of 145   Page ID #:1553
ID #:1590

unsponsored ADS program was established. If the issuer objected, further discussions would be had to attempt to convince the issuer to acquiesce to the sale of unsponsored ADSs. If the issuer maintained its objection, BNY would not establish an unsponsored program for the sale of its shares. The managing director stated that issuer contacts were typically made through BNY's marketing department, typically by e-mail. If BNY had a pre-existing business relationship with the issuer, contact could also be made in person or by telephone.

(b)     An industry consultant retained by plaintiffs similarly said, based on his experience at a depositary and communications with colleagues at other banks, that it was customary for the Depositary Banks to contact foreign issuers before an unsponsored program is established to obtain their consent or non-objection to the program. He said that while the nature of the contact varied depending on the specific depositary institution involved and the extent of its other commercial relationships with the issuer, the depositaries would generally not move forward with an unsponsored program over the objection of the issuer.

70.     Based on the foregoing information and belief, one or more of the Depositary Banks, consistent with their business practices and the custom in the industry, contacted Toshiba before the TOSYY ADS program was established and before any TOSYY shares were registered or sold in the United States. On the same information and belief, during those contacts the Depositary Banks: (i) provided Toshiba with an opportunity to object to and prevent the establishment of such program; (ii) obtained a letter of non-objection or other evidence of consent from Toshiba; and/or (iii) took other actions intended to obtain Toshiba's consent to the sale of unsponsored ADSs in the United States or from which such consent could reasonably be implied.

71.     Toshiba either provided its affirmative consent to the sale of its 6502 shares as ADSs in the United States or its consent may be implied under the circumstances.

- 21 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice
28 of 145
Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

72.    Toshiba did not make any affirmative objection to, or take any other action reasonably calculated to prevent, the sale of its common stock as unsponsored ADSs in the United States, despite having been provided with an opportunity to do so.

73.    TOSYY would not have been offered for sale in the United States absent Toshiba's affirmative or implied consent to the sale of unsponsored ADSs in the United States.

74.    The following facts lend additional support for finding that Toshiba either affirmatively consented to and participated in the sale of its 6502 stock or that such consent and participation may reasonably be implied from its actions.

(a)    Toshiba published its quarterly and annual results and regulatory filings in English, as required to support the sale of unsponsored ADSs in the United States.  Had Toshiba not published that information in English, or ceased such publication, the sale of its 6502 stock as ADSs would have been prohibited and Toshiba would have been required to register its common stock pursuant to §12(g) of the Exchange Act, 15 U.S.C. §78L(g).

(b)    It is unlikely that the Depositary Banks or brokers assisting with transactions in TOSYY or TOSBF, individually or collectively, could have obtained a sufficient number of 6502 shares to support sales of those securities without the participation, assistance or consent of Toshiba.  For example, BNY was one of Toshiba's largest ten shareholders during the Class Period.  At the end of FY14, Toshiba reported that BNY held 1.3% (~55 million shares) of the Company's outstanding common stock.  It is unlikely that many shares of 6502 could have been acquired on the open market without the consent, assistance or participation of Toshiba.

(c)    BNY's substantial holdings in Toshiba common stock also make it unlikely that BNY would have established an unsponsored ADS program for the sale of TOSYY shares without the consent, or over the objection, of Toshiba.

- 22 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

**C.    The OTC Market**

75.    TOSYY and TOSBF shares trade on the Pink market, which is part of the OTC Market.  The OTC Market and the Pink market are both located in the United States, and are operated by OTC Markets Group, which is based in New York City.

76.    The OTC Market is regulated by FINRA and the SEC.

77.    Trades on the OTC Market are accomplished through the OTC Link Alternative Trading System ("ATS") registered with the SEC and regulated by both the SEC and FINRA.  OTC Link ATS allows broker-dealers to quote any OTC equity security eligible for quoting under SEC Rule 15c2-11, 17 C.F.R. §240.15c2-11.  There are approximately 10,000 securities quoted on the OTC Link ATS.  OTC Link ATS delivers trade messages electronically, allowing subscribers to execute, negotiate, or decline trade messages.

78.    The SEC maintains a website containing lists of alternative trading systems, which states: "An ATS is a trading system that meets the definition of 'exchange' under federal securities laws but is not required to register as a national securities exchange . . . ."  SEC Comm'n, *Alternative Trading System ("ATS") List*, https://tinyurl.com/p3k5144.  By rule, the SEC has exempted ATSs from the definition of "exchange" only for the purpose of relieving ATSs from the requirement to register as a national exchange subject to §6 of the Exchange Act, 15 U.S.C. §78f.

79.    In its 2014 annual report to investors, issued on March 4, 2015, during the Class Period, OTC Markets Group described OTC Link as follows:

> Through our OTC Link ATS, we directly link a diverse network of broker-dealers that provide liquidity and execution services for a wide spectrum of securities.  We organize securities into marketplaces to better inform investors of opportunities and risks – the OTCQX Best Marketplace; the OTCQB Venture Marketplace; and the OTC Pink Open Marketplace, which incentivize companies to provide better information to create more efficient prices in their securities.  Our data-driven platform enables investors to easily trade through the broker of their choice at the best possible price, and empowers a broad range of

- 23 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice
30 of 145
Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA    Document 82-2    Filed 09/22/21    Page 32 of 146    Page
Case 2:15-cv-04194-DDP-JC    Document 75-1 Filed 08/08/19    Page 31 of 145    Page ID #:1556
ID #:1593

companies to improve the quality and availability of information for their investors.

80.    The OTC Link ATS permits subscribing broker-dealers to view and publish quotes and negotiate trades in Pink-listed securities, including TOSYY and TOSBF.  OTC Link ATS is described on OTC Markets Group's website as an "electronic messaging system" where "[t]raders have direct access to send, execute, negotiate or decline trade messages with increased efficiency and speed."  OTC Link ATS is operated by OTC Link LLC, located in New York City.

81.    Broker-dealers access OTC Link though OTC Dealer, which OTC Markets Group describes as a "high-performance, real-time, front-end application [that] provides a consolidated quotation, trading and information system to attract and access market liquidity."  The trading platform includes OTC Fix, which uses the industry standard Financial Information eXchange ("FIX") protocol for quote submission, trading and routing of execution (drop copy) reports.

82.    As of December 31, 2014, 120 broker-dealers had subscribed to OTC Link.

83.    All of the broker-dealers listed in the OTC Market Group's online directory of broker dealers are located in the United States.

84.    According to the company profile posted by Bloomberg, "OTC Link serves clients in the United States."

85.    Trades on the OTC Market are arranged through the broker-dealers who have subscribed to OTC Link ATS.  The broker-dealers may execute the trade internally or externally through market or limit offers posted on OTC Link ATS. Completed trades are reported, cleared and settled by the broker-dealers involved in the transaction.  Trades on the OTC Market are deemed complete upon the delivery of funds by the buyer and delivery of securities by the seller.

86.    FINRA members are prohibited from publishing quotations in any security unless the member is prepared to purchase or sell at the price quote and

- 24 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice                                31 of 145                        Hashem, et al., v. NMC Health PLC, et al.,
                                                                                                        2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA   Document 82-2   Filed 09/22/21   Page 33 of 146   Page
Case 2:15-cv-04194-DDP-JC   Document 75   Filed 08/08/19   Page 32 of 145   Page ID #:1557
ID #:1594

under the conditions stated at the time the offer is posted.  FINRA, Rule 5220 (2012) ("Rule 5220").  The OTC Market Group further describes Rule 5220 on its website as follows: "Plain speak: Broker-dealers must honor their posted quotes."

87.   Transactions in TOSYY and TOSBF were conducted via servers and facilities located wholly within the United States.

88.   According to OTC Markets Group's FY13, FY14 and FY15 annual reports, its operations during the Class Period were conducted from offices located in New York City and Washington D.C.  Those reports further state (in substantially similar language) that OTC Markets Group "also contract[ed] with SunGuard Availability Services in Carlstadt, New Jersey and Philadelphia, Pennsylvania, for computer hosting and networking services, including production, back-up and disaster recovery, as well as internet and telecommunications services."  According to OTC Markets Group's website, brokers access OTC Dealer and OTC Fix through one of five extranet providers in the United States:  BT Radianz, TNS, Century Link, NYSE Technologies Connectivity Inc. (SFTI), or Options-IT.

89.   ADRs are issued and shares of Toshiba common stock (6502) required to support the sale of TOSYY shares are maintained by depositaries located in New York, where transfers of interests in those securities are recorded.  *Supra* §IV.B.

90.   As a result of the foregoing, purchasers and sellers of TOSYY and TOSBF incur irrevocable liability in the United States to complete transactions executed through the OTC Link ATS.

## V.   OVERVIEW OF SCHEME TO DEFRAUD

### A.   Government Inquiry Sparks Widening Probes into Toshiba's Fraudulent Accounting

91.   On February 12, 2015, Toshiba received an order from the SESC pursuant to JFIEA Article 26 requiring an inspection of projects using the percentage of completion ("POC") method of accounting, and submission of a report to the agency detailing the findings.  No public announcement or disclosure of the order

- 25 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice

32 of 145

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

was made.  The Company carried out an investigation pursuant to the order and by late March 2015 had discovered extensive evidence of GAAP violations in projects using POC accounting.

92.    On April 3, 2015, Toshiba issued a press release announcing the establishment of a "Special Investigation Committee" ("SIC") to look into the Company's use of POC accounting on "certain infrastructure projects undertaken by the Company."  The SIC was composed of six members: Toshiba's chairman of the Board, a member of its Audit Committee, a representative from its legal and its audit departments, an outside lawyer, and an outside auditor.

93.    Over the course of the next five weeks, the SIC identified instances in which POC accounting had been improperly applied to underestimate contract costs with the result that contract losses (including provisions for contract loss) were not recorded in a timely manner.  During that time period, the committee also identified other instances in which POC accounting was used in a suspect manner that required further investigation.

94.    On May 8, 2015, Toshiba issued a press release announcing that, as a result of the findings described in the preceding paragraph, the SIC would be reconstituted as an "Independent Investigation Committee" ("IIC") consisting solely of impartial outside experts with no interests in Toshiba.  The May 8 press release alerted investors that the scope of the investigation had broadened to include investigations of accounting in areas other than POC contracts and that, as a result, "there has emerged a possibility that past financial results for 2013 or earlier may be corrected, and the Company is currently ascertaining the amount of the impact on the financial results for fiscal 2015."  The Company issued two additional press releases the same day announcing that, as a result of the investigations into its financial reporting and accounting, it was withdrawing its FY14 earnings forecast and cancelling the expected payment of its FY14 dividend.  The May 8 disclosures caused an immediate 16.6% decline in the price of Toshiba common stock.

- 26 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice

33 of 145

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

95.   Five days later, on May 13, 2015, Toshiba announced that it expected to restate its financial results from FY11 to FY13 to reduce operating income by ¥50 billion (~$420 million[7]) due to improper use of POC accounting for projects undertaken through its Power Systems Company, Social Infrastructure Systems Company, and Community Solutions Company.  The Company cautioned that the ¥50 billion reduction was "only the current expected amount" and the final adjustment could differ after the IIC completed its investigation.  The release then went on to describe additional categories of accounting that would be investigated by the SIC, including the appropriateness of the timing and amount of recorded loss provisions, the appropriateness of the timing of recorded operating expenses, and the appropriateness of valuations of inventory.  The release stated that these matters would be subject to "a Company-wide, comprehensive investigation, which includes its in-house companies other than the above three, as well as its consolidated subsidiaries."   The release stated that it was "undetermined" whether the investigation into these matters would result in the restatement of periods prior to FY11.

96.   On May 15, 2015, Toshiba issued a press release announcing that it had appointed two attorneys and two CPAs to form the IIC.  The press release revealed additional details regarding the SIC's findings, including that, in addition to discovering improper POC accounting, the SIC investigation had raised questions regarding "the appropriateness of the timing and recorded amounts of provisions for losses, the timing of recording operating expenses, and valuations of inventory."  The release also said Toshiba had "identified some of the cause of inappropriate

---

[7]   All conversions from ¥ to $ contained herein use the same year-end exchange rates that were used by Toshiba to convert yen to dollars in its annual financial reports: FY14 (¥120 = $1); FY13 (¥103); FY12 (¥94); FY11 (¥82); FY10 (¥83); FY09 (¥93); and FY08 (¥98).

- 27 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice                    34 of 145                    Hashem, et al., v. NMC Health PLC, et al.,
                                                                                                    2:20-cv-02303-CBM-MAA

accounting practice[s]," including "the high priority of budget achievement in the Company, and the imperfect function of internal controls for accounting."

97.    On May 22, 2015, Toshiba issued a press release announcing that, in addition to POC accounting, the IIC would also be looking at the accounting for operating expenses in Toshiba's Visual Products Business, the valuation of inventory in the Semiconductor Business, and the accounting for component (parts) transactions in the PC Business. The release also stated that Toshiba was conducting a "self check" of accounting practices throughout its entire business in parallel with the IIC's investigation. To carry out the self check, Toshiba sent a list of specific types of inappropriate accounting to each of its 585 business units and asked them to self report any violations of accounting principles or Company rules that occurred from FY09 thru FY14. The Company said it would also conduct a second round of self checks aimed primarily at misreporting of income, expenses, profits, and losses at the 83 consolidated subsidiaries that it "considered particularly important to closing the Company's financial accounts."

98.    The purported results of Toshiba's self check were contained in a press release issued on June 12, 2015.[8] Apx. Ex. 2-A. In the June 12 press release, as corrected, Toshiba identified additional types and instances of inappropriate accounting that it said were being examined by the IIC, including additional violations of POC accounting rules and untimely or inaccurate reporting of promotional and other general expenses, inventory costs, and profits and losses, including nine specific cases of improper accounting that had been referred to the IIC for further investigation and 12 additional cases that would not be referred to the IIC for further investigation. The report described specific failures to accurately or timely post contract expenses and anticipated losses and described other instances

---

[8]    On June 17, 2015, Toshiba filed a further press release to correct factual errors in the June 12 release, mostly related to the fiscal years in which specific cases of accounting fraud had occurred. Apx. Ex. 2-B.

- 28 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice                35 of 145          Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

of improper accounting used to understate costs or overstate income, including: failures to timely or accurately record provisions for warranty claims; postponements of selling, general and administrative ("SG&A") expenses including advertising, promotion, and marketing expenses; understating parts and inventory costs; failing to timely post losses for obsolete inventory; and failing to post write-downs for changes in foreign currency exchange rates. Toshiba said that it estimated that the 21 specific projects identified in the self check report had caused a cumulative overstatement of Toshiba's operating income of ¥54.8 billion from FY09 to FY13.

99.    On June 25, 2015, Toshiba held an Ordinary General Meeting of Shareholders, at which time it provided additional details on the nature of the accounting fraud, including by revealing that: (i) the Company had "identified unrealistic cost reduction measures [that] were included in percentage-of-completion method accounting producing inappropriate estimates of total contract costs"; (ii) the Visual Products business had "coordinat[ed] with vendors to adjust the purchase price of materials and carry over part of the payment to the following period" to lower reported materials costs in the periods in which they were incurred; (iii) in addition to artificially lowering production costs in the semiconductor business, the Company had manipulated the recorded value of inventories of discontinued products stocked for customers; and (iv) PC profits had been inflated by failing to accurately record costs of parts and components supplied to original design manufacturers ("ODMs"). Apx. Ex. 3.

100.    On July 17, 2015, the Company announced that the IIC report would be made public on July 20 and a press conference to discuss its findings would be conducted on July 21. On July 20, 2015, the Company issued a press release announcing that it had received the IIC report, and released a summary version of the report in Japanese. The July 20 press release stated that, based on the IIC report, Toshiba expected to restate its financial results from FY08 through FY13 to reduce

- 29 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice
36 of 145
Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA   Document 82-2   Filed 09/22/21   Page 38 of 146   Page
Case 2:15-cv-04194-DDP-JC   Document 75 Filed 08/08/19   Page 37 of 145   Page ID #:1562
ID #:1599

income before income taxes and noncontrolling interests by ¥185.8 billion. The release also stated that Toshiba expected the restatement to include fixed asset impairment charges of up to ¥246 billion and annual valuation allowances of up to ¥270 billion regarding long-term deferred tax assets.

101. The full version of the IIC report, in Japanese with portions redacted, was released on July 21, 2015. The report was based on internal information of Toshiba that the IIC had reviewed. Toshiba claimed prior to and after the issuance of the report that it had cooperated fully with the IIC in its investigation, and claimed to have provided it with access to any relevant information that it asked to review.

102. Also on July 21, the Company announced that Tanaka, Sasaki, and seven other senior executives had resigned as a result of the "substantial amount of inappropriate accounting over a long period of time" and the IIC's findings that "pointed to the involvement of top management in respect to the causes of the inappropriate accounting."

103. On July 25, 2015, Toshiba published an English translation of the summary version of the IIC report. Apx. Ex. 1.

**B.     Investigators Find that Toshiba Deliberately Inflated Profits by Forcing Subsidiaries to Misrepresent Their Financial Results**

104. The IIC report, together with Toshiba's public statements and restated annual reports, provides a detailed account of the deliberate misuse of accounting standards on a worldwide basis that was perpetrated pursuant to the directions and demands of Toshiba's most senior executives. The manipulations were designed and used to achieve market expectations and conceal poor business performance from investors over a period of at least 27 consecutive quarters.

105. The IIC found direct and circumstantial evidence of deliberate and repeated instances of accounting fraud in Toshiba's accounting for POC contracts and its recording of revenues and expenses in its Visual Products, Semiconductor, and PC businesses. *Infra* §VII; Apx. Ex. 1. The POC accounting violations occurred

- 30 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice
37 of 145
Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA   Document 82-2   Filed 09/22/21   Page 39 of 146   Page
Case 2:15-cv-04194-DDP-JC   Document 75   Filed 08/08/19   Page 38 of 145   Page ID #:1563
ID #:1600

primarily in the Power Systems Business, which formed a major part of the Social Infrastructure and, later, the Energy Infrastructure segment.  Other fraudulent accounting practices, including channel stuffing and cookie jar accounting, were carried out in Toshiba's Semiconductor business, which formed the primary part of the Electronic Devices segment; and in the Visual Products and PC businesses, which formed the substantial parts of the Digital and, later,  Lifestyle Product segments.  Additional instances of fraud were uncovered by Toshiba's self check report, and by its outside auditor, as also described below.

106.   The IIC limited its review to specific issues and transactions that had been identified by Toshiba and specifically delegated to the IIC for review.  The IIC was not permitted to, and did not, undertake investigations with respect to issues of potential accounting fraud other than those that were delegated to it or uncovered in the course of its investigation of the delegated matters.  The IIC report specifically recognized that the restatement required by its findings could lead to secondary effects, including requirements to restate inventory valuations, take fixed asset impairment charges, or write-down the value of deferred tax assets.  However, the IIC said that it had "not considered" such secondary effects, which were beyond the scope of the authority delegated to it.  Apx. Ex. 1 at 17.

107.   Following the July 21, 2015 press conference where the IIC discussed its findings, one analyst wrote:

- 31 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice

38 of 145

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

**Limitations of scope of independent investigation**

> The independent investigative committee held a press conference at 7pm JST on 21 July, largely reiterating points from the committee's report. The point that came up a number of times in the Q&A session was that the scope of the committee's investigation was determined by Toshiba's requirements.   Some key areas of interest to investors, including the financial situation at subsidiaries Westinghouse and Landis Gyr, were not part of the investigation, and we will have to rely on the opinions of auditors for the time being.   The fact that the committee did not look into every item on Toshiba's balance sheet certainly needs to be noted.

Mitsubishi UFJ Morgan Stanley, *Resignation of top management merely the start of a long restructuring road* (July 21, 2015) at 1.

108.   The IIC found that Toshiba's top management directed and demanded the accounting fraud to be carried out in order to meet their objective of overstating current period profits.   Apx. Ex. 1 at 67-69.   Toshiba's management did this by exerting strong pressure on subordinates to achieve budgeted targets by any means necessary, including by the deliberate misapplication of accounting standards. Toshiba's executives did so knowing that the Company's employees were unable to act contrary to the intent of their superiors, even when superiors were instructing them to falsify the reported results of their business.   *Id.*  By carrying out their fraud through subtle changes in accounting that were difficult for outsiders to detect, and then deliberately concealing the true facts from external auditors (including by deliberately falsifying corporate records), Toshiba's executive management was able to falsify Toshiba's financial results over a period of more than six years.   *Id.* at 17-18, 69, 73-74.   Management's ability to carry out their scheme was enhanced by their efforts to foster confusion among subordinates about proper accounting requirements, and their deliberate failure to adopt internal controls that would be effective in detecting or preventing their fraud.   *Id.* at 69-73.

109.   Toshiba and its senior executives operated the Company as a unitary enterprise, enforcing their will on each of Toshiba's consolidated business units and subsidiaries by requiring them to falsify earnings reports where necessary to meet

- 32 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice
39 of 145
Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA   Document 82-2   Filed 09/22/21   Page 41 of 146   Page
Case 2:15-cv-04194-DDP-JC   Document 75 #1602 8/08/19   Page 40 of 145   Page ID #:1565
ID #:1602

the targets that Toshiba's executives had established.  Toshiba did so by establishing and enforcing a strict command and control culture throughout the Company's operations.

110.   As the IIC concluded:

> The inappropriate accounting treatment that was carried out or continued in a number of Companies simultaneously and in an institutional manner with the involvement of Corporate-level top management . . . should be considered a management decision, and correcting such situation was practically impossible.

*Id.* at 67.

111.   To carry out their will, Toshiba's executive management held monthly meetings with the CEOs of all of Toshiba's companies where they demanded that each company meet performance targets that the executives had established.  The targets were established based only on Toshiba's desire to meet quarterly profit objectives.  The targets were communicated to each of Toshiba's subsidiaries at CEO Monthly Meetings.  Although referred to internally as "Challenges," they were in fact mandatory requirements.  Subsidiaries were *required* to report results in line with the "Challenge" targets, even if fraudulent accounting was the only way to do so.

112.   As described by the IIC:

> At the CEO Monthly Meetings, etc., P [Toshiba's President, Tanaka] indicated targets for improved income set as "Challenges" to each CP [Company President], with the strong suggestion that those targets needed to be achieved, and sometimes implied that under-performing Companies would have to withdraw from their business if they did not improve their profit.  In particular, from FY 2011 to FY 2012 when inappropriate accounting treatments were carried out broadly, those Companies were required by P to set out strict Challenges (excessive targets) in order to achieve budget.  Therefore, the CP of each Company was faced with strong pressure to achieve these targets.
>
> Most of the Challenges indicated by P were based not on long-term profit targets, but on target values to achieve, set with a view to maximizing current year or current quarter profits (over-riding current profit policy).  Also, toward the end of each quarter, when it was difficult to achieve a large amount of profit improvement even with a concerted sales effort, a "Challenge" was given to achieve an overstated budget that exceeded the capabilities of the Company.  Given this

- 33 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice

40 of 145

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

management policy, in order to achieve the Challenge, each Company was driven into a situation where it was forced to engage in inappropriate accounting treatments, instead of carrying out accounting treatment reflective of performance at the end of the applicable period, by way of bringing apparent current-period profits closer to the budget and Challenge values substantially with pre-emption of profits for subsequent accounting periods or with postponement of recording of current losses and expenses to subsequent accounting periods.  Even though pre-empting profits or postponing the recording of expenses and losses in order to overstate apparent profits in one period would make the recording of profits in subsequent periods difficult, an excessive Challenge was set for that subsequent period as well, and this resulted in Companies being forced to carry out inappropriate accounting treatment in an even larger amount in order to achieve it, the repetition of which caused the inappropriate accounting treatments to continue and expand in scale.

113.   The IIC found that Toshiba attained its unreasonable targets by imposing its will on subsidiaries to force them to falsely report results that met the challenge:

A corporate culture existed at Toshiba whereby employees could not act contrary to the intent of their superiors.  For this reason, when certain top management established a "Challenge", the CPs, who were subject to the will of such top management, the business division heads under the CPs, and in turn the employees under the heads continuously engaged in inappropriate accounting treatments to achieve the targets in line with the will of their superiors.

*Id.* at 68-69.

114.   Toshiba's control over its subsidiaries was so complete that executive consent was even needed to ***comply*** with stated accounting policies, where doing so would negatively impact the Company's performance:

Moreover, under this corporate culture, a de facto rule existed for Toshiba accounting practices, whereby approval from a progressively senior personnel was required before making an accounting treatment in accordance with an express rule provided for in the Company's accounting rules, etc., with respect to any matter that entailed a significant amount of impact, such that if at any point a superior's approval was not obtained, then the appropriate accounting treatment itself, based on an express rule, would not be carried out.

*Id.* at 69.

115.   The IIC found that misstatements of accounting had been deliberately concealed from Toshiba's outside auditors:

- 34 -

4847-0125-0718.v2

Exhibit 7 to B.R. Shetty's
Request for Judicial Notice

41 of 145

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

> [M]ost of the instances of accounting treatment in question were the intentional operation of internal accounting treatment, and were instances of inappropriate accounting treatment carried out in an institutional manner, and skillfully utilizing circumstances where confirming the facts based on external evidence was difficult, such as by using methods that were difficult for the accounting auditor to detect and, in response to questions and requests for materials from the accounting auditor, hiding facts and providing explanations by presenting materials creating stories different from the facts.

*Id.* at 73.

116.   Even after the fraud was revealed, Toshiba continued to fight with its auditors who sought to reveal the full extent of the accounting manipulations. According to an article in The Mainichi based on competent sources of information, a "fierce tug-of-war" developed between Toshiba and its auditors after PriceWaterhouseCoopers U.S. headquarters refused to let its Japanese arm, PriceWaterhouseCoopers Arata LLC, acquiesce to Toshiba's attempt to pressure it into declining to express an opinion on Toshiba's FY16 financial statements. *Fierce tug-of-war between Toshiba, PwC Arata auditors before settlement*, The Mainichi (Aug. 11, 2017) https://tinyurl.com/y3jgm3yp.   According to the article: "An executive of PwC Arata flew to the U.S. to coordinate views with the firm's American arm.  The point of contention between PwC and Toshiba was when the electronics giant became aware of losses in its U.S. nuclear power business."

117.   The accounting fraud was directed, approved, or ratified by Nishida, Tanaka, Sasaki, and other members of Toshiba's top-level management.  The IIC specifically found repeated instances where Toshiba's most senior executives directed or deliberately turned a blind eye to accounting fraud:

(a)     "members of top management were aware of the intentional overstating of apparent current-period profits and the postponement of recording expenses and losses, or the continuation thereof, but did not give instructions to stop or correct them" (Apx. Ex. 1 at 67);

- 35 -

4847-0125-0718.v2

Exhibit 7 to B.R. Shetty's
Request for Judicial Notice

42 of 145

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

(b)   "although the Company requested approval to record provisions for contract losses [on contracts subject to POC accounting], certain top management either rejected it or instructed the recording to be postponed" (*id.*);

(c)   "while certain top management was aware that [achieving performance targets] would inevitably lead to a situation where Channel Stuffing of ODM Parts was necessary, still they imposed strict "Challenges" onto the Company and drove it into such situation, or showed reluctance when the Company expressed its intent to eliminate the overstating of apparent profits by way of the Channel Stuffing of ODM Parts" (*id.*);

(d)   "Company-level top management like the CP and business unit heads were involved in carrying out or the continuation of inappropriate accounting treatments" and "Company-level top management [] actively instructed that inappropriate accounting treatments be carried out" (*id.*);

(e)   "certain Corporate or Company-level top management had the objective to carry out the 'overstating of apparent current-period profits'" and "executive officials [] carried out or continued inappropriate accounting treatments under such objective of certain top management" (*id.* at 68);

(f)   "the involvement of certain top management and key executives led to the deviation from and ineffectiveness of the internal control function for financial reporting, with inappropriate accounting treatments then being carried out by instructions, etc. from outside of the internal control framework" (*id.* at 70);

(g)   "accounting personnel knew of a fact that made an accounting treatment necessary, such as recording a provision, but did not take any action … there were many projects where no action was taken in accordance with the instruction of a superior such as a business unit head or CPs" (*id.*); and

(h)   "several members of the Audit Committee were aware that inappropriate accounting treatments were being carried out with respect to several projects . . . [but] no action was taken" (*id.* at 73).

- 36 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice

43 of 145

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

## C. Toshiba Admits Wrongdoing; Fires, Disciplines, and Sues Its Top Executives

118. Toshiba has repeatedly acknowledged its responsibility for the fraud alleged herein, and admitted that the fraud was carried out at the direction and under the control of its most senior executives. At least nine senior executives of the Company resigned or were fired as a result of their participation in the misconduct alleged herein. Dozens more were reprimanded or had their salaries reduced, and Toshiba has sued five of its most senior executives – Tanaka, Sasaki, Nishida, Kubo, and Muraoka – for damages arising from their roles in the fraud.

119. In a July 21, 2015 press release, Toshiba acknowledged responsibility for the misconduct:

**Clarification of managerial responsibility**

Although the Company is currently committed to reviewing and closely checking the investigation report, it wishes at this juncture to express its sincere apologies to shareholders, investors and all other stakeholders for what has been identified as a substantial amount of inappropriate accounting over a long period of time, from fiscal 2008 to fiscal 2014. The outcome is that the cumulative amount of income before income tax to be corrected, discovered within the scope of the investigation carried out by the Independent Investigation Committee, is minus 151.8 billion yen. The Company also wishes to apologize for any concerns or inconvenience arising from not yet being able to announce the Company's financial results for fiscal year 2014 as at July 21.

In light of the foregoing, and effective as of July 21, Hisao Tanaka, Representative Executive Officer, President and Chief Executive Officer and Director; Norio Sasaki, Vice Chairman of the Board and Director; Hidejiro Shimomitsu, Representative Executive Officer, Corporate Senior Executive Vice President and Director; Masahiko Fukakushi, Representative Executive Officer, Corporate Senior Executive Vice President and Director; Kiyoshi Kobayashi, Representative Executive Officer, Corporate Senior Executive Vice President and Director; Toshio Masaki, Representative Executive Officer, Corporate Senior Executive Vice President and Director; and Makoto Kubo, Chairman of the Audit Committee and Director, will all resign from their positions in the Company; and Keizo Maeda, Representative Executive Officer, Corporate Executive Vice President and Director, will resign from his positions as Representative Executive Officer and Director. In addition, Atsutoshi Nishida, Adviser to the Board, will also resign from his position, effective as of today.

- 37 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice

44 of 145

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

120. Toshiba made similar admissions of responsibility in nearly every other press release it issued to provide updates on the status of the investigations or disclose additional findings about the nature, cause, extent, or impact of the accounting fraud. *E.g.*, Apx. Ex. 2-A ("The Company expresses sincere apologies to its shareholders, investors, and all other stakeholders for any concerns or inconvenience caused by the current investigation into accounting practices."); Apx. Ex. 4 ("The Company will make every effort to regain the trust of shareholders, investors, all other stakeholders and the public, and asks for your understanding and ongoing support."); Apx. Ex. 7 ("The Company deeply apologizes to our shareholders, investors and stakeholders for causing the state of matters this time. The Company, under its new management team, will endeavor with all of its effort to regain trust in the Company from all shareholders, investors and other stakeholders, and humbly requests your ongoing support.").

121. On July 29, 2015 Toshiba announced "further personnel measures to be taken in respect of inappropriate accounting," including the resignation of another executive officer – Corporate Senior Vice President, Masaaki Osumi – and salary reductions for other executive officers and Board members. Apx. Ex. 4. The release stated that the Company "will seek to establish a new corporate culture under new management and governance structures" and would immediately begin to implement measures recommended by the IIC. Toshiba stated that it would effect a "[c]hange in [the] mindset of top management" by removing incentives to achieve short-term budget targets, reform its accounting policies, enhance its internal controls, and increase the number of outside directors. Among the measures that Toshiba said needed to be undertaken was the elimination of budgets that were not "commensurate with company capability." The release stated:

> The Company has confirmed, company-wide, that it will not focus only on short-term profit in the current period, but, taking a long-term perspective, first disclose actual results and then stress consideration of how to improve those results. In order to guarantee this, the Company has decided to abolish the CEO Monthly Meeting

- 38 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice                45 of 145                Hashem, et al., v. NMC Health PLC, et al.,
                                                                     2:20-cv-02303-CBM-MAA

held at the end of every month, which mainly dealt with figures for short-term outlooks.

122.   On August 18, 2015, Toshiba described how it would reform its governance structure, improve its internal controls, and take other measures needed to correct the problems identified in the IIC report.  Apx. Ex. 5.  In announcing the formation of a Management Revitalization Committee to propose measures for the reform of Toshiba's corporate governance, Toshiba stated:

> The investigation report by the Independent Investigation Committee found the direct causes of inappropriate accounting to include: the involvement of top management; a policy that placed an over-riding concern on current profit; and strong pressure to achieve budget targets.  The report noted, as the indirect causes why the Company was unable to prevent these actions, that the involvement of top-level management resulted in deviation from or the non-functioning of internal controls, and also found that an internal control structure that anticipated top management's involvement in inappropriate accounting had not been established.  The report also determined that internal control structures did not function efficiently, at both the corporate and in-house company level.  As measures toward preventing recurrence of such actions, the report recommends the enhancement of corporate governance by strengthening the internal control function of the Board of Directors and the Audit Committee; establishing a new and stronger internal control department; and such as increasing the number of Outside Directors and revising the membership of the Board.

*Id.*

123.   On September 17, 2015, Toshiba formed an Executive Liability Investigation Committee to investigate wrongdoing by its senior executives.  The release stated, in part:

> Toshiba Corporation . . . received an Investigation Report from the Independent Investigation Committee on July 20 containing findings on the facts and causes of the series of inappropriate accounting practices at the Company, and recommendations on prevention of any recurrence.  The Company carefully reviewed the report and took steps necessary to restate past financial statements and compile its fiscal year 2014 financial results.
>
> *            *            *
>
> Separately from the restatement of past financial results and compilation of financial results, and discussions on the management structure, reform of corporate governance and measures to prevent recurrence, the Company has also validated the facts contained in the report, and discussed the methods to determine whether there is a need

- 39 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice                46 of 145                Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

to enforce liability of current and former directors and executive officers for inappropriate accounting.

124.    On November 7, 2015, the Company announced that the committee had investigated 98 individuals who had been directors or executive officers of the Company between FY08 and 3Q14 regarding their involvement in the accounting fraud.  Apx. Ex. 8.  On November 10, 2015, the Company filed suit against five of its former executives – Nishida, Sasaki, Tanaka, Kubo, and Muraoka – seeking damages arising from their participation in the accounting fraud.  The Company also said that, in addition to previously-announced personnel measures taken against other directors and executive officers, the Company would implement disciplinary measures against 26 additional employees suspected of involvement, "mainly the top managerial employees mentioned in the [IIC report]."

**D.    Toshiba Restates Five Years of Results**

125.    As a result of the false accounting described above, Toshiba falsified its reported financial results for at least 27 consecutive quarters from 1Q08 through 3Q14, as summarized in the charts at ¶¶131-132, 169-170, 173-174.  Toshiba did not officially restate its FY08 financial statements to correct the errors found by the IIC and the other investigations described herein, presumably because, by the time of the restatement, the FY08 financial reports were no longer formally available for public inspection pursuant to Article 25 of the JFIEA.[9]  Restated FY08 results are, however, included in Toshiba's restated FY09 financial statements.

126.    On August 18, 2015, Toshiba provided an initial outline of the anticipated restatement of its financial results from FY08 through 3Q14.  The release stated that Toshiba planned to issue its restatement when its FY14 results were released at the end of the month.  Apx. Ex. 5.

---

[9]    The IIC also found errors in Toshiba's FY07 financial reports.

- 40 -

4847-0125-0718.v2

Exhibit 7 to B.R. Shetty's
Request for Judicial Notice

47 of 145

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

127. On August 31, 2015, Toshiba announced that it would be unable to meet the August 31 deadline for submitting its FY14 annual report and restatement, and had obtained an extension until September 7 to do so. On the same day, UBS reported that:

> Reasons for delay include 1) discovery of multiple new instances of inappropriate accounting and the need for investigation, 2) miscalculation of impairment amounts for fixed assets that required restatement, 3) inappropriate timing for booking provisions for a project in which the percentage-of-completion method was used at a US subsidiary, and 4) an audit of a US subsidiary taking longer than scheduled.

The delay announcement caused Toshiba's stock to drop by 5.3%, its largest decline since the May announcement of the broader inquiry into accounting fraud.

128. When Toshiba's restatement was issued, the restatement of income (loss) before taxes had grown by ¥11.8 billion from what had been reported on August 18. The largest contributors to the increase were adjustments to POC accounting used by a US subsidiary on a hydroelectric project, increases in the amount of unrecognized FY14 costs at U.S. subsidiaries, and a reserve for an administrative monetary penalty.

129. On September 7, 2015, Toshiba issued its FY14 annual report and earnings release, including details of its restatement. Because the IIC and other investigations were limited in scope, as described above, Toshiba's restatement is likely to have significantly understated the true extent of the fraud or its impact on Toshiba's previously reported financial results.

130. The restatement eliminated more than ¥l90.5 billion (~$2.1 billion) in previously reported net income from FY08 through FY13, and resulted in Toshiba recording an additional ¥90.6 billion (~$1.0 billion) in delayed asset impairment charges that should have been taken in FY08 (¥41.7 billion) and FY11 (¥48.9 billion). Although net income for the first three quarters of FY14 increased as a result of the restatement, this was simply due to moving expenses that the Company had deliberately delayed reporting until FY14 back to the earlier periods

- 41 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice
48 of 145
Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA    Document 82-2    Filed 09/22/21    Page 50 of 146    Page
Case 2:15-cv-04194-DDP-JC   Document 75 Filed 08/08/19   Page 49 of 145   Page ID #:1574
ID #:1611

in which they should have been recognized, thereby reducing FY14 expenses by the same amount.

131. The restatement reduced Toshiba's cumulative pre-tax profit for FY08 through 3Q14 by ¥225 billion ($2.6 billion), which was 39% lower than the previously reported amounts:

| Cumulative restatements | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| ¥ billions | | FY08 | FY09 | FY10 | FY11 | FY12 | FY13 | 1Q-3Q14 | Total |
| Pre-tax Profit | Before | -259.7 | 27.2 | 194.7 | 145.4 | 159.6 | 180.9 | 134.9 | 583.0 |
| | After | -336.1 | -14.3 | 201.8 | 61.4 | 74.9 | 182.3 | 188.2 | 358.2 |
| | Change | -76.4 | -41.5 | 7.1 | -84 | -84.7 | 1.4 | 53.3 | -224.8 |
| Net Profit | Before | -343.6 | -19.7 | 137.8 | 70.1 | 77.4 | 50.8 | 71.9 | 44.7 |
| | After | -398.9 | -53.9 | 158.3 | 3.2 | 13.4 | 60.2 | 107.2 | -110.5 |
| | Change | -55.3 | -34.2 | 20.5 | -66.9 | -64 | 9.4 | 35.3 | 155.2 |
| $ millions | | FY08 | FY09 | FY10 | FY11 | FY12 | FY13 | 1Q-3Q14 | Total |
| Pre-tax Profit | Change | -779.6 | -446.2 | 85.5 | -1024.4 | -901.1 | 13.6 | 444.2 | -2608.0 |
| Net Profit | Change | -564.3 | -367.7 | 247.0 | -815.9 | -680.9 | 91.3 | 294.2 | -1796.3 |

*Source: Macquarie Research, Sept. 9, 2015*

132. The restatement also eliminated ¥953.2 billion (~$9.9 billion) in previously reported shareholder equity from Toshiba's books, reducing equity by as much as 20% below the amounts the Company had previously reported:

| Restatement of Shareholder Equity | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Reported Equity | | FY08 | FY09 | FY10 | FY11 | FY12 | FY13 | 1Q-3Q14 | Total |
| Before Restatement | | 447.3 | 797.4 | 868.1 | 863.5 | 1,034.3 | 1,229.1 | 1,426.5 | 6,666.2 |
| After Restatement | | 385.2 | 705.9 | 793.9 | 718.7 | 824.6 | 1,027.2 | 1,257.5 | 5,713.0 |
| Change in S/H Equity | ¥ billions | (62.1) | (91.5) | (74.2) | (144.8) | (209.7) | (201.9) | (169.0) | (953.2) |
| | $ millions | (633.7) | (983.9) | (894.0) | (1,765.9) | (2,230.9) | (1,960.2) | (1,408.3) | (9,876.8) |
| | % change | -13.9% | -11.5% | -8.5% | -16.8% | -20.3% | -16.4% | -11.8% | -14.3% |

133. The restatement confirmed the breadth of the fraud and the extensive efforts that were used to conceal the manipulations from the Company's investors. As one analyst noted following Toshiba's investor conference call to discuss the restatement:

> We were not impressed by the old president's *mea culpa*: it takes a certain discipline to fiddle accounts over half a dozen years.

- 42 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice
49 of 145
Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

Generally, any fool can tweak the P&L, it is more difficult to twiddle effectively the balance sheet and quite hard to fiddle the cashflow. To get whole teams to do such in a way consistent with each other and tenable against general reporting requires care and systematic deceit. Foreign subsidiaries, if they are to be involved, need be involved similarly. Alternatively, their numbers, though reported locally, are not reported in Japan in such a way that comparisons can be made.

Mirabaud 1819, *What they did* (Sept. 10, 2015) at 3.

### E.   Toshiba Belatedly Reveals Westinghouse Goodwill Impairment

134.   Toshiba acquired Westinghouse in 2006, paying $5.4 billion.  At the time of the acquisition many analysts pointed to the huge amount of goodwill as evidence that Toshiba had paid too much for Westinghouse.[10]  Analysts again raised questions about the need to write-down goodwill following the Fukushima nuclear accident in March 2011.[11]  Questions were raised again in FY11, when Toshiba became obligated to pay approximately ¥125 billion after the Shaw Group exercised its option to sell its 20% interest in Westinghouse.[12]  At each of these times, Toshiba

---

[10]  *See, e.g.*, UBS, *Toshiba earnings potential highest ever* (Aug. 8, 2011) at 7 ("[T]he purchase consideration was an unprecedented ¥621bn, and at the time the acquisition was announced, there was a number of reports indicating that it would be difficult to generate a sufficient return on investment at such a high purchase price.").

[11]  *See, e.g.*, Deutsche Bank, *Pessimism excessive; still a Buy* (Apr. 10, 2011) at 4 ("[F]uture profit expectations in the nuclear power business will have a large impact on the application of impairment of goodwill."); UBS, *Toshiba earnings potential highest ever* (Aug. 8, 2011) at 44 (noting risk of goodwill impairment if "opinion moved against nuclear power in the US"); Macquarie Research, *Whether thou goest, Westinghouse?* (Dec. 28, 2012) at 1 ("[P]rospect of goodwill impairment taken upon the disposal of stakes in Westinghouse has been a perennial concern of investors.").

[12]  *See, e.g.*, UBS, *Re-iterating our Buy rating* (Sept. 14, 2012) at 7 ("the possibility arises of impairment losses on the Westinghouse goodwill" as result of Shaw Group exercise of option); Macquarie Research, *Production cut brings NAND to the nadir* (July 25, 2012) at 6 (noting "creditor wariness over worsened balance sheet" and potential for impairment if investor replacing Shaw Group were to value Westinghouse on a lower assessed fair value accepted by Toshiba); *see also* UBS, *OP growth likely in FY11, but shares volatile on nuclear power* (Apr. 11, 2011) at 1 ("Financial risks from nuclear power market changes include 1) partial write-down of ¥350.8bn in Westinghouse goodwill and 2) the need for roughly ¥100bn if the Shaw Group exercises put options.  This impact cannot be overlooked since the balance sheet at end-Dec was not solid . . . .").

- 43 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice

50 of 145

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

told investors that Westinghouse's goodwill was not impaired, including by assuring investors in the wake of the Fukushima disaster that the large percentage of sales that Toshiba derived from fuel and maintenance contracts insulated it from the larger impacts in the industry arising from weakened demand for construction of new nuclear power plants.

135. In FY12 and FY13 Westinghouse took goodwill impairment charges totaling $1.3 billion. Toshiba did not publicly disclose the impairment charges taken by Westinghouse. Toshiba did not write-down any of the Westinghouse goodwill in its consolidated financial statements in FY12, FY13, or any subsequent period.

136. When the Shaw Group exercised the option requiring Toshiba to purchase its interest in FY12, Toshiba initially claimed it had an offer from a third party to acquire the interest. Toshiba ultimately chose to acquire rather than resell the Shaw Group interest, even though doing so required the majority of the cash on its balance sheet. Had Toshiba accepted an offer to sell the Shaw Group interest to a third party at a price lower than the value of Westinghouse that was reflected on Toshiba's books, accounting practices generally accepted in the United States ("US-GAAP") would likely have required Toshiba to write-down goodwill. *See infra* §VII.D.

137. One of the ways that Toshiba avoided taking an impairment charge was to restructure its business at the outset of FY13. *See* ¶¶32-33, *supra*. In Toshiba's FY12 annual report, Sasaki explained the restructuring of the Company's segments as follows:

> One key part of our basic management strategy is to press ahead with the "restructuring of businesses." Using FY2008 as a reference point, over a period of three years starting from FY2009, we have achieved a reduction in fixed costs of about ¥1,500 billion, and with regard to variable costs, we have also significantly reduced procurement and logistics costs. As a result, operating income, income before taxes and net income were all brought back to the levels attained prior to the financial crisis. . . .

- 44 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice

51 of 145

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA    Document 82-2    Filed 09/22/21    Page 53 of 146  Page
Case 2:15-cv-04194-DDP-JC  Document 75  Filed 08/08/19  Page 52 of 145  Page ID #:1577
ID #:1614

Based on the results of our efforts to build a strong profit-making business structure, which we have been implementing over the past three years, we are now moving ahead along the path of growth.

138. Contrary to Sasaki's statements, the reduction in costs was achieved not by successful management but through improper accounting, as described above. Moreover, the reorganization of Toshiba's segments therefore was not designed to capitalize on successful cost-reduction strategies. Rather, it appears to have been undertaken, in whole or in part, to avoid taking a write-down of the Westinghouse goodwill on a consolidated basis. *Infra* §VII.D.

139. The goodwill associated with the Westinghouse transaction represented more than 60% of all the goodwill on Toshiba's books. Goodwill impairment charges would have reduced Toshiba's earnings at a time when Toshiba and its top executives were falsifying financial results on a massive scale to avoid much smaller negative earnings impacts. Goodwill charges would have also had significant derivative impacts on the Company, potentially requiring it to cancel its dividend payments and giving rise to violations of the covenants attached to its ¥600 billion in long-term debt.

140. On November 17, 2015, Toshiba issued a press release describing the circumstances leading to the recording of the write-downs at Westinghouse. At the end of the release, Toshiba admitted that, at least for FY12, the write-downs were required to be disclosed at the time they were taken:

Although impairment recorded by Westinghouse Group did not influence Toshiba's financial consolidated statement, impairment recorded by Westinghouse Group in fiscal 2012 fell under the guidelines for timely disclosure, and the Company should have disclosed it appropriately at the appropriate timing.

141. According to a November 17, 2015 Nikkei Business report describing the Company's failure to write down its Westinghouse goodwill:

Internal documents reveal the gap between Toshiba's claims and the actual state of affairs at Westinghouse. As the nuclear unit fell into a prolonged slump, Toshiba's management tried a number of methods to prevent it from affecting the parent's bottom line. An internal document clearly states that if Toshiba had had to write down its

- 45 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice
52 of 145
Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

goodwill related to Westinghouse, there might have been "insufficient funds for cash dividends." Executives appear to have been concerned about this and other possibilities.

Apx. Ex. 9.

142. The Nikkei Business article quotes at least six internal Toshiba e-mails from 2013 and 2014 reflecting the Company's efforts to avoid Westinghouse's write-down of goodwill and, after that could not be avoided, to conceal the write-downs from investors. On July 23, 2013, Westinghouse's U.S.-based auditor, Ernst & Young ("E&Y"), signed its FY12 audit report requiring the write-down of $926 million in goodwill. According to the Nikkei Business report:

> Ernst & Young had clear reasons for recommending a write-down in view of the difficulties Westinghouse was experiencing. An internal e-mail from Westinghouse from the time stated that it "had a particularly serious shortage of funds in the second quarter. This fiscal year, the failure to meet sales targets for uranium and the drop in revenue due to deferred plant construction [could] have a large impact on the bottom line."

*Id.*

143. On July 28, 2013, five days after the Company received E&Y's audit report, Kubo sent the following e-mail to Westinghouse executives describing his efforts to get the auditor to change its mind:

> EY . . . has tried to cut off debate. It's completely inappropriate for an auditor to say they can't change their conclusion. I brought this up with H, partner at [EY] ShinNihon. I told him we'll be soliciting bids, and we hope EY will put its best foot forward with a new team.

*Id.* Toshiba subsequently pressured EY to replace Westinghouse's U.S.-based audit manager with a Japanese manager for subsequent audits.

144. Despite the level of internal concern at Toshiba regarding the goodwill write-downs taken at Westinghouse, the write-downs were not publicly disclosed. As reported by Nikkei Business:

> If Westinghouse's troubles became publicly known, Toshiba would have been pressured to write down the unit's value on its consolidated statement. Given the size of the write-down – over 100 billion yen – Toshiba no doubt wanted to contain the damage to its subsidiary.

- 46 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice
53 of 145
Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

*Id.*; *see also id.* (Quoting April 2014 e-mail from executive at Toshiba's nuclear power division: "The Westinghouse impairment test is extremely important for Toshiba. Even when on the premises, be careful not to needlessly share information with people who are not directly involved, and do not discuss company matters outside the office (during lunch, in taxis, etc.).").

145.   Throughout the investigations into Toshiba's accounting, analysts and investors again questioned whether the concealed losses and other circumstances revealed by the inquiries would require a write-down of the $2.9 billion (¥344.1 billion) in goodwill remaining on Toshiba's books from the 2006 acquisition of Westinghouse.  Following the April release announcing the SIC investigation, analysts expressed relief that Westinghouse did not appear to be involved.[13]  But on May 8, 2015 when Toshiba announced the formation of the IIC to conduct a wider probe, analysts grew more concerned over the potential impact on Westinghouse goodwill.[14]

---

[13]  *See, e.g.*, MorganStanley MUFG, *Our Take on Infrastructure Business Accounting Probe and Lifestyle Business* (Apr. 13, 2015) at 1 ("we do not think [the April 3 announcement of the SIC investigation] has anything to do with . . . Westinghouse"); SMBC Nikko, *Cut to hold on white goods deterioration, accounting investigation* (Apr. 21, 2015) at 5 ("Westinghouse Electric (nuclear power-related) is probably not involved.").

[14]  *See, e.g.*, J.P. Morgan, *Westinghouse Already Included as Potential Investigation Target* (May 16, 2015) at 1 ("[W]e question whether overseas actions to achieve quotas differ from those in Japan.   Westinghouse was included as a potential investigation target, but we still see risk of uncertainty because it was not actually subject to investigation."); Mitsubishi UFJ Morgan Stanley, *Independent Committee plans to report in mid-July; Securities filing deadline extended by two months* (May 29, 2015) at 1 ("We will probably have to wait to hear the conclusions of the independent investigation committee to find out if there are problems at Westinghouse."); UBS, *The heart of the matter* (June 10, 2015) at 1 ("When we discuss Toshiba's accounting irregularities with investors, interest centers on whether Westinghouse assets will be impaired.").

- 47 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice
54 of 145
Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

146.   Following the July 21 release of the IIC report, analysts again questioned whether Toshiba was addressing the impact of the business conditions concealed by accounting fraud on the Westinghouse goodwill.[15]   For example:

**Explanation of past profits/losses at Westinghouse on shaky ground**

We note that certain aspects of the report's content differ from Toshiba's own past explanations of profit fluctuations.   We take for example Westinghouse (WEC), mentioned as Project G on page 27. Based on Toshiba's previous explanation, we understand that a total of JPY30bn in additional costs related to WEC were posted: JPY10bn in 2Q and JPY20bn in 3Q FY3/14.   Moreover, Toshiba wrote down the South Texas Project, an overseas nuclear power project operated independently of WEC, by JPY30bn in 4Q FY3/14.   This caused a total impact on the overseas nuclear power business from one-time factors of JPY60bn.   However, according to the investigation report, WEC reported to Toshiba that the risk of additional cost was $385mn in 2Q and $401mn in 3Q for a total of $786mn.   ***The amount of costs recognized in each quarter and their accompanying explanation differ considerably, raising the possibility that Toshiba misled investors on the actual situation in the nuclear power business***.

Mitsubishi UFJ Morgan Stanley, *Hit to net assets may be up to JPY448.2bn; risk of capital increase a concern* (July 21, 2015) at 1.

147.   In another July 21, 2015 research report, UBS similarly noted that:

[I]n business plans unveiled in FY06, immediately after the acquisition, the company targeted FY15 sales for the overall nuclear business (Toshiba + Westinghouse) of ¥700bn.   However, we estimate that actual sales have remained at about ¥600bn. Furthermore, the OPM target for Westinghouse was 12%, much higher than at the time of acquisition (7%), and here too the business has likely fallen short. We believe the only way that Toshiba can convince equity markets that there is no need to write down the value of the business despite it being below medium-term business plan targets and despite the unforeseen nuclear accident in FY11 is to disclose absolute earnings levels.

UBS, *Still stuck* (July 21, 2015) at 3.

---

[15]   *See, e.g.*, Macquarie Research, *Set to clean the slate* (July 21, 2015) at 2 ("We continue to see risk of further provisioning in FY3/16-19 related to cost overruns, notably in the AP1000 projects in the US."); UBS, *Still stuck* (July 21, 2015) at 3 ("We believe the probability has increased of the Westinghouse impairment risk that we have been concerned with not being taken care of now. . . .   [W]e believe there is a high probability that there has been no improvement since the time of the acquisition and that operations are below levels planned at that time.").

- 48 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice
55 of 145
Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA   Document 82-2   Filed 09/22/21   Page 57 of 146   Page
Case 2:15-cv-04194-DDP-JC   Document 75   Filed 08/08/19   Page 56 of 145   Page ID #:1581
ID #:1618

148. When Toshiba provided its initial outline of the restatement on August 18, 2015, it sought to address concerns like those raised by Macquarie Research and UBS by telling investors that no impairment charges had been taken because Westinghouse had performed as expected since the acquisition, achieving cumulative earnings before interest, taxes, depreciation, and amortization ("EBITDA") of ¥370 billion since 2006. Toshiba assured investors that goodwill had been repeatedly tested for impairment and nothing had been detected to indicate even a "potential" for impairment. On an August 18, conference call, Kubo told investors that annual impairment testing of Westinghouse's goodwill had been conducted every year since the acquisition, and there had been "no change" and "no event [that] happened" to show any impact on goodwill.

149. When Toshiba issued its FY14 and restated FY09-3Q14 financial results on September 7, 2015, it confirmed that no goodwill impairment charge would be included in either the restated or current results. Investors were buoyed by the assurances that Westinghouse's business had remained strong through the meltdowns in the financial markets and at Fukushima. Although the market continued to question whether future write-downs would be required in light of the continuing high valuation placed on Westinghouse in Toshiba's books, the assurances that no past write-downs had been required led investors to believe that any write-down, should one be required, would be relatively slight.[16]

---

[16] *See, e.g.*, SMBC Nikko, *NAND slowdown in 1H and full-FY3/16 could dent core profits* (Sept. 16, 2015) at 6 (even though "[r]umors abound concerning the risk of impairment losses at nuclear power-related US subsidiary Westinghouse (WEC)" based on Toshiba's description of its nuclear power business "the risk from WEC write-downs is relatively minor.") ; UBS, *Disappointing Results* (Sept. 14, 2015) at 2 ("A key point for the company's irregular accounting issue was whether Westinghouse's assets would be impaired or not. No impairment loss was taken and the company has only recorded ¥528.2bn (UBS estimate) in related intangible assets on its balance sheet. However, the impression given is that impairment was not recorded this time but has not been ruled out going forward, and the market has not likely entirely disregarded the risk of impairment losses.").

- 49 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice

56 of 145

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

150. However, when Toshiba issued its 2Q15 financial results on November 6, 2015, it admitted, for the first time, that Westinghouse itself had taken goodwill impairment charges in FY12 and FY13. On a conference call the same day, Toshiba spokesman, CFO Masayoshi Hirata acknowledged that the impairment charges were "not fully disclose[d] in the past on the side of the Westinghouse."

151. According to a November 17, 2015 Nikkei Business report:

> The write-downs were first discovered by Nikkei Business in Toshiba internal e-mails and documents, and Toshiba did not disclose them until questioned by Nikkei Business reporters. In response to the newly revealed accounting issues, the Tokyo Stock Exchange is launching a probe.

Apx. Ex. 9.

152. When Toshiba first disclosed the existence of the impairment charges, it refused to quantify the amounts. On November 12, 2015, however, Nikkei Business reported that Westinghouse had written down its assets by $926 million in FY12 and $400 million in FY13. On November 13, 2015, Toshiba issued a press release confirming the amounts of the impairment charges. These developments stunned investors:

> The report comes after Toshiba said in July that Westinghouse was more profitable today than when Toshiba bought it in 2006. It could be a sign that Toshiba is yet to draw a line under its $1.3 billion accounting scandal.
>
> *       *       *
>
> The writedowns mainly reflected sluggish demand for new nuclear power plants, the report said, citing Toshiba's internal documents. The Japanese laptops-to-nuclear conglomerate does not disclose results for the nuclear power business alone.

Reuters, *Toshiba's Westinghouse unit booked losses in 2012, 2013 – report* (Nov. 12, 2013).

153. By the close of trading on November 12, Toshiba shares had fallen more than 11% below their closing price on November 5, before the impairments were revealed. As the *Wall Street Journal* reported on November 13, 2015:

- 50 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice                    57 of 145              Hashem, et al., v. NMC Health PLC, et al.,
                                                                        2:20-cv-02303-CBM-MAA

Toshiba Corp. shares fell sharply Friday after the Japanese electronics and industrial giant said its U.S. nuclear business, Westinghouse Electric Co., booked $1.3 billion in impairment charges, raising investor concerns about a new phase in a drawn-out accounting scandal.

It was the latest in a series of unusual financial disclosures that have shaken investor trust, even after Toshiba overhauled its board and senior management this summer to try to move on from the scandal.

Toshiba said at an earnings briefing last weekend that Westinghouse's plant construction business stalled after the Fukushima nuclear disaster in Japan four years ago, but didn't reveal the amount written down until late Thursday. The company confirmed the $1.3 billion impairment charges, which took place during the 2012 and 2013 fiscal years, after a report in Japanese magazine Nikkei Business.

"It's a big amount," said Naoki Fujiwara, fund manager at Shinkin Asset Management. "It would have been fairer had they disclosed that from the beginning."

Wall Street Journal, *Toshiba Shares Dive as Westinghouse Disclosure Spooks Investors* (Nov. 13, 2015).

## VI. FRAUDULENT STATEMENTS, OMISSIONS & COURSE OF BUSINESS DURING THE CLASS PERIOD

154. During the Class Period, Toshiba made at least three types of materially false and misleading statements and omissions: (i) false financial statements that misrepresented the Company's financial results and financial condition (*infra* §VI.A.); (ii) misrepresentations about the financial condition and performance of Westinghouse and the impairment of the goodwill associated with Toshiba's acquisition of Westinghouse (*infra* §VI.B.); and (iii) misrepresentations about the existence and effectiveness of internal controls to detect or prevent the misrepresentation of financial results or other information about the Company's operating results and condition (*infra* §VI.C.).

155. These misrepresentations and omissions were related to the value or merit of 6502, TOSYY and TOSBF, in that they concealed the true condition of Toshiba's business and the risks to its financial success and misled investors about the risks associated with the purchase or sale of securities evidencing an ownership interest in the Company. As a result, the misrepresentations and omissions alleged

- 51 -

4847-0125-0718.v2

Exhibit 7 to B.R. Shetty's
Request for Judicial Notice

58 of 145

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

below caused the price of Toshiba 6502 stock and TOSYY and TOSBF shares to trade at prices that were higher than what the market price would have been had the true facts concealed by defendant's fraud been known.   Defendant's fraudulent statements and omissions thereby caused economic harm to Class members who purchased 6502, TOSYY or TOSBF at the inflated prices prevailing in the market during the Class Period.

156.   The facts that have been admitted by Toshiba, as detailed in §V above, are sufficient to establish *prima facie* violations of the Exchange Act (with respect to domestic transactions) and the JFIEA (with respect to foreign transactions).  As a result of the SIC and IIC investigations, most of the relevant documents regarding the fraud alleged herein have already been gathered and collected, and much of the relevant witness testimony has been preserved.  Such evidence can be quickly and expeditiously produced by defendant.

157.   Should additional discovery be necessary in Japan, it will not be unduly burdensome or difficult for the parties or the Court:

(a)   These are well established procedures for conducting discovery in Japan, which have been used successfully in numerous cases litigated in the United States.

(b)   The key sources of evidence regarding aspects of the fraud not addressed in the SIC and IIC investigations – *i.e.*, the misrepresentations regarding the financial condition of and prospects for Westinghouse (*supra* §V.E) – are located in the United States.

(c)   To the best of plaintiffs' knowledge, information and belief based on a review of court filings, Toshiba has not introduced any witness testimony or non-public documentary evidence on any issue of liability in any proceeding pending in Japan arising out of the misrepresentations alleged below, including in proceedings that have reached the stage where such evidence would customarily be offered by a defendant seeking to dispute liability.

- 52 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice

59 of 145

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

## A.    False Financial Statements

158.    As a result of the improper and inaccurate accounting described herein, Toshiba's quarterly and annual earnings reports included numerous materially false and misleading statements about its financial condition and results.    These statements were made in the press releases, conference calls, and presentation materials Toshiba issued to report its earnings, and in the quarterly and annual reports it filed with the FSA and SESC.

159.    The Company's financial results were initially reported in quarterly earnings releases issued about a month after the end of the quarter for the first three quarters of the year, and about two months after the end of the fiscal year.    These releases consisted of two parts: (i) a press release describing Toshiba's financial results for the period, and (ii) a set of presentation slides used at the quarterly conference calls Toshiba hosted to discuss its results with analysts and investors. References herein to earnings releases refer collectively to both parts.    Toshiba issued both English and Japanese versions of each earnings release.

160.    The Company's financial results were also reported in the quarterly and annual reports that Toshiba was required to file with the FSA and SESC.    The reports were signed by Nishida and Sasaki in FY11-FY13, and by Masashi Muromachi and Tanaka in FY14.    Toshiba's annual reports were also issued in two parts: an Operational Review containing the CEO's report and a narrative description of the Company and its business; and a Financial Review containing the Company's financial statements.    References herein to annual reports refer collectively to both parts.    Toshiba issued its quarterly and annual reports in both Japanese and English.

161.    According to Toshiba's Disclosure Policy, before the Company's earnings releases, annual and quarterly reports, and other disclosure materials were released they were reviewed and approved by the Company's Finance & Accounting Division, Legal Affairs Division, Corporate Communications Division, and then by the Company's executive officers. The materials were also discussed with the Board

- 53 -

4847-0125-0718.v2

Exhibit 7 to B.R. Shetty's
Request for Judicial Notice

60 of 145

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

of Directors before being publicly released.   Pre-announcements of earnings, dividend payments, and earnings forecasts were specifically approved by the Board of Directors before being released.

162.   The quarterly and annual reports were filed on the Tokyo stock exchange's Electronic Disclosure for Investors Network ("TDnet").   Pursuant to JFIEA Art. 25, copies of the annual reports were made available for public inspection for a period of five years from the date of filing on TDnet, and copies of the quarterly reports were made available for public inspection for a period of three years from the date of filing.   The Company's Disclosure Policy states that "Toshiba makes full use of the electronic facilities provided by the Tokyo stock exchange's TDnet. Information disclosed on TDnet is also promptly disclosed via other media, including the Toshiba Web site and direct e-mail."   The policy states that Toshiba "makes every effort to assure full disclosure to investors by appropriate methods." Pursuant to this policy, Toshiba's annual and quarterly reports, earnings releases, investor presentations, financial statements, and other information were published and continuously made available for viewing and download on the investor relations portion of the Company's website.

163.   On the day that each earnings release was issued, Toshiba also hosted a conference call to discuss the Company's financial results with investors and analysts.   During the Class Period, Kubo or another senior executive of Toshiba began each call with a power point presentation and discussion of the Company's financial results for the quarter.   Toshiba provided an interpreter for the call, who was present on the live call and provided spoken translations of the statements into English.   The calls were publicized in advance by the Company, and written transcripts of the call were published and disseminated by Thomson Reuters and other sources.

164.   The contents of the Company's earnings releases, annual and quarterly reports, and other information published on its website and disclosed on its

- 54 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice                    61 of 145                    Hashem, et al., v. NMC Health PLC, et al.,
                                                                              2:20-cv-02303-CBM-MAA

conference calls was disseminated further by news organizations, financial analysts, investor websites, and other sources of information for investors and, as a result, the information communicated in the Company's statements became widely available to investors and reflected in the market price for Toshiba securities.

165.   Toshiba's annual and quarterly financial reports misrepresented the Company's net sales and operating income and other financial results and metrics derived therefrom, as described below.  Net sales and operating income were the basic key performance indicators that the Company and its management used to assess its performance, as the Company told investors in its FY12 and FY13 annual reports.

166.   The misstatement of net sales and operating income in turn caused numerous other statements included with Toshiba's financial results to be materially false and misleading, including Toshiba's segment results as well as the three other key performance indicators identified by Toshiba's annual reports: operating income ratio (ratio of operating income to net sales), shareholders' equity ratio (ratio of equity attributable to shareholders of the Company to total assets), and debt-to-equity ratio.

167.   The accounting practices that caused Toshiba's net sales, operating income, and other financial results and metrics to be falsely reported are described in the IIC report (Apx. Ex. 1) and summarized in §VII below.

168.   The facts giving rise to a strong inference of scienter are detailed in the IIC report and the Company's admissions of wrongdoing, as described in §V, *supra* and §VII, *infra*.  In particular, the improper accounting resulted from acts that were intended to conceal Toshiba's true financial condition and results by delaying recognition of losses, expenses, and required charges.  Toshiba deliberately used accounting methods that its senior executives knew to be improper, leading to the publication of financial results that were known to be inaccurate at the time they were issued.  The false accounting was systemic to the business and was directed or

- 55 -

4847-0125-0718.v2

Exhibit 7 to B.R. Shetty's
Request for Judicial Notice

62 of 145

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

knowingly permitted by Tanaka, Sasaki and Nishida during the time periods when they served as Toshiba's CEO and numerous other senior Company executives.  The false financial information resulted from earnings requirements imposed on Toshiba's business units that Toshiba executives knew were unattainable without falsifying the entities financial results.

### 1.    False Annual Financial Reports

169.   Toshiba's annual earnings reports for FY11, FY12, and FY13 were published in the following earnings releases and annual reports that were issued during the Class Period and that falsely reported the following amounts of net sales and operating income:

| Class Period Annual Financial Reports | | | | (¥ billions) |
|---|---|---|---|---|
| Period | Type | Date | Net Sales | Op. Income (loss) |
| FY11 | Release | May 8, 2012 | 6,100.3 | 206.6 |
| FY11 | Report | June 22, 2012 | 6,100.3 | 206.6 |
| FY12 | Release | May 8, 2013 | 5,800.3 | 194.3 |
| FY12 | Report | June 25, 2013 | 5,800.3 | 194.3 |
| FY13 | Release | May 8, 2014 | 6,502.5 | 290.8 |
| FY13 | Report | June 25, 2014 | 6,502.5 | 290.8 |

170.   The Company's Class Period annual reports and earnings releases incorporated or referenced the Company's FY08, FY09, and FY10 financial results, which were originally reported in the following earnings releases and annual reports that falsely reported the following amounts of net sales and operating income:

- 56 -

4847-0125-0718.v2

Exhibit 7 to B.R. Shetty's
Request for Judicial Notice

63 of 145

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

| Pre-Class Period Annual Financial Reports | | | | (¥ billions) |
|---|---|---|---|---|
| **Period** | **Type** | **Date** | **Net Sales** | **Op. Income (loss)** |
| FY08 | Release | May 8, 2009 | 6,654.5 | (343.6) |
| | Report | June 24, 2009 | 6,654.5 | (343.6) |
| FY09 | Release | May 7, 2010 | 6,381.6 | 117.2 |
| | Report | June 23, 2010 | 6,381.6 | 117.2 |
| FY10 | Release | May 9, 2011 | 6,398.5 | 240.3 |
| | Report | June 22, 2011 | 6,398.5 | 240.3 |

171. The Company's FY08, FY09, and FY10 net sales and operating income, along with other pre-Class Period financial data, was presented in the Company's Class Period financial statements as bases for investors to compare the Company's results or understand business trends across multiple earnings periods. Toshiba's FY08, FY09, and FY10 earnings releases and annual reports remained available for public inspection and continued to be made available for viewing or downloading on Toshiba's website during the Class Period.

172. The false financial information in Toshiba's FY09 and FY10 reports was not corrected prior to the commencement of the Class Period. At the outset of the Class Period, Class members therefore did not know, and could not in the exercise of reasonable diligence have discovered, that the information in those releases and reports was materially false, or had been based on deliberate manipulations of accounting practices for the purpose of concealing losses and improving reported results. As a result, the uncorrected false information that predated the Class Period remained alive in the market and continued to mislead investors during the Class Period.

173. Toshiba's financial reports from FY09 through 3Q14 misrepresented its net sales, operating income, and other financial results and metrics by at least the amounts of the Company's restatement, as summarized in the following chart issued by the Company on September 7, 2015:[17]

---

[17] The "before" figures in the chart below do not precisely match the previously reported results because, in preparing the chart, the Company did not revise or

- 57 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice

64 of 145

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

## Restatement of Past Financial Results
### FY2009-FY2013

(Yen in billions)

| | FY2009 | | | FY2010 | | | FY2011 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Before | Correction | After | Before | Correction | After | Before | Correction | After |
| Net Sales | 6,129.9 | 7.8 | 6,137.7 | 6,270.7 | -6.7 | 6,264.0 | 5,994.3 | 2.1 | 5,996.4 |
| Operating Income (Loss) | 117.6 | -45.8 | 71.8 | 238.7 | 5.8 | 244.5 | 202.6 | -87.7 | 114.9 |
| Income (Loss) before income taxes and noncontrolling interests | 27.2 | -41.5 | -14.3 | 194.7 | 7.1 | 201.8 | 145.4 | -84.0 | 61.4 |
| Net Income (Loss) | -19.7 | -34.2 | -53.9 | 137.8 | 20.5 | 158.3 | 70.1 | -66.9 | 3.2 |
| Free cash flow | 198.5 | 2.3 | 200.8 | 159.4 | -2.5 | 156.9 | -42.2 | 2.5 | -39.7 |
| Equity attributable to shareholders of the Company | 797.4 | -91.5 | 705.9 | 868.1 | -74.2 | 793.9 | 863.5 | -144.8 | 718.7 |
| Net interest-bearing debt | 950.9 | 0.0 | 950.9 | 822.5 | 2.5 | 825.0 | 1,021.5 | 0.0 | 1,021.5 |
| Net debt-to-equity ratio | 119% | 16% | 135% | 95% | 9% | 104% | 118% | 25% | 143% |

| | FY2012 | | | FY2013 | | |
|---|---|---|---|---|---|---|
| | Before | Correction | After | Before | Correction | After |
| Net Sales | 5,727.0 | -4.8 | 5,722.2 | 6,502.5 | -12.8 | 6,489.7 |
| Operating Income (Loss) | 197.7 | -105.6 | 92.1 | 290.8 | -33.7 | 257.1 |
| Income (Loss) before income taxes and noncontrolling interests | 159.6 | -84.7 | 74.9 | 180.9 | 1.4 | 182.3 |
| Net Income (Loss) | 77.4 | -64.0 | 13.4 | 50.8 | 9.4 | 60.2 |
| Free cash flow | -64.0 | 0.0 | -64.0 | 40.0 | 0.0 | 40.0 |
| Equity attributable to shareholders of the Company | 1,034.3 | -209.7 | 824.6 | 1,229.1 | -201.9 | 1,027.2 |
| Net interest-bearing debt | 1,262.4 | 0.0 | 1,262.4 | 1,217.0 | 0.0 | 1,217.0 |
| Net debt-to-equity ratio | 122% | 31% | 153% | 99% | 19% | 118% |

**TOSHIBA** Leading Innovation >>>

© 2015 Toshiba Corporation    13

### 2.    False Quarterly Financial Reports

174.    The quarterly earnings reports Toshiba issued during the Class Period falsely reported the following amounts of net sales and operating income:[18]

| Class Period Quarterly Financial Reports | | | | (¥ billions) |
|---|---|---|---|---|
| Period | Type | Date | Net Sales | Op. Income (loss) |
| 1Q12 | Release | July 31, 2012 | 1,268.9 | 11.5 |
| | Report | Aug. __, 2012 | 1,268.9 | 11.5 |
| 2Q12 | Release | Oct. 31, 2012 | 1,417.0 | 57.5 |
| | Report | Nov. 13, 2012 | 1,417.0 | 57.2 |
| 3Q12 | Release | Jan. 31, 2013 | 1,357.1 | 29.3 |
| | Report | Feb. 8, 2013 | 1,357.1 | 29.6 |

reclassify prior results to reflect subsequent discontinuation of businesses, changes in the organization of its segments, or a change in the allocation method for administrative and overhead expenses.

[18]  The 1Q reports were typically filed in the first week of August.  However, the dates of the 1Q12 and 1Q13 reports are presently unknown because those reports are no longer publicly available.

- 58 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's Request for Judicial Notice
65 of 145
Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

| Class Period Quarterly Financial Reports | | | | (¥ billions) |
|---|---|---|---|---|
| Period | Type | Date | Net Sales | Op. Income (loss) |
| 1Q13 | Release | July 31, 2013 | 1,390.6 | 24.3 |
| 1Q13 | Report | Aug. __, 2013 | 1,371.1 | 25.1 |
| 2Q13 | Release | Oct. 30, 2013 | 1,648.6 | 81.3 |
| 2Q13 | Report | Nov. 12, 2013 | 1,629.6 | 81.8 |
| 3Q13 | Release | Jan. 30, 2014 | 1,549.6 | 47.7 |
| 3Q13 | Report | Feb. 10, 2014 | 1,531.3 | 48.3 |
| 1Q14 | Release | July 31, 2014 | 1,408.0 | 39.5 |
| 1Q14 | Report | Aug. 8, 2014 | 1,414.0 | 47.7 |
| 2Q14 | Release | Oct. 30, 2014 | 1,700.4 | 75.6 |
| 2Q14 | Report | Nov. 11, 2014 | 1,700.0 | 75.6 |
| 3Q14 | Release | Jan. 29, 2015 | 1,607.8 | 49.7 |
| 3Q14 | Report | Feb. 9, 2015 | 1,608.0 | 49.7 |

175.    As with the Company's annual reports, Toshiba's Class Period quarterly earnings releases and reports also included net sales, operating income, and other financial metrics and information that had been falsely reported in prior quarters as bases for investors to compare the Company's results or understand business trends across multiple earnings periods.  For the first three quarters of FY12, this included false pre-Class Period information that had been reported in the first three quarters of FY11.  In addition, all of the quarterly earnings releases and quarterly reports that Toshiba had issued in FY08, FY09, FY10, and FY11 remained available for public inspection at the outset of the Class Period and continued to be made available for viewing or downloading on Toshiba's website during the Class Period.

176.    The false financial information in Toshiba's FY08, FY09, FY10, and FY11 quarterly earnings releases and reports was not corrected prior to the commencement of the Class Period.  At the outset of the Class Period, Class members therefore did not know, and could not in the exercise of reasonable diligence have discovered, that the information in those releases and reports was materially false, or had been based on deliberate manipulations of accounting practices for the purpose of concealing losses and improving reported results.  As a

- 59 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice

66 of 145

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA   Document 82-2   Filed 09/22/21   Page 68 of 146   Page
Case 2:15-cv-04194-DDP-JC   Document 75 #Filed 08/08/19   Page 67 of 145   Page ID #:1592
ID #:1629

result, the uncorrected false information that predated the Class Period remained alive in the market and continued to mislead investors during the Class Period.

177.   The IIC found that the matters delegated to it for investigation had caused the net sales and net income originally reported in the false earnings releases and false SESC reports to have been misstated for every quarter between 1Q08 and 3Q14, in at least the following amounts (Apx. Ex. 1 at Ex. 1 (Quarterly Correction List):

| ¥100 million | FY08 | | | | | FY09 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Period | Q1 | Q2 | Q3 | Q4 | YEAR | Q1 | Q2 | Q3 | Q4 | YEAR |
| Sales | -- | 5 | 20 | 15 | 40 | 4 | (8) | (3) | 7 | -- |
| Net Profit | 31 | 142 | 90 | 20 | 282 | 131 | 167 | (13) | 115 | 400 |
| | FY10 | | | | | FY11 | | | | |
| Period | Q1 | Q2 | Q3 | Q4 | YEAR | Q1 | Q2 | Q3 | Q4 | YEAR |
| Sales | 1 | (54) | -- | -- | (53) | 43 | (10) | -- | (28) | 5 |
| Net Profit | 201 | (94) | (187) | 4 | (84) | 224 | 157 | (112) | 42 | 312 |
| | FY12 | | | | | FY13 | | | | |
| Period | Q1 | Q2 | Q3 | Q4 | YEAR | Q1 | Q2 | Q3 | Q4 | YEAR |
| Sales | 32 | 5 | 8 | (16) | 28 | (11) | 252 | (139) | (24) | 78 |
| Net Profit | 240 | 116 | 131 | 371 | 858 | (134) | 471 | (196) | (87) | 54 |
| | FY14 | | | | | | | | | |
| Period | Q1 | Q2 | Q3 | Q1-Q3 | | | | | | |
| Sales | 59 | -- | (7) | 52 | | | | | | |
| Net Profit | (69) | (83) | (152) | (304) | | | | | | |

178.   The actual quarterly misrepresentations were greater than the amounts identified in the chart above, which does not include adjustments required for improper accounting on issues outside of the matters delegated to or specifically investigated by the IIC, alleged above.

**B.   False Statements About Westinghouse Goodwill Impairment**

**1.   Failure to Disclose or Record Goodwill Impairment Charges in FY12 and FY13**

179.   **Failure to comply with GAAP**.  Toshiba's FY12 financial statements falsely reported goodwill and other intangible assets of $9.8 billion (¥919.3 billion)

- 60 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice
67 of 145
Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

without further disclosure. Toshiba's annual report stated that "[t]he Group tested goodwill for impairment in accordance with ASC No. 350[19] applying a fair value based test and has concluded that there was no impairment for the years ended March 31, 2013 and 2012."

180. Toshiba's FY13 financial statements falsely reported goodwill and other intangible assets of $9.8 billion (¥1,006.6 billion) without further disclosure. Toshiba's annual report stated that "[t]he Group tested goodwill for impairment in accordance with ASC No. 350, applying a fair value based test and has concluded that there was no impairment for the years ended March 31, 2014 and 2013."

181. Westinghouse took goodwill impairment charges of approximately $930 million in FY12 and $390 million in FY13. Toshiba did not include any impairment charge for Westinghouse goodwill in either its FY12 or FY13 annual reports. Neither did Toshiba disclose the goodwill impairment charges that had been taken by Westinghouse until November 2015. After the goodwill impairment charges taken by Westinghouse were revealed, Toshiba asserted that the impairment charges were not required to be taken on a consolidated basis because there were sufficient overall cash flows to support the goodwill on its balance sheet. However, on November 17, 2015 Toshiba admitted that the impairment charges that had been taken by Westinghouse were material and were required to have been disclosed at the time they were taken.

182. Toshiba's recent assertions that GAAP did not require the Westinghouse impairment charges to be taken at the corporate level and reflected in Toshiba's consolidated financial statements are conclusory and insufficiently particularized to establish that this is, in fact, correct. Toshiba had both the motive and opportunity to manipulate its financial reporting in a manner that was designed

---

[19] Accounting Standard Codification ("ASC") Topic 350, *Intangibles-Goodwill and Other*.

- 61 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice
68 of 145
Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

to avoid recording the impairment charge at the corporate level, including by manipulating the segments and reporting units used to evaluate the impairment, and falsifying actual or projected earnings at Westinghouse or other business units in a manner designed to avoid recording an impairment.

183.   Toshiba's efforts to avoid taking a charge at the subsidiary level and then to prevent public disclosure of the charges after they were taken, together with the other deliberate and extensive manipulations of reported revenues and earnings designed to avoid negative charges on the Company's financial statements, render Toshiba's recent assertions of GAAP compliance uncredible.  Toshiba's FY12 and FY13 annual reports were materially false and misleading to investors to the extent that the reported goodwill amounts (¥1,006.6 billion for FY13) were not stated in compliance with GAAP.

184.   **<u>Omission of impairment charges taken by Westinghouse</u>**.  Toshiba's omission to disclose the impairment charges taken by Westinghouse in FY12 and FY13 was also materially misleading to investors.  At the time of the Westinghouse acquisition, Toshiba projected that the transaction would enable it to secure contracts to build over 30 new reactors and increase revenue to ¥1 trillion by FY15.  By 2015, however, Toshiba had won only ten contracts for new nuclear plants.  A decline in cash flows resulting from the failure to secure new contracts and project delays on other contracts was the primary reason that E&Y's U.S.-based auditors required an asset write-down in FY13, according to a November 17, 2015 Nikkei Business article based on internal Toshiba documents.  Apx. Ex. 9.

185.   To avoid recording the FY13 impairment charge on its consolidated financial statements, Toshiba changed the way it valued goodwill by combining Westinghouse with its nuclear business in Japan for valuation purposes, and then valuing the business based only on its own internal projections of earnings, which were (as the other accounting fraud described herein illustrates) easily manipulated. *See* Apx. Ex. 9.  Avoiding the charge at the corporate level was necessary to protect

- 62 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice

69 of 145

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA    Document 82-2    Filed 09/22/21    Page 71 of 146    Page
Case 2:15-cv-04194-DDP-JC   Document 75   Filed 08/08/19   Page 70 of 145   Page ID #:1595
ID #:1632

Toshiba from having to cancel payment of its annual cash dividend or breach the debt covenants in the agreements covering its ¥600 billion in long-term debt.  Taking the charges – or even disclosing that the charges had been taken at Westinghouse – also would have alerted investors to the magnitude of the business decline in the wake of the March 11, 2011 accident at the Fukushima Daiichi nuclear reactor, causing a substantial decline in Toshiba's stock price.

186.  **Materially incomplete disclosures about Shaw Group put option**. Toshiba's FY11 annual report stated the following with respect to the Shaw Group's exercise of its put option:

> In December 2011, The Shaw Group Inc. announced that its put options to sell to the Group all or a part of its stake in the holding companies of Westinghouse Electric (20% of the holding companies of Westinghouse Electric) which are currently held by Nuclear Energy Holdings LLC, a wholly owned subsidiary of the Shaw Group Inc., the announcement of which was made in September 2011, will be exercised automatically in October 2012 in accordance with the contractual terms between Shaw Group and the Group because it did not receive the consent from the third party in order to exercise its put options.  In the case such put options are exercised, the Group will seek for the participation of new strategic partner in investment in Westinghouse, however the Group may bear substantial amount of investment funds during the period from January 2012 when the Group acquires the stakes to the time of such investment by new strategic partner.  Several companies have already expressed an interest in investing in Westinghouse and it remains open to the idea of inviting the participation of new investors in Westinghouse, if the Company and such potential investors could share a long-term vision and business strategy with respect to Westinghouse business.

187.  Following Toshiba's acquisition of the Shaw Group's stake in Westinghouse, Toshiba's ownership interest in Westinghouse stood at 87%. Toshiba's FY12 cash flow statement reflected the $1.3 billion (¥124.7 billion) purchase of the Shaw Group interest.  The FY12 annual report continued to state that:

> Several companies have already expressed an interest in investing in Westinghouse and the Company is considering inviting the participation of new investors in Westinghouse, on the condition that the Company retains a majority-in-interest.

- 63 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice

70 of 145

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

188. Toshiba did not sell the Westinghouse stake acquired from the Shaw Group, or any other portion of its Westinghouse ownership interests, to a new investor. The note about the expressions of outside interest in acquiring a stake in Westinghouse was not included in the notes to Toshiba's FY14 financial statements. The most likely reason that Toshiba failed to sell any part of its Westinghouse stake to outside investors is that the offers to acquire the Westinghouse interests were at a value below that reflected on Toshiba's financial statements, such that accepting the offer would have required Toshiba to test and likely write-down the value of the Westinghouse goodwill on its financial statements. *See* ASC Topic 350-20-35-22 (quoted market prices are best evidence of fair value and should be used as basis for measurement where available).

189. The statements about the acquisition and potential resale of the Shaw Group interests were materially misleading to investors in the absence of disclosure of the significant goodwill impairment charges that had been taken at Westinghouse. The concealment of the impairment charges, together with Toshiba's failure to reflect those charges on its consolidated financial statements and its assertions about the interest expressed by outside investors were designed to, and did, falsely assure investors about the strength of Westinghouse's business and the adequacy of support for the values ascribed to Westinghouse in Toshiba's consolidated financial statements.

## 2. Continuing Concealment of Goodwill Impairment Charges During 2015 Investigations of Accounting Fraud

190. When Toshiba released its preliminary restatement on August 18, 2015, it told investors that no impairment charges had been required for the goodwill booked on the Westinghouse acquisition. A power point presentation that Toshiba provided to investors along with its August 18 press release included the following two slides:

- 64 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice
71 of 145
Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA   Document 82-2   Filed 09/22/21   Page 73 of 146   Page
Case 2:15-cv-04194-DDP-JC   Document 75   Filed 08/08/19   Page 72 of 145   Page ID #:1597
ID #:1634



191.   On the August 18, 2015 conference call, Toshiba CEO Muromachi explained the slides as follows:

- 65 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice
72 of 145
Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA    Document 82-2    Filed 09/22/21    Page 74 of 146    Page
Case 2:15-cv-04194-DDP-JC   Document 75   Filed 08/08/19   Page 73 of 145   Page ID #:1598
ID #:1635

Compared to the time of the acquisition of Westinghouse in 2006, EBITDA has reached – accumulated JPY370 billion, since its acquisition.

In terms of the impairment evaluation of Westinghouse goodwill, we are conducting impairment tests every year for there was no change or no event happened to confirm that the – there was not the impact on the book value of the asset. We will continue to have the strict test carried out with the audit house.

192.   When Toshiba issued its restated financial results on September 7, 2015 it did not include any charges in any period reflecting the impairment of Westinghouse goodwill. Neither did Toshiba disclose the goodwill write-downs that had been taken by Westinghouse in FY12 and FY13.

193.   Toshiba's deliberate omission to disclose the $1.3 billion in write-downs that had been taken of Westinghouse goodwill in FY12 and FY13 was materially misleading to investors, particularly given the contemporaneous circumstances surrounding the investigation into Toshiba's accounting fraud, the restatement of its results for those fiscal years, and the heightened investor concern over the potential impairment of Westinghouse goodwill.

194.   Toshiba's statements in the August 18, 2015 presentation materials showing the growth in EBITDA resulting from the Westinghouse acquisition and its assurances that it had "[f]ound nothing indicating the possibility" of an impairment charge were highly misleading to investors in the absence of a disclosure of the $1.3 billion in Westinghouse goodwill write-downs, as they presented a misleading picture of financial strength and growth that was at odds with the true condition of Westinghouse's business since the acquisition.

195.   The statements that "there was no change or no event [that] happened to confirm" that Westinghouse goodwill was impaired, and that "the fair value of goodwill has always exceeded the book value since the acquisition" were misleading both affirmatively and by omission of the FY12 and FY13 goodwill charges, which demonstrate that there had, in fact, been changes and events that had demonstrated

- 66 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice                    73 of 145                    Hashem, et al., v. NMC Health PLC, et al.,
                                                                            2:20-cv-02303-CBM-MAA

that Westinghouse goodwill was overstated and had been written down by Westinghouse.

196. Toshiba knew or recklessly disregarded that its statements about Westinghouse goodwill were materially misleading to investors, or would be without disclosure of the $1.3 billion in goodwill write-downs that they knew had been taken in FY12 and FY13. Throughout the disclosures of the findings from the fraud investigations, Toshiba studiously avoided disclosing the historical charges against Westinghouse goodwill, even as the Company was assuring investors that it was providing complete disclosure in an effort to restore shareholder confidence and trust in the Company. When the goodwill charges were revealed in its 2Q15 earnings report, Toshiba then took the unusual step of holding its earnings conference call on a Saturday, hoping that the weekend disclosure would blunt market reaction to the announcement.

197. In its November 7, 2015, conference call with investors at which the goodwill write-downs had been taken, Toshiba spokesman Hirata, using the slide reproduced below, acknowledged that the Company had "not fully disclose[d] in the past" the circumstances surrounding the evaluation or need to write-down Westinghouse goodwill.

- 67 -

4847-0125-0718.v2

Exhibit 7 to B.R. Shetty's
Request for Judicial Notice

74 of 145

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

198.   After directing investors to the chart above, Hirata stated:

This slide, I believe will help you better understand the overall stations in terms of impairment, which I'm afraid we did not fully disclose in the past on the side of the Westinghouse. So I would like to now go through this conceptual graph to help your better understanding. The left is the Westinghouse stand-alone and the right is Toshiba on a consolidated basis. Westinghouse in the left shows it has four product lines on its own. As on FY 2012, Fuel, Automation Services, and New Construction, as of FY 2013, Fuel, Automation Field Services and Engineering Equipment and the Large Construction and the New Construction. So these are the four operating lines in operation even before the acquisition which took place back in 2006.

Westinghouse had believed that impairment should be recorded by each line after the M&A done. So in FY 2012 impairment, we had impairments recorded in Automation and in New Construction and in FY 2014, in New Construction.

199.   Toshiba did not disclose the amount of the impairment charges until November 13, 2015, when it issued a press release generally confirming the amounts reported the prior day by the Nikkei Business journal.

200.   Toshiba contended on the November 7 conference call and in its November 13 press release that the goodwill impairment reflected on

- 68 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice

75 of 145

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

Westinghouse's books was not required to be taken at the corporate level. Westinghouse's contentions are not credible in light of the Company's repeated misrepresentations about the accuracy of its accounting. *Infra* §VII. Even if Toshiba was correct that goodwill was not impaired at the corporate level, the failure to disclose the historical impairment charges that had been taken by Westinghouse was misleading, particularly in light of the statements the Company had made when the restatement was announced about the historical performance and financial condition of Westinghouse since the acquisition.

201. Toshiba's efforts to conceal the write-downs at Westinghouse were deliberate, and designed to prevent investors from discovering the significant difficulties being experienced in its nuclear business. As the November 17, 2015 Nikkei Business article reported:

> Toshiba has been consistently upbeat regarding its nuclear power business until now. But it has become clear that there is a gap between the company's public statements and its actual state of affairs.

Apx. Ex. 9.

202. Toshiba had significant motives to avoid taking required write-downs of the Westinghouse goodwill or disclosing the goodwill write-downs that Westinghouse itself had taken. As alleged above, writing down goodwill would have: (i) reduced earnings at a time when Toshiba was engaging in widespread accounting fraud to avoid reporting any negative earnings; (ii) given rise to potential liquidity problems arising from breaches of debt covenants attached to the debt it had incurred in acquiring Westinghouse; (iii) forced cancellation of the Company's payment of an annual dividend to investors; and (iv) required Toshiba to acknowledge that it had paid too much for the acquisition, and that Westinghouse's business had suffered to a far greater extent than was revealed following the Fukushima disaster in FY11.

- 69 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice
76 of 145
Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA   Document 82-2   Filed 09/22/21   Page 78 of 146   Page
Case 2:15-cv-04194-DDP-JC   Document 75-1 Filed 08/08/19   Page 77 of 145   Page ID #:1602
ID #:1639

### C. False Statements About Internal Controls

203.   Each of the operational review portions of the annual reports issued by Toshiba during the Class Period contained the following statement:

**Toshiba's Internal Control Systems**

Toshiba Group constantly refines its system of internal controls, towards ensuring management effectiveness and efficiency and reliable reporting on operations and finances, and to secure high level legal compliance and risk management.

We also ensure that domestic Group companies, regardless of the scale of their operations, establish internal control systems based on those of the parent company.

The following website provides detailed information on the structure of our internal control systems. http://www.toshiba.co.jp/ about/ir/en/governance/governance_ system.htm

2012 Annual Report Operational Review at 46; 2013 Annual Report Operational Review at 44; 2014 Annual Report Operational Review at 60.

204.   The financial review portion of Toshiba's annual reports issued during the Class Period each contained the following statement regarding the risks related to internal control:

**Compliance and internal control**

The Group is active in various businesses in regions worldwide, and its business activities are subject to the laws and regulations of each region.   The Group has implemented and operates necessary and appropriate internal control systems for a number of purposes, including compliance with laws and regulations and strict reporting of business and financial matters.

However, there can be no assurance that the Group will always be able to structure and operate effective internal control systems. Furthermore, such internal control systems may themselves, by their nature, have limitations, and it is not possible to guarantee that they will fully achieve their objectives.  Therefore, there is no assurance that the Group will not unknowingly and unintentionally violate laws and regulations in future. Changes in laws and regulations or changes in Management's Discussion and Analysis interpretations of laws and regulations by the relevant authorities may also cause difficulty in achieving compliance with laws and regulations or may result in increased compliance costs.  On these grounds, the Group makes every effort to minimize these risks by making periodic revisions to the internal control systems, continuously monitoring operations, and so forth.

- 70 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice
77 of 145
Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

2012 Annual Report Financial Review at 16; 2013 Annual Report Financial Review at 16; 2014 Annual Report Financial Review at 15.

205. The operational review portion of Toshiba's 2012, 2013, and 2014 annual reports also contained the following statement, or a substantially identical statement:

**Risk Management**

At Toshiba, throughout our worldwide operations, we strive to ensure compliance with laws and regulations, social and ethical norms and internal rules. According top priority to human life and safety and to compliance in everything we do underpins our commitment to promoting business activities through fair competition and serving the interests of customers to the best of our ability.

We consider thorough adherence to the Toshiba Group Standards of Conduct (SOC), which embodies the Basic Commitment of the Toshiba Group, to be the foundation of our compliance. Thus we are working toward the SOC becoming an integral part of the entire Toshiba Group. Every year, priority themes regarding compliance are established and promoted in light of business circumstances. By implementing a Plan-Do-Check-Action (PDCA) cycle of self-assessment, not only at each in-house company but also at group companies worldwide, we are stepping up our efforts to ensure compliance.

The Risk Compliance Committee, headed by the CRO [Chief Risk Compliance Management Officer], manages serious risk and compliance issues and works with the relevant divisions to strengthen the risk management system by developing countermeasures to specific risks, plus measures to prevent their spread and recurrence.

2012 Annual Report Operational Review at 46; 2013 Annual Report Operational Review at 44; 2014 Annual Report Operational Review at 60.

206. Toshiba's Standards of Conduct were made available to investors on Toshiba's corporate website throughout the Class Period. The Standards of Conduct included the following provisions:

- 71 -

4847-0125-0718.v2

Exhibit 7 to B.R. Shetty's
Request for Judicial Notice

78 of 145

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

**13.  Accounting**

**1.  Toshiba Group Corporate Policy**

Toshiba Group Companies shall comply with all applicable laws and regulations regarding accounting and conduct proper accounts management and financial reporting in accordance with generally accepted principles.

**2.  SOC for Toshiba Group Directors and Employees**

Directors and Employees shall:

1.  maintain proper and timely accounts in accordance with generally accepted accounting principles;

2.  promote the prompt release of accurate accounts; and

3.  endeavor to maintain and improve the accounting management system, and establish and implement internal control procedures for financial reporting.

**14.  Corporate Communications**

**1.  Toshiba Group Corporate Policy**

Toshiba Group Companies shall:

1.  endeavor to obtain the understanding of stakeholders, including customers, shareholders and the local community, with respect to corporate activities, products and services, and further improve public recognition of Toshiba Group and its corporate image by means of positive and timely corporate communications activities on business information (Note), such as corporate strategy and financial data; and

2.  ensure that management policies are well communicated within the company, and promote information sharing as a means of raising morale and creating a sense of unity.

**2.  SOC for Toshiba Group Directors and Employees**

Directors and Employees shall:

1.  conduct corporate communications with integrity on the basis of objective facts;

2.  conduct corporate communications by appropriate means, to enable customers, shareholders, potential investors and the members of the community of each country or region to obtain a reasonable understanding of Toshiba Group's activities; and

- 72 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice
79 of 145
Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

3.    obtain prior consent from the persons responsible for corporate communications before disclosing business information to analysts and to the media, including newspapers, magazines and television stations.

Note:  Herein, "business information" includes but is not limited to information regarding actions or activities which may raise the suspicion of such actions prohibited by these SOC (hereinafter called "Risk Compliance Information").

207.  The operational review section of Toshiba's 2012, 2013, and 2014 annual reports stated:

**Status of Internal Audits and Audits by the Audit Committee**

The Corporate Audit Division . . . reports directly to the president.  It is responsible for internal audits from the perspectives of appropriate operational procedures, accountability of results and legal compliance.

The Division holds advance discussions with the Audit Committee on each year's audit policy and plans.  It also holds semimonthly liaison meetings with the Audit Committee for pre-audit discussions and to share information on the divisions subject to audit.

The Corporate Audit Division carries out on-site inspections and reports its results to the Audit Committee.  However, if it deems it necessary, the Audit Committee has the right to carry out its own on-site inspections.

Furthermore, in addition to receiving explanations from independent auditors (CPA) on their audit plans at the beginning of each fiscal year, the Audit Committee can also request reports on the status of audits during the course of each term, and explanations and reports on end-of-year audits, as necessary.

2012 Annual Report Operational Review at 47; 2013 Annual Report Operational Review at 45; 2014 Annual Report Operational Review at 60-61.

208.  Each of the foregoing representations was materially false and misleading to investors.  Each of the representations falsely assured investors that Toshiba had an adequate and functioning system of internal controls that was reasonably designed to prevent the type of misconduct and accounting fraud herein alleged.

209.  The IIC specifically found that a lack of adequate internal controls had caused or permitted the accounting violations to occur.  Apx. Ex. 1 at 70-74; *see also*

- 73 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice

80 of 145

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA    Document 82-2    Filed 09/22/21    Page 82 of 146    Page
Case 2:15-cv-04194-DDP-JC    Document 75    Filed 08/08/19    Page 81 of 145    Page ID #:1606
ID #:1643

*id.* at 46-49, 56-58, 78-79. The IIC found that "each internal control system at Toshiba did not function sufficiently," including because "[t]here was no Internal Audit Department at any Company, other than the Accounting Division, such as could check for inappropriate accounting treatment" and the Accounting Division was not doing its job:

> In the case subject to this investigation, accounting personnel knew of a fact that made an accounting treatment necessary, such as recording a provision, but did not take any action, or although they easily could have known of a fact that made a certain accounting treatment necessary, they did not take any action, and further, there were many projects where no action was taken in accordance with the instruction of a superior such as a business unit head or CPs, etc., and the internal control by the Accounting Division was not functioning.

*Id.* at 70.

210. The IIC found that: (i) Toshiba's Finance Division performed no internal control measures such as checking whether or not accounting treatment was appropriate; (ii) no internal control measures were performed by other corporate divisions tasked with control responsibilities, including the Risk Management Division and the Securities Report, Etc., Disclosure Committee; (iii) the Corporate Audit Division was mainly concerned with providing management consulting services to Toshiba's business units, and "rarely conducted any services from the perspective of an accounting audit into whether or not an accounting treatment was appropriate"; (iv) internal control measures at the Board of Director level were routinely ignored; and (v) outside auditors were deliberately misled to prevent detection of the Company's fraudulent accounting activities. *Id.* at 70-74.

211. Thus, it was materially false and misleading to investors for Toshiba to assert that:

(a) Toshiba was "constantly refin[ing] its system of internal controls" to assure "reliable reporting on operations and finances, and to secure high level legal compliance and risk management";

- 74 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice
81 of 145
Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA   Document 82-2   Filed 09/22/21   Page 83 of 146   Page
Case 2:15-cv-04194-DDP-JC   Document 75   Filed 08/08/19   Page 82 of 145   Page ID #:1607
ID #:1644

(b)   Toshiba had "implemented and operates necessary and appropriate internal control systems" to achieve "compliance with laws and regulations and strict reporting of business and financial matters";

(c)   The internal controls were functioning in a manner such that only "unknowing[]" and "unintentional[]" violations were at risk of escaping detection, and Toshiba was "mak[ing] every effort to minimize these risks by making periodic revisions to the internal control systems, continuously monitoring operations, and so forth"; or

(d)   Toshiba's risk management department was "striv[ing] to ensure compliance with laws and regulations, social and ethical norms and internal rules" by "developing countermeasures to specific risks" and taking actions designed to require adherence to Toshiba's Standards of Conduct, including standards requiring Toshiba's companies, directors, and employees to "conduct proper accounts management and financial reporting in accordance with [GAAP]," to "establish and implement internal control procedures for financial reporting," and to provide timely and accurate disclosure of Toshiba's business information, including information regarding actions or activities raising suspicions of violations of GAAP or internal control requirements.

212.   The accounting fraud perpetrated prior to and during the Class Period was not the type of concealed or difficult-to-detect activity that could escape detection by an adequate and functioning system of internal controls. To the contrary, as found by the IIC, the accounting manipulations were open and obvious, well known to and directed by management, and of a type that could not have been perpetrated if Toshiba had a functioning system of controls. The IIC findings establish a strong inference of scienter on the part of Toshiba and its management:

> At Toshiba, the involvement of certain top management and key executives led to the deviation from and ineffectiveness of the internal control function for financial reporting, with inappropriate accounting treatments then being carried out by instructions, etc. from outside of the internal control framework. It also must be noted that an internal

- 75 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice                    82 of 145                    Hashem, et al., v. NMC Health PLC, et al.,
                                                                            2:20-cv-02303-CBM-MAA

control (risk management) structure that anticipates inappropriate accounting treatment being carried out by such persons' involvement had not been established.

*Id.* at 70.

## VII.   SUMMARY OF ACCOUNTING FRAUD

213.   Toshiba's consolidated financial statements were based on accounting principles generally accepted in the United States (US-GAAP).  US-GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time.  The audit reports from Toshiba's independent auditor, Ernst & Young ShinNihon LLC ("E&Y ShinNihon"), which were included within Toshiba's annual reports opined on whether Toshiba's consolidated financial statements were presented fairly, in all material respects, in conformity with US-GAAP.

214.   The SIC and IIC investigations focused primarily on, and found repeated instances of fraud in, Toshiba's accounting for POC contracts and the improper recording of revenues and expenses in Toshiba's Visual Products, Semiconductor, and PC businesses, as described below.  Apx. Ex. 1 at 13.

215.   Toshiba's self check report identified other similar instances of improper accounting, including cases where the Company had improved its operating results by overstating the value of inventory; using outdated (more favorable) currency conversion rates; postponing the recording of advertising, marketing, and other SG&A expenses; understating anticipated warranty expenses and materials costs; failing to recognize incurred labor costs; and not reporting actual or anticipated contract losses.  Apx. Ex. 2-A (Attachment 1 at 2-3).

216.   Additional accounting violations were detected by E&Y ShinNihon during the review of Toshiba's FY14 results in connection with the restatement. Apx. Ex. 6.  Toshiba has admitted the accounting for the additional violations described in its self check report and detected by E&Y ShinNihon was improper. Toshiba claims to have included a correction of such violations in its restatement.

- 76 -

4847-0125-0718.v2

Exhibit 7 to B.R. Shetty's
Request for Judicial Notice

83 of 145

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA    Document 82-2    Filed 09/22/21    Page 85 of 146    Page
Case 2:15-cv-04194-DDP-JC    Document 75    Filed 08/08/19    Page 84 of 145    Page ID #:1609
ID #:1646

217. Due to the nature of the fraud and its perpetration on a worldwide basis over a number of years, the internal investigations conducted to date have not yet uncovered all of the instances of improper accounting or the full extent of Toshiba's accounting fraud.

218. In reporting the results of its self check at its June 25, 2015 general meeting, Toshiba cautioned that, due to the geographic and temporal scope of the misconduct and the manner in which it was carried out, the amounts that needed to be corrected due to improper accounting could be incorrect because the financial impact was very difficult to determine, particularly in the Visual Products and PC businesses. Apx. Ex. 3 at 6-7 (amounts difficult to determine because "the volume of transactions requiring examination is massive," "the scale of transactions subject to investigation is expansive," and "the transactions include those involving countries other than Japan").

219. The IIC based its analyses on a limited sampling of Toshiba's accounting during the Class Period. For example, the IIC's analysis of Toshiba's violations of POC accounting rules was based on reviewing a limited number of POC projects that had been selected from a group of such projects that had (i) been undertaken by Toshiba or eight of its largest subsidiaries and (ii) identified as candidates for review based on the size of the contract, amount of loss, or other criteria. Apx. Ex. 1 at 22-23. The IIC similarly limited its review of improper recording of operating expenses and parts transactions in the Visual Products and PC businesses to a subset of transactions selected for review, and did not conduct a complete review of all transactions over the entire time period under study.

220. Thus, the specific cases of improper accounting found by the IIC and SIC or described in Toshiba's self-check report or by its outside auditor only represent examples of the type of misconduct that occurred, and are not a definitive determination of the full nature or extent of Toshiba's fraudulent accounting.

- 77 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice
84 of 145
Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA    Document 82-2    Filed 09/22/21    Page 86 of 146    Page
Case 2:15-cv-04194-DDP-JC    Document 75    Filed 08/08/19    Page 85 of 145    Page ID #:1610
ID #:1647

Subject to this understanding, examples of the misconduct detected to date are summarized below.

### A. False Accounting of Percentage of Completion Contracts

221. POC accounting rules represent an exception to the rule that revenues are to be recognized only after services are performed or products are delivered and the money is earned. POC rules apply to construction and other contracts involving performance over a long period of time, and permit revenues to be recognized throughout the life of the contract in proportion to the amount of services that have been performed (*i.e.*, in proportion to the percentage of completion of the contract), subject to certain requirements. One of those requirements is that as soon as it becomes apparent that the company will suffer a loss on the contract, the entire expected loss must be recognized, including losses that are expected to be incurred in future quarters as additional (unprofitable) work required by the contract is performed.

222. To inflate reported income, Toshiba understated the estimated costs associated with construction projects accounted for under the POC method. This had the direct effect of overstating revenue and profits associated with the projects, delaying recognition of losses on unprofitable contracts, and overstating the Company's net income during the Class Period.

223. Toshiba's improper accounting violated US-GAAP, including ASC Topic 605-35, *Revenue Recognition [for] Construction-Type and Production-Type Contracts*. Profits reported based on POC accounting must be based on the difference between estimated contract revenues and costs over the life of the contract, not just the revenues and costs incurred as of the date of the reported financial results. ASC Topic 605-35-25-37f, 82. Estimates of the total cost to complete a contract must also be periodically reviewed and revised to reflect new information. ASC Topic 605-35-25-44e. A provision for loss on the entire contract

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice
Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA    Document 82-2    Filed 09/22/21    Page 87 of 146    Page
Case 2:15-cv-04194-DDP-JC   Document 75  Filed 08/08/19   Page 86 of 145   Page ID #:1611
ID #:1648

(not just the portion completed) must be recognized when the estimated cost for the contract exceeds its estimated revenue.  ASC Topic 605-35-45-1.

224.   The Summary of Significant Accounting Policies in Toshiba's annual reports assured investors that the Company's use of POC accounting was consistent with US-GAAP, including the provisions of ASC Topic 605-35 described above:

> Revenue on long-term contracts is recorded under the percentage of completion method.  To measure the extent of progress toward completion, [Toshiba] generally compares the costs incurred to date to the estimated total costs to complete based upon the most recent available information. When estimates of the extent of progress toward completion and contract costs are reasonably dependable, revenue from the contract is recognized based on the percentage of completion.  A provision for contract losses is recorded in its entirety when the loss first becomes evident.

*See, e.g.*, 2011 Annual Report Operational Review at 25.

225.   The IIC found that Toshiba had manipulated POC accounting rules to overstate profits from FY09 through FY14, primarily by recognizing POC revenues under contracts known to be unprofitable while refusing to recognize anticipated project expenses in order to delay taking required provisions for the expected losses. Apx. Ex. 1 at 19-42.   The IIC reported that violations of POC accounting requirements had resulted in an overstatement of pre-tax income of ¥36 billion ($367 million) in FY08, ¥79 billion ($963 million) in FY11, ¥180 billion ($1.915 billion) in FY12, ¥245 billion ($2.379 billion) in FY13, and ¥9 billion ($75 million) in the first three quarters of FY14.

### 1.    Westinghouse ("Project G")

226.   The manner in which Toshiba accounted for significant cost overruns on a $7.6 billion power plant construction contract obtained by Westinghouse provides an illustrative example of the type of accounting fraud that was perpetrated during the Class Period.  As a result of design changes and construction delays on the project (referred to as "Project G" in the IIC report), Westinghouse reported that it expected to incur additional costs of $385 million in 2Q13 and $401 million in

- 79 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice                          86 of 145                          Hashem, et al., v. NMC Health PLC, et al.,
                                                                                        2:20-cv-02303-CBM-MAA

3Q13. However, Toshiba recorded the risks at just $69 million for 2Q13 and $293 million for 3Q13.

227. According to the IIC report, during the 3Q13 quarterly review, Toshiba's outside auditor "insisted" that Toshiba use the $401 million amount reported by Westinghouse because "there were no specific grounds for the [$293 million] figure adopted by Toshiba." Apx. Ex. 1 at 31. Toshiba refused to do so, and then got the auditor to agree to overlook the misrepresentation by improperly treating it as an immaterial error. Based on the unsubstantiated cost reduction, Toshiba understated its 3Q13 losses from the project by $107 million. The IIC concluded that the unsubstantiated cost reduction was made at the direction of Power Systems Company President Igarashi, and known to Tanaka (Toshiba's President) and Kubo (its CFO) before the financials were released:

> There is a high possibility that the cause of this treatment was that Hisao Tanaka P and Makoto Kubo CFO, with an intention to avoid a substantial negative impact that would result from recording losses in the consolidated financial statements for that quarter based on a large increase in the total estimated cost of contract work of Project G in accordance with the estimated increase amount reported by WEC [Westinghouse Electric Co.] and to postpone that until a subsequent period, used an unsubstantiated figure of negative USD 225 million[20] without a detailed statement as grounds for that as an increase in the total estimated cost of contract work.

*Id.* at 32.

### 2.    Landis + Gyr ("Project H")

228. Another example of the type of fraud committed by defendant is provided by Toshiba's refusal to record losses on a ¥31.9 billion contract (Project H in the IIC report) calling for its Social Infrastructure Systems Company ("SIS Co.") to develop a communication system for utility smart meters, which is referred to as Project H in the IIC report. The contract was being performed by Landis + Gyr, a

---

[20]  The $225 million was the loss on the project reported in Toshiba's consolidated financial statements based on the understated expenses. Based on the amounts reported by Westinghouse, the actual loss was $332 million, a material discrepancy of $107 million. *See* Apx. Ex. 1 at 31-32.

- 80 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice
87 of 145
Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

Swiss subsidiary that Toshiba had acquired in 2012, announcing plans to use the acquisition to enter the U.S. smart home energy market.

229.    In September 2013, Toshiba received an order under the contract, on which it immediately forecast incurring an ¥8 billion loss.  The SIS Co. sought approval for recording contract losses of at least ¥4.2 billion even before the contract was awarded, but Tanaka and Hideo Kitamura refused to permit it to do so.  No provision for contract losses was ever recorded.

230.    The IIC found that Tanaka, CFO Kubo and other Toshiba executives "were fully aware of the need to record provisions for contract losses in each quarter from [2Q13]."  Apx. Ex. 1 at 34.  The IIC report stated:

> It can be surmised that both Hisao Tanaka P and Hideo Kitamura GCEO intended to postpone recording a loss.  It can also be surmised that no provision for contract losses was recorded in the second quarter of FY 2014 because SIS Company understood from prior statements by P and others that, from the perspective of budgetary control, it would be necessary to generate profits equivalent to such provision to be recorded.

*Id.* at 33.

### 3.    TIC America ("Project I")

231.    The IIC found that Toshiba had similarly failed to record losses incurred due to cost increases under "Project I," a $129 million order received in December 2010 by its U.S.-based subsidiary, TIC America, to provide electrical equipment for 364 subway cars in the U.S., with an option to add an additional 384 cars to the order for another $122 million.  Although the project was accounted for using inspection-based rather than POC accounting (*i.e.*, recording sales as equipment passed inspection), the relevant accounting rules still required provisions to be made for anticipated contract losses.  By the time TIC America was ready to conduct its Final Design Review in March 2012, it had projected that it would cost $207 million to fill the requirements of the $129 million initial order, resulting in an anticipated loss of $78 million on the project.  The IIC found that a provision for the loss should have been recorded at the end of FY11, with additional losses reported

- 81 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice
88 of 145
Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

in subsequent periods during FY12. "However, despite the absence of any reasonable grounds, no provision for losses was recorded on receipt of the order." Apx. Ex. 1 at 35.

232. The IIC found that the decision to postpone recording the loss was made by Kitamura and Kubo on March 16, 2012. *Id.* at 35. Although the need to record the losses was discussed and the accounting treatment was deliberated at that time, "Makoto Kubo CFO made the decision to not record provisions and no appropriate instructions were given since the end of FY 2011 despite an awareness of the need to record provisions for losses every quarter." *Id.* at 36. Sasaki knew about and ratified that decision:

> Norio Sasaki P was also aware of both the multi-billion yen of anticipated losses and the lack of provisions for losses regarding Project I, and should have either instructed or demanded the recording of provisions for losses, but there is no evidence that he did so. Rather, it is presumed that he did not instruct or demand the recording of provisions in order to avoid recording losses regarding Project I for that period.

*Id.* at 35.

233. By the end of 2Q13, Toshiba had still recorded only a portion of the required provision for losses on Project I, because sufficient profits to offset the remaining losses on the project still had not been generated. Tanaka and Kitamura only approved the recording of a ¥2 billion loss for the project, even though "[i]t was highly probable that both of them were able to recognize that the figure of such provision was not adequate to cover the reasonably expected loss." *Id.* at 35-36. The loss remained understated at the end of FY13 because sufficient profits had still not been generated to cover the loss. Tanaka and Kitamura were advised during CEO Monthly Meetings and quarterly review sessions that a ¥6 billion loss needed to be recorded, but Toshiba only recorded a loss of ¥2.5 billion. "There is no evidence of instruction or demand to record provisions. It can be surmised that there is a high possibility that Hisao Tanaka P and Hideo Kitamura GCEO intended to postpone recording losses for that period." *Id.* at 36.

- 82 -

4847-0125-0718.v2

Exhibit 7 to B.R. Shetty's
Request for Judicial Notice

89 of 145

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

## 4.   Other Instances of False POC Accounting

234.   Despite limiting its review to just a sampling of projects where POC accounting was used, the IIC found repeated instances of deliberate violations of those rules.  The IIC report identified 19 examples of projects where POC rules had been intentionally misused to improve financial results: (i) Toshiba won contracts by agreeing to do work for less than the expected cost but refused to report the expected losses at the outset of the contract, as POC rules required (Projects A, H, I, M); (ii) Toshiba chose not to apply POC accounting rules where required to do so in order to avoid reporting losses on unprofitable contracts (Projects B, L); (iii) Toshiba did not report costs incurred for additional contract work required to be performed, in order to delay reporting a contract loss (Projects C, N); and (iv) in projecting expected profits and losses on POC contracts, Toshiba chose to ignore expected cost increases caused by higher materials acquisition costs, changed foreign currency conversion rates, or other known circumstances (Projects D, E, F, K, O), or simply reduced expense projections without any reasonable basis to do so (Projects G, J). Apx. Ex. 1 at 19-42.

235.   The IIC report identified repeated instances where the false accounting was directed by or known to and not corrected by senior executives of Toshiba, or carried out based on expectations they had set that losses should be deferred or concealed rather than reported.  *E.g.*, *id.* at 25 ("recording a provision for contract losses would not be accepted by Yasuhuru Igarashi CP"); *id.* at 26 (same); *id.* at 28 (subordinates "intended to delay recording a provision for contract losses under heavy pressure to achieve their sales target"); *id.* at 29 ("CP did not give approval for recording a provision for contract losses because he intended to postpone recording losses"); *id.* at 30 ("the sales managers were convinced that it would not be possible to receive approval to record a provision for contract losses"); *id.* at 32 (Tanaka and Kubo ordered that projected losses be reduced or deferred to later quarters, as described further below); *id.* at 33 ("Hisao Tanaka P and Toshio

- 83 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice

90 of 145

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

Kitamura GCEO intended to postpone recording a loss"); *id.* at 34 (Kubo was "fully aware of the need to record provisions for contract losses" but "no appropriate instructions were given to record provisions"); *id.* at 35 ("Hideo Kitamura GCEO and Makoto Kubo CFO intended to postpone recording a loss in this period.  Norio Sasaki P was also aware of both the multi-billion yen of anticipated losses and the lack of provisions for losses regarding Project I, and should have either instructed or demanded the recording of provisions for losses, but there is no evidence that he did so."); *id.* at 38 ("Hisao Tanaka P and Hideo Kitamura GCEO were informed of the situation at the time, but there is no evidence of instruction or demand for SIS Company to record provisions for contract losses in that period."); *id.* at 39 ("Tanaka P was informed that the target for Project K would result in prospective losses of JPY 8.7 billion . . . but indicated a course of action to the effect that the contract losses of JPY 3.5 billion be recorded").

### B.    Cookie Jar Accounting in Visual Products Business

236.    From 2008 or earlier through 2014, Toshiba used a form of cookie jar accounting to reduce or avoid reporting losses in its Visual Products Business. Toshiba did so through a variety of schemes designed to defer operating expenses and charges incurred in one period so that they would not be reported until a later date when Toshiba was able to generate sufficient earnings to incur the expense without reporting a loss.  As the IIC later recognized, "it can generally be understood by anyone without any accounting expertise that this sort of treatment is a diversion from appropriate accounting practice."  Apx. Ex. 1 at 46.

237.    The 2007 financial crisis in the United States and ensuing recession caused a significant and sustained slump in Toshiba's sales of televisions and related products, causing a sustained loss of profitability in its Visual Products Business.  In response, corporate executives issued "Challenges" to the presidents, business division heads, accounting executives and subsidiaries in the Visual Products Business requiring them "to achieve the profits and losses required by each budget

- 84 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice                    91 of 145                    Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

and to meet improvements in the profits and losses mandated during each relevant period." *Id.* at 45. "What was fundamentally merely an estimate to be seen as a budget or goal amount from Corporate to the Visual Products Company was transformed into a mandatory profit and loss figure that needed to be achieved within Toshiba at some stage, driving the Visual Product Company to be in the situation where it had no choice but to push forward and achieve those figures." *Id.* To achieve these targets, "profits were intentionally overstated at the Visual Products Company through Inappropriate [carryover of expenses]." *Id.*

238. Toshiba referred to the deferred operating expenses as "carryover," or "C/O" for short. By the end of FY10, the C/O balance had risen to ¥19.6 billion (~$236 million). However, the business "continued to generate losses, and the Challenges set by Corporate became more severe. From FY 2011 at the latest, the CEO Monthly Meetings and individual exchanges often featured stern rebukes and Challenges from the CEO of Corporate, directed at the Visual Product Company executives." *Id.* In response, the Visual Products Business established express C/O requirements in amounts needed to meet Challenge goals. The C/O requirements were then communicated to area managers by division business heads with authorization from the Company President. In this manner, the instructions from Toshiba's President were conveyed throughout the business, and "a culture came to be established in the Visual Products Company of using every available means to meet Challenges or avoid losses." *Id.* "[T]he root cause of the Inappropriate C/O stems from excessive demands to meet Challenges from certain top management at Corporate level." *Id.*

239. Toshiba used a variety of schemes to generate fraudulent C/O in response to the Challenge directives from FY11 through FY14, including: (i) using cash-based accounting where accrual accounting was required; (ii) requesting vendors to delay submission of invoices for services that had already been provided; (iii) increasing the price of products shipped to affiliated companies outside of Japan

- 85 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice
92 of 145
Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA   Document 82-2   Filed 09/22/21   Page 94 of 146   Page
Case 2:15-cv-04194-DDP-JC   Document 75   Filed 08/08/19   Page 93 of 145   Page ID #:1618
ID #:1655

while concurrently decreasing cost of manufactured goods for that quarter to generate false profits; and (iv) recognizing cost reductions that had been requested from manufacturers but not yet approved, even when they were unlikely to be achieved.

240. Toshiba's use of C/O violated accounting rules. US-GAAP requires expenses to be recorded in the period they are incurred. *See, e.g.*, FASB Statement of Financial Accounting Concerts No. 5, *Recognition and Measurement in Financial Statements of Business Enterprises*, ¶¶85-87, and ASC Topic 450-20, *Loss Contingencies*. The concept that expenses be recorded in the same period in which the corresponding benefit is realized is one of the most basic tenets underlying accrual accounting. Toshiba deliberately ignored this basic rule and instead systematically engaged in a scheme of improper timing of expense recognition, understating its expenses in a current period and/or improperly delaying expense recognition to inflate profits.

241. Toshiba's use of C/O in its Visual Products concealed the impact of the economic downturn precipitated by the U.S. financial crisis on Toshiba's business and misrepresented actual demand for the Company's televisions and other Visual Products.

242. The IIC found that, through its improper use of C/O, Toshiba had misstated its profits and losses in the following amounts over a six-year period:

(¥100 million)

| FY08 | FY09 | FY10 | FY11 | FY12 | FY13 | 3Q14 |
|------|------|------|------|------|------|------|
| 53 | 78 | 65 | (115) | 37 | (13) | (47) |

243. The IIC concluded that the misstatements were deliberate:

[A]ccording to C/O reports provided to Corporate, it is evident that Norio Sasaki P was aware that C/Os were conducted to overstate the profit in the Visual Products Company by November 2011 at the latest, while Hisao Tanaka P was aware by either August 2013 or March 2014 at the latest. . . .

It is considered that both Norio Sasaki P and Hisao Tanaka P were aware that the C/O adjustments including Inappropriate C/Os

- 86 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice
93 of 145
Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

were conducted to overstate profits, but took no action to address this issue.

Apx. Ex. 1 at 46.

244.  Accounting and finance personnel at both the Visual Products Company and Toshiba headquarters also knew about the inappropriate use of C/Os to inflate profits but did nothing to stop the practice.  As found by the IIC:

> [T]he C/O balances including the Inappropriate C/Os . . . were shared with the accounting department, which recognized that Inappropriate C/Os were conducted, but no evidence indicates that the accounting department tried to stop or prevent the implementation of Inappropriate C/Os.  From 2012 at the latest, the accounting department itself played a proactive role by examining and proposing Inappropriate C/O items, assessing the possibility of Inappropriate C/Os and communicating that to the accounting managers at overseas affiliated companies, or preparing explanations for audit corporations.

*Id.* at 46-47.

245.  Toshiba's internal audit personnel were also made aware of the use of C/Os but did nothing to investigate further, due to the fact that the Corporate Audit Division put emphasis on advising how to improve business performance and ignored their internal control function.

246.  To avoid detection, the use of C/Os was concealed from Toshiba's outside auditors.  "[T]he Visual Products Company did not disclose to the accounting auditors materials or information indicating the existence of C/Os, and devised explanations so that the existence of C/Os would not be revealed to the accounting auditors." *Id.* at 49.

247.  The improper C/O balances were eliminated in FY14 in connection with Toshiba's plans to spin off the Visual Products Business.  "It can be surmised that one of the reasons for this lies in the fact that Inappropriate C/O would be difficult to continue because of the spin-off . . . causing an issue with respect to auditing and also because of the substantial withdrawal from overseas business . . . scheduled for FY 2015." *Id.* at 46.

- 87 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice
94 of 145
Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

## C.   Channel Stuffing in PC Business

248.   In reaction to a business decline triggered by the 2007 financial crisis in the U.S., Toshiba began a long running scheme to inflate the profitability of its PC business through channel stuffing.[21] The practice continued uninterrupted through 2014, resulting in "enormous amounts of Channel Stuffing" (Apx. Ex. 1 at 55) that masked true demand for and misrepresented worldwide sales of Toshiba's PCs.  The IIC found that the practice had caused *operating profit to exceed PC sales* in the last month of some quarters, when channel stuffing typically occurred.

> The Challenge was often set in the CEO Monthly Meetings, etc. held when there was only a short time left until the end of that quarter. Since it was difficult for the Company issued with the Challenge to achieve such large amounts of profit improvement during the short time remaining until the end of the quarter, even if they made every effort in sales, it seems that they were often forced to use the inappropriate method of Channel Stuffing of ODM Parts in order to overstate profits as the only way available to them to achieve the Challenge.

*Id.* at 56.

249.   Toshiba's channel stuffing was "conducted in an institutional manner by Toshiba, involving certain top management" and was "intentionally conducted with the firm aim of overstating current-period profit."  *Id.*  These illegal practices were known to and continued through the tenures of three successive Toshiba Presidents, Nishida, Sasaki, and Tanaka:

> It can be found that, against the above backdrop, the Company was forced to embark on Channel Stuffing of ODM Parts because Atsutoshi Nishida P and Norio Sasaki P demanded the Company to be sure to reach the Challenge with high profit improvement.  Moreover, although Atsutoshi Nishida P and Hisao Tanaka P were aware that the profit was overstated by Channel Stuffing of ODM Parts, they did not

---

[21]   Channel stuffing has been defined by the American Institute of Certified Public Accountants ("AICPA") as: "[A] marketing practice that suppliers sometimes use to boost sales by inducing distributors to buy substantially more inventory than they can promptly resell.  Inducements to overbuy may range from deep discounts on the inventory to threats of losing the distributorship if the inventory is not purchased. Channel stuffing without appropriate provision for sales returns is an example of booking tomorrow's revenue today in order to window-dress financial statements." AICPA *Indicators of Improper Revenue Recognition*.

- 88 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice

95 of 145

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA    Document 82-2    Filed 09/22/21    Page 97 of 146    Page
Case 2:15-cv-04194-DDP-JC   Document 75   Filed 08/08/19   Page 96 of 145   Page ID #:1621
ID #:1658

take action such as giving instructions to immediately correct this, and instead allowed the situation to continue.

*Id.* at 55-56.

250. During his tenure as Toshiba's President, Sasaki recognized the overstatement of profits due to channel stuffing but would not permit the practices to be stopped or the past overstatements to be corrected unless the PC business could do so without reporting a loss, which was not possible. *Id.* at 55. Although Tanaka sought to bring an end to the practice in FY14 after he became President, he similarly did not permit Toshiba to correct the misstatements all at once, but instead sought to do so gradually in a manner that was calculated to avoid revealing the fraud or alarming investors. *See id.*

251. Toshiba's channel stuffing scheme was based on its ability to sell large volumes of parts at inflated prices to the third party ODMs responsible for building Toshiba's computers to its specifications. Because Toshiba determined both the price and volume of the parts supplied to the ODMs, it had the ability to, and did, sell more parts to ODMs than were required to meet actual demand for its PCs.

252. Under its manufacturing agreements with the ODMs, Toshiba supplied parts like hard drives and RAM sticks in amounts needed to support production volumes that had been determined by Toshiba. Toshiba supplied the parts to ODMs through an overseas subsidiary, Taiwan Toshiba International Procurement Corp. ("TTIP"). TTIP charged the ODMs prices that were four-to-eight times higher than Toshiba's actual cost, *i.e.*, well above the wholesale value of the parts.[22] Toshiba did so to prevent its true acquisition cost from being leaked to competitors by the ODMs. ODMs agreed to pay inflated parts prices because Toshiba was obligated to

_____

[22] In most cases, Toshiba or TTIP obtained the parts from an outside vendor, then TTIP supplied the parts to the ODM at an inflated price. From 2Q12 to 4Q12 Toshiba used a more complicated series of internal transactions involving two other Toshiba subsidiaries – Toshiba Trading, Inc. ("TTI") and Toshiba Information Equipment (Hanghzhou) Co. Ltd. ("TIH") – that had the same effect. *See* Apx. Ex. 1 at 52-53.

- 89 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice                    96 of 145                    Hashem, et al., v. NMC Health PLC, et al.,
                                                                            2:20-cv-02303-CBM-MAA

purchase the ODMs' inventories of assembled computers, work-in-progress ("WIP") and unused parts within a specified amount of time after TTIP had supplied the parts, and to do so at prices that would include the full price of the delivered parts. Pursuant to the terms of its production agreements, Toshiba "in fact purchased incontrovertible extra inventories every term" – *i.e.*, inventory exceeding actual demand for its products.

253. The difference between Toshiba's actual procurement price and the price charged to the ODMs was called the "masking difference." At the time the parts were supplied to the ODMs, Toshiba recorded a receivable from TTIP in the amount of the masking difference. When the assembled computers were delivered back to Toshiba through TTIP, the receivable would be marked paid and the masking difference eliminated, such that the final cost of goods sold ("COGS") ("would reflect only the actual procurement price of the parts. However, during the time that the parts (or finished goods and WIP using the parts) remained in ODM inventories, the TTIP receivable (*i.e.*, the masking difference) was reflected as a negative cost of manufactured goods on Toshiba's books, thereby inflating its profits. By shipping more products than needed to support actual demand, Toshiba was able to cause the ODMs to hold excess inventory and inflate its profits by the amount of the masking difference of unused Toshiba-supplied parts still sitting in ODM inventories.

254. Through the foregoing transactions, the masking difference became a phantom profit on Toshiba's books during the period that parts remained with the ODMs. Recording profits at the time the parts were supplied to the ODMs was improper, as it did not accurately represent the actual series of transactions or their economic reality. Because the purchase of parts by an ODM was premised on Toshiba's obligation to purchase the ODM's inventories of finished goods, WIP and parts within a set amount of time, the original parts sale was required to be treated as a transaction subject to repurchase conditions. As a result, Toshiba was not permitted to recognize any profit on the parts transactions at the time they were

- 90 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice                97 of 145                Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA    Document 82-2    Filed 09/22/21    Page 99 of 146    Page
Case 2:15-cv-04194-DDP-JC   Document 75 #:1660 08/08/19   Page 98 of 145   Page ID #:1623
ID #:1660

made, and was required to deduct the masking price of all parts still in ODM inventories from its profits on a quarterly basis, which it did not do.

255. A major objective of GAAP in accounting for inventories is the proper determination of income through the process of matching appropriate costs with revenues. ASC Topic 330-10-05, *Inventory*. This requires determining what portion of the cost of goods available for sale should be deducted from current period revenue, and what portion should be carried forward as inventory to be matched against the revenue of a subsequent period in which it is sold. The proper determination of profits and income takes precedence over other goals. In measuring the gross profit on sales earned during an accounting period, the COGS is subtracted from sales. If COGS is understated (*i.e.*, because some of the costs are held up in inventory at the ODMs), then current period profits will be overstated. Thus, by causing the ODMs to hold excess inventory, Toshiba caused the masking difference for those parts to be recognized as negative costs of manufactured goods on the parts transactions, thereby reducing COGS and inflating current period profits.

256. In addition, at least during FY12, Toshiba also sold parts held as inventory by Toshiba at an inflated price to fully owned subsidiaries, TTI and TIH, and improperly recorded profits without eliminating the intercompany profit in violation of ASC Topic 810, *Consolidation*.

257. Toshiba's FY13 Corporate Audit Report asserted that E&Y had detected the improper accounting for ODM parts transactions but agreed to accept it based on Toshiba's representations that the parts were only in ODM inventories for a short period of time such that the improper accounting had only an immaterial impact on Toshiba's reported results:

> "Under the accounting policies, the resale profit from Buy-Sell cannot be realized until it becomes sales revenue after shifting to products. However, Buy-Sell parts held by ODMs as inventory are ordinarily equivalent to three days' worth of production. Therefore, it was explained to the auditor that the impact on unrealized profit and loss from this situation would be very limited and approval of the current accounting treatment was obtained."

- 91 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice                 98 of 145                 Hashem, et al., v. NMC Health PLC, et al.,
                                                                      2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA    Document 82-2    Filed 09/22/21    Page 100 of 146
Case 2:15-cv-04194-DDP-JC   Document 75   Filed 06/08/19   Page 99 of 145   Page ID #:1624
Page ID #:1661

Apx. Ex. 1 at 58.

258.   By using channel stuffing to keep PC parts sold at inflated prices in ODM inventories for an extended period of time, Toshiba was able to conceal the impact of the economic downturn precipitated by the U.S. financial crisis on Toshiba's business and misrepresented actual demand for the Company's PCs.  The IIC found that, through the improper recording of profits on buy-sell ODM parts transactions, Toshiba had misstated its profits and losses in the following amounts:

(¥100 million)

| FY08 | FY09 | FY10 | FY11 | FY12 | FY13 | 1Q-3Q14 |
|------|------|------|------|------|------|---------|
| 198 | 286 | (105) | 166 | 296 | 1 | (247) |

259.   "Successive CFOs and Finance and Accounting Division heads and managers were aware that the Company had recorded a large profit at the end of every quarter since 2009 and that a large portion of such profit was overstated by using Channel Stuffing of ODM Parts." *Id.* at 57.  To conceal the improper recording of profits from detection, Toshiba's Finance and Accounting Division "intentionally provided insufficient explanations to the accounting auditors so that they would not be criticized by them, and acted in ways that could be seen to conceal the issues in an institutional manner." *Id.*  Even when the audit department, despite these efforts at concealment, "noted that there was a possibility that Buy-Sell Transactions were being used to cause ODMs to retain excess volumes of parts, [] they did not go so far as to make any clear comment regarding the intentional Channel Stuffing of ODM Parts," thereby permitting the illegal practices to continue.  *Id.*

260.   Toshiba's Audit Committee similarly failed to take any action prior to January 2015 to stop or correct the overstatement of profits due to channel stuffing, despite the fact that former CFOs who were aware of the practices were members of the committee from June 2011 forward.  *Id.*  In November 2015, Toshiba filed suit against Muraoka for damages arising from his participation or acquiescence in the fraudulent channel stuffing activities, including for breaching his duty of care of

- 92 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice
99 of 145
Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA    Document 82-2    Filed 09/22/21    Page 101 of 146
Case 2:15-cv-04194-DDP-JC   Document 75 #:1662 08/08/19   Page 100 of 145   Page ID
#:1625

monitoring and supervision as a director and chairman of the Company's Audit Committee from 1Q11 to 1Q14, and as a director and executive officer in charge of the Finance & Accounting Division from 3Q08 to 1Q11.

**D.    Failure to Report Westinghouse Goodwill Impairment Charges, or to Record Charges on Consolidated Financial Statements**

261.    Goodwill represents the excess of the purchase price over the fair value of the net assets acquired in a business combination.   Goodwill is an asset representing the future economic benefits arising from the other assets acquired in the acquisition that are not individually identified and separately recognized.  ASC Topic 350-10-20.  In other words, goodwill is considered to be an asset because future economic benefits are expected from it in combination with the future economic benefits of the other assets acquired.

262.    Westinghouse took goodwill impairment charges totaling $1.3 billion in FY12 and FY13.  Toshiba was required to, but did not, publicly disclose those charges.   Toshiba also did not record the charges on its consolidated financial statements.  Toshiba's recent assertions that GAAP did not require it to do so are not credible, and appear to be incorrect.

263.    GAAP, specifically ASC Topic 350, requires that goodwill be tested for impairment at the "reporting unit" level.  ASC Topic 350-20-20.  A reporting unit is an operating segment or one level below an operating segment.  *Id*.  A component of an operating segment is a reporting unit if the component constitutes a business or a nonprofit activity for which discrete financial information is available and segment management regularly reviews the operating results of that component. ASC Topic 350-20-35.  Two or more components of an operating segment can be aggregated and deemed a single reporting unit, but only if the components have similar economic characteristics.  *Id*.  The Company therefore had the opportunity to manipulate its reporting units in a manner that was designed to avoid recording

- 93 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice

100 of 145

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA   Document 82-2   Filed 09/22/21   Page 102 of 146
Case 2:15-cv-04194-DDP-JC   Document 75   Filed 08/08/19   Page 101 of 145   Page ID
#:1663
#:1626

an impairment charge.  The fact that Toshiba was changing its operating segments during this time raises the possibility that it did so.

264.   If the goodwill evaluation shows that the carrying value of the reporting unit exceeds its book value, then the goodwill is considered impaired and an impairment charge must be recorded in that period.  ASC Topic 350-20-35-11.  The consideration of carrying value includes consideration of the reporting unit's actual and anticipated earnings.  Falsification of earnings or projections can affect the need to take an impairment charge.  Toshiba was falsifying its financial results at Westinghouse, the Power Company, and throughout the Social Infrastructure (in FY12) and Energy (in FY13) segments during the time that the impairment charges were recorded at the subsidiary level.  The nature, extent, and intent of the manipulations, as described above, raises the possibility that Toshiba's false accounting was perpetrated, at least in part, to avoid recording an impairment charge on the consolidated financial statements.

265.   Toshiba has not disclosed sufficient information to demonstrate the accuracy of its assertion that GAAP did not require the impairment charges to be reported at the corporate level.  However, the information that *has* since been publicly revealed since the Westinghouse impairment charges were publicly revealed strongly indicates that Toshiba violated GAAP by not taking an impairment charge in its consolidated financial statements for FY12 and FY13.

266.   Additional evidence strongly suggesting that Toshiba manipulated its consolidated accounting at the corporate level to avoid recording the Westinghouse write-down is found in a November 17, 2015 Nikkei Business article based on internal e-mails and corporate records.  Apx. Ex. 9.  The article recounts how Toshiba initially fought with Westinghouse's U.S. auditor over the FY13 write-down, then got the auditor to replace the U.S.-led team with one led by its Japanese office for subsequent audits, under threat of losing the ¥1 billion audit contract.  After Toshiba recognized, in March 2014, that "'it would be very hard for even [the

- 94 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice
101 of 145
Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA   Document 82-2   Filed 09/22/21   Page 103 of 146
Case 2:15-cv-04194-DDP-JC   Document 75 #:1664 08/08/19   Page 102 of 145   Page ID
#:1627

new audit team leader] to alter Ernst & Young's position'" that another write-down be recorded in FY14, it began intensive efforts to "'minimize[] the impact of a write-down on consolidated performance.'" *Id.* As an executive at Toshiba's energy division wrote in an April 2014 e-mail:

> We need to make an argument that will convince [EY] ShinNihon to evaluate our consolidated results using slightly different methods than Ernst & Young proper, that is, using methods that the Japan side takes the initiative in applying.

*Id.*

267. According to the Nikkei Business article, at the end of FY13, Toshiba executives recognized the Company would have to take an impairment charge of up to ¥150 billion on its consolidated financial statements if the Westinghouse impairment charge exceeded $500 million, "meaning," according to an e-mail quoted in the report, that "'there would be no funds for cash dividends.'" Apx. Ex. 9. To avoid this, Toshiba changed the way it was evaluating and accounting for goodwill. First, Toshiba integrated Westinghouse with its Japanese nuclear power division, which had the effect of increasing projected cash flows for the reporting unit used to evaluate goodwill, thus lessening the impact of the goodwill charges taken at Westinghouse. Second, Toshiba stopped using competitor stock prices as a measure of the value of the business, and instead began valuing it exclusively on the basis of projected future cash flows, which made it easier to inflate the value of the business.

268. Toshiba's decision to stop using market prices in its goodwill valuation methodology is particularly suspicious in light of its failure to resell the Shaw Group's equity stake in Westinghouse after assuring investors in FY12 that it had received significant interest from qualified purchasers of that interest. Sale of the Shaw Group stake at a price that was lower than that reflected on Westinghouse's books would have required Toshiba to test for goodwill impairment. US-GAAP would have required the Company to use prices in active markets, rather than

- 95 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice

102 of 145

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA   Document 82-2   Filed 09/22/21   Page 104 of 146
Case 2:15-cv-04194-DDP-JC   Document 75   Filed 08/08/19   Page 103 of 145   Page ID
#:1605
Page ID #:1628

internal discounted cash flow projections, as the best evidence of value.  ASC Topic 350-20-35-3; ASC Topic 350-20-35-22.  Eliminating market prices as a basis for comparison appears to have been designed to avoid the impairment findings that could have resulted from such a review.  That the FY13 impairment charge at Westinghouse was limited to $400 million – below the threshold that Toshiba executives had recognized would require a consolidated write-down – provides additional strong circumstantial evidence that the change in accounting procedures was designed solely to avoid taking the charge.

269.  Even if Toshiba was not required to write down goodwill on a consolidated level, Toshiba's statements in the FY12 and FY13 annual reports that there was no goodwill impairment were materially misleading.

270.  Toshiba violated the Tokyo Stock Exchange's ("TSE") timely disclosure rules which stipulate that a company must disclose information about losses if a subsidiary included in the company's securities report incurs losses that account for 3% or more of the parent company's net assets.  The $930 million write-down represented approximately 6% of Toshiba's net assets of $15.1 billion at March 31, 2013.  Toshiba's reported goodwill overstated the future benefit Westinghouse would provide by at least that amount.

271.  The TSE's parent, Japan Exchange Group, confirmed on November 17, 2015 that Westinghouse's FY12 write-downs met the timely disclosure guidelines and should have been communicated to investors.  Toshiba's publicly-issued Disclosure Policy states that its information disclosure policies meet the TSE standards, as well as the disclosure standards of the Securities Exchange Law, other legislation, and rules on timely disclosure defined by any other stock exchanges on which Toshiba is listed.

272.  Toshiba's Disclosure Policy also requires it to disclose information ***not*** required under rules of timely disclosure "in the event that such information is considered to have the potential to impact investment decisions by interested

- 96 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice

103 of 145

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA    Document 82-2    Filed 09/22/21    Page 105 of 146
Case 2:15-cv-04194-DDP-JC    Document 75    Filed 08/08/19    Page 104 of 145    Page ID
#:1606
#:1629

parties." The impairment charges taken by Westinghouse were information that had the potential to impact investment decisions by interested parties. Toshiba stated that its policy was to disclose such matters "as promptly and comprehensively as possible."

273. In its November 17, 2015 press release, Toshiba admitted that the approximately $930 million impairment of goodwill recorded by Westinghouse Group in FY12 "fell under the guidelines for timely disclosure, and [Toshiba] should have disclosed it appropriately at the appropriate timing."

### E.    Other False Accounting Practices

274. The IIC and other internal investigations found proof of additional instances of fraudulent accounting by the Company, including the practices described below. These practices, individually and collectively, had the purpose and effect of materially overstating Toshiba's reported profits or minimizing its reported losses.

### 1.    Failure to Record Asset Impairment Charges

275. Toshiba's restatement also revealed that the Company had failed to write down the value of impaired fixed assets in violation of US-GAAP, including ASC Topic 360-10-35, *Property, Plant, and Equipment*, which requires that an impairment loss be recognized if the carrying amount of a long-lived asset is not recoverable and exceeds its fair value.

276. Although the IIC recognized in its July 20, 2015 report that the required restatements resulting from Toshiba's inappropriate accounting methods could require fixed asset impairment and inventory charges to be booked, it did not investigate or attempt to quantify the amount of those adjustments.

277. On August 18, 2015, the Company acknowledged that fixed asset impairment charges would be required in the PC Business, Visual Products business, and Semiconductor business. The Company said that the charges would reduce pre-tax income by ¥41.8 billion ($427 million) in FY08 and ¥49.0 billion ($598 million)

- 97 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice
104 of 145
Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA    Document 82-2    Filed 09/22/21    Page 106 of 146
Case 2:15-cv-04194-DDP-JC    Document 75 #:1667 08/08/19    Page 105 of 145    Page ID
#:1630

in FY11.  Apx. Ex. 5 at 4-5.  The Company release stated that the FY08 impairment was related to the PC and Visual Products businesses, and the FY11 impairment was in the Semiconductor business.

278.  Toshiba's FY14 financial report, released at the same time as the restatement, revealed an additional ¥127 billion (~$1.1 billion) in asset impairment charges in FY14, including a ¥41 billion (~$342 million) full impairment charge for the Company's investment in the South Texas Project, a Houston-area nuclear power plant being built by Westinghouse.  Toshiba also took a ¥41.9 billion (~$349 million) partial impairment charge in the Semiconductor business that Muromachi attributed to a "business downturn in white LEDs."  Although Toshiba claimed that these and other assets did not become impaired until the end of FY14, based on the nature and extent of the misconduct alleged herein, there is a significant probability that the actual charges were required to be taken much earlier than they were.

**2.    Failure to Devalue Obsolete Semiconductor Inventory**

279.  In connection with plans to transfer manufacturing of semiconductor parts from one plant to another in FY08, Toshiba manufactured a considerable number of extra parts before the first plant was shutdown to assure sufficient parts would be on hand during the period in which the new plant was being brought on line.  However, forecast demand for those parts never materialized and Toshiba was left holding a large amount of excess inventory, much of it designated for specific customers who no longer needed or wanted it.  The excess and obsolete inventory was not disposed of until FY13, when Toshiba recorded a total loss of approximately ¥8.0 billion for disposed inventory.  Although some of the inventory had been partially devalued before then, for most of the inventory no valuation loss was recorded before the FY13 loss was recorded.

280.  Toshiba violated applicable accounting rules in delaying recognition of the loss until FY13, and in only partially devaluing the excess and obsolete inventory before then.  Toshiba did so by: (i) not providing for any method for its

- 98 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice                    105 of 145                    Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA   Document 82-2   Filed 09/22/21   Page 107 of 146
Case 2:15-cv-04194-DDP-JC   Document 75   Filed 08/08/19   Page 106 of 145   Page ID
#:1631

semiconductor business to devalue obsolete or unsaleable parts based on their disposal value; (ii) failing to make any devaluation of its manufacturing inventory (*i.e.*, parts designated for use by third parties in manufacturing other products) prior to FY13; and (iii) using a combined allocation method for determining cost variances where a process specific method was required due to variations in the manner in which the increased unit cost of manufacturing due to lower plant utilization was allocated to inventory. *See* Apx. Ex. 1 at 61-66. This accounting was carried out "in such a way that made it difficult to detect from outside the Company." *Id.* at 66.

281. Toshiba's accounting for semiconductor inventory violated US-GAAP, including ASC Topic 330-10-35, *Inventory*, which requires that inventory be written down to market value "when the utility of the goods is no longer as great as their cost." "Where there is evidence that the utility of goods, in their disposal in the ordinary course of business, will be less than cost, whether due to damage, physical deterioration, obsolescence, changes in price levels, or other causes, the difference shall be recognized as a loss of the current period." *Id.*

282. Both Sasaki and Tanaka "were aware of the fact that the apparent quarterly profits had been overstated as a result of [using the combined allocation method]." Apx. Ex. 1 at 66. The IIC found that the inappropriate accounting treatment was continued until FY13 in order to meet the "strong demands" of Toshiba's management at CEO Monthly Meetings to meet Challenges for improved performance. *Id.*

283. The IIC found that the use of combined allocation method for semiconductor inventory caused Toshiba to overstate its profits and losses in the following amounts:

- 99 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice

106 of 145

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA   Document 82-2   Filed 09/22/21   Page 108 of 146
Case 2:15-cv-04194-DDP-JC   Document 75 #:1669 08/08/19   Page 107 of 145   Page ID
#:1632

| | | | | | (¥100 million) |
|---|---|---|---|---|---|
| **FY09** | **FY10** | **FY11** | **FY12** | **FY13** | **3Q14** |
| 32 | 16 | 104 | 308 | (165) | 5 |

284. Toshiba's failure to properly account for inventory was not limited to the excess semiconductor parts described above.

285. Toshiba's self check report identified other similar instances of fraudulent and improper accounting, including: (i) failing to post a loss in FY13 when inventory was discarded due to discontinuation of sales activities; (ii) postponing the discard of obsolete inventory in an attempt to avoid posting a loss, and failing to post a provision for such loss at the time the inventory became obsolete; and (iii) under-recording the cost of inventory by failing to reflect increased unit costs of inventory. Apx. Ex. 2-A (Attachment 1 at Case Nos. 1, 3, 7).

### 3. Recognition of Phantom Profits in the Visual Products Business

286. Toshiba applied a masking difference to increase the price of parts supplied to ODMs for its Visual Products Business, and accounted for the difference between the actual acquisition cost and the inflated parts cost in the same manner as it engaged in the fraudulent practices in its PC business that are described above. This caused Toshiba to recognize the masking difference as a negative cost of manufactured goods at the time parts were supplied, artificially inflating its profits. Apx. Ex. 1 at 49-50.

287. The accounting for ODM parts transactions in the Visual Products Business violated US-GAAP for the same reasons described above with respect to ODM parts transactions in the PC business. *See supra* §VII.C.

288. The IIC found that Toshiba's improper accounting for ODM parts transactions in the Visual Products Business caused Toshiba to misstate its profits and losses in the following amounts:

| | | | | | | (¥100 million) |
|---|---|---|---|---|---|---|
| **FY08** | **FY09** | **FY10** | **FY11** | **FY12** | **FY13** | **1Q-3Q14** |

- 100 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice
107 of 145
Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA   Document 82-2   Filed 09/22/21   Page 109 of 146
Case 2:15-cv-04194-DDP-JC   Document 75 #:1670  Filed 08/08/19   Page 108 of 145   Page ID
#:1633

| (5) | 6 | (7) | (5) | 14 | 3 | (8) |

### 4. Improper Deferral of Operating Expenses in the PC Business

289. Toshiba deferred operating expenses in its PC Business using improper C/O adjustments to overstate profits in the same manner and for the same reasons in which it did so in the Visual Products Business. Apx. Ex. 1 at 58-60.

290. The accounting for C/O expenses in the PC Business violated US-GAAP for the same reasons described above with respect to expense accounting in the Visual Products Business. *See supra* §VII.B.

291. The IIC found that Toshiba's improper accounting for C/O expenses in the PC Business caused Toshiba to misstate its profits and losses in the following amounts:

(¥100 million)

| FY10 | FY11 | FY12 | FY13 | 1Q-3Q14 |
|------|------|------|------|---------|
| 17 | 83 | (36) | (17) | (17) |

### 5. Manipulation of Foreign Currency Exchange Rates

292. Toshiba failed to apply accurate foreign currency exchange rates, where using the correct rate would have caused profits to decline or expenses to increase due to the performance of the Japanese yen against the U.S. dollar or other currencies.

293. In FY11, for example, Toshiba obtained a contract to construct a power plant, and utilized estimates of the cost of work to be performed under the contract that were denominated in U.S. dollars. Throughout the project, Toshiba continued to use the exchange rate prevailing at the time the order was received ($1~85¥) from FY11 through 3Q14, by which time the value of the yen ($1~104¥) had fallen significantly. Apx. Ex. 1 at 27-28 (Project D). Using the incorrect conversion rate had inflated Toshiba's gross profit by ¥1,600 million (~$19.5 million).

294. By the end of FY13 the contract was in a loss position, as the total estimated costs exceeded the total estimated income under the contract when using

- 101 -

4847-0125-0718.v2

Exhibit 7 to B.R. Shetty's
Request for Judicial Notice

108 of 145

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA   Document 82-2   Filed 09/22/21   Page 110 of 146
Case 2:15-cv-04194-DDP-JC   Document 75   Filed 08/08/19   Page 109 of 145   Page ID
#:1634
#:1671

current exchange rates. Toshiba's Power Systems Company nevertheless failed to record a loss and deferred taking the required loss for three more quarters. The IIC found that there was a "reasonable degree of possibility" that the delay in recording the loss was due to "heavy pressure to achieve their sales target" and that "there was no evidence of any specific consideration" of whether the losses could be avoided. *Id.* at 28.

295. Toshiba's self-check report described a similar instance where the Company had taken advantage of foreign currency fluctuations to improve reported results. Apx. Ex. 2-A (Attachment 1 at Case No. 2). There, the Company had valued a claim for unpaid accounts receivable on a cancelled contract using foreign currency rates prevailing at the time the contract was in force. Toshiba admitted that the Company should have taken a write down to reflect the lowered expectancy under the claim based on current foreign currency exchange rates.

### 6. Delayed Charge and Expense Recognition

296. Toshiba's self check report, E&Y ShinNihon's audit and the SIC and IIC investigations detected additional instances of fraudulent deferral of charges and expenses to improve reported results. These instances further illustrate the extent and institutional nature of the accounting fraud that was perpetrated by Toshiba.

297. <u>Deferred recognition of contract and production losses:</u> (i) In FY11, Toshiba failed to register an order resulting in a loss, and improperly delayed taking the required provision for the contract loss until FY12; (ii) Toshiba improperly transferred losses under a consumables contract to a related contract, thereby delaying recognition of a loss that should have been recorded when the consumables order was received; (iii) Toshiba waited until FY14 to record an impairment or loss provision for orders that fell short of expectations in FY12 under a development contract for which Toshiba had recorded development expenses as an asset; and (iv) in FY11, Toshiba failed to record the actual estimated costs of materials, using

- 102 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice
109 of 145
Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA   Document 82-2   Filed 09/22/21   Page 111 of 146
Case 2:15-cv-04194-DDP-JC   Document 75 #:1672 08/08/19   Page 110 of 145   Page ID
#:1635

an under-estimated amount and improperly waiting until FY12 to record the difference.

298. <u>Deferral of SG&A and other expenses</u>: (i) In FY12, Toshiba improperly postponed recording advertising, promotional and other SG&A expenses until FY13; (ii) Toshiba improperly postponed recording advertising expenses incurred in FY10 until FY11; (iii) Toshiba understated its provision for product warranties by delaying inclusion of anticipated warranty costs until a subsequent fiscal period; and (iv) Toshiba failed to record FY13 labor costs, then improperly transferred those costs to another department in FY14.

299. <u>Additional errors detected by E&Y ShinNihon</u>. During its review of the restatement, Toshiba's outside auditor detected four additional items of inappropriate accounting: (i) a delay in recording losses under an overseas contract to build a hydroelectric power plant; (ii) a failure to record provisions for manufacturing costs under a components transaction; and (iii & iv) misstatements of the amount of depreciation and profit and loss on a sale accompanying the impairment of assets, and following the evaluation of assets of an acquired overseas subsidiary.

## VIII. PRESUMPTION OF RELIANCE (FRAUD ON THE MARKET)

300. Through the efficient operation of the markets in which Toshiba's common stock was publicly traded, plaintiffs and the other members of the proposed Class may be presumed to have relied upon each of the false and misleading statements alleged herein.

301. At all relevant times, 6502, TOSYY and TOSBF traded in an efficient market. The efficiency of the market for these securities may be established by the following facts, among others:

    (a)    Toshiba's common stock met the requirements for listing, and was listed and actively traded on the Tokyo and Nagoya stock exchanges, a highly efficient and automated market;

- 103 -

Exhibit 7 to B.R. Shetty's
Request for Judicial Notice
Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA   Document 82-2   Filed 09/22/21   Page 112 of 146
Case 2:15-cv-04194-DDP-JC   Document 75 #:1673 08/08/19   Page 111 of 145   Page ID
#:1636

(b)     TOSYY and TOSBF were actively traded as ADSs on the OTC Market in the United States at prices that matched the contemporaneous trading price of Toshiba common stock on the Tokyo and Nagoya markets.  The OTC Market is a highly efficient and automated market.

(c)     As a regulated issuer, Toshiba filed periodic public reports with the FSA and the SESC.  Toshiba was also required to comply with the formal requirements for listing on the Tokyo and Nagoya stock exchanges, as set forth in Rule 601 of the Securities Listing Regulations, including minimum market capitalization requirements;

(d)     Toshiba published its quarterly and annual reports, press releases, presentation materials, and other material information of significance to investors on its website, including contemporaneous English-language versions of materials submitted to regulators in Japanese;

(e)     Toshiba regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the worldwide circuits of major news services, publications on its website and other Internet sites, and through other wide-ranging public disclosures, such as through conference calls, communications with the financial press, and other similar reporting services;

(f)     During the Class Period, Toshiba was followed by securities analysts employed by major brokerage firms with worldwide influence, including Citigroup, Credit Suisse Securities, UBS Securities, JP Morgan Securities, Macquarie Capital Securities, BNP Parnibas, Deutsche Bank, Morgan Stanley MUFG Securities, SBC Nikko, and others.  Analysts employed by each of these firms regularly wrote reports based upon the publicly available information disseminated about Toshiba.  These reports were distributed to the sales force and certain customers of their respective brokerage firms;

- 104 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice
111 of 145
Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA    Document 82-2    Filed 09/22/21    Page 113 of 146
Case 2:15-cv-04194-DDP-JC   Document 75 #:1674  08/08/19   Page 112 of 145   Page ID
#:1637

(g)    During the Class Period, financial institutions in Japan collectively owned approximately 37% of Toshiba's outstanding shares, and other Japanese companies, including securities companies, owned approximately 6% of the outstanding shares.  Overseas investors, including financial institutions based in the United States, owned approximately 25% of Toshiba's outstanding shares during the Class Period.  Each of these institutional investors regularly analyzed and reported on the publicly available information about Toshiba and its operations; and

(h)    During the Class Period, the average daily trading volume of Toshiba's common stock was approximately 36.3 million shares.

302.   Information that affected the price of Toshiba's common stock affected the price of TOSYY and TOSBF in the same manner and to the same extent.  The price of Toshiba's common (F) shares and ADSs traded on the OTC market in the United States during the Class Period was based upon and moved in tandem with the price of Toshiba's common stock traded on the TSE, as illustrated by the chart in ¶311 below.  The price of TOSBF shares generally tracks the currency-adjusted price of Tokyo common stock on the Tokyo exchange.  The price of TOSYY shares, which reflect an ownership interest in six shares of Toshiba's common stock, is generally six-times the currency-adjusted price of Toshiba's common stock traded on the TSE.  As a result, the same facts that support the finding that the market for Toshiba common stock sold on the TSE in Japan was efficient also support a finding that the market for Toshiba's common stock sold on the OTC market in the United States was efficient.

303. Through the foregoing mechanisms, the information publicly disseminated by defendant about the Company and its operations, and the import thereof, became widely available to and was acted upon by investors in the marketplace such that, as a result of its transactions in Toshiba stock and ADSs, the information disseminated by defendant, including the false and misleading

- 105 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice                    112 of 145              Hashem, et al., v. NMC Health PLC, et al.,
                                                                        2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA    Document 82-2    Filed 09/22/21    Page 114 of 146
Case 2:15-cv-04194-DDP-JC   Document 75 #:1675 08/08/19   Page 113 of 145   Page ID
#:1638

statements described above, became incorporated into and were reflected by the market price of Toshiba securities.

304. Under these circumstances, all purchasers of 6502, TOSYY and TOSBF during the Class Period are presumed to have relied upon the false and misleading statements and material omissions alleged herein.

## IX. LOSS CAUSATION & DAMAGES

305. Each member of the proposed Class suffered economic losses as a direct and proximate result of the misleading conduct alleged herein.  Each Class member suffered similar injury as a result of: (i) their purchase of Toshiba securities at prices that were higher than they would have been had defendant made truthful and complete disclosures of information about the Company as necessary to prevent the statements, omissions, and course of business alleged herein from being materially false or misleading to investors; and (ii) their retention of those securities through the date of one or more declines in the market price of those shares that was caused by the revelation of facts, transactions, occurrences, or risks concealed from investors by defendant's scheme to defraud, including the actual or anticipated financial consequences of its concealed actions.

306. The fraudulent accounting and the other misrepresentations and omissions alleged herein caused Toshiba securities to trade at prices higher than they would have during the Class Period had the Company disclosed accurate and truthful information about the financial condition, results, and operations of its business.

307. Because the misrepresentations and omissions that occurred before the start of the Class Period remained uncorrected at the outset of the Class Period, they continued to impact the price of Toshiba securities during the Class Period by causing securities to trade at prices that were higher than they would have traded had accurate and complete information been disclosed at the time of those misrepresentations or omissions, or had Toshiba, prior to the start of the Class

- 106 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice                    113 of 145                    Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA   Document 82-2   Filed 09/22/21   Page 115 of 146
Case 2:15-cv-04194-DDP-JC   Document 75 #:1676   Filed 08/08/19   Page 114 of 145   Page ID
#:1639

Period, corrected the misrepresentations and disclosed the omitted facts that rendered them misleading to investors.

308.   Even when Toshiba reported results or information that caused its stock price to decline the disclosures were incomplete and misleading.  The false and concealed information described herein therefore continued to maintain artificial inflation in the price of Toshiba's shares by preventing the share price from suffering even steeper declines that would have occurred had accurate and complete information been disclosed, or had investors learned that Toshiba had long been manipulating its reported results through deliberately false accounting, discovered the specific manner in which Toshiba had done so at the time of each of the false earnings reports described herein, or understood the impact that those manipulations had on current, previously reported, or anticipated financial results.

**A.   TOSYY and TOSBF Trade at the Same Price as 6502 in Japan**

309.   The misrepresentations and omissions alleged herein affected the price of TOSYY and TOSBF in the same manner and to the same extent it affected the price of 6502 sold in Japan.

310.   TOSYY and TOSBF shares are bought and sold at market prices that are set to equal the trading price of 6502 shares on the Tokyo and Nagoya stock exchanges at the time of the transaction, converted to U.S. dollars at the then-current foreign currency exchange rate (USD to Japanese yen).  Foreign currency conversion fees and other expenses do not have a material impact on the price of TOSYY and TOSBF shares as compared with the contemporaneous market price of 6502 shares in Japan.

- 107 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice
114 of 145
Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA   Document 82-2   Filed 09/22/21   Page 116 of 146
Case 2:15-cv-04194-DDP-JC   Document 75 #:1677 08/08/19   Page 115 of 145   Page ID
#:1640

311.   As illustrated by the chart below, the price of  TOSBF and TOSYY tracked and moved in tandem with the price of Toshiba's common stock sold on the Tokyo exchange (6502) during the Class Period:[23]



312.   The prevailing prices on the markets for 6502, TOSYY and TOSBF were therefore inflated to a similar extent by the false and misleading information alleged herein.[24]  The securities reacted similarly to the disclosure of corrective

---

[23]  The chart compares closing prices in Japan and the United States on the same trading day.  Differences in the closing prices of TOSYY and TOSBF as compared with 6502 result from the 13-hour time difference between closing on the OTC Market and the Tokyo exchange.

[24]  The separation between the two lines in the early and later periods of the chart above results from differences in the relative value of the dollar versus the yen (*i.e.*, the exchange rate), and not from any differences regarding how the two securities were valued, or from any inefficiencies regarding how TOSYY and 6502 were priced.  When the data used for the chart is converted to a constant currency value (whether $ or ¥) at the contemporaneous prevailing exchange rates, the gaps between the two lines effectively disappear, confirming that TOSYY and TOSBF traded in tandem with 6502 during the relevant period covered by the chart.

- 108 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice

115 of 145

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA   Document 82-2   Filed 09/22/21   Page 117 of 146
Case 2:15-cv-04194-DDP-JC   Document 75   Filed 08/08/19   Page 116 of 145   Page ID #:1678
#:1641

information that revealed the facts, transactions, and occurrences concealed by Toshiba's fraud, or the actual or potential impact of those occurrences on the Company's financial condition, results, or prospects.[25]

**B.     Investors Were Harmed When the Risks and Information Concealed by Defendant's Fraud Were Revealed**

313.   The fraud alleged herein caused shares of 6502, TOSYY and TOSBF to trade at prices that were higher than those securities would have sold for had the true facts concealed from investors been known.

314.   Disclosure of the true facts concealed by defendant's fraud would have caused 6502 stock, TOSBF and TOSYY to trade at prices that were materially lower than the prices prevailing in the markets for those securities during the Class Period.

315.   The fraud alleged herein caused AIPTF, NETPF, and the members of the Class to pay higher prices for the 6502, TOSYY and TOSBF shares they purchased during the Class Period.  Neither AIPTF or NETPF, or the members of the Class, would have purchased those securities at the prices they paid had the true condition of Toshiba's business been known.

316.   The facts, transactions, and occurrences concealed from investors by defendant's scheme to defraud reached the market through a series of partial disclosures.  Though each of the disclosures was incomplete, each revealed some of the business conditions and risks concealed by defendant's fraud scheme, leading to price declines that partially corrected Toshiba's stock price by reducing the extent to which it had been inflated by defendant's fraud.  These price declines caused economic injury to plaintiffs and other members of the Class who had purchased

---

[25]   During the Class Period, for example, the median difference between the closing price on the American and Japanese exchanges on the same trading day (0.60% for TOSYY and 0.81% for TOSBF) was less than the median intraday change on the Japanese market (0.92%), providing strong evidence that the close-to-close price variance reflects ordinary trading volatility occurring during the period between the exchange closing times, not pricing inefficiency.  If necessary, the exact correlation between the OTC Market and Tokyo exchange prices for Toshiba securities will be further developed through expert analysis following discovery.

- 109 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice
116 of 145
Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

Toshiba securities during the Class Period at prices that had been artificially inflated by the fraudulent course of business and misleading statements and omissions alleged herein.

317. The price of Toshiba shares declined precipitously from the time it announced the formation of the SIC to investigate its use of POC accounting to the time it issued its restated earnings and FY14 financial results detailing the full impact of the accounting fraud on its financial condition and prospects and disclosed the existence and magnitude of the goodwill impairment at Westinghouse. From April 3, 2015 thru November 13, 2015 (the "Corrective Period"), the price of Toshiba's common stock dropped by 41.8%, falling from ¥512 to ¥298 and resulting in a loss of more than ¥907 billion ($7.5 billion) in market capitalization, the majority of which was caused by the revelation of the risks, conditions, and circumstances that had been concealed by the fraud alleged herein. During the same period, the price of TOSBF traded in the United States declined by 44.1% ($1.89/share) and the price of TOSYY traded in the United States declined by 44.6% ($11.49/share).[26]

| Loss in Value Over Corrective Period | | | |
|---|---|---|---|
| Closing Price | 6502 | TOSBF | TOSYY |
| 4/2/2015 | ¥ 512.6 | $ 4.29 | $ 25.79 |
| 11/13/2015 | ¥ 298.3 | $ 2.40 | $ 14.30 |
| % decline | -41.8% | -44.1% | -44.6% |

318. By comparison, the Nikkei 225 Index (the "Nikkei") declined by 1.3% during the same period.[27]

---

[26] Because the U.S. markets were closed on April 3, 2015 (Good Friday), the TOSBF and TOSYY data is based on the closing price on April 2, the last trading day before the information in the April 6 disclosure reached the market.

[27] The Nikkei, traded under the symbol NKY, is a price-weighted index of the 225 largest industrial stocks traded on the TSE. Because the Nikkei includes Toshiba as part of its index, a portion of the decline of the index during the Corrective Period reflects the decline in the value of Toshiba shares. Thus, the disparity between the

- 110 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice
117 of 145
Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA    Document 82-2    Filed 09/22/21    Page 119 of 146
Case 2:15-cv-04194-DDP-JC   Document 75 #:1680 08/08/19   Page 118 of 145   Page ID
#:1643

319.   The decline in value during the Corrective Period exceeded the decline in value, if any, caused by general macroeconomic factors or industry-specific conditions, and was caused by the continued disclosure of information regarding the nature and extent of Toshiba's accounting fraud and delayed impairment charges and its impact on the Company's financial condition and prospects.

320.   The average trading volume of Toshiba common stock exceeded 46 million shares per day during the Corrective Period, nearly double the average volumes during the first three months of the year, and well above the 35 million share/day average from 2010 thru 2014.  The increased level of activity in the market during the Corrective Period reflects the volume of new information revealed during this period about the extent to which Toshiba's past results had been improved through false accounting, the measures that would be needed to correct and remediate the harm from those violations, and the impact that those circumstances would have on Toshiba's financial condition and earnings prospects.

321.   The disclosures that corrected the market price of Toshiba securities during the Corrective Period to eliminate fraud-induced inflation include those identified and described below.  The corrective events identified herein are based upon plaintiffs' analysis and investigation to date.  Upon further investigation and discovery and additional analyses, plaintiffs may change, alter, or amend their theory of damages, including by identifying additional corrective events that caused or contributed to the damages claimed in this action.

322.   On April 6, 2015, the next trading day following Toshiba's April 3 announcement of the investigation into POC accounting issues and the formation of the SIC, the price of Toshiba common stock dropped by 4.9%, while the price of TOSYY fell by 4.8% and the price of TOSBF declined by 3.8%.  By comparison,

movement of Toshiba's share price and the overall market during this period is even greater than is reflected by the data presented above.

- 111 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice                      118 of 145                      Hashem, et al., v. NMC Health PLC, et al.,
                                                                                 2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA    Document 82-2    Filed 09/22/21    Page 120 of 146
Case 2:15-cv-04194-DDP-JC   Document 75  #F16808/08/19   Page 119 of 145   Page ID
#:1644

the Nikkei fell 1.4% that day.  Market reaction was muted by the lack of information in the press release about the extent of the accounting violations, leading analysts, and market observers to anticipate a relatively modest impact on earnings.[28]

### 1.    Release of SIC Findings

323.    On May 8, 2015, Toshiba announced that the initial findings of the SIC would require it to delegate the investigation to the IIC for a broader investigation into the "appropriateness" of Toshiba's accounting.  The price of TOSBF and TOSYY shares declined by 12.34% and 13.21% respectively.  Although the Tokyo stock market was closed at the time Toshiba issued its announcement on May 8, when the market reopened on May 11, 2015, Toshiba's common stock fell by 16.55%.

324.    The lack of detailed information in the May 8 announcement prevented analysts, investors, and other market participants from reaching firm conclusions about the scope of the problems or their impact on previously reported earnings, leading to uncertainty in the market and volatility in Toshiba's stock price.  As more information was released and further analyses were conducted, the price of Toshiba's common stock continued to fall, and by May 12 had declined by 16.8% from its closing price on May 7 prior to the announcement.  TOSBF and TOSYY shares declined by 16.4% and 17.5%, respectively, during the same period, while

---

[28] *See, e.g.*, J.P. Morgan, *We Expect Company to Target May 15 for End of Accounting Audit in Infrastructure Business* (April 6, 2015) at 1 ("The information disclosed by the company is extremely limited . . . but we think that any impact on earnings due to the audit will be only temporary.  We think that any ongoing overreaction by the share price to the results of the audit could offer a good opportunity to increase exposure to the stock."); Macquarie Research, *Looking for a change in Lifestyle* (April 13, 2015) at 5 ("We do not have enough information to accurately estimate the amount at risk.  However, . . . a wide impact is likely ruled out."); MorganStanley MUFG, *Our Take on Infrastructure Business Accounting Probe and Lifestyle Business* (April 13, 2015) at 1 ("we do not foresee a sizable numerical impact"); SMBC Nikko, *Cut to hold on white goods deterioration, accounting investigation* (April 21, 2015) at 5 ("Toshiba's press release says that the investigation is into non-consolidated accounts, which we take to mean that major US subsidiary Westinghouse Electric (nuclear power-related) is probably not involved.").

- 112 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice

119 of 145

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA    Document 82-2    Filed 09/22/21    Page 121 of 146
Case 2:15-cv-04194-DDP-JC   Document 75   Filed 08/08/19   Page 120 of 145   Page ID
#:1682
#:1645

the Nikkei dropped by just 1%. The declines over these three trading days[29] reflect the cumulative impact of the information that reached the market during this period about the scope and causes of the internal investigation and its potential impact on Toshiba's financial condition and results.[30]

325. On May 13, 2015, Toshiba provided additional details of the accounting violations discovered by the SIC and announced that correcting the errors would require a ¥50 billion restatement of previously reported operating income. This led to a temporary increase in Toshiba's stock price, as investors wary of uncertainty over the impact of the accounting violations returned to the market. But following Toshiba's May 15 press conference to discuss the SIC findings and IIC investigation, at which CEO Tanaka revealed more information about the SIC findings and scope of the IIC's mandate that revealed broader problems and continued uncertainty, the price of Toshiba's shares again began to decline.[31] By May 22, 2015, when Toshiba

---

[29]  May 8, 2015 was a Friday. The markets in both Japan and the United States were closed on May 9 and 10, 2015. It should be noted that the difference in time zones between the United States and Japan can affect when market reactions are reflected in the stock price, particularly with respect to information released at a time when markets in Japan are closed but those in the United States remain open (or vice versa).

[30]  *See, e.g.*, Macquarie Research, *Taking a harder, deeper look* (May 8, 2015) at 1 ("We are lowering our rating to Neutral until we have further clarity on the scope and scale of accounting irregularities, potential restatements of historical financials, and risk of organisational disruptions."); MorganStanley MUFG, *Suspending Rating Given Uncertain Outlook* (May 9, 2015) at 1 ("We suspend our rating, price target on Toshiba: However, we intend to continue researching the company and exchanging views with investors."); Mitsubishi UFJ Morgan Stanley, *Changing to Not Rated, from Neutral* (May 11, 2015) at 1 ("Depending on the findings of the committee, we see a possibility that the firm may have to restate earnings for earlier fiscal years. This raises questions about the reliability of the financial figures on which our earnings estimates are based, in view of which we withdraw our estimates and target price . . . .").

[31]  *See, e.g.*, Macquarie Research, *Pain, with no gain* (May 15, 2015) at 1 ("Our impression is that the level of market concern is likely to rise; we think the market will perceive a high likelihood that the amount of improperly-booked profit will be larger than the >¥50bn already found, given risk of systematic accounting abuses and poor oversight. Our estimate remains ¥100bn."); UBS, *Far from out of the woods* (May 15, 2015) at 1 ("As of now, the required adjustments exceed ¥50bn, which would amount to minor impact based on the size of the company's assets. This is likely to be welcomed by the stock market. The share priced declined though,

- 113 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice
120 of 145
Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA    Document 82-2    Filed 09/22/21    Page 122 of 146
Case 2:15-cv-04194-DDP-JC   Document 75 #:1683 08/08/19   Page 121 of 145   Page ID
#:1646

issued a press release announcing the specific scope of the investigation delegated to the IIC, the gains in the price of Toshiba's common stock following the May 13 announcement had been completely erased.

326.   Thereafter, the price of Toshiba's shares in Japan and the United States continued to be volatile as the market reacted to new information and analyses about the extent of the fraud and the size of the required restatement, just as J.P. Morgan had predicted in a May 11, 2015 research report.  *See* J.P. Morgan, *Downgrade to Neutral on Withdrawal of Guidance* (May 11, 2015) at 1 ("[W]e expect the share price to be based more on the related news flow than on business fundamentals until the results [of IIC investigation] report.").  Despite the volatility in Toshiba's daily share price in reaction to the frequent updates and analyses of the fraud investigation, the market for Toshiba securities remained efficient, keeping Toshiba's stock price on a consistent downward trend that reflected the repeated negative news during the Corrective Period.

327.  For example, Toshiba's common stock rose 3% following CEO Tanaka's comment on May 29, 2015 that Toshiba's self check report had not uncovered significant new concerns, leading investors to conclude that the restatement would be limited to the ¥50 billion previously reported.  The stock price then fell by the same amount following a July 4, 2015 report in Japan's leading financial newspaper, the Nikkei Business Daily (Nikkei Sangyo Shimbun, the

---

probably because management's explanation that this basically wraps things up seems insufficient. . . .    The market generally dislikes uncertainties."); MorganStanley MUFG, *Selection of Members of Independent Investigation Committee* (May 18, 2015) at 1 (Investigative findings that false accounting had resulted from weak controls and unrealistic budget targets suggest that the scope of misconduct could be broader than revealed: "Over the last few years many analysts have presumably noticed that as earnings in Toshiba's struggling business fell far short of the company's targets, other segments were being tasked with high profit targets."); J.P. Morgan, *Westinghouse Already Included as Potential Investigation Target* (May 16, 2015) at 1 ("[W]e question whether overseas actions to achieve quotas differ from those in Japan.   Westinghouse was included as a potential investigation target, but we still see risk of uncertainty because it was not actually subject to investigation.").

- 114 -

Exhibit 7 to B.R. Shetty's
Request for Judicial Notice

Case 2:20-cv-02303-CBM-MAA Document 82-2 Filed 09/22/21 Page 123 of 146
Case 2:15-cv-04194-DDP-JC Document 75 #:1684 08/08/19 Page 122 of 145 Page ID
#:1647

publisher of the Nikkei index), that Toshiba's restatement was expected to rise to ¥150 billion. Toshiba shares declined further following a July 12 Business Daily report that the restatement had climbed to ¥170-¥200 billion.[32] On July 13, 2015, Toshiba's share price closed at ¥372, which was 17% lower than the ¥450 it had reached following Tanaka's May 29 press conference. The price of TOSBF and TOSYY shares declined by similar amounts (losing 16% and 15%, respectively) over the same period, while the Nikkei did not (dropping just 0.2%).

### 2. Release of IIC Report and Restatement of Financial Results

328. When the IIC issued its report on July 21, 2015, Toshiba's share price initially increased as the scope of the accounting adjustments was in line with the Business Daily report. However, the price soon began to decline again with the disclosure of additional information and analyses revealing that the scope of the problems and extent of the risks were larger even than what had been reported in the IIC report.[33] By July 29, 2015, following the release of the English translation of the IIC summary report (Apx. Ex. 1), the gains had been completely erased, and Toshiba shares were trading below the level they were at prior to the initial release

---

[32] *See, e.g.*, UBS, *Expected to avoid delisting* (May 29, 2015) at 1 ("at this point it appears that no major problems have been found"); MorganStanley MUFG, *Approval of Postponed Deadlines for Submitting Securities Reports* (May 30, 2015) at 1 ("assuming that the only issue at this point is the anticipated ¥50bn downward revision" that was previously disclosed, "we expect the share price to rebound in the near term"); MorganStanley MUFG, *Nikkei Shimbun Reports Further Cases of Inappropriate Accounting* (July 6, 2015) at 1 ("If the cumulative negative effect relating to inappropriate accounting on OP through [FY14] exceeds ¥150bn . . . shareholders' equity (¥1.2991trn) would be reduced by ~7%. . . . [W]e do not think the stock will be regarded as investable for the medium and long term until there is clarity on fundamental improvement in management, taking into account the findings of the [IIC]."); Macquarie Research, *Waiting for resolution* (July 9, 2015) at 1 ("persistent uncertainty on strategic and financial development keeps us on the sidelines").

[33] *See, e.g.*, UBS, *Still Stuck* (July 21, 2015) at 1 ("We do not expect the scepticism that has gradually become widespread in the markets to be completely dispelled by the investigative report and President Hisao Tanaka's Q&A session. . . . We do not expect a continued share price rise.").

- 115 -

Case 2:20-cv-02303-CBM-MAA   Document 82-2   Filed 09/22/21   Page 124 of 146
Case 2:15-cv-04194-DDP-JC   Document 75   Filed 08/08/19   Page 123 of 145   Page ID
#:1648
#:1685

of the IIC report.  Toshiba's common stock, which had closed at ¥377 prior to the report's release was down to ¥366, a 3% price decline.  TOSYY and TOSBF were down as well (dropping 2% and 4%, respectively).

329.   Toshiba shares were trading at the same level on August 18, 2015, when the Company issued a press release outlining the expected restatement, updating its financial forecasts, and describing the governance reforms that would be implemented to address the IIC findings.  The initial stock price reaction to Toshiba's announcement was again positive, as the restatement and guidance changes were generally consistent with the market's already-lowered expectations, and the announced reforms seemed to indicate that Toshiba was putting the problems behind it.  The price gains were again only temporary, however, as subsequent analyses and information revealed that significant risks arising from or revealed by the accounting fraud remained unaddressed by the anticipated restatement, including the risk of impairment charges against the goodwill that had been booked in connection with Toshiba's acquisition of Westinghouse, and the potential for additional write-downs of deferred tax assets rendered unusable as a result of Toshiba's continued lack of profitability.[34]  By August 24, 2015, the temporary gains had been erased and Toshiba's common stock had fallen back to ¥360.

330.   On September 7, 2015, following Toshiba's release of its FY15 earnings and a partial restatement of its prior earnings, the price of Toshiba's common stock fell even further, closing at ¥336, a 4.4% drop from its prior-day

[34] *See, e.g.*, Macquarie Research, *After the Deluge* (Aug. 19, 2015) at 1 ("We are satisfied that bulk of negative newsflow surrounding the accounting scandal is now out."); UBS, *Risks receding slightly* (Aug. 18, 2015) at 1 ("Our impression is that the main uncertainties remaining in connection with the inappropriate accounting are now limited to the financial statement details.  In the short term we expect a share price rise, but the long-term issues for the company remain unchanged."); Mitsubishi UFJ MorganStanley, *Toshiba (6502): Restatements leave three major balance sheet risks* (Aug. 19, 2015) at 1 ("What the market is mainly worried about, though, are the three major balance sheet risks, which Toshiba has effectively left unaddressed at this point.").

- 116 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice
123 of 145
Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA    Document 82-2    Filed 09/22/21    Page 125 of 146
Case 2:15-cv-04194-DDP-JC   Document 75 #:1686 08/08/19   Page 124 of 145   Page ID
#:1649

close.  The price reaction in the United States was delayed by the Labor Day holiday, but on September 8, 2015, the price of TOSBF dropped by 5.12% and the price of TOSYY shares declined 5.26%.  Between September 8 and September 11, 2015 additional details and analyses of the restatement and its impact on Toshiba's financial condition and results reached the market, causing Toshiba's common stock to lose an additional 8.8% in value, closing at ¥316 at the end of the trading week on Friday, September 11.  TOSBF and TOSYY shares similarly fell by 9.3% and 8.7%, respectively, during this period.

331.    The price decline continued the following week after Toshiba issued its 1Q15 earnings report on Monday, September 14, which revealed the extent to which Toshiba's profits had declined once the improper accounting ceased, and the expectations that profits would continue to lag as the Company struggled to change the business practices and correct the problems that had been concealed by its false accounting.[35]  On this news, the price of Toshiba's common stock fell as low as ¥292, before closing at ¥309 on September 15, a further decline of 6.9% in value since the end of the prior week.  TOSYY and TOSBF fell by 5.6% and 7.2%, respectively, over the same period.

332.    Toshiba's stock declined an additional 2.3% on September 18, 2015, following the Company's announcement that it had formed an Executive Liability Investigation Committee to investigate the potential for bringing suit against its former executives and directors.  The Nikkei rose by 2.7% the same day, resulting in a net decline in Toshiba shares of approximately 5% on the news of continuing investigations into misconduct by Toshiba's officers and directors.

---

[35] *See, e.g.,* MorganStanley MUFG, *Jun Q Results: Profit Deterioration in All Segments, Inventories Also Rising* (Sept. 15, 2015) at 1 ("Toshiba's priority is evidently to stem the losses in unprofitable business (especially PCs, LCD TVs, home appliances), and it will need to restructure and pull out of businesses speedily without giving undue emphasis to near-term earnings.").

- 117 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice                    124 of 145                    Hashem, et al., v. NMC Health PLC, et al.,
                                                                              2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA   Document 82-2   Filed 09/22/21   Page 126 of 146
Case 2:15-cv-04194-DDP-JC   Document 75   Filed 08/08/19   Page 125 of 145   Page ID #:1687
#:1650

### 3.   Disclosure of Westinghouse Impairment

333.   On November 9, 2015, following Toshiba's weekend disclosure of the FY12 and FY13 write-downs of Westinghouse goodwill, the price of TOSYY and TOSBF shares each declined by more than 7%.  Toshiba's common stock fell more than 5% on November 9 and 10, and then dropped a further 5% on November 13, following the Nikkei report quantifying the amounts of the write-downs.

### X.   CLASS ACTION ALLEGATIONS

334.   Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of: (i) all persons who purchased TOSYY or TOSBF on the OTC Market during the Class Period ("American Securities Purchasers"); and (ii) all citizens and residents of the United States who purchased shares of Toshiba 6502 common stock during the Class Period ("6502 Purchasers") (collectively, the "Class").  Excluded from the Class are defendant, all subsidiaries, business units, and consolidated entities of Toshiba, and any person who was an officer or director of Toshiba or any of its subsidiaries,  business units, or consolidated entities at any time from 2008 to the present (collectively, "Excluded Person(s)").  Also excluded from the Class are all members of the immediate families of any Excluded Person, all legal representatives, heirs, successors, or assigns of any Excluded Person or any member of their immediate families, all entities in which any Excluded Person has or had a controlling interest, and any person or entity claiming under any Excluded Person.

335.   The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  There are over 4.2 billion shares of Toshiba common stock outstanding, approximately 485 million of which were held or beneficially owned in the United States during the Class Period.  The shares of Toshiba 6502 common stock, TOSBF and TOSYY are owned by hundreds of thousands of persons.

- 118 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice                    125 of 145          Hashem, et al., v. NMC Health PLC, et al.,
                                                                    2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA   Document 82-2   Filed 09/22/21   Page 127 of 146
Case 2:15-cv-04194-DDP-JC   Document 75   Filed 08/08/19   Page 126 of 145   Page ID
#:1651
#:1688

336.   Reliance on the alleged misrepresentations and material omissions is presumed.  The market for Toshiba securities is efficient, as alleged above.  Public information regarding the Company is rapidly incorporated into and reflected by the market price for Toshiba 6502 common stock and thereby is also rapidly incorporated into the price of both TOSBF and TOSYY, both of which trade at prices that are set by reference to the contemporaneous trading price of 6502 common stock in Japan.

337.   The omitted information described herein was not known to, and could not have been discovered through reasonable investigation by, members of the Class.  Investors who purchased Toshiba securities at the prices prevailing in the market during the Class Period therefore presumptively did so in reliance upon each of the false and misleading statements and material omissions alleged herein.

338.   There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

  (a) whether the Exchange Act or the JFIEA was violated by Toshiba;

  (b) whether Toshiba omitted and/or misrepresented material facts;

  (c) whether Toshiba's statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

  (d) with respect to the Exchange Act claims, whether Toshiba knew or deliberately disregarded that their statements were false and misleading;

  (e) whether and to what extent the price of 6502, TOSYY and TOSBF was affected by the alleged misrepresentations; and

  (f) the extent of damage sustained by Class members and the appropriate measure of damages.

- 119 -

4847-0125-0718.v2

Exhibit 7 to B.R. Shetty's
Request for Judicial Notice

126 of 145

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA    Document 82-2    Filed 09/22/21    Page 128 of 146
Case 2:15-cv-04194-DDP-JC    Document 75    Filed 08/08/19    Page 127 of 145    Page ID
#:1652
#:1689

339.    All purchases of TOSYY and TOSBF on the OTC Market during the Class Period were the result of a domestic transaction in securities within the meaning of the Exchange Act, because, *inter alia*: (i) TOSYY and TOSBF were only sold on the OTC Market, based in the United States; (ii) transactions on the OTC Market are arranged through electronic trading systems that are located in the United States, trade in U.S. dollars and clear through U.S. settlement systems; (iii) all TOSYY shares were issued and sold by one of the four Depositary Banks, all of which are located in the United States; and (iv) the underlying shares of Toshiba common stock (6502) sold as ADSs were deposited with Depositary Banks located in the United States which held and controlled them for the benefit of the TOSYY purchaser.  As a result of these and other facts alleged herein, AIPTF and each of the other Class members who purchased TOSYY or TOSBF incurred irrevocable liability within the United States to take and pay for those securities, or the seller of those securities incurred irrevocable liability within the United States to deliver the security, or both.  *Supra* ¶¶20-22 and §IV.B.

340.    Plaintiffs' claims are typical of those of the Class because plaintiffs and the members of the Class both purchased Toshiba securities at the prices prevailing in the market during the Class Period and sustained damages from Toshiba and its management's wrongful conduct.  Damages under the JFIEA and under the Exchange Act will both be calculated using common and reliable methodologies that are based on the movement of Toshiba's stock price during and after the Class Period, including calculations based on the price at which the Class member obtained Toshiba securities, the market price of Toshiba securities at the time corrective information was disclosed, and analysis of the public information that impacted the market price of Toshiba securities at those times.

341.    Plaintiffs will adequately protect the interests of the Class and have retained counsel who are experienced in class action securities litigation.  Plaintiffs have no interests which conflict with those of the Class.  There are no conflicts

- 120 -

4847-0125-0718.v2

Exhibit 7 to B.R. Shetty's
Request for Judicial Notice

127 of 145

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA   Document 82-2   Filed 09/22/21   Page 129 of 146
Case 2:15-cv-04194-DDP-JC   Document 75 #:1690 08/08/19   Page 128 of 145   Page ID
#:1653

between American Securities Purchasers and 6502 Purchasers, as all purchasers seek to hold defendant liable based on the same alleged misrepresentations and omissions and seek damages based on the same corrective events.

342.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## XI.   CLAIMS FOR RELIEF

### First Claim for Relief
### (Violation of §10(b) of the Exchange Act & Rule 10b-5)
### (On Behalf of American Securities Purchasers Only)

343.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

344.   By engaging in the acts, practices, and omissions previously alleged, Toshiba violated §10(b) of the Exchange Act and Rule 10b-5 by:

(a)   employing devices, schemes, and artifices to defraud;

(b)   making untrue statements of material facts or omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)   engaging in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiffs and others similarly situated in connection with their purchases of Toshiba securities during the Class Period.

345.   During the Class Period, Toshiba made, disseminated, and/or approved each of the statements specified in §VI, *supra*.

346.   Each of the statements and omissions specified in §VI, *supra*, were materially false or misleading at the time they were made, in that they contained misrepresentations of fact or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

- 121 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice                    128 of 145                    Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA   Document 82-2   Filed 09/22/21   Page 130 of 146
Case 2:15-cv-04194-DDP-JC   Document 75   Filed 08/08/19   Page 129 of 145   Page ID
#:1691
#:1654

347.  Each of the statements and omissions specified in §VI, *supra*, were in connection with the purchase or sale of TOSYY or TOSBF by the members of the Class in that they affected the value or merit of those securities and the risks associated with their purchase or sale, thereby causing the members of the Class to purchase those securities at market prices that were fraudulently-inflated during the Class Period.

348.  The statutory safe harbor conditionally provided by 15 U.S.C. §78u-5 for certain forward-looking statements does not apply to any of the statements alleged herein to be materially false or misleading because:

(a)  the statements were not forward-looking, or identified as such when made;

(b)  the statements were not accompanied by meaningful cautionary language that sufficiently identified the specific, important factors that could cause actual results to differ materially from those in the statement;

(c)  the statements were included in a financial statement prepared in accordance with GAAP; or

(d)  the statements were made by defendant with actual knowledge that the statements were false or misleading.

349.  Toshiba made, disseminated, or approved the statements specified in §VI, *supra*, while knowing or recklessly disregarding that the statements were false or misleading, or omitted to disclose facts necessary to prevent the statements from misleading investors in light of the circumstances under which they were made.

350.  Plaintiffs purchased Toshiba securities in reliance upon the truth and accuracy of the statements specified in §VI, *supra*, and the other information that was publicly reported by Toshiba about its operations, and without knowledge of the facts, transactions, circumstances, and conditions fraudulently misrepresented to or concealed from the market during the Class Period, as specified above.

- 122 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice                129 of 145                Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA   Document 82-2   Filed 09/22/21   Page 131 of 146
Case 2:15-cv-04194-DDP-JC   Document 75 #:1692 08/08/19   Page 130 of 145   Page ID
#:1655

351.   Plaintiffs and the Class have suffered damages as a result of the material misrepresentations and omissions alleged in §VI, *supra*, in that they:

(a)   paid artificially inflated prices for publicly-issued shares of TOSYY and TOSBF;

(b)   purchased their TOSYY and TOSBF shares on an open, developed, and efficient public market; and

(c)   incurred economic losses when the price of those securities declined as the direct and proximate result of the public dissemination of information that was inconsistent with defendant's prior public statements or otherwise alerted the market to the facts, transactions, circumstances, risks, and conditions concealed by Toshiba's misrepresentations and omissions, or the economic consequences thereof.

352.   Plaintiffs and the Class would not have purchased Toshiba securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by the false and misleading statements and omissions specified above.

**Second Claim for Relief**
**(Violation of §20(a) of the Exchange Act)**
**(On Behalf of American Securities Purchasers Only)**

353.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein

354.   Toshiba and/or persons under its control violated §10(b) of the Exchange Act and Rule 10b-5 by their acts and omissions described above, causing economic injury to plaintiffs and the other members of the Class.

355.   By virtue of its position as a controlling person, Toshiba is liable pursuant to §20(a) of the Exchange Act for the acts and omissions of its directors, executive officers, subsidiaries, and affiliates in violation of the Exchange Act.

- 123 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice                    130 of 145                    Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA   Document 82-2   Filed 09/22/21   Page 132 of 146
Case 2:15-cv-04194-DDP-JC   Document 75   Filed 08/08/19   Page 131 of 145   Page ID
#:1693
#:1656

356.   Toshiba, through its ability to hire, fire, appoint, compensate, supervise, direct, and discipline employees, had the ability to control the actions of the directors, executive officers, managers, and other employees of the Company and of its business subsidiaries and affiliates, including the capacity to control the actions of each of the individuals identified in the chart below.

| Hisao Tanaka | Norio Sasaki | Hideo Kitamura |
|---|---|---|
| Makoto Kubo | Fumio Muraoka | Atsutoshi Nishida |
| Hidejiro Shimomitsu | Masahiko Fukakushi | Kiyoshi Kobayashi |
| Toshio Masaki | Yasuharu Igarashi | Keizo Maeda |
| Naoto Nishida | Fumiaki Ushio | Seiya Shimaoka |
| Masaaki Osumi | Yasuo Naruke | Shigenori Tokumitsu |
| Shinichiro Akiba | Takeshi Yokota | Yoshihiro Aburatani |
| Masakazu Kakumu | Kiyoshi Okamura | Hidehito Murato |

357.   Toshiba had the power to prevent or correct the actions of its directors, executive officers, managers, and employees to prevent the actions in violation of the federal securities laws or the securities laws of Japan.

358.   Toshiba failed to act to prevent the actions of its directors, executive officers, managers, and employees in violation of the federal securities laws or the securities laws of Japan, or actively controlled and directed those actions so as to cause the violations of the federal securities laws and the securities laws of Japan complained of herein.

359.   Toshiba, through its ownership of the subsidiaries and affiliates involved in the fraudulent conduct herein, and its ability to hire, fire, appoint, compensate, supervise, and discipline the officers, directors, and employees thereof, had but failed to exercise the capacity to control the actions of its business subsidiaries and affiliates, and the actions of the officers and employees of those subsidiaries and affiliates, in violation of the federal securities laws and the securities laws of Japan, including by failing to act to prevent the actions of the persons named in the chart above who exercised direct control over Toshiba's subsidiaries and

- 124 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice
131 of 145
Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA   Document 82-2   Filed 09/22/21   Page 133 of 146
Case 2:15-cv-04194-DDP-JC   Document 75   Filed 08/08/19   Page 132 of 145   Page ID
#:1657
#:1694

affiliates in order to carry out the fraudulent actions complained of herein, or directing the actions they took in violation of those laws.

360.   Toshiba's executive officers and the other persons identified in the chart above had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to, and did, control or influence the business practices or conditions giving rise to the securities violations alleged herein, and the contents of the statements which misled investors about those conditions and practices, as alleged above.  By virtue of their high-level positions, participation in or awareness of the Company's operations, and intimate knowledge of the matters discussed in the public statements filed by the Company with the SESC and disseminated to the investing public, Toshiba's executive officers had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the contents and dissemination of the false and misleading statements alleged above.

361.   Toshiba and its executive officers and directors, because of their positions with the Company, possessed the power and authority to control the contents of Toshiba's quarterly reports, press releases, quarterly conference calls, and other presentations to securities analysts, money and portfolio managers, and institutional investors. Toshiba and its executive officers were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

**Third Claim for Relief**
**(Violation of JFIEA Article 21-2)**
**(On Behalf of 6502 Purchasers and on Behalf of American Securities**
**Purchasers Pursuant to Fed. R. Civ. P. 8(d)(2))**

362.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

- 125 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice

132 of 145

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA   Document 82-2   Filed 09/22/21   Page 134 of 146
Case 2:15-cv-04194-DDP-JC   Document 75   Filed 08/08/19   Page 133 of 145   Page ID
#:1695
#:1658

363.   Pursuant to Fed. R. Civ. P. 8(d)(2), this Third Claim for Relief is asserted on behalf of the American Securities Purchasers subclass as an alternative theory of liability to the First and Second Claims for Relief.

364.   Toshiba was the Issuer of the securities acquired by plaintiffs and other members of the Class.

365.   Toshiba submitted the annual reports and quarterly reports identified in ¶¶169-170, 174 above (collectively, the "Reports") to the FSA via the TDnet.

366.   Each of the Reports contained false statements about material particulars, omitted statements as to material particulars that were required to be stated, or omitted statements of material fact that were necessary to prevent the Reports from being misleading, as alleged in §§VI-VII above.

367.   Toshiba breached its duty to make a reasonable and diligent investigation of the statements in the Reports and any incorporated or attached documents and to ensure that the statements contained therein were truthful and accurate, and that no material information necessary to prevent the statements from being misleading had been omitted.

368.   During the period that the Reports were required to be made available for public inspection, plaintiffs and the other members of the Class acquired securities issued by Toshiba.

369.   The false statements and omissions were concealed by defendant and unknown to the investing public, as alleged above.  At the time plaintiffs and the other members of the Class acquired the securities issued by Toshiba they did not know, and in the exercise of reasonable diligence could not have known, that the statements in the Reports were false or that the Reports omitted statements of material particulars or material facts that were required to be stated therein or necessary to prevent the Reports from being misleading.

- 126 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice
133 of 145
Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA    Document 82-2    Filed 09/22/21    Page 135 of 146
Case 2:15-cv-04194-DDP-JC    Document 75    Filed 08/08/19    Page 134 of 145    Page ID
#:1659
#:1659

370. The material false information and omissions in the Reports artificially inflated the prices of the securities acquired by plaintiffs and the other members of the Class.

371. Plaintiffs and other members of the Class suffered damages arising from the statements alleged herein being false or having omitted material information due to the declines in the market value of Toshiba securities that occurred during the Corrective Period, as alleged above. The damages sustained by plaintiffs and other members of the Class were not due to circumstances other than the decline in the value of Toshiba securities arising from the false and misleading statements alleged herein.

372. Toshiba is therefore liable under Article 21-2 to compensate plaintiffs for damage arising from the false statements and omissions in the Reports.

373. Neither the government of Japan or any prosecutorial or regulatory authority in Japan, nor the U.S. government or state department, has objected to the pendency of this action, or contended that this action will interfere, in any way, with civil, criminal or any other legislative, regulatory or official proceeding arising out of the facts, transactions and occurrences described herein.

374. No proceeding that has been filed in Japan will resolve the claims asserted in this case on behalf of the named plaintiffs or all other members of the putative Class.

375. As detailed in prior submissions to the Court, Japan has a civil law system of adjudication. *See* ECF Nos. 52-53. Thus, this action cannot and will not affect, in any way, the outcome of any lawsuit, regulatory proceeding, investigation or other action in Japan.

376. Because of the nature of Japan's legal system, the outcome of this litigation cannot and will not affect the interpretation of the JFIEA in Japan.

## XII.    PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for judgment as follows:

- 127 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice
134 of 145
Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA   Document 82-2   Filed 09/22/21   Page 136 of 146
Case 2:15-cv-04194-DDP-JC   Document 75   Filed 08/08/19   Page 135 of 145   Page ID
#:1607
#:1660

A.  Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.  Awarding compensatory damages in favor of plaintiffs and the other Class members against defendant for all damages sustained as a result of defendant's wrongdoing in an amount to be proven at trial, including interest;

C.  Awarding plaintiffs and the Class reasonable costs and expenses incurred in this action, including attorneys' fees; and

D.  Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## XIII.  JURY DEMAND

377.  Plaintiffs demand a trial by jury on all issues so triable.

DATED:  August 8, 2019

ROBBINS GELLER RUDMAN &
  DOWD LLP
DENNIS J. HERMAN
WILLOW E. RADCLIFFE
JOHN H. GEORGE

s/ Dennis J. Herman
DENNIS J. HERMAN

Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)

Lead Counsel for Plaintiffs

- 128 -

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice

135 of 145

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA    Document 82-2    Filed 09/22/21    Page 137 of 146
Case 2:15-cv-04194-DDP-JC   Document 75   Filed 08/08/19   Page 136 of 145   Page ID
#:1661

# EXHIBIT A

129

Exhibit 7 to B.R. Shetty's                136 of 145         Hashem, et al., v. NMC Health PLC, et al.,
Request for Judicial Notice                                              2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA   Document 82-2   Filed 09/22/21   Page 138 of 146
Case 2:15-cv-04194-DDP-JC   Document 75   Filed 08/08/19   Page 137 of 145   Page ID
#:1662
Page ID #:1609

CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

AUTOMOTIVE INDUSTRIES PENSION TRUST FUND ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|---|---|---|---|

*See* attached Schedule A.

5.    Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

*Wang, et al. v. Ariad Pharmaceuticals, Inc., et al.*, No. 1:13-cv-12544 (D. Mass.)

6.    The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

130 TOSHIBA

Exhibit 7 to B.R. Shetty's
Request for Judicial Notice

137 of 145

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA   Document 82-2   Filed 09/22/21   Page 139 of 146
Case 2:15-cv-04194-DDP-JC   Document 75   Filed 08/08/19   Page 138 of 145   Page ID
#:1663
Page ID #:1700

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 16th day of December, 2015.

AUTOMOTIVE INDUSTRIES PENSION TRUST FUND

By: _____

Michael Schumacher, Fund Manager

- 2 -

131 TOSHIBA

Exhibit 7 to B.R. Shetty's
Request for Judicial Notice

138 of 145

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA    Document 82-2    Filed 09/22/21    Page 140 of 146
Case 2:15-cv-04194-DDP-JC   Document 75   Filed 08/08/19   Page 139 of 145   Page ID
#:1701
#:1664

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Acquisitions**

| Date Acquired | Type/Amount of Securities Acquired | Price |
|:---:|:---:|:---:|
| 03/23/2015 | 36,000 | $25.57 |

Exhibit 7 to B.R. Shetty's
Request for Judicial Notice

139 of 145

132

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA    Document 82-2    Filed 09/22/21    Page 141 of 146
Case 2:15-cv-04194-DDP-JC   Document 75 #:1702 08/08/19   Page 140 of 145   Page ID
#:1665


# EXHIBIT B


Exhibit 7 to B.R. Shetty's
Request for Judicial Notice

140 of 145

133

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

NEW ENGLAND TEAMSTERS & TRUCKING INDUSTRY PENSION FUND ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|---|---|---|---|

*See* attached Schedule A.

5.    Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

6.    The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

TOSHIBA

134

Exhibit 7 to B.R. Shetty's
Request for Judicial Notice                    141 of 145                    Hashem, et al., v. NMC Health PLC, et al.,
                                                                              2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA   Document 82-2   Filed 09/22/21   Page 143 of 146
Case 2:15-cv-04194-DDP-JC   Document 75   Filed 08/08/19   Page 142 of 145   Page ID
#:1704
#:1667

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 14th day of December, 2015.

NEW ENGLAND TEAMSTERS & TRUCKING INDUSTRY PENSION FUND

By: _____
Edward F. Groden. Executive Director

- 2 -

TOSHIBA

135

Case 2:20-cv-02303-CBM-MAA    Document 82-2    Filed 09/22/21    Page 144 of 146
Case 2:15-cv-04194-DDP-JC   Document 75  Filed 08/08/19   Page 143 of 145   Page ID
#:1668
Page ID #:1705

## SCHEDULE A

## SECURITIES TRANSACTIONS

**Acquisitions**

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 04/01/2015 | 110,400 | ¥ 503.42 |
| 04/02/2015 | 66,600 | ¥ 512.26 |
| 09/04/2015 | 58,000 | ¥ 356.51 |
| 10/22/2015 | 57,600 | ¥ 340.53 |
| 10/23/2015 | 9,000 | ¥ 343.35 |
| 10/26/2015 | 23,400 | ¥ 356.66 |
| 10/27/2015 | 18,000 | ¥ 349.00 |

Exhibit 7 to B.R. Shetty's
Request for Judicial Notice

143 of 145

136

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

Case 2:20-cv-02303-CBM-MAA   Document 82-2   Filed 09/22/21   Page 145 of 146
Case 2:15-cv-04194-DDP-JC   Document 75 #:1706 08/08/19   Page 144 of 145   Page ID
#:1669

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on August 8, 2019, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Dennis J. Herman
DENNIS J. HERMAN
ROBBINS GELLER RUDMAN
& DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
E-mail:  dennish@rgrdlaw.com

4847-0125-0718.v2
Exhibit 7 to B.R. Shetty's
Request for Judicial Notice

144 of 145

137
Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

## Mailing Information for a Case 2:15-cv-04194-DDP-JC Mark Stoyas v. Toshiba Corporation et al

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Jaime M Crowe**
  jcrowe@whitecase.com

- **Christopher M Curran**
  ccurran@whitecase.com

- **John Hamilton George**
  jgeorge@rgrdlaw.com

- **Dennis J Herman**
  dennish@rgrdlaw.com,jgeorge@rgrdlaw.com

- **Bryan A Merryman**
  bmerryman@whitecase.com,cgomez@whitecase.com,jdisanti@whitecase.com,irma.mares@whitecase.com,karmella.salgado@whitecase.com,rsequeira@whitecase.cc

- **Danielle S Myers**
  dmyers@rgrdlaw.com,dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **Owen C Pell**
  opell@whitecase.com,jdisanti@whitecase.com,mco@whitecase.com

- **Willow E Radcliffe**
  willowr@rgrdlaw.com,e_file_sd@rgrdlaw.com,kirstenb@rgrdlaw.com,sbloyd@rgrdlaw.com,e_file_sf@rgrdlaw.com,3608655420@filings.docketbird.com

- **Darren J Robbins**
  e_file_sd@rgrdlaw.com

- **Laurence M Rosen**
  lrosen@rosenlegal.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)

Exhibit 7 to Bar Sheffer's
Request for Judicial Notice

138

Hashem, et al., v. NMC Health PLC, et al.
2:20-cv-02303-CBM-MAA