Mark B. Chassman, SBN 119619
Email: mchassman@chassmanseelig.com
Ana Vasquez, SBN 231903
Email: avasquez@chassmanseelig.com
CHASSMAN & SEELIG, LLP
1250 Sixth Street, Suite 403
Santa Monica, CA 90401
Telephone: (310) 929-7192
Fax: (310) 929-7627

Alexander D. Pencu (*pro hac vice*)
Email: adp@msf-law.com
Benjamin D. Bianco (*pro hac vice*)
Email: bdb@msf-law.com
Austin D. Kim (*pro hac vice*)
Email: adk@msf-law.com
MEISTER SEELIG & FEIN LLP
125 Park Avenue, 7th Floor
New York, NY 10017
Telephone: (212) 655-3500
Fax: (646) 539-3649

*Attorneys for Defendant B.R. Shetty*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRIS HASHEM, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> NMC HEALTH PLC, PRASANTH MANGHAT, KHALIFA BIN BUTTI, PRASHANTH SHENOY, H.J. MARK TOMPKINS, and B.R. SHETTY, <br><br> Defendants. | Case No.: 2:20-cv-02303-CBM-MAA <br><br> (Consolidated with Case No. 2:20-cv-02895-CBM-MAA) |

## EXHIBIT 8
### TO SECOND REQUEST FOR JUDICIAL NOTICE AND INCORPORATION BY REFERENCE IN SUPPORT OF MOTION TO DISMISS OF DEFENDANT B.R. SHETTY



### nmc health

# HOPE OF A HEALTHY AND HAPPY LIFE

NMC Health plc
ANNUAL REPORT & ACCOUNTS 2014



## VISION

At NMC Health, we guarantee personalized care, genuine concern and a sincere commitment to the overall well-being of the society. We believe that healthcare is simply not about detecting, diagnosing, informing or treating an individual but it is about helping people to lead a wholesome and healthy life. We are committed to serve the communities where we do business and pledge to provide our customers with hope – Hope of a Healthy and Happy Life.

## Overview

1   Group Overview
2   Our Key Assets
4   Chairman's 2014 Report to Shareholders
7   Financial Summary and Highlights

## Group Strategic Report

10   Executive Vice Chairman & CEO Review
12   Our Business Model
14   Our Strategy
18   Business Overview
24   Financial Review
26   Principal Risks and Uncertainties
27   Corporate Social Responsibility

## Governance

36   Board of Directors
42   Senior Management
45   Directors' Report
49   Corporate Governance Report
67   Directors' Remuneration Report 2014

## Financial Statements

87   Independent Auditor's Report to the members of NMC Health plc
91   Consolidated Statement of Comprehensive Income
92   Consolidated Statement of Financial Position
93   Consolidated Statement of Changes in Equity
94   Consolidated Statement of Cash Flows
95   Notes to the Consolidated Financial Statements
125   Statement of Financial Position
126   Statement of Changes in Equity
127   Statement of Cash Flows
128   Notes to the Financial Statements



Read the annual report and much more on our website:
**www.nmchealth.com**



▲
Learn where we operate on p2.



▲
Read about our hospitals throughout this report.



▲
Read more about our business model on p12.



▲
Discover our healthcare strategy on p14



▲
Learn about our Centres of Excellence on p15.



▲
Read more about our distribution value chain on p17.

# HEALTHCARE



Providing the UAE with a range of high quality outpatient and inpatient services through hospitals, day surgery centres, medical centres and pharmacies.

Our facilities range from the larger specialty hospitals to medical centres. In addition, we have retail pharmacies mainly selling pharmaceuticals prescribed by our doctors to our patients either within, or in the immediate vicinity of, our healthcare services facilities. Our comprehensive care approach maximises patient convenience and increases revenue contribution to our business.

| Healthcare Revenue (US$m) | Healthcare EBITDA (US$m) | Doctors across the group |
|---|---|---|
| 332.2 | 88.2 | 603 |

| Healthcare Revenue Growth | Healthcare EBITDA Margin | Total number of Nurses across the group |
|---|---|---|
| 14.8% | 26.6% | 1,266 |

# DISTRIBUTION



Offering products across several wholesale segments including FMCG[1], Pharmaceuticals, Scientific Equipment and Food.

We supply our customers with a portfolio of globally and locally established brands and products with end-user demand in the UAE. Our distribution capabilities are supported by a network of strategically located warehouses and a fleet of vehicles.

[1] Fast moving consumer goods

| Distribution Revenue (US$m) | Distribution EBITDA (US$m) | Absolute number of staff |
|---|---|---|
| 338.9 | 34.1 | 1,882 |

| Distribution Revenue Growth | Distribution EBITDA Margin | Warehouse space (Sqft) |
|---|---|---|
| 12.9% | 10.1% | 500,000 |

| Overview | Group Strategic Report | Governance | Financial Statements |

# GROUP OVERVIEW

## NMC Health is the largest private healthcare operator in the UAE and one of the largest product distribution and wholesale companies in the country.

### 2 main lines of business:

#### HEALTHCARE:
Owns and operates hospitals, day surgery centres, medical centres and pharmacies

#### DISTRIBUTION:
Wholesale of pharmaceutical, scientific equipment, FMCG, food, veterinary and education products



TURNOVER                    2014

Revenue
$643.9m

■ Distribution 50%   ■ Healthcare 50%

EBITDA                      2014

EBITDA
(US$m)
102.5

■ Distribution 25%   ■ Healthcare 75%





Exhibit 8 to B.R. Shetty's Request for Judicial Notice          5 of 142          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

Overview

# OUR KEY ASSETS

## Map of group assets





### Healthcare ●

01. NMC Specialty Hospital
Abu Dhabi

02. NMC Day Surgery
Mohammed Bin Zayed
City

03. Brightpoint Royal
Women's Hospital
Abu Dhabi
(Opened July 2014)

04. NMC Specialty Hospital
Khalifa City (H1, 2015)

05. NMC General Hospital
Dubai Investments Park
(Opened July 2014)

06. B R Medical Suites
DHCC

07. NMC General Hospital
Deira, Dubai

08. NMC Specialty Hospital
Dubai

09. NMC Medical Centre
Sharjah

10. Sheikh Khalifa
General Hospital (Operator)
Umm al Quwain

11. NMC Specialty Hospital
Al Ain

12. NMC Medical Centre
Al Ain
(Opened December 2014)

### Distribution ○

A. NMC Warehouse
Mina, Abu Dhabi

B. NMC Sales and
Marketing Office
Abu Dhabi

C. NMC Warehouse
Al Ain

D. NMC Sales and
Marketing Office
Al Ain

E. NMC Warehouse
DIP, Dubai

F. NMC Warehouse
Al Quoz, Dubai

G. NMC Sales and
Marketing Office
Dubai and
Northern Emirates

H. NMC Warehouse
DIC, Dubai

Healthcare division patients

## 2.4m

Distribution Division
SKU's

## 83,635

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          6 of 142          Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

## Selection of our assets










Exhibit 8 to B.R. Shetty's Request for Judicial Notice        7 of 142        Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

Overview

# CHAIRMAN'S 2014 REPORT TO SHAREHOLDERS
## A YEAR OF CONTINUED GOOD PROGRESS

**Economic conditions, and the anticipated growth in private healthcare, in the UAE continue to be favourable.**



Dear Shareholder,

I am delighted to be able to report to shareholders that good progress has again been made in 2014. The Company continues to perform well as we enter the final stages of implementation of our initial growth strategy set out at the time of our IPO in April 2012. Group Revenue increased from US$550.9m in 2013 to US$643.9m in 2014. Consolidated EBITDA also improved by 10.2% from US$92.9m to US$102.5m in the latest financial year.

### CONTINUED GROWTH
I wrote last year that the Group had faced a number of challenges in relation to the Group's capital development programme, with construction delays encountered in relation to both the Brightpoint Royal Women's Hospital and NMC General Hospital in DIP. The Board are delighted that these problems have been resolved and that both facilities were opened in the first few days of H2, 2014. Work at our biggest development, the 250 bed hospital being built on a green field site in the expanding Abu Dhabi suburb of Khalifa City, has continued to progress well during the year and we expect to commence operations towards the end of H1, 2015, following receipt of required approvals. Our new medical centre in Al Ain opened on time in Q4, 2014. These facilities will be key to the Group's continued growth in the UAE.

The roll-out of mandatory health insurance for all residents in Dubai which commenced in 2014 is expected to be a further catalyst for growth. The estimate by Dubai Health Authority that this will result in the addition of 2 million individuals to the population of insured residents in the emirate of Dubai confirms the case for continued investment in the UAE private healthcare market. Our existing presence providing healthcare services in Dubai for many years leaves the Group well placed to benefit from this anticipated growth.

### FINANCIAL STABILITY
During any period of substantial growth and capital development, it is vital that this can be undertaken against a background of a strong financial base. In June 2013, the Company completed the replacement of its existing Syndicated Bank Loan which enabled the Company to restructure existing loans, reduce its cost of funds

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          8 of 142          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

and create additional headroom to ensure that the Group was more conservatively financed. This financial planning benefited the Company in the year, with a significant positive effect on the Group's net profit and EPS.

On 16 February 2015, the Company announced a new US$825m financing facility which was made up of two elements, namely a US$350m facility which will be used to repay existing debt and for general corporate purposes reducing the Group's cost of capital in the current financial year, and a US$475m facility to facilitate NMC's next phase of growth by making phased acquisitions. This facility leaves the Company well financed to take advantage of improvements in global markets.

### DIVIDEND

As a result of the continued good performance and financial stability of the Company, your Board plans to submit a resolution to shareholders at the 2015 Annual General Meeting authorising payment of a cash dividend of 5.4 pence per share. For the third year running this is approximately 20% of profit after tax, within the range which the Board indicated at the time of the Company's IPO would be their dividend target.

### BOARD CHANGES

During the year there were a number of Board changes. H.E. Saeed Bin Butti and Mr Khalifa Bin Butti, two of the Company's substantial shareholders, stepped down from the Board in February 2014 and March 2014 respectively. Both H.E. Saeed and Khalifa were integral to the Company's growth plan and its successful IPO in London in April 2012. As previously reported, NMC Health plc, as a result of this flotation, became the first UAE business to list on the premium segment of the London Stock Exchange. Their leadership and focus during the Company's first two years of growth on the public markets was invaluable.

The year also saw a number of additions to the Board. Mr Abdulrahman Basaddiq joined the Board as a Non-Executive Director in February 2014 and Dr Ayesha Abdullah, Mrs Salma Hareb, Dr Nandini Tandon, as Independent Non-Executive Directors, and Mr Keyur Nagori, as a Non-Executive Director, in June 2014. In addition, Mr Prasanth Manghat and Mr Binay Shetty were promoted from the Senior Management Team to become Executive Directors, also in June 2014.

The structure of your Board has changed significantly in 2014. Your new Board now has:

- A wider cultural and ethnic mix benefitting Board discussions given the Company's listing in the UK and operations in the UAE;
- Significant female representation (33%) on the Board;
- More than half of its number resident in the UAE, the Company's home market; and
- A wide range of skills and experience, including more than half of the Board having significant operational or regulatory experience of healthcare services from different parts of the world.

Your Board is diverse in terms of experience, gender and culture and well-structured to oversee the achievement of the Company's strategic objectives.

### GOVERNANCE

The changes to the Board have also resulted in a restructure and diversification of the Company's Board Committees. Each of the Board Committees have retained the same Chair Person, but now have a different membership structure to the other committees benefiting the



# Brightpoint Royal Women's Hospital

www.brightpoint.ae

## 1st
Private mother and child hospital in Abu Dhabi

## July 2014
First open to patients

Overview

# CHAIRMAN'S 2014 REPORT TO SHAREHOLDERS CONTINUED

work, focus and oversight of each Committee and therefore the Company's overall governance structure.

Work has continued during the year on the establishment of integrated IT systems; a new Hospital Information System and the Group's new Enterprise Resources Planning ('ERP') financial system. The implementation of new IT infrastructure is always a significant challenge to all organisations, and the Company's experience in this respect is no different to that of others. The implementation of both new systems will continue on a phased basis to ensure that the new IT infrastructure is solid and relevant for the Company's future. The HIS became operational in our new facilities in 2014 but implementation in the existing facilities is planned over the next two financial years; the ERP system implementation will be completed in 2015. Alongside new IT systems and controls, during the phasing in period the core internal controls under which the Group has been operating successfully for many years, will remain in place as an important part of the Group's governance structure.

## MANAGEMENT CHANGES

The Company announced a number of senior management changes in October 2014. The Board would like to express their appreciation to Binay Shetty for the very significant contribution that he has made to NMC Health in his Executive role over many years. We wish him well in his new role and are delighted that he remains on the Board as a Non-Executive Director.

The Board are also delighted that Prasanth Manghat and Suresh Krishnamoorthy have taken up positions as Deputy Chief Executive Officer and Chief Financial Officer respectively. We wish them well in their new roles during the Company's next phase of growth.

Finally, subsequent to the year end, the Board appointed Dr B.R. Shetty to an enhanced role of Executive Vice Chairman and Chief Executive Officer. This new role reflects Dr Shetty's position as a founder of the Group and his key role in the formulation of the Group's strategic thinking and its operational performance.

## EXECUTIVE REMUNERATION

As the Group develops, the Remuneration Committee, under the chairmanship of Lord Clanwilliam, has continued to roll out its intended Executive remuneration structure; this is now complete within the parameters of the Directors' Remuneration Policy which shareholders approved at the 2014 Annual General Meeting with 97.5% of votes in favour of the proposals. Long Term Incentive Plan awards were granted to the Executive Directors and Senior Management Team for the first time in 2014 which, alongside the existing Short Term Incentive Plan, focus and incentivise management on the long term value enhancement of your Company and align them with any value change experienced by shareholders in the Company over the longer term.

## MANAGEMENT AND STAFF

The Company's human capital continues to be vital to the success of your Company, particularly during a period of significant change and growth. Dr Shetty, his management team and staff across the Group have worked extremely hard through the year to achieve strong results on your behalf. The Board greatly appreciates the continued commitment, energy and goodwill which they have shown in 2014 and would like to thank them all for their respective contributions.

## OUTLOOK

Economic conditions, and the anticipated growth in private healthcare, in the UAE continue to be favourable and your Board continues to view the outlook for the Group with confidence and enthusiasm.

H.J. Mark Tompkins
*Non-Executive Chairman*

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          10 of 142

| Overview | Group Strategic Report | Governance | Financial Statements |
|---|---|---|---|

# FINANCIAL SUMMARY AND HIGHLIGHTS

## Financial Summary

| US$m (unless stated) | FY2014 | FY2013 | Growth |
|---|---|---|---|
| **Group** | | | |
| Revenue | 643.9 | 550.9 | 16.9% |
| Gross profit | 209.2 | 185.5 | 12.8% |
| Gross profit margin | 32.5% | 33.7% | -119bps |
| EBITDA | 102.5 | 92.9 | 10.2% |
| EBITDA margin | 15.9% | 16.9% | -96bps |
| Net Profit | 77.5 | 69.1 | 12.1% |
| Net Profit margin | 12.0% | 12.6% | -51bps |
| Earnings per share (US$) | 0.412 | 0.367 | 12.3% |
| Dividend per share (GBP pence) | 5.4 | 4.4 | 22.7% |
| Net cash from operating activities | 85.7 | 85.1 | 0.7% |
| Total Capital Expenditure additions in the year | 112.3 | 82.7 | 35.8% |
| Capital Expenditure relating to four capital projects announced at IPO | 86.4 | 72.2 | 19.7% |
| Total cash and short term bank deposits | 263.2 | 268.7 | -2.1% |
| Total debt | 376.1 | 332.4 | 13.2% |
| Net Debt | 113.0 | 63.7 | 77.3% |
| **Divisional performances** | | | |
| Healthcare revenue | 332.2 | 289.3 | 14.8% |
| Healthcare EBITDA | 88.2 | 81.7 | 8.0% |
| Healthcare EBITDA margin | 26.6% | 28.2% | -168bps |
| Healthcare net profit | 73.1 | 74.3 | -1.7% |
| Healthcare net profit margin | 22.0% | 25.7% | -14.4% |
| Healthcare occupancy | 71.3% | 64.7% | 660bps |
| Distribution revenue | 338.9 | 300.2 | 12.9% |
| Distribution EBITDA | 34.1 | 29.9 | 14.1% |
| Distribution EBITDA margin | 10.1% | 10.0% | 11bps |
| Distribution net profit | 28.4 | 27.8 | 2.0% |
| Distribution net profit margin | 8.4% | 9.3% | -89bps |

Notes:
- Net Profit is a non-IFRS term which is the same as profit after tax as shown in the Consolidated Statement of Comprehensive Income.
- EBITDA is the same as Profit from operations before depreciation and impairment as shown in the Consolidated Statement of Comprehensive Income.
- Net cash from operating activities is equivalent to Net cash from operating activities as shown in the Consolidated Statement of Cash Flows.
- Total cash is represented by short term bank deposits and bank balances and cash.
- Total debt is a non-IFRS line item and includes term loans and bank overdrafts and other short term borrowings shown on the face of the Consolidated Statement of Financial Position.
- Net Debt is a non-IFRS line item and is total cash less total debt, both as defined above.

### FY2014 FINANCIAL HIGHLIGHTS
- Group revenues increased by 16.9% to US$643.9m
- Healthcare division revenue increased by 14.8% to US$332.2m[1]
- Distribution division revenue grew by 12.9% to US$338.9m[2]
- EBITDA increased by 10.2% to US$102.5m
- EBITDA margin declined by 96bps to 15.9%
- Net profits increased by 12.1% to US$77.5m
- Net profit margins declined by 51bps to 12.0%
- Earnings per share (EPS) amounted to US$0.412
- Proposed dividend pay-out ratio is maintained at 20% of profit after tax, amounting to GBP[3] 5.4 pence per share

- Total capital expenditure for the year reached US$112.3m, 35.8% higher compared to FY2013[4]
- Net debt reached US$113.0m as the Group continued to advance its on-going healthcare projects

### FY2014 BUSINESS HIGHLIGHTS - A YEAR ON YEAR (YOY) COMPARISON
- Healthcare division's patients increased by 15.6% to 2.4m
- Revenue per patient from healthcare services increased by 2.6% to reach US$114.5
- Hospital bed occupancy rates reached 71.3%, an improvement of 660bps, despite a 10.0% increase in operational beds to 287
- Doctors' employed reached 603, an increase of 19.9%

- Distribution division increased its product portfolio by 17.4% to 83,635 stock keeping units (SKU)
- Sales and marketing personnel at the Distribution division grew 6.1% to 642
- NMC General Hospital in Dubai Investment Park and Brightpoint Royal Women's Hospital in Abu Dhabi commenced operations in July 2014
- NMC Medical Centre in Al Ain commenced operations in Dec 2014
- Dubai Emirate rolled out the first phase of mandatory healthcare insurance in October 2014

[1] Before inter-company elimination
[2] Before inter-company elimination
[3] British Pound
[4] Includes US$112.3m on capital projects



Exhibit 8 to B.R. Shetty's Request for Judicial Notice          12 of 142

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

# Group Strategic Report

**In this section:**
10  Executive Vice Chairman & CEO Review
12  Our Business Model
14  Our Strategy
18  Business Overview
24  Financial Review
26  Principal Risks and Uncertainties
27  Corporate Social Responsibility

## 2014 AT A GLANCE

### REVENUE (US$M) AND ANNUAL GROWTH



- NMC Health reports revenues of US$643.9m in 2014
- Top-line growth was 16.9% in 2014 year on year
- Both the healthcare and distribution divisions delivered double digit growth

### EBITDA (US$M) AND MARGIN



- EBITDA reached US$102.5m in 2014, exceeding 2013 by 10.2%
- EBITDA margins dropped to 15.9% mainly as a result of the initial financial impact from the Group's three new healthcare assets
- Depending on a number of variables, it takes new healthcare assets between 12-24 months to reach EBITDA breakeven
- NMC opened two hospitals in July 2014 and a medical centre in December 2014

### SHAREHOLDERS EQUITY (US$M)



- NMC shareholders equity increased by 16.3% year on year to close 2014 at US$449m

### NET DEBT (US$M)



- Net debt as of 2014 year-end amounted to US$113.0m
- Capital expenditure during the year reached US$112.3m

### NET PROFIT (US$M) AND MARGIN



- Net profit reached US$77.5m, representing a year on year increase of 12.1%
- Net profit margin (NPM) declined to 12.0% from 12.6% in 2013, mainly due to the introduction of three new healthcare assets during the second half of 2014

### NET WORKING CAPITAL AS % OF SALES



- More effective management of working capital reduced the net working capital to sales ratio by 142bps in FY2014.

### ADJUSTED OPERATING CASH FLOW (US$M)



- Group adjusted operating cash flow reached US$81.8m in 2014, slightly below last year on account of the increased working capital levels in-line with the increased business. Adjusted operating cash excludes changes in amounts due from/to related parties

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          13 of 142          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

Group Strategic Report

# EXECUTIVE VICE CHAIRMAN & CEO REVIEW
## STRONG PERFORMANCE CONTINUED IN 2014

**We continued to make progress on the roll-out of new corporate and operations management tools to further enhance our planning and operational effectiveness for our growing company.**



The past year proved to be a major milestone in our nearly forty year old UAE operations with progress at several of our capital developments. I am particularly proud of the completion and opening of three healthcare assets; the Brightpoint Royal Women's Hospital in Abu Dhabi, NMC General Hospital in Dubai Investment Park (DIP) and NMC Medical Centre in Al Ain. With these accomplishments we have increased our licensed bed capacity by 52% in the UAE, a strong foundation for our long-term growth prospects in our rapidly expanding country and a determined contribution from the NMC team towards the UAE's vision of better availability and quality of healthcare for all its residents.

With Brightpoint Royal Women's Hospital, we introduced the first private sector women's hospital in Abu Dhabi - focused on gynaecology and obstetrics specialities with a very strong patient demand outpacing expansion of specialist capacity. Opening the NMC General Hospital in DIP, was a pioneering healthcare investment in the area - with NMC being one of the first and largest investors in this strategic area of the Dubai market. The DIP hospital is located within the investment park surrounded by large corporates and growing residential areas and a short drive from the new Al Maktoum Airport, Jebel Ali Port and the Dubai Expo area.

The Al Ain Medical Centre is a welcome addition to our capabilities in the strongly performing Al Ain market. It will expand our primary care services to a new community and act as a referral point back to the NMC Specialty Hospital in Al Ain City for secondary and tertiary care.

The Group's healthcare division now manages and operates a total of 11 healthcare services assets with 11 in-hospital pharmacies including, the 205 bed Sheikh Khalifa General Hospital in Umm Al Quwain which is operated by NMC on behalf of the UAE government in return for an annual management fee. We also made substantial progress on our largest project, the 250 bed NMC Super Specialty Hospital in the Khalifa City suburb of Abu Dhabi, with the completion of the building and external façade followed by commencement of work on the internal fit-out. We expect construction at this NMC flagship asset to be completed and commence

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          14 of 142          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

Overview

Group
Strategic Report

Governance

Financial
Statements

operations towards the end of H1 2015, subject to receiving the required regulatory approvals.

NMC Health received almost 2.4m patients in 2014, a year on year growth of 15.6%. Group hospital occupancy increased by 660bps to 71.3%. We continued to strengthen our human resources with the addition of 100 new doctors in the past year.

In the Distribution division we made strong progress in terms of increasing the availability of our products across the fast expanding UAE retail market through our strengthened product portfolio and accomplished wholesale operations with the associated sourcing and logistics capabilities. The number of Stock Keeping Units (SKU's) reached 83,635 in 2014, an increase of 17.4% compared to 2013. Meanwhile, we continued to strengthen the division with the recruitment of additional staff to grow this successful team of professionals. Divisional staff expansion during the period was 4.2%, with a particular focus on new personnel within our front-line sales, promotion and marketing capabilities.

We continued to make progress on the roll-out of new corporate and operations management tools to further enhance our planning and operational effectiveness for our growing company. Our new Hospital Information System (HIS) was implemented at the recently opened hospitals; however, the implementation across operational assets with legacy systems is more

challenging and will be phased over the next two years to ensure a tested and seamless transition. The Enterprise Resource Planning (ERP) implementation is on-going and we expect implementation to be completed in 2015.

Group financial performance in 2014 was good, with revenue growth amounting to 16.9% and EBITDA appreciating by 10.2% despite the initial negative earning impact by the new healthcare asset additions. Revenues reached US$643.9m with an EBITDA of US$102.5m in 2014. We expect a considerable growth in both top-line and EBITDA contribution from Brightpoint Royal Women's Hospital and NMC General Hospital in DIP in future periods. Excluding the impact from the new assets, the group EBITDA would have been US$108.2m.

On 16 February 2015 we announced a new US$825m financing facility had been secured by NMC which will serve to improve our funding efficiency and strategic capabilities. This loan is comprised of two tranches, i) a US$350m facility used to replace existing debt with this lower cost loan, leading to expected annual savings of US$2.75-3.75m, ii) a US$475m delayed draw acquisition facility that will further enhance our ability to complement NMC's growth through inorganic opportunities.

During 2014 we also announced management changes effective from 1 January 2015. Mr Binay Shetty, Chief Operating Officer (COO), decided to leave

his executive role at NMC Health to pursue a role within the Shetty Family Investment Office. Binay has played a major role in advancing the Group's operations and he was instrumental in the success of our expansion program including the above mentioned hospitals. He will stay on NMC Health's Board, as a Non-Executive Director. Mr Prasanth Manghat was promoted from Chief Financial Officer (CFO) to the new role of Deputy CEO. His new role will include the responsibilities previously held by the COO and working closely with me on strategy and operations. Prasanth has been working within NMC related businesses for nearly 12 years and he was a key driving force behind our achievements to date and the successful initial public offering of NMC. Mr Suresh Krishnamoorthy was promoted from Deputy CFO to become the new CFO.

I would like to thank our shareholders and my fellow members of the Board of Directors for their continued support throughout the past year.

Finally, NMC Health's successful journey of growth and prosperity would not have been possible without the vision and drive of the founders and leaders of the United Arab Emirates (UAE). On behalf of the Board and management, I would like to extend our gratitude to the UAE.

Dr B.R. Shetty

Executive Vice Chairman and CEO



NMC HOSPITAL
Dubai Investment Park

60
Beds

US$96
Revenue per patient

Group Strategic Report

# OUR BUSINESS MODEL

NMC Health plc is the leading private sector healthcare operator in the United Arab Emirates, with a nationwide network of hospitals and operations founded in 1975. The group also operates a UAE wide product distribution and wholesale business.



HEALTHCARE SERVICES

nmc health

PRODUCT DISTRIBUTION

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          16 of 142          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

Overview

Group
Strategic Report

Governance

Financial
Statements

## HEALTHCARE SERVICES

Through our healthcare services division we provide people in the UAE with a range of high quality outpatient and inpatient services across our facilities. Our facilities range from the larger specialty hospitals to medical centres. In addition, we have retail pharmacies mainly selling pharmaceuticals prescribed by our doctors to our patients either within, or in the immediate vicinity of, our healthcare services facilities. Our comprehensive care approach maximises patient convenience and increases revenue contribution to our business.

While we serve both insured and self-paying patients, the overwhelming majority of our healthcare division's revenue is generated through insured patients. In return for the services rendered to insured patients, we submit claims to insurance companies to collect the remainder of our fees (usually insured patients have some co-pay element, which is paid directly when services are delivered to them at our facilities).

Pricing of our healthcare services is typically negotiated on an annual basis with the insurance companies we work with and may differ between the various insurance plans offered in the market. In contrast, prices of the majority of pharmaceutical products sold in our pharmacies are regulated and set by the UAE Ministry of Health.

NMC Hospitals are currently covered by the majority of the approximately 40 insurance companies operating in the UAE, including the largest market participants. These companies have either a direct relationship with us or through the 13 Third Party Administrators (TPAs) who currently provide private medical insurance into the Abu Dhabi market.

Our Healthcare division also provides operational and management services to third party owned healthcare assets. In return for our services, we receive a contracted management fee by the asset owner. Typically the fee received is partially tied to a set of pre-agreed performance metrics incorporating either qualitative and/or quantitative operational targets. We currently have one management contract with the UAE Ministry of Presidential Affairs pertaining to a general hospital in Umm al Quwain in the Northern Emirates.

## PRODUCT DISTRIBUTION AND WHOLESALE

NMC's Distribution Division is now one of the largest in the UAE and it offers products across several segments including FMCG[5], Pharmaceuticals, Scientific Equipment and Food.

NMC counts among its clients UAE Government entities, the largest UAE retailers, pharmacies and hospital operators. We supply our customers with a portfolio of globally and locally established brands and products with end-user demand in the UAE. We ensure our customers receive quality products in a timely manner with the required support services.

Our distribution capabilities are supported by a network of strategically located warehouses and a fleet of vehicles ensuring timely delivery to our customers across the country. Products are overwhelmingly sold on credit, with payments collected based on agreed terms. Our pricing of these products includes a mark-up over the product cost to generate a profit and to cover import costs and duties, registration administration and fees, distribution expenses, credit costs and, in certain cases, marketing costs. Pharmaceuticals are the only segment where pricing is widely regulated by the UAE Ministry of Health.

Only registered domestic distributors, a locally established company like NMC, are entitled by customs authorities to import products into the country. Principals (suppliers) contract NMC as their distributor to gain access to the UAE market through a reputable partner with a long track-record, established distribution channels and infrastructure and strong financial standing. Every individual brand and product has to go through an approval and registration process with local authorities before being allowed to be sold in the country. NMC facilitates this process and ensures local requirements are met. The majority of agreements with our Principals are on exclusive basis. All agreements are registered with the government.

NMC procurement is on a principal basis. In the majority of cases, NMC takes the inventory and collection risk of the product that it buys and sells. Acting as a Principal rather than an agent enhances NMC's margins at the expense of increasing the Group's risk profile. Our agreements are almost exclusively operated on a credit basis, with the number credit days agreed with our Principals.

5 Fast moving consumer goods

Group Strategic Report

# OUR STRATEGY

Over the past 40 years we have grown from being a pharmacy and clinic combined in a very small space for the service of our patients, to be the largest private healthcare group and one of the leading product distribution and wholesale traders in our home market of the UAE.

The UAE and the gulf region as a whole, is one of the most attractive healthcare markets in the world for investments in high quality healthcare to the service of a growing and increasingly affluent population with unparalleled support from the leadership and local governments. Since our Initial Public Offering (IPO) in 2012 we have committed over US$320m to grow our network of healthcare assets and bring our services and capabilities closer to a growing number of the people of the UAE and eventually the region.

In July 2014, we proudly entered into a new phase of growth with the addition of two hospitals to our growing portfolio of six. We start the 2015 financial year with a total of 470 licensed beds - a year on year growth of 52% in bed capacity. The hard work in recent years to bring this expansion to market and to the service of our country, people, patients and shareholders - has been tremendous. This dedication continues to manifest itself through the commitment to open our largest hospital in H1 2015 in Abu Dhabi - the 250 bed NMC Khalifa City Super Specialty Hospital, bringing the total licensed bed capacity available to the Group to 720 beds later this year. We also continue to successfully operate and manage the 205 bed Sheikh Khalifa General Hospital in Umm Al Quwain on behalf of the UAE government. In tandem with our hospital developments, we grew our network of day surgeries and medical centres to four from only one at the time of our IPO in 2012. The most recent addition was the medical centre in Al Ain's industrial area which opened in December 2014.

Despite large investments by both the public and private sectors over the past 40 years in the local and regional healthcare infrastructure, the region, which has one of the fastest extended rates of population growth in the world, mainly due to the influx of expatriates, has considerable opportunities for further investments. At NMC Health we are committed to continue exploring organic and inorganic investment opportunities. While our priority is to expand within the UAE, we are also increasingly interested in expanding outside our current home market and into the wider gulf region by leveraging on our growing platform, experience and funding capabilities. NMC may also bolster its participation in local and regional growth by targeting top-in-class institutions outside the gulf region deemed capable of supporting its regional strategic objectives with transferable specialist medical know-how, long track-record and regionally scalable business models.

The positive economics and demographics in the UAE and wider gulf region also serve as a favourable environment for growth in consumption and by extension in our strongly performing distribution and wholesale division. We continue to add new product ranges and brands to our line-up in key segments like FMCG, pharmaceutical and food. As of year-end 2014 we have 83,635 (+17.4% YoY) Stock keeping units (SKUs) in our portfolio (71,215 SKU's as of 31 December 2013), making NMC one of the leading distributors in the UAE. We see potential in the UAE and the gulf region for organic and inorganic growth of our operations and product portfolio. Our distribution division is well positioned with its extensive human capital capabilities, substantial logistical platform of strategically located warehouses and vehicle fleet, established track-record and financial standing.

## HEALTHCARE DIVISION

Since our IPO our strategic focus has been on advancing in the UAE through expanding our healthcare network and most specifically the core hubs, the hospitals, onto which we could eventually 'plug & play' additional medical centres and day surgeries and thus expand our addressable market further through relatively lower per asset capital expenditure. With the opening of the Brightpoint Royal Women's Hospital

Our hub-and-spoke model consists of primary to tertiary care facilities across the UAE:



- ⚫ Regional (UAE)
- ⚪ Local/City
- 🔵 Community

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          18 of 142          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

and the NMC General Hospital in DIP in July 2014 followed by the expected opening of the NMC Super Specialty Hospital in Khalifa City (Abu Dhabi) by the end of H1 2015 - we would have concluded our core organic investment program and delivered the largest and most challenging elements of our network. These core assets should serve as the platform for NMC's future growth.

Hence the key strategic objective behind NMC's organic expansion is to build an inter-connected, interacting and identifiable private healthcare network. The objective is to supply a continuously evolving and increasingly effective quality of care to our patients, in what remains a developing healthcare market with an overwhelmingly fragmented private sector dominated by single asset and mostly outpatient focused operators.

With all the key components of our core network expected to be in place by H1 2015, we see considerable opportunities to elevate the level and complexity of care available within the UAE and eventually the regional healthcare sector. Going into the next phase of growth in the Healthcare Division, the Group intends to expand both organically and via acquisitions to achieve the objectives of the updated Group Strategy, which include:

- Accelerate the establishment of Centres of Excellence in key specialties within its existing hospitals;
- Increase its participation in the rapidly growing medical tourism industry within the UAE by establishing its facilities as a destination of choice for medical tourists;
- Grow its medical specialty offering and clinic network within the UAE and maximising operational synergies in the region;
- Selectively establish a strategic presence outside the UAE via acquisitions of, or collaborations with, leading global medical institutions in order to further enhance and expand the technological know-how and medical expertise available across all of NMC's facilities; and
- Increase its footprint in Saudi Arabia and the broader Gulf Cooperation Council (GCC) region via organic initiatives and acquisitions.

### Centres of Excellence - Raising the bar

Outpatient services are by far the largest contributor to the UAE healthcare market by volume and total value. This is particularly evident in the private sector, which continues, with varying degrees of success to evolve from its primary care focused origins in the pre-mandatory insurance era, towards secondary, tertiary and to a lesser degree quaternary care. In general, the entry barriers to general outpatient services have always been lower than specialist inpatient services, which are by definition more complex and require even higher investments in both human capital and facilities.

Both specialist out and inpatient services, in the UAE, historically originated in government owned healthcare facilities. To date the public sector remains the largest provider, especially on the inpatient side. However, a key objective of the insurance reform is to encourage the private sector's increased participation

and investment in these areas to allow the level, quality and capacity of care in the UAE to be advanced even further through the joint contribution of the private and public sectors - to the ultimate benefit of the patient.

Along with our large investment program and the growing network of state-of-the-art healthcare facilities NMC offers today, we are also increasingly raising the level, quality and focus of our healthcare services - effectively seeking to advance our competitive advantage through offering better and more specialised services. To accumulate higher levels of clinical expertise and experience, our vision is to ensure that all service delivery is done around the specialties.

More secondary and tertiary care surgeries will contribute to higher inpatient revenues. Successfully operated centres of excellence will attract and retain highly qualified physicians and surgeons, by offering: patient concentration, higher number of surgeries and a highly qualified and experienced peer group as colleagues.

Our long term goal for each of the existing and prospective branded centres of excellence is to occupy the top slot in the UAE and eventually the gulf residents' minds for the particular service line. By developing our core competitive advantages in quality healthcare around branded and highly identifiable centres, we are also allowing for enhanced scalability of the respective centres of excellence across the UAE and the gulf region. This specialisation driven expansion of the service offering at NMC may also be enhanced and strengthened by acquisition of specialist entities and/or formation of partnerships with top-in-class international centres of excellence.

### Rebranding for the future

In 2014, NMC also undertook a rebranding exercise and now has a new logo, brand colours and brand guidelines. This exercise was undertaken with the objective of broadening the appeal of NMC among a wider section of the target audience, especially the Arab speaking residents and to an extent the gulf population, while at the same time not doing it at the cost of the NMC brand equity that has built up over the last four decades. The new brand guidelines have

The current centres of excellence include:

**Ophthalmology**



Centre for Advanced Eye Surgery

www.nmceyecare.ae

**Urology and Andrology**



Centre for Advanced Urology and Andrology

www.nmcurocare.ae

**Orthopaedics**



Centre for Advanced Orthopaedic, Spine and Joint Surgery

www.nmcorthocare.ae

**Cardiology**



Centre for Advanced Cardiac Sciences

www.heartcare.ae

**Surgery**



Centre for Advanced and Minimally Invasive Surgeries

www.nmcsurgery.ae

Group Strategic Report

# OUR STRATEGY
## CONTINUED

been well received and are currently being implemented across all our assets, outdoor signage, uniforms, digital assets and other collateral.

 

### Healthcare insurance reform – A key driver for growth

Abu Dhabi adopted mandatory healthcare insurance in 2007, leading to the coverage of nearly all of the Emirate's residents and rapidly expanding the healthcare market size with strong encouragement by the government for increased private sector participation in the provision of care. The results have been very positive for residents and the private sector which increased investments in capacity.

Dubai adopted a mandatory healthcare insurance law in 2013 and started the implementation and roll-out to the uninsured part of the population in Q4 2014. Based on Dubai Healthcare Authority's (DHA) communication, it is estimated that around 66% of the Emirate's around three million residents were uninsured before the implementation. By 2016 all Dubai residents should have healthcare insurance. This would imply that two million additional people stand to benefit from the mandatory medical insurance and that the number of healthcare insurance members in Dubai could triple over the coming years.

### LOW MEDICAL INSURANCE PENETRATION IN DUBAI AND NORTHERN EMIRATES

### MOST OF UAE POPULATION RESIDES IN DUBAI AND NORTHERN EMIRATES (M)



■ Mostly insured   ■ Mostly uninsured

### DUBAI INSURANCE PENETRATION



■ Insured 33%   ■ Uninsured 67%

Source: World Bank, DHA

Discussions are also ongoing at the authority level to eventually adopt mandatory insurance in Sharjah the third largest Emirate in the UAE, where NMC today operates a medical centre, and eventually in the rest of the UAE.

This sector reform will have an undeniably positive effect on the size of the UAE healthcare market by increasing domestic healthcare revenue pool. This step is expected to spur investments in healthcare assets and elevate the quality of care in the country to make the UAE a more competitive medical services destination in the region. With the extensive growth of our hub and spoke healthcare network across the UAE and our experience from the roll-out in Abu Dhabi in 2007 to date, we believe we are well positioned to compete for a share of this market growth.

In Dubai, NMC already operates an extensive network of three hospitals with a total of 170 beds and a separate day surgery. The 100 bed NMC Specialty Hospital in Al Nahda being the prime asset, around which we own a connected land plot with capacity to house an additional building with up to 100 bed capacity. In short, we have the capacity to reap the rewards of the upcoming stepped growth in the Dubai healthcare market through our sizeable and scalable operations.

We expect the growing medical insurance penetration and the associated growth in demand for locally delivered healthcare services to promote advancement in the clinical services within our centres of excellence to the benefit of all market segments.

### Healthcare division staff

One of the most critical success factors through the years has been our consistent recruitment ability, without which we would have been unable to meet the growing demand for healthcare services in the UAE. As mentioned in previous sections, the UAE's population growth has consistently been one of the highest in the world and, together with the stepped growth in per capita utilisation derived from healthcare insurance reform in Abu Dhabi and now commencing in Dubai, this has led to tremendous growth in demand.

Over the past year we have continued to execute our recruitment strategy by focusing on the hiring of skilled and highly experienced healthcare personnel. We have increasingly prioritised the hiring of specialists to meet both general demand growth and introduce more sub-specialties as we increase the sophistication of our service offering to the growing number of patients visiting the expanding NMC Health network of assets across the UAE.

The number of doctors employed by the Group increased to 603 as at 31 December 2014, a 19.9% increase year on year. The total number of nursing staff increased by 27.1% to reach 1,266 at 2014 year end.

### Select medical staff employed

### TOTAL DOCTORS AND ANNUAL GROWTH



■ Doctors   ■ Growth

Exhibit 8 to B.R. Shetty's Request for Judicial Notice     20 of 142     Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

## TOTAL NURSES AND ANNUAL GROWTH



Nurses: 824 (2012), 996 (2013), 1,266 (2014)
Growth: 6.6% (2012), 20.9% (2013), 27.1% (2014)

■ Nurses  ■ Growth

### Enterprise Resource Planning (ERP) - Advancing business management

NMC's pursuit of increased integration and efficiency in the use of our growing organisation's business resources made us determined to pursue the set-up of a best-in-class Enterprise Resource Planning (ERP) system - we believe that this is an instrumental step in the growth of our company and the strengthening of management and institutionalisation of information, knowledge and resource planning. This objective is important in the planning and implementation of strategic, operational and financial initiatives, especially now that NMC has almost completed most of the investment program announced during IPO. On completion of our IPO investment

program in 2015, the company's hospital bed capacity would have increased by around 132%.

It was reported in the 2013 Annual Report that the Company planned to implement a new financial IT system in the first half of 2014. Implementation of the new system was delayed following challenges in the integration and customisation of the modules. The company has put in place a new project management team and now expects the implementation of the new ERP system to be completed in 2015.

### DISTRIBUTION DIVISION STRATEGY

NMC Health's product distribution and wholesale business is one of the largest in the UAE in terms of product portfolio and sales. This portfolio of international and regional brands, sold mainly on exclusive basis by NMC to local retailers, has been built over the past 40 years across diverse product areas, including key segments such as FMCG, Pharmaceuticals and Scientific Equipment. Today NMC has 83,635 SKU's sold across the UAE through its over 1,800 divisional staff, six warehouses with a total of over 500,000 sq feet and 207 delivery vehicles. Around 98% of our SKU's are imported and sold exclusively in UAE by NMC to retailers.

This division has continued to perform well during the year on brand and product line expansions, positive macro environment and growth in the retail space across the UAE.

Our strategy in the distribution division continues to focus on investing in our people, logistical management capabilities and in existing and new relationships across the world with current and prospective principals. We aim to leverage on these assets within a market benefitting from strong economic and population growth coupled with high GDP per capita, growing consumption and rapidly expanding flow of tourists and last but not least the introduction of mandatory insurance with associated positive effect on pharmaceutical demand (previously in Abu Dhabi, starting now in Dubai and in the future it is likely that the rest of UAE will follow).

We also believe the business is well-placed to expand its product range beyond its traditional healthcare spectrum and potentially beyond the UAE and into the gulf region, which is also benefitting from high consumption growth supported by positive macro-economics. We are exploring potentially attractive organic and inorganic growth opportunities to accelerate growth in the Distribution division. A process of enhancing the division's management capabilities and structure has been initiated to ensure that it is optimised for the opportunities ahead.



THE NMC DISTRIBUTION VALUE CHAIN

01 IMPORT OF PRODUCTS FROM AROUND THE WORLD

02 FLEET OF DISTRIBUTION VEHICLES COVERING THE ENTIRE COUNTRY

03 500,000 SQFT OF WAREHOUSE SPACE

04 DISTRIBUTION TO: GROCERIES HYPERMARKETS SUPERMARKETS PHARMACIES PETROL STATIONS

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          21 of 142          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

Group Strategic Report

# BUSINESS OVERVIEW

### OPERATIONAL REVIEW

NMC Health's business spans across the UAE through its healthcare and distribution divisions. The Group reported consolidated revenues of US$643.9m in FY2014 (+16.9% YoY)) with approximately 49.5% (49.1% FY2013) coming from its healthcare business and 50.5% (50.9% FY2013) from the wholesale product distribution.

#### NMC Health Group revenues

##### REVENUE US$M AND ANNUAL GROWTH



| | Revenue | ● Growth |

##### 2014 REVENUE CONTRIBUTION



■ Distribution and Services 50%
■ Healthcare 50%

In contrast, the healthcare division accounted for 72% (73% FY2013) of Group EBITDA with the balance of 28% (27% FY2013) coming from the comparatively lower margin distribution business. With the expansion in NMC's healthcare network, healthcare revenue growth will continue to outpace the distribution division to eventually exceed its top-line contribution, however, the short-to-medium term effect of the new hospital openings will be negative on the divisional margin.

Consolidated group EBITDA reached US$102.5m with a year on year growth of 10.2%. The group EBITDA margin retreated to 15.9% and was down by 96bps year on year due to the initial negative impact from new hospital openings. If we adjust group revenue and EBITDA by excluding the impact from recent healthcare asset openings, EBITDA growth would be 15.6% and the margin 17.1% (FY2013 margin: 17.1%).

##### EBITDA US$M AND MARGIN



| | EBITDA | ● EBITDA margin |

##### 2014 EBITDA CONTRIBUTION



■ Distribution and Services 28%
■ Healthcare 72%

Depending on a number of variables, reaching EBITDA breakeven for the group's new healthcare assets is estimated to take:
- 12-18 months for medical centres and day surgeries
- 18-24 months for hospitals

### HEALTHCARE DIVISION

Our healthcare division operates in the major emirates and cities of the UAE including Abu Dhabi, Al Ain, Dubai, Sharjah and Umm Al Quwain. Together these Emirates and cities account for nearly 85% of UAE residents. We operate six hospitals, two day surgeries, two medical centres and eleven in-hospital pharmacies. In addition, the Group operates a seventh hospital on behalf of the UAE Ministry of Presidential Affairs, the 205 bed Sheikh Khalifa General Hospital in Umm Al Quwain, under an operations and management contract initiated in Q4 2012 with a five year duration.

This division reported revenues of US$332.2m in FY2014 (+14.8% YoY), including US$273.7m from healthcare services, US$52.8m from hospital pharmacies and US$5.7m from the operation and management of third-party healthcare assets.

#### Healthcare Revenue & Patients

##### HEALTHCARE REVENUE US$M AND YOY GROWTH



■ Revenue  ● Growth

##### PATIENTS ('000)



■ Total patients  ● Growth

Exhibit 8 to B.R. Shetty's Request for Judicial Notice        22 of 142        Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

| Overview | Group Strategic Report | Governance | Financial Statements |
|---|---|---|---|

A total of 2.4m patients visited our healthcare network in FY2014, an increase of 15.6% compared to FY2013.

The average revenue per patient from healthcare services amounted to US$114.5, 2.6% higher than FY2013 with growth derived from a combination of price increase and service mix. This figure was slightly subdued due to the initial out-patient only operations of Brightpoint Royal Women's Hospital and the NMC General Hospital in DIP. A further factor was the relative exhaustion of inpatient capacity at Abu Dhabi Specialty Hospital due to the near full occupancy at the facility.

We typically guide on full occupancy equivalent in the UAE of around 75%, Abu Dhabi Specialty reached 81% during 2014. We also highlight that NMC's occupancy calculation is based on overnight stay only, in other words, day patient surgery without overnight stay is not accounted for in the occupancy rates.

## Table with per asset indicators

| Detail | NMC Abu Dhabi | NMC Al Ain | B. Point | NMC Sp. Dubai | NMC Dubai | DIP | BR Med. | MBZC | AAMC | NMC Sharjah | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Established | 1975 | 2008 | 2014 | 2004 | 1999 | 2014 | 2011 | 2013 | 2014 | 1996 | N/A |
| Emirate | Abu Dhabi | Abu Dhabi | Abu Dhabi | Dubai | Dubai | Dubai | Dubai | Abu Dhabi | Abu Dhabi | Sharjah | N/A |
| City | Abu Dhabi | Al Ain | Abu Dhabi | Dubai | Dubai | Dubai | Dubai | Abu Dhabi | Al Ain | Sharjah | N/A |
| Location | City centre | City Centre | Muroor | Al Nahda | Deira | DIP | DHCC | MBZC | Saniya | City Centre | N/A |
| Owned/ Leased | Leased | Leased | Leased | Owned | Leased | Leased | Leased | Leased | Leased | Leased | N/A |
| Category | Specialty Hospital | Specialty Hospital | Specialty Hospital | Specialty Hospital | General Hospital | General Hospital | Day Surgery | Day Surgery | Day Surgery | Medical Centre | N/A |
| Accreditation | JCI | JCI | – | JCI | – | – | – | – | – | – | – |
| Revenue (USD '000) | 111,062 | 57,980 | 929 | 65,599 | 13,902 | 2,496 | 3,608 | 5,342 | 3 | 12,785 | 273,706 |
| Growth, YoY | 10.1% | 20.5% | N/A | 17.3% | 13.7% | N/A | 40.0% | 489.7% | N/A | 24.2% | 18.5% |
| Revenue/ patient | 109 | 121 | 122 | 175 | 65 | 96 | 262 | 65 | 99 | 74.9 | 115 |
| Growth, YoY | 1.3% | 3.2% | N/A | 6.5% | 4.7% | N/A | -2.5% | 36.3% | N/A | 11.0% | 2.6% |
| Capacity | | | | | | | | | | | |
| Licensed beds | 100 | 100 | N/A | 100 | 10 | N/A | N/A | N/A | N/A | N/A | 310 |
| Operational beds | 100 | 83 | N/A | 94 | 10 | N/A | N/A | N/A | N/A | N/A | 287 |
| Growth, YoY | 0% | 38% | N/A | 3% | 0% | N/A | N/A | N/A | N/A | N/A | 10.0% |
| Spare capacity (beds %) | 0% | 17% | N/A | 6% | 0% | N/A | N/A | N/A | N/A | N/A | 7.4% |
| Staff | 1,448 | 808 | 83 | 727 | 269 | 322 | 47 | 191 | 60 | 174 | 3,895 |
| Patients | | | | | | | | | | | |
| Inpatients | 21,620 | 10,380 | N/A | 10,096 | 1,348 | N/A | N/A | N/A | N/A | N/A | 43,444 |
| Outpatients | 996,653 | 470,685 | 7,636 | 365,492 | 213,384 | 26,044 | 13,760 | 82,372 | 27 | 170,727 | 2,346,780 |
| Total | 1,018,273 | 481,065 | 7,636 | 375,588 | 214,732 | 26,044 | 13,760 | 82,372 | 27 | 170,727 | 2,390,224 |
| Growth, YoY | 8.7% | 16.8% | N/A | 10.1% | 8.6% | N/A | 43.6% | 332.6% | N/A | 12.0% | 15.6% |
| Bed Occupancy | 81% | 69% | N/A | 66% | 45% | N/A | N/A | N/A | N/A | N/A | 71.3% |
| Change, YoY | 170bps | 876bps | N/A | 1166bps | 129bps | N/A | N/A | N/A | N/A | N/A | 660bps |

Note: Revenue per patient is based on contribution from our healthcare services, excluding the contribution from the operation & management contract on the Sheikh Khalifa Hospital in UAQ. It also excludes the contribution from four out of our eleven pharmacies, specifically those located around the hospitals rather than within them.

Exhibit 8 to B.R. Shetty's Request for Judicial Notice        23 of 142        Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

Group Strategic Report

# BUSINESS OVERVIEW
## CONTINUED

### Abu Dhabi Emirate

NMC treated a total of 1.59m patients in 2014 (+16.2% YoY) within the Abu Dhabi Emirate across its facilities in both Abu Dhabi City and Al Ain City. As of year-end 2014, the Group had a total licensed capacity of 300 hospital beds, a 50% increase year on year resulting from the addition of Brightpoint Royal Women's Hospital during the period.

1. **Abu Dhabi Specialty Hospital**
   Despite being the longest serving and most mature asset within our healthcare portfolio, Abu Dhabi Specialty Hospital had another strong year in 2014 - delivering relatively high growth in revenues, patients, occupancy and revenue per patient. This remains the largest patient recipient within the NMC network. The facility continues to provide a wide range of specialties and has Joint Commission International (JCI) accreditation for its service levels. It is located in the densely populated centre of Abu Dhabi City.

   Revenues reached US$111.1m, with a year on year growth of 10.1%, on 8.7% growth in patients compared to 2013 and with the total number of patients received rising to 1.02m. The revenue per patient increased by 1.3% to reach US$109, with the growth diluted by the

near full occupancy on the higher revenue inpatient services. The utilisation of this 100 bed facility, in terms of bed occupancy, amounted to 81% during the year compared to 79% in 2013.

2. **Al Ain Specialty Hospital**
   NMC Health inaugurated the Al Ain Specialty Hospital in the second largest city within the emirate of Abu Dhabi in 2008. This expansion was encouraged by the adoption of mandatory healthcare insurance in Abu Dhabi Emirate in the immediately preceding years. Al Ain Specialty Hospital had the JCI accreditation of its quality and service levels renewed for a further three year period in 2012.

   This hospital has 100 licensed beds, but started its inpatient operations in 2008 with 12 operational beds. As of FY2014 year end the number of operational beds had increased to 83 beds. Despite a 38% rise in operational beds YoY, occupancy increased by 876bps to 69% in 2014.

   Al Ain Specialty Hospital has continued to deliver strong growth since opening, with 2014 revenues reaching US$58.0m (+20.5% YoY) on 0.48m patients (+16.8% YoY). Revenue per patient amounted to US$121 (+3.2% YoY).

3. **Brightpoint Royal Women's Hospital**
   Brightpoint Royal Women's Hospital opened its doors to the first patients in July 2014 with the intention to gradually introduce its service capacity to market. We commenced operations with outpatient services and plan to open our inpatient services in Q1 2015. In the first few months of 'soft' start outpatient operations, our focus was on ensuring the best possible patient experience with priority to initial patient feedback as opposed to volume and business ramp-up. This patient feedback has overwhelmingly confirmed our strategic direction and positioning of this premium women's hospital, and as a result we have recently launched our marketing campaign and expect to commence a higher ramp-up in business and patient volumes from 2015 onwards.

   During the same period we accelerated the hiring of medical professionals with international experience to meet the anticipated growth in demand from the Abu Dhabi market, which currently has only one maternity hospital. Brightpoint is the first private sector women's hospital in the Emirate of Abu Dhabi. We also plan to seek JCI accreditation for Brightpoint and will commence preparations for this in 2015.



NMC Specialty Hospital
Abu Dhabi

100
Beds

US$109
Revenue per patient

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          24 of 142          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

Revenues from the initial months of operations reached US$0.93m on 7,636 out patients. The revenue per patient was US$122.

#### 4   Mohammad bin Zayed City Day Surgery

NMC Day Surgery in Mohammad bin Zayed City is strategically located on the peripheries of Abu Dhabi City close to both the Mussafah industrial area and the Khalifa City suburb. In addition to serving the growing population in its surroundings it is also a strong referral base to existing and upcoming NMC hospitals.

This day surgery opened in July 2013 and subsequently gradually ramped up its operations, with FY2014 being the first full year of operations. Revenues reached US$5.3m, with a year on year growth of 490%, on 333% growth in patients compared to 2013 and with the total number of patients received rising to 82,372. The revenue per patient increased by 36.3% to reach US$65.

#### 5   Al Ain Medical Centre

Al Ain Medical Centre opened in December 2014, in line with our guidance, and received a few patients from the surrounding areas in the city. The centre is located in the Sanaiya area in Al Ain City, an area with considerable concentration of businesses and industries with surrounding residential areas. This facility will serve the primary healthcare needs of people working and living in the area and act as a referral point for secondary and tertiary care needs to the NMC Al Ain Specialty Hospital located in the city centre.

While the revenue contribution of this facility was immaterial in 2014 given the opening in December, this facility is expected to deliver considerable growth in future periods on full year operations and as we ramp up patient flow to the facility from the surrounding area - where NMC is a highly recognised and reputable name in the minds of residents and the work force.

#### Dubai Emirate

NMC treated a total of 0.63m patients in 2014 (+14.9% YoY) across its facilities in the Dubai Emirate. As of year-end 2014, the Group had a total licensed capacity of 170 hospital beds, a 55% increase year on year resulting from the addition of NMC General Hospital in DIP in July 2014.

#### 6   Dubai Specialty Hospital

Opened in 2004, the 100 bed Dubai Specialty Hospital is located in the growing residential area of Al Nahda on the Dubai-Sharjah border, which enables the hospital to take advantage of referrals from NMC's assets in Dubai and our Medical Centre in Sharjah. This location has helped the hospital grow significantly since opening. The facility continues to provide a wide range of specialties. Dubai Specialty Hospital had its JCI accreditation for its quality and service levels renewed for a further three year period in 2012.

NMC owns a connected land plot to this hospital which could house a building with up to 100 bed additional capacity. Should the growth in demand in Dubai from the mandatory insurance adoption require us to add further capacity in the Emirate we are well positioned to organically scale-up our capacity with limited exposure to the sharp rise in real estate prices in recent years.

Revenues reached US$65.6m, with a year on year growth of 17.3%, on 10.1% growth in patients compared to 2013 and with the total number of patients received rising to 0.38m. The revenue per patient increased by 6.5% to reach US$175. The utilisation of this 100 bed facility, in terms of bed occupancy, amounted to 66% during the year compared to 54% in 2013.

#### 7   Dubai General Hospital

Dubai General Hospital was established in 1999, this 10 bed facility is located in the highly populated area of Deira. The hospital acts as a referral centre to the NMC Dubai Specialty Hospital which is a short distance away.

Revenues reached US$13.9m, with a year on year growth of 13.7%, on 8.6% growth in patients compared to 2013

and with the total number of patients received rising to 0.21m. The revenue per patient increased by 4.7% to reach US$65. The utilisation of this 10 bed facility, in terms of bed occupancy, amounted to 45% during the year compared to 44% in 2013.

#### 8   NMC General Hospital, DIP

NMC General Hospital in DIP opened in July 2014 and has a licensed bed capacity of 60 beds. Initial operations started with outpatient services. The first phase of inpatient services will commence in Q1 2015 and it consists of 30 beds out of the total available capacity in the facility. We plan to roll-out the rest of the bed capacity over future periods along with the growth in demand for this hospital's services from the surrounding area. We plan to seek JCI accreditation for NMC General Hospital, DIP, and will commence preparations for this in 2015.

This asset is located in a strategic region of Dubai within a key investment park with substantial presence of large companies, in the vicinity of Dubai's new Al Maktoum Airport, the Dubai Expo area not too far from Jebel Ali Port and Freezone.

Revenues from the initial months of operations reached US$2.5m on 26,044 patients. The revenue per patient was US$96.

#### 9   BR Medical Suites

BR Medical Suites is a high-end specialty day surgery, located in Dubai Healthcare City. It is specifically designed to attract highly experienced surgeons from around the world to carry out minimally invasive surgery and other highly specialised procedures with limited availability in the UAE. Increasingly over the past two years we have worked to diversify the business model of this facility to include NMC clinics and allow for improved utilisation of the facility. This has had a positive impact on both the top-line and patients figures; however, this growth is partially offset by a decline in revenue per patient. The Group acquired BR Medical Suites for a consideration of US$9m paid in cash on 1 July 2012.

Group Strategic Report

# BUSINESS OVERVIEW
## CONTINUED

Revenues reached US$3.6m, with a year on year growth of 40.0%, on 43.6% growth in patients compared to 2013 and with the total number of patients received rising to 13,760. The revenue per patient decreased by 2.5% to become US$262.

Unlike our healthcare assets, this day surgery is overwhelmingly focused on utilisation by external doctors. Consequently, its revenues are accounted for net of the external doctor's share.

### Sharjah Emirate
### 10. Sharjah Medical Centre
This multi specialist medical centre was opened in 1996 and is located on the busy commuter route along the Corniche in Sharjah. Since the facility was upgraded in 2010 from a clinic to a medical centre offering increased specialities such as radiology and minor procedures, revenue has increased significantly. The Group also benefits from referrals made from this facility to the Dubai Specialty Hospital. Revenues reached US$12.8m, with a year on year growth of 24.2%. The number of patients reached 0.17m, 12% higher than in 2013. The revenue per patient increased by 11% to reach US$75.

### Umm Al Quwain Emirate
### 11. Sheikh Khalifa General Hospital
Since Q4 2012 NMC Health has operated and managed on behalf of the UAE Ministry of Presidential Affairs this 205-bed hospital in Umm Al Quwain. The agreement is based on a five year contract in return for an annual management fee based on qualitative metrics. We believe this is the first such contract to manage a large Government healthcare facility awarded by a Government Department to a local UAE business. This demonstrates confidence in NMC's significant healthcare experience and capabilities.

### DISTRIBUTION DIVISION
NMC has over the past 40 years amassed one of the largest product portfolios in the UAE with 83,635 SKU's (+17.4% YoY). Our distribution division operates across the entire UAE through a network of five warehouses and three sales and marketing offices strategically located

in the major cities and a fleet of 207 vehicles ensuring timely distribution.

Division revenues reached US$338.9m in 2014, 12.9% higher than the preceding year. Meanwhile, EBITDA increased by 14.1% to US$34.1m with a resulting EBITDA margin of 10.1%.

**Distribution Division's revenue and EBITDA contribution**

**REVENUE US$M AND ANNUAL GROWTH**



■ Revenue   ■ Growth

**EBITDA US$M AND MARGIN**



■ EBITDA   ■ EBITDA margin

The FMCG segment (+11.7% year on year) remained the largest contributor to the distribution division, however, the fastest growth came from the Food and Catering (+32.4% year on year) and Education material (+29.3% year on year) segments. Pharmaceutical revenue increased by 15.7%, in contrast, Scientific Equipment sales declined by 7.3%.

**Distribution division segment contribution change**

**SEGMENT CONTRIBUTION 2014**



| | | | |
|---|---|---|---|
| ■ Scientific | 12.0% | ■ Education | 4.1% |
| ■ Re-Exports | 0.0% | ■ FMCG | 38.6% |
| ■ Pharma | 31.1% | ■ Food | 13.8% |
| ■ Veterinary | 0.4% | | |

**SEGMENT CONTRIBUTION 2013**



| | | | |
|---|---|---|---|
| ■ Scientific | 14.6% | ■ Education | 3.6% |
| ■ Re-Exports | 0.4% | ■ FMCG | 39.0% |
| ■ Pharma | 30.3% | ■ Food | 11.8% |
| ■ Veterinary | 0.4% | | |

Recent additions to our product portfolio include SuperMax, one of the leading disposable razor blade manufacturers in the world and a very well established brand in India, Everyuth fairness creams, Anchor toothpaste and Kuwait Danish Dairy (KDD) juices.

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          26 of 142          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA



## NMC Hospital
Deira, Dubai

### 10
Beds

### US$65
Revenue per patient

### IT

The Group has operated in recent years with legacy IT systems which, as a smaller private company, were appropriate for the needs of the Group. Following a review of the Group's IT requirements, the Board agreed capital investment in two new primary Group systems:

### A. Hospital Information System (HIS)

The current HIS system operating within NMC is a home-grown system which has been operating successfully over many years. Continuing developments in the regulatory framework in the UAE healthcare system, as well as additional monitoring and reporting requirements which the Group feels that it requires as the business grows, has resulted in a decision to implement a new HIS.

The Group has chosen to implement a third party system which is already operating successfully within the UAE regulatory structure. The new system has been implemented in the three new facilities which commenced operations during the year as part of the plan for a phased implementation before rolling out in the major facilities.

The new system requires customisation and integration of certain modules before being rolled out completely, which is expected to be completed by early 2016. The Company feels that the new system will be robust enough to deal with the demands of significant growth of the business.

### B. Enterprise Resources Planning (ERP) financial system

It was reported in the 2013 Annual Report that the Company planned to implement a new financial IT system in the first half of 2014. Implementation of the new system was delayed following challenges in the integration and customisation of the modules. The company has put in place a new project management team and now expects the implementation of the new ERP system to be completed in 2015.

The Company has been aware of the need to improve its IT infrastructure. The implementation of new IT systems always presents organisations with a significant challenge, and implementing two new primary systems within the Group, especially with two divergent business models, will be no different.

However, the management team and the Board realises the importance of implementing a new IT infrastructure as the Group prepares for significant growth in the coming years. This investment in new technology will help to reduce an element of manual intervention and improve reporting and therefore the company's internal control environment.

The company has spent a total amount of US$3.2m as of 31 December 2014 on the Enterprise Resources Planning (ERP) financial system and the Hospital Information System (HIS).

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          27 of 142          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

Group Strategic Report

# FINANCIAL REVIEW

NMC Health delivered a strong performance in 2014 at both the Group and divisional level. Consolidated Group Revenues increased from US$550.9m in FY2013 to US$643.9m in FY2014, a growth of 16.9%. After elimination of US$27.2m of intra-group trading revenue, Consolidated Group EBITDA improved from US$92.9m in FY2013 to US$102.5m in FY2014, a growth of 10.2%.

Group Net profit reached US$77.5m in FY2014, yielding Earnings per share (EPS) of US$0.412 compared to US$0.367 for the same period in 2013.

## HEALTHCARE DIVISION
Revenue in the Healthcare division increased from US$289.3m in FY2013 to US$332.2m in FY2014, a growth of 14.8%. EBITDA increased from US$81.7m in FY2013 to US$88.2m in FY2014, a growth of 8.0%. EBITDA margin declined from 28.2% in FY2013 to 26.6% in FY2014, as a result of the losses from the three new facilities opened during the year.

## DISTRIBUTION DIVISION
Within the Distribution division, revenues increased from US$300.2m in FY2013 to US$338.9m in FY2014, a growth of 12.9%. EBITDA increased from US$29.9m in FY2013 to US$34.1m in FY2014, a growth of 14.1%. EBITDA margin was at 10.1% in FY2014 (10.0% during FY2013).

## CAPITAL EXPENDITURE
Capital expenditure incurred for the year was US$112.3m (FY2013: US$82.7m). This encompassed US$96.0m on the Group's capital projects. The Group also incurred US$13.5m on equipment required across the existing operations.

The Company was able to capitalise certain expenses, in accordance with IFRS and the Company's accounting policies. We expect this to continue in relation to costs (for example lease costs) arising during the construction of future projects. Although pre-operating expenses were nil in the year to 31 December 2014, we expect a small level of pre-operating costs which will be expensed in the 2015 financial year as a result of the opening of new facilities.

As a result of the delays in the opening of certain facilities discussed in "Business overview", additional costs in respect of loan interest and leases have been capitalised. Had these facilities opened in line with original plan these costs would have been expensed. Other than these items the delays have not resulted in an increase in budgeted capital costs.

A table outlining original estimated capital expenditure and other budgeted costs for each of our current development projects is set out in table below.

Apart from the projects mentioned in the table below, the Group had spent US$9m on the acquisition of BR Medical Suites during 2012 as part of the projects announced during the IPO.

In addition to the above, the Group has spent US$7.7m from its internal funds towards the development of the Al Ain Medical Centre which commenced operations on 07 December 2014.

The company has spent a total amount of US$3.2m as of 31 December 2014 on the Enterprise Resources Planning (ERP) financial system and Hospital Information System (HIS).

The company has reviewed all significant capital expenditure projects including the delayed projects for impairments and have concluded that the projects have sufficient headroom and concluded that none of the assets are impaired.

## CASH
Net cash inflow from operating activities for the 2014 financial year was US$85.7m, compared with US$85.1m for the comparative period in 2013. This was mainly due to the improved performance of the Group and effective management of working capital, despite an increase in the revenues.

Including funds held on deposit, cash as at 31 December 2014 was at US$263.2m compared to US$268.7m at the end of FY2013. The company had allocated the funds raised through the IPO as well as through the JP Morgan syndicated loan against the capital cost of the five expansion projects announced during the IPO. As a result, together with positive operating cashflow, the Company is well financed to complete its capital expenditure program.

| (All US$m) | Budget | Actuals | | | |
|---|---|---|---|---|---|
| Project | Budgeted Capital Costs | Capital Costs | Capitalised Expenses[1] | Accounting adjustment for lease rentals | Total Capital Costs |
| Brightpoint Royal Women's Hospital | 70 | 75.8 | 6.1 | 25.5 | 107.4 |
| Khalifa City Specialty Hospital | 200 | 95.0 | 6.8 | – | 101.9 |
| Day Surgery Centre LLC | 15 | 10.4 | 1.1 | 2.8 | 14.3 |
| Dubai Investment Park LLC | 30 | 27.0 | 2.5 | 5.8 | 35.3 |
| Total | 315 | 208.2 | 16.5 | 34.1 | 258.9 |

Notes:
1:  Prior to commencement of development of the existing four capital projects, management had an expectation that there would be an element of expense incurred before the new facilities were opened which would be written off through the Income Statement. Following a review certain of these costs have been capitalised in line with the Company's accounting policies (for example lease rent paid and finance costs). The Group expects such costs will continue to be capitalised on these projects during the construction phase.
2:  The lease in respect of Brightpoint contains a rent free period as well as specified rent increases. In line with IFRS and the Company's accounting policies, the rental cost of the lease has been adjusted to appropriately account for these items over the length of the lease. Accounting policies stipulate that the total lease value for the full lease period is divided evenly over the years.

Exhibit 8 to B.R. Shetty's Request for Judicial Notice              28 of 142              Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

As expected, the Group had a net debt position of US$113.0m at 31 December 2014 compared with US$63.7m at 31 December 2013. As the Group continues with its capital project development program, and the Company's cash is committed to such projects, the level of net debt is expected to increase during FY2015.

### MOVEMENT IN NET DEBT

The movement in cash and the level of capital expenditure have had a significant effect on the movement in net debt during the 2014 financial year. A summary of the principal drivers is shown in the table below.

### WORKING CAPITAL

Working capital for our two operating business divisions is funded differently due to the nature of their business models. The Group is able to fund its working capital requirements for its Healthcare division from operational cash flow, and we do not expect this position to change in the 2015 financial year.

In relation to our Distribution division, the working capital requirement is dependent on a number of factors including the timing of receipt of debtors and the timing of payment of creditors as well as inventory flow during the year and the timing of re-imbursement of promotional expenses agreed with our Principals in relation to the sale and marketing of their products. The Distribution division requires external working capital facilities throughout the year, the level of which is dependent on business seasonality. These working capital facilities are arranged through a number of banking providers and in general terms the level of working capital required is between 30%-40% of the Group's total debt facilities

### LONG TERM DEBT FACILITIES

In 2013, the Group had raised a five year debt facility of up to US$300m through a syndicate of lenders led by J.P. Morgan Chase Bank, to refinance high interest bearing credit lines. A total of US$225m has been drawn down from this facility to date. The cost of funds for this facility is 3.0% over one month LIBOR.

The total debt of the Group, excluding accounts payable and accruals, was US$376.1m as at 31 December 2014 compared to US$332.4m as at 31 December 2013.

### FINANCE COSTS AND INCOME

Total finance costs for 2014 were US$14.4m compared to US$14.3m in 2013. This was mainly on account of the savings from the JP Morgan facility which carried a relatively lower finance charge as the LIBOR rate softened during the year. Apart from this the efficient utilization of working capital lines also contributed to the savings.

As part of the Group's capital expenditure programme, borrowing costs of US$4,068,000 (2013: US$4,886,000) net of finance income of US$NIL (2013: US$54,000) have been capitalised during the year. The rate used to determine the amount of borrowing costs eligible for capitalisation was 3.15% (2013: 3.40%) which is the effective rate of the borrowings used to finance the capital expenditure.

### DIVIDEND

The Board is proposing to continue with its policy of annual dividend payments of between 20% and 30% of profit after tax, outlined in the Company's IPO prospectus in 2012. The Board is therefore recommending that a final dividend of 5.4 pence per share be paid in cash in respect of the year ended 31 December 2014 (FY2013: 4.4 pence per share).

## Movement of Net Debt (amounts in US$m)

| Total Debt as at 1 January 2014 | 332.4 | Total Cash as at 1 January 2014 | 268.7 | Net Debt as at 1 January 2014 | 63.7 |
|---|---|---|---|---|---|
| Add: | | Add: | | | |
| Other Bank facilities & refinancing (Net Movement) | 93.7 | Operational cash inflow | 85.7 | | |
| | | Finance Income | 3.6 | | |
| | | Other Bank facilities & refinancing (Net Movement) | 93.7 | | |
| | | | 183.0 | | |
| Less: | | Less: | | | |
| JP Morgan Loan Repayments | 50.0 | JPM Loan Repayments | 50.0 | | |
| | | Additions & Disposals to Property | 111.2 | | |
| | | Finance Costs | 13.6 | | |
| | | Dividends Paid | 13.8 | | |
| | | | 188.6 | | |
| Total Debt as at 31 December 2014 | 376.1 | Total Cash as at 31 December 2014 | 263.1 | Net Debt as at 31 December 2014 | 113.0 |

Exhibit 8 to B.R. Shetty's Request for Judicial Notice            29 of 142            Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

Group Strategic Report

# PRINCIPAL RISKS AND UNCERTAINTIES

The Board consider the identification and mitigation of material risks and uncertainties faced by the Group as a key issue to be monitored at all levels of the organisation. The senior management team ensure that operational management consider risk as part of their day to day activities. This is considered to be particularly key for NMC as a Group working in a regulated environment.

In order to enhance the Group's risk management process, towards the end of 2014 the management team, assisted by an independent third party, PwC, undertook a review the Group's key risks alongside the macro-economic environment within which the Group operates to establish a Strategic Risk Register.

The Strategic Risk Register, which is the basis for the list of principal risks and uncertainties will be reviewed and maintained on an on-going basis by management, with the Board retaining oversight over the Register and the risk management process.

These risks, the potential effect of these risks on the Group and the mitigation of those risks is analysed in the following table. It should be noted that the order that these risks are expressed in the table do not reflect an order of magnitude as regards their potential impact on the Group.

| Risk Class | Description and Potential Impact | Current Mitigations |
|---|---|---|
| Investments | Delays in completion, or errors in assessing the impact, of new strategic expansion projects may result in: <br>• lower Return on Investment (ROI); <br>• lower revenue than expected; <br>• decreased margins and market share; <br>• potential for impairment of assets; <br>• reputational issue leading to difficulty in raising future finance. | • Board oversight in approving and monitoring strategic projects <br>• Project management controls <br>• Detailed market and business appraisal processes |
| Competition | Increased competition due to high private and public investments in the UAE healthcare sector and to associated investments coming from new entrants or existing player partnerships would lead to market share loss and potential reduction in access to future growth in UAE healthcare spend. | • Integrated Hub-Spoke model <br>• Growing healthcare network <br>• Government Partnership for managing Government hospitals <br>• Diversification of patient base |
| Financial | Potential inability to improve NMC's earnings due to medical related cost inflation and potential changes in insurance environment may directly impact the top line and profit margin. | • Diversification of the revenue streams <br>• Frequent monitoring of both fixed and variable cost <br>• Insurance sector is highly regulated <br>• Good relationships with insurance providers <br>• Strategy to increase patient volumes and focus on clinical specialisms |
| Macro-economic | Potential instability in revenue impairing cash flow and working capital health as a result of demographic and geopolitical factors both globally and in the region will significantly impact NMC revenue. | • UAE is a traditionally stable market <br>• Diverse business and revenue streams <br>• Long Term debt facilities and unutilised working capital limits <br>• Strong banking and supplier relationships |
| Human Capital | Shortage of medical staff due to talent acquisition challenges, scarcity in medical professionals and competitive market and any lack of depth and breadth in management structure during the period of significant growth could potentially lead to inability to deliver the Company's strategy and required healthcare services and potential loss of reputation. | • Partnership with education institutes <br>• Effective sourcing strategies and <br>• Recruitment campaigns <br>• Ongoing review of senior management resource. <br>• Competitive salary packages, patient growth and good working conditions act as a good retention tool |
| Technology and Innovation | Data Security breach or a lack of up to date integrated IT infrastructure may result in hindered operations and reputation damage. | • ISO 27001 certified framework for IT policies and controls. <br>• Strict measures towards clients' data and records <br>• Investment in new Hospital Information System and ERP financial system approved by the Board and implementation in progress |
| Compliance and Regulation | Failure to comply with multi regulatory and standards bodies' requirements could result in financial fines, inability to renew licences, as well as NMC reputation damage. | • Quality & Standards Department monitoring regulatory changes <br>• Partnership with government <br>• Good relationships with regulators and accrediting organisations <br>• Continuous focus on delivering high levels of service |
| Product and Services Risk | Failure to comply with internationally recognised clinical care and quality standards, clinical negligence, the mis-diagnosis of medical conditions or pharmaceuticals and the supply of unfit products across both divisions could result in regulatory sanction, licence removal, significant reputational damage, loss of patient and customer confidence and potential criminal proceedings. | • Doctors subject to rigorous licensing procedures which operate in the UAE <br>• Healthcare division is a regulated business and the Group's three principal hospitals have international quality standards accreditation <br>• Many aspects of the operation of the Distribution division, including the sale of pharmaceuticals, is regulated in the UAE <br>• Board oversight and integrated governance structure <br>• Medical malpractice insurance to cover any awards of financial damages |

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          30 of 142          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

# CORPORATE SOCIAL RESPONSIBILITY

Caring for the health of UAE's residents for nearly 40 years is an important responsibility that NMC takes very seriously. Equally important is our responsibility in utilizing the resources provided by the natural environment in a sustainable manner. Within this Corporate Social Responsibility report we focus on our responsibilities to both the environment and also the rights of individuals and the wider community with whom the Group comes into contact.

### ENVIRONMENTAL MATTERS
Protecting our Environment and using natural resources in a sustainable manner

We recognise the importance of environmental stewardship. The UAE is a country of extremes when it comes to natural resources. Being a country with a significant proportion of desert, there is a shortage of vegetation and water. However, there is a surplus of hydrocarbon resources. As a stakeholder in the long term future of the UAE, NMC believes it should be a steward of the UAE environment, achieving a balance between growth driven by energy consumption, while conserving resources that are scarce. Some of the initiatives undertaken by NMC towards the cause of a healthy environment are:

• Delivery vehicles in NMC's Distribution division have been equipped with an automated vehicle tracking system

to enable central despatch to track the whereabouts of the fleet of almost 200 vehicles. This will enable more efficient route planning, optimizing routes and times based on traffic patterns and thus help the Distribution division reduce delivery time to the benefit of customers, save fuel and minimize $CO_2$ emissions to the benefit of the company's expenses and the environment respectively. Regular maintenance of the transport fleet is also done to keep vehicle engines running efficiently and curtail $CO_2$ emissions.

• NMC purchases large volumes of medical consumables and pharmaceuticals including gloves, syringes, plastic bags, toilet rolls, tablets, syrups etc which come packed in cardboard cartons. Once the contents are unpacked, we are left with large quantities of these

cardboard boxes. NMC has put in place a collection and disposal facility for recycling and re-use of cartons.

• NMC is fully in compliance with the Environment, Health and Safety (EHS) requirements of Health Authority of Abu Dhabi (HAAD), Dubai Health Authority (DHA), Ministry of Health (MOH) and local city municipalities in whose jurisdictions we operate including for the safe disposal of medical waste.

• NMC provides housing facilities to a significant number of its employees, usually very close to their place of work. This is advantageous to both the employees, who save on commute time and cost and the company, since our specialist doctors who are on call can respond to emergency patients very quickly. This results in NMC boasting some of the best response



### NMC Specialty Hospital
Al Ain

## 100
Beds

## US$121
Revenue per patient

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          31 of 142          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

Group Strategic Report

# CORPORATE SOCIAL RESPONSIBILITY
## CONTINUED

time indicators, such as "Door to Balloon" time for primary angioplasty cases. Across our significant number of doctors, nurses and other clinicians, this adds up to a lot of fuel saved.

- Complementing the efforts in developing Environment, Health and Safety (EHS) policies and procedures, the quality teams in NMC Healthcare and NMC's Distribution division conduct regular audits, inspections and incident investigations, ensuring continuous improvement of the NMC EHS management system and processes. The Distribution division has received the EHS certification (ISO 14001:2004), EMS certification and OHSAS (Occupational Health & Safety Advisory Services) certification.

- The implementation of e-claims for health insurance has significantly reduced the amount of printed paper submitted in our monthly invoices to insurance paying companies. We also encourage recycling of paper used internally to reduce consumption of paper.

- NMC has undertaken a company-wide survey and study to evaluate its greenhouse gas emission and energy consumption during business processes. The findings of this study, which has been conducted with the assistance of an independent third party, PwC, is published below. Commencing in 2014, this exercise will be carried out annually along with the company's initiatives to become more efficient and a less intensive greenhouse gas emitter and energy consumer.

## Greenhouse Gas Emissions
As a UK listed company, the Group is required to report its greenhouse gas (GHG) emissions under the Companies Act 2006 (Strategic and Directors' Reports) Regulations 2013. For the first time during 2014, we have gathered data on the GHG emissions of NMC Health plc. As this is the first year that the Company has collected all of the relevant information on GHG emissions, there is no comparative data for the previous financial year. Our data is set out in the table below.

We have prepared our GHG emissions reporting in line with the GHG Protocol developed by the World Business Council for Sustainable Development, and additional guidance issued by the UK Government Department for Energy, Food and Rural Affairs ("DEFRA"). The emissions have been calculated using carbon conversion factors published by DECC/Defra in May 2014. A conversion factor for Sevoflurane was not available from DEFRA so an epa.govghg reporting figure was used. Conversion factors applicable to the UAE for Scope 2 have been obtained from the publication IEA $CO_2$ Emissions from Fuel Combustion (2012 edition).

We have applied an operational control approach in presenting our GHG emissions, and have reported on all material emission sources within scope 1 (combustion of fuel and operation of facilities) and scope 2 (purchased electricity and cooling). Gas and electricity usage information has been obtained from purchase invoices. Vehicle fuel usage is based upon purchase invoices. Where NMC is not directly billed for the consumption of power and therefore does not have full visibility the data, an estimation using average consumption from other similar sites has been applied.

The primary sources of our GHG emissions relate to the use of fuels in vehicles in our Distribution division and electricity consumption in our hospitals. We take our role as a corporate citizen seriously and therefore we continually review our operations and the impacts they have in the communities we operate. As we develop new facilities and re-design existing operations, we look for opportunities to increase the efficiency of the resources we consume and minimise the level of GHG emissions.

## RESPONSIBILITIES TO OUR EMPLOYEES, PATIENTS AND THE WIDER COMMUNITY
NMC Health was initiated with the motto of 'affordable quality healthcare for all' and has been delivering the best medical care to UAE residents since 1975. We adhere to ethical human rights policies at all levels including our employees, our patients and our wider stakeholders. NMC employs without discrimination and offers world class medical treatment across varied specialists accessible to over 90% of the UAE's population. We welcome patients from all segments of society, nationalities and income levels. We treat over two million patients a year across five cities and four Emirates of the UAE.

| For the 12 months to 31 December 2014 | | GHG emissions (tonnes $CO_2$e) | |
| --- | --- | --- | --- |
| | Healthcare | Distribution | Total |
| Scope 1 emissions (fuel use in generators and vehicles) | 3,687 | 4,634 | 8,321 |
| Scope 2 emissions (purchased power, including electricity and cooling) | 21,965 | 4,859 | 26,824 |
| Total GHG emissions | 25,652 | 9,493 | 35,145 |
| GHG emissions intensity | 9.6 (tonnes $CO_2$e/1,000 patient) | 25.0 (tonnes $CO_2$e/1,000 orders) | 0.05 (tonnes $CO_2$e/US$1,000) |

Scope 1 = direct emissions from fuel combustion and industrial processes. At these sites, this takes the form of gas for heating, diesel and petrol for the fleet and diesel for generators.
Scope 2 = indirect emissions from the generation of purchased electricity.

Exhibit 8 to B.R. Shetty's Request for Judicial Notice        32 of 142        Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

| Overview | Group Strategic Report | Governance | Financial Statements |
|---|---|---|---|

## RESPONSIBILITIES TO INDIVIDUALS

### Employees

NMC's employees are its greatest resource in serving its customers every day. Some of NMC's doctors have been with the organization for over three decades and have treated different generations from the same family. We consider our employees as ambassadors of NMC and take great care in providing them with a healthy, safe and positive work environment.

- Benefits offered to NMC employees include:
  - Free company accommodation or an accommodation allowance. Employees can stay in the vicinity of their workplace and also spend less time commuting. Our patients also benefit from arrangement as on-call doctors can be at the patient's side within minutes in case of an emergency.

- All female employees over the age of 40 are offered free mammogram screening at all our hospitals during the breast cancer awareness month every year.

- Employees are eligible for discounted rates for most services within our medical facilities, and can also take advantage of discounted prices for products that are distributed by the Distribution division.

- NMC Health celebrates community events and festivals and conducts cultural and social gatherings for its employees including Eid, Onam, Diwali and Christmas celebrations as well as commemoration of International Nurses' Day, NMC Annual Day and UAE National Day among many other such occasions.

- NMC runs a number of fitness events and sports clubs including cricket and volleyball teams.

- Diversity and discrimination
  - Our commitment to diversity and anti-discrimination policies are reflected in the profile of our employees. As at 31 December 2014, the Group had grown its employee base across all its business operations to over 6,000 employees. We employed individuals of 54 different nationalities. In addition 4% of our workforce is female and 59% male.

  - We have adopted an anti-discrimination policy to ensure that there is no discrimination or harassment of any person employed or seeking employment on the basis of their race, colour, religion, gender, age or citizenship.

  - A comparison of the split of employees by gender within the different business groups and different levels within the NMC Group is set out in the following table:

## Gender Comparision Study

| Facilities | Categories | Total | Gender Male | Female | Percentage Male | Female |
|---|---|---|---|---|---|---|
| | | | **31 December 2014** | | | |
| | | | Gender | | Percentage | |
| Board of Directors & Senior Management Team | NMC Board of Directors | 12 | 8 | 4 | 67% | 33% |
| | Senior Management Team | 6 | 5 | 1 | 80% | 20% |
| | Grand Total | 6,388 | 3,757 | 2,631 | 59% | 41% |
| Corporate Office | Total - Corporate Office | 186 | 143 | 43 | 77% | 23% |
| | Corporate Management* | 44 | 39 | 5 | 89% | 11% |
| | Corporate Staff | 142 | 104 | 38 | 73% | 27% |
| Reliance Infotech | Total - Reliance Infotech | 64 | 56 | 8 | 88% | 13% |
| | Reliance Management | 7 | 6 | 1 | 86% | 14% |
| | Reliance Staff | 57 | 50 | 7 | 88% | 12% |
| Healthcare | Total - Healthcare | 4,320 | 1,997 | 2,323 | 46% | 54% |
| | Healthcare Management | 45 | 12 | 33 | 27% | 73% |
| | Doctors | 603 | 394 | 209 | 65% | 35% |
| | Staff Nurse | 1,266 | 218 | 1,048 | 17% | 83% |
| | Technicians & Pharmacist | 547 | 277 | 270 | 51% | 49% |
| | Healthcare - Others | 1,859 | 1,096 | 763 | 59% | 41% |
| Distribution | Total - Distribution | 1,818 | 1,561 | 257 | 86% | 14% |
| | Distribution Management | 122 | 109 | 13 | 89% | 11% |
| | Distribution Staff | 1,696 | 1,452 | 244 | 86% | 14% |

* Corporate Management Staff includes six Senior Management Personnel, three of whom were Executive Directors also, but excludes Non-Executive Directors.

Group Strategic Report

# CORPORATE SOCIAL RESPONSIBILITY
CONTINUED

**PATIENTS**
**Patient base**
NMC is one of the few large private hospital chains in the UAE that accepts patients from virtually all health insurance plans, from top end plans for higher income groups to the lowest end plans meant for blue collar workers.

The UAE is a culturally diverse country with a significant expat resident population alongside Emirati nationals. As well as treating patients from all aspects of society, our patient profile confirms the wide breadth of our multi-cultural healthcare services offering.

**QUALITY OF CARE AND STANDARDS**
**Healthcare division**
NMC Healthcare is committed to providing quality healthcare and aspires to be regarded as the most respected and trusted provider of healthcare services by patients, families, doctors, nurses and other professional staff.

Our business is about improving the health and quality of life of individuals. The health and safety of our patients therefore is the core of our business.

Desired best clinical outcomes can only be possible through infrastructure of the highest standard and care processes that are standardized, reliable and free of errors. To this end, our clinical governance and quality framework, oversight and initiatives are designed to ensure the highest possible international healthcare standards on quality of care.

• **Clinical Governance and Quality**
Focus on quality healthcare is reflected in the robust clinical governance and oversight structures created for ensuring the delivery of safe and high quality of care consistently across the group facilities.

By focusing on a patient-centred team approach to improve quality of care, the Group has encouraged a culture

of quality that permeates every aspect of care and encourages the group's employees and clinical staff to continuously strive to improve patient care and patient safety.

Our clinical operations are monitored in a number of ways:

• **Internal oversight**
The Group Medical Director, along with the Quality Management Team and Hospital and Nursing Administrators, provide internal oversight and direction to these efforts at each facility. A number of important hospital committees are in place with multidisciplinary team membership to review and recommend suitable guidelines in respect of patient safety and quality, medication management, infection prevention and control, medical record documentation and facility management.

• **Independent oversight**
To ensure that there is independent oversight to the key area of clinical governance and safety, the Board created a Clinical Governance Committee which is constituted of Non-Executive Directors, the majority of whom are independent Non-Executive Directors. In addition to the internal and regulatory oversight which exists over our healthcare operations, we believe that this is a key additional control. Details of the work of the Clinical Governance Committee is set out on pages 59 to 60.

• **External oversight**
NMC Healthcare is a regulated business. Our facilities are regulated by the respective regulatory bodies in the UAE of:
- Ministry of Health
- Health Authority of Abu Dhabi
- Dubai Health Authority
- Dubai Healthcare City Authority

Our approach to delivering high quality care to our patients is also enhanced by our voluntary accreditation to quality standards bodies such as Joint Commission International. Our three Specialty Hospitals are JCI accredited and it is our intention to seek JCI accreditation for our new hospital facilities also.

• **Quality framework**
NMC Healthcare's quality framework is broadly based on the following key 'Principles' of:
- Patient safety
- Clinical excellence
- Current evidence based clinical practices, clinical pathways and protocols
- Clinical care monitoring
- Patient experience

The group has placed huge emphasis on patient safety as this is the basic tenet of healthcare quality.

• **International Patient safety goals**
Across the Group, facilities monitor the compliance with the International Patient Safety Standards such as correct patient identification, improved communication between care givers and preventing patient falls. Surgical safety standards to prevent wrong patient, wrong side and wrong surgery are diligently practised through right patient identification, surgical site marking and calling of "time out" before every procedure. The data on patient safety goals is regularly monitored and is consistently matching to best international benchmarks.

• **Medication errors**
As part of quality monitoring, important metrics on patient safety and quality are regularly monitored, reported, analyzed and improvements made. Standard protocols in terms of procurement, storage and usage are

| | % of NMC patients in 2014 |
|---|---|
| Emiratis | 7.7 |
| Indian sub-continent | 65.1 |
| Asia (excluding Indian sub-continent) | 4.5 |
| Arab Expats | 9.3 |
| Western Expats and others | 13.4 |

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          34 of 142          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

in place in terms of category of medications called "High Alert Medications", as any errors in this area can lead to serious patient harm. Globally medication errors are a regular concern across healthcare organizations. NMC monitors them and they are lower than the globally recorded rate of approximately 2 per 100 admissions. Staff are regularly trained and oriented to standard protocols and best practices in improving the medication safety such as the ordering, storage and administration of drugs.

- **Infection Prevention and Control**
Infection prevention and control is a very high priority area for quality as this could result in serious patient safety issues with adverse outcomes. This activity is monitored by a team of multidisciplinary medical, nursing and other professionals at each facility. Active surveillance is in place to identify any developing risks of infections. Stringent norms and monitoring tools are in place for environmental sanitation and sterilization/disinfection of equipment. Hand hygiene in the form of appropriate hand wash is proved to prevent the majority of the Hospital Acquired Infections (HAI). Regular education and training apart, hand hygiene guidelines are part of an

active infection control program. The result of all these is reflected in extremely low HAI rates across the group facilities. This ensures patients go home early after any surgery/ interventions and are free from any complications.

- **Clinical excellence**
Clinical excellence, through multidisciplinary team work and based on current evidence based clinical guidelines and pathways, is the foundation on which NMC has created its Healthcare provision. To reduce variation and increase standardization of care, clinical specialties of group facilities have adopted current evidence based clinical guidelines/ pathways, especially on the most commonly treated, complex and high risk procedures. This ensures patients are provided the most appropriate and safe care. The compliance with guidelines/pathways is audited quarterly and reported. The key performance indicators are regularly tracked, reported and monitored for improving clinical care and the outcomes of clinical care.

- **Patient experience**
Acknowledging that every patient visit is a high stake interaction which patients might perceive as a positive or negative experience, NMC consistently

reviews the patient experience gathered through satisfaction surveys, feedback and complaints. This feedback is used to analyze and improve performance.

- **The Way Forward**
Going forward, our JCI Accreditation will certainly be a high focus area for consistent compliance on standards. This apart, to improve the quality of care further, NMC believes in the building of positive and productive relationships with clinical professionals and in developing an increased culture of quality and safety. We believe that to be really successful, quality has to be more of a cultural legacy and transformational rather than just a transactional activity.

**Distribution division**
NMC's distribution division has a number of pharmaceutical medical representatives and medical equipment salespersons who remain in close contact with the doctors and bio-medical and administrative teams in hospitals, medical centres and pharmacies across the UAE. The business imports and distributes essential pharmaceuticals including controlled medicines, medical equipment and consumables of high quality and ensures they are readily available to healthcare institutions.



**NMC Super Specialty Hospital**
Khalifa City

**250**
Beds

**H1 2015**
Open

Exhibit 8 to B.R. Shetty's Request for Judicial Notice                35 of 142                Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

Group Strategic Report

# CORPORATE SOCIAL RESPONSIBILITY
## CONTINUED

The Group has sufficient controls and processes over the stocking and distribution of medicines. Its warehouses are all compliant with the relevant regulatory standards stipulated by the respective authorities.

### RESPONSIBILITIES TO COMMUNITY

NMC Health is always at the forefront of building a healthier society and a safer future for generations to come. Community outreach programmes are one of the ways we contribute towards enhancing the health of the society and the nation. Quality medical care is always a priority but we also undertake hundreds of community initiatives over the year including the NMC Health Index, blood donation camps, health awareness programs, free health screenings and hygiene workshops among others. The following section will provide a few examples of our Community Health Awareness program.

### NMC Health Index (April 2014)

NMC Healthcare launched the UAE's first health index (www.healthindex.ae) in April 2014. By evaluating the physical, social and emotional aspects of the overall health of UAE residents, NMC Health Index is aimed at strengthening NMC's efforts to create a healthier society.

NMC Health Index gives a deeper insight of the health conditions of the residents of UAE and raises awareness about the country's health issues. NMC Health Index was launched at a press conference held in Dubai Healthcare City with an audience comprising of over 50 journalists from varied media outlets, including major daily newspapers, TV channels, radio stations and online publications.

### World Heart Day (September 2014)

NMC Healthcare conducted one of the largest public awareness and education drives in the UAE on heart diseases and cardiac care where almost 15,000 people (a significant increase on 2013 levels) received free health check-ups comprising of Blood Pressure, Body Mass Index (BMI), Blood glucose and cholesterol measurements. The week-long initiative from 22 -29 September 2014 was held at selected NMC Healthcare hospitals and centres across Abu Dhabi, Dubai, Sharjah and Al Ain.

NMC Healthcare also launched a 'Dedicate a Beat' campaign which allowed users to dedicate-a-beat on social media. For each dedication, NMC Healthcare pledged to offer free heart check-ups to people in need.

NMC also sent its teams to private companies and government ministries to perform health checks for their employees.

### Blood Donation Camp

NMC Healthcare organised a blood donation camp at NMC's Distribution facilities in Al Ain on 2 August 2014 and Abu Dhabi on 3 August 2014 as part of the birthday celebrations of Dr B.R. Shetty - Executive Vice Chairman & CEO, NMC Health. NMC believes that there is no greater gift than the gift of life and such initiatives help in spreading awareness within the community on the importance of blood donation and how even a drop of blood can be instrumental in saving a life.

### HalaBaby

Brightpoint Royal Women's Hospital has initiated the HalaBaby programme for educating, coaching and training of pregnant women. It is aimed at preparing the patient for their pregnancy journey, health education, safety and understanding how to deal with unexpected events. The initiative also includes interactive counselling sessions and group education with an opportunity to interact with other families as well as advice on a healthy diet provided by a specialised nutritionist.

### BUSINESS ETHICS

The Group is proud of the values with which it conducts its business activities and encourages all of its employees to uphold these values and the highest levels of business ethics and personal integrity in all types of transactions and interactions. In this respect the Group has the following policies in place which all employees of the Group are subject to:

### Code of Business Conduct and Ethics

This Code sets out how employees should act in a range of different areas including:
- potential conflicts of interest;
- dealing with matters fairly as regards competitors, suppliers, customers and colleagues;
- maintaining confidentiality in all areas of the business;
- compliance with all laws and regulations; and
- the protection and proper use of Group assets.


▲ NMC Healthcare launched the UAE's first health index in April 2014
Source: The Gulf Today (23 April 2014)


▲ World Heart Day - NMC Healthcare sent teams to perform health checks for employees.
Source: Khaleej Times (23 September 2014)


▲ Blood Donation Camp - NMC Healthcare organised a blood donation camp at NMC's Distribution facilities.

### Anti-Bribery, Anti-Corruption, Gifts and Entertainment Policy

This Policy sets out the rules and obligations of employees in relation to:

- the offer or acceptance, or the engagement in any activity that gives the appearance of accepting or accepting, a bribe;
- the offer or acceptance of gifts or entertainment;
- prohibition of facilitation payments;
- any payment of charitable contributions or political donations; and
- the procedure for engaging any third parties.

All employees have been provided with a copy of these policies, as well as guidelines relating to them, and are aware of the significance of these policies to the Group. The Company also ran a series of workshops to explain these policies to employees in more detail. New employees receive training on all company policies and procedures as part of their induction program. A copy of the policies is included on the Company's employee intranet.

Given the principal activities of the Group, NMC Healthcare employees are issued with specific guidance in relation to attendance at pharmaceutical conferences and clinical training events. Employees of NMC's Distribution division are also specifically made aware, as part of their training activities, of the potential issues which may arise ethically in their dealings with the division's Principals and Customers.

The Group also has in place a Whistleblowing procedure which is made aware to all employees of the Group and is available on the Company's Employee intranet site.

The Group Strategic Report set out on pages 9 to 33 has been approved by the Board and is signed on its behalf by:

Dr B.R. Shetty
Executive Vice Chairman & CEO



## NMC Specialty Hospital
Dubai

### 100
Beds

### US$175
Revenue per patient

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          37 of 142          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA



| Overview | Group Strategic Report | Governance | Financial Statements |
|---|---|---|---|

# Governance

**In this section:**

36  Board of Directors
42  Senior Management
45  Directors' Report
49  Corporate Governance Report
67  Directors' Remuneration Report 2014

The Board is responsible for, and committed to, ensuring that procedures are in place so that good standards of corporate governance are operated at all levels in the Group in accordance with the guidance and principles set out in the UK Corporate Governance Code. In this report, the Board reviews its compliance against the UK Corporate Governance Code published by the Financial Reporting Council in September 2012 (the "Code"). The Code can be found on the Financial Reporting Council website, frc.org.uk.

The Board, supported by its Committees and the Senior Management team, have in place a governance and control environment which they believe is appropriate for the NMC Group and that would be expected of a FTSE 250 Company listed on the Premium Segment of the London Stock Exchange. The Board ensures that governance processes are documented and implemented and, where appropriate, continue to be improved. This Corporate Governance report describes how the Board has applied Corporate Governance principles during the 2014 financial year.

## COMPLIANCE WITH THE UK CORPORATE GOVERNANCE CODE

The Board has reviewed the Company's compliance against the provisions of the Code. There is only one set of Code provisions with which the Company has not complied with in 2014, and one code provision which was not complied with for a short period of the 2014 Financial Year. This is significantly less than when compared with non-compliance experienced in the first full year following the Company's IPO in April 2012. These provisions are stated and an explanation of non-compliance provided below.

- Provision A.4.1 of the Code.
  The Company did not have a Senior Independent Director for the period from 1 January 2014 to 20 January 2014. Jonathan Bomford was appointed as Senior Independent Director on 21 January 2014 and continues to serve in that role. The Company was therefore compliant with this provision of the Code for the majority of the 2014 financial year.
- Board appraisals and evaluation process.
  Provisions B.6, B.6.1 and B.6.3 of the Code. The Board has not to date undertaken a formal and rigorous annual evaluation of its own performance and that of its committees and individual directors. The Company therefore did not comply with provisions B.6, B.6.1 and B.6.3 of the Code during 2014. The Board will assess a preferred process for proceeding with such an appraisal and evaluation in 2015, but given the significant change in the membership of the Board during 2014, such an evaluation was considered to be inappropriate in the year under review.

Unless otherwise stated above or in the Corporate Governance Report, the Board believes that it has been compliant with the remaining provisions of the Code for the 2014 Financial Year.

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          39 of 142          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

Governance

# BOARD OF DIRECTORS





## H.J. MARK TOMPKINS
### Independent Non-Executive Chairman, aged 74 (NC)

Mr H.J. Mark Tompkins was appointed to the Board of NMC Health plc in March 2012 and is the Chairman of the Board and of the Nominations Committee. Mr Tompkins has significant public company experience having previously served on a total of 11 publicly listed company boards, including five on NYSE, NASDAQ or junior market U.S. exchange boards and four London Stock Exchange Primary Market or AIM boards. A number of these listed companies operated in various aspects of the Healthcare sector.

Mr Tompkins was Non-Executive Chairman of Allied Healthcare International Inc, one of the UK's leading providers of domiciliary care and healthcare staffing services, from 2007 to 2009, serving as a Director from 2005 to 2009. From 2005 to 2008 he also served as Non-Executive Chairman of Healthcare Enterprise Group Plc, an international healthcare products company which was listed on the AIM market in London. Mr Tompkins served as Conseiller Special aupres du Conseil D'Administration of Sodexo S.A. from November 2010 to August 2012 after serving as a Non-Executive Director from 2002 to 2010 and a member of its Audit Committee for six of those eight years. Other previous directorships have included Abbey Healthcare Group Inc., and Apria Healthcare Group Inc. Prior to his non-executive director roles, Mr Tompkins served as the Chief Executive Officer of Compagnie Financiere Haussmann, a publicly listed company in France involved in property development, investment and management.

Mr Tompkins began his career in investment banking in 1964 with Samuel Montagu & Company (now HSBC). From 1965 to 1971, he was a Management Consultant with Booz Allen Hamilton, Inc., working on assignments in the UK, continental Europe and the U.S. Mr Tompkins returned to investment banking joining Slater Walker Securities group from 1972 to 1974. He subsequently entered into international real-estate development from 1974 to 1987 investing in both residential and commercial assets across the Middle East, the United States and Europe.

Since 1987, he has been focussed on financing small and medium sized enterprises whilst also contributing at board level of a number of listed companies.

## DR B.R. SHETTY
### Executive Vice Chairman & CEO, aged 72

Dr B.R. Shetty is the founding partner of NMC and was appointed to the Board of NMC Health plc in July 2011. Dr Shetty has been involved in the private healthcare and pharmaceutical sectors since these were established in the UAE nearly 40 years ago.

Born in India, Dr Shetty arrived in the UAE in 1973 shortly after the country's formation. As a trained pharmacist, he opened his first pharmacy in 1975. In 1975 he established the New Medical Centre (NMC), which also included a dedicated dental department.

NMC has since grown to become the UAE's largest private sector healthcare provider. Today, it has hospitals and clinics across the UAE and treats almost two million patients a year.

Dr Shetty's other business activities include UAE Exchange, a leading global money transfer and foreign exchange provider, of which he is Managing Director and CEO, and investments in hospitality, food and beverage, pharmaceutical manufacturing and real estate.

Dr Shetty received the Order of Abu Dhabi in 2005, the country's highest civilian award, for contribution to the development of the community and the cause of the Emirate, as well as the Padma Shri Award from the government of India in January 2009.

In addition to his business activities, Dr Shetty is involved in several philanthropic causes. He has supported the development of a medical institution in the north Indian state of Uttaranchal and is the founder and patron of the Indian Pharmaceutical Association in the UAE.

He is a member of the Advisory Board of the Dubai Economic Department's Financial Sector, Chairman of the Abu Dhabi Indian School, Founder and Vice President of the Swiss Business Council, and Founder of the Australian Business Council, the Canadian Business Council, the Netherlands Business Group and the Philippines Business Council.

Dr Shetty is also a member of the Executive Panel of Dubai's Pharmaceutical and Health Equipment Trading Business Group under the Dubai Chamber of Commerce and Industry. A passionate cricket fan, Dr Shetty is the former President of the Abu Dhabi Cricket Council and was the Managing Director of the Abu Dhabi Cricket Club from its inception in 1989 until 2006.

Dr B.R. Shetty received a Doctorate from Georgia State University, Atlanta, USA and was invited by the Harvard Business School to attend its Owner/President Management program. He is also a member of the International Advisory Board of Boston University, USA.

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          40 of 142          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA



## DR AYESHA ABDULLAH

**Independent Non-Executive Director, aged 48 (AC, CGC)**

Dr Ayesha Abdullah was appointed to the Board of NMC Health plc in June 2014 and is a member of the Audit Committee and Clinical Governance Committee. Dr Abdullah is an industry professional with more than 20 years of experience in the healthcare industry.

Dr. Ayesha Abdullah has recently been appointed the Executive Dean of Health Sciences and Business at Higher College of Technology. In her capacity as the Executive Dean, she is responsible for academic excellence and advancing linkage with industry. Dr Abdullah is also the Chief Executive Officer of Centre of Excellence for Applied Research and Training and her role is to advance Applied Research and technology innovations.

Prior to her current roles, she was responsible for overseeing an independent regulatory authority for all healthcare providers, medical educational and research institutions and other businesses operating within the Dubai Healthcare City Free Zone.

Dr Abdullah previously held the position of the Managing Director of the Science Cluster. She was responsible for managing and formulating the strategic direction of the three major companies in Dubai for the development of the knowledge based economy-namely Dubai Healthcare City Cluster and its subsidiaries, Dubai Biotechnology & Research Park- Dubiotech and Enpark, a Business Park facilitating the growth of energy and environmental businesses.

Prior to that Dr Abdullah held the position of CEO of Dubai Healthcare City (DHCC). Under her leadership, DHCC rapidly gained a status as an internationally recognised location of choice for quality healthcare and an integrated centre of excellence for clinical and wellness services, medical education and research. In 2008, DHCC won the Dubai Quality award and the 'DHCC Out-Patient Quality Standards' were the first Middle Eastern standards to be accredited by The International Society for Quality in Healthcare (ISQua).

Prior to this, as Chief Executive Officer at the Center for Healthcare Planning and Quality (CPQ), Dr Abdullah was responsible for setting up and upholding healthcare standards within DHCC. She also played a key role in establishing CPQ into a premier regulatory body in the industry.

In October 2009, Dr Abdullah received the prestigious 'Leading Woman CEO' Award, marking a milestone in her achievements and recognizing her strategic management and leadership acumen that significantly contributed to the healthcare cluster's growth. She was also awarded the L' Officiel Arab Women of the Year in 2010.

She holds a bachelor's degree in Biomedical Engineering from Marquette University in Wisconsin, USA, an MBA with an emphasis on Finance and a PhD in Strategy Management & Planning Studies from Sheffield University in the UK.



## ABDULRAHMAN BASADDIQ

**Non-Executive Director, aged 66 (RC, NC)**

Mr Abdulrahman Basaddiq was appointed to the Board of NMC Health plc in February 2014 and is a member of the Remuneration Committee and Nominations Committee. He has significant business experience across a number of business sectors in the Middle East.

Mr Basaddiq is a fellow of the Institute of Chartered Accountants in England & Wales (FCA) and a licensed auditor and consultant in the UAE. He trained and qualified as a chartered accountant with Ernst & Young (EY), London and spent over 25 years with EY in the UK and the GCC, 15 of those as an equity partner. During his period at EY, Mr Basaddiq served as the Managing Partner of their Riyadh and Abu Dhabi offices, in addition to responsibilities as UAE Country partner in charge.

During his tenure in Riyadh with EY, he oversaw the development and implementation of the only Saudisation program within the profession in the Kingdom at the time. He also served as an elected member of the firm's executive committee for eight years, in addition to serving on the human resources committee for a number of years.

Mr Basaddiq spent over 12 years with a number of Gulf based diversified groups across multiple jurisdictions and sectors including healthcare, global public and private equities, venture capital, real estate investment, development and construction, steel trading and fabrication, in addition to food manufacturing, retail and packaging. He also spent over five years serving on two audit committees, chairing one of them, in addition to oversight responsibilities in the development of audit committees and the related internal audit functions of other entities, which have grown in size and complexity, to comply with the ever increasing governance and other regulatory demands.

Exhibit 8 to B.R. Shetty's Request for Judicial Notice        41 of 142        Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

Governance

# BOARD OF DIRECTORS CONTINUED





### JONATHAN BOMFORD FCA
Senior Independent Non-Executive Director, aged 66 (AC, RC)

Mr Jonathan Bomford was appointed to the Board of NMC Health plc in June 2013 and is the Chairman of the Audit Committee. He is a Chartered Accountant and has significant accounting, financial and audit experience gained principally in the Middle East and East Africa. Mr Bomford is the Company's Senior Independent Director

Mr Bomford is a qualified Chartered Accountant who spent 24 years with EY in a number of roles in the Middle East and East Africa including Abu Dhabi, Riyadh, Dubai and Jeddah. For his last 15 years with EY, he was a partner with a number of international clients across a range of sectors including healthcare, oil, banking and construction.

In 2000, Mr Bomford retired from EY and since then has undertaken a number of roles including a Board Member of an Agricultural Trust funding agricultural projects and an Official Mentor providing Business Advice and Services to clients of the Prince's Trust.

### LORD CLANWILLIAM
Independent Non-Executive Director, aged 54 (RC, NC)

Lord Clanwilliam was appointed to the Board of NMC Health plc in March 2012 and is the Chairman of the Remuneration Committee. He has significant business experience in the Middle East and on the Boards of overseas companies listed on the London Stock Exchange.

Lord Clanwilliam is an international businessman and high-level government and financial communications specialist possessing over 30 years of business and political experience across a broad range of sectors, including mining, drilling, oilfield services and operational management and consultancy. During his career, Lord Clanwilliam has established an extensive network of senior level governmental and institutional contacts across the Middle East, the United Kingdom and Eastern Europe. He is currently Chairman of Eurasia Drilling Company, a drilling and work-over company operating in Eurasia and listed on the Premium Segment of the London Stock Exchange. He is also a Non-Executive Director of Polyus Gold OJSC, a Russian gold mining company listed on the Premium Segment of the London Stock Exchange. Lord Clanwilliam is the Founding Partner and Chairman of Gardant Communications Limited, a political, strategic, financial and litigation communications company based in London and Senior Advisor to Milio International Limited, a British owned and operated commodities and logistics company.

Lord Clanwilliam graduated from Eton College in 1978 and from The Royal Military Academy, Sandhurst in 1979 after which he served for four years with the 1st Battalion Coldstream Guards.

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          42 of 142          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA





## SALMA HAREB

Independent Non-Executive Director, aged 49 (RC)

Mrs Salma Hareb was appointed to the Board of NMC Health plc in June 2014 and is a member of the Remuneration Committee. She has significant business experience business and is a recognized leading businesswoman in the Middle East.

Mrs Salma Hareb, is the CEO of Economic Zones World (EZW) and spearheads innovative product development to provide greater value to EZW customers. She has been instrumental in the creation of the Dubai Logistics Corridor, which quadruples Dubai's logistics efficiencies.

Under her leadership, Jebel Ali Free Zone (Jafza) the flagship Free Zone of Economic Zones World, has been recognized as one of the most efficient Free Zones in the World, with a customer base of more than 7,300 companies, and 120 of the Global Fortune 500 enterprises, with total non-oil trade of US$90.2 billion, contributing more than 20 percent to Dubai's GDP.

As head of Economic Zones World, she also leads Technopark, the company's research and development initiative in core economic sectors including Water, Health, Energy, Engineering, e-Commerce and Logistics, as well as Dubai Auto Zone (DAZ), a comprehensive market place for the Auto Industry catering to buyers, sellers, service providers, principals and traders.

Internationally, she is actively overseeing Economic Zones World's development of a logistics park in South Carolina, USA, Special Economic Zones in India, and a Free Zone in Djibouti, Africa.

Prior to her role as CEO, she worked as Jafza's Chief Planning Officer, responsible for strategic planning, business development, finance, and human resources. Before that she worked as Chief Haematologist in the Department of Health and Medical Services. She completed her education in the UAE and the UK, in the fields of Medical Sciences, Information Technology and Business in addition to a one year post graduate study in Haematology at the University of Cardiff.

Mrs Salma Hareb's distinctive initiatives and achievements have been recognised with several awards over the years.

Most recently, she received the Frost & Sullivan Growth, Innovation and Leadership Award 2014, and last year, she was named the "Overall Winner - Professional Category" in Emirates Women Awards 2013.

Her array of awards over the years includes the 'Women CEO Excellence Award' conferred at the 9th Middle East CEO of the Year Awards; the 'Asian Business Leadership Award at the Asian Business Leadership Forum Awards; the 'Woman CEO of the Year' at the Women in Leadership (WIL) Forum and "Business Women Award 2006 for Leadership".

She was also recognized as the 2nd most influential Arab woman in Government in the Middle East and North Africa region by Forbes Middle East in 2013 and was also rated among the 100 most powerful Arab Women earlier by CEO Middle East as well as the Asian Business Magazine. She was declared one of the most influential business women in the region by MEED magazine in 2008. She also topped Forbes Arabia's list of the 50 most powerful Arab business women in the same year.

## HEATHER LAWRENCE OBE

Independent Non-Executive Director, aged 65 (AC, CGC)

Mrs Heather Lawrence OBE was appointed to the Board of NMC Health plc in March 2012 and is the Chairman of the Clinical Governance Committee. Mrs Lawrence has significant operational experience in the healthcare sector as well as operating on a number of UK Governmental Boards.

Mrs Lawrence has over 20 years' experience as a Chief Executive Officer in the hospital and healthcare sector. From 2000 to July 2012 she served as CEO of the Chelsea and Westminster Hospital, which gained NHS Foundation Trust status in 2006. Prior to 2000 she served as CEO of North Hertfordshire NHS trust from 1996 to 2000 and Hounslow and Spelthorne Community and Mental Health Trust from 1989 to 1996.

Mrs Lawrence chaired the UK-wide negotiations for the Staff and Associate Specialists (SAS) Doctors contract during 2004 to 2006 and chaired the "Agenda for Change" three-year pay deal for non-medical staff on behalf of NHS employers during 2006 to 2009. She has also served as a Commissioner for the UK Prime Minister's Commission for the Future of Nursing and Midwifery and was a Founding Member of the Dr Foster Global Comparators Founders Board, which is an initiative to share comparative health data with other leading medical institutions in various countries to improve clinical quality. Mrs Lawrence originally trained as a nurse at St Mary's Hospital Paddington and is a Chartered Fellow of the Institute of Personnel Management.

She was appointed, by Secretary of State for Health, as a Non-Executive Director of Monitor, the NHS Regulator, in July 2012. Mrs Lawrence was awarded an OBE in the 2010 New Year Honours List for her services to healthcare.

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          43 of 142          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

Governance

# BOARD OF DIRECTORS CONTINUED





## PRASANTH MANGHAT
### Deputy Chief Executive Officer, aged 40

Mr Prasanth Manghat was appointed to the Board of NMC Health plc in June 2014 and to the role of Deputy Chief Executive Officer in January 2015.

Mr Manghat has had a number of roles within NMC related businesses for the last 12 years including, prior to his current role, as Chief Financial Officer of NMC Health for 5 years. As CFO, he was primarily responsible for running the Company's finance function including treasury, corporate finance and accounting. Mr Manghat spearheaded NMC Healthcare's successful listing on the Premium Segment of the London Stock Exchange (LSE) in April 2012. This was a landmark transaction in many ways, being the first UAE company to list on the LSE and raising US$187 million in the process. Mr Manghat has played a major role in the growth of the NMC businesses both prior to and since the IPO.

Mr Manghat was honoured with the "CFO of the Year" award - 2012 by ICAEW, Middle-East.

He was also conferred with the prestigious award for "Excellence in Finance" by the Institute of Chartered Accountants of India, Abu Dhabi Chapter in Nov, 2012 and "Professional Excellence Award in the Healthcare Sector" by ICAI UAE (Dubai) Chapter in May 2013.

Prior to joining NMC, Mr Manghat has worked as Credit and Operations Head with Kotak Mahindra Finance, one of the leading non-banking financial institutions in India. A Fellow member of the Institute of Chartered Accountants of India (FCA), Bachelor of Science (1995), MG University, Kerala, India, CIA, ACCA from UK (2004) and pursuing CA (Institute of Chartered Accountants of England and Wales), he has 14 years of experience in management of treasury and banking functions, corporate finance, accounting and financial reporting activities.

Mr Manghat assumed the role of Deputy Chief Executive Officer of NMC Health plc with effect from 1 January 2015. In his new role, Mr Manghat's responsibility will extend to cover strategic matters and to support the Chief Executive Officer with planning and strategy execution across both of NMC's Divisions.

## KEYUR NAGORI
### Non-Executive Director, aged 36

Mr Keyur Nagori was appointed to the Board of NMC Health plc in June 2014 and is a Non-Executive Director.

Mr Nagori has a background working in International audit firms including Deloitte and KPMG for 8 years. During this time he had significant experience in the audit of multinational and local companies in both India and Abu Dhabi.

For the last 10 years, he has been working within the finance department of KBBO Group based in Abu Dhabi and he is currently Chief Financial Officer of KBBO Group.

Mr Nagori was an Alternate Director to the Company's previous Director, H.E. Saeed Bin Butti, from June 2013 to February 2014.

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          44 of 142          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA





## BINAY SHETTY
Non-Executive Director, aged 31

Mr Binay Shetty was appointed to the Board of NMC Health plc in June 2014 and is a Non-Executive Director. Prior to January 2015 he was Chief Operating Officer for the Group.

Since 2010, Mr Binay Shetty has been overseeing operations of NMC Health's healthcare and distribution divisions. He is also closely involved with the HR, Marketing, IT and Projects units of the organisation.

Prior to his current role, he was an Executive Director of NMC Healthcare LLC with responsibility for strategic planning and governance and the management of new projects.

Prior to holding this position, from 2004-2010 he was an Executive Director of NMC with responsibility for strategic planning and governance and the management of new projects. From 2006 to early 2011 he was also Head of Investments for BR Shetty Pvt Investments, and from 2004 to 2006 he was Business Co-ordinator at Neopharma - Abu Dhabi's premier pharmaceutical manufacturing company.

Mr Shetty is a director of UAE Exchange, a leading global remittance and foreign exchange provider.

He holds a Bachelor of Science in Business Administration with specialisations in Finance and Entrepreneurship from Boston University, Massachusetts, USA.

## DR NANDINI TANDON
Independent Non-Executive Director, aged 52 (CGC)

Dr Nandini Tandon was appointed to the Board of NMC Health plc in June 2014 and is a member of the Clinical Governance Committee. She has significant experience in healthcare investment and innovation.

Dr Tandon is presently engaged in investing in healthcare and healthcare/IT in USA, UAE and India. Dr Tandon has extensive board experience. She is currently Vice Chairman of the Board of El Camino Hospital, Silicon Valley, California and Chair of its Executive Compensation Committee and Vice-Chair of its Governance and Finance Committees. Additionally she has served on 12 high tech proprietary company boards in the USA. Dr Tandon's past investments and Board roles include, IDUN (acquired by Pfizer), U-Systems (acquired by General Electric), KAI Pharmaceuticals (acquired by Amgen), Ception Therapeutics (acquired by Cephalon), Conforma Therapeutics (acquired by Biogen Idec), Corus Pharma (acquired by Gilead Sciences), Acorda Therapeutics (NASDAQ: ACOR), Alexza (NASDAQ: ALXA), Guava Technologies (acquired by Millipore), Ambit Biosciences, Saegis Pharmaceuticals and Cell Biosciences. Dr Tandon has been a venture capitalist in Silicon Valley for over 10 years and was Managing Director, Lumira/MDS Capital in Palo Alto with US$1.2bn under management and before was Partner, Royal Bank of Canada's RBC Capital Partners, in San Francisco.

She is on multiple not for profit boards which are committed to global innovation, entrepreneurship and healthcare including MD Anderson Center for Entrepreneurship and PD Board, Bay Area Council Economic Institute Board, University of California, Berkeley, Center for Emerging & Neglected Diseases Board, Chair,"20/20"Vision: Investing in USA & Emerging Markets", C21 BioVentures Board, TIE Global Board, Stanford University, School of Medicine Career Center's Advisory Council and San Francisco-Bangalore Sister City initiative's board and co-Chair for its SF-India focus.

Dr Tandon is a strong champion for global investments in healthcare, entrepreneurship and innovation. She was delegate for President Obama's US State Department's Global Entrepreneurship program to Turkey, delegate for Secretary Hillary Clinton's Women and Economy Summit, moderator for Healthcare focus of US Senator's Congressional delegation to India, spoke at Milken Conference for Obama-Care and spoke at Clinton Global Initiative for Women in Technology, chaired investment focus for Super Return Conference in Geneva, San Francisco and Dubai, spoke at Secretary Geithner for US Department of Treasury's symposium on Women in Finance and recently co-chaired Healthcare delegation of Mayor of San Francisco to India. Dr Tandon has strong operational experience as Chief Business Officer of Zyomyx Inc., Vice President of BD, Hyseq Inc. and BD Mangaer at Chiron Corp. A White House Intern, Nandini received her Ph.D. in biochemistry, Phi Lambda Upsilon from Duke University, North Carolina and her B.A. cum laude, Sigma Xi, Phi Beta Kappa from Hollins University, Virginia.

In January 2015 Dr Tandon received the Pravasi Bharatiya Samman 2015 award in Gandhinagar, India for her work in, life sciences and Healthcare and IT in USA and India along with other emerging markets.

This award is conferred by the President of India and is the highest honour conferred on overseas Indians honoring exceptional and meritorious contribution in their chosen field.

From 25 million global overseas Indian diaspora, 15 received this prestigious award including 3 American citizens, Dr.Nandini Tandon in life sciences and healthcare, Mr. Satya Nadella, CEO of Microsoft in computers and Dr.Lulla, Chief scientist, Earth observation, NASA for aeronautics.

AC - member of the Audit Committee
RC - member of the Remuneration Committee
CGC - member of the Clinical Governance Committee
NC - member of the Nominations Committee

Exhibit 8 to B.R. Shetty's Request for Judicial Notice        45 of 142        Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

Governance

# SENIOR MANAGEMENT





## DR B.R. SHETTY
### Executive Vice Chairman & CEO, aged 72

Mr B.R. Shetty is the founding partner of NMC and was appointed to the Board of NMC Health plc in July 2011. Dr Shetty has been involved in the private healthcare and pharmaceutical sectors since these were established in the UAE nearly 40 years ago.

Born in India, Dr Shetty arrived in the UAE in 1973 shortly after the country's formation. As a trained pharmacist, he opened his first pharmacy in 1975. In 1975 he established the New Medical Centre (NMC), which also included a dedicated dental department. NMC has since grown to become the UAE's largest private sector healthcare provider. Today, it has hospitals and clinics across the UAE and treats almost two million patients a year. Dr Shetty's other business activities include UAE Exchange, a leading global money transfer and foreign exchange provider, of which he is Managing Director and CEO, and investments in hospitality, food and beverage, pharmaceutical manufacturing and real estate.

Dr Shetty received the Order of Abu Dhabi in 2005, the country's highest civilian award, for contribution to the development of the community and the cause of the Emirate, as well as the Padma Shri Award from the government of India in January 2009. In addition to his business activities, Dr Shetty is involved in several philanthropic causes. He has supported the development of a medical institution in the north Indian state of Uttaranchal and is the founder and patron of the Indian Pharmaceutical Association in the UAE. He is a member of the Advisory Board of the Dubai Economic Department's Financial Sector, Chairman of the Abu Dhabi Indian School, Founder and Vice President of the Swiss Business Council, and Founder of the Australian Business Council, the Canadian Business Council, the Netherlands Business Group and the Philippines Business Council.

Dr Shetty is also a member of the Executive Panel of Dubai's Pharmaceutical and Health Equipment Trading Business Group under the Dubai Chamber of Commerce and Industry. A passionate cricket fan, Dr Shetty is the former President of the Abu Dhabi Cricket Council and was the Managing Director of the Abu Dhabi Cricket Club from its inception in 1989 until 2006.

Dr B.R. Shetty received a Doctorate from Georgia State University, Atlanta, USA and was invited by the Harvard Business School to attend its Owner/President Management program. He is also a member of the International Advisory Board of Boston University, USA.

## PRASANTH MANGHAT
### Deputy Chief Executive Officer, aged 40

Mr Manghat has had a number of roles within NMC related businesses for the last 12 years including, prior to his current role, as Chief Financial Officer of NMC Health for 5 years. As CFO, he was primarily responsible for running the Company's finance function including treasury, corporate finance and accounting.

Mr Manghat spearheaded NMC Healthcare's successful listing on the Premium Segment of the London Stock Exchange (LSE) in April 2012. This was a landmark transaction in many ways, being the first UAE company to list on the LSE and raising US$187 million in the process. Mr Manghat has played a major role in the growth of the NMC businesses both prior to and since the IPO.

Mr Manghat was honoured with the "CFO of the Year" award – 2012 by ICAEW, Middle-East. He was also conferred with the prestigious award for "Excellence in Finance" by the Institute of Chartered Accountants of India, Abu Dhabi Chapter in Nov, 2012 and "Professional Excellence Award in the Healthcare Sector" by ICAI UAE (Dubai) Chapter in May 2013.

Prior to joining NMC, Mr Manghat has worked as Credit and Operations Head with Kotak Mahindra Finance, one of the leading non-banking financial institutions in India. A Fellow member of the Institute of Chartered Accountants of India (FCA), Bachelor of Science (1995), MG University, Kerala, India, CIA, ACCA from UK (2004) and pursuing CA (Institute of Chartered Accountants of England and Wales), he has 14 years of experience in management of treasury and banking functions, corporate finance, accounting and financial reporting activities.

Mr Manghat assumed the role of Deputy Chief Executive Officer of NMC Health plc with effect from 1 January 2015. In his new role, Mr Manghat's responsibility will extend to cover strategic matters and to support the Chief Executive Officer with planning and strategy execution across both of NMC's Divisions.

Exhibit 8 to B.R. Shetty's Request for Judicial Notice     46 of 142     Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA



## DR CHANDRAKUMARI R. SHETTY
### Group Medical Director

Dr Shetty is the Group Medical Director of NMC Health. Along with her husband, Dr B.R. Shetty, she has been a pioneer in establishing and developing the private healthcare sector in the UAE.

Dr Shetty has been instrumental in establishing Centres of Excellence in various units of NMC Healthcare. She has been actively involved in the conception, planning, design, execution and management of various healthcare facilities besides driving critical healthcare initiatives. Under her leadership, NMC Specialty Hospitals in Abu Dhabi, Dubai and Al Ain have received accreditation from the Joint Commission International (JCI).

Dr Shetty supervises a diversified multi-cultural workforce within NMC Health comprising of over 500 doctors and 3,000 medical staff. In her present role, Dr Shetty chairs various committees including Governance, Infection Control, Patient Rights, Care of Patients, Quality and Facility Management.

Despite her wide ranging responsibilities, Dr Shetty remains rooted to the basic ethos of the healthcare profession of providing quality care with a human touch to all patients by continuing to remain as a practicing Physician for over three decades.



## ROY CHERRY
### Head of Strategy & Investor Relations

Mr Cherry works closely with the Executive Vice Chairman & CEO and Deputy CEO on NMC Health's strategy.

He also leads the Group's investor relations efforts. Mr Cherry played an instrumental role in the re-rating of NMC's shares by investors and analysts, with the company's shares being among the top-10 best performing on the London Stock Exchange in 2013.

His career includes PwC Transaction Services where he advised on feasibilities and M&A transactions with a combined transaction value exceeding US$10bn across a variety of sectors including healthcare. He previously headed the Equity Research Department at SHUAA Capital in Dubai, one of the region's first and most acclaimed equity research teams. Mr Cherry played an important role on several regional IPOs including, Saudi Catering, NMC Health, Deyaar, DP World and Royal Jordanian Airlines.

Immediately prior to joining NMC Health, Mr Cherry was with Saudi Fransi Capital, where he was the Head of Research & Advisory Department. He holds a BSc in Management from the University of London. In addition to English, he is a fluent speaker of both Arabic and Swedish.

NMC Health plc Annual Report 2014                                                                43

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          47 of 142          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

Governance

# SENIOR MANAGEMENT CONTINUED





### SURESH KRISHNAMOORTHY
Chief Financial Officer

Mr Krishnamoorthy was appointed Chief Financial Officer of the Company with effect from 1 January 2015.

He joined NMC in December 2000 as an Internal Audit Manager and he continued in this role until March 2011. Since April 2011 Mr Krishnamoorthy has worked as a senior member of NMC's finance team, having significant involvement in the Company's IPO and in the Company's major fund raising initiatives. Prior to be appointed as Deputy Chief Financial Officer in July 2014, he was responsible for the MIS and Corporate Planning portfolio including close involvement in the Group's internal and external audits and other Audit Committee activities since its inception following IPO.

Prior to joining NMC, he worked as Assistant Finance Manager in Kerala Industrial Infrastructure Corporation (KINFRA), a Government agency involved in the development of infrastructure in the State of Kerala.

Mr Krishnamoorthy qualified as a Chartered Accountant from the Institute of Chartered Accountants of India in Nov 1998. He has 16 years of experience in the field of audits, corporate finance, accounting and financial reporting activities.

### SIMON WATKINS
Group Company Secretary

Mr Watkins is Group Company Secretary of NMC Health plc. Mr Watkins joined NMC Health in May 2012 shortly after the Group's IPO and is responsible to the Board for the Group's listing obligations, all Governance matters affecting the Group and, with the Chairman, for ensuring that the Board operates effectively.

He has 25 years of experience as a Company Secretary, principally within UK companies having a London Stock Exchange Listing on either the Main Market or on AIM. Previous experience includes Deputy Group Secretary of Rank Group plc and four years as Group Company Secretary of lastminute.com plc. Mr Watkins' primary experience in the last 14 years has been within businesses focussed on strategic and acquisitive growth

Mr Watkins is an Associate Member of the UK Institute of Chartered Secretaries and Administrators.

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          48 of 142          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

| Overview | Group Strategic Report | Governance | Financial Statements |
|---|---|---|---|

# DIRECTORS' REPORT

The Directors of NMC Health plc (the "Group" or the "Company") are pleased to submit their Annual Report and audited financial statements of the Group and the Company for the financial year ended 31 December 2014.

Information in the Group Strategic Report on pages 9 to 33, which constitutes a fair review of the business required by the Companies Act 2006, and in the Corporate Governance Report on pages 49 to 66, is incorporated into this Directors' Report by reference.

The details of salaries, bonuses, benefits and share interests of directors are shown in the Directors' Remuneration Report on pages 67 to 85.

## RESULTS AND DIVIDENDS

The Group results are shown in the Consolidated Statement of Comprehensive Income on page 91. Profit after taxation for the year was US$77.5m (2013: US$69.1m). Factors influencing the results are discussed in the Business Overview and Financial review on pages 18 to 25.

No interim dividend was declared during the year. Subject to shareholder approval, a final dividend of 5.4p per share (2013: 4.4p) is proposed, to be paid on 25 June 2015 to shareholders on the Company's share register on 29 May 2015.

## FUTURE DEVELOPMENTS

The Group's strategy and potential future development are outlined in the Group Strategic Report on pages 9 to 33.

## COMPOSITION OF THE BOARD

The following have served as directors of the Company during the 2014 financial year:

| Director | Position | Date of appointment | Date ceased to be a director (if applicable) |
|---|---|---|---|
| H.J. Mark Tompkins | Non-Executive Chairman | 7 March 2012 | - |
| Dr B.R. Shetty | Executive Vice Chairman & Chief Executive Officer | 20 July 2011 | - |
| Dr Ayesha Abdullah | Non-Executive Director | 26 June 2014 | - |
| Abdulrahman Basaddiq | Non-Executive Director | 24 February 2014 | - |
| Jonathan Bomford | Non-Executive Director | 27 June 2013 | - |
| Lord Clanwilliam | Non-Executive Director | 7 March 2012 | - |
| Salma Hareb | Non-Executive Director | 26 June 2014 | - |
| Heather Lawrence | Non-Executive Director | 19 March 2012 | - |
| Prasanth Manghat | Deputy Chief Executive Officer | 26 June 2014 | - |
| Keyur Nagori | Non-Executive Director | 26 June 2014 | - |
| Binay Shetty | Non-Executive Director | 26 June 2014 | - |
| Dr Nandini Tandon | Non-Executive Director | 26 June 2014 | - |
| His Excellency Saeed Bin Butti | Non-Executive Director | 20 July 2011 | 24 February 2014 |
| Khalifa Bin Butti | Executive Vice Chairman | 20 July 2011 | 25 March 2014 |

No other directors have been appointed to serve during the period from 1 January 2014 to 31 December 2014 or subsequently.

## SHARE CAPITAL

There have been no changes to the issued share capital of the Company during the year. The issued share capital as at 1 January 2014 and at 31 December 2014 is £18,571,428 divided into 185,714,286 shares of 10p each. Options granted by the Company over its share capital are set out in the Directors' Remuneration Report on pages 67 to 85.

Under the articles of association of the Company, all Ordinary shares have equal rights to dividends and capital and to vote at general meetings of the Company. There are no restrictions on the size of holding nor on the transfer of shares, which are both governed under the terms of the articles of association and relevant legislation. The directors are not aware of any agreements between holders of the Company's shares that may result in restrictions on the transfer of securities or in voting rights.

Exhibit 8 to B.R. Shetty's Request for Judicial Notice   49 of 142   Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

Governance

# DIRECTORS' REPORT CONTINUED

## PRINCIPAL SHAREHOLDERS

As at 23 February 2015, the Company is aware of the following significant shareholdings in the Ordinary shares of the Company:

| Shareholder | Number of shares | % of issued share capital held | Nature of holding |
|---|---|---|---|
| Dr B.R. Shetty | 47,742,409 | 25.7 | Direct |
| H.E. Saeed Bin Butti | 43,466,559 | 23.4 | Direct |
| Khalifa Bin Butti | 19,059,842 | 10.3 | Direct |
| Infinite Investment LLC | 14,072,024 | 7.6 | Direct |

The Company has an agreement with Dr B.R. Shetty, H.E. Saeed Bin Butti and Khalifa Bin Butti ("Controlling Shareholders") under which the Controlling Shareholders agree to comply with the independence provisions of the UKLA Listing Rules.

## POLITICAL DONATIONS

Neither the Company nor any subsidiary company in the Group made any Political donations during the year ended 31 December 2014

Whilst the Company has no intention of making formal political donations in the future, the Board acknowledge that given the wide interpretation of such donations, certain business events in which the Company or any of its subsidiaries, or the Board, may wish to participate may be caught under the formal definition of political donations. The Company will therefore again be seeking approval from shareholders at this year's annual general meeting, for a small approved limit for "political donations", for use in such circumstances. If this is approved by shareholders, the Board will provide full details of any such payments made in the next annual report.

## GREENHOUSE GAS EMISSIONS

The Company's disclosure in relation to its greenhouse gas emissions is set out in the Corporate Social Responsibility section on pages 27 to 33.

## CONTRACTS OF SIGNIFICANCE WITH DIRECTORS

Under UAE law and regulations, with the exception of certain specific areas designated by the Government as such, all land must be held legally by a UAE National. In addition, all healthcare facility and pharmacy operating licences may only be held legally by a UAE National, and not a body corporate. As a result, some of the property owned beneficially by the Group and all the Group's medical facility and pharmacy licences, are held legally in the name of either H.E. Saeed Bin Butti or Mr Khalifa Bin Butti, both previous Directors and continuing significant shareholders of the Company.

## RELATED PARTY TRANSACTIONS

Details of related party transactions are included in Note 27 of the Financial Statements on pages 117 and 118.

## DISCLOSURE OF INFORMATION UNDER LISTING RULE 9.8.4C

In accordance with the UK Financial Conduct Authority's Listing Rules (LR 9.8.4C), the information to be included in the Annual Report, where applicable, under LR 9.8.4, is set out in this Directors' Report, with the exception of transactions with controlling shareholders which is set out on pages 117 and 118 (note 27 to the Consolidated Financial Statements) and interest capitalised which is set out on page 112 (note 15 to the Consolidated Financial Statements).

## SUBSEQUENT EVENTS

### New Financing Facility

On 16 February 2015, the Company announced that it has obtained underwriting commitments for a new US$825 million financing facility from a number of international and regional banks through its subsidiary, NMC Healthcare LLC. The New Facility has been structured as two separate tranches:

1) an Amortizing Term Loan Facility of US$350 million equivalent to refinance existing indebtedness of NMC and its subsidiaries (including the existing JP Morgan syndicated term loan facility) and to provide additional funds for general corporate purposes; and

2) a Delayed Draw Acquisition Facility of US$475 million equivalent to facilitate NMC's ongoing strategy of making phased acquisitions that will be accretive to the Company's underlying business and profitability.

The overall quantum of the New Facility, combined with the Company's robust balance sheet, is expected to ensure adequate available liquidity to capitalize on growth opportunities as they are identified.

| Overview | Group Strategic Report | Governance | Financial Statements |
|---|---|---|---|

### Acquisition of Clinica Eugin

On 23 February 2015, the Group acquired 86.4% of the issued share capital of Clinica Eugin, a leading global fertility treatment provider based in Barcelona, Spain, for a total enterprise value of €143m. Eugin is one of the largest fertility clinics in Europe and an established leader in cross-border fertility treatment with patients from the largest Western European countries, as well as the MENA region.

### Transfer of Title Deeds

Subsequent to year end US$5,177,000 of the land and buildings which were held in the name of a previous shareholder for the beneficial interest of the Group were transferred into the name of a current UAE national shareholder.

There were no other events which would have a material effect on the Consolidated Statement of Financial Position between 31 December 2014 and the date of this report.

### GOING CONCERN

The Group has two diverse operating divisions, both of which operate in a growing market. The Board have undertaken an assessment of the future prospects of the Group and the wider risks that the Group is exposed to. In its assessment of whether the Group should adopt the going concern basis in preparing its financial statements, the Board has considered:

*Operating risk:* The Board receives monthly management reports covering key operational matters, monthly comparison to budget and updated forecasts on a half yearly basis for the full financial year to ensure that the business is trading in line with its expectations. The management team prepare a Group budget for each financial year and a cashflow forecast for the following 18 months which allows the Board to monitor the financial position of the Group and to consider appropriate risks which the business may face from a financial perspective.

*Financing risk:* The Company has worked to structure its debts for the medium and long term as well as utilising short term facilities to meet the Group's working capital requirements. The funds raised as a result of the share issue undertaken at IPO in April 2012 and the US$300m five year syndicated term debt facility, of which US$225m has been drawn down to date, are more than sufficient to fund the Group's material capital projects. The Group has banking arrangements through a spread of local and international banking groups. Debt covenants are reviewed by the board each month. The Board believes that the level of cash in the Group, the spread of bankers and the improved debt facility terms agreed during 2013 mitigates the financing risks that the Group faces from both its capital expenditure program and in relation to working capital requirements.

*Customer and Supplier risk:* Both the Healthcare and the Distribution divisions have continued their positive growth trends. All major financial and non-financial KPIs showed good improvement during 2014. In NMC Healthcare, trade receivables are monitored regularly, provisions made where necessary and the Group has no history of significant bad debts. In the Distribution division, the increase in revenue and product flow has an adverse effect on the Group's working capital position. Trade receivables are monitored regularly and management maintain a close working relationship with all major suppliers to monitor performance as well as signs of financial risk The Board has reviewed a high level budget for 2015 as well as considered growth forecasts for the healthcare sector in UAE, and considers the Group's future forecasts to be reasonable.

*Impairment risk:* The Board has considered the carrying value of inventories, accounts receivable and property and equipment and concluded that there are no indicators of material impairment of these items and therefore no material cash flow impact associated with any loss in those areas.

The Board has reviewed the cash flow forecast that has been prepared for the period to 30 June 2016 and this forecast indicates that the Group has positive cash flows with sufficient headroom.

In its review, the Board considered other areas of potential risk, including regulatory risk, insurance and legal risks and potential areas of material contingent liability and found no matters which are likely to affect the viability of the Group in the medium term.

The Directors therefore continue to adopt the going concern basis in the preparation of the financial statements.

### FINANCIAL RISK MANAGEMENT OBJECTIVES

The financial risk management objectives and policies of the Group are included in note 29 to the financial statements on pages 119 to 121.

### ANNUAL GENERAL MEETING

The annual general meeting of NMC Health plc will be held at Allen & Overy LLP, One Bishops Square, London E1 6AD on 16 June 2015 at 2.00 pm.

Further details of the resolutions to be proposed at the annual general meeting will be set out in the Notice of Annual General Meeting circular which will be circulated separately to shareholders in due course.

Governance

# DIRECTORS' REPORT CONTINUED

## AUDITORS

Directors' statement as to disclosure of information to auditors:

The Directors who were members of the Board at the time of approving the Directors' Report are set out on page 45. Having made enquiries of fellow directors and of the Company's Auditor, each of these Directors confirms that:

- to the best of each Director's knowledge and belief, there is no information (that is, information needed by the group's Auditor in connection with preparing their report) of which the Company's Auditor is unaware; and
- each Director has taken all the steps a Director might reasonably be expected to have taken to be aware of relevant audit information and to establish that the Company's Auditor is aware of that information.

EY have confirmed that they are willing to be reappointed as auditor for the financial year ending 31 December 2015.

## STATEMENT OF DIRECTORS' RESPONSIBILITIES

The Directors are responsible for preparing the Annual Report, the Directors' Remuneration Report and the financial statements in accordance with applicable law and regulations.

The Directors are required by Company Law to prepare financial statements for the Group and the Company in accordance with the International Financial Reporting Standards as adopted by the European Union ('IFRS').

The financial statements are required to present fairly for each financial period the Company's financial position, financial performance and cash flows. In preparing the Group and parent company financial statements the Directors are also required to:

- Properly select and consistently apply accounting policies;
- Present information, including accounting policies, in a manner that provides relevant, reliable, comparable and understandable information;
- Provide additional disclosures when compliance with the specific requirements in IFRS is insufficient to enable users to understand the impact of particular transactions, other events and conditions on the entity's financial position and financial performance; and
- Make an assessment of the company's ability to continue as a going concern.

The Directors confirm that they have complied with the above requirements in preparing the financial statements. The Directors also confirm that they consider the annual report and accounts, taken as a whole, is fair, balanced and understandable and provides the information necessary for shareholders to assess the Company's performance, business model and strategy.

The Directors are responsible for keeping proper accounting records that are sufficient to show and explain the Company's transactions and disclose with reasonable accuracy at any time the financial position of the Company and to enable them to ensure that the financial statements comply with the Companies Act 2006. The Directors are also responsible for safeguarding the assets and hence for taking reasonable steps for the prevention and detection of fraud and other irregularities and for the preparation of a Directors' report and Directors' remuneration report which comply with the requirements of the Companies Act 2006.

The Directors are responsible for the maintenance and integrity of the Company's website. Legislation in the United Kingdom governing the preparation and dissemination of financial statements differs from legislation in other jurisdictions.

We confirm to the best of our knowledge:

- The financial statements, prepared in accordance with the International Financial Reporting Standards as adopted by the EU, give a true and fair view of the assets, liabilities, financial position and profit or loss of the Company and the undertakings included in the consolidation taken as a whole; and
- The Strategic Report includes a fair review of the development and performance of the business and the position of the Company and the undertakings included in the consolidation taken as a whole, together with a description of the principal risks and uncertainties they face.

The Directors' Report was approved by the Board on 23 February 2015 and are signed on behalf of the Board by:

Simon Watkins
Group Company Secretary

NMC Health plc (registered in England and Wales, number 7712220)
23 Hanover Square, London W1S 1JB

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          52 of 142          Hashem, et al., v. NMC Health PLC, et al.,
                                                                                                    2:20-cv-02303-CBM-MAA

# CORPORATE GOVERNANCE REPORT

## GOVERNANCE FRAMEWORK
The Company operates within a traditional governance framework



The roles and responsibilities of each of the individuals and groups above, and their role in the overall governance framework, are set out in the remainder of this Governance section.

## HOW THE BOARD OPERATES

### THE ROLE OF THE BOARD
The Board is responsible to shareholders for the overall conduct of the Group's business and the performance of management and of the Group. The Board has the powers and duties as set out in the Company's articles of association and the relevant regulations applicable to the Company as a registered public listed company registered in England and Wales.

The Board is primarily responsible for:

- determining the strategic direction of the Group;
- approving major capital projects, acquisitions and divestments;
- setting the annual budget;
- monitoring the financial performance of the Group against its targets;
- approving annual and half-year results and monitoring shareholder communications;
- reviewing the risk management process in place within the Group to ensure that significant risks are monitored and mitigated where possible;
- promoting good governance within the Group, and seeking to ensure that the Company meets its responsibilities towards all stakeholders; and
- demonstrating leadership and focussing on matters that affect shareholder value.

The Board seeks at all times to ensure that there is an appropriate balance between short term and long term considerations and objectives of the Group.

The Company has an agreed formal schedule of matters reserved for the Board which includes approval of strategic plans, financial statements, budgets, material investment decisions, acquisitions and divestments. The Board has overall responsibility for the effectiveness of the Group's systems of internal control and the mitigation of the Group's significant risks and is assisted by the Audit Committee in this respect.

As part of the terms of their appointment, each director agreed that they will act collectively with the rest of the Board to ensure the success of the Group. The Board delegates authority in relation to matters which it has not reserved to the Executive Vice Chairman & CEO who is responsible for delivering the Company's strategic objectives.

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          53 of 142          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

Governance

# CORPORATE GOVERNANCE REPORT
## CONTINUED

### BOARD COMPOSITION

The names of the directors and their biographical details are set out on pages 36 to 41.

The Board of the Company comprises twelve directors, five of whom have served throughout the year:

- the Non-Executive Chairman who is considered to be Independent
- two Executive Directors
- six Independent Non-Executive Directors
- three Non-Independent Non-Executive Directors

The Senior Independent Director is Jonathan Bomford, who is available to shareholders should they have any concerns that they do not wish to raise with the Company or the Chairman directly. The Senior Independent Director can be contacted through the registered office of the Company at 23 Hanover Square, London W1S 1JB.

### PROCESS UNDERTAKEN FOR BOARD APPOINTMENTS DURING THE YEAR

Seven new Directors were appointed to the Board in 2014. Of these appointments, a formal Nominations Committee process was followed in relation to the appointment of three new Independent Non-Executive Directors and two additional Executive Directors, one of whom has subsequently become a Non-Executive Director.

Given NMC's desire to enhance the Board's cultural, geographic and gender diversity, to reflect among other things, the Group's home business market diversity, the Group's search for the new Independent Non-Executive Directors revolved around informal discussions with a number of professional firms and individuals in the UAE from which a list of potential candidates, and subsequently proposals, were produced. This approach ensured that the highest calibre and experienced local professionals could be attracted to become Directors of the Company. These were considered by the Nominations Committee and recommendations for the appointment of Directors to the Board were approved.

The decision to appoint the other two non-Independent Non-Executive Directors during the year was considered by the Board as a whole, which included all members of the Nominations Committee. Both Mr Abdulrahman Basaddiq and Mr Keyur Nagori were appointed at the request of the Company's Principal Shareholders under the terms of the Relationship Agreement in place with the Company.

### BOARD DIVERSITY

In considering the structural change to the Board during 2014, the Board were keen to ensure that consideration was given to:

- The cultural and racial mix of the Board considering the Company's listing in the UK and operations in the UAE, as well as global drivers and practice in healthcare related services;
- The conclusions of the Davis Report on Women on Boards and in particular the benefits of significant male and female representation on the Board; and
- The new skills and experience that additional Directors could bring to complement the existing Board.

The constitution of the current Board is diverse in terms of gender and in relation to its experience and cultural and racial mix.

- Four of the Board Members (33%) are female;
- Four of the Board Members (33%) reside and have significant experience in UK businesses;
- Seven of the Board members (58%) are resident in the UAE, the Group's home market, and have significant business experiences in the Middle East and Asian markets;
- One member of the Board is resident in the USA and has experience of the US healthcare market and in relation to investment in healthcare assets;
- Seven of the Board members (58%) have significant operational or regulatory experience of healthcare services, contributing experience from different parts of the World

Individual Directors also bring a number of other attributes and experiences.

The Board will continue to consider appropriate skills, gender and cultural balance when reviewing future Board appointments.

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          54 of 142          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

The Board considers that the extensive and diverse business, cultural and operational experience of all the Directors, both Independent and non-Independent, ensures a good balance in all aspects of Group decision making and control. The above attributes also enable the Board to take account of diverse and independent judgement to bear on key issues of:

• strategy, including constructively challenging the strategic direction of the Group;
• scrutinising and challenging the performance of the Group;
• assessing risk and controls operating within the Group and in its decision making; and
• standards of conduct and governance and other matters presented to the Board.

Similar practices to ensure a diverse employee base is also operated within the Group's businesses and this is summarised in the Corporate Social Responsibility report on pages 27 to 33.

### BOARD INDEPENDENCE
The Board considers the following Directors to be independent:

• Mark Tompkins
• Dr Ayesha Abdullah
• Jonathan Bomford
• Lord Clanwilliam
• Heather Lawrence
• Salma Hareb
• Dr Nandini Tandon

Independent Non-Executive Directors met separately to the other directors during the year. During their meetings the Independent Non-Executive Directors discussed various board related matters and other matters which, given their position as Independent Directors, they considered were of interest to them.

The Board does not, or in the case of previous Directors of the Company, did not, classify the following as Independent for the reasons stated:

• His Excellency Saeed Bin Butti until his resignation from the Board on 24 February 2014 because of his significant shareholding in the Company.
• Khalifa Bin Butti until his resignation from the Board on 25 March 2014 because of his significant shareholding and his Executive role in the Company.
• Dr B.R. Shetty because of his significant shareholding and his Executive role in the Company.
• Abdulrahman Basaddiq, because he was nominated to be appointed a Director by one of the Company's Principal Shareholders.
• Keyur Nagori, because he was recommended for appointment as a Director by one of the Company's Principal Shareholders and is an employee of a company in which that Principal Shareholder has a Controlling Interest.
• Prasanth Manghat because of his Executive role in the Company.
• Binay Shetty because of his previous Executive role in the Company.

The Board considers that it is Independent.

### TENURE OF INDEPENDENT NON-EXECUTIVE DIRECTORS
Provision B.1.1 of the Code suggests that length of tenure is a factor in determining the independence of non-executive directors. The table below therefore shows how long each of the Independent Non-Executive Directors have been members of the Board.

|  | Date of appointment | Full Term years to 2015 AGM | Considered to be independent by the Board |
| --- | --- | --- | --- |
| H.J. Mark Tompkins | 7 March 2012 | 3 | Yes |
| Dr Ayesha Abdullah | 26 June 2014 | 1 | Yes |
| Jonathan Bomford | 27 June 2013 | 2 | Yes |
| Lord Clanwilliam | 7 March 2012 | 3 | Yes |
| Heather Lawrence | 19 March 2012 | 3 | Yes |
| Salma Hareb | 26 June 2014 | 1 | Yes |
| Dr Nandini Tandon | 26 June 2014 | 1 | Yes |

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          55 of 142          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

Governance

# CORPORATE GOVERNANCE REPORT
CONTINUED

**KEY ROLES AND RESPONSIBILITIES IN THE GOVERNANCE STRUCTURE**

The roles of the Chairman and Chief Executive Officer ("CEO") are separate.

**Chairman**

The Chairman was appointed to the Board in March 2012 in anticipation of the Company's IPO. He was independent at the time of his appointment and is considered to be independent by the Board. The Chairman is responsible for the proper functioning of the Company's Board of directors who oversee the strategic direction of the Group including:

• the effective operation and governance of the Board
• setting the agenda and coordinating the style and tone of Board discussions
• ensuring the directors receive accurate and timely information

**Chief Executive Officer**

The Chief Executive Officer is responsible for identifying, with the senior management team, opportunities that are deemed appropriate and in line with the Board's strategic objectives. He is also responsible for delivering the key strategic objectives set by the Board. The Chief Executive Officer is assisted in this task by the senior management team who meet regularly to review the performance of the business, the progress of key capital projects, new development opportunities as well as other material matters arising within the business.

**Senior Independent Director**

The Senior Independent Director acts as a sounding board for the Chairman and serves as an intermediary for the other Directors as required. The Senior Independent Director is available to shareholders if they have concerns which they have not managed to resolve through the normal channels of the Chairman or the Executive Directors, or who feel that such contact is inappropriate for the concerns that they may have.

**Group Company Secretary**

The Group Company Secretary acts as Secretary to the Board and to the Board Committees. He assists the Chairman in ensuring that all Directors have full and timely access to all relevant information and in organising induction programmes for new Directors. The Group Company Secretary is responsible for ensuring that the correct Board procedures are followed and advises the Board on corporate governance matters. The appointment and removal of the Group Company Secretary is a matter for the Board as a whole.

The biographical details of the Chairman, Executive Vice Chairman & CEO and Senior Independent Director can be found on pages 36 to 41. The biographical details of the Group Company Secretary can be found on page 44.

**CONFLICTS OF INTEREST**

Given the previous history of the Group as a private business, the Board is aware of the interest that some Directors have in other businesses in which they have invested. Any conflicts of interest and related party transactions that may arise are monitored by:

• A list of the other interests of each Executive Director being circulated to the Board at each of its Board Meetings;
• Each of the Directors are asked to confirm that they have no other interests which would conflict them for the purposes of any item to be discussed at the meeting; where such conflict is reported, the respective Director is not permitted to take part in the consideration of that matter by the Board;
• Each Director discloses to the Board any related party transactions in which they are connected, and such transactions are reported in the Group's financial statements.

Whilst Directors on the Board have other business interests, the Board do not consider that these, nor the time commitment that they require, affect the ability of such Directors to undertake their role or comply with their statutory obligations.

**BOARD MEETINGS**

The Group Company Secretary supports the Chairman in finalising an agenda for each Board meeting and ensuring that appropriate papers are provided from the management team in a timely manner for circulation in advance of Board and Board Committee meetings. This is to ensure that fully informed decisions can be reached.

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          56 of 142          Hashem, et al., v. NMC Health PLC, et al.,
                                                                                    2:20-cv-02303-CBM-MAA

The Board considers the following standard matters at each of its Board meetings:

- Operational performance through the Executive Vice Chairman & CEO's report
- Financial performance, including monitoring current and forecast trading, cash and debt levels against its expectations presented through the CFO report
- Progress being made on the Group's key capital development projects and other potential growth opportunities
- Legal and regulatory matters
- Investor relations, including an update in relation to activity in the Company's shares and principal movements of its shareholders

During the course of the 2014 financial year the Board has also considered, as appropriate:

- the Group's half-year and full-year results
- interim management statements
- updates from the Chair of discussions held at each of the Board Committees
- the proposed budget for the following financial year
- the Group's future strategy and potential developments and growth opportunities
- the changes made in the Corporate Governance environment
- Ongoing review of progress in relation to the implementation of the group's new IT systems
- Monitoring of progress in relation to the Group's capital development projects
- Risk Management and the Group's approach to risk.

**BOARD EFFECTIVENESS**
**Director Induction**
On appointment, directors have the benefit of a personalised induction programme which is undertaken during the first few months of their tenure as a director. Each induction programme covers a number of different areas including:

- briefings and presentations from management to understand the business operations and financial drivers
- their legal and regulatory responsibilities as directors and the governance environment in which the Company operates
- opportunities to visit the Group's key facilities and new capital development project locations
- meetings with the Company's key advisors

**Board information and professional development**
The Directors maintain an appropriate dialogue amongst themselves and with senior management, which ensures that Non-Executive Directors are kept up to date with major developments in the Group's business.

Following an initial induction process, it is important that the Non-Executive Directors meet with management and undertake visits to operational facilities each year in order to further understand the way the business operates and any change within the business. Each of the Non-Executive Directors who have been in office for the full financial year have visited Company facilities a number of times in 2014, with particular emphasis on monitoring progress in relation to the Company's key capital projects and to oversee the implementation of improving controls and governance within the Group.

As part of their overall training and development needs, all of the non-executive directors who have served for the full year agreed a 2014 training and professional development plan with the Chairman and have attended externally provided seminars and discussion forums during the year relating to their general responsibilities as Directors or areas of specific responsibility, in particular in relation to the Board Committees on which they serve. The Directors appointed during the year have undertaken an induction program as outlined above. Development plans for all board members will be agreed for 2015.

**Performance evaluation**
As mentioned above, the Board did not undertake an evaluation of its own performance during the year to 31 December 2014. Given that the enhanced Board has been in office since mid-2014, the Board will consider appropriate processes to formally evaluate the performance of directors individually and collectively during 2015.

**Election and re-election of directors**
All of the directors of the Company submit themselves for re-election at the annual general meeting of the Company to be held on 16 June 2015, with the exception of Mr Keyur Nagori, who will seek election at his first annual general meeting as required by the Company's articles of association. Each resolution for re-election or election of a retiring director will be proposed as a separate resolution. Whilst a formal performance evaluation has not taken place, the Board confirms that the contribution made by each director to board deliberations continues to be effective and that the shareholders of the Company should support their re-election or election.

Governance

# CORPORATE GOVERNANCE REPORT
## CONTINUED

### Independent advice

Each of the directors is permitted to obtain independent legal advice at the Company's expense in the performance of their duties as directors. This would normally be managed through the Group Company Secretary.

All directors, and the Board as a whole, also have access to the advice and services of the Group Company Secretary who, under the Chairman's direction, is responsible for ensuring that good Board procedures are followed.

### Indemnification of directors

The Company has put in place a Directors and Officers Liability Insurance policy which provides all Board members with insurance cover in respect of liabilities that may arise against the Directors collectively or individually. The Directors do not benefit from any form of qualifying third party indemnities made by the Company.

### BOARD COMMITTEES

The Board has established an Audit Committee, a Clinical Governance Committee, a Nominations Committee and a Remuneration Committee. The terms of reference of each committee are available on our website at www.nmchealth.com. Further details in relation to these Committees are set out below.

### Board and Board Committee attendance in the 2014 financial year

During the period under review, the Board met on nine occasions; six of these meetings were scheduled as full periodic board meetings and three meetings were either brief meetings on matters requiring board approval or ad-hoc matters which arise. Scheduled periodic Board Meetings are planned in each financial year to be split, where possible, evenly between London and Abu Dhabi.

The attendance of the Directors at each of the Board and Committee meetings during the period was as follows:

| | Board Meetings | Audit Committee | Remuneration Committee | Clinical Governance Committee | Nominations Committee |
|---|---|---|---|---|---|
| H.J. Mark Tompkins | 9(9) | - | 2(2) | 1(1) | 4(4) |
| Dr B.R. Shetty | 8(9) | - | - | - | - |
| Dr Ayesha Abdullah | 3(4) | 2(2) | - | 2(2) | - |
| Abdulrahman Basaddiq | 6(7) | - | 3(3) | - | 1(1) |
| Jonathan Bomford | 9(9) | 5(5) | 5(5) | 1(1) | 3(3) |
| Lord Clanwilliam | 8(9) | 3(3) | 5(5) | 1(1) | 4(4) |
| Salma Hareb | 2(4) | - | 2(3) | - | - |
| Heather Lawrence | 7(9) | 5(5) | 2(2) | 3(3) | 3(3) |
| Prasanth Manghat | 4(4) | - | - | - | - |
| Keyur Nagori | 3(4) | - | - | - | - |
| Binay Shetty | 4(4) | - | - | 2(2) | - |
| Dr Nandini Tandon | 3(4) | - | - | 0(2) | - |
| His Excellency Saeed Bin Butti | 0(3) | - | - | - | - |
| Khalifa Bin Butti | 0(3) | - | - | - | - |

\*   Note: The number of meetings that each director could have attended during the period under review is noted in brackets.

### Enhancement of Board Committee membership and structure

Prior to June 2014, all of the Board Committees, with the exception of the Audit Committee, had a similar structure with all of the Independent Non-Executive Directors being a member of each Board Committee, although each of the Committees had a different Chair Person. The Audit Committee was an exception as the Chairman of the Company had resigned as a member of that Committee in December 2013.

Following the increase in the number of Directors appointed to the Board, the Board decided that a change in the structure of each Board Committee be undertaken. Each of the Board Committees has retained the same Chair Person, but since June 2014 the constitution of each Committee has changed such that they have a different membership structure to the other Committees. The Board consider that the different experience and cultural diversity of each Committee benefit the work and oversight of each Committee and therefore the governance structure of the Board as a whole.

## AUDIT COMMITTEE REPORT

### Audit Committee Chairman foreword

This is my second Audit Committee report since my appointment as Audit Committee Chairman in June 2013.

2014 has seen further changes in various aspects of UK listed company reporting and governance requirements, and I am pleased to report that both management and the audit committee have been committed to ensuring that they have a good understanding of these new requirements as they arise. This report sets out the work of the Committee, significant matters addressed by the Committee during the year and the responsibilities of, and work undertaken by, the external and internal auditors.

### THE AUDIT COMMITTEE

### Membership

The Audit Committee has consisted entirely of independent non-executive directors during the year under review. The Audit Committee members who have served during the year are:

| Audit Committee Member | Position | Period of membership during 2014 |
|---|---|---|
| Jonathan Bomford | Audit Committee Chairman and financial expert | Member and Chairman of Audit Committee throughout the year |
| Dr Ayesha Abdullah | Independent Non-Executive Director | Member of Audit Committee since 26 June 2014 |
| Heather Lawrence | Independent Non-Executive Director | Member of Audit Committee throughout the year |
| Lord Clanwilliam | Independent Non-Executive Director | Member of Audit Committee until 26 June 2014 |

During the 2014 financial year, the Chairman of the Committee and the Committee's financial expert is Mr Jonathan Bomford. Mr Bomford is a Chartered Accountant and his biographical details and experience are set out on page 38 of the annual report.

### Key role and responsibilities

The key role of the Committee is ensure that the integrity of published financial information by the Company, and the effectiveness of both external and internal audit processes, are appropriate to ensure that the interests of all shareholders are protected.

The Audit Committee assists the Board in:

- discharging its responsibilities with regard to financial reporting, external and internal audits and controls;
- reviewing the Company's financial results announcements, Annual Report and audited financial statements;
- monitoring the independence and extent of the non-audit work undertaken by the external auditors;
- making recommendations to the Board on the appointment of external auditors and the level of their remuneration;
- reviewing the effectiveness of the Company's internal audit activities and internal policies;
- overseeing the Group's compliance processes; and
- undertaking reviews of the Group's internal controls and risk management systems.

The Audit Committee is required to report regularly to the Board of Directors in relation to its findings on the above. The ultimate responsibility for reviewing and approving the Company's Annual Report and audited financial statements and the half yearly reports remains with the Directors of the Company.

### Committee meetings

The Audit Committee met formally five times during the year. The Meetings are scheduled to align with the Group's reporting timetable with planning meetings in advance of both the half-year review and full-year audit, and approving meetings shortly in advance of the announcement of the Group's half-year and full-year results.

Meetings are normally attended by the Chief Executive Officer, the Deputy Chief Executive Officer and the Chief Financial Officer. The Chairman and some other Non-Executive Directors also attend some meetings. The Group Company Secretary acts as Secretary to the Committee. The Committee also meets separately with the external auditors, the internal auditors and management with the other parties not present.

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          59 of 142          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

Governance

# CORPORATE GOVERNANCE REPORT
## CONTINUED

**Main activities of the Committee during the year**

During the year, the Committee has focussed significantly on areas of corporate governance and management of risk. Specific items which the Audit Committee discussed during the year included:

- The implementation of the new ERP financial accounting system.
  The Group is in the process of implementing a new accounting IT system which is designed to ensure a less manual working environment than has previously been in existence when the Group was in private ownership. Implementation of the new system commenced in 2013 and has been delayed as a result of a number of technical issues arising which have had to be resolved. Implementation is now being progressed on a phased basis as regards the specific functions of the new system and also the facilities into which the system is being implemented. The Committee has monitored implementation progress and asked for the independent verification of certain aspects of the implementation plan for assurance.
- Capitalisation of Work-In-Progress
  The capital expenditure programs were reviewed by the Committee regularly. The Committee looked into the costs incurred, costs versus budgets, accounting of capitalisation of work in progress and finally the re-classification of such costs to the relevant asset category when the project is completed and its disclosure in the financials. During the current year, the Group had re-classified three of its projects under development based on the extent to which it was completed and commenced operations. The Committee also reviewed the technical paper on the impairment assessment on the capital projects.
- Risk Management
  In addition to the evolution of governance processes within the Group, the external focus and increasing Board responsibility in relation to risk has resulted in the Committee considering the Group's approach to risk, its risk appetite and the process through which management mitigate the Group's key risks and uncertainties. These considerations were in the form of either direct discussion on risk or indirectly whilst other matters were being discussed. The Committee, on behalf of the Board, will monitor the new strategic risk management process that the management team has implemented from 2015, further details of which are set out below.
- The internal audit program.
  Internal Audit Reports are presented at Committee meetings twice a year. During 2014, the internal audit plan has been more focussed and has been set to ensure that those areas of key and strategic risks are more closely and independently monitored. As part of their work during the year, and given its importance to the Group's future Control Environment, the Committee instructed the Internal Auditors to undertake a review of the implementation plan for the Group's new ERP Financial system and asked them to review and confirm that all principal manual business processes are fully reflected in the new system.
- Internal Control environment.
  Given the lack of robust IT systems in place fully across the Group, the Committee continues to monitor closely the Group's Internal Control Environment and this, and connected issues, were therefore the subject of specific discussions during the year. In particular the Committee has been keen to understand the extent to which non-automated processes provide assurance to the Board that the Control Environment is effective. The Committee is also keen to ensure that management reflect all good and efficient business practices and processes which the businesses have operated under are fully reflected in the implementation of the Group's new IT systems. During the 2015 financial year, the Audit Committee is intending to continue to closely monitor the roll-out of the Group's new financial system, which the Committee sees as the one key element of the Group's future internal control environment.

**Other considerations in review of Financial Statements**

In addition to the above main activities on which the Committee focussed during the year, the following matters were also reviewed as part of the Committee's consideration, and approval, of the FY2014 Interim Results and this 2014 Annual Report:

- Revenue recognition
  The Group has a number of revenue streams across both its Healthcare and Distribution businesses. Whilst the Group ordinarily acts as principal in relation to its sales, there are a number of areas within both businesses where the recognition of revenue has been reviewed to ensure that the correct treatment of principal versus agency revenue has been adopted in all business areas. There is a risk that incorrect accounting treatment could be adopted within a particular business unit, for example agency revenue being treated as principal revenue. Any error of this nature would affect the Revenue and not the EBITDA of the Group. The Committee has reviewed the different treatment adopted by management in each relevant business unit and is comfortable with the accounting for revenue across the Group.
- Trade receivables and other receivables
  The time taken for payers to settle invoices in the UAE is generally longer than would normally be expected in other parts of the world. In addition, within the Healthcare division, the vast majority of healthcare customers settle their invoices through medical insurance claims. The Group therefore experiences delays in payment as a result of the time taken to process claims through insurance companies and to arrange settlement of the claim. In the distribution business, payment delays are experienced from bulk retail sales customers and delays in processing bulk discounts and rebates achieved from key suppliers have an additional effect on receivables and working capital. The level of both trade and other receivables has been improving following a number of actions undertaken by management, but this will continue to be a key focus for the Committee particularly to ensure that adequate bad debt provisioning is made.

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          60 of 142          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

## Internal control

The Committee has reviewed the process by which the Group evaluates its control environment. The CFO provides a report to the Audit Committee on the effectiveness of internal controls and confirms to the Committee whether or not he is aware of any significant fraud that may have occurred within the business. The internal auditors also undertake a review across a wide range of control areas to give the Audit Committee and the Board assurance on the internal control environment.

## Risk Management

The Committee has previously reviewed and monitored a detailed register of risks which is produced by management and reviewed in conjunction with the Internal Auditors. This risk register is produced in discussions with the Group's operating facilities. As detailed below in the section on risk mitigation, the Audit Committee has considered an enhanced risk management structure recommended by management under which the Group's key risks are reviewed alongside the macro-economic environment within which the Group operates to establish a Strategic Risk Register. This register will be reviewed by the Audit Committee and the Board as part of their standard processes. Further details on strategic risks are set out on page 26.

## Internal audit

A review of the work undertaken by the Group's internal auditors is an agenda item for the majority of Audit Committee meetings. The internal auditors report to the Committee their findings together with action plans to resolve any matters which they believe require to be addressed. Action plans are graded with key high risk matters taking priority to be resolved.

## External audit and auditor independence

The Committee believes that the effectiveness of the external audit is dependent on the identification of key risks during the financial year under review. EY produces and discusses with the Committee a detailed audit plan identifying these key risks, the focus of audit procedures and the work to be done to test management's assumptions and accounting treatment in these areas.

The Committee meets separately with the External Auditors to ensure that an independent dialogue is maintained in relation to monitoring key business and financial risks and to ensure that management have not restricted the scope of their audit. The Audit Committee Chairman also meets with the lead audit partner on a number of occasions during the year outside the formality of Audit Committee meetings.

The Committee discusses separately with management matters arising from the audit process and also to assess their view of the effectiveness of the audit work being undertaken.

The Committee did not undertake a formal review of the effectiveness of the external audit during the year although the Audit Committee and the external auditors discussed the audit process in detail, including matters which had worked well and areas of improvement in audit process for FY2014.

## Auditor fees and appointment

EY were appointed as auditor to the Company at the time of the Company's IPO in April 2012. The Company agreed a basis for audit fees for the three year period of 2012, 2013 and 2014 and agreed that, subject to their annual re-appointment by shareholders, EY would remain as Auditors to the Group for those financial years. The level of audit fees paid in relation to the 2014 financial year is set out in note 11 to the Consolidated Financial Statements.

## Non-Audit fees

During FY2014, the level of non-audit fees, excluding the fees for the half-year review, amounted to a total of US$0.19m.

The Audit Committee has adopted a non-audit fees policy whereby it will only permit such fees in circumstances where they feel that use of the auditor firm is necessary, appropriate or efficient, and has delegated authority to the CFO to agree such projects subject to a strict cap on fees in relation to each financial year.

Governance

# CORPORATE GOVERNANCE REPORT
## CONTINUED

### Auditor Independence

The Audit Committee formally reviewed the independence of the Company's auditor, EY, during the period under review. The review took account of the relationship between management and the audit team, the processes that EY have in place internally to ensure objectivity and independence and also the level of non-audit fees incurred during the year.

As part of this review the Committee reviewed the potential threats to auditor independence as a result of:

- auditor self-interests, being those areas where the auditor may have a financial or other interest in the Company;
- auditor self-review, being areas where the results of non-audit services are reflected in the amounts included or disclosed in the financial statements;
- management threats, which may occur if partners or employees of the auditor take decision on behalf of management; and
- Other threats, such as familiarity and intimidation.

The Audit Committee is satisfied that in all areas sufficient safeguards were adopted by the auditor and that the independence of EY and of the audit engagement partner had not been compromised. There is no limitation of liability in the terms of appointment of the Auditor for the audit of the Company's financial statements.

### Jonathan Bomford, FCA
On behalf of the Audit Committee

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          62 of 142          Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

## CLINICAL GOVERNANCE COMMITTEE

### Clinical Governance Committee Chair foreword

The Clinical Governance Committee was established in June 2013 and has met regularly to provide independent Board oversight in the key area of Clinical Governance. The Committee works with the Group Medical Director and Vice President - Quality and Standards to ensure that the governance structure within the healthcare business is appropriate to ensure that clinical care is enhanced and that clinical quality indicators are monitored. This oversight is designed to mitigate as far as possible the risks associated with operating a healthcare organisation.

Dr G.V.J. Prabhakar joined NMC Healthcare towards the end of 2013 and during 2014 he has focussed on enhancing the monitoring of quality and standards within the Healthcare Division. Good progress has been made during the year with the majority of key clinical care indicators improving, a wider range of clinical care indicators being monitored and a governance structure being implemented in each of the Group's new healthcare facilities. The rate of progress in the evolution of healthcare regulation in the UAE has also increased and the Committee is delighted with the determination of management to keep up to date with regulatory change ensuring that the Group is well positioned in its compliance with all regulatory requirements.

The Quality team and clinical care monitoring within the business is being further enhanced which will give further assurance to management and the Board in relation to clinical risk mitigation. I would like to thank my fellow Committee members for their contribution during the year and Dr C.R. Shetty, Dr G.V.J. Prabhakar and the NMC Quality and Standards team for the excellent work which they continue to do.

### Clinical Governance Committee

The Committee was established by the Board to provide assurance to shareholders that the key risk of clinical care and quality associated with the Group's healthcare business is independently monitored.

The Committee consists of a majority of Independent Non-Executive Directors during the period under review. The Clinical Governance Committee members who have served during the year are:

| Clinical Governance Committee Member | Position | Period of membership during 2014 |
| --- | --- | --- |
| Heather Lawrence | Clinical Governance Committee Chair | Member and Chair of Clinical Governance Committee for the full financial year |
| Dr Ayesha Abdullah | Independent Non-Executive Director | Member of Clinical Governance Committee since 26 June 2014 |
| Binay Shetty | Non-Executive Director | Member of Clinical Governance Committee since 26 June 2014 |
| Dr Nandini Tandon | Independent Non-Executive Director | Member of Clinical Governance Committee since 26 June 2014 |
| Lord Clanwilliam | Independent Non-Executive Director | Member of Clinical Governance Committee until 26 June 2014 |
| H.J. Mark Tompkins | Independent Non-Executive Chairman | Member of Clinical Governance Committee until 26 June 2014 |
| Jonathan Bomford | Independent Non-Executive Director | Member of Clinical Governance Committee until 26 June 2014 |

Meetings of the Committee are scheduled three times per financial year. In addition to the Clinical Governance Committee members, the Group Medical Director and Vice President - Quality and Standards attend each meeting. The Group Company Secretary is Secretary to the Committee.

Exhibit 8 to B.R. Shetty's Request for Judicial Notice                63 of 142                Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

Governance

# CORPORATE GOVERNANCE REPORT
## CONTINUED

**Key role and responsibilities**

The key role of the Committee is to oversee governance structures, processes and controls in relation to Clinical matters in place within the Group healthcare operations. This is to ensure that the risks associated with clinical care are mitigated in the interests of the Company and its stakeholders, including shareholders.

Specific responsibilities of the Committee, and work undertaken by it during the year, include:

- Ensuring processes and controls are in place across the NMC Healthcare hospitals to promote safety and excellence in patient care and manage risks arising from clinical care on a continuing basis;
- Review the systems of clinical governance, monitoring that they operate effectively and that action is being taken to address any areas of concern;
- Review clinical performance indicators quarterly to gain assurance;
- Reviewing the governance structures and KPI monitoring put in place in the Group's new healthcare facilities, Brightpoint Royal Women's Hospital and NMC General Hospital in DIP, including KPIs and clinical guidelines used to monitor performance;
- Consideration of the procedures in place within NMC facilities and implemented by the Health Authorities in the UAE to deal with any incidence or outbreak of Ebola in the country; and
- Review compliance to local Health Authority requirements and standards as well as reviewing the implications of any new regulations which are adopted from time to time.

An outline of the Clinical Governance and Quality framework in place within the Healthcare division, and the primary initiatives that the business has undertaken during the year to improve the level of quality and patient care are set out in the Corporate Social Responsibility Statement on pages 27 to 33.

The establishment of the Clinical Governance Committee was undertaken as a result of an appreciation of the clinical risks faced by the Group. As a result the Committee is a key aspect of the Group's internal control environment.

The Chair of the Clinical Governance Committee is also a member of the Audit Committee which assists in ensuring that the two committees interact providing an overall control and governance framework to manage the Group's key clinical risks.

**Heather Lawrence, OBE**
For and on behalf of the Clinical Governance Committee

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          64 of 142          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

## REMUNERATION COMMITTEE

Details of the Remuneration Committee, its membership and its role and responsibilities, is set out in the Remuneration Report on pages 67 to 85.

## NOMINATIONS COMMITTEE

The Nominations Committee has consisted of a majority of Independent Non-Executive Directors during the year under review. The Nominations Committee members who have served during the year are:

| Nominations Committee Member | Position | Period of membership during 2013 |
|---|---|---|
| H.J. Mark Tompkins | Nominations Committee Chairman | Member and Chairman of Nominations throughout the year |
| Abdulrahman Basaddiq | Non-Executive Director | Member of Nominations Committee since 26 June 2014 |
| Lord Clanwilliam | Independent Non-Executive Director | Member of Nominations Committee throughout the year |
| Heather Lawrence | Independent Non-Executive Director | Member of Nominations Committee until 26 June 2014 |
| Jonathan Bomford | Independent Non-Executive Director | Member of Nominations Committee until 26 June 2014 |

The Nominations Committee has a role to assist the Board in:

- reviewing and making recommendations to the Board in relation to its structure, size and composition;
- reviewing succession planning in place for senior management;
- determining the appropriate skills and characteristics required of directors; identifying individuals qualified to become Board members and recommending such individuals to the Board;
- recommending individuals to be considered for election as Directors at the next Annual General Meeting of the Company or to fill vacancies; and
- preparing a description of the experience and capabilities required for a particular Board appointment.

The Committee will also undertake annual reviews of the composition of the Board and assess various attributes of each Board member. Whilst the composition of the Board was considered by the Committee during 2014, reviews have not yet been undertaken in relation to the attributes of each Board member. Such reviews will be part of the Board's appraisal and effectiveness review program when this commences.

The Nominations Committee met four times during 2014. The matters considered by the Committee included:

- The recommendation for the appointment of new Directors to the Board in June 2014.
- The change in the senior management structure announced by the Company in October 2014.

Other than in relation to specific matters which the Nominations Committee will be required to discuss, it is expected that the Nominations Committee will meet at least once in each financial year, or otherwise as requested by any member of the Committee. The Committee would expect to meet to consider appropriate candidates to fill any vacancy created on the Board should such a vacancy arise or be considered appropriate given other skills and experience on the Board. The Committee will also meet to review progress on the implementation of a new board appraisal and effectiveness review and any effect the results of such review has on the structure of the Board.

The duties and activities of the Committee during the year will be disclosed in the Company's Annual Report and audited financial statements each year.

Exhibit 8 to B.R. Shetty's Request for Judicial Notice    65 of 142    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

Governance

# CORPORATE GOVERNANCE REPORT
CONTINUED

## SHAREHOLDER ENGAGEMENT

The Company is committed to communicating with shareholders and stakeholders and to be available to meet with shareholders who require additional explanation of any matter which is of concern to them.

The Chairman and Senior Independent Non-Executive Director are also available, either through contacting the Company Secretary or at the Company's Annual General Meeting, to discuss any matters within their areas of responsibility or where individuals do not feel it is possible to discuss these matters with management.

During 2014, the Company has continued to focus on its formal program of investor interaction including one-to-one meetings with institutional investors, investor days and attendance at investor conferences. Mr Roy Cherry, who is the Head of Strategy & Investor Relations and a member of the senior management team leads these efforts.

In relation to the financial year ended 31 December 2014, the Company issued its half year unaudited results, two interim management statements and a pre-close trading update prior to entering the close period at the end of the first half of the financial year.

Aside from direct shareholder meetings, the principal ongoing communication with shareholders will be through the publication of the Company's Annual report and audited financial statements, Interim Results and Interim Management Statements, together with the opportunity to question the Board and Committees at the AGM. Financial Results presentations are made available on the Company's Investor Relations website. Shareholders are encouraged to attend the AGM and if unable to do so are encouraged to vote by proxy. The Chairman and other board members meet regularly with the Company's brokers and/or other healthcare sector specialists to remain up to date with shareholder views and sector developments.

The Company has an investor relations section on its corporate website, www.nmchealth.com. This has been updated regularly with information that the Company considers relevant to its investors. Additionally, the number of analysts monitoring the Company and issuing notes in relation to their forecasts and expectations for the group continues to increase.

## INTERNAL CONTROL AND RISK MANAGEMENT
### Financial and operational controls

The Group has for nearly 40 years grown into a substantial business and a leader in the provision of private healthcare, as well as operating a substantial distribution business, in the United Arab Emirates. The Group is a regulated business operating many clinical and quality controls processes. Not unusually for a Group which was until recent years a private business, the financial and operational performance was monitored closely by a senior management team prior to IPO without the benefit of formal written policies and governance procedures.

Following the Company's IPO in 2012, the management team has been progressively:

- incorporating additional key internal controls into its financial and operational processes;
- implementing new policies and procedures covering all aspects of the Group's accounting policies and controls;
- extending its Quality Team and the Group's Quality and Clinical Governance processes;
- ensuring that Group's Internal Audit function reviews and monitors key business processes; and
- developing new financial and hospital management IT systems.

All of these changes are part of an overall process to improve the Governance structure within the Group and to improve further the Group's formal internal control processes.

The key elements of the Groups' internal controls are as follows:

- An annual budget and updated long-term forecasts for the Group that identifies risks and opportunities which are reviewed and approved by the Board.
- Monthly meetings at which the senior management team review Group financial and operational performance, progress on capital projects and other principal functional areas of the business.
- A system of internal monthly operational and financial reporting which includes monthly comparison of results and against budget and forecast, a review of KPIs, each discussed with additional management commentary and the reporting of key matters arising within the business during the month under review. The Group has a very flat organisational hierarchy resulting in an easy flow of information throughout the organisational structure. Communication of exceptional items happens naturally.
- A defined process for controlling capital expenditure, including appropriate authorisation levels, which is monitored and approved by the Board as appropriate.
- Medical Directors' meetings to monitor clinical governance procedures.
- The production of quarterly and annual Quality reports.

- An effective externally provided internal audit programme which independently assists management in identifying key risks to the Group and monitors those risks through a programme agreed with both management and the Audit Committee.
- The independent oversight provided by the Company's Board Committees, in particular the Audit Committee in relation to financial related matters and the Clinical Governance Committee in relation to clinical matters.
- An appropriate approach to decentralisation within the Group. Each healthcare facility has a Medical Director and Head of Administration who are accountable for the operation of the facility. Both Healthcare and Distribution divisions have Financial Controllers and a finance team and are managed through fundamental activities of planning, executing and checking. The strategic direction of all operations is governed by the corporate office. All banking, treasury, procurement and payment processing is centralised within Group functions, but accounting for payments is decentralised. The management team believes that these divisions of responsibility provide a natural check and balance across all internal control areas.
- A delegation of authority which provides that very few individuals within the organisation have payment approval authority. Access to cash is also restricted to very few individuals. All material payments are restricted to the senior management team.

### Risk appetite

As there are multiple risks associated with the healthcare sector, the process of risk management is an essential mechanism to enable risk based decision making process. The Board of Directors at NMC recognizes that complete risk control/avoidance is impossible, but that risks can be reduced by putting the right controls and mitigations in place as well as agreeing on a threshold for risk taking (risk appetite).

Risk appetite provides a structure within which opportunities can be pursued by setting out which, why and how much risk NMC is willing to take. The NMC leadership team has approved a set of risk appetite statements covering different views on the risk landscape surrounding NMC's business environment whilst addressing various risk classes. For each risk class, Key Risk Indicators (KRIs) were articulated to alert against unacceptable loss events.

The purpose of setting limits and triggers is to avoid concentrations of risk which would be out of line with internal or external expectations and to:

- keep business activities aligned to the strategic goals of NMC;
- ensure activities remain of an appropriate scale relative to the underlying risk andreward;
- ensure risk-taking is supported by appropriate expertise and capabilities.

### General Risk Appetite Statement

The Board of Directors will not accept any risks that would cause losses due to:

- malpractice,
- significant decline in patient satisfaction rate,
- brand damages,
- hospital acquired infections,
- decrease in the utilization rate for outpatient clinics,
- uncontrolled discharge for inpatients,
- downtime of life saving/ sustaining systems,
- inaccuracy of patients' records,
- non-compliance with internal and/or external controls and standards/ regulatory bodies,
- sensitive information/ patient record confidentiality breach/ loss,
- loss of sole distribution partnership agreement,
- loss of key staff/ key specialities in NMC,
- acquisitions, which are expected to be accretive and not dilutive.

NMC Board of Directors has approved a set of thresholds which relates to multiple business dimensions in the Healthcare and Distribution divisions to protect shareholders' value. Any areas falling short of the agreed indicators should be highlighted to management for action.

Governance

# CORPORATE GOVERNANCE REPORT
CONTINUED

### Approach to risk mitigation

As a regulated business, the Group operates within a framework of managing all elements of risk which arise within the Group. As a result there are a number of ways in which the Company monitors its keys risks and considers independent review of such risks to be beneficial to the Group.

### Internal Audit

The Group have appointed Crowe Horwath as Internal Auditors to the Group. The Internal Auditors report directly to the Chairman of the Audit Committee but work in conjunction with the CFO. Their reports to the Audit Committee are received and discussed at Audit Committee meetings twice a year, in June and December.

Following the completion of each review, the internal auditors identify areas for remedial action and the required action plans are discussed and agreed with management. The internal auditors present the reviews and the agreed management action plans for any remedies to the Audit Committee and then monitor the implementation of any required changes on behalf of the Audit Committee.

The consideration by the management team of the key risks faced by the Group is crucial to the work to be undertaken by the Internal Auditors. Management consider such risks before discussing with the internal auditors their planned areas of focus for reviews in each financial year. The Internal Audit plan for each year is agreed with the Audit Committee.

### Risk Management Process

The Group's risk management process has primarily been driven by scrutiny of a register of significant risks which is produced by management and reviewed in conjunction with the Internal Auditors. This risk register is produced in discussions with the Group's operating facilities. Towards the end of 2014, management decided to enhance the Group's risk management process by engaging with PwC to independently review the Group's key risks alongside the macro-economic environment within which the Group operates and to work with management and the Board in establishing a Strategic Risk Register.

The Strategic Risk Register, which is the basis for the list of principal risks and uncertainties which are set out on page 26, will be reviewed and maintained on an ongoing basis by management, with the Board retaining oversight over the Register and the risk management process.

### Quality and Regulatory oversight

Aside of financial risks, the Board is aware that as a significant healthcare business it is subject to a range of risks related to clinical care and quality.

The Healthcare division, and elements of the Distribution division, are regulated by governmental and non-governmental organisations. The key regulatory framework is set out in the UAE Economy and Healthcare Market section of the Group Strategic Report. In summary:

- Each Healthcare facility is licensed by one of four regulatory bodies which exist in the UAE. The regulatory bodies monitor performance and clinical procedures against its regulations, key metrics and guidelines;
- Each of the Group's three Specialty Hospitals is accredited by Joint Commission International, an internationally renowned organisation monitoring clinical metrics and quality of patient care;
- The distribution of pharmaceuticals is controlled through the UAE Ministry of Health;
- The majority of the Group's healthcare revenue results from medical insurance arrangements. The Group's contractual arrangements with insurance providers include the monitoring of claims processing and clinical outcomes.

The Group has a Quality Team which operates in both the Healthcare and Distribution divisions. Quarterly and annual Quality reports monitor performance against a range of key KPIs based on clinical quality and safety metrics.

The Board has created a Clinical Governance Committee which independently monitors at Board level the work of the Quality Department and the clinical team within the Healthcare business.

Further detail in relation to the approach of the Healthcare division in relation to Quality and Safety is set out in the Corporate Social Responsibility section on pages 27 to 33. The work of the Clinical Governance Committee is set out on pages 59 to 60.

### Independent Audit Committee

The Audit Committee is an independent committee of the Board and reviews, directly and indirectly, key risk factors and how those risks are mitigated. The work of the Audit Committee is set out on pages 55 to 58.

## Effectiveness of Internal Controls

The Board has overall responsibility for the Group's systems of internal control and on behalf of the Board, the Audit Committee has been engaged in the process of ensuring that management have established continuous processes for identifying, evaluating and managing the risks the Group faces. These processes include the reporting from the finance department on Group performance, the work of the internal auditors and issues identified by the external auditors to the extent covered by their audit work. The Board is responsible for monitoring the ongoing effectiveness of these systems and for conducting a formal annual review of the effectiveness of the Group's internal controls.

A system of internal controls is designed to manage, rather than eliminate, the risk of failure to meet business objectives and is designed to provide reasonable, but not absolute, assurance against material misstatement or loss.

In reviewing the effectiveness of the internal controls in place during the year, the Audit Committee considered, amongst other matters, manual controls in place, the independence of the separate operating units, the delegation of authority, the balance of centralised and decentralised systems and the reporting process in relation to exceptional items.

The Audit Committee has noted that the Group does not operate under a fully integrated high end IT environment and therefore an element of manual intervention is prevalent within the Group. The Board has approved the implementation of a new Hospital Information System which, together with the implementation of the new ERP financial system, will result in a new integrated IT system becoming fully functional across the Group.

The Board notes that the implementation of new IT systems will not change the level of controls inherent in the business, but they will remove elements of manual intervention from financial and operational processes. Management have taken time to ensure that all previous business processes are captured within the new IT systems. The roll out of the new ERP system into the Healthcare division is progressing. There have been challenges in relation to the roll out of the ERP system into the Distribution division as a result of the volume and types of transactions to be captured, but these challenges are in the process of being resolved. The full roll-out of the new ERP system has therefore been delayed from its original target date in the interests of ensuring that the system is compatible with the best standards of assurance. The completion of the implementation of the ERP system is expected in 2015.

The Group continues to enhance its Internal Control practices and environment and as part of that progression has also revised its Delegation of Authority matrix keeping in line with the current requirements.

In November 2014, the group carried out a strategic risk management review with the assistance of a third party, PwC, the findings of which, including the mitigating factors and its ongoing review, were discussed and deliberated by the Board. The Group's strategic risks are included in the Principal Risks and Uncertainties section on page 26 and the description of the Group's risk appetite on page 63.

The Board has reviewed the effectiveness of the Group's systems of internal controls for the 2014 financial year, in light of the key elements of the Group's internal controls outlined above. Given the additional internal controls that have been incorporated into the Group's financial and operational reporting process, such that sufficient internal controls were in place to monitor the Group's key risks, the Board believes, having evaluated the effectiveness of the internal controls and procedures, that these were effective during the period covered by this report. The Board also believes that the process undertaken by the Board and its Committees to monitor the internal control environment, accords with the guidance provided in Internal Control: Revised Guidance for Directors on the Combined Code.

## OTHER GOVERNANCE MATTERS

### Whistleblowing Policy

A confidential whistleblowing procedure is in operation allow employees to raise concerns of possible improprieties in relation to either operational or financial conduct.

Employees have been provided with a copy of this policy and are aware of the significance of it. New employees receive training on all company policies and procedures as part of their induction program. A copy of the policy is included on the Company's employee intranet.

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          69 of 142          Hashem, et al., v. NMC Health PLC, et al.,
                                                                                                        2:20-cv-02303-CBM-MAA

Governance

# CORPORATE GOVERNANCE REPORT
CONTINUED

**Bribery Act 2010**

The Group has an Anti-Bribery and Anti-Corruption Policy which applies to all directors and employees of all Group Companies. The Policy, which has been communicated to all employees, includes clear statements setting out the Group's Anti-Bribery measures and Anti-Corruption culture. Practical guidance has been issued in relation to specific circumstances considered to be most relevant to Group employees. These include guidance notes for clinical staff attending pharmaceutical and training and development conferences in relation to entertainment and other possible inducements, as well as guidance notes in relation to the receipt of free products and equipment and how such products and incentives may affect clinical judgement. Specific guidance has also been provided in relation to the provision of sales incentives to senior sales and marketing staff within our Distribution division.

New employees receive training on all company policies and procedures as part of their induction program. A copy of the policy is included on the Company's employee intranet.

The Corporate Governance Report set out on pages 49 to 66 has been approved by the Board and is signed on its behalf by:

H.J. Mark Tompkins
Chairman

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          70 of 142          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

# DIRECTORS' REMUNERATION REPORT 2014

## Letter from the Remuneration Committee Chairman

Dear Shareholder,

I am pleased to present to you our Directors' Remuneration Report for the 2014 financial year.

In the Directors' Remuneration Report for 2013, and in accordance with new regulations in relation to listed company disclosures on Directors' remuneration, we set out the Company's Directors' Remuneration Policy.

The Directors' Remuneration policy was submitted for approval at the Company's Annual General Meeting held on 26 June 2014 and I was delighted that our policy was approved by shareholders, with 97.5% of votes validly cast were in favour of our proposals. I would like to thank all shareholders for their continuing support in this area.

There are no proposed changes in our Directors' Remuneration Policy for 2015 and therefore the Policy is not required to be set out in full and submitted for approval at this year's Annual General Meeting. However, to assist shareholders we have included a summary of our Directors' Remuneration Policy within this Directors' Remuneration Report as well as explaining how this policy will be implemented in 2015 and disclosing the remuneration earned by Executive Directors and Non-Executive Directors in 2014.

### INCENTIVE ARRANGEMENTS

Following the finalisation of our remuneration policy with the introduction of short and long-term incentive arrangements, the executive remuneration structure now fully reflects our philosophy which is to provide competitive remuneration packages which reward strong performance in line with our short and long term objectives.

The use of performance based incentives, a significant part of which is delivered in shares, seeks to align the interests of management with those of our shareholders and reflects market practice in the listed environment in which we now operate.

The operation of the Short Term Incentive Plan (STIP) was amended slightly in 2014 with a wider range of financial and operational measures being included, focussed on the Board's key aims for the year. The Company's strong growth in 2014, together with good progress in the opening of new facilities and our continued focus on clinical safety and patient care, has led to bonuses of between 71.25% and 75.0% for the senior management team for the 2014 financial year.

We have also granted awards under the Company's Long Term Incentive Plan (LTIP) for the first time in 2014. The LTIP is an integral part of the remuneration structure and ensures that Executive Directors and Senior Management work towards improved performance in the longer term and therefore become aligned with shareholders' interests. The use of Earnings per share growth and comparative Total Shareholder Return targets will ensure management focus on longer term performance.

The operation of both the STIP and LTIP are detailed in this Directors' Remuneration Report.

### ALIGNMENT OF BASE PAY

No base pay increases were awarded to any of the Executive Directors or Senior Management during the 2014 financial year. Towards the end of 2014, the Remuneration Committee (the Committee) undertook a detailed benchmarking exercise with its advisors. The benchmarking exercise for UAE based executives was undertaken by a Middle East consultancy firm and took account of base salaries and related remuneration packages for similar roles available in the UAE. The Committee concluded that base salaries were significantly behind the desired positioning taking into account market practice, the scope and responsibilities of the roles and the performance of the individuals. To address this, the Committee decided to increase base salary for the Executive Directors and Senior Management with effect from 1 January 2015. The Executive Vice Chairman & CEO's base salary was increased from £255,000 to £300,000 (a 17.6% increase). The Deputy CEO's salary was increased from £200,000 to £260,000 (a 30.0% increase) reflecting the increase in the scope of his role following his move from CFO to Deputy CEO.

### BOARD CHANGES

Both Mr Khalifa Bin Butti and Mr Binay Shetty decided to step down from their Executive roles during the year. Binay Shetty received an end of service benefit of US$58.8k. No additional payments were made to them as a result of their departure in line with the Company's policy in such circumstances. However, both Mr Bin Butti and Mr Shetty relinquished their Executive roles with the Board's very best wishes.

Governance

# DIRECTORS' REMUNERATION REPORT 2014
## Letter from the Remuneration Committee Chairman
CONTINUED

**REMUNERATION COMMITTEE CHANGES**

Finally, we have made a number of changes to the membership of the Remuneration Committee during the year made possible following the enlargement of the Company's Board of Directors. The Committee is now structured with both UK and UAE representation providing a good geographic and cultural balance to discussions on Executive Remuneration matters.

I would like to express my appreciation for the input of all my fellow Remuneration Committee members, both past and present, during the year and for their support and work in implementing a balanced and effective remuneration structure over the last two years.

Lord Clanwilliam
Chairman of the Remuneration Committee

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          72 of 142          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

# DIRECTORS' REMUNERATION REPORT 2014

## INTRODUCTION

This Directors' Remuneration Report summarises the Company's policy on Executive remuneration, the structure and role of the Remuneration Committee and, in the Annual Remuneration Report section, details of how our remuneration policy was implemented for the year ended 31 December 2014 and how we intend for the policy to apply for the year ending 31 December 2015. The Annual Remuneration Report will be subject to an advisory shareholder vote at the 2015 AGM.

Within the Directors' Remuneration Report, there is reference to a number of incentive plans used by the Company within the Executive Remuneration structure. The plans used are as follows:

- Short Term Incentive Plan (STIP) - used to deliver an annual bonus to Executive Directors and Senior Management based on performance for the financial year under review.
- Deferred Share Bonus Plan - it is the Committee's current policy that 50% of any bonus earned under the STIP is paid in shares which are retained and released after a period of three years. The Deferred Share Bonus Plan is therefore not an additional incentive arrangement, but the vehicle used to deliver the share portion of STIP bonuses earned.
- Long Term Incentive Plan (LTIP) - used to deliver rewards to Executive Directors and Senior Management based on performance over a three year period.

Where the information is subject to audit this is identified in the relevant heading.

## THE REMUNERATION COMMITTEE
### Membership

The Remuneration Committee consists of four Non-Executive Directors, three of whom are Independent Non-Executive Directors, with an Independent Non-Executive Director holding the chairmanship of the Committee. During the 2014 financial year, the following have served as members of the Committee:

| Chairman: | Lord Clanwilliam | |
| Committee members: | Abdulrahman Basaddiq | (from 26 June 2014) |
| | Jonathan Bomford | |
| | Salma Hareb | (from 26 June 2014) |
| | Heather Lawrence | (until 26 June 2014) |
| | H.J. Mark Tompkins | (until 26 June 2014) |

The Chairman of the Company is invited to attend Committee meetings. Whilst the Chief Executive Officer does not generally attend Remuneration Committee meetings, the Chairman of the Committee discussed proposed remuneration policies with him during their formulation. The Deputy CEO may attend Remuneration Committee meetings to discuss certain items at the request of the Committee but is not present when his own remuneration is discussed.

The Group Company Secretary acts as Secretary to the Remuneration Committee and provides advice to the Committee on Corporate Governance aspects relating to remuneration matters. He also provides assistance to the Chairman of the Committee as required in discussions with the Remuneration Committee advisers and on implementation of Committee decisions. The Group Company Secretary is not present when his own remuneration is discussed.

### Role and responsibility

The Remuneration Committee assists the Board in

- making recommendations to the Board on the Company's framework of executive remuneration, including the use of incentive arrangements within that framework; and
- determining on the Board's behalf the entire individual remuneration packages for each Executive Director and the senior management team.

All other recommendations must be referred to the Board for approval. In setting remuneration for senior management, the Committee has considered market practice in the UAE and are aware of remuneration structures existing for employees who are below senior management level. The Committee understands the need to incentivise executives appropriately, whilst ensuring that higher rewards are only achieved for exceptional performance.

No Committee member is permitted to participate in any discussion or decision regarding his/her own remuneration. The remuneration of non-executive directors is a matter for consideration by the Chairman of the Company, assisted by the Remuneration Committee Chairman, and the Executive Directors.

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          73 of 142          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

Governance

# DIRECTORS' REMUNERATION REPORT 2014
## CONTINUED

The Remuneration Committee terms of reference clearly set out its authority and duties and were approved by the Board prior to IPO. The terms of reference are available on the Investor Relations section of the Group's website at www.nmchealth.com, or by contacting the Group Company Secretary.

### Support and External Advice

The Remuneration Committee seeks and considers advice from Deloitte LLP, independent remuneration advisers. Deloitte provides no other advisory role to the Group. Deloitte were appointed by the Remuneration Committee and have acted as advisors to the Company since 2012, specifically providing the Committee with objective and independent advice on executive remuneration matters. Deloitte is a founding member of the Remuneration Consultants' Group and, as such, voluntarily operates under the code of conduct in relation to executive remuneration consulting in the UK. The Committee is satisfied that the advice they have received from Deloitte during the year has been objective and independent. The Committee is satisfied that the Deloitte LLP engagement partner and team, which provide remuneration advice to the Committee, do not have connections with NMC that might impair their independence. The Committee reviewed the potential for conflicts of interest and judged that there were appropriate safeguards against such conflicts.

The Chairman has direct access to Deloitte as and when required. The Group Company Secretary liaises with Deloitte as required to ensure that all Committee requests and decisions are dealt with and implemented, but does so under the guidance of the Remuneration Committee Chairman. Deloitte attend meetings of the Committee as required.

During the year, Deloitte provided the following services and advice to the Committee:

- Latest market practice and trends in relation to remuneration practices in FTSE250 companies;
- An update of the governance structure and latest shareholder views in relation to remuneration policies and practice;
- Assistance in reviewing and setting the targets used for the operation of the 2014 STIP and the initial award grants under the Deferred Bonus Plan in relation to the 2013 STIP; and
- The setting of targets, composition of an appropriate comparator group for use in measuring Company performance and the granting of awards under the LTIP, used for the first time in 2014.

Deloitte received fees of £39.3k (charged on a time plus expenses basis) for advice received during the year.

The Committee also received market data from Hay Group, an independent third party organisation, in relation to the benchmarking of UAE Executive Director and Senior Management remuneration at a cost of $7.5k.

### Meetings

The Remuneration Committee met formally five times during the period under review, in addition to a number of discussions held informally during the year whilst the structure and implementation of the new incentive arrangements were being discussed.

The significant discussions in relation to the structure of Executive Director and Senior Management remuneration had taken place during 2013. Therefore the Committee's primary discussions during the year related to the operation of each element of the Executive remuneration package and specifically in relation to:

- A review of the STIP following the first year of operation which resulted in a number of amendments to the measures used to assess performance in the year, but not to the structure of the STIP;
- Consideration of the structure of the LTIP which commenced in 2014, including the quantum of awards and the performance conditions to apply to LTIP awards made;
- The granting of initial share awards under both the Deferred Bonus Plan and the LTIP;
- A benchmarking exercise undertaken towards the end of 2014 which led to salary reviews for all members of senior management, including the Executive Directors, with effect from 1 January 2015; and
- Consideration of matters relating to the resignation of both Khalifa Bin Butti and Binay Shetty from their Executive roles during the year.

#### Assessment of risk and key priorities

The Committee is aware of the need to be mindful of potential risks associated with elements of executive remuneration. The Committee is keen to ensure that variable remuneration is not structured in such a way as to encourage the taking of undue business risks for the purposes of achieving higher remuneration.

The remuneration structure ensures that an appropriate reward system is in place, but considers that the incentive structure mitigates key business risks as follows:

• the deferral of 50% of STIP awards into shares for a three year period;
• the initial share awards made under the LTIP in 2014 will encourage focus on long term share value enhancement;
• the STIP includes both financial and operational measures, with differing targets for various individuals, which the Committee believe are key to the success of the Company in a particular financial year;
• market practice malus provisions allow the Company to forfeit the delivery of share related benefits to plan participants. The Committee is reviewing the malus and clawback provisions for incentive arrangements in light of the recent changes to the UK Corporate Governance Code.

#### SUMMARY OF DIRECTORS' REMUNERATION POLICY

The following provides a summary of the Company's approved remuneration policy for Executive and Non-Executive Directors and is not subject to audit. The full Directors' Remuneration Policy, as approved by shareholders at the 2014 AGM, can be found at www.nmchealth.com/shareholder-information/

#### Executive Director Remuneration

The table below summarises the remuneration package provided to our Executive Directors.

| Remuneration element | Purpose and link to remuneration strategy | Operation | Maximum opportunity | Performance measures |
|---|---|---|---|---|
| Base salary | To attract and retain management of the calibre required to deliver the Group's strategy without paying more than is necessary.<br><br>To reward executives for the performance of their role. | Salaries are reviewed annually.<br><br>When setting base salaries, consideration is given to a number of factors including individual and performance and local market conditions. | There is no maximum salary level. | None, although an individual's performance in the role will be considered when reviewing base salary levels. |
| Benefits | To provide benefits that are competitive relative to the employee's local market. | The Group provides a range of benefits which reflect typical benefits offered in the UAE including family accommodation, Private Medical Insurance and Life and Permanent Health Insurance cover. | The cost of benefit provision will depend on the cost to the Company of providing individual items and the individual's circumstances and therefore there is no maximum value. | None. |
| Retirement benefits | To provide a market competitive retirement benefit. | The Company currently does not operate any pension arrangements, but an end of service benefit, payable to the employee when he leaves the Group, is accrued annually in accordance with local UAE laws. | The Committee will determine the level of benefit based on local market practice, individual's circumstances and their role. | None. |

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          75 of 142          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

Governance

# DIRECTORS' REMUNERATION REPORT 2014
## CONTINUED

| Remuneration element | Purpose and link to remuneration strategy | Operation | Maximum opportunity | Performance measures |
|---|---|---|---|---|
| STIP | To provide an annual bonus to attract, retain and motivate senior executives of the calibre required to manage the business and to align the interests of senior executives with those of shareholders by linking a significant proportion of the potential remuneration to performance and delivery of strategic objectives. | Bonus measures and performance targets are set annually dependent on the deemed strategic priorities for that year. The annual bonus is normally paid 50% in cash and 50% is deferred into Company shares which vest three years from award subject to continued employment. Malus provisions apply. | The maximum bonus opportunity is 100% of base salary. | Performance is based on a mix of key financial, operational/strategic metrics and individual KPIs measured over one financial year. |
| LTIP | To incentivise long-term value creation and exceptional business performance through the achievement of stretching Group financial targets. | Awards vest based on performance measured over a three year period against set targets. Awards are subject to malus provisions. | Maximum award is normally 150% of base salary. In exceptional circumstances the Committee may grant awards of up to 200% of base salary. It is intended that awards for 2015 will be 100% of base salary. | [It is intended that 2015 awards will be based 50% on earnings per share growth and 50% on relative total shareholder return growth against our key healthcare peers]. |
| Share option plan ("SOP") | To incentivise executive directors to increase the share price and deliver value for shareholders. | Awards under the plan are in the form of market value share options. It is intended that awards would only be made under this plan in exceptional circumstances. | Maximum award would normally be 150% of base salary. In exceptional circumstances the Committee may grant awards of up to 200% of base salary. | In the event that an award was to be granted under this plan in exceptional circumstances the Committee would determine appropriate performance conditions at that time. |

### SHAREHOLDING GUIDELINE
Executive directors are expected to build a shareholding of 200% of base salary over a period of 5 years.

### Committee discretion
The Committee has retained some discretion in a number of areas of the remuneration policy approved by shareholders including:

- where the terms of any payment was agreed before the policy came into effect;
- where arrangements were agreed at a time when the relevant individual was not a Director of the Company;
- the amendment of performance conditions applicable to the LTIP or Share Option Plan awards in certain circumstances;
- any payment which is not explicitly provided in this policy which is it obliged to make under UAE other relevant local laws; or
- minor amendments required for regulatory, exchange control, tax or administrative purposes or to take account of a change in legislation.

### Remuneration policy on recruitment
The Policy includes a number of principles which the Committee would seek to apply for newly appointed Executive Directors. These are not summarised here but can be reviewed within the Directors' Remuneration Policy document (http://nmchealth.com/shareholder-information/).

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          76 of 142          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

**Termination policy**

The policy includes a number of elements which the Committee will consider when individuals leave their Executive positions with the Company. These are not fully summarised here but can be reviewed within the Directors' Remuneration Policy document (http://nmchealth.com/shareholder-information/).

In general terms, if an individual leaves as a result of ill health, injury, disability, death, sale of employing company or business from the Group or for any other reason at the Committee's discretion, the Committee will normally pay contractual salary and retirement benefits and allow the retention of any incentive awards pro-rated to the date of cessation. For all other leavers, the contractual salary and benefits will be paid over any notice period to the date of cessation of employment, but unvested awards made under the Company's incentive arrangements would normally lapse. In the event of termination, the Company would also make any payments which it is contractually obliged to do under UAE law.

**Remuneration outcomes in different performance scenarios**

The Committee has set a remuneration structure which ensures that a high proportion of the potential total reward available for Executive Directors and senior management is related to the performance of the Company, and specifically that significant rewards are only paid for exceptional performance.

To demonstrate this three scenarios have been illustrated below for each Executive Director.

| | Chart label | Fixed Pay (US$) | Annual Bonus (US$) | Long-term incentive (US$) | Total compensation (US$) |
|---|---|---|---|---|---|
| Executive Vice Chairman & CEO | Minimum performance | 617,630 | 0 | 0 | 618 |
| | Mid performance | 617,630 | 175,624 | 117,083 | 910 |
| | Maximum performance | 617,630 | 351,248 | 468,330 | 1,437 |
| Deputy CEO | Minimum performance | 535,279 | 0 | 0 | 535 |
| | Mid performance | 535,279 | 152,207 | 101,472 | 789 |
| | Maximum performance | 535,279 | 304,415 | 405,886 | 1,246 |



Exhibit 8 to B.R. Shetty's Request for Judicial Notice          77 of 142          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

Governance

# DIRECTORS' REMUNERATION REPORT 2014
## CONTINUED

Fixed pay is comprised of the following:

| | Executive Vice Chairman & CEO | | | Deputy CEO | | |
|---|---|---|---|---|---|---|
| | Salary | Benefits | Pension | Salary | Benefits | Pension |
| Minimum performance | 468,330 | 149,300 | 0 | 405,886 | 129,393 | 0 |
| Mid Performance | 468,330 | 149,300 | 0 | 405,886 | 129,393 | 0 |
| Maximum Performance | 468,330 | 149,300 | 0 | 405,886 | 129,393 | 0 |

### Non-Executive Director Remuneration

| | Purpose and link to remuneration strategy | Operation | Maximum opportunity |
|---|---|---|---|
| Chairman and Non-Executive Director fees | To provide an appropriate reward to attract and retain high-calibre individuals | The remuneration of Non-Executive Directors is approved by the Executive Directors following recommendations and discussions with the Chairman of the Company and the Chairman of the Remuneration Committee. Non-Executive Directors do not currently receive any benefits. However, benefits may be provided in the future if this was considered appropriate. | The maximum level of Non-Executive Director remuneration is set out in the Company's articles of association. This may be amended from time to time subject to shareholder approval. |

Details of Non-Executive Director fees with effect from 1 January 2015 are set out on page 81.

### DIRECTORS' SERVICE AGREEMENTS AND LETTERS OF APPOINTMENT
### Executive Directors' service agreement and employment contracts
Each of the following served as Executive Directors for all or part of the 2014 financial year and for the period that they served as Executive Directors, were subject to service agreements entered into with NMC Healthcare LLC, one of the Company's subsidiaries.

| | Date of agreement |
|---|---|
| Dr B.R. Shetty | 19 March 2012 |
| Khalifa Bin Butti | 19 March 2012 |
| Prasanth Manghat | 1 May 2011 |
| Binay Shetty | 1 May 2011 |

Dr B.R. Shetty is employed by NMC Healthcare LLC pursuant to a service agreement dated 19 March 2012. The service agreement provides for an indefinite term of employment unless terminated earlier in accordance with the terms of the service agreement. The service agreement provided that, unless otherwise agreed between the parties, the service agreement can only be terminated on twelve months' prior written notice given by either Dr B.R. Shetty or NMC Healthcare LLC.

Until 25 March 2014, when he resigned as Executive Vice Chairman of the Company, Mr Khalifa Bin Butti was employed by NMC Healthcare LLC pursuant to a service agreement dated 19 March 2012. The service agreement provided for an indefinite term of employment unless terminated earlier in accordance with the terms of the service agreement. The service agreement provided that, unless otherwise agreed between the parties, the service agreement was only able to be terminated on twelve months' prior written notice given by either Khalifa Bin Butti or NMC Healthcare LLC.

Mr Prasanth Manghat is employed by NMC Healthcare LLC pursuant to an employment contract dated 1 May 2011. The contract provides for a renewable two year term of employment unless terminated earlier in accordance with the terms of the contract. The Contract provides that, unless otherwise agreed between the parties, the contract can be terminated on one months' prior written notice given by either Prasanth Manghat or NMC Healthcare LLC.

Exhibit 8 to B.R. Shetty's Request for Judicial Notice        78 of 142        Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

Until 31 December 2014, when he resigned as Chief Operating Officer of the Company, Mr Binay Shetty was employed by NMC Healthcare LLC pursuant to an employment contract dated 1 May 2011. The contract provided for a renewable two year term of employment unless terminated earlier in accordance with the terms of the contract. The Contract provided that, unless otherwise agreed between the parties, the contract was only able to be terminated on one months' prior written notice given by either Binay Shetty or NMC Healthcare LLC.

Copies of the Service Agreement for Dr B.R. Shetty and employment contract for Mr Prasanth Manghat are available for inspection during normal business hours at the Company's Registered Office, and are available for inspection at the Company's annual general meeting.

For future executives the Committee policy is that notice periods will not exceed 12 months. There are no matters for which the Company requires approval of shareholders for the purposes of Chapter 4A of Part 10 of the Companies Act 2006.

### Letters of appointment for Non-Executive Directors

The Non-Executive Directors do not have service agreements with the Company, but instead have letters of appointment. The appointment of each of the Non-Executive Directors is stated for an initial term until the next annual general meeting of the Company at which, and at subsequent annual general meetings, they need to submit themselves for re-election if they so wish. Each of the Non-Executive Directors have a minimum time commitment that they need to give to the Company in any year.

The letters of appointment for each Non-Executive Director are summarised below:

| Director | Position | Date of appointment | Company and Director notice period |
|---|---|---|---|
| H.J. Mark Tompkins | Non-Executive Chairman | 7 March 2012 | 3 months |
| Dr Ayesha Abdullah | Independent Non-Executive Director | 26 June 2014 | 3 months |
| Abdulrahman Basaddiq | Non-Executive Director | 24 February 2014 | 3 months |
| Jonathan Bomford | Senior Independent Director | 27 June 2013 | 3 months |
| Lord Clanwilliam | Independent Non-Executive Director | 7 March 2012 | 3 months |
| Salma Hareb | Independent Non-Executive Director | 26 June 2014 | 3 months |
| Heather Lawrence | Independent Non-Executive Director | 19 March 2012 | 3 months |
| Keyur Nagori | Non-Executive Director | 26 June 2014 | 3 months |
| Binay Shetty | Non-Executive Director | 1 January 2015 | 3 months |
| Dr Nandini Tandon | Independent Non-Executive Director | 26 June 2014 | 3 months |

There is no compensation payable upon the early termination of a Non-Executive Directors' appointment.

Copies of the above Non-Executive Directors' Letters of Appointment are available for inspection during normal business hours at the Company's Registered Office, and available for inspection at the Company's annual general meeting.

### REMUNERATION ARRANGEMENTS THROUGHOUT THE GROUP

The remuneration philosophy is the same throughout NMC - that individuals should be remunerated based on their role, responsibilities, experiences and local market practice. NMC has a variety of different roles from senior executives, to doctors to administrators and therefore remuneration levels and structures vary to reflect the different requirements and expectations of these roles.

The Committee does consider that it is important, however, that senior executives are remunerated in a similar way to ensure that they are incentivised to collectively deliver the Group's strategy and create value for shareholders. Executive Directors and senior managers will therefore all participate in the STIP and LTIP.

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          79 of 142          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

Governance

# DIRECTORS' REMUNERATION REPORT 2014
## CONTINUED

The Committee has retained the existing benefits structure which applied to UAE based Executive Directors and Senior Management in previous years. The benefits included reflect the expatriate nature of senior management in the UAE and are similar in nature to the types of benefits which are available to other expatriate employees in the Group. The benefits include private medical insurance, which is mandatory for employees in Abu Dhabi, where the Group is based.

### SHAREHOLDER VIEWS AND CONSIDERATION OF EMPLOYMENT CONDITIONS ELSEWHERE IN THE GROUP
### Communication with our Shareholders
The Committee maintains an open dialogue with our shareholders and seeks their views when any significant changes are made to remuneration arrangements. The Chairman of the Remuneration Committee met or spoke with several of our external shareholders to discuss the Committee's new Remuneration arrangements prior to them being approved at the 2014 Annual General Meeting.

### Consideration of pay and conditions of employees
The Committee considers pay information in relation to senior management when determining executive pay, to ensure that pay structures are appropriately aligned. The Committee did not consult with employees when setting Executive Director pay.

### THE APPLICATION OF EXECUTIVE REMUNERATION POLICY FOR 2015
### Base salaries for 2015
In reviewing base salaries for 2015, the Committee decided that it should take account of specific local market conditions where employees are based. Accordingly a benchmarking exercise was undertaken towards the end of 2014 which, together with changes required as a result of the new management structure implemented for the Group, has been reflected in the following new base salaries for Executive Directors with effect from 1 January 2015.

| | Current salary | Salary with effect from 1 January 2015 |
|---|---|---|
| Executive Vice Chairman & CEO | £255,000 | £300,000 (17.6% increase) |
| Deputy CEO | £200,000 | £260,000 (new role) |

The benchmarking exercise was undertaken by the Middle East consultancy firm of Hay Group and took account of base salaries and related remuneration packages available for similar roles in the UAE in a large number of medium and large business organisations. The exercise also reviewed the level of cash and non-cash benefits available in such comparator organisations.

### Operation of the STIP for 2015
The operation of the annual bonus for 2015 will be consistent with the Company's Remuneration policy approved by Shareholders at the Company's 2014 Annual General Meeting and similar in operation to the annual bonus plan for 2014. The maximum award level will be 100% of base salary.

The performance targets that will apply for the 2015 financial year have been set after considering the Group's priorities for the year and will be as follows:

### Executive Vice Chairman and Chief Executive Officer

| Measure | Purpose and link to remuneration strategy | Performance measure | Target | Percentage Weighting for relevant individuals |
|---|---|---|---|---|
| Financial | Grow organizational revenues | Healthcare Revenues | Achieve a minimum level of healthcare revenues set by the Committee (including revenues from existing facilities, new facilities to open in FY 2015, pharmacies and management fees). | 33.3 |
| | Optimize cost of services | EBITDA Margin target and gateway hurdle | Achieve minimum levels of EBITDA and EBITDA margins set by the Committee (including EBITDA from existing facilities, new facilities to open in FY 2015, pharmacies and management fees).<br><br>Additionally, a targeted level of EBITDA must be achieved before any STIP entitlement is earned in relation to FY2015. | 33.3 |
| Corporate image | Strengthen and maintain NMC's corporate image | JCI Accreditation | Achievement of set targets in relation to the monitoring of those clinical and quality indicators which are required to reach a certain standard under the Group's JCI accreditations. | 33.3 |

Exhibit 8 to B.R. Shetty's Request for Judicial Notice        80 of 142        Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

| Overview | Group Strategic Report | Governance | Financial Statements |

### Deputy Chief Executive Officer

| Measure | Purpose and link to remuneration strategy | Performance measure | Target | Percentage Weighting for relevant individuals |
|---|---|---|---|---|
| Financial | Grow organizational revenues | Healthcare Revenues | Achieve a minimum level of healthcare revenues set by the Committee (including revenues from existing facilities, new facilities to open in FY 2015, pharmacies and management fees). | 20 |
| | | Revenue/Patient | Revenue/patient to achieve minimum average levels set by the Committee. | 10 |
| | Optimize cost of services | EBITDA Margin hurdle and target | Achieve minimum levels of EBITDA and EBITDA margins set by the Committee (including EBITDA from existing facilities, new facilities to open in FY 2015, pharmacies and management fees). | 35 |
| | | | Additionally, a targeted level of EBITDA must be achieved before any STIP entitlement is earned in relation to FY2015 | |
| | | Patient Occupancy Levels | Patient occupancy to achieve minimum average levels set by the Committee | 10 |
| Organizational capability | Build new patient serving facilities and implement state-of-deliver-art infrastructure | Milestones achieved for capital and technology enablement programs | Specific targeted milestones set by the Committee for capital and technology enablement programs to be met | 15 |
| | Attract and develop capable and motivated manpower | Succession planning | Targets set by the Committee in relation to the enhancement of succession planning capabilities within the Group given the Company's growth and acquisition plans for 2015. | 10 |

### Operation of the LTIP for 2015

The operation of the LTIP for 2015 will be consistent with the Company's Remuneration policy approved by Shareholders at the Company's 2014 Annual General Meeting and similar in operation to the LTIP commenced in 2014. The maximum award level will be 100% of base salary.

The performance targets that will apply for awards made under the plan in the 2015 financial year will be as follows:

| Measure | Purpose and link to remuneration strategy | Performance measure | Target | Percentage Weighting for relevant individuals | Individual subject to target |
|---|---|---|---|---|---|
| Total shareholder return (TSR) | To incentivise management to deliver long term returns to shareholders | TSR growth compared to a comparator group of companies. The comparator group for 2015 will be the same as for awards granted in 2014 (see below). | 25% of this element of the award will vest for performance equal to the median of the comparator group with 100% vesting for upper quartile performance or better. Vesting is on a straight line basis between these points. | 50% | Executive Vice Chairman and CEO (Dr B.R. Shetty) Deputy CEO (Prasanth Manghat) |
| Earnings per share (EPS) | To incentivise management to deliver bottom line earnings growth | Annual compound growth in EPS between the base year (i.e. 2014) and the end of the performance period. | 25% of this element of the award vests for compound EPS growth of 6% per annum with 100% vesting for EPS growth of 15% per annum. Vesting is on a straight line basis between these points. | 50% | Executive Vce Chairman and CEO (Dr B.R. Shetty) Deputy CEO (Prasanth Manghat) |

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          81 of 142          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

Governance

# DIRECTORS' REMUNERATION REPORT 2014
## CONTINUED

**THE OUTCOME OF EXECUTIVE REMUNERATION IN 2014**
**Remuneration paid in 2014 (single pay figure) - subject to audit**

The table below sets out the remuneration paid to or received by each Executive Directors of the Company who served during the financial year ended 31 December 2014.

| Executive Director | Salary $'000 | | Benefits $'000 | | STIP $'000 | | LTIP awards $'000 | | Pension $'000 | | Total $'000 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2014 | 2013 | 2014 | 2013 | 2014 | 2013 | 2014 | 2013 | 2014 | 2013 | 2014 | 2013 |
| Dr B.R. Shetty | 408.4 | 408.4 | 157.9 | 149.3 | 283.4 | 229.7 | 0.0 | 0.0 | 0.0 | 0.0 | 849.7 | 787.4 |
| Khalifa Bin Butti | 56.5 | 245.0 | 0.0 | 0.0 | 0.0 | 137.8 | 0.0 | 0.0 | 0.0 | 0.0 | 56.5 | 382.8 |
| Prasanth Manghat | 330.8 | 330.8 | 20.2 | 7.5 | 222.3 | 183.9 | 0.0 | 0.0 | 0.0 | 0.0 | 573.3 | 522.2 |
| Binay Shetty | 268.2 | 268.2 | 5.4 | 3.0 | 187.2 | 147.1 | 0.0 | 0.0 | 0.0 | 0.0 | 460.8 | 418.3 |

**Benefits - subject to audit**

Taxable benefits include the following items:

| Executive Director | Provision of family accommodation $'000 | | Private medical insurance $'000 | | Life insurance cover $'000 | | Annual family return flights to home country $'000 | |
|---|---|---|---|---|---|---|---|---|
| | 2014 | 2013 | 2014 | 2013 | 2014 | 2013 | 2014 | 2013 |
| Dr B.R. Shetty | 153.2 | 145.9 | 2.2 | 0.9 | 0.0 | 0.0 | 2.5 | 2.5 |
| Prasanth Manghat | 0.0 | 0.0 | 4.4 | 1.8 | 0.6 | 0.0 | 15.2 | 5.7 |
| Binay Shetty | 0.0 | 0.0 | 1.1 | 0.5 | 0.5 | 0.0 | 3.8 | 2.5 |

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          82 of 142          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

STIP - subject to audit

A bonus, out of a potential maximum entitlement of 75% of base salary, was paid to Executive Directors in respect of the 2014 financial year as follows:

- Dr B R Shetty (71.25%)
- Mr Prasanth Manghat (71.25%)
- Mr Binay Shetty (75.0%)

Mr Khalifa Bin Butti did not receive any STIP entitlement in the 2014 financial year. The bonus was based on the following performance measures:

| Measure | Percentage Weighting for relevant individuals | Performance [this section to be reviewed further to assess whether additional information in relation to targets can be disclosed] | Individual subject to target | Outcome |
|---|---|---|---|---|
| EBITDA | 60% | EBITDA performance for the year was US$-m representing a growth of -% on 2013. This strong performance exceeded the relevant EBITDA targets set by the Committee and therefore this portion of the bonus paid out in full. | Dr B.R. Shetty Mr Prasanth Manghat Mr Binay Shetty | 60% |
| Progress on capital development projects | 10% | The Committee considered that sufficient progress on capital development projects was achieved, with a number of new facilities opening during the period under review. | Dr B.R. Shetty Mr Binay Shetty | 10% |
| Doctor/nurse recruitment targets | 10% | Targets set for the recruitment of new Doctors and nurses to the Group was met in 2014. | Mr Binay Shetty | 10% |
| Clinical Safety | 10% | Targets were set to ensure that achievement averages in relation to KPIs monitored under the terms of each Specialty Hospital JCI accreditation were well above the levels required for such accreditation. Group performance was well in excess of this target. The other measure under this target was to ensure that there were no disputed mortalities in Group Healthcare facilities during the period. | Mr Binay Shetty | 10% |
| Staff Safety | 10% | No staff fatalities occurred in any Group facilities. | Dr B.R. Shetty | 10% |
| Succession Planning | 10% | A new management structure was put in place taking effect from 1 January 2015. | Dr B.R. Shetty Mr Prasanth Manghat | 10% |
| HR function | 10% | Recognised Listed Company HR practices and capabilities to be implemented during the year. Sufficient progress was not made in relation to this measure during the period. A plan has been put in place to achieve this objective during 2015. | Dr B.R. Shetty Mr Prasanth Manghat | 5% |
| Share Price | 10% | A target was set in relation to share price performance of the Company against a comparator group. This target was not met. | Mr Prasanth Manghat | 10% |
| Investor Profile | 10% | The measure was set to ensure that external investors in the Company were not concentrated within one geographic region and the target was met. | Mr Prasanth Manghat Mr Binay Shetty | 10% |

Half of the bonus paid to the Executive Directors is deferred into shares for a period of three years under the terms of the Deferred Share Bonus Plan, for which additional performance conditions or other conditions, with exception of continued employment, do not apply.

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          83 of 142          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

Governance

# DIRECTORS' REMUNERATION REPORT 2014
## CONTINUED

### LTIP - subject to audit

Awards for Executive Directors under the LTIP were granted for the first time in 2014 and are subject to performance targets measured over a three financial years. The performance targets set for the 2014 LTIP Awards, and our assessment of performance against these targets over the 2014 financial year, are as follows:

### Target 1. Company's Earnings Per Share (EPS) growth

This measures the Company's annual compound growth in EPS and represents 50% of the total award. The table below sets out the EPS targets for the 2014 award and the corresponding level of vesting:

| Annual compound growth in EPS over the Performance Period | Vesting percentage of target |
| --- | --- |
| 15% or more | 100% |
| Between 6% and 15% | On a straight-line basis between 25% and 100% |
| 6% | 25% |
| Less than 6% | 0% |

### Target 2. Total Shareholder Return (TSR) growth

This measures the Company's TSR compared against a comparator group of companies and represents 50% of the total award. The table below sets out the TSR targets for the 2014 award and the corresponding level of vesting:

| Company's TSR compared to the comparator group | Vesting percentage of target |
| --- | --- |
| Upper quartile or above | 100% |
| Between median and upper quartile | Pro rata between 25% and 100% on a ranking basis |
| Median | 25% |
| Below median | 0% |

The Remuneration Committee has chosen a comparator group of international companies that are of a 'similar' size and business scope to the Company. The table below sets out our comparator group:

| Company | Country of listing |
| --- | --- |
| Korian Medica | France |
| Al Noor Hospitals GP | UK |
| Spire Healthcare GP | UK |
| Raffles Medical GP | Singapore |
| Banmedica | Chile |
| Synergy Health | UK |
| KPJ Healthcare | Malaysia |
| NIB Holdings | Australia |
| Al-Maidan DNL Clinic | Kuwait |

**Pension - subject to audit**

There were no pension contributions in 2013 or 2014.

**Executive Director cessation arrangements - subject to audit**

Two Executive Directors of the Company stepped down from their positions during the 2014 financial year and the following summarises terms which the Remuneration Committee have agreed in relation to their respective resignations:

- Mr Khalifa Bin Butti
  Mr Bin Butti resigned from his Executive role and as a Director of the Company with effect from 25 March 2014. The Base salary payable to Mr Bin Butti ended on that date and no payment was made in relation to his notice period. Mr Bin Butti had earned a bonus in relation to the STIP for the 2013 Financial Year which, in accordance with the Company's normal remuneration policy, would ordinarily have been paid 50% in cash and 50% in deferred shares. In recognition of Mr Bin Butti's significant contribution to the IPO of the Company and in its growth over a number of years, the Remuneration Committee decided to pay Mr Bin Butti's earned bonus for the 2013 financial year fully in cash. Mr Khalifa Bin Butti did not receive any STIP entitlement in the 2014 financial year due to his resignation.

- Mr Binay Shetty
  Mr Shetty resigned from his Executive role with the Company on 31 December 2014 but remains on the Board as a Non-Executive Director with effect from 1 January 2015. As a result, Mr Shetty's base salary and benefits as an Executive Director ceased with effect from 31 December 2014 and no payment was due in relation to any notice period under his contract of employment. End of Service benefit of US$58.8k was paid to Mr Shetty.

There were no payments for loss of office during the year. There were no payments made to any past Directors during the year.

**NON-EXECUTIVE DIRECTORS REMUNERATION**
**How remuneration policy will be applied for 2015**

For 2015, the fees payable to the non-executive directors effective as at 1 January 2015 are as follows:

|  | (£'000) |
|---|---|
| Chairman | 180 |
| Senior Independent Director | 70 |
| Non-executive director | 60 |

Additional fees may be also payable to non-executive directors from time to time for additional board responsibilities (this may include fees for additional time commitments).

No additional fees are payable in relation to the Chairmanship or membership of any Board Committees.

Details of the remuneration paid to each of the non-executive directors who served during the year are included in the table on page 82.

Non-executive directors do not participate in any bonus or incentive plan or other form or performance-related remuneration. The Company does not provide any contribution to their pension arrangements.

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          85 of 142          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

Governance

# DIRECTORS' REMUNERATION REPORT 2014
## CONTINUED

### What remuneration was paid in 2014 (single pay figure) - subject to audit

The fee paid in cash to each Non-Executive Director during the year ended 31 December 2014 is set out in the following table:

| Director | Position | FY2014 (£'000) | FY2013 (£'000) |
|---|---|---|---|
| H.J. Mark Tompkins (see note 1 below) | Independent Non-Executive Chairman | 170.0 | 2245 |
| H.E. Saeed Bin Butti | Non-Executive Director | 7.6 | 50.0 |
| Dr Ayesha Abdullah | Independent Non-Executive Director | 25.2 | N/A |
| Abdulrahman Basaddiq | Non-Executive Director | 42.3 | N/A |
| Jonathan Bomford | Senior Independent Non-Executive Director | 59.5 | 25.4 |
| Lord Clanwilliam (see note 1 below) | Independent Non-Executive Director | 50.0 | 1045 |
| Salma Hareb | Independent Non-Executive Director | 25.2 | n/a |
| Heather Lawrence (see note 1 below) | Independent Non-Executive Director | 50.0 | 1045 |
| Keyur Nagori | Non-Executive Director | 25.2 | n/a |
| Dr Nandini Tandon | Independent Non-Executive Director | 25.2 | n/a |

Notes:
1 The fees to Mr Mark Tompkins, Lord Clanwilliam and Mrs Heather Lawrence for the year ended 31 December 2013 includes additional payments for each of the 2012 and 2013 financial years, both of which were made in the 2013 financial year. Details of these payments were set out in the 2013 Annual Report.

### DIRECTORS' SHAREHOLDINGS AND SHARE INTERESTS - SUBJECT TO AUDIT
### Directors shareholdings

The table below shows details of the Directors' holdings of Ordinary Shares in the Company as at 1 January 2014 (or date of appointment if later) and at 31 December 2014 (or at date of cessation of appointment if earlier).

| | Ordinary shares of 10p each | |
|---|---|---|
| Director | 1 January 2014 (or at date of appointment if later) | 31 December 2014 (or at date of cessation of appointment if earlier) |
| H.J. Mark Tompkins | 17,083 | 17,083 |
| H.E. Saeed Bin Butti | 53,466,559 | 53,466,559 |
| Khalifa Bin Butti | 19,059,842 | 19,059,842 |
| Dr B.R. Shetty | 37,742,409 | 47,742,409 |
| Dr Ayesha Abdullah | 0 | 0 |
| Abdulrahman Basaddiq | 0 | 0 |
| Jonathan Bomford | 0 | 10,000 |
| Lord Clanwilliam | 0 | 0 |
| Salma Hareb | 0 | 0 |
| Heather Lawrence | 0 | 4,557 |
| Prasanth Manghat | 8,308 | 8,308 |
| Keyur Nagori | 0 | 0 |
| Binay Shetty | 6,842 | 6,842 |
| Dr Nandini Tandon | 0 | 0 |

Note: In addition to the above holdings, during their period in office, H.E. Saeed Bin Butti and Mr Khalifa Bin Butti also held an interest over 14,072,024 Ordinary shares of the Company (14,072,024 Ordinary shares as at 1 January 2014) held by Infinite Investment LLC, a company owned jointly by H.E. Saeed Bin Butti and Mr Khalifa Bin Butti.

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          86 of 142          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

H.E. Saeed Bin Butti resigned as a Director of the company on 24 February 2014. Mr Khalifa Bin Butti resigned as a Director of the company on 25 March 2014.

None of the Directors received any loans, advances or other form of credit granted by the Company, nor were any guarantees of any kind provided by the Company on behalf of any Directors during the year ended 31 December 2014.

Except as stated above, none of the Directors who held office during the year held any Ordinary Shares or options over Ordinary Shares of the Company during their period in office in the year. There have been no changes in the above shareholdings between 31 December 2014 and the date of this Directors' Remuneration Report.

Executive directors are expected to build a shareholding of 200% of base salary over a period of 5 years. The Executive Vice Chairman & CEO is a significant shareholder in the Company and therefore already meets this requirement. The Deputy CEO holds shares valued at £38,217 (based on the share price at 31 December 2014). These have a value of c.19% of salary (based on salary at 31 December 2014).

### Directors' options awarded during the year

The tables below shows that share awards made to Executive Directors that have not yet vested.

### Long Term Incentive Plan

| | Type of interest | Performance period ending | Award Date | Market Price at Date of Award | Exercise price | Shares Awarded | Face value of award | % vesting for minimum performance | Vesting Date |
|---|---|---|---|---|---|---|---|---|---|
| Dr B.R. Shetty | LTIP award subject to performance | 31 December 2016 | 29 October 2014 | 494.9p | 0p | 50,923 | £252,018 | 25% of award | 29 October 2017 |
| Mr Prasanth Manghat | LTIP award subject to performance | 31 December 2016 | 29 October 2014 | 494.9p | 0p | 40,738 | £202,834 | 25% of award | 29 October 2017 |

For details of the performance measures attached to awards see page 77.

### Deferred Share Bonus Plan

| | Type of interest | Financial Year Share Award made in respect of | Award Date | Market Price at Date of Award | Exercise price | Shares Awarded | Face value of award | Vesting Date |
|---|---|---|---|---|---|---|---|---|
| Dr B.R. Shetty | Deferred shares subject to continued employment | 2013 | 29 October 2014 | 494.9p | 0p | 15,510 | £76,759 | 29 October 2017 |
| Mr Prasanth Manghat | Deferred shares subject to continued employment | 2013 | 29 October 2014 | 494.9p | 0p | 12,408 | £61,407 | 29 October 2017 |
| Mr Binay Shetty | Deferred shares subject to continued employment | 2013 | 29 October 2014 | 494.9p | 0p | 9,926 | £49,123 | 29 October 2017 |

No options vested or were exercised during the year.

Governance

# DIRECTORS' REMUNERATION REPORT 2014
## CONTINUED

### PERFORMANCE GRAPH AND HISTORIC EXECUTIVE VICE CHAIRMAN & CEO REMUNERATION OUTCOMES

The following graph shows the Total Shareholder Return performance of NMC Health plc shares against the FTSE 250.



Note: The performance graph shows the Total Shareholder Return performance of the Company from the date of the Company's IPO in April 2012.

The Committee believes that the FTSE 250 Index is an appropriate comparator index used to compare performance given that the Company is a constituent of this Index and the lack of direct competitor comparators available in the London market.

The table below summarises the Executive Vice Chairman & CEO's single figure for total remuneration since listing. This table is also required to show the long-term incentive vesting as a percentage of the maximum for each year, however LTIP grants were made for the first time in 2014 and none have yet vested.

| Executive Vice Chairman  & CEO - Dr B.R. Shetty | 2012 (US$'000) | 2013 (US$'000) | 2014 (US$'000) |
| --- | --- | --- | --- |
| Single remuneration figure | 550.6 | 787.4 | 849.7 |
| STIP payout (% of maximum) | n/a | 75% | 95% |
| LTI vesting (% of maximum) | n/a | n/a | n/a |

The Company did not operate the STIP in respect of 2012.

### PAY ACROSS THE GROUP

The table below sets out the increase in total remuneration of the Executive Vice Chairman & CEO and that of all employees during the 2014 financial year:

| % | Salary | Annual bonus | Benefits |
| --- | --- | --- | --- |
| Executive Vice Chairman & CEO | 0% | 23.4% | 5.8% |
| All-employees | 10.0% | n/a* | 9.0% |

*note: the Company does not operate bonus plans for all employees.

Case 2:20-cv-02303-CBM-MAA   Document 82-3   Filed 09/22/21   Page 90 of 143   Page ID #:1797

Overview

Group
Strategic Report

Governance

Financial
Statements

## RELATIVE IMPORTANCE OF SPEND ON PAY

The graph below shows the total group-wide remuneration expenditure and dividends for the last two years.



Profit for the financial year attributable to equity shareholders ($m); Distributions to shareholders ($m); Total employee pay ($m): 68.2, 76.6; 11.6, 13.8; 128.9, 148.4

## RESULTS OF VOTING ON REMUNERATION MATTERS AT THE COMPANY'S 2014 ANNUAL GENERAL MEETING

The following summarises voting at the 2014 AGM in respect of the two resolutions proposed in relation to the 2013 Directors' Remuneration Report.

| Resolution | For | Against | Number of votes withheld |
|---|---|---|---|
| To approve the Directors' Remuneration Policy | 97.51% | 2.49% | 0 |
| To approve the Annual Remuneration Report | 99.9% | 0.01% | 0 |

It is my pleasure to submit this report to shareholders. The Directors' Remuneration Report has been approved by the Board and is signed on its behalf by:

Lord Clanwilliam
Chairman of the Remuneration Committee

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          89 of 142          Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA



# Financial Statements

**In this section:**

87  Independent Auditor's Report to the members of NMC Health plc
91  Consolidated Statement of Comprehensive Income
92  Consolidated Statement of Financial Position
93  Consolidated Statement of Changes in Equity
94  Consolidated Statement of Cash Flows
95  Notes to the Consolidated Financial Statements
125  Statement of Financial Position
126  Statement of Changes in Equity
127  Statement of Cash Flows
128  Notes to the Financial Statements

## INDEPENDENT AUDITOR'S REPORT TO THE MEMBERS OF NMC HEALTH PLC

### OPINION ON FINANCIAL STATEMENTS

In our opinion:

- the financial statements give a true and fair view of the state of the group's and of the parent company's affairs as at 31 December 2014 and of the group's profit for the year then ended;
- the group financial statements have been properly prepared in accordance with IFRSs as adopted by the European Union; and
- the parent company financial statements have been prepared in accordance with IFRSs as adopted by the European Union and as applied in accordance with the provisions of the Companies Act 2006; and
- the financial statements have been prepared in accordance with the requirements of the Companies Act 2006 and, as regards the group financial statements, Article 4 of the IAS Regulation.

### WHAT WE HAVE AUDITED

We have audited the financial statements of NMC Health plc for the year ended 31 December 2014 which comprise in respect of the group financial statements: the consolidated statement of comprehensive income, the consolidated statement of financial position, the consolidated statement of changes in equity, the consolidated statement of cash flows  and the related notes 1 to 34, and which comprise in respect of the parent company financial statements: the Statement of Financial Position, the Statement of Changes in Equity and the Statement of Cash Flows,

and the related notes 1 to 15. The financial reporting framework that has been applied in their preparation is applicable law and International Financial Reporting Standards (IFRSs) as adopted by the European Union and, as regards the parent company financial statements, as applied in accordance with the provisions of the Companies Act 2006.

This report is made solely to the company's members, as a body, in accordance with Chapter 3 of Part 16 of the Companies Act 2006.  Our audit work has been undertaken so that we might state to the company's members those matters we are required to state to them in an auditor's report and for no other purpose.  To the fullest extent permitted by law, we do not accept or assume responsibility to anyone other than the company and the company's members as a body, for our audit work, for this report, or for the opinions we have formed.

### RESPECTIVE RESPONSIBILITIES OF DIRECTORS AND AUDITOR

As explained more fully in the Directors' Responsibilities Statement set out on page 48, the directors are responsible for the preparation of the financial statements and for being satisfied that they give a true and fair view. Our responsibility is to audit and express an opinion on the financial statements in accordance with applicable law and International Standards on Auditing (UK and Ireland). Those standards require us to comply with the Auditing Practices Board's Ethical Standards for Auditors.

### SCOPE OF THE AUDIT OF THE FINANCIAL STATEMENTS

An audit involves obtaining evidence about the amounts and disclosures in the financial statements sufficient to give reasonable assurance that the financial statements are free from material misstatement, whether caused by fraud or error. This includes an assessment of: whether the accounting policies are appropriate to the group's and the parent company's circumstances and have been consistently applied and adequately disclosed; the reasonableness of significant accounting estimates made by the directors; and the overall presentation of the financial statements. In addition, we read all the financial and non-financial information in the Annual Report to identify material inconsistencies with the audited financial statements and to identify any information that is apparently materially incorrect based on, or materially inconsistent with, the knowledge acquired by us in the course of performing the audit. If we become aware of any apparent material misstatements or inconsistencies we consider the implications for our report.

Financial Statements

# INDEPENDENT AUDITOR'S REPORT
## CONTINUED

**Our assessment of risk of material misstatement and response to that risk**

The table below shows the risks we identified that have had the greatest effect on the overall audit strategy; the allocation of resources in the audit; and directing the efforts of the engagement team, together with our audit response to the risk:

| Risk | How the scope of our audit addressed the risk |
| --- | --- |
| **The valuation of trade receivables** (as described on page 56 of the Report of the Audit Committee) | We performed the following audit procedures around the valuation of trade receivables: |
| The most significant revenue streams of the Group are healthcare services and distribution sales.  The vast majority of healthcare customers settle their invoices through medical insurance claims, therefore payments to the Group can be delayed due to the time taken to process claims through the insurance companies. Furthermore, the Group experiences delays in payment for bulk retail sales from key customers. This can result in a high level of aged outstanding receivables balances and therefore an increased risk of non-recoverability and inadequate bad debt provisioning. | We challenged management on the significant estimation and subjectivity involved in the appropriateness of provisions for bad debts which included obtaining evidence to support the recoverability of the older un-provided debts. <br><br> We obtained direct external confirmations for a sample of customer receivable balances and we vouched post year end cash receipts for a sample of year-end trade receivable balances. <br><br> No significant issues were noted from our work. |
| **Revenue recognition, including the timing of revenue recognition and the determination of whether the Group is acting in the capacity of an agent rather than principal** (as described on page 56 of the Report of the Audit Committee). | We performed the following audit procedures around revenue recognition: |
| The Group has a number of revenue streams relating to its Healthcare and Distribution segments including clinic revenues, insurance claims, over-the-counter sales, pharmacy sales and sales of goods. There is a risk of improper revenue recognition given the diversity of the Group's healthcare operations, particularly with regard to cut-off at period end dates. There is also a risk of improper revenue recognition in the distribution business with regard to cut-off at period end dates. Furthermore, there is a risk that distribution agreements with key suppliers indicate that the Group may be acting in the capacity of an agent rather than principal. | We relied upon testing performed by internal audit relating to controls over revenue recognition, including the timing of revenue recognition. <br><br> We performed analytical review procedures and performed cut-off testing procedures (by selecting a sample of transactions either side of year-end) to check that revenue had been recognised in the appropriate accounting period. <br><br> We tested a sample of new distribution agreements entered into during the year to verify that the Group's determination that they are acting as a principal rather than an agent is appropriate. <br><br> We checked the Group's adherence to their revenue recognition policies, including their determination of whether the Group is acting as an agent rather than as a principal, to agree that these policies are in accordance with IFRSs as adopted by the European Union. <br><br> No significant issues were noted from our work. |

| Risk | How the scope of our audit addressed the risk |
|---|---|
| **The capitalisation of costs into capital work in progress** (as described on page 56 of the Report of the Audit Committee)<br><br>Given the quantum of costs being incurred on capital work in progress (CWIP) there is a risk that incorrect cost capitalisation may occur and that, consequently, CWIP may be overstated. | We performed the following audit procedures around the capitalisation of costs into capital work in progress (CWIP):<br><br>We verified that the Group's capitalisation policies, including relating to the capitalisation of internal salary costs, lease costs and interest costs, are in accordance with IFRSs as adopted by the European Union and applied appropriately.<br><br>We vouched the majority of additions to CWIP in the year to supporting documentation to check that the costs met the criteria for capitalisation into work in progress in accordance with IFRSs as adopted by the European Union.<br><br>We obtain evidence of independent third party surveyors' approval of construction costs incurred to date on capital projects.<br><br>We undertook site visits of major capital projects completed in the year or still in progress as at 31 December 2014.<br><br>We also held discussions with the project managers on major capital projects and undertook a comparison of actual capital work in progress spend to budget.<br><br>We also performed audit procedures to verify that completed capital projects were transferred to the appropriate property, plant and equipment category and depreciation commenced at the correct point in time.<br><br>No significant issues were noted from our work. |

## Our application of materiality

We apply the concept of materiality both in planning and performing our audit, and in evaluating the effect of misstatements on our audit and on the financial statements. For the purposes of determining whether the financial statements are free from material misstatement, we define materiality as the magnitude of an omission or misstatement that, individually or in the aggregate, in light of the surrounding circumstances, could reasonably be expected to influence the economic decisions of the users of the financial statements. We also determine a level of performance materiality which we use to determine the extent of testing needed to reduce to an appropriately low level the probability that the aggregate of uncorrected and undetected misstatements exceeds materiality for the financial statements as a whole.

When establishing our overall audit strategy, we determined a magnitude of uncorrected misstatements that we judged would be material for the financial statements as a whole. We initially determined materiality for the Group to be $3.35 million (2013: $3.60 million), which was approximately 5% of profit before tax (2013: 5% of adjusted profit before tax). Last year we used adjusted profit before tax to exclude the non-recurring write-off of unamortised finance fees resulting from the refinance of loan facilities in that year. This provided a basis for determining the nature, timing and extent of risk assessment procedures, identifying and assessing the risk of material misstatement and determining the nature, timing and extent of further audit procedures. During the course of our audit, the actual profit before tax figure was higher than that which we had used as the basis for determining materiality and as a result we revised our materiality threshold to $3.88 million, which is approximately 5% of profit before tax. On the basis of our risk assessments, together with our assessment of the Group's overall control environment, our judgement was that overall performance materiality (ie: our tolerance for misstatement in an individual account or balance) for the Group should be 50% (2013: 50%) of materiality, namely $194 million (2013: $180 million). Our objective in adopting this approach was to ensure that total detected and undetected audit differences in all accounts did not exceed our materiality level.

Audit work at individual components is undertaken based on a percentage of our total performance materiality. The performance materiality set for each component is based on the relative size of the component and our view of the risk of misstatement at that component. In the current year the range of performance materiality allocated to components was $0.34 million to $1.18 million.

Exhibit 8 to B.R. Shetty's Request for Judicial Notice        93 of 142        Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

Financial Statements

# INDEPENDENT AUDITOR'S REPORT
## CONTINUED

We agreed with the Audit Committee that we would report to the Audit Committee all audit differences in excess of $0.17 million (2013: $0.16 million) as well as differences below that threshold that, in our view, warranted reporting on qualitative grounds.

### An overview of the scope of our audit
Following our assessment of the risk of material misstatement to the Group financial statements we selected ten components which represent the principal business units within the Group's two reportable segments and which account for 100% of the group's profit before tax and 95% of the group's total assets. Six of these components were subject to a full audit, whilst four components were subject to a partial audit where the extent of audit work was based on our assessment of the risks of material misstatement and the materiality of the Group's business operations at those components. They were also selected to provide an appropriate basis for undertaking audit work to address the risks of material misstatement identified above. For the remaining five components, we performed other procedures to confirm there were no significant risks of material misstatement in the Group financial statements.

The audit work at the ten components and the statutory audits were executed at levels of materiality applicable to each individual entity which were much lower than Group materiality.

Given that the Group operates solely in the United Arab Emirates the Senior Statutory Auditor or members of the Group audit team visited the United Arab Emirates four times during the current year audit process. The Group audit team interacted regularly with the component team in the United Arab Emirates where appropriate during the various stages of the audit, reviewed key working papers and took responsibility for the scope and direction of the audit process.

### OPINION ON OTHER MATTERS PRESCRIBED BY THE COMPANIES ACT 2006
In our opinion:
- the part of the Directors' Remuneration Report to be audited has been properly prepared in accordance with the Companies Act 2006; and
- the information given in the Strategic Report and the Directors' Report for the financial year for which the financial statements are prepared is consistent with the financial statements.

### MATTERS ON WHICH WE ARE REQUIRED TO REPORT BY EXCEPTION
We have nothing to report in respect of the following:

Under the ISAs (UK and Ireland), we are required to report to you if, in our opinion, information in the annual report is:
- materially inconsistent with the information in the audited financial statements; or
- apparently materially incorrect based on, or materially inconsistent with, our knowledge of the Group acquired in the course of performing our audit; or
- is otherwise misleading.

In particular, we are required to consider whether we have identified any inconsistencies between our knowledge acquired during the audit and the directors' statement that they consider the annual report is fair, balanced and understandable and whether the annual report appropriately discloses those matters that we communicated to the audit committee which we consider should have been disclosed.

Under the Companies Act 2006 we are required to report to you if, in our opinion:
- adequate accounting records have not been kept by the parent company, or returns adequate for our audit have not been received from branches not visited by us; or
- the parent company financial statements and the part of the Directors' Remuneration Report to be audited are not in agreement with the accounting records and returns; or

- certain disclosures of directors' remuneration specified by law are not made; or
- we have not received all the information and explanations we require for our audit.

Under the Listing Rules we are required to review:
- the directors' statement, set out on page 47, in relation to going concern; and
- the part of the Corporate Governance Statement relating to the company's compliance with the nine provisions of the UK Corporate Governance Code specified for our review.

Cameron Cartmell
(Senior statutory auditor)
for and on behalf of Ernst & Young LLP, Statutory Auditor
London
23 February 2015

Notes:
1. The maintenance and integrity of the NMC Health plc web site is the responsibility of the directors; the work carried out by the auditors does not involve consideration
   of these matters and, accordingly, the auditors accept no responsibility for any changes that may have occurred to the financial statements since they were initially presented on the web site.
2. Legislation in the United Kingdom governing the preparation and dissemination of financial statements may differ from legislation in other jurisdictions.

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          94 of 142

# CONSOLIDATED STATEMENT OF COMPREHENSIVE INCOME

## For the year ended 31 December 2014

| | Notes | 2014 US$ '000 | 2013 US$ '000 |
|---|---|---|---|
| Revenue | 5 | 643,931 | 550,878 |
| Direct costs | 6 | (434,725) | (365,336) |
| **GROSS PROFIT** | | 209,206 | 185,542 |
| General and administrative expenses | 6 | (137,188) | (119,562) |
| Other income | 7 | 30,440 | 26,960 |
| **PROFIT FROM OPERATION BEFORE DEPRECIATION AND IMPAIRMENT** | | 102,458 | 92,940 |
| Depreciation | 15 | (14,050) | (9,663) |
| Impairment of property and equipment | 15 | – | (210) |
| **PROFIT FROM OPERATIONS** | | 88,408 | 83,067 |
| Finance costs | 8 | (14,497) | (14,344) |
| Finance income | 9 | 3,623 | 3,814 |
| Unamortised finance fees written off | 24 | – | (3,394) |
| **PROFIT FOR THE YEAR BEFORE TAX** | 10 | 77,534 | 69,143 |
| Tax | 13 | – | – |
| **PROFIT FOR THE YEAR** | | 77,534 | 69,143 |
| Other comprehensive income | | – | – |
| **TOTAL COMPREHENSIVE INCOME FOR THE YEAR** | | 77,534 | 69,143 |
| Total profit and comprehensive income attributable to: | | | |
| Equity holders of the Parent | | 76,566 | 68,165 |
| Non-controlling interests | | 968 | 978 |
| Total profit and comprehensive income for the year | | 77,534 | 69,143 |
| Earnings per share for profit attributable to the equity holders of the Parent: | | | |
| Basic and diluted (US$) | 14 | 0.412 | 0.367 |

These results relate to continuing operations of the Group. There are no discontinued operations in the current and prior year.

The attached notes 1 to 34 form part of the consolidated financial statements.

Exhibit 8 to B.R. Shetty's Request for Judicial Notice    95 of 142    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

Financial Statements

# CONSOLIDATED STATEMENT OF FINANCIAL POSITION
As at 31 December 2014

| | Notes | 2014 US$ '000 | 2013 US$ '000 |
|---|---|---|---|
| **ASSETS** | | | |
| **Non-current assets** | | | |
| Property and equipment | 15 | 368,357 | 273,792 |
| Intangible assets | 16 | 4,236 | 1,016 |
| | | 372,593 | 274,808 |
| **Current assets** | | | |
| Inventories | 17 | 110,209 | 94,123 |
| Accounts receivable and prepayments | 18 | 196,569 | 168,382 |
| Amounts due from related parties | 27 | 7,985 | 9,254 |
| Bank deposits | 19 | 183,577 | 193,366 |
| Bank balances and cash | 19 | 79,592 | 75,329 |
| | | 577,932 | 540,454 |
| **TOTAL ASSETS** | | 950,525 | 815,262 |
| **EQUITY AND LIABILITIES** | | | |
| **Equity** | | | |
| Share capital | 20 | 29,566 | 29,566 |
| Share premium | | 179,152 | 179,152 |
| Group restructuring reserve | 21 | (10,001) | (10,001) |
| Retained earnings | 22 | 250,306 | 187,519 |
| **Equity attributable to equity holders of the Parent** | | 449,023 | 386,236 |
| Non-controlling interests | | 4,004 | 2,915 |
| **Total equity** | | 453,027 | 389,151 |
| **Non-current liabilities** | | | |
| Term loans | 24 | 114,457 | 161,845 |
| Employees' end of service benefits | 25 | 12,450 | 10,036 |
| Other payable | | 21 | 408 |
| | | 126,928 | 172,289 |
| **Current liabilities** | | | |
| Accounts payable and accruals | 26 | 98,044 | 76,087 |
| Amounts due to related parties | 27 | 8,380 | 5,079 |
| Bank overdrafts and other short term borrowings | 19 | 169,607 | 82,238 |
| Term loans | 24 | 92,055 | 88,355 |
| Employees' end of service benefits | 25 | 2,484 | 2,063 |
| | | 370,570 | 253,822 |
| **Total liabilities** | | 497,498 | 426,111 |
| **TOTAL EQUITY AND LIABILITIES** | | 950,525 | 815,262 |

The consolidated financial statements were authorised for issue by the board of directors on 23 February 2015 and were signed on its behalf by

**Dr B.R. Shetty**
Executive Vice Chairman & Chief Executive Officer

**Mr Suresh Krishnamoorthy**
Chief Financial Officer

The attached notes 1 to 34 form part of the consolidated financial statements.

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          96 of 142          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

# CONSOLIDATED STATEMENT OF CHANGES IN EQUITY
## For the year ended 31 December 2014

| | Share capital US$ '000 | Share premium US$ '000 | Group restructuring reserve US$ '000 | Retained earnings US$ '000 | Total US$ '000 | Non-controlling interests US$ '000 | Total US$ '000 |
|---|---|---|---|---|---|---|---|
| Balance as at 1 January 2013 | 29,566 | 179,152 | (10,001) | 130,952 | 329,669 | 1,934 | 331,603 |
| Total comprehensive income for the year | – | – | – | 68,165 | 68,165 | 978 | 69,143 |
| Dividend (note 23) | – | – | – | (11,598) | (11,598) | – | (11,598) |
| Contribution by non-controlling interest | – | – | – | – | – | 3 | 3 |
| Balance as at 31 December 2013 | 29,566 | 179,152 | (10,001) | 187,519 | 386,236 | 2,915 | 389,151 |
| Total comprehensive income for the year | – | – | – | 76,566 | 76,566 | 968 | 77,534 |
| Dividend (note 23) | – | – | – | (13,846) | (13,846) | – | (13,846) |
| Contribution by non-controlling interest | – | – | – | – | – | 121 | 121 |
| Share based payments (note 28) | – | – | – | 67 | 67 | – | 67 |
| Balance as at 31 December 2014 | 29,566 | 179,152 | (10,001) | 250,306 | 449,023 | 4,004 | 453,027 |

The attached notes 1 to 34 form part of the consolidated financial statements.

Exhibit 8 to B.R. Shetty's Request for Judicial Notice       97 of 142       Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

Financial Statements

# CONSOLIDATED STATEMENT OF CASH FLOWS
For the year ended 31 December 2014

| | Notes | 2014 US$ '000 | 2013 US$ '000 |
|---|---|---|---|
| **OPERATING ACTIVITIES** | | | |
| Profit for the year before tax | | 77,534 | 69,143 |
| Adjustments for: | | | |
| Depreciation | 15 | 14,050 | 9,663 |
| Impairment of property and equipment | 15 | – | 210 |
| Employees' end of service benefits | 25 | 3,492 | 2,362 |
| Finance income | 9 | (3,623) | (3,814) |
| Finance costs | 8 | 14,497 | 14,344 |
| Loss on disposal of property and equipment | | 224 | 383 |
| Unamortised finance fees written off | 24 | – | 3,394 |
| Share based payments expense | 28 | 88 | – |
| | | 106,262 | 95,685 |
| Working capital changes: | | | |
| Inventories | | (16,086) | (21,665) |
| Accounts receivable and prepayments | | (28,080) | 11,582 |
| Amounts due from related parties | | 1,269 | (7,653) |
| Accounts payable and accruals | | 19,673 | 2,809 |
| Amounts due to related parties | | 3,301 | 4,956 |
| Net cash from operations | | 86,339 | 85,714 |
| Employees' end of service benefits paid | 25 | (657) | (643) |
| Net cash from operating activities | | 85,682 | 85,071 |
| **INVESTING ACTIVITIES** | | | |
| Purchase of property and equipment | | (111,245) | (78,616) |
| Purchase of intangible assets | 16 | (22) | – |
| Proceeds from disposal of property and equipment | | 256 | 257 |
| Bank deposits maturing in over 3 months | | 66,171 | (12,251) |
| Restricted cash | | 14,150 | (22,732) |
| Finance income received | | 3,637 | 5,255 |
| Net cash (used in) investing activities | | (27,053) | (108,087) |
| **FINANCING ACTIVITIES** | | | |
| New term loans and draw-downs | | 263,594 | 524,465 |
| Repayment of term loans | | (307,282) | (500,627) |
| Receipts of short term borrowings | | 383,705 | 275,347 |
| Repayment of short term borrowings | | (314,013) | (252,768) |
| Finance costs paid | | (13,669) | (14,532) |
| Dividend paid to shareholders | 23 | (13,846) | (11,598) |
| Net cash (used in) / from financing activities | | (1,511) | 20,287 |
| **INCREASE / (DECREASE) IN CASH AND CASH EQUIVALENTS** | | 57,118 | (2,729) |
| Cash and cash equivalents at 1 January | | 79,201 | 81,930 |
| **CASH AND CASH EQUIVALENTS AT 31 DECEMBER** | 19 | 136,319 | 79,201 |

The attached notes 1 to 34 form part of the consolidated financial statements.

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          98 of 142

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

# NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS

## At 31 December 2014

### 1   CORPORATE INFORMATION

NMC Health plc (the "Company" or "Parent") is a Company which was incorporated in England and Wales on 20 July 2011. The Company is a public limited company operating solely in the United Arab Emirates ("UAE"). The address of the registered office of the Company is 23 Hanover Square London, W1S 1JB. The registered number of the Company is 7712220. The Company's immediate and ultimate controlling party is a group of three individuals (H.E. Saeed Bin Butti, Dr B.R. Shetty and Mr Khalifa Bin Butti) who are all shareholders and of whom one is a director of the company and who together have the ability to control the company.

The Parent and its subsidiaries (collectively the "Group") are engaged in providing professional medical services, wholesale of pharmaceutical goods, medical equipment, cosmetics, food and IT products and services in the United Arab Emirates.

The consolidated financial statements of the Group for the year ended 31 December 2014 were authorised for issue by the board of directors on 23 February 2015 and the consolidated statement of financial position was signed on the Board's behalf by Dr B.R. Shetty and Mr Suresh Krishnamoorthy.

### 2.1 BASIS OF PREPARATION

The consolidated financial statements have been prepared in accordance with International Financial Reporting Standards as adopted by the European Union as they apply to the financial statements of the Group for the year ended 31 December 2014 and applied in accordance with the Companies Act 2006.

The consolidated financial statements are prepared under the historical cost convention, except for derivative financial instrument that have been measured at fair value. The principal accounting policies adopted in the preparation of these consolidated financial statements are set out below. These policies have been consistently applied to all periods presented.

#### Functional and reporting currency

The functional currency of the Company and its subsidiaries is UAE Dirham. The reporting currency of the Group is United States of America Dollar (US$) as this is a more globally recognised currency. The UAE Dirham is pegged against the US Dollar at a rate of 3.673 per US Dollar.

All values are rounded to the nearest thousand dollars ($000) except when otherwise indicated.

#### Going concern

The Group's business activities, together with the factors likely to affect its future development, performance and position are set out in the Strategic Review on pages 9 to 33. The financial position of the Group, its cash flows, liquidity position and borrowing facilities are described in the Financial Review on pages 24 to 25.

The Group has two diverse operating divisions, Healthcare and Distribution, both of which operate in a growing market.

The directors have undertaken an assessment of the future prospects of the Group and the wider risks that the Group is exposed to. In its assessment of whether the Group should adopt the going concern basis in preparing its financial statements, the directors have considered the adequacy of financial resources in order to manage its business risks successfully, together with other areas of potential risk such as regulatory, insurance and legal risks.

The Group has considerable financial resources including banking arrangements through a spread of local and international banking groups and utilizes short and medium term working capital facilities to optimise business funding. Debt covenants are reviewed by the board each month. The Board believes that the level of cash in the Group, the spread of bankers and debt facilities mitigates the financing risks that the Group faces from both its capital expenditure program and in relation to working capital requirements.

Group delivered a strong performance in 2014. Both the Healthcare and Distribution divisions have continued their positive growth in revenue during 2014. Net profit and EBITDA of both healthcare and distribution divisions have increased in 2014. EBITDA margin of Distribution is almost same as last year whereas for Healthcare it decreased slightly which is due to opening of new facilities during the year. The directors have reviewed the business plan for 2015 and the five year cash flow, together with growth forecasts for the healthcare sector in UAE. The directors consider the Group's future forecasts to be reasonable.

The directors have not identified any other matters that may impact the viability of the Group in the medium term and therefore they continue to adopt the going concern basis in preparing the consolidated financial statements.

Financial Statements

# NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS CONTINUED

### 2.2 BASIS OF CONSOLIDATION

The consolidated financial statements comprise the financial statements of the Group and its subsidiaries as at 31 December 2014. Control is achieved when the Group is exposed, or has rights, to variable returns from its involvement with the investee and has the ability to affect those returns through its power over the investee. Specifically, the Group controls an investee if, and only if, the Group has:

· Power over the investee (i.e., existing rights that give it the current ability to direct the relevant activities of the investee).
· Exposure, or rights, to variable returns from its involvement with the investee.
· The ability to use its power over the investee to affect its returns.

Generally, there is a presumption that a majority of voting rights result in control. To support this presumption and when the Group has less than a majority of the voting or similar rights of an investee, the Group considers all relevant facts and circumstances in assessing whether it has power over an investee, including:

· The contractual arrangement with the other vote holders of the investee.
· Rights arising from other contractual arrangements.
· The Group's voting rights and potential voting rights.

The Group re-assesses whether or not it controls an investee if facts and circumstances indicate that there are changes to one or more of the three elements of control. Consolidation of a subsidiary begins when the Group obtains control over the subsidiary and ceases when the Group loses control of the subsidiary. Assets, liabilities, income and expenses of a subsidiary acquired or disposed of during the year are included in the consolidated financial statements from the date the Group gains control until the date the Group ceases to control the subsidiary.

Profit or loss and each component of other comprehensive income (OCI) are attributed to the equity holders of the parent of the Group and to the non-controlling interests, even if this results in the non-controlling interests having a deficit balance. When necessary, adjustments are made to the financial statements of subsidiaries to bring their accounting policies into line with the Group's accounting policies. All intra-group assets and liabilities, equity, income, expenses and cash flows relating to transactions between members of the Group are eliminated in full on consolidation.

A change in the ownership interest of a subsidiary, without a loss of control, is accounted for as an equity transaction.

If the Group loses control over a subsidiary, it derecognises the related assets (including goodwill), liabilities, non-controlling interest and other components of equity while any resultant gain or loss is recognised in profit or loss. Any investment retained is recognised at fair value.

The consolidated financial statements include the financial statements of the Company and its principal subsidiaries listed below:

| | Percentage of holdings | |
| --- | --- | --- |
| | 31 December 2014 | 31 December 2013 |
| *Direct subsidiaries* | | |
| NMC Holding Co LLC | 100% | 100% |
| NMC Health Holdco Limited | 100% | 100% |
| *Indirect subsidiaries* | | |
| NMC Healthcare LLC | 100% | 100% |
| New Pharmacy Company Limited | 99% | 99% |
| New Medical Centre Hospital LLC-Dubai | 99% | 99% |
| NMC Specialty Hospital LLC-Abu Dhabi | 99% | 99% |
| NMC Specialty Hospital LLC-Dubai | 99% | 99% |
| New Medical Centre Trading LLC | 99% | 99% |
| Bait Al Shifaa Pharmacy LLC-Dubai | 99% | 99% |
| New Medical Centre LLC-Sharjah | 99% | 99% |
| New Medical Centre Specialty Hospital LLC-Al Ain | 99% | 99% |
| Reliance Information Technology LLC | 99% | 99% |
| BR Medical Suites FZ LLC | 100% | 100% |
| Brightpoint Hospital LLC | 99% | 99% |
| NMC Day Surgery Centre LLC | 99% | 99% |
| NMC Dubai Investment Park LLC | 99% | 99% |

All the above subsidiaries are incorporated in the UAE except for NMC Health Holdco Limited, which is incorporated in England and Wales.

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          100 of 142          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

## 2.3 SIGNIFICANT ACCOUNTING JUDGEMENTS AND ESTIMATES

The key assumptions concerning the future, key sources of estimation uncertainty and critical judgements at the reporting date that have a significant risk of causing a material adjustment to the carrying amounts of assets and liabilities within the next financial year are discussed below:

### Significant estimates

Impairment of inventories
Inventories are held at the lower of cost and net realisable value. When inventories become old or obsolete, an estimate is made of their net realisable value. For individually significant amounts this estimation is performed on an individual basis. Amounts which are not individually significant, but which are old or obsolete, are assessed collectively and a provision applied according to the inventory type and the Group's policy for inventory provisioning. The gross carrying amount of inventories at 31 December 2014 was US$111,597,000 (2013: US$94,839,000) and the provision for old and obsolete items at 31 December 2014 was US$1,388,000 (2013: US$716,000).

Impairment of accounts receivable
An estimate of the collectible amount of trade accounts receivable is made when collection of the full amount is no longer probable. For individually significant amounts, this estimation is performed on an individual basis. Amounts which are not individually significant, but which are past due, are assessed collectively and a provision applied according to the length of time past due, based on historical recovery rates.

A majority of the receivables that are past due but not impaired are from insurance companies and government-linked entities in the United Arab Emirates which are inherently slow payers due to their long invoice verification and approval of payment procedures. Payments continue to be received from these customers and accordingly the risk of non-recoverability is considered to be low.

Gross trade accounts receivable at 31 December 2014 were US$177,203,000 (2013: US$ 154,234,000) and the provision for doubtful debts at 31 December 2014 was US$8,996,000 (2013: US$8,241,000). Any difference between the amounts actually collected in future periods and the amounts expected will be recognised in the consolidated statement of comprehensive income.

### Significant judgements

Functional currency
The UAE Dirham is determined to be the functional currency of the Company.

Judgement has been used to determine the functional currency of the Company that most appropriately represents the economic effects of the Company's transactions, events and conditions.

The primary economic environment influencing the Company's income (dividends) is the UAE and the effect of the local environment is limited to expenses incurred within the UK. The ability of the Company to meet its obligations and pay dividends to its shareholders is dependent on the economy of, and the operation of its subsidiaries in, the UAE.

Assets held in the name of the previous shareholder
In accordance with local laws, except in some specific locations in the UAE the registered title of land and buildings must be held in the name of a UAE national. As a result, land and buildings of the Group are legally registered in the name of shareholders or previous shareholders of the Group. As at 31 December 2014 certain land and buildings with a carrying amount of US$9,321,000 (2013: US$9,648,000) are held in the name of a previous shareholder for the beneficial interest of the Group. As the beneficial interest of such land and buildings resides with the Group, these assets are recorded within land and buildings in the Group consolidated financial statements. The directors take into account this local legal registration requirement, the Group's entitlement to the beneficial interest arising from these assets, as well as other general business factors, when considering whether such assets are impaired. Subsequent to year end US$5,177,000 of the land and buildings which were held in the name of a previous shareholder for the beneficial interest of the Group were transferred into the name of a current UAE national shareholder.

Financial Statements

# NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS CONTINUED

**2.3 SIGNIFICANT ACCOUNTING JUDGEMENTS AND ESTIMATES** (CONTINUED)

**Leases for buildings and land**

Generally our hospitals, day patient medical centres and hospital projects under development are located on land and in buildings which are leased. As at 31 December 2014, the majority of the lease periods range from five to twenty seven years apart from the leases for New Medical Centre Hospital LLC-Dubai (Dubai General Hospital) and the warehouse facilities, which had leases which are renewable on an annual basis with a total value of US$1,015,000 included within property, and equipment as at 31 December 2014. If any such leases are terminated or expire and are not renewed, the Group could lose the investment, including the hospital buildings and the warehouses on the leased sites which could have a material adverse effect on our business, financial condition and results of operations. The directors have considered the following facts in determining the likelihood that these leases will be renewed:

- Whilst some leases can be for long term durations, it is not unusual and can often be common practice throughout all of the emirates in the United Arab Emirates for landlords to lease land and buildings to companies on annually renewable leases of one year terms and for these leases to be renewed automatically. Throughout the Group's 41 year history it has never had a lease cancelled or not renewed, and the Group enjoys a high degree of respect in the region and believes that it maintains strong relationships with the landlords.
- Both the Dubai General Hospital and the warehouse facilities have been occupied by the Group on annually renewable leases, for a period of more than 14 years and each year these leases have been automatically renewed.
- The warehouse facilities have been built by the Group on land leased from government bodies in the Emirates of Dubai and Abu Dhabi on the back of the policies of these governments to attract investment in warehousing in the United Arab Emirates.

**2.4 CHANGES IN ACCOUNTING POLICIES**

**New and amended standards and interpretations:**

The Group applied for the first time certain standards and amendments which are effective for annual periods beginning on or after 1 January 2014.

The amendments to IFRS, which are effective as of 1 January 2014 and are described in more detail below, have no impact on the Group.

**Investment Entities (Amendments to IFRS 10, IFRS 12 and IAS 27)**

These amendments provide an exception to the consolidation requirement for entities that meet the definition of an investment entity under IFRS 10 *Consolidated Financial Statements*. The exception to consolidation requires investment entities to account for subsidiaries at fair value through profit or loss. These amendments have no impact on the Group, since none of the entities in the Group qualifies to be an investment entity under IFRS 10.

**Offsetting Financial Assets and Financial Liabilities - Amendments to IAS 32**

These amendments clarify the meaning of 'currently has a legally enforceable right to set-off' and the criteria for non-simultaneous settlement mechanisms of clearing houses to qualify for offsetting. These amendments have no impact on the Group, since none of the entities in the Group has any offsetting arrangements.

**Novation of Derivatives and Continuation of Hedge Accounting - Amendments to IAS 39**

These amendments provide relief from discontinuing hedge accounting when novation of a derivative designated as a hedging instrument meets certain criteria and retrospective application is required. These amendments have no impact on the Group as the Group has no derivatives as of 31 December 2014.

**Recoverable Amount Disclosures for Non-Financial Assets-Amendments to IAS 36**

These amendments remove the unintended consequences of IFRS 13 Fair Value Measurement on the disclosures required under IAS 36 Impairment of Assets. In addition, these amendments require disclosure of the recoverable amounts for the assets or cash-generating units (CGUs) for which an impairment loss has been recognised or reversed during the period. These amendments have no impact on the Group as the Group has not recognised or reversed any impairment loss during the period.

**IFRIC 21 Levies**

IFRIC 21 clarifies that an entity recognises a liability for a levy when the activity that triggers payment, as identified by the relevant legislation, occurs. For a levy that is triggered upon reaching a minimum threshold, the interpretation clarifies that no liability should be anticipated before the specified minimum threshold is reached. This interpretation has no impact on the Group.

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          102 of 142

Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

**2.4 CHANGES IN ACCOUNTING POLICIES** (CONTINUED)

**Annual Improvements 2010-2012 Cycle**

In the 2010-2012 annual improvements cycle, the IASB issued seven amendments to six standards, which included an amendment to IFRS 13 Fair Value Measurement. The amendment to IFRS 13 is effective immediately and, thus, for periods beginning at 1 January 2014, and it clarifies in the Basis for Conclusions that short-term receivables and payables with no stated interest rates can be measured at invoice amounts when the effect of discounting is immaterial. This amendment is relevant to the Group as the Group has determined that the effect of discounting is immaterial and so short term receivables and payables have been measured at invoiced amounts.

**Annual Improvements 2011-2013 Cycle**

In the 2011-2013 annual improvements cycle, the IASB issued four amendments to four standards, which included an amendment to IFRS 1 First-time Adoption of International Financial Reporting Standards. This amendment to IFRS 1 has no impact on the Group, since the Group is an existing IFRS preparer.

**3   SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

**Revenue recognition**

Revenue is recognised to the extent that it is probable that the economic benefits will flow to the Group and the revenue can be reliably measured, regardless of when the payment is being made. Revenue is measured at the fair value of the consideration received or receivable, less discounts and rebates and taking into account contractually defined terms of payment and excluding taxes or duties.

Revenue streams include clinic service revenues, sale of goods - Pharmacy, sale of goods -Distribution, Healthcare management fees and revenue from BR Medical Suites.

The Group assesses its revenue arrangements against specific criteria in order to determine if it is acting as principal or agent. The Group determines it is acting as principal when it has exposure to the significant risks and rewards associated with the transaction and measures revenue as the gross amount received or receivable. When the Group does not retain the significant risks and rewards, it deems that it is acting as an agent and measures revenue as the amount received or receivable in return for its performance under the contract and excludes any amounts collected on behalf of a third party.

Clinic service revenues:

Clinic service revenues represent the revenue which NMC generates from the provision of either inpatient or outpatient medical services. The group primarily receives clinic service revenues from patients' private /medical insurance schemes. Clinic revenues are recognised when, and to the extent that, performance of a medical service occurs, and is measured at the fair value of the consideration received or receivable. NMC has determined that it is acting as Principal in these arrangements as it has the responsibility for providing the medical services to the patient, it sets the prices for the clinic services which are provided, it bears the credit risk and it bears the risk of providing the medical service.

Sale of Goods - Pharmacy:

The sales of goods from pharmacy relates to the sale of pharmaceutical and other products from hospitals and pharmacies. Whilst the Group does not establish the prices for the pharmaceutical products sold as both the purchase and selling prices for all pharmaceutical products are fixed by the Ministry of Health, NMC has determined that it is acting as Principal in respect of these sales as it provides the goods for sale, it bears the inventory risk, and it bears the credit risk from customers. Revenue from the sale of goods - Pharmacy is therefore recognised when the significant risks and rewards of ownership of the goods have passed to the buyer. Significant risk for retail goods is passed to the buyer at the point of sale.

Sale of Goods - Distribution:

Where the Group bears the inventory risk and the customer credit risk and has the ability to set the prices for the products sold then the Group has determined that it is acting as Principal. Revenue from the sale of goods is therefore recognised when the significant risks and rewards of ownership of the goods have passed to the buyer. Significant risk for retail goods is passed to the buyer for wholesale goods at the time of delivery.

For agency relationships, the revenue earned is measured as the Group's share of the revenue, as specified in the contract. Any amounts collected on behalf of the third party are excluded from revenue and are recorded as a payable. There are currently no material agency relationships.

Healthcare Management fees:

Management fees represent fees earned for managing a hospital. Management fees are recognised when the services under the contract are performed, and the service level criteria have been met, and are measured at the fair value of the consideration received or receivable, in line with the terms of the management contract.

Financial Statements

# NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS CONTINUED

### 3  SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)

Revenue from BR Medical Suites:

BR Medical Suites enters into contracts with doctors whereby these doctors are employed to perform certain procedures or run outpatient services using the facilities at BR Medical Suites. In return the doctors obtain a share of the revenues that are generated from these facilities. Each contractual arrangement with individual doctors is assessed against specific criteria to determine whether the Group is acting as principal or agent in the arrangement with these doctors.

### Other income

Other income comprises revenue from suppliers for the reimbursement of advertising and promotion costs incurred by the Group. Revenue is recognised following formal acceptance of the Group's reimbursement claims by suppliers and is measured at the confirmed amount receivable.

### Interest income

For all financial instruments measured at amortised cost, interest income or expense is recorded using the effective interest rate (EIR), which is the rate that exactly discounts the estimated future cash payments or receipts through the expected life of the financial instrument or a shorter period, where appropriate, to the net carrying amount of the financial asset or liability. Interest income is included in finance income in the consolidated statement of comprehensive income.

### Rebates from Suppliers

The Distribution business receives rebates in the ordinary course of business from a number of its suppliers of pharmaceutical products, in accordance with contractual arrangements in place with specific suppliers. Rebates are accounted for once approval has been received from the supplier following the negotiations which have taken place with them. Rebates receivable are accounted for as a deduction from the cost of purchasing pharmaceutical goods, once the rebate has been approved by the supplier on the basis under IAS 18 that the probability of inflow is not sufficiently certain and the amounts cannot be reliably measured until that point. When rebates have been agreed in advance, for example when it has been agreed that a certain rebate will be applied to the purchase of specific goods for a set period of time rather than just to a specific one off purchase, then the rebate is recognised as a reduction in the purchase price as soon as the goods are purchased. When rebates are offered based upon the volume purchased and it is probable that the rebate will be earned and the amount can be estimated reliably, then the discount is recognised as a reduction in the purchase price when the goods are purchased and the assessment is reviewed on an ongoing basis. Rebates receivable are accounted for on a net basis, being set off against the trade payables to which they relate, as they are a reduction in the amount we owe to our suppliers in respect of pharmaceutical products purchased.

### Business combinations and goodwill

The Group applies the acquisition method to account for business combinations. The consideration transferred for the acquisition of a subsidiary is the fair values of the assets transferred, the liabilities incurred to the former owners of the acquiree and the equity interests issued by the Group. The consideration transferred includes the fair value of any asset or liability resulting from a contingent consideration arrangement. Identifiable assets acquired and liabilities and contingent liabilities assumed in a business combination are measured initially at their fair values at the acquisition date. The Group recognises any non-controlling interest in the acquiree on an acquisition-by-acquisition basis, either at fair value or at the non-controlling interest's proportionate share of the recognised amounts of acquiree's identifiable net assets. Acquisition-related costs are expensed as incurred.

If the business combination is achieved in stages, the acquisition date fair value of the acquirer's previously held equity interest in the acquiree is remeasured to fair value at the acquisition date through profit or loss.

Any contingent consideration to be transferred by the Group is recognised at fair value at the acquisition date. Subsequent changes to the fair value of the contingent consideration that is deemed to be an asset or liability is recognised in accordance with IAS 39 either in profit or loss or as a change to other comprehensive income. Contingent consideration that is classified as equity is not remeasured, and its subsequent settlement is accounted for within equity.

Goodwill is initially measured at cost, being the excess of the aggregate of the consideration transferred and the amount recognised for non-controlling interest over the net identifiable assets acquired and liabilities assumed. If the fair value of the net assets acquired is in excess of the aggregate consideration transferred, the gain is recognised in profit or loss.

After initial recognition, goodwill is measured at cost less any accumulated impairment losses. For the purpose of impairment testing, goodwill acquired in a business combination is, from the acquisition date, allocated to each of the Group's cash-generating units that are expected to benefit from the combination, irrespective of whether other assets or liabilities of the acquiree are assigned to those units.

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          104 of 142          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

### 3   SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)

Where goodwill has been allocated to a cash-generating unit and part of the operation within that unit is disposed of, the goodwill associated with the disposed operation is included in the carrying amount of the operation when determining the gain or loss on disposal. Goodwill disposed in these circumstances is measured based on the relative values of the disposed operation and the portion of the cash-generating unit retained.

Business combinations involving entities under common control
Business combinations involving entities under common control do not fall under the scope of IFRS 3 Revised 'Business Combinations'. The transfer of companies under common control is therefore accounted for using the pooling of interests method. Under this method there is no requirement to fair value the assets and liabilities of the transferred entities and hence no goodwill is created upon transfer of ownership as the balances remain at book value. The consolidated income statement, consolidated balance sheet and the consolidated statement of cash flows comparative figures are also presented as if the Company had been the parent undertaking of the Group throughout the current and previous year. The consolidated financial statements are therefore presented as though the Group had always existed in its current form.

Restructuring reserve
The group restructuring reserve arises on consolidation under the pooling of interests method used for the group restructuring which took place on 1 April 2012. This represents the difference between the share capital of NMC Healthcare LLC, the previous parent company of the Group, and the carrying amount of the investment in that company at the date of the restructure. This reserve is non-distributable.

#### Property and equipment
Property and equipment are stated at cost less accumulated depreciation and any impairment in value.

Depreciation is calculated on all property and equipment other than land and capital work in progress, at the following rates calculated to write off the cost of each asset on a straight line basis over its expected useful life:

| | |
|---|---|
| Hospital building | 6% |
| Buildings | 6% |
| Leasehold improvements | 20% |
| Motor vehicles | 20% |
| Furniture, fixtures and fittings | 12.5% – 20% |
| Medical equipment | 10% – 25% |

The carrying amounts of property and equipment are reviewed for impairment when events or changes in circumstances indicate the carrying value may not be recoverable. If any such indication exists and where the carrying values exceed the estimated recoverable amount, the assets are written down to their recoverable amount, being the higher of their fair value less cost to sell and their value in use.

Capital work in progress is stated at cost and is not depreciated. Lease costs in respect of capital work in progress are capitalised within capital work in progress during the period up until it is commissioned. When commissioned, capital work in progress is transferred to the appropriate property and equipment asset category and depreciated in accordance with the Group's policies. The carrying amounts of capital work in progress are reviewed for impairment when events or changes in circumstances indicate the carrying value may not be recoverable. If any such indication exists and where the carrying values exceed the estimated recoverable amount, the assets are written down to their recoverable amount.

Expenditure incurred to replace a component of an item of property and equipment that is accounted for separately is capitalised and the carrying amount of the component that is replaced is written off. Other subsequent expenditure is capitalised only when it increases future economic benefits of the related item of property and equipment. All other expenditure is recognised in the consolidated statement of comprehensive income as the expense is incurred.

#### Intangible assets
Intangible assets acquired separately are measured on initial recognition at cost. The cost of intangible assets acquired in a business combination is their fair value at the date of acquisition. Following initial recognition, intangible assets are carried at cost less any accumulated amortisation and accumulated impairment losses. Internally generated intangibles, excluding capitalised development costs, are not capitalised and the related expenditure is reflected in consolidated statement of comprehensive income in the period in which the expenditure is incurred.

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          105 of 142          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

Financial Statements

# NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS CONTINUED

**3  SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES** (CONTINUED)

The useful lives of intangible assets are assessed as either finite or indefinite.

Intangible assets with finite lives are amortised over the useful economic life and assessed for impairment whenever there is an indication that the intangible asset may be impaired. The amortisation period and the amortisation method for an intangible asset with a finite useful life are reviewed at least at the end of each reporting period. Changes in the expected useful life or the expected pattern of consumption of future economic benefits embodied in the asset are considered to modify the amortisation period or method, as appropriate, and are treated as changes in accounting estimates. The amortisation expense on intangible assets with finite lives is recognised in the statement of consolidated comprehensive income in the expense category that is consistent with the function of the intangible assets.

Intangible assets with indefinite useful lives are not amortised, but are tested for impairment annually, either individually or at the cash-generating unit level. The assessment of indefinite life is reviewed annually to determine whether the indefinite life continues to be supportable. If not, the change in useful life from indefinite to finite is made on a prospective basis.

Gains or losses arising from derecognition of an intangible asset are measured as the difference between the net disposal proceeds and the carrying amount of the asset and are recognised in the consolidated statement of comprehensive income when the asset is derecognised.

**Borrowing costs**

Borrowing costs that are directly attributable to the acquisition or construction of an asset are capitalised as part of the cost of the asset until the asset is commissioned for use. Borrowing costs in respect of completed assets or not attributable to assets are expensed in the period in which they are incurred.

**Pre-operating expenses**

Pre-operating expenses are the expenses incurred prior to start of operations of a new business unit. These are recognised in the consolidated statement of comprehensive income in the year in which they occur.

**Inventories**

Inventories are valued at the lower of cost and net realisable value after making due allowance for any obsolete or slow moving items. Costs are those expenses incurred in bringing each product to its present location and condition and are determined on a weighted average basis. Net realisable value is based on estimated selling price less any further costs expected to be incurred to disposal.

**Accounts receivable**

Accounts receivable are stated at original invoice amount less a provision for any uncollectible amounts. Accounts receivable with no stated interest rates are measured at invoiced amounts when the effect of discounting is immaterial. An estimate of doubtful debts is made when collection of the full amount is no longer probable. Bad debts are written off when there is no possibility of recovery.

**Cash and cash equivalents**

For the purpose of the consolidated statement of cash flows, cash and cash equivalents consist of cash in hand, bank balances and short term deposits with an original maturity of three months or less, net of outstanding bank overdrafts.

**Equity**

The Group has issued ordinary shares that are classified as equity. The difference between the issue price and the par value of ordinary share capital is allocated to share premium. The transaction costs incurred for the share issue are accounted for as a deduction from share premium, net of any related income tax benefit, to the extent they are incremental costs directly attributable to the share issue that would otherwise have been avoided.

**Accounts payable and accruals**

Liabilities are recognised for amounts to be paid in the future for goods and services received whether billed by the supplier or not. Accounts payable are classified as current liabilities if payment is due within one year or less (or in the normal operating cycle of the business if longer). If not, they are presented as non-current liabilities. Accounts payable are recognised initially at fair value and subsequently measured at amortised cost using the effective interest method.

**Provisions**

Provisions are recognised when the Group has an obligation (legal or constructive) arising from a past event, and the costs to settle the obligation are both probable and able to be reliably measured.

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          106 of 142          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

### 3  SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)

Provisions are measured at the present value of the expenditures expected to be required to settle the obligation using a pre-tax rate that reflects current market assessments of the time value of money and risks specific to the obligation. Increases in provisions due to the passage of time are recognised in the consolidated income statement within 'Finance costs'.

#### Term loans

Term loans are initially recognised at the fair value of the consideration received less directly attributable transaction costs. After initial recognition, term loans are subsequently measured at amortised cost using the effective interest method. Interest on term loans is charged as an expense as it accrues, with unpaid amounts included in "accounts payable and accruals".

When an existing financial liability is replaced by another from the same lender on substantially different terms, or the terms of an existing liability are substantially modified, such an exchange or modification is treated as the derecognition of the original liability and the recognition of a new liability. The difference in the respective carrying amounts is recognised in the statement of comprehensive income.

#### Employees' end of service benefits

The Group operates an un-funded post-employment benefit plan (employees' end of service benefits) for its expatriate employees in UAE, in accordance with the labour laws of the UAE. The entitlement to these benefits is based upon the employees' final salary and length of service, subject to the completion of a minimum service period. Payment for employees' end of service benefits is made when an employee leaves, resigns or completes his service.

The cost of providing benefits under the post-employment benefit plan is determined using the projected unit credit method. Re-measurements, comprising of actuarial gains and losses, are recognized immediately in the statement of financial position with a corresponding debit or credit to retained earnings through other comprehensive income in the period in which they occur. Re-measurements are not reclassified to profit or loss in subsequent periods.

Interest is calculated by applying the discount rate to the defined benefit liability. The rate used to discount the end of service benefit obligation is determined by reference to market yields at the balance sheet date on high quality corporate bonds. The current and non-current portions of the provision relating to employees' end of service benefits are separately disclosed in the consolidated statement of financial position.

The Group recognises the following changes in the employees' end of service benefits under 'direct costs' and 'general and administrative expenses' in the consolidated statement of comprehensive income:

- Service costs comprising current service costs.
- Interest expense.

With respect to its UAE national employees, the Group makes contributions to the relevant UAE Government pension scheme calculated as a percentage of the employees' salaries. The obligations under these schemes are limited to these contributions, which are expensed when due.

#### Share based payments

Equity-settled share-based payments to employees (including executive directors) are measured at the fair value of the equity instruments at the grant date. The fair value excludes the effect of non-market-based vesting conditions. Details regarding the determination of the fair value of equity-settled share-based transactions are set out in note 28.

The fair value determined at the grant date of the equity-settled share-based payments is expensed on a straight-line basis over the vesting period, based on the Group's estimate of equity instruments that will eventually vest. At each reporting date, the Group revises its estimate of the number of equity instruments expected to vest as a result of the effect of non-market-based vesting conditions. The impact of the revision of the original estimates, if any, is recognised in the consolidated statement of comprehensive income such that the cumulative expense reflects the revised estimate, with a corresponding adjustment to equity reserves/other payables.

No expense is recognised for awards that do not ultimately vest, except for equity-settled transactions for which vesting is conditional upon a market or non-vesting condition. These are treated as vesting irrespective of whether or not the market or non-vesting condition is satisfied, provided that all other performance and/or service conditions are satisfied.

The dilutive effect of outstanding options is reflected as additional share dilution in the computation of diluted earnings per share (see note 14).

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          107 of 142          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

Financial Statements

# NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS CONTINUED

**3   SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES** (CONTINUED)

**Foreign currencies**

Transactions in foreign currencies are recorded in UAE Dirhams at the exchange rate ruling at the date of the transaction. Monetary assets and liabilities denominated in foreign currencies are retranslated at the rate of exchange ruling at the balance sheet date. All differences are taken to the consolidated statement of comprehensive income.

**Translation of foreign operations**

On consolidation the assets and liabilities of foreign operations are translated into US Dollars at the rate of exchange prevailing at the reporting date and their income statements are translated at exchange rates prevailing at the dates of the transactions. Since the UAE Dirham is pegged against the US Dollar a single rate of 3.673 per US Dollar is used to translate assets and liabilities and balances in the income statement.

**Derivative financial instruments**

The Group used derivative financial instruments such as interest rate swaps and caps to hedge its interest rate risks. Such derivative financial instruments were initially recognised at fair value on the date on which a contract is entered into and were subsequently remeasured at fair value. The fair value of interest rate swaps were determined by reference to market values for similar instruments. Derivatives with positive market values (unrealised gains) were included in other assets and derivatives with negative market values (unrealised losses) were included in other liabilities in the consolidated statement of financial position. Any gains or losses arising from changes in fair value on derivatives during the year were taken directly to profit or loss. Whilst the policy of the Group is not to apply hedge accounting, the derivatives were economic hedges of liabilities in issue and it is therefore considered appropriate to show the changes in fair value of derivatives in finance costs in the consolidated statement of comprehensive income.

**Fair value measurement**

Fair value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. The fair value measurement is based on the presumption that the transaction to sell the asset or transfer the liability takes place either:

- In the principal market for the asset or liability, or
- In the absence of a principal market, in the most advantageous market for the asset or liability.

The principal or the most advantageous market must be accessible to by the Group.

The fair value of an asset or a liability is measured using the assumptions that market participants would use when pricing the asset or liability, assuming that market participants act in their economic best interest.

A fair value measurement of a non-financial asset takes into account a market participant's ability to generate economic benefits by using the asset in its highest and best use or by selling it to another market participant that would use the asset in its highest and best use.

The Group uses valuation techniques that are appropriate in the circumstances and for which sufficient data are available to measure fair value, maximising the use of relevant observable inputs and minimising the use of unobservable inputs.

All assets and liabilities for which fair value is measured or disclosed in the financial statements are categorised within the fair value hierarchy, described as follows, based on the lowest level input that is significant to the fair value measurement as a whole:

- Level 1 – Quoted (unadjusted) market prices in active markets for identical assets or liabilities.
- Level 2 – Valuation techniques for which the lowest level input that is significant to the fair value measurement is directly or indirectly observable
- Level 3 – Valuation techniques for which the lowest level input that is significant to the fair value measurement is unobservable

For assets and liabilities that are recognised in the financial statements on a recurring basis, the Group determines whether transfers have occurred between levels in the hierarchy by re-assessing categorisation (based on the lowest level input that is significant to the fair value measurement as a whole) at the end of each reporting period.

**Impairment of financial assets**

An assessment is made at each consolidated statement of financial position date to determine whether there is objective evidence that a specific financial asset may be impaired. If such evidence exists, any impairment loss is recognised in the consolidated statement of comprehensive income. Impairment is determined as the difference between carrying value and the present value of future cash flows discounted at the current market rate of return for a similar financial asset.

### 3  SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)
#### Leases
The determination of whether an arrangement is, or contains, a lease is based on the substance of the arrangement at inception date, whether fulfilment of the arrangement is dependent on the use of a specific asset or assets or the arrangement conveys a right to use the asset, even if that right is not explicitly specified in an arrangement. Operating leases are recognised as an operating expense in the consolidated statement of comprehensive income on a straight line basis.

### 4  ACCOUNTING STANDARDS AND INTERPRETATIONS ISSUED BUT NOT EFFECTIVE
The standards and interpretations that are issued, but not yet effective, up to the date of issuance of the Group's financial statements are listed below. The Group intends to adopt these standards, if applicable, when they become effective.

#### IFRS 15 Revenue from Contracts with Customers
IFRS 15 was issued in May 2014 and establishes a new five-step model that will apply to revenue arising from contracts with customers. Under IFRS 15 revenue is recognised at an amount that reflects the consideration to which an entity expects to be entitled in exchange for transferring goods or services to a customer. The principles in IFRS 15 provide a more structured approach to measuring and recognising revenue. The new revenue standard is applicable to all entities and will supersede all current revenue recognition requirements under IFRS. Either a full or modified retrospective application is required for annual periods beginning on or after 1 January 2017 with early adoption permitted. The Group is currently assessing the impact of IFRS 15 and plans to adopt the new standard on the required effective date.

The standards and interpretations that are issued, but not yet effective, up to the date of issuance of the Group's financial statements and not expected to have any impact on the Group are as follows:

- IFRS 9 Financial Instruments
- IFRS 14 Regulatory Deferral Accounts
- Amendments to IAS 19 Defined Benefit Plans: Employee Contributions
- Annual improvements 2010-2012 Cycle:

  - IFRS 3 Business Combinations
  - IFRS 8 Operating Segments
  - IAS 16 Property, Plant and Equipment and IAS 38 Intangible Assets
  - IAS 24 Related Party Disclosures

- Annual improvements 2011-2013 Cycle:

  - IFRS 3 Business Combinations
  - IFRS 13 Fair Value Measurement
  - IAS 40 Investment Property

- Amendments to IFRS 11 Joint Arrangements: Accounting for Acquisitions of Interests.
- Amendments to IAS 16 and IAS 38: Clarification of Acceptable Methods of Depreciation and Amortisation.
- Amendments to IAS 16 and IAS 41 Agriculture: Bearer Plants.
- Amendments to IAS 27: Equity Method in Separate Financial Statements.

### 5  SEGMENT INFORMATION
For management purposes, the Group is organised into business units based on their products and services and has two reportable segments as follows:

- The healthcare segment is engaged in providing professional medical services, comprising diagnostic services, in and outpatient clinics and retailing of pharmaceutical goods. It also includes the provision of management services in respect of a hospital.
- The distribution & services segment is engaged in wholesale trading of pharmaceutical goods, medical equipment, cosmetics and food.

No operating segments have been aggregated to form the above reportable operating segments.

Management monitors the operating results of its business units separately for the purpose of making decisions about resource allocation and performance assessment. Segment performance is evaluated based on EBITDA and profit or loss. These are measured consistently with EBITDA and profit or loss excluding finance income and group administrative expenses, unallocated depreciation and unallocated other income, in the consolidated financial statements. From the current year, the Group has started allocating its finance costs and IT costs to its segments.

NMC Health plc Annual Report 2014                                                                                     105

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          109 of 142          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

Financial Statements

# NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS CONTINUED

## 5   SEGMENT INFORMATION (CONTINUED)

Group financing and investments (including finance costs and finance income) are managed on a group basis and are not allocated to operating segments.

Transfer prices between operating segments are on an arm's length basis in a manner similar to transactions with third parties.

The following tables present revenue and profit and certain asset and liability information regarding the Group's business segments for the years ended 31 December 2014 and 2013.

| | Healthcare US$ '000 | Distribution and services US$ '000 | Total segments US$ '000 | Adjustments and eliminations US$ '000 | Consolidated US$ '000 |
|---|---|---|---|---|---|
| **Year ended 31 December 2014** | | | | | |
| **Revenue** | | | | | |
| External customers | 327,714 | 316,217 | 643,931 | – | 643,931 |
| Inter segment | 4,484 | 22,675 | 27,159 | (27,159) | |
| **Total** | 332,198 | 338,892 | 671,090 | (27,159) | 643,931 |
| **(Expenses)/Income** | | | | | |
| Depreciation | (11,215) | (2,349) | (13,564) | (486) | (14,050) |
| Finance costs | (3,927) | (3,396) | (7,323) | (7,174) | (14,497) |
| **Segment EBITDA** | 88,211 | 34,121 | 122,332 | (19,874) | 102,458 |
| **Segment profit** | 73,070 | 28,376 | 101,446 | (23,912) | 77,534 |
| **Segment assets** | 459,745 | 208,935 | 668,680 | 281,845 | 950,525 |
| **Segment liabilities** | 50,497 | 58,300 | 108,797 | 388,701 | 497,498 |
| **Other disclosures** | | | | | |
| Capital expenditure | 108,809 | 3,005 | 111,814 | 501 | 112,315 |
| | | | | | |
| **Year ended 31 December 2013** | | | | | |
| **Revenue** | | | | | |
| External customers | 285,043 | 265,835 | 550,878 | – | 550,878 |
| Inter segment | 4,252 | 34,341 | 38,593 | (38,593) | – |
| **Total** | 289,295 | 300,176 | 589,471 | (38,593) | 550,878 |
| **(Expenses)/Income** | | | | | |
| Depreciation | (7,120) | (2,092) | (9,212) | (451) | (9,663) |
| Finance costs | – | – | – | (14,344) | (14,344) |
| **Segment EBITDA** | 81,668 | 29,908 | 111,576 | (18,636) | 92,940 |
| **Segment profit** | 74,339 | 27,815 | 102,154 | (33,011) | 69,143 |
| **Segment assets** | 338,341 | 190,407 | 528,748 | 286,514 | 815,262 |
| **Segment liabilities** | 33,818 | 47,028 | 80,846 | 345,265 | 426,111 |
| **Other disclosures** | | | | | |
| Capital expenditure | 80,845 | 1,220 | 82,065 | 587 | 82,652 |

Inter-segment revenues are eliminated upon consolidation and reflected in the 'adjustments and eliminations' column. All other adjustments and eliminations are part of detailed reconciliations presented further below.

### Adjustments and eliminations

Finance income and group overheads are not allocated to individual segments as they are managed on a group basis.

Term loans, bank overdraft and other short term borrowings and certain other assets and liabilities are substantially not allocated to segments as they are also managed on a group basis.

Capital expenditure consists of additions to property and equipment.

Exhibit 8 to B.R. Shetty's Request for Judicial Notice      110 of 142      Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

## 5   SEGMENT INFORMATION (CONTINUED)

From current year the Group started allocating finance cost and IT cost to its subsidiaries. Prior period comparatives have not been restated, however, segment EBITDA and segment profit for the current period, had these costs not been allocated, are presented in the table below:

| | Healthcare US$ '000 | Distribution and services US$ '000 | Total segments US$ '000 | Adjustments and eliminations US$ '000 | Consolidated US$ '000 |
|---|---|---|---|---|---|
| **Year ended 31 December 2014** | | | | | |
| **(Expenses)/Income** | | | | | |
| Depreciation | (11,215) | (2,349) | (13,564) | (486) | (14,050) |
| Finance costs | – | – | – | (14,497) | (14,497) |
| **Segment EBITDA** | 89,138 | 34,416 | 123,554 | (21,096) | 102,458 |
| **Segment profit** | 77,924 | 32,067 | 109,991 | (32,457) | 77,534 |

**Reconciliation of Segment EBITDA to Group profit**

| | 2014 US$ '000 | 2013 US$ '000 |
|---|---|---|
| Segment EBITDA | 122,332 | 111,576 |
| Unallocated group administrative expenses | (20,010) | (18,654) |
| Unallocated other income | 136 | 18 |
| Unallocated finance income | 3,623 | 3,814 |
| Unallocated unamortised finance fees written off | – | (3,394) |
| Impairment of property and equipment | – | (210) |
| Finance costs | (14,497) | (14,344) |
| Depreciation | (14,050) | (9,663) |
| **Group Profit before tax** | 77,534 | 69,143 |

**Reconciliation of Segment profit to Group profit**

| | 2014 US$ '000 | 2013 US$ '000 |
|---|---|---|
| Segment profit | 101,446 | 102,154 |
| Unallocated finance income | 3,623 | 3,814 |
| Unallocated finance costs | (7,175) | (14,344) |
| Unallocated group administrative expenses | (20,010) | (18,654) |
| Unallocated unamortised finance fees written off | – | (3,394) |
| Unallocated depreciation | (486) | (451) |
| Unallocated other income | 136 | 18 |
| **Group Profit before tax** | 77,534 | 69,143 |

**Reconciliation of Group assets**

| | 2014 US$ '000 | 2013 US$ '000 |
|---|---|---|
| Segment assets | 668,680 | 528,748 |
| Unallocated property and equipment | 9,341 | 12,365 |
| Unallocated inventory | 26 | 36 |
| Unallocated accounts receivable and prepayments | 7,253 | 5,526 |
| Unallocated amounts due from related parties | – | 267 |
| Unallocated bank balances and cash | 78,633 | 74,954 |
| Unallocated bank deposits | 183,577 | 193,366 |
| Unallocated intangible assets | 3,015 | – |
| **Group assets** | 950,525 | 815,262 |

NMC Health plc Annual Report 2014                                                                                                          107

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          111 of 142          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

Financial Statements

# NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS CONTINUED

## 5   SEGMENT INFORMATION (CONTINUED)
### Reconciliation of Group liabilities

|  | 2014 US$ '000 | 2013 US$ '000 |
|---|---|---|
| Segment liabilities | 108,797 | 80,846 |
| Unallocated term loans | 206,512 | 250,200 |
| Unallocated employees' end of service benefits | 1,101 | 219 |
| Unallocated accounts payable and accruals | 11,335 | 12,547 |
| Unallocated bank overdraft and other short term borrowings | 169,607 | 82,238 |
| Unallocated amounts due to related parties | 146 | 61 |
| Group liabilities | 497,498 | 426,111 |

### Other information

The following table provides information relating to Group's major customers who contribute more than 10% towards the Group's revenues:

|  | Healthcare US$ '000 | Distribution and services US$ '000 | Total US$ '000 |
|---|---|---|---|
| Year ended 31 December 2014 |  |  |  |
| Customer 1 | 92,246 | – | 92,246 |
| Customer 2 | 35,005 | – | 35,005 |
|  | 127,251 | – | 127,251 |
| Year ended 31 December 2013 |  |  |  |
| Customer 1 | 75,802 | – | 75,802 |
| Customer 2 | 32,715 | – | 32,715 |
|  | 108,517 | – | 108,517 |

### Geographical information

The Group has only one geographical segment - United Arab Emirates. All revenues from external customers are generated in the United Arab Emirates and all non-current assets are located in the United Arab Emirates.

Analysis of revenue by category:

|  | 2014 US$ '000 | 2013 US$ '000 |
|---|---|---|
| Revenue from services: |  |  |
| Healthcare - clinic | 260,938 | 207,532 |
| Healthcare - management fees | 5,717 | 5,445 |
|  | 266,655 | 212,977 |
| Sale of goods: |  |  |
| Distribution | 316,217 | 265,835 |
| Healthcare | 61,059 | 72,066 |
|  | 377,276 | 337,901 |
| Total | 643,931 | 550,878 |

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          112 of 142          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

## 6   EXPENSES BY NATURE

| | 2014 US$ '000 | 2013 US$ '000 |
|---|---|---|
| Cost of inventories recognised as an expense | 314,408 | 265,852 |
| Salary expenses | 157,990 | 136,668 |
| Rent expenses | 27,728 | 21,518 |
| Sales promotion expenses | 35,174 | 29,533 |
| Repair & maintenance expenses | 7,630 | 5,796 |
| Others | 28,983 | 25,531 |
| | 571,913 | 484,898 |
| Allocated to : | | |
|  Direct costs | 434,725 | 365,336 |
|  General and administrative expenses | 137,188 | 119,562 |
| | 571,913 | 484,898 |

The classifications of the remaining expenses by nature recognised in the consolidated statement of comprehensive income are:

| | 2014 US$ '000 | 2013 US$ '000 |
|---|---|---|
| Depreciation | 14,050 | 9,663 |
| Impairment of property and equipment | – | 210 |
| Finance costs | 14,497 | 14,344 |
| Unamortised finance fees written off | – | 3,394 |
| | 28,547 | 27,611 |

## 7   OTHER INCOME

Other income includes US$30,180,000 (2013: US$26,771,000) relating to reimbursement of advertisement and promotional expenses incurred by the Group. Revenue is recognised following the formal acceptance of the Group's reimbursement claims by suppliers and is measured at the confirmed amount receivable.

## 8   FINANCE COSTS

| | 2014 US$ '000 | 2013 US$ '000 |
|---|---|---|
| Bank interest | 12,324 | 12,788 |
| Bank charges | 2,173 | 2,258 |
| Change in fair value of derivative financial instrument | – | (702) |
| | 14,497 | 14,344 |

## 9   FINANCE INCOME

| | 2014 US$ '000 | 2013 US$ '000 |
|---|---|---|
| Bank and other interest income | 3,623 | 3,814 |
| | 3,623 | 3,814 |

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          113 of 142          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

Financial Statements

# NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS CONTINUED

### 10  PROFIT FOR THE YEAR BEFORE TAX

The profit for the year before tax is stated after charging:

| | 2014 US$ '000 | 2013 US$ '000 |
|---|---|---|
| Cost of inventories recognised as an expense (note 6) | 314,408 | 265,852 |
| Cost of inventories written off and provided | 2,318 | 2,381 |
| Minimum lease payments recognised as operating lease expense | 27,728 | 21,518 |
| Depreciation (note 15) | 14,050 | 9,663 |
| Net Impairment of accounts receivable (note 18) | 2,498 | 2,462 |
| Employees' end of service benefits (note 25) | 3,492 | 2,362 |
| Net foreign exchange loss | 1,490 | 3,841 |
| Loss on disposal of property and equipment | 224 | 383 |
| Share based payments expense (note 28) | 88 | - |

### 11  AUDITOR'S REMUNERATION

The Group paid the following amounts to its auditor and its associates in respect of the audit of the financial statements and for other services provided to the Group.

| | 2014 US$ '000 | 2013 US$ '000 |
|---|---|---|
| Fees payable to the Company's auditor for the audit of the Company's annual accounts | 593 | 615 |
| Fees payable to the Company's auditor and its associates for other services: | | |
| - the audit of the company's subsidiaries pursuant to legislation | 149 | 142 |
| - audit related assurance services | 130 | 155 |
| - other assurance services | - | 15 |
| - Tax compliances services | 12 | 25 |
| - Tax advisory services | 8 | 25 |
| - non audit services | 41 | 19 |
| | 933 | 996 |

Included in the fees payable to the Company's auditor for the audit of the Company's annual accounts is US$NIL (2013: US$100,000) which was under-accrued in respect of the prior year audit of the Company's annual accounts.

The fees paid to the auditor includes US$92,000 (2013: US$85,000) in respect of out of pocket expenses. There were no benefits in kind provided to the auditor or its associates in either 2014 or 2013.

### 12  STAFF COSTS AND DIRECTORS' EMOLUMENTS
### (a) Staff costs

| | 2014 US$ '000 | 2013 US$ '000 |
|---|---|---|
| Wages and salaries | 144,942 | 126,580 |
| Employees' end of service benefits (note 26) | 3,492 | 2,362 |
| Share based payments expense  (note 28) | 88 | - |
| Others | 9,468 | 7,726 |
| | 157,990 | 136,668 |

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          114 of 142

## 12  STAFF COSTS AND DIRECTORS' EMOLUMENTS (CONTINUED)

Staff costs include amounts paid to directors, disclosed in part (b) below. The average number of monthly employees during the year was made up as follows:

|  | 2014 | 2013 |
|---|---|---|
| Healthcare | 3,874 | 3,169 |
| Distribution & services | 1,846 | 1,726 |
| Administration | 174 | 151 |
|  | 5,894 | 5,046 |

### (b) Directors' remuneration

|  | 2014 US$ '000 | 2013 US$ '000 |
|---|---|---|
| Directors' remuneration | 2,141 | 1,746 |

Some of the executive directors are entitled to end of service benefits and to participate in share option plans as disclosed in note 28. Further information in respect of this compensation paid to directors is disclosed in the Directors' Remuneration Report.

## 13  TAX

The Group operates solely in the United Arab Emirates and as there is no corporation tax in the United Arab Emirates, no taxes are recognised or payable on the operations in the UAE. It is the opinion of management that there are sufficient expenses in the Company to offset taxable income arising in the UK and accordingly any tax liability that could arise is likely to be immaterial. The unused tax losses amount to US$5,155,000 as at 31 December 2014 (2013: US $nil).

## 14  EARNINGS PER SHARE (EPS)

Basic EPS amounts are calculated by dividing net profit for the year attributable to ordinary equity holders of the Parent Company by the weighted average number of ordinary shares outstanding during the year.

Diluted EPS amounts are calculated by dividing the profit attributable to ordinary equity holders of the parent by the weighted average number of ordinary shares outstanding during the year plus the weighted average number of ordinary shares that would be issued on conversion of all the dilutive potential ordinary shares into ordinary shares.

The following reflects the income and share data used in the basic and diluted earnings per share computations:

|  | 2014 | 2013 |
|---|---|---|
| Profit attributable to equity holders of the Parent (US$ '000) | 76,566 | 68,165 |
| Weighted average number of ordinary shares in issue ('000) for basic EPS | 185,714 | 185,714 |
| Effect of dilution from share based payments ('000) | 56 | – |
| Weighted average number of ordinary shares ('000) for diluted EPS | 185,770 | 185,714 |
| Basic earnings per share (US$) | 0.412 | 0.367 |
| Diluted earnings per share (US$) | 0.412 | 0.367 |

## 15  PROPERTY AND EQUIPMENT

Property and equipment consists of the following:

|  | 2014 US$ '000 | 2013 US$ '000 |
|---|---|---|
| Property and equipment | 368,357 | 273,792 |
|  | 368,357 | 273,792 |

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          115 of 142          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

Financial Statements

# NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS CONTINUED

## 15  PROPERTY AND EQUIPMENT (CONTINUED)

| | Freehold land US$ '000 | Hospital building US$ '000 | Buildings US$ '000 | Leasehold improvements US$ '000 | Motor vehicles US$ '000 | Furniture, fixtures fittings and medical equipment US$ '000 | Capital work in progress US$ '000 | Total US$ '000 |
|---|---|---|---|---|---|---|---|---|
| **31 December 2014** | | | | | | | | |
| Cost: | | | | | | | | |
| At 1 January 2014 | 19,206 | 12,343 | 26,300 | 17,388 | 5,887 | 114,074 | 171,389 | 366,587 |
| Additions | – | – | – | 1,064 | 1,576 | 14,967 | 94,686 | 112,293 |
| Disposals | – | – | – | – | (42) | (1,265) | – | (1,307) |
| Transfer from CWIP | – | – | – | 33,407 | – | 15,712 | (49,119) | – |
| Transfer to intangible assets | – | – | – | – | – | – | (3,198) | (3,198) |
| At 31 December 2014 | 19,206 | 12,343 | 26,300 | 51,859 | 7,421 | 143,488 | 213,758 | 474,375 |
| Depreciation: | | | | | | | | |
| At 1 January 2014 | – | 7,804 | 4,501 | 10,279 | 4,868 | 65,343 | – | 92,795 |
| Charge for the year | – | 310 | 1,419 | 3,451 | 359 | 8,511 | – | 14,050 |
| Relating to disposals | – | – | – | – | (42) | (785) | – | (827) |
| At 31 December 2014 | – | 8,114 | 5,920 | 13,730 | 5,185 | 73,069 | – | 106,018 |
| Net carrying amount: At 31 December 2014 | 19,206 | 4,229 | 20,380 | 38,129 | 2,236 | 70,419 | 213,758 | 368,357 |
| **31 December 2013** | | | | | | | | |
| Cost: | | | | | | | | |
| At 1 January 2013 | 19,206 | 12,343 | 26,269 | 12,722 | 5,544 | 110,594 | 104,067 | 290,745 |
| Additions | – | – | 31 | 907 | 83 | 8,791 | 72,840 | 82,652 |
| Disposals | – | – | – | – | (47) | (6,553) | – | (6,600) |
| Transfer from CWIP progress | – | – | – | 3,759 | 307 | 1,242 | (5,308) | – |
| Impairment of property and equipment | – | – | – | – | – | – | (210) | (210) |
| At 31 December 2013 | 19,206 | 12,343 | 26,300 | 17,388 | 5,887 | 114,074 | 171,389 | 366,587 |
| Depreciation: | | | | | | | | |
| At 1 January 2013 | – | 7,494 | 3,083 | 8,932 | 4,701 | 64,882 | – | 89,092 |
| Charge for the year | – | 310 | 1,418 | 1,347 | 214 | 6,374 | – | 9,663 |
| Relating to disposals | – | – | – | – | (47) | (5,913) | – | (5,960) |
| At 31 December 2013 | – | 7,804 | 4,501 | 10,279 | 4,868 | 65,343 | – | 92,795 |
| Net carrying amount: At 31 December 2013 | 19,206 | 4,539 | 21,799 | 7,109 | 1,019 | 48,731 | 171,389 | 273,792 |

As part of the Group's capital expenditure programme, borrowing costs of US$4,068,000 (2013: US$4,886,000) net of finance income of US$NIL (2013: US$54,000) have been capitalised during the year. The rate used to determine the amount of borrowing costs eligible for capitalisation was 3.15% (2013: 3.40%) which is the effective rate of the borrowings used to finance the capital expenditure. Companies in UAE are not subject to taxation and as such there is no tax relief in respect of capitalised interest.

Total capital expenditure during the year ended 31 December 2014 was US$112,293,000 (2013: US$82,652,000). Of the total capital expenditure spend during the year, US$94,686,000 (2013: US$72,840,000) related to new capital projects and US$17,607,000 (2013: US$9,812,000) related to further capital investment in our existing facilities.

Generally hospital and distribution operations are carried out on land and buildings which are leased from Government authorities or certain private parties. The majority of the lease periods range from five to twenty seven years apart from New Medical Centre Hospital LLC-Dubai ('Dubai General Hospital'), and the warehouse facilities which had leases renewable on an annual basis (note 2.3). As at 31 December 2014 US$1,015,000 (2013: US$50,245,000) of the amounts included in property and equipment related to assets with annually renewable leases. During the current year, the lease for the land on which Khalifa City Specialty Hospital is being constructed (which as at 31 December 2013 was an annually renewable lease) has been renewed so that it is now a 27 year lease expiring in the year 2040.

## 15  PROPERTY AND EQUIPMENT (CONTINUED)

In accordance with the local laws, except in some specific locations in the UAE the registered title of land and buildings must be held in the name of a UAE national. As a result, land and buildings of the Group are legally registered in the name of shareholders or previous shareholders of the Group. Certain land and buildings with a carrying amount of US$9,321,000 (31 December 2013: US$9,648,000) are held in the name of a previous shareholder for the beneficial interest of the Group. As the beneficial interest of such land and buildings resides with the Group, these assets are recorded within land and buildings in the Group's consolidated financial statements. The directors take into account this local legal registration requirement, the Group's entitlement to the beneficial interest arising from these assets, as well as other general business factors, when considering whether such assets are impaired. Subsequent to year end US$5,177,000 of the land and buildings which were held in the name of a previous shareholder for the beneficial interest of the Group were transferred into the name of a current UAE national shareholder.

## 16  INTANGIBLE ASSETS

| | 2014 US$ '000 | | | 2013 US$ '000 | | |
|---|---|---|---|---|---|---|
| | Software | Goodwill | Total | Software | Goodwill | Total |
| As at 1 January | – | 1,016 | 1,016 | – | 1,016 | 1,016 |
| Transfer from Capital work in progress (note 15) | 3,198 | – | 3,198 | – | – | – |
| Addition during the year | 22 | – | 22 | – | – | – |
| As at 31 December | 3,220 | 1,016 | 4,236 | – | 1,016 | 1,016 |

Software represents work-in-progress on the ERP system of the Group. During the year, an amount of US$3,198,000 in respect of ERP software has been transferred from capital work in progress within property and equipment to intangible assets. Management is currently in the process of estimating the useful economic life of the software and is still determining the amortization method to be applied. Amortization of the software will commence once it is implemented and goes live.

Management has performed an impairment assessment of ERP software and believes that no impairment is required.

Goodwill arose on the acquisition of BR Medical Suites FZ LLC on 1 July 2012.

## 17  INVENTORIES

| | 2014 US$ '000 | 2013 US$ '000 |
|---|---|---|
| Pharmaceuticals and cosmetics | 58,444 | 44,959 |
| Scientific equipment | 11,295 | 11,899 |
| Consumer products | 32,719 | 27,915 |
| Food | 6,041 | 6,796 |
| Telecommunication equipment | 231 | 569 |
| Consumables | 211 | 290 |
| Opticals | 333 | 358 |
| Goods in transit | 1,750 | 1,594 |
| Other | 573 | 459 |
| | 111,597 | 94,839 |
| Less: provisions for slow moving and obsolete inventories | (1,388) | (716) |
| | 110,209 | 94,123 |

The amount of write down of inventories recognised as an expense for the year ended 31 December 2014 is US$1,646,000 (2013: US$1,781,000). This is recognised in direct costs.

Charge for the year in respect of provision provided for slow moving and obsolete inventories is US$672,000 (2013: US$600,000).

Trust receipts issued by banks amounting to US$25,059,000 (2013: US$3,100,000) are secured against the inventories.

## 18  ACCOUNTS RECEIVABLE AND PREPAYMENTS

| | 2014 US$ '000 | 2013 US$ '000 |
|---|---|---|
| Accounts receivable | 168,207 | 145,993 |
| Receivable from suppliers for promotional expenses | 9,349 | 9,696 |
| Other receivables | 6,262 | 6,845 |
| Prepayments | 12,751 | 5,848 |
| | 196,569 | 168,382 |

Exhibit 8 to B.R. Shetty's Request for Judicial Notice        117 of 142        Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

Financial Statements

# NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS CONTINUED

### 18 ACCOUNTS RECEIVABLE AND PREPAYMENTS (CONTINUED)

Receivables from suppliers relate to advertising and promotional expenses incurred by the Group. Accounts receivable are stated net of provision for doubtful debts of US$8,996,000 (2013: US$8,241,000). Movements in the provision for doubtful debts are as follows:

|  | 2014 US$ '000 | 2013 US$ '000 |
|---|---|---|
| At 1 January | 8,241 | 6,444 |
| Written off | (1,743) | (665) |
| Written back (note 10) | (471) | (472) |
| Charge for the year (note 10) | 2,969 | 2,934 |
| At 31 December | 8,996 | 8,241 |

The ageing of unimpaired accounts receivable is as follows:

|  | Total US$ '000 | Neither past due nor impaired US$ '000 | Past due but not impaired | | | |
|---|---|---|---|---|---|---|
|  |  |  | < 90 days US$ '000 | 91-180 days US$ '000 | 181-365 days US$ '000 | >365 days US$ '000 |
| **31 December 2014** |  |  |  |  |  |  |
| Accounts receivable | 168,207 | 115,379 | 37,884 | 9,985 | 3,777 | 1,182 |
| 31 December 2013 |  |  |  |  |  |  |
| Accounts receivable | 145,993 | 104,028 | 31,658 | 6,053 | 2,774 | 1,480 |

Unimpaired receivables are expected, on the basis of past experience, to be fully recoverable. It is not the practice of Group to obtain collateral over receivables and they are therefore unsecured. As at 31 December 2014 trade receivables of US$8,996,000 (2013: US$8,241,000) were impaired and fully provided for.

Credit risk is managed through the Group's established policy, procedures and controls relating to credit risk management (note 29). A majority of the receivables that are past due but not impaired are from insurance companies and government-linked entities in the United Arab Emirates which are inherently slow payers due to their long invoice verification and approval of payment procedures. Payments continue to be received from these customers and accordingly the risk of non-recoverability is considered to be low.

Of the net trade receivables balance of US$168,207,000 (2013: US$145,993,000) amount of US$73,069,000 is against five customers (2013: US$61,353,000 is against five customers).

The Group's terms require receivables to be repaid within 90-120 days depending on the type of customer, which is in line with local practice in the UAE. Due to the long credit period offered to customers, a significant amount of trade accounts receivable are neither past due nor impaired.

Amounts due from related parties amounting to US$7,985,000 (31 December 2013: US$9,254000) as disclosed on the face of the consolidated statement of financial position are trading in nature and arise in the normal course of business.

### 19 CASH AND CASH EQUIVALENTS

Cash and cash equivalents included in the consolidated statement of cash flows comprise of the following:

|  | 2014 US$ '000 | 2013 US$ '000 |
|---|---|---|
| Bank deposits | 183,577 | 193,366 |
| Bank balances and cash | 79,592 | 75,329 |
| Bank overdrafts and other short term borrowings | (169,607) | (82,238) |
|  | 93,562 | 186,457 |
| Adjustments for: |  |  |
| Short term borrowings | 143,875 | 74,183 |
| Bank deposits maturing in over 3 months | (82,209) | (148,380) |
| Restricted cash | (18,909) | (33,059) |
| Cash and cash equivalents | 136,619 | 79,201 |

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          118 of 142

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

| Overview | Group Strategic Report | Governance | Financial Statements |
|---|---|---|---|

### 19 CASH AND CASH EQUIVALENTS (CONTINUED)

Bank deposits of US$183,577,000 (2013: US$193,366,000) are with commercial banks in the United Arab Emirates. These are mainly denominated in the UAE Dirhams and earn interest at the respective deposit rates. These deposits have original maturity between 3 to 12 months (2013: 3 to 12 months).

Short term borrowings include trust receipts and invoice discounting facilities which mature between 90 and 180 days. Trust receipts are short term borrowings to finance imports. The bank overdrafts and short term borrowings are secured by assets of the Group up to the amount of the respective borrowings and personal guarantees of the shareholders (H.E. Saeed Mohamed Butti Mohamed Al Qebaisi, Dr B.R. Shetty and Khalifa Butti Omair Yousif Ahmad Al Muhairi) and carry interest at EIBOR plus margin rates ranging from 1% to 4% (2013: 3% to 4%) per annum.

At 31 December 2014, the Group had US$19,474,000 (2013: US$18,323,000) of undrawn bank overdraft facilities, which are renewable annually.

Restricted cash mainly represents funds held by a bank in respect of upcoming loan repayment instalments.

### 20 SHARE CAPITAL

As at 31 December 2014 and 31 December 2013:

| | Number of shares (thousands) | Ordinary shares US$ '000 | Share premium US$ '000 | Total US$ '000 |
|---|---|---|---|---|
| **Issued and fully paid** | | | | |
| *(nominal value 10 pence sterling each)* | 185,714 | 29,566 | 179,152 | 208,718 |

### 21 GROUP RESTRUCTURING RESERVE

The Group restructuring reserve arises on consolidation under the pooling of interests method used for group restructuring, which took place on 28 March 2012 when the Company became the holding company of NMC Healthcare LLC through its wholly owned subsidiaries, NMC Holding LLC and NMC Health Holdco Limited. Under this method, the group is treated as a continuation of the NMC Healthcare LLC group. The difference between the share capital of NMC Healthcare LLC (US$27,226,000) and the carrying amount of the investment in that company (US$37,227,000), which equates to the net assets of NMC Healthcare LLC at the date of reorganisation (28 March 2012), amounting to US$10,001,000 (debit), is recorded on consolidation as a group restructuring reserve. This reserve is non-distributable.

### 22 RETAINED EARNINGS

As at 31 December 2014, retained earnings of US$16,101,000 (2013: US$14,333,000) are not distributable. This relates to a UAE Companies Law requirement to set aside 10% of annual profit of all UAE subsidiaries until their respective reserves equal 50% of their paid up share capital. The subsidiaries discontinue such annual transfers once this requirement has been met.

### 23 DIVIDEND

In the AGM on 26 June 2014 the shareholders approved a dividend of 4.4 pence per share, amounting to GBP 8,212,700 (US$13,846,000) to be paid to shareholders on the Company's share register on 31 May 2014. The dividend amount was paid to the shareholders on 4 July 2014 (2013: a dividend of GBP 7,614,286 equivalent to US$11,598,326 was approved on 25 June 2013 and paid on 4 July 2013). No interim dividend was declared during the year. Subject to shareholders' approval at the Annual General Meeting on 16 June 2015, a final dividend of 5.4 pence per share, GBP10,028,600 (US$15,444,000) will be paid to shareholders on the Company's share register on 29 May 2015.

### 24 TERM LOANS

| | 2014 US$ '000 | 2013 US$ '000 |
|---|---|---|
| Current portion | 92,055 | 88,355 |
| Non-current portion | 114,457 | 161,845 |
| | 206,512 | 250,200 |
| Amounts are repayable as follows: | | |
| Within 1 year | 92,055 | 88,355 |
| Between 1 - 2 years | 49,129 | 50,871 |
| Between 2 - 5 years | 65,328 | 110,974 |
| | 206,512 | 250,200 |

Financial Statements

# NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS CONTINUED

**24 TERM LOANS** (CONTINUED)

During the year ended 31 December 2014, the Group drew down term loans of US$263,594,000 (Year ended 31 December 2013: US$ 524,465,000) and repaid term loans of US$307,282,000 (Year ended 31 December 2013: US$500,627,000).

During the year ended 31 December 2013, the Group agreed a new syndicated loan facility, led by JP Morgan Chase Bank, of US$ 225,000,000 (with an additional available facility of US$75,000,000 which the group has not drawn down to date). The loan facility is repayable over 54 monthly instalments with a grace period of six months and carries interest at the rate of 1 month US$ LIBOR + 3% + mandatory costs; if any, per annum. The new syndicated loan facility was utilised to repay some of the existing debts including the debt with JP Morgan Chase Bank against the facility of US$150,000,000 obtained in 2012 and is also being utilised for capital expenditures. The Group has utilised an amount of US$ 225,000,000 against the new syndicated loan facility as of 31 December 2014 (31 December 2013: US$225,000,000).

This new syndicated loan is guaranteed by corporate guarantees provided by NMC Health plc and operating subsidiaries of the Group. The new syndicated loan is secured against a collateral package which includes an assignment of some insurance company receivables and their proceeds by the Group and a pledge over certain bank accounts within the Group.

In addition to the JP Morgan loan facility, term loans also include other short term revolving loans which get drawn down and repaid over the year and carry interest at varying rates  which include EIBOR + margins ranging from 3% to 3.75% per annum, except for one of the loans which carries interest at a fixed rate of 7.5% per annum.

The Group charged an amount of US$3,394,000 in the previous year to the consolidated statement of comprehensive income with respect to unamortised transaction costs of previously existing debts which were settled during the year ended 31 December 2013 using the proceeds of the new syndicated loan led by JP Morgan Chase Bank.

**25 EMPLOYEES' END OF SERVICE BENEFITS**

Movements in the provision recognised in the consolidated statement of financial position are as follows:

|  | 2014 US$ '000 | 2013 US$ '000 |
|---|---|---|
| Balance at 1 January | 12,099 | 10,380 |
| Charge for the year | 3,492 | 2,362 |
| Employees' end of service benefits paid | (657) | (643) |
| Balance at 31 December | 14,934 | 12,099 |
| Current | 2,484 | 2,063 |
| Non-current | 12,450 | 10,036 |
| Balance at 31 December | 14,934 | 12,099 |
| Charge for the year comprise of the following |  |  |
| Current service cost | 2,991 | 1,909 |
| Interest cost | 501 | 453 |
| Balance at 31 December | 3,492 | 2,362 |

In accordance with the provisions of IAS 19 - 'Employee Benefits', management has carried out an exercise to assess the present value of its obligation at 31 December 2014 and 2013, using the projected unit credit method, in respect of employees' end of service benefits payable under the UAE Labour Law. The impact of the actuarial valuation is not material to the Group, accordingly no actuarial gain or losses are recognised in other comprehensive income. Management has assumed an average length of service of 5 years (2013: 5 years) and increment/promotion costs of 3.0% (2013: 3.0%). The expected liability at the date of employees' leaving service has been discounted to its net present value using a discount rate of 4.0% (2013: 4.5%). Management also performed a sensitivity analysis for changes in discount rate and increment costs; the results of this analysis showed that none of the factors had any material impact on the actuarial valuation.

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          120 of 142                    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

## 26 ACCOUNTS PAYABLE AND ACCRUALS

|  | 2014 US$ '000 | 2013 US$ '000 |
|---|---|---|
| Trade accounts payable | 77,906 | 57,565 |
| Other payables | 16,178 | 13,416 |
| Accrued interest | 1,532 | 705 |
| Accrued expenses | 2,428 | 4,401 |
|  | 98,044 | 76,087 |

Trade and other payables are non-interest bearing and are normally settled on 50-60 day terms.

## 27 RELATED PARTY TRANSACTIONS

These represent transactions with related parties, including major shareholders and senior management of the Group, and entities controlled, jointly controlled or significantly influenced by such parties, or where such parties are members of the key management personnel of the entities. Pricing policies and terms of all transactions are approved by the management of the Group.

The Company's immediate and ultimate controlling party is a group of three individuals (H.E. Saeed Bin Butti, Dr B.R. Shetty and Mr Khalifa Bin Butti) who are all shareholders and of whom one is a director of the Company and who together have the ability to control the company. As the immediate and ultimate controlling party is a group of individuals, it does not produce consolidated financial statements.

### Relationship agreement

The Controlling Shareholders and the Company have entered into a relationship agreement, the principal purpose of which is to ensure that the Company is capable of carrying out its business independently of the Controlling Shareholders and that transactions and relationships with the Controlling Shareholders are at arm's length and on a normal commercial basis.

In accordance with the terms of the relationship agreement, the Controlling Shareholders have a collective right to appoint a number of Directors to the Board depending upon the level of their respective shareholdings. This entitlement reduces or is removed as the collective shareholdings reduce. The relationship agreement includes provisions to ensure that the Board remains independent.

Transactions with related parties included in the consolidated statement of comprehensive income are as follows:

|  | 2014 US$ '000 | 2013 US$ '000 |
|---|---|---|
| **Entities significantly influenced by a shareholder who is a key management personnel in NMC** |  |  |
| Sales | 9,775 | 8,828 |
| Purchases | 32,336 | 30,040 |
| Rent charged | 422 | 418 |
| Other Income | 970 | 582 |
| **Entities where a shareholder of NMC is a key member of management personnel of such entity** |  |  |
| Management fees received from such entity by NMC | 5,717 | 5,445 |
| Sales | 2,015 | 2,608 |

Amounts due from and due to related parties disclosed in the consolidated statement of financial position are as follows:

|  | 2014 US$ '000 | 2013 US$ '000 |
|---|---|---|
| **Entities significantly influenced by a shareholder who is a key management personnel in NMC** |  |  |
| Amounts due from related parties | 3,603 | 3,619 |
| Amounts due to related parties | 8,380 | 5,018 |
| **Entities where a shareholder of NMC is a key member of management personnel of such entity** |  |  |
| Amounts due from related parties | 4,382 | 5,635 |
| **Shareholder:** |  |  |
| Amounts due to related parties | – | 61 |

Outstanding balances with related parties at 31 December 2014 and 31 December 2013 were unsecured, payable on 50-60 days term and carried interest at 0% (31 December 2013: 0%) per annum. Settlement occurs in cash. As at 31 December 2014 US$1,998,000 of the amounts due from related parties were past due but not impaired (31 December 2013: US$3,249,000).

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          121 of 142          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

Financial Statements

# NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS CONTINUED

**27 RELATED PARTY TRANSACTIONS** (CONTINUED)
The Group has incurred expenses and recharged back an amount of US$3,018,000 (31 December 2013: US$12,340,000) made on behalf of a related party where a shareholder who has significant influence over the Group is a key management personnel of that entity.

With the exception of the JP Morgan Chase syndicated loan facility of US$225,000,000, all credit facilities provided by the bankers to the Group are secured by joint and several personal/corporate guarantees of the shareholders (H.E. Saeed Mohamed Butti Al Qebaisi, Dr B.R. Shetty and Khalifa Butti Omair Yousif Ahmad Al Muhairi).

Pharmacy licenses, under which the Group sells its products, are granted to the shareholders or directors of the Company, who are UAE nationals. No payments are made in respect of these licenses to shareholders or directors.

**Compensation of key management personnel**

|  | 2014 US$ '000 | 2013 US$ '000 |
|---|---|---|
| Short term benefits | 3,074 | 4,065 |
| Employees' end of service benefits | 20 | 19 |
|  | 3,094 | 4,084 |

The key management personnel include all the Non-Executive Directors, the three Executive Directors (31 December 2013: two) and three (31 December 2013: five) senior management personnel.

Two individuals who are related parties of one of the shareholders are employed by the Group. The total compensation for employment received by those related parties in the year ended 31 December 2014 amounts to US$572,000 (2013: US$541,000).

**28 SHARE BASED PAYMENTS**
The Group currently operates two share option schemes:

**Long term incentive plan (LTIP)**
Options awarded under the LTIP are made annually to Executive Directors and other senior management. The exercise prices are nil. Options have a life of ten years and a vesting period of three years. The LTIP is subject to performance conditions which can be found in the Directors' Remuneration Report on pages 67 to 85.

**Short term incentive plan (STIP)**
Options awarded under the STIP are made annually to Executive Directors and other senior management. The exercise prices are nil. Options have a life of ten years and a vesting period of three years.

Fair values are determined using the Black-Scholes model. Expected volatility has been based on historical volatility over the period since the Company's shares have been publically traded.

Administrative expenses include a charge of US$88,000 (2013: US$nil) in respect of the cost of providing share options. The cost is calculated by estimating the fair value of the option at grant date and spreading that amount over the vesting period after adjusting for an expectation of non-vesting.

For options granted in the year ended 31 December 2014, the fair value per option granted and the assumptions used in the calculation are as follows:

|  | 2014 LTIP | 2014 STIP |
|---|---|---|
| Share price at grant date | £4.949 | £4.570 |
| Fair value at measurement date | £4.769 | £4.403 |
| Exercise price | £nil | £nil |
| Expected volatility | 35% | 35% |
| Expected option life | 3 years | 3 years |
| Expected dividend yield | 1.23% | 1.23% |
| Risk free interest rate | 0.98% | 0.98% |

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          122 of 142          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

## 28 SHARE BASED PAYMENTS (CONTINUED)

The options existing at the year-end were as follows:

| | Number of shares | 2014 Exercise price | Period when exercisable | 2013 Number of shares |
|---|---|---|---|---|
| **Long term incentive plan (LTIP)** | | | | |
| October 2014 | 160,778 | £nil | 29/10/17 to 28/10/24 | - |
| **Short term incentive plan (STIP)** | | | | |
| October 2014 | 55,527 | £nil | 29/10/17 to 28/10/24 | - |
| Total options subsisting on existing ordinary shares | 216,305 | | | - |
| Percentage of issued share capital | 0.1% | | | - |

Movement of share options during the year is as follows:

| | 2014 | 2013 |
|---|---|---|
| Granted during the year | 216,305 | - |
| Outstanding at 31 December | 216,305 | - |

No options expired, were exercised or forfeited during the year (2013: nil).

## 29 FINANCIAL RISK MANAGEMENT OBJECTIVES AND POLICIES

The Group's principal financial liabilities comprise loans and borrowings and trade and other payables. In addition of these financial liabilities the Group had an interest rate swap as of 31 December 2013 which matured during the current year. The main purpose of these financial liabilities is to finance the Group's operations. The Group has accounts and other receivables, and cash and short-term deposits that arise directly from its operations.

The Group is exposed to interest rate risk, credit risk, liquidity risk and foreign currency risk.

The Group's senior management oversees the management of these risks. The Board of Directors reviews and agrees policies for managing each of these risks which are summarised below.

### Interest rate risk

Interest rate risk is the risk that the fair value or future cash flows of a financial instrument will fluctuate because of changes in market interest rates. The Group is exposed to interest rate risk on its interest bearing assets and liabilities (bank deposits, bank overdrafts and other short term borrowings and term loans). Management is of the opinion that the Group's exposure to interest rate risk is limited.

The following table demonstrates the sensitivity of the statement of comprehensive income to reasonably possible changes in interest rates, with all other variables held constant. The sensitivity of the statement of comprehensive income is the effect of the assumed changes in interest rates on the Group's profit for the year based on the floating rate financial assets and financial liabilities as of the respective year end. Sensitivity impact as of 31 December 2013 has been calculated after taking into account interest rate swap arrangement held at 31 December 2013.

| Increase/(decrease) in basis points | Effect on profit at 31 December 2014 US$ '000 | Effect on profit at 31 December 2013 US$ '000 |
|---|---|---|
| 100 | (1,925) | (1,105) |
| (100) | 1,925 | 1,105 |

### Credit risk

Credit risk is the risk that counterparty will not meet its obligations under a financial instrument or customer contract, leading to a financial loss. The Group limits its credit risk with respect to customers due to the nature of the customers that it has dealings with. Within the Healthcare business the majority of the Group's customers are Insurance Companies. The largest insurance company is fully backed by Sovereign wealth funding from Abu Dhabi. All other insurance companies are required to be listed on a stock exchange and therefore are governed by the regulations of their respective markets. Within the distribution business the Group deals primarily with large reputable multinational retail companies. The Group further seeks to limit its credit risk by setting credit limits for individual customers and monitoring outstanding receivables.

Exhibit 8 to B.R. Shetty's Request for Judicial Notice    123 of 142    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

Financial Statements

# NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS CONTINUED

## 29 FINANCIAL RISK MANAGEMENT OBJECTIVES AND POLICIES (CONTINUED)

The Group limits its credit risk with regard to bank deposits by only dealing with reputable banks. The external credit ratings for the banks at which the bank deposits and cash at bank are held are as follows:

|  | 2014 US$ '000 | 2013 US$ '000 |
|---|---|---|
| B2 | 229 | – |
| AA-/A-1/Aa3 | 812 | 498 |
| A+/A1 | 4,345 | 701 |
| A/A2 | 267 | 32,352 |
| A+/A-1 | – | 1,762 |
| A3/A- | 599 | 1,188 |
| Baa2 | 16,224 | 789 |
| Baa3 | 208,694 | – |
| BBB- | 30,229 | 187,822 |
| BBB+/Baa1/Baa1/P-2 | 280 | 13,099 |
| Without external credit rating | 1,149 | 30,167 |
| Total bank deposit and cash at bank | 262,828 | 268,378 |

With respect to credit risk arising from cash and cash equivalents, the Group's exposure to credit risk arises from default of the counterparty, with a maximum exposure equal to the carrying amount of these instruments.

### Liquidity risk

The Group's objective is to maintain a balance between continuity of funding and flexibility through the use of banking facilities. The Group limits its liquidity risk by raising funds from its operations and ensuring bank facilities are available. Trade payables are normally settled within 50-60 days of the date of purchase.

The table below summarises the maturities of the Group's undiscounted financial liabilities, based on contractual payment dates and current market interest rates.

|  | On demand US$ '000 | Less than 3 months US$ '000 | 3 to 12 months US$ '000 | 1 to 5 years US$ '000 | Total US$ '000 |
|---|---|---|---|---|---|
| **At 31 December 2014** |  |  |  |  |  |
| Trade accounts payable | – | 77,906 | – | – | 77,906 |
| Amounts due to related parties | – | 8,380 | – | – | 8,380 |
| Other payables | – | 16,178 | – | 21 | 16,199 |
| Terms loans | – | 21,847 | 78,342 | 121,135 | 221,324 |
| Bank overdrafts and other short term borrowings | 26,180 | 60,136 | 87,982 | – | 174,298 |
| Financial guarantees | 8,311 | – | – | – | 8,311 |
| **Total** | 34,491 | 184,447 | 166,324 | 121,156 | 506,418 |
| At 31 December 2013 |  |  |  |  |  |
| Trade accounts payable | – | 57,565 | – | – | 57,565 |
| Amounts due to related parties | – | 5,079 | – | – | 5,079 |
| Other payables | – | 13,416 | – | 408 | 13,824 |
| Terms loans | – | 21,128 | 75,603 | 175,803 | 272,534 |
| Bank overdrafts and other short term borrowings | 8,178 | 42,090 | 34,048 | – | 84,316 |
| Financial guarantees | 7,067 | – | – | – | 7,067 |
| Total | 15,245 | 139,278 | 109,651 | 176,211 | 440,385 |

The Group also has future capital commitments for the completion of ongoing capital projects of US$25,012,000 (2013: US$76,402,000) (note 31). These are to be financed from the fixed deposits held by the Group.

### Foreign currency risk

Foreign currency risk is the risk that the fair value or future cash flows of a financial instrument will fluctuate because of changes in foreign exchange rates. Foreign currency risk comprises of transaction and statement of financial position risk. Transaction risk relates to the Group's cash flow being adversely affected by a change in the exchange rates of foreign currencies against the UAE Dirham. Statement of financial position risk relates to the risk of the Group's monetary assets and liabilities in foreign currencies acquiring a lower or higher value, when translated into UAE Dirhams, as a result of currency movements.

Exhibit 8 to B.R. Shetty's Request for Judicial Notice    124 of 142    Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

## 29 FINANCIAL RISK MANAGEMENT OBJECTIVES AND POLICIES (CONTINUED)

The Group is exposed to currency risk on its trade accounts payable denominated in foreign currencies, mainly in Euros and Swiss Francs. Management believes that the foreign currency risk is not significant for any possible movement in foreign currency rates.

### Capital management

The primary objective of the Group's capital management is to ensure that it maintains healthy capital ratios in order to support its business and maximise shareholders' value.

The Group manages its capital structure and makes adjustments to it in light of changes in business conditions. Capital comprises share capital, share premium, Group restructuring reserve and retained earnings and is measured at US$449,023,000 as at 31 December 2014 (2013: US$ 386,236,000). In order to maintain or adjust the capital structure, the group may adjust the amount of dividends paid to shareholders, return capital to shareholders, issue new shares or sell assets to reduce debt. Certain banking facilities may also impose covenant requirements on the Group with respect to capital management.

The Group monitors capital using a gearing ratio, which is net debt divided by capital plus net debt. The Group includes within net debt, interest bearing loans and borrowings, accounts payable and accruals and other payables less bank deposits and bank balances and cash.

|  | 2014 US$ '000 | 2013 US$ '000 |
|---|---|---|
| Interest bearing loans and borrowings | 376,119 | 332,438 |
| Accounts payable and accruals | 98,065 | 76,495 |
| Less: bank deposits, bank balances and cash | (263,169) | (268,695) |
| Net debt | 211,015 | 140,238 |
| Capital | 449,023 | 386,236 |
| Capital and net debt | 660,038 | 526,474 |
| Gearing ratio | 32% | 27% |

## 30 CONTINGENT LIABILITIES

The Group had contingent liabilities in respect of bank and other guarantees and other matters arising in the ordinary course of business from which it is anticipated that no material liabilities will arise at 31 December 2014 of US$8,311,000 (2013: US$7,067,000).

## 31 COMMITMENTS

### Capital commitments

The Group had future capital commitments of US$25,012,000 at 31 December 2014 (2013: US$76,402,000) principally relating to the completion of ongoing capital projects.

### Other commitments

|  | 2014 US$ '000 | 2013 US$ '000 |
|---|---|---|
| Future minimum rentals payable under non-cancellable operating leases | | |
| Within one year | 10,816 | 10,491 |
| After one year but not more than five years | 44,947 | 43,984 |
| More than five years | 91,003 | 102,782 |
|  | 146,766 | 157,257 |

## 32 DERIVATIVE FINANCIAL INSTRUMENT

The Group entered into the following interest rate swap to manage its interest rate exposure:

|  | Negative fair value US$ '000 | Notional amount US$ '000 | Maturity profile |
|---|---|---|---|
| At 31 December 2014 | | | |
| Interest rate swap US$ | – | – | – |
| At 31 December 2013 | | | |
| Interest rate swap US$ | (179) | 24,503 | Feb-14 |

Exhibit 8 to B.R. Shetty's Request for Judicial Notice     125 of 142     Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

Financial Statements

# NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS CONTINUED

**32 DERIVATIVE FINANCIAL INSTRUMENT** (CONTINUED)
The interest rate swaps were contracted to hedge the interest cash flows on term loans. As these swaps do not qualify for hedge accounting in accordance with IAS 39, the movement in fair value gain/loss of US$ NIL for the year ended 31 December 2014 (2013: gain of US$ 702,000) has been charged to the consolidated statement of comprehensive income.

During the year the interest rate swap reached maturity and so as at 31 December 2014 the Group no longer had any interest rate swaps.

The notional amounts indicate the volume of transactions outstanding at year end and are neither indicative of the market risk nor credit risk.

The negative fair value of interest rate swaps was included within accounts payable and accruals as "other payables" as at 31 December 2013.

**33 FAIR VALUES OF FINANCIAL INSTRUMENTS**
The fair values of the Group's financial instruments are not materially different from their carrying values at the statement of financial position date.

The Group uses the following hierarchy for determining and disclosing the fair value of financial instruments by valuation technique:

*Level 1* quoted (unadjusted) prices in active markets for identical assets or liabilities.

*Level 2* other techniques for which all inputs which have a significant effect on the recorded fair value are observable, either directly or indirectly.

*Level 3* techniques which use inputs which have a significant effect on the recorded fair value that are not based on observable market data.

For financial instruments that are recognized at fair value on a recurring basis, the Group determines whether transfers have occurred between Levels in the hierarchy by re-assessing categorization (bases on the lowest level input that is significant to the fair value measurement as a whole) at the end of each reporting period.

**Liabilities measured at fair value**

| | Level 1 US$ '000 | Level 2 US$ '000 | Level 3 US$ '000 | Total fair value US$ '000 |
|---|---|---|---|---|
| **31 December 2014** | | | | |
| Interest rate swaps | – | – | – | – |
| **31 December 2013** | | | | |
| Interest rate swaps | – | (179) | – | (179) |

During the years ended 31 December 2014 and 31 December 2013, there were no transfers between Level 1 and Level 2 fair value measurements, and no transfers into or out of Level 3 fair value measurements.

During the year the interest rate swap reached maturity and so as at 31 December 2014 the Group no longer had any interest rate swaps.

The fair value of the interest rate swap is determined by reference to market values for similar instruments. It is measured using the Forward Price Method; under this method a forward rate or value is determined based on the current market price or value of the interest rate and an appropriate rate curve and assuming that the forward price, rate or value will be realized in future periods.

Exhibit 8 to B.R. Shetty's Request for Judicial Notice        126 of 142

## 34 SUBSEQUENT EVENTS

### New financing facility

On 16 February 2015, the Company announced that it has obtained underwriting commitments for a new US$825 million financing facility from a number of international and regional banks through its subsidiary, NMC Healthcare LLC. The new facility has been structured as two separate tranches:

1) an Amortizing Term Loan Facility of US$350 million equivalent to refinance existing indebtedness of NMC and its subsidiaries (including the existing JP Morgan syndicated term loan facility) and to provide additional funds for general corporate purposes; and

2) a Delayed Draw Acquisition Facility of US$475 million equivalent to facilitate NMC's ongoing strategy of making phased acquisitions that will be accretive to the Company's underlying business and profitability.

The overall quantum of the new facility, combined with the Group's robust statement of financial position, is expected to ensure adequate available liquidity to capitalize on growth opportunities as they are identified.

### Acquisition of Clinica Eugin

On 23 February 2015 the Group acquired 86.4% of the issued share capital of Clinica Eugin, a leading global fertility treatment provider based in Barcelona, Spain, for a total consideration of €143m which was settled in cash, thereby obtaining control of Clinica Eugin. The primary reasons for this acquisition include; Eugin is a leading global IVF centre of excellence, bringing technologies in fertility services to NMC's network in the UAE, accelerating the development of NMC into a centre of clinical excellence for women's health and allowing NMC to establish a foothold in the UAE medical tourism market.

As this acquisition took place on 23 February 2015 which is the same day that the financial statements were authorised for issue, the initial accounting for this business combination is incomplete. Accordingly, the Group has been unable to provide the remaining disclosures required by paragraph B64 of IFRS 3 Business Combinations in respect of business combinations which have taken place after the end of the reporting period  (such as the amount of goodwill or gain on bargain purchase recognised, disclosures in respect of acquired receivables, major classes of receivables and contingent liabilities and the amount of the non-controlling interest in Clinica Eugin and the measurement basis of that amount).

### Transfer of land and buildings

Subsequent to year end US$5,177,000 of the land and buildings which were held in the name of a previous shareholder for the beneficial interest of the Group were transferred into the name of a current UAE national shareholder.

There were no other events which would have a material effect on the consolidated financial statements between 31 December 2014 and the date of this report.



| Overview | Group Strategic Report | Governance | Financial Statements |
|---|---|---|---|

# STATEMENT OF FINANCIAL POSITION
## As at 31 December 2014

|  | Notes | 2014 US$ '000 | 2013 US$ '000 |
|---|---|---|---|
| **ASSETS** | | | |
| **Non-current assets** | | | |
| Investment in subsidiary | 4 | 204,127 | 204,127 |
| **Current assets** | | | |
| Other receivables and prepayments | 5 | 290 | 50 |
| Amounts due from a related party | 6 | – | 2,875 |
| Bank balances and cash | | 131 | 234 |
|  | | 421 | 3,159 |
| **TOTAL ASSETS** | | 204,548 | 207,286 |
| **EQUITY AND LIABILITIES** | | | |
| **Equity** | | | |
| Share capital | 7 | 29,566 | 29,566 |
| Share premium | 7 | 179,152 | 179,152 |
| Accumulated losses | 9 | (12,029) | (2,904) |
| **Total equity** | | 196,689 | 205,814 |
| **Non-current liabilities** | | | |
| Other payables | | 21 | – |
| **Current liabilities** | | | |
| Other payables and accruals | 8 | 261 | 1,472 |
| Amount due to related party | 6 | 7,577 | – |
|  | | 7,838 | 1,472 |
| **Total liabilities** | | 7,859 | 1,472 |
| **TOTAL EQUITY AND LIABILITIES** | | 204,548 | 207,286 |

The financial statements were authorised for issue by the board of directors on 23 February 2015 and were signed on its behalf by

Dr B.R. Shetty
Executive Vice Chairman & Chief Executive Officer

Mr Suresh Krishnamoorthy
Chief Financial Officer

The attached notes 1 to 15 form part of the financial statements.

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          129 of 142          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

Financial Statements

# STATEMENT OF CHANGES IN EQUITY
For the year ended 31 December 2014

| | Share Capital US$'000 | Share premium US$'000 | Accumulated losses US$'000 | Total US$'000 |
|---|---|---|---|---|
| Balance as at 1 January 2013 | 29,566 | 179,152 | (5,938) | 202,780 |
| Total (other) comprehensive income for for the year (note 9) | – | – | 14,632 | 14,632 |
| Dividends paid (note 14) | – | – | (11,598) | (11,598) |
| Balance as at 31 December 2013 | 29,566 | 179,152 | (2,904) | 205,814 |
| Total (other) comprehensive income for the year (note 9) | – | – | 4,654 | 4,654 |
| Share based payments (note 12) | – | – | 67 | 67 |
| Dividends paid (note 14) | – | – | (13,846) | (13,846) |
| Balance as at 31 December 2014 | 29,566 | 179,152 | (12,029) | 196,689 |

The attached notes 1 to 15 form part of the financial statements.

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          130 of 142          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

# STATEMENT OF CASH FLOWS
## For the year ended 31 December 2014

|  | 2014 US$ '000 | 2013 US$ '000 (restated) |
|---|---|---|
| **OPERATING ACTIVITIES** |  |  |
| Profit for the year before tax | 4,654 | 14,632 |
| Adjustments for: |  |  |
|   Finance costs | 2 | 3 |
|   Share based payments | 88 | – |
|   Dividends payment (note 6) | (13,846) | (11,598) |
|  | (9,102) | 3,037 |
| Working capital changes: |  |  |
|   Amounts due from a related party | 2,875 | (2,852) |
|   Other receivables and prepayments | (240) | (50) |
|   Amounts due to a related party | 7,577 | – |
|   Other payables and accruals | (1,211) | (279) |
| **Net cash used in operations** | (101) | (144) |
| **FINANCING ACTIVITY** |  |  |
| Finance costs paid | (2) | (3) |
| **Cash used in financing activity** | (2) | (3) |
| **DECREASE IN CASH AND CASH EQUIVALENTS** |  |  |
| Cash and cash equivalents at 1 January | (103) | (147) |
| **CASH AND CASH EQUIVALENTS AT 31 DECEMBER** | 131 | 234 |

The attached notes 1 to 15 form part of the financial statements.

Exhibit 8 to B.R. Shetty's Request for Judicial Notice     131 of 142     Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

Financial Statements

# NOTES TO THE FINANCIAL STATEMENTS
At 31 December 2014

## 1   CORPORATE INFORMATION

NMC Health plc (the "Company" or "Parent") is a Company which was incorporated in England and Wales on 20 July 2011. The Company is a public limited company. The address of the registered office of the Company is 23 Hanover Square, London, W1S 1JB. The registered number of the Company is 7712220. The Company's immediate and ultimate controlling party is a group of three individuals (H.E. Saeed Bin Butti, Dr B.R. Shetty and Mr Khalifa Bin Butti) who are all shareholders and of whom one is a director of the company and who together have the ability to control the company.

The Parent and its subsidiaries (collectively the "Group") are engaged in providing professional medical services, wholesale of pharmaceutical goods, medical equipment, cosmetics, food and IT products and services in the United Arab Emirates.

The financial statements of the Company for the year ended 31 December 2014 were authorised for issue by the board of directors on 23 February 2015 and the statement of financial position was signed on the Board's behalf by Dr B.R. Shetty and Mr Suresh Krishnamoorthy.

### 2.1 BASIS OF PREPARATION

The financial statements have been prepared in accordance with International Financial Reporting Standards as adopted by the European Union as they apply to the financial statements of the Company for the year ended 31 December 2014 and applied in accordance with the Companies Act 2006.

The financial statements are prepared under the historical cost convention. The principal accounting policies adopted in the preparation of these financial statements are set out below.

No profit and loss account is presented by the Company as permitted by Section 408 of the Companies Act 2006.

### Comparative information
Statement of Cash Flows Reclassification
The Company has made the following reclassification in respect of the comparatives included in the Statement of Cash Flows to correct the presentation of the dividend paid to shareholders:

- An amount of US$11,598,000 included as dividend paid to shareholders within financing activities in the prior year has now been included within non-cash adjustments in operating activities given that the dividend was paid, on behalf of the Company, by a subsidiary of the Company.

This reclassification had no impact on previously reported equity, profit or movement in cash of the Company.

### Functional currency
The UAE Dirham is determined to be the functional currency of the Company. The reporting currency of the Company is United States of America Dollar (US$) as this is a more globally recognised currency. The UAE Dirham is pegged against the US Dollar at a rate of 3.673 per US Dollar.

All values are rounded to the nearest thousand dollars ($000) except when otherwise indicated.

### Going concern
These financial statements have been prepared on a going concern basis. The Company has made a profit of US$4,654,000 (2013: US$14,632,000) and has equity of US$196,689,000 (2013: US$205,814,000).

The Company is the parent of NMC Health plc group and is solely a holding company with no business activities of its own. The Company earned a dividend and reported a net profit during the year. The Group's business activities, together with the factors likely to affect its future development, performance and position are set out in the Strategic Review on pages 9 to 33. The financial position of the Group, its cash flows, liquidity position and borrowing facilities are described in the Strategic Review on pages 24 to 25.

The Group has considerable financial resources including bank facilities. As a consequence, the directors believe that the Group is well placed to manage its business risks successfully. The directors expect that the Group has adequate resources to continue in operational existence for the foreseeable future. Thus they continue to adopt the going concern basis in preparing the financial statements.

128                                                                                    NMC Health plc Annual Report 2014

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          132 of 142          Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

## 2.2 SIGNIFICANT ACCOUNTING JUDGEMENTS AND ESTIMATES

The key assumptions concerning the future, key sources of estimation uncertainty and critical judgements at the statement of financial position date, that have a significant risk of causing a material adjustment to the carrying amounts of assets and liabilities within the next financial year are discussed below:

### Significant judgements
Functional currency
The UAE Dirham is determined to be the functional currency of the Company.

Judgement has been used to determine the functional currency of the Company that most appropriately represents the economic effects of the Company's transactions, events and conditions. As part of this assessment, the following information has been taken into account:

The primary economic environment influencing the Company's income (dividends) is the UAE and the effect of the local environment is limited to expenses incurred within the UK. The ability of the Company to meet its obligations and pay dividends to its shareholders is dependent on the economy of, and the operation of its subsidiaries in, the UAE.

### 2.3 CHANGES IN ACCOUNTING POLICIES
The accounting policies adopted are consistent with those of the previous financial period.

### New and amended standards and interpretations:
The Company applied for the first time certain standards and amendments which are effective for annual periods beginning on or after 1 January 2014

The amendments to IFRS, which are effective as of 1 January 2014 and are described in more detail below, have no impact on the Company.

### Investment Entities (Amendments to IFRS 10, IFRS 12 and IAS 27)
These amendments provide an exception to the consolidation requirement for entities that meet the definition of an investment entity under IFRS 10 Consolidated Financial Statements and must be applied retrospectively, subject to certain transition relief. The exception to consolidation requires investment entities to account for subsidiaries at fair value through profit or loss. These amendments have no impact on the Company.

### Offsetting Financial Assets and Financial Liabilities - Amendments to IAS 32
These amendments clarify the meaning of 'currently has a legally enforceable right to set-off' and the criteria for non-simultaneous settlement mechanisms of clearing houses to qualify for offsetting and is applied retrospectively. These amendments have no impact on the Company.

### Novation of Derivatives and Continuation of Hedge Accounting - Amendments to IAS 39
These amendments provide relief from discontinuing hedge accounting when novation of a derivative designated as a hedging instrument meets certain criteria and retrospective application is required. These amendments have no impact on the Company as the Company has no derivatives.

### Recoverable Amount Disclosures for Non-Financial Assets - Amendments to IAS 36
These amendments remove the unintended consequences of IFRS 13 Fair Value Measurement on the disclosures required under IAS 36 Impairment of Assets. In addition, these amendments require disclosure of the recoverable amounts for the assets or cash-generating units (CGUs) for which an impairment loss has been recognised or reversed during the period. These amendments have no impact on the Company as the Company has not recognised or reversed any impairment loss during the period.

### IFRIC 21 Levies
IFRIC 21 clarifies that an entity recognises a liability for a levy when the activity that triggers payment, as identified by the relevant legislation, occurs. For a levy that is triggered upon reaching a minimum threshold, the interpretation clarifies that no liability should be anticipated before the specified minimum threshold is reached. Retrospective application is required for IFRIC 21. This interpretation has no impact on the Company.

### Annual Improvements 2010-2012 Cycle
In the 2010-2012 annual improvements cycle, the IASB issued seven amendments to six standards, which included an amendment to IFRS 13 Fair Value Measurement. The amendment to IFRS 13 is effective immediately and, thus, for periods beginning at 1 January 2014, and it clarifies in the Basis for Conclusions that short-term receivables and payables with no stated interest rates can be measured at invoice amounts when the effect of discounting is immaterial. This amendment to IFRS 13 has no impact on the Company. This amendment to IFRS 13 is relevant to the Company as the Company has determined that the effect of discounting is immaterial and so short term receivables and payables have been measured at invoiced amounts.

Financial Statements

# NOTES TO THE FINANCIAL STATEMENTS
CONTINUED

### 2.3 CHANGES IN ACCOUNTING POLICIES (CONTINUED)
**Annual Improvements 2011-2013 Cycle**
In the 2011-2013 annual improvements cycle, the IASB issued four amendments to four standards, which included an amendment to IFRS 1 First-time Adoption of International Financial Reporting Standards. This amendment to IFRS 1 has no impact on the Company, since the Company is an existing IFRS preparer.

### 2.4 SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES
**Investment in subsidiary**
Subsidiaries are entities over which the Company controls the operating and financial policies, generally by owning more than 50% of voting rights. Investments in subsidiaries are recognised at acquisition cost less any provision for impairment.

When the Company incurs increases in or return of share capital, to/from its subsidiaries, such movements are recognised within the cost of investment in subsidiaries.

At each reporting date, an assessment is made to determine whether there are any indicators of impairment. Where an indicator of impairment exists, a formal estimate of the recoverable amount of the investment in subsidiary is made, which is considered to be the higher of the fair value less costs to sell and the value in use. Fair value is determined as the amount that would be obtained from the sale of the investment in an arm's length transaction between knowledgeable and willing parties. When this information is not available the fair value is determined based on the net present value of the future cash flows related to its subsidiaries, using a discount rate that reflects current market assessments of the time value of money and the risks specific to the asset. If the carrying amount of an investment exceeds the recoverable amount, a provision is recorded in the income statement to reflect the investment at the recoverable amount.

Where an impairment charge has previously been recognised, an assessment is made at the end of each reporting period as to whether there is any indication that the impairment loss may no longer exist or may have decreased. If any such indication exists, an estimate of the recoverable amount is made. An impairment loss is reversed to the income statement to the extent that the increased carrying value of the investment in subsidiary does not exceed the carrying value that would have been determined had no impairment loss been recognised for the asset in prior years.

**Acquisition of subsidiary under common control**
When the Company acquires a subsidiary under common control, the cost of the investment is deemed to be the Company's share of the net assets of the subsidiary at the date of acquisition,

**Cash and cash equivalents**
For the purpose of the statement of cash flows, cash and cash equivalents consists of cash in hand and bank balances.

**Equity**
The Company has issued ordinary shares that are classified as equity. The difference between the issue price and the par value of ordinary share capital is allocated to share premium. The transaction costs incurred for the share issue are accounted for as a deduction from share premium, net of any related income tax benefit, to the extent they are incremental costs directly attributable to the share issue that would otherwise have been avoided.

**Accounts payable and accruals**
Liabilities are recognised for amounts to be paid in the future for goods and services received whether billed by the supplier or not. Accounts payable are classified as current liabilities if payment is due within one year or less (or in the normal operating cycle of the business if longer). If not, they are presented as non-current liabilities. Accounts payable are recognised initially at fair value and subsequently measured at amortised cost using the effective interest method.

**Provisions**
Provisions are recognised when the Company has an obligation (legal or constructive) arising from a past event, and the costs to settle the obligation are both probable and able to be reliably measured.

Provisions are measured at the present value of the expenditures expected to be required to settle the obligation using a pre-tax rate that reflects current market assessments of the time value of money and risks specific to the obligation. Increases in provisions due to the passage of time are recognised in the consolidated income statement.

**Share based payments**
Equity-settled share-based payments to employees are measured at the fair value of the equity instruments at the grant date. The fair value excludes the effect of non-market-based vesting conditions. Details regarding the determination of the fair value of equity-settled share-based transactions are set out in note 12.

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          134 of 142

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

## 2.4 SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)

The fair value determined at the grant date of the equity-settled share-based payments is expensed on a straight-line basis over the vesting period, based on the Group's estimate of equity instruments that will eventually vest. At each reporting date, the Group revises its estimate of the number of equity instruments expected to vest as a result of the effect of non-market-based vesting conditions. The impact of the revision of the original estimates, if any, is recognised in the statement of comprehensive income such that the cumulative expense reflects the revised estimate, with a corresponding adjustment to equity reserves/other payables.

No expense is recognised for awards that do not ultimately vest, except for equity-settled transactions for which vesting are conditional upon a market or non-vesting condition. These are treated as vesting irrespective of whether or not the market or non-vesting condition is satisfied, provided that all other performance and/or service conditions are satisfied.

### Foreign currencies

Transactions in foreign currencies are recorded in UAE Dirhams at the exchange rate ruling at the date of the transaction. Monetary assets and liabilities denominated in foreign currencies are retranslated at the rate of exchange ruling at the balance sheet date. All differences are taken to the statement of comprehensive income.

### Impairment of financial assets

An assessment is made at each statement of financial position date to determine whether there is objective evidence that a specific financial asset may be impaired. If such evidence exists, any impairment loss is recognised in the statement of comprehensive income. Impairment is determined as the difference between carrying value and the present value of future cash flows discounted at the current market rate of return for a similar financial asset.

### Financial guarantee contracts

Financial guarantee contracts issued by the Company are those contracts that require a payment to be made to reimburse the holder for a loss it incurs because the specified debtor fails to make a payment when due in accordance with the terms of a debt instrument. Financial guarantee contracts are recognised initially as a liability at fair value, adjusted for transaction costs that are directly attributable to the issuance of the guarantee. Subsequently, the liability is measured at the higher of the best estimate of the expenditure required to settle the present obligation at the reporting date and the amount recognised less cumulative amortisation.

## 3   ACCOUNTING STANDARDS AND INTERPRETATIONS ISSUED BUT NOT EFFECTIVE

The standards and interpretations that are issued, but not yet effective, up to the date of issuance of the Company's financial statements are disclosed below. The Company intends to adopt these standards, if applicable, when they become effective.

### Amendments to IAS 27: Equity Method in Separate Financial Statements

The amendments will allow entities to use the equity method to account for investments in subsidiaries, joint ventures and associates in their separate financial statements. Entities already applying IFRS and electing to change to the equity method in its separate financial statements will have to apply that change retrospectively. The amendments are effective for annual periods beginning on or after 1 January 2016, with early adoption permitted. The Company is currently assessing the impact of this amendment on its financial statements.

The standards and interpretations that are issued, but not yet effective, up to the date of issuance of the Company's financial statements and not expected to have any impact on the Company are as follows:

- IFRS 9 Financial Instruments
- IFRS 14 Regulatory Deferral Accounts
- Amendments to IAS 19 Defined Benefit Plans: Employee Contributions
- Annual improvements 2010-2012 Cycle:

  - IFRS 3 Business Combinations
  - IFRS 8 Operating Segments
  - IAS 16 Property, Plant and Equipment and IAS 38 Intangible Assets
  - IAS 24 Related Party Disclosures

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          135 of 142          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

Financial Statements

# NOTES TO THE FINANCIAL STATEMENTS
CONTINUED

**3  ACCOUNTING STANDARDS AND INTERPRETATIONS ISSUED BUT NOT EFFECTIVE** (CONTINUED)

Annual improvements 2011-2013 Cycle:
· IFRS 3 Business Combinations
· IFRS 13 Fair Value Measurement
· IAS 40 Investment Property

· IFRS 15 Revenue from Contracts with Customers
· Amendments to IFRS 11 Joint Arrangements: Accounting for Acquisitions of Interests
· Amendments to IAS 16 and IAS 38: Clarification of Acceptable Methods of Depreciation and Amortisation
· Amendments to IAS 16 and IAS 41 Agriculture: Bearer Plants

**4  INVESTMENT IN SUBSIDIARY**

|  | 2014 US$ '000 | 2013 US$ '000 |
|---|---|---|
| As at 1 January | 204,127 | 37,227 |
| Transfer of amount due from a related party (note 6) | – | 166,900 |
| As at 31 December | 204,127 | 204,127 |

This represents the cost of investment in NMC Healthcare LLC (previous parent company), a wholly owned subsidiary held through the holding company subsidiaries NMC Health Holdco Limited and NMC Holding Co LLC. As part of the restructuring of NMC Healthcare LLC group, on 28 March 2012, NMC Health plc issued shares to the existing shareholders of NMC Healthcare LLC in exchange for shares already held in NMC Healthcare LLC. The cost of investment as at 1 January 2013 represented the Company's share of the net assets of NMC Healthcare LLC at the date of the group restructuring.

During the year ended 31 December 2013 NMC Healthcare LLC issued a promissory note to the Company in respect of the amount that it owed to the Company. Subsequently, during the same year, agreement was reached between the Company and NMC Healthcare LLC, that the obligations which NMC Healthcare LLC had under the terms of the promissory note would be released and discharged by the Company in return for the Company receiving shares in NMC Healthcare LLC. Accordingly, NMC Healthcare LLC issued 14,568 shares to the Company. The market value of the shares issued was equal to the market value of the inter-company debt as at the date of the loan capitalisation of US$166,900,000.

The subsidiaries held by NMC Heath plc are as follows:

|  | Percentage of holdings | |
|---|---|---|
|  | 31 December 2014 | 31 December 2013 |
| *Direct subsidiaries:* |  |  |
| NMC Holding Co LLC | 100% | 100% |
| NMC Health Holdco Limited | 100% | 100% |
| *Indirect subsidiaries:* |  |  |
| NMC Healthcare LLC | 100% | 100% |
| New Pharmacy Company Limited | 99% | 99% |
| New Medical Centre Hospital LLC-Dubai | 99% | 99% |
| NMC Specialty Hospital LLC-Abu Dhabi | 99% | 99% |
| NMC Specialty Hospital LLC-Dubai | 99% | 99% |
| New Medical Centre Trading LLC | 99% | 99% |
| Bait Al Shifaa Pharmacy LLC-Dubai | 99% | 99% |
| New Medical Centre LLC-Sharjah | 99% | 99% |
| New Medical Centre Specialty Hospital LLC-Al Ain | 99% | 99% |
| Reliance Information Technology LLC | 99% | 99% |
| BR Medical Suites FZ LLC | 100% | 100% |
| Brightpoint Hospital LLC | 99% | 99% |
| NMC Day Surgery Centre LLC | 99% | 99% |
| NMC Dubai Investment Park LLC | 99% | 99% |

All the above subsidiaries are incorporated in the UAE except for NMC Health Holdco Limited, which is incorporated in England and Wales.

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          136 of 142          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

## 5  ACCOUNTS RECEIVABLE AND PREPAYMENTS

| | 2014 US$ '000 | 2013 US$ '000 |
|---|---|---|
| Other receivables | 263 | 33 |
| Prepayments | 27 | 17 |
| | 290 | 50 |

## 6  RELATED PARTY TRANSACTIONS

These represent transactions with related parties, i.e. major shareholders and senior management of the Company, and entities controlled, jointly controlled or significantly influenced by such parties. Pricing policies and terms of all transactions are approved by the management of the Company.

The Company's immediate and ultimate controlling party is a group of three individuals (H.E. Saeed Bin Butti, Dr B.R. Shetty and Mr Khalifa Bin Butti) who are all shareholders and of whom one is a director of the Company and who together have the ability to control the Company. As the immediate and ultimate controlling party is a group of individuals, it does not produce consolidated financial statements.

As referred to in note 4, during the year ended 31 December 2013 the inter-company amount owed to the Company by NMC Healthcare LLC was capitalised into share capital in NMC Healthcare LLC.

During the year the Company was charged a management fees of US$5,506,000 (2013: US$NIL) by NMC Healthcare LLC.

Dividend amount of US$13,846,000 (2013: US$11,598,000) was paid, on behalf of the Company, by a subsidiary to the shareholders of the Company.

| | 2014 US$ '000 | 2013 US$ '000 |
|---|---|---|
| **Amounts due from Subsidiary** | | |
| Amounts due from a related party | – | 2,875 |
| **Amounts due to Subsidiary** | | |
| Amounts due to a related party | 7,577 | – |

The Company is a guarantor along with other fellow subsidiary undertakings for US$166,561,000 (2013: US$225,000,000) of syndicated loans from JP Morgan raised by its subsidiary NMC Healthcare LLC.

### Compensation of key management personnel

| | 2014 US$ '000 | 2013 US$ '000 |
|---|---|---|
| Short term benefits | 1,504 | 1,586 |

Key management personnel include all the Non-Executives Directors (2013: all) and two senior management personnel (2013: two).

## 7  SHARE CAPITAL AND SHARE PREMIUM

As at 31 December 2014 and 31 December 2013:

### Share capital

| | Number of shares (thousands) | Ordinary shares US$ '000 | Share premium US$ '000 | Total US$ '000 |
|---|---|---|---|---|
| **Issued and fully paid** | | | | |
| *(nominal value 10 pence sterling)* | 185,714 | 29,566 | 179,152 | 208,718 |

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          137 of 142          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

Financial Statements

# NOTES TO THE FINANCIAL STATEMENTS
## CONTINUED

### 8 OTHER PAYABLES AND ACCRUALS

| | 2014 US$ '000 | 2013 US$ '000 |
|---|---|---|
| Other payables | 67 | 238 |
| Accrued expenses | 194 | 1,234 |
| | 261 | 1,472 |

### 9 PROFIT ATTRIBUTABLE TO MEMBERS OF THE PARENT COMPANY
The Profit for the year in the financial statements of the Company is US$4,654,000 (2013: US$14,362,000).

### 10 AUDITOR'S REMUNERATION
The Company paid US$593,000 to its auditor in respect of the audit of the Company's annual accounts for the year ended 31 December 2014 (2013: US$615,000), which includes a portion in respect of the audit of the financial statements of the Company.

Fees paid to Ernst & Young LLP and its associates for non-audit services to the Company itself are not disclosed in the individual accounts of NMC Health plc because group financial statements are prepared which are required to disclose such fees on a consolidated basis.

### 11 DIRECTORS' REMUNERATION

| | 2014 US$ '000 | 2013 US$ '000 |
|---|---|---|
| Directors' remuneration | 863 | 944 |

Further information in respect of this compensation paid to directors is disclosed in the Directors' Remuneration Report

### 12 SHARE BASED PAYMENTS
The Company currently operates two share option schemes:

### Long term incentive plan (LTIP)
Options awarded under the LTIP are made annually to Executive Directors and other senior management. The exercise prices are nil. Options have a life of ten years and a vesting period of three years. The LTIP is subject to performance conditions which can be found in the Directors' Remuneration Report on pages 67 to 85.

### Short term incentive plan (STIP)
Options awarded under the STIP are made annually to Executive Directors and other senior management. The exercise prices are nil. Options have a life of ten years and a vesting period of three years.

Fair values are determined using the Black-Scholes model. Expected volatility has been based on historical volatility over the period since the Company's shares have been publically traded.

The cost is calculated by estimating the fair value of the option at grant date and spreading that amount over the vesting period after adjusting for an expectation of non-vesting.

For options granted in the year ended 31 December 2014, the fair value per option granted and the assumptions used in the calculation are as follows:

| | 2014 LTIP | 2014 STIP |
|---|---|---|
| Share price at grant date | £49.49 | £45.70 |
| Fair value at measurement date | £47.69 | £44.03 |
| Exercise price | £nil | £nil |
| Expected volatility | 35% | 35% |
| Expected option life | 3 years | 3 years |
| Expected dividend yield | 1.23% | 1.23% |
| Risk free interest rate | 0.98% | 0.98% |

Exhibit 8 to B.R. Shetty's Request for Judicial Notice       138 of 142

Hashem, et al., v. NMC Health PLC, et al.,
2:20-cv-02303-CBM-MAA

| Overview | Group Strategic Report | Governance | Financial Statements |
|---|---|---|---|

## 12 SHARE BASED PAYMENTS (CONTINUED)

The options existing at the year-end were as follows:

| | Number of shares | 2014 Exercise price | Period when exercisable | 2013 Number of shares |
|---|---|---|---|---|
| **Long term incentive plan (LTIP)** | | | | |
| October 2014 | 160,778 | £nil | 29/10/17 to 28/10/24 | – |
| **Short term incentive plan (STIP)** | | | | |
| October 2014 | 55,527 | £nil | 29/10/17 to 28/10/24 | – |
| Total options subsisting on existing ordinary shares | 216,305 | | | – |
| Percentage of issued share capital | 0.1% | | | – |

Movement of share options during the year is as follows:

| | 2014 | 2013 |
|---|---|---|
| Granted during the year | 216,305 | – |
| Outstanding at 31 December | 216,305 | – |

No options expired, were exercised or forfeited during the year (2013: nil).

## 13 FINANCIAL RISK MANAGEMENT

The Company's principal financial liabilities are other payables, arising in the normal course of business. The Company's financial assets include an amount due from a related party and bank balances. The company's activities expose it to a variety of financial risks: interest rate risk, credit risk, liquidity risk and foreign currency risk.

### Interest rate risk

Interest rate risk is the risk that the fair value or future cash flows of a financial instrument will fluctuate because of changes in market interest rates. The Company is exposed to interest rate risk on its bank balances only, as the balance due from a related party is interest free, and therefore the Company's exposure to interest rate risk is limited.

### Credit risk

Credit risk is the risk that counterparty will not meet its obligations under a financial instrument, leading to a financial loss. The Company's credit risk arises from amounts due from a related party and bank balances.

The directors assess the credit quality of the related party by taking into account their financial position, past experience and other factors. Management does not expect any losses from non-performance by this counterparty, which is a subsidiary of the Company.

The Company limits its credit risk with regard to bank balances by only dealing with reputable banks. The credit rating of the bank at which the cash at bank is held is AA+.

The Company's credit risk exposure against a corporate guarantee provided to NMC Healthcare LLC in respect of the JP Morgan Chase loan is US$166,561,000 (2013: US$225,000,000).

### Liquidity risk

The Company's objective is to maintain sufficient funding to meet its obligations as they fall due.

The table below analyses the Company's undiscounted financial liabilities into relevant maturity groupings based on the contractual payment dates.

Balances due within 12 months equal their carrying balances as the impact of discounting is not significant.

Financial Statements

# NOTES TO THE FINANCIAL STATEMENTS
CONTINUED

**13  FINANCIAL RISK MANAGEMENT** (CONTINUED)

| | On demand US$ '000 | Less than 3 months US$ '000 | 3 to 12 months US$ '000 | 1 to 5 years US$ '000 | Total US$ '000 |
|---|---|---|---|---|---|
| **At 31 December 2014** | | | | | |
| Other payables | – | 67 | – | 21 | 88 |
| Total | – | 67 | – | 21 | 88 |
| At 31 December 2013 | | | | | |
| Other payables | – | 238 | – | – | 238 |
| Total | – | 238 | – | – | 238 |

In addition to the above financial liabilities the Company has provided a corporate guarantee of US$166,561,000 (2013: US$225,000,000) to NMC Healthcare LLC in respect of the JP Morgan Chase loan. Fair value of corporate guarantee is US$nil as at 31 December 2014 (2013: US$nil).

**Foreign currency risk**
Foreign currency risk arises when future commercial transactions or recognised assets or liabilities are denominated in a currency that is not the entity's functional currency.

The Company is exposed to currency risk on its other payables denominated in Pound Sterling. Foreign currency payable balances included in the statement of financial position denominated in Pound Sterling are US$144,000 (2013: US$571,000). The impact of possible of foreign currency movement is not significant.

**Fair value estimation**
The fair values of the Company's financial instruments are not materially different from their carrying values at the statement of financial position date.

**Financial guarantees**
The company is a guarantor along with other fellow subsidiary undertakings for US$166,561,000 (2013: US$225,000,000) of syndicated loans from JP Morgan raised by its subsidiary NMC Healthcare LLC.

**14  DIVIDENDS**
In the AGM on 26 June 2014 the shareholders approved a dividend of 4.4 pence per share, amounting to GBP8,212,700 (US$13,846,000) to be paid to shareholders on the Company's share register on 31 May 2014. The dividend amount was paid to the shareholders on 4 July 2014 (31 December 2013: a dividend of GBP 7,614,286 equivalent to US$11,598,326 was approved on 25 June 2013 and paid on 4 July 2013). No interim dividend was declared during the year. Subject to shareholder's approval at the Annual General Meeting on 16 June 2015, a final dividend of 5.4 pence per share, GBP10,028,600 (US$15,444,000) will be paid to shareholders on the Company's share register on 29 May 2015.

**15  TAX**
The Group operates solely in the United Arab Emirates and as there is no corporation tax in the United Arab Emirates, no taxes are recognised or payable on the operations in the UAE. It is the opinion of management that there are sufficient expenses in the Company to offset taxable income arising in the UK and accordingly any tax liability that could arise is likely to be immaterial. The unused tax losses amount to US$5,155,000 as at 31 December 2014 (2013: US$nil).

Exhibit 8 to B.R. Shetty's Request for Judicial Notice          140 of 142          Hashem, et al., v. NMC Health PLC, et al., 2:20-cv-02303-CBM-MAA

Established in 1975, NMC Health plc is now the leading private sector healthcare operator in the United Arab Emirates, with a nationwide network of hospitals and operations in the country. The group also operates a UAE wide distribution and wholesale business.





Designed and produced by Emperor
www.emperordesign.co.uk +44 (0)131 220 7990



NMC Health plc
23 Hanover Square
London, W1S 1JB
United Kingdom